## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**JOSEPH CARTAGENA**,

*Plaintiff,*

v.

**TERRANCE DIXON, TYRONE BLACKBURN, and T.A. BLACKBURN LAW, PLLC,**

*Defendants*.

Civil Action No. 25-cv-03552

**JURY TRIAL DEMANDED**

---

## PLAINTIFF JOSEPH CARTAGENA'S
## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

---

Joseph Tacopina
Chad Seigel
**Tacopina Seigel & DeOreo**
275 Madison Avenue, 35th Floor
New York, New York 10016
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
212-227-8877

**Of Counsel:**

Jordan W. Siev
**Reed Smith LLP**
599 Lexington, 22nd Floor
New York, New York 10022
jsiev@reedsmith.com
212-205-6085

*Attorneys for Plaintiff*
*Joseph Cartagena*

Plaintiff Joseph Cartagena, as and for his Second Amended Complaint against Defendants Terrance Dixon, Tyrone Blackburn and T.A. Blackburn Law, PLLC, hereby alleges as follows:

**Introduction**

1.     Plaintiff Joseph Cartagena, who is professionally known as "Fat Joe," is a world-renowned musician, entrepreneur, and philanthropist. For approximately a dozen years, and ending nearly 6 years ago, Defendant Terrance Dixon, who is professionally known as "TA," worked with Cartagena as a hype man — a supporting performer who increases audience engagement with interjections and chants. Cartagena compensated Dixon at the industry standard rate for his role, and Dixon never complained or expressed any dissatisfaction with his pay or other conditions of his work. Nor could he.

2.     Cartagena began working with Dixon in approximately 2006. Dixon eagerly accepted the once-in-a-lifetime opportunity to be a part of Cartagena's team. He also accepted the industry standard compensation package Cartagena paid him. And throughout their relationship, Dixon enjoyed the perquisites of touring, luxurious travel, and other fringe benefits of being part of a world-renowned musician's team. The relationship ended amicably in 2019, and Dixon never raised any issues or sought any additional compensation over these past 6 years.

3.     Then something changed. In an obvious money grab, all these years later, Dixon claims that he should have been paid more. He claims (falsely) that Cartagena recently blocked him from getting outside funding for a record label. He also claims that Cartagena's "former manager" told him that he should have been paid more than he had. These were apparently the "last straw[s]" that caused him to dredge up decades old, supposed grievances and issues, none of which were aired contemporaneously and – more importantly – none of which are true.

4.     Thus, instead of speaking to Cartagena about his *post-hoc* grievances, Dixon made countless posts on social media containing a torrent of wholly fabricated, grotesque, and

1

scandalous allegations — accusing Cartagena of unspeakable acts such as pedophilia, statutory rape, and sexual assault. For example, Dixon published shocking falsehoods on Instagram that he knew were false, including that Cartagena: (*a*) "WAS DATING AND HAVING SEX WITH A 16 YEAR OLD GIRL;" (*b*) flew an "underage" girl "across state lines and out the country;" (*c*) "HAD A FULL FLEDGE RELATIONSHIP WITH NIKKI WHO WAS UNDERAGE;" and (*d*) "DOES @marketamerica KNOWS [SIC] THEY HAVE A PEDOPHILE AS THEY SPOKE'S PERSON[?]."

5.      Dixon knew that his abhorrent statements about Cartagena were false when he made them and/or otherwise acted with reckless disregard of their truth or falsity. He nonetheless wielded these statements as weapons in a calculated campaign to shatter Cartagena's reputation and extort him into surrendering to Dixon's outrageous financial demands with known falsehoods.

6.      Simply put, Defendants were threatening Cartagena with harm to his reputation to seek money to which Dixon was not entitled, and Defendants could not reasonably have believed Dixon was so entitled. Furthermore, Defendants knew that there was zero nexus between Dixon's threat to publicize the alleged statutory rape and alleged right to such compensation. Thus, the threat was inherently wrongful and extortionate because Cartagena's alleged relationships with alleged underage females had nothing to do with Dixon's false claim to be owed compensation for alleged services he provided to Cartagena.

7.      Dixon calculated incorrectly. Cartagena is steadfast and resolute: the allegations are false, and Cartagena will ***never*** succumb to Dixon's repugnant tactics.

8.      But Dixon was not done. Frustrated by Cartagena's fortitude, Dixon hired Defendant Tyrone Blackburn who, in the words of the Honorable Judge Denise Cote of this Court, "improperly files cases in federal court to garner media attention, embarrass defendants with

salacious allegations, and pressure defendants to settle quickly." *Zunzurovski v. Fisher*, No. 23-cv-10881, 2024 U.S. Dist. LEXIS 62568, at *14 (S.D.N.Y. Apr. 3, 2024) (attached as Exhibit "A" hereto). And just a few months ago, the Honorable J. Paul Oetken of this Court issued a "warning to" Blackburn, because his "filings are replete with inaccurate statements of law" and "full of similar irrelevant insults, misstatements, and exaggerations." *Jones v. Combs*, No. 24-cv-1457, 2025 U.S. Dist. LEXIS 54277, at *10 (S.D.N.Y. Mar. 24, 2025) (attached as Exhibit "B" hereto). Judge Oetken was flabbergasted by Blackburn's misconduct and stated: "That any licensed member of the bar would espouse such an absurd understanding of the law is not just disturbing, but shocking." *Id.* More recently, the Honorable William S. Stickman IV of the United States District Court for the Western District of Pennsylvania ordered Blackburn to show cause why Rule 11 sanctions should not be imposed against him for various fabrications and misrepresentations he made in two briefs he filed. Memorandum Order at 7-8, *Jakes v. Youngblood*, No. 24-cv-1608 (W.D. Pa. June 26, 2025), ECF 53 (attached as Exhibit "C" hereto).

9.     Dixon and Blackburn started with a written demand on March 23, 2025 for compensation as a "ghostwriter and uncredited vocalist" on certain of Cartagena's songs. When this absurd and false claim did not garner the response that the Defendants desired — namely an unwarranted payout from Cartagena — they sunk to much lower depths.

10.     By letter dated April 21, 2025, which attached an intended complaint against Cartagena, Dixon and Blackburn threatened to file that complaint not just for unpaid wages and other compensation, but also — and with utter disregard for truth or decency — knowingly false and outrageous allegations against Cartagena that have absolutely nothing to do with Dixon's purported unpaid wages, including unspeakable acts such as statutory rape, forced labor, sex trafficking, and fraud. To the contrary, Dixon and Blackburn's allegations concern third parties

that Blackburn admitted are not his clients. These monstrous accusations — notably lacking from the March 2025 demand letter — are conjured from thin air, knowingly false and, once again, designed to extort Cartagena to pay Dixon's and Blackburn's outrageous financial demands.

11.      Blackburn also made knowingly false statements during calls with Cartagena's counsel that he personally verified all allegations and had spoken with critical witnesses, including one of the alleged minors, who have denied speaking to Blackburn.

12.      Blackburn continued to threaten Cartagena on a daily basis with many evening and late night/early morning email messages to his counsel, stating things like "we will report him to Homeland Security" (8:57 p.m. email on April 22, 2025); "playtime is over" (12:15 a.m. email on April 29, 2025); the "case has just expanded into a Civil RICO case" (7:27 p.m. email on April 28, 2025); and that he was adding Cartagena's marketing partner to the complaint for aiding and abetting (9:52 p.m. email on April 26, 2025). The threats have failed to achieve their goal, and Cartagena filed this lawsuit.

13.      Blackburn then took matters into his own hands. In a public Instagram post directed to Joseph Tacopina, Cartagena's counsel, Blackburn falsely claimed to have an audio recording showing that Cartagena "ordered a hit job" against Dixon. Exhibit D. But Blackburn knew this statement was false because (1) the transcript of that alleged audio recording is not from a call with Cartagena, and (2), in any event, does not contain anything indicating that Cartagena "ordered a hit job" against Dixon.

14.      Blackburn also went on a podcast falsely stating that he had a recording of Cartagena's "girlfriend" admitting that she started dating Cartagena when she was 16 years old. When the host of the podcast interjected that he has "no knowledge of this," Blackburn clarified that his statement was "According to me, 100 percent," and told the host to "blame me" and that

he will "indemnify [the host] a hundred percent. A hundred percent." Even then, however, Blackburn either knew that Cartagena had not dated a 16-year old or otherwise acted with reckless disregard for the truth. He failed to corroborate the information with the purported minor himself.

15.    Despite Blackburn's online bravado, Blackburn and Dixon knew they were caught. Blackburn has misrepresented his and Mr. Dixon's home addresses in order to fabricate a jurisdictional dispute to avoid Cartagena's lawsuit. Blackburn even attempted to evade service of process by abruptly reversing his vehicle and hitting and injuring one of the process servers. Blackburn was arrested on June 25, 2025 and charged with felony assault for hitting the process server with his car.

16.    Most recently, Dixon (through Blackburn) followed through on his threats to file an extortionate complaint against Cartagena. *Dixon v. Cartagena*, Case No. 25-cv-05144 (S.D.N.Y.). Dixon's complaint largely mirrored the draft complaint Blackburn previously sent to Cartagena's counsel but also alleged a sweeping and frivolous RICO claim against Cartagena and several other individuals and entities affiliated with Cartagena, including Roc Nation. Blackburn later acknowledged that some of these claims were baseless when he emailed counsel for Roc Nation stating that he and Dixon believed that Cartagena had "defrauded" Roc Nation and that Dixon "has no animosity towards your client." If Cartagena *had* defrauded Roc Nation (he did not), then Dixon would have no basis to sue Roc Nation for the claims alleged in his complaint.

17.    Dixon's and Blackburn's conduct is thus a cold-blooded attempt to extort exorbitant sums from Cartagena by leveraging the specter of public disgrace and professional ruin. Their defamatory and other statements accusing Cartagena of heinous crimes are devoid of any factual foundation, relying instead on the power of shock, scandal and Cartagena's high-profile status to maximize leverage. And Blackburn's threats to publish false allegations against Cartagena under

5

the cloak of the judicial system are shakedown tactics masquerading as lawyering, and are entirely consistent with Judge Cote's statement above. Cartagena thus brings this lawsuit in the pursuit of justice and to shut down Dixon's and Blackburn's predatory plot, built entirely on lies, to destroy Cartagena's reputation and business for profit.

18.     Moreover, Defendants' conduct described herein establishes that they acted with wanton dishonesty and with clear criminal indifference to their civil obligations. They made knowingly false statements about Cartagena and supported those statements with knowingly false evidence — all in an attempt to criminally extort and blackmail Cartagena into paying them money Dixon and Blackburn knew they were not owed. Hence, punitive damages should be awarded here.

### Parties

19.     Plaintiff Joseph Cartagena, known professionally as "Fat Joe," is an individual and citizen and resident of the State of Florida.

20.     Defendant Terrance Dixon, known professionally as "TA," is an individual and citizen and resident of the State of New York.

21.     Defendant Tyrone Blackburn is an attorney and resident of the State of New York. He is the principal of his eponymous law firm, Defendant T.A. Blackburn Law, PLLC. Blackburn's conduct described in this Complaint were taken on behalf of himself, individually, and on behalf of Defendant T.A. Blackburn Law, PLLC.

22.     Defendant T.A. Blackburn Law, PLLC ("Blackburn Law") is a law firm organized under the laws of the State of New York and operates its principal place of business from Brooklyn, New York.

## Jurisdiction and Venue

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

24.     Cartagena is a citizen of the State of Florida. Dixon and Blackburn are citizens of the State of New York. Blackburn is the sole member of Blackburn Law, which is a law firm organized under the laws of the State of New York. Blackburn Law is thus a citizen of the State of New York because its sole member, Blackburn, is a citizen of the State of New York.

25.     This Court has personal jurisdiction over Dixon, Blackburn and Blackburn Law because they are citizens of and reside in the State of New York.

26.     Venue in this district is appropriate under 28 U.S.C. § 1391 because Dixon resides in this judicial district, and a substantial part of the events or omissions giving rise to the claim herein occurred in this judicial district.

## Factual Background

I.      **Cartagena Is A World-Renowned Musician, Producer, Actor, Entrepreneur and Philanthropist**

27.     Cartagena is a native of the Bronx, New York. His music career began in the early 1990s and has spanned decades. He is known as one of the most influential figures in the rap industry. Cartagena has released eleven studio albums and five collaborative albums to much critical acclaim. He has sold over 1.5 million albums. He has won Billboard Latin Music Awards' Latin Dance Club Play Track of the Year and has been nominated for five Grammy Awards.

28.     Cartagena is also a successful entrepreneur. He co-founded the clothing store "FJ560" and launched his own sneaker line, "FJ560." He co-founded "Rewind it 10" ("Rewind It") a men's hair color company, for which he remains a co-owner and brand ambassador today.

He founded and owns "Up NYC," a Bronx-based sneaker retail store. He launched a sports and culture podcast entitled "Joe & Jada." Cartagena also has countless endorsement deals, which rely on his pristine image.

29.    Cartagena is a philanthropist. His many philanthropic endeavors include, in January 2022, helping to organize a day-long fundraiser for families who were impacted by a tragic apartment fire at the Twin Parks North West apartments in the Bronx.

30.    In late September 2023, Cartagena visited the Eagle Academy for Young Men in the Bronx and gifted unknowing students over $100,000 in brand-new clothing to start the school year.

31.    Cartagena frequently arranges speaking engagements at public schools and with politicians to promote a wide array of community-forward initiatives, including educational advancement in low-income areas and public health awareness.

32.    Cartagena has received numerous civic awards, including the Key to New York City and an honorary doctorate from Lehman College. He has a place on the Bronx Walk of Fame.

33.    Cartagena's biography with the Bronx Walk of Fame states that "[h]is contributions to the genre, his entrepreneurial pursuits, and his dedication to philanthropy have made him a respected figure in both the music industry and the wider community."

II.    **After Years of Working Together, Dixon Fabricates Claims That Cartagena Engaged In Unspeakable Acts, Including Pedophilia and Rape**

34.    At various times from approximately 2006 to 2019, Dixon acted as a "hype man" for Cartagena, assisting him on tours and concerts. In exchange for these services, Cartagena compensated Dixon at the industry standard rate.

35.    For years, their arrangement worked well and without issue. Some 4 years after their relationship ended, however, Dixon — in a blatant money grab — began to attack Cartagena in order to attempt to monetize Cartagena's fame and good reputation for his own benefit.

36.    In 2023, Dixon initiated a campaign of public harassment against Cartagena by making and publishing countless defamatory and false statements on his public social media accounts, including his Instagram account, @thatstrategy. This pattern of conduct is unfortunately par for the course for Dixon – *he has repeatedly told even members of his family that if they did not stop working with Cartagena, he would put false information about Cartagena out on social media, and would "take all of Joe's money."*

A.    **Dixon Falsely Accuses Cartagena of a Sexual Assault in Wisconsin Despite Knowing That it Never Occurred.**

37.    In June 2010, Cartagena performed in Wisconsin. Following a show, a fan made allegations of "inappropriate touching." Within hours, Cartagena was cleared of any wrongdoing. As explained by his attorney: "Fat Joe had no contact with, and never spoke to his accuser. He was questioned for a few minutes at his hotel room and was never detained by the police."

38.    For his part, Dixon never complained to Cartagena (or, upon information and belief, to anyone else) about the supposedly horrific acts that he witnessed. In fact, the "inappropriate touching" allegation was made against Dixon, not Cartagena, which Dixon knew. Nevertheless, and knowing that his statements were false, on June 17, 2023, Dixon posted a screenshot of a 2010 CNN news article to his Instagram account, entitled, "Rapper Fat Joe questioned about sex assault complaint [in Wisconsin]." Dixon's post featured a picture of Cartagena with the following caption: "@FATJOE THIS RAPE CHARGE WAS ON YOU I KNOW THE STORY AND I WILL GO INTO FULL DETAIL:" Exhibit E.

9

39.     Dixon again accused Cartagena of rape later that day, posting: "@FATJOE MILWAUKEE WAS SCARY AND IT WAS YOUR FAULT SHOULD I GO INTO DETAIL???" Exhibit F.

40.     In October 2023, Dixon sent a series of extortionate WhatsApp messages to Cartagena's manager ("Manager"). Dixon sent Manager a fake picture of a news headline — "FAT JOE STATUTORY RAPE VICTIM REVEALED."

41.     Dixon threatened:

> This is what the news paper is going to look like wow is daughter is going to be real proud of him I'm going to tag Jordan Nike cnn the wthite the president and the vice president every major outlet will have this now think about it this just one.

Exhibit G.

42.     On the same day, Dixon ominously warned: "***The count down is on***[.] Tell the fat man be smart I warned him before" and that "Joe got it fucked up I get it joe didn't get it yet ***I'm the predator joes the prey***." Exhibit H (emphasis added).

43.     Dixon doubled down on his knowingly false allegations of sexual assault in a December 2024 YouTube interview in which he falsely accused Cartagena of sexually assaulting a woman in Wisconsin by placing his hand up her skirt. Exhibit I.

44.     Dixon knew that these statements were false: Cartagena never sexually assaulted anyone. Authorities never charged or detained Cartagena in connection with the allegations in Wisconsin and cleared him of any involvement shortly after speaking with him. Rather, Dixon attempted to resurrect a decade plus-old false accusation and headline to support his campaign of harassment and extortion.

**B.    Dixon Outrageously Accuses Cartagena of Statutory Rape**

45.    Dixon's statements escalated later in 2023. Desperate to harm Cartagena, Dixon accused him of being a pedophile. These allegations were again false, which Dixon ***knew*** when he made them.

46.    On August 31, 2023, for example, Dixon posted about Cartagena, whom Dixon occasionally calls "Lil Joey," stating "lil joey doing his pedophile dance when he bags another 16 year old." Exhibit J.

47.    Similarly, on September 9, 2023, Dixon posted another picture and stated: "LIL JOEY CAP DOING HIS PEDOPHILE DANCE HE'S DIVING LOOKING FOR LITTLE GIRLS 💯." Exhibit K.

48.    On September 13, 2023, Dixon posted: "@FATJOE YOU ASK ME DO I TAKE ANY ACCOUNTABILITY YES I DO FOR WATCHING YOU MESS WITH UNDER AGE GIRLS BUT I WAS MINDING MY BUSINESS," "STOP MOVING AROUND IN THE STREETS LIKE YOU WASN'T MESSING WITH A UNDER AGE GIRL" and "YOU'RE A PEDOPHILE." Exhibit L.

49.    Dixon further attempted to tarnish Cartagena's professional reputation and connections by explicitly tagging Cartagena's business connections in his defamatory posts. For example, Cartagena is the President of Urban and Latino Development of Market America, a product brokerage and internet marketing company. On December 6, 2023, Dixon posted about Cartagena, tagging Market America's Instagram account and writing: "DOES @marketamerica KNOWS THEY HAVE A PEDOPHILE AS THEY SPOKE'S PERSON." Exhibit M.

50.    Dixon's abhorrent, defamatory conduct continued throughout 2024:

a)     **May 23, 2024**. Dixon posted about Cartagena, stating: "LIL JOEY WAS DATING AND HAVING SEX WITH A 16 YEAR OLD GIRL NAMED NIKKI AKA CHIQUITA HE HAD A FULL FLEDGE RELATIONSHIP WITH HER FOR 5 YEARS." Exhibit N.

b)     **June 15, 2024**. Dixon sent Manager a WhatsApp message, stating: "Tell lil Joey I got something he's afraid of just when y'all thought he was untouchable." He instructed Manager to "Tell your man this will end it all." Exhibit O.

c)     **September 20, 2024**. Dixon posted a picture of Cartagena, Sean "Diddy" Combs, and DJ Khaled to his Instagram account, stating: "#fatjoe Nikki was underage when u flew her across state lines and out the country." Exhibit P.

d)     **October 1, 2024.** Dixon posted to both his Instagram and Threads account, a post stating: "FAT JOE HAD A FULL FLEDGE RELATIONSHIP WITH NIKKI WHO WAS UNDERAGE" and "FAT JOE KNEW DRE WAS HAVING SEX WITH A UNDERAGE GIRL BECAUSE JOE WAS THE GUY TELLING HIM CALM DOWN WE GOING TO TAKE CARE OF IT." Exhibit Q.

51.     On December 28, 2024, Dixon posted to his Instagram account images of Cartagena with the following caption: "#FATJOE Milwaukee was scary the girl wasn't lying" and "this happened in Wisconsin joe was being a thirsty n**** and almost got us locked up for #sexualassault." The caption is accompanied by four headlines, "It's Officially Over for Fat Joe," "Fat Joe Investigated for Sexual Assault," "Fat Joe's Ghostwriter T.A. The Legend," and "Fat Joe Former employee finally speaks out." Exhibit R.

52.    As noted above, Dixon knew that these statements were false. Cartagena never sexually assaulted anyone, and authorities never charged or detained Cartagena in connection with the allegations in Wisconsin. In fact, the police cleared him of any involvement shortly after speaking with him, and the allegations were made against Dixon, not Cartagena.

53.    Dixon knew that all his claims regarding Cartagena committing sexual acts with underage girls were false (because they were false) or otherwise acted with reckless disregard for their truth. Upon information and belief, neither Dixon nor Blackburn corroborated the ages of any of the women that they now claim engaged in sexual acts with Cartagena at the time they purportedly engaged in sexual acts with Cartagena.

### C.    Dixon Falsely Alleges That Cartagena Cheated Him Out of Money and Credit

54.    Beyond the false allegations of pedophilia and sexual assault, Dixon also falsely claimed that Cartagena underpaid him for his services and did not credit him for songs he allegedly wrote for Cartagena.

55.    For example, on March 17, 2025, Dixon published a "story" to his Instagram account accompanying the headline of a video titled "Fat Joe Calls Gongu Roach a Liar!" The story stated: "You have a very long history of stealing and robbing people" and "You stole from Pun and his family you settled in court to pay Liaz Rios 2.3 million not counting the rest of the money you stole." Exhibit S.

56.    On March 18, 2025, Dixon posted to his Instagram Threads account: "#FATJOE DONT NEVER FORGET WHO KEPT YOU BREATHING I WROTE THIS FOR YOUR HOMIE." Exhibit T.

57.    Dixon also published defamatory statements in an April 13, 2025 interview on the "Off da Books Podcast." On the podcast, Dixon falsely alleged that Cartagena underpaid him for

his hype man services and did not credit him for songs he allegedly wrote for Cartagena. Exhibit U. Dixon knew that he was not underpaid and that he had no right to the "credit" he so desperately sought.

58.     Dixon publicly published these statements on his social media accounts and in interviews knowing they were false. He plainly intended to humiliate and defame Cartagena, harm his reputation, and coerce him into paying Dixon millions of dollars that Cartagena did not owe.

### D.    Dixon Falsely Made Heinous Posts About Cartagena and His Wife

59.     Dixon also attempted to pressure Cartagena by humiliating him and his wife. On January 22, 2024, Dixon asked Manager to "Tell Joe I'm going to live to talk about that 3 some his wife had sheese . . . . She's a nasty scum bag u know that right your boss is a sucker." Exhibit V.

60.     In another Instagram post, Dixon tagged Cartagena's wife and stated:

> YOU REALLY DON'T CARE THAT THIS SAFARI GRASS BAC 3 INCH PINK SLIMY KING JERK CHICKEN 🐓 SPIDER 🕷 PATH ASS WAS CHEATING ON YOU SO MUCH THAT NEVER EVEN GAVE IT A SHOT OF BEING FAITHFUL YOU DON'T CARE THAT HE LIVED IN THE WHORE HOUSES YOU DON'T CARE??? YOU KNOW WHAT I WITNESS HIM GETTING HIS ASS EATEN THAT NIGGA IS OUT OF CONTROL 💯 I GOT SOMETHING SPECIAL DO YOU WANT IT

Exhibit W.

61.     Dixon even tagged Cartagena in a post and stated: "@FATJOE SHOULD I BLAST ONE NAME OFF THAT YOUR WIFE CHEATED ON YOU WITH OR SHOULD I WAIT TO GO INTO FULL DETAIL 💯 IT WILL HURT YOU SHEESE SHES A BEAST." Exhibit X.

62.     Dixon made countless other posts attempting to belittle and humiliate Cartagena. Many of these posts superimpose Cartagena's head on another person's body:



### III.    Dixon Hired Blackburn to Further His Extortionate Scheme

63.    Frustrated by his inability to overcome Cartagena's resolve, Dixon upped the ante by hiring Blackburn and Blackburn Law to shake Cartagena down. But Blackburn is no ordinary lawyer. He is an extortionist masquerading as a lawyer in a cynical ruse to use the court system as both a sword and a shield for his unethical conduct.

64.    Blackburn's gambit has not gone unnoticed. Just over a year ago, in April 2024, Judge Cote stated that:

> A reasonable inference from Blackburn's pattern of behavior is that he improperly files cases in federal court to garner media attention, embarrass defendants with salacious allegations, and pressure defendants to settle quickly. Indeed, his submissions to this Court have been rife with disturbing allegations against the defendants and defense counsel. Blackburn has called defense counsel in this action a 'disgusting racist' for rejecting his preferred mediators. In response to this Court's Order requiring plaintiff to submit an affidavit 'regarding the representation made by the plaintiff to counsel regarding Fisher's residence,' Blackburn filed a wholly inappropriate 53-paragraph affidavit containing multiple irrelevant and scandalous accusations against Fisher.

*Zunzurovski v. Fisher*, No. 23-cv-10881, 2024 U.S. Dist. LEXIS 62568, at *14 (S.D.N.Y. Apr. 3, 2024).

65. Recently, Judge Oetken issued a "warning" to Blackburn. *Combs*, No. 24-cv-1457, U.S. Dist. LEXIS 54277. Judge Oetken first stated that Blackburn filed "admittedly false claims." Then, after reviewing Blackburn's filings, Judge Oetken concluded that they are "replete with inaccurate statements of law, conclusory accusations, and inappropriate ad hominem attacks on opposing counsel."

66. And less than a month ago, a Pennsylvania district judge ordered Blackburn to show cause why Rule 11 sanctions should not be imposed for various fabrications and misrepresentations in two briefs filed by Blackburn. Memorandum Order at 7-8, *Jakes v. Youngblood*, No. 24-cv-1608 (W.D. Pa. June 26, 2025), ECF 53. The court noted that a brief written and signed by Blackburn contained "wholly fabricated" case law and otherwise misrepresented the law, including fabricated quotations from the court's own prior opinion that Blackburn twisted "beyond recognition." When opposing counsel first raised this issue in its own briefing, Blackburn failed to fix the issue, falsely asserted that opposing counsel's brief also contained fabrications of law, and cited even more fabricated case law in his reply brief. The Court viewed Blackburn's actions as "clear ethical violation of the highest order," finding that Blackburn invoked "a conscious effort to deceive and mislead the Court." In his response to the order, Blackburn acknowledged that he failed to verify his citations to case authority, claiming that he relied on new technology with which he was not well-versed. Exhibit Y.

67. Blackburn also appears to be suffering from a personal crisis. An Investigation Report of the East Orange Police Department provides that, on April 17, 2024, Blackburn's girlfriend's best friend alleged that Blackburn was harassing her. Exhibit Z. According to the report, the best friend stated that Blackburn "called her a 'bitch' numerous times, texted her, 'I hope your mother has a life insurance policy because you are worth more dead than alive,' and

made various statements to her that she claimed were false." The report states that the best friend "is in fear of her safety because she does not know what Mr. Blackburn is capable of."

68.     Blackburn's conduct regarding Cartagena appears to be more of the same. He has demonstrated a pattern of unprofessional and erratic behavior that raises significant concerns. Blackburn has repeatedly referenced unrelated cases involving other clients, often to intimidate or distract from the issues at hand. In several communications, Blackburn has engaged in name-dropping celebrities seemingly to bolster his own credibility and to exert undue pressure on Cartagena. Most troubling, however, are the numerous emails sent well after business hours, which are characterized by a bizarre, stream-of-consciousness style and contain threatening language.

### A.    Blackburn Sends Frivolous Extortionate Letters and Emails

69.     Following the unsuccessful shakedown by way of the March 23, 2025 letter seeking compensation for songwriting and performing, on April 21, 2025, Blackburn sent a second letter reasserting Dixon's demands for payment (the "Second Letter"). This time, however, Blackburn added outrageous, false allegations of misconduct, including purported violations of the Trafficking Victims Protection Act for alleged acts of forced labor and coercive sex trafficking.

70.     As a plain indication of its lack of merit, the Second Letter lacked any specific allegations of purported wrongdoing, failing to specify a single instance in which Cartagena allegedly compelled Dixon to continue working for him or engage in a sex act.

71.     Despite Dixon's claims lacking any basis, Blackburn threatened to immediately file an already drafted complaint premised on Dixon's false allegations of forced labor and sex trafficking if Cartagena did not accede to Dixon's demands by April 25, 2025. This demand gave Cartagena a four-day window before Dixon would go public with his false allegations.

72.     On April 22, 2025, Blackburn sent an email to Cartagena's counsel bizarrely threatening to "report [Cartagena] to Homeland Security and file suit without further warning." He also claimed that he had video and other evidence to back up Dixon's claims.

**B.      Blackburn Lies About Corroborating Dixon's False Claims of Pedophilia and Admits to Not Corroborating Claims that Cartagena had Issued a "Hit" on Dixon**

73.     On April 23, 2025, Cartagena's counsel spoke to Blackburn to ascertain why Blackburn threatened to call Homeland Security and discuss Dixon's allegations.

74.     In explaining why he threatened to call Homeland Security, Blackburn claimed that an anonymous individual had told Dixon that Cartagena had "put a hit out on" Dixon.

75.     Cartagena's counsel asked for the identity of the unnamed individual. Blackburn admitted that Dixon had not told him the individual's name and confirmed that he had not personally corroborated the story with the purported witness. Cartagena's counsel then told Blackburn that it was "absolutely not true" that Cartagena had ever put a hit out on anybody.

76.     Blackburn also attempted to "corroborat[e]" Dixon's claims of statutory rape, despite those claims having no connection to the matter for which Dixon purportedly hired Blackburn — to obtain compensation for his purportedly underpaid services. Blackburn described three different women he claimed to have spoken with about purported sexual encounters they had with Cartagena while still underage. Though Cartagena *did not* engage in any sexual acts with any underage individuals, Cartagena recognized the three women based on Blackburn's descriptions of their names and whereabouts.

77.     Investigators retained by Cartagena were later able to locate two of the women and confirm that they had never, in fact, spoken with Blackburn.

78.    Cartagena's counsel also asked Blackburn for the video "evidence" of Dixon's sex trafficking claim, but Blackburn admitted he had never seen some of the video evidence he claims substantiates his client's allegations.

79.    Further, Blackburn threatened to submit a sworn statement by one of Cartagena's former managers to "corroborate" the sex trafficking claims against Cartagena, but never did.

80.    Throughout the call, Blackburn made it abundantly clear that the hit job claims and accusations of statutory rape were mere side shows and leverage to obtain shakedown money, stating:

> I mean, listen, **Homeland Security and all that stuff aside**, you know, nothing -- The whole resolution of this before my client's call yesterday to me, and my email to you, you know, **my goal was to see if we can have some sort of resolution to the claims that my client has regarding what he feels to be, you know, his contributions** that was not compensated, and you know, work and all sorts of stuff, and time and all these other things that he feels that he was not compensated for.
>
> . . . .
>
> Listen, **I want you to be very clear. This is not about Joe's decisions in the bedroom with whomever he chooses to sleep with. This is business**. This is about what he required my client to do, and left my client in Africa, left my client in Asia, left my client in Europe when my client refused to do those things. Right? That is the key. That's the part. If any part of the TVPA was going to be brought, it's going to be based on those things. Nothing to do with [Doe 3]. I'm not filing on her behalf. I'm not filing on [Doe 2]'s behalf. I'm not filing on [Doe 1]'s behalf. I'm not filing on any of people's behalf.

81.    Blackburn's sheer insistence on extorting a settlement from Cartagena on Dixon's behalf indicated that they would do whatever it took to get the money Dixon knew Cartagena did not owe him. To Dixon and Blackburn, money was far more important than the truth.

**C.    Blackburn Continues to Send Extortionate Correspondence, Prompting Cartagena to File this Lawsuit**

82.    On April 25, 2025, Blackburn sent Cartagena's counsel a third letter containing even more vile and false allegations against Cartagena and demanding that Cartagena pay Dixon a settlement payment of $20,000,000 to release Cartagena from Dixon's bogus claims (the "Third Letter") – multiples higher than his previous $2.6 million demand. The Third Letter again threatened that Dixon would "initiate litigation immediately" if Cartagena failed to accede to Dixon's demands that same day.

83.    Blackburn's baseless threats were then repeated in a flurry on unhinged emails sent long after the close of business:

a)    **April 26, 2025 at 9:52 PM.** Stating that he was going to sue a business affiliated with Cartagena along with the business's owners.

b)    **April 27, 2025 at 11:36 PM**. Refusing to provide names of individuals Blackburn claims were making allegations against Cartagena.

c)    **April 28, 2025 at 11:01 PM**. Refusing to provide evidence and baselessly claiming that Cartagena's counsel was "conflicted."

d)    **April 29, 2025 at 12:15 AM**. "Playtime is over."

84.    Blackburn repeated his heinous and false allegations against Cartagena on a call with Cartagena's lawyer on April 28, 2025, during which he stated that he personally verified the alleged claims and spoke with certain critical witnesses, including one of the alleged minors, and that his $20 million demand was based on other cases which bore little resemblance to the facts herein. For example, to inflate his demand, Blackburn referenced how former-National League Football star Shannon Sharpe's attempt to settle a case for $10 million was turned down. In fact, Blackburn warned: "Tony Buzbee has been, he just, he just filed against Shannon Sharpe last week.

And like Shannon Sharp's right, career is damned near over now because of that, with that, with that woman who was 19 years old and and [sic] a model on only fans or whatever it is, right? And you know, he and Shannon Sharpe offered $10 million in mediation, you know, to get rid of it. You know, to try to resolve it. And Tony Buzbee still filed, did not care. You know what it $50 million for, for a clearly consensual adult relationship. And you know, like, like Shannon Sharpe, got kicked off of ESPN, he lost everything." On the call, Blackburn also stated that he emailed Cartagena's lawyer a completely irrelevant audio recording without Dixon's permission.

85.    And Blackburn followed up on his third letter and call with Cartagena's counsel with yet another email to Cartagena's counsel, this time threatening to bring a RICO claim against Cartagena supposedly concerning claims that have nothing to do with Dixon's and Cartagena's relationship or the allegations in Dixon's demand letters. Adding insult to injury, when Blackburn last brought a RICO claim, Judge Oetken was flabbergasted that Blackburn argued that the defendants were "presumed guilty of being a RICO criminal organization" because they were subject to a Grand Jury Indictment. *Jones v. Combs*, No. 24-cv-1457, 2025 U.S. Dist. LEXIS 54277, at *10 (S.D.N.Y. Mar. 24, 2025). Judge Oetken observed: "That any licensed member of the bar would espouse such an absurd understanding of the law is not just disturbing, but shocking."

86.    Blackburn's and Dixon's claims regarding Cartagena — both public and in the foregoing correspondence and calls — are false, and both Dixon and Blackburn knew those claims to be false when they made them.

87.    Dixon's and Blackburn's unrelenting efforts to humiliate and threaten Cartagena into an extortionate settlement agreement to avoid the painstaking efforts of publicly dispelling

21

Dixon's lies compelled Cartagena to file the initial complaint initiating this lawsuit on April 29, 2025.

### D.    Blackburn Takes to Social Media to Defame Cartagena and his Lawyers

88.    Blackburn wasted no time in turning to social media to further disparage Cartagena. On April 29, 2025, Blackburn directed a post from his Instagram to Cartagena's counsel, Joseph Tacopina, stating:

> @joetacopina_spal, you ran and filed a baseless lawsuit against my client and me in the SDNY, alleging Defamation and Intentional Infliction of emotional distress in an attempt to get ahead of the forthcoming lawsuit against your client @fatjoe. No matter how hard you try to deflect and cherry-pick emails and conversations, your client has a lot of explaining to do. I invited you and me to meet with the SDNY Prosecutors, but you have yet to respond. You can bring your baseless accusation of extortion, and I will bring the 19-min audio recording of your client's felonious henchman, Pistol Pete, soliciting a former member of Terror Squad to lure my client to a specific location for Pistol Pete and his thugs to "pound him out." ***Your client, @fatjoe , ordered a hit job against my client.*** Pistol Pete also discusses how he had to run down on @tonyyayo a member of @gunitbrands due to some fued [sic] with @50cent and run up into clubs to attack other victims. Your client should also prepare to answer questions surrounding two additional recordings where two females discuss your client's disgusting pattern of grooming and sleeping with 16-year-old children.

89.    Blackburn's claim that Cartagena had "ordered a hit job against" his client, Dixon, and his implication that Cartagena had "groom[ed]" and slept with minors was false. They also had nothing to do with Dixon's claim for unpaid wages and credit.

90.    Blackburn knew that these statements were false, or acted with reckless disregard for the truth, at the time he made them.

91.    Several days later, on May 2, 2025, Blackburn appeared on an interview published by the Instagram account @officialprinceofpain. Upon information and belief, Blackburn agreed to have this interview published or caused it to be published. During the interview, Blackburn

stated that he had given Cartagena's attorneys an audio clip purportedly proving that Cartagena had set Dixon up "to be pounded out:"

> [W]e gave Joe Tacopina and his office a one-minute clip of, um, Pistol Pete . . . threatening, or actually no, . . . trying to set up [Dixon] to be, uh, pounded out. . . . and for 19 minutes he was trying to convince this man to lure my client to a certain location so he and his goons can pound him out and teach him a lesson on behalf of Fat Joe.

92.    These statements were false, which Blackburn knew at the time he made them. Blackburn had sent Cartagena's attorneys two audio files containing a conversation between two men who identified each other as "Pete" and "Percy." In these conversations, neither man said anything about luring Dixon out to be "pound[ed]" out, or that Cartagena had ordered or otherwise requested anything be done to Dixon. Blackburn did not otherwise send Cartagena's attorneys an audio file containing such allegations.

93.    Blackburn also stated during the interview that he had given Cartagena's attorneys a different audio file containing a conversation with a girl who purportedly engaged in an "inappropriate" relationship with Cartagena while she was still a minor:

> Before that, they got a recording of a young lady that I gave them, another snippet. It was probably like about 60 seconds long of a 15-minute conversation of another young lady who was Fat Joe's, uh, girlfriend. And he started dating her when she was 16 years old and he was in his late 30s. And it is clear as day on this recording she's saying that where he did to her—because now she's an adult and now she's a Christian . . . .was inappropriate . . . 'cause, you know, she was a child.

94.    These statements were also false, which Blackburn knew at the time he made them. Blackburn had sent Cartagena's attorneys a 60-second audio segment of a conversation between an unidentified woman and man in which the woman makes vague statements about something being "wrong" and "inappropriate" and someone dating somebody twice their age. Neither participant in the conversation identifies the individual who purportedly dated somebody twice

their age, states what (if anything) transpired between the purported subjects of their conversation, or references Cartagena at all. Blackburn did not otherwise send Cartagena's attorneys an audio file containing such allegations.

      **E.**     **Blackburn and Dixon Attempt to Avoid Service; Blackburn Mows Down Cartagena's Process Server With His Car, And Gets Arrested**

95.     Blackburn's contempt for Cartagena and his attempts to thwart Dixon and Blackburn's scheme did not stop at defamatory statements. He desperately tried to avoid Cartagena's attempts at serving the complaint and summons, ran over Cartagena's process server — which led to his arrest — and then lied to reporters after being arrested about his attempts to avoid service.

96.     These events began on April 29, 2025, when Cartagena's counsel wrote to Blackburn to inform him that Blackburn would be named as a defendant in this lawsuit. In an email response sent later that day, Blackburn stated:

> I will gladly waive services for any BS lawsuit your pedophile client wants to file against me, and ***I'll gladly meet you at the SDNY prosecutors' office to file your extortion claim. Let me know what time you want to meet.*** I'll be sure to walk with the 19-minute recorded call of Pistol Pete trying to set up my client to be killed on behalf of Mr. Cartagena. I will walk with the complete recordings of [Doe 3] and her cousin, which detail how your disgusting pedophile client solicited and manipulated a 10th grader into performing sex acts. Not to mention all of the other crimes your client has personally committed or commissioned. ***This will be fun!***

97.     Seeing that Blackburn had conditioned waiver on an absurd agreement to involve prosecuting authorities, Cartagena proceeded to attempt to effectuate service of process on Dixon and Blackburn.

98.     On April 30, 2025, Cartagena's process server attempted to serve Dixon at the Bronx address listed on Dixon's New York Department of Motor Vehicles ("DMV") record.

Dixon was not home, and the process server left the complaint and summons with a woman who identified herself as Dixon's grandmother.

99.    Also on April 30, 2025, Cartagena's process server attempted to serve Blackburn at the Brooklyn address listed on Blackburn's New York DMV record — the same address reflected in Blackburn's email signature block, letterhead, driver's license, law firm's website, and his prior court submissions. Blackburn did not answer. Cartagena's counsel learned that Blackburn was allegedly out of town until May 5, 2025, and accordingly resumed attempts at personal service then. On May 7, 2025, after several days of unsuccessful attempts to personally serve Blackburn, the process server left a copy of the summons and complaint at Blackburn's door and mailed a copied of the same to the address. Cartagena filed corresponding certificates of service for both defendants later that day.

100.    On May 8, 2025, after seeing the filed certificates of service, Blackburn sent an email explaining that his offer to waive service was conditional on a meeting with federal prosecutors (which Cartagena's counsel declined), and that Cartagena's service on Dixon and Blackburn was ineffective. Blackburn wrote that neither he nor Dixon were "domiciled" in New York, that it was Cartagena's "duty and obligation to locate" the correct domiciles, and that Cartagena had therefore "woefully failed to substantiate diversity jurisdiction." He then "advise[d]" Cartagena's counsel to "withdraw the case, do your research, and refile in the appropriate jurisdiction." Of course, all of Cartagena's research showed that Dixon and Blackburn are domiciled in New York.

101.    Blackburn's blatant attempts to evade service therefore appear to have served a bewildering ulterior motive—to obscure Defendants' domiciles to prevent Cartagena from

establishing complete diversity between the parties, which he then planned to use as a basis to dismiss this lawsuit.

102.   Cartagena was ultimately able to serve both Dixon and Blackburn in New York, but not without issue.

103.   On May 13, 2025, Cartagena's process server witnessed Dixon approaching his Bronx address and handed Dixon the process documents. Dixon lied and claimed that he was his brother, but nevertheless retained possession of the documents.

104.   On May 12, 2025, Cartagena's process server again attempted to serve Blackburn at his office. Blackburn was in his car when the process server arrived.

105.   The process server placed the summons, complaint, and other legal documents underneath the windshield wiper of Blackburn's car and stated that Blackburn had been served. Blackburn then abruptly put the vehicle in reverse and ran his car into the process server, causing a gash in the process server's leg that began to bleed immediately. Blackburn was ultimately apprehended and arrested on June 25, 2025 for felony assault.

106.   Blackburn continues to spread lies about this lawsuit today. Shortly after his arrest, Blackburn and his attorney represented to the media that the arrest was a "setup" because Blackburn had previously offered to waive service. This, again, was obviously false. Nobody set Blackburn up to commit felony assault, and while Blackburn had originally offered to waive service, he later reneged, claiming that his offer was conditional on Mr. Tacopina's meeting with federal prosecutors.

## IV.  Dixon Files a Frivolous Lawsuit Against Cartagena Failing to Corroborate The Previous Defamatory Statements

107.   On June 19, 2025, Dixon followed through with his previous threats and filed a 774-paragraph complaint ("Dixon's Complaint"), alleging, *inter alia*, RICO claims premised on

26

Dixon's baseless hit job, sex trafficking, and forced labor claims contained in Blackburn's prior letters.

108.    As it pertained to the Hit Job Claims, Dixon's Complaint revealed Dixon's purported source — an individual named Percy, whom Dixon described as a "mutual associate." Dixon's Complaint also included what Dixon represented were transcripts of recorded conversations between Percy and two of Cartagena's associates. Across thirteen pages of the purported transcripts, however, no one claimed or otherwise indicated that Cartagena had directed anybody to do anything to Dixon — let alone "pound him out" or "put a hit out" on him.

109.    Dixon's Complaint also included purported conversations between Dixon and Cartagena exchanged through Instagram. But Cartagena did not send those messages and, in any event, the messages do not indicate that Cartagena had directed a hit on Dixon.

110.    And despite having no relation to his actual claims against any of the named defendants, Dixon's Complaint also repeated his prior baseless accusations against Cartagena for purportedly engaging in vague "sexual acts" with underage girls who matched the same descriptions Blackburn gave on his April 23, 2025 phone call with Cartagena's counsel. Upon information and belief, these are the same women with whom Blackburn had falsely claimed to have corroborated Dixon's story.

## V.    Cartagena Has Suffered Significant Business Losses and Severe Emotional Distress as a Result of Dixon and Blackburn's Actions

111.    Defendants' actions have caused Cartagena severe emotional distress.

112.    In addition to the concomitant suffering of being publicly and falsely accused of being a violent pedophile who has slept with underage girls and ordered the death of another human being, Cartagena suffered pain and humiliation from Dixon's embarrassing doctored images of Cartagena and stories regarding Cartagena's wife.

113.    Dixon's and Blackburn's malicious allegations have resulted in a torrent of negative social media commentary about Cartagena, including that "Fat Joe belongs in prison."

114.    Shortly after filing the lawsuit against Cartagena, Dixon's and Blackburn's unrelenting efforts to humiliate and threaten Cartagena into an extortionate settlement agreement manifested in Cartagena losing significant business.

115.    For example, a major national television network cancelled Cartagena's appearance on three episodes of a primetime show citing Dixon's and Blackburn's lawsuit against Cartagena. Cartagena and the network had finalized an agreement for him to appear on three episodes of the show for $10,000 per appearance. On the same day that Dixon filed his lawsuit against Cartagena, the network pulled the plug on the deal citing "current events."

116.    Several sponsors for the Joe & Jada Podcast have moreover either reneged on their contractual obligations or placed their advertising support on hold citing Dixon and Blackburn's allegations against Cartagena. On June 20, 2025, within 24 hours of Dixon filing his complaint, one sponsor withdrew from its $675,000 advertising investment in the podcast, asking for all mentions of its company to be pulled while it monitored how the allegations unfolded. On June 23, 2025, another sponsor withdrew from a $400,000 advertising investment, citing to an article concerning Dixon's complaint and stating that "in light of the most recent news coming out of last week, we'd like to postpone . . . [our] launch on the show for all conditions[.]" On June 20, 2025, a potential sponsor withdrew from a planned agreement in which it contemplated investing $40,000 into advertising airtime, stating that "with the news coming out recently, we will be taking a step back here[.]" As a result, Cartagena lost 32.5% of all advertising revenue, less costs and expenses to which he was entitled as an executive producer of the podcast.

117.    As discussed above, Cartagena is a co-owner and brand ambassador for Rewind It, a men's hair color product supplier. As a brand ambassador whose image appears on Rewind It products, Cartagena's image is closely tied to the success of Rewind It. Shortly after Dixon filed his lawsuit, at least three potential retailers terminated advanced negotiations with Rewind It for agreements projected to be worth hundreds of millions of dollars. This has resulted in the loss of tens of millions of dollars for Cartagena.

118.    For months, Rewind It had been negotiating an agreement with one of the top five largest domestic retailers to stock Rewind It products in the retailer's brick-and-mortar stores around the country. On June 24, 2025, just several days after Dixon filed his lawsuit, the retailer told Rewind It that it was "worried" about the recent news concerning the allegations made about Cartagena and that it would now only consider selling Rewind It products on its e-commerce platform, where Rewind It already sells products. Rewind It projects a first-year revenue loss of at least $21.25 million through this retailer, representing at least a $7,083,333.33 loss to Cartagena.

119.    Rewind It had also reached advanced discussions with one of the ten largest domestic retailers, when on June 25, 2025, the retailer expressed concern about Defendants' claims. The retailer did not meaningfully communicate with Rewind It again until July 21, 2025, when it formally terminated discussions for a deal. Rewind It projected first year revenues of $7.5 million through this retailer, representing at least a $2,500,000 loss to Cartagena.

120.    Rewind It similarly was in advanced talks with one of the five largest domestic pharmacy retail chains concerning a supply deal. By the end of May 2025, Rewind It and the retailer had already hand-picked a selection of Rewind It products that the retailer would sell. On June 24, 2025, however, the retailer advised that they were passing on the brand. Rewind It

projected first year revenues of $1.25 million for this retailer, representing a $416,666.66 loss to Cartagena as a 33% owner.

121.    National press outlets have moreover canceled Cartagena's scheduled events and appearances and at least one potential business partner refused to work with Cartagena until Dixon's lawsuit was resolved.

122.    The foregoing harms are illustrative of the damages that Cartagena has incurred as a result of Defendants actuation, but by no means comprise a complete list.

## FIRST CAUSE OF ACTION FOR DEFAMATION

### (Against Dixon)

123.    Cartagena incorporates by reference each allegation set forth above.

124.    Dixon has made false statements on his public social media platforms falsely accusing Cartagena of vile sexual misconduct, pedophilia, statutory rape, violence and stealing, including posting on his Instagram account, @thatstrategy:

    a)    On May 23, 2024, Dixon posted to his Instagram account, a post, directed at Cartagena which Dixon notoriously refers to as "Lil Joey," stating: "LIL JOEY WAS DATING AND HAVING SEX WITH A 16 YEAR OLD GIRL NAMED NIKKI AKA CHIQUITA HE HAD A FULL FLEDGE RELATIONSHIP WITH HER FOR 5 YEARS."

    b)    On September 20, 2024, Dixon posted to his Instagram account, a post accompanying a picture of Cartagena, Sean "Diddy" Combs, and DJ Khaled stating: "#fatjoe Nikki was underage when u flew her across state lines and out the country."

    c)    On October 1, 2024, Dixon posted to his Instagram account, a post stating: "FAT JOE HAD A FULL FLEDGE RELATIONSHIP WITH NIKKI WHO

WAS UNDERAGE" and "FAT JOE KNEW DRE WAS HAVING SEX
WITH A UNDERAGE GIRL BECAUSE JOE WAS THE GUY TELLING
HIM CALM DOWN WE GOING TO TAKE CARE OF IT."

d)     On December 28, 2024, Dixon posted to his Instagram account, a post
accompanying images of Cartagena with the following caption: "#FATJOE
Milwaukee was scary the girl wasn't lying" and "this happened in
Wisconsin joe was being a thirsty n**** and almost got us locked up for
#sexualassault." The caption is accompanied by four headlines, "It's
Officially Over for Fat Joe," "Fat Joe Investigated for Sexual Assault" "Fat
Joe's Ghostwriter T.A. The Legend," and "Fat Joe Former employee finally
speaks out."

e)     On December 28, 2024, Dixon posted to his Instagram account, a post of an
interview he did in which he made false statements accusing Cartagena of
sexually assaulting a woman in Wisconsin by placing his hand up her skirt.

f)     On March 17, 2025, Dixon published to his Instagram account,
accompanying the headline of a video title "Fat Joe Calls Gongu Roach a
Liar!" an Instagram story stating: "You have a very long history of stealing
and robbing people" and "You stole from Pun and his family you settled in
court to pay Liaz Rios 2.3 million not counting the rest of the money you
stole."

g)     On March 18, 2025, Dixon posted to his Instagram Threads account, a post
accompanying an image of Cartagena's album cover "Jealous Ones Still

Enny" stating: "#FATJOE DONT NEVER FORGET WHO KEPT YOU BREATHING I WROTE THIS FOR YOUR HOMIE."

h)   On April 13, 2025, Dixon did an interview on "Off da Books Podcast" and falsely alleged that Cartagena underpaid him for his services and did not credit him for songs he allegedly wrote for Cartagena.

125.   Dixon intentionally published these false statements to his publicly accessible social media accounts, which third parties viewed and commented on.

126.   Dixon published these statements or caused them to be published with actual malice because he had a subjective awareness of either falsity or probable falsity of the statements, or otherwise acted with reckless disregard of the truth or falsity of the statements. Such knowing falsity or reckless disregard is evidenced by the fact that, *inter alia*:

a)   Dixon claims to have been with Cartagena for some of the alleged incidents;

b)   Dixon told family members that he would put false information about Cartagena out on social media to obtain money from Cartagena;

c)   Dixon knew that he, not Cartagena, was the subject of the Wisconsin police investigation;

d)   Dixon's attorney, Blackburn and Blackburn Law PLLC, made it clear that the intention of Dixon's accusations was to obtain a settlement for an unrelated dispute over purported unpaid compensation;

e)   Dixon's attorney, Blackburn and Blackburn Law PLLC, lied about providing recordings that corroborate Dixon's claims, indicating that no such recordings exist;

f)    Dixon's attorney, Blackburn and Blackburn Law PLLC, lied about corroborating Dixon's claims with the alleged victims; and

g)    Dixon's attorney, Blackburn and Blackburn Law PLLC, lied about providing a sworn statement from those same victims.

127.    Dixon had neither privilege nor authorization to publish such false statements to third parties.

128.    Dixon's statements also constitute defamation per se:

a)    Dixon intentionally made false statements charging Cartagena with the serious crimes of sexual assault and statutory rape;

b)    Such accusations of crimes of moral turpitude tend to injure a person's trade, business and profession;

c)    Dixon published his false statements to third parties on his public social media accounts and in publicly available interviews; and

d)    Dixon's false statements and actions were intended to harm Cartagena's reputation and caused emotional distress.

129.    Cartagena incurred a special injury as a result of the statements, losing at least $11,115,000 from lost business deals and potential contracts as a result of Dixon's defamatory statements.

130.    Based on this conduct, Cartagena is entitled to (i) injunctive relief restraining Dixon from defaming Cartagena; (ii) an award of damages in an amount to be proven at trial, but in no event less than $15,000,000, plus interest; (iii) an award of exemplary damages; and (iv) an award of attorney's fees, costs and expenses.

## SECOND CAUSE OF ACTION FOR DEFAMATION

### (*Against Defendants Blackburn and T.A. Blackburn Law, PLLC*)

131.    Cartagena incorporates by reference each allegation set forth above.

132.    Blackburn made false statements on public social media platforms falsely accusing Cartagena of vile sexual misconduct, pedophilia, statutory rape, violence and stealing, including:

a)    On April 30, 2025, Blackburn posted on his Instagram account, @tyrone_blackburn, that Cartagena "ordered a hit job against" Dixon.

b)    On or around May 2, 2025, Blackburn stated in an interview that he caused to be published that:

i.    He "gave Joe Tacopina and his office a one-minute clip of, um, Pistol Pete . . . threatening, or actually no, . . . trying to set up [Dixon] to be, uh, pounded out. . . . and for 19 minutes he was trying to convince this man to lure my client to a certain location so he and his goons can pound him out and teach him a lesson on behalf of Fat Joe[;]" and

ii.    "Before that, they got a recording of a young lady that I gave them, another snippet. It was probably like about 60 seconds long of a 15-minute conversation of another young lady who was Fat Joe's, uh, girlfriend. And he started dating her when she was 16 years old and he was in his late 30s. And it is clear as day on this recording she's saying that where he did to her—because now she's an adult and now she's a Christian . . . .was inappropriate . . . 'cause, you know, she was a child[.]"

c)    During the interview, Blackburn affirmed that these statements were his, stating that the information was "according to [him], one hundred percent . . . a hundred percent all Tyrone Blackburn." Blackburn went as far as to stated that he would "indemnify" the interviewer "100 million bajillion percent[.]"

133.    Blackburn intentionally published these false statements or caused them to be published to publicly accessible social media accounts, which third parties viewed.

134.    Blackburn published these statements or caused them to be published with actual malice because he had a subjective awareness of either falsity or probable falsity of the statements, or otherwise acted with reckless disregard of the truth or falsity of the statements. Such reckless disregard is evidenced by the fact that, *inter alia*:

a)    Dixon previously admitted to being willing to put false information about Cartagena out on social media to "take all of [his] money;"

b)    Blackburn nevertheless failed to corroborate the claims with his purported firsthand witnesses, as confirmed by Cartagena's investigators;

c)    The purported "corroborating" evidence supporting Dixon's hit job claim that Blackburn included in Dixon's Complaint was either fabricated or does not actually indicate that Cartagena had "ordered a hit job" against Dixon or otherwise set him up to be "pounded out;"

d)    Blackburn acknowledged that these purported issues were "aside[s]" and that the purpose of his pre-suit correspondence was to obtain a settlement from Cartagena;

e)    Blackburn published the statements even after Cartagena's attorneys told Blackburn that they were false; and

f)    Blackburn published the statements while claiming to support them with evidence that he knew did not exist, including the foregoing audio recordings and "sworn statements" from alleged victims he promised, but failed, to produce to Cartagena.

135.    Blackburn otherwise acted with malice as evidenced by his blatant attempts to avoid service of the original complaint, his assault on Cartagena's process server, and his easily-disproven lies to the public about being set up by Cartagena.

136.    Blackburn had neither privilege nor authorization to publish such false statements to third parties.

137.    Blackburn's statements constitute defamation per se. The statements charge Cartagena with the serious crimes of sexual assault and statutory rape. Such accusations of crimes of moral turpitude tend to injure a person's trade, business and profession.

138.    Blackburn's false statements and actions were intended to harm Cartagena's reputation and caused emotional distress.

139.    Blackburn published these statements in his capacity as Dixon's attorney and within the scope of his employment at Blackburn Law PLLC.

140.    Cartagena incurred a special injury as a result of the statements, losing at least $11,115,000 from lost business deals and potential contracts as a result of Blackburn's defamatory statements.

141.    Based on this conduct, Cartagena is entitled to (i) injunctive relief restraining Blackburn from defaming Cartagena; (ii) an award of damages in an amount to be proven at trial,

but in no event less than $15,000,000, plus interest; (iii) an award of exemplary damages; and (iv) an award of attorney's fees, costs and expenses.

## THIRD CAUSE OF ACTION FOR
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (*Against Dixon, Blackburn and Blackburn Law*)

142.    Cartagena incorporates by reference each allegation set forth above.

143.    Since 2023, Dixon intentionally initiated a campaign of public harassment and falsehoods against Cartagena to cause professional and emotional harm by publishing various social media posts falsely accusing Cartagena of vile crimes of sexual assault, statutory rape, violence, and stealing:

    a)    On August 31, 2023, Dixon posted to his Instagram account about Cartagena, whom Dixon occasionally calls "Lil Joey," stating "lil joey doing his pedophile dance when he bags another 16 year old."

    b)    On September 9, 2023, Dixon posted to his Instagram account: "LIL JOEY CAP DOING HIS PEDOPHILE DANCE HE'S DIVING LOOKING FOR LITTLE GIRLS 💯."

    c)    On September 13, 2023, Dixon posted to his Instagram account: "@FATJOE YOU ASK ME DO I TAKE ANY ACCOUNTABILITY YES I DO FOR WATCHING YOU MESS WITH UNDER AGE GIRLS BUT I WAS MINDING MY BUSINESS," "STOP MOVING AROUND IN THE STREETS LIKE YOU WASN'T MESSING WITH A UNDER AGE GIRL" and "YOU'RE A PEDOPHILE."

    d)    On May 23, 2024, Dixon posted to his Instagram account, a post, directed at Cartagena which Dixon notoriously refers to as "Lil Joey" stating: "LIL

JOEY WAS DATING AND HAVING SEX WITH A 16 YEAR OLD GIRL NAMED NIKKI AKA CHIQUITA HE HAD A FULL FLEDGE RELATIONSHIP WITH HER FOR 5 YEARS."

e)    On September 20, 2024, Dixon posted to his Instagram account, a post accompanying a picture of Cartagena, Sean "Diddy" Combs, and DJ Khaled stating: "#fatjoe Nikki was underage when u flew her across state lines and out the country."

f)    On October 1, 2024, Dixon posted to his Instagram account, a post stating: "FAT JOE HAD A FULL FLEDGE RELATIONSHIP WITH NIKKI WHO WAS UNDERAGE" and "FAT JOE KNEW DRE WAS HAVING SEX WITH A UNDERAGE GIRL BECAUSE JOE WAS THE GUY TELLING HIM CALM DOWN WE GOING TO TAKE CARE OF IT."

g)    On October 1, 2024, Dixon posted to his Instagram Threads account: "FAT JOE HAD A FULL FLEDGE RELATIONSHIP WITH NIKKI WHO WAS UNDERAGE" and "FAT JOE KNEW DRE WAS HAVING SEX WITH A UNDERAGE GIRL BECAUSE JOE WAS THE GUY TELLING HIM CALM DOWN WE GOING TO TAKE CARE OF IT."

h)    On December 28, 2024, Dixon posted to his Instagram account, a post accompanying images of Cartagena with the following caption: "#FATJOE Milwaukee was scary the girl wasn't lying" and "this happened in Wisconsin joe was being a thirsty n**** and almost got us locked up for #sexualassault." The caption is accompanied by four headlines, "It's Officially Over for Fat Joe," "Fat Joe Investigated for Sexual Assault" "Fat

Joe's Ghostwriter T.A. The Legend," and "Fat Joe Former employee finally speaks out."

i)     On December 28, 2024, Dixon posted to his Instagram account, a post of an interview he did in which he made false statements accusing Cartagena of sexually assaulting a woman in Wisconsin by placing his hand up her skirt.

j)     On March 17, 2025, Dixon published to his Instagram account, accompanying the headline of a video title "Fat Joe Calls Gongu Roach a Liar!" an Instagram story stating: "You have a very long history of stealing and robbing people" and "You stole from Pun and his family you settled in court to pay Liaz Rios 2.3 million not counting the rest of the money you stole."

k)     On March 18, 2025, Dixon posted to his Instagram Threads account, a post accompanying an image of Cartagena's album cover "Jealous Ones Still Enny" stating: "#FATJOE DONT NEVER FORGET WHO KEPT YOU BREATHING I WROTE THIS FOR YOUR HOMIE."

l)     On April 13, 2025, Dixon did an interview on "Off da Books Podcast" and falsely alleged that Cartagena underpaid him for his services and did not credit him for songs he allegedly wrote for Cartagena.

144.     Dixon escalated his campaign of harassment by sending Cartagena extortionate demand letters through his attorney, Blackburn, threatening to initiate frivolous lawsuits with false accusations of statutory rape, forced labor and coercive sex trafficking.

145.    On March 23, 2025, Blackburn sent Cartagena a baseless demand letter alleging that Cartagena underpaid Dixon and denied him credit for his contributions to Cartagena's success under their oral agreement, and demanding retroactive songwriting credit and monetary settlement.

146.    When Cartagena refused to succumb to Dixon's extortionate demand letters, Blackburn sent a second letter on April 21, 2025, demanding payment for alleged withheld payments and credit. Dixon further included false allegations of vile conduct by Cartagena, including purported sex with minors, violations of the Trafficking Victims Protect Act for alleged acts of forced labor and coercive sex trafficking, and threatened to file a lawsuit alleging the same if Cartagena failed to accede to Dixon's demands within four days of receipt of the demand.

147.    On April 22, 2025, Blackburn emailed Cartagena's counsel bizarrely threatening to "report [Cartagena] to Homeland Security and file suit without further warning." He also claimed that there was video and other evidence to support Dixon's claims.

148.    The next day, Cartagena's counsel spoke to Blackburn to discuss Dixon's allegations against Cartagena and ascertain Blackburn's grounds for threatening to call Homeland Security on Cartagena. Despite Cartagena's counsel requesting information during the call, including the last names of the individuals Blackburn claims he personally spoke with to "corroborate" Dixon's claims, Blackburn was unable to answer such requests.

149.    Blackburn further admitted that he has never seen some of the videos he claims support the allegations against Cartagena and threatened to submit a sworn statement by one of Cartagena's former managers to "corroborate" the claims against Cartagena.

150.    After attorneys for the parties corresponded on April 25, 2025, Blackburn sent a third demand letter with more vile false accusations against Cartagena demanding settlement payment of $20,000,000 to release Cartagena from Dixon's baseless claims, or the initiation of

immediate litigation if Cartagena failed to accede to such demands that day. He also threatened to name Cartagena's marketing partner, Market America, in the baseless lawsuit in a further attempt to harm Cartagena's business interests and reputation.

151.    The heinous and false allegations were repeated in a call with Blackburn on April 28, 2025, during which he admitted to relying on his client as the basis for certain of the otherwise independently verifiable (and false) claims, and that his $20 million demand was based on other cases which bore little resemblance to the facts herein.

152.    Dixon published such false statements, publicly and in his extortionate demand letters, negligently, with knowledge of the falsity of the statements, malice, and/or with reckless disregard of the truth.

153.    Dixon's publication of false and vile accusations against Cartagena was intentional and/or reckless and constitutes extreme and outrageous conduct.

154.    Blackburn's threats to call Homeland Security against Cartagena and threats of initiating a lawsuit with baseless claims were intentional and constitute extreme and outrageous conduct.

155.    Blackburn also falsely stated to Cartagena's counsel that he personally verified all allegations and had spoken with certain critical witnesses, including one of the alleged minors, who deny that they have spoken to Blackburn

156.    Defendants' attempt to extort Cartagena by asserting false and vile accusations and threatening the initiation of a lawsuit was intentional and/or reckless and constitutes extreme and outrageous conduct.

157.    After Cartagena initiated this lawsuit, Blackburn engaged in several acts of extreme and outrageous conduct, including:

a)    posting on his Instagram account, @tyrone_blackburn, that Cartagena "ordered a hit job against" Dixon.

b)    stating in an interview that he caused to be published that:

i.    He "gave Joe Tacopina and his office a one-minute clip of, um, Pistol Pete . . . threatening, or actually no, . . . trying to set up [Dixon] to be, uh, pounded out. . . . and for 19 minutes he was trying to convince this man to lure my client to a certain location so he and his goons can pound him out and teach him a lesson on behalf of Fat Joe[;]" and

ii.    "Before that, they got a recording of a young lady that I gave them, another snippet. It was probably like about 60 seconds long of a 15-minute conversation of another young lady who was Fat Joe's, uh, girlfriend. And he started dating her when she was 16 years old and he was in his late 30s. And it is clear as day on this recording she's saying that where he did to her—because now she's an adult and now she's a Christian . . . .was inappropriate . . . 'cause, you know, she was a child[.]"

c)    intentionally or recklessly running his car into Cartagena's process server in an attempt to avoid service of the complaint.

158.    Defendants' publication of false statements, threats of litigation alleging false and vile misconduct, and Blackburn's physical violence against Cartagena's legal team has caused Cartagena severe emotional distress. As a result of Defendants' actions, Cartagena also suffered substantial losses and sustained significant unreimbursed costs in an amount to be proven at trial,

but in no event less than $15,000,000, plus interest. He will suffer additional significant special damages, including loss of business opportunities, harm to his professional reputation, and financial setbacks, once Dixon's and Blackburn's allegations become public.

159.    All of Blackburn's malicious, outrageous and extreme conduct detailed herein was done with the express authority of Blackburn Law PLLC and within the scope of Blackburn's employment with Blackburn Law PLLC.

160.    Based on this conduct, Cartagena is entitled to (i) injunctive relief restraining Defendants from engaging in further conduct of the type alleged herein; (ii) an award of damages to be proven at trial; (iii) an award of exemplary damages; and (iv) an award of attorney's fees, costs and expenses.

## Prayer for Relief

**Wherefore**, Cartagena respectfully prays for judgment and relief against Terrance Dixon (as to Counts I and III) and Tyronne Blackburn and T.A. Blackburn Law, PLLC (as to Counts II and III) as follows:

A.    Damages in an amount to be proved at trial but not less than $15,000,000, plus interest;

B.    Entering a preliminary and permanent injunction restraining Defendants from engaging in further conduct of the type alleged herein;

C.    An award of exemplary damages;

D.    An award of attorneys' fees, costs and expenses; and

E.    Such other and further relief as this Court may deem just, equitable and proper.

## Demand for Jury Trial

Cartagena demands a trial by jury for all issues so triable.

Dated:  July 21, 2025
      New York, New York

/s/ Joseph Tacopina

Joseph Tacopina
Chad Seigel
**Tacopina Seigel & DeOreo**
275 Madison Avenue, 35th Floor
New York, New York 10016
212-227-8877
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
**Of Counsel:**

Jordan W. Siev
**Reed Smith LLP**
599 Lexington Avenue, 22nd Floor
New York, New York 10022
212-205-6087
jsiev@reedsmith.com