# Exhibit A



**User Name:** Fred Charles
**Date and Time:** Friday, June 20, 2025 12:33□AM EDT
**Job Number:** 255827493

## Document (1)

1. *Flaherty v. Dixon*
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | | -None- |

 Caution
As of: June 20, 2025 4:33 AM Z

## *Flaherty v. Dixon*

United States District Court for the Southern District of New York

February 16, 2023, Decided; February 16, 2023, Filed

22 Civ. 2642 (LGS)

**Reporter**

2023 U.S. Dist. LEXIS 26876 *; 2023 WL 2051861

MARIE FLAHERTY, Plaintiff, -against- LINDSEY S. DIXON, et al., Defendants.

**Subsequent History:** Motion denied by, As moot, Remanded by *Flaherty v. Dixon, 2024 U.S. Dist. LEXIS 51502 (S.D.N.Y., Mar. 22, 2024)*

## Core Terms

alleges, employees, tortious interference, futile, fired, email, coworkers, retaliation, quotation, marks, statute of limitations, retaliation claim, protected activity, defamation, harassment, at-will, cleaned, courts, racist, good faith, conclusory, disability, hostile, limitations period, conditions, asserts, orders, reasonable accommodation, discrimination claim, amended complaint

**Counsel:** **[*1]** For Lindsey S. Dixon, Defendant: Eli Zev Freedberg, Littler Mendelson, P.C. (NYC), New York, NY; Gary Moy, Littler Mendelson, P.C., New York, NY.

For Does 1-50, Defendant: Gary Moy, Littler Mendelson, P.C., New York, NY.

**Judges:** LORNA G. SCHOFIELD, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LORNA G. SCHOFIELD

## Opinion

### OPINION AND ORDER

LORNA G. SCHOFIELD, District Judge:

Plaintiff Marie Flaherty brought this action in New York County Supreme Court against Defendant Lindsey S. Dixon and several "John Doe" Defendants for defamation, tortious interference with contract, intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"). Dixon timely removed the case to this Court. Defendant moves to dismiss the First Amended Complaint ("FAC"), the operative complaint. Plaintiff opposes dismissal and seeks leave to file a proposed second amended complaint ("PSAC") adding Defendants Amazon.com, Inc. ("Amazon"), Prime Now LLC, Whole Foods Markets Services, Inc. ("WFM"), Jennifer Hutt, Davy Cumberland, and several additional Doe Defendants, and adding claims under *Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981*, the *New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), New York Labor Law § 740* ("*NYLL § 740*"), and claims for negligent supervision, negligent hiring and breach of the implied covenant of good faith and **[*2]** fair dealing. For the reasons below, Defendant's motion to dismiss is granted, and Plaintiff's motion for leave to amend is granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiff's First Amended Complaint

The following facts are taken from the FAC and assumed to be true for purposes of this motion. *See Francis v. Kings Park Manor, Inc., 992 F.3d 67, 72 (2d Cir. 2021)*. Plaintiff is a licensed attorney in Massachusetts. From March 27 to May 15, 2020, Plaintiff was employed by Amazon as a "Seasonal Amazon Shopper." Plaintiff's job was to complete shopping orders for customers who ordered food and other products online from two WFM locations in Manhattan. Defendant Dixon was Plaintiff's manager, and the Doe Defendants are other individuals or entities associated with Amazon.

Plaintiff worked for Amazon at a time when the COVID-19 pandemic affected New York City particularly severely. Plaintiff diligently complied with safety protocols, including social distancing and personal protective equipment ("PPE") rules. Defendants did not comply with or enforce COVID-19 safety protocols in the workplace, and they mocked, harassed and retaliated against employees who raised concerns about COVID-19. Amazon routinely notified its employees when coworkers were **[*3]** diagnosed with COVID-19 but did not notify customers. Plaintiff raised concerns about this practice. On April 26, 2020, Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") complaint regarding the conditions of her employment at Amazon and Defendants' failure to follow COVID-19 protocols and to notify customers when employees were infected with COVID-19. Dixon failed to respond adequately to the ensuing EEOC investigation.

On May 6, 2020, Dixon sent Plaintiff an email stating: "On 4/26/20, you were found to have participated in harassing/discriminatory behavior. Specifically, you admitted to the STL on site that you called WFM employees racist and stated that all of the 'colored people' in the store are racist." The email also notified Plaintiff that her employment would end, "effective immediately." Plaintiff did not call any "WFM employees racist," did not "admit" that she did so, did not say "that all of the 'colored people' in the store are racist," would not use the term "colored" in that context and did not participate in any harassing or discriminatory behavior. Plaintiff denied the allegations in the email and asked Dixon to identify the "STL" and the "WFM employees" **[*4]** referenced in the email, but Dixon has not done so. Dixon avoided speaking with Plaintiff about the allegations and has refused to retract the statements in the email or reinstate Plaintiff's employment. Dixon forwarded the email quoted above to other Amazon employees in April and May 2020, and repeated the statements contained therein during the EEOC investigation.

Dixon lacked authority to fire Plaintiff, but after she sent the email above to Plaintiff, Dixon told Plaintiff not to show up for scheduled shifts. On May 13, 2020, Plaintiff received notice from Amazon that she was being fired effective May 15, 2020, for missing her shifts.

### B. Plaintiff's Proposed Second Amended Complaint

The following facts are taken from Plaintiff's PSAC and assumed to be true for purposes of this motion, since Defendant opposes Plaintiff's motion on the ground that amendment would be futile. *See Francis, 992 F.3d at 72*. The PSAC includes most of the allegations in the FAC, and only allegations that are new in the PSAC are recited below.

At the time Plaintiff was hired by Amazon, the company did not conduct background checks or drug tests on most employees, nor did it conduct training on COVID-19. Supervisors from Amazon and **[*5]** WFM did not enforce COVID-19 safety measures, and many Amazon and WFM employees did not comply with such measures. Amazon was accused by the New York Attorney General of retaliating against employees who raised concerns over working conditions during the COVID-19 pandemic.

Plaintiff was often the only white person or one of two white people working as an Amazon Shopper, and Plaintiff asserts that she was treated less well than her coworkers who were people of color. On one occasion, an unnamed coworker began speaking to Plaintiff in Gaelic and told Plaintiff she assumed Plaintiff was Irish and therefore might speak Gaelic. During "New Hire Orientation," Plaintiff was instructed to ask WFM employees for assistance if she was unable to find an item requested by a customer, but Plaintiff claims that coworkers refused to help her on several occasions. Plaintiff asserts that on some unspecified occasions various Doe Defendants told her falsely that products were unavailable, and that those same Doe Defendants would immediately check the stock when asked by Plaintiff's coworkers of color. Another Doe Defendant asked Plaintiff to speak louder when she approached the deli counter, apparently **[*6]** because Plaintiff wore two masks and a face shield to protect herself from COVID-19. That same Doe Defendant gave Plaintiff different, inferior products instead of those Plaintiff requested. Plaintiff also alleges that she was treated less well because of the measures she took to protect herself from COVID-19, and that her coworkers engaged in various behaviors that risked increasing the spread of COVID-19 and harmed customers. Plaintiff did not observe her coworkers of color being subjected to any of the conditions described above.

When Plaintiff complained to a manager about WFM employees' hostility, the manager informed her that WFM employees' treatment of Amazon Shoppers was a chronic problem. A "Regular Amazon Shopper" -- as opposed to a "Seasonal Amazon Shopper" like Plaintiff -- failed to train Plaintiff adequately on certain aspects of the job and complained about Seasonal Amazon Shoppers taking shifts. Some Regular Amazon Shoppers attempted to "help" Plaintiff with her orders but made errors that reduced Plaintiff's productivity.

On April 26, 2020, after a WFM employee refused to help Plaintiff fill an order, Plaintiff complained about her employment conditions to a supervisor, **[*7]** Davy Cumberland. Plaintiff complained about what she perceived as WFM employees' racially motivated refusal to help her and refusal to comply with COVID-19 safety measures. Cumberland asked her if she was OK and suggested that she should be sent home. Plaintiff stated that she was particularly concerned about COVID-19 because she had undergone open-heart surgery. Plaintiff asked if she should call the police to report violations of COVID-19 policies, and Cumberland agreed that she should. Plaintiff left her phone in the room where she had been speaking with the supervisor, and Cumberland refused to return it.

On May 1, 2020, another Doe Defendant initially refused to help Plaintiff fill an order at the meat counter, then became angry and threw a piece of meat at the wall. After that incident, Plaintiff complained about perceived racial harassment to two more supervisors. One supervisor suggested that he would not preserve video of the incident absent a subpoena. Defendants never followed up on any of Plaintiff's complaints.

Defendant Dixon's email to Plaintiff, discussed above, was preceded by an email from Cumberland to Dixon on April 26, 2020, in which Cumberland said that Plaintiff **[*8]** had accused coworkers of being racist and threatened to call the police on those who failed to comply with COVID-19 safety measures. Cumberland wrote that Plaintiff "seemed a little off as if she was hyper or on a drug." Cumberland told Dixon, "Marie admitted to me that she called them racists on the sales floor and also let me know all the 'colored people' in our store is racists." Prior to Cumberland sending this email, he was aware that Plaintiff had made a complaint about his behavior by calling Amazon's Human Resources Emergency Line.

## II. DISCUSSION

## A. Defendant's Motion to Dismiss the FAC

### 1. Legal Standard for a Motion to Dismiss

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee, 994 F.3d 95, 101 (2d Cir. 2021)* (internal quotation marks omitted). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face." *Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854 (2d Cir. 2021)* (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*). "Threadbare recitals of the elements of a cause of action, [*9] supported by mere conclusory statements, do not suffice." *Iqbal, 556 U.S. at 678*; *accord Nat'l Rifle Ass'n of Am. v. Vullo, 49 F.4th 700, 716 (2d Cir. 2022)*. It is not enough for a complaint to allege facts that are consistent with liability; it must "nudge[]" claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; *accord Bensch v. Estate of Umar, 2 F.4th 70, 80 (2d Cir. 2021)*. To survive dismissal, "plaintiffs must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC, 939 F.3d 112, 121 (2d Cir. 2019)* (alteration in original) (internal quotation marks omitted). While courts generally afford pro se litigants "special solicitude," courts "do[] not give special solicitude to pro se litigants who are themselves attorneys." *Chevron Corp. v. Donziger, 990 F.3d 191, 203 (2d Cir. 2021)*.

## 2. Statute of Limitations

Plaintiff's claims are not barred by the statute of limitations. The claims accrued in May 2020 during the COVID-19 statutory tolling period described below. Their statutes of limitations began to run on November 4, 2020. The claims were first filed in state court on November 4, 2021. Plaintiff's defamation and IIED claims have a one-year statute of limitations, and Plaintiff's tortious interference and NIED claims have a three-year limitations period. Accordingly, all of the claims are timely.

Prior to the accrual of Plaintiff's [*10] claims, on March 20, 2020, New York Governor Andrew Cuomo issued Executive Order 202.8, which stated, "any specific time limit for the commencement, filing, or service of any legal action . . . is hereby tolled from the date of this executive order until April 19, 2020." *9 N.Y.C.R.R. § 8.202.8*. Governor Cuomo issued nine subsequent orders extending the period during which time limits were "tolled" until November 3, 2020. *9 N.Y.C.R.R. §§ 8.202.14*, *8.202.28*, *8.202.38*, *8.202.48*, *8.202.55*, 8.202.55.1, *8.202.60*, *8.202.67*, *8.202.72*. Dixon argues that Governor Cuomo's executive orders "suspended" but did not "toll" statutes of limitations. If statutes of limitations were only suspended, limitations periods that would have expired during the tolling period expired instead on November 4, 2020, and limitations periods that would have expired after November 4, 2020, would be unaffected by the executive orders. In the alternative, Dixon argues that Plaintiff's defamation and IIED claims are untimely because Plaintiff filed her original complaint in state court on November 4, 2021, not November 3. Neither argument is persuasive.

While several New York trial courts initially found that Governor Cuomo's orders "suspended" rather than "tolled" statutes of limitations, New York's intermediate appellate courts that have addressed [*11] the issue agree that limitations periods were "tolled," i.e., extended by the length of the tolling period. *See Murphy v. Harris, 210 A.D.3d 410, 177 N.Y.S.3d 559, 2022 WL 16556686, at *1-2 (1st Dep't 2022)*; *Roach v. Cornell Univ., 207 A.D.3d 931, 172 N.Y.S.3d 215, 218 (3d Dep't 2022)*; *Brash v. Richards, 149 N.Y.S.3d 560, 195 A.D.3d 582, 585 (2d Dep't 2021)*. While the language of the executive orders is not perfectly consistent, most use the language of "tolling" rather than "suspension." It is likely that the New York Court of Appeals would agree with the view of the intermediate appellate courts if presented with the issue. *See Dunnegan v. 220 E. 54th St. Owners, Inc., 518 F. Supp. 3d 764, 767-68 (S.D.N.Y. 2021)* ("Absent law from a state's highest court, a federal court sitting in diversity has to predict how the state court would resolve an ambiguity in state law." (citing *Michalski v. Home Depot, Inc., 225 F.3d 113, 116 (2d Cir. 2000)*)).

New York courts have been less clear on when to commence the one-year limitations period for a cause of action that accrued during the tolling period, which ended on November 3, 2020 -- whether on November 3 or November 4, 2020. The better view, and the one adopted by the Appellate Division, First Department, is that the statutes of limitations were tolled up to and including November 3, 2020, and "started to run again *after* November 3, 2020," i.e., on November 4, 2020. *Murphy, 210 A.D.3d 410, 2022 WL 16556686, at *2*. Thus, the limitations period for Plaintiff's claims "started to run" on November 4, 2020, and ended one year later, on November 4, 2021. Other intermediate New [*12] York appellate courts have stated that limitations periods ran (or restarted) from November

2023 U.S. Dist. LEXIS 26876, *12

3, 2020, but the statements in those cases were dicta because the one-day difference did not matter, and those cases are less persuasive than *Murphy*. *See* [Roach, 172 N.Y.S.3d at 218](); [Brash, 195 A.D.3d at 585](). Plaintiff's claims are therefore timely.


### 3. Defamation

The FAC's defamation claim is dismissed for failure to state a claim. Under New York law, the elements of a defamation claim are "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." [*3P-733, LLC v. Tawan Davis, 187 A.D.3d 626, 135 N.Y.S.3d 27, 30 (1st Dep't 2020)*](). Dixon argues that the defamation claim in the FAC should be dismissed both (1) for failure to plead what statements were made, when and to whom, and (2) because Dixon's statements are protected by a qualified privilege. Dixon's motion is granted because, to the extent the FAC adequately alleges the statements at issue, those statements are protected by the common-interest privilege.


### a. Defamation Pleading Standard

Many of the allegedly defamatory statements in the FAC are insufficiently pleaded. In federal court, a plaintiff "must 'identify (1) **[*13]** the allegedly defamatory statements; (2) the person who made the statements; (3) the time when the statements were made; and (4) the third parties to whom the statements were published.'" [*Nouinou v. Smith, No. 20 Civ. 8682, 2021 U.S. Dist. LEXIS 182293, 2021 WL 4340952, at *5 (S.D.N.Y. Sept. 22, 2021)*](). "[P]laintiff need not allege 'the exact time, place and speaker of each defamatory statement'" as required under New York procedural law. [*Wellner v. City of New York, No. 16 Civ. 7032, 2019 U.S. Dist. LEXIS 48257, 2019 WL 1511022, at *2 (S.D.N.Y. Mar. 22, 2019)*](). Those "'state procedural rules do not apply to federal courts sitting in diversity,' and federal courts instead apply the pleading standards set forth in [*Rule 8*]()." [*Nouinou, 2021 U.S. Dist. LEXIS 182293, 2021 WL 4340952, at *5*](); *see* [*Tannerite Sports, LLC v. NBCUniversal News Grp., 864 F.3d 236, 251 n.10 (2d Cir. 2017)*]() (citing [*Kelly v. Schmidberger, 806 F.2d 44, 46 (2d Cir. 1986)*]()). "But the plaintiff must provide enough context for the defendants to defend themselves -- namely, 'an indication' of who made what statements, when, and to whom." [*Wellner, 2019 U.S. Dist. LEXIS 48257, 2019 WL 1511022, at *2*](); *see* [*Tannerite, 864 F.3d at 251 & n.10*]() (noting the importance of fair notice in defamation suits).

With few exceptions, the FAC is too general to meet this federal standard. The FAC alleges that Dixon made various defamatory statements in an email to Plaintiff, and then makes general allegations that Dixon forwarded the email to unspecified Amazon employees at unspecified times. Those allegations are too indefinite to give an "indication" of to whom and when statements were made. The allegations of the FAC that are more specific and potentially sufficient under **[*14]** the lower federal standard are addressed below.


### b. Defamation Qualified Privilege

To the extent the FAC sufficiently alleges when and to whom Dixon published defamatory statements, those statements are protected by the qualified privilege for statements "made by one person to another upon a subject in which both have an interest." [*Liberman v. Gelstein, 80 N.Y.2d 429, 605 N.E.2d 344, 349, 590 N.Y.S.2d 857 (N.Y. 1992)*]() (internal quotation marks omitted); *accord* [*Loughlin v. de Bary, Nos. 22-01948, 22-04110, 2023 N.Y. App. Div. LEXIS 366, 2023 WL 404004, at *1 (1st Dep't Jan. 26, 2023)*](). "This 'common interest' privilege has been applied, for example, to employees of an organization . . . ." [*Liberman, 605 N.E.2d at 349*]() (citation omitted); *accord* [*Richards v. Sec. Res., 187 A.D.3d 452, 133 N.Y.S.3d 12, 14 (1st Dep't 2020)*](). The privilege applies if, "given the relation of the parties and the surrounding circumstances, there is a reasonable ground for supposing an innocent motive for giving the information, and to deprive the act of an appearance of officious intermeddling with the affairs of others." [*Porges v. Weitz, 205 A.D.3d 13, 165 N.Y.S.3d 584, 589 (2d Dep't 2022)*]() (cleaned up) (quoting [*Lewis v. Chapman, 16 N.Y. 369, 375 (1857)*]()). If the privilege applies, it can be "defeated by alleging malice in the making of

the statements." *Keeling v. Salvo, 188 A.D.3d 463, 131 N.Y.S.3d 885, 886 (1st Dep't 2020)* (citing *Liberman, 605 N.E.2d at 349*). The privilege can be vitiated by "malice" either in the constitutional sense of knowledge of or recklessness as to falsity, or the common-law sense of spite or ill will. *Liberman, 605 N.E.2d at 349-50; accord Loughlin, 2023 N.Y. App. Div. LEXIS 366, 2023 WL 404004, at \*2*.

Federal and state courts in New York are split on whether the qualified privilege is an **[\*15]** affirmative defense -- and thus not a basis for dismissal unless clear on the face of the complaint -- or whether Plaintiff must plead facts showing the absence of a privilege. *See Hillel v. Obvio Health USA, Inc., No. 20 Civ. 4647, 2021 U.S. Dist. LEXIS 12253, 2021 WL 229967, at \*6, \*9-10 (S.D.N.Y. Jan. 21, 2021), rev'd on other grounds sub nom. Hillel v. Iqvia, Inc., No. 21-666-cv, 2022 U.S. App. LEXIS 8198, 2022 WL 905852 (2d Cir. Mar. 29, 2022)* (summary order); *Yukos Cap. S.A.R.L. v. Feldman, No. 15 Civ. 4964, 2016 U.S. Dist. LEXIS 125287, 2016 WL 4940200, at \*7 & n.55 (S.D.N.Y. Sept. 14, 2016)*. Even assuming the privilege is an affirmative defense, a defamation claim must be dismissed if facts establishing the privilege appear on the face of the complaint. *See Front, Inc. v. Khalil, 24 N.Y.3d 713, 4 N.Y.S.3d 581, 28 N.E.3d 15, 17 (N.Y. 2015)* (applying privilege to statements in a letter sent by an attorney reasonably in anticipation of litigation).

To the extent the FAC sufficiently alleges any defamatory statements, those statements are privileged. The FAC alleges that, between May 6 and May 15, 2020, Dixon published the allegedly defamatory statements to "HR Regional Director Jennifer Hutt," Amazon or WFM managers "Davie" Cumberland, "Fios," "Steve," "Rachel" and "Phil," and WFM employee "Johanna." However, the FAC alleges that the statements concerned a subject -- Plaintiff's purportedly harassing behavior -- in which Dixon shared an interest with fellow managers, HR professionals, and employees at the stores where Plaintiff worked. *See, e.g., Mancuso v. Allergy Assoc. of Rochester, 70 A.D.3d 1499, 895 N.Y.S.2d 756, 758 (4th Dep't 2010)* (applying qualified privilege to statements that "were communicated to a limited **[\*16]** number of people, all of whom were employees of [defendant] who had worked with plaintiff and who had a legitimate interest in knowing that a serious sanction had been imposed" (cleaned up)); *Richards, 133 N.Y.S.3d at 14* (dismissing statement made between co-employees about employer's conduct); *cf. Harpaz v. Dunn, 203 A.D.3d 601, 162 N.Y.S.3d 732, 732-33 (1st Dep't 2022)* (dismissing statement made between members of a condominium board about another member's conduct). The statements are privileged even though Plaintiff was not employed by the same company as the WFM employees. The FAC alleges that the recipients all either supervised or worked with Plaintiff, and any allegedly harassing behavior was of interest to employees of both companies. *Cf., e.g., Hammond v. Equinox Holdings LLC, 193 A.D.3d 586, 148 N.Y.S.3d 34, 36 (1st Dep't 2021)* (dismissing statement made between coworkers about customer's conduct).

The defamation claim based on these statements is dismissed because the FAC contains no non-conclusory allegations of malice. *See Harpaz, 162 N.Y.S.3d at 733* ("[T]he motion court correctly dismissed the action as foreclosed by defendant's qualified privilege, as plaintiff's allegations of malice on the part of defendant are conclusory."). The FAC "makes no factual allegations to support her contention that defendant knew" the reports she repeated "were false, or that defendant recklessly **[\*17]** disregarded the truth." *Id.; cf., e.g., Keeling, 131 N.Y.S.3d at 886* (finding malice sufficiently pleaded based on "detailed factual allegations about" the defendant's access to information showing the statements to be false). Nor does the FAC allege any factual basis for its conclusory accusations of spite or ill will. *Loughlin, 2023 N.Y. App. Div. LEXIS 366, 2023 WL 404004, at \*2*.

### 4. Tortious Interference

The FAC alleges that Dixon tortiously interfered with Plaintiff's "work contract" with Amazon by getting Plaintiff fired by ordering Plaintiff not to show up for her work shifts. This claim is dismissed for failure to state a claim.

"The elements of tortious interference are a valid contract between plaintiff and another, the defendant's knowledge of the contract and intentional procurement of its breach without justification, and damages resulting therefrom." *Nostalgic Partners, LLC v. N.Y. Yankees P'ship, 205 A.D.3d 426, 168 N.Y.S.3d 444, 447-48 (1st Dep't 2022)*. The FAC does not sufficiently allege a contract between Plaintiff and Amazon. The FAC states, in conclusory fashion, that Plaintiff had an employment contract, but "fails to plead the terms of the alleged underlying contract . . . and

any specific breach thereof." *Bennett v. State Farm Fire & Cas. Co., 137 A.D.3d 731, 26 N.Y.S.3d 554, 555 (2d Dep't 2016)*; *see Lindberg v. Dow Jones & Co. Inc., No. 20 Civ. 8231, 2021 U.S. Dist. LEXIS 151397, 2021 WL 3605621, at *11 (S.D.N.Y. Aug. 11, 2021)*. The FAC also does not allege any damages resulting from the end of her employment, because she had no contractual right to be employed any longer **[*18]** than she was. *Smalley v. Dreyfus Corp., 10 N.Y.3d 55, 882 N.E.2d 882, 884, 853 N.Y.S.2d 270 (N.Y. 2008)* ("In that the length of employment is not a material term of at-will employment, a party cannot be injured merely by the termination of the contract . . . .").

A tortious interference claim by an at-will employee is better pleaded as tortious interference with prospective business relations. In general, "there can be no tortious interference with prospective at-will employment." *Petrisko v. Animal Med. Ctr., 187 A.D.3d 553, 135 N.Y.S.3d 2, 4 (1st Dep't 2020)*; *accord Pezhman v. Chanel, Inc., 126 A.D.3d 497, 2 N.Y.S.3d 792, 792 (1st Dep't 2015)*. Instead, "an agreement terminable at will is classified as a prospective contractual relation only, not an existing contract." *Petrisko, 135 N.Y.S.3d at 4*; *Pezhman, 2 N.Y.S.3d at 792*. This classification creates a limited exception to the general rule that "the employment-at-will doctrine 'cannot be circumvented by casting the cause of action in terms of tortious interference with employment.'" *Sullivan v. Harnisch, 81 A.D.3d 117, 915 N.Y.S.2d 514, 520 (1st Dep't 2010)*, *aff'd, 19 N.Y.3d 259, 969 N.E.2d 758, 946 N.Y.S.2d 540 (N.Y. 2012)*.

The elements of a claim for tortious interference with prospective economic relations are: "(1) that [Plaintiff] had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) that the defendant's interference caused injury to the **[*19]** relationship with the third party." *Stuart's, LLC v. Edelman, 196 A.D.3d 711, 152 N.Y.S.3d 472, 476 (2d Dep't 2021)*. An at-will employee can bring a tortious interference claim if the employee can otherwise satisfy the elements of tortious interference with prospective economic relations, by alleging that "the interference . . . was accomplished by wrongful means or [that] the offending party acted for the sole purpose of harming the other party." *Stuart's, 152 N.Y.S.3d at 476*; *see also Miller v. Livanis, 189 A.D.3d 446, 137 N.Y.S.3d 15, 16 (1st Dep't 2020)*; *Pezhman, 2 N.Y.S.3d at 792*.

Even if Plaintiff's claim were construed as one for tortious interference with prospective business relations, that claim would be dismissed for failure to state a claim. The FAC does not sufficiently allege tortious interference with prospective at-will employment. As an initial matter, the FAC does not sufficiently allege that Dixon is outside of Plaintiff's employment relationship with Amazon, such that Amazon is a "third party." The FAC does not allege that Dixon, as Plaintiff's supervisor, acted "outside of the scope of [her] employment" in directing Plaintiff not to come into work. *Barcellos v. Robbins, 50 A.D.3d 934, 858 N.Y.S.2d 658, 660 (2d Dep't 2008)*. While the FAC alleges that Dixon "had no authority or permission to terminate Plaintiff's employment based on . . . Dixon's Defamatory Statements," it does not allege that Dixon lacked the power in general to fire Plaintiff. **[*20]**

Even assuming Dixon interfered with a third-party relationship between Plaintiff and Amazon, the FAC does not allege that Dixon used "wrongful means" to accomplish the firing. "'Wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference" with prospective contractual relations. *106 N. Broadway, LLC v. Lawrence, 189 A.D.3d 733, 137 N.Y.S.3d 148, 157 (2d Dep't 2020)* (quoting *Guard-Life Corp. v. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 406 N.E.2d 445, 449, 428 N.Y.S.2d 628 (N.Y. 1980)*). The FAC alleges that Dixon told Plaintiff not to come to work -- not that she threatened her, pressured her economically or misled her about the consequences. Nor does the FAC allege facts that plausibly show that Dixon instructed Plaintiff not to come to work "for the sole purpose of harming" Plaintiff, even drawing all reasonable inferences in favor of Plaintiff as the non-moving party.

## 5. Intentional Infliction of Emotional Distress

The IIED claim is dismissed because the FAC fails to allege "extreme and outrageous conduct" sufficient to sustain this cause of action. *Biehner v. City of New York, 19 Civ. 9646, 2021 U.S. Dist. LEXIS 44003, 2021 WL 878476, at*

2023 U.S. Dist. LEXIS 26876, *20

*9 (S.D.N.Y. Mar. 9, 2021) (internal quotation marks omitted). "Extreme and outrageous conduct" is a very high bar. The New York Court of Appeals observed that, "of the intentional [*21] infliction of emotional distress claims considered by this Court, *every one* has failed because the alleged conduct was not sufficiently outrageous." *Chanko v. Am. Broad. Cos. Inc., 27 N.Y.3d 46, 29 N.Y.S.3d 879, 49 N.E.3d 1171, 1179 (N.Y. 2016)* (internal quotation marks omitted). This standard is not met by one allegedly false email vaguely accusing Plaintiff of using racist language, or even by getting Plaintiff fired. *See, e.g., Drimer v. Zionist Org. of Am., 194 A.D.3d 641, 150 N.Y.S.3d 48, 50 (1st Dep't 2021)* ("Here, although plaintiff alleges in a conclusory fashion that defendants engaged in a pattern of harassment that caused him to suffer from anxiety and stress that eventually led to a serious cardiac event, the allegations of abusive conduct directed at plaintiff in the context of his employment do not rise to the level of outrageousness required to state a claim."); *Suarez v. Bakalchuk, 66 A.D.3d 419, 887 N.Y.S.2d 6, 7 (1st Dep't 2009)* ("The conduct challenged here, while extremely offensive and bizarre, does not satisfy the requirement of outrageous conduct . . . ."); *Kaye v. Trump, 58 A.D.3d 579, 873 N.Y.S.2d 5, 6 (1st Dep't 2009)* ("Plaintiff alleges that defendants variously made rude remarks to and about her, commenced two baseless lawsuits and filed a criminal complaint against her, and frightened her and her daughter by attempting to instigate her arrest. This conduct, while not to be condoned, is not 'so outrageous in character, and so extreme in degree, as to go beyond [*22] all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'").

### 6. Negligent Infliction of Emotional Distress

The NIED claim is dismissed for failure to allege breach of a duty of care. *See Xenias v. Roosevelt Hosp., 180 A.D.3d 588, 120 N.Y.S.3d 298, 299 (1st Dep't 2020)* ("The claim was properly dismissed since the allegations do not set forth the breach of a duty of care owed to plaintiff . . . ."). An NIED claim, like other kinds of negligence claims, must be premised on breach of "a duty which could furnish a basis for tort liability." *Derago v. Ko, 189 A.D.3d 1352, 134 N.Y.S.3d 801, 802 (2d Dep't 2020)* (internal quotation marks omitted); *see generally Sheila C. v. Povich, 11 A.D.3d 120, 781 N.Y.S.2d 342, 347 (1st Dep't 2004)* ("The threshold question in any negligence action is whether the alleged tortfeasor owes a duty of care to the injured party . . . ."). Beyond stating in conclusory terms that Dixon acted negligently, "no allegations of negligence appear in the pleadings." *Chiesa v. McGregor, 209 A.D.3d 963, 176 N.Y.S.3d 687, 691 (2d Dep't 2022).*[1]

### B. Plaintiff's Motion for Leave to File the PSAC

### 1. Legal Standard for Leave to Amend

"[C]ourts should 'freely give' leave to amend 'when justice so requires'" but district courts have "considerable discretion to deny amendment" if one of several reasons is present, including "futility of amendment." *Knife Rights, Inc. v. Vance, 802 F.3d 377, 389 (2d Cir. 2015)* (internal quotation marks omitted); *accord Metzler Inv. GmbH v. Chipotle Mexican Grill, Inc., 970 F.3d 133, 147 n.4 (2d Cir. 2020).* "Futility [*23] is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under *Rule 12(b)(6) of the Federal Rules of Civil Procedure.*" *Olson v. Major League Baseball, 29 F.4th 59, 72 (2d Cir. 2022)* (internal quotation marks omitted).

---

[1] The NIED claim might also be dismissed for failure to allege "extreme and outrageous conduct" as with the IIED claim. The New York intermediate appellate courts are split on this issue. *Compare Hammond v. Equinox Holdings LLC, 193 A.D.3d 586, 148 N.Y.S.3d 34, 37 (1st Dep't 2021)* (extreme and outrageous conduct still an element of NIED), *with Taggart v. Costabile, 131 A.D.3d 243, 14 N.Y.S.3d 388, 398 (2d Dep't 2015)* (extreme and outrageous conduct not an element of NIED). The Court of Appeals has suggested that "[c]ontemporaneous or consequential physical harm" could substitute for "extreme outrage and moral blame." *Johnson v. State, 37 N.Y.2d 378, 334 N.E.2d 590, 591-92, 372 N.Y.S.2d 638 (N.Y. 1975); see Ornstein v. N.Y.C. Health & Hosps. Corp., 10 N.Y.3d 1, 881 N.E.2d 1187, 1189, 852 N.Y.S.2d 1 (N.Y. 2008).* The FAC does not plead extreme and outrageous conduct or physical harm.

2023 U.S. Dist. LEXIS 26876, *23

**2. Time-Barred Claims: Defamation, IIED, _NYLL § 740_ and Title VII**

In the PSAC, Plaintiff seeks to add claims for defamation and IIED against Defendants other than Dixon (the "New Defendants"), and to add claims for discrimination and retaliation under Title VII and retaliation under _NYLL § 740_. It would be futile to allow the filing of the PSAC to assert these claims because they do not "relate back" to when the original complaint or the FAC were filed, and they are all time-barred under their respective one-year statutes of limitations.

> _Rule 15(c)(1)(C)_ allows for an amended pleading to relate back to the date of the original pleading if four conditions are met: "(1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, _but for a mistake of identity_, the original action would have been brought against it; and (4) the second and third criteria are fulfilled within the period **[*24]** provided by _Rule 4(m)_ for serving the summons and complaint, and the original complaint was filed within the limitations period.

_Ceara v. Deacon, 916 F.3d 208, 211 (2d Cir. 2019)_ (emphasis added) (cleaned up) (quoting _Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013)_). "_Rule 15(c)_ does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities," and "'John Doe' pleadings cannot be used to circumvent statutes of limitations." _Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 468, 470 (2d Cir. 1995)_; _accord Ceara, 916 F.3d at 213_ (holding that "_Krupski [v. Costa Crociere S. p. A., 560 U.S. 538, 546, 130 S. Ct. 2485, 177 L. Ed. 2d 48 (2010)]_ did not abrogate _Barrow_, which remains the law of this Circuit"). The Complaint and the FAC name Dixon as the sole defendant and challenge only her conduct. The addition of the New Defendants in the PSAC does not relate back.

Plaintiff's defamation, IIED and _NYLL § 740_ claims against the New Defendants are therefore untimely. All three claims have a one-year statute of limitations. _See Smulyan v. N.Y. Liquidation Bureau, 158 A.D.3d 456, 71 N.Y.S.3d 412, 413 (1st Dep't 2018)_ (citing _CPLR § 215(3)_) (one-year statute of limitations for defamation); _Winslow v. New York-Presbyterian/Weill-Cornell Med. Ctr., 203 A.D.3d 533, 161 N.Y.S.3d 775, 776 (1st Dep't 2022)_ (same for IIED); _NYLL § 740(4)_ (2021), _amended by 2021 N.Y. Sess. Laws ch. 522_.[2] The latest of any challenged conduct occurred in May 2020. The statute of limitations started running on November 4, 2020, at the conclusion of the statutory tolling period discussed above, and ended on November 4, 2021.

Any Title VII claim against the New Defendants is also **[*25]** barred because it will have been filed more than 90 days after Plaintiff received the EEOC right-to-sue letter on October 12, 2021. _See Garnes v. ABM Janitorial Servs. Inc., No. 22 Civ. 2078, 2022 U.S. Dist. LEXIS 71357, 2022 WL 1156154, at *2 (S.D.N.Y. Apr. 18, 2022)_ ("[A] Title VII action must be commenced within 90 days of receiving the Notice of Right to Sue . . . ."). Even if such a claim were deemed filed April 20, 2022, when Plaintiff first stated her desire to file a second amended complaint, the claim would be untimely.

It is unnecessary to consider whether Plaintiff's Title VII and _§ 740_ claims against Dixon relate back to the filing of Plaintiff's original complaint, because Dixon is not subject to liability under either statute. _See Sassaman v._

---

[2] The amendment to _§ 740_ in 2021, effective January 26, 2022, to extend the statute of limitations from one year to two years, does not apply. Assuming the statute of limitations on Plaintiff's claims started running on November 4, 2020, the one-year statute of limitations had expired on November 4, 2021, before the longer statute of limitations became effective. Under New York law, any statute that would impact substantive rights, such as by imposing new liability on past conduct, triggers a "presumption against retroactivity." _Regina Metro. Co., LLC v. N.Y. State Div. of Hous. & Cmty. Renewal, 35 N.Y.3d 332, 130 N.Y.S.3d 759, 154 N.E.3d 972, 989-91 (N.Y. 2020)_. "If retroactive application would not only impose new liability on past conduct but also revive claims that were time-barred at the time of the new legislation, we require an even clearer expression of legislative intent than that needed to effect other retroactive statutes -- the statute's text must unequivocally convey the aim of reviving claims." _Id. at 992_. There is no indication in the text of _§ 740_ that New York's legislature intended to revive time-barred claims.

*Gamache, 566 F.3d 307, 315 (2d Cir. 2009)* ("[I]ndividuals are not subject to liability under Title VII." (internal quotation marks omitted)); *accord Accely v. Consol. Edison Co. of N.Y., No. 19 Civ. 5984, 2022 U.S. Dist. LEXIS 60877, 2022 WL 973415, at *5 (S.D.N.Y. Mar. 31, 2022)*; *see also Ulysse v. AAR Aircraft Component Servs., 128 A.D.3d 1053, 10 N.Y.S.3d 309, 310 (2d Dep't 2015)* (holding that an individual supervisor is not an "employer" subject to liability under *NYLL § 740*). Therefore, Plaintiff's proposed addition of Title VII and *§ 740* claims against Dixon also would be futile.

### 3. Tortious Interference

The PSAC includes a claim for tortious interference with contract against New Defendants WFM, Cumberland, and Steve, Phil, Ebrima and Johanna Doe, as well as Defendant Dixon. If the tortious interference claim in the PSAC is construed as a claims for **[*26]** tortious interference with contract, the claim is futile for the same reasons as in the FAC. The PSAC does not contain any non-conclusory allegation that a contract existed, or any allegations about its material terms, including whether Plaintiff was an at-will employee. If the PSAC is construed as pleading tortious interference with prospective contractual relations, that claim is futile for the same reason it would be futile to assert this claim against Dixon. Even assuming all of the Defendants are properly considered third parties to Plaintiff's employment with Amazon, the PSAC does not allege that any of them procured Plaintiff's firing by wrongful means or for the sole purpose of harming Plaintiff.

As discussed above, "wrongful means" means "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure," but it generally only encompasses conduct that is itself "criminal or tortious." *Stuart's, LLC, 152 N.Y.S.3d at 476* (internal quotation marks omitted). A defendant acts solely out of malice only if he was not motivated by "self-interest or other economic considerations." *Bradbury v. Israel, 204 A.D.3d 563, 168 N.Y.S.3d 16, 18-19 (1st Dep't 2022)*.

The PSAC's tortious interference claim arises from Dixon telling Plaintiff not **[*27]** to come to work. The claim against Dixon fails because, while the PSAC alleges that Dixon acted with the intent to get Plaintiff fired, neither the FAC nor the PSAC alleges that Dixon used wrongful means to achieve that end -- such as fraud, misrepresentation or threats -- or did so for the sole purpose of harming Plaintiff. *See Miller, 137 N.Y.S.3d at 16; Pezhman, 2 N.Y.S.3d at 792*. The PSAC could be read to allege that other Defendants misrepresented Plaintiff's behavior to Dixon, but the claim fails against them because the PSAC does not allege facts to support the plausible inference that any of those Defendants intended to or did cause Plaintiff's firing.

The PSAC comes closest to alleging tortious interference on the part of Cumberland. The PSAC alleges that Plaintiff complained to Cumberland about perceived discrimination and harassment by other Amazon and WFM employees, and that Cumberland responded by threatening to email her manager -- Dixon -- to send Plaintiff home. The PSAC alleges that, in an email to Dixon, Cumberland made false statements about Plaintiff having purportedly called Amazon and WFM employees racist. The PSAC alleges that Dixon incorporated the defamatory statements made by Cumberland into the email Dixon **[*28]** sent to Plaintiff. Even assuming Cumberland made misrepresentations about Plaintiff that constitute "wrongful means" or that Cumberland's sole motive was to harm Plaintiff, the PSAC does not allege that Cumberland did anything that caused Plaintiff's firing. The PSAC does not allege that Cumberland's email caused Dixon to tell Plaintiff not to come to work, since the PSAC affirmatively alleges that Dixon knew Cumberland's accusations were false. The PSAC's allegation that Dixon and Cumberland worked "in complicity" is otherwise conclusory.

The PSAC contains no non-conclusory allegations about any other New Defendant's involvement in Plaintiff's firing. The PSAC alleges that Steve and Phil Doe "conspir[ed]" with Cumberland but provides no factual basis for that claim. The PSAC contains no allegations whatsoever about Ebrima or Johanna Doe playing any role in Plaintiff's firing. The PSAC contains no allegations that WFM itself played any role in Plaintiff's firing. Even if WFM might be vicariously liable for the acts of any of its employees, the PSAC's tortious interference claim against those WFM employees fail for the reasons above.

## 4. NIED, Negligent Hiring and Negligent Supervision [*29]

The PSAC asserts several negligence claims, including NIED against all putative Defendants and negligent hiring and supervision against Amazon and WFM. The NIED claim in the PSAC fails, including against the New Defendants, for the same reason as that in the FAC. The PSAC does not allege what duty any Defendant owed to Plaintiff or what duty allegedly was breached. *See Xenias, 120 N.Y.S.3d at 299* (affirming dismissal of NIED claim where complaint failed to allege breach of a duty of care owed to plaintiff). The negligent hiring and negligent supervision claims fail because, to the extent the PSAC specifies what conduct by any Amazon or WFM employee caused Plaintiff's injury, the PSAC does not allege that the employers knew or should have known of the employees' propensity for that conduct. *Waterbury v. N.Y.C. Ballet, Inc., 205 A.D.3d 154, 168 N.Y.S.3d 417, 423 (1st Dep't 2022)* ("A cause of action for negligent hiring and retention requires allegations that an employer knew of its employee's harmful propensities, that it failed to take necessary action, and that this failure caused damage to others.").

## 5. NYSHRL, NYCHRL and *Section 1981* Discrimination

The PSAC asserts, against all Defendants, race, gender and disability discrimination claims under the NYSHRL and NYCHRL, and race discrimination claims under *§ 1981*. Unlike **[*30]** the Title VII claims, these discrimination claims are not time barred. These claims are futile, however, because the PSAC does not sufficiently allege that Plaintiff was fired under circumstances giving rise to an inference of discrimination, that she was treated less well because of a protected characteristic, or that she was denied a reasonable accommodation for a disability.

In all respects that are relevant here, *§ 1981* claims are subject to the same "substantive standards" as Title VII. *See Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004)*; *accord Boncoeur v. Haverstraw-Stony Point Cent. Sch. Dist., No. 20 Civ. 10923, 2022 U.S. Dist. LEXIS 51428, 2022 WL 845770, at *8 (S.D.N.Y. Mar. 22, 2022)*. As discussed in more detail below, the NYCHRL has long been subject to less stringent standards than the federal employment discrimination laws, and since the NYSHRL was amended in 2019, "the standard for [NYSHRL] claims is closer to the standard under the NYCHRL." *Wellner v. Montefiore Med. Ctr., No. 17 Civ. 3479, 2019 U.S. Dist. LEXIS 147844, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019)*. Because the PSAC fails to state a claim under the NYSHRL and NYCHRL, the PSAC fails to state a claim under *§ 1981* a fortiori.

## a. Unlawful Termination

*Section 1981* employment discrimination claims, like Title VII claims, "are analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*." *Ramirez v. Temin & Co. Inc., No. 20 Civ. 6258, 2021 U.S. Dist. LEXIS 183760, 2021 WL 4392303, at *5 (S.D.N.Y. Sept. 24, 2021)* (parallel citations omitted) (citing *Littlejohn v. City of New York, 795 F.3d 297, 307 (2d Cir. 2015)*). Plaintiff bears the burden of establishing a *prima facie* case of discrimination, which requires **[*31]** allegations "that (1) she belonged to a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Id.* Unlike Title VII and the state and city laws, *§ 1981* prohibits only discrimination on the basis of race. *See Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000)*; *accord Bibliotechnical Athenaeum v. Am. Univ. of Beirut, No. 211642-cv, 2022 U.S. App. LEXIS 6208, 2022 WL 710896, at *3 (2d Cir. Mar. 10, 2022)* (summary order).[3]

---

[3] While the elements of a *§ 1981* claim are often stated to require that plaintiffs be members of a racial minority, "the Supreme Court has held that *§ 1981* also applies 'to racial discrimination against white persons.'" *Maynard v. Montefiore Med. Ctr., No. 18 Civ. 8877, 2021 U.S. Dist. LEXIS 21570, 2021 WL 396700, at *5 (S.D.N.Y. Feb. 4, 2021)* (quoting *McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 287, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976)*). The first element is thus no barrier to Plaintiff's claims.

"Under the NYCHRL," and the NYSHRL as amended, Plaintiff need allege only that she "was subject to an unfavorable employment change or treated less well than other employees on the basis of a protected characteristic." _Ayers v. Bloomberg, L.P., 203 A.D.3d 872, 165 N.Y.S.3d 554, 557 (2d Dep't 2022)_. To the extent Plaintiff's discrimination claims rest on alleged discrimination in her firing, the PSAC contains no allegations to support that charge. As discussed below, some of Defendants' actions around Plaintiff's firing may be interpreted as retaliatory, but the PSAC does not allege any facts suggesting that Plaintiff was fired because of her race, gender or disability.

### b. Hostile Work Environment

To plead the elements of a federal claim for hostile work environment, a claim must allege "conduct (1) that is objectively severe or pervasive, that is, conduct that creates an **[*32]** environment that a reasonable person would find hostile or abusive, (2) that the plaintiff subjectively perceives as hostile or abusive, and (3) that creates such an environment because of plaintiff's membership in a protected class." _Tassy v. Buttigieg, 51 F.4th 521, 533 (2d Cir. 2022)_ (cleaned up). "[A] plaintiff must allege that the harassment she experienced was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment," and that she experienced those conditions because of her race. _Ramirez, 2021 U.S. Dist. LEXIS 183760, 2021 WL 4392303, at *7-8_ (cleaned up) (quoting _Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)_).

The NYCHRL and amended NYSHRL are less demanding and require only that a plaintiff allege she was treated "less well" on the basis of a protected characteristic. _See Emamian v. Rockefeller Univ., 971 F.3d 380, 390 (2d Cir. 2020)_ (quoting _Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013)_); _accord Hamburg v. N.Y. Univ. Sch. of Med., 155 A.D.3d 66, 62 N.Y.S.3d 26, 33 (1st Dep't 2017)_. "Under this standard, the conduct's severity and pervasiveness are relevant only to the issue of damages." _Mihalik, 715 F.3d at 110_; _accord Aiken v. MTA N.Y.C. Transit, No. 18 Civ. 11756, 2021 U.S. Dist. LEXIS 167332, 2021 WL 6621579, at *13 (S.D.N.Y. Sept. 2, 2021)_. Nevertheless, a plaintiff must show that "the conduct is caused by a discriminatory motive" and she was "treated less well at least in part because of" a protected characteristic. _Emamian, 971 F.3d at 390_ (quoting _Mihalik, 715 F.3d at 110_); _accord Brown v. Montefiore Med. Ctr., No. 19 Civ. 11474, 2021 U.S. Dist. LEXIS 57179, 2021 WL 1163797, at *8 (S.D.N.Y. Mar. 25, 2021)_. The alleged differential treatment also must "rise above the level of nonactionable petty slights or inconveniences." _O'Rourke v. Nat'l Foreign Trade Council, Inc., 176 A.D.3d 517, 110 N.Y.S.3d 104, 105 (1st Dep't 2019)_.

The PSAC alleges that Plaintiff's coworkers sometimes **[*33]** were hostile toward her and made it more difficult to do her job. The PSAC does not, however, allege circumstances giving rise to an inference of discrimination with respect to anything other than "petty slights or inconveniences." The PSAC contains no non-conclusory allegations of gender bias, and the allegations concerning race and disability discrimination are also insufficient.

The PSAC's allegations to support an inference of race discrimination are almost exclusively that Plaintiff is white and that she had negative interactions with coworkers who are not white. The fact that most of Plaintiff's coworkers were of a different race, and that they did not get along, does not give rise to an inference of race discrimination. _See, e.g., Milledge v. City of Hartford, No. 3:19 Civ. 1104, 2020 U.S. Dist. LEXIS 114201, 2020 WL 3510813, at *3 (D. Conn. June 29, 2020)_ ("Law does not blindly ascribe to race all personal conflicts between individuals of different races . . . ." (internal quotation marks omitted)); _Thompson v. New York City, No. 12 Civ. 8034, 2013 U.S. Dist. LEXIS 172993, 2013 WL 6409326, at *10 (S.D.N.Y. Dec. 9, 2013)_ (collecting cases); _cf. Yusuf v. Vassar Coll., 35 F.3d 709, 714 (2d Cir. 1994)_ (affirming dismissal where plaintiff "offered no reason to suspect" racial bias "other than his assertion that" decision-makers were of a different race). The PSAC alleges one incident in which a coworker allegedly spoke to Plaintiff in Gaelic, apparently making assumptions about **[*34]** Plaintiff's ethnic background. At most, such a comment is a "nonactionable petty slight." _See Mullins v. Consol. Edison Co. of N.Y., No. 13 Civ. 6800, 2015 U.S. Dist. LEXIS 96276, 2015 WL 4503648, at *13 (S.D.N.Y. July 22, 2015)_ (holding that "isolated observation that Plaintiff speaks well" and "sporadic race-based teasing" were insufficient to make out an NYCHRL discrimination claim). Plaintiff's other allegations that other Amazon and WFM employees treated her a

particular way because of her race, and that employees of other races were not treated the same way, are conclusory and insufficient to state a claim.

The PSAC also does not state a claim for disability discrimination under the NYSHRL or the NYCHRL. The PSAC alleges that Plaintiff had open-heart surgery, and as a result was particularly fearful of COVID-19 and diligent about safety protocols. Even if these circumstances amount to a "physical impairment" under state and local law, the PSAC fails to allege any facts giving rise to an inference of discrimination on that basis. *Jacobsen v. N.Y.C. Health & Hosps. Corp., 22 N.Y.3d 824, 988 N.Y.S.2d 86, 11 N.E.3d 159, 166 (N.Y. 2014)*. The PSAC alleges that, on several occasions, people asked Plaintiff to speak louder or indicated they could not hear her because she wore two masks and a face shield. The PSAC does not allege, however, that those people were insincere or mocking Plaintiff in doing so. The PSAC alleges **[*35]**  that many of Plaintiff's coworkers mocked Plaintiff and others for wearing PPE and adhering to COVID-19 safety protocols, not that anybody mocked Plaintiff *because of* her physical impairment.

### c. Failure to Provide a Reasonable Accommodation

Plaintiff's NYSHRL and NYCHRL disability discrimination claims include allegations that Defendants failed to provide her a reasonable accommodation for her alleged disability. The NYCHRL requires employers "to provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job." *N.Y.C. Admin. Code § 8-107(15)(a)*. The NYSHRL also requires reasonable accommodations, meaning "actions taken which permit an employee . . . to perform in a reasonable manner the activities involved in the job or occupation." *N.Y. Exec. Law § 292(21-e)*. The reasonable accommodation claims in the PSAC fail for lack of any allegation that a reasonable accommodation would "enable" or "permit" Plaintiff to perform her job duties. Rather, the PSAC alleges that, by diligently wearing face coverings, Plaintiff was already able and permitted reasonably to perform all essential job functions with no accommodation, until she was fired for unrelated reasons.

### 6. NYSHRL, NYCHRL and *Section 1981* Retaliation

 **[*36]**  Plaintiff asserts claims for retaliation under the NYSHRL, NYCHRL and *§ 1981* against all Defendants. The *§ 1981* retaliation claim would be futile because Plaintiff has not alleged that she opposed a practice prohibited by the federal employment discrimination laws. The NYSHRL and NYCHRL claims would not be futile, however, against some Defendants, under the more liberal standards applicable to retaliation claims under state and local law, and may be pleaded in a second amended complaint.

### a. Legal Standards

"To survive a motion to dismiss on a *Section 1981* retaliation claim," Plaintiff must allege "[i] participation in a protected activity; [ii] that the defendant knew of the protected activity; [iii] an adverse employment action; and [iv] a causal connection between the protected activity and the adverse employment action." *Cadet v. All. Nursing Staffing of N.Y., Inc., No. 21 Civ. 3994, 2022 U.S. Dist. LEXIS 178044, 2022 WL 4584246, at *10 (S.D.N.Y. Sept. 29, 2022)* (internal quotation marks omitted) (quoting *Littlejohn, 795 F.3d at 315-16*). "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as she can establish that she possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *2022 U.S. Dist. LEXIS 178044, [WL] at *11* (cleaned up).

However, "[n]ot every act by an employee in opposition to discrimination is protected. **[*37]**  The opposition must be directed at an unlawful employment practice of an employer." *Small v. City of New York, No. 21 Civ. 1527, 2022 U.S. Dist. LEXIS 21922, 2022 WL 376030, at *8 (S.D.N.Y. Feb. 7, 2022)* (cleaned up) (quoting *Wimmer v. Suffolk Cnty. Police Dep't, 176 F.3d 125, 135 (2d Cir. 1999)*; *see McMenemy v. City of Rochester, 241 F.3d 279, 282-85 (2d Cir. 2001)* (permitting retaliation claim against plaintiff's employer where plaintiff opposed a different employer's

unlawful employment practices). *See generally Cadet, 2022 U.S. Dist. LEXIS 178044, 2022 WL 4584246, at \*10* ("[R]etaliation claims are analyzed in the same manner and under the same tests under both Title VII and *Section 1981*." (citing *Littlejohn, 795 F.3d at 312, 315-16, 320-21*)). "[O]pposing discrimination by co-employees against non-employees is not directed at an unlawful employment practice, and does not constitute protected activity under either Title VII or *Section 1981*." *Butler v. City Sch. Dist. of New Rochelle, No. 19 Civ. 7395, 2020 U.S. Dist. LEXIS 211679, 2020 WL 6639121, at \*2 (S.D.N.Y. Nov. 12, 2020)* (citing *Wimmer, 176 F.3d at 134-35*).

The elements of retaliation under state and city law are similar to those under federal law, with two principal exceptions. Plaintiff must allege that she "participated in a protected activity known to [Defendants], that [Defendants] took an action that 'disadvantaged' [her], and that a causal connection exists between the protected activity and the adverse action." *Zurich Am. Life Ins. Co. v. Nagel, 590 F. Supp. 3d 702, 736 (S.D.N.Y. 2022)* (citing *Cadet-Legros v. N.Y. Univ. Hosp. Ctr., 135 A.D.3d 196, 21 N.Y.S.3d 221, 230 (1st Dep't 2015)*). Plaintiff need not allege an adverse employment action that necessarily would be actionable under federal law, only something "that would be reasonably likely to deter a person from engaging in protected activity." *Benzinger v. Lukoil Pan Ams., LLC, 447 F. Supp. 3d 99, 129 (S.D.N.Y. 2020)*. The scope of "protected **[\*38]** activity" is also broader under state and local law. Retaliation claims can survive under those laws based on retaliation for complaints about discrimination by a non-employer and outside of the employment context. *N.Y. Exec. Law § 296(7)* (prohibiting retaliation by *any person*, not just employers, for opposing discriminatory conduct in a wide range of contexts besides employment, such as public accommodations); *N.Y.C. Admin. Code § 8-107(7)* (same).

### b. Plaintiff's Protected Activity

The PSAC alleges that Plaintiff engaged in protected activity on April 26 and May 1, 2020. First, on April 26, 2020, after what she perceived as hostile interactions with several WFM employees, Plaintiff complained to Cumberland about perceived race discrimination and failure to comply with COVID safety protocols by WFM employees. Second, after her interaction with Cumberland, Plaintiff repeated her complaint to an Amazon telephone reporting hotline and further complained about what she perceived as hostility from Cumberland, a WFM manager. Third, on May 1, 2020, after a WFM employee reacted violently to a request from Plaintiff, she complained to another WFM manager and an Amazon manager, again about both racial discrimination and COVID protocol violations. **[\*39]**

Plaintiff alleges that no one from WFM or Amazon ever followed up about any of her complaints. Shortly thereafter, Dixon told Plaintiff not to come into work, citing Cumberland's accusations that Plaintiff had called WFM employees racist. After Plaintiff stopped coming to work following that email, she ultimately was fired. The PSAC repeatedly alleges that WFM was *not* Plaintiff's employer and that WFM employees, such as Cumberland, were *not* her coworkers.

### c. Viability of Retaliation Claims Based on Plaintiff's Activity

Plaintiff's proposed *§ 1981* retaliation claim would be futile because the PSAC does not allege that Plaintiff opposed "an unlawful employment practice." Rather, the PSAC alleges that she complained about being mistreated by people who were *not* her coworkers or supervisors. WFM employees' alleged practice of mistreating Amazon employees who came to their stores is not an employment practice. Even if Plaintiff's employer retaliated against her for opposing WFM's bad practices, that retaliation would not be actionable under the federal employment discrimination laws. *See Butler, 2020 U.S. Dist. LEXIS 211679, 2020 WL 6639121, at \*2* (citing *Wimmer, 176 F.3d at 134-35*).

Plaintiff's proposed NYSHRL and NYCHRL claims, on the other hand, would not be futile against all **[\*40]** Defendants because those statutes cover more "protected activity." WFM's unlawful practices that Plaintiff opposed are akin to a defendant's mistreatment of any non-employee on the basis of race. The NYSHRL and NYCHRL protect individuals from retaliation by any person in response to opposing discrimination in a wide array of contexts beyond employment, such as public accommodations. *N.Y. Exec. Law § 296(7)*; *N.Y.C. Admin. Code § 8-107(7)*.

While the PSAC does not sufficiently allege discrimination on the basis of race or disability, as discussed above, a plaintiff need not allege independently actionable acts of discrimination to plead a viable retaliation claim. It is sufficient that the PSAC alleges that Plaintiff reasonably and in good faith believed that WFM employees were discriminating against her because of her race. *See*, *e.g.*, *La Porta v. Alacra, Inc., 142 A.D.3d 851, 38 N.Y.S.3d 20, 22 (1st Dep't 2016)* ("A plaintiff need not establish an underlying HRL violation in order to prevail on a retaliation claim, and, based on her allegations, it can be readily inferred that she had a good faith, reasonable belief that the underlying challenged actions violated the law." (cleaned up)).

### d. Liability of Particular Defendants

The PSAC's retaliation claims may be pleaded against some Defendants, but are futile as to **[*41]** others. Under the NYSHRL, "an individual who has an ownership interest in the relevant organization or the power to do more than carry out personnel decisions made by others" is liable as a principal, but under the "aiding and abetting provision, personal liability may be imposed on an individual who does not have such authority, but who also actually participates in the conduct giving rise to the discrimination." *Deveaux v. Skechers USA, Inc., No. 19 Civ. 9734, 2020 U.S. Dist. LEXIS 63356, 2020 WL 1812741, at *5 (S.D.N.Y. Apr. 9, 2020)* (cleaned up) (quoting *Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 57 (2d Cir. 2012)*; *Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004)*). The NYCHRL makes it unlawful "[f]or an employer or an employee or agent thereof, because of [a protected characteristic] . . . to discriminate against such person in . . . terms, conditions or privileges of employment." *N.Y.C. Admin. Code § 8-107(1)(a)*. This creates principal liability for individual defendants who "participate[] in the conduct giving rise to the discrimination claim." *See Feingold, 366 F.3d at 158* (internal quotation marks omitted); *accord Deveaux, 2020 U.S. Dist. LEXIS 63356, 2020 WL 1812741, at *5*. Separately, the NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so." *N.Y.C. Admin. Code § 8-107(6)*.

The NYCHRL also explicitly provides for vicarious liability of employers based on the acts of employees who "exercised managerial **[*42]** or supervisory responsibility." *N.Y.C. Admin. Code § 8-107(13)*. Under the NYSHRL, employers are not liable unless they aid and abet the discrimination. *See Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 819 N.E.2d 998, 1011, 786 N.Y.S.2d 382 (N.Y. 2004)* ("[A]n employer cannot be held liable under state law for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." (cleaned up)); *accord Reynolds v. State, 180 A.D.3d 1116, 119 N.Y.S.3d 266, 269-70 (3d Dep't 2020)*; *Friederick v. Passfeed, Inc., No. 21 Civ. 2066, 2022 U.S. Dist. LEXIS 60743, 2022 WL 992798, at *8 (S.D.N.Y. Mar. 31, 2022)*.

The retaliation claims are not futile against Dixon or Cumberland, who allegedly directly participated in getting Plaintiff fired because of her complaints. The NYCHRL claim also is not futile against Amazon, Prime Now LLC and WFM, because those employers could be vicariously liable for the acts of their managers and supervisors, Dixon and Cumberland.

The NYSHRL claim is futile against the employer Defendants, however, because PSAC contains no allegations that provide a basis for imputing encouragement, condonation or approval of Dixon or Cumberland's acts to their employers. And the retaliation claims against the other Defendants are futile, because the PSAC contains no non-conclusory allegations that the other Defendants played any role in getting Plaintiff fired or engaged in any other retaliatory conduct.

### 7. Breach of the Implied Covenant of Good Faith and [*43] Fair Dealing

Plaintiff's proposed claim of breach of the implied covenant of good faith and fair dealing would be futile. "The implied covenant of good faith and fair dealing between parties to a contract embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of

the contract.'" *Moran v. Erk, 11 N.Y.3d 452, 901 N.E.2d 187, 190, 872 N.Y.S.2d 696 (N.Y. 2008)*; *accord Rad & D'Aprile, Inc. v. Arnell Constr. Corp., 203 A.D.3d 855, 164 N.Y.S.3d 653, 655-56 (2d Dep't 2022)*. The PSAC alleges that Plaintiff's employment created an implied duty to refrain and/or protect her from harassment, discrimination and retaliation, which was breached as described above. Again, while the PSAC asserts that Plaintiff had an employment contract with Amazon and Prime Now, it does not allege any terms of that supposed contract. The most that can be inferred from the fact that Plaintiff went to work is that she had an at-will employment agreement. The PSAC affirmatively alleges that Plaintiff did not have an employment relationship with WFM and does not suggest that Plaintiff had a contract with any Individual Defendant. The implied covenant claim therefore would be futile as to each Defendant either because the PSAC does not allege the existence of a contract, the PSAC does not allege **[*44]** a duty that could be implied in any contract that is alleged and/or the PSAC does not allege breach of any duty that is allegedly implied.

First, the Defendants that are not parties to any alleged contract cannot be liable for breach of a duty purportedly implied in that contract. *Cf. Clervil v. Bellevue, 77 A.D.3d 697, 909 N.Y.S.2d 524, 526 (2d Dep't 2010)* (affirming summary judgment on implied covenant claim because "plaintiff failed to raise a triable issue of fact as to whether the defendants were a party to the contract alleged to have been breached"); *accord Fischkoff v. Iovance Biotherapeutics, Inc., No. 17 Civ. 5041, 2018 U.S. Dist. LEXIS 112839, 2018 WL 4574890, at *7 (S.D.N.Y. July 5, 2018)*; *see also Parlux Fragrances, LLC v. S. Carter Enters., LLC, 204 A.D.3d 72, 164 N.Y.S.3d 108, 123 (1st Dep't 2022)* ("[A] breach of the covenant of good faith and fair dealing is a breach of the contract itself."). The implied covenant claim would therefore be futile against WFM and all of the Individual Defendants.

Second, even assuming the PSAC sufficiently alleges that Plaintiff had at least an at-will employment arrangement with Amazon and Prime Now LLC, an at-will employment contract cannot contain an implied covenant not to fire Plaintiff. *See Barber v. Deutsche Bank Sec., Inc., 103 A.D.3d 512, 961 N.Y.S.2d 39, 41 (1st Dep't 2013)*; *Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 448 N.E.2d 86, 91, 461 N.Y.S.2d 232 (N.Y. 1983)*, *superseded by statute on other grounds*, *NYLL § 740*, *as recognized in Leibowitz v. Bank Leumi Tr. Co. of N.Y., 152 A.D.2d 169, 548 N.Y.S.2d 513 (2d Dep't 1989)*. Thus, the implied covenant claim would be futile against all Defendants to the extent the retaliation and discrimination to which the PSAC refers are Plaintiff's firing.

Third, assuming that **[*45]** even an at-will employment contract contains an implied promise not to create a hostile work environment, making it difficult or impossible for Plaintiff to remain employed, the PSAC does not sufficiently allege a breach of that duty, as discussed above.


### III. CONCLUSION

For the foregoing reasons, Dixon's motion to dismiss is GRANTED, Plaintiff's motion for leave to amend is GRANTED in part and DENIED in part. By March 2, 2023, Plaintiff may file a revised version of the PSAC asserting retaliation claims under the NYSHRL and NYCHRL against Dixon and Cumberland, and under the NYCHRL against Amazon, Prime Now LLC and WFM. If Plaintiff can, in good faith, allege a factual basis for her tortious interference claim that cures the deficiencies identified above -- either pleading that any Defendant used "wrongful means," as defined above, or a factual basis for the assertions about Defendants' states of mind --Plaintiff may replead a revised version of the tortious interference claim in the PSAC. Plaintiff is not granted leave to replead any of her other claims, which she has already had several opportunities to plead sufficiently and for which the PSAC provided no factual basis.

Plaintiff is **[*46]** advised that, because her proposed federal claims are futile, if she elects to replead state-law claims and include Defendants who are citizens of the same state(s) of which Plaintiff is a citizen, the Court will have discretion to remand the case to state court.

The Clerk of Court is respectfully directed to close the motion at Docket Number 37 and close the case.

Dated: February 16, 2023

2023 U.S. Dist. LEXIS 26876, *46

New York, New York

/s/ Lorna G. Schofield

**LORNA G. SCHOFIELD**

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**

152 Misc.2d 909

Supreme Court, New York County, New York,
IAS Part 13.

George H. FOWLER, Pro Se, Plaintiff,

v.

Michael CONFORTI, Defendant.

April 9, 1992.

**Synopsis**

Defamation action was brought against attorney. Upon defendant attorney's motion for summary judgment dismissing the complaint and for imposition of sanctions, and upon cross motion for recusal, the Supreme Court, New York County, Tompkins, J., held that: (1) defamation action against attorney who successfully defended client in underlying action was brought in bad faith in an attempt to harass and retaliate and therefore sanctions in the amount of $10,000 would be imposed, and (2) attorney would be restrained from bringing future lawsuits arising out of, or related to, directly or indirectly an underlying action or its progeny where plaintiff attorney engaged in a pattern of instituting a new meritless action arising out of an aspect of the underlying action after each successive action had been dismissed.

Defendant's motions granted and plaintiff's cross motion denied.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (5)

**[1]    Judges**  🔑  Bias and Prejudice

No basis for recusal was shown in defamation action brought against attorney for allegedly defamatory statement made in oral argument of underlying suit; court's knowledge of underlying suit was based on the papers submitted by counsel for both parties together with the papers on the related actions and no evidence of a lack of impartiality was shown.

**[2]    Libel and Slander**  🔑  Judicial Proceedings

**Libel and Slander**  🔑  Privilege

There is an absolute privilege for defamatory words in the context of a judicial proceeding; in determining the relationship to a judicial proceeding, all doubts as to the pertinence are resolved in favor of the privilege.

**[3]    Libel and Slander**  🔑  Briefs, arguments, and statements of counsel

Attorney's statement, which was made in open court in oral argument of an appeal and which related to a footnote in opposing party's reply brief, was within the absolute privilege for defamatory words in the context of a judicial proceeding.

**[4]    Costs, Fees, and Sanctions**  🔑  Defamation

Defamation action against attorney who successfully defended client in underlying action was brought in bad faith in an attempt to harass and retaliate and therefore sanctions in the amount of $10,000 would be imposed; clarity of the applicability of absolute privilege rule and the inadequate nature of plaintiff's legal research warranted the imposition of sanctions.

**[5]    Injunction**  🔑  Particular cases

Attorney would be restrained from bringing future lawsuits arising out of, or related to, directly or indirectly an underlying action or its progeny where attorney engaged in a pattern of instituting a new meritless action arising out of an aspect of the underlying action after each successive action had been dismissed.

**Attorneys and Law Firms**

**\*\*790    \*909** George Fowler, pro se.

Leahey & Johnson, **\*910** Peter James Johnson, Michael Conforti, New York City, for defendant.

**Opinion**

HAROLD TOMPKINS, Justice:

The imposition of an order restraining an attorney from bringing future lawsuits is an extreme step for a court to take. The circumstances under which such an action is appropriate is the issue before the Court. It arises in the context of spinoff litigation related to a prior action which has been dismissed, two successor lawsuits dismissed and sanctions imposed. The context under which this arises is defendant's motion for summary judgment dismissing the complaint and for the imposition of sanctions. This motion and plaintiff's cross motion for recusal are consolidated for disposition and decided as noted below.

The amended complaint sounds in slander. The purportedly defamatory statement was made by defendant Conforti in oral argument of the action entitled, "*Parks v. Leahey & Johnson* " before the Appellate Division, First Department. Defendant Conforti stated that the Departmental Disciplinary Committee requested him to advise the Appellate Bench that the Committee considered a statement made in a footnote in plaintiff's reply brief to be misleading.

At this point, it is appropriate to set forth the procedural history. The underlying lawsuit entitled, "*Parks v. Greenberg* " involved a claim for property damages that resulted from a fire in the Greenbergs' apartment. Mr. Parks contended that due to the Greenbergs' conduct his apartment below suffered smoke, heat and water damages. This Court granted the Greenberg's motion for summary judgment dismissing the complaint by order dated January 11, 1990. It held that plaintiff failed to controvert the Greenbergs' showing that the fire was caused by an exploding light bulb and a short circuit in the lamp. This Court also ruled that there was no evidence that the Greenbergs delayed notification. The Appellate Division unanimously affirmed this Court's order, 161 A.D.2d 467, 555 N.Y.S.2d 376 (1st Dept.1990). It denied leave to appeal to the Court of Appeals. The Court of Appeals dismissed the attempted as-of-right appeal, 76 N.Y.2d 888, 561 N.Y.S.2d 549, 562 N.E.2d 874 (1990) and denied leave to appeal, 76 N.Y.2d 712, 563 N.Y.S.2d 768, 565 N.E.2d 517 (1990).

After the Appellate Division affirmed this Court's order, but prior to the dismissal of the motion for leave to appeal by the **\*911** Court of Appeals, plaintiff moved to vacate the Court's judgment dismissing the action. The basis for the

vacatur of the judgment **\*\*791** was the purported fraud in that the attorney who notarized the Greenbergs' affidavit had allowed his notary license to lapse. At oral argument on the record on September 17, 1990, this Court inquired of plaintiff whether he had complied with Judicial Law 468– a requirement of biennial registration and the applicable fee payments. Mr. Fowler stated he had not done so. This Court denied the motion to vacate citing as authority the 6–month bar of collateral attacks contained in Executive Law 142–a and imposed sanctions. [1]

Plaintiff then commenced the action entitled, "*Parks v. Leahey & Johnson.* " This action was brought against the law firm representing the Greenbergs based on an expired notary license. These allegations were the identical allegations that the Court had found lacked merit on the motion to vacate on September 17, 1990. The Court dismissed the complaint in *Parks v. Leahey & Johnson* in a decision dictated on the record on October 11, 1990. The Court found that the *Parks v. Leahey & Johnson* action was barred by collateral estoppel and by Executive Law 142–a. It further held that the action was frivolous and imposed sanctions against both Mr. Parks and Mr. Fowler. The Appellate Division by order dated February 11, 1992 unanimously affirmed this Court's dismissal of the complaint. 174 A.D.2d 173, 579 N.Y.S.2d 672. It affirmed the imposition of sanctions but reduced the amount to $1,000.

On March 22, 1991, plaintiff commenced an action in his own name against the experts employed by the Leahey & Johnson law firm in connection with the *Parks v. Greenberg* case. Defendants moved to dismiss and for sanctions. This Court granted the motion on default by order dated September 30, 1991. It denied plaintiff's motion to vacate his default by its decision of January 23, 1992. This Court held that plaintiff had failed to show any legitimate excuse for his default. It also held the claim of a false statement in an affidavit in connection with a prior lawsuit was barred by collateral estoppel and also failed to set forth a cognizable claim. The Court denied the motion to vacate and imposed the maximum sanction permitted by 22 N.Y.C.R.R. 130–1.1.

In his reply brief in the *Parks v. Leahey & Johnson* action, **\*912** plaintiff in response to a comment in Leahey & Johnson's brief wrote that he "believed that this matter (his failure to register and pay the statutory fees pursuant to Judicial Law 468–a and the Departmental Disciplinary Committee's investigation of this failure) has been satisfactorily concluded ..."

At oral argument before the Appellate Division, defendant Conforti stated that he had been requested by staff counsel for the Departmental Disciplinary Committee to inform the Appellate Bench that the Departmental Disciplinary Committee considered this statement misleading. Plaintiff commenced this action for slander identifying this statement as false, malicious and not germane to the merits of the appeal. Defendant Conforti's motion for summary judgment is based on the absolute privilege for statements made by counsel in litigation and based on the statement's truth.

[1]  The Court will first address the plaintiff's cross motion for recusal. Plaintiff cites to the language of the Court in imposing sanctions on him. The Court notes that although the amount of the sanction imposed by it in *Parks v. Greenberg* was reduced on appellate review, the imposition of sanctions and the consequent finding of frivolous behavior were sustained.

Additionally, plaintiff has not set forth any evidence of a lack of impartiality, see *Burdick v. Shearson–American Express, Inc.,* 160 A.D.2d 642, 559 N.Y.S.2d 506 (1st. Dept.1990), app. denied, 76 N.Y.2d 706, 560 N.Y.S.2d 988, 561 N.E.2d 888. *Hinckley v. Resciniti,* 159 A.D.2d 276, 552 N.Y.S.2d 278 (1st. Dept.1990), presents a striking parallel to this action. In that case, an action was brought for defamation based on statements in an attorney's affidavit in **792 support of a motion. After holding that the statements were protected by the absolute privilege adhering to statements made in the underlying litigation, the Appellate Division upheld the denial of the application for recusal.

It noted that no bias or prejudice had been shown and that the IAS Justice's knowledge of the underlying suit based on her reading of the papers filed with the court was not a basis for recusal. Similarly, in this action the Court's knowledge is based on the papers submitted by counsel for both parties together with the papers on the related actions. No evidence of any basis for recusal has been shown. The cross motion for recusal is denied.

[2]  [3]  It is well settled that there is an absolute privilege for defamatory words in the context of a judicial proceeding, id.; *Park Knoll Associates v. Schmidt,* 59 N.Y.2d 205, 464 N.Y.S.2d 424, 451 N.E.2d 182 (1983). The purpose of this absolute privilege is to  *913 protect the official processes of government, *Toker v. Pollak,* 44 N.Y.2d 211, 405 N.Y.S.2d 1, 376 N.E.2d 163 (1978) so that persons may speak freely without any fear of financial hazard or litigation, *Park Knoll, supra,* at 209, 464 N.Y.S.2d 424,

451 N.E.2d 182; *Baratta v. Hubbard,* 136 A.D.2d 467, 523 N.Y.S.2d 107 (1st. Dept.1988). An absolute privilege "confers immunity regardless of motive," *Park Knoll, supra, at 209, 464 N.Y.S.2d 424, 451 N.E.2d 182.* In determining the relationship to a judicial proceeding, all doubts as to pertinence are resolved in favor of the privilege, *Baratta, supra; Grasso v. Mathew,* 164 A.D.2d 476, 564 N.Y.S.2d 576 (3d Dept.1991), app. dismissed, 77 N.Y.2d 940, 569 N.Y.S.2d 613, 572 N.E.2d 54. Defendant Conforti's statement relating to a footnote in plaintiff's reply brief was made in open court in oral argument of an appeal. Reference to the Disciplinary Committee was made also in the transcript on the underlying motion. Defendant Conforti's statement is plainly within the absolute privilege and defendant Conforti's motion for summary judgment must be granted, *Park Knoll, supra; Baratta, supra.*

[4]  At oral argument, plaintiff stated on the record that he had researched the law on this point prior to commencing litigation. He cited *Murphy v. Klein,* 9 N.Y.2d 754, 214 N.Y.S.2d 734, 174 N.E.2d 608 (1961) as providing support for his claim. This decision merely dismissed leave to appeal to the Court of Appeals. The underlying case, *Murphy v. Klein,* 12 A.D.2d 683, 207 N.Y.S.2d 794 (3d Dept.1960) has only been cited for authority once in more than 30 years. To the extent that the case places a restrictive, narrow view on the absolute privilege, it has been, sub silentio, overruled by *Toker, supra* and *Park Knoll, supra. Grasso, supra* illustrates the current longstanding appellate authority for a broad reading of the absolute privilege. Plaintiff had an obligation to undertake a meaningful review of the case law prior to commencing this lawsuit. He could have discovered the above-cited authorities by looking under the same West Key digest numbers under which *Murphy, supra,* is catalogued. Defendant Conforti in his letter of January 22, 1992 clearly placed plaintiff on notice of the absolute privilege and offered him an opportunity to withdraw the action to avoid an application for sanction. Plaintiff failed to avail himself of this opportunity or the opportunity to withdraw his action after being served with defendant Conforti's moving papers. Defendant Conforti's memorandum of law cited the authoritative governing authority that this Court has followed in granting defendant's motion for summary judgment.

The plaintiff's research of the applicable law was grossly  *914 inadequate. The clarity of the applicability of the absolute privilege rule and the inadequate nature of plaintiff's legal research warrant the imposition of sanctions, see *Grasso, supra.* The prior history of the related *Parks v.*

*Greenberg* litigation and its progeny establish the plaintiff's bad faith. This action is an attempt to harass the successful counsel and to retaliate in the form of a meritless lawsuit. Sanctions in the maximum amount of $10,000 to be paid defendant's counsel is warranted, see *Winters v. Gould,* 143 Misc.2d 44, 539 N.Y.S.2d 686 (Sup.Ct., N.Y.Cty.1989).

**\*\*793** **[5]** Finally, the Court must take action addressing the pattern of frivolous behavior of Mr. Fowler. The sanctions imposed by this Court on three prior occasions have failed to deter plaintiff and, accordingly, the Court must impose an additional constraint. Mr. Fowler's pattern consists of instituting a new meritless action arising out of an aspect of *Parks v. Greenberg* action after each successive action has been dismissed. This pattern of frivolous satellite litigation imposes significant unnecessary burdens on the defendants and constitutes an abuse of the judicial process, see *Ultracashmere House, Ltd. v. Kenston Warehousing Corp.,* 166 A.D.2d 386, 561 N.Y.S.2d 561 (1st Dept.1990). The remedy is to enjoin Mr. Fowler from commencing any further actions arising out of, or related to, directly or indirectly, the *Parks v. Greenberg* action or its progeny (noted in the procedural history above) without prior permission of this court, *id.; Schwartz v. Nordstrom,* 160 A.D.2d 240, 553 N.Y.S.2d 684 (1st Dept.1990). Prior to commencing any new action in the courts of this state arising from, or related to, directly or indirectly, the *Parks v. Greenberg* action or its progeny, plaintiff shall present a copy of the proposed new pleading together with a copy of this decision and the order settled thereon to the Ex Parte Motion Office, Room 315 for transmittal to this Court or its designee for authorization, see *Sassower v. Signorelli,* 99 A.D.2d 358, 472 N.Y.S.2d 702 (2d Dept.1984); *Silverman v. Leucadia,* 159 A.D.2d 254, 552 N.Y.S.2d 248 (1st Dept.1990). Equity may enjoin a litigious, vexatious plaintiff to prevent meritless litigation that burdens both defendant and the Court, see *Sassower, supra; Ultracashmere, supra.*

Settle order granting defendant's motion for summary judgment dismissing the complaint denying the cross motion for recusal, granting the motion for sanctions in the amount of $10,000 and imposing the restraining order noted above.

**All Citations**

152 Misc.2d 909, 583 N.Y.S.2d 789

---

## Footnotes

1      The Court referred the plaintiff's failure to abide by the requirement of Judiciary Law 468–a to the Departmental Disciplinary Committee.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by  Arazi v. Cohen Brothers Realty Corporation,  S.D.N.Y.,
March 28, 2022

510 F.Supp.3d 86
United States District Court, S.D. New York.

HC2, INC., Plaintiff,
v.
Andrew DELANEY, Defendant.

20-cv-3178 (LJL)
|
Signed 12/18/2020

**Synopsis**
**Background:** Employer brought action against former
employee, alleging claims of breach of contract and
faithless servant, and employee brought counterclaims
for whistleblower retaliation, breach of confidentiality,
intentional infliction of emotional distress, and abuse of
process. Employer moved to dismiss counterclaims.

**Holdings:** The District Court, Lewis J. Liman, J., held that:

[1] employee failed to state counterclaim for whistleblower
retaliation;

[2] employee failed to state counterclaim for breach of
confidential relationship;

[3] employee failed to state counterclaim for intentional
infliction of emotional distress; and

[4] employee failed to state counterclaim for abuse of process.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (25)

[1]    **Labor and Employment**  🔑 Reporting
       or Opposing Wrongdoing;  Criticism and
       "Whistleblowing"

       At the pleading stage of a claim under New
       York's whistleblower statute, a plaintiff must
       (1) specify that an actual violation occurred,
       and (2) describe how the defendant's activities
       endangered the health and safety of the public.
       N.Y. Labor Law § 740.

       2 Cases that cite this headnote

[2]    **Labor and Employment**  🔑 Protected
       activities

       **Labor and Employment**  🔑 Pleading

       Under New York's whistleblower statute, neither
       the complaint to the employer nor the complaint
       filed in court need identify the actual law,
       rule, or regulation the employer violated, but
       the employee's complaint to the company
       must identify the particular activities, policies
       or practices in which the employer allegedly
       engaged, so that the complaint provides
       the employer with notice of the allegedly
       complained-of conduct. N.Y. Labor Law § 740.

       5 Cases that cite this headnote
       More cases on this issue

[3]    **Labor and Employment**  🔑 Pleading

       Under New York's whistleblower statute, the
       substantive allegations of the complaint must
       allege facts that, if true, would violate a specific
       law, rule or regulation. N.Y. Labor Law § 740.

       1 Case that cites this headnote

[4]    **Labor and Employment**  🔑 Protected
       activities

       Employee failed to allege conduct that violated
       any law, rule, or regulation and, thus, did
       not state counterclaim against employer for
       whistleblower retaliation in violation of New

York law, although employee sent e-mail to employer complaining that employer had permitted several employees to come to work with "flu-like symptoms"; Executive Orders by Governor that pre-dated e-mail did not prohibit conduct of which employee complained, and federal and city agency guidance to which employee pointed to were not laws, rules, or regulations which could give rise to whistleblower claim. N.Y. Labor Law § 740.

4 Cases that cite this headnote
More cases on this issue

**[5]    Administrative Law and Procedure**  🔑  Compliance with rulemaking procedures or other process

For a New York City agency's pronouncement to be a rule with the force and effect of law, it must be adopted in accordance with the rulemaking requirements under the City Administrative Procedure Act.

**[6]    Federal Civil Procedure**  🔑  Motion and proceedings thereon

Employee abandoned, at motion to dismiss stage, counterclaim against employer for retaliation in violation of New York Labor Law (NYLL); employee failed to respond to employer's argument that complaint did not allege that employee made complaint about conduct that he reasonably and in good faith believed violated NYLL or an order of the Commissioner of Labor. N.Y. Labor Law § 215(1).

5 Cases that cite this headnote
More cases on this issue

**[7]    Torts**  🔑  Miscellaneous torts in general

For a breach of confidence claim to be established under New York law, plaintiff must show that the parties either stood in a relationship imposing a duty of trust or confidentiality, or that they entered into an agreement establishing such a confidential relationship.

**[8]    Torts**  🔑  Miscellaneous torts in general

To recover for disclosure of confidential information under New York law, a plaintiff must allege the creation of a confidential relationship and that the defendant, in fact, accepted that relationship; such a relationship may arise either explicitly by contract, or implicitly by the actions of the parties or other circumstances.

**[9]    Labor and Employment**  🔑  Records and confidentiality in general

Employee failed to allege that employer owed him any duty of confidentiality, either by contract or arising from his relationship to it as its employee, and, thus, did not state counterclaim for breach of confidential relationship under New York law; employer did not agree to keep employee's name or identity confidential nor could any such obligation be inferred from employment agreement, and agreement specifically contemplated that information employee provided employer would be shared with third parties including employer's clients.

More cases on this issue

**[10]    Labor and Employment**  🔑  Records and confidentiality in general

Even assuming employer owed employee duty of confidentiality, employee failed to allege that information employer disclosed was confidential or that employer in fact disclosed it and, thus, did not state counterclaim for breach of confidential relationship under New York law; employee's allegations that employer disclosed his status as employee on document review project was merely speculative.

More cases on this issue

**[11]    Torts**  🔑  Publications or Communications in General

Under New York law, to plead a claim for disclosure of confidential information, a plaintiff must allege facts showing that there was

confidential information belonging to him that was disclosed, identify the information, and plead sufficient facts that a reasonable inference can be drawn that the defendant was the source of the information.

**[12]**  **Infliction of Emotional Distress** 🔑 Elements in general

Under New York law, a claim for intentional infliction of emotional distress (IIED) requires: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.

5 Cases that cite this headnote

**[13]**  **Infliction of Emotional Distress** 🔑 Intentional or Reckless Infliction of Emotional Distress; Outrage

Intentional infliction of emotional distress (IIED) is a highly disfavored tort under New York law.

1 Case that cites this headnote

**[14]**  **Infliction of Emotional Distress** 🔑 Extreme or outrageous conduct

To constitute intentional infliction of emotional distress (IIED) under New York law, the conduct alleged must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

6 Cases that cite this headnote

**[15]**  **Infliction of Emotional Distress** 🔑 Termination in general

**Infliction of Emotional Distress** 🔑 Labor and Employment

Employee's allegations that employer allowed disclosure of employee's confidential and personal information to opposing lawyers

and lobbyists without his consent, terminated employee for making public health and safety complaint, filed lawsuit to ruin employee's professional reputation, and posted unsealed resume on public docket, did not state counterclaim against employer for intentional infliction of emotional distress (IIED) under New York law; employee failed to allege either extreme and outrageous conduct or intent to cause, or reckless disregard of substantial probability of causing, severe emotional distress.

4 Cases that cite this headnote
More cases on this issue

**[16]**  **Infliction of Emotional Distress** 🔑 Labor and Employment

**Torts** 🔑 Litigation privilege; witness immunity

Employee could not state counterclaim for intentional infliction of emotional distress (IIED) under New York law based on statements made by employer in course of lawsuit; statements were absolutely privileged and could not form basis of IIED claim.

1 Case that cites this headnote
More cases on this issue

**[17]**  **Torts** 🔑 Litigation privilege; witness immunity

Under New York law, statements made in the course of a lawsuit are absolutely privileged as long as they are pertinent to the subject of the litigation.

1 Case that cites this headnote

**[18]**  **Infliction of Emotional Distress** 🔑 Labor and Employment

Employee failed to state counterclaim for intentional infliction of emotional distress (IIED) under New York law based on receipt of "suspicious" phone call to his hotel room and fact that employer placed him on "do not reuse" blacklist which would preclude him from future document review work, where allegations were

speculative and were not supported by sufficient factual matter.

More cases on this issue

[19]    Process 🔑    Nature and elements in general

To state a claim for abuse of process under New York law, a plaintiff must plausibly allege that the defendant (1) employed regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

5 Cases that cite this headnote

[20]    Process 🔑    Process, what constitutes

Under New York law, institution of civil action by summons and complaint is not legally considered process capable of being abused.

5 Cases that cite this headnote

[21]    Process 🔑    Nature of process in general

Under New York law, "process" is a direction or demand that the person to whom it is directed shall perform or refrain from the doing of some prescribed act.

3 Cases that cite this headnote

[22]    Process 🔑    Misuse of process

Under New York law, there must be an unlawful interference with one's person or property under color of process in order that action for abuse of process may lie; examples of writs which can be so abused include writs of attachment, execution, garnishment, or sequestration proceedings, or arrest of the person, or criminal prosecution, or even such infrequent cases as the use of a subpoena for the collection of a debt.

5 Cases that cite this headnote

[23]    Process 🔑    Misuse of process

Under New York law, the filing of a complaint itself does not constitute the requisite unlawful interference with one's person or property under color of process in order that action for abuse of process may lie; neither does the expense arising from the defense of a lawsuit, which is an insufficient injury to sustain the cause of action.

3 Cases that cite this headnote

[24]    Process 🔑    Pleading

Party cannot state claim for abuse of process under New York law by alleging that lawsuit was filed against it to gain tactical advantage in that or another litigation.

5 Cases that cite this headnote

[25]    Process 🔑    Particular cases

Employee's allegations that employer made outrageous allegations seeking temporary restraining order on default and made false allegations in its pleadings failed to state counterclaim against employer for abuse of process under New York law.

2 Cases that cite this headnote
More cases on this issue

**Attorneys and Law Firms**

**\*89** Michael Nacchio, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Morristown, NJ, Valerie Lisa Weiss, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Madison, NJ, Ronald Robert Rossi, Kasowitz, Benson, Torres LLP, New York, NY, for Plaintiff.

Robert Rotman, Robert Rotman, Esq., New York, NY, for Defendant.

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

**\*90** Plaintiff, Counterclaim-Defendant, HC2, Inc. ("HC2"), moves, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss

the amended counterclaims at Dkt. No. 74 ("Amended Counterclaims") against it filed by Defendant, Counterclaim Plaintiff, Andrew Delaney ("Delaney"). *See* Dkt. Nos. 81 and 82.

For the following reasons, the motion is granted.

## BACKGROUND

The following facts are taken from the answer and the Amended Counterclaims and the documents incorporated therein, and the paragraphs of the complaint that are admitted, all of which are assumed to be true for purposes of this motion only.

Delaney is a New York resident and lawyer admitted to practice in New York. HC2, which also does business under the name Hire Counsel, is a legal staffing agency incorporated in the District of Columbia with its principal place of business in Chicago, Illinois.

From September 30, 2019 to January 3, 2020 and again from February 18, 2020 to March 17, 2020, Delaney worked on an at-will basis for HC2 on a Thai language document review project (the "Project") for a law firm (the "Law Firm") and its client (the "Client"). Dkt. No. 74 ¶ 6. Pursuant to a three-way agreement, dated September 25, 2019, the Law Firm and the Client agreed to retain HC2 to provide attorneys proficient in Japanese and Thai languages to work on the Project, and HC2 agreed to maintain the confidences of the Law Firm and the Client in connection with such project. *Id.*; Dkt No. 45-6. According to Delaney, the Project involved the review of documents related to an investigation of corrupt practices in Thailand. Dkt. No. 74 ¶ 7. Delaney worked on the Project from a document review center in New York City, sitting "several inches away from the other two reviewers in a small office with no windows." *Id.* ¶ 13.

Delaney makes a series of complaints about his treatment during his employment with HC2. On November 28, 2019, he "out of the blue and unexpectedly received a suspicious email to his personal email account from a well-connected, influential tax lawyer whose professional interests were at risk from the investigation." *Id.* ¶ 8. From November 29, 2019 to December 2, 2019, he complained to HC2 and to the Law Firm "about the misuse of his private information and involvement in th[e] document review." *Id.* ¶ 9.

On March 5, 2020, after a State of Emergency had been declared by New York Governor Andrew Cuomo as a result of the Covid-19 pandemic, HC2 sent an email to employees with the subject line "Inform—COVID 19 & Seasonal Flu —Update," stating: "Due to the nature of our business, we will continue to operate all our locations, but continue to take precautionary measures, such as reducing the number of contractors per review room." *Id.* ¶ 14 n.6. But throughout early March, Delaney alleges, HC2 "simply emailed workers to commute with wipes and to watch President Trump's speech on TV" **\*91** and did not reduce the number of contractors per review room. *Id.* ¶ 14. [1]

On March 17, 2020, Delaney came to the office "wearing a mask, latex gloves, and goggles which he bought on his own." *Id.* ¶ 15 n.7. That day and the previous day, he observed three workers at the office with "clear flu-like symptoms." *Id.* ¶ 30.

In the late morning of March 17, 2020, Delaney emailed HC2 and the Law Firm, copying his co-workers, complaining that "workers were coming into the office with flu-like symptoms," and asking "if they could either work remotely or short of that if they could stay at home with pay while still being on document review." *Id.* ¶¶ 15, 30. The email (with redactions) read as follows:

> Dear [representative of the Law Firm] & Hire Counsel: I have been coming in to work during the coronavirus but there are at least 3 people in the office who have flu-like symptoms—coughing, sneezing, runny nose—who are at the office, both yesterday & today. This office is quite a closed environment. Obviously this poses a health risk. I wear a mask and gloves but except for my two [redacted] colleagues others are not.

> 'Patti Ayala' of Hire Counsel HR sent two emails, the first saying that clients in some cases were still requiring us to come into the office but that we employees should make our 'own choice' as to whether we felt like coming into the office or not & the second telling us to listen to the president's speech. Frankly, these emails were extremely unhelpful & seemed to shift the responsibility to the employees.

> We have asked for a remote work option which many other similarly confidential cases & projects have. The agency, the law firm, & the client are [redacted]. I care about the case & doing a good job but do not feel that the working environment is safe. Contrary to HC HR, this is not my problem or merely my perception. I believe we should be

either allowed to work from home or be paid to stay at home. Thank you for your attention.

Dkt. No. 74-2.

Delaney's email was sent at 11:27 a.m. An hour and a half later, at 1:02 p.m., HC2 responded to Delaney's email by stating that remote work was not an option. Dkt. No. 74 ¶ 20. Shortly thereafter, HC2 sent an email to Delaney and the two other Thai language reviewers in the office stating as follows:

Team, we understand and appreciate everyone's concerns regarding the work environment and well-being of those around you. Most importantly, we understand the need for an immediate response regarding remote work. At this time, the client is electing to suspend work on the case in NYC effective immediately. Please note that remote work has not been authorized for this project, as of now. If a decision to re-start the project in NYC is made, we will contact you—directly. We are requesting all team members to gather their belongings and depart the facility in an orderly fashion and exit our environment since the project is effectively ending. You will be compensated for your time today. We will continue to monitor the efforts of Congress in helping to off-set the impact of lost work.

**\*92** We appreciate your efforts and will be back in touch.

Dkt No. 39-4.

Between Delaney's 11:27 a.m. email and HC2's response at 1:02 p.m., HC2 representatives and a Law Firm representative had email correspondence about Delaney's email. Most of the email correspondence is redacted. In a portion attached to the Amended Counterclaims that is not redacted, and that precedes the HC2 email to Delaney and others announcing that work was being suspended in the New York office, an HC2 representative asks a Law Firm representative: "Can we fire him? Just a thought." Dkt. No. 74-2. The exhibits to the Amended Counterclaims do not contain a copy of any email responding to this query.

Delaney and HC2 thereafter disputed the basis and consequences of the Project's suspension and the termination of Delaney's employment. On March 30, 2020, in response to a series of emails from Delaney that "reflect[ed] a misunderstanding about his employment situation and status," Dkt. No. 45-26, HC2 sent an email to Delaney's lawyer, reminding Delaney that he had obligations under his employment agreement and the HC2 employee handbook:

On Friday, March 27, 2020, we received a series of emails from Mr. Delaney that appear to reflect a misunderstanding about his employment situation and status, and we felt it was necessary to address a couple of points that he made in his emails to ensure we have a clear understanding. In his email, he mentioned that he was not an employee of Hire Counsel. While that may currently be true, he certainly was an employee of Hire Counsel while assigned to work on the Wilmer Hale project in New York. Hire Counsel hired him to service its client, Wilmer Hale, and he was paid by Hire Counsel as a W-2 employee. He worked onsite at a Hire Counsel facility using a Hire Counsel computer. His direct supervisor during the project was also a Hire Counsel employee. He was also subject to a Hire Counsel employment agreement, which he had signed, and an employee handbook that he acknowledged.

....

Mr. Delaney was not illegally terminated. Hire Counsel lawfully terminated his employment—and the employment of two other reviewers—when the services performed by Hire Counsel at its New York facility were legitimately suspended by Wilmer Hale due to health concerns over the COVID-19 outbreak.

*Id.*

Two weeks later, on April 15, 2020, Delaney filed a complaint under the pseudonym *John Doe* against the Client and two others in state court in Florida (the "Florida Action"), the state in which Delaney was then residing. Dkt. No. 74 ¶ 25. According to the allegations of HC2's complaint in this action, which Delaney denies, the Florida Action alleged that HC2 had engaged in unlawful business practices and retaliatory termination in connection with the Project.

One week later, HC2 filed its complaint in this action, alleging claims for breach of contract and "faithless servant," and seeking preliminary and permanent injunctive relief. *Id.* ¶ 26; *see* Dkt No. 1. HC2 alleged that the Law Firm had "suspended the Project as the number of COVID-19 infections in New York City was increasing at an alarming rate, while it considered whether, given the highly confidential subject matter of the Project, it wished to continue the Project remotely," Dkt. No. 1 ¶ 3, and that Delaney, apparently disgruntled with that decision, had "set out to manufacture a false claim" that his employment **\*93** had been terminated for his having raised concerns about the potential for exposure

to COVID-19," *id.* ¶ 5. HC2 complained that Delaney, directly and through counsel—but without authorization and in breach of his employment agreement—had emailed the Client, its Chief Executive Officer, and its Board of Directors with the "unfounded accusations" of retaliation, had recited information belonging to the Client that was confidential and subject to the attorney-client privilege, and had "threatened to commence legal action and publicly disclose ... confidential and privilege information about the [Client] that Delaney had obtained during the Project" if Delaney's demand that he be paid $450,000 was not met the next day. *Id.* ¶ 6. HC2 further complained that, after the $450,000 payment was not made, Delaney had followed through on the threat by filing the *John Doe* complaint in the Florida Action which, HC2 alleged, disclosed the Client's confidential and privileged information and information protected by the attorney work-product doctrine. *Id.* ¶ 8. HC2's complaint stated that the contents of the Florida Action "leave no doubt" that Delaney is the *John Doe* plaintiff in the Florida Action. *Id.* ¶¶ 9, 31. HC2 alleged that Delaney's conduct violated his employment agreement with HC2 and the employment rules and policies by which he agreed to be bound. The complaint also alleged that Delaney violated his duties as a member of the New York bar. *Id.* ¶ 1.

On May 22, 2020, HC2 filed a motion for a preliminary injunction. *See* Dkt. No. 43. In support of its application, HC2 submitted the declaration of the Law Firm's General Counsel, Michael R. Heyison, which attached as an exhibit Delaney's resume. *See* Dkt. No. 44-1. The declaration noted that, as of the resume reflected, Delaney was a lawyer admitted to practice in the State of New York, who had graduated from Harvard Law School and named a prominent New York law firm as one with which he had been associated. *Id.* In its memorandum in support of the motion for a preliminary injunction, HC2 argued that both directly as a member of the Bar of the State of New York and as a matter of his employment agreement pursuant to which he agreed to comply with the rules of the Bar of New York, Delaney was bound to keep the confidences of HC2, the Client, and the Law Firm, and that he had violated those obligations.

## PROCEDURAL HISTORY

This action was commenced on April 22, 2020 by HC2, alleging claims of breach of contract and faithless servant against Delaney. Dkt. No. 1. [2] Delaney filed his answer **\*94** and first set of counterclaims on May 13, 2020. Dkt. No.

26. He asserted nine counterclaims: fraudulent inducement, fraudulent misrepresentation, whistleblower retaliation in violation of N.Y. Lab. L. ("NYLL") §§ 740 and 215, breach of a confidential relationship, intentional infliction of emotional distress, invasion of privacy under N.Y. Civ. Rights L. §§ 50 and 51, failure to pay New York sick leave, defamation per se, and abuse of process.

On June 3, 2020, HC2 moved to dismiss the first set of counterclaims. Dkt No. 61.

The Court granted HC2's motion and dismissed the counterclaims without prejudice by opinion and order delivered orally and on the record on July 17, 2020. *See* Dkt. No. 76. In brief, the Court dismissed the claims for fraudulent inducement and fraudulent misrepresentation for failure to satisfy the pleading requirements of Fed. R. Civ. P. 9(b). The counterclaims failed to identify who made the alleged fraudulent statements, where and when they were made, and who was responsible for any omission and the context of such omission. *Id.* at 3-4. The Court dismissed the claim for whistleblower retaliation because Delaney did not allege any activity, policy, or practice of HC2 that was in violation of any law, rule, or regulation. The Court noted the existence of state court decisions holding that, as a matter of state pleading, a complaint for illegally terminating a whistleblower need not identify the specific law, rule, or regulation that the employer has violated, but the Court ruled that the counterclaim failed even to identify facts that would violate a law, rule or regulation. *Id.* at 4-5. The Court dismissed the claim under NYLL Section 215, which addresses complaints about conduct that the employee reasonably and in good faith believes violates a provision of the labor laws or order of the Commissioner of Labor, because Delaney did not allege HC2's conduct violated any specific provision of the NYLL. *Id.* at 5. The Court dismissed the counterclaim for breach of a confidential relationship because Delaney did not allege any facts to support the claim that HC2 had disclosed confidential information in violation of a duty to Delaney. *Id.* at 6. The Court also dismissed Delaney's counterclaim for intentional infliction of emotional distress. Delaney alleged that HC2 intentionally inflicted emotional distress on him by disclosing his name and that he was working on the Project and by the statements it made in this litigation. The Court ruled that the claim based on the alleged unlawful disclosure was conclusory and that the claim based on statements in this litigation sought to make tortious conduct that was protected by the litigation privilege. *Id.* at 6. The Court dismissed the counterclaim for invasion of privacy in violation of N.Y. Civ.

Rights L. §§ 50 and 51 as too general and conclusory to support a claim for relief. *Id.* It dismissed the claim for the failure to pay unpaid sick leave under [N. Y. Lab. L. § 196-B](#) on the grounds that such provision did not take effect until September 30, 2020—after Delaney's termination. *Id.* at 7. It dismissed the claims for defamation and abuse of process because those claims were based solely on HC2's statements in this litigation, which are subject to an absolute litigation privilege. *Id.*

The Court granted Delaney leave to replead if he believed in good faith he could state a claim for relief. *Id.* at 8.

**\*95** Delaney filed his amended answer and the Amended Counterclaims on July 31, 2020. Dkt. No. 74. In his Amended Counterclaims, Delaney alleges four claims for relief that echo those in his earlier pleading: whistleblower retaliation, breach of confidentiality, intentional infliction of emotional distress, and abuse of process. He has dropped his claims for fraudulent inducement, fraudulent misrepresentation, invasion of privacy, failure to pay New York sick leave, and defamation.

HC2 moved to dismiss the Amended Counterclaims on August 17, 2020. Dkt. No. 81. Delaney opposed on August 31, 2020. Dkt. No. 89. HC2 filed its reply brief on September 8, 2020. Dkt. No. 91.

### LEGAL STANDARD

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *[Town & Country Linen Corp. v. Ingenious Designs LLC](#)*, [2020 WL 3472597, at \*4 (S.D.N.Y. June 25, 2020)](#) (citing *[Orientview Techs. LLC v. Seven For All Mankind, LLC](#)*, [2013 WL 4016302, at \*2 (S.D.N.Y. Aug. 7, 2013)](#)). To survive a motion to dismiss pursuant to [Fed. R. Civ. P. 12(b)(6)](#) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *[Ashcroft v. Iqbal](#)*, [556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)](#) (quoting *[Bell Atlantic Corp. v. Twombly](#)*, [550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)](#)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *[Twombly](#)*, [550 U.S. at 555, 557, 127 S.Ct. 1955](#). The ultimate question is whether "[a]

claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *[Iqbal](#)*, [556 U.S. at 678, 129 S.Ct. 1937](#). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *[Id.](#)* at 679, [129 S.Ct. 1937](#). Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *[Twombly](#)*, [550 U.S. at 556, 127 S.Ct. 1955](#); *see also [Matrixx Initiatives, Inc. v. Siracusano](#)*, [563 U.S. 27, 46, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011)](#).

### DISCUSSION

#### A. Whistleblower Retaliation in Violation of NYLL Sections 740 and 215

In Count One, Delaney alleges that HC2 violated NYLL §§ 740 ("Section 740") and 215 ("Section 215") by terminating his employment after he complained about HC2's handling of the Covid-19 pandemic. Specifically, he alleges that he was terminated because of the complaints contained in his March 17, 2020 email and for criticizing HC2's human resources department. Dkt. No. 74 ¶ 22. Delaney also alleges the instant lawsuit was filed in retaliation for his complaints.

**[1]** Section 740 provides, in relevant part, that "[a]n employer shall not take any retaliatory personnel action against an employee because such employee ... discloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of the employer that is in violation of law, rule or regulation which violation creates and prevents a substantial and specific danger to the public health or safety." [N.Y. Lab. L. § 740](#). Thus, "[a]t the **\*96** pleading stage, a plaintiff must (1) specify that an actual violation occurred, and (2) describe how the defendant's activities endangered the health and safety of the public." *[Semeraro v. Woodner Co.](#)*, [2018 WL 3222542, at \*6 (S.D.N.Y. July 2, 2018)](#); *see also [Barker v. Peconic Landing at Southold, Inc.](#)*, [885 F. Supp. 2d 564, 569-70 (E.D.N.Y. 2012)](#) ("To maintain an action under [Section 740](#), an employee must plead and prove that the employer engaged in an activity, policy, or practice that constituted an actual violation of law, rule, or regulation.") (internal citations and quotations omitted).

**[2]** **[3]** Under [Section 740](#), neither the complaint to the employer nor the complaint filed in court need identify the

actual law, rule, or regulation the employer violated, but "the employee's complaint to the company must 'identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the allegedly complained-of conduct.' " *Tonra v. Kadmon Hldg's, Inc.*, 405 F. Supp. 3d 576, 586 (S.D.N.Y. 2019) (quoting *Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 23 N.Y.3d 448, 992 N.Y.S.2d 163, 165, 15 N.E.3d 1172 (2014)). Moreover, the substantive allegations of the complaint must allege facts that, if true, would violate a specific law, rule or regulation. *See Webb-Weber*, 992 N.Y.S.2d at 166, 15 N.E.3d 1172 (sustaining complaint where "[t]he substantive allegations in the complaint ... sufficiently support plaintiff's allegation that defendants violated various laws, rules or regulations"); *see also Ulysse v. AAR Aircraft Component Servs.*, 188 A.D.3d 760, 131 N.Y.S.3d 609, 610 (2020) (granting summary judgment where "the incidents forming the subjects of the plaintiff's complaints did not involve any actual violation of a law, rule, or regulation"); *Kamdem-Ouaffo v. Pepsico, Inc.*, 133 A.D.3d 825, 21 N.Y.S.3d 150, 151 (2015) (affirming summary judgment for defendant where communications did not involve actual violations of law or regulation); *Tomo v. Episcopal Health Servs., Inc.*, 85 A.D.3d 766, 925 N.Y.S.2d 563, 566 (2011) (dismissing complaint where threatened conduct was not consummated because "there was no actual violation of any law, rule or regulation"); *Khan v. State Univ. of N.Y. Health Sci. Ctr. at Brooklyn,* 288 A.D.2d 350, 734 N.Y.S.2d 92, 93 (2001) (same); *Perez v. G&P Auto Wash Inc.* 930 F. Supp. 2d 423, 437 (E.D.N.Y. 2013) (granting summary judgment where plaintiff failed to offer evidence of an activity that violated any law or regulation); *Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 268 (S.D.N.Y. 2001) ("New York's Whistleblower Act provides New York employees with a limited protection for a carefully-defined category of whistleblowing activity: reporting violations of any law, rule or regulation which 'creates and presents a substantial and specific danger to the public health or safety.' ") (citing NYLL § 740(2)(a)). [3]

**\*97**  **[4]**  Delaney's allegations fail to state a claim under Section 740. Delaney bases his claim on his March 17, 2020 email to HC2 complaining that HC2 had permitted several employees to come to work with "flu-like symptoms," noting that his workplace was a "closed environment," and requesting the opportunity to "work from home or be paid to stay at home." Dkt. No. 74-1. Delaney claims that the conduct that was the subject of his March 17, 2020 email violated executive orders by Governor Cuomo's declaring a State of

Emergency and instructing certain categories of employers to observe certain safety measures, *id.* ¶ 11; guidance issued by the New York City Health Department ("NYCHD") to New York employers that they should promote physical distancing and send home immediately workers who arrive sick or become sick at work ("NYCHD Guidance"), *id.* ¶ 36; and interim guidance of the federal Centers for Disease Control and Prevention ("CDC") that indicate that employers "are responsible for providing a safe and healthy workplace" and should "separate[e] sick employees" ("CDC Guidance"), *id.* ¶ 37.

Drawing all reasonable inferences in favor of Delaney, the complaint nevertheless fails to allege conduct that, at the time, violated any law, rule or regulation. The only Executive Orders by Governor Cuomo that pre-dated Delaney's March 17, 2020 email (i.e., the only Executive Orders that could possibly have been the basis of Delaney's complaint and HC2's alleged retaliation) are Executive Order No. 202, issued on March 7, 2020, and Executive Order 202.4, issued on March 16, 2020. Neither Executive Order prohibited the conduct of which Delaney complained or established any requirements for employers to bar employees who appeared to be sick from coming to work or to offer work from home options. Executive Order 202 declared a state of emergency, but it said nothing of what precautions employers should be taking. *See* Dkt. No. 95-8; N.Y. Exec. Order 202 (March 7, 2020), *available at* https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york. Executive Order 202.4 was directed to local governments and political subdivisions. It required "[a]ny local government or political subdivision ..., effective March 17, 2020, [to] allow non-essential personnel ... to be able to work from home or take leave without charging accruals." N.Y. Exec. Order 202.4 (March 16, 2020), *available at* https://www.governor.ny.gov/news/no-2024-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency. The Executive Order was not addressed to private employers and did not require such employers to offer a work from home option or make it illegal for them to permit employees with flu-like symptoms to come into work. *See Tonra*, 405 F. Supp. 3d at 587 (dismissing complaint where conduct did not violate a law, rule or regulation); *Semeraro*, 2018 WL 3222542, at *6 (dismissing complaint where plaintiff did not properly plead that an actual violation occurred); *Klein v. Metropolitan Child Servs., Inc.*, 100 A.D.3d 708, 954 N.Y.S.2d 559, 561 (2012) ("There must

be an actual violation of a law, rule or regulation" to make out a claim under NYLL § 140).[4]

The guidance of the NYCDH and CDC to which Delaney points also are not laws, **\*98** rules, or regulations the violation of which can give rise to a New York whistleblower claim. For an activity, policy, or practice to come within the ambit of Section 740, it must "violat[e] ... a law, rule or regulation." N.Y. Lab. L. § 740(2)(a). Section 740(1)(c) defines "law, rule or regulation" to "include[e] any duly enacted statute or ordinance or any rule or regulation promulgated pursuant to any federal, state or local statute or ordinance." N.Y. Lab. L. § 740(1)(c).

In Segarra v. Fed. Reserve of New York, another court in this District addressed a similar question of whether federal agency guidance could be the predicate for a federal whistleblower retaliation claim pursuant to a federal law, 12 U.S.C. § 1831j, which prohibits banking agencies from, inter alia, terminating employees for providing information regarding "any possible violation of any *law or regulation* ..." 12 U.S.C. § 1831j(a)(2) (emphasis added). The court noted that "[a] 'central distinction' in administrative law is between those agency pronouncements that amount to 'substantive rules' and those that are merely 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.' " *Segarra v. Fed. Reserve of New York*, 17 F. Supp. 3d 304, 311 (S.D.N.Y. 2014), aff'd, 802 F.3d 409 (2d Cir. 2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 301, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)). The Segarra court explained:

> The former category of agency actions creates new obligations or rights, *N.Y. Emps.' Ret. Sys. v. S.E.C.*, 45 F.3d 7, 12 (2d Cir. 1995); must be subjected to the Administrative Procedure Act's notice-and-comment procedures, see 5 U.S.C. § 553(b)-(d); and carries the force of law, *N.Y. Emps.' Ret. Sys.*, 45 F.3d at 12. The latter category—of interpretative rules and general policy statements— merely clarifies existing law, see id.; need not undergo notice and comment, see 5 U.S.C. § 553(b)(3)(A); and "lack the force of law," *Christensen v. Harris*

*County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

Id. at 311. The Segarra court thus concluded that agency guidance was not subsumed within "law or regulation" under 12 U.S.C. § 1831j. Id. at 312.

**[5]** A similar analysis applies here. Delaney has offered no reason to suspect that the New York legislature in passing Section 740 had a different view of a law, rule, or regulation than Congress had in mind when it referred to a "law or regulation." The guidance issued by the NYCDH and CDC are plainly not "duly enacted statute[s]." See N.Y. Lab. L. § 740(1)(c). Neither are they "rule[s] or regulation[s] promulgated pursuant to any federal, state or local statute or ordinance." See id. Under federal law, as noted in Segarra, substantive rules that carry the force of law are "subjected to the Administrative Procedure Act's notice-and-comment procedures." Segarra, 17 F. Supp. 3d at 311; see 5 U.S.C. §§ 553(b)-(d). Similarly, "[f]or a New York City agency's pronouncement to be a rule with the force and effect of law, it must be adopted in accordance with the rulemaking requirements under the City Administrative Procedure Act." *1700 York Assocs. v. Kaskel*, 182 Misc.2d 586, 701 N.Y.S.2d 233, 240 (Civ. Ct. 1999) (collecting cases); see N.Y.C. Charter §§ 1041–46. Neither the CDC Guidance nor the NYCDH Guidance was promulgated pursuant to the relevant administrative procedure act that govern federal and city regulations respectively.

Significantly, Delaney has not alleged, nor do the documents themselves reflect, that the NYCHD or the CDC purported to interpret some rule or regulation with force of law capable of being violated when **\*99** they promulgated their respective guidances. The NYCDH Guidance to which Delaney points comes in the form of answers to frequently asked questions regarding the 2019 novel coronavirus for businesses and employers. See Dkt. No. 95-2. It contains recommendations for steps employers can take to prevent the spread of Covid-19. Those steps include that an employer should: recommend that employees who have "symptoms of an acute respiratory illness" stay home "until they no longer have a fever," "[e]ncourage employees to get the flu vaccine," "[e]mphasize and encourage healthy hygiene habits and etiquette," "[e]ncourage employees who are sick to stay home and seek medical care if needed," "[s]eparate employees who are sick," and "[m]ake sure [that their] work policies are flexible and consistent with public health guidelines." Id.

at 2. HC2's activity on March 16 and 17, 2020 arguably was inconsistent with the recommendation that employees who were sick should be separated or encouraged to stay at home and that an employer should have flexible work policies. The guidance, however, was just that—guidance, in the form of recommendations. However prudent it may have been to follow the guidance, the guidance itself did not create any legally binding obligations that could have been violated, even by its own terms. It did not require employers to separate employees who were sick any more than it required them to encourage employees to get the flu vaccine. And it did not require them to permit a work-from-home option or make it illegal for employers to suspend a project rather than permitting employees to work on it from home.

The CDC Guidance was issued on March 2, 2020, under the title "Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus." Dkt. No. 95-5. It was based on what was "currently known" about Covid-19 and pointed out "[m]uch is unknown about how the virus that causes Covid-19 spreads." *Id.* It contained guidance, or recommendations, to "help prevent workplace exposures to acute respiratory illnesses, including COVID-19, in non-healthcare settings." *Id.* The CDC Guidance contained "Recommended strategies for employers to use now." *Id.* Like the NYCDH Guidance, the CDC Interim Guidance contained the "CDC recommend[ation] that employees who appear to have acute respiratory illness (i.e. cough, shortness of breath) upon arrival to work or become sick during the day should be separated from other employees and be sent home immediately," that "[s]ick employees should cover their noses and mouths with a tissue when coughing or sneezing (or an elbow or shoulder if no tissue is available)," and that an employer should "[a]ctively encourage sick employees to stay home." *Id.* It also recommended that employers "[t]alk with companies that provide your business with contract or temporary employees about the importance of sick employees staying home and encourage them to develop non-punitive leave policies." *Id.* Those "strategies," however, were stated to be recommendations. They constituted advice that the CDC "commend[ed] to the attention of [employers] as reputable, worthy, or desirable." American Heritage Online Dictionary (defining "recommend"), *available at* https://ahdictionary.com/word/search.html?q=recommend. They were not mandates or dictates, did not constitute laws, rules, or regulations, and did not admit of violations.

Moreover, neither Delaney's March 17, 2020 email nor the complaint itself alleges conduct by HC2 that, if true, would contradict CDC Guidance. In particular, the complaint did not allege that employees were coming into work with acute respiratory **\*100** illnesses or that those employees who were sick and coughing or sneezing were failing to cover their noses and mouths with a tissue. And the CDC Guidance did not require employers to offer work-from-home options. Indeed, and to the contrary, it appeared to recognize that employers might need to have employees work at the office and should only, when that was not possible, offer non-punitive leave policies. Thus, even if Delaney's employment was terminated because of his complaint that HC2 was allowing employees with flu-like symptoms to come to work and that HC2 had not offered a work-from-home option, that complaint did not trigger rights for Delaney under Section 740 based on a violation of the CDC Guidance or make his subsequent termination illegal.

Delaney also alleges a violation of Section 215. That provision prohibits an employer from "discharge[ing], threatening, penalizing, or in any other manner discriminat[ing] or retaliate[ing] against any employee (i) because such employee has made a complaint to his or her employer ... that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of [the NYLL] or any order issued by [the Commissioner of Labor]." N.Y. Lab L. § 215(1).

**[6]** Delaney, however, fails to respond to HC2's argument that the complaint does not allege that Delaney made a complaint about conduct that he reasonably and in good faith believed violated the New York Labor Laws or an order of the Commissioner of Labor. Thus, the Court deems the claim to be abandoned. *See Youmans v. Schriro,* 2013 WL 6284422, at *5 (S.D.N.Y. Dec. 3, 2013) ("A plaintiff's failure to respond to contentions raised in a motion to dismiss claims constitutes an abandonment of those claims.") (collecting cases). Even if it were not abandoned, it would not state a claim for relief. The complaint does not allege that Delaney made a complaint about a violation of the New York Labor Laws or an order of the Commissioner of Labor. *See Copantilla v. Fiskardo Estiatorio Inc.,* 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011) (to state a claim for retaliation under NYLL Section 215, a plaintiff must allege that "while employed by the defendant, [he] made a complaint about the employer's violation of [NYLL] and, as a result, was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action"); *Kassman*

*v. KPMG LLP*, 925 F. Supp.2d 453, 472 (S.D.N.Y. 2013) (dismissing a claim under Section 215 because the alleged complaints did not "ris[e] to the level of specificity to state a retaliation claim under ... the New York Labor Law"); *Robledo v. No. 9 Parfume Leasehold*, 2013 WL 1718917, at *9 (S.D.N.Y. Apr. 9, 2013) (dismissing a Section 215 claim where plaintiff did not "[make] a complaint—to anyone—by which she indicated that she had any good-faith belief that Defendants had violated any provision of the NYLL or any order of the Labor Commissioner").

### B. Breach of a Confidential Relationship

Delaney alleges in Count Two that HC2 breached their confidential relationship by publicly disclosing his confidential information without his authorization. The alleged confidential information that Delaney alleges was disclosed consists of Delaney's name, resume, status as an employee working on the Project, and identity as the *John Doe* plaintiff in the Florida Action.

Specifically, Delaney complains that HC2 "misused information about him" based upon the call that he purportedly received on November 28, 2019 "from a well-connected influential tax lawyer **\*101** whose professional interests were potentially at risk from the investigation." Dkt. No. 74 ¶ 47. Delaney asserts that "[t]he only way these individuals in Thailand could have known about Delaney's work on this review was by a disclosure from it." *Id.* ¶ 47. He also complains that HC2 exposed him as the *John Doe* in the Florida Action by its allegations in the complaint in this action. *Id.* ¶¶ 48. Finally, Delaney complains that on May 22, 2020, HC2 violated his confidence and the protective order, Dkt. No. 22 ("Protective Order"), by publicly filing Delaney's resume on the public docket as an exhibit in support of HC2's motion for a preliminary injunction. *Id.* ¶ 57.

**[7]  [8]**  Delaney does not properly allege that HC2 owed him a duty of confidentiality, that he had a protectable interest in the confidentiality of his name, and that he was working on the Project or that HC2 disclosed that he was working on the Project. "For a breach of confidence claim to be established, plaintiff must show that the parties either stood in a relationship imposing a duty of trust or confidentiality, or that they entered into an agreement establishing such a confidential relationship." *Stewart v. World Wrestling Fed'n Entm't, Inc.*, 2005 WL 66890, at *4 (S.D.N.Y. Jan. 11, 2005). To recover for disclosure of confidential information, a plaintiff must allege the creation of a confidential relationship and that the defendant, in fact, accepted that relationship. *See id.* ("Courts will find a duty not to reveal confidential information only when the recipient has accepted the confidential relationship.") (citing *Smith v. Weinstein*, 578 F. Supp. 1297, 1307 (S.D.N. Y 1984)). "Such a relationship may arise either explicitly by contract, or implicitly by the actions of the parties or other circumstances." *Id.* (citing *Klein v. Ekco Prods. Co.*, 135 N.Y.S.2d 391, 395-96 (Sup. Ct. 1954)). [5]

**[9]**  Delaney, however, has not pled that HC2 owed him any duty of confidentiality, either by contract or arising from his relationship to it as its employee. Pursuant to his employment agreement with HC2, Delaney assumed certain obligations of confidentiality toward HC2, the Law Firm, and the Client. Under the Employment Agreement, Delaney agreed "not to divulge any confidential information ... obtained in the course of any assignment with an HC[2] client to which Attorney has provided temporary services under this Agreement as described in Exhibit A, attached hereto and made a part hereof." Dkt. No. 1 ¶ 37. Pursuant to the NDA, Delaney also assumed certain confidentiality obligations. *Id.* ¶ 38. The obligations, however, were not reciprocal. HC2 did not agree to keep his name or identity confidential. Nor can any such obligation be inferred from the agreement. Indeed, the opposite inference obtains. Delaney was being retained by an employment agency on a document review project of an investigation conducted by a law firm involving the law firm's client. Contrary to Delaney's conclusory assertion that "HC2 never had the right to disclose anything about Delaney to third parties," Dkt. No. 74 ¶ 47, Delaney had no reason to expect that HC2, **\*102** or those with whom HC2 was in privity, would necessarily keep his identity and work on the Project confidential. HC2's employment agreement with Delaney specifically contemplated that the information Delaney provided HC2 would be shared with third parties including HC2's clients. It stated, "HC[2] is in the business of providing attorneys, paralegals, and other legal professionals ('Contract Professional(s)') ... to satisfy the short-term and long-term staffing needs of its third party clients," and further that "HC[2]'s clients may accept or reject Contract Professional [sic] referred to them by HC[2] for any reason or no reason." Dkt. No. 45-1. Although Delaney avers that the Client wanted to keep the investigation it was conducting confidential, he has alleged no facts to support that if, and when, the Client decided it was in its interest to disclose the investigation, it would be precluded from doing so or precluded from mentioning Delaney's name and his work on the investigation. It would have been unreasonable for Delaney to assume otherwise.

**[10]**    **[11]** Moreover, even assuming HC2 owed some undefined obligation of confidentiality, there is no well-pled allegation that the information Delaney contends was disclosed was confidential or that HC2 in fact disclosed it. To plead a claim for disclosure of confidential information, a plaintiff must allege facts showing that there was confidential information belonging to him that was disclosed, identify the information, and plead sufficient facts that a reasonable inference can be drawn that the defendant was the source of the information. *See Art Cap. Grp., LLC v. Carlyle Inv. Mgmt. LLC*, 151 A.D.3d 604, 55 N.Y.S.3d 54, 55 (2017) (affirming dismissal where plaintiff "does not identify what confidential information was allegedly misused by defendant during the two year confidentiality period"); *cf. Diversified Fuel Carriers Corp. v. Coastal Oil NY, Inc.*, 280 A.D.2d 448, 720 N.Y.S.2d 169, 170 (2001) (affirming post-verdict judgment as a matter of law where plaintiff "failed to provide sufficient evidence from which the jury could rationally determine that the defendant breached the confidentiality agreement in question"). The Amended Counterclaims are deficient on every account. Delaney has not pled that he himself kept confidential or protected his relationship with HC2 and the work he was doing for it. *See Edelman v. Starwood Cap. Grp.*, LLC, 70 A.D.3d 246, 892 N.Y.S.2d 37, 39 (2009) (affirming dismissal of a claim for misappropriation of proprietary information where "plaintiffs did not allege that [they] took sufficient precautionary measures to insure that the information remained secret") (citation omitted). Moreover, Delaney's pleadings that HC2 disclosed his status as an employee on the Project is merely speculative. Delaney complains that an influential tax lawyer in Thailand "whose professional interests were potentially at risk from the investigation" sent him a suspicious email in November 2019, Dkt. No. 74 ¶ 8, and attempts to draw from that the inferences that (a) the individual learned that Delaney was working on the Project; and (b) that the individual learned of Delaney's work on the project through a tortious disclosure by HC2. His claim, however, is pure surmise, and not does not allege sufficient factual material to state a claim. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Delaney does not allege what was said by the Thai lawyer that gives rise to the reasonable inference **\*103** that the lawyer was contacting Delaney because the lawyer knew that Delaney was working on the Project, or any facts to support the proposition that,

if the lawyer learned of Delaney working on the Project, he learned of it through HC2. Delaney admits that he himself is a Thai national who intends to return to Thailand. Dkt. No. ¶ 47. He also notes that others worked on the Project and knew of his involvement. Dkt. No. 1 ¶ 2; Dkt. No. 74 ¶ 2 ("Defendant admits that 'Delaney, along with two other HC2 employees, began working on the Project at HC2's facility in New York City ...'"). Thus, even if one were to assume that the Thai lawyer had learned of Delaney's involvement, there is no reason to assume the information came from HC2. Although Delaney claims that he did not want his involvement in the Project to become known to individuals in Thailand, Dkt. No. 74 ¶ 47, he engages in guesswork when he complains that the information was "leak[ed]" by HC2. *Id.* Indeed, this speculative assertion is undermined by Delaney's own pleadings which otherwise assert that HC2 jealously guards its confidences, including by reminding Delaney of his own his obligations of non-disclosure.

HC2 also did not violate any obligations of confidentiality by referring to the Florida Action in its complaint in this action. Believing that Delaney had violated his contractual and ethical responsibilities to it, the Law Firm, and the Client, HC2 had every right to file a complaint against him and to do it publicly. Delaney undertook contractual obligations to HC2; if HC2 believed there was a breach, it had to have a right to enforce those obligations.

Moreover, the reference in the complaint in this action to the *John Doe* complaint filed in the Florida Action was not some scurrilous, irrelevant material. It forms the heart of HC2's complaint here—that Delaney improperly disclosed confidential and privileged material. HC2 not only did not have the obligation to withhold Delaney's name, it likely did not have the right to withhold his name. Federal Rule of Civil Procedure 10(a) requires the caption of a civil case to "name all the parties." Fed. R. Civ. P. 10(a); *see, e.g.*, *N. Jersey Media Grp. Inc. v. Doe Nos. 1-5*, 2012 WL 5899331, at \*3 (S.D.N.Y. Nov. 26, 2012) (applying the Rule 10(a) standard to a defendant's motion to proceed anonymously). "[T]his requirement, though seemingly pedestrian, serves the vital purpose of facilitating public scrutiny of judicial proceedings." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188-89 (2d Cir. 2008); *see also Doe v. Del Rio*, 241 F.R.D. 154, 156-59 (S.D.N.Y. 2006) (discussing the presumption against anonymous pleading, its exceptions, and the reasons underlying the "significant interest in open judicial proceedings even in ordinary civil litigation between private parties"). Delaney has made no motion to seal

his name as it appears in this lawsuit, and has made no showing why his interest in anonymity outweighs the public interest in disclosure. *See Sealed Plaintiff*, 537 F.3d at 189 ("[i]dentifying the parties to the proceeding is an important dimension of publicness. The people have a right to know who is using their courts.") (quoting *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir. 1997) (Posner, J.)). If Delaney had wanted to assure his anonymity to the public with respect to any employment related dispute, he could have negotiated for a contractual provision requiring confidential arbitration of all disputes with HC2. He did not do so. What he is not free to do is engage in conduct that allegedly breached his agreement with HC2 and then complain when HC2 attempts to call him to account for such conduct in a federal forum available to **\*104** HC2 and in which Delaney is subject to jurisdiction.

A similar point applies to the disclosure of Delaney's resume. The Protective Order did not create an entitlement on Delaney's part to keep that information from the public docket. It conferred the right on HC2 to disclose any information Delaney produced to the Court, Dkt. No. 22 at 3 § 6(I), and did not "affect or restrict the rights of" HC2 "with respect to its own documents or information produced in this action," *id.* at 4 § 11. Delaney was put on notice "that the Second Circuit puts limitations on the documents or information that may be filed in redacted form or under seal and that the Court retains discretion not to afford confidential treatment to any Confidential Discovery Material submitted to the Court or presented in connection with any motion, application or proceeding that may result in an order and/or decision by the Court" and that "there is no presumption that Confidential Discovery Material will be filed with the Court under seal." *Id.* at 4 § 13. It appears that the resume was improperly marked as confidential in the first place. It does not contain any information entitling Delaney to confidential treatment under the terms of the Protective Order (notably it does not contain Delany's phone number or address). Delaney did not make a motion, as he could have, for the resume to be under seal. And, in any event, had either Delaney or HC2 made a motion to file it under seal, such motion would have been denied. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006) (holding that common law and First Amendment right of access can be overcome only if specific, on the record, findings are made demonstrating that closure is essential to preserving higher values and is narrowly tailored to serve that interest).

### C. Intentional Inflication of Emotional Distress

**[12]** **[13]** **[14]** Under New York law, a claim for intentional infliction of emotional distress ("IIED") requires: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). Intentional infliction of emotion distress is a "highly disfavored [tort] under New York law." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014) (citation omitted). The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985).

Delaney alleges that HC2 intentionally inflicted emotional distress on him by the following alleged conduct: (1) "allow[ing] the disclosure of Delaney's confidential and personal information to opposing lawyers and lobbyists in Thailand without his consent," Dkt. No. 74 ¶ 54; (2) terminating Delaney for making a public health and safety complaint, *id.* ¶ 55; (3) filing this lawsuit to ruin Delaney's professional reputation, *id.* ¶ 56; (4) posting unsealed resume on the public docket, *id.* ¶ 57; (5) harassing Delaney and interfering with his right to peace and quiet because while he was in Nebraska, "the front desk at Delaney's Hotel in Nebraska received what they said was 'a suspicious phone call' from someone purporting to know him asking if he was there and his room number and then hanging up," *id.* ¶ 58; and (6) placing Delaney "on the industry DNR ('Do Not Reuse') blacklist which would preclude him **\*105** from future document review work," *id.* ¶ 59.

**[15]** The Court has already addressed the first four allegations in connection with Delaney's substantive tort claims. Those allegations cannot be made to state a claim simply by relabeling them intentional infliction of emotional distress. *See Turley*, 774 F.3d at 159 ("[The] New York Court of Appeals ... has cautioned that a claim for IIED may not be sustainable 'where the conduct complained of falls well within the ambit of other traditional tort liability.'") (quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978)); *id.* at 159 n.18 ("[W]here the gravamen of a complaint is another tort, IIED is not available as a cause of action.") (quoting *Young v. Krantz*, 434 S.W.3d 335, 344 (Tex. Ct. App. 2014)). Moreover, as to these four theories, Delaney has not alleged either "extreme and outrageous conduct" or "intent to cause, or

reckless disregard of a substantial probability of causing, severe emotional distress." *Stuto*, 164 F.3d at 827. Delaney was an at-will employee. HC2 had every right to end his employment whether because, as the email Delaney cites sets forth, the Client decided not to continue the Project in New York due to the health concerns arising from the Covid-19 pandemic or simply because HC2 was not willing to accede to Delaney's demand that he be permitted to work from home. *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) ("[T]here is ... no cause of action in tort in New York for abusive or wrongful discharge of an at-will employee, [and] plaintiff should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress.").

HC2 also had the right, whether or not its breach of contract claim in this Court succeeds, to bring this lawsuit and to allow the Court to decide whether it was meritorious or not. The filing of this lawsuit and the activities connected with it are ordinary litigation. They are neither extreme nor outrageous. *See, e.g., Hebrew Inst. for Deaf & Exceptional Children v. Kahana*, 21 Misc.3d 1107A, 873 N.Y.S.2d 234, 234 (Sup. Ct. 2008) ("[T]he mere commencement of litigation, even if alleged for the purpose of harassment and intimidation, is insufficient to support a claim for intentional infliction of emotional distress."). Nor do the Amended Counterclaims offer anything other than conclusory allegations that HC2 acted with the intent to cause, or in reckless disregard of a substantial probability of causing, severe emotional distress. From Delaney's own allegations, his employment was terminated because HC2 (or its Client) was unwilling to continue to employ him on the terms that Delaney (and perhaps HC2 and its Client) believed were safe. HC2 filed the lawsuit not to inflict emotional distress but to obtain relief in the form of an order preventing Delaney from disclosing confidential information.

**[16]** **[17]** As to statements made by HC2 in the course of this lawsuit, such statements are "absolutely privileged as long as they are pertinent to the subject of the litigation." *In re Swift*, 2016 WL 355515 at *4 (Bankr. E.D.N.Y. Jan. 28, 2016) (citing *Front v. Khalil*, 4 N.Y.3d 581, 583, 24 N.Y.3d 713, 28 N.E.3d 15 (2015)). Such statements therefore cannot form the basis for an IIED claim. *See id.* ("[T]he [litigation] privilege is ... applicable to intentional infliction of emotional distress claims.") (citing *Taggart v. Moody's Investors Serv., Inc.*, 2007 WL 2076980, at *6 (S.D.N.Y. July 17, 2007) ("[A] plaintiff's claim for intentional infliction **\*106** of

emotional distress cannot arise out of statements made during a judicial or quasi-judicial proceeding where those statements are material and pertinent to the questions involved in the proceedings.") (internal quotation marks and citations omitted)); *see also Brady v. John Goldman, Esq.*, 2016 WL 8201788, at *8 (S.D.N.Y. Dec. 5, 2016) ("Cases relying on statements made in the context of adversarial litigation have been summarily dismissed under [the IIED] standard.") (citing *Kaye v. Trump*, 58 A.D.3d 579, 873 N.Y.S.2d 5, 6 (2009) (statements made in adversarial litigation "cannot provide a foundation for the claim" for IIED); *Yalkowsky v. Century Apts. Assocs.*, 215 A.D.2d 214, 626 N.Y.S.2d 181, 183 (1995) (same)), *report and recommendation adopted sub nom. Brady v. Goldman*, 2017 WL 111749 (S.D.N.Y. Jan. 11, 2017), *aff'd*, 714 F. App'x 63 (2d Cir. 2018).

**[18]** Delaney's last two theories, that he received a "suspicious" phone call to his hotel room in Nebraska, and that HC2 placed him on the "do not reuse" blacklist which would preclude him from future document review work, are speculative and are not supported by sufficient "factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). They must be dismissed for that reason alone.

**D. Abuse of Process**

**[19]** To state a claim for abuse of process under New York law, a plaintiff must plausibly allege that the defendant "(1) employed regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Teddy Volkswagen of the Bronx, LLC v. Demersky*, 2020 WL 6424115, at *2 (S.D.N.Y. Nov. 1, 2020); *see Manhattan Enter. Grp. LLC v. Higgins*, 816 F. App'x 512, 514 (2d Cir. June 1, 2020) ("Under New York law, 'a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that it outside the legitimate ends of the process.' ") (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)).

**[20]** **[21]** **[22]** **[23]** Under New York law, "the institution of a civil action by summons and complaint is not legally considered process capable of being abused." *Curiano v. Suozzi*, 63 N.Y.2d 113, 114, 480 N.Y.S.2d 466, 469 N.E.2d

1324 (1984); *see Demersky*, 2020 WL 6424115, at *2 (same); *Influx Capital, LLC v. Pershin*, 186 A.D.3d 1622, 131 N.Y.S.3d 712, 716 (2020) ("[T]he mere commencement of a civil action cannot serve as the basis for a cause of action alleging abuse of process."). "Process is a 'direction or demand that the person to whom it is directed shall perform or refrain from the doing of some prescribed act.' " *Williams v. Williams*, 23 N.Y.2d 592, 298 N.Y.S.2d 473, 476, 246 N.E.2d 333 (1969) (citation omitted). "It follows that there must be an unlawful interference with one's person or property under color of process in order that action for abuse of process may lie." *Id.* Examples of writs which can be so abused include writs of "attachment, execution, garnishment, or sequestration proceedings, or arrest of the person, or criminal prosecution, or even such infrequent cases as the use of a subpoena for the collection of a debt." *Id.* at 476 n.1, 246 N.E.2d 333 (quotation marks and citation omitted); *see also* **\*107** *Greco v. Christoffersen*, 70 A.D.3d 769, 896 N.Y.S.2d 363, 365-66 (2010) (holding that "the mere commencement of a lawsuit cannot serve as the basis for a cause of action alleging abuse of process" and that interference with person or property comes from "resort to a provisional remedy, such as arrest, attachment, injunction, receivership, or notice of pendency"); *Island Fed. Credit Union v. Smith*, 60 A.D.3d 730, 875 N.Y.S.2d 198, 201 (2009) ("A claim to recover damages for abuse of process cannot be based on the mere commencement of an action by summons and complaint, without unlawful interference with person or property."). Thus, the filing of a complaint itself does not constitute the requisite "unlawful interference with one's person or property under color of process." *Williams*, 298 N.Y.S.2d at 476, 246 N.E.2d 333. Neither does "the expense arising from the defense of a lawsuit," which is "an insufficient injury to sustain the cause of action." *Stroock & Stroock & Lavan v. Beltramini*, 157 A.D.2d 590, 550 N.Y.S.2d 337, 338 (1990).

 **[24]**  A party also cannot state a claim by alleging that a lawsuit was filed against it to gain tactical advantage in that or another litigation. *Tenore v. Kantrowitz, Goldhamer & Graifman, P.C.*, 76 A.D.3d 556, 907 N.Y.S.2d 255, 257 (2010) (allegation that defendant undertook litigation with an objective of "obtaining a tactical advantage in a pending divorce action" insufficient to state a claim for relief). Skillful lawyers not infrequently take advantage of whatever forums are available to them to prevail either in the prosecution of a lawsuit or in the defense of another lawsuit. Such conduct is part of the litigation process; it is not tortious.

 **[25]**  Delaney's allegations do not state a claim for abuse of process. He complains that HC2, in this action, made "outrageous allegations seeking a temporary restraining order on default," Dkt. No. 74 ¶ 67, and made false allegations in its pleadings, *id.* ¶ 69. Those allegations do not satisfy any of the elements of an abuse-of-process claim. If Delaney believes that HC2 cannot "put forward any evidence supporting its claims, then he should ... mov[e] for summary judgment." *Demersky*, 2020 WL 6424115, at *3. "The defense to purportedly frivolous litigation is generally to prevail in that litigation, not to seek a state-law tort remedy." *Id.*, at *2.

Delaney also alleges that it was wrongful for HC2 to file its litigation in this Court when Delaney had "sought refuge in Florida" and "there was a pending action in Florida." Dkt. No. 74 ¶¶ 66-67. However, Delaney does not deny, but admits, that he is a resident of New York and an attorney licensed to practice law in New York. Dkt. No. 1 ¶ 14; Dkt. No. 74 ¶ 14. HC2 is incorporated in the District of Columbia and has its principal place of business in Illinois. Dkt. No. 1 ¶ 13. HC2's cause of action arises, in substantial part, from Delaney's conduct in New York—he was employed in New York and he allegedly took the confidential information of HC2, the Law Firm, and the Client while he was in New York and extorted HC2 while in New York. HC2 was not required to file in Florida, and certainly not required to file confidentially. Diversity jurisdiction, personal jurisdiction and venue properly lie in this Court. HC2 is not a party to the Florida Action. Even if it were, that Delaney filed suit in Florida did not compel HC2 to file in that same forum. *See Harris v. Steinem*, 571 F.2d 119, 123-24 (2d Cir. 1978); *Sanders v. New World Design Build, Inc.*, 2020 WL 1957371, at *3 (S.D.N.Y. Apr. 23, 2020).

Delaney further complains that HC2 filed this action, and filed in the Southern District of New York, to "intimidate him" and to force him to "incur costs." Dkt. No. 74 ¶ 67. However, if the allegations of the complaint are assumed to be true, and at **\*108** this stage must be, Delaney committed very serious misconduct against HC2 and its clients. If, as a result of that conduct, it has been forced to incur costs, that is an expense of its own doing. *See Stroock*, 550 N.Y.S.2d at 338.

Finally, Delaney complains that HC2 and counsel for the defendants in the Florida Action are cooperating in connection with the Florida Action and seeking there to obtain a "desirable ruling albeit under different evidentiary standards," Dkt. No. 74 ¶ 70, that can be "used collaterally in this action," *id.* ¶ 72. The legitimate defense of a

litigation, however, cannot constitute an abuse of process. The defendants in the Florida action—who are not defendants here —have a right to defend themselves and, if they have sought HC2's help and HC2 has provided it, there is nothing Plaintiff alleges that would create any liability for such cooperation. [6]

**CONCLUSION**

The motion to dismiss the counterclaims is GRANTED. IT IS FURTHER ORDERED that the parties shall appear for a post-discovery status conference on January 5, 2021 at 12:00 p.m.

At that date and time the parties are directed to dial the Court's conference line at 888-251-2909 (access code: 2123101).

The Clerk of Court is respectfully directed to close Dkt. Nos. 81 and 83.

SO ORDERED.

**All Citations**

510 F.Supp.3d 86

---

**Footnotes**

1    By this email, HC2 was allegedly referring to a speech delivered by President Trump on March 13, 2020, in which the President announced that he had declared a national emergency and given broad new authority to the Secretary of the Department of Health and Human Services to address the pandemic. *See* Dkt. No. 95-10.

2    Simultaneously, HC2 filed an application for an order to show cause why a temporary restraining order and preliminary injunction should not be entered against Delaney preventing Delaney, in part, from disclosing confidential information he obtained during the course of his work for HC2. Dkt No. 5. That same day, the Court denied the *ex parte* application for a temporary restraining order, partly on the grounds that as a member of the bar, Delaney "surely [was] aware that the disclosure of client confidences without consent can subject him to severe remedies with respect to his ability to practice law" and that "the filing of this lawsuit and this Order itself should put him on notice that future improper disclosures can be met with the most severe sanctions." Dkt. No. 9. After receiving briefing and hearing argument from both parties, on April 29, 2020, the Court entered an order restraining Delaney from divulging any privileged or confidential information that he learned through his employment with HC2. *See* Dkt. No. 14. The Court also set a schedule for briefing and a hearing on Plaintiff's motion for a preliminary injunction. By opinion and order delivered orally and on the record on May 27, 2020, the Court denied HC2's motion for a preliminary injunction on the grounds that HC2 had not identified the confidential information that Delaney allegedly disclosed with the requisite specificity (notably, HC2 declined to file with the Court a copy of the sealed Florida Action complaint which allegedly contained the illicit disclosures), and did not meet its burden to show that there was a threat of irreparable injury because it had provided no evidence to support the likelihood that Delaney would disclose any confidential information in the future. *See* Dkt. No. 65 at 8-11, 16-22.

3    The New York Court of Appeals has explained that "the language and legislative history of Labor Law s 740 militate in favor of a construction of that statute requiring proof of an actual violation of law to sustain a cause of action." *Bordell v. General Elec. Co.*, 88 N.Y.2d 869, 871, 644 N.Y.S.2d 912, 667 N.E.2d 922 (1996). The language of Section 740 thus is markedly different from that of Section 75-b of the Civil Service Law, a whistleblower statute that protects the rights of public employees. "While the latter statute was amended to protect public employees' disclosure of information 'which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action,' no such amendment was ever made to Section 740." *Barker*, 885 F. Supp. 2d at 570 (citing *Bordell*, 88 N.Y.2d at 871, 644 N.Y.S.2d 912, 667 N.E.2d 922). "[P]rior to the enactment of Labor law § 740, three successive efforts to enact a whistleblowers'

statute embodying a reasonable belief standard had failed." *Bordell v. General Elec. Co.*, 208 A.D.2d 219, 622 N.Y.S.2d 1001 (1995).

4    HC2 also argues that the Executive Order does not constitute a "law, rule or regulation" under Section 740. The Court need not reach that issue. Even if it did constitute a law, rule, or regulation, HC2's conduct did not violate it.

5    For example, a fiduciary may owe a duty of confidentiality to his principal. *See Poller v. VioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) ("A breach of fiduciary duty, and generally in tandem, of loyalty, 'occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, *misuse of confidential information*, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity.' ") (quoting *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010)).

6    Plaintiff alleges that the litigation has been picked up by the press. But he does not allege that HC2 was the source of the press articles or that, if it was, it did anything improper in that respect.

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   18

KeyCite Yellow Flag

Declined to Extend by    Andrade v. Cultural Care, Inc.,    E.D.N.Y.,
December 13, 2023

257 A.D.2d 352

Supreme Court, Appellate Division,
First Department, New York.

David C. WALENTAS, Plaintiff–Appellant,

v.

Carl JOHNES, et al., Defendants–Respondents.

2432, 2433
|
Jan. 5, 1999.

**Synopsis**

Landlord sought rent arrearages from tenant who had
succeeded his brother in possession of apartment, and who
had for ten years paid rent at legal rate established for
year ending just prior to his assumption of possession. The
Supreme Court, New York County, Louise Gruner Gans,
J., granted claim for rent increases for seven of ten years
sought, entered judgment for tenant on his tort claims, and
awarded attorney fees to tenant. Landlord appealed, and the
Supreme Court, Appellate Division, held that: (1) landlord
established tenant's receipt of notice of maximum rent for all
years in question, and thus was entitled to rent arrears for all
years; (2) tenant could not recover for intentional infliction
of emotional distress, or abuse of process; and (3) judgment
was not substantially favorable to tenant, as would support
attorney fee award.

Vacated in part, remanded in part, and affirmed as modified.

See also, 126 A.D.2d 417, 510 N.Y.S.2d 121.

**Procedural Posture(s):** On Appeal.

West Headnotes (14)

**[1]    Landlord and Tenant    To support finding,
verdict, or judgment**

**Landlord and Tenant    Costs and attorney
fees**

Tenant's receipt of requisite notice of maximum
allowable rent for prior years, which would

allow landlord to recover maximum allowable
rent increases in action for rent arrearages, was
established by master building rent schedule
indicating that service was made on all tenants,
evidence of landlord's regular practice of
distributing notices, and lack of affirmative
denial of receipt by tenant.

**[2]    Evidence    Showing system or habit**

Evidence of regular practice is admissible to
demonstrate compliance with that practice on
occasions specified.

**[3]    Evidence    Showing system or habit**

Evidence of landlord's regular practice of
distributing notices of maximum collectible rent
to tenants was admissible to show landlord's
compliance with that practice at times in question
in action to recover rent arrears.

**[4]    Infliction of Emotional Distress    Elements
in general**

Claim for intentional infliction of emotional
distress requires extreme and outrageous conduct
which was intended to cause, and resulted in,
severe emotional distress.

38 Cases that cite this headnote

**[5]    Infliction of Emotional
Distress    Litigation conduct**

Commencement of litigation, even if alleged to
be for purpose of harassment and intimidation,
is insufficient to support claim for intentional
infliction of emotional distress.

26 Cases that cite this headnote

**[6]    Infliction of Emotional Distress    Severity
and verifiability in general**

**Infliction of Emotional Distress    Necessity
of medical or other expert testimony**

To prevail on claim for intentional infliction
of emotional distress, plaintiff is required to

establish that severe emotional distress was suffered, which must be supported by medical evidence, not mere recitation of speculative claims.

53 Cases that cite this headnote

**[7]**    **Infliction of Emotional Distress**    Claims against tenants

Landlord's conduct in commencing action to recover for rent arrears from previous ten-year period fell far short of conduct that was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community, and thus could not support claim by tenant for intentional infliction of emotional distress.

13 Cases that cite this headnote

**[8]**    **Process**    Nature and elements in general

To sustain cause of action for abuse of process, plaintiff must demonstrate deliberate premeditated infliction of economic injury without economic or social excuse or justification.

**[9]**    **Process**    Use of process

**Process**    Malice or intent

Commencement of an action, even with malicious intent, is insufficient to support claim for abuse of process.

9 Cases that cite this headnote

**[10]**    **Process**    Resulting damage

To support claim for abuse of process, process employed must entail some unlawful interference with one's person or property.

4 Cases that cite this headnote

**[11]**    **Process**    Particular cases

Landlord's assertion of claims for rent arrears against tenant, who had succeeded his brother in possession of apartment, and had for ten years paid rent at legal rate established for year ending just prior to his assumption of possession, did not support claim for abuse of process, where tenant's right to assume his brother's tenancy was not free from doubt, so that valid legal basis existed for action, and no specific quantifiable damages were demonstrated to be attributable to landlord's actions.

1 Case that cites this headnote

**[12]**    **Landlord and Tenant**    Retaliatory eviction

Various actions commenced by landlord, including holdover proceeding alleging violation of lease provision prohibiting roommates, each had sound legal foundation, and thus did not support counterclaim by tenant for retaliatory eviction. McKinney's Real Property Law § 223–b.

4 Cases that cite this headnote

**[13]**    **Landlord and Tenant**    Costs and attorney fees

Judgment must be substantially favorable to tenant to support award of attorney fees under statute affording tenant a reciprocal right to attorney's fees where lease contains provision entitling landlord to their recovery. McKinney's Real Property Law § 234.

9 Cases that cite this headnote

**[14]**    **Landlord and Tenant**    Damages and costs

Judgment which awarded landlord rent arrearages over ten-year period, allowed recovery for tenant on claim for breach of warranty of habitability, and dismissed tenant's tort counterclaims against landlord, was not substantially favorable to tenant, and thus could not support award of attorney fees under statute granting tenant reciprocal right to fees where lease contains provision entitling landlord to their recovery. McKinney's Real Property Law § 234.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*57** Bruce H. Wiener, for plaintiff-appellant.

Anne Jaffe, for defendants-respondents.

NARDELLI, J.P., RUBIN, TOM and MAZZARELLI, JJ.

**Opinion**

MEMORANDUM DECISION.

 **\*352** Order and judgment (one paper), Supreme Court, New York County (Louise Gruner Gans, J.), entered December 2, 1997, which, *inter alia,* granted plaintiff's claim for rent increases for seven of the ten years for which sought, and which granted defendant Carl Johnes judgment against plaintiff in the amount of $7,835.02 on his counterclaim for breach of warranty of habitability and $37,020.00 on his counterclaims of abuse of process, retaliatory eviction, and intentional infliction of mental and emotional distress, and which awarded defendant Carl Johnes, as the prevailing party, judgment against plaintiff for the reasonable amount of attorney's fees and referred that issue to a special referee to hear and report with recommendations, unanimously modified, on the law, to the extent of awarding plaintiff rent increases for all ten years claimed, dismissing the counterclaims for abuse of process, retaliatory eviction, and intentional infliction of mental and emotional distress and vacating judgment therefor, and vacating the award of attorney's fees, and remanding the matter to Supreme Court for determination of the amount of rent arrears and, except as so modified, affirmed, without costs. Appeal from order, same court and Justice, **\*353** entered on or about March 19, 1998, unanimously dismissed, without costs, in view of the foregoing.

The history of this litigation, involving several different proceedings, extends back to 1982. In January 1987, this Court held that the status of defendant Carl Johnes (defendant) as tenant of the apartment leased to his brother, Stephen Johnes, but never occupied by him, had been resolved in one of the actions, in which defendant sought a *Yellowstone* injunction (126 A.D.2d 417, 510 N.Y.S.2d 121). The appeal now before us concerns the amount of rent due for the period from March 1986 to present, during which defendant continued to pay rent at the legal amount established for the year ending February 1986.

 **\*\*58** **[1]** **[2]** **[3]** Supreme Court awarded plaintiff the maximum allowable rent increases for all years except 1990, 1992 and 1993, finding service of the requisite notice of maximum collectible rent insufficiently documented for these years. However, the record contains the master building rent schedule for 1992, which includes certification that service was made on all tenants. Furthermore, plaintiff offered uncontroverted evidence of his practice of distributing the notices, and such evidence is admissible to demonstrate compliance on the occasions specified (*Halloran v. Virginia Chems.,* 41 N.Y.2d 386, 391, 393 N.Y.S.2d 341, 361 N.E.2d 991). Finally, defendant never affirmatively denied receipt of the notices. Therefore, we find that plaintiff is entitled to rent increases for all years for which rent arrears are sought.

 **[4]** **[5]** **[6]** **[7]** While we discern no reason to disturb Supreme Court's abatement of rent, we find no merit to the remainder of defendant's counterclaims. Intentional infliction of emotional distress requires extreme and outrageous conduct, intended to cause, and resulting in, severe emotional distress (*Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699). Commencement of litigation, even if alleged to be for the purpose of harassment and intimidation, is insufficient to support such a claim (*see, Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 [defamation action]; *Artzt v. Greenburger,* 161 A.D.2d 389, 555 N.Y.S.2d 127 [nonprimary residence action] ). The plaintiff is required to establish that severe emotional distress was suffered (*Richard L. v. Armon,* 144 A.D.2d 1, 536 N.Y.S.2d 1014), which must be supported by medical evidence, not the mere recitation of speculative claims (*Leone v. Leewood Serv. Sta.,* 212 A.D.2d 669, 672, 624 N.Y.S.2d 610, *lv. denied* 86 N.Y.2d 709, 634 N.Y.S.2d 443, 658 N.E.2d 221). Examined in the context of often-contentious landlord-tenant proceedings, plaintiff's conduct falls far short of conduct " ' "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" ' " (*Howell v. New York Post Co.,* 81 N.Y.2d 115, supra, at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699).

 **[8]** **[9]** **[10]** **[11]** **\*354** To sustain a cause of action for abuse of process, the plaintiff must demonstrate "the deliberate premeditated infliction of economic injury without economic or social excuse or justification" (*Board of Educ. of Farmingdale Union Free School Dist. v. Farmingdale Classroom Teachers Assn.,* 38 N.Y.2d 397, 405, 380 N.Y.S.2d

635, 343 N.E.2d 278). Commencement of an action, even with malicious intent, is insufficient (*Curiano v. Suozzi,* 63 N.Y.2d 113, 116–117, 480 N.Y.S.2d 466, 469 N.E.2d 1324; *Family Media v. Printronic Corp. of Am.,* 140 A.D.2d 151, 152, 527 N.Y.S.2d 786). In addition, the process employed must entail some " 'unlawful interference with one's person or property' " (*Curiano v. Suozzi, supra,* at 116, 480 N.Y.S.2d 466, 469 N.E.2d 1324, citing *Williams v. Williams,* 23 N.Y.2d 592, 596, 298 N.Y.S.2d 473, 246 N.E.2d 333). We note that defendant's right to assume his brother's tenancy was hardly free from doubt, and this litigation therefore possessed a valid legal basis. Finally, no specific, quantifiable damages were demonstrated to be attributable to this or any other tort advanced as the basis of a counterclaim by defendant.

[12]    Similarly, with respect to the counterclaim for retaliatory eviction pursuant to Real Property Law § 223–b, we note that the various actions commenced by plaintiff each had a sound legal foundation. For example, in 1982, plaintiff commenced a holdover proceeding alleging violation of a lease provision prohibiting roommates. We note that this action preceded the enactment of the Omnibus Housing Act (L.1983, ch. 403, § 39, eff. June 30, 1983 [L.1983, ch. 403,

§ 64] ) construing any rental agreement to permit occupancy by "one additional occupant" (Real Property Law § 235–f[3] ), and it cannot be said that the proceeding was so completely devoid of merit as to be undeniably attributable to retaliatory motive.

[13]    [14]    In view of plaintiff's recovery of rent arrears and our dismissal of those counterclaims sounding in tort, the award of attorney's fees to defendant cannot stand. Real Property Law § 234 affords the tenant a reciprocal right to attorney's fees where **\*\*59** the lease contains a provision entitling the landlord to their recovery. However, to support such an award, the judgment must be substantially favorable to the tenant (*Lynch v. Leibman,* 177 A.D.2d 453, 576 N.Y.S.2d 550). In this Court's view, neither party can claim to have prevailed in this litigation, just as neither can claim to have been merely the hapless victim of the other's combative litigation style.

**All Citations**

257 A.D.2d 352, 683 N.Y.S.2d 56, 1999 N.Y. Slip Op. 00034

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

48 N.Y.S.3d 530, 2017 N.Y. Slip Op. 01412

⚑ KeyCite Yellow Flag
Distinguished by   J.F. v. D.F.,   N.Y.Sup.,   October 22, 2021

147 A.D.3d 1223

Supreme Court, Appellate Division,
Third Department, New York.

XIAOKANG XU, Respondent,

v.

XIAOLING SHIRLEY HE, Appellant.

519496

|

Feb. 23, 2017.

**Synopsis**

**Background:** Ex-husband commenced action against ex-wife, alleging libel per se, intentional infliction of emotional distress, misuse of legal procedure-abuse of process, and violation of his right to privacy. The Supreme Court, Saratoga County, Ferradino, J., granted default judgment and awarded damages. Ex-wife appealed.

**Holdings:** The Supreme Court, Appellate Division, Mulvey, J., held that:

[1] award of $5,000 in compensatory damages was reasonable compensation for libel per se;

[2] award of $5,000 in compensatory damages was reasonable compensation for misuse of legal procedure-abuse of process;

[3] award of $5,000 in punitive damages was reasonable;

[4] trial court did not abuse its discretion when it granted permanent injunction;

[5] award of counsel fees against defendant ex-wife was warranted;

[6] damages could not be awarded on cause of action for intentional infliction of emotional distress; and

[7] order of protection could not issue.

Affirmed as modified in part, and reversed in part.

**Procedural Posture(s):** On Appeal; Judgment; Motion for Permanent Injunction; Motion for Attorney's Fees; Motion for Default Judgment/Order of Default; Motion for Protective Order.

**West Headnotes (18)**

[1] **Damages** ⚷ Scope of issues and questions considered

**Pleading** ⚷ Admissions by Failure to Traverse or Deny

By failing to answer the summons and complaint, a defendant is deemed to have admitted all traversable allegations in the complaint, including the basic issue of liability and, at an inquest, a defendant is only permitted to contest the amount of damages.

[2] **Appeal and Error** ⚷ Consideration of other cases and matters therein

Since awards for any personal injuries, especially those alleging libel per se, intentional infliction of emotional distress, misuse of legal procedure-abuse of process, and violation of his right to privacy, are not subject to precise quantification, examination of comparable cases is necessary to determine whether the award materially deviated from reasonable compensation. McKinney's CPLR 5501(c).

1 Case that cites this headnote

[3] **Libel and Slander** ⚷ Libel

Award of $5,000 in compensatory damages was reasonable compensation for libel per se, where claimant ex-husband had Ph.D. in electrical engineering, worked with computer software programs, traveled as part of his job and came into contact with similar professionals, nature of his employment required background checks and security clearances, and defendant ex-wife's letter to his employer, called him abuser, accusing him of cruel and inhuman treatment, theft of trade secrets, fraud and perjury, together with numerous online postings, resulted in

damage to his professional reputation as well as public humiliation and embarrassment.

1 Case that cites this headnote
More cases on this issue

[4]    **Libel and Slander** 🔑 Injury to reputation

**Libel and Slander** 🔑 Mental suffering and emotional distress

Harm to emotional well-being and professional reputation constitutes a basis for an award of compensatory damages on claims alleging libel per se.

2 Cases that cite this headnote

[5]    **Process** 🔑 Damages; relief granted

Award of $5,000 in compensatory damages was reasonable compensation for misuse of legal procedure-abuse of process, where defendant ex-wife initiated multiple actions and proceedings against claimant ex-husband with intent to relitigate issues that previously had been determined, without justification, and used process in perverted manner to obtain collateral objective, and in so doing, ex-husband and his family were subjected to plethora of litigious practices that were best deemed frivolous and grounded in malice.

More cases on this issue

[6]    **Damages** 🔑 Nature and Theory of Damages Additional to Compensation

Punitive damages are not to compensate the injured party but rather to punish the tortfeasor and to deter this wrongdoer and others similarly situated from indulging in the same conduct in the future.

2 Cases that cite this headnote

[7]    **Damages** 🔑 Grounds for Exemplary Damages

An award of punitive damages is permitted when the defendant's wrongdoing is not simply intentional but evinces a high degree of

moral turpitude and demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations.

3 Cases that cite this headnote

[8]    **Damages** 🔑 Actual damage or compensatory damages; relationship and ratio

A punitive damages award must bear a reasonable relationship to the defendant's culpability.

1 Case that cites this headnote

[9]    **Damages** 🔑 Amount Awarded in Particular Cases

Award of $5,000 in punitive damages was reasonable, where defendant ex-wife repeatedly harassed claimant ex-husband and his family, attempted to discredit him and damage his reputation, brought numerous suits against him and his agents, employers, and associates, and continued to attempt to relitigate issues long since determined.

1 Case that cites this headnote
More cases on this issue

[10]    **Injunction** 🔑 Particular cases

**Injunction** 🔑 Tort or Financial Liabilities

Trial court did not abuse its discretion when it granted permanent injunction restraining defendant ex-wife for five years from, among other things, contacting plaintiff ex-husband's past, present, and future employers and commencing any legal proceedings against ex-husband, his family, and employers without first obtaining consent from trial court.

1 Case that cites this headnote
More cases on this issue

[11]    **Injunction** 🔑 Grounds in general; multiple factors

In order to be granted a permanent injunction, a plaintiff must establish that he or she would suffer irreparable injury in the absence of an

adequate legal remedy; in considering such an application, the court must balance the equities between the parties to determine whether the irreparable harm that a plaintiff would suffer substantially outweighs the injury that the injunctive relief would cause to the defendant.

3 Cases that cite this headnote

[12]    **Injunction** ⚷ Particular cases

Requirement imposed by trial court in imposing permanent injunction for abuse of process, that defendant first seek approval of court before commencing any further actions or proceedings involving plaintiff ex-husband and others, was sufficiently narrow and balanced so as to protect any legitimate claims that defendant ex-wife may have, while, at the same instance, protecting plaintiff from further vexatious actions or proceedings by defendant.

More cases on this issue

[13]    **Costs, Fees, and Sanctions** ⚷ Statutory or contractual authorization

Counsel fees, which are incidents of litigation, cannot be awarded unless authorized by statute, court rule, or agreement between the parties.

2 Cases that cite this headnote

[14]    **Costs, Fees, and Sanctions** ⚷ Particular Litigation Conduct

Award of counsel fees against defendant ex-wife was warranted under court rule intended to limit frivolous and harassing behavior, where ex-wife in several prior actions involving ex-husband, asserted false material statements, significantly delayed litigation, asserted positions without basis in the law, and continually attempted to relitigate issues previously decided, all of which could be considered frivolous. N.Y.Ct.Rules, § 130–1.1.

1 Case that cites this headnote
More cases on this issue

[15]    **Damages** ⚷ Nature and theory of compensation

Damages could not be awarded on cause of action for intentional infliction of emotional distress, where complaint incorporated libel and abuse of process allegations as basis for that cause of action and damages were awarded on those other causes of action.

1 Case that cites this headnote
More cases on this issue

[16]    **Infliction of Emotional Distress** ⚷ Relationship to other torts, theories, or causes of action; exclusive and concurrent remedies

A cause of action for intentional infliction of emotional distress should not be entertained where the conduct complained of falls well within the ambit of other traditional tort liability.

[17]    **Torts** ⚷ Types of invasions or wrongs recognized

A cause of action for violation of the right to privacy is strictly limited to nonconsensual commercial appropriations of the name, portrait, or picture of a living person. McKinney's Civil Rights Law §§ 50, 51.

[18]    **Divorce** ⚷ Injunction against interference with person or property

Order of protection could not issue where matrimonial action was not pending. McKinney's DRL §§ 240, 252.

2 Cases that cite this headnote
More cases on this issue

**Attorneys and Law Firms**

**532 Xiaoling Shirley He, Clifton Park, appellant pro se.

Xiaokang Xu, Greendale, Wisconsin, respondent pro se.

48 N.Y.S.3d 530, 2017 N.Y. Slip Op. 01412

Before: PETERS, P.J., McCARTHY, EGAN JR., ROSE and MULVEY, JJ.

**Opinion**

MULVEY, J.

**\*1223** Appeals (1) from an order and judgment of the Supreme Court (Ferradino, J.), entered May 21, 2014 and June 4, 2014 in Saratoga County, which, upon an inquest, awarded damages to plaintiff, and (2) from an order of said court, entered June 4, 2014 in Saratoga County, which granted plaintiff an order of protection against defendant.

The parties were divorced in 2005 and have been involved in multiple actions and proceedings since. In April 2013, plaintiff commenced this action alleging several causes of action. When defendant failed to answer, Supreme Court, on plaintiff's motion, granted plaintiff a default judgment and ordered an inquest on damages. After the inquest, Supreme Court awarded plaintiff $5,000 on each of plaintiff's causes of action for libel per se, intentional infliction of emotional distress, misuse of legal procedure/abuse of process and violation of plaintiff's right to privacy. Supreme Court also awarded plaintiff $5,000 in punitive damages and $10,000 in counsel fees, and granted plaintiff a permanent injunction restraining defendant from certain actions for five years. In a separate order, the court granted plaintiff an order of protection and full stay away order for a period of five years. Defendant appeals.

**[1]** **[2]** By failing to answer the summons and complaint, defendant is deemed to have admitted "all traversable allegations in the complaint, including the basic issue of liability" (*Amusement Bus. Underwriters v. American Intl. Group,* 66 N.Y.2d 878, 880, 498 N.Y.S.2d 760, 489 N.E.2d 729 [1985] ) and, at an inquest, defendant is only permitted to contest the amount of damages (see *D D & P Realty, Inc. v. Robustiano,* 68 A.D.3d 1496, 1497, 890 N.Y.S.2d 363 [2009] ). Supreme Court's award of damages is subject to this Court's review on appeal to determine "whether the awards deviate materially from what would be considered reasonable compensation" (*Morrisseau v. State of New York,* 265 A.D.2d 647, 648, 696 N.Y.S.2d 545 [1999]; *see* CPLR 5501 [c]; *Garrison v. Lapine,* 72 A.D.3d 1441, 1442, 900 N.Y.S.2d 770 [2010] ). Since awards for any personal injuries, especially like **\*\*533** those claimed by plaintiff, "are not subject to precise quantification, examination **\*1224** of comparable cases is necessary to determine whether the award materially

deviated from reasonable compensation" (*Nolan v. Union Coll. Trust of Schenectady, N.Y.,* 51 A.D.3d 1253, 1256, 858 N.Y.S.2d 427 [2008] [internal quotation marks and citation omitted], *lv. denied* 11 N.Y.3d 705, 866 N.Y.S.2d 608, 896 N.E.2d 94 [2008] ).

**[3]** **[4]** We find ample support for Supreme Court's assessment of damages on the causes of action for libel per se and abuse of process. With regard to the cause of action for libel per se, plaintiff testified that he had a Ph.D. in electrical engineering, worked with computer software programs, travels as part of his job and comes into contact with similar professionals. Plaintiff explained that the nature of his employment requires background checks and security clearances. He testified that defendant's letter to his employer, calling him an abuser, accusing him of cruel and inhuman treatment, theft of trade secrets, fraud and perjury, together with numerous online postings, resulted in damage to his professional reputation as well as public humiliation and embarrassment. Harm to emotional well-being and professional reputation constitutes a basis for an award of compensatory damages (see *Dobies v. Brefka,* 45 A.D.3d 999, 1001, 846 N.Y.S.2d 669 [2007] ). We find that Supreme Court's award to plaintiff of $5,000 in compensatory damages "is fairly supported by the evidence and does not deviate from what is reasonable compensation" (*id.* at 1001, 846 N.Y.S.2d 669 [$225,000 award for false accusation of sexual abuse of the plaintiff's daughter]; *compare Strader v. Ashley,* 61 A.D.3d 1244, 1247–1248, 877 N.Y.S.2d 747 [2009], *lv. dismissed* 13 N.Y.3d 756, 886 N.Y.S.2d 92, 914 N.E.2d 1010 [2009] [$26,800 award for false accusations of criminal conduct]; *Allen v. CH Energy Group, Inc.,* 58 A.D.3d 1102, 1104, 872 N.Y.S.2d 237 [2009] [award reduced to $50,000 for false accusations of improper conduct in public]; *Rossignol v. Silvernail,* 185 A.D.2d 497, 498, 586 N.Y.S.2d 343 [1992], *lv. denied* 80 N.Y.2d 760, 591 N.Y.S.2d 138, 605 N.E.2d 874 [1992] [award reduced to $85,000 for slanderous statements regarding purported acts of child abuse]; *Parkin v. Cornell Univ.,* 182 A.D.2d 850, 852, 581 N.Y.S.2d 914 [1992], *appeal dismissed* 80 N.Y.2d 914, 588 N.Y.S.2d 821, 602 N.E.2d 229 [1992] [award reduced to $10,000 for false accusations of stealing employer's property] ).

**[5]** Testimony presented with respect to the cause of action for abuse of process demonstrated that defendant initiated multiple actions and proceedings against plaintiff with the intent to relitigate issues that had previously been determined, without justification, and used the process in a perverted manner to obtain a collateral objective (see *Board of Educ.*

*of Farmingdale Union Free School Dist. v. Farmingdale Classroom Teachers Assn., Local 1889, AFT AFL–CIO,* 38 N.Y.2d 397, 403, 380 N.Y.S.2d 635, 343 N.E.2d 278 [1975]; *Ettienne v. Hochman,* 83 A.D.3d 888, 888, 920 N.Y.S.2d 717 [2011] ). In so **\*1225** doing, plaintiff and his family were "subjected to a plethora of litigious practices" that are best deemed "frivolous and grounded in malice" (*Chew Wah Bing v. Sun Wei Assn.,* 191 A.D.2d 361, 362, 595 N.Y.S.2d 417 [1993], *appeal dismissed* 82 N.Y.2d 886, 610 N.Y.S.2d 141, 632 N.E.2d 450 [1993] ). Accordingly, Supreme Court's award of $5,000 on the abuse of process cause of action should not be disturbed (*compare id.* at 363, 595 N.Y.S.2d 417 [$25,000 award] ).

**[6]    [7]    [8]    [9]**    We next turn to plaintiff's request for punitive damages which "are not to compensate the injured party but rather **\*\*534** to punish the tortfeasor and to deter this wrongdoer and others similarly situated from indulging in the same conduct in the future" (*Ross v. Louise Wise Servs., Inc.,* 8 N.Y.3d 478, 489, 836 N.Y.S.2d 509, 868 N.E.2d 189 [2007] ). Such an award is "permitted when the defendant's wrongdoing is not simply intentional but 'evince[s] a high degree of moral turpitude and demonstrate[s] such wanton dishonesty as to imply a criminal indifference to civil obligations' " (*id.* at 489, 836 N.Y.S.2d 509, 868 N.E.2d 189, quoting *Walker v. Sheldon,* 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497 [1961]; *accord Strader v. Ashley,* 61 A.D.3d at 1248, 877 N.Y.S.2d 747). "[S]uch an award [must] bear a reasonable relationship to [the] defendant['s] culpability" (*Parkin v. Cornell Univ.,* 182 A.D.2d at 852, 581 N.Y.S.2d 914). Here, defendant has repeatedly harassed plaintiff and his family, attempted to discredit him and damage his reputation, brought numerous suits against plaintiff and his agents, employers and associates and continues to attempt to relitigate issues long since determined. As such, Supreme Court properly granted plaintiff $5,000 in punitive damages (*see Strader v. Ashley,* 61 A.D.3d at 1248, 877 N.Y.S.2d 747 [awards of $100,000, $5,000 and $12,500 for false accusations of criminal conduct]; *Dobies v. Brefka,* 45 A.D.3d at 1001, 846 N.Y.S.2d 669 [$30,500 for false accusation of sexual abuse of the plaintiff's daughter]; *Heller v. Ingber,* 134 A.D.2d 733, 735, 521 N.Y.S.2d 554 [1987] [award reduced to $10,000 for malicious prosecution] ).

**[10]    [11]    [12]**    Supreme Court did not abuse its discretion when it granted a permanent injunction restraining defendant for five years from, among other things, contacting plaintiff's past, present and future employers and commencing any

legal proceedings against plaintiff, his family and employers without first obtaining consent from Supreme Court. In order to be granted a permanent injunction, a plaintiff must establish that he or she would suffer "irreparable injury in the absence of an adequate legal remedy" (*Town of Liberty Volunteer Ambulance Corp. v. Catskill Regional Med. Ctr.,* 30 A.D.3d 739, 740, 816 N.Y.S.2d 246 [2006] ). In considering such an application, the court must balance the equities between the parties to determine whether the irreparable harm that a plaintiff would suffer "substantially outweighs the injury that the injunctive relief would cause to the defendant[[[[[ **\*1226** ]" (*Parry v. Murphy,* 79 A.D.3d 713, 715, 913 N.Y.S.2d 285 [2010] ). The requirement imposed by Supreme Court, that defendant first seek approval of the court before commencing any further actions or proceedings involving plaintiff and others, is sufficiently narrow and balanced so as to protect any legitimate claims that defendant may have, while, at the same instance, protecting plaintiff from further vexatious actions or proceedings by defendant.

**[13]    [14]**    Counsel fees, which are "incidents of litigation, cannot be awarded unless authorized by statute, court rule, or agreement between the parties" (*Matter of Ernestine R.,* 61 A.D.3d 874, 876, 877 N.Y.S.2d 407 [2009]; *see Matter of A.G. Ship Maintenance Corp. v. Lezak,* 69 N.Y.2d 1, 5, 511 N.Y.S.2d 216, 503 N.E.2d 681 [1986]; *Matter of Kaczor v. Kaczor,* 101 A.D.3d 1403, 1404, 956 N.Y.S.2d 650 [2012] ). "22 NYCRR 130–1.1, a court rule intended to limit frivolous and harassing behavior, authorizes a court, in its discretion, to award to any party or attorney in a civil action reasonable [counsel] fees resulting from conduct found to be 'frivolous' " (*Matter of Ernestine R.,* 61 A.D.3d at 876, 877 N.Y.S.2d 407 [internal citation omitted] ). In several prior actions involving the parties, defendant has asserted false material statements, significantly delayed litigation, asserted positions without basis in the law and continually attempted **\*\*535** to relitigate issues previously decided, all of which conduct could be considered frivolous. We find ample support in the record for the amount awarded for counsel fees.

**[15]**    However, we are compelled to vacate other awards of damages. When considering an application for a default judgment, it is incumbent upon the court to examine the proof submitted pursuant to CPLR 3215(f) and determine whether " 'a viable cause of action exists' " (*State of New York v. Williams,* 73 A.D.3d 1401, 1402, 901 N.Y.S.2d 751 [2010], *lv. denied* 15 N.Y.3d 709, 2010 WL 3702602 [2010], quoting *Woodson v. Mendon Leasing Corp.,* 100 N.Y.2d 62, 70–71, 760 N.Y.S.2d 727, 790 N.E.2d 1156 [2003] ). We find

that plaintiff's causes of action for intentional infliction of emotional distress and for violation of his right to privacy fail as a matter of law.

 [16]    A cause of action for intentional infliction of emotional distress should not be entertained "where the conduct complained of falls well within the ambit of other traditional tort liability" (*Fischer v. Maloney,* 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 373 N.E.2d 1215 [1978]; *accord Sweeney v. Prisoners' Legal Servs. of N.Y.,* 146 A.D.2d 1, 7, 538 N.Y.S.2d 370 [1989], *appeal dismissed* 74 N.Y.2d 842, 546 N.Y.S.2d 558, 545 N.E.2d 872 [1989] ). Here, plaintiff's complaint incorporated his libel and abuse of process allegations as the basis for this cause of action. Because damages were awarded on those causes of action, the damages awarded on the cause of action for intentional infliction of emotional distress must be vacated.

 [17]    **\*1227** A cause of action for violation of the right to privacy under Civil Rights Law §§ 50 and 51 is "strictly limited to nonconsensual commercial appropriations of the name, portrait or picture of a living person" (*Finger v. Omni Publs. Intl.,* 77 N.Y.2d 138, 141, 564 N.Y.S.2d 1014, 566 N.E.2d 141 [1990] ). Absent from the proof furnished by plaintiff was any indication that defendant sought to use his name or photograph "for advertising purposes or for the purposes of trade only" (*id.* [internal quotation marks, emphasis and citation omitted] ). Therefore, Supreme Court should have determined that this was not a viable cause of action. Consequently, there was no basis for an award of damages on this cause of action.

 [18]    Next, defendant argues that Supreme Court erred in granting an order of protection, and we agree. Supreme Court can properly issue an order of protection in a matrimonial action under Domestic Relations Law §§ 240, 252 (*see Jennifer JJ. v. Scott KK.,* 117 A.D.3d 1158, 1159, 985 N.Y.S.2d 316 [2014] ); here, no matrimonial action was pending. Although such an order is available under Family Ct. Act article 8, the pleadings do not contain allegations of conduct that would constitute one of certain enumerated family offenses (*see* Family Court Act § 812[1]; *Jennifer JJ. v. Scott KK.,* 117 A.D.3d at 1159, 985 N.Y.S.2d 316).

Defendant's remaining contentions have been examined and found to be lacking in merit.

ORDERED that the order and judgment entered May 21, 2014 and June 4, 2014 are modified, on the law, without costs, by vacating the award of damages on the causes of action for intentional infliction of emotional distress and violation of the right to privacy, and, as so modified, affirmed.

ORDERED that the order of protection entered June 4, 2014 is reversed, without costs.

PETERS, P.J., McCARTHY, EGAN JR. and ROSE, JJ., concur.

**All Citations**

147 A.D.3d 1223, 48 N.Y.S.3d 530, 2017 N.Y. Slip Op. 01412

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 Caution
As of: October 3, 2025 3:38 AM Z

## *Rother v. NYS Dep't of Corr. & Cmty. Supervision*

United States District Court for the Northern District of New York

August 4, 2013, Decided; September 4, 2013, Filed

1:12-CV-0397 (LEK/CFH)

**Reporter**
970 F. Supp. 2d 78 *; 2013 U.S. Dist. LEXIS 125726 **; 2013 WL 4774484

SGT. MARIE ROTHER, Plaintiff, -against- THE NYS DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION; BRIAN FISCHER, Commissioner of NYS Department of Corrections and Community Supervision; GREENE CORRECTIONAL FACILITY; COXSACKIE CORRECTIONAL FACILITY; DAVID MORSE (in both his official and individual capacity); JAMES WEEKS (in both his official and individual capacity); JOHN DOE; and RICHARD ROE (as unknown individual defendants in both their official and individual capacities), Defendants.

# Core Terms

constructive discharge, allegations, discipline, resignation, Defendants', counseling, discriminatory, retaliation, co-workers, inmate, quotation, marks, prima facie tort, conspiracy, deprived, workers' compensation, complaints, monitoring, outrageous, premised, damages, summary judgment, give rise, harassment, paperwork, substantive due process, leave to amend, due process, constructive-discharge, futile

# Case Summary

**Overview**
HOLDINGS: [1]-A prison employee's allegations that co-workers and supervisors engaged in numerous acts of gender discrimination using offensive and explicitly gendered terms were sufficient to plausibly suggest the existence of an objectively hostile work environment; [2]-The allegedly abusive conduct at the prison did not rise to the level of a constructive discharge, and the prospect of termination was too remote to give rise to a constructive-discharge claim premised on inevitable termination; [3]-The employee's complaints of discrimination were personal rather than matters of public concern to support a claim for retaliation based on protected speech; [4]-The employee's allegations that no male co-workers were subjected to similar discriminatory treatment were sufficient to support a constitutional claim for denial of equal protection.

**Outcome**
Motion to dismiss granted in part and denied in part.

# LexisNexis® Headnotes

Constitutional Law > State Sovereign Immunity > General Overview

Governments > State & Territorial Governments > Claims By & Against

*HN1* **Constitutional Law, State Sovereign Immunity**

970 F. Supp. 2d 78, *78; 2013 U.S. Dist. LEXIS 125726, **125726

The *Eleventh Amendment* immunizes states and state agencies from suits that seek both monetary damages and injunctive relief.

> Constitutional Law > State Sovereign Immunity > Abrogation of Immunity
>
> Governments > State & Territorial Governments > Claims By & Against
>
> Constitutional Law > State Sovereign Immunity > Waiver > General Overview

**HN2** **State Sovereign Immunity, Abrogation of Immunity**

States may waive their sovereign immunity or Congress may abrogate that immunity pursuant to authority granted by a subsequent constitutional amendment.

> Constitutional Law > State Sovereign Immunity > General Overview
>
> Governments > State & Territorial Governments > Claims By & Against
>
> Governments > State & Territorial Governments > Employees & Officials

**HN3** **Constitutional Law, State Sovereign Immunity**

The state for purposes of the *Eleventh Amendment* generally includes state officials sued in their official capacities. A narrow exception is carved out to the general rule of *Eleventh Amendment* immunity from suit. Under this exception, a plaintiff may sue a state official acting in his official capacity—notwithstanding the *Eleventh Amendment*—for prospective, injunctive relief from violations of federal law. A party may sue to stop a present and continuing violation of federal law that is premised on past state actions, but cannot obtain relief that would be tantamount to an award of damages for those past actions. In the employment context, a request for reinstatement is not barred by the *Eleventh Amendment* because reinstatement is purely prospective injunctive relief that orders the state official to return the former employee to the state's payroll. The recovery of attorneys' fees is also permitted as relief ancillary to prospective relief. However, a claim for damages, including back pay, front pay, and compensatory and punitive damages, is barred by the *Eleventh Amendment*.

> Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
>
> Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN4** **Motions to Dismiss, Failure to State Claim**

To survive a motion to dismiss for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6)*, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. A complaint may be dismissed pursuant to *Rule 12(b)(6)* only where it appears that there are not enough facts to state a claim to relief that is plausible on its face. Plausibility requires enough facts to raise a reasonable expectation that discovery will reveal evidence of the alleged misconduct. The plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully. The pleading standard *Fed. R. Civ. P. 8* announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. Where a court is unable to infer more than the mere possibility of the alleged misconduct

970 F. Supp. 2d 78, *78; 2013 U.S. Dist. LEXIS 125726, **125726

based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

*HN5* **Amendment of Pleadings, Leave of Court**

Where a plaintiff has already been given notice of a claim's deficiencies and the opportunity to amend her complaint, a court may dismiss that claim with prejudice. Leave to amend should also be denied if any amendment would be futile.

Labor & Employment Law > Discrimination > Actionable Discrimination

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > General Overview

Labor & Employment Law > ... > Disparate Treatment > Employment Practices > Pattern & Practice

*HN6* **Discrimination, Actionable Discrimination**

An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. The misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. A plaintiff may show that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of his working environment. Courts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance.

Labor & Employment Law > Wrongful Termination > Constructive Discharge > Burdens of Proof

*HN7* **Constructive Discharge, Burdens of Proof**

An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily. The inquiry is objective: did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign? A claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. The constructive-discharge inquiry focuses on the working conditions preceding the employee's resignation. Constructive discharge is therefore unlikely to be found where an employee's working conditions materially improve before she resigns.

Labor & Employment Law > Wrongful Termination > Constructive Discharge > Burdens of Proof

*HN8* **Constructive Discharge, Burdens of Proof**

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 55 of 105

Page 4 of 26

970 F. Supp. 2d 78, *78; 2013 U.S. Dist. LEXIS 125726, **125726

An employer must intentionally create intolerable working conditions for a constructive-discharge claim to lie. Thus, the conduct giving rise to an employee's resignation must be the result of an employer's deliberate action. An employer's negligent failure to prevent or remedy co-worker harassment does not amount to deliberate action.

Labor & Employment Law > Wrongful Termination > Constructive Discharge > Burdens of Proof

### *HN9* Constructive Discharge, Burdens of Proof

A constructive-discharge claim may also lie where an employee resigns in the face of an impending and inevitable termination. However, apprehension of future termination is insufficient to establish constructive discharge—instead, an employee is obliged not to assume the worst, and not to jump to conclusions too fast. Thus, when an employee resigns rather than respond to disciplinary charges, the resignation cannot later be construed as a constructive discharge.

Labor & Employment Law > ... > Retaliation > Elements > Adverse Employment Actions

### *HN10* Elements, Adverse Employment Actions

Retaliation is actionable only where it amounts to a materially adverse action—an action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

### *HN11* Freedom of Speech, Public Employees

The *First Amendment* protects a public employee's speech from retaliation only where the employee spoke on a matter of public concern. Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public. Thus, speech that primarily concerns an issue that is personal in nature and generally related to the speaker's own situation, such as his or her assignments, promotion, or salary, does not address matters of public concern.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

### *HN12* Procedural Due Process, Scope of Protection

See U.S. Const. amend. XIV, § 1.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

### *HN13* Procedural Due Process, Scope of Protection

To plead a violation of procedural due process, a plaintiff must plausibly allege that he was deprived of property without constitutionally adequate pre- or post-deprivation process. A plaintiff must first identify a property right, second show that the government has deprived him of that right, and third show that the deprivation was effected without due process.

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 56 of 105

Page 5 of 26

970 F. Supp. 2d 78, *78; 2013 U.S. Dist. LEXIS 125726, **125726

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Labor & Employment Law > Wrongful Termination > Constructive Discharge > General Overview

**HN14** **Procedural Due Process, Scope of Protection**

While a public employee with a property right in her job is normally entitled to a pre-termination hearing, employees who are constructively discharged are not. As long as a meaningful post-resignation hearing is available, a constructively discharged employee has received constitutionally adequate process.

Civil Procedure > ... > Affirmative Defenses > Statute of Limitations > General Overview

Labor & Employment Law > Wrongful Termination > Constructive Discharge > General Overview

**HN15** **Affirmative Defenses, Statute of Limitations**

Where a plaintiff is constructively discharged, the statute of limitations applicable to commencing Article 78 proceedings—*N.Y. C.P.L.R. 217(1)*—begins to runs on the date of the resignation.

Constitutional Law > Substantive Due Process > Scope

**HN16** **Constitutional Law, Substantive Due Process**

To state a substantive due process claim, a plaintiff must allege that: (1) the complained-of state action compromised a constitutionally-protected liberty or property right; and (2) the state action that deprived him of that interest was oppressive or arbitrary. For a substantive due process claim to survive a *Fed. R. Civ. P. 12(b)(6)* dismissal motion, it must allege governmental conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.

Constitutional Law > Substantive Due Process > Scope

**HN17** **Constitutional Law, Substantive Due Process**

Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims. Thus, substantive-due-process claims must be dismissed where they are merely duplicative of claims explicitly protected under other constitutional sources.

Constitutional Law > Equal Protection > Nature & Scope of Protection

**HN18** **Equal Protection, Nature & Scope of Protection**

To prove a violation of the *Equal Protection Clause*, a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.

970 F. Supp. 2d 78, *78; 2013 U.S. Dist. LEXIS 125726, **125726

Civil Rights Law > Protection of Rights > Immunity From Liability > Respondeat Superior Distinguished

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

*HN19* **Immunity From Liability, Respondeat Superior Distinguished**

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *42 U.S.C.S. § 1983*. Thus, a supervisor's liability cannot rest on respondeat superior. Supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference by failing to act on information indicating that the violation was occurring.

Civil Rights Law > Protection of Rights > Immunity From Liability > Respondeat Superior Distinguished

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

*HN20* **Immunity From Liability, Respondeat Superior Distinguished**

Personal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under *42 U.S.C.S. § 1983*. All that a plaintiff must show is that the official had: (1) a direct connection to, or responsibility for, the alleged illegal actions; and (2) the authority to perform the required act.

Civil Rights Law > Protection of Rights > Conspiracy Against Rights > Elements

*HN21* **Conspiracy Against Rights, Elements**

In order to make out a *42 U.S.C.S. § 1985(3)* claim, a plaintiff must demonstrate: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. A plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end. The pleading standard for a conspiracy claim is demanding. Even detailed allegations of parallel conduct do not suffice without some factual basis for inferring the existence of an agreement.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements

*HN22* **Intentional Infliction of Emotional Distress, Elements**

In order to make out a claim of intentional infliction of emotional distress (IIED)in New York, a plaintiff must demonstrate extreme and outrageous conduct. Conduct is extreme and outrageous only where it so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and be utterly intolerable in a civilized community. Very few claims satisfy the extreme and outrageous requirement of an IIED claim.

Torts > ... > Statute of Limitations > Begins to Run > Continuing Violations

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Defenses

970 F. Supp. 2d 78, *78; 2013 U.S. Dist. LEXIS 125726, **125726

### *HN23* Begins to Run, Continuing Violations

Claims of intentional infliction of emotional distress (IIED) have a one-year statute of limitations. Under the continuing-violations doctrine, otherwise time-barred conduct may give rise to IIED liability where the plaintiff alleges continuous harm extending into the limitations period. The series of events alleged to constitute continuous harm must not be isolated and sporadic.

Torts > Intentional Torts > Prima Facie Tort > General Overview

### *HN24* Intentional Torts, Prima Facie Tort

A duplicative prima facie tort claim must be dismissed.

Torts > Intentional Torts > Prima Facie Tort > General Overview

### *HN25* Intentional Torts, Prima Facie Tort

Prima facie tort should not become a catch-all alternative for every cause of action which cannot stand on its own legs. Where relief may be afforded under traditional tort concepts, prima facie tort may not be invoked as a basis to sustain a pleading which otherwise fails to state a cause of action in conventional tort.

Labor & Employment Law > Wrongful Termination > General Overview

Torts > Intentional Torts > Prima Facie Tort > General Overview

### *HN26* Labor & Employment Law, Wrongful Termination

There is no New York tort of wrongful discharge. Thus, where a plaintiff brings a claim for prima facie (or other) tort seeking to challenge the termination of her employment, the claim must be dismissed.

**Counsel: [**1]** For Sgt. Marie Rother, Plaintiff: Karen L. Kimball, LEAD ATTORNEY, Office of Karen L. Kimball, Wynantskill, NY.

For The NYS Department of Corrections, Brian Fischer, Commissioner of NYS Department of Correctional Services, Greene County Department of Corrections, Coxsackie Department of Corrections, David Morse, James Weeks, John Doe, as unknown individual Defendants, Defendants: Gregory J. Rodriguez, Office of Attorney General - Albany, Albany, NY.

**Judges:** Lawrence E. Kahn, U.S. District Judge.

**Opinion by:** Lawrence E. Kahn

# Opinion

## [*85] MEMORANDUM-DECISION and ORDER

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 59 of 105

Page 8 of 26

970 F. Supp. 2d 78, *85; 2013 U.S. Dist. LEXIS 125726, **1

## I. INTRODUCTION

In this employment action, Plaintiff, Sergeant Marie Rother ("Plaintiff"), brings a number of claims arising out of her treatment by supervisors and co-workers while she was employed by Defendant the NYS Department of Corrections and Community Supervision ("DOCCS"). <u>See generally</u> Dkt. No. 23 ("Amended Complaint"). Presently before the Court is Defendants' Motion to dismiss. Dkt. No. 25 ("Motion"). For the reasons that follow, the Motion is granted in part and denied in part.

## II. BACKGROUND[1]

Plaintiff began working as a DOCCS corrections officer in 1998. Am. Compl. ¶ 6. She was promoted to sergeant in 2009 and was subsequently transferred to Defendant Coxsackie Correctional Facility ("Coxsackie") in March 2010. <u>Id</u>. ¶ 18.

### A. Treatment at Coxsackie

At Coxsackie, Plaintiff was one of only two female sergeants. <u>Id</u>. ¶¶ 36, 39. Plaintiff was passed over in favor of male employees for overtime assignments for which she was qualified. <u>Id</u>. ¶ 51. She was denied training in an area of expertise, **[*86]** and was temporarily denied mandatory sexual harassment training. <u>Id</u>. ¶¶ 52-54, 110-1. Plaintiff was entitled by virtue of her "seniority, training, and experience" to vacant single-shift job assignments but was instead assigned to work at various times. <u>Id</u>. ¶¶ 55-56, 61. She was also forced to wait to be assigned to an open administrative-sergeant position.[2] <u>Id</u>. ¶ **[**3]** 61.

Defendant Liutenant James Weeks ("Weeks") disciplined Plaintiff for her conduct relating to a nurse's administration of medicine to an inmate,[3] as well as Plaintiff's "inappropriate shower shoes, inappropriate response to an inmate's bad behavior and inappropriate preparation of a disciplinary meal for an inmate." <u>Id</u>. ¶¶ 145-48, 150-67. Weeks informally "counseled" Plaintiff for these incidents and formally "counseled" Plaintiff twice for the medication incident. <u>Id</u>. ¶¶ 150-51, 155, 176. The first formal counseling violated "protocol" in that there was no list of charges prepared. <u>Id</u>. ¶ 160. Both formal counselings violated "union rules" prohibiting multiple counselings for a single incident.[4] <u>Id</u>. ¶ 178. Documentation of the formal counseling was to remain in Plaintiff's personnel file for three years. <u>Id</u>. ¶ 182. Plaintiff was also unfairly chastised by a supervisor for leaving a document with a supervisor's secretary rather than giving it to the supervisor himself. <u>Id</u>. ¶¶ 143-44. Plaintiff alleges that all of the conduct for which she was disciplined or chastised was proper.

---

[1] Because this matter is before the Court on a motion to dismiss, the allegations of the Amended Complaint are accepted as true and form the basis of this section. **[**2]** See <u>Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 408 (2d Cir. 2000)</u>; see also <u>Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir. 2011)</u> (noting that, in addressing a motion to dismiss, a court must view a plaintiff's factual allegations "in a light most favorable to the plaintiff and draw[] all reasonable inferences in her favor").

[2] It is unclear whether the administrative-sergeant position entailed working different shifts.

[3] The Amended **[**4]** Complaint provides little information regarding this incident. As alleged, Plaintiff "responded" to an "incident" that was "mishandled" by a nurse "with respect to an inmate's medication." Am. Compl. ¶¶ 145-46. The nurse filed a false report regarding this incident and Plaintiff was ordered by a "Lt. Meigs" to do likewise. <u>Id</u>. ¶¶ 147-48. Plaintiff "questioned" this order, was chastised for doing so, and then filed the false report. <u>Id</u>. ¶¶ 149-50. It is unclear what aspect of this conduct Plaintiff was disciplined for. <u>Id</u>. ¶¶ 150, 155.

[4] The second formal counseling appears to have been a mere continuation of the first formal counseling, which, as discussed <u>infra</u>, was not completed because of Plaintiff's medical issues. However, Plaintiff alleges that both formal counselings violated "union rules" because the informal counseling she had already received constituted the one permitted counseling for the medication incident. Am. Compl. ¶ 177-78.

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 60 of 105

Page 9 of 26

970 F. Supp. 2d 78, *86; 2013 U.S. Dist. LEXIS 125726, **4

Plaintiff points to three incidents of harassing and injurious personal treatment at Coxsackie. In early January 2011, Defendant David Morse ("Morse"),[5] a Coxsackie and DOCCS employee,[6] told Plaintiff—in front [**5] of inmates, her co-workers, and her subordinates—that she had received her administrative-sergeant position by performing sexual favors and that she was a "bitch and a backstabber," "a stupid cunt," and a "whining bitch" who "sucked." Id. ¶¶ 63, 65-66.

 [*87]  Approximately two weeks later, Plaintiff discovered that her chair had been removed and replaced with a chair intended for inmates, and that her computer and phone were  [**6] no longer working. Id. ¶¶ 90-107. The loss of Plaintiff's phone prevented her from using the emergency response system that she needed to do so. Id. ¶¶ 103-06. She later found her chair "in pieces hidden behind large boxes." Id. ¶¶ 92-95.

In early March 2011, Weeks formally counseled Plaintiff in a small, airless inmate hearing room, even though such rooms were not used to counsel other DOCCS employees.[7] Id. ¶¶ 154-74. Weeks spent half an hour quietly thumbing through the employee manual, which intimidated Plaintiff, as did the unprecedented use of an inmate hearing room. Id. ¶¶ 159, 161-63. Although Weeks told Plaintiff that she did not need a union representative at the meeting, she was permitted to request one. Id. ¶¶ 164-65.

Plaintiff suffered severe physical and psychological reactions as a result of the Morse incident and Weeks's formal counseling. She suffered from "elevated blood pressure, shaking and nausea" after Morse's tirade. Id. ¶ 74 This incident made Plaintiff feel unsafe because her "credibility, authority and professionalism had been damaged in a significant way." Id. ¶ 78. Plaintiff [**7] passed out and was taken to the hospital after she left the inmate hearing room where Weeks was formally counseling her; she was diagnosed with anxiety, panic attacks, and stress.[8] Id. ¶¶ 168-75.[9]

Plaintiff repeatedly complained, both verbally and in writing, about this putatively discriminatory treatment. She complained to Weeks, Lieutenant Kenneth Baldwin ("Baldwin"), an "EAP" officer, Deputy Security Superintendent Christopher Miller ("Miller"), and the Department of Diversity Management about Morse's tirade. Id. ¶¶ 70, 73,79, 80, 82, 124-27. She complained about the destruction of her chair to "Lieutenant Humphrey" ("Humphrey") and Miller. Id. ¶¶ 98-101. Everyone to whom she [**8] complained was dismissive and took no remedial action even though video recordings of the Morse and chair incidents were available. See generally Am. Compl. Morse was not disciplined for his conduct. Id. ¶ 142. Plaintiff alleges that, as a result of her complaints about Morse, she was shunned by her co-workers and advised to check the tires of her vehicle because "rats" had their tires slashed. Id. ¶¶ 109-10. She also complained about this shunning but no remedial action was taken. Id. ¶¶ 139.


**B. Treatment at Greene**

---

[5] Other individuals named as Defendants in this action include Brian Fischer ("Fischer"), the Commissioner of DOCCS, as well as John Doe ("Doe") and Richard Roe("Roe"), whom the Amended Complaint describes as "any unknown employees of DOCC[S], Greene Correctional Facility or Coxsackie Correctional Facility who participated in discrimination and retaliation against Sgt. Rother and/or any of the other known and unknown actions which violated any of her rights as set forth in this complaint." Am. Compl. ¶ 32. Morse, Weeks, Fischer, Doe, and Roe will be collectively referred to as "the Individual Defendants."

[6] The Amended Complaint does not provide Morse's position. Plaintiff now alleges that Morse was a co-worker with "superior responsibility." Dkt. No. 29 ("Response") at 23.

[7] This was the first of the medication-incident-related formal counselings discussed supra.

[8] Weeks was aware, or should have been aware, that Plaintiff had a "history of migraines" and therefore should have known that the counseling session was likely to distress her. Am. Compl. ¶ 174.

[9] The New York Workers' Compensation Board subsequently found that Plaintiff had: (1) suffered stress as a result of the Morse and formal-counseling incidents; and (2) presented credible evidence that these incidents had caused Post Traumatic Stress Disorder, adjustment disorder, anxiety, and depression. Id. ¶¶ 251-58.

970 F. Supp. 2d 78, *87; 2013 U.S. Dist. LEXIS 125726, **8

Plaintiff then transferred to Defendant Greene Correctional Facility ("Greene") (collectively with DOCCS and Coxsackie, the "Employer Defendants") on March 14, 2011. Id. ¶ 184. Plaintiff was denied a position to which she was entitled by job seniority and was instead assigned to the most difficult cell block, an assignment she could have declined but chose to accept to **[*88]** show that she was a "team player." Id. ¶¶ 185-86. Her performance was regularly scrutinized on video monitors and tapes that were generally reviewed only after an incident and were not used to regularly scrutinize male employees. Id. ¶¶ 191-203. Supervisors met with Plaintiff on multiple occasions to criticize **[**9]** her performance. Id. ¶¶ 192-94. She was formally counseled for her conduct in keeping a cell block "under control," even though Plaintiff argued that her "solution was the safer solution." Id. ¶¶ 200, 205.

On April 6, 2011, Plaintiff was told by another sergeant that she would be disciplined for an incident that had happened on his shift, when Plaintiff was not working. Id. ¶¶ 210-11. Plaintiff had a severe physiological reaction to this news, including hyper-ventilation, nausea, sweating, high blood-pressure, and a migraine. Id. ¶¶ 213-20. She was taken to the hospital. Id.

## C. Treatment Pre-Retirement

The following day, Plaintiff was told by her doctor that she should not work for two weeks. Id. ¶ 221. She gave Greene paperwork needed to obtain workers' compensation payments for the two-week period, but "Lieutenant Mahoney" refused to fill it out for four months because he believed Plaintiff's injury was not work related. Id. ¶¶ 224-30. Plaintiff also received a letter from Defendants in late July 2011 demanding that she "immediately return to work or be considered AWOL" even though she was on approved medical leave. Id. ¶¶ 231-32.[10]

Defendants falsely claimed that Plaintiff did not have sick or vacation time and thus did not pay her while she was on leave. Id. ¶ 234. Defendants also falsely claimed that Plaintiff was AWOL and on "probationary status," which, in combination with the failure to complete the workers' compensation paperwork, rendered her "essentially" ineligible for a facility transfer that she likely would have received had she been eligible. Id. ¶¶ 235-36.

In May 2011, Plaintiff filed a discrimination complaint with the New York State Division of Human Rights ("DHR"),[11] which commenced an investigation. Id. ¶¶ 9, 237. Defendants did not provide DHR with relevant videos or documentation, and falsely told DHR that Plaintiff had been on probation when she stopped working. Id. ¶¶ 238-40. Morse falsely described his tirade and claimed that Plaintiff had lost her temper and behaved unprofessionally. Id. ¶¶ 248-49. Weeks truthfully but misleadingly claimed that Plaintiff had not filed a written complaint with him; Plaintiff had instead followed established procedure by filing a **[**11]** complaint with Baldwin. Id. ¶¶ 246-47.

Greene has also failed to return personal items left by Plaintiff. Id. ¶ 250. On September 2, 2011, Plaintiff retired. Id. ¶ 263. She is currently receiving disability benefits from both the Social Security Administration and the New York State Retirement System. Id. ¶¶ 266-67.

## D. Procedural History

Plaintiff filed a Complaint with the Court on March 2, 2012. Dkt. No. 1 ("Original Complaint"). Defendants subsequently filed a Motion to dismiss and accompanying Memorandum of law. Dkt. Nos. 14 ("Original Motion"); 14-1 ("Original **[*89]** Memorandum"). Plaintiff then moved to amend the Original Complaint, and Defendants agreed to withdraw the Original Motion if the Court permitted Plaintiff to amend. Dkt. Nos. 18, 21. The Court permitted Plaintiff to do so, and Plaintiff then filed the Amended Complaint. Dkt. No. 22; Am. Compl. In it, she brought eight claims: (1) discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), _42 U.S.C. 2000e et seq._; (2) retaliation under Title VII; (3) denial of equal protection pursuant to _42 U.S.C. § 1983_; **[**12]** (4) denial of

---

[10] It is unclear when or how Plaintiff, who was told **[**10]** by her doctor in early April that she should not work for two weeks, was approved by DOCCS to be on medical leave through July.

[11] This complaint was dual-filed with the Equal Employment Opportunity Commission ("EEOC"). Am Compl. ¶ 9.

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 62 of 105
Page 11 of 26

970 F. Supp. 2d 78, *89; 2013 U.S. Dist. LEXIS 125726, **10

procedural and substantive due process; (5) *First Amendment* retaliation;[12] (6) conspiracy under *42 U.S.C. § 1985(3)*; (7) intentional infliction of emotional distress ("IIED"); and (8) prima facie tort. Am. Compl at 25-35. Plaintiff sought damages as well as declaratory and injunctive relief. Id. at 36-37. Defendants then filed the Motion and an accompanying Memorandum of law seeking dismissal of the Amended Complaint for both lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted, pursuant to *Rules 12(b)(1)* and *12(b)(6)*, respectively, of the Federal Rules of Civil Procedure. Mot.; Dkt. No. 25-1 ("Memorandum"). Many of the specific grounds on which Defendants sought dismissal were identical to the grounds raised in the Original Memorandum. Compare Original Mem., with Mem. Plaintiff filed the Response and Defendants a Reply. Resp.; Dkt. No. 30 ("Reply").


## III. DISMISSAL UNDER *RULE 12(b)(1)*

Defendants argue that the *Eleventh Amendment* deprives the Court of subject-matter jurisdiction over Plaintiff's claims to the extent those claims are brought against the Employer Defendants or for damages against the Individual Defendants in their official capacities. Mem. at 5-6.[13] **HN1** "The *Eleventh Amendment* immunizes states and state agencies from suits that seek both monetary damages and injunctive relief." *Kozaczek v. N.Y. Higher Educ. Servs. Corp., No. 10-cv-107, 2011 U.S. Dist. LEXIS 94466, 2011 WL 3687379, at *4 (D. Vt. Aug. 23, 2011)* **[**14]** (citing *Cory v. White, 457 U.S. 85, 90-91, 102 S. Ct. 2325, 72 L. Ed. 2d 694 (1982)*; *Alabama v. Pugh, 438 U.S. 781, 782, 98 S. Ct. 3057, 57 L. Ed. 2d 1114 (1978)*).[14] DOCCS and it facilities are **[*90]** state agencies for purposes of the *Eleventh Amendment*. See *Simmons v. Gowanda Corr. Facility, No. 13-CV-0647, 2013 U.S. Dist. LEXIS 92926, 2013 WL 3340646, at *2 (W.D.N.Y. July 1, 2013)*; *Jackson v. Johnson*, 985 F. Supp. 422, 426 (S.D.N.Y. 1997).

**HN2** States may waive their sovereign immunity or Congress may abrogate that immunity pursuant to authority granted by a subsequent constitutional amendment. *Gollomp v. Spitzer, 568 F.3d 355, 366 (2d Cir. 2009)*; *In re Deposit Ins. Agency, 482 F.3d 612, 623 (2d Cir. 2007)*. Congress did so in passing Title VII pursuant to its enforcement power under Section Five of the *Fourteenth Amendment*. See *Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 729-30, 123 S. Ct. 1972, 155 L. Ed. 2d 953 (2003)*; *Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S. Ct.*

---

[12] While Plaintiff explicitly states that her equal-protection claim is brought pursuant to *§ 1983*, she does not state the specific procedural mechanism upon which her due-process and *First Amendment* claims rest. These claims, to the extent they seek damages, must be brought pursuant **[**13]** to *§ 1983* as well. See *Koumantaros v. City Univ. of N.Y., No. 03 Civ. 10170, 2007 U.S. Dist. LEXIS 19530, 2007 WL 840115, at *5 (S.D.N.Y. Mar. 19, 2007)* ("Plaintiff claims defendant violated the due process and *equal protection clauses of the Fourteenth Amendment*. . . . [B]ecause *§ 1983* provides a remedy for plaintiff's causes of action, plaintiff cannot base her constitutional claims directly on the *Fourteenth Amendment*." (citing *Pauk v. Bd. of Trustees of City Univ. of N.Y., 654 F.2d 856, 865 (2d Cir. 1981)*); see also *Koger v. Woody, No. 9-cv-90, 2009 U.S. Dist. LEXIS 53084, 2009 WL 1766639, at *7 (E.D. Va. June 22, 2009)* ("A claim of 'retaliation' for the exercise of *First Amendment* rights must be asserted under *42 U.S.C. § 1983*.").

[13] Plaintiff correctly notes that Defendants failed to comply with *Local Rule 7.1(a)(2)*, which requires that motions to dismiss for lack of subject-matter jurisdiction must be accompanied by an affidavit. Resp. at 21. The Court deems this omission harmless because Defendants have raised only legal arguments. Moreover, even if Defendants' failure to file an affidavit rendered dismissal pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure* inappropriate, the Court would still *sua sponte* dismiss, pursuant to *Rule 12(h)(3) of the Federal Rules of Civil Procedure*, those claims over which it lacked of subject-matter jurisdiction.

[14] Plaintiff argues that her claims should not be dismissed on *Eleventh Amendment* grounds before she conducts discovery regarding the Employer Defendants' "patterns and practices with respect to sex discrimination and constitutional **[**15]** violations." Resp. at 21. This appears to be a reference to the requirement that a municipality cannot be held liable under *§ 1983* unless the violation of an individual's rights was the result of a custom or policy. See *Monell v. Dep't of Social Servs., 436 U.S. 658, 690-695, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. This requirement has no bearing on states' sovereign immunity under the *Eleventh Amendment*.

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 63 of 105
Page 12 of 26

970 F. Supp. 2d 78, *90; 2013 U.S. Dist. LEXIS 125726, **15

*2666, 49 L. Ed. 2d 614 (1976)*. The Motion, to the extent it seeks dismissal of Plaintiff's Title VII claims under *Rule 12(b)(1)*, is therefore denied. Because Congress has not abrogated, and Plaintiff has not waived, sovereign immunity with respect to Plaintiff's non-Title VII claims, see, e.g., *Santiago v. N.Y.S. Dep't of Corr. Servs., 945 F.2d 25, 30 (2d Cir. 1991)*; **[**16]** *Moore v. City of New York, No. 08-CV-2449, 2011 U.S. Dist. LEXIS 20370, 2011 WL 795103, at *4, *7 n.3 (E.D.N.Y. Feb. 28, 2011)*; *Koumantaros, 2007 U.S. Dist. LEXIS 19530, 2007 WL 840115, at *5*, those claims, to the extent they are brought against the Employer Defendants, are dismissed for lack of subject-matter jurisdiction.

*HN3* "The 'state' for purposes of the *Eleventh Amendment* generally includes . . . state officials sued in their official capacities." *Riley v. Town of Bethlehem, 44 F. Supp. 2d 451, 457 (N.D.N.Y. 1999)* (citing *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978))*. In *Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*, the U.S. Supreme Court "carved out a 'narrow exception to the general rule of *Eleventh Amendment* immunity from suit.'" *Murray v. New York, 585 F. Supp. 2d 471, 472 (W.D.N.Y. 2008)* (quoting *Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 438, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004))*. Under this exception, "'a plaintiff may sue a state official acting in his official capacity—notwithstanding the *Eleventh Amendment*—for prospective, injunctive relief from violations of federal law.'" *State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 95 (2d Cir. 2007)* (quoting *In re Deposit Ins. Agency, 482 F.3d at 617*). A party may sue under Ex Parte Young to stop a present **[**17]** and continuing violation of federal law that is premised on past state actions, but cannot obtain relief that would be tantamount to an award of damages for those past actions.[15] See *Papasan v. Allain, 478 U.S. 265, 278, 281, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)*; *State Emps. Bargaining [*91] Agent Coalition, 494 F.3d at 97-98*. In the employment context, a request for reinstatement is not barred by the *Eleventh Amendment* because "[r]einstatement is purely prospective injunctive relief that orders the state official to return the former employee to the state's payroll." *Dwyer v. Regan, 777 F.2d 825, 836 (2d Cir. 1985)*. The recovery of attorneys' fees is also permitted as relief ancillary to prospective relief. *N.Y.C. Health & Hosps. Corp. v. Perales, 50 F.3d 129, 135 (2d Cir. 1995)*. However, a claim for damages, including back pay, front pay, and compensatory and punitive damages, is barred by the *Eleventh Amendment*. See *Campbell v. Ark. Dep't of Corr., 155 F.3d 950, 962 (8th Cir. 1998)*; *Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698 (3d Cir. 1996)*; *Freeman v. Mich. Dep't of State, 808 F.2d 1174, 1179 (6th Cir. 1987)*; *Dwyer, 777 F.2d at 836*. Plaintiff's non-Title VII claims against the Individual Defendants in their official **[**18]** capacities are therefore, to the extent damages are sought, dismissed for lack of subject-matter jurisdiction.[16]

## IV. DISMISSAL UNDER *RULE 12(b)(6)*

### A. Legal Standard

*HN4* To survive a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* **[**19]** (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*; see also *Fed. R. Civ. P. 12(b)(6)*. A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See *Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006)*. A complaint may be dismissed pursuant to *Rule*

---

[15] Plaintiff argues that her claims against the Individual Defendants should not be dismissed on *Eleventh Amendment* grounds before she conducts discovery "with respect to their official vs. individual capacities . . . and thus a determination of immunity and/or qualified immunity." Resp. at 21. But because the *Eleventh Amendment* automatically applies where a state official is sued for damages in her official capacity, and because Defendants seek dismissal only of Plaintiff's damages claims against the Individual Defendant in their official capacities, the requested discovery would be irrelevant.

[16] Plaintiff has not brought Title VII claims against the Individual Defendants, as there is no individual liability under Title VII. See *Tomka v. Seiler Corp., 66 F.3d 1295, 1314 (2d Cir. 1995)*.

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 64 of 105
Page 13 of 26

970 F. Supp. 2d 78, *91; 2013 U.S. Dist. LEXIS 125726, **19

*12(b)(6)* only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." *Twombly, 550 U.S. at 570*. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Id. at 556*. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 556 U.S. at 678* (citing *Twombly, 550 U.S. at 556*). "[T]he pleading standard *Rule 8* announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (citing *Twombly, 550 U.S. at 555*). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and **[\*\*20]** the action is subject to dismissal. See *id. at 678-79*. **HN5** Where a plaintiff has already been given notice of a claim's deficiencies and the opportunity to amend her complaint, a court may dismiss that claim with prejudice. See *Advanced Marine Techs. v. Burnham Sec..., 16 F. Supp. 2d 375, 384 (S.D.N.Y.1998)*. Leave to amend should also be denied if any amendment would be futile. See *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*; *Rivera v. Governor of N.Y., 92 Fed. Appx. 25, 2004 WL 569274, at \*1 (2d Cir. 2004)*.


**B. Title VII Claims**


*1. Discrimination*

Defendants argue that Plaintiff's Title VII discrimination claim must **[\*92]** be dismissed because Plaintiff has not alleged any conduct amounting to an adverse employment action. See Mem. at 6-13; *Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006)* (noting that conduct is actionable as discrimination under Title VII only where it amounts to an "adverse employment action"). **HN6** "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry v. Ashcroft, 336 F.3d 128, 133 (2d Cir. 2003)* (internal quotation marks omitted). A hostile work environment constitutes an adverse employment action. **[\*\*21]** *Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)*. "[T]he misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id. at 374* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993))*. A plaintiff may show that "a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)* (citation and internal quotation marks omitted). "[C]ourts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 693 (2d Cir. 2012)* (citation, internal quotation marks, and alterations omitted).

Here, Plaintiff alleges that she was subjected to a public verbal tirade featuring the use of offensive and explicitly **[\*\*22]** gendered terms—a tirade that reduced her standing among co-workers and inmates and had the potential to endanger her safety. Such conduct might, alone, suffice to give rise to a hostile-work-environment claim. See *Dawson v. Cnty. of Westchester, 373 F.3d 265, 273 (2d Cir. 2004)* (reversing grant of motion to dismiss where correctional-officer plaintiffs' co-workers disseminated sexually-explicit letters written by inmates regarding plaintiffs); *Howley v. Stratford, 217 F.3d 141, 154 (2d Cir. 2000)* (reversing grant of summary judgment on hostile-work-environment claim based primarily on a single incident where supervisor publicly called firefighter-plaintiff a "whining cunt" and suggested that she had not been promoted because she did not "suck cock good enough"). This is particularly so given the dangerous nature of correctional work:

> [I]n the prison context especially, officers must depend upon their co-workers for mutual protection and rely upon them for their own ability to assert authority over others in potentially dangerous situations. In such a setting, actions of co-officers and superiors that undermine an officer's sense of personal safety or compromise her capacity to command **[\*\*23]** respect and obtain compliance from co-workers, subordinates, and inmates assume greater, not lesser, significance.

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 65 of 105

Page 14 of 26

970 F. Supp. 2d 78, *92; 2013 U.S. Dist. LEXIS 125726, **23

*Dawson, 373 F.3d at 273 (2d Cir. 2004)*; see also *Howley, 217 F.3d at 154* (noting that the "fomenting of gender-based skepticism" might easily diminish the respect accorded plaintiff and thereby impair her ability to lead in the "life-threatening circumstances often faced by firefighters"). Plaintiff's allegations regarding Morse's public tirade, in combination with putatively discriminatory co-worker shunning and tire-slashing threats, assignment denials, performance criticisms, discipline, vigilant monitoring, safety-threatening phone vandalism, and overtime- and leave-pay denials, **[*93]** are certainly sufficient to plausibly suggest the existence of an objectively hostile environment. See *Petrosino v. Bell Atl., 385 F.3d 210, 229 (2d Cir. 2004)* (holding that plantiff could offer proof of her unsuccessful efforts to secure managerial positions in support of her hostile-work-environment claim); *Duzant v. Electric Boat Corp. 81 F. App'x 370, 371-72 (2d Cir. 2003)* (affirming denial of employer's summary judgment motion on discriminatory-denial-of-overtime claim); *Parrott v. Krasicky, No. 12-CV-820, 2013 U.S. Dist. LEXIS 92630, 2013 WL 3338570, at *2 (D. Conn. July 2, 2013)* **[**24]** (denying motion to dismiss discriminatory-denial-of-paid-leave claim); *Pratesi v. N.Y.S. Unified Ct. Sys., No. 08-4828, 2010 U.S. Dist. LEXIS 11087, 2010 WL 502950, at *11 (E.D.N.Y. Feb. 9, 2010)* (finding plaintiff's allegations of harassing comments and discriminatory non-promotion sufficient to withstand a motion to dismiss her hostile-work-environment claim); *Anderson v. Nassau Cnty. Dep't of Corr., 558 F. Supp. 2d 283, 295-96 (E.D.N.Y. 2008)* (denying summary judgment on hostile-work-environment claim based on discriminatory statements, failure to promote, and improper discipline). Plaintiff has also sufficiently alleged, through her description of the emotional and physiological toll of Defendants' treatment, that she subjectively perceived her work environment to be abusive.

Plaintiff also argues that her retirement was an adverse employment action because she was constructively discharged. See Resp. at 12. **HN7** "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry, 336 F.3d at 151-52.* "The inquiry is objective: Did working conditions become so intolerable that a reasonable **[**25]** person in the employee's position would have felt compelled to resign?" *Pa. State Police v. Suders, 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).* This is a "demanding" standard. *Miller v. Praxair, Inc., 408 F. App'x 408, 410 (2d Cir. 2010).* "The standard for constructive discharge is even higher than that required to prevail on a hostile environment claim." *Mandel v. Champion Int'l Corp., 361 F. Supp. 2d 320, 327 (S.D.N.Y. 2005)*; see also *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000)* (denying summary judgment on hostile-work-environment claim but granting summary judgment on constructive discharge claim). "[A] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Stetson v. NYNEX Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993).*

The constructive-discharge inquiry focuses on the working conditions preceding the employee's resignation. See *McKelvey v. Sec'y of U.S. Army, 450 F. App'x 532, 535 (6th Cir. 2011)* **[**26]** ("Plaintiffs alleging constructive discharge must establish that 'the working environment *at the time of their resignation*' forced them to quit." (quoting *Baugham v. Battered Women, Inc., 211 F. App'x 432, 440 (6th Cir. 2006)));* *Petrosino, 385 F.3d at 230* (finding no constructive discharge, despite eight-year hostile work environment, because employee had endured that harassment and employer's actions immediately preceding resignation had not '"ratcheted'" the harassment up to '"the breaking point'" (quoting *Suders, 542 U.S. at 147-48*)); *Woodcock v. Montefiore Med. Ctr. Univ. Hosp., No. 98-CV-4420, 2002 U.S. Dist. LEXIS 2965, 2002 WL 403601, at *7 (E.D.N.Y. Jan. 28, 2002)* (finding no constructive discharge **[*94]** where plaintiff resigned months after most of the incidents upon which the constructive-discharge claim was premised). Constructive discharge is therefore unlikely to be found where an employee's working conditions materially improve before she resigns. See *Aguirre v. City of Miami, No. 04-23205-CIV, 2007 U.S. Dist. LEXIS 67328, 2007 WL 2700579, at *5 (S.D. Fla. Sept. 12, 2007).*

In this case, Plaintiff did not retire until September 2011. The most egregious discriminatory incident, Morse's tirade, took place eight months before her retirement **[**27]** and approximately three months before she stopped working. Moreover, this incident took place at a different facility than the facility at which Plaintiff was working when she went on leave and to which Plaintiff would have returned had she not resigned. Plaintiff has not alleged that this incident, the vandalism of her chair and phone, or the co-worker shunning at Coxsackie had any carry-over effect on her

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 66 of 105

Page 15 of 26

970 F. Supp. 2d 78, *94; 2013 U.S. Dist. LEXIS 125726, **27

work environment at Greene.[17] See *Butts v. N.Y.C. Dep't of Hous. Pres., No. 00-CV-6307, 2007 U.S. Dist. LEXIS 6534, 2007 WL 259937, at *21 (S.D.N.Y. Jan. 29, 2007)* (finding no constructive discharge where much of the conduct underlying Plaintiff's constructive-discharge claim occurred under previous supervisors).

At Greene, Plaintiff: (1) received a job assignment that she "would have preferred" not to have and that she could have refused; (2) was watched while working; (3) was criticized for what she perceived to be appropriate conduct; (4) was given a single formal counseling that did not carry with it any reduction in pay or responsibility; and (5) and was told by another sergeant that she would be disciplined for an incident for which she was not responsible. After Plaintiff stopped working in April 2011, Defendants delayed filling out her workers' compensation paperwork, made false statements to the DHR, denied Plaintiff paid leave, and "effectively" prevented her from a lateral transfer to another facility. Much of Defendants' conduct while Plaintiff was on leave had little impact on her working conditions—had Plaintiff returned to Greene, Morse's inaccurate statements to the DHR or Defendants' failure to timely fill out the workers' compensation paperwork would not have affected Plaintiff's day-to-day experience. Cf. *Cecil v. U.S. Postal Serv., No. 3 Civ. 8404, 2004 U.S. Dist. LEXIS 16766, 2004 WL 1886202, at *2 (S.D.N.Y. Aug. 24, 2004)* [**29] (finding that significant time period between the commencement of plaintiff's sick leave and her retirement "makes it less likely that the resignation was prompted by an atmosphere so intolerable that a reasonable person would have felt compelled to resign." (internal quotation marks omitted)). Defendants' post-Coxsackie conduct, however discriminatory or unpleasant, cannot give rise to a constructive discharge claim, because a reasonable employee would not have felt compelled to resign. See *Miller, 408 F. App'x at 410* ("[R]outine disagreements with supervisors or mild criticisms . . . are simply insufficient to establish the sort of 'intolerable' working conditions necessary to a constructive discharge claim"); *Heno v. Sprint/United Mgmt. Co., 208 F.3d 847 [*95] (10th Cir. 2000)* (no constructive discharge where plaintiff's telephone calls were monitored and her employer refused to further investigate her discrimination complaint after she filed an EEOC complaint); *Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 241 (4th Cir. 1997)* (holding that supervisor's ordering of other employees to spy on plaintiff and plaintiff's unfavorable assignment did not amount to a constructive discharge); [**30] *Stetson, 995 F.2d at 360-62* (holding that plaintiff's dissatisfaction with criticisms of his work, his compensation, and employer's failure to allow him to transfer, did not support claim of constructive discharge); *Trimble v. Alliance-DeKalb/Rock-Tenn Co., 801 F. Supp. 2d 764, 778 (N.D. Ill. 2011)* (finding that a constructive-discharge claim "clearly fail[ed]" where the plaintiff was "subjected to increased monitoring, received a negative review, was removed from the interview committee, and received a verbal warning—all without cause"); *Carone v. Mascolo, 573 F. Supp. 2d 575, 597 (D. Conn. 2008)* (finding no constructive discharge where plaintiff received four letters of reprimand and a suspension); *Chavez v. Iberia Foods Corp., No. 05 CV 2464, 2007 U.S. Dist. LEXIS 47449, 2007 WL 1959028, at *8 (E.D.N.Y. June 29, 2007)* (granting summary judgment on constructive-discharge claim where plaintiff was allegedly deprived of bonuses and health benefits to which he was entitled).

However severe Plaintiff's reaction may have been to the treatment she received, and however many entities may have deemed Plaintiff disabled or unable to work as a result of that treatment, the intolerability of working conditions is an objective [**31] test. See, e.g., *Munday, 126 F.3d at 241* (finding no constructive discharge where plaintiff went on job-stress-related disability leave); *Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993)*; *Carone, 573 F. Supp. 2d at 597 (D. Conn. 2008)*; *Nakis v. Potter, 422 F. Supp. 2d 398, 416 (S.D.N.Y. 2006)*.

*HN9* A constructive-discharge claim may also lie where an employee resigns in the face of an impending and inevitable termination. See *Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 377 (7th Cir. 1998)* ("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired."); *Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1989)* (finding constructive discharge where employee was told that he would be fired at the end of a 90-day period). However, "apprehension of future termination is

---

[17] Even if these incidents had happened more recently and at Greene, they likely would not give rise to a constructive-discharge claim. As discussed *supra*, *HN8* an employer must intentionally create intolerable working conditions for a constructive-discharge claim to lie. See *Whidbee, 223 F.3d at 74*. Thus, the conduct giving rise to an employee's resignation must be the result of an employer's "deliberate action." Id. An employer's negligent failure to prevent or remedy co-worker harassment does not amount [**28] to deliberate action. Id. Plaintiff has, at most, alleged that the Employer Defendants were negligent with respect to Morse's tirade and the co-worker shunning.

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 67 of 105

Page 16 of 26

970 F. Supp. 2d 78, *95; 2013 U.S. Dist. LEXIS 125726, **28

insufficient to establish constructive discharge—instead, an employee is obliged not to assume the worst, and not to jump to conclusions too fast." *Torrech-Hernandez v. GE., 519 F.3d 41, 52 (1st Cir. 2008)*; see also *Stetson, 995 F.2d at 361* (finding no constructive discharge where employer "never either expressly or implicitly suggested **[\*\*32]** that [plaintiff's] employment would be terminated"). Thus, "when an employee resigns rather than respond to disciplinary charges, the resignation cannot later be construed as a constructive discharge." *Bailey v. N.Y.C. Bd. of Educ., 536 F. Supp. 2d 259, 266 (E.D.N.Y. 2007)*; see also *Carmellino v. District 20, No. 03 Civ. 5942, 2006 U.S. Dist. LEXIS 63705, 2006 WL 2583019, at \*4 (S.D.N.Y. Sept. 6, 2006)*. When she ceased working and then later retired, Plaintiff had been formally counseled twice, had never been suspended, and was facing the possibility of unspecified additional discipline. The prospect of termination was simply too remote to give rise to a constructive-discharge claim premised on inevitable termination. Plaintiff's Title VII discrimination claim, to the extent it alleges constructive discharge, is therefore dismissed. The Court denies Plaintiff leave to amend because: (1) the Original Memorandum gave **[\*96]** Plaintiff notice of the infirmities of her constructive-discharge allegations; and (2) any amendment would be futile. See Original Mem. at 6-9, 12-13, 16-20.

*2. Retaliation*

Defendants also seek dismissal of Plaintiff's Title VII retaliation claim on the ground that the conduct at issue was insufficiently **[\*\*33]** adverse. Mem. at 18. **HN10** Retaliation is actionable only where it amounts to a materially adverse action—an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)*. This is a "lesser standard" than the adverse-employment-action standard discussed *supra*. *Evarts v. S. New Eng. Tel. Co., No. CV 112, 2006 U.S. Dist. LEXIS 71257, 2006 WL 2864716, at \*10 (D. Conn. Oct. 2, 2006)*. The litany of putatively retaliatory conduct Plaintiff endured following her discrimination complaints, including unmerited criticism and discipline, the failure to remedy Morse's treatment, repeated co-worker shunning and threats of tire slashing, video-camera monitoring, denial of vacation pay, and delay in filling out workers' compensation paperwork, might well have dissuaded a reasonable employee from complaining about discrimination. See *Richardson v. N.Y.S. Dep't of Corr. Servs., 180 F.3d 426, 446 (2d Cir. 1999)* ("[U]nchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the [adverse action requirement].") , abrogated on other grounds by *Burlington N, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345*; **[\*\*34]** *Uddin v. City of New York, 316 F. App'x 4, 5-6 (2d Cir. 2008)* (finding disciplinary charges that were to remain in employee's file, as well as employer's removal of employee's phone, sufficiently adverse); *Klaes v. Jamestown Bd. of Public Utils., No. 11-CV-606, 2013 U.S. Dist. LEXIS 45872, 2013 WL 1337188, at \*11 (W.D.N.Y. Mar. 29, 2013)* (finding adverse action based on Plaintiff's compelled use of sick-time benefits). Plaintiff has thus sufficiently alleged a materially adverse action. However, for the reasons discussed *supra*, Plaintiff cannot make out a claim for retaliatory constructive discharge.

## B. Constitutional Claims

Plaintiff brings four constitutional claims: (1) *First Amendment* retaliation; (2) denial of procedural and substantive dues process; (3) denial of equal protection under *§ 1983*; and (4) conspiracy under *§ 1985(3)*. Am. Compl. at 26-31. The first claim is brought against "each Defendant;" the second against the Employer Defendants and the Individual Defendants in their official capacity; the third against "all Defendants;" and the fourth against Morse, Weeks, Roe, and Doe. Id. Defendants seek dismissal of that part of each of these claims not dismissed for lack of subject-matter jurisdiction.

*1. **[\*\*35]** First Amendment Retaliation*

**HN11** The *First Amendment* protects a public employee's speech from retaliation only where the employee spoke "on a matter of public concern." *Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008)* (quoting *Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006))*. "Speech deals with matters of public

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 68 of 105
Page 17 of 26

970 F. Supp. 2d 78, *96; 2013 U.S. Dist. LEXIS 125726, **35

concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps, 131 S. Ct. 1207, 1216, 179 L. Ed. 2d 172 (2011)* (citation and internal quotation marks omitted). Thus, speech that "primarily **[*97]** concerns an issue that is personal in nature and generally related to [the speaker's] own situation, such as his or her assignments, promotion, or salary, does not address matters of public concern." *Jackler v. Byrne, 658 F.3d 225, 236 (2d Cir. 2011)* (internal quotation marks omitted); *see also Ezekwo v. N.Y.C. Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991)* (upholding the dismissal of a medical resident's *First Amendment* claim involving complaints about aspects of residency program that **[**36]** negatively affected her because those complaints were "personal in nature and generally related to her own situation"); *Agard v. N.Y.S. Dep't of Taxation & Fin., No. 10-CV-4726, 2012 U.S. Dist. LEXIS 34614, 2012 WL 601474, at *6 n.7 (E.D.N.Y. Feb. 23, 2012)* ("[R]etaliation against the airing of generally personal grievances is not brought within the protection of the *First Amendment* by the mere fact that one or two of a public employee's comments could be construed broadly to implicate matters of public concern." (quoting *Ruotolo, 514 F.3d at 190*) (quotation marks and brackets omitted)).

All of Plaintiff's complaints regarding discrimination, whether made internally or to the EEOC and DHR, concerned only discrimination against her. This speech was therefore not on a matter of public concern. *See Pressley v. City of New York, No. 11-CV-3234, 2013 U.S. Dist. LEXIS 5374, 2013 WL 145747, at *10 (E.D.N.Y. Jan. 14, 2013)* (finding speech unprotected where "Plaintiff's EEOC complaints concerned unfair treatment and denial of transfers, which involves her own situation and is not a public matter"); *Jay Jian-Qing Wang v. Swain, No. 09-CV-306, 2011 U.S. Dist. LEXIS 25164, 2011 WL 887815, at *9 (N.D.N.Y. Mar. 14, 2011)* ("The mere filing of an EEOC complaint does not equate with *First Amendment* **[**37]** protected speech . . . . [T]he nature of EEOC complaints are to address personal grievances about the way an employee has been treated by an employer."); *cf. Friel v. Cnty. of Nassau, No. 12-CV-4297, 947 F. Supp. 2d 239, 2013 U.S. Dist. LEXIS 75361, 2013 WL 2316644, at *16 (E.D.N.Y. May 25, 2013)* (finding protected speech where plaintiff's EEOC charge concerned how challenged policy was causing "'system-wide' gender discrimination impacting all female detectives, not just the Plaintiff"). For the same reason, Plaintiff's internal complaints regarding discipline she received, to the extent those complaints alleged merely that such discipline was procedurally improper or unfair, do not amount to speech regarding matters of public concern.

Plaintiff argues that some of her communications implicated prison safety, management, and inmate-welfare issues. Resp. at 15-16. But these communications cannot constitute protected speech because: (1) the Amended Complaint does not allege that Plaintiff addressed these issues; and (2) even if Plaintiff did address these issues, she did so in the context of complaining about her own working conditions or defending her conduct in the face of Defendants' criticisms and imposition of discipline. *See Garcia v. City of Hartford Police Dep't, No. 95-CV-279, 2011 U.S. Dist. LEXIS 111356, 2011 WL 4460321, at *13-14 (D. Conn. Sept. 27, 2011)* **[**38]** (granting motion for summary judgment where plaintiff spoke at a press conference in order to defend himself from his employer's accusations); *Carroll v. Neumann, 204 F. Supp. 2d 1344, 1351 (S.D. Fla. 2002)* (finding that speech by plaintiff-toxicologist criticizing his employer's procedures was not on a matter of public concern because speech was made in the context of plaintiff's defending himself against an internal investigation of errors occurring in his lab). Plaintiff now claims that she complained about "the improper use of State time (stalking on video monitors)" and "the vandalism of State property, which was a safety concern for everyone assigned **[*98]** to that work space." Resp. at 15. But while the Amended Complaint does allege that Plaintiff complained about being monitored and having her equipment vandalized, it does not allege Plaintiff ever addressed the budgetary and safety implications of this conduct. Even if she had done so, and even though Plaintiff does allege that she addressed inmate disciplinary procedures, she did so only in the context of either: (1) expressing concerns about her own working conditions; or (2) responding to, and attempting to challenge, reprimands **[**39]** and discipline. *See* Am. Compl. ¶¶ 98-101, 202, 205-06. This speech was therefore unprotected.

Plaintiff also alleges that she "questioned" an order to falsify a report regarding an incident that had been "mishandled by [a] nurse . . . with respect to an inmate's medication." Id. ¶¶ 146-49. But her allegations regarding the incident and Plaintiff's speech are entirely too sparse and vague to sufficiently allege that the latter was

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 69 of 105
Page 18 of 26

970 F. Supp. 2d 78, *98; 2013 U.S. Dist. LEXIS 125726, **39

protected—speech questioning an order to lie is not inherently protected.[18] Cf. *Buazard v. Meridith, 172 F.3d 546, 549 (8th Cir. 1999)* ("If, as plaintiff contends, his superior ordered him to lie and then demoted him for refusing, an injustice has been done. But it is not one actionable . . . on a free-speech theory."); *Poli v. SEPTA, No. Civ. A. 97-6766, 1998 U.S. Dist. LEXIS 9935, 1998 WL 405052, at *8 (E.D. Pa. July 7, 1998)* (finding employee-plaintiff's speech unprotected where plaintiff questioned employer's order because of consequences he believed he might face if he complied ). Plaintiff's *First Amendment* retaliation claim is therefore dismissed. The Court denies Plaintiff leave to amend her *First Amendment* claim because: (1) the Original Memorandum gave Plaintiff notice of this **[**40]** claim's infirmities; and (2) any amendment would be futile. See Original Mem. at 6-12, 16-20.


*2. Due Process*

a. Procedural Due Process

The *Fourteenth Amendment* provides, in relevant part, that *HN12* "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. *HN13* "To plead a violation of procedural due process, a plaintiff must plausibly allege that he was deprived of property without constitutionally adequate pre- or post-deprivation process." *J.S. v. T'Kach, 714 F.3d 99, 105 (2d Cir. 2013)* (citing *Ahlers v. Rabinowitz, 684 F.3d 53, 62 (2d Cir. 2012))*. "[A] plaintiff must 'first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process.'" Id. (quoting *Local 342 v. Town Bd. of Huntington, 31 F.3d 1191, 1194 (2d Cir. 1994))* (second alteration in original).

Plaintiff premises **[**41]** her claim for deprivation of due process on her putatively constructive discharge. Am. Compl. ¶¶ 298-302. Her claim fails for two reasons. First, even if Plaintiff had a property right in her continued employment, she has not shown that she was deprived of that right—the Court has already determined *supra* that she was not constructively discharged. See *Abel v. City of Algona, No. C07-956, 2008 U.S. Dist. LEXIS 83556, 2008 WL 4542428, at *9 (W.D. Wash. Oct. 8, 2008)* (applying Title VII constructive-discharge standard to claim for denial of procedural due process).

Moreover, even if Plaintiff was constructively discharged, she cannot show that she did not receive due process. [*99] *HN14* While a public employee with a property right in her job is normally entitled to a pre-termination hearing, see *Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)*, employees who are constructively discharged are not. See *Hoover v. Cnty. of Broome, 340 F. App'x 708, 711 (2d Cir. 2009)*; *Giglio v. Dunn, 732 F.2d 1133, 1134-35 (2d Cir. 1984)* ("When an employee resigns, the only possible dispute is whether the resignation was voluntary or involuntary, and this cannot be determined in advance."); *Fortunato v. Liebowitz, No. 10 Civ. 02681, 2012 U.S. Dist. LEXIS 180396, 2012 WL 6628028, at *4 (S.D.N.Y. 2012)*.[19] **[**42]** As long as a meaningful post-resignation hearing is available, a constructively discharged employee has received constitutionally adequate process. *Giglio, 732 F.2d at 1135*; *Hoover, 340 F. App'x at 711*. A hearing under *N.Y. C.P.L.R. § 7801 et seq.* ("Article 78 hearing") is meaningful. *Giglio, 732 F.2d at 1135*; *Hoover, 340 F. App'x at 711*. Thus, if Plaintiff could have initiated an Article 78 proceeding, she has not been denied due process.

---

[18] Defendants previously noted that the Original Complaint's description of this incident was "vague" and "conclusory." Original Mem. at 13. Despite being put on notice of this deficiency, Plaintiff failed to provide any additional details in the Complaint.

[19] Plaintiff correctly notes that, in general, a pre-deprivation hearing may be required where the deprivation is predictable because it is the result of an established policy or procedure. *Hellenic Am. Neighborhood Action Committee v. City of New York, 101 F.3d 877, 880 (2d Cir. 1996)*. However, courts in this circuit have consistently found that this principle is inapplicable to constructive-discharge claims and that a pre-resignation hearing is therefore not required even when the constructive discharge was the result of an established policy or procedure or was otherwise predictable. See *Giglio, 732 F.2d at 1134-35*; *Stenson v. Kerlikowske, No. 99-7833, 2000 U.S. App. LEXIS 3478, 2000 WL 254048, at *1 (2d Cir. Mar. 3, 2000)*; *Fleming v. Kerlikowske, No. 99-7677, 1999 U.S. App. LEXIS 32445, 1999 WL 1212553, at *2 (2d Cir. Dec. 10, 1999)*; **[**43]** *Fortunato, 2012 U.S. Dist. LEXIS 180396, 2012 WL 6628028, at *4*.

970 F. Supp. 2d 78, *99; 2013 U.S. Dist. LEXIS 125726, **43

Article 78 proceedings are available to public employees, including employees of state agencies. See *Giglio, 732 F.2d at 1135*; *Sebast v. Mahan, 754 F. Supp. 2d 423 (N.D.N.Y. 2010)*; *Allen v. Howe, 84 N.Y.2d 665, 645 N.E.2d 720, 621 N.Y.S.2d 287 (N.Y. 1994)*. The only argument Plaintiff advances regarding the putative unavailability of an Article 78 proceeding is that Defendants' "actions in refusing to cooperate in providing paperwork to Worker's Compensation delayed the process beyond the 90 days limitation of an Article 78." Resp. at 18. Plaintiff errs in suggesting that Defendants' delay in filling out workers' compensation paperwork caused the statute of limitations for an Article 78 proceeding to run, thereby rendering this adequate procedure unavailable to Plaintiff. *HN15* Where a plaintiff is constructively discharged, the statute of limitations applicable to commencing Article 78 proceedings—*N.Y. C.P.L.R. § 217(1)*—begins to runs on the date of the resignation. See *Lewis v. State Univ. of N.Y. Downstate Med. Ctr., 35 A.D.3d 862, 826 N.Y.S.2d 722, 724 (App. Div. 2006)*; *Meyers v. City of New York, 208 A.D.2d 258, 622 N.Y.S.2d 529, 534 (App. Div. 1995)*.[20] Here, Plaintiff resigned in September 2011, after Defendants **[\*\*44]** had submitted the required workers' compensation paperwork. Moreover, Plaintiff has offered no explanation as to how the paperwork delay prevented her from bringing an Article 78 proceeding. While a workers' compensation finding might have provided some support for her assertion that she was constructively discharged, Plaintiff has not pointed to any authority suggesting that such a finding is a prerequisite to commencing an Article 78 proceeding or that an Article 78 hearing that takes place without such a finding is constitutionally defective. Her claim for a violation of procedural due process is **[\*100]** therefore dismissed. Furthermore, the Court denies Plaintiff leave to amend her procedural-due-process claim because: (1) the Original Memorandum gave Plaintiff notice of this claim's infirmities; and (2) any amendment would be futile. See Original Mem. at 9-12. 15-20.

### b. Substantive Due Process

Plaintiff's claim for a violation of substantive due process also fails. *HN16* "To state a substantive due process claim, a plaintiff must allege that: (1) the complained-of state action compromised a constitutionally-protected **[\*\*45]** liberty or property right, and (2) the state action that deprived him of that interest was oppressive or arbitrary." *JG & PG ex rel. JGIII v. Card, No. 08-CV-5668, 2009 U.S. Dist. LEXIS 85372, 2009 WL 2986640, at \*5 (S.D.N.Y. Sept. 17, 2009)*. "For a substantive due process claim to survive a *Rule 12(b)(6)* dismissal motion, it must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005)* (quoting *Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998))*.

As alleged in the Amended Complaint, Plaintiff's substantive-due-process claim is premised on her constructive discharge. See Am. Compl. ¶¶ 301-02. Because the Court has already determined that Plaintiff was not constructively discharged, this claim must be dismissed. See *Carone, 573 F. Supp. 2d at 596 (D. Conn. 2008)*.

The claim fails for another reason. *HN17* "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994)* **[\*\*46]** (internal quotation marks omitted). Thus, substantive-due-process claims must be dismissed where they are "merely duplicative of claims explicitly protected under other constitutional sources." *Roman v. Velleca, No. 11-CV-186, 2012 U.S. Dist. LEXIS 136946, 2012 WL 4445475, at \*10 (D. Conn. Sept. 25, 2012)*.

Here, Plaintiff's substantive-due-process claim overlaps entirely with her procedural-due-process claim—they both seek to remedy the same harm and challenge the same conduct. See Am. Compl. ¶¶ 296-302. Moreover, the harm and conduct challenged by the substantive-due-process, *First Amendment*, and equal-protection claims significantly overlap. Because the claim for substantive due process is subsumed by Plaintiff's other constitutional claims, it must be dismissed. See *Cronin v. St. Lawrence, No. 08-CV-6346, 2009 U.S. Dist. LEXIS 68320, 2009 WL 2391861, at \*8 (S.D.N.Y. Aug. 5, 2009)*.

---

[20] The statute of limitations is four months, not ninety days. See *N.Y. C.P.L.R. § 217(1)*.

970 F. Supp. 2d 78, *100; 2013 U.S. Dist. LEXIS 125726, **46

In her Response, Plaintiff argues that her substantive-due-process claim is also premised, in part, on Defendants' discriminatory failure to transfer her, provide her with paid leave, and submit her workers' compensation paperwork. Resp. at 19. But a claim based on this conduct is also subsumed by Plaintiff's equal-protection claim; moreover, this conduct does not **[\*\*47]** shock the conscience and thus does not rise to the level of a substantive-due-process violation. See _Thomas v. N.Y.C. Dep't of Educ., No. 10-CV-464, 938 F. Supp. 2d 334, 2013 U.S. Dist. LEXIS 48271, 2013 WL 1346258, at \*17 (E.D.N.Y. Mar. 29, 2013)_ (holding that discriminatory failure to accommodate disabled plaintiff and compelled leave of absence did not amount to a substantive-due-process violation). Plaintiff's claim for a violation of substantive due process is therefore dismissed. The Court denies Plaintiff leave to amend because any amendment would be futile.

**[\*101]**  _3. Equal Protection_

_HN18_ "To prove a violation of the _Equal Protection Clause_ . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." _Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005)_. Defendants argue that Plaintiff has failed to point to comparators—similarly situated male employees who received more favorable treatment than she did—and has offered only "conclusory" allegations of discriminatory intent. Mem. at 20-21. But Plaintiff alleges that no male employee was subjected to the treatment of which she complains, including excessive monitoring, procedurally irregular discipline, **[\*\*48]** and the denial of overtime. See Am. Compl. ¶¶ 157, 197. Because Plaintiff was one of only two female sergeants at Coxsackie, some of these male employees would almost necessarily have been supervised by the same supervisors as Plaintiff and had similar job responsibilities. Moreover, Plaintiff alleges that she was criticized and disciplined repeatedly for proper and innocuous conduct while Morse received no criticism or discipline whatsoever for his patently improper and inappropriate tirade, and that she was to be disciplined for conduct committed by a male sergeant. These comparator allegations are sufficient. See _Russell v. Aid to Developmentally Disabled, Inc., No. 12-CV-389, 2013 U.S. Dist. LEXIS 23259, 2013 WL 633573, at \*12 (E.D.N.Y. Feb. 20, 2013)_ (finding that plaintiff's allegations that she received more severe punishment than male co-workers for similar offenses met comparator requirement).

In addition to this comparator evidence, Plaintiff has offered additional evidence of discrimination, including the explicitly sexist language used by Morse; Defendants' repeated contravention of DOCCS policy and standard practice in, _inter alia_, watching her on video monitors, counseling her multiple times for the **[\*\*49]** same incident, denying her overtime and training, and failing to give her assignments to which she was entitled; and Defendants' discipline of Plaintiff for proper conduct. This is sufficient evidence of discriminatory intent. See _Back v. Hastings-on-Hudson Union Free Sch. Dist., 365 F.3d 107 (2d Cir. 2004)_ (denying employer's motion for summary judgment where the plaintiff offered evidence of discriminatory comments); _Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1226-27 (2d Cir. 1994)_ (finding sufficient evidence of discriminatory intent where employer's treatment of plaintiff violated its own policy); _Bonura v. Chase Manhattan Bank, N.A., 795 F.2d 276, 277 (2d Cir. 1986)_ (same); see also _EEOC. v. La. Office of Cmty. Servs., 47 F.3d 1438, 1446 (5th Cir. 2005)_ (noting that employer actions that are "irrational" may give rise to inference of discrimination). Thus, Plaintiff has sufficiently alleged a _§ 1983_ claim for equal protection. However, for the reasons discussed _supra_, the claim is dismissed to the extent it seeks to hold the Individual Defendants liable for constructively discharging Plaintiff.

Defendants seeks dismissal of the equal-protection claim against Fischer **[\*\*50]** because Plaintiff has failed to allege personal involvement. "It is well settled in this Circuit that _HN19_ personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under _§ 1983_." _Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)_ (citation and internal quotation marks omitted). Thus, a supervisor's liability "cannot rest on respondeat superior." _Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003)_. Supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a **[\*102]** report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference by failing to act on information indicating that the violation was occurring. _Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)_. But "mere linkage in the prison chain of command is insufficient to

implicate a state commissioner of corrections or a prison superintendent in a *§ 1983* claim." *Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003)* **[**51]** (internal quotation marks omitted).

The Amended Complaint does allege that the Individual Defendants negligently supervised persons committing equal-protection violations and that "[s]upervisory personnel did not remedy the situation after they were advised of it and were thus grossly negligent in their performance of their duties and/or allowed a custom or practice of discrimination and retaliation to pervade the workplace." Am. Compl. ¶¶ 288, 295. Plaintiff has thus alleged personal involvement by Fischer. However, these allegations are entirely conclusory.

Plaintiff's additional allegations in the Response are also insufficient. She claims that Fischer may have known about the other Individual Defendants' conduct because: (1) Defendants "vigorous[ly]" contested her DHR complaint and workers' compensations claim; and (2) DOCCS has settled certain "civil lawsuits" in the last few years—settlements that were covered in a *New York Times* article. Resp. at 23.

Plaintiff has pointed to nothing suggesting that the Commissioner of DOCCS has any reason to know about DHR complaints or workers' compensation claims, even when they are vigorously contested. Indeed, Plaintiff's logic would require **[**52]** that allegations of Fischer's personal involvement be found sufficient any time a prisoner's internal grievance regarding putatively § 1983-violative conduct is denied. And Plaintiff does not allege that the settled civil lawsuits involved any of the Individual Defendants, or even that these lawsuits involved discrimination. Cf. *Murphy v. Goord, 445 F. Supp.2d 261, 266 (W.D.N.Y. 2006)* (finding allegations of prison superintendent's personal involvement in beating insufficient where prisoner-plaintiff pointed to unrelated lawsuit against superintendent; book describing conditions at plaintiff's prison; and another lawsuit alleging rights-violations by DOCCS officials). Plaintiff has not plausibly alleged that Fischer knew or should have known about the Individual Defendants' conduct. She has done no more than use "mere linkage in the prison chain of command . . . to implicate a state commissioner of corrections . . . in a *§ 1983* claim." *Richardson, 347 F.3d at 435*. The *§ 1983* claim against Fischer, to the extent it seeks damages, is therefore dismissed. Furthermore, the Court denies Plaintiff leave to amend because: (1) the Original Memorandum gave Plaintiff notice of the infirmities **[**53]** of her allegations regarding Fischer's personal involvement; and (2) any amendment would be futile. See Original Mem. at 20

However, **HN20** "'[p]ersonal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under *42 U.S.C. § 1983*.'" *Duffy v. Evans, No. 11 Civ. 7605, 2012 U.S. Dist. LEXIS 134174, 2012 WL 4327605, at *4 n.2 (S.D.N.Y. Sept. 19, 2012)* (quoting *Davidson v. Scully, 148 F. Supp. 2d 249, 254 (S.D.N.Y. 2001)* (citation omitted)). All that a Plaintiff must show is that the official had: (1) "a direct connection to, or responsibility for, the alleged illegal action[s]"; and (2) "the authority to perform the required act." *Zappulla v. Fischer, [*103] No. 11 Civ. 6733, 2013 U.S. Dist. LEXIS 49728, 2013 WL 1387033, at *10 (S.D.N.Y. Apr. 5, 2013)* (internal quotation marks omitted and alteration in original). Fischer, by virtue of his supervisory position, has both a direct connection to the discrimination and the authority to reinstate and transfer Plaintiff. Cf. *id.* (refusing to dismiss prisoner-plaintiff's *§ 1983* claim against Fischer to the extent it sought an injunction compelling the provision of adequate medical care).[21] The Motion, to the extent it seeks dismissal **[**54]** of Plaintiff's equal-protection claim for injunctive or declaratory relief against Fischer in his official capacity, is therefore denied.

### 4. Conspiracy

Plaintiff alleges that the equal protection violations discussed *supra* were the result of a conspiracy by the Individual Defendants. Am. Compl. ¶¶ 310-16. **HN21** In order to make out a *§ 1985(3)* claim, a plaintiff must demonstrate: "(1)

---

[21] The Court's finding that Plaintiff was not constructively discharged likely precludes the injunctive relief sought by Plaintiff. See *Hertzberg v. SRAM Corp., 261 F.3d 651, 660 (7th Cir. 2001)* (holding that, in the Title VII context, an employee who resigns and fails to demonstrate that she was constructively discharged is not entitled to reinstatement). But Defendants have not sought dismissal of Plaintiff's claims against Fischer on this ground.

Case 1:25-cv-03552-JLR    Document 58-1    Filed 10/03/25    Page 73 of 105
Page 22 of 26

970 F. Supp. 2d 78, *103; 2013 U.S. Dist. LEXIS 125726, **54

a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of [**55] the United States." *United Bhd. of Carpenters v. Scott, 463 U.S. 825, 828-29, 103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983)*. "[A] plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003)*. The pleading standard for a conspiracy claim is demanding. See *Kiryas Joel Alliance v. Village of Kiryas Joel, 495 F. App'x 183, 190 (2d Cir. 2012)* (noting that vague and conclusory allegations that defendants entered into unlawful agreement are insufficient); *Gyadu v. Hartford Ins. Co., 197 F.3d 590, 591 (2d Cir. 1999)* (same). Even detailed allegations of parallel conduct do not suffice without some factual basis for inferring the existence of an agreement. See *Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929*.

Plaintiff has not sufficiently alleged a factual basis for her conspiracy claim. The Individual Defendants' discriminatory actions differed significantly: Morse insulted Plaintiff publicly, while Weeks failed to discipline Morse for doing so and improperly counseled Plaintiff. Moreover, the Defendants also occupied different positions: Morse was a co-worker of Plaintiff's at Coxsackie, Weeks a supervisor, [**56] Fischer the Commissioner of DOCCS, and Doe and Roe occupied undetermined positions at Coxsackie, Greene, or some other section of DOCCS. Plaintiff has, at most, alleged somewhat parallel action in that each of the Defendants allegedly discriminated against her in some way. Plaintiff's conspiracy claim is therefore dismissed. Furthermore, the Court denies Plaintiff leave to amend her conspiracy claim because: (1) the Original Memorandum gave Plaintiff notice of this claim's infirmities; and (2) any amendment would be futile. See Original Mem. at 21.

## C. State Tort Claims

### 1. IIED

*HN22* In order to make out an IIED claim in New York, a plaintiff must demonstrate [*104] extreme and outrageous conduct. *Howell v. N.Y. Post Co., 81 N.Y.2d 115, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350 (N.Y. 1993)*. Conduct is extreme and outrageous only where it "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency . . . and [be] utterly intolerable in a civilized community." *Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 448 N.E.2d 86, 90, 461 N.Y.S.2d 232 (N.Y. 1983)* (internal quotation marks omitted). "Very few claims satisfy the extreme and outrageous requirement of a[n] IIED claim. In fact, none of the IIED claims considered by the New York [**57] Court of Appeals have survived because the conduct was not sufficiently outrageous." *Elmowitz v. Exec. Towers at Lido, 571 F. Supp. 2d 370, 378 (E.D.N.Y. 2008)*.

*HN23* IIED claims have a one-year statute of limitations. See *Koster v. Chase Manhattan Bank, 609 F. Supp. 1191, 1198 (S.D.N.Y. 1985)*; *Hansen v. Petrone, 124 A.D.2d 782, 508 N.Y.S.2d 500 (App. Div. 1986)*; *N.Y. C.P.L.R. § 215(3)*. Conduct occurring more than a year before the March 2, 2012 filing of the Original Complaint can therefore be the basis for an IIED claim only if the continuing-violations doctrine applies. Under the continuing-violations doctrine, otherwise time-barred conduct may give rise to IIED liability where the plaintiff alleges continuous harm extending into the limitations period. *White v. City of New York, No. 09-CV-10127, 2010 U.S. Dist. LEXIS 67402, 2010 WL 2697054, at *3 (S.D.N.Y. July 7, 2010)*; see also *Acosta v. Loews Corp., 276 A.D.2d 214, 717 N.Y.S.2d 47, 50 (App. Div. 2000)*. The series of events alleged to constitute continuous harm must not be isolated and sporadic. *White, 2010 U.S. Dist. LEXIS 67402, 2010 WL 2697054, at *3*.

### a. Morse

Morse publicly insulted Plaintiff in January 2011. Plaintiff's telephone was disabled and her chair dismantled at about the same time by "unknown persons"—persons [**58] who might have included Morse. Am. Compl. ¶ 26. However, Plaintiff also alleges conduct by Morse that may have fallen within the limitations period: his incitement of

970 F. Supp. 2d 78, *104; 2013 U.S. Dist. LEXIS 125726, **58

her co-workers to shun her and threaten her with tire slashing. Even if this were a sufficiently continuous course of conduct for application of the continuing-violations doctrine, Morse's aggregate conduct is insufficiently extreme and outrageous. His tirade, although highly offensive, misogynist, and demeaning, was a one-time occurrence unaccompanied by physical contact or the threat thereof; likewise, the vandalism, shunning, and threats of tire slashing, however disconcerting, did not involve actual or threatened physical contact or implicate immediate bodily harm.[22]  See *Biberaj v. Pritchard Indus., Inc., 859 F. Supp. 2d 549, 557, 564-65 (S.D.N.Y. 2012)* (granting defendants summary judgment on IIED claim where Plaintiff alleged that supervisor and another employee repeatedly told her, in front of others, that she was "shit," "nothing," an animal, a "bitch," a "slut," and a "whore"; and where plaintiff left work twice in an ambulance as a result of this conduct); *Salvatore v. KLM Royal Dutch Airlines, No. 98 Civ. 2450, 1999 U.S. Dist. LEXIS 15551, 1999 WL 796172, at *2-3 (S.D.N.Y. Sept. 30, 1999)* **[**59]** (finding that supervisor's comments to employee-plaintiffs, including statement that one plaintiff "looks like a whore" and women were "cunts," accompanied by unwanted touching, were insufficient to give rise an to IIED claim); *Walther v. Maricopa Int'l Inv., Corp., No. 97 Civ. 4816, 1998 U.S. Dist. LEXIS 15592, 1998* **[*105]** *WL 689943, at *4 (S.D.N.Y. Sept. 30, 1998)* (finding that defendant's alleged conduct, including threatening plaintiff by saying "cocksucker, you're gonna pay," making unannounced visits to plaintiff's home late at night, and frequently calling and leaving messages on plaintiff's phone, was insufficient to give rise to IIED liability); *Boyce v. N.Y.C. Mission Soc'y, 963 F. Supp. 290, 297 (S.D.N.Y. 1997)* (dismissing IIED claim where plaintiff alleged that her supervisor yelled and cursed at her, indicated that she was not liked, and pounded on her office door); *Kirwin v. N.Y.S. Office of Mental Health, 665 F. Supp. 1034, 1040 (E.D.N.Y. 1987)* (dismissing IIED claim where plaintiff alleged that she was "ostracized and isolated" from fellow staff); *Seltzer v. Bayer, 272 A.D.2d 263, 709 N.Y.S.2d 21, 23 (App. Div. 2001)* (finding that IIED claim should have been dismissed where defendant allegedly dumped a pile of cement **[**60]** on the sidewalk in front of plaintiff's house, tossed lighted cigarettes into plaintiff's backyard, and threw eggs on his front steps); *Owen v. Leventritt, 174 A.D.2d 471, 571 N.Y.S.2d 25, 25 (App. Div. 1991)* (finding that public threat to kill pregnant plaintiff was insufficient to give rise to an IIED claim and noting that "mere threats . . . no matter how upsetting, are insufficient to constitute the tort of intentional infliction of emotional distress"); *cf.* Bujnicki v. Am. Paving & Excavating, Inc., No. 99-CV-646, 2002 WL 34691183, at *1-3, *7-9 (W.D.N.Y. Jan. 22, 2002) (holding that IIED was sufficiently alleged where plaintiff endured daily public humiliation and verbal harassment, was not permitted to take breaks, had water and a shovel thrown at her, and was ordered to continue working after she fell ill); *Wishner v. Cont'l Airlines, No. 94 CIV. 8239, 1997 U.S. Dist. LEXIS 10867, 1997 WL 420286, at *1-3, *6 (S.D.N.Y. July 25, 1997)* (denying motion for summary judgment on IIED claim where plaintiff's supervisor called her a "fucking cunt" with such regularity that she thought he believed it was her first name; there were crude and explicit cartoons and photographs of nude women directed at plaintiff in the lunch and break **[**61]** rooms; and plaintiff was forced to perform menial tasks, regularly called racist and sexist names, and subjected to a supervisor's unwanted sexual advances and threats); *Kohlhausen v. SUNY Rockland Cmty. Coll., No. 10-CV-3168, 2011 U.S. Dist. LEXIS 42055, 2011 WL 1404934, at *15-16 (S.D.N.Y. Feb. 9, 2011)* (finding IIED sufficiently alleged where supervisor-defendant repeatedly threatened to "kill and destroy [plaintiff]," yelled that he wanted to "kick [plaintiff] in the uterus and smash her in the face," warned her not to "fuck" with him or she would be "dead," threatened to lower her into her coffin after she'd committed suicide, and actually slashed her tires); *Weisman v. Weisman, 108 A.D.2d 853, 485 N.Y.S.2d 570, 570-71 (App. Div. 1985)* (finding IIED sufficiently alleged where defendant: (1) destroyed windows in a house where plaintiff and her children were staying, thereby exposing them to severe cold; and (2) threatened plaintiff's life by displaying a bullet).

b.  **[**62]** Weeks

Plaintiff premises her IIED claim against Weeks on his hearing-room counseling, his other unmerited counseling, his false reports to the DHR, and his failure to remedy Morse's harassment or the vandalism of Plaintiff's chair, computer, and phone. Am. Compl. ¶¶ 317-25. Even if this conduct were sufficiently continuous for application of the continuing-violations doctrine, it is insufficiently extreme and outrageous. At the hearing-room counseling Weeks did

---

[22] Morse's putatively false statements to the DHR were made months later and are insufficiently related to his earlier conduct for application of the continuing-violations doctrine. Moreover, as discussed *infra*, those statements cannot give rise to IIED liability.

970 F. Supp. 2d 78, *105; 2013 U.S. Dist. LEXIS 125726, **62

no more than sit quietly and, for half an hour, thumb through the employee manual in a room that, however airless, was regularly used for inmate hearings. Plaintiff was not confined—indeed, **[*106]** she was permitted to call a union representative and subsequently left the room when she began to feel ill. Even if this conduct was, as Plaintiff claims, likely to induce stress and lead to a migraine headache, it is a far cry from conduct deemed sufficiently outrageous to give rise to an IIED claim. See *Kaminski v. United Parcel Serv., 120 A.D.2d 409, 501 N.Y.S.2d 871, 872-73 (App. Div. 1986)* (affirming non-dismissal of an IIED claim where supervisors subjected the plaintiff to three hours of confinement, abusive language, and threats of criminal prosecution **[**63]** and prison time on Riker's Island); *Vasarhelyi v. New Sch. for Soc. Research, 230 A.D.2d 658, 646 N.Y.S.2d 795, 795, 797 (App. Div. 1996)* (finding extreme and outrageous conduct where criminal attorneys retained by the plaintiff's employer interrogated the plaintiff for ten hours, during which time they were "hostile, abusive and threatening," stated that the FBI in Washington was assisting in the investigation, humiliated the plaintiff for her poor knowledge of English, probed into her personal relationships with co-workers and her husband, and impugned her honesty and chastity); cf. *Boyce, 963 F. Supp. at 297* (dismissing IIED claim where plaintiff alleged that her supervisor yelled and cursed at her, indicated that she was not liked, pounded on her office door, and temporarily prevented her from leaving her supervisor's office). The other complained-of conduct, however discriminatory or disconcerting, is also insufficient to give rise to an IIED claim. See *Gallo v. Alitalia-Linee Aeree, 585 F. Supp. 2d 520, 554 (S.D.N.Y. 2008)* (dismissing IIED claim where plaintiff alleged that his complaints of harassment went unheeded); *Daniels v. Alvarado, No. 03 CV 5832, 2004 U.S. Dist. LEXIS 3893, 2004 WL 502561, at *6 (E.D.N.Y. Mar. 12, 2004)* **[**64]** (finding that putatively false statements submitted to the DHR accusing plaintiff of incompetence, fraud, and unjustified billing practices were insufficiently outrageous); *Murphy, 58 N.Y.2d at 303* (affirming dismissal of IIED claim where plaintiff was unjustly transferred, demoted, and then discharged in a humiliating manner); *Burlew v. Am. Mut. Ins. Co., 63 N.Y.2d 412, 472 NE.2d 682, 685, 482 N.Y.S.2d 720 (N.Y. 1984)* (dismissing an IIED claim premised on employer's refusal to authorize an operation for a work-related injury). The IIED claim against Weeks must therefore be dismissed.

### c. Roe and Doe

Plaintiff premises her IIED claims against Roe and Doe on conduct identical or similar to Weeks' and Morse's conduct, as well their role in monitoring Plaintiff on the video monitors at Greene. Am. Compl. ¶¶ 317-25. For the same reasons discussed *supra*, the IIED claims against Roe and Doe must be dismissed. The Court denies Plaintiff leave to amend her IIED claim because: (1) the Original Memorandum gave Plaintiff notice of this claim's infirmities; and (2) any amendment would be futile. See Original Mem. at 22-23

### 2. Prima Facie Tort

Plaintiff also brings a claim for prima facie tort. Am. Compl. ¶¶ 336-63. The claim is deficient **[**65]** for two reasons. First, it is duplicative of the IIED claim, as it is premised on the same misconduct and alleges much of the same harm—nearly every paragraph alleges that Defendants caused Plaintiff "emotional harm" or "emotional distress." Id. **HN24** A duplicative prima facie tort claim must be dismissed. See *Chao v. Mount Sinai Hosp., No. 10 CV 2869, 2010 U.S. Dist. LEXIS 133686, 2010 WL 5222118, at *15 (S.D.N.Y. Dec. 17, 2010)* (dismissing prima facie tort claim where liability was premised on same conduct underlying defamation claim); *Freihofer v. Hearst Corp., 65 N.Y.2d 135, 480 N.E.2d [*107] 349, 355, 490 N.Y.S.2d 735 (N.Y. 1985)* (**HN25** "[P]rima facie tort should not become a catch-all alternative for every cause of action which cannot stand on its own legs. Where relief may be afforded under traditional tort concepts, prima facie tort may not be invoked as a basis to sustain a pleading which otherwise fails to state a cause of action in conventional tort." (internal citations and quotation marks omitted)).

Second, Plaintiff's claim for prima facie tort challenges her constructive discharge by seeking to recover her lost wages and benefits. See Am. Compl. ¶¶ 358, 361, 363. But **HN26** there is no New York tort of wrongful discharge. *Murphy, 58 N.Y.2d at 304*. Thus, where **[**66]** a plaintiff brings a claim for prima facie (or other) tort seeking to challenge the termination of her employment, the claim must be dismissed. See id. (dismissing prime face tort claim as an attempt to bring a wrongful discharge claim); see also *Jones v. Ecological Analysts, Inc., No. 84 Civ. 1226,*

970 F. Supp. 2d 78, *107; 2013 U.S. Dist. LEXIS 125726, **66

*1986 U.S. Dist. LEXIS 25057, 1986 WL 6168, at \*5 (S.D.N.Y. May 27, 1986)* (dismissing plaintiff's claim for prima facie tort as an attempt to bootstrap a wrongful-discharge tort onto Title VII discrimination claims); *Shipper v. Avon Prods., Inc., 605 F. Supp. 701, 706-07 (S.D.N.Y. 1985)*; *Brooks v. Blue Cross of Ne. N.Y., Inc., 190 A.D.2d 894, 593 N.Y.S.2d 119, 120 (App. Div. 1993)* (granting summary judgment where the allegations underlying plaintiff's prima facie tort claim, including that his discharge followed a "campaign of harassment" that included "unjustifiable criticism of his working ability" and "threats of firing," were too closely related to the unavailable cause of action of wrongful discharge). Plaintiff's claim for prima facie tort is therefore dismissed. The Court denies Plaintiff leave to amend her prima-facie-tort claim because any amendment would be futile.

## IV. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' **[\*\*67]** Motion (Dkt. No. 25) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that the Amended Complaint's (Dkt. No. 23) Third Claim (for denial of equal protection under *§ 1983*); Fourth Claim (for denial of procedural and substantive due process); and Fifth Claim (for *First Amendment* retaliation) are, to extent they are brought against the Employer Defendants, **DISMISSED with prejudice** for lack of subject-matter jurisdiction; and it is further

**ORDERED**, that the Amended Complaint's (Dkt. No. 23) Third Claim (for denial of equal protection under *§ 1983*); Fourth Claim (for denial of procedural and substantive due process); Fifth Claim (for *First Amendment* retaliation); Sixth Claim (for conspiracy under *§ 1985(3)*); Seventh Claim (for IIED); and Eighth Claim (for prima facie tort) are, to the extent that they seek damages—including back bay, front pay, punitive damages, and compensatory damages—against the Individual Defendants in their official capacities, **DISMISSED with prejudice** for lack of subject-matter jurisdiction; and it is further

**ORDERED**, that the remainder of Amended Complaint's (Dkt. No. 23) Fourth Claim (for denial of procedural and substantive due process); Fifth Claim **[\*\*68]** (for *First Amendment* retaliation); Sixth Claim (for conspiracy under *§ 1985(3)*); Seventh Claim (for IIED); and Eighth Claim (for prima facie tort) are **DISMISSED with prejudice**; and it is further

**ORDERED**, that the Amended Complaint's (Dkt. No. 23) Third Claim (for denial of equal protection under *§ 1983*) is, to the extent it is brought against Fischer in his individual capacity, **DISMISSED with prejudice**; and it is further

**[\*108] ORDERED**, that the Amended Complaint's (Dkt. No. 23) First Claim (for Title VII discrimination); Second Claim (for Title VII retaliation); and Third Claim (for denial of equal protection under *§ 1983*) are, to the extent they allege constructive discharge, **DISMISSED with prejudice**; and it is further

**ORDERED**, that the Motion (Dkt. No. 25), to the extent it seeks dismissal of the Amended Complaint's (Dkt. No. 23) non-constructive-discharge: (1) First Claim (for Title VII discrimination); (2) Second Claim (for Title VII retaliation); (3) Third Claim (for denial of equal protection under *§ 1983*) against the non-Fischer Individual Defendants in their individual capacities; and (4) Third Claim (for denial of equal protection under *§ 1983*) for injunctive and declaratory relief **[\*\*69]** against all Individual Defendants in their official capacities, is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: August 04, 2013

Albany, NY

970 F. Supp. 2d 78, *108; 2013 U.S. Dist. LEXIS 125726, **69

/s/ Lawrence E. Kahn

Lawrence E. Kahn

U.S. District Judge

---

**End of Document**

548 F.Supp.3d 330

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

United States District Court, S.D. New York.

Roy Stewart MOORE and Kayla Moore, Plaintiffs,
v.
Sacha Noam Baron COHEN et al., Defendants.

19 Civ. 4977 (JPC)
|
Signed 07/13/2021

**Synopsis**

**Background:** Former United States Senate candidate and his spouse brought action against television show producer and related entities, asserting claims for defamation, intentional infliction of emotional distress, and fraudulent inducement, arising from interview which aired on comedy television show. Defendants moved for summary judgment.

**Holdings:** The District Court, John P. Cronan, J., held that:

[1] candidate waived claims by signing enforceable standard consent agreement, and

[2] First Amendment barred spouse's claims.

Motion granted.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (35)

[1]    **Courts**  ☞  Previous Decisions in Same Case as Law of the Case

The law of the case doctrine does not abrogate a court's discretion over case management and its ability to modify prior scheduling orders.

More cases on this issue

[2]    **Constitutional Law**  ☞  Necessity of Determination

Federal courts should, where possible, avoid reaching constitutional questions.

1 Case that cites this headnote
More cases on this issue

[3]    **Constitutional Law**  ☞  Resolution of non-constitutional questions before constitutional questions

Where possible, a federal court must strive to resolve the issues before it on the basis of state law, which may render decisions on federal constitutional questions unnecessary.

[4]    **Compromise, Settlement, and Release**  ☞  Matters Included or Affected

Under New York law, a valid release constitutes a complete bar to an action on a claim which is the subject of the release.

[5]    **Compromise, Settlement, and Release**  ☞  Conclusiveness

Under New York law, if the language of a release is clear and unambiguous, the signing of a release is a "jural act" binding on the parties.

[6]    **Compromise, Settlement, and Release**  ☞  Validity and Enforceability

Under New York law, once a defendant meets the initial burden of establishing that it has been released from any claims, a signed release shifts the burden of going forward to plaintiff to show that there has been fraud, duress or some other fact which will be sufficient to void the release.

[7]    **Contracts**  ☞  Ambiguity in general

Under New York law, question of whether written contract is ambiguous is question of law for court.

[8]    **Contracts**  ☞  Existence of ambiguity

**Evidence** 🔑 Nature and Existence of Ambiguity in General

In resolving issue of whether written contract is ambiguous under New York law, court must first determine from face of agreement, without reference to extrinsic evidence, whether contract is ambiguous.

More cases on this issue

[9] **Contracts** 🔑 Existence of ambiguity

Under New York law, contract is ambiguous when terms of contract could suggest more than one meaning when viewed objectively by reasonably intelligent person who has examined context of entire integrated agreement and who is cognizant of customs, practices, usages, and terminology as generally understood in particular trade or business.

More cases on this issue

[10] **Contracts** 🔑 Language of contract

Under New York law, a court interpreting a contract must give effect to the expressed intentions of the parties, and the best evidence of what parties to a written agreement intend is what they say in their writing.

More cases on this issue

[11] **Contracts** 🔑 Language of Instrument
**Contracts** 🔑 Reasonableness of construction
**Contracts** 🔑 Construction by Parties

Under New York law, a court should not find contract language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning.

[12] **Contracts** 🔑 Rewriting, remaking, or revising contract

Under New York law, if an agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity.

[13] **Compromise, Settlement, and Release** 🔑 Employers and employees

**Compromise, Settlement, and Release** 🔑 Corporations and business organizations

Under New York law, standard consent agreement which former Senate candidate signed prior to television interview, and which purported to waive numerous potential claims related to interview, could be enforced by interviewer, television network which aired interview, and network's parent company, in action by candidate for defamation, intentional infliction of emotional distress, and fraudulent inducement; agreement stated that it was between limited liability company "including its assigns, licensees, parents, subsidiaries, and affiliates" and candidate, and all defendants fell within designated categories as defined by agreement.

More cases on this issue

[14] **Compromise, Settlement, and Release** 🔑 Future, unknown, or after-arising claims in general

Under New York law, standard consent agreement which former Senate candidate signed prior to television interview contained unambiguous waiver of claims for infliction of emotional distress, defamation, and fraud, and thus candidate's claims for intentional infliction of emotional distress, defamation, and fraudulent inducement against interviewer, television network which aired interview as part of comedy series, and network's parent company were barred; agreement expressly enumerated candidate's pleaded causes of actions, candidate brought no other cause of action, and candidate's purported modification of agreement, by striking through language in other provision of agreement, did not alter his waiver of the enumerated causes of action.

More cases on this issue

**[15]    Contracts** 🔑 **Rewriting, remaking, or revising contract**

Under New York law, a court may not write into a contract conditions the parties did not insert, or, under the guise of construction, add or excise terms, and it may not construe the language in such a way as would distort the apparent meaning.

**[16]    Compromise, Settlement, and Release** 🔑 **Future, unknown, or after-arising claims in general**

Under New York law, assuming that standard consent agreement which former Senate candidate signed prior to television interview was general release, it was enforceable waiver of candidate's claims for infliction of emotional distress, defamation, and fraudulent inducement against interviewer, television network which aired interview as part of comedy series, and network's parent company; under agreement, candidate clearly and unambiguously waived certain identified claims related to interview, including the three claims that he brought.

More cases on this issue

**[17]    Compromise, Settlement, and Release** 🔑 **General release**

Under New York law, the validity of a general release depends on the controversy being settled and upon the purpose for which the release was actually given, and a general release may not be read to cover matters which the parties did not desire or intend to dispose of.

**[18]    Compromise, Settlement, and Release** 🔑 **Clarity and ambiguity; multiple meanings**

Under New York law, courts determining the validity of a release typically look to the terms of the release and whether it clearly and unambiguously encompasses the causes of action asserted in the action.

**[19]    Compromise, Settlement, and Release** 🔑 **Fraud, Misrepresentation, or Collusion**

Under New York law, standard consent agreement which former Senate candidate signed prior to television interview precluded candidate's claim that interviewer, television network which aired interview as part of comedy series, and network's parent company fraudulently induced him into signing agreement by misrepresenting nature of interview and identity of participating parties; agreement contained explicit disclaimer that candidate was "not relying upon any promises or statements made by anyone" about nature of interview or identities of participants, agreement contained separate waiver of claims involving fraud, including as to alleged deception about agreement, and candidate failed to identify separate fraud not contemplated by release.

More cases on this issue

**[20]    Contracts** 🔑 **Fraud and Misrepresentation**

To invalidate a contract under New York law, on grounds of fraudulent inducement, a plaintiff must establish the basic elements of fraud.

More cases on this issue

**[21]    Fraud** 🔑 **Elements of Actual Fraud**

Under New York law, the basic elements of fraud are: (1) a representation of material fact, (2) the falsity of that representation, (3) knowledge by the party who made the representation that it was false when made, (4) justifiable reliance by the plaintiff, and (5) resulting injury.

**[22]    Contracts** 🔑 **Reliance on representation**

Under New York law, when a contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations; this requires that the agreement contain explicit disclaimers of the

particular representations that form the basis of the fraud-in the inducement claim.

More cases on this issue

**[23]    Compromise, Settlement, and Release** 🔑 **Fraud, Misrepresentation, or Collusion**

Under New York law, where a party releases a fraud claim, it may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release.

**[24]    Contracts** 🔑 **Duties and liabilities of third persons**

Under New York law, general principle is that only the parties to a contract are bound by its terms.

**[25]    Constitutional Law** 🔑 **Freedom of Speech, Expression, and Press**

**Constitutional Law** 🔑 **Conduct, protection of**

First Amendment safeguards certain forms of speech and expressive conduct. U.S. Const. Amend. 1.

**[26]    Constitutional Law** 🔑 **Public figures in general**

**Constitutional Law** 🔑 **Public employees and officials**

Under the First Amendment, public officials and public figures bringing state defamation claims must show that the allegedly defamatory statements were made with "actual malice," that is, with knowledge that it was false or with reckless disregard of whether it was false or not. U.S. Const. Amend. 1.

**[27]    Constitutional Law** 🔑 **Public figures in general**

An intentional infliction of emotional distress claim brought by a public figure and alleging

reputational damage falls within the ambit of the First Amendment. U.S. Const. Amend. 1.

**[28]    Constitutional Law** 🔑 **Defamation**

Regardless of the claim at issue, heightened First Amendment protections apply to any tort alleging reputational harm as long as the underlying speech relates to a matter of public concern. U.S. Const. Amend. 1.

**[29]    Constitutional Law** 🔑 **Defamation**

Under the First Amendment, liability may not attach for statements that cannot reasonably be interpreted as stating actual defamatory facts about an individual; this protection of speech is necessary to provide assurance that public debate will not suffer for lack of imaginative expression or rhetorical hyperbole which has traditionally added much to discourse of nation. U.S. Const. Amend. 1.

**[30]    Libel and Slander** 🔑 **Construction of defamatory language in general**

The determination of whether an allegedly defamatory statement is opinion or rhetorical hyperbole as opposed to a factual presentation is a question of law for the court.

**[31]    Libel and Slander** 🔑 **Privilege**

Determination of whether allegedly defamatory speech concerns matter of public concern is for judge to decide.

**[32]    Constitutional Law** 🔑 **Defamation**

Speech deals with matters of "public concern," for purposes of determining whether allegedly defamatory speech is entitled to heightened protection under the First Amendment, when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest

and of value and concern to the public. U.S. Const. Amend. 1.

**[33]    Libel and Slander** 🔑 Construction of language used

In determining whether allegedly defamatory statements may be reasonably interpreted as stating actual facts against a plaintiff, a court considers whether the general tenor of the speech negates the impression that the challenged statements imply defamatory facts.

**[34]    Constitutional Law** 🔑 Parody

**Constitutional Law** 🔑 Political speech, beliefs, or activity in general

Political and satirical speech is afforded substantial First Amendment protections. U.S. Const. Amend. 1.

**[35]    Constitutional Law** 🔑 Program content

**Infliction of Emotional Distress** 🔑 Matters of public concern; fair report privilege

First Amendment barred intentional infliction of emotional distress and fraud claims by spouse of former Senate candidate who had been accused of sexual misconduct involving young females, against interviewer, television network which aired interview as part of comedy series, and network's parent company, arising from interview in which interviewer used wand on candidate which he claimed could detect enzymes secreted by pedophiles; comedy series was commentary on matters of public concern, series was satire which no reasonable viewer would have interpreted as asserting factual statements about candidate. U.S. Const. Amend. 1.

**Attorneys and Law Firms**

**\*333** Larry Klayman, Freedom Watch, Inc., Larry E. Klayman, Klayman Law Group, P.A., Washington, DC, for Plaintiffs.

Elizabeth A. McNamara, Pro Hac Vice, Rachel Fan Stern Strom, Davis Wright Tremaine LLP, New York, NY, Eric Joel Feder, Lisa Beth Zycherman, Davis Wright Tremaine LLP, Washington, DC, for Defendants.

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

**\*334** Plaintiff Roy Stewart Moore, the former Chief Justice of the Alabama Supreme Court, was tricked into participating in an interview with Defendant Sacha Noam Baron Cohen on February 14, 2018. Expecting to receive an award in Washington, D.C. for his support of Israel, Judge Moore alleges that he was instead met with extreme and outrageous questioning from Cohen. The interview later aired on television as part of a comedy series that was broadcast by Defendants Showtime Networks, Inc. ("Showtime") and CBS Corporation ("CBS"). Judge Moore and his wife, Kayla Moore, allege intentional infliction of emotional distress and fraud, and Judge Moore alone additionally pleads a claim of defamation.

Defendants have moved for summary judgment, arguing that Plaintiffs' claims are barred by both a waiver clause in the agreement that Judge Moore signed prior to the interview and also by the First Amendment of the U.S. Constitution. The Court agrees that Judge Moore's claims are barred by the unambiguous contractual language, which precludes the very causes of action he now brings. Although Kayla Moore was not a signatory to that contract, her claims are barred by the First Amendment. Accordingly, Defendants' motion is granted in its entirety.

## I. Background

### A. Factual Background [1]

Judge Moore ran as a candidate for the U.S. Senate in 2017. Pls. Counter-Rule 56.1 Stmt. ¶¶ 1, 3. During the campaign, several published articles accused Judge Moore of inappropriate sexual encounters with young females,

including one who was underage at the time, Defs. Rule 56.1 Stmt. ¶ 4, accusations that Plaintiffs strongly dispute and maintain were uncorroborated by any reputable source, Pls. Counter-Rule 56.1 Stmt. ¶ 4. Judge Moore **\*335** lost the election on December 12, 2017. Pls. Counter-Rule 56.1 Stmt. ¶ 5. Not long after, Judge Moore and his wife, Kayla Moore, were invited to Washington, D.C., purportedly for Judge Moore to receive an award for his support of Israel. Defs. Counter-Rule 56.1 Stmt. ¶ 7.

Plaintiffs flew from Alabama to Washington, D.C. on February 13, 2018, and were transported by a car service to their hotel. Pls. Counter-Rule 56.1 Stmt. ¶¶ 39, 41. The interview took place the next day, on February 14, 2018, at a different hotel. *Id.* ¶¶ 45, 51. Before the interview, Judge Moore, in his wife's presence, signed an agreement titled the "Standard Consent Agreement," Dkt. 113-5 ("SCA"), with an entity called Yerushalayim TV ("YTV"). Pls. Counter-Rule 56.1 Stmt. ¶¶ 67-69. This agreement purports to waive numerous potential claims related to the interview, and, as discussed in greater detail below, includes a handwritten modification purportedly made by Judge Moore. *Id.* ¶ 76.

The interview was conducted by Cohen, who was dressed up and acting in the role of an Israeli "Anti-Terrorism Expert" named "Gen. Erran Morad." Defs. Rule 56.1 Stmt. ¶¶ 31, 52; Dkt. 112-2 ("Episode 3 Video"); Pls. Counter-Rule 56.1 Stmt. ¶ 50. At the time, Plaintiffs did not know that Defendants were involved in the interview, including that Cohen was actually the interviewer. Defs. Counter-Rule 56.1 Stmt. ¶ 11. Cohen first asked Judge Moore about Alabama's "strong connection with Israel," before proceeding to describe technology used by the Israeli military to combat terrorism. Defs. Rule 56.1 Stmt. ¶ 55; Episode 3 Video. Cohen discussed one specific device which he claimed the Israeli army employs to uncover tunnels used by terrorists to launch attacks. Defs. Rule 56.1 Stmt. ¶ 56; Episode 3 Video. Cohen explained that the device also can detect certain enzymes that are secreted only by "sex offenders and particularly pedophiles." Defs. Rule 56.1 Stmt. ¶ 57; Episode 3 Video. Retrieving this device, a black wand-like object, Cohen commented that "because neither of us are sex offenders, then it make absolutely nothing [sic]." Defs. Rule 56.1 Stmt. ¶¶ 58-59; Episode 3 Video. But when Cohen moved the wand closer to Judge Moore, the gadget seemed to emit a beeping noise. Defs. Rule 56.1 Stmt. ¶ 60; Episode 3 Video. Cohen then hit the device against his hand, stating that the device "must be faulty," before asking Judge Moore if he might have lent his jacket to someone else. Defs. Rule 56.1 Stmt. ¶ 61; Episode 3 Video. After declaring that he has

been "married for 33 [years] – and never had an accusation of such things," Judge Moore left the hotel room, ending the interview. Defs. Rule 56.1 Stmt. ¶¶ 62-63; Episode 3 Video. As Judge Moore exited the room, Cohen maintained, "I am not saying you are a sex offender at all." Defs. Rule 56.1 Stmt. ¶ 63; Episode 3 Video.

This segment was aired as part of Episode 3 of *Who Is America?*, a comedy series in which Cohen plays fictional characters "from across the political spectrum" while conducting interviews with various individuals (the "Program"). Defs. Rule 56.1 Stmt. ¶¶ 25, 52; Pls. Counter-Rule 56.1 Stmt. ¶ 50. The series touched on various political issues in America, with Cohen interviewing various former and current politicians, lobbyists, and rights activists. Defs. Rule 56.1 Stmt. ¶¶ 30-38. The first episode featured a discussion with a U.S. Senator, during which a disguised Cohen offered his economic proposal of "hav[ing] 100% of the people" put "in the one percent" to address economic disparity and showed the Senator a document purportedly created by the "International Institute of Truth and Knowledge" as support for his proposal. *Id.* ¶ 30; Dkt. 112-2 ("Episode 1 Video"). That same episode **\*336** also featured Cohen, in his "Erran Morad" character, promoting to several lobbyists and politicians his idea for "Kinderguardians", a program that would entail arming children as young as three years old with firearms to defend against school shootings. Defs. Rule 56.1 Stmt. ¶¶ 31-34; Episode 1 Video. On another episode of *Who Is America?*, Cohen, again as "Erran Morad", interviewed a former Vice President of the United States. Defs. Rule 56.1 Stmt. ¶¶ 37-38; Dkt. 112-2 ("Episode 2 Video"). After discussions of prior international conflicts and enhanced interrogation, Cohen produced his "waterboarding kit" and asked the former Vice President to sign it. Defs. Rule 56.1 Stmt. ¶ 38; Episode 2 Video.

Cohen created, co-produced, and co-wrote the Program, while Showtime aired and distributed it. Pls. Counter-Rule 56.1 Stmt. ¶ 26; Defs. Rule 56.1 Stmt. ¶¶ 26-27. CBS is the parent company of Showtime. Defs. Rule 56.1 Stmt. ¶ 73.

**B. Procedural Background**

This case was filed on September 5, 2018, in the United States District Court for the District of Columbia. Plaintiffs allege that Judge Moore was fraudulently induced by "Defendant Cohen and his agents[,] including Defendants Showtime and CBS," into agreeing to be interviewed. Compl. ¶¶ 11, 15. The Complaint asserts Plaintiffs would never have come to

Washington, D.C., nor would Judge Moore have appeared in the Program, had they known the truth about the nature of the Program and the identity of its producers and broadcasters. *Id.* ¶¶ 15-16. Both Plaintiffs plead claims of intentional infliction of emotional distress and fraud. *Id.* ¶¶ 33-48. Judge Moore also brings a defamation claim, asserting that Cohen "falsely painted, portrayed, mocked, and with malice defamed" him "as a sex offender." *Id.* ¶ 18; *see id.* ¶¶ 26-32.

On April 29, 2021, the Honorable Thomas F. Hogan of the United States District Court for the District of Columbia transferred venue to this District pursuant to 28 U.S.C. § 1404(a) based on the SCA's forum-selection clause. *See* Dkt. 34, Dkt. 52-3; SCA ¶ 6. Upon transfer, the case was assigned to the Honorable Andrew L. Carter, Jr.

Defendants filed a motion to dismiss on September 12, 2019, arguing in part that the SCA bars Plaintiffs' claims. *See* Dkt. 50, Dkt. 51 at 9-16. Judge Carter denied the motion at a court conference on July 2, 2020, explaining that, at the motion to dismiss stage, he could not consider Defendants' extrinsic evidence of their relationship with the SCA's signatory, YTV. Dkt. 88 at 2-4. At another conference later that month, Judge Carter ordered discovery to commence. Dkt. 86 at 8-10.

 **[1]** The case was reassigned to the undersigned on September 29, 2020. Defendants requested a pre-motion conference on November 13, 2020, explaining that they had produced all discovery relating to their corporate relationship with YTV and intended to move for summary judgment and to seek a stay of discovery pending disposition of that motion. Dkt. 90. On December 3, 2020, the Court stayed most discovery, but allowed limited discovery on the issues raised in the instant motion for summary judgment: whether either the SCA or the First Amendment precludes Plaintiffs' claims. Dkt. 96 ("12/3/2020 Tr.") at 40. [2]

 **\*337** Defendants filed their motion for summary judgment and supporting documents on February 8, 2021. Dkts. 111, 112, 113, 114, 115, 116 ("Motion"), 117. Plaintiffs opposed the motion on March 15, 2021. Dkts. 124 ("Opposition"), 125, 126. Defendants filed their reply on April 5, 2021. Dkts. 127 ("Reply"), 128, 129.

## II. Applicable Legal Standards

### A. Rule 56 of the Federal Rules of Civil Procedure

Under Federal Rule of Civil Procedure 56, a movant seeking summary judgment must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A moving party may show that there is no genuine issue of material fact "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Id.* at 114 (quoting *Farid v. Smith,* 850 F.2d 917, 924 (2d Cir. 1988)).

In considering whether Defendants have met this burden, the Court "construe[s] the evidence adduced ... in the light most favorable to plaintiff's case." *Holcomb v. Iona College,* 521 F.3d 130, 132 (2d Cir. 2008). If a motion for summary judgment is "properly supported by documents or other evidentiary materials," the nonmoving party "may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise ... must set forth 'specific facts' demonstrating that there is a 'genuine issue for trial.' " *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed R. Civ. P. 56(e) (amended in 2010)); *see also Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011).

### B. The Canon of Constitutional Avoidance

 **[2]**  **[3]** Defendants present two independent arguments for dismissal: Plaintiffs' claims are barred by the waiver language in the SCA and the claims fail under the First Amendment. It is well settled that "federal courts should, where possible, avoid reaching constitutional questions." *Allstate Ins. Co. v. Serio,* 261 F.3d 143, 149-50 (2d Cir. 2001), *certified question accepted,* 96 N.Y.2d 931, 733 N.Y.S.2d 366, 759 N.E.2d 364 (2001), *and certified question answered,* 98 N.Y.2d 198, 746 N.Y.S.2d 416, 774 N.E.2d 180 (2002). Therefore, a court must strive to resolve the issues before it on the basis of state law, which may "render decisions on federal constitutional questions unnecessary." *Id.* (citing *Bell v. Maryland,* 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964)); *see also Caviezel v. Great Neck Pub. Sch.,* 739 F. Supp. 2d 273, 282 (E.D.N.Y. 2010) ("[F]ederal courts endeavor to avoid deciding constitutional questions whenever a **\*338** case or controversy may be decided on other grounds"), *aff'd,* 500 F. App'x 16 (2d Cir. 2012).

The Court therefore first applies New York contract law to attempt to resolve Defendants' motion based on the waiver provisions of the SCA, and only turns to Defendants' First Amendment arguments if necessary. As discussed below, the Court treats each Plaintiff's causes of action separately because only Judge Moore signed the SCA. While Judge Moore's claims can be resolved by application of state law to the SCA, Kayla Moore's claims require this Court to consider constitutional issues.

### III. Judge Moore's Claims

#### A. Relevant Principles of Contract Interpretation Under New York Law

**[4]** **[5]** **[6]** Under New York law,[3] "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (quoting *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276, 929 N.Y.S.2d 3, 952 N.E.2d 995 (2011)). "If 'the language of a release is clear and unambiguous, the signing of a release is a "jural act" binding on the parties.' " *Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 276, 929 N.Y.S.2d 3, 952 N.E.2d 995 (quoting *Booth v. 3669 Delaware*, 92 N.Y.2d 934, 935, 680 N.Y.S.2d 899, 703 N.E.2d 757 (1998)). Once a defendant meets "the initial burden of establishing that it has been released from any claims, a signed release 'shifts the burden of going forward ... to the [plaintiff] to show that there has been fraud, duress or some other fact which will be sufficient to void the release.' " *Id.* (alterations in original) (quoting *Fleming v. Ponziani*, 24 N.Y.2d 105, 111, 299 N.Y.S.2d 134, 247 N.E.2d 114 (1969)).

**[7]** **[8]** **[9]** **[10]** **[11]** **[12]** "[T]he question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). In resolving this issue, the Court must first "determine[ ] from the face of the agreement, without reference to extrinsic evidence," whether the contract is ambiguous. *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (quoting *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)). A contract is ambiguous when "the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally

understood in the particular trade or business.' " *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). This Court must "give effect to the *expressed* intentions of the parties; [t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* at 467 (alteration in original) (internal quotation marks and citations omitted). Further, "[a] court should not find contract language **\*339** ambiguous ... on the basis of the interpretation urged by one party where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." *Psenicska v. Twentieth Century Fox Film Corp.*, No. 07 Civ. 10972 (LAP), 2008 WL 4185752, at \*4 (S.D.N.Y. Sept. 3, 2008), *aff'd*, 409 F. App'x 368 (2d Cir. 2009). "[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *L. Debenture Tr. Co. of N.Y.*, 595 F.3d at 468 (alteration in original) (quoting *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569-70, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002)).

#### B. Defendants May Enforce the Standard Consent Agreement

**[13]** The preamble to the SCA provides that the agreement is between "Yerushalayim TV (including its assigns, licensees, parents, subsidiaries, and affiliates) (collectively, the 'Producer') and the undersigned participant (the 'Participant')." SCA at p.1. Defendants have submitted corporate documents, declarations, and deposition testimony demonstrating that they all fall within the term "Producer" as defined by the SCA. This evidence, which has not been controverted, establishes that Cohen was the sole member of the limited liability corporations that own YTV, therefore making him a "parent[ ]" of YTV for purposes of the SCA.[4] The uncontroverted evidence also establishes that YTV's parent companies, La Quinta and PYCT, licensed the Program to Showtime, thereby similarly making Showtime and its parent company, CBS, "licensees" of YTV and thus "Producer[s]" under the SCA. Dkt. 112 (Declaration of Brendan Countee) ¶¶ 3-7; Dkt. 112-1; Dkt. 113 (Declaration of Todd Schulman ("Schulman Declaration")) ¶ 5.

Plaintiffs contend that they "were only given extremely limited discovery as to the corporate ownership of YTV," while failing to cite to admissible evidence in their Counter-Rule 56.1 Statement. Opposition at 19; *see, e.g.*, Pls. Counter-Rule 56.1 Stmt. ¶ 21 (citing "[in]adequate

knowledge of the actual [sic] of the corporate entities used to defraud Judge Moore" and invoking Rule 56(d)). Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may defer considering the motion or deny it" or "allow time to obtain affidavits or declarations to take discovery." Fed R. Civ. P. 56(d). Plaintiffs have not filed such an affidavit, and "[t]his failure alone is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Mattel, Inc. v. AnimeFun Store*, No. 18 Civ. 8824 (LAP), 2021 WL 765766, at *2 (S.D.N.Y. Feb. 26, 2021) (internal quotation marks and citations omitted). But regardless, the parties were granted several months of discovery, including six weeks of discovery largely focused on this very issue, 12/3/20 Tr. at 29-30, 40, and Plaintiffs deposed multiple individuals with knowledge of the corporate relationship between YTV and Defendants, **\*340** *see* Cohen Deposition; Schulman Deposition; Wallis Deposition, and received document discovery on this issue, *see* Dkt. 114 (Declaration of Elizabeth A. McNamara) ¶¶ 12-25, Exhs. 10-23. [5] Plaintiffs had ample opportunity to develop and come forward with evidence to challenge Defendants' ability to enforce the SCA, and they have failed to do so.

The Court therefore finds that Defendants all fall within the scope of the "Producer" under the SCA.

### C. The Standard Consent Agreement Expressly Waives All Claims Brought by Judge Moore

[14]   The Court begins with the plain language of the SCA that Judge Moore signed to determine whether he has waived the causes of action he now brings. The Court concludes he has. Not only does the SCA set forth a clear waiver of any claims "related to the Program," but the contract even enumerates certain waived claims, including the very three pleaded in this case. Paragraph 4 of the SCA reads:

> [Judge Moore] specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Program, which are related to the Program or its production, or this agreement, including, but not

limited to, claims involving assertions of ... (h) **infliction of emotional distress** (whether allegedly intentional or negligent), ... (m) **defamation** (such as any allegedly false statements made in the Program), ... (p) **fraud** (such as any alleged deception about the Program or this consent agreement) ....

SCA ¶ 4 (emphases added); *see* Compl. ¶¶ 26-32 (defamation), 33-38 (intentional infliction of emotional distress), 39-48 (fraud). In fact, the Complaint does not plead any cause of action in addition to these three claims. *See Salinger v. Salinger*, 125 A.D.3d 747, 4 N.Y.S.3d 81, 83 (2015) ("Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used.") (quoting *Ayers v. Ayers*, 92 A.D.3d 623, 938 N.Y.S.2d 572, 574 (2012)).

Confronted with these unambiguous waivers of his only causes of action, Judge Moore turns to language he apparently struck through in another provision of Paragraph 4, which concerns an entirely different potential cause of action, "intrusion or invasion of privacy." SCA ¶ 4(f). With this modification, the provision reads that Judge Moore waives any claims related to the Program

> involving assertions of ... (f) intrusion or invasion of privacy (such as any allegedly sexual-oriented or offensive behavior or questioning) ....

*Id.* [6] Judge Moore contends that this alteration somehow modifies the entire SCA to **\*341** permit him to bring the causes of action alleged in the Complaint. The Court disagrees.

The modification to Paragraph 4(f) of the SCA at most reflects an agreement of the parties to exempt from waiver an intrusion or invasion of privacy claim based on "any allegedly sexual oriented or offensive behavior or questioning." But Judge Moore has not brought such a claim. And the modification does not pertain to the three causes of action —defamation, intentional infliction of emotion distress, and fraud—that Judge Moore in fact has pleaded. Those claims,

as discussed above, are expressly waived by the introductory language of Paragraph 4 and then specifically identified in subsections (h), (m), and (p). Simply put, the parties' apparent agreement to modify the scope of the waiver as to one specific claim, *i.e.*, intrusion or invasion of privacy, has no effect on the agreement's waiver of claims relating to entirely different causes of action, *i.e.*, defamation, intentional infliction of emotional distress, and fraud. *See Woodard v. Reliance Worldwide Corp.*, No. 18 Civ. 9058 (RA), 2019 WL 3288152, at \*4 (S.D.N.Y. July 22, 2019) ("The modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement *while leaving the balance of it intact.*") (emphasis added) (quoting *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 429 N.Y.S.2d 715, 717-18 (1980)), *aff'd*, 819 F. App'x 48 (2d Cir. 2020). [7]

 [15]   The Court also rejects Judge Moore's argument that the SCA expresses the intent of Defendants to agree "not to put forth '*any* allegedly sexual oriented or offensive behavior or questioning.' " Opposition at 17. "A court may not write into a contract conditions the parties did not insert, or, under the guise of construction, add or excise terms, and it may not construe the language in such a way as would distort the apparent meaning." *Salinger*, 4 N.Y.S.3d at 83 (internal quotation marks and citations omitted). There is no language in the SCA that obligated Defendants to refrain from any particular conduct or questioning during the course of the interview. *See Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 277, 929 N.Y.S.2d 3, 952 N.E.2d 995 ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." (internal quotation marks and citation omitted)). To the contrary, the SCA provides that Judge Moore "is signing this agreement with no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program." SCA ¶ 5.

### D. The Standard Consent Agreement's Waiver Language Is Not an Unenforceable General Release

 [16]   Plaintiffs further challenge the waiver language in Paragraph 4 of the SCA by characterizing it as a general release **\*342**  and arguing that the release "does not extend to claims that a party does not know or suspect at the time of executing the release." Opposition at 13. This argument too fails.

As an initial matter, the SCA is far more specific than agreements that courts have identified as general releases. *See, e.g.*, *Hui-Wen Chang v. N.Y.C. Dep't of Educ.*, 412 F. Supp. 3d 229, 244 (E.D.N.Y. 2019) (a plaintiff agreeing to "release and forever discharge ... any and all claims ... whatsoever, known or unknown, which RELEASOR had, now has or hereafter can, shall or may have"); *Rivera v. Wyckoff Heights Med. Ctr.*, 113 A.D.3d 667, 978 N.Y.S.2d 337, 341 (2014) (involving a release that "forever discharge[d]" "any and all actions, causes of action, suits, ... claims, and demands whatsoever, in law, admiralty or equity" that the plaintiff "ever had, now has, can or may have, or claim to have, arising from or relating to" the relevant agreements and the provision of services to the plaintiff (second alteration in original)). The release in the SCA applies to "any claims ... which are related to the Program or its production, or this agreement," and goes on to enumerate a non-exhaustive list of waived claims. SCA ¶ 4.

 [17]   [18]   But even assuming *arguendo* that the SCA is a general release, New York courts routinely enforce such releases "where it is directly or circumstantially evident that the purpose is to achieve a truly general settlement." *Mangini v. McClurg*, 24 N.Y.2d 556, 562, 301 N.Y.S.2d 508, 249 N.E.2d 386 (1969). The validity of a general release "depends on the controversy being settled and upon the purpose for which the release was actually given, and a general release may not be read to cover matters which the parties did not desire or intend to dispose of." *Rivera*, 978 N.Y.S.2d at 341. Courts typically look to "the terms of the release" and whether it "clearly and unambiguously encompass[es] the causes of action asserted in the ... action." *Kulkarni v. Arredondo & Co., LLC*, 151 A.D.3d 705, 56 N.Y.S.3d 351, 352 (2017); *see also Mateo v. Carinha*, 799 F. App'x 51 (2d Cir. 2020) ("The language of the notably broad General Release is clear on its face. In such cases, court should generally interpret the contract without reference to extrinsic evidence ....").

The release language in the SCA "clearly and unambiguously encompass[es]" the claims brought by Judge Moore, and does so with specificity. In very plain terms, Judge Moore waived certain identified claims related to the Program, including the three claims that he has brought. As mentioned above, courts routinely enforce similar, if not broader, releases. *See Bihag v. A&E Television Networks, LLC*, 669 F. App'x 17, 18-19 (2d Cir. 2016); *Shapiro v. NFGTV, Inc.*, No. 16 Civ. 9152 (PGG), 2018 WL 2127806, at \*6-9 (S.D.N.Y. Feb. 9, 2018); *RBS Holdings, Inc. v. Wells Fargo Cent., Inc.*, 485 F. Supp.

2d 472, 478 (S.D.N.Y. 2007); *Klapper v. Graziano*, 41 Misc. 3d 401, 405-09, 970 N.Y.S.2d 355 (N.Y. Sup. Ct. 2013), *aff'd*, 129 A.D.3d 674, 10 N.Y.S.3d 560 (2015).

### E. The Standard Consent Agreement Precludes Judge Moore's Fraudulent Inducement Argument

**[19]** Judge Moore further asserts that the SCA is void because Defendants fraudulently induced him into signing the contract by misrepresenting the nature of the Program and the identity of the participating parties. Compl. ¶¶ 11, 15-16; Opposition at 8-13. Two provisions of the SCA foreclose this argument.

First, Judge Moore disclaimed reliance on the same representations that he now alleges fraudulently induced him to enter **\*343** into the agreement. Paragraph 5 of the SCA provides:

> the Participant acknowledges that in entering into [this agreement], the Participant is not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program. Participant is signing this agreement with no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program.

SCA ¶ 5.

**[20]   [21]   [22]** To invalidate a contract, a plaintiff "must 'establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury.' " *Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 276, 929 N.Y.S.2d 3, 952 N.E.2d 995 (quoting *Glob. Mins. & Metals Corp. v. Holme*, 35 A.D.3d 93, 824 N.Y.S.2d 210, 214 (2006)). Under New York law, when a "contract states that a contracting party disclaims the existence of or reliance upon *specified* representations, that party will not be allowed

to claim that he was defrauded into entering the contract in reliance on those representations." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 488 (S.D.N.Y. 2017) (quoting *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993)). This requires that the agreement "contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim." *Mfrs. Hanover Tr. Co.*, 7 F.3d at 316.

Paragraph 5 is such an explicit disclaimer. In signing the SCA, Judge Moore affirmed that he was "not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any" other individuals who were participating in the Program. SCA ¶ 5. Judge Moore further affirmed that he had "no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program." *Id.* This explicit language disclaims Judge Moore's "reliance upon *specified* representations," which forecloses him from now claiming "that he was defrauded into entering the contract in reliance on those representations." *PetEdge, Inc.*, 234 F. Supp. 3d at 488 (quoting *Mfrs. Hanover Tr. Co.*, 7 F.3d at 315).

The Honorable Loretta A. Preska reached this same conclusion when she considered substantially identical language in a release and dismissed claims brought by individuals featured in Cohen's 2006 film, *Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan. See Psenicska*, 2008 WL 4185752, at \*4. The relevant language before Judge Preska stated that "Plaintiff has not relied 'upon any promises or statements made by anyone about the *nature of the Film* or the *identity* of any other Participants or persons involved in the Film.' " *Id.* at \*6 (citation omitted). Like here, the plaintiffs in *Psenicska* argued that the waivers they signed should not be enforced because they were fraudulently induced by misrepresentations as to the nature of the production and identities of the defendants. *Id.* at \*5-6. Judge Preska rejected this argument, finding that "a Plaintiff may not claim to have relied on a statement upon which he or she has explicitly disclaimed reliance." *Id.* at \*6; *see id.* (explaining that accepting the plaintiffs' arguments that the defendants had a duty to disclose the true nature of the film "would empower these Plaintiffs to avoid the clear wording of their own contracts in a manner [the court] must decline to condone **\*344** under well-settled New York law"). Here, too, Judge Moore disclaimed reliance on the very "promises

or statements" that he now relies on to argue fraudulent inducement.

**[23]** Second, Plaintiffs' fraudulent inducement allegations are also foreclosed by the specific fraud waiver under Paragraph 4(p) of the SCA. *See* SCA ¶ 4(p). Not only does Paragraph 4(p) waive "any claims ... related to the Program ... involving ... fraud," but it even specifies that this waiver includes "any alleged deception about the Program or this consent agreement." *Id.* Pursuant to New York law, "[w]here a party releases a fraud claim, it 'may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release.' " *Usach v. Tikhman*, No. 11 Civ. 1472 (DLC), 2011 WL 6106542, at *6 (S.D.N.Y. Dec. 7, 2011) (quoting *Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 276, 929 N.Y.S.2d 3, 952 N.E.2d 995). The SCA's release specifically contemplates fraud arising from "deception about the Program," SCA ¶ 4(p), and Judge Moore has failed to identify a "separate fraud" not contemplated by this release.

For these reasons, the Court grants Defendants' motion for summary judgment as to Judge Moore and dismisses his defamation, fraud, and intentional infliction of emotional distress claims. The Court next considers whether Kayla Moore's claims must also be dismissed.

## IV. Kayla Moore's Claims

**[24]** Defendants argue that the waivers contained in the SCA should apply to the claims brought by Kayla Moore as well. Even though Kayla Moore was not a signatory to the agreement, Defendants maintain that she is "closely related" to Judge Moore and it was foreseeable that she could be bound by the contract. Motion at 22. While a non-signatory may be bound to the contract in certain circumstances, *see Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009), it appears that the "closely related" doctrine has been predominantly—if not exclusively —applied in the context of forum selection clauses. *See, e.g.*, *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013); *Highland Crusader Offshore Partners, L.P. v. Targeted Delivery Techs. Holdings, Ltd.*, 184 A.D.3d 116, 124 N.Y.S.3d 346, 352-53 (2020). [8] In fact, the Second Circuit has explicitly rejected this doctrine in the context of mandatory arbitration clauses. *See Smoothline Ltd. v. N. Am. Foreign Trading Corp.*, 249 F.3d 147, 155 n.4 (2d Cir. 2001). Mindful of the "general principle that only the parties to a

contract are bound by its terms," *Highland Crusader Offshore Partners, L.P.*, 124 N.Y.S.3d at 352, and the Complaint's allegations of injuries suffered by Kayla Moore, *see* Compl. ¶¶ 38, 48, the Court declines to apply the "closely related" doctrine to bind Kayla Moore to the SCA's waiver provisions.

That of course does not end the Court's analysis of Defendants' motion to dismiss Kayla Moore's claims of intentional infliction of emotional distress and fraud. The Court now turns to Defendants' alternative argument that the First Amendment bars her claims because Cohen's conduct during the interview "cannot reasonably be interpreted as stating actual facts about" Judge Moore. Motion at 23 (quoting **\*345** *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). The Court agrees.

## A. Applicable First Amendment Principles

**[25]  [26]  [27]  [28]** The First Amendment safeguards certain forms of speech and expressive conduct. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 404-05, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *Spence v. Washington*, 418 U.S. 405, 409-11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). As part of these protections, the Supreme Court has placed limits on state defamation claims, requiring public officials and public figures to show that the allegedly defamatory statements were made with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *see Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("Today, there is no question that public figure libel cases are controlled by the *New York Times* standard ...."). In *Hustler Magazine, Inc. v. Falwell*, the Supreme Court further held that an intentional infliction of emotional distress claim brought by a public figure and alleging reputational damage falls within the ambit of the First Amendment. 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *see Snyder v. Phelps*, 562 U.S. 443, 458, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (similarly finding that the defendant's speech was entitled " 'special protection' under the First Amendment" in an intentional infliction of emotional distress claim brought by a private figure concerning a matter of public concern). Following the reasoning of these decisions, the Second Circuit has explained that "regardless of the claim at issue," the "heightened First Amendment protections apply to any tort alleging reputational harm as long as the underlying speech relates to a matter of public concern." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 129 (2d Cir. 2013).

**[29]**  The Supreme Court has emphasized that under the First Amendment, liability may not attach for "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695 (alteration in original) (quoting *Falwell*, 485 U.S. at 50, 108 S.Ct. 876). This protection of speech is necessary to "provide[ ] assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Id.*; *see Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin*, 418 U.S. 264, 284, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (holding inactionable words that "cannot be construed as representations of fact"); *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) ("[T]he thrust of the dispositive inquiry under both New York and constitutional law is whether a reasonable [reader] could have concluded that [the publications were] conveying facts about the plaintiff." (second and third alterations in original) (internal quotation marks and citation omitted)).[9]

This is especially so in the context of political satire when the target of the purportedly defamatory content is a public figure, given satire's "prominent role in public and political debate." *Falwell*, 485 U.S. at 54, 108 S.Ct. 876; *see also* **\*346** *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 493 (2d Cir. 1989) ("We have stated the general proposition that parody and satire *are* deserving of substantial freedom—both as entertainment and as a form of social and literary criticism." (internal quotation marks and citation omitted)); Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 5:5.2, at 5-121 (5th ed. 2017) ("Humor is an important medium of legitimate expression and central to the well-being of individuals, society, and their government. Despite its typical literal 'falsity,' any effort to control it runs severe risks to free expression as dangerous as those addressed to more 'serious' forms of communication.").

The context surrounding a statement thus is important in determining whether a reasonable reader could interpret it as stating facts. *See Milkovich*, 497 U.S. at 21, 110 S.Ct. 2695 (considering the "general tenor" of the article in which the allegedly defamatory statement was included); *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 13-14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (finding a newspaper's use of the word "blackmail" about the conduct of a public figure in articles reporting on "heated" town meetings was "no more than rhetorical hyperbole" where the articles were "accurate and full" and no one would think that the public figure was

in fact being charged with the crime of blackmail); *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 151 (2d Cir. 2000) (concluding that "[a] reasonable reader would not expect ... hyperbole" in a directory of attorneys featuring concrete facts as to those professionals, which made a reader more likely to treat the description of an attorney as an "ambulance chaser" as fact).

**[30]    [31]**  "The determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual presentation is a question of law for the court." *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985); *accord McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 181 (S.D.N.Y. 2020) ("[T]he question of whether the statements at issue are statements of fact is a legal one, informed by factual context of the statements in question."). Whether the speech at issue concerns a matter of public concern is similarly for a judge to decide. *See Connick v. Myers*, 461 U.S. 138, 148 n.7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

## B. Kayla Moore's Claims Are Barred by the First Amendment

**[32]**  As an initial matter, the First Amendment applies to Kayla Moore's intentional infliction of emotional distress and fraud claims. As noted above, the Second Circuit has instructed that "heightened First Amendment protections apply to any tort alleging reputational harm as long as the underlying speech relates to a matter of public concern." *Dongguk Univ.*, 734 F.3d at 129. Both of Kayla Moore's claims stem from harm to Judge Moore's reputation, Compl. ¶¶ 38, 47-48, and her fraud claim additionally alleges damages as to her own reputation, *id.* ¶ 48 ("[P]laintiffs' entire family, including Mrs. Moore, have suffered loss of reputation ...."). Looking at the "content, form, and context as revealed by the whole record," *Dongguk Univ.*, 734 F.3d at 130 (citing *Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)), it is clear that the Program, including the segment featuring Judge Moore, was commentary on matters of public concern. "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'" *Snyder*, 562 U.S. at 453, 131 S.Ct. 1207 (quoting **\*347** *Connick*, 461 U.S. at 145, 103 S.Ct. 1684), "or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public,'" *id.* (quoting *San Diego v. Roe*, 543 U.S. 77, 83-84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004)). Cohen's conduct during the interview with Judge Moore was

related to press reports of accusations against Judge Moore of sexual misconduct involving young females, with this media coverage occurring while Judge Moore was campaigning for the U.S. Senate. Defs.' Rule 56.1 Stmt. ¶¶ 3-4, 53-54. The episode at issue began with footage of news agencies reporting these accusations against Judge Moore, followed by a clip of a public endorsement of Judge Moore's candidacy. *Id.* ¶ 54; Episode 3 Video. These matters are of public concern and are therefore protected by the First Amendment.

**[33]** **[34]** The Court next considers whether the segment could have been "reasonably ... interpreted as stating actual facts about" Judge Moore. *Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695 (quoting *Falwell*, 485 U.S. at 50, 108 S.Ct. 876); *see Flamm*, 201 F.3d at 150 (explaining that "statements of 'imaginative expression' or 'rhetorical hyperbole' " are not actionable). In conducting this analysis, the Court considers whether the "general tenor" of the interview "negates the impression that [the] challenged statements imply defamatory facts." *Flamm*, 201 F.3d at 150. Also relevant is the political and satirical nature of the segment, as such content is afforded substantial First Amendment protections. *See Falwell*, 485 U.S. at 54-55, 108 S.Ct. 876. Plaintiffs do not challenge the characterization of the segment as satire, and the Supreme Court has previously defined satire as "work 'in which prevalent follies or vices are assailed with ridicule,' ... or are 'attacked through irony, derision, or wit.' " *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 581 n.15, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (citations omitted). As the D.C. Circuit in *Farah v. Esquire Magazine* noted, "[s]atire's unifying element is the use of wit to expose something foolish or vicious to criticism," and may at times "seem cruel and mocking, attacking the core beliefs of its target." 736 F.3d 528, 536 (D.C. Cir. 2013) (internal quotation marks and citations omitted). The interview, with Cohen using a wand that supposedly detects enzymes secreted by pedophiles, Defs.' Rule 56.1 Stmt. ¶ 57; Episode 3 Video, was a comment on the accusations faced by Judge Moore and falls within this genre.

Several courts have precluded claims based on reputational injury stemming from satirical publications because they did not contain statements that could be reasonably interpreted as stating facts, including in situations where the statements at issue seemed far more likely to be viewed as conveying actual facts than Cohen's patently absurd conduct during his interview of Judge Moore. For instance, the D.C. Circuit in *Farah* held that the First Amendment barred a suit brought by the writer and the publisher of a book that questioned whether

former President Barack Obama was born in the United States against *Esquire* for publishing on its blog an article falsely claiming that the book had been pulled from bookstores. 736 F.3d at 536-40. The plaintiffs argued that "reasonable readers would take the fictitious blog post literally" and pointed to numerous inquiries the plaintiffs received following the post and *Esquire*'s update clarifying that the story was satire. *Id.* at 536. After considering the post in context, and observing that satire is often "grounded in truth" and that the story at issue "layer[ed] fiction upon fact," the D.C. Circuit concluded that no reasonable reader could understand the story to assert actual facts about the plaintiffs. *Id.* at 537-39.

**\*348** In *New Times, Inc. v. Isaacks*, the Supreme Court of Texas similarly found that a satirical article—loosely based on real events that transpired at a school—was protected under the First Amendment despite the article being published as a lead story under the heading "News" in a section ordinarily "devoted to hard-hitting investigative news." 146 S.W.3d 144, 159-61 (2004). As the court noted, "[w]hile a reader may initially approach the article as providing straight news, [the article] contains such a procession of improbable quotes and unlikely events that a reasonable reader could only conclude that the article was satirical." *Id.* at 161.

The Tenth Circuit conducted a similar analysis in *Mink v. Knox*, 613 F.3d 995 (10th Cir. 2010). At issue in *Mink* was a criminal investigation, including the execution of a residential search, of a student who authored an editorial column under the name "Junius Puke," which displayed edited photographs of a university professor with the similar name of Junius Peake. *Id.* at 998-99. The Tenth Circuit found that the "editorial column addressed subjects on which Mr. Peake would be unlikely to write, in language he would be unlikely to use, asserting views that were diametrically opposed to Mr. Peake's." *Id.* at 998. The court then held that the comments at issue "constituted satire in its classic sense," and that "a reasonable person would not take the statements in the editorial column as statements of facts by or about Professor Peake." *Id.* at 1009-10.

**[35]** In light of the context of Judge Moore's interview, the segment was clearly a joke and no reasonable viewer would have seen it otherwise. The segment began with an absurd joke (*i.e.*, "Gen. Erran Morad" boasting about once killing a suicide bomber with an iPad 4, but luckily he had purchased AppleCare), followed soon by footage of numerous news reporters commenting on the accusations brought against Judge Moore. *See* Defs.' Rule 56.1 Stmt. ¶¶ 53; Episode

3 Video. At this point, it should have been abundantly clear to any reasonable viewer that Defendants were using humor to comment on those accusations, rather than making independent factual assertions or even remarking on the truth or accuracy of the allegations. The actual interview of Judge Moore then became even more absurd. No reasonable viewer would have interpreted Cohen, in his over-the-top "Erran Morad" character, waving a wand that supposedly detects enzymes emitted by pedophiles in the vicinity of Judge Moore as stating facts about Judge Moore. Nor would a viewer have reasonably believed that this gadget—which "Erran Morad" contended also was able to detect hidden tunnels used by terrorists—doubled as a device that also could detect enzymes secreted by pedophiles.

The interview therefore was not "a statement of opinion that is based on undisclosed facts," which could "imply assertions of objective fact" to the viewer. *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) (internal quotation marks and citation omitted). Additionally, as the court in *Farah* noted, political satire necessarily comments on and involves news and facts that take place in the world. 736 F.3d at 537; *see also Falwell*, 485 U.S. at 54, 108 S.Ct. 876 ("The appeal of the political cartoon or caricature is often based on exploitation of unfortunate physical traits or politically embarrassing events—an exploitation often calculated to injure the feelings of the subject of the portrayal."). It is this type of satire —which comments on social and political news—that the Supreme Court has found to be deserving of First Amendment protections due to its effect "on the course and outcome of contemporaneous **\*349** debate." *Falwell*, 485 U.S. at 55, 108 S.Ct. 876.

And taking a step back from the Judge Moore interview segment, no viewer could have reasonably believed that *Who Is America?* was providing accurate news to its audience, unlike for instance the attorney directory in *Flamm*. *See Flamm*, 201 F.3d at 151-52; *see also Farah*, 736 F.3d at 537-38 (emphasizing that the satirical article's "primary intended audience ... would have been familiar with [the defendant's] history of publishing satirical stories" and therefore readers "could not reasonably have taken the story literally"). As demonstrated by videos of episodes filed in support of Defendants' motion, throughout the *Who Is America?* series, Cohen portrayed ridiculous characters conducting absurd interviews of seemingly unsuspecting individuals. For instance, during the same episode that featured Judge Moore, Cohen also taught three men how to kidnap illegal immigrants by having one of them dress up as a teenage girl and host a fake Quinceañera celebration; he attempted to facilitate an interview between the rapper "Bone Crusher" and a former South Carolina politician; and he engaged in a rap battle in Atlanta. Defs. Rule 56.1 Stmt. ¶¶ 64-65; Episode 3 Video. On Episode 1 of the series, Cohen—disguised then too as the supposed anti-terrorist expert "Erran Morad"—endorsed a program that would arm children as young as three years old with firearms to defend against school shootings, and sought the support of several politicians. Defs. Rule 56.1 Stmt. ¶¶ 31-33. On another episode, after a brief discussion of "interrogation techniques" with a former Vice President of the United States, Cohen admitted to waterboarding his wife and then asked the former Vice President to sign his "waterboarding kit." Defs. Rule 56.1 Stmt. ¶ 38; Episode 2 Video. It is simply inconceivable that the Program's audience would have found a segment with Judge Moore activating a supposed pedophile-detecting wand to be grounded in any factual basis.

Given the satirical nature of that segment and the context in which it was presented, no reasonable viewer would have interpreted Cohen's conduct during the interview as asserting factual statements concerning Judge Moore. Because both of Kayla Moore's claims are premised on reputational damage arising from that segment, her claims are barred by the First Amendment and must be dismissed. *See Dongguk Univ.*, 734 F.3d at 129.

### V. Conclusion

For the reasons set forth above, the Court grants summary judgment on all claims in favor of Defendants, and dismisses Plaintiffs' claims with prejudice.

**All Citations**

548 F.Supp.3d 330

## Footnotes

1    The following facts are primarily taken from the parties' filings pursuant to Local Civil Rule 56.1. On February 8, 2021, Defendants filed their statement of undisputed facts pursuant to Local Civil Rule 56.1, Dkt. 117 ("Defs. Rule 56.1 Stmt."), and on March 15, 2021, Plaintiffs filed their Rule 56.1 statement, which responded to Defendants' proffered undisputed facts and contained Plaintiffs' own statement of undisputed facts, Dkt. 126 at 1-25 ("Pls. Counter-Rule 56.1 Stmt."); Dkt. 126 at 25-29 ("Pls. Rule 56.1 Stmt."). On April 15, 2021, Defendants filed a response to Plaintiffs' Rule 56.1 Statement. Dkt. 129 ("Defs. Counter-Rule 56.1 Stmt.").

In responding to the undisputed facts proffered in Defendants' Rule 56.1 statement, Plaintiffs repeatedly deny facts without citation to admissible evidence to controvert as required by Local Civil Rule 56.1(d). For instance, Plaintiffs deny Defendants' relatively innocuous factual proffer of Cohen's career as "a comedian and political satirist," Defs. Rule 56.1 Stmt. ¶ 11, by unhelpfully stating only that "Cohen is simply a fraudster," Pls. Counter-Rule 56.1 Stmt. ¶ 11, even though their Complaint alleges Cohen to be "an actor, comedian, screenwriter, and producer," Dkt. 1 ("Compl.") ¶ 10. Courts routinely deem admitted those facts "not contradicted by citations to admissible evidence." *Russell v. Aid to Developmentally Disabled, Inc.*, 416 F. Supp. 3d 225, 227 n.3 (E.D.N.Y. 2017), *aff'd*, 753 F. App'x 9 (2d Cir. 2018). The Court therefore disregards Plaintiffs' denials that lack citation to evidence, *see Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003); *Lozada v. Cty. of Nassau*, No. 16 Civ. 6302 (JS), 2021 WL 1209740, at *6 n.6 (E.D.N.Y. Mar. 31, 2021), and has conducted its own independent review of the record supplied in connection with Defendants' motion to ensure that any facts relied upon in this Opinion and Order have adequate support.

2    Plaintiffs' counsel has repeatedly asserted that the Court's decision to stay discovery pending disposition of this motion somehow contravened earlier rulings of Judge Carter, which counsel has characterized as "law of the case." *See* 12/3/2020 Tr. at 5, 7, 25; Dkt. 105 at 30; Opposition at 25. "[T]he law of the case doctrine," however, "does not abrogate this Court's discretion over case management and its ability to modify prior scheduling orders." *City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345 (AJN) (KHP), 2019 WL 11662228, at *1 (S.D.N.Y. Oct. 24, 2019). Further, in denying Defendants' motion to dismiss because of Defendants' reliance on extrinsic evidence, Judge Carter made clear that Defendants may "raise the issues addressed" in that motion "in a subsequent motion for summary judgment." Dkt. 75.

3    The forum-selection provision of the SCA, which Judge Hogan applied to transfer the case to this District, states that the substantive laws of New York apply to any claims "in connection with the Program or its production." SCA ¶ 6. The claims at issue are covered by this language, and both parties apply New York law in their briefs. The Court therefore applies New York law. *See, e.g.*, *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000) ("The parties' briefs assume that New York law controls this dispute, and such implied consent ... is sufficient to establish choice of law." (alteration in original) (internal quotation marks and citation omitted)).

4    Cohen is the sole member of Please You Can Touch, LLC ("PYCT"). *See* Dkt. 114-21; Dkt. 114-22; Dkt. 114-23; Dkt. 114-7 (Deposition of Sacha Baron Cohen ("Cohen Deposition")) at 30; Dkt. 114-9 (Deposition of Jenifer Wallis ("Wallis Deposition")) at 22. PYCT is the sole member of La Quinta Entertainment, LLC ("La Quinta"). *See* Dkt. 114-19; Dkt. 114-18; Wallis Deposition at 22; Dkt. 114-8 (Deposition of Todd Schulman ("Schulman Deposition")) at 34. La Quinta is the sole member of Greenpark Television, LLC ("Greenpark"). *See* Dkt. 114-15; Dkt. 114-16; Wallis Deposition at 22; Schulman Deposition at 33. Greenpark is the sole member of YTV. *See* Dkt. 114-11; Wallis Deposition at 21-22; Schulman Deposition at 33.

5    Plaintiffs questioned Cohen at his deposition about his role in these corporate entities. Cohen Deposition at 30-31. Plaintiffs also deposed two non-parties with direct knowledge as to the agreements signed by YTV, as well as the relevant corporate documents. They deposed Todd Schulman, who was an Executive Producer

and a Director for *Who is America?* and was responsible for executing agreements on behalf of YTV. *See* Schulman Declaration ¶¶ 1, 8; *see generally* Schulman Deposition. And they deposed Jenifer Wallis, an attorney who created YTV and had knowledge of the corporate relationships between YTV and the parent companies linking Cohen to YTV. *See* Wallis Deposition at 38, 51-56; Dkt. 114-10.

6    Judge Moore's initials, "RSM," are handwritten alongside the modification. SCA ¶ 4(f); Pls. Counter-Rule 56.1 Stmt. ¶ 76. While the parties do not provide any details as to when or how this portion of the contract was struck out, both parties assume that Judge Moore signed the contract with this amendment included. Defs. Counter-Rule 56.1 Stmt. ¶ 1.

7    Plaintiffs argue that "[i]f the intent was truly to only limit the amendment to intrusion or invasion of privacy claims, then [the amendment] should have said something like, 'intrusion or invasion of privacy claims involving allegedly sexual oriented or offensive behavior or questioning.' " Opposition at 7. But it is irrelevant in what other ways the contract could have been amended. Judge Moore only struck out the phrase beginning with "such as," which followed the mention of an "intrusion or invasion of privacy" claim.

8    Defendants also cite to *Buckley v. National Freight, Inc.*, 90 N.Y.2d 210, 217, 659 N.Y.S.2d 841, 681 N.E.2d 1287 (1997), but that case is inapposite because it was specific to New York's rule against double recovery under loss of consortium claims.

9    While the *Milkovich* Court affirmed this doctrine and found that "loose, figurative, or hyperbolic" statements are protected, there is no "wholesale" constitutional "protection for so-called 'expressions of opinion' if those expressions imply assertions of objective fact." *Levin*, 119 F.3d at 196 (quoting *Milkovich*, 497 U.S. at 18, 110 S.Ct. 2695).

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

⚠ Caution
As of: October 3, 2025 3:37 AM Z

## *Chanko v American Broadcasting Cos. Inc.*

Court of Appeals of New York

February 18, 2016, Argued; March 31, 2016, Decided

No. 44

**Reporter**

27 N.Y.3d 46 *; 49 N.E.3d 1171 **; 29 N.Y.S.3d 879 ***; 2016 N.Y. LEXIS 702 ****; 2016 NY Slip Op 02478; 44 Media L. Rep. 1813

 [1]  Anita Chanko, Individually and as Executor of Mark S. Chanko, Deceased, et al., Appellants, v American Broadcasting Companies, Inc., et al., Respondents, et al., Defendants.

**Prior History:** Appeal, by permission of the Appellate Division of the Supreme Court in the First Judicial Department, from an order of that Court, entered November 18, 2014. The Appellate Division (1) reversed, on the law, so much of an order of the Supreme Court, New York County (Manuel J. Mendez, J.; op *2014 NY Slip Op 30116[U] [2014]),* as had (a) denied the motions of defendants American Broadcasting Companies, Inc., The New York and Presbyterian Hospital and Sebastian Schubl, M.D., to dismiss plaintiffs' fifth cause of action for intentional infliction of emotional distress, and (b) denied defendant hospital and defendant doctor's motion to dismiss plaintiffs' fourth cause of action for violation of physician-patient confidentiality; and (2) dismissed the complaint. The following question was certified by the Appellate Division: "Was the order of this Court, which unanimously reversed the order of Supreme Court, properly made?"

*Chanko v American Broadcasting Cos. Inc., 122 AD3d 487, 997 NYS2d 44, 2014 NY App Div LEXIS 7897 (N.Y. App. Div. 1st Dep't, 2014),* modified.

**Disposition:** Order modified, without costs, by denying the motion of defendants New York and Presbyterian Hospital and Sebastian Schubl, M.D. to dismiss the fourth cause of action and, as so modified, affirmed.

## Core Terms

patient, decedent's, cause of action, confidentiality, physician-patient, disclosure, emotional distress, outrageous, medical information, film, diagnose, medical treatment, broadcast, episode, privacy, footage, intentional infliction of emotional distress, television, modify, medical record, quotation, decency, watch

## Case Summary

### Overview

HOLDINGS: [1]-The actions of defendants, a broadcasting network, a hospital, and a treating physician, in filming or allowing the filming, without consent, of a patient's treatment and death in an emergency room and broadcasting the footage were not so extreme and outrageous as to support an IIED claim by the patient's family members, as the episode did not include the patient's name, his image was blurred, and less than three minutes were devoted to him; [2]-However, the complaint sufficiently stated a cause of action against the hospital and physician for breach of physician-patient confidentiality in violation of *CPLR 4504(a);* that the patient was not identifiable on the episode aired on television was immaterial, as the complaint also alleged an improper disclosure of medical information to the network employees who filmed and edited the recording.

Fred Charles

27 N.Y.3d 46, *46; 49 N.E.3d 1171, **1171; 29 N.Y.S.3d 879, ***879; 2016 N.Y. LEXIS 702, ****702; 2016 NY Slip Op 02478, *****02478

**Outcome**
The order was modified and affirmed as modified.

# LexisNexis® Headnotes

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Appeals > Standards of Review

*HN1* When considering pre-answer motions to dismiss a complaint for failure to state a cause of action, an appellate court  must give the pleadings a liberal construction, accept the allegations as true and accord the plaintiffs every possible favorable inference. The appellate court may also consider affidavits submitted by the plaintiffs to remedy any defects in the complaint, because the question is whether plaintiffs have a cause of action, not whether they have properly labeled or artfully stated one.

Evidence > Privileges > Doctor-Patient Privilege > Elements

Business & Corporate Compliance > Healthcare > Medical Treatment > Patient Confidentiality

Healthcare Law > Medical Treatment > Patient Confidentiality

*HN2* See *CPLR 4504(a)*.

Evidence > Privileges > Doctor-Patient Privilege > Elements

Governments > Legislation > Interpretation

Business & Corporate Compliance > Healthcare > Medical Treatment > Patient Confidentiality

Healthcare Law > Medical Treatment > Patient Confidentiality

*HN3* The policy objectives of *CPLR 4504(a)* are to: (1) maximize unfettered communication between patients and medical professionals, so that people will not be deterred by possible public disclosure from seeking medical help and securing adequate diagnosis and treatment; (2) encourage physicians to candidly record confidential information in medical records, so they are not torn between the legal duty to testify and the professional obligation to honor patient confidences; and (3) protect the reasonable privacy expectations of patients that their sensitive personal information will not be disclosed. The physician-patient privilege should be given a broad and liberal construction to carry out its policy.

Evidence > Privileges > Doctor-Patient Privilege > Scope

Business & Corporate Compliance > Healthcare > Medical Treatment > Patient Confidentiality

Healthcare Law > Medical Treatment > Patient Confidentiality

*HN4* The physician-patient privilege applies not only to information orally communicated by the patient,  but also to information ascertained by observing the patient's appearance and symptoms, unless those factual observations

27 N.Y.3d 46, *46; 49 N.E.3d 1171, **1171; 29 N.Y.S.3d 879, ***879; 2016 N.Y. LEXIS 702, ****702; 2016 NY Slip
Op 02478, *****02478

would be obvious to lay observers. Generally, the privilege covers all information relating to the nature of the treatment rendered and the diagnosis made. Although not covered by *CPLR 4504(a)*, information obtained in a professional capacity but not necessary to enable the physician to fulfill his or her medical role is a protected confidence, the disclosure of which constitutes professional misconduct in the absence of patient consent or legal authorization.

Evidence > Privileges > Doctor-Patient Privilege > Scope

Business & Corporate Compliance > Healthcare > Medical Treatment > Patient Confidentiality

Healthcare Law > Medical Treatment > Patient Confidentiality

*HN5* A physician's disclosure of secrets acquired when treating a patient naturally shocks the public's sense of decency and propriety, which is one reason it is forbidden. Even apart from *CPLR 4504*, the legislature has declared that it is the public policy of the State of New York to protect the privacy and confidentiality of sensitive medical information. As relates to emergency rooms, specifically, patients should not fear that merely by obtaining emergency medical care they may lose the confidentiality of their medical records and their physicians' medical determinations.

Evidence > Privileges > Doctor-Patient Privilege > Scope

Business & Corporate Compliance > Healthcare > Medical Treatment > Patient Confidentiality

Healthcare Law > Medical Treatment > Patient Confidentiality

*HN6* The physician-patient privilege, together with its concomitant duty of confidentiality, belongs to the patient and is not terminated by death alone.

Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > Doctors & Physicians

Healthcare Law > Medical Treatment > Patient Confidentiality > Breach

*HN7* The elements of a cause of action for breach of physician-patient confidentiality are: (1) the existence of a physician-patient relationship; (2) the physician's acquisition of information relating to the patient's treatment or diagnosis; (3) the disclosure of such confidential information to a person not connected with the patient's medical treatment, in a manner that allows the patient to be identified; (4) lack of consent for that disclosure; and (5) damages.

Healthcare Law > Medical Treatment > Patient Confidentiality > Breach

Evidence > Privileges > Doctor-Patient Privilege > Scope

*HN8* Whether the confidentiality inherent in the fiduciary physician-patient relationship is breached does not depend on the nature of the medical treatment or diagnosis about which information is revealed. New York's broad rule protects all types of medical information and provides consistency, avoiding case-by-case determinations of what is considered embarrassing to any particular patient.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements

27 N.Y.3d 46, *46; 49 N.E.3d 1171, **1171; 29 N.Y.S.3d 879, ***879; 2016 N.Y. LEXIS 702, ****702; 2016 NY Slip Op 02478, *****02478

*HN9* There are four elements of a cause of action for intentional infliction of emotional distress: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements

*HN10* To state a cause of action for intentional infliction of emotional distress, the plaintiff must already be aware of the offending conduct and have suffered emotional distress as a result thereof.

# Headnotes/Summary

**Headnotes**

**Physicians and Surgeons — Disclosure of Confidential Information — Television Film Crew Present during Emergency Medical Treatment without Consent**

1. Plaintiffs sufficiently stated a cause of action for breach of the physician-patient privilege in alleging that defendants hospital and physician allowed a television film crew, without the knowledge or consent of decedent or plaintiffs, to film decedent's emergency room medical treatment and death and to subsequently broadcast the footage in a televised documentary series. Pursuant to *CPLR 4504 (a)*, "[u]nless the patient waives the privilege, a person authorized to practice medicine . . . shall not be allowed to disclose any information which he [or she] acquired in attending a patient in a professional capacity, and which was necessary to enable him [or her] to act in that capacity." Whether the confidentiality inherent in the fiduciary physician-patient relationship is breached does not depend on the nature of the medical treatment or diagnosis about which information is revealed. Even if no one who actually viewed the televised program recognized decedent, the complaint expressly alleged an improper disclosure of medical information to the television employees who filmed and edited the recording, in addition to the broadcast itself, and that defendants revealed confidential medical information concerning decedent's treatment and diagnosis to the film crew while treatment was occurring. Moreover, a lack of consent could be inferred from the allegation that the disclosure violated privacy statutes and patient confidentiality.

**Torts — Intentional Infliction of Emotional Distress — Outrageousness of Conduct**

2. The actions of defendants hospital and physician in allegedly allowing decedent's emergency room medical treatment and death to be filmed, without the knowledge or consent of decedent or plaintiffs, and then broadcasted as part of a television documentary series were not so extreme and outrageous as to support plaintiffs' cause of action for intentional infliction of emotional distress. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Plaintiffs' allegations that they watched the episode and were shocked and upset, and that it was foreseeable that they would be caused to suffer emotional distress, were not sufficient to support the cause of action because they did not rise to the level necessary to satisfy the outrageousness element. The footage aired was edited so that it did not include decedent's name, his image was blurred, and the episode included less than three minutes devoted to decedent and his circumstances.

**Counsel:** [****1] *Norman A. Olch*, New York City, and *Law Offices of Mark J. Fox*, New York City, for appellants. I. The allegation of the [*48] complaint that the hospital and a doctor gave a television film crew access to private medical information without the consent of the patient states a cause of action for breach of physician-patient confidentiality. (*Edington v Mutual Life Ins. Co. of N.Y., 67 NY 185*; *Doe v Guthrie Clinic, Ltd., 22 NY3d 480, 982 NYS2d 431, 5 NE3d 578*; *Burton v Mattelano, 81 AD3d 1272, 916 NYS2d 438*; *Lightman v Flaum, 97 NY2d 128,*

27 N.Y.3d 46, *48; 49 N.E.3d 1171, **1171; 29 N.Y.S.3d 879, ***879; 2016 N.Y. LEXIS 702, ****1; 2016 NY Slip Op 02478, *****02478

*761 NE2d 1027, 736 NYS2d 300*; *Matter of Camperlengo v Blum, 56 NY2d 251, 436 NE2d 1299, 451 NYS2d 697*; *People v Decina, 2 NY2d 133, 138 NE2d 799, 157 NYS2d 558*; *Renihan v Dennin, 103 NY 573, 9 NE 320, 4 NY St 261*; *Nelson v Village of Oneida, 156 NY 219, 50 N.E. 802, 5 N.Y. Ann. Cas. 244, 27 Civ. Proc. R. 282*; *Matter of City Council of City of N.Y. v Goldwater, 284 NY 296, 31 NE2d 31*; *Matter of Grand Jury Investigation of Onondaga County, 59 NY2d 130, 450 NE2d 678, 463 NYS2d 758*.) II. American Broadcasting Companies, Inc.'s DVD—an edited version of all its film crew saw and recorded—is not "documentary evidence" under *CPLR 3211 (a) (1)* which can provide the basis for dismissing a complaint. (*Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 774 NE2d 1190, 746 NYS2d 858*; *Held v Kaufman, 91 NY2d 425, 694 NE2d 430, 671 NYS2d 429*; *Zegarelli v Hughes, 3 NY3d 64, 814 NE2d 795, 781 NYS2d 488*; *Peter Scalamandre & Sons, Inc. v Kaufman, 113 F3d 556*; *Amsterdam Hospitality Group, LLC v Marshall-Alan Assoc., Inc., 120 AD3d 431, 992 NYS2d 2*; *Sunset Café, Inc. v Mett's Surf & Sports Corp., 103 AD3d 707, 959 NYS2d 700*.) III. Plaintiffs have a cause of action for the infliction of emotional distress by the doctor and by the hospital. (*Howell v New York Post Co., 81 NY2d 115, 612 NE2d 699, 596 NYS2d 350*; *Murphy v American Home Prods. Corp., 58 NY2d 293, 448 NE2d 86, 461 NYS2d 232*; *Davis v Supreme Lodge, Knights of Honor, 165 NY 159, 58 NE 891, 31 Civ. Proc. R. 298*; *Dillenbeck v Hess, 73 NY2d 278, 536 NE2d 1126, 539 NYS2d 707*; *Sawicka v Catena, 79 AD3d 848, 912 NYS2d 666*; *Roach v Stern, 252 AD2d 488, 675 NYS2d 133*.) IV. The plaintiff has a claim that American Broadcasting Companies, Inc. is an aider and abettor of the torts committed by the doctor and the hospital, and that its own broadcast inflicted emotional distress. (*Oster v Kirschner, 77 AD3d 51, 905 NYS2d 69*; *Small v Lorillard Tobacco Co., 94 NY2d 43, 720 NE2d 892, 698 NYS2d 615*.)


*Nixon Peabody LLP*, Jericho (*Michael S. Cohen, Christopher J. Porzio* and *Michelle Yuen* of counsel), for New York and Presbyterian Hospital and another, respondents. I. Dismissal of the fourth cause of action should be affirmed. (*Messenger v Gruner + Jahr Print. & Publ., 94 NY2d 436, 727 NE2d 549, 706 NYS2d 52*; *Howell v New York Post Co., 81 NY2d 115, 612 NE2d 699, 596 NYS2d 350*; *Arrington v New York Times Co., 55 NY2d 433, 434 NE2d 1319, 449 NYS2d 941*; *Cohen v Herbal Concepts, 63 NY2d 379, 472 NE2d 307, 482 NYS2d 457*; *Dillenbeck v Hess, 73 NY2d 278, 536 NE2d 1126, 539 NYS2d 707*; *Doe v Roe, 93 Misc 2d 201, 400 NYS2d 668*; *MacDonald v Clinger, 84 AD2d 482, 446 NYS2d 801*; *Tighe v Ginsberg, 146 AD2d 268, 540 NYS2d 99*; *Randi A. J. v Long Is. Surgi-Ctr., 46 AD3d 74, 842 NYS2d 558*; *Juric v Bergstraesser, 44 AD3d 1186, 844 NYS2d 465*.) II. Appellants' arguments concerning the DVD offered by American Broadcasting Companies, Inc. as documentary evidence provide no basis to reverse any portion **[*49]** of the order appealed from. (*Yue Fung USA Enters., Inc. v Novelty Crystal Corp., 105 AD3d 840, 963 NYS2d 678*; *Furlender v Sichenzia Ross Friedman Ference LLP, 79 AD3d 470, 912 NYS2d 204*; *Solco Plumbing Supply, Inc. v Hart, 123 AD3d 798, 999 NYS2d 126*; *Fontanetta v John Doe 1, 73 AD3d 78, 898 NYS2d 569*.) III. Dismissal of the fifth cause of action, alleging intentional infliction of emotional distress, should be affirmed. (*Howell v New York Post Co., 81 NY2d 115, 612 NE2d 699, 596 NYS2d 350*; *Freihofer v Hearst Corp., 65 NY2d 135, 480 NE2d 349, 490 NYS2d 735*; *Conboy v AT & T Corp., 241 F3d 242*; *Stuto v Fleishman, 164 F3d 820*; *Murphy v American Home Prods. Corp., 58 NY2d 293, 448 NE2d 86, 461 NYS2d 232*; *Sawicka v Catena, 79 AD3d 848, 912 NYS2d 666*; *Roach v Stern, 252 AD2d 488, 675 NYS2d 133*; *Stella v County of Nassau, 71 AD3d 573, 896 NYS2d 357*; *Anderson v Abodeen, 29 AD3d 431, 816 NYS2d 415*; *Seltzer v Bayer, 272 AD2d 263, 709 NYS2d 21*.)


*Levine Sullivan Koch & Schulz, LLP*, New York City (*Nathan Siegel* of counsel), for American Broadcasting Companies, Inc., respondent. I. The Appellate Division correctly dismissed the claim for intentional infliction of emotional distress against American Broadcasting Companies, Inc. because the NY Med broadcast was not extreme and outrageous. (*Howell v New York Post Co., 81 NY2d 115, 612 NE2d 699, 596 NYS2d 350*; *Sheila C. v Povich, 11 AD3d 120, 781 NYS2d 342*; *Murphy v American Home Prods. Corp., 58 NY2d 293, 448 NE2d 86, 461 NYS2d 232*; *Marmelstein v Kehillat New Hempstead: The Rav Aron Jofen Community Synagogue, 11 NY3d 15, 892 NE2d 375, 862 NYS2d 311*; *Kasachkoff v City of New York, 68 NY2d 654, 496 NE2d 226, 505 NYS2d 67*; *Freihofer v Hearst Corp., 65 NY2d 135, 480 NE2d 349, 490 NYS2d 735*; *Burlew v American Mut. Ins. Co., 63 NY2d 412, 472 NE2d 682, 482 NYS2d 720*; *Fischer v Maloney, 43 NY2d 553, 373 NE2d 1215, 402 NYS2d 991*; *Cohn-Frankel v United Synagogue of Conservative Judaism, 246 AD2d 332, 667 NYS2d 360*; *Sarwer v Conde Nast Publs., 237 AD2d 191, 654 NYS2d 768*.) II. Alternatively, the intentional infliction of emotional distress claim against

27 N.Y.3d 46, *49; 49 N.E.3d 1171, **1171; 29 N.Y.S.3d 879, ***879; 2016 N.Y. LEXIS 702, ****1; 2016 NY Slip Op 02478, *****02478

American Broadcasting Companies, Inc. fails on several other grounds. (*Town of Massena v Niagara Mohawk Power Corp., 45 NY2d 482, 382 NE2d 1139, 410 NYS2d 276*; *Martin v Citibank, N.A., 762 F2d 212*; *Smukler v 12 Lofts Realty, 156 AD2d 161, 548 NYS2d 437*; *Green v Leibowitz, 118 AD2d 756, 500 NYS2d 146*; *Owen v Leventritt, 174 AD2d 471, 571 NYS2d 25*; *Herlihy v Metropolitan Museum of Art, 214 AD2d 250, 633 NYS2d 106*; *Nader v General Motors Corp., 25 NY2d 560, 255 NE2d 765, 307 NYS2d 647*; *V. Groppa Pools, Inc. v Massello, 106 AD3d 722, 964 NYS2d 563*; *Semper v New York Methodist Hosp., 786 F Supp 2d 566*; *Preston v Martin Bregman Prods., Inc., 765 F Supp 116*.) III. The remaining issues appellants raise with respect to American Broadcasting Companies, Inc. are not properly before this Court. (*Hecht v City of New York, 60 NY2d 57, 454 NE2d 527, 467 NYS2d 187*; *Little Joseph Realty v Town of Babylon, 41 NY2d 738, 363 NE2d 1163, 395 NYS2d 428*; *Matter of Harmon, 73 AD3d 1059, 900 NYS2d 761*; *Zeman v Falconer Elecs., Inc., 55 AD3d 1240, 865 NYS2d 420*; *Mazzu v Benderson Dev. Co., 224 AD2d 1009, 637 NYS2d 540*; *Misicki v Caradonna, 12 NY3d 511, 909 NE2d 1213, 882 NYS2d 375*; *Collucci v Collucci, 58 NY2d 834, 446 NE2d 770, 460 NYS2d 14*; *Harvey v Mazal Am. Partners, 79 NY2d 218, 590 NE2d 224, 581 NYS2d 639*; *Matter of Colton v Riccobono, 67 NY2d 571, 496 NE2d 670, 505 NYS2d 581*.) IV. The theories appellants raise for the first time in this Court lack merit. (*Oster v Kirschner, 77 AD3d 51, 905 NYS2d 69*; *Small v Lorillard Tobacco Co., 94 NY2d 43, 720 NE2d 892, 698 NYS2d 615*; *Landmark Communications, Inc. v Virginia, 435 US 829, 98 S. Ct. 1535, 56 L. Ed. 2d 1*; *Jean v Massachusetts State Police, 492 F3d 24*; *United States v Morison, 844 F2d 1057*; *Zerilli v Evening News Assn., 628 F2d 217, 202 US App DC 217*; *Ava v NYP Holdings, Inc., 20 Misc 3d 1108[A], 866 NYS2d 90, 2008 NY Slip Op 51281[U]*; *Cruz v Latin News Impacto Newspaper, 216 AD2d 50, 627 NYS2d 388*; *FMC Corp. v Capital Cities/ABC, Inc., 915 F2d 300*; *Galella v Onassis, 487 F2d 986*.)

**Judges:** Opinion by Judge Stein. Judges Pigott, Rivera, Abdus-Salaam, Fahey and Garcia concur. Chief Judge DiFiore took no part.

**Opinion by:** STEIN

# Opinion

[***881] [**1173] [*50] Stein, J.

Defendants' actions in filming a patient's medical treatment and death in a hospital emergency room without consent, and then broadcasting a portion of the footage as part of a documentary series about medical trauma, were not so extreme and outrageous [**1174] [***882] as to support a cause of action by the patient's family members for intentional infliction of emotional distress. However, the complaint sufficiently states a cause of action against the hospital and treating [2] physician for breach of physician-patient confidentiality. Therefore, the Appellate Division order should be modified to reinstate that cause of action against those two defendants.

I.

Mark Chanko (decedent) was brought into the emergency room of defendant The New York and Presbyterian Hospital (the Hospital). He had been hit by a vehicle, but was alert and responding to questions. Defendant Sebastian Schubl was the Hospital's chief [****2] surgical resident and was responsible for decedent's treatment. While decedent was being treated, employees of ABC News, a division of defendant American Broadcasting Companies, Inc. (ABC), were in the Hospital—with the Hospital's knowledge and permission—filming a documentary series (NY Med) about medical trauma and the professionals who attend to the patients suffering from such trauma. No one informed decedent or any of the individual [*51] plaintiffs[1]—most of whom were at the Hospital—that a camera crew was present and filming, nor was their consent obtained for filming or for the crew's presence.

---

[1] The plaintiffs consist of decedent's widow, individually and as executor of decedent's estate, as well as other family members.

27 N.Y.3d 46, *51; 49 N.E.3d 1171, **1174; 29 N.Y.S.3d 879, ***882; 2016 N.Y. LEXIS 702, ****2; 2016 NY Slip Op 02478, *****02478

Less than an hour after decedent arrived at the Hospital, Schubl declared him dead. That declaration was filmed by ABC, and decedent's prior treatment was apparently filmed as well. Schubl then informed the family of decedent's death, with that moment also being recorded without their knowledge.

Sixteen months later, decedent's widow, plaintiff Anita Chanko, watched an episode of NY Med on her television at home. She recognized the scene, heard decedent's voice [****3] asking about her, saw him on a stretcher, heard him moaning, and watched him die. In addition, she saw, and relived, Schubl telling the family of his death. She then told the other plaintiffs, who also watched the episode. This was the first time plaintiffs became aware of the recording of decedent's medical treatment and death.

Plaintiffs commenced this action against, among others, ABC, the Hospital and Schubl. Defendants separately moved to dismiss the complaint. Supreme Court partially granted the motions, dismissing all causes of action except breach of physician-patient confidentiality against the Hospital and Schubl (the fourth cause of action), and intentional infliction of emotional distress against ABC, the Hospital and Schubl (the fifth cause of action) *(2014 NY Slip Op 30116[U] [2014])*. Defendants separately appealed the order insofar as the motions to dismiss were denied. Plaintiffs did not cross-appeal.

The Appellate Division modified Supreme Court's order by reversing the portions of the order that were appealed, granted the motions in their entirety and dismissed the entire **[3]** complaint *(122 AD3d 487, 997 NYS2d 44 [1st Dept 2014])*. That Court granted plaintiffs leave to appeal.

II.

A. Breach of Physician-Patient Privilege

Initially, we note that plaintiffs [****4] did not cross-appeal to the Appellate Division from [**1175] [***883] Supreme Court's dismissal of the cause of action for breach of physician-patient confidentiality as asserted against ABC. Thus, we may consider only whether that cause of action was adequately alleged against the Hospital [*52] and Schubl (*see CPLR 5515; Hecht v City of New York, 60 NY2d 57, 60-61, 454 NE2d 527, 467 NYS2d 187 [1983]; Matter of Harmon, 73 AD3d 1059, 1062, 900 NYS2d 761 [2d Dept 2010])*. To the extent plaintiffs belatedly attempt to argue that ABC aided and abetted those defendants in breaching confidentiality, that argument is not properly before us.

*HN1* When considering these pre-answer motions to dismiss the complaint for failure to state a cause of action, we must give the pleadings a liberal construction, accept the allegations as true and accord the plaintiffs every possible favorable inference (*see Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326, 774 NE2d 1190, 746 NYS2d 858 [2002])*. We may also consider affidavits submitted by plaintiffs to remedy any defects in the complaint, because the question is whether plaintiffs have a cause of action, not whether they have properly labeled or artfully stated one (*see Leon v Martinez, 84 NY2d 83, 88, 638 NE2d 511, 614 NYS2d 972 [1994])*.

With that standard in mind, we begin by observing that the physician-patient privilege did not exist at common law; it was created by statute, with New York having the first such statute in the nation, now codified at *CPLR 4504* (*see Matter of Grand Jury Investigation in N.Y. County, 98 NY2d 525, 529, 779 NE2d 173, 749 NYS2d 462 [2002]; Dillenbeck v Hess, 73 NY2d 278, 283, 536 NE2d 1126, 539 NYS2d 707 [1989])*. That statute provides [****5] that, *HN2* "[u]nless the patient waives the privilege, a person authorized to practice medicine . . . shall not be allowed to disclose any information which he [or she] acquired in attending a patient in a professional capacity, and which was necessary to enable him [or her] to act in that capacity" (*CPLR 4504 [a]*).

*HN3* The policy objectives of the statute are to: (1) maximize unfettered communication between patients and medical professionals, so that people will not be deterred by possible public disclosure "from seeking medical help and securing adequate diagnosis and treatment"; (2) encourage physicians to candidly record confidential information in medical records, so they are not torn between the legal duty to testify and the professional obligation to honor patient confidences; and (3) protect the reasonable privacy expectations of patients that their sensitive personal information will not be disclosed (*Dillenbeck, 73 NY2d at 285* [internal quotation marks and citation

27 N.Y.3d 46, *52; 49 N.E.3d 1171, **1175; 29 N.Y.S.3d 879, ***883; 2016 N.Y. LEXIS 702, ****5; 2016 NY Slip Op 02478, *****02478

omitted]; *see Matter of Grand Jury Investigation in N.Y. County, 98 NY2d at 529*). The privilege should "be given a broad and liberal construction to carry out its policy" (*Matter of Grand Jury Investigation in N.Y. County, 98 NY2d at 530* [internal quotation marks and citations omitted]).

 **[\*53]** *HN4* The privilege applies not only to information orally communicated by the patient, **[4]** but also to information ascertained **[\*\*\*\*6]** by observing the patient's appearance and symptoms, unless these factual observations would be obvious to lay observers (*see Dillenbeck, 73 NY2d at 284*). Generally, the privilege covers all " 'information relating to the nature of the treatment rendered and the diagnosis made' " (*Laura Inger M. v Hillside Children's Ctr., 17 AD3d 293, 295, 794 NYS2d 36 [1st Dept  [\*\*\*884] 2005]*, **[\*\*1176]** quoting *Hughson v St. Francis Hosp. of Port Jervis, 93 AD2d 491, 499, 463 NYS2d 224 [2d Dept 1983]*). Although not covered by the statute, "information obtained in a professional capacity but not necessary to enable the physician to fulfill his or her medical role is a protected confidence, the disclosure of which constitutes professional misconduct in the absence of patient consent or legal authorization" (*Lightman v Flaum, 97 NY2d 128, 136, 761 NE2d 1027, 736 NYS2d 300 [2001]*, cert denied 535 US 1096, 122 S Ct 2292, 152 L Ed 2d 1050 [2002]; *see Education Law § 6530 [23]*).

*HN5* A physician's disclosure of secrets acquired when treating a patient "naturally shocks our sense of decency and propriety," which is one reason it is forbidden (*Dillenbeck, 73 NY2d at 285* [internal quotation marks omitted]). Even apart from *CPLR 4504*, the legislature has declared that it is the public policy of this State to protect the "privacy and confidentiality of sensitive medical information" (*Randi A. J. v Long Is. Surgi-Ctr., 46 AD3d 74, 82, 842 NYS2d 558 [2d Dept 2007]*; *see Public Health Law § 2803-c [1], [3] [f]*; *4410 [2]*). As relates to emergency rooms, specifically, this Court has stated that "[p]atients should not fear that merely by obtaining emergency medical care they may lose the confidentiality of their medical records and their physicians' **[\*\*\*\*7]** medical determinations. A contrary result would discourage critical emergency care, intrude on patients' confidential medical relationships and undermine patients' reasonable expectations of privacy" (*Matter of Grand Jury Investigation in N.Y. County, 98 NY2d at 532*). *HN6* The physician-patient privilege, together with its concomitant duty of confidentiality, belongs to the patient and is not terminated by death alone (*see Prink v Rockefeller Ctr., 48 NY2d 309, 314, 398 NE2d 517, 422 NYS2d 911 [1979]*).

*HN7* The elements of a cause of action for breach of physician-patient confidentiality are: (1) the existence of a physician-patient relationship; (2) the physician's acquisition of information relating to the patient's treatment or diagnosis; (3) the disclosure of such confidential information to a person not connected with the patient's medical treatment, in a manner that allows the patient to be identified; (4) lack of consent for that **[\*54]** disclosure; and (5) damages (*see Burton v Matteliano, 81 AD3d 1272, 1274, 916 NYS2d 438 [4th Dept 2011]*, *lv denied 17 NY3d 703, 952 NE2d 1088, 929 NYS2d 93 [2011]*; *MacDonald v Clinger, 84 AD2d 482, 485-486, 446 NYS2d 801 [4th Dept 1982]*; *Doe v Roe, 93 Misc 2d 201, 210-213, 217-218, 400 NYS2d 668 [Sup Ct, NY County 1977]*; *see also Rut v Young Adult Inst., Inc., 74 AD3d 776, 777, 901 NYS2d 715 [2d Dept 2010]*). Here, the complaint alleges that decedent was a patient at the Hospital and that Schubl was his treating physician. In the complaint's fourth cause of action, decedent's estate alleges "[t]hat defendants[ ] unnecessarily, recklessly, willfully, maliciously and in conscious disregard of [decedent's] rights disclosed and discussed his medical condition **[\*\*\*\*8]** with cast members of NY MED and allowed them to videotape said conversations and videotape his **[5]** medical treatment for broadcast and dissemination to the public in an episode of that television show." Asserting that the public does not have any legitimate interest in this information, the complaint states that "[d]efendants' disclosure of [decedent's] medical information constitutes a violation of physician[-]patient confidentiality and an invasion of his privacy and is a violation of State and Federal **[\*\*1177] [\*\*\*885]** statutes protecting the privacy of medical records and information." The complaint seeks damages for injuries and loss as determined at trial.

The fourth cause of action, when liberally construed, can be read to state a claim sounding in breach of physician-patient confidentiality. Initially, we reject the assertion of the Hospital and Schubl that, in order to support such a cause of action, the disclosed medical information must be embarrassing or something that patients would naturally wish to keep secret. While the disclosures of medical information considered in various prior court decisions may have fit within those categories (*see e.g. Doe v Guthrie Clinic, Ltd., 22 NY3d 480, 482-483, 982 NYS2d 431, 5 NE3d 578 [2014]* [nurse revealed to patient's girlfriend that patient had **[\*\*\*\*9]** sexually transmitted disease]; *Randi A. J., 46 AD3d at 75-76* [clinic revealed to patient's mother that patient had an abortion]), that is not an element of

27 N.Y.3d 46, *54; 49 N.E.3d 1171, **1177; 29 N.Y.S.3d 879, ***885; 2016 N.Y. LEXIS 702, ****9; 2016 NY Slip Op 02478, *****02478

the cause of action. Stated otherwise, *HN8* whether the confidentiality inherent in the fiduciary physician-patient relationship is breached does not depend on the nature of the medical treatment or diagnosis about which information is revealed. Our broad rule protects all types of medical information and provides consistency, avoiding case-by-case determinations of what is considered embarrassing to any particular patient.

**[1]** Here, defendants do not contest the existence of a physician-patient relationship or that the Hospital and Schubl **[*55]** obtained confidential medical information regarding decedent. Rather, defendants assert that, inasmuch as decedent was not identifiable on the aired episode of the television program, his confidential information was not disclosed. Indeed, in concluding that the complaint did not sufficiently state a cause of action for breach of physician-patient confidentiality, the Appellate Division appears to have focused only on the aired television episode and the fact that decedent's image was blurred and his name was not used in the episode **[****10]** (*122 AD3d at 488*). However, affidavits submitted in opposition to defendants' motions allege that at least one other person who watched the broadcast recognized decedent.

Moreover, even if no one who actually viewed the televised program recognized decedent, thereby rendering plaintiffs unable to state a cause of action based solely on the broadcast of the program, the complaint expressly alleges an improper disclosure of medical information to the ABC employees who filmed and edited the recording, in addition to the broadcast itself. Thus, the Appellate Division viewed the allegations too narrowly, in contravention of the liberal standard for reviewing pleadings at this stage of the litigation. Specifically, the complaint clearly alleges that the Hospital and Schubl revealed confidential medical information concerning decedent's treatment and diagnosis to the ABC film crew that was present in the Hospital while the treatment was occurring. As expanded by the motion **[6]** papers, plaintiffs also allege that decedent's medical information was depicted in the raw footage of the recordings, and 13 people are listed on the DVD as being involved in the editing process, any of whom may have seen such information. **[****11]** At this pre-discovery stage of the litigation, it is unclear exactly what information was contained in that raw footage, who saw it, and to what degree decedent could be identified by anyone who viewed it.

In sum, the pleadings, together with the submitted affidavits, allege that a fiduciary physician-patient relationship existed, and that the duty of confidentiality springing from that relationship was breached when **[**1178]** **[***886]** the Hospital and Schubl allowed the ABC crew to be present during the filming of decedent's medical treatment and/or to view such film at a later time. Although the complaint does not explicitly state that decedent's consent was not obtained for that disclosure, a lack of consent can be inferred from the allegation that the disclosure violated privacy statutes and patient confidentiality. **[*56]** Hence, at this point, the only element for which the sufficiency of the allegations is truly at issue is damages.

In that regard, defendants argue that plaintiffs have not alleged any specific damages. However, as noted, discovery has not yet taken place, and plaintiffs have viewed only a few minutes of aired video footage from which to craft their allegations. In discovery, they will presumably **[****12]** have access to the raw footage of film covering the nearly 50 minutes that decedent was in the Hospital before he died, as well as deposition testimony of witnesses who were in decedent's presence there. That evidence could very well reveal the level of decedent's awareness that others were present while he was being treated, and any reaction he may have had to their presence. Defendants can then demand that plaintiffs clarify the alleged damages in a bill of particulars. Notably, damages may be awarded for injury even if it only lasted for a short period of time before death (*see generally Cummins v County of Onondaga, 84 NY2d 322, 324-326, 642 NE2d 1071, 618 NYS2d 615 [1995]*).

Thus, although the allegations of damages here lacked detail, they were sufficient in view of the pre-answer, pre-discovery posture of defendants' motions, particularly given that defendants hold the evidence that plaintiffs need to formulate their allegations. Viewing the complaint liberally, and granting plaintiffs every favorable inference, we conclude that the estate has stated a cause of action against the Hospital and Schubl for breach of physician-patient confidentiality.

B. Intentional Infliction of Emotional Distress

27 N.Y.3d 46, *56; 49 N.E.3d 1171, **1178; 29 N.Y.S.3d 879, ***886; 2016 N.Y. LEXIS 702, ****12; 2016 NY Slip Op 02478, *****02478

This Court has enumerated _HN9_ four elements of a cause of action for intentional **[****13]** infliction of emotional distress: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress" (_Howell v New York Post Co., 81 NY2d 115, 121, 612 NE2d 699, 596 NYS2d 350 [1993]_). " 'Liability has been found only where the conduct **[7]** has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' " (_Howell, 81 NY2d at 122_ [internal quotation marks and citation omitted], quoting _Murphy v American Home Prods. Corp., 58 NY2d 293, 303, 448 NE2d 86, 461 NYS2d 232 [1983]_). Here, the complaint's fifth cause of action addresses each element above and alleges that the Hospital and Schubl allowed **[*57]** ABC to broadcast and disseminate the footage of the final moments of decedent's life, without the knowledge or consent of decedent or plaintiffs. The complaint alleges that plaintiffs watched the episode and were shocked and upset, that "[d]efendants acted intentionally, recklessly, willfully, maliciously and deliberately," and that it was foreseeable that plaintiffs would be caused to suffer emotional distress. Alternatively, the complaint alleges that "defendants acted with reckless disregard for the probability **[****14]** that they would cause plaintiffs to suffer emotional distress," and that defendants knew or should have known that emotional **[**1179]** **[***887]** distress was a likely result of their actions. The complaint further alleges that plaintiffs experienced emotional distress due to defendants' conduct, and that "[d]efendants' conduct was extreme and outrageous, beyond all possible bounds of decency, utterly intolerable in a civilized community, and without privilege."

Although these allegations facially address all of the required elements, they are not sufficient to support this cause of action because they do not rise to the level necessary to satisfy the outrageousness element—the element most susceptible to a determination as a matter of law—which is designed to filter out petty complaints and assure that the emotional distress is genuine (_see Howell, 81 NY2d at 121_). Noting that "the requirements . . . are rigorous, and difficult to satisfy," we have commented that, "of the intentional infliction of emotional distress claims considered by this Court, _every one_ has failed because the alleged conduct was not sufficiently outrageous" (_Howell, 81 NY2d at 122_ [internal quotation marks and citations omitted and emphasis added]).

**[2]** The conduct at issue here for purposes **[****15]** of the fifth cause of action—the broadcasting of a recording of a patient's last moments of life without consent—would likely be considered reprehensible by most people, and we do not condone it. Nevertheless, it was not so extreme and outrageous as to satisfy our exceedingly high legal standard.[2] The footage aired by **[8]** ABC was edited so that it did not include decedent's name, **[*58]** his image was blurred, and the episode included less than three minutes devoted to decedent and his circumstances. We cannot conclude that defendants' conduct in allowing the broadcasting of that brief, edited segment is more outrageous than other conduct that this Court and the Appellate Division Departments have determined did not rise to the level required to establish "extreme and outrageous conduct" sufficient to state a cause of action for intentional infliction of emotional distress. For example, we did not deem a newspaper's conduct sufficiently outrageous when it published a picture of a person in a psychiatric facility—thereby informing the world that the photographed person was a patient at such a facility—even though the residents were photographed by someone trespassing on facility grounds **[****16]** and the facility had expressly requested that the newspaper not publish pictures of residents (_see Howell, 81 NY2d at 118_). Similarly, the conduct of a television station has been deemed insufficiently outrageous when the station displayed recognizable images of rape victims after repeatedly assuring them that they would not be identifiable (_see Doe v American Broadcasting Cos., 152 AD2d 482, 483, 543 NYS2d 455 [1st Dept 1989]_, appeal dismissed 74 NY2d 945, 549 NE2d 480, 550 NYS2d 278 [1989]).

We conclude that defendants' conduct here, while offensive, was not so atrocious and utterly intolerable as to support a cause of action in the context of this tort **[**1180]** **[***888]** ( **[****17]** _see Marmelstein v Kehillat New_

---

[2] We note that, after viewing the broadcast, one of decedent's sons (who is a physician) submitted an affidavit commenting on, among other things, what he perceived as highly inappropriate conduct on Schubl's part, namely, focusing on the camera and giving an interview in the emergency room, instead of concentrating on providing lifesaving medical services to decedent. However, plaintiffs have never relied—and do not now rely—on such conduct to supply a basis for their claim for intentional infliction of emotional distress. We, therefore, have no occasion at this time to express an opinion as to whether allegations of that nature would be sufficient to state a cause of action.

27 N.Y.3d 46, *58; 49 N.E.3d 1171, **1180; 29 N.Y.S.3d 879, ***888; 2016 N.Y. LEXIS 702, ****17; 2016 NY Slip Op 02478, *****02478

*Hempstead: The Rav Aron Jofen Community Synagogue, 11 NY3d 15, 22-23, 892 NE2d 375, 862 NYS2d 311 [2008]; Freihofer v Hearst Corp., 65 NY2d 135, 143-144, 480 NE2d 349, 490 NYS2d 735 [1985])*[3] Hence, there is no need to address whether the newsworthiness privilege is applicable.

Accordingly, the Appellate Division order should be modified, without costs, by denying the motion of defendants New York and Presbyterian Hospital and Sebastian Schubl to dismiss the fourth cause of action for breach of physician-patient confidentiality and as, as so **[9]** modified, affirmed.

Judges Pigott, Rivera, Abdus-Salaam, Fahey and Garcia concur. Chief Judge DiFiore took no part.

 **[*59]** Order modified, without costs, by denying the motion of defendants New York and Presbyterian Hospital and Sebastian Schubl, M.D. to dismiss the fourth cause of action and, as so modified, affirmed.

---

**End of Document**

---

[3] Unlike plaintiffs' fourth cause of action, the fifth cause of action cannot rely on additional evidence that might be revealed in discovery. *HN10* To state a cause of action for intentional infliction of emotional distress, plaintiffs must already be aware of the offending conduct and have suffered emotional distress *as a result thereof*. Thus, dismissal of this claim is appropriate at this stage of the litigation.