# Exhibit A

Ex. A page 1



# T. A. BLACKBURN LAW

**TYRONE A. BLACKBURN**

MEMBER OF
NY & NJ BAR

FEDERAL DISTRICT COURT MEMBERSHIP
EDNY, NDNY, SDNY & DNJ

FEDERAL APPELLATE COURT MEMBERSHIP
SECOND CIRCUIT

1242 East 80th Street, 3rd Floor
Brooklyn, New York 11236

November 25, 2025

**Sent via e-Courts**:
The Honorable Joseph A. Marutollo
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *Cain v. United Mortgage Corp., et al.*
Civil Action No. 21-cv-3325 (BMC)(JAM)

Dear Judge, Marutollo:

  I write respectfully in response to the Court's February 13, 2026, Order, February 20, 2026, Order, February 23, 2026, Order to Show Cause, and the Court's February 25, 2026, Order entered this morning at 12:09 a.m. I apologize sincerely for my delayed compliance with the Court's orders and wish to explain the circumstances that caused the delay.

  On February 11, 2026, I departed on a pre-paid Royal Caribbean cruise from Puerto Rico, which was scheduled to return to Puerto Rico on February 20, 2026. I have attached documentation confirming my reservation (Reservation #2037883, Royal Caribbean Booking #8696578) and proof of travel. This reservation was made and paid in full on a payment plan that began in March 2025, well before the Court set the pretrial deadlines in this matter.

  When the Court's February 13, 2026, Order issued setting deadlines for meet-and-confer and pretrial submissions, I was at sea and did not have access to the full case file, my office files, or reliable internet connectivity sufficient to access CM/ECF or prepare the required submissions. Although the cruise departed from and returned to Puerto Rico, it traveled through international waters and foreign ports, and I did not have meaningful access to ECF outside the United States or to my litigation systems while at sea.

  On or about February 19, 2026, I advised counsel for Defendants of my situation when I happened to receive an email from them while at sea. However, I did not have the ability to download documents, access the docket, review discovery materials, confer meaningfully with opposing counsel, or prepare substantive pretrial filings until my return.

  I returned from the cruise to Puerto Rico on February 20, 2026, and I did not return to New York until February 22, 2025, and immediately began working to comply with the Court's orders. I acknowledge that I should have filed a formal application on the docket seeking an extension

  347-342-7432   tblackburn@tablackburnlaw.com   TABlackburnlaw.com



# T. A. Blackburn Law

rather than relying on email communication with chambers, and I take full responsibility for that error.

    I am filing herewith all documents required by the Court's February 13, 2026, Order and subsequent orders, including Plaintiff's Statement of the Case, Plaintiff's Proposed Voir Dire Questions, and Plaintiff's Names and Places That May Be Mentioned at Trial, as well as any other required pretrial submissions. I understand the seriousness of the Court's February 25, 2026, Order warning that failure to comply by 11:00 a.m. today is likely to result in sanctions, and I am filing these submissions immediately to fully comply.

    Defendants will suffer no prejudice from this brief delay. The pretrial conference is scheduled for later today, February 25, 2026, Defendants have been made aware of my travel situation, and all required submissions are now being filed. I am fully prepared to proceed with the conference and trial as scheduled.

    I deeply regret any inconvenience my absence has caused and assure the Court that I did not intentionally disregard its orders. The confluence of pre-paid international travel and unanticipated pretrial deadlines created a situation in which compliance was not feasible while I was at sea without ECF access or my case files. I respectfully request that the Court accept these submissions and excuse the delay considering these circumstances.

    I remain prepared to proceed with the pretrial conference today and with trial as scheduled, and I thank the Court for its patience and consideration.

Respectfully Submitted,

/s/*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

Cc: All counsel of record via ECF.



347-342-7432    tblackburn@tablackburnlaw.com    TABlackburnlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL CAIN,<br>      Plaintiff,<br>-against-<br><br>UNITED MORTGAGE CORP., and individually and jointly EMMANUEL CATECHIS<br>      Defendants. | Civil Action No.<br>21-cv-3325 (BMC)(JAM)<br><br><u>PROPOSED VOIR DIRE QUESTIONS</u> |

Plaintiff, Michael Cain, respectfully submits the following statement of the case.

1. What is your current occupation, and what are your primary responsibilities?
2. Are any of you currently employed in the mortgage industry, banking, or financial services? If so, in what capacity and for how long?
3. Have any of you, or anyone close to you, ever worked as a loan officer, sales assistant, or in any other role at a mortgage company?
4. Have any of you ever had any dealings, business or personal, with United Mortgage Corp. or Emanuel Catechis?
5. Do any of you know or recognize any of the parties, attorneys, or witnesses whose names were read to you at the beginning of this proceeding?
6. Have any of you ever been treated unfairly by a supervisor or manager at your place of employment? If so, can you briefly describe what happened?
7. Have any of you ever witnessed a coworker being treated unfairly or harassed by a supervisor? If so, how did that experience affect you?
8. Have any of you ever reported misconduct, discrimination, or unfair treatment at your workplace to a supervisor, human resources, or any outside agency? What happened after you made that report?
9. Have any of you ever felt that you suffered negative consequences at work after speaking up about something you believed was wrong?
10. Is there anyone here who believes that employers should have the absolute right to terminate an employee for any reason, even if that reason is discriminatory?
11. Do any of you recognize that in most workplaces, there is an imbalance of power between a supervisor and the employees who report to that person? How do you feel about that dynamic?

12. Have any of you ever been in a situation at work where you felt you could not speak up because you feared consequences from your supervisor or employer?

13. Have any of you ever stayed in a difficult or unpleasant job because you needed the paycheck and could not afford to leave? How did that feel?

14. This case involves allegations that Mr. Cain, who is African American, was subjected to racial epithets and a hostile work environment because of his race. Is there anything about the nature of these allegations that would make it difficult for you to sit as a fair and impartial juror in this case?

15. Have any of you ever personally experienced discrimination based on your race, ethnicity, national origin, or any other characteristic? Would that experience affect your ability to be fair in this case?

16. Have any of you ever witnessed racial slurs or racial epithets being used in the workplace? How did that make you feel?

17. Do any of you believe that the use of a racial slur in the workplace is acceptable under any circumstances?

18. Do any of you believe that when a supervisor directs a racial slur at an employee, it fundamentally changes the nature of the working relationship, regardless of how many times it is said?

19. Do any of you believe that a racial slur can be excused if it is said "only once or twice"? Or do you agree that certain words are so inherently degrading that even a single use can cause real harm?

20. Some people believe that because certain racial language appears in music, movies, or popular culture, it is less offensive when used in the workplace. Does anyone here agree with that view?

21. If the evidence shows that a supervisor used a racial epithet against an employee, would any of you require additional evidence of racism before concluding that the work environment was hostile?

22. Some people believe that claims of racial discrimination are often exaggerated. Do any of you hold that belief? If so, would that belief prevent you from fairly evaluating the evidence in this case?

23. Some people believe that because society has made progress on issues of race, discrimination in the workplace is no longer a real problem. Does anyone here hold that view?

24. Do any of you believe that the racial or ethnic makeup of a workforce proves that no discrimination could have occurred against any individual employee?

25. How would you describe your comfort level discussing issues related to race in a group setting?

26. Have any of you ever been in a situation where you were telling the truth, but no one believed you? How did that experience affect you?

27. Do any of you believe that a corporation or a business owner is automatically more credible than an individual employee simply because the corporation has more resources?

28. If you heard testimony from one person on one side and testimony from several people on the other side, would you automatically believe the side with more witnesses, or would you evaluate the credibility of each witness individually?

29. Do you agree that sometimes the truth is known only to two people in a room, and the absence of other witnesses does not mean the event did not happen?

30. Do any of you believe that an employer has the right to retaliate against an employee who complains about discrimination, if the employer has other reasons it can point to for the adverse action?

31. If you were to find that an employer gave one reason for terminating an employee, but the evidence showed that the real reason was retaliation for the employee's complaints of discrimination, would you have any difficulty holding the employer accountable?

32. Do any of you believe that an employee who complains about racial harassment is just being overly sensitive or looking for trouble?

33. Have any of you ever seen someone at work get in trouble or lose their job after they complained about something, and you suspected the complaint was the real reason, even though the employer gave a different explanation?

34. If the evidence showed that an employer began documenting alleged performance problems shortly after an employee complained about discrimination, would any of you consider that timing significant?

35. Do any of you agree that it is relatively easy for an employer to create a paper trail of performance issues to justify a termination it has already decided to make for other reasons?

36. If the Court instructs you that a plaintiff who proves his case is entitled to compensatory damages for emotional distress, humiliation, and mental anguish, would any of you have difficulty awarding such damages even without physical injury?

37. Do any of you believe that there should be a limit or cap on the amount of money a jury can award for emotional suffering caused by discrimination?

38. If the evidence supports it and the Court instructs you on the law, would any of you have difficulty awarding punitive damages against an employer who acted with malice or reckless indifference to an employee's civil rights?

39. Do any of you believe that lawsuits for employment discrimination result in windfalls for plaintiffs and that damage awards are generally too high?

40. Do any of you agree that being subjected to racial hostility at work can cause lasting emotional harm, even if the person does not go to a doctor or therapist?

41. Have any of you or anyone close to you ever experienced anxiety, sleeplessness, or depression because of something that happened at work?

42. If the Court instructs you that emotional distress damages do not require proof of physical injury or a medical diagnosis, would any of you have difficulty following that instruction?

43. Do any of you believe that a man who experiences racial harassment should simply "toughen up" and not let it bother him?

44. Would any of you have difficulty accepting that the humiliation of being called a racial slur by your own supervisor could cause genuine emotional suffering that deserves compensation?

45. Defendants contend that Mr. Cain failed to mitigate his damages by not obtaining replacement employment after his termination. Do any of you believe that a person who has been unlawfully terminated and suffered emotional distress from racial harassment should be penalized if returning to the workforce was difficult for him?

46. Do any of you recognize that after a traumatic termination, it may take time for a person to recover emotionally before he is able to seek new employment?

47. Do any of you believe that an employer who fires someone unlawfully should be able to reduce the consequences of its own wrongdoing by blaming the victim for not recovering fast enough?

48. Do any of you believe that when a company allows racial harassment to occur in one of its offices, the company itself bears responsibility, not just the individual supervisor?

49. Do you agree that a company has a duty to ensure that its managers and supervisors treat every employee with dignity and respect, regardless of race?

50. If you find that a company failed to take meaningful action to stop racial harassment, would you be willing to hold that company financially accountable?

51. Do any of you believe that punitive damages serve an important purpose in sending a message that certain conduct will not be tolerated?

52. Would any of you have difficulty awarding a significant amount of money if you concluded that a company knowingly allowed its branch manager to use racial slurs against an employee and then retaliated against the employee for complaining about it?

53. On a scale of one to ten, with one being strongly disagree and ten being strongly agree, how would you rate the statement: "Employers should be held to a high standard when it comes to preventing racial harassment in the workplace"?

54. On the same scale, how would you rate the statement: "When someone is fired shortly after complaining about discrimination, that timing is suspicious"?

55. On the same scale, how would you rate the statement: "If a jury finds that an employer engaged in racial discrimination, the damages should be large enough to deter the company from ever doing it again"?

56. Do all of you understand that in a civil case like this, Plaintiff is not required to prove his case beyond a reasonable doubt, but rather by a preponderance of the evidence, meaning that it is more likely than not that what Plaintiff claims occurred did in fact occur?

57. Can each of you promise that you will evaluate the credibility of every witness, whether called by the Plaintiff or the Defendants, based solely on the evidence and the Court's instructions, without favoring either side?

58. Is there anyone here who, for any reason, could not return a verdict in favor of Mr. Cain and against the Defendants if the evidence and the law support such a verdict?

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL CAIN,<br>      Plaintiff,<br>-against-<br><br>UNITED MORTGAGE CORP., and individually and jointly EMMANUEL CATECHIS<br>      Defendants. | Civil Action No.<br>21-cv-3325 (BMC)(JAM)<br><br>NAMES AND PLACES<br>THAT MAY BE<br>MENTIONED AT TRIAL |

  Plaintiff respectfully submits the following list of names and places that may be discussed during trial:

Names:

Michael Cain
Juanice Cain
United Mortgage Corp.
Emanuel ("Manny") Catechis
Mark Rosenbloom
Patricia ("Pat") Taylor
Nicole Cathnott
Patrice Dalencour
Donny Chmela
Maxence ("Max") Metzger
Emmanuel Applyrs
Roi Ben-Zvi
Ira Zimmerman
Lillian Phillipe
Jose Reyes
Silvio Reyes
Nicholas Freeman
Bonnie Joseph
Zuma Osman
Dr. Camille Morgan
Eric Goldsmith, M.D.

Addresses:

48-02 25th Avenue, Suite 304, Astoria, New York (United Mortgage Corp. Astoria Branch)
Astoria, Queens, New York
Equal Employment Opportunity Commission (EEOC)
AIMS (Plaintiff's prior employer)

Case 2:25-cv-03552-JLR   Document 14-1   Filed 02/27/26   Page 10 of 13 PageID #: 1903
Case 1:25-cv-03552-AYS   Document 15-1   Filed 02/27/26   Page 10 of 13

Print

Ex. A page 9

# Reservation #2037883 Epic Carnival Experience 2026

Royal Caribbean Booking 8696578

| Guest Name | Email |
|---|---|
| Tyrone Blackburn | Tblackburn@tablackburnlaw.com |
| Anthony Blackburn | Blackburn.manthony@gmail.com |

**Epic Carnival Experience 2026 (February 11, 2026 - February 20, 2026)**

| Item | Category | Guest | Amount |
|---|---|---|---|
| 1522 - Ocean View Balcony | Ocean View Balcony Category D Staterooms | Tyrone Blackburn | $4,099.00 |
| Port Taxes and Fees | Taxes/Fees | | $349.00 |
| 1522 - Ocean View Balcony | Ocean View Balcony Category D Staterooms | Anthony Blackburn | $4,099.00 |
| Port Taxes and Fees | Taxes/Fees | | $349.00 |
| | | Item Total | $8,896.00 |
| | | Tyrone Blackburn Responsibility | $8,896.00 |

**Dining Assignment**

| Item | Category | Guest | |
|---|---|---|---|
| M | Main Dining | Tyrone Blackburn | $0.00 |
| M | Main Dining | Anthony Blackburn | $0.00 |
| | | Reservation Total | $8,896.00 |

**Tyrone Blackburn Responsibility**

| | | | |
|---|---|---|---|
| | | Total Cost | $8,896.00 |
| | | Paid To Date | $8,896.00 |
| | | Balance Due | $0.00 |

| Scheduled Payment Date | Amount Due | Payment Method | Completed Payment Date | Amount Paid |
|---|---|---|---|---|
| 03/08/2025 | $598.00 | Visa-0043 | 03/08/2025 | $598.00 |
| 04/15/2025 | $829.80 | Visa-0043 | 05/01/2025 | $829.80 |
| 05/15/2025 | $829.80 | Visa-0043 | 05/15/2025 | $829.80 |
| 06/15/2025 | $829.80 | Visa-0043 | 08/04/2025 | $829.80 |
| 07/15/2025 | $829.80 | Visa-0043 | 08/04/2025 | $829.80 |
| 08/15/2025 | $829.80 | Visa-9648 | 10/16/2025 | $829.80 |
| 09/15/2025 | $829.80 | Visa-0043 | 09/15/2025 | $829.80 |
| 10/15/2025 | $829.80 | Visa-9648 | 10/16/2025 | $829.80 |
| 11/15/2025 | $829.80 | Visa-9648 | 11/15/2025 | $829.80 |
| 12/15/2025 | $829.80 | Visa-9648 | 12/15/2025 | $829.80 |
| 01/15/2026 | $829.80 | Visa-9648 | 01/12/2026 | $829.80 |

Case 2:25-cv-03552-JLR   Document 14-1   Filed 02/27/26   Page 11 of 13
Case 1:25-cv-03505-AYR   Document 15-1   Filed 02/27/26   Page 11 of 13 PageID #: 1904

Ex. A page 10

**Travel Insurance**     **Policy # TCLI086156390**

| Item | Category | Guest | Amount |
|---|---|---|---|
| Insurance - Travel Insurance Teladoc Global | iTravelInsured Lite Fee | Tyrone Blackburn | $178.60 $0.00 |
| Insurance - Travel Insurance Teladoc Global | iTravelInsured Lite Fee | Anthony Blackburn | $292.16 $0.00 |
| | | **Item Total** | **$470.76** |
| | | Tyrone Blackburn Responsibility | $470.76 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL CAIN,<br>　　　　　　　　　Plaintiff,<br>-against-<br><br>UNITED MORTGAGE CORP., and individually and jointly<br>EMMANUEL CATECHIS<br>　　　　　　　　　Defendants. | Civil Action No.<br>21-cv-3325 (BMC)(JAM)<br><br>STATEMENT OF THE CASE |

Plaintiff, Michael Cain, respectfully submits the following statement of the case.

Mr. Cain is an experienced mortgage industry professional who was hired by United Mortgage Corp. in October 2017 as a sales assistant at its Astoria, Queens branch office, located at 48-02 25th Avenue, Suite 304, Astoria, New York. The Astoria Branch was managed by defendant Emanuel Catechis. Mr. Cain had previously worked in the mortgage loan industry for years prior to the 2008 financial crisis and brought substantial knowledge of the business to his role at United Mortgage.

Mr. Cain performed his duties competently and was a dependable employee. During his tenure at the Astoria Branch, Mr. Cain was subjected to a racially hostile work environment created by his branch manager, Mr. Catechis. On at least two occasions within a two-week period, Mr. Catechis directed a racial epithet at Mr. Cain. The use of this language was not an isolated slip of the tongue. The racial hostility at the Astoria Branch was pervasive and included demeaning treatment and conduct that made Mr. Cain's daily work environment intolerable. The harassment became so severe that Mr. Cain's wife urged him to begin documenting the incidents in writing, which he did, keeping contemporaneous handwritten notes of what was occurring.

Mr. Cain complained about the discriminatory conduct. Rather than taking meaningful corrective action, Defendants retaliated against him. In April 2018, Mr. Cain's position was reduced from full-time to part-time, a demotion that Defendants attempted to justify by claiming attendance issues. The evidence will show that this reduction was pretextual and was motivated by Mr. Cain's complaints about the racial harassment he was enduring. Defendants continued to build a paper trail against Mr. Cain, issuing purported counseling memoranda in August and September 2018 regarding his alleged performance and productivity. In October 2018, Defendants terminated Mr. Cain's employment entirely. Mr. Cain contends that his termination was not the product of any legitimate performance concerns but was instead motivated by racial animus and retaliation for his complaints of discrimination.

Defendants deny the use of any racial epithets and claim that the Astoria Branch had a diverse workforce. Defendants further contend that Mr. Cain was terminated for poor attendance and performance. Mr. Cain disputes these characterizations. The presence of other minority employees in a workplace does not immunize an employer from liability for discrimination directed at a

particular employee, and the evidence at trial will demonstrate that Defendants' proffered reasons for the adverse employment actions are pretextual.

Mr. Cain seeks compensatory damages for the emotional distress, humiliation, and mental anguish caused by the hostile work environment and his retaliatory termination, as well as punitive damages for Defendants' willful and malicious conduct. Mr. Cain also seeks back pay and front pay to make him whole for the economic losses caused by his unlawful termination. Defendants' assertion that Mr. Cain "elected to retire" and thereby cut off his damages mischaracterizes the record. Mr. Cain was unlawfully terminated from a position he wished to maintain, and the toll of the racial harassment and retaliatory discharge affected his ability and willingness to reenter the workforce.

The jury will be asked to determine whether Defendants subjected Mr. Cain to a hostile work environment based on his race, whether Defendants retaliated against him for complaining about discrimination, and whether Mr. Cain is entitled to damages for the harm he suffered.