# Exhibit B

Albert v. Loksen, 239 F.3d 256 (2001)

142 Lab.Cas. P 59,148, 17 IER Cases 361

KeyCite Yellow Flag

Distinguished by Goldfarb v. Channel One Russia, S.D.N.Y., March 21, 2023

239 F.3d 256

United States Court of Appeals, Second Circuit.

Samuel ALBERT, Plaintiff–Appellant,

v.

Salmen LOKSEN, Brooklyn Hospital and

Karen Buono, Defendants–Appellees.

No. 99–7520
|
Argued Feb. 2, 2000.
|
Decided Feb. 02, 2001.

**Synopsis**

Terminated physicist sued hospital, supervisor, and chief administrator of radiology department, asserting claims of breach of contract, defamation, and tortious interference with employment relationship. The United States District Court for the Eastern District of New York, Raymond J. Dearie, District Judge, entered summary judgment for defendants on all claims. Physicist appealed. The Court of Appeals, Sack, Circuit Judge, held that: (1) action was governed by New York law; (2) any oral assurances made by hospital representative did not give rise to implied contract of employment; (3) assertions allegedly made by supervisor, if proven, would tend to injure physicist in his profession, and thus, if false and defamatory, would be actionable per se; and (4) chief administrator was not third party who could be held liable for tortious interference with employment.

Affirmed in part; reversed and remanded in part.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (38)

**[1]**    **Health**  Adverse employment action; wrongful discharge

**Libel and Slander**  What law governs

New York law governed physicist's action against hospital, supervisor, and chief administrator of radiology department for breach of contract, defamation, and tortious interference with employment relationship, even though physicist was New Jersey resident, where New York was situs of his employment with hospital, events around which suit revolved occurred in New York, defendants were New York citizens, and parties had proceeded under tacit agreement that New York law applied.

6 Cases that cite this headnote
More cases on this issue

**[2]**    **Labor and Employment**  Termination; cause or reason in general

Under New York law, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party.

14 Cases that cite this headnote

**[3]**    **Labor and Employment**  Manuals, Handbooks, and Policy Statements

Under New York law, to rebut the presumption of at-will employment, an employee must produce evidence that he or she was made aware of a written policy expressly limiting the employer's right of termination and that he or she detrimentally relied on that policy in accepting the employment.

3 Cases that cite this headnote

**[4]**    **Health**  Officers and Employees

Any oral assurances made by hospital representative during employe orientation session, and any postings and literature indicating employees' obligation to seek out and come forward with safety violations, did not give rise to implied contract of employment under New York law.

6 Cases that cite this headnote
More cases on this issue

**[5]**    **Summary Judgment**  Contracts in general

On a motion for summary judgment, oral assurances cannot of themselves give rise to a triable question of fact as to the existence of a contractual relationship under New York law. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

2 Cases that cite this headnote

**[6]    Federal Courts** 🔑 Mode and sufficiency of presentation

Terminated physicist failed to preserve for appeal issue whether contract of employment limiting hospital's right to terminate him was created by New York City Health Code provision prohibiting retaliatory action against employees who reported radiation safety violations, where he merely referred in affidavit to "all applicable federal, state and local regulation re the handling of radioactive materials," and failed to cite specifically to provision or claim that it or any other statutory provision created such contract.

2 Cases that cite this headnote

**[7]    Libel and Slander** 🔑 Nature and elements of defamation in general

Under New York law, generally, spoken defamatory words are "slander," and written defamatory words are "libel."

92 Cases that cite this headnote

**[8]    Libel and Slander** 🔑 Words Tending to Injure in Profession or Business

Under New York law, terminated physicist's defamation claim against former supervisor was claim for slander rather than for libel, in that it was explicitly directed at words spoken by former supervisor, not their subsequent reduction to writing in termination report.

41 Cases that cite this headnote
More cases on this issue

**[9]    Libel and Slander** 🔑 Nature and elements of defamation in general

The elements of a cause of action for slander under New York law are: (1) a defamatory statement of fact, (2) that is false, (3) published to a third party, (4) of and concerning the plaintiff, (5) made with the applicable level of fault on the part of the speaker, (6) either causing special harm or constituting slander per se, and (7) not protected by privilege. Restatement (Second) of Torts § 558.

180 Cases that cite this headnote

**[10]   Libel and Slander** 🔑 Actionable Words in General

Under New York law, defamatory conduct is that which exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society.

17 Cases that cite this headnote

**[11]   Summary Judgment** 🔑 Defamation

Alleged statements made by supervisor in connection with termination of physicist by hospital could not be basis for physicist's New York law slander claim at summary judgment stage, inasmuch as evidence that he made statements was hearsay. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

3 Cases that cite this headnote
More cases on this issue

**[12]   Summary Judgment** 🔑 Speculation or conjecture; mere assertions, conclusions, or denials

When challenged on a motion for summary judgment, a plaintiff may not rely solely on hearsay or conclusory allegations that a slanderous statement was made. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

22 Cases that cite this headnote

**[13]   Libel and Slander** 🔑 Questions for Jury

**Summary Judgment** 🔑 Defamation

Genuine issues of material fact existed as to whether supervisor made defamatory statements of fact by in effect accusing hospital physicist of having misplaced radiation sources so as to endanger patient and co-workers and then lying about it, precluding summary judgment in physicist's New York law slander action. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

2 Cases that cite this headnote
More cases on this issue

[14]    **Libel and Slander** 🔑 Actionable Words in General

Under New York's single instance rule, the wrongful assertion that a person erred in a single instance does not lower that person in the estimation of others as a matter of law and the assertion is therefore not defamatory; that rule, however, is a narrow one.

[15]    **Libel and Slander** 🔑 Questions for Jury

**Summary Judgment** 🔑 Defamation

Genuine issues of material fact existed as to whether alleged statements by supervisor, in effect accusing hospital physicist of having misplaced radiation sources so as to endanger patient and co-workers and then lying about it, were untrue, precluding summary judgment in physicist's New York law slander action. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

More cases on this issue

[16]    **Libel and Slander** 🔑 Presumptions and Burden of Proof

For constitutional reasons, a private-figure defamation plaintiff generally has the burden of proving falsity, at least where the allegedly defamatory statements concern a matter of public interest

6 Cases that cite this headnote

[17]    **Libel and Slander** 🔑 Libel

Under New York defamation law, "publication" is a term of art; a defamatory writing is not published if it is read by no one but the one defamed, but is published as soon as read by any one else.

20 Cases that cite this headnote

[18]    **Libel and Slander** 🔑 Libel

Under New York law, the rule that a defamatory writing is not published if it is read by no one but the one defamed but is published if read by anyone else applies even to statements made by one employee to another. Restatement (Second) of Torts § 577.

24 Cases that cite this headnote

[19]    **Libel and Slander** 🔑 Weight and Sufficiency

Under New York law, where the content of an article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover if he or she can establish by a preponderance of the evidence that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

6 Cases that cite this headnote

[20]    **Libel and Slander** 🔑 Criticism and Comment on Public Matters;  Public Figures

Under New York law, the *Chapadeau* standard for determining when the content of an article is arguably within the sphere of legitimate public concern governs suits by private plaintiffs against non-media defendants if the allegedly defamatory statements were arguably within the sphere of public concern and admit of measurement by the *Chapadeau* standard, at least when they are publicly made.

10 Cases that cite this headnote

[21]    **Libel and Slander** 🔑 Words Actionable as Causing Special Damage

**Albert v. Loksen, 239 F.3d 256 (2001)**

142 Lab.Cas. P 59,148, 17 IER Cases 361

**Libel and Slander** 🔑 Presumption as to damage; special damages

To establish a cause of action in slander under New York law, a plaintiff must show either that the statement complained of caused him or her special harm or that it constituted slander per se.

119 Cases that cite this headnote

[22] **Libel and Slander** 🔑 Special Damage

Generally speaking, "special harm," supporting a finding of slander under New York law, means the loss of something having economic or pecuniary value. Restatement (Second) of Torts § 575.

13 Cases that cite this headnote

[23] **Libel and Slander** 🔑 Questions for Jury

The issue of whether a statement is actionable per se under New York defamation law is for the court.

72 Cases that cite this headnote

[24] **Libel and Slander** 🔑 Words Tending to Injure in Profession or Business

**Libel and Slander** 🔑 Special damages

Assertions allegedly made by supervisor about hospital physicist, that, inter alia, he handled radioactive material in manner that compromised welfare of patient, endangered safety of co-workers, and neglected established radiation safety procedures, if proven, would tend to injure him in his profession, and thus, if false and defamatory, would be actionable per se under New York law, such that pleading and proof of special harm would be unnecessary.

14 Cases that cite this headnote
More cases on this issue

[25] **Libel and Slander** 🔑 Common Interest in Subject-Matter

New York affords qualified protection to defamatory communications made by one person

to another upon a subject in which both have an interest.

10 Cases that cite this headnote

[26] **Libel and Slander** 🔑 Common business interest

Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within New York's privilege for qualified protection to defamatory communications made by one person to another upon a subject in which both have an interest.

41 Cases that cite this headnote

[27] **Libel and Slander** 🔑 Discharge of duty to others or to public and common interest in subject-matter

Under New York law, a defendant forfeits the qualified privilege for defamatory communications made by one person to another upon a subject in which both have an interest if the defendant makes a false, defamatory statement with malice of either the common-law or constitutional variety.

36 Cases that cite this headnote

[28] **Libel and Slander** 🔑 Discharge of duty to others or to public and common interest in subject-matter

Under New York law, "common-law malice" on the part of a defendant, resulting in the defendant forfeiting the qualified privilege for defamatory communications made by one person to another upon a subject in which both have an interest, means spite or ill will, and defeats the privilege only if it is the one and only cause for the publication.

18 Cases that cite this headnote

**[29]    Libel and Slander** 👉 Discharge of duty to others or to public and common interest in subject-matter

Under New York law, "constitutional malice" or "actual malice" on the part of a defendant, resulting in the defendant forfeiting the qualified privilege for defamatory communications made by one person to another upon a subject in which both have an interest, means publication with a high degree of awareness of the publication's probable falsity or while the defendant in fact entertained serious doubts as to the truth of the publication.

15 Cases that cite this headnote

**[30]    Libel and Slander** 👉 Privilege

**Summary Judgment** 👉 Defamation

Genuine issues of material fact existed as to whether supervisor initiated proceeding that led to hospital physicist's termination solely because, by making false and defamatory statements to chief administrator of radiology department, he wished to prevent physicist from reporting his own misconduct, precluding summary judgment as to whether supervisor acted with common-law malice, so as to forfeit qualified privilege available under New York law for defamatory communications made by one person to another upon subject in which both have interest. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

2 Cases that cite this headnote
More cases on this issue

**[31]    Libel and Slander** 👉 Privilege

**Summary Judgment** 👉 Defamation

Genuine issues of material fact existed as to whether hospital physicist violated hospital's standard procedures with respect to misplaced radioactive sources, precluding summary judgment as to whether supervisor acted with actual malice in making allegedly defamatory statements about physicist, so as to forfeit qualified privilege available under New York law for defamatory communications made by one person to another upon subject in which

both have interest. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

1 Case that cites this headnote
More cases on this issue

**[32]    Libel and Slander** 👉 Intent, malice, or good faith

Unlike situations in which the actual malice standard is constitutionally imposed and must therefore be proved by clear and convincing evidence to defeat qualified privilege in New York, the plaintiff need only establish actual malice by a preponderance of the evidence.

3 Cases that cite this headnote

**[33]    Torts** 👉 Contracts

Under New York law, the elements of a claim for tortious interference with contractual relations are: (1) that a valid contract exists; (2) that a third party had knowledge of the contract; (3) that the third party intentionally and improperly procured the breach of the contract; and (4) that the breach resulted in damage to the plaintiff.

87 Cases that cite this headnote

**[34]    Labor and Employment** 👉 Contracts or relationships susceptible or subject to interference

Although New York does not allow employees to evade the employment at-will rule and relationship by recasting a cause of action in the garb of tortious interference with employment, an at-will employee may maintain a tortious interference claim in certain limited situations, by establishing that a third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice.

43 Cases that cite this headnote

**[35]    Labor and Employment** 👉 Persons liable

Under New York law, hospital could not be liable for tortious interference with physicist's

Albert v. Loksen, 239 F.3d 256 (2001)
142 Lab.Cas. P 59,148, 17 IER Cases 361

employment contract where hospital was party to contract at issue. Restatement (Second) of Torts, § 766.

26 Cases that cite this headnote
More cases on this issue

[36]    **Labor and Employment**  ⚷ Persons liable

Under New York law, a plaintiff may maintain an action for tortious interference with contractual relations against a co-employee by showing that the co-employee acted outside the scope of his or her authority.

46 Cases that cite this headnote

[37]    **Labor and Employment**  ⚷ Persons liable

Under New York law, chief administrator of hospital's radiology department did not act outside scope of his authority as hospital employee when he compiled report on hospital physicist's conduct based on information from supervisor and physician, and chief administrator thus was not third party who could be held liable for tortious interference with at-will employment arrangement between hospital physicist and hospital.

More cases on this issue

[38]    **Summary Judgment**  ⚷ Tortious interference

**Torts**  ⚷ Business relations or economic advantage, in general

Genuine issues of material fact existed as to whether supervisor acted outside scope of his authority as hospital employee when he allegedly defamed hospital physicist, precluding summary judgment as to whether supervisor was third party who could be held liable under New York law for tortious interference with at-will employment arrangement between hospital physicist and hospital. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

3 Cases that cite this headnote
More cases on this issue

**Attorneys and Law Firms**

 **\*260**  Richard A. Levin, Proskauer Rose LLP, New York, NY, for Defendants–Appellees.

Michael P. Barnes, Law Offices of Michael P. Barnes, New York, NY, for Plaintiff–Appellant.

Before OAKES, CABRANES and SACK, Circuit Judges.

**Opinion**

SACK, Circuit Judge:

Plaintiff–Appellant, Samuel Albert, a physicist formerly employed at Brooklyn Hospital (the "Hospital"), brought an action in the United States District Court for the Eastern District of New York alleging that the Hospital fired him in breach of his  **\*261**  contract; that Salmen Loksen, his former supervisor, and Karen Buono, the chief administrator of the Hospital's radiology department, defamed him in the course of his discharge; that Loksen and Buono tortiously interfered with his employment relationship with the Hospital; and that the Hospital was liable for the defamatory statements of its employees. The district court (Raymond J. Dearie, *Judge*) granted summary judgment in favor of the defendants on all claims. We affirm the summary judgment as to Brooklyn Hospital and Buono, but reverse and remand with respect to the defamation and tortious interference claims against Loksen.

**BACKGROUND**

*Albert's Role at the Hospital*
Albert began work as an "assistant physicist" in the Hospital's radiology department in 1994. Loksen, one of the defendants, was his supervisor.

Albert did not have a written employment contract with the Hospital. Shortly after he was hired, however, he attended an orientation session at which Hospital policies were reviewed. Excerpts from the Hospital's "Policy and Procedure Manual" were distributed to those attending. Albert claims he was told throughout the hiring process that the Policy and Procedure Manual governed the terms and conditions of his employment and that it barred the Hospital from terminating him for reporting potentially dangerous conditions. He also asserts that he was told at the orientation session that no reprisals were ever taken against people who reported safety violations.

One of Albert's duties as an assistant physicist was to prepare a device called a "Fletcher Suit applicator" for use in brachytherapy treatment for cervical cancer. The applicator is a tube containing radioactive sources which is inserted into a patient's uterus during the brachytherapy procedure. The sources are sealed cylinders containing pellets of radioactive cesium 137 that have been loaded into the applicator by a physicist. In preparation for treating a patient, the radiation oncologist performing the procedure requests that a physicist prepare the applicator using sources of a specified strength, or level of radioactivity.

The parties dispute the appropriate procedure to be followed when a physician specifies a source of a particular strength that is unavailable at the Hospital. The controversy stems in part from the fact that there are two ways to indicate the strength of a source. A source's strength at the time it is fabricated is its "nominal value." Because of radioactive decay, its strength decreases over time. A source's decayed strength at a particular time post-fabrication is its "actual value."

Loksen asserts that doctors at the Hospital ordered sources using their nominal values, fully aware that such values were ordinarily greater than the actual values of the Hospital's stock, and that when a doctor requested a source of a particular nominal value, he or she wanted that source to be used irrespective of its actual strength. He testified that accordingly, he instructed Albert to have a physician change his or her orders in writing before Albert substituted sources of a different nominal value from those the physician had initially requested.

Albert insists to the contrary that Loksen had given him standing instructions to load the applicator with sources of the closest actual values to the nominal values requested by the doctor. He asserts that after an applicator containing loaded sources is inserted into a patient's body, a computer-generated radiation distribution map guides the supervising physicist in determining how long the applicator should be left there. Albert maintains that after loading an applicator he would ordinarily report the actual values of the sources he had used to Loksen, who would then calculate the appropriate exposure time. By adjusting the exposure time, Albert says, the resulting dose of radiation **\*262** would be brought in line with the doctor's original prescription, even though the sources being used had an actual value different from the nominal value requested by the doctor. Albert suggests that

because of this procedure, a variation in source strength between the nominal value specified by the doctor and the actual value supplied by Albert would not harm the patient or compromise the treatment.

*The January 30 Incident*

On January 30, 1995, while Albert was loading cesium sources stored in the Hospital's radioactive materials room into an applicator to be used by Dr. Nina Dlugy, a radiation oncologist, two of the sources fell to the floor. Albert was unable to find them. Because no sources of equal strength were available, he loaded the applicator with replacement sources that were weaker than those that had been misplaced.

The parties dispute when and to whom Albert first reported this incident. Albert claims he told Dlugy about the replacement sources as soon as he delivered the applicator to her. He asserts that at that time, Dlugy did not ask, and he did not tell her, about the radioactivity levels of the substituted sources. He further claims that he checked the delivery cart with a Geiger counter, in her presence, to make certain that the missing sources were not on the cart. Another employee, Lilya Fridman, said she overheard Albert tell Dlugy he had dropped the sources and saw him check the cart with the Geiger counter. She also stated that Dlugy was calm and did not ask Albert any questions about the dropped sources or their replacements. Dlugy testified that she does not remember any such conversation.

Loksen and Dlugy maintain that Albert did not inform Dlugy about the replacement sources when he delivered the applicator. Loksen was away from the Hospital at the time of the incident. When he returned later that afternoon, about an hour and a half after the two sources had been dropped, Albert told Loksen what had happened. According to Loksen and Dlugy, it was only then that Albert sought out Dlugy and told her about the substituted sources.

According to Loksen, after Albert provided Dlugy with the details of the source substitution, he returned to Loksen's office. The two then found the missing sources in the radioactive materials room using a Geiger counter. Albert alleges that he was unable to retrieve the sources earlier because Loksen had taken the particular Geiger counter necessary to find them with him when he left the Hospital.[1]

With the original sources recovered, Dlugy decided to remove the applicator from the patient and have the sources changed.

Albert assisted her with this procedure. The parties agree that the patient was not injured or endangered by the use of the replacement sources or the subsequent exchange of sources.

Albert asserts that he was upset about what he perceived to be the consistently defective equipment that had caused the dropping of the sources in the first place. He claims that he told Loksen that he intended to inform the Hospital and the appropriate regulatory agencies of both the deficiency of the Hospital's equipment and Loksen's frequent absences from the Hospital. According to Albert, Loksen replied that if Albert made any such report he would be fired. Albert also claims to have mentioned to Loksen his concerns about the applicator several times in the weeks before the incident, including when Loksen first gave him the brachytherapy assignment for January 30. Dlugy also acknowledges having told Loksen before **\*263** January 30 that the applicator had a defective part.

The day after the incident, Loksen met with Buono, the chief administrator of the radiology department, and told her his version of the event. Buono discussed the situation with others at the Hospital, including Dlugy and Dr. Huh, the senior physician in the radiology department. Buono testified that she decided, in accordance with Hospital policy, that Albert should be summarily discharged because of his behavior during the incident. She therefore completed a "Termination Report" to submit to the Hospital's director of labor relations. The report was, according to Buono, a "collaborative effort" by Loksen and her. It stated that on January 30, Albert had endangered the welfare of a patient; endangered the safety of co-workers through unnecessary radiation exposure; failed to follow the order of a physician and physicist; was dishonest to a physician and a physicist; and neglected established radiation safety procedure.

*Albert's Termination*

On February 2, Brooklyn Hospital fired Albert for the reasons stated in the report. Albert was notified of his dismissal that day at a meeting also attended by Buono and Loksen. Albert asserts that Buono told him the basis for his discharge was a statement by Loksen that Albert had deliberately attempted to harm a patient. Albert also claims that one Ms. Norris, the director of labor relations, also told him that Loksen had accused him of deliberately endangering a patient. According to Albert, the purpose of these statements by Loksen and Buono about Albert was to neutralize Albert's threat to report Loksen's absences from the department, his use of Hospital equipment to perform outside work during working hours, and the Hospital's inappropriate tolerance of defective equipment. Albert alleges that Loksen's charges have destroyed his professional reputation and left him incapable of obtaining other employment in his field, although it is not clear from the fragmentary record on appeal whether or to what extent Loksen's alleged statements about Albert were disseminated outside the Hospital.

*Procedural History*

Albert brought this diversity action in the Eastern District of New York in 1996, alleging breach of contract, defamation, and tortious interference with contractual relations. The defendants moved to dismiss all the claims pursuant to Fed.R.Civ.P. 12(b)(6). Judge John R. Bartels denied the motion and discovery followed. Upon its conclusion, the defendants moved for summary judgment before Judge Raymond J. Dearie.[2] The district court granted the motion. The court found that Albert was an at-will employee with no contractual right of employment; that Loksen's statements at issue were subject to a qualified privilege that Albert had failed to overcome; and that Loksen and Buono could not have tortiously interfered with Albert's contractual relations with the Hospital, if any existed, because as Hospital employees they were not third parties to the contract that created those relations, a prerequisite for establishment of the tort.

This appeal followed.

## DISCUSSION

### I. Standard of Review and Choice of Law

We review the district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving party. *See Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), cert. denied, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact **\*264** to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue

of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

[1] Although Albert is a New Jersey resident, New York State was the situs of his employment with the Hospital, the events around which the suit revolves occurred in New York, the defendants are New York citizens, New York is the forum state, and the parties proceeded in the district court and before us under the tacit agreement that New York law applies. We see no reason for us not to apply the law of New York. *Cf. Celle v. Filipino Reporter Enterprises Inc.,* 209 F.3d 163, 175 (2d Cir.2000) ("No reason of policy warrants a departure from [the parties'] implied choice-of-law" during jury trial); *Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 121 n. 5 (2d Cir.1998) ("Jurisdiction in this case is premised on diversity, and the parties both present arguments based on New York law, the law of the forum state. It is therefore appropriate for this Court to apply New York law.").

### II. Breach of Contract

Albert alleges that his discharge breached an implied contract of employment between him and the Hospital. He had no written employment agreement with the Hospital, but he claims that oral assurances made to him regarding the Hospital's employment practices limited the Hospital's right to discharge him. He further argues that the Hospital had a contractual and regulatory obligation to protect employees who reported hazardous work conditions from retaliation.

[2] [3] New York has a well-established at-will employment doctrine: "[A]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 333, 506 N.E.2d 919, 920, 514 N.Y.S.2d 209, 211 (1987). Albert concedes that he did not have an employment contract of fixed duration. In order to rebut the presumption of at-will employment, then, he was required to produce "evidence that [he] was made aware of a written policy expressly limiting [the employer's] right of termination and that [he] detrimentally relied on that policy in accepting the employment." *Fitzgerald v. Martin-Marietta,* 256 A.D.2d 959, 960, 681 N.Y.S.2d 895, 896 (3d Dep't 1998).

Albert has not produced any express, written limitations on the Hospital's rights to discharge its employees. Although he asserts that he relied upon assurances contained in the Hospital's Policy and Procedure Manual, he has produced nothing from the manual that would limit the Hospital's right to discharge him.[3]

[4] [5] Albert claims to have relied upon oral assurances made by a Hospital representative during an orientation session and on "postings and literature indicating an obligation to seek out and come forward with safety violations." Accepting this claim as true, as we must at the summary judgment stage, it does not alter his at-will employment status. "[O]ral assurances ... cannot of themselves give rise to a triable question of fact" as to the existence of a contractual relationship. *Fitzgerald,* 256 A.D.2d at 960, 681 N.Y.S.2d at 897. In any event, oral assurances that employees would only be fired for serious misconduct and "postings and literature" advising employees to report health and safety hazards **\*265** are the kind of "generalized language" that under New York law "will not give rise to an implied employment contract." *Id.,* 256 A.D.2d at 960, 681 N.Y.S.2d at 896–97. In the absence of evidence that Albert had a contractual relationship with the Hospital, his breach of contract claim fails as a matter of law.

[6] Albert also directs us to Title IV, Article 175 of the New York City Health Code,[4] which prohibits retaliatory action against employees who report radiation safety violations. This issue was insufficiently pursued below to require us to hear it on appeal. *See Gurary v. Winehouse,* 190 F.3d 37, 44 (2d Cir.1999) ("Having failed to make the present argument to the district court, plaintiff will not be heard to advance it here"). Albert claims that the issue was preserved by his reference in an affidavit to "all applicable federal, state and local regulation re the handling of radioactive materials," which marks the only even oblique reference to the Health Code in the record. But nowhere in the affidavit, the complaint, or any other document in the record on appeal does Albert cite specifically to Article 175 or claim that it or any other statutory provision created a contract of employment that limited the Hospital's right to terminate him.

Albert has failed to demonstrate a genuine issue of material fact as to the existence of an obligation, contractual or otherwise, that the Hospital breached by discharging him. Summary judgment was therefore properly granted to the Hospital on this cause of action.

### III. Defamation

Albert alleges that Loksen willfully and maliciously made false and defamatory statements to others at the Hospital

about his conduct on January 30.[5] These defamatory statements, Albert argues, resulted in his discharge.

*A. Libel or Slander?*

**[7]** **[8]** "Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." *Hogan v. Herald Co.,* 84 A.D.2d 470, 474, 446 N.Y.S.2d 836, 839 (4th Dep't), *aff'd on op. below,* 58 N.Y.2d 630, 444 N.E.2d 1002, 458 N.Y.S.2d 538 (1982). Generally, spoken defamatory words are slander; written defamatory words are libel. *See, e.g, Matherson v. Marchello,* 100 A.D.2d 233, 239, 473 N.Y.S.2d 998, 1003 (2d Dep't 1984); *see also Celle,* 209 F.3d at 176 ("Libel is a method of defamation expressed in writing or print."). Albert's defamation claim is explicitly directed at words spoken by Loksen, not their subsequent reduction to writing in the Termination Report. It is therefore a claim for slander.

*B. Elements of Slander*

**[9]** **[10]** The elements of a cause of action for slander under New York law are (i) a defamatory[6] statement of fact, (ii) **\*266** that is false, (iii) published to a third party, (iv) "of and concerning" the plaintiff,[7] (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege. *See, e.g., Dillon v. City of New York,* 261 A.D.2d 34, 37–38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) (citing Restatement (Second) of Torts § 558 (1976));[8] *see also Celle,* 209 F.3d at 176 (setting forth the similar elements of a cause of action for libel under New York law). We conclude that there are triable issues of fact that precluded summary judgment on the slander cause of action against Loksen.

Despite the fact that neither the parties nor the district court addressed all of the elements of a cause of action for slander, we discuss each of them. Although we conclude that the plaintiff has raised a triable issue of fact as to each element and, therefore, cannot affirm the district court's grant of summary judgment, *see Name.Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573, 584 (2d Cir.2000) ("We may, of course, affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely."), we discuss each element in order to give some measure of guidance to the district court in conducting further proceedings on remand, *see, e.g., Sound Aircraft Servs. v. Town of E. Hampton,* 192 F.3d 329, 334 (2d Cir.1999) (commenting on the proceedings

to be undertaken on remand "for the guidance of the district court"); *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995) (offering district court guidance with respect to applicability of a Second Circuit decision on remand).

**[11]** **[12]** *1. Defamatory Statements of Fact.* The record on appeal is unclear as to just what Loksen said to whom. Evidence that Loksen actually made two of the assertedly defamatory statements attributed to him by Albert is clearly hearsay. Albert claims that Buono told him that the reason for his discharge was that "Loksen told her ... [he] had deliberately attempted to harm a patient," and that Norris told him Loksen had said Albert had "deliberately endangered a patient." Nothing else in the record on appeal supports the assertion that Loksen in fact made these statements. "When challenged on a motion for summary judgment, a plaintiff may not rely solely on hearsay or conclusory allegations that the slanderous statement was made." *Snyder v. Sony Music Entm't, Inc.,* 252 A.D.2d 294, 298, 684 N.Y.S.2d 235, 238 (1st Dep't 1999) (citing **\*267** *Schwartz v. Society of the New York Hosp.,* 232 A.D.2d 212, 213, 647 N.Y.S.2d 776, 778 (1st Dep't 1996)); *see also* Fed.R.Civ.P. 56(e) (affidavits in opposition to summary judgment motion "shall set forth such facts as would be admissible in evidence"); *Sarno v. Douglas Elliman– Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999) (holding that hearsay statement "did not constitute competent evidence" and thus could not be considered in opposition to motion for summary judgment); *Courtney v. Canyon Television & Appliance Rental, Inc.,* 899 F.2d 845, 851 (9th Cir.1990) (affirming summary judgment against defamation claim where only evidence that defamatory statements were in fact made was inadmissible hearsay); *Barber v. Daly,* 185 A.D.2d 567, 569–70, 586 N.Y.S.2d 398, 400 (3d Dep't 1992) (holding that plaintiff's hearsay assertion that slanderous statements were published did not raise a triable issue of fact). Those alleged statements cannot, therefore, serve as the basis for Albert's defamation claim.

**[13]** There is, however, sufficient nonhearsay evidence in the record from which a jury could properly conclude that Loksen made other defamatory statements about Albert. Loksen testified that in meetings with others, he called Albert "dishonest" with respect to the January 30 incident. He also testified that he told Buono that Albert had "compromised the welfare of a patient." Those statements, in context, essentially accused Albert of (1) failing to notify Dlugy about the change in the sources, (2) leaving the misplaced sources for them to be stumbled upon by co-workers, and (3) then trying to cover up his misbehavior with lies.

Moreover, the Termination Report accused Albert of "[f]ailure to follow the order of a physician and physicist," "[e]ndanger[ing] the safety of co-workers," and "neglect for established radiation safety procedures." Buono testified that the report was a "collaborative effort" between her and Loksen. A reasonable juror could conclude from this concededly sparse evidence that Loksen orally made those statements reflected in the Termination Report, or words to that effect, to Buono.

In deciding whether the jury should be allowed to pass upon statements alleged to be defamatory, the court need only determine that the contested statements "are reasonably susceptible of defamatory connotation." If any defamatory construction is possible, it is a question of fact for the jury whether the statements were understood as defamatory.

*Purgess v. Sharrock,* 33 F.3d 134, 140 (2d Cir.1994) (citations omitted); *see also Weiner v. Doubleday & Co.,* 74 N.Y.2d 586, 592, 549 N.E.2d 453, 455, 550 N.Y.S.2d 251, 253 (1989) ("Whether the contested statements are reasonably susceptible of a defamatory connotation is in the first instance a legal determination for the court"), *cert. denied,* 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990). The question for the district court thus became whether these words, if spoken by Loksen, were capable of a defamatory meaning.

 **[14]**    Accusing a hospital worker such as Albert of compromising the welfare of patients by substituting radioactive sources without telling the doctor who was administrating them to a patient about it, being dishonest with respect to a specific set of statements that he made in an effort to cover up his safety violations, disobeying orders from his superiors with respect to safety, and ignoring established safety procedures may "induce an evil opinion of him in the minds of right-thinking persons," *Dillon,* 261 A.D.2d at 38, 704 N.Y.S.2d at 5 (internal quotation marks omitted), and are therefore capable of a defamatory meaning.[9]

 **\*268**  We pause for a word of caution. No workplace, we think, can operate effectively unless the employers and employees who work there have the ability to speak freely in evaluating the actions of their employees and co-employees. Freedom from fear of litigation is of particular importance when, as in the case before us, personal safety is at stake. It would be tragic if silence induced by the inhibiting effect of defamation lawsuits resulted in the loss of life, limb or the good health of doctors, medical staff or their patients.

Statements very much like those Loksen is alleged to have made, that a co-employee's work is dangerous and his employment should therefore be terminated, if articulated as an evaluation of his performance, would likely be protected as a statement of opinion. Had Loksen referred to something that Albert in fact had done as "compromising the welfare of patients," or contrary to safety procedures, or even dishonest, *see Edwards v. National Audubon Soc'y,* 556 F.2d 113, 121 (2d Cir.1977), the statement might very well have been incapable of supporting an action for slander.

But Loksen did more. If Albert's assertions are true, Loksen in effect accused Albert of failing to inform Dr. Dlugy of the change in strength of the radioactive sources she was administering to a patient. Loksen in effect accused Albert of leaving misplaced sources in a way that endangered co-workers. Loksen in effect accused Albert of then lying about what he did in an attempt to cover it up. Those accusations are more than statements of opinion about Albert's work performance; they are specific statements of fact—statements capable of objective proof-about what Albert did and did not do. And the statements were all made in the context of Loksen's seeking the summary termination of Albert, which virtually eliminates the possibility that they were meant as rhetorical hyperbole. The statements thus heavily laden with assertions of fact were capable of a defamatory meaning sufficient to sustain a defamation recovery.

 **[15]**    **[16]**    *2. Falsity.* A rational juror could conclude that the statements Albert complains of were untrue.[10] Albert, Dlugy, and a radiation oncologist who gave deposition testimony as an expert witness all said that Albert had not endangered  **\*269**  the patient or his co-workers. There is also a genuine dispute as to whether, as Loksen assertedly said, Albert violated standing department policy by using replacement sources with the closest available actual value to the nominal value of the sources that were missing. Albert claims, moreover, that he locked the door to the room containing the dropped sources and posted a "do not enter" sign, thereby precluding the possibility that any of his co-workers could have been unnecessarily exposed to radiation. And Fridman's testimony that Albert told Dlugy about the dropped sources upon delivery casts further doubt upon the notion that Albert endangered the patient and co-workers by not revealing to Dlugy what had happened. If a jury believes Albert's account of events, it thus could conclude that the statements by Loksen about the January 30 incident to Buono and others were also false.

[17]    [18]    *3. Publication.* Under New York defamation law, "publication is a term of art.... A defamatory writing is not published if it is read by no one but the one defamed. Published it is, however, as soon as read by any one else." *Ostrowe v. Lee,* 256 N.Y. 36, 38, 175 N.E. 505 (1931) (Cardozo, C.J.). In New York, this rule applies even to statements made by one employee to another. Other jurisdictions have held that communications made by one employee of a corporation to another have not been published within the law of defamation's meaning of the term. *See Bals v. Verduzco,* 600 N.E.2d 1353, 1354 n. 1 (Ind.1992) (collecting cases). New York, however, does not adhere to that view. *See Pirre v. Printing Developments, Inc.,* 468 F.Supp. 1028, 1041 (S.D.N.Y.) (citing, *inter alia, Kennedy v. James Butler, Inc.,* 245 N.Y. 204, 156 N.E. 666 (1927); Restatement (Second) of Torts § 577, cmt. (i) (1977)), *aff'd without opinion,* 614 F.2d 1290 (2d Cir.1979); *Loughry v. Lincoln First Bank, N.A.,* 67 N.Y.2d 369, 377, 502 N.Y.S.2d 965, 969, 494 N.E.2d 70 (1986).

[19]    [20]    *4. Fault.* The New York Court of Appeals has held that "where the content of [an] article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover" if he or she can establish "by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d 196, 199, 341 N.E.2d 569, 571, 379 N.Y.S.2d 61, 64 (1975). We recently noted that while *Chapadeau* itself was about the liability of a media defendant for statements contained in a published article, the standard also governs suits by private plaintiffs such as Albert against non-media defendants such as Loksen if the allegedly defamatory statements were "arguably within the sphere of public concern" and admit of measurement by the *Chapadeau* standard, at least when they are publicly made. *See Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 101–02 & n. 8 (2d Cir.2000), (collecting cases).

Whether the subject matter of Loksen's statements was arguably a matter of legitimate public interest is by no means clear. In light of the extremely broad interpretation of that standard by New York courts, decisions in which *Chapadeau* was held inapplicable because the subject matter was not a matter of legitimate public concern are extremely rare. *See Krauss v. Globe Int'l, Inc.,* 251 A.D.2d 191, 193–94, 674 N.Y.S.2d 662, 664–65 (1st Dep't 1998) (liaison between

ex-husband of television personality and prostitute prior to divorce was not arguably of legitimate public concern);[11] *cf.* **\*270** *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 64 (2d Cir.1993) (implying that *Chapadeau* does not apply to suit by private plaintiff suing for defamation in course of discharge from private employment). It is therefore difficult to infer from the case law a standard by which to distinguish between private statements that are and are not arguably of legitimate public concern.

The safety of patients undergoing radiation treatment at a public hospital may arguably be a matter of legitimate public concern. *Cf. Konikoff,* 234 F.3d at 102 (validity of appraisals of property owned by real-estate funds arguably within the sphere of public concern); *Mott v. Anheuser-Busch, Inc.,* 910 F.Supp. 868, 874 (N.D.N.Y.1995) (issues involving alleged water pollution by defendant arguably within the sphere of public concern), *aff'd mem.,* 112 F.3d 504 (2d Cir.1996); *Post v. Regan,* 677 F.Supp. 203, 209 (S.D.N.Y.) (unauthorized transactions conducted by the defendant insurance brokerage arguably within the sphere of public concern), *aff'd mem.,* 854 F.2d 1315 (2d Cir.1988), *cert. denied,* 488 U.S. 1043, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989); *Luisi v. JWT Group, Inc.,* N.Y.L.J., Sept. 18, 1987, at 7, col.3, 14 Media L. Rep. (BNA) 1732 (N.Y.Sup.Ct.1987) (allegedly improper accounting practices by defendant's employee arguably within the sphere of public concern), *aff'd w/o opinion,* 138 A.D.2d 987, 525 N.Y.S.2d 454 (1st Dep't), *appeal denied,* 72 N.Y.2d 803, 528 N.E.2d 520, 532 N.Y.S.2d 368 (1988).

On the other hand, the New York Court of Appeals has said that "publications directed only to a limited, private audience are 'matters of purely private concern.' " *Huggins v. Moore,* 94 N.Y.2d 296, 303, 726 N.E.2d 456, 460, 704 N.Y.S.2d 904, 908 (1999) (citing, *inter alia, Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 759, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)); *see also Mott,* 910 F.Supp. at 874 (" 'A public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.' " (quoting *Fairley v. Peekskill Star Corp.,* 83 A.D.2d 294, 298, 445 N.Y.S.2d 156, 159 (2d Dep't 1981))). Loksen's statements were directed only to Buono and others on the hospital staff. They concerned a single instance of misconduct affecting a single patient. As such, they may plausibly be found to have been about a purely private matter outside the scope of the *Chapadeau* standard. *Cf. Weldy,* 985 F.2d at 64 (holding that the discharge of an employee by a private airline was not a matter of public concern); *Yesner v. Spinner,* 765

F.Supp. 48, 52–53 (E.D.N.Y.1991) (holding that statements in letter to state agency accusing court reporter of "modifying transcripts" were "a matter of purely private and not public concern," and thus that the plaintiff may recover "presumed damages" without a showing of "actual malice") (citing *Dun & Bradstreet* ).

What is the applicable standard of fault if the statements were not covered by *Chapadeau?* The New York Court of Appeals has not addressed the issue. At least one intermediate appellate court has held that a plaintiff in such circumstances "need show only that [the] defendant [was] negligent in publishing the [statement]." *Krauss,* 251 A.D.2d at 194, 674 N.Y.S.2d at 665 (citing *Gaeta v. New York News Inc.,* 95 A.D.2d 315, 466 N.Y.S.2d 321 (1st Dep't 1983), *rev'd on other grounds,* 62 N.Y.2d 340, 465 N.E.2d 802, 477 N.Y.S.2d 82 (1984)).[12]

**\*271** The parties did not argue the appropriate level of fault either before the district court or on this appeal. The district court did not address the issue, granting summary judgment to Loksen on the ground of qualified privilege instead. "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals." *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). In light of the sparsity of the record on Loksen's level of care in gathering and disseminating the information contained in the statements he allegedly made, the likelihood that a fuller record will enable a sounder determination of whether the contents of the statements were "arguably within the sphere of legitimate public concern," and the absence of argument by the parties or a decision by the district court on this issue, we decline to decide whether Loksen's statements are covered by the *Chapadeau* standard and, if not, whether negligence or some other level of fault is applicable. We leave those issues for decision by the district court in the first instance on remand.

 **[21]** **[22]** **[23]** *5. Special harm or actionability per se.* To establish a cause of action in slander, the plaintiff must show either that the statement complained of caused him or her "special harm" or that it constituted slander "per se." *See Dillon,* 261 A.D.2d at 38, 704 N.Y.S.2d at 5. Generally speaking, "special harm" means " 'the loss of something having economic or pecuniary value.' " *Liberman v. Gelstein,* 80 N.Y.2d 429, 434–35, 605 N.E.2d 344, 347, 590 N.Y.S.2d 857, 860 (1992) (quoting Restatement (Second) of Torts § 575, cmt. b (1976)). The four categories of statements that have historically constituted slander per se in New York

are those that (i) charge the plaintiff with a serious crime; (ii) tend to injure the plaintiff in his or her trade, business or profession; (iii) imply that the plaintiff has a loathsome disease; or (iv) impute unchastity to a woman. *See Liberman,* 80 N.Y.2d at 435, 605 N.E.2d at 347, 590 N.Y.S.2d at 860. The issue of whether a statement is actionable per se is for the court. *James v. Gannett Co.,* 40 N.Y.2d 415, 419, 353 N.E.2d 834, 837, 386 N.Y.S.2d 871, 874 (1976).

 **[24]** There is no proof of "special harm" incurred by Albert in the record on appeal. But we conclude that as a matter of law, the assertions allegedly made by Loksen about Albert, a hospital physicist, that, *inter alia,* he handled radioactive material in a manner that "compromised the welfare of a patient and [,] if [it] ... continued, ... definitely could have resulted in improper treatment and endangered the patient's life," he "endangered the safety of co-workers," and he "had neglect for established radiation safety procedures" would obviously tend to injure him in his profession. The statement, if false and defamatory, is therefore actionable per se. Pleading and proof of special harm is unnecessary.[13]

 **\*272** **[25]** **[26]** *6. Privilege.* New York affords qualified protection to defamatory "communication[s] made by one person to another upon a subject in which both have an interest." *Stillman v. Ford,* 22 N.Y.2d 48, 53, 238 N.E.2d 304, 306, 290 N.Y.S.2d 893, 897 (1968) (citation omitted). Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege. *See, e.g., McNaughton v. City of New York,* 234 A.D.2d 83, 84, 650 N.Y.S.2d 688, 689 (1st Dep't 1996); *Mock v. LaGuardia Hospital-Hip Hosp., Inc.,* 117 A.D.2d 721, 722, 498 N.Y.S.2d 446, 447 (2d Dep't 1986).

 **[27]** **[28]** **[29]** A defendant forfeits this qualified privilege by making a false, defamatory statement with "malice" of either the common-law or constitutional variety. *See Liberman,* 80 N.Y.2d at 437–38, 605 N.E.2d at 349–50, 590 N.Y.S.2d at 862–63. Common-law malice "mean[s] spite or ill will," *id.,* 80 N.Y.2d at 437, 605 N.E.2d at 349, 590 N.Y.S.2d at 862, and defeats the privilege only if it is " 'the one and only cause for the publication,' " *id.,* 80 N.Y.2d at 439, 605 N.E.2d at 350, 590 N.Y.S.2d at 863 (quoting *Stukuls v. State,* 42 N.Y.2d 272, 282, 366 N.E.2d 829, 835, 397 N.Y.S.2d 740, 746 (1977)). Constitutional or "actual" malice means publication with "knowledge that [the statement] was false

or ... reckless disregard of whether it was false or not." *Id.,* 80 N.Y.2d at 438, 605 N.E.2d at 349, 590 N.Y.S.2d at 862 (quoting *New York Times v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964)) (brackets in original). "Reckless disregard" as to falsity means that the statement is " 'made with [a] high degree of awareness of [the publication's] probable falsity' " or while " 'the defendant in fact entertained serious doubts as to the truth of [the] publication.' " *Id.,* 80 N.Y.2d at 438, 605 N.E.2d at 350, 590 N.Y.S.2d at 863 (quoting, respectively, *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) and *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)) (first and third brackets in original).

*a. Common Law Malice.* The district court concluded that as a matter of law, Loksen did not forfeit his qualified privilege by acting with common-law malice. We disagree. The court's conclusion turned largely on its finding that it was not Loksen but Dlugy who initiated the complaint that led to Albert's termination. The record on appeal does support a finding that Dlugy initially reported the incident to Huh. But evidence in the record would also support a jury finding that Buono initiated the termination proceeding, and that it was Loksen who first told Buono of Albert's alleged misconduct. And Loksen concedes that he met with Buono on the morning after the incident and told her that Albert had endangered a patient and had been dishonest. A rational jury could conclude from this evidence that Loksen initiated the termination proceedings.

Material in the record on appeal would also support a finding that Loksen had a motive to defame Albert in order to prevent him from revealing the unsafe conditions at the Hospital and the fact that Loksen was performing other jobs, sometimes with the use of Hospital equipment, during working hours. Albert asserts that he had previously complained to Loksen about defective equipment and lax procedures, and that following the incident on January 30, 1995, he threatened to bring his complaints to Hospital administrators or city officials. Other Hospital employees also testified at their depositions that they had complained to Loksen about defective equipment in the radiology department. Loksen concedes, moreover, that he was using Hospital equipment to perform a second job and had not disclosed that to **\*273** the Hospital. Norris, the Hospital's director of labor relations, testified that if an employee was working elsewhere during working hours, she would consider it a "theft of time."

**[30]** In sum, Albert has adduced enough evidence to create a genuine issue of material fact as to whether Loksen initiated the proceeding that led to Albert's termination solely because, by making false and defamatory statements to Buono, he wished to prevent Albert from reporting his own misconduct. Such evidence, if believed by a jury, could support a finding that Loksen acted with common-law malice. This conclusion could be bolstered by evidence, discussed below, that Loksen may have known or strongly suspected that some of his statements were false. *See Pecue v. West,* 233 N.Y. 316, 323, 135 N.E. 515, 517 (1922) (common-law malice inferred from defendant's making of "a false charge, not caring whether it was true or false"). Because there is a triable issue of fact as to whether Loksen's false and defamatory statements were made with common-law malice, the privilege covering each of those statements would be lost upon proof of such malice at trial.

**[31]** **[32]** *b. "Actual Malice."* Albert also raised a triable issue as to "actual malice" which, under New York law, also defeats a claim of privilege, with respect to some of the alleged statements at issue. As noted, a defendant acts with "actual malice" by making false statements with knowledge of their falsity, *Liberman,* 80 N.Y.2d at 438, 605 N.E.2d at 349, 590 N.Y.S.2d at 862, or " 'with [a] high degree of awareness of [the publication's] probable falsity' " or while " 'the defendant in fact entertained serious doubts as to the truth of [the] publication.' " *Id.,* 80 N.Y.2d at 438, 605 N.E.2d at 350, 590 N.Y.S.2d at 863 (quoting, respectively, *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) and *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)) (first and third brackets in original). Unlike situations in which the "actual malice" standard is constitutionally imposed and must therefore be proved by "clear and convincing" evidence, *see, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), to defeat qualified privilege in New York, the plaintiff need only establish "actual malice" by a preponderance of the evidence, *see Weldy,* 985 F.2d at 65.

Loksen claimed that Albert endangered a patient's well-being and failed to follow standard procedures and the prescriptions of a physician. This claim turns on Albert's alleged failure to obtain Dlugy's written permission before loading into the applicator a source of a different strength than that Dlugy had originally requested. But there is a genuine issue of fact as to whether such conduct violated the radiology department's standard procedures. Albert claims he had standing orders to load a source of the closest actual value to the nominal

value requested by the doctor and then relay the actual value to Loksen. Were a jury to accept Albert's version, then it could also conclude that Loksen—who himself had instructed Albert on the department's standard procedures—was fully aware that Albert had neither "fail[ed] to follow the order of a physician and physicist" nor neglected "established radiation safety procedures," as claimed in the Termination Report.

Similarly, Albert asserts that it was Loksen's duty, not Albert's, to inform the radiation oncologist of the actual value of the source loaded into the applicator and to calculate the appropriate exposure time. Were a jury to credit this claim, it could conclude that Loksen knew that Albert's failure to inform Dlugy immediately of the actual value of the replacement sources was consistent with standard practice and posed no additional danger to the patient. Thus, Loksen would lose qualified privilege protection with respect to those statements if Albert were to establish by a preponderance of the evidence that they were made by Loksen with knowledge of their falsity or while he in fact entertained serious doubts as to their truth.

**\*274** There is insufficient evidence as to "actual malice" with respect to the other allegedly defamatory statements to give rise to a triable issue of fact. Loksen admits having accused Albert of being "dishonest," although the record on appeal is sparse on the substance of Loksen's statements on this issue. At a minimum, Loksen told Buono that Albert was dishonest in claiming he had told Dlugy shortly after he dropped the original sources that he had inserted a replacement source. While Fridman's testimony provides some corroboration for Albert's version of this aspect of the story, there is nothing in the record on appeal to indicate that Loksen knew or was "subjectively aware" of any such statement's falsity.

Loksen also appears to have accused Albert of endangering co-workers. There is no evidence in the record on appeal from which a jury reasonably could find that Loksen knew that accusation to be false or entertained serious doubts as to its truth.

There are thus triable issues of material fact as to common-law and "actual" malice that would permit a rational jury to conclude that Loksen lost protection of the privilege that covers the statements at issue. A triable issue of fact therefore exists as to every element of Albert's slander claim against Loksen. Summary judgment should not have been awarded to Loksen on that claim.

## IV. Tortious Interference with Contractual Relations

**[33]**    Albert argues that Buono and Loksen tortiously interfered with his employment relationship with the Hospital by procuring his discharge.

Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a "third party" had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff.

*Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996).

**[34]**    We have already found that Albert, as an at-will employee, did not have an employment contract with the Hospital. New York has adamantly refused to allow employees "to evade the employment at-will rule and relationship by recasting [a] cause of action in the garb of tortious interference with ... employment." *Ingle v. Glamore Motor Sales, Inc.,* 73 N.Y.2d 183, 189, 535 N.E.2d 1311, 1313, 538 N.Y.S.2d 771, 774 (1989). An at-will employee may maintain a tortious interference claim, however, in "certain limited situations." *Finley,* 79 F.3d at 1295; *see also Mansour v. Abrams,* 120 A.D.2d 933, 934, 502 N.Y.S.2d 877, 878 (4th Dep't 1986). To do so, he or she must establish that a "third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice." *Cohen v. Davis,* 926 F.Supp. 399, 403 (S.D.N.Y.1996) (citing New York cases).

**[35]**    The requirement that the defendant be a third party to the terminated employment relationship determines the outcome of the claim against the Hospital. "[T]he tort of interference with an employment contract cannot lie against the Hospital [because it is] a party to the alleged employment contract."[14] *Kosson v. Algaze,* 203 A.D.2d 112, 113, 610 N.Y.S.2d 227, 228–29 (1st Dep't 1994) (citing *Koret, Inc. v. Christian Dior, S.A.,* 161 A.D.2d 156, 157, 554 N.Y.S.2d 867, 869 (1st Dep't 1990)); *see also Finley,* 79 F.3d at 1295 (third-party requirement applies in employment context) (citing *Mansour,* 120 A.D.2d at 934, 502 N.Y.S.2d at 878; **\*275** Restatement (Second) of Torts, § 766 cmt. g (1979)).

**[36]**    Both Buono and Loksen were employees of the Hospital and thus would not normally be considered third parties with respect to Albert's relationship with the Hospital. But a plaintiff may maintain an action for tortious interference

Albert v. Loksen, 239 F.3d 256 (2001)
142 Lab.Cas. P 59,148, 17 IER Cases 361

against a co-employee by showing that the co-employee "acted outside the scope of [his or her] authority." *Kosson,* 203 A.D.2d at 113, 610 N.Y.S.2d at 228 (citing *Kartiganer Assocs., P.C. v. Town of New Windsor,* 108 A.D.2d 898, 899, 485 N.Y.S.2d 782, 783–84 (2d Dep't 1985)); *Finley,* 79 F.3d at 1295 ("[T]o show that a defendant-employee is a 'third party,' a plaintiff must show that the defendant-employee has exceeded the bounds of his or her authority").

There is also some indication that an action for tortious interference under New York law may lie against a co-employee who committed an independent tortious act against the plaintiff. *See, e.g., Nu–Life Const. Corp. v. Bd. of Educ.,* 204 A.D.2d 106, 107, 611 N.Y.S.2d 529, 530–31 (1st Dep't 1994) (granting summary judgment to co-employee accused of inducing employer to breach contract with plaintiff, an independent contractor, where plaintiff "failed to produce evidence ... to prove that [the defendant employee] was at any time acting other than as an agent of the Board *or* to show that [the defendant employee] committed any independent tort.") (emphasis added); *Miller v. Richman,* 184 A.D.2d 191, 194, 592 N.Y.S.2d 201, 203 (4th Dep't 1992) (noting that "[t]he complaint fail[ed] to allege that [the defendant] was acting outside the scope of her employment ... *or* that [the defendant] procured her discharge through fraudulent misrepresentation, threats or the violation of a duty owed to plaintiff by virtue of a confidential relationship") (emphasis added) (citations omitted); *Waldron v. Lutheran Social Services of Upper New York, Inc.,* 207 A.D.2d 1027, 1028, 617 N.Y.S.2d 665, 665 (4th Dep't 1994) (tortious interference claim fails "because plaintiff, an at-will employee, offered no proof that defendants made any fraudulent misrepresentations or threats or violated any duty owed to plaintiff based on a confidential relationship") (citing *Miller*); *Cohen,* 926 F.Supp. at 404 ("supervisor is considered to have acted outside the scope of his employment if ... the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, *or* [if] ... he acted purely from malice or self-interest") (emphasis added). Such a rule is consistent with general agency principles as interpreted in New York. *See BIB Const. Co. v. City of Poughkeepsie,* 204 A.D.2d 947, 948, 612 N.Y.S.2d 283, 285 (3d Dep't 1994) (an agent "cannot be held liable for inducing [its] principal ... to breach its contract with plaintiff .... except[ ] ... when an agent does not act in good faith and commits independent torts or predatory acts directed at another for personal pecuniary gain"). It is also consistent with the rule that a corporate officer can be held liable for interfering with an employee's relationship with the corporation if he or she

commits independent torts in the process. *See, e.g., Bonanni v. Straight Arrow Publishers, Inc.,* 133 A.D.2d 585, 586, 520 N.Y.S.2d 7, 8 (1st Dep't 1987); *Buckley v. 112 Central Park South, Inc.,* 285 A.D.2d 331, 333–35, 136 N.Y.S.2d 233, 235–36 (1st Dep't 1954).

**[37]**    The district court concluded that neither Buono nor Loksen acted outside the scope of their authority as employees of the Hospital and thus were not "third parties" who could be held liable for tortious interference with the at-will employment arrangement between Albert and the Hospital. As to Buono, this conclusion was clearly correct. There is no evidence that Buono did anything more than compile a report on Albert's conduct based on information from Loksen and Dlugy. Albert points to nothing in the record to indicate that Buono was independently responsible for any misrepresentations or that she acted with malice of any kind. **\*276** Albert has thus failed to produce evidence either that Buono was a third party for purposes of a tortious interference claim, *Kosson,* 203 A.D.2d at 113, 610 N.Y.S.2d at 228–29, or that she used "wrongful means" or acted with malice in effecting the termination of Albert's employment. *Cohen,* 926 F.Supp. at 403.

**[38]**    We disagree, however, with the district court as to the tortious interference claim against Loksen. There is a genuine issue of fact as to whether Loksen acted with common-law or "actual" malice in making false and defamatory statements about Albert, and specifically whether Loksen was motivated by a desire to undermine Albert's threats to report safety violations and other misconduct. The same factual dispute precludes summary judgment on the question of whether Loksen was a third-party to Albert's employment relationship such that he may be held liable for tortious interference. Under Albert's version of events, Loksen acted purely out of self-interest and undermined the Hospital's interests by defaming Albert in order to prevent him from reporting safety and disciplinary violations. Such third-party interference with an at-will employee's employment status is actionable under New York law.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court as to defendants Brooklyn Hospital and Karen Buono is affirmed; the judgment as to defendant Loksen is reversed and remanded for further proceedings consistent with this opinion.

**All Citations**

239 F.3d 256, 142 Lab.Cas. P 59,148, 17 IER Cases 361

Footnotes

1   Albert asserts that the Geiger counter that he used to check the delivery cart for the missing sources was a "digital" counter, which is used to measure the strength of radiation fields and which could not have been used to locate them in the radioactive materials room. That task, he testified during his deposition, required the sort of audible "pinging" Geiger counter that Loksen had taken with him out of the hospital.

2   Judge Bartels had passed away in the interim.

3   Albert now argues that he was not allowed to see the complete manual during discovery. That is something he should have pursued in the district court during the course of discovery, not here.

4   Section 175.04(g) reads:

    (1) Any worker ... who believes that a violation of this Code ... exists or has occurred ... with regard to radiological working conditions in which the worker is engaged, may request an inspection by giving notice of the alleged violation to the Bureau of Radiological Health. Any such notice shall be in writing, shall set forth the specific grounds for the notice, and shall be signed by the worker....

    (2) If, upon receipt of such notice, the Bureau of Radiological Health determines that the complaint meets the requirements set forth in § 175.04(g)(1) and that there are reasonable grounds to believe that the alleged violation exists or has occurred, an inspection shall be made as soon as practicable....

    (3) No licensee ... or registrant shall discharge or in any manner discriminate against any worker because such worker has filed any complaint or instituted or caused to be instituted any proceeding under this Code....

    24 RCNY Hlth.Code Tit. IV, Art. 175, § 175.04.

5   Albert does not argue on appeal that he was defamed by Buono or by the Hospital as the employer of Buono, Loksen or any other employee.

6   Modern courts in New York still use variations on arcane definitions of "defamatory": that which "exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induces an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society.' " *Celle,* 209 F.3d at 177 (quoting *Kimmerle v. New York Evening Journal,* 262 N.Y. 99, 102, 186 N.E. 217, 218 (1933)* (ellipses in *Celle* )); *cf. Dillon v. City of New York,* 261 A.D.2d 34, 37–38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) (that "which tends to 'expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society" ' ") (quoting, *inter alia, Sydney v. MacFadden Newspaper Pub. Corp.,* 242 N.Y. 208, 211–12, 151 N.E. 209, 210 (1926))). *See also Triggs v. Sun Printing & Publishing Ass'n,* 179 N.Y. 144, 153, 71 N.E. 739, 742 (1904) (collecting cases); *Riggs v. Denniston,* 3 Johns. Cas. 198, 205–06, note b (N.Y.Sup.Ct.1802) (collecting cases).

7   There is no doubt, and the defendants do not suggest otherwise, that the alleged Loksen statements of which Albert complains are "of and concerning" Albert. The issue is therefore not addressed further in this opinion.

8   Although *Dillon* omits mention of the "of and concerning" element of the tort reflected in the Restatement, that requirement logically must be and plainly is recognized by New York law. *See Aronson v. Wiersma,* 65 N.Y.2d 592, 594, 483 N.E.2d 1138, 1140, 493 N.Y.S.2d 1006, 1008 (1985),.

9   Under New York's "single instance rule," the wrongful assertion that a person erred in a single instance does not lower that person in the estimation of others as a matter of law and the assertion is therefore not defamatory. *See, Celle,* 209

F.3d at 180; *Twiggar v. Ossining Printing & Pub. Co.,* 161 A.D. 718, 719–20, 146 N.Y.S. 529, 530 (2d Dep't 1914). That rule, however, is a narrow one. *See Armstrong v. Simon & Schuster, Inc.,* 85 N.Y.2d 373, 379 n. 5, 649 N.E.2d 825, 828 n. 5, 625 N.Y.S.2d 477, 480 n. 5 (1995); *see also Handelman v. Hustler Magazine, Inc.,* 469 F.Supp. 1048, 1052 (S.D.N.Y.1978) ("single instance" rule did not bar recovery where article tended to show that plaintiff, an attorney, "acted in total disregard of professional ethics"); *Mason v. Sullivan,* 26 A.D.2d 115, 117, 271 N.Y.S.2d 314, 316 (1st Dep't 1966) (rule does not apply "where the deviation from professional conduct shows a lack of character or a total disregard of professional ethics"). We decline to address the issue, however, in light of the parties' failure to raise it here or in the district court. *See Gurary,* 190 F.3d at 44 (2d Cir.1999).

For constitutional reasons, *see Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), a private-figure plaintiff such as Albert generally has the burden of proving falsity, at least where the allegedly defamatory statements concern a matter of public interest, *see Flamm v. Am. Ass'n of Univ. Women,* 201 F.3d 144, 148–49 (2d Cir.2000); *Fairley v. Peekskill Star Corp.,* 83 A.D.2d 294, 297, 445 N.Y.S.2d 156, 158 (2d Dep't 1981). There is some authority for the proposition that the general rule at common law, that falsity is presumed and that defendants must bear the burden of pleading and proving truth, survives in defamation suits by private-figure plaintiffs concerning statements on purely private matters. *See Eckhaus v. Alfa–Laval, Inc.,* 764 F.Supp. 34, 37 n. 4 (S.D.N.Y.1991); *King v. Tanner,* 142 Misc.2d 1004, 1010, 539 N.Y.S.2d 617, 622 (N.Y.Sup.Ct.1989). Even if Loksen's allegedly defamatory statements were about a matter of private concern, a question we discuss below, that would not affect who bears the burden of showing truth or falsity in this case, because even if the burden is initially on the defendant, it shifts to the plaintiff in cases such as this where the statements are protected by a qualified privilege. *See Stukuls v. State,* 42 N.Y.2d 272, 279, 366 N.E.2d 829, 833–34, 397 N.Y.S.2d 740, 745 (1977).

The continued viability of *Krauss* 's holding that such matters are not of public concern is in doubt in light of *Huggins v. Moore,* 94 N.Y.2d 296, 303–05, 726 N.E.2d 456, 461–62, 704 N.Y.S.2d 904, 909–10 (1999), in which the New York Court of Appeals held that alleged "economic spousal abuse" by the husband of a popular stage actress and singer was a matter of public concern, at least when it was treated by a media defendant as an example of broader social issue.

The court in *Krauss* applied a negligence standard with little discussion, citing only the Appellate Division, First Department's decision in *Gaeta.* That decision offers no discussion and cites no authority in applying a negligence standard. *Gaeta,* 95 A.D.2d at 319, 327, 466 N.Y.S.2d at 324, 328. The same is true of the trial court decision affirmed by the Appellate Division in *Gaeta,* which noted that New York courts had yet to determine the applicable level of fault in such situations, but concluded, again without discussion or authority, that "negligence principles are applicable." *Gaeta v. New York News, Inc.,* 115 Misc.2d 483, 485, 454 N.Y.S.2d 179, 181 (1982). In light of this rather attenuated string of authority, we are somewhat reluctant to view *Krauss* as binding on this issue.

There are threads of case law in New York holding or suggesting that entirely apart from the requirement that a plaintiff prove special (pecuniary) damages in some defamation cases, such a plaintiff must *always* establish that his or her reputation incurred some injury as a result of the defamatory communication in order to prevail. *Compare Silberman v. Georges,* 91 A.D.2d 520, 456 N.Y.S.2d 395 (1st Dep't 1982), *France v. St. Clare's Hosp. & Health Ctr.,* 82 A.D.2d 1, 441 N.Y.S.2d 79 (1st Dep't 1981), *Salomone v. MacMillan Publishing Co.,* 77 A.D.2d 501, 429 N.Y.S.2d 441 (1st Dep't 1980), *Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 926 (2d Cir.1987) ("New York does not permit compensatory damages to be recovered absent proof of injury to reputation or malice."), and *Richie v. Paramount Pictures Corp.,* 544 N.W.2d 21, 29–30 (Minn.1996) (holding that proof of injury to reputation is required *under New York law*), *with Matherson v. Marchello,* 100 A.D.2d 233, 238, 473 N.Y.S.2d 998 (2d Dep't 1984) (holding that special damages are not a prerequisite to defamation suit but purporting to disapprove of *France* and *Salomone,* which held that proof of injury to reputation, not special damages, is such a prerequisite). The issue was not raised in the district court and was therefore not addressed by the district court; nor was it argued to us. We thus do not address it here.

Albert argued below that the Hospital was vicariously liable for the alleged tortious interference by Buono and Loksen. The district court rejected that claim. Albert does not contest that ruling on this appeal.

---

**End of Document**                                                                    © 2026 Thomson Reuters. No claim to original U.S.
                                                                                        Government Works.

771 F.3d 118
United States Court of Appeals, Second Circuit.

Wing F. CHAU, Harding Advisory
LLC, Plaintiffs–Appellants,
v.
Michael LEWIS, Steven Eisman, W.W. Norton
& Company, Inc., Defendants–Appellees.

Docket No. 13–1217
|
Argued: Feb. 19, 2014.
|
Decided: Nov. 14, 2014.

**Synopsis**
**Background:** Manager of investment firm that specialized in collateralized debt obligations (CDOs) and firm filed libel suit against author of book about CDOs' contribution to collapse of financial markets, author's source, and publisher of book. The United States District Court for the Southern District of New York, George B. Daniels, J., 935 F.Supp.2d 644, granted summary judgment in favor of defendants. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Wesley, Circuit Judge, held that:

[1] certain statements were not capable of defamatory meaning, and thus, were not actionable for libel;

[2] references in book to manager as "sucker," "fool," "frontman," and "crook or moron" amounted to hyperbolic language, which were not actionable for libel;

[3] certain statements were not concerning plaintiff, and thus were not actionable;

[4] some statements were substantially true, as required to defeat libel claims;

[5] statement describing manager's investment only in CDOs backed by the triple-B tranche of a mortgage bond as "the equivalent of three levels of dog shit lower than the original bonds" was non-actionable for libel; and

[6] false statement about manager's income was not actionable for libel.

Affirmed.

Winter, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (27)

[1]    **Federal Courts** 🔑 Conflict of Laws; Choice of Law

When a federal court sits in diversity, it applies the choice of law rules of the forum state.

17 Cases that cite this headnote

[2]    **Action** 🔑 What law governs

Under New York choice of law rules, parties' implied consent is sufficient to establish choice of law.

57 Cases that cite this headnote
More cases on this issue

[3]    **Libel and Slander** 🔑 Construction of language used

Under New York law, when deciding how to construe allegedly defamatory words, which when written or in print, constitute libel, courts must do so in the context of the publication as a whole, not just the paragraph or chapter containing them, and do so in the same way that the reading public, acquainted with the parties and the subject would take them.

1 Case that cites this headnote

[4]    **Libel and Slander** 🔑 Nature and elements of defamation in general

In New York, a plaintiff must establish five elements to recover in libel: (1) a written defamatory factual statement concerning the

plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability.

33 Cases that cite this headnote

**[5]    Libel and Slander**  Actionable Words in General

**Libel and Slander**  Person defamed

To establish libel, under New York law, there must be a writing, that is defamatory, that is a factual statement, rather than an opinion, about the plaintiff, not just a general statement.

27 Cases that cite this headnote

**[6]    Libel and Slander**  Actionable Words in General

Under New York law, a statement is "defamatory" if it exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of their confidence and friendly intercourse in society.

18 Cases that cite this headnote

**[7]    Libel and Slander**  Actionable Words in General

To be actionable, as defamatory, under New York law, the statement must do more than cause discomfort or affront; the statement is measured not by the sensitivities of the maligned, but the critique of reasonable minds that would think the speech attributes odious or despicable characterizations to its subject.

17 Cases that cite this headnote

**[8]    Libel and Slander**  Construction of defamatory language in general

Under New York law, if a statement is susceptible to only a single meaning, the court must determine, as a matter of law, whether that one meaning is defamatory.

6 Cases that cite this headnote

**[9]    Libel and Slander**  Actionable Words in General

A statement or word is often capable of more than one definition, and in that case, in New York, courts employ an ordinary person standard to determine if that statement is reasonably susceptible to a defamatory connotation.

2 Cases that cite this headnote

**[10]    Libel and Slander**  Words Tending to Injure in Profession or Business

Author's statements in book about financial crisis, that manager of investment firm that handled collateralized debt obligations (CDOs) told source that he "sold everything out," and that he passed on all the risk, that manager spent most of his career at "sleepy jobs at sleepy life insurance companies," that manager "would rather have $50 billion in crappy CDOs than none at all, as he was paid mostly on volume," that source wanted to "short" anything that manager was buying, and that source actually did so, were not reasonably capable of defamatory meaning, and thus, were not actionable for libel under New York law.

**[11]    Libel and Slander**  Actionable Words in General

New York law protects derogatory statements which may be categorized as opinion as opposed to fact.

7 Cases that cite this headnote

**[12]    Libel and Slander**  Construction of defamatory language in general

Determining whether an alleged defamatory statement is an allegation of fact or mere opinion is a legal question for the court, under New York law.

17 Cases that cite this headnote

**[13]** **Libel and Slander** 🔑 Actionable Words in General

Under New York law, allegedly defamatory statements more likely to be characterized as fact, rather than opinion, are readily understood by the reader to have a precise, unambiguous and definite meaning and can be objectively characterized as true or false.

7 Cases that cite this headnote

**[14]** **Libel and Slander** 🔑 Actionable Words in General

As with defamation in general, under New York law, courts make the assessment of whether a statement is one of fact or opinion, by looking at the full context of the communication in which the statement appears, while also considering the broader social context or setting surrounding the communication.

11 Cases that cite this headnote

**[15]** **Libel and Slander** 🔑 Actionable Words in General

Under New York law, if a statement is found to contain opinion, the court must next determine whether the statement is pure opinion, and thus non-actionable as defamatory, or mixed opinion, and therefore actionable as defamatory.

38 Cases that cite this headnote

**[16]** **Libel and Slander** 🔑 Actionable Words in General

Under New York law, pure opinion, which is not actionable as defamatory, is a statement of opinion which is accompanied by a recitation of the facts upon which it is based or does not imply that it is based on undisclosed facts.

33 Cases that cite this headnote

**[17]** **Libel and Slander** 🔑 Actionable Words in General

Under New York law, a mixed opinion statement, which is actionable as defamatory, is an opinion

that does imply a basis in undisclosed facts, or facts known only to the author, and is actionable.

33 Cases that cite this headnote

**[18]** **Libel and Slander** 🔑 Words Tending to Injure in Profession or Business

Author's references in book to manager of asset management firm that specialized in management of collateralized debt obligations (CDOs) as "sucker," "fool," "frontman," and "crook or moron" represented hyperbolic language that lacked precise meaning and were incapable of being proven true or false, and therefore, were not actionable for libel under New York law.

**[19]** **Libel and Slander** 🔑 Person defamed

In New York, a plaintiff cannot sustain a libel claim if the allegedly defamatory statement is not of and concerning plaintiff, but rather only speaks about a group of which the plaintiff is a member.

18 Cases that cite this headnote

**[20]** **Libel and Slander** 🔑 Person defamed

Author's statements in book about role of collateralized debt obligations (CDOs) in collapse of financial markets regarding CDO managers generally or the typical CDO manager were not of and concerning the plaintiff, who was one CDO manager, as required to support plaintiff's libel claim, under New York law.

**[21]** **Libel and Slander** 🔑 Truth of part of defamatory matter; substantial truth

In New York, a statement need not be completely true, but can be substantially true, in order to defeat a defamation claim, as when the overall gist or substance of the challenged statement is true.

19 Cases that cite this headnote

**[22]    Libel and Slander** 🔑 Truth of part of defamatory matter;  substantial truth

Author's statements in book about financial crisis, describing manager of investment firm that handled collateralized debt obligations (CDOs) and his firm as having goal to "maximize dollars in [their] care," loving "guys who short [their] market," and having "fear that the U.S. economy would strengthen" thus minimizing the number of people betting against the subprime mortgage market, were substantially true, as required to defeat manager and firm's libel claims against author.

**[23]    Libel and Slander** 🔑 Words Tending to Injure in Profession or Business

Author's statement in book about financial crisis, describing investment firm manager's investment only in collateralized debt obligations (CDOs) backed by the triple-B tranche of a mortgage bond as "the equivalent of three levels of dog shit lower than the original bonds" was non-actionable for libel, under New York law; the "dog shit" comparison was an epithetic opinion, and even if statement was false because 38% of manager's CDOs were backed by triple A securities or better, there was no showing that average reader would have better impression about manager if informed about the triple A rated securities.

1 Case that cites this headnote

**[24]    Libel and Slander** 🔑 Words Tending to Injure in Profession or Business

Author's false statement in book about financial crisis, that manager of investment firm that specialized on collateralized debt obligations made $26 million a year was not actionable for libel, under New York law; although manager made only fraction of that amount, the false statement as to managers income could have produced no worse an effect on the mind of the reader than the truth.

1 Case that cites this headnote

**[25]    Libel and Slander** 🔑 Words Tending to Injure in Profession or Business

Under New York law, the false attribution of a quotation to a speaker may be defamatory if putting the words in the plaintiff's mouth casts doubt on the plaintiff's fitness for his profession.

2 Cases that cite this headnote

**[26]    Libel and Slander** 🔑 Actionable Words in General

Under New York law, a fabricated quotation may injure reputation, and thus, be actionable as defamatory, if it attributes an untrue factual assertion to the speaker or if the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold.

2 Cases that cite this headnote

**[27]    Summary Judgment** 🔑 Defamation

To survive a motion for summary judgment, a plaintiff asserting a defamation claim who denies making a statement that has been attributed to him must also demonstrate that the statement, when read in context, was defamatory, under New York law.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*121** Steven F. Molo (Robert K. Kry, Andrew M. Bernie, MoloLamken LLP, Washington, DC, on the brief), MoloLamken LLP, New York, NY, for Plaintiffs–Appellants.

Celia Goldwag Barenholtz (Gabriel Rauterberg, Annika Goldman, on the brief), Cooley LLP, New York, NY, for Defendants–Appellees Michael Lewis and W.W. Norton & Co., Inc.

David A. Schulz (Michael D. Sullivan, Celeste Phillips, Paul Safier, on the brief), Levine Sullivan Koch & Schulz, LLP, New York, NY, for Defendant–Appellee Steven Eisman.

Before: KEARSE, WINTER, and WESLEY, Circuit Judges.

42 Media L. Rep. 2728

## Opinion

[WESLEY](), Circuit Judge:

Plaintiffs–Appellants Wing F. Chau and Harding Advisory LLC appeal from a March 29, 2013 judgment of the United States District Court for the Southern District of New York (Daniels, J) dismissing their claims of libel against Defendants–Appellees author Michael Lewis, his source, Steven Eisman, and Lewis's publisher, W.W. Norton, for twenty-six allegedly defamatory statements in Lewis's book *The Big Short.* The district court granted Defendants' motion for summary judgment and dismissed each of Plaintiffs' claims. We AFFIRM the district court's grant of summary judgment.

## BACKGROUND [1]

The United States' housing market collapse in 2008–2009 and the ensuing global financial crisis are widely considered the worst financial disasters since the Great Depression; their causes have been hotly debated. One of the many books that explore the genesis of the financial decline is *The Big Short: Inside the Doomsday Machine,* written by Defendant Michael Lewis and published in 2010 by Defendant W.W. Norton. A work of non-fiction, *The Big Short* looks at a "small group of iconoclasts who 'shorted,' or bet against, the subprime mortgage bond market at a time when most investors thought real estate prices would continue to rise (*i.e.,* were 'long')." One of the so-called "iconoclasts" described in *The Big Short* is Defendant Steve Eisman, who managed a hedge fund and served as one of Lewis's sources for the book. Like many of Lewis's previous books, a great number of which have dealt with business and financial topics, *The Big Short* met with considerable success and spent 28 weeks on *The New York Times* best-seller list.

Thankfully, we do not have to weigh in on the root of America's fiscal crisis. The **\*122** task before us is much more focused: to determine whether one chapter of *The Big Short* Chapter 6, titled *Spider–Man at the Venetian*—contains statements that are defamatory to Plaintiffs Wing Chau and his business Harding Advisory.

Chapter 6 comprises twenty-four pages of the 270–page, ten-chapter book, and one-third of that chapter focuses on a dinner conversation that took place in January 2007 at the Wynn Las Vegas Hotel during the 2007 American Securitization Forum.

The dinner was notable in its design to introduce people who shorted the market to the people who went long. Eisman was in attendance and was seated next to Chau.

Chau, an "investment professional," is the founder and owner of Harding Advisory LLC. He received a BA in economics from the University of Rhode Island and an MBA from Babson College. After graduating from Babson, he spent the next twelve years of his career in structured finance. For five years, he worked as an analyst specializing in asset-backed securities at Salomon Smith Barney and Prudential Securities, then spent two years as a portfolio manager at New York Life Investment Management. With the experience he gained in asset-backed securities through his work at those firms, Chau set off on his own in 2006 and founded Harding Advisory. At the time of the January 2007 dinner, Harding was a top-ranked manager of Collateralized Debt Obligations[2] (commonly known as "CDOs") and was on its way to issuing more asset-backed CDOs by volume than any other CDO manager.

*Spider–Man at the Venetian* recounts Eisman's interaction and discussions with Chau at that dinner and paints CDO managers in general, and Plaintiffs in particular, in a negative light. In response to this chapter's representations, Chau sued Lewis for writing, Norton for publishing, and Eisman for communicating to Lewis twenty-six allegedly defamatory statements (reproduced below). The district court granted summary judgment to Defendants, finding that none of the statements were actionable defamation because they either were substantially true, were not "of or concerning" Plaintiffs, were not reasonably susceptible to any defamatory meaning, or were mere opinions rather than assertions of fact. Plaintiffs now appeal, arguing that the court erred in most of its findings. For the following reasons, we affirm.

## STATEMENTS AT ISSUE

These statements are as they appear in the book, except that the bolded language in each Statement is the language that was bolded by the district court in its decision.

1. When Eisman asked exactly what Harding Advisory advised, Wing Chau explained that he was a CDO manager. "**I had no idea there was such a thing as a CDO manager,**" said Eisman. "**I didn't know there was anything to manage.**"

("Statement 1"), *The Big Short* at 138.

2. He'd graduated from the University of Rhode Island, earned a business degree at Babson College, and **spent most of his career working sleepy jobs at sleepy life insurance companies**—but all that was in the past.

("Statement 2"), *Id.* at 139.

**\*123** 3. Danny didn't know Wing Chau, but when he heard that he was the end buyer of subprime CDOs, he knew exactly who he was: **the sucker.**

("Statement 3"), *Id.* at 139.

4. When they saw that Lippman had seated Eisman right next to **the sucker,** both Danny and Vinny had the same thought: *Oh no. This isn't going to end well.* Eisman couldn't contain himself. **He'd figure out the guy was a fool,** and let him know it, and then where would they be? **They needed fools; only fools would take the other side of their trades.**

("Statement 4"), *Id.* at 139.

5. Later, **whenever Eisman set out to explain to others the origins of the financial crisis, he'd start with his dinner with Wing Chau.** Only now did he fully appreciate the central importance of the so-called mezzanine CDO—the CDO composed mainly of triple-B-rated subprime mortgage bonds—and its synthetic counterpart: the CDO composed entirely of credit default swaps on a triple-B-rated subprime mortgage bonds. "You have to understand this," he'd say. "**This was the engine of doom.**" He'd draw a picture of several towers of debt. The first tower was the original subprime loans that had been piled together. At the top of this tower was the triple-A tranche, just below it the double-A tranche, and so on down to the riskiest, triple-B tranche—the bonds Eisman had bet against. The Wall Street firms had taken these triple-B tranches—the worst of the worst—to build yet another tower of bonds: a CDO. A collateralized debt obligation. The reason they'd done this is that the rating agencies, presented with the pile of bonds backed by dubious loans, would pronounce 80 percent of the bonds in it triple-A. These bonds could then be sold to investors—pension funds, insurance companies—which were allowed to invest only in highly rated securities. It came as news to Eisman that **this ship**

**of doom was piloted by Wing Chau and people like him.**

("Statement 5"), *Id.* at 140.

6. The guy controlled roughly $15 billion, **invested in** nothing but CDOs backed by the triple-B tranche of a mortgage bond or, as Eisman put it, "**the equivalent of three levels of dog shit lower than the original bonds.**"

("Statement 6"), *Id.* at 140.

7. **All by himself, Chau generated vast demand for the riskiest slices of subprime mortgage bonds,** for which there had previously been essentially no demand. This demand led inexorably to the supply of new home loans, as material for the bonds. The soy sauce in which Eisman double-dipped his edamame was shared by **a man who had made it possible for tens of thousands of actual human beings to be handed money they could never afford to repay.**

("Statement 7"), *Id.* at 140–41.[3]

8. As it happened, FrontPoint Partners had spent a lot of time digging around in those loans, and knew that the default rates were already sufficient **\*124** to wipe out Wing Chau's entire portfolio. "God," Eisman said to him. "You must be having a hard time." "No," **Wing Chau said. "I've sold everything out.**" ("Statement 8"), *Id.* at 141.

9. It made no sense. The CDO manager's job was to select the Wall Street firm to supply him with subprime bonds that served as the collateral for CDO investors, and then to vet the bonds themselves. The CDO manager was further charged with monitoring the hundred or so individual subprime bonds inside each CDO, and replacing the bad ones, before they went bad, with better ones. That, however, was mere theory; in practice, the sorts of investors who handed their money to Wing Chau, and thus bought the triple-A-rated tranche of CDOs—German banks, Taiwanese insurance companies, Japanese farmers' unions, European pension funds, and, in general, entities more or less required to invest in triple-A-rated bonds—did so precisely because they were meant to be foolproof, impervious to losses, and unnecessary to monitor or even think about very much. **The CDO manager, in practice, didn't do much**

of anything, which is why all sorts of unlikely people suddenly hoped to become one.

("Statement 9"), *Id.* at 141.

10. "**Two guys and a Bloomberg terminal in New Jersey" was Wall Street shorthand for the typical CDO manager.**

("Statement 10"), *Id.* at 141.

10. **The less mentally alert the two guys, and the fewer the questions they asked about the triple-B-rated subprime bonds they were absorbing into their CDOs, the more likely they were to be patronized by the big Wall Street firms.**

("Statement 11"), *Id.* at 141.

12. The whole point of the CDO was to launder a lot of subprime mortgage market risk that the firms had been unable to place straightforwardly. **The last thing you wanted was a CDO manager who asked lots of tough questions.**

("Statement 12"), *Id.* at 141.

13. The bond market had created what amounted to a **double agent—a character who seemed to represent the interests of investors when he better represented the interests of Wall Street bond trading desks.**

("Statement 13"), *Id.* at 141–42.

14. To assure the big investors who had handed their billions to him that he had their deep interests at heart, the CDO manager kept ownership of what was called the "equity," or "first loss" piece, of the CDO—the piece that vanished first when the subprime loans that ultimately supplied the CDO with cash defaulted.... **Now, almost giddily, Chau explained to Eisman that he simply passed all the risk that the underlying home loans would default on to the big investors who had hired him to vet the bonds.**

("Statement 14"), *Id.* at 142.

15. But the CDO manager was also paid a fee of 0.01 percent off the top, before any of his investors saw a dime, and another, similar fee, off the bottom, as his investor received their money back. That doesn't sound like much, but, when you're **\*125** running tens of billions of dollars with little effort and no overhead,

it adds up. Just a few years earlier, Wing Chau was making $140,000 a year managing a portfolio for the New York Life Insurance Company. **In one year as a CDO manager, he'd taken home $26 million, the haul from half a dozen lifetimes of working at New York Life.... His job was to be the CDO "expert," but he actually didn't spend a lot of time worrying about what was in CDOs.**

("Statement 15"), *Id.* at 142.

16. **His goal, he explained, was to maximize the dollars in his care. He was now doing this so well that, from January 2007 until the market crashed in September, Harding Advisory would be the world's biggest subprime CDO manager.**

("Statement 16"), *Id.* at 142.

17. Among its other achievements, Harding had established itself as the **go-to buyer for Merrill Lynch's awesome CDO machine, notorious not only for its rate of production** (Merrill created twice as many of the things as the next biggest Wall Street firm) **but also for its industrial waste (its CDOs were later proven to be easily the worst).**

("Statement 17"), *Id.* at 142.

18. "He 'managed' the CDOs," said Eisman, "but managed what? I was just appalled that the structured finance market could be so insane as to allow someone to manage a CDO portfolio without having any exposure to the CDOs. People would pay up to have someone 'manage' their CDOs—**as if this moron was helping you. I thought,** *You prick, you don't give a fuck about the investors in this thing.***"

("Statement 18"), *Id.* at 142–43.

19. **Chau's real job was to serve as a new kind of front man for the Wall Street firms he "hired";** investors felt better buying a Merrill Lynch CDO if it didn't appear to be run by Merrill Lynch.

("Statement 19"), *Id.* at 143.

20. "Then he says something that blew my mind," said Eisman. "He says, '**I love guys like you who short my market. Without you I don't have anything to buy.**' "

("Statement 20"), *Id.* at 143.

21. That's when Steve Eisman finally understood the madness of the machine. He and Vinny and Danny had been making these side bets with Goldman Sachs and Deutsche Bank on the fate of the triple-B tranche of subprime mortgage-backed bonds without fully understanding why those firms were so eager to accept them. **Now he was face-to-face with the actual human being on the other side of his credit default swaps.** Now he got it: The credit default swaps, filtered through the CDOs, were being used to replicate bonds backed by actual home loans. *There weren't enough Americans with shitty credit taking out loans to satisfy investors' appetite for the end product.* Wall Street needed his bets in order to synthesize more of them. "**They weren't satisfied getting lots of unqualified borrowers to borrow money to buy a house they couldn't afford,**" said Eisman. "**They were creating them out of whole cloth. One hundred times over!** That's why **\*126** the losses in the financial system are so much greater than just the subprime loans. That's when I realized they needed us to keep the machine running. I was like, *This is allowed?* "

("Statement 21"), *Id.* at 143.

22. Wing Chau didn't know he'd been handpicked by Greg Lippmann to persuade Steve Eisman that the **people on the other end of his credit default swaps were either crooks or morons,** but he played the role anyway.

("Statement 22"), *Id.* at 144.

23. Between shots of sake he told Eisman that **he would rather have $50 billion in crappy CDOs than none at all, as he was paid mainly on volume.**

("Statement 23"), *Id.* at 144.

24. **He told Eisman that his main fear was that the U.S. economy would strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market.**

("Statement 24"), *Id.* at 144.

25. But when the meal was over, they watched Eisman grab Greg Lippmann, point to Wing Chau, and say, "**Whatever that guy is buying, I want to short it.**" Lippmann took it as a joke, but Eisman was completely serious: **He wanted to place a bet specifically against Wing Chau.** "Greg," Eisman said, "I want to short his

paper. Sight unseen." Thus far Eisman had bought only credit default swaps on subprime mortgage bonds; **from now on he'd buy specifically credit default swaps on Wing Chau's CDOs.**

("Statement 25"), *Id.* at 144.

26. **Upon their return they raised it to $550 million, with new bets against the CDOs created by Wing Chau.** With only $500 million under management, the position now overwhelmed their portfolio.

("Statement 26"), *Id.* at 159.

## DISCUSSION [4]

[1] [2]    The parties and district court assume without discussion that New York substantive law applies to this defamation action. When a federal court sits in diversity, it applies the choice of law rules of the forum state, here New York. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "The parties' briefs assume that New York law controls, and such implied consent ... is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) (internal quotation marks omitted).

[3] [4] [5]    When deciding how to construe allegedly defamatory words—which when written or in print constitute libel—courts must do so in the context of the publication as a whole, not just the paragraph or chapter containing them, and do so "in the same way that the reading public, acquainted with the parties and the subject would take [them]." *Sydney v. MacFadden Newspaper Publ'g Corp.,* 242 N.Y. 208, 214, 151 N.E. 209 (1926). In New York, a plaintiff must establish five elements to recover in libel: (1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; **\*127** (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability. *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 176 (2d Cir.2000). On closer inspection, the first element of these five is actually composed of multiple parts: there must be (A) a writing, it must be (B) defamatory, it must be (C) factual— that is, not opinion—and it must be (D) about the plaintiff, not just a general statement. Issues B, C, and D take up the bulk of our analysis in the present case, with the remainder dealing with the falsity of the defamatory statement. We find, for the reasons below, that the twenty-six statements at issue all fail to fulfill one or more of these elements, making them unable

to serve as the basis for a cause of action. Accordingly, the district court's grant of summary judgment to Defendants is affirmed.

### A. Statements that Simply Are Not Defamatory in Meaning

[6] [7] Not all (or even most) maligning remarks can be considered defamatory. A statement is defamatory if it exposes an individual "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or ... induce[s] an evil opinion of one in the minds of right-thinking persons, and ... deprive[s] one of their confidence and friendly intercourse in society." *Kimmerle v. N.Y. Evening Journal, Inc.,* 262 N.Y. 99, 102, 186 N.E. 217 (1933). A statement, therefore, can meet all of the other elements of defamation—be factual, published, false, and about the plaintiff—but still not be actionable if it fails to rise to the necessary level of derogation. To be actionable, therefore, the statement must do more than cause discomfort or affront; the statement is measured not by the sensitivities of the maligned, but the critique of reasonable minds that would think the speech attributes odious or despicable characterizations to its subject.

[8] [9] If a statement is susceptible to only a single meaning, the court must determine, as a matter of law, whether that one meaning is defamatory. *See Aronson v. Wiersma,* 65 N.Y.2d 592, 593, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985). Of course, a statement or word is often capable of more than one definition, and in that case, in New York, courts employ an ordinary person standard to determine if that statement is "reasonably susceptible [to] a defamatory connotation." *James v. Gannett Co.,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976).

[10] Statements 2, 8, 14, 23, 25, and 26 are not reasonably susceptible to a defamatory connotation and are therefore non-actionable. Statement 8, for example, purports to quote Chau stating "I've sold everything out." It is unclear how such a quote, true or not, could produce hatred, shame, or contempt of Chau or his business. Perhaps it would give Harding's investors more confidence if their money managers also had an equity stake in the investments, but that they did not does not make the statement defamatory. Statement 14, which describes Chau as "almost giddily" telling Eisman that he had "passed all the risk," is also non-defamatory: passing risk is the business of a money manager, and we cannot characterize this as defamatory. Moreover, Lewis's (or Eisman's) characterization of Chau as "almost gidd[ ]y" is a subjective assessment and an opinion. This same logic applies to Statement 23. Chau's statement that he would "rather have $50 billion in crappy CDOs than none at all, as he was paid mainly on volume" merely conveys a fundamental truth: $10 worth of a lousy security *is* worth more than none at all. Similarly, being paid on volume is a statement that is generally applicable to brokers, **\*128** dealers, and firms. It is unclear how an ordinary reader would interpret this, in context, as defamatory.

Statements 25 and 26 are also not defamatory. Statement 25—which quotes Eisman, referring to Chau in saying, "[w]hatever that guy is buying, I want to short it" and seeking to place a bet specifically against Chau would not be interpreted by an average reader as defamatory. *James,* 40 N.Y.2d at 419, 386 N.Y.S.2d 871, 353 N.E.2d 834. Chau's business—by its very nature—operated by having people to bet against. In this statement, Eisman is merely expressing his intention to bet against Chau—to short Chau's long. The same reasoning applies to Statement 26, which states that Eisman did in fact make new bets against the CDOs created by Chau. Chau correctly points out that Eisman never *actually* bet against Harding CDOs and that this sentence was removed from the tenth and subsequent printings of the book But even though this statement is conceded to be false, it cannot be considered defamatory for the same reasons as Statement 25: it would not be interpreted by an average reader as defamatory.

Statement 2—that Chau "spent most of his career working sleepy jobs at sleepy life insurance companies—but that was all in the past," followed by "He was newly, obviously rich"—was dismissed as non-actionable by the district court on the basis that it was non-factual and merely Lewis's opinion of Chau's career. We disagree in part with this reasoning, but not with the result. Chau spent only two years out of twelve prior to starting Harding, working at a life insurance company—certainly not "most" of his career, and Lewis himself conceded that this description of Chau's career was "incomplete." Because the "most of his career" part of the statement is concededly false, that part was improperly characterized by the district court as opinion. It is properly dismissed, however, because an ordinary person would not take the statement (albeit incorrect) in context to be sufficiently derogatory to make an actionable claim for defamation. The parry at the end of the statement in question —"but that was all in the past," along with the following assertion that "[Chau] was newly, obviously rich"—makes clear that "sleepy jobs at sleepy life insurance companies"

is being contrasted with Chau's "new[ ]" and "obvious[ ]" wealth. Further, in this context, sleepy means a steady, typical job, or even at its most negative dictionary definition, a job having "little activity, quietly slowly moving." *Webster's Third New International Dictionary* 2140 (2002). Such a characterization is a statement of opinion, and it also does not rise to the odium necessary to constitute defamatory meaning.

**B. Opinion**

[11]  [12]  [13]  [14]  As mentioned above, only factual statements are actionable as defamation or libel. This is because, in part, New York law protects derogatory statements which may be categorized as "opinion" as opposed to "fact." *See Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 252, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991); *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 289, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986). Determining whether a statement is an allegation of fact or mere opinion is a legal question for the court. *Brian v. Richardson,* 87 N.Y.2d 46, 51, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (1995). This is no easy task. Over time, New York courts have identified factors to be considered in determining whether something is an expression of fact rather than opinion; statements more likely to be characterized as fact are readily understood by the reader to have a precise, unambiguous and definite meaning and can be objectively characterized as true or false. **\*129** *Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550. As with defamation in general, courts make these assessments by looking at the full context of the communication in which the statement appears, while also considering the broader social context or setting surrounding the communication. *Id.* Broader social context can include any particular customs or conventions that could "signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* (internal quotation marks omitted).

[15]  [16]  [17]  But this is not necessarily the end of the analysis: if a statement is found to contain opinion, the court must next determine whether the statement is "pure opinion" (and thus non-actionable) or "mixed opinion" (and therefore actionable). Pure opinion is a "statement of opinion which is accompanied by a recitation of the facts upon which it is based" or does not imply that it is based on undisclosed facts. *Id.* at 289–90, 508 N.Y.S.2d 901, 501 N.E.2d 550. Mixed opinion, on the other hand, is an opinion that *does* imply a basis in undisclosed facts, or facts known only to the author, and is actionable. *Id.*

[18]  In the instant case, the district court correctly held that Statements 1, 3, 4, 5, 17, 18, 19, 21, and 22 are non-actionable opinions. In the case of Statements 1, 18, 19 and 21, the use of phrasing such as, "I had no idea ..." and "I didn't know ..." are particular customs or signals to readers that something is opinion, not fact. *Steinhilber,* 68 N.Y.2d. at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550. Likewise, the epithets in Statements 3, 4, 5, 17, 19, 22—"sucker," "fool," "frontman," "industrial waste," "pilot[ ]" of the "ship of doom," and "crooks or morons"—are hyperbole and therefore not actionable opinion. *Id.* at 294, 508 N.Y.S.2d 901, 501 N.E.2d 550; *see also Weiner v. Doubleday & Co., Inc.,* 142 A.D.2d 100, 535 N.Y.S.2d 597, 600 (1st Dep't 1988), *aff'd,* 74 N.Y.2d 586, 550 N.Y.S.2d 251, 549 N.E.2d 453 (1989). While someone may not appreciate being called a fool, it is an expression of one's view of another, and moreover might not reflect reality: history has shown many "fools" to have indeed been visionaries. Time may prove the insult misguided, but the insult is not itself a fact—but rather, is one's perception of facts—at the time it is uttered.

**C. Not of and Concerning Plaintiff**

[19]  [20]  In New York, a plaintiff cannot sustain a libel claim if the allegedly defamatory statement is not "of and concerning plaintiff" but rather only speaks about a group of which the plaintiff is a member. *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 398 (2d Cir.2006). As many of the statements concern "CDO managers" generally, the district court correctly held that they are not "of and concerning" Chau. This includes Statements 9, 10, 11, 12, and 13, which respectively describe the "CDO manager's job;" the "typical CDO manager;" "[t]he last thing you wanted [from] a CDO manager;" and the "double agent" created by the bond market. Though Chau is described in the book as a CDO manager, these statements are *solely* about the group.

**D. Substantial Truth**

[21]  Falsity of a statement is needed to make out a claim of libel. But in defamation law, as in life, determinations of fact and fiction are not zero-sum. In New York, a statement need not be *completely* true, but can be *substantially* true, as when the overall "gist or substance of the challenged statement" is true. *Printers II, Inc. v. Prof'ls Publ'g, Inc.,* 784 F.2d 141, 146–47 (2d Cir.1986) (citing **\*130** *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977); *Fairley v. Peekskill Star Corp.,* 83 A.D.2d 294, 445 N.Y.S.2d 156 (2d Dep't 1981)).

[22]    Statements 16, 20, and 24—which describe Plaintiffs' goal to "maximize dollars in [their] care;" their "love [of] guys who short [their] market" and Chau's "main fear ... that the U.S. economy would strengthen" thus minimizing the number of people betting against the subprime mortgage market —are all completely or substantially true. Plaintiffs' sole dispute with Statement 16, for example, is that the first part suggests that "maximiz[ing] the dollars in [Chau's] care" was Chau's *only* goal, which they state is false and defamatory. But as the district court pointed out, this sentence does not imply that Chau was indifferent to his clients' interests. This statement also lacks a defamatory meaning, as it merely alleges that Chau intended to expand his business. Likewise, Statement 20, which includes Chau's supposed statement that he "love[s] guys like you who short my market. Without you I don't have anything to buy" is substantially true in content: one literally cannot take a long position without someone taking a corresponding short position. As with Statement 16, Statement 20 is also not defamatory, but rather reflects a reality of the market.

Parallel logic applies to Statement 24; Chau's entire business operated by having people to bet against. Bets are simply gambles that the result of an event—here, mortgage defaults that would devalue CDOs—will favor their side of the wager. While some may cringe at the thought of investing money as a gamble, such bets are the nature of much of the financial market and are especially the case with CDOs. Reducing risk by limiting a CDO to triple-A rated mortgage loans is merely placing the odds in favor of those who were long in the market. Thus, the statement is both substantially true and not reasonably susceptible to defamatory connotation.

### E. Combined Issues of Statements 6 and 15

[23]    Statement 6 discusses Plaintiffs' investment "in nothing but CDOs backed by the triple-B tranche of a mortgage bond," which Eisman characterizes as "the equivalent of three levels of dog shit lower than the original bonds." While the "dog shit" comparison is a non-actionable epithetic opinion, Plaintiffs argue that the characterization of Harding's CDOs as backed by *nothing but* triple-B mortgage bonds is false. They contend that of Harding's "21 CDOs, eight were high-grade, backed almost entirely by securities rated A-/ A3 or better." (Plaintiffs' Br. 43). The district court found the statement to be substantially true and non-actionable, as all parties conceded that a significant portion of Plaintiffs' collateral in CDOs was rated triple-B, and a majority was "non-prime." We find it unnecessary to sort out the "fine and shaded distinctions" of Statement 6 because even if Chapter

6 had published the "truth" (according to Chau) that 38% of Harding's CDOs were backed by A-/A3 securities or better, the effect on the reader would have been appreciably the same. *Fleckenstein v. Friedman,* 266 N.Y. 19, 23, 193 N.E. 537 (1934) (holding that false statements are not actionable if the statement could have produced no worse an effect on the mind of the reader than the publication of the truth pertinent to the allegation). Plaintiffs offered nothing in their submissions to the district court (as reflected in the record) or in their briefs before us that demonstrates to us the significant superiority of A-/A3 rated securities over triple-B rated securities such that the average reader would come away with a different impression of Chau's **\*131** business had Lewis published the former and not the latter. This lack of proof is all the more telling considering this statement in the broad social context of the financial world at the time *The Big Short* was written. We are reminded that the various ratings assigned to bonds were ever changing and that market participants were continually coming up with new packages and terminologies to make their backings appear more attractive. Indeed, this is a major theme of *The Big Short.* Accordingly, Statement 6 is non-actionable.

[24]    We affirm the district court's assessment of Statement 15 as non-actionable for similar reasons. Plaintiffs rightly contend that the statement that Chau "took home $26 million a year" was false: Harding made $25 million in fees in 2007 and Chau personally received only a portion of that amount. But false statements as to Chau's income could have produced no worse an effect on the mind of the reader than the truth. *See Fleckenstein,* 266 N.Y. at 23, 193 N.E. 537. If indeed Chau spent only a negligible amount of time considering the quality of his CDOs, we doubt it matters whether he took home $26 million or a fraction of that amount, as conceded by Plaintiffs. Accordingly, Statement 15 is non-actionable.

### F.   Chau's   Argument   of   Fabricated   Quotes   as Defamatory

[25]    [26]    [27]    The "false attribution" of a quotation to a speaker may be defamatory if putting the words in the plaintiff's mouth "cast[s] doubt on the plaintiff's fitness for his profession." *Mahoney v. Adirondack Publ'g Co.,* 71 N.Y.2d 31, 38, 523 N.Y.S.2d 480, 517 N.E.2d 1365 (1987). Such a "fabricated quotation may injure reputation" if "it attributes an untrue factual assertion to the speaker" or if "the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 511, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

To survive a motion for summary judgment, a plaintiff who denies making a statement that has been attributed to him must also demonstrate that the statement, "when read in context, was ... defamatory." *James,* 40 N.Y.2d at 419, 386 N.Y.S.2d 871, 353 N.E.2d 834.

Chau denies having said portions of Statements 8, 14, 16, 20, 23, and 24 that are attributed to him, either as direct quotes or in the form of a paraphrase. This claim fails, because, as discussed above, Chau did not show that the Statements were defamatory, or were not substantially true.

**CONCLUSION**

Chapter 6 of *The Big Short* portrays Chau as starting out from a series of simple finance-related jobs to becoming the founder and principal of a financial firm managing CDOs, which provided him with what many Americans hope for —great wealth. The market events of 2008 and 2009 may undoubtedly influence one's perception as to whether going long on CDOs meant Chau was a fool, or Chau was a rube, or his motivations were avarice; but hindsight cannot give such opinions a defamatory meaning. Lewis's various implications that Chau was wrong about the mortgage market are not actionable.

The law of defamation in New York is predicated on the free exchange of ideas and viewpoints. That marketplace can wound one's pride—for words can offend or insult—but simple slights are not the stuff of defamation. The tort requires conduct that vilifies or exposes one to shame "in the minds of right-thinking persons." *Kimmerle,* 262 N.Y. at 102, 186 N.E. 217. Chau's feelings may be hurt but **\*132** his claims were rightly dismissed by the district court.

The dissent presses for reversal because, it asserts, the majority opinion evaluates statements from *The Big Short* without regard for the context in which they were made. The dissent examines a "portrait [of] the context [of] the book's portrayal of appellant" to conclude that the majority's view of *The Big Short* is not "the sole meaning intended by the author or understood by the book's readership." As the dissent recognizes, whether a statement is defamatory is a fact issue for a jury only if the statement is "reasonably susceptible of a defamatory connotation." *Davis v. Ross,* 754 F.2d 80, 82 (2d Cir.1985) (internal quotation marks omitted). However, if a writing "is not susceptible of a libelous meaning, then innuendo cannot make it libelous." *Tracy v. Newsday, Inc.,* 5

N.Y.2d 134, 136, 182 N.Y.S.2d 1, 155 N.E.2d 853 (1959). The dissent's error is that it emphasizes the implication, perceived tone, and innuendo of Defendants' writing, even though the statements in question are either non-defamatory, privileged opinion, not of or concerning Plaintiffs, or substantially true. We conclude that the statements are not libel as a matter of law.

"Consideration of the circumstances and of the broader social context" confirms our conclusion that *The Big Short* does not contain actionable defamation. *Steinhilber,* 68 N.Y.2d at 294, 508 N.Y.S.2d 901, 501 N.E.2d 550. The dissent highlights the fact that the individual plaintiff has been "professionally shunned" since *The Big Short* was published in 2010. It is understandable that Chau was displeased by a book that laid a good share of the blame for the financial crisis at the feet of Wall Street banks—and the advisors they chose to manage the CDOs—that collapsed so spectacularly. Before the crash, Chau was a top manager of asset-backed CDOs. By the time the book was published, every CDO managed by Chau was either in default, liquidated, or downgraded to junk status, and his investors incurred substantial losses that would damage any money manager's reputation. Our dissenting brother exploits Chau's fate as context for his view that the Defendants' writing did not have an "innocent meaning[ ]"; our view is that a non-defamatory reflection on this disastrous chapter of our nation's financial history would not necessarily have an "innocent meaning" for those depicted.

We have considered all of Plaintiffs' contentions on this appeal and have found them to be without merit. For the reasons above, the judgment of the district court is AFFIRMED as to all statements.

Judge WINTER dissents in a separate opinion.

WINTER, Circuit Judge, dissenting:
I respectfully dissent.[1]

Michael Lewis's book describes appellant as admitting to acts that a jury could easily find to have breached his obligations to investors in the fund that employed him and to have constituted civil or criminal fraud. Although the authority my colleagues cite demonstrates that it is axiomatic that allegedly defamatory statements must be viewed by reading the document as a whole, *Sydney v. MacFadden Newspaper*

*Publ'g Corp.,* 242 N.Y. 208, 214, 151 N.E. 209 (1926), their conclusion that certain statements are not defamatory is reached only by evaluating those statements in hermetic isolation from the **\*133** context in which they were made. They conclude that certain statements can have only a single and non-defamatory meaning even where the book clearly conveyed a different and defamatory meaning that was adopted by the book's readership. And while opinions are protected so long as the facts underlying them are set forth or the opinions do not imply facts that can be disproved, *see Steinhilber v. Alphonse,* 68 N.Y.2d 283, 289–92, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986), my colleagues apply this rule in a fashion that renders opinions protected regardless of implied facts.

a) *Overall Context*

The chapter of the book at issue portrays CDO managers, in pre-crisis times, as selling interests in funds holding portfolios of risk-laden derivatives, the value of which was dependent on the value of residential mortgages. *The Big Short* at 136–59. The investors in these funds relied on the managers to monitor the portfolios to reduce risk. In the book's words, the managers were paid "to select the Wall Street firm to supply [the] ... bonds that served as the collateral for CDO investors, [and to].... monitor[ ] the hundred or so individual subprime bonds inside each CDO, and [to] replac[e] the bad ones, before they went bad, with better ones." *Id.* at 141.

While the CDO managers purported to be trained specialists in such management risk, they had little specialized knowledge. Indeed, the chapter asserts that the less knowledgeable the managers, the fewer questions that were asked of "the big Wall Street firms" that put the various investment packages together, and the more likely those managers were to be patronized by those firms. *Id.* While the CDO managers purported to manage, they actually did very little. According to the book, the managers were actually indifferent to the risks because they were paid by the volume of managed assets. *Id.* at 142. As it turned out, of course, the investors were left with worthless interests, causing or contributing to the ensuing economic crisis.

This portrait is the context to the book's portrayal of appellant, to which I now turn.

b) *Context of Specific Defamatory Statements*

A trier of fact could easily find the following.

Appellant is the only CDO manager mentioned by name in the relevant chapter of the book and is depicted as the poster child for the CDO managers described above. Appellant is portrayed as lining his own pockets and foisting doomed-to-fail portfolios upon investors. Although he was paid to monitor the amount of risk in the fund's portfolio, he worried only about volume because he was paid by volume. And, knowing that the default rate of residential mortgages was sufficient to wipe out the fund's holdings, appellant sold all his interests in the fund, passing all the risk to the fund's investors, who believed he was monitoring that risk. The portrayal of the appellant is particularly graphic because it purports to show his state of mind and his actions out of his own mouth.

The book states that appellant managed a fund controlling "roughly $15 billion, invested in nothing but CDOs backed by the triple-B tranche of a mortgage bond," described as "dog shit." *Id.* at 140. The book states that appellant had little training or background in CDO management because he had "spent most of his career working sleepy jobs at sleepy life insurance companies." *Id.* at 139. While appellant was paid to manage these investments to reduce risk, "he actually didn't spend a lot of time worrying about what **\*134** was in CDOs." *Id.* at 142. Indeed, the book portrays appellant as not caring about how much risk was borne by the fund's investors. Appellant is said to have stated that "he would rather have $50 billion in crappy CDOs than none at all, as he was paid mainly on volume." *Id.* at 144.

Moreover, the book depicts appellant as believing that the fund's portfolio was so risky that he had taken all his personal wealth out of the fund. When confronted by a dinner partner who knew that the rates of mortgage defaults were "already sufficient to wipe out [the fund's] entire portfolio," and who noted to appellant that he "must be having a hard time," appellant is quoted as responding, "No, ... I've sold everything out." *Id.* at 141. Although the book states that CDO managers generally keep a piece of the investment so as to assure investors that the manager's interests are aligned with the investors, appellant is said to have "almost giddily ... explained ... that he simply passed all the risk [of] ... default on to the big investors who had hired him to vet the bonds." *Id.* at 142. This statement thus portrays appellant as happily and knowingly putting his interests before those of the fund's investors whose interests he was paid to protect.

c) *The Merits*

The book's author admits that he does not use a fact checker, and much of what the book says about the appellant is known even now (before a trial) as false. For example, appellant's fund did not manage "nothing but CDOs backed by the triple-B tranche of a mortgage bond." *Id.* at 140. In fact, 38% of the assets were more highly rated. For another example, appellant spent only two of his 12–year career at life insurance companies, sleepy or not, and had substantial experience in CDO management. He did not make $26 million annually; his income was one-tenth of that.

These falsehoods provide the scenic background for the portrayal of the appellant as engaging in conduct that a trier of fact could find amounted to fraud in order to line appellant's own pockets. This portrayal can be described as non-defamatory only by declining to view it as a whole; by taking some of the statements and quotations entirely out of the context in which they were made; by finding that some statements have only a single and non-defamatory meaning when the book clearly intended a different and defamatory meaning, one adopted by readers, or so a trier could find; and by labeling some statements as opinion without regard to the facts that they imply.

For example, the chapter describes appellant as being paid vast sums "to be the CDO expert," *id.* at 142, and "to vet" the fund's portfolio, and in the book's words, to "monitor[ ] the ... bonds inside each CDO, and [to] replac[e] the bad ones, before they went bad, with better ones," *id.* at 141. However, the chapter states that in reality appellant "actually didn't spend a lot of time worrying about what was in [the] CDOs." *Id.* at 142. The description of appellant as being paid $26 million by investors to monitor risk while deliberately not doing so is considered, without discussion, not to be defamatory by my colleagues.

The claim that appellant did not monitor the risk in the fund's portfolio is made even worse by the charge that he failed to do so in order to increase his fees. Appellant is quoted as saying that he would "rather have $50 billion in crappy CDOs than none at all, as he was paid mostly on volume." *Id.* at 144. This remark is said by my colleagues to be non-defamatory because $10 worth of lousy stock (or $50 **\*135** billion in crappy CDOs) is worth more than none at all. That is not the single possible meaning of the quote; in fact, it is not even a plausible meaning. The quoted remark was not that $50 billion is worth more than nothing; the plain meaning was that

a high volume of CDOs led to a higher income for appellant without regard to the increased peril to investors. The book does not portray investors as believing they were choosing between (much less ended up with) $50 billion of crappy CDOs or nothing; they are portrayed as believing they were investing in a fund with ongoing monitoring of its portfolio. Instead, the book states that the monitoring extended only to the maximizing of appellant's fees. The book itself shows no doubt about this point; the paragraph that describes appellant's indifference to investors' risk quotes Eisman as thinking, "*You prick, you don't give a fuck about the investors....*" *Id.* at 143.

As noted, the book erroneously describes the fund as holding "nothing but CDOs backed by the triple-B tranche...." *Id.* at 140. My colleagues find this falsehood to be irrelevant because the "average reader" would not believe the difference between A–/A–3 rated securities and triple-B-rated securities to be significant. However, the book itself treats the distinction as of great significance by quoting Eisman to the effect that the triple-B tranche of a mortgage is "the engine of doom," *id.* at 140, and "the equivalent of three levels of dog-shit lower than the original bonds." *Id.* My colleagues inconsistently find these passages to be either not defamatory because the average reader would know undisputed facts that render the statements insignificant or opinions protected because the facts cannot be disproven.[2]

The book goes further and portrays appellant as knowing the risk had become so great he took his personal wealth out of the fund. The assertion that "I've sold everything out," *id.* at 141, is regarded by my colleagues as non-defamatory. This view simply ignores the context in which the purported statement was made: in response to a question of whether appellant was having a hard time because the mortgage default rate was so great as to wipe out the fund's entire portfolio. One could as easily say that a statement that a person took money handed him by a bank teller is not defamatory because one can ignore a prefatory statement about a concealed firearm and hold-up note.

The book's statement that the appellant had "almost giddily" made about "pass [ing] all the risk ... to the big investors who had hired him to vet the bonds," *id.* at 142, is held to be non-defamatory again only by ignoring the context. The inference clearly intended by the author was that appellant was well aware of the risks of "crappy CDOs," *id.* at 144, and concluded that they were too great for him to take personally. My colleagues find this non-defamatory because, they say, passing risk is the business of money managers; but the book

42 Media L. Rep. 2728

alleges far more than informed risk passing. It describes the appellant as not doing the monitoring of risk he was paid to do, privately caring only about volume rather than reducing risk because he was paid by volume, and, as he learned of the growing number of defaults in amounts that wiped out the fund's portfolio, selling his interests in the fund to pass all risk on to buyers who were deceived into believing that the risk was **\*136** being vetted. This description could easily serve as the opening statement in a civil or criminal fraud trial. *See Capital Mgmt. Select Fund Ltd. v. Bennett,* 680 F.3d 214 (2d Cir.2012) ("Private actions may succeed under Section 10(b) if there are particularized allegations that the contract itself was a misrepresentation, *i.e.,* the plaintiff's loss was caused by reliance upon the defendant's specific promise to perform particular acts while never intending to perform those acts."). Appellant's purported statements would then provide the evidence of knowing fraud. *Id.* However, my colleagues' view that only innocent meanings could as a matter of law be found by a trier of fact would render the admissions irrelevant.

The book's use of the adverb "giddily" in modifying appellant's purported description of his conduct suggests glee at accomplishing the fraud. My colleagues find this use as protected opinion because it does not imply facts that can be disproven. The book's use of the word "giddily" does not purport to be a quotation from Eisman, and my colleagues state that it is protected whether the opinion is Eisman's or Lewis's. "Giddily" in my view implies an observable, describable, physical manifestation that either occurred or did not, *i.e.,* a provable event. However, even conceding that the issue may be close with regard to Eisman's opinion, the issue is not at all close if it is Lewis's opinion. Such an opinion surely implies first-hand observation, and Lewis was admittedly not present at the conversation.

As my colleagues point out, a statement is defamatory if it exposes the individual "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace...." *Kimmerle v. N.Y. Evening Journal,* 262 N.Y. 99, 102, 186 N.E. 217 (1933). Whether a statement is defamatory is an issue of fact to be determined by a jury if it is "reasonably susceptible [to] a defamatory connotation." *Davis v. Ross,* 754 F.2d 80 (2d Cir.1985) (quoting *James v. Gannett Co.,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976)). Appellant has offered, in his opposition to summary judgment, evidence that since *The Big Short* was published, he has been professionally shunned as a result of its defamatory statements. For example, prior to the publication of the book, appellant was involved in marketing two real estate investment funds. However, because of the book, appellant's business partners, fearing that his involvement would discourage investors, asked appellant to step aside. Moreover, since November 2011, appellant was the Chief Financial Officer of a company that developed communications platforms. After several potential investors voiced concerns about appellant based on the book, the CEO asked appellant to step down from his role. This is sound evidence that the innocent meanings adopted as a matter of law by my colleagues are hardly the sole meaning intended by the author or understood by the book's readership.

Were the statements attributed to appellant described above introduced in a civil or criminal fraud trial in which he was the defendant, they would not be excluded on relevance grounds. And if the claims made by the book were proven in such a trial, we would unanimously affirm by summary order admission of the statements and a resultant judgment against appellant.

I, therefore, respectfully dissent.

### All Citations

771 F.3d 118, 42 Media L. Rep. 2728

Footnotes

1    Unless otherwise noted, the following facts are largely taken from the parties' Rule 56.1 statements and are undisputed.

2    Though largely irrelevant for purposes of this discussion, a CDO is a type of structured asset-backed security that evolved to encompass the mortgage and mortgage-backed securities market. Their ready availability and decline in quality is largely credited with fueling the subprime mortgage crisis.

3    Plaintiffs quote Statement 7, but make no argument about it in their briefs, and fail to rebut Lewis's position that any claim vis-à-vis this statement has been abandoned. Therefore, we consider any claim related to Statement 7 to be abandoned.

**Chau v. Lewis, 771 F.3d 118 (2014)**

42 Media L. Rep. 2728

We review a district court's grant of summary judgment de novo, drawing all reasonable inferences and resolving all ambiguities in favor of the non-movant. *Singer v. Ferro,* 711 F.3d 334, 339 (2d Cir.2013).

This being a dissent, I see no need to prolong matters by examining every statement alleged to be defamatory. I will limit my remarks to what seem to me to be the most seriously defamatory allegations.

Perhaps the book's 28–week presence on the *New York Times's* best-seller list was due to sales to below-average readers.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

902 N.Y.S.2d 707, 257 Ed. Law Rep. 1016, 2010 N.Y. Slip Op. 04902

74 A.D.3d 1528
Supreme Court, Appellate Division,
Third Department, New York.

Linda CLARK, Appellant,

v.

SCHUYLERVILLE CENTRAL
SCHOOL DISTRICT et al., Respondents.

June 10, 2010.

**Synopsis**
**Background:** High school teacher brought defamation action against school district and principal, after she was suspended for showing "R" rated motion picture to students. The Supreme Court, Saratoga County, Ferradino, J., dismissed complaint and teacher appealed. The Supreme Court, Appellate Division, Mercure, J.P., 24 A.D.3d 1162, 807 N.Y.S.2d 175, reinstated cause of action for defamation. Teacher moved to compel testimony and document production. The Supreme Court denied motion. Teacher appealed. The Supreme Court, Appellate Division, Mercure, J.P., affirmed. The Supreme Court, Saratoga County, Ferradino, J., then granted defendants summary judgment and denied teacher's motion for sanctions. Teacher appealed.

**[Holding:]** The Supreme Court, Appellate Division, Mercure, J., held that principal's statement was protected by qualified privilege from teacher's defamation claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (2)

**[1]      Libel and Slander** 🔑 Malice

In the context of defamation, "malice" includes spite, ill will, knowledge that a statement is probably false or a reckless disregard for its falsity, and that spite or ill will refers not to defendant's general feelings about plaintiff,

but to the speaker's motivation for making the defamatory statements.

4 Cases that cite this headnote

**[2]      Libel and Slander** 🔑 Common Interest in Subject-Matter

High school principal's alleged statement to school district's attorney, that teacher had shown an "R" rated film to students in violation of district's policies and procedures, was protected by qualified privilege from teacher's defamation claim, absent showing of malice; communication occurred between persons with common interest in the subject matter.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*\*707** Tuczinski, Cavalier, Gilchrist & Collura, P.C., Albany (Andrew W. Gilchrist of counsel), for appellant.

Girvin & Ferlazzo, P.C., Albany (Patrick J. Fitzgerald of counsel), for respondents.

Before: CARDONA, P.J., MERCURE, LAHTINEN, MALONE JR. and EGAN JR., JJ.

**Opinion**

MERCURE, J.

**\*1528** Appeals (1) from an order of the Supreme Court (Ferradino, J.), entered June 23, 2009 in Saratoga County, which granted defendants' motion for summary judgment dismissing the complaint, and (2) from an order of said court, entered June 23, 2009 in Saratoga County, which denied plaintiff's motion for sanctions.

The underlying facts are fully set forth in our prior decisions involving this action (57 A.D.3d 1145, 870 N.Y.S.2d 493 [2008], 24 A.D.3d 1162, 807 N.Y.S.2d 175 [2005] ). In separate orders, Supreme Court has now granted defendants' motion dismissing plaintiff's sole remaining cause of action for defamation, and denied plaintiff's motion **\*\*708** to strike defendants' answer and for a default judgment based upon the alleged spoliation of evidence. Upon plaintiff's appeal from both orders, we affirm.

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 37 of 230

Clark v. Schuylerville Central School Dist., 74 A.D.3d 1528 (2010)
902 N.Y.S.2d 707, 257 Ed. Law Rep. 1016, 2010 N.Y. Slip Op. 04902

 [1]    [2]    Plaintiff's defamation claim is based upon her assertion that defendant Thomas S. Martin, principal of Schuylerville Junior/Senior High School, stated to defendant Schuylerville Central School District's attorney that plaintiff had shown an "R" rated **\*1529** film to students in violation of the District's policies and procedures. Martin, however, denied ever having made the statement set forth in the complaint and plaintiff failed to raise a triable issue of fact in that regard. Moreover, plaintiff concedes that, even if made, the alleged statement would have been subject to a qualified privilege, unless it was made with malice, because the communication occurred between persons with a common interest in the subject matter (see *Foster v. Churchill,* 87 N.Y.2d 744, 751–752, 642 N.Y.S.2d 583, 665 N.E.2d 153 [1996]; *Liberman v. Gelstein,* 80 N.Y.2d 429, 437–439, 590 N.Y.S.2d 857, 605 N.E.2d 344 [1992] ). We note that in this context, malice includes spite, ill will, knowledge that a statement is probably false or a reckless disregard for its falsity, and that "spite or ill will refers not to defendant's general feelings about plaintiff, but to the speaker's motivation for making the defamatory statements" (*Liberman v. Gelstein,* 80 N.Y.2d at 439, 590 N.Y.S.2d 857, 605 N.E.2d 344; *see Foster v. Churchill,* 87 N.Y.2d at 752, 642 N.Y.S.2d 583, 665 N.E.2d 153). Inasmuch as plaintiff failed to present any competent evidence that the alleged statement was "made with an intent to harm [her,] ... with a reckless disregard for [its] truth, ... [or] solely because [Martin] disliked [her]" (*Foster v. Churchill,* 87 N.Y.2d at 752, 642 N.Y.S.2d 583, 665 N.E.2d 153), she failed to demonstrate an issue of fact regarding the existence of malice

sufficient to defeat the qualified privilege (see *id.; Liberman v. Gelstein,* 80 N.Y.2d at 438–439, 590 N.Y.S.2d 857, 605 N.E.2d 344; *cf. Curren v. Carbonic Sys., Inc.,* 58 A.D.3d 1104, 1107, 872 N.Y.S.2d 240 [2009] ).

Finally, as Supreme Court concluded in declining to impose sanctions on defendants, the record does not support a conclusion that Martin improperly destroyed documents related to this action. Plaintiff's vague and speculative allegations regarding prejudice arising from the alleged destruction of documents do not support a claim of spoliation (see *O'Connor v. Syracuse Univ.,* 66 A.D.3d 1187, 1191, 887 N.Y.S.2d 353 [2009], *lv. dismissed* 14 N.Y.3d 766, 898 N.Y.S.2d 92, 925 N.E.2d 97 [2010]; *see also Dobson v. Gioia,* 39 A.D.3d 995, 998, 834 N.Y.S.2d 356 [2007]; *cf. Cutroneo v. Dryer,* 12 A.D.3d 811, 813, 784 N.Y.S.2d 247 [2004] ).

The parties' remaining arguments, to the extent that they are not rendered academic by our decision, lack merit.

ORDERED that the orders are affirmed, without costs.

CARDONA, P.J., LAHTINEN, MALONE JR. and EGAN JR., JJ., concur.

**All Citations**

74 A.D.3d 1528, 902 N.Y.S.2d 707, 257 Ed. Law Rep. 1016, 2010 N.Y. Slip Op. 04902

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Declined to Extend by Restis v. American Coalition Against Nuclear Iran, Inc., S.D.N.Y., September 30, 2014

880 F.Supp.2d 494
United States District Court, S.D. New York.

Ashot EGIAZARYAN, Plaintiff,

v.

Peter ZALMAYEV, Defendant.

No. 11 Civ. 2670(PKC)(GWG)
|
July 30, 2012.

**Synopsis**

**Background:** Former Russian politician brought defamation action against author of newspaper articles and letters urging the United States to deny him asylum. Author moved to dismiss.

**Holdings:** The District Court, P. Kevin Castel, J., held that:

[1] politician's status as a public figure was law of the case; but

[2] the Court's prior determination that politician had adequately alleged false assertions of fact was not law of the case;

[3] author's statements in Jewish weekly newspaper were non-actionable opinions;

[4] author's statement in article implicating politician as anti-Semitic was non-actionable opinion;

[5] author's letters to elected official were expressions of non-actionable opinion; and

[6] author's letters to government officials responsible for homeland security and monitoring anti-Semitism expressed non-actionable opinion.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

West Headnotes (30)

[1] **Libel and Slander** Nature and elements of defamation in general

Under New York law, to adequately plead a defamation cause of action, a public figure is required to plausibly allege: (1) a defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party; (4) that was false; (5) made with the actual malice; (6) causing injury; and (7) not protected by privilege.

1 Case that cites this headnote

[2] **Libel and Slander** Existence and Effect of Malice

To act with actual malice, under New York law, the defendant must entertain serious doubts as to the truth of his publication.

[3] **Libel and Slander** By others in general

Under New York law, the original publisher is not liable for republication of allegedly libelous material when he had nothing to do with the decision to republish and he had no control over it.

[4] **Courts** Previous Decisions in Same Case as Law of the Case

Law of the case is concerned with the extent to which law applied in a decision at one stage of litigation becomes the governing principle in later stages of the same litigation.

More cases on this issue

[5] **Courts** Previous Decisions in Same Case as Law of the Case

As most commonly defined, the law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to

govern the same issues in subsequent stages in the same case.

More cases on this issue

**[6]**   **Courts** 🔑 Previous Decisions in Same Case as Law of the Case

The doctrine of law of the case comes into play only with respect to issues previously determined.

1 Case that cites this headnote
More cases on this issue

**[7]**   **Courts** 🔑 Dicta

Because the issue must have been determined, dictum, that is, a statement not essential to the holding, is not the law of the case.

2 Cases that cite this headnote

**[8]**   **Courts** 🔑 Previous Decisions in Same Case as Law of the Case

Even when the law of the case doctrine applies, it directs a court's discretion, it does not limit the tribunal's power.

More cases on this issue

**[9]**   **Federal Civil Procedure** 🔑 Grounds and Factors

The major grounds justifying reconsideration prior to entry of final judgment are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. Fed.Rules Civ.Proc.Rule 54(b), 28 U.S.C.A.

1 Case that cites this headnote

**[10]**   **Courts** 🔑 Jurisdiction, dismissal, nonsuit, and summary judgment, rulings relating to

Former Russian politician's status as a public figure was law of the case, in his defamation action against author of newspaper articles and letters urging the United States to deny him asylum, where the District Court previously

determined, in dismissing defamation claims in politician's original complaint, that politician was a public figure, and politician's additions to amended complaint alleging that he was little known in the United States and that most of author's alleged collaborators had not heard of him before author brought him to their attention did not in any way alter or reduce import of alleged facts on which the Court based its previous decision. Fed.Rules Civ.Proc.Rule 54(b), 28 U.S.C.A.

More cases on this issue

**[11]**   **Courts** 🔑 Jurisdiction, dismissal, nonsuit, and summary judgment, rulings relating to

District Court's prior determination, on motion to dismiss defamation claims in original complaint, that former Russian politician had adequately alleged false assertions of fact was not law of the case, in his defamation action against author of newspaper articles and letters urging the United States to deny him asylum, where the Court went on to hold that politician failed plausibly to allege that author acted with actual malice in making any assertions in the letters, and any conclusions as to whether the letters contained false assertions of fact were unnecessary to the holding.

More cases on this issue

**[12]**   **Libel and Slander** 🔑 Actionable Words in General

Under New York law, to support a defamation claim a statement must be one of fact, not opinion.

10 Cases that cite this headnote

**[13]**   **Libel and Slander** 🔑 Actionable Words in General

**Libel and Slander** 🔑 Falsity

Since falsity is a necessary element of a defamation cause of action under New York law, and only facts are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action.

2 Cases that cite this headnote

**[14]    Constitutional Law** 🔑 Opinion

**Libel and Slander** 🔑 Actionable Words in General

Statements of opinion are not proper subjects of a defamation action; instead, they receive absolute protection under the New York Constitution. N.Y.McKinney's Const. Art. 1, § 8.

4 Cases that cite this headnote

**[15]    Libel and Slander** 🔑 Actionable Words in General

To qualify as opinion, under New York law, a statement must be accompanied by a recitation of the accurate facts on which it is based.

**[16]    Libel and Slander** 🔑 Actionable Words in General

Under New York law, when a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable mixed opinion.

5 Cases that cite this headnote

**[17]    Libel and Slander** 🔑 Actionable Words in General

Under New York law, if the predicate facts are stated but are themselves false, to a degree that the difference between the stated facts and the actual truth would cause a reader to question the validity of the opinion, then that opinion may be an actionable defamatory opinion.

4 Cases that cite this headnote

**[18]    Libel and Slander** 🔑 Truth of part of defamatory matter; substantial truth

Under New York law, even when a statement is found to be a statement of fact, the statement is not itself a false defamatory fact if it is substantially true.

1 Case that cites this headnote

**[19]    Libel and Slander** 🔑 Truth of part of defamatory matter; substantial truth

Under New York law, when the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done.

1 Case that cites this headnote

**[20]    Libel and Slander** 🔑 Truth as justification in general

The proper test is whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced; under New York law, it is only necessary that the gist or substance of the challenged statements be true.

1 Case that cites this headnote

**[21]    Libel and Slander** 🔑 Construction of defamatory language in general

Under New York law, whether a particular statement expresses fact or opinion is a question that the court must decide as a matter of law.

2 Cases that cite this headnote

**[22]    Libel and Slander** 🔑 Actionable Words in General

Considering them in their context, author's statements in newspaper article implicating former Russian politician as anti-Semitic and/or anti-American were opinions that were not actionable as libel under New York law, where reasonable reader would understand that the article, which appeared in opinion section of Jewish weekly newspaper, was rife with epithets, fiery rhetoric, and hyperbole that signaled advocacy, and never stated that politician was anti-Semitic and anti-American, contained conclusions based on stated, substantially accurate facts, namely, politician's strong association with a group that

had a record of anti-Semitic and anti-American expression.

2 Cases that cite this headnote

**[23]** **Libel and Slander** Actionable Words in General

A statement must contain a provably false factual connotation in order to be an expression of fact.

**[24]** **Libel and Slander** Actionable Words in General

Words that are imprecise, whose meanings are debatable, loose, and varying, are insusceptible to proof of truth or falsity.

3 Cases that cite this headnote

**[25]** **Libel and Slander** Actionable Words in General

Considering them in their context, author's statements in newspaper article implying that former Russian politician was anti-Semitic was not intended as demonstrable fact, and, thus, was non-actionable opinion, under New York law, where the article had tone of a call for investigation based on what author had gleaned from the public record and from private sources and personal knowledge, and it stated that author did not purport to have undertaken a thorough investigation or to have deliberated over the statements.

**[26]** **Libel and Slander** Words Imputing Crime and Immorality

Author's letters to elected official, written for representatives of advocacy groups, allegedly falsely suggesting that former Russian politician embezzled or mismanaged funds and was responsible for war crimes or contributed to human rights violations while he was a member of Russia's lower house of parliament, were expressions of opinion, and thus were not actionable as libel under New York law, where they were unsworn missives from members of the public who were not parties

to any proceeding before the government, and they were notably speculative in tone, discussing concerns over purported information representatives had received, widely-held perceptions, and credible reports.

**[27]** **Libel and Slander** Actionable Words in General

Although false facts alleged in support of a defamatory opinion, may make the opinion actionable, under New York law, the opinion must have a defamatory character.

4 Cases that cite this headnote

**[28]** **Libel and Slander** Actionable Words in General

Under New York law, a statement is defamatory if it exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society.

2 Cases that cite this headnote

**[29]** **Libel and Slander** By others in general

Under New York law, the fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character.

**[30]** **Libel and Slander** Actionable Words in General

Author's letters stating that group of which former Russian politician had been a leader was anti-Semitic and anti-American, and that the United States should demonstrate its intolerance for bigotry by denying politician's bid for asylum, expressed non-actionable opinion, under New York law, where term "leader" had a debatable, loose, and varying meaning when used to describe relationship of politician to

political party he overtly represented, and the letters, addressed to government officials, represented advocacy.

3 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*497** Mark Carl Zauderer, Grant Alan Shehigian, Jason Todd Cohen, **\*498** Jonathan Daniel Lupkin, Flemming Zulack Williamson Zauderer, LLP, New York, NY, for Plaintiff.

Andrew J. Ryan, Salisbury & Ryan, LLP, New York, NY, James P. Golden, Thomas B. Roberts, Hamburg & Golden, P.C., Philadelphia, PA, for Defendant.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge:

Plaintiff Ashot Egiazaryan commenced this action in April 2011, asserting claims of defamation and injurious falsehood against defendant Peter Zalmayev. By Memorandum and Order dated December 7, 2011, this Court dismissed plaintiff's injurious falsehood claim and three of his four defamation claims. *Egiazaryan v. Zalmayev,* 2011 WL 6097136 (S.D.N.Y. Dec.7, 2011). Plaintiff thereafter sought leave to amend his complaint, which was granted. Plaintiff's amended complaint asserts the same four defamation claims but omits the claim of injurious falsehood. Defendant now moves to dismiss the amended complaint. Because plaintiff fails plausibly to allege that defendant made false assertions of fact, defendant's motion is granted, and leave to further amend is denied.

**BACKGROUND**

 I. *Parties and People*

Ashot Egiazaryan is a Russian businessman and was, at the time of the actions giving rise to his complaint, a member of the Duma, Russia's lower house of parliament. (Am Compl. ¶ 5.) He is "engaged in a complex international legal dispute" to recover his ownership interest in a project to redevelop the "landmark Moskva hotel." (*Id.* ¶ 16.) He alleges that a rival businessman, Suleyman Kerimov, and his associates

orchestrated a "corporate raid" to steal his ownership interest, and that Kerimov and his associates are behind various threats leveled against him and his family. (*Id.* ¶¶ 16, 18, 21–23.) Because of the threats, Egiazaryan moved with his family to the United States in 2010. (*Id.* ¶ 24.) Egiazaryan alleges that, were he and his family to return to Russia, they would "face a real and imminent risk of losing life and liberty." (*Id.* ¶ 27.)

Since his arrival in the United States, Egiazaryan has been the subject of negative publicity ("a black ... public relations campaign against Mr. Egiazaryan, designed to discredit him, undermine his chances of remaining in the United States and force him to return to Russia"). (*Id.*) Egiazaryan alleges that Kerimov is the "sponsor" of this negative publicity and that, through his company, Denoro, he has retained the public relations firm Public Strategies, Inc., and the investigative firm Thomas Dale & Associates to aid the "smear campaign." (*Id.* ¶ 8.)

Defendant Zalmayev is the director of the New York-based non-profit organization Eurasia Democracy Initiative. (*Id.* ¶ 6.) As detailed below, Zalmayev wrote or helped draft several newspaper articles and letters urging the United States to deny Egiazaryan asylum. Egiazaryan alleges that Zalmayev wrote and/or helped draft the articles and letters as part of his role as a "central figure in a dishonest smear campaign against Mr. Egiazaryan." (*Id.* ¶ 7.) Zalmayev describes his actions as an "aggressive advocacy campaign" against Egiazayran. (*Id.* ¶ 28.)

Zalmayev paid several people for assistance in generating publicity against Egiazaryan. Zalmayev paid two political consultants, Rinat Akhmetshin and Douglas Bloomfield, a total of $30,000. (*Id.* ¶¶ 9–10.) Egiazaryan alleges that Akhmetshin worked not only with Zalmayev but also "in concert with Public Strategies and Mr. Kerimov." (*Id.* ¶ 9.) Zalmayev also paid $7,000 to Leonid Komarovsky, a radio host and the apparent author of one of the negative articles. (*Id.* ¶ 63.) Egiazaryan **\*499** alleges that Kerimov provided Zalmayev the money for these payments. (*Id.* First ¶ 115 at p. 33.)

 II. *The Articles and Letters*

a. *Zalmayev Article (Count I)*

On March 9, 2011, the *Jewish Journal,* a Jewish weekly with 150,000 readers and a popular website, published an

article titled "Hiding in Beverly Hills," with Zalmayev listed as the author. (*Id.* ¶ 38 & Ex. A.) The online edition of the article, which is the one provided to the Court, appears in the "opinion" section of the website. (Ex. A.) The subject of the article is Egiazaryan, and it questions the desirability of his presence in the United States. (*Id.*) The article asserts that Egiazaryan is a "prominent financial backer and member of the ultranationalist Liberal Democratic Party of Russia (LDPR), headed by his friend Vladimir Zhirinovsky." (*Id.*) At one point, the article refers to the LDPR as the "Zhirinovsky–Egiazaryan party." (*Id.*) It goes on to assert that Jewish groups have "repeatedly condemned" Zhirinovsky and the LDPR as "anti-American" and "anti-Semitic." (*Id.*) The article concludes by commending Christian Dior's swift condemnation of designer John Galliano's anti-Semitic rant, and it urges the United States "likewise [to] put anti-Semites worldwide on notice: You are not welcome in this country." (*Id.*) Egiazaryan alleges that, contrary to the assertions of the article, he is not a member or leader of the LDPR, but instead is a "non-party candidate nominated to its parliamentary group." (Am. Compl. ¶ 55.) Egiazaryan also alleges that he is neither an anti-Semite nor a friend of Zhirinovsky. (*Id.* ¶¶ 53, 57).

### b. *Komarovsky Article (Count II)*

On March 14, 2011, the *Moscow Times,* an English-language daily published in Moscow and generally available online, published an article titled "No Safe U.S. Haven for Hatemongers," with Komarovsky listed as the author. (*Id.* Ex. B.) The online edition—again the format provided to the Court—appears in the "opinion" pages of the website. (*Id.*) Zalmayev wrote the *Moscow Times* article himself and submitted it under Komarovsky's name, because Zalmayev was dissatisfied with Komarovsky's earlier writing. (*Id.* ¶¶ 64–67.) The article asserts that Egiazaryan is a "long-standing member of the [LDPR], and, consequently its anti-Semitic and xenophobic agenda." (*Id.*) The article also makes reference to the Galliano scandal and urges "Washington [to] follow the example of the fashion label," and "get real on anti-Semitism" by creating a no-entry list for "anti-Semitic bigots like [E]giazaryan." (*Id.*) As noted, Egiazaryan denies that he is a "member" of the LDPR or that he is an anti-Semite. (*Id.* ¶¶ 73–74.)

### c. *Ponomarev and Alexeyeva Letters (Count III)*

Prior to the publication of the Zalmayev and Komarovsky articles, human rights activists Lev Ponomarev and Lyudmilla Alexeyeva sent letters to Representative Chris Smith, "Ranking Member of the Commission on Security and Cooperation in Europe," stating their concern over Egiazaryan's presence in the United States. (*Id.* Ex. C., Ponomarev Ltr., January 29, 2011, & Alexeyeva Ltr., January 30, 2011.) Zalmayev "admit[s] that he drafted the two letters and provided them to Mr. Ponomarev and Ms. Alexeyeva for their respective signatures." (*Id.* ¶ 80.)

Both letters assert that Egiazaryan is associated with the LDPR. (*Id.* Ex. C.) Both add the assertion that Egiazaryan helped create and then became deputy chairman of the Duma Committee for Assistance in Political Regulation and Observance of Human Rights in Chechnya (The "Chechnya Committee"). (*Id.*) Both repeat reports that funds entrusted to the **\*500** Chechnya Committee never reached their intended recipients. (*Id.*) The Ponomarev letter states that this makes Egiazaryan "a contributor to the destructive second Chechen war." (*Id.,* Ponomarev Ltr.) The Alexeyeva letter further states that the Committee "provid[ed] cover for the numerous well-documented atrocities during the war." (*Id.,* Alexeyeva Ltr.) Both letters reference the possible creation of a no-entry list; both urge the recipient to raise their concerns with the Department of State and the Department of Homeland Security so that those departments might investigate the appropriateness of Egiazaryan's continued presence in the United States. (*Id.*) Egiazaryan denies that the Chechnya Committee controlled the mislaid funds, and he further denies any implication that, as a result of his role on the Committee, he contributed to war crimes or human rights violations. (Am. Compl. ¶¶ 87–88.)

Ponomarev and Alexeyeva retracted their letters within days of signing them. (Am. Compl. Ex. D, Ponomarev Retraction & Alexeyeva Retraction, February 7, 2011.) Ponomarev stated that he "made a grave mistake." (*Id.*) Alexeyeva later explained in a radio interview that she "had been misled" and that Egiazaryan "did not do what I accused him of doing." (*Id.* ¶ 92.)

### d. *Freedom House Letters (Count IV)*

On March 14, 2011, the human rights organizations Freedom House, American Jewish Committee, and National Council on Soviet Jewry sent joint letters to the Department of Homeland Security and the United States Department of State

Office to Monitor and Combat Anti–Semitism (collectively, the "Freedom House Letters"). (*Id.* Ex. E.) The nearly identical letters assert that Egiazaryan "has for years been one of the leaders and a Duma representative of the LDPR, which is known for its virulently anti-Semitic, anti-American and xenophobic views." (*Id.*) The letters conclude by urging the United States to take swift action and deny any bid by Egiazaryan for asylum. (*Id.*) Zalmayev drafted these letters with help of Bloomfield and Akhmetshin. (*Id.* ¶ 99.)

III. *Dismissal of Defamation Claims in Original Complaint*
On December 7, 2011, this Court dismissed defamation Counts II, III, and IV of plaintiff's original complaint. 2011 WL 6097136. (Zalmayev did not move for dismissal of Count I.)

 **[1]**    The Court first held that plaintiff was a "public figure" for the purposes of defamation law and that he therefore had to meet a heightened pleading requirement. The Court explained that public figures are held to a heightened pleading standard in defamation cases both because of the importance of public debate and because public figures enjoy access to channels of effective communication to rebut allegations against them. *Id.* at *3–*4. The Court stated that public figures are those who have achieved " 'special prominence in the affairs of society.' " *Id.* at *3 (quoting *Gertz v. Robert Welch,* 418 U.S. 323, 344–45, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). The Court held that Egiazaryan was a public figure because he was a member of the Russian parliament, a banker who had arranged one of the largest loans ever made for a real estate project in Russia, and a man with the resources to employ "attorneys, consultants, and public relations professionals to fight the defendant's smear campaign." *Id.* at *4 (quoting Compl. ¶ 89.iii). Therefore, in order to adequately plead a defamation cause of action, Egiazaryan was required plausibly to allege "(1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that was false, (5) made with the actual malice (6) causing  **\*501**  injury, and (7) not protected by privilege." *Id.* at *5 (citing *Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (1st Dep't 1999); *Albert v. Loksen,* 239 F.3d 256, 265 (2d Cir.2001)).

 **[2]**    As to Counts III and IV, the Court held that Egiazaryan failed plausibly to allege actual malice. In order to act with actual malice, "the defendant 'must ... entertain serious doubts as to the truth of his publication.' " *Id.* at *7 (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). The Court examined whether Egiazaryan plausibly alleged that Zalmayev entertained

serious doubt as to the truth of two statements that the Court speculated were statements of fact: the fact implied in the Ponomarev and Alexeyeva Letters that Egiazaryan was "complicit in the mismanagement or misappropriation of humanitarian funds,"[1] and the fact stated in the Freedom House Letters that Egiazaryan was a "leader" of the LDPR. *Id.* at *7–*8. The Court held that Egiazaryan failed plausibly to allege that Zalmayev entertained serious doubts as to the truth of either assertion. *Id.* Egiazaryan attempted to sustain the allegation of actual malice in the Ponomarev and Alexeyeva Letters with allegations that Zalmayev had recruited others to his cause and that he had employed deliberate phrasing to create "guilt by association." *Id.* at *8. But those allegations established only Zalmayev's hostility to Egiazaryan; they said nothing about whether Zalmayev doubted the truth of the assertion that Egiazaryan was complicit in misappropriation. *Id.* at *8. As regards the Freedom House letters, Egiazaryan failed to establish that Zalmayev seriously doubted whether Egiazaryan was a leader of the LDPR simply because Zalmayev overlooked the distinction between being a prominent LDPR politician (the allegedly false assertion) and being a prominent politician who happens to occupy one of LDPR's seats in parliament (the alleged truth). *Id.*

 **[3]**    The Court held that Count II failed because Egiazaryan failed plausibly to allege that Zalmayev was responsible for publishing the *Moscow Times* article. In the original complaint Egiazaryan alleged only that the Komarovsky article was a "remix" of the Zalmayev article; he did not allege that Zalmayev had in fact written the article or that he had directly participated in its publication. "The original publisher is not liable for republication where he had 'nothing to do with the decision to [republish] and [he] had no control over it.' " *Id.* (quoting *Rinaldi v. Viking Penguin, Inc.,* 73 A.D.2d 43, 425 N.Y.S.2d 101, 104 (1st Dep't 1980)). The Court held that because Egiazaryan did not allege Zalmayev's involvement in the "remixed" article, Egiazaryan failed plausibly to allege Zalmayev's publication of the article.

On February 14, 2012, Egiazaryan moved for leave to amend his complaint. Egiazaryan asserted that, with the aid of evidence obtained during ongoing discovery, he could cure the deficiencies in his first complaint.[2] Leave to amend was granted, and on February 29, 2012, Egiazaryan filed his amended complaint.

## *502  DISCUSSION

I. *Standard of Review Under Rule 12(b)(6)*

Zalmayev now moves to dismiss Egiazaryan's amended complaint in its entirety. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In assessing plausibility, courts draw all reasonable inferences in favor of the non-movant. *See In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007). However, legal conclusions are not entitled to any assumption of truth, and a court assessing the sufficiency of a complaint disregards them. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Instead, the court examines only the well-pleaded factual allegations, if any, "and then determines whether they plausibly give rise to an entitlement to relief." *Id.* If not, the complaint must be dismissed.

II. *Law of the Case*

[4]  [5]  [6]  [7]  Both parties urge the Court to adopt statements from the Court's earlier opinion as the law of the case governing the present motion. "[L]aw of the case is concerned with the extent to which law applied in a decision at one stage of litigation becomes the governing principle in later stages of the same litigation." *Rezzonico v. H & R Block, Inc.,* 182 F.3d 144, 148 (2d Cir.1999). "As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). However, "[t]he doctrine of law of the case comes into play only with respect to issues previously determined." *Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Because the issue must have been determined, dictum, *i.e.,* a statement not essential to the holding, is not the law of the case. *See U.S. v. Hussein,* 178 F.3d 125, 129–30 (2d Cir.1999); Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 4478 at 664 (2002).

[8]  [9]  As Egiazaryan points out, even when the law of the case doctrine applies, it "directs a court's discretion, it does not limit the tribunal's power." *Arizona,* 460 U.S. at 618, 103 S.Ct. 1382. Rulings of a district court remain subject to revision "at any time before entry of final judgment." Rule 54(b), Fed R. Civ. P. "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *DiLaura v. Power Auth. of N.Y.,* 982 F.2d 73, 76 (2d Cir.1992) (quotations and citations omitted).

a. *Egiazaryan's Status as a Public Figure is the Law of the Case.*

[10]  Zalmayev argues that Egiazaryan's status as a public figure is the law of the case. (Def. Mem. 12.) Egiazaryan admits the same, but he asks the Court to "revisit" this conclusion based on new allegations in the amended complaint. (Pl. Mem. 25–26.) The only relevant additions to the amended complaint are allegations that Zalmayev described Egiazaryan as "little known" in the United States and that most of Zalmayev's alleged collaborators had not heard of Egiazaryan before Zalmayev brought him to their attention. (Am. Compl. ¶ 108.) These new allegations do not in any way alter or reduce the import of the alleged facts on which the Court based its first decision, *i.e.,* that *503 Egiazaryan was a prominent member of the Russian Parliament, a banker able to secure unprecedented loans based on his own business interests, and a man capable of—indeed, in the process of—marshalling his own channels of effective communication to combat Zalmayev's writings. *See* 2011 WL 6097136 at *4. Accordingly, the Court adheres to the established law of the case: Egiazaryan is a public figure.

b. *The Adequacy of Egiazaryan's Pleadings Regarding Assertions of Fact is Not the Law of the Case.*

[11]  Egiazaryan argues that the Court "recognized" that the allegedly false accusations in the Ponomarev and Alexeyeva Letters were actionable statements of fact. (Pl. Mem. 31.) The Court did state in its earlier opinion that Egiazaryan had adequately alleged false assertions of fact not only in the Alexeyeva and Ponomarev Letters but also in the Freedom House Letters. 2011 WL 6097136 at *7–*8. However, the Court then went on to hold that Egiazaryan failed plausibly to allege that Zalmayev acted with actual malice in making any assertions in the letters. *Id.* at *7–*9. Therefore, any conclusions as to whether the letters contained false assertions of fact were unnecessary to the holding and cannot operate as law of the case. *See Hussein,* 178 F.3d at 129–30; Wright,

*Miller & Cooper, supra,* § 4478 at 664. Even if the Court's earlier statements regarding false assertions of fact were the law of the case, the Court would revise those statements to "correct a clear error," *DiLaura,* 982 F.2d at 76, for the reasons stated in Part III, below.

### III. *Egiazaryan Fails Plausibly to Allege False Statements of Fact.*

Egiazaryan asserts, as he must to support this action, that the statements to which he objects are false statements of fact. This Court concludes that the statements are either not plausibly false or are statements of opinion. Therefore, the challenged statements cannot support a defamation action.

### a. *Applicable Law*

 **[12]**   **[13]**   **[14]**   In order to support a defamation claim a statement must be one of fact, not opinion. "Since falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, 'it follows that only statements alleging facts can properly be the subject of a defamation action.' " *Gross v. N.Y. Times Co.,* 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993) (quoting *600 W. 115th St. Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 139, 589 N.Y.S.2d 825, 603 N.E.2d 930 (1992)). Statements of opinion, on the other hand, are not proper subjects of a defamation action; instead, they receive "absolute protection" under the New York Constitution. *Celle v. Filipino Reporter Enters. Inc.,* 209 F.3d 163, 178 (2d Cir.2000).

 **[15]**   **[16]**   **[17]**   To qualify as opinion, the statement must be accompanied by a recitation of the accurate facts on which it is based. *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 289, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986). When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable "mixed opinion." *Id.* If the predicate facts are stated but are themselves false, to a degree that the difference between the stated facts and the actual truth would cause a reader to question the validity of the opinion, then that opinion may be an actionable "defamatory opinion." *Silsdorf v. Levine,* 59 N.Y.2d 8, 15–16, 462 N.Y.S.2d 822, 449 N.E.2d 716 (1983) (reinstating defamation claim based on letter accusing former mayor of corruption because listed facts demonstrating corruption were allegedly false); *see Como v. Riley,* 287 A.D.2d 416, 731 N.Y.S.2d 731, 731 (1st Dep't 2001).

 **\*504**   **[18]**   **[19]**   **[20]**   Similarly, even where a statement is found to be a statement of fact, the statement is not itself a false defamatory fact if it is substantially true. "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Cafferty v. S. Tier Publ'g Co.,* 226 N.Y. 87, 93, 123 N.E. 76 (1919). The proper test is whether "the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Fleckenstein v. Friedman,* 266 N.Y. 19, 23, 193 N.E. 537 (1934); *accord Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 302 (2d Cir.1986). Put sufficiently, "[u]nder New York law ... [i]t is only necessary that the gist or substance of the challenged statements be true," *Printers II, Inc. v. Professionals Publ'g, Inc.,* 784 F.2d 141, 146 (2d Cir.1986) (citations omitted).

 **[21]**   Whether a particular statement expresses fact or opinion is a question that the court must decide as a matter of law. *Id.* In order to distinguish expressions of opinion from expressions of fact, the New York Court of Appeals has adopted a variant of the four-factor "*Ollman* " analysis. The four *Ollman* factors are as follows:

"(1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous;

(2) a determination of whether the statement is capable of being objectively characterized as true or false;

(3) an examination of the full context of the communication in which the statement appears; and

(4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might 'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.' "

*Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550 (citing and quoting *Ollman v. Evans,* 750 F.2d 970, 978–84 (D.C.Cir.1984) (plurality opinion)). To provide a full understanding of how New York applies the *Ollman* analysis, the Court examines four decisions of the New York Court of Appeals.

1. *Steinhilber*

The Court of Appeals first adopted the *Ollman* analysis in *Steinhilber,* 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550. There, the court considered whether the defendant, a union official, had defamed the plaintiff, a picket-line crosser, in a message he recorded for a union telephone number. *Id.* at 286–87, 508 N.Y.S.2d 901, 501 N.E.2d 550. Through a serious of rude "one-liner" jokes, the defendant implied and/or expressed that the plaintiff was a dumb, ugly, fat, backstabbing, talentless failure. *Id.* at 287, 508 N.Y.S.2d 901, 501 N.E.2d 550. The *Steinhilber* defendants urged that all of the statements were protected opinions.

In determining whether the defendants' statements asserted facts or opinions, the court relied for guidance on the above-quoted *Ollman* factors and focused on the third and fourth, or contextual, factors. The court concluded that the context of the message itself made clear that the statements were all jokes intended as invective and that the broader social context —a punishing phone message during a heated labor dispute —would signal to listeners that it set forth pure opinion. *Id.* at 294, 508 N.Y.S.2d 901, 501 N.E.2d 550. The court accepted that at least one of the message's assertions, that plaintiff lacked talent, ambition, and initiative, could be taken as fact under the first and second of the *Ollman* factors; however, the court **\*505** found that the weight of the contextual factors overwhelmed the first two factors, stating that "even apparent statements of fact may assume the character of statements of opinion ... when made in public debate, heated labor dispute, or other circumstances in which an audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole." *Id.* (quoting *Info. Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 784 (9th Cir.1980) (quotation and citation omitted)).

2. *Immuno AG*

In *Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991), the Court of Appeals held that context should be the primary focus of the fact/opinion analysis. Plaintiff, a maker of "biologic blood products" had hoped to open a facility in Sierra Leone for hepatitis research involving chimpanzees. *Id.* at 240, 566 N.Y.S.2d 906, 567 N.E.2d 1270. Defendant, editor of the *Journal of Medical Primatology,* published a letter to the editor, written by Dr. Shirley McGreal, Chairwoman of the International Primate Protection League. *Id.* The

letter speculated that plaintiff's plan was intended to avoid legal restrictions on chimpanzee importation, that it would decimate the chimpanzee population, and that returning animals to the wild could cause hepatitis to spread. *Id.*

The case came before the Court of Appeals twice. On first hearing, the court affirmed the holdings of the Appellate Division that (1) there were no triable issues concerning the falsity of the avowedly factual statements in the McGreal letter, and (2) Dr. McGreal's other statements were protected opinion. *See id.* at 242, 566 N.Y.S.2d 906, 567 N.E.2d 1270. Thereafter, the U.S. Supreme Court decided *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). *Milkovich* reversed a state-court judgment that had relied heavily on the contextual *Ollman* factors in holding that the challenged statements were expressions of opinion. *Id.* at 9–10, 110 S.Ct. 2695. *Milkovich* "look[ed] at basically the same first two *Ollman* factors," but then "reduced [the contextual factors] essentially to one: type of speech," by which the Supreme Court "had in mind ... [only] rhetorical hyperbole, vigorous epithets and lusty and imaginative expression." *Immuno AG.,* 77 N.Y.2d at 244, 566 N.Y.S.2d 906, 567 N.E.2d 1270. The U.S. Supreme Court vacated the first *Immuno* ruling and remanded for reconsideration in light of *Milkovich.*

On remand, the Court of Appeals affirmed dismissal again, both on federal and on independent state-law grounds. The court's state-law analysis expressly departed from the federal-law analysis, because, under the federal "type of speech" analysis, "insufficient protection may be afforded to central values protected by the law of [New York] state." *Id.* at 250, 566 N.Y.S.2d 906, 567 N.E.2d 1270. Instead, the court held, *Steinhilber* "furnishes the operative standard in [New York]." *Id.* at 252, 566 N.Y.S.2d 906, 567 N.E.2d 1270. According to the court, the *Steinhilber* standard required focusing first, and primarily, on context:

> [A]n analysis that begins by looking at the content of the whole communication, its tone and apparent purpose better balances the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions.... [S]tatements must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying *any* facts.

*Id.* at 255, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (citation omitted).

As regards the broader context, the court noted that "the common expectation **\*506** of a letter to the editor is not that it will serve as a vehicle for the rigorous and comprehensive presentation of factual matter but as one principally for the expression of individual opinion." *Id.* at 253, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (quotation and citation omitted). Turning to the immediate context, the court emphasized that the journal had a specialized readership steeped in the issues addressed by the letter and that the author—and the institution she represented—had a clear, and clearly identified, point of view. *Id.* at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270. Furthermore, the letter made clear that its purpose was to draw attention to the situation. *Id.* In this context McGreal's conclusions, based on stated facts, were opinions. *Id.* at 255, 566 N.Y.S.2d 906, 567 N.E.2d 1270.

### 3. *Gross*

Two subsequent Court of Appeals cases applying the *Steinhilber* analysis demonstrate the determinative power of context. In *Gross v. N.Y. Times Co.,* 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993), the court reversed the dismissal of a libel action against the *New York Times.* Plaintiff was the City's Chief Medical Examiner. *Id.* at 149, 603 N.Y.S.2d 813, 623 N.E.2d 1163. Defendant newspaper published a series of investigative reports that alleged that plaintiff had altered autopsy reports in cases in which people died in police custody. *Id.* The articles included quotes from sources in the office that plaintiff had "ben[t] over backwards to help the police," and that he was either incompetent or "looking for a way out for the police." *Id.* According to the court "[t]he over-all thrust of the series was that plaintiff had issued false or misleading reports ... to protect the police and that his conduct ranged from 'highly suspicious' to 'possibly illegal.' " *Id.* (quoting articles).

The court held that, in the context of investigative news reports, allegations of cover-ups, "misleading" autopsy reports, and "possibly illegal" conduct would be understood as assertions of fact. *Id.* at 154, 603 N.Y.S.2d 813, 623 N.E.2d 1163. In the Court's view, the circumstances of the investigative reports, namely, their placement as a series of special features in the news section and their apparent basis in a "thorough investigation" and "deliberation," would have "encourag[ed] the reasonable reader to be less skeptical and more willing to conclude that [they] stat[ed] or impl[ied] facts." *Id.* (quoting *Von Gutfeld,* 80 N.Y.2d at 142, 589 N.Y.S.2d 825, 603 N.E.2d 930).

### 4. *Richardson*

In *Brian v. Richardson,* 87 N.Y.2d 46, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (1995), the court distinguished *Gross* and held that accusations of misbehavior and criminal conduct made in an op-ed in the *New York Times* were pure opinion. The defendant, a former United States Attorney General, had recently been the attorney for a software company. *Id.* at 48, 637 N.Y.S.2d 347, 660 N.E.2d 1126. He adopted and built upon the reports of one "Michael Riconosciuto, an out-of-fiction character" who claimed that the company's software had been stolen and pirated "as part of a payoff to [plaintiff] for helping to get some Iranian leaders to collude in the so-called October surprise, the alleged plot by the Reagan campaign in 1980 to conspire with Iranian agents to hold up release of the American Embassy hostages until after election." *Id.* at 49, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (quotations omitted). Defendant credited this sensational report based on its alleged corroboration by "credible ... informants from the world of covert operations." *Id.* He concluded by calling for the appointment of a special prosecutor. *Id.* at 49–50, 637 N.Y.S.2d 347, 660 N.E.2d 1126.

The court found the op-ed distinguishable from *Gross.* As regards broader context, **\*507** the court held that, unlike the investigative reports in *Gross* and similarly to the letter to the editor in *Immuno AG.,* the op-ed format created the "common expectation" that the communication would "represent the viewpoint of [its] author[ ] and ... contain considerable hyperbole, speculation, diversified forms of expression and opinion." *Id.* at 53, 637 N.Y.S.2d 347, 660 N.E.2d 1126. As regards immediate context, the court noted that the author disclosed that he was associated with the software company, thereby "signaling that he was not a disinterested observer." *Id.* Furthermore, the court noted, the defendant had stated the bases for his allegations, and based on those alleged facts had called for official investigation. *Id.* Under such circumstances, the court held, "a reasonable reader would understand the statements made about plaintiff as mere *allegations* to be investigated rather than as *facts.*" *Id.*

### b. *Application*

### 1. *Zalmayev Article*

**[22]**   Egiazaryan asserts that the Zalmayev article falsely concludes that Egiazaryan is anti-Semitic and anti-American, based on the false predicates that Egiazaryan is a "member" of the LDPR and a "friend" of Zhirinovsky. (Am. Compl. ¶¶ 52–57.)

The Court considers the alleged statements in their context. Beginning with the broader context, the article appears in the "opinion" section of the newspaper. As the Court of Appeals noted in both *Immuno AG.* and *Richardson,* editorial formats—in sharp contrast to news reporting, *e.g., Gross,* 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d 1163—create the "common expectation" that the communication would "represent the viewpoint of [its] author[ ] and ... contain considerable hyperbole, speculation, diversified forms of expression and opinion." *Richardson,* 87 N.Y.2d at 53, 637 N.Y.S.2d 347, 660 N.E.2d 1126; *see also Immuno AG.,* 77 N.Y.2d at 253, 566 N.Y.S.2d 906, 567 N.E.2d 1270. Turning to the immediate context, the article describes the author, Zalmayev, as the director of an organization "dedicated to fighting anti-Semitism and xenophobia," thereby "signaling that he was not a disinterested observer." *Richardson,* 87 N.Y.2d at 54, 637 N.Y.S.2d 347, 660 N.E.2d 1126; *see also Immuno AG.,* 77 N.Y.2d at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270. The article appeared in the *Jewish Journal,* a "Jewish weekly" (Am. Compl. ¶ 38), a choice of publication that seems calculated "to draw th[e] situation to the attention of interested parties," who bring to the article a "well-developed understanding of the issues" raised, *Immuno AG.,* 77 N.Y.2d at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270. While the tone of the article is undoubtedly serious, it is also rife with the "epithets, fiery rhetoric, [and] hyperbole," *Steinhilber,* 68 N.Y.2d at 294, 508 N.Y.S.2d 901, 501 N.E.2d 550 (quotation and citation omitted), that signal advocacy. (*See* Ex. A, *Jewish Times* Article, at 1–2) (finding various assertions and viewpoints "blasphemous," "repugnant," "reprehensible," "pernicious," and "insidious"; labeling Zhirinhovsky "infamous"; and coining phrase "Zhirinovsky–Egiazaryan party").

In this context, the reasonable reader would understand any implication that Egiazaryan himself is anti-Semitic and/or anti-American to be the opinion of a person "voicing no more than a highly partisan point of view." *Immuno AG.,* 77 N.Y.2d at 255, 566 N.Y.S.2d 906, 567 N.E.2d 1270. Zalmayev does not state that Egiazaryan is anti-Semitic or anti-American. Instead, as Egiazaryan recognizes when he decries Zalmayev's "guilt by association" tactics (*e.g.* Am. Compl. ¶ 117), Zalmayev states only that Egiazaryan is

strongly associated with a group, the LDPR, that has a record of anti-Semitic and anti-American expression. Even assuming **\*508** that Zalmayev thereby implies that Egiazaryan is himself anti-Semitic or anti-American—rather than asserting that anyone who willingly associates with anti-Semites and xenophobes should be shunned—it is overtly a "personal surmise built upon th[e] facts [of Egiazaryan's association with LDPR]." *Gross,* 82 N.Y.2d at 155, 603 N.Y.S.2d 813, 623 N.E.2d 1163.

Similarly, the statement that Egiazaryan is a "friend" of Zhirinovsky is the "rhetorical flourish or ... speculative accusation" of a partisan. *Id.* The reasonable reader would understand that, in this hyperbole-laden opinion piece, the designation of Egiazaryan as a "friend" of Zhirinovsky is another way of stating the author's opinion that a person long associated with the LDPR is probably allied with LDPR's leader and sympathetic to his views.

**[23]**   **[24]**   Moreover, in the context of the political associations involved in this case, the word "friend" is too vague, and the relationship it describes too immune to proof, to be an expression of fact. Even under the less protective federal standard, a statement must "contain a provably false factual connotation" in order to be an expression of fact. *Milkovich,* 497 U.S. at 19, 110 S.Ct. 2695. Words that are imprecise, whose meanings are "debatable, loose and varying," are "insusceptible to proof of truth or falsity." *Buckley v. Littell,* 539 F.2d 882, 894 (2d Cir.1976). Usage of words in the "realm of political debate" increases their imprecision. *Id.* For that reason, in *Buckley,* the Second Circuit held that the statement that a political commentator was a "fellow traveler" of fascism was an unprovable statement of opinion. *Id.* Like the phrase "fellow traveler," the word "friend," when used to describe the relationship of one prominent politician to another prominent politician with whom he has some association, has a meaning too "debatable, loose, and varying," *id.,* to be proven.

Zalmayev's assertion that Egiazaryan is a "member" of the LDPR may be an expression of fact. However, this statement need only be substantially true, and it is. For purposes of defamation law, a statement is substantially true if it "would [not] have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Fleckenstein,* 266 N.Y. at 23, 193 N.E. 537. The pleaded truth is that Egiazaryan was for many years a "nonparty candidate nominated to [LDPR's] parliamentary group." (Am. Compl. ¶ 55.) Egiazaryan also does not deny that he has

been a "prominent financial backer" of the LDPR. (*Id.* Ex. A.) Without special explanation—and none is provided by Egiazaryan—the allegation of membership in the LDPR seems likely to produce the same, or lesser, effect on the reader than the pleaded truth of long-time parliamentary representation and financial backing. "[T]he gist or substance of the challenged statement," *Printers II, Inc.,* 784 F.2d at 146, is, at worst, the same: Egiazaryan has long been associated with the LDPR. In sum, then, the Zalmayev article is a communication that the intended reader would understand to contain conclusions based on stated, substantially accurate facts—in other words, "pure opinion." *Steinhilber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550.

### 2. *Komarovsky Article*

 **[25]**    Egiazaryan asserts that the Komarovsky article falsely concludes that Egiazaryan is anti-Semitic, based on the false predicate that Egiazaryan is a "member" of the LDPR.[3] (Am. Compl. ¶¶ 72–75.)   **\*509**   As just discussed, Egiazaryan's membership in the LDPR is not plausibly false for present purposes. Accordingly, the only challenged statement is the alleged implication that Egiazaryan is anti-Semitic.

As with the Zalmayev article, the context of the Komarovsky article signals that any allegation of anti-Semitism is opinion, not fact. Beginning with the broader context, the Komarovsky article is another "opinion" piece, again creating the expectation of viewpoint and speculation. *See Richardson,* 87 N.Y.2d at 53, 637 N.Y.S.2d 347, 660 N.E.2d 1126; *see also Immuno AG.,* 77 N.Y.2d at 253, 566 N.Y.S.2d 906, 567 N.E.2d 1270. Turning to the immediate context, the Komarovsky article has fewer cues to partisanship than the Zalmayev article, but it has the tone, emphasized in *Richardson,* of a call for investigation based on what the author had "gleaned from the public record and from private sources and personal knowledge." 87 N.Y.2d at 54, 637 N.Y.S.2d 347, 660 N.E.2d 1126. Specifically, the apparent author, Komarovsky, relayed what he had gleaned from listeners to his radio show, certain identified critics and human rights lawyers, and from personal and public knowledge about Egiazaryan and the LDPR; based on this information, he urged "the relevant judicial authority" to "swiftly review [the] merits" of Egiazaryan's application to reside in the United States. (Am. Compl. Ex. B.) The author, who is identified as a "journalist," "host of a ... radio talk show," and "new American ... concerned about unsavory characters ... try[ing] to fool the public and the justice system," (*id.*) is

not a news writer for the periodical and does not purport to have undertaken a "thorough investigation" or to have "deliberat[ed]" over the statements, *Gross,* 82 N.Y.2d at 156, 603 N.Y.S.2d 813, 623 N.E.2d 1163. "Given this contextual background, ... a reasonable reader would understand the statements defendant made about plaintiff as mere *allegations* to be investigated." *Richardson,* 87 N.Y.2d at 54, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (distinguishing *Gross,* 82 N.Y.2d at 155–56, 603 N.Y.S.2d 813, 623 N.E.2d 1163). As such, any implication of anti-Semitism is not intended as "demonstrable fact" and is non-actionable opinion. *See id.*

### 3. *Ponomarev and Alexeyeva Letters*

 **[26]**    Egiazaryan argues that Ponomarev and Alexeyeva letters "falsely suggest" that he "embezzled or mismanaged funds" and that he was "responsible for war crimes or contributed to human rights violations." (Am. Compl. ¶¶ 87–89.) Egiazaryan also alleges that the reports cited in the letters are false to the extent that they state or imply that the Committee managed funds that did not reach their intended recipients. (*Id.* ¶ 87.)

Turning first to the broader context, these are letters to an elected official from representatives of advocacy groups. They are unsworn missives from members of the public who are not parties to any proceeding before the government. In general, substantial leeway is afforded to this sort of petitioning activity. *See, e.g., E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 140–141, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (because "extreme caution" warranted in regulating political activity, Court will not construe Sherman Act to prohibit "widespread" "unethical" and "decept[ive]" public relations practices designed to make "propaganda circulated by a party in interest" appear independent). Perhaps as a result, government officials and their staffs treat such submissions with skepticism. Two examples of this skepticism are found in Egiazaryan's own pleadings. First, Egiazaryan alleges **\*510** that when an assistant to Senator Benjamim Cardin received copies of the Alexeyeva and Ponomarev letters, the staffer questioned the format and, indicating that he understood such letters to be parts of larger advocacy campaigns, questioned who was organizing the campaign. (Am. Compl. ¶ 83.) Second, Egiazaryan alleges that when a congressional staffer was given a copy of the *Jewish Times* article to support a condemnation of Egiazaryan in the Congressional Record, the staffer refused to act, understanding that the article merely

speculated as to Egiazaryan's anti-Semitism without offering hard proof. (*Id.* ¶ 118.) The broader context indicates that these advocacy-campaign letters are a type of communication that the intended reader expects will contain opinion and speculation.

The immediate context also signals to the intended reader to expect opinion and speculation. The apparent authors are, respectively, a "member of" and the "chairperson of" the Moscow Helsinki Group, Russia's "largest" and "oldest" human rights organization (*Id.* Ex. C), thus indicating that they are "not ... disinterested observer[s]." *Richardson,* 87 N.Y.2d at 53, 637 N.Y.S.2d 347, 660 N.E.2d 1126; *compare id., and Immuno AG.,* 77 N.Y.2d at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270, *with Gross,* 82 N.Y.2d at 156, 603 N.Y.S.2d 813, 623 N.E.2d 1163. The letters are addressed to an elected official, Representative Chris Smith, serving on a Committee charged with monitoring "[s]ecurity and [c]ooperation" in the region in which the advocates work. (Am. Compl. Ex. C). Presumably, Representative Smith is an "interested part[y]," who brings to the article a "well-developed understanding of the issues" raised. *Immuno AG.,* 77 N.Y.2d at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270. The letters are also notably speculative in tone, discussing their "concerns" over "information [they] have received," "widely-held perception [s]," and "credible reports." (Am. Compl. Ex. C, Ponomarev Ltr.; *see also id.,* Alexeyeva Ltr.) And, as in *Richardson,* 87 N.Y.2d at 53–54, 637 N.Y.S.2d 347, 660 N.E.2d 1126, based on these reports, the authors urge investigation, requesting that the recipients "inquire" and "raise their concerns" with the relevant governmental officials. (Am. Compl. Ex. C.) As such, these letters are both calls for investigation, *see Richardson,* 87 N.Y.2d at 54, 637 N.Y.S.2d 347, 660 N.E.2d 1126, and attempts to "draw the situation to the attention of interested parties," *Immuno AG.,* 77 N.Y.2d at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270. They are not, by contrast, conclusions of an exhaustive investigation undertaken by disinterested parties and offered as matters of general interest. *E.g. Gross,* 82 N.Y.2d at 156, 603 N.Y.S.2d 813, 623 N.E.2d 1163.

In this context, the challenged statements are expressions of opinion. Even accepting Egiazaryan's assertion that the letters "suggest that [he] was responsible for war crimes or contributed to human rights violations," (*Id.* ¶ 88) these are not assertions of fact. First, these allegations, vaguely imputing to an elected official responsibility for wrongs that occurred during his incumbency, are not specific or provable enough to stand as assertions of fact. *See Buckley,* 539 F.2d

at 894. Second, the intended reader would readily view such hyperbolic suggestions as an advocate's "rhetorical flourish or ... speculative accusation," *Gross,* 82 N.Y.2d at 155–56, 603 N.Y.S.2d 813, 623 N.E.2d 1163, based on the stated predicates.

More importantly, a fair reading of the letters does not disclose the assertions that Egiazaryan finds in them. The letters do not accuse Egiazaryan of responsibility for war crimes, contributing to human rights violations, or, lastly, embezzlement. Instead, the letters first note Egiazaryan's **\*511** role in founding and leading the Committee. The letters then allege that reports exist stating that the Committee's "management" (Am. Compl. Ex. C., Alexeyeva Ltr.) of funds "entrusted" to it (*Id.,* Ponomarev Ltr.) resulted in a "large portion" (*id.*) not reaching its intended recipients. The Ponomarev letter concludes that "therefore, [E]giazaryan was a contributor to the destructive second Chechen war." (*Id.*) The Alexeyeva Letter draws no conclusions; it ends by urging an airing of the "concerns." (*Id.,* Alexeyeva Ltr.) The fair reading is that the author believes Egiazaryan bears responsibility for mismanagement by the Committee because he was a founder and leader of the Committee.[4] There is no accusation that Egiazaryan misappropriated or obtained the use or benefit of any of the funds. The assertion that funds for reconstruction in a war zone did not reach their intended recipients does not accuse Egiazaryan himself of venality or gross negligence.[5] The author is asserting an opinion about Egiazaryan's shared supervisory responsibility, not asserting facts about Egiazaryan's personal actions.

**[27]   [28]**   Finally, the alleged falsity of reports that funds managed by the Chechnya Committee did not reach their intended recipients does not support a defamation action. The allegation is not a defamatory statement *about* Egiazaryan and so cannot support a defamation action on its own. *See Albert,* 239 F.3d at 265 (statement must be "of and concerning" plaintiff). Although false facts alleged in support of a "defamatory opinion," may make the opinion actionable, *Silsdorf,* 59 N.Y.2d at 15–16, 462 N.Y.S.2d 822, 449 N.E.2d 716, the opinion must have a defamatory character. A statement is defamatory if it "exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induce[s] an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society.' " *Celle,* 209 F.3d at 177 (quoting *Kimmerle v. N.Y. Evening Journal,* 262 N.Y. 99, 102, 186 N.E. 217 (1933)). Here, the opinion expressed, which amounts

to an accusation of failed oversight, would not result in "hatred," "shame," "ostracism" or any of the other extreme results covered by the above-quoted definition. Because the allegedly false fact is not about Egiazaryan and also does not form the basis of a defamatory opinion about him, its alleged falsity does not support a defamation action.

 [29]  Moreover, even if the allegation that reconstruction of funds did not reach their intended recipients could support a defamation action, it would not in this case because it is, in context, no more than another "allegation[ ] to be investigated." *Richardson,* 87 N.Y.2d at 54, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (emphasis removed).  **\*512**  The Court recognizes that "the fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character." *Id.* However, this was not a hurdle to the *Richardson* court's finding that the specific and sensational assertions in that case, which seemed to demand little in the way further inquiry, were non-actionable statements to be investigated. *See id.* at 49, 637 N.Y.S.2d 347, 660 N.E.2d 1126. Here, the reports make unelaborated assertion that government funds destined for a war zone did not reach their intended recipients. At least as much as in *Richardson,* "the[se] charges were included not necessarily to convince the reader of the plaintiff's dishonesty but rather to demonstrate the need for an investigation." *Id.* at 54, 637 N.Y.S.2d 347, 660 N.E.2d 1126.

### 4. *Freedom House Letters*

 [30]  The bases for the fourth defamation count are the Freedom House letters. The nearly identical letters state that the LDPR is anti-Semitic and anti-American; that Egiazaryan has been a "leader" of the LDPR; and that leaders of the LDPR should be "boycott[ed]." (Am. Compl. Ex. E.) The letters conclude that "the United States government must once again demonstrate its intolerance for bigotry by denying [Egiazaryan's] bid for asylum." (*Id.*) Egiazaryan asserts that the letters falsely accuse him of "anti-Semitic [and] anti-American ... views" (*id.* ¶ 103) based on the false predicate that he is a "leader" of the LDPR (*id.* ¶ 74).

For much the same reason that Egiazaryan's alleged friendship with Zhirinovsky is an expression of opinion, the assertion that Egiazaryan is or was a "leader" of the LDPR is an expression of opinion. When used in political discourse, terms of relation and association often have

meanings that are "debatable, loose, and varying," rendering the relationships they describe insusceptible of proof of truth or falsity. *Buckley,* 539 F.2d at 894. The word "leader" has a debatable, loose and varying meaning when used to describe the relationship of a prominent politician to the political party he overtly represents. Egiazaryan is an admittedly "prominent" former banker who assumed managerial roles in the Duma while occupying an LDPR seat there for over a decade. Given the vagueness of the word "leader" in this context, and given Egiazaryan's admitted prominence and overt association with the LDPR, the assertion that he is a "leader" of the LDPR is a non-provable opinion.

To the degree the Freedom House Letters can be fairly read to accuse Egiazaryan of being anti-Semitic or anti-American —rather than asserting that he is unfit for asylum simply because of his association with the LDPR—those accusations are also expressions of opinion. Beginning with the broader context, the Freedom House Letters are, like the Ponomarev and Alexeyeva letters, petitions to the government from advocacy groups, and, for the reasons explained in discussing the Ponomarev and Alexeyeva letters, the intended reader would expect speculation and opinion. *See* Part III.b.3, *supra.* The immediate context also signals that the letters contain opinion. First, the letters, coming from self-identified "major U.S. Jewish and human rights organizations" who have "consistently condemned LDPR's message of hate," (Am. Compl. Ex. E.) are overt works of advocacy. *Compare Immuno AG.,* 77 N.Y.2d at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270, *and Richardson,* 87 N.Y.2d at 54, 637 N.Y.S.2d 347, 660 N.E.2d 1126, *with Gross,* 82 N.Y.2d at 156, 603 N.Y.S.2d 813, 623 N.E.2d 1163. Second, the letters, addressed to government officials responsible for homeland security and monitoring anti-Semitism, **\*513** respectively, are clearly calculated "to draw th[e] situation to the attention of interested parties," who bring to the article a "well-developed understanding of the issues" raised. *Immuno AG.,* 77 N.Y.2d at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270. Third, there is no implication that the authors base their statements on a special investigation into Egiazaryan's background. *E.g. Gross,* 82 N.Y.2d at 156, 603 N.Y.S.2d 813, 623 N.E.2d 1163. In this context, any conclusion that Egiazaryan himself is anti-Semitic and/or anti-American is "personal surmise," *Gross,* 82 N.Y.2d at 155, 603 N.Y.S.2d 813, 623 N.E.2d 1163, based solely on Egiazaryan's being a leader of the LDPR—no other predicates are stated or implied. The challenged statements— if they exist in the letters—are opinions.

As a final note regarding allegations of anti-Semitism, the Court does not resolve the parties' debate over whether "anti-Semite" is a term of sufficient specificity and provability to support a defamation claim. Plaintiff offers a host of cases supporting the proposition that false allegations of anti-Semitic and racist acts can be sufficiently factual, and damaging, to support defamation actions. (Pl. Mem. 28–30.) Defendant argues that all of the cited cases concern demonstrably false allegations regarding the plaintiffs' actions, not their beliefs, and offers cases in which defamation actions based on allegations of racism have been dismissed. (Def. Reply Mem. 15–16 & n. 2.) In this action, the positions of the parties, however resolved, are not controlling. The Court assumes arguendo that accusations of anti-Semitism generally, even apart from false allegations of anti-Semitic acts, can be defamatory statements of fact. The Court concludes that in the present context they are statements of opinion. *See, e.g., Steinhilber,* 68 N.Y.2d at 294, 508 N.Y.S.2d 901, 501 N.E.2d 550 (assuming that assertion of lack of talent, etc., could be factual, but holding that circumstances make the assertion a statement of opinion).

IV. *Leave to Amend is Denied.*

Egiazaryan asks for leave to further amend his pleadings in the event the Court dismisses the Amended Complaint. The basis for this request is that ongoing discovery allegedly has revealed and will continue to reveal further evidence demonstrating Zalmayev's actual malice. (Def. Mem. 34–35.) The Court has concluded as a matter of law that all of the challenged statements are statements of opinion or are not plausibly false. *See* Part III, *supra.* It was not necessary for the Court to reach the allegations of actual malice. Further amendment has no prospect of altering the Court's legal conclusion.

### *CONCLUSION*

For the foregoing reasons, defendant's motion to dismiss (ECF No. 117) is GRANTED.

SO ORDERED.

### All Citations

880 F.Supp.2d 494

Footnotes

1    Notwithstanding the language of this Court's prior Memorandum and Order, neither the Ponomarev nor Alexeyeva Letter accuses Egiazaryan of complicity in the "misappropriation" of any funds. The letters assert that a "large portion" of funds allocated for reconstruction did not reach their intended recipients. (Am. Compl. Ex. C., Ponomarev Ltr.; *see also id.,* Alexeyeva Ltr.)

2    Zalmayev's first motion to dismiss did not encompass Count I, relating to the Zalmayev article, and discovery continued during the pendency of the motion.

3    Egiazaryan also denies that he is a "leader" of the LDPR (Am. Compl. ¶ 74), but the Komarovsky article does not assert that Egiazaryan is a leader of the LDPR. The Freedom House Letters state that Egiazaryan is or was a leader of the LDPR. (*Id.* Ex. E.) The status of that statement in that context is discussed in Part III.b.3, *infra.*

4    At his deposition, excerpts of which Egiazaryan has included in his present submissions, Zalmayev asserted that the any allegations against Egiazaryan regarding his "Chechen record" were based on his association with the Committee. (Lupkin Decl., May 4, 2012, Ex. 2, at 211–12 ("He was associated with the [Committee], and therefore in my opinion and view he was associated with whatever the [Committee] was known for and its results, the results of its work, whatever allegations were made against it.").)

5    *Cf.* Office of the Special Investigator for Iraq Reconstruction, *Final Forensic Audit Report of Iraq Reconstruction Funds,* Preface (July 13, 2012), *available at* http://www.sigir.mil/files/audits/12–017.pdf. ("SIGIR audits, inspections, and investigations have found serious weaknesses in the government's controls over Iraq reconstruction funds that put billions of American taxpayer dollars at risk of waste and misappropriation.")

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

553 F.Supp.3d 48
United States District Court, S.D. New York.

Linda FAIRSTEIN, Plaintiff,

v.

NETFLIX, INC., Ava DuVernay
and Attica Locke, Defendants.

20-cv-8042 (PKC)
|
Signed 08/09/2021

**Synopsis**
**Background:** Former county prosecutor who had supervisory authority over sexual assault case, which led to convictions of five teenagers of color who were eventually exonerated, brought action for defamation under New York law against online streaming service, director, and writer of docudrama depicting sexual assault case and its aftermath. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, P. Kevin Castel, Senior District Judge, held that:

[1] scene depicting prosecutor's presence at scene of crime did not have defamatory meaning;

[2] prosecutor's public remarks did not establish that scene depicting prosecutor's role in creation of timeline for sexual assault case was substantially true;

[3] scenes depicting prosecutor discussing "surprising" defense with undisclosed DNA evidence were mixed opinion that could support defamation claim;

[4] scene depicting colleague criticizing prosecutor for coercing defendants into confessing was not pure opinion;

[5] scene depicting prosecutor directing interrogation had defamatory meaning;

[6] scene depicting prosecutor directing police to engage in discriminatory canvas had defamatory meaning; and

[7] scene depicting prosecutor referring to suspects as "animals" did not have defamatory meaning.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (53)

**[1]** **Federal Civil Procedure** ← Matters considered in general

In deciding a motion to dismiss for failure to state a claim, the district court is limited to the factual allegations of the complaint, materials that are attached by the complaint or integral thereto, and matters of which the court may take judicial notice. Fed. R. Civ. P. 12(b)(6).

5 Cases that cite this headnote

**[2]** **Federal Civil Procedure** ← Insufficiency in general

**Federal Civil Procedure** ← Matters deemed admitted; acceptance as true of allegations in complaint

In assessing the sufficiency of a pleading on a motion to dismiss for failure to state a claim, a court must disregard legal conclusions, which are not entitled to the presumption of truth; instead, the court must examine the well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement to relief. Fed. R. Civ. P. 12(b)(6).

**[3]** **Federal Civil Procedure** ← Clear or certain nature of insufficiency

Dismissal of a complaint for failure to state a claim is appropriate when it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law. Fed. R. Civ. P. 12(b)(6).

4 Cases that cite this headnote

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**[4]** **Federal Civil Procedure** 🔑 Pleading, Defects In, in General

A motion to dismiss for failure to state a claim challenges only the legal feasibility of a complaint. Fed. R. Civ. P. 12(b)(6).

**[5]** **Summary Judgment** 🔑 Summary Judgment

The test of a claim's substantive merits is reserved for the summary judgment procedure, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule. Fed. R. Civ. P. 56.

**[6]** **Federal Civil Procedure** 🔑 Matters considered in general

A court reviewing a motion to dismiss for failure to state a claim takes no account of the complaint's basis in evidence and may review only a narrow universe of materials; such materials include documents incorporated in the complaint, matters of which judicial notice may be taken, and documents that are integral to the complaint, even if they are not expressly incorporated. Fed. R. Civ. P. 12(b)(6).

5 Cases that cite this headnote

**[7]** **Federal Civil Procedure** 🔑 Matters considered in general

**Summary Judgment** 🔑 Motion to dismiss

Episodes of docudrama depicting sexual assault case were integral to former prosecutor's defamation complaint against docudrama's director, writer, and streaming service, and, thus, on defendants' motion to dismiss for failure to state a claim, district court could consider episodes of docudrama without converting motion into one for summary judgment, where complaint extensively referenced docudrama's contents, including quotations of dialogue and descriptions of scenes accompanied by timestamps of relevant sequences, defendants submitted electronic copy of docudrama as part of their motion papers, and prosecutor stated

that docudrama was integral to complaint and requested that court consider it when evaluating motion. Fed. R. Civ. P. 12(b)(6), 56.

1 Case that cites this headnote
More cases on this issue

**[8]** **Evidence** 🔑 Local government proceedings and acts

Would district court take judicial notice of public remarks?**Yes**
District court would take judicial notice of public remarks that prosecutor, who brought defamation action against director, writer, and online streaming service, made to city council's public safety committee regarding prosecution that was subject of dramatization. Fed. R. Evid. 201(b)(2), 201(c)(2).

More cases on this issue

**[9]** **Evidence** 🔑 Administrative proceedings and acts

An official's statements to a governmental body are precisely the sort of materials of which courts may take judicial notice.

**[10]** **Libel and Slander** 🔑 Actionable Words in General

**Libel and Slander** 🔑 Falsity

Under New York law, "defamation" is defined as the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.

1 Case that cites this headnote

**[11]** **Libel and Slander** 🔑 Nature and elements of defamation in general

The elements of defamation under New York law are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence

standard, and it must either cause special harm or constitute defamation per se.

**[12]    Libel and Slander** 🔑 Words Tending to Injure in Profession or Business

Under New York law, a statement is defamatory on its face when it suggests improper performance of one's professional duties or unprofessional conduct.

**[13]    Libel and Slander** 🔑 Actionable Words in General

Under New York law, not all or even most maligning remarks can be considered defamatory; a statement is defamatory if it exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of their confidence and friendly intercourse in society.

**[14]    Libel and Slander** 🔑 Matter imputed

New York recognizes a defamation claim when a statement is not defamatory on its face and instead alleges an innuendo that attaches a defamatory meaning to language referencing a plaintiff.

2 Cases that cite this headnote

**[15]    Libel and Slander** 🔑 Actionable Words in General

Under New York law, in a claim of defamation per quod, no defamatory statement is present on the face of the communication at issue, but a defamatory import arises through reference to facts extrinsic to the communication.

4 Cases that cite this headnote

**[16]    Libel and Slander** 🔑 Actionable Words in General

**Libel and Slander** 🔑 Construction of defamatory language in general

A plaintiff bringing a claim of defamation per quod under New York law needs to show that the challenged language was capable of communicating the alleged defamatory idea when words were given meaning not ordinarily attributed to them or due to external factors; whether the allegedly libelous language is capable of the libelous meaning charged by innuendo is a matter of law for the courts to decide.

5 Cases that cite this headnote

**[17]    Libel and Slander** 🔑 Office and functions

Under New York law, to support a claim of defamation per quod, the innuendo at issue may not enlarge upon the meaning of words so as to convey a meaning that is not expressed.

**[18]    Libel and Slander** 🔑 Necessity and propriety

Under New York law, a plaintiff asserting a claim of defamation per quod must identify a plausible defamatory meaning of the challenged statement or publication.

2 Cases that cite this headnote

**[19]    Libel and Slander** 🔑 Construction of defamatory language in general

Under New York law, if the statement giving rise to a claim of defamation per quod is susceptible of only one meaning the court must determine, as a matter of law, whether that one meaning is defamatory.

**[20]    Libel and Slander** 🔑 Construction of defamatory language in general

Under New York law, if the words of a statement at issue in a claim of defamation per quod are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the

issue solely as a matter of law, to determine in what sense the words were used and understood.

**[21]    Libel and Slander** 🔑 Construction of language used

In deciding whether a statement is defamatory under New York law, courts will not strain to interpret allegedly defamatory works in their mildest and most inoffensive sense to hold them nonlibelous, but they also will not strain to find a defamatory interpretation where none exists.

**[22]    Libel and Slander** 🔑 Judicial officers

For purpose of determining whether former prosecutor who was depicted in docudrama plausibly alleged that such depiction was defamatory under New York law in context of docudrama as a whole, average viewer of docudrama would understand that dramatization's dialogue was not verbatim recounting of events but was intended to capture essence of prosecutor's and other real-life participants' words and deeds; docudrama starred famous actors and was distributed to paying subscribers of online streaming service, and docudrama genre, with which viewers were likely to be familiar, often relied heavily on dramatic interpretations of events.

**[23]    Libel and Slander** 🔑 Truth as justification in general

**Libel and Slander** 🔑 Truth of part of defamatory matter;  substantial truth

Under New York law, because the falsity of a statement is an element of a defamation claim, the statement's truth or substantial truth is an absolute defense.

1 Case that cites this headnote

**[24]    Libel and Slander** 🔑 Truth of part of defamatory matter;  substantial truth

Under New York law, a statement is substantially true, for purposes of a defamation claim, if the

statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced.

1 Case that cites this headnote

**[25]    Libel and Slander** 🔑 Falsity

In determining whether a statement is false, as an element of a claim of defamation under New York law, courts typically compare the complained-of language with the alleged truth to determine whether the truth would have a different effect on the mind of the average reader; if the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain the claim of defamation, no legal harm has been done.

**[26]    Federal Civil Procedure** 🔑 Affirmative Defenses, Raising by Motion to Dismiss

The issue of whether a statement at issue in a defamation action under New York law is substantially true may present an issue of law properly decided on a motion to dismiss for failure to state a claim, provided that the court limits its consideration to materials appropriately considered on such a motion. Fed. R. Civ. P. 12(b)(6).

2 Cases that cite this headnote

**[27]    Libel and Slander** 🔑 Actionable Words in General

**Libel and Slander** 🔑 Absolute Privilege

Under New York law, a defamatory statement of fact is in contrast to pure opinion, which is not actionable because expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation.

**[28]    Libel and Slander** 🔑 Actionable Words in General

Under New York law, a "pure opinion" that cannot support a defamation claim may take one of two forms: it may be a statement of opinion which is accompanied by a recitation of the facts upon which it is based, or it may be an opinion not accompanied by such a factual recitation so long as it does not imply that it is based upon undisclosed facts.

1 Case that cites this headnote

[29]  **Constitutional Law**  Opinion

Statements of imaginative expression or rhetorical hyperbole are entitled to constitutional protection as opinion and cannot support a defamation claim under New York law. U.S. Const. Amend. 1.

[30]  **Libel and Slander**  Actionable Words in General

While a pure opinion cannot be the subject of a defamation claim under New York law, an opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it is a "mixed opinion" and is actionable.

1 Case that cites this headnote

[31]  **Libel and Slander**  Actionable Words in General

What differentiates a mixed opinion, which may support a defamation claim under New York law, from a privileged, pure opinion is the implication that the speaker knows certain facts, unknown to the audience, which support the speaker's opinion and are detrimental to the person being discussed.

1 Case that cites this headnote

[32]  **Libel and Slander**  Construction of defamatory language in general

Under New York defamation law, the distinction between fact and opinion is an issue of law for the courts, based on the court's assessment of how the statement would be understood by the

average person exposed to the statement in its full context.

[33]  **Libel and Slander**  Construction of language used

Under New York law, courts weigh three factors to decide whether a disputed statement is fact-based or a non-actionable opinion, for purposes of a defamation claim: (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

1 Case that cites this headnote

[34]  **Libel and Slander**  Construction of language used

In the analysis of whether a statement at issue in a defamation claim under New York law is fact-based or a non-actionable opinion, the factor asking whether the context signals that the statement is likely to be opinion rather than fact requires that the court consider the content of the communication as a whole, its tone and apparent purpose.

1 Case that cites this headnote

[35]  **Libel and Slander**  Construction of language used

When determining whether statements at issue in a defamation claim are fact-based or non-actionable opinions, courts should not focus on the statements in isolation and instead look to the overall context to decide whether the average viewer would conclude that the challenged statements conveyed facts about the plaintiff.

[36]  **Libel and Slander**  Actionable Words in General

**Libel and Slander** 👈 Construction of language used

Even apparent statements of fact may assume the character of statements of opinion, and thus be privileged in the context of a defamation claim under New York law, when made in public debate, heated labor dispute, or other circumstances in which an audience may anticipate the use of epithets, fiery rhetoric or hyperbole; the essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion.

1 Case that cites this headnote

[37]    **Libel and Slander** 👈 Judicial officers

Docudrama scene depicting former prosecutor's presence at scene of sexual assault did not negatively portray prosecutor, and, thus, did not support prosecutor's claim against director and others for defamation under New York law, even if prosecutor was not present at crime scene in hours after crime and did not direct police activity as depicted; scene, which showed prosecutor expressing confusion as to victim's presence in wooded area and noting marks left by single perpetrator, oriented viewer to circumstances of attack and introduced prosecutor's character as influential presence in investigation, and average viewer would understand reference to marks left by single perpetrator as passing observation rather than firm conclusion later contradicted by charges against five suspects.

[38]    **Libel and Slander** 👈 Judicial officers

Docudrama scene depicting former prosecutor participating in drafting of press release regarding sexual assault did not expose prosecutor to public contempt, ridicule, or disgrace or induce evil opinion of her, and, thus, did not support prosecutor's claim against docudrama's director and others for defamation

under New York law, even if prosecutor never drafted press release and district attorney's office had policy against statements to press; contents of release were not revealed, release was banal administrative task with no larger relevance to series, and average viewer was unlikely to know of district attorney's internal policies about employee communications to press or to view prosecutor-character's remark to "get this statement out" as effort to incite press or stoke public anger.

[39]    **Libel and Slander** 👈 Judicial officers

Docudrama scenes depicting former prosecutor as having internal rivalry with coworker regarding whose division would prosecute sexual assault case that was subject of docudrama did not convey defamatory meaning, as necessary to support prosecutor's defamation claim against docudrama's director and others under New York law; scenes depicted type of departmental turf war typical of many television dramas set in workplace, prosecutor-character's statement regarding suspects "on a rampage" employed provocative language but was not so inflammatory as to expose prosecutor to public contempt, ridicule, or disgrace or induce evil opinions of her, and scenes depicted prosecutor as competing to take lead in high-profile matter in manner consistent with her role as chief of sex crime prosecution unit.

[40]    **Libel and Slander** 👈 Truth of part of defamatory matter; substantial truth

Former prosecutor's public remarks to city council committee regarding sexual assault case that was subject of docudrama did not establish that docudrama scene depicting prosecutor's role in creation of timeline for sexual assault was substantially true, and, thus, did not preclude prosecutor from stating claim against docudrama's writer, director, and streaming series for defamation under New York law; prosecutor's remarks defending timeline's accuracy to committee after the fact, unlike docudrama, did not indicate prosecutor

performed hands-on role in assembling timeline or directing suspect interviews, but, rather, indicated prosecutor agreed with timeline that was put together by others, whereas docudrama depicted prosecutor as principal architect of theory of case.

[41]  **Libel and Slander**  👉 Judicial officers

Docudrama scenes which depicted prosecutor in charge of sexual assault case as explaining that prosecution would "surprise" defense by testing DNA-marked sock in its possession on eve of trial and suggesting, after sock was found not to match any defendant, that sixth attacker was involved "if it helps a jury believe what we know is true" were not pure opinion, but, rather, were mixed opinion that could support prosecutor's defamation action against docudrama's director and others under New York law, where statements and actions attributed to prosecutor had precise meaning and were capable of being proved or disproved, and average viewer, even in docudrama's artistic contexts, had no reason to believe scenes were opinion rather than being based on undisclosed facts known to filmmakers.

[42]  **Libel and Slander**  👉 Judicial officers

Docudrama scenes depicting prosecutor and colleague discussing strengths and weaknesses of sexual assault case against five defendants and stating that prosecution needed "one of these little shits to tie this whole thing together" by making incriminating statement, would not be understood by average viewer as representations of fact, and, thus, did not support prosecutor's claim against docudrama's director and others for defamation under New York law; in context of work of popular entertainment, scenes' dialogue was simplified to convey filmmakers' views of flaws in prosecution's case to general audience, using heightened rhetoric in service of narrative that defendants were falsely convicted, without depicting prosecutor as taking direct actions to impair defense.

[43]  **Libel and Slander**  👉 Judicial officers

Docudrama scene depicting colleague confronting prosecutor who supervised sexual assault prosecution, stating that prosecutor "coerced" defendants into confessing and that colleague's investigative team "pored over your confession tapes," contained statements of allegedly defamatory meaning that were not pure opinion, supporting prosecutor's defamation claim against docudrama's director and others under New York law, where scene implied that colleague's investigation concluded prosecutor directed police interviews that secured coerced confessions, allowing viewer to believe scene was based on facts from colleague's investigation, statements had precise, verifiable meaning, and depiction of professional colleague making damning judgment of prosecutor's conduct could hold prosecutor up to shame, ridicule, and contempt.

[44]  **Libel and Slander**  👉 Judicial officers

Docudrama scene depicting colleague confronting prosecutor who supervised sexual assault prosecution generally reflected filmmakers' opinions about strengths and weaknesses of prosecution, and, thus, prosecutor's complaint against filmmakers for defamation under New York law failed to allege defamatory meaning as to scene in general, where scene, which portrayed prosecutor as principal villain in docudrama and colleague as fair-minded person who consistently sought truth, functioned as closing summary of filmmakers' views of weaknesses in evidence leading to convictions for sexual assault, including quality of police investigation, and dialogue reflected conflicting, subjective opinions of fictionalized versions of prosecutor and colleague.

[45]  **Libel and Slander**  👉 Judicial officers

Former prosecutor adequately alleged that docudrama scene depicting prosecutor directing interrogation of sexual assault suspects had defamatory meaning, as necessary to support

defamation claims against director, writer, and streaming service under New York law; docudrama allegedly falsely showed prosecutor having hands-on role in supervising early stages of investigation and implied she had authority to direct police actions, depicting prosecutor as instructing officers to "make" suspects name their accomplices and not to use "kid gloves" because suspects committed rape and were "not kids," allowing average viewer to believe prosecutor instructed police to coerce suspects into naming accomplices and to treat them as adults, beginning chain of events resulting in unjust convictions.

[46]    **Libel and Slander** 👈 Judicial officers

Former prosecutor adequately alleged that docudrama scenes depicting her as directing police to engage in discriminatory canvas to investigate sexual assault had defamatory meaning, as necessary to support defamation claims against writer, director, and streaming service under New York law, where docudrama allegedly falsely depicted prosecutor telling police officers to go into housing "projects" and "stop every little thug you see" to find all young Black males who were near scene of crime and treat them as suspects, term "thug" was used in dialogue to describe young, Black, male residents of "projects" rather than actual suspects, complaint alleged that prosecutor did not instruct officers in case, and average viewer could view scenes as showing prosecutor directed police stops in discriminatory manner without reasonable suspicion. U.S. Const. Amend. 4.

[47]    **Libel and Slander** 👈 Judicial officers

Former prosecutor failed to allege that her depiction in scene of docudrama that showed her directly questioning minor suspects in sexual assault investigation, without showing *Miranda* warnings or presence of suspects' parents or guardians, had defamatory meaning, as necessary to support defamation claims against writer, director, and streaming service under

New York law, where scene, which depicted large number of minor suspects gathered in room when prosecutor arrived, did not suggest suspects never received *Miranda* warnings, actions and dialogue did not reflect express or implied limitation on suspects' *Miranda* rights or calculated effort to exclude parents from questioning, and average viewer would be unlikely to know of requirement that parents be present during questioning.

[48]    **Libel and Slander** 👈 Judicial officers

Docudrama scene depicting prosecutor using term "wilding" or "wilding out" in context of interrogating suspects in sexual assault investigation did not contain defamatory meaning, as necessary to support prosecutor's defamation claim against director, writer, and streaming service under New York law, where docudrama depicted prosecutor as having encountered word, which was allegedly subsequently adopted by press and used to stoke public fears of Black men, for first time in internal report shortly before interrogation, and as being unfamiliar with its definition and pronunciation.

[49]    **Libel and Slander** 👈 Judicial officers

Docudrama scene depicting prosecutor as referring to teenagers of color who were suspected of sexual assault as "animals" did not expose prosecutor to type of public hatred or shame sufficient to support prosecutor's defamation claim against director, writer, and streaming service under New York law, where in context of dramatized interpretation of historical events, use of term "animals" reflected outrage that fictionalized version of prosecutor felt as result of violent sexual assault and other attack, and term was not used to refer to all young men of color, but, rather, was reserved for supposed participants in particularly brutal crime.

1 Case that cites this headnote

[50]    **Libel and Slander** 👈 Judicial officers

**Libel and Slander** 🔑 Absolute Privilege

Docudrama scene depicting prosecutor as referring to teenagers of color who were suspected of sexual assault as "animals" was privileged opinion on the part of docudrama's director, writer, and streaming service, and, thus, did not support prosecutor's defamation claim under New York law; in context of docudrama as a whole, which criticized sexual assault prosecution as racially biased, average viewer would understand that term was used hyperbolically to reflect filmmakers' perception that prosecutors and law enforcement viewed suspects as violent, out-of-control pack presumed to be guilty rather than as individuals, and degree to which prosecutor pre-judged suspects' guilt and considered them to be less than human was subjective opinion not readily capable of verification.

[51]    **Conspiracy** 🔑 Civil Liability

**Conspiracy** 🔑 Conspiracy as independent claim; necessity of and relationship to underlying wrong

New York law recognizes a claim of civil conspiracy where a plaintiff adequately alleges an underlying tort.

1 Case that cites this headnote

[52]    **Conspiracy** 🔑 Pleading

In order to properly plead a cause of action to recover damages for civil conspiracy under New York law, the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement.

2 Cases that cite this headnote

[53]    **Conspiracy** 🔑 Particular Subjects of Conspiracy

Former prosecutor's complaint against streaming service, director, and writer of docudrama depicting sexual assault case that prosecutor supervised adequately alleged that defendants conspired to make defamatory statements, as

necessary to support civil conspiracy claim under New York law based on underlying tort of defamation, where prosecutor alleged that certain scenes in docudrama, including one depicting prosecutor as concealing exculpatory evidence from defense counsel and manipulating timing of DNA test to advantage prosecution, were false statements of fact that defendants collaborated to write, produce, and publish, and writer's public statement that prosecutor was "trash" lent plausibility to allegation that defendants agreed to defame prosecutor.

**Attorneys and Law Firms**

 **\*56** Edward K. Cheffy, Rachael S. Loukonen, Kimberly Dawn Swanson, Cheffy Passidomo, P.A., Naples, FL, Andrew Todd Miltenberg, Kara Lynn Gorycki, Nesenoff & Miltenberg, L.L.P., New York, NY, for Plaintiff.

Eric S. Olson, Cardinal Law, P.A., Kelley Geraghty Price, Dentons Cohen & Grigsby, PC, Naples, FL, Kiran Patel, Pro Hac Vice, Sandra Denise Hauser, Dentons US LLP, New York, NY, Gregory R. Naron, Pro Hac Vice, Jacqueline A. Giannini, Pro Hac Vice, Natalie J. Spears, Pro Hac Vice, Dentons US LLP, Chicago, IL, for Defendants.

OPINION AND ORDER

CASTEL, U.S.D.J.

On the night of April 19, 1989, a young woman was viciously beaten and raped in Central Park. Five young men of color (the "Five"), ranging in age from 14 to 16, were arrested, tried and convicted for the attack. They were exonerated in 2002, after the confession of a man whose DNA matched a sample found near the victim. The case, which is known among the press and public as the "Central Park Jogger" or "Central Park Five" case, drew intense public interest in the immediate aftermath of the attack and remains the subject of scrutiny and debate.

Plaintiff Linda Fairstein was chief of the Sex Crimes Prosecutions Unit in the District Attorney's office of New York County during the investigation and prosecution of the Five. According to her Complaint, Fairstein had supervisory

authority over the case but was not one of the prosecution's **\*57** trial attorneys. After a successful and high-profile legal career, Fairstein remained in the public eye as a prolific mystery writer and public speaker. In the years following the exoneration of the Five, Fairstein made public statements that defended the work of police and prosecutors on the case, and she has publicly argued that the Five were hastily exonerated.

In May 2019, the popular streaming service owned by defendant Netflix, Inc. ("Netflix") released a four-part dramatization of the arrest and prosecution of the Five, called "When They See Us." Produced by Oprah Winfrey, the limited series features high production values that have become standard in subscription television, including a cast of famous actors, a soundtrack of popular music, and atmospheric, hallucinatory sequences intended to reflect the characters' psychological states. "When They See Us" is also openly sympathetic to the Five. In early scenes, it depicts the Five as typical teenagers negotiating the challenges of school, family and social life before they are incorrectly and unjustly suspected of rape. The series then follows the Five through trial and incarceration, and their later struggles as young adults adjusting to post-release life. Throughout, "When They See Us" depicts the Five as innocent young men who are harmed by an unjust prosecution and an unsympathetic and often brutal system bent on incarcerating the Five.

Fairstein is portrayed as a central villain of "When They See Us." As depicted in the series, she quickly concludes that the Five are responsible for the attack, and is thereafter portrayed as a zealous, win-at-all-costs prosecutor. In one sequence, she intentionally delays the production of critical DNA evidence to defendants until the eve of trial, and in others, she instructs members of the New York City Police Department ("NYPD") to engage in harsh investigative techniques. The series portrays her as the architect of various theories of the Five's guilt, and through the concluding scenes of the series, she remains persuaded of their involvement in the face of countervailing evidence. Fairstein alleges that nearly every scene depicting her is a fabrication that presents her in a false and defamatory light.

The Complaint brings claims of defamation against Netflix, series director and producer Ava Duvernay, and series writer and producer Attica Locke. All defendants move to dismiss the Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P., urging that it has not plausibly alleged that the depictions of Fairstein are defamatory under New York law.

**[1]**   In deciding the motion to dismiss, the Court is limited to the factual allegations of the Complaint, materials that are attached by the Complaint or integral thereto, and matters of which the Court may take judicial notice. As defendants acknowledge, the issue of actual malice is more appropriately weighed at a later stage of the proceedings. See, e.g., New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (noting "the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials."). Similarly, on the present motion, defendants are not permitted to offer evidence (except the limited materials that may be considered on a motion to dismiss) to dispute Fairstein's factual assertions that she played only a limited role in the NYPD's investigation. The arguments raised in defendants' motion are therefore narrow and directed to whether Fairstein's Complaint has plausibly alleged a defamatory **\*58** meaning to eleven scenes of "When They See Us."

For the reasons that will be explained, defendants' motion will be granted in part and denied in part. Certain scenes alleged to be defamatory merely show routine and prosaic activities that lack a plausible defamatory meaning. In other scenes, the depictions of Fairstein are privileged against a claim of defamation because they convey the subjective opinions of defendants and could not be understood by the average viewer to be a literal recounting of her words and actions.

Fairstein has plausibly alleged a claim of defamation as to five scenes. These scenes depict Fairstein as orchestrating acts of misconduct, including the withholding of evidence, the existence of "tapes" showing that she "coerced" confessions from the Five, an instruction not to use "kid gloves" when questioning suspects, and directing a racially discriminatory police roundup of young men in Harlem. The average viewer could conclude that these scenes have a basis in fact and do not merely reflect the creators' opinions about controversial historical events. Separately, the Court concludes that defendants have not demonstrated the substantial truth of a scene depicting Fairstein's creation of an attack timeline because they rely on public remarks that are inconsistent with her depiction in the scene.

BACKGROUND.

A. Overview of the Underlying Events Relating to the Five.

On the night of April 19, 1989, a jogger, Patricia or "Trisha" Meili, was beaten and raped in Central Park. (Compl't ¶ 37.) Five young men of color, ranging in age from 14 to 16, were arrested, charged, tried and convicted for their purported roles in the attack: Korey Wise, Raymond Santana, Kevin Richardson, Yusef Salaam and Antron McCray. (Compl't ¶¶ 4, 38.)

Fairstein was employed in the Manhattan District Attorney's Office from 1972 to 2002, and she was chief of its Sex Crimes Prosecution Unit during the events depicted in "When They See Us." (Compl't ¶¶ 32, 39.) Along with District Attorney Robert Morgenthau and Trial Division Chief John Fried, Fairstein was one of the decisionmakers who assigned Assistant District Attorney Elizabeth Lederer to the case. (Compl't ¶ 39.)

According to Fairstein, during the prosecution of the Five, she functioned as a liaison to Morgenthau and gave technical assistance to Lederer. (Compl't ¶¶ 39-40.) Fairstein asserts that she was neither the lead prosecutor nor a courtroom litigator in the proceedings. (Compl't ¶¶ 39-40.) According to Fairstein, Lederer was responsible for the prosecution and Fairstein acted principally as a technical adviser to Lederer and a liaison to Morgenthau. (Compl't ¶ 39.) Fairstein also was a witness in suppression hearings and trial proceedings of the Five. (Compl't ¶ 39.)

In 2002, after the trial and conviction of the Five, a man named Matias Reyes confessed to raping and attacking Meili. (Compl't ¶ 41.) Testing showed that Reyes's DNA matched samples taken from Meili and her belongings. (Compl't ¶ 41.) The convictions of the Five were vacated on the basis of this newly discovered evidence. (Compl't ¶ 41.)

The Five subsequently brought civil claims against the City and individual defendants, including Fairstein. (Compl't ¶ 42.) According to the Complaint, during the pendency of this litigation, several books and films were published about the case, "some of which falsely portrayed Ms. Fairstein as prosecuting The Five." (Compl't ¶ 42.) Fairstein states that, at the direction of a federal district judge, she "was unable to comment on the case or **\*59** respond to any such false portrayals." (Compl't ¶ 42.) The Five's civil claims settled for $41 million in 2014. (Compl't ¶ 43.) When the settlement was announced, the Manhattan District Attorney and the Corporation Counsel for the City publicly stated that the prosecutors acted reasonably and did not engage in acts of wrongdoing. (Compl't ¶ 43.)

B. Overview of "When They See Us" and Its Depiction of Fairstein.

On May 31, 2019, Netflix released "When They See Us" on its popular streaming service. (Compl't ¶ 1.) It was written, directed and produced by defendant Ava DuVernay and co-written and produced by defendant Attica Locke. (Compl't ¶¶ 2-3.) "When They See Us" consists of four episodes of approximately 60 to 90 minutes in length. (Compl't ¶ 44.) Fairstein features prominently in Episode 1 and makes brief but memorable appearances in Episodes 2 and 4.[1] The Complaint asserts that as to Fairstein, "[n]early every portrayal is false and defamatory." (Compl't ¶ 44.)

The series primarily centers on the individual experiences of each of the Five, beginning with their everyday lives as adolescents prior to the events of April 19, 1989, and then following them through their arrest, trial, incarceration and exoneration. In the first two episodes, the Five are shown as young teenagers, and in the final two episodes they are shown as young adults. Episodes 3 and 4 depict their struggles adjusting to post-prison life and their eventual exoneration following the confession of Reyes.

Fairstein is played by the Oscar-nominated actress Felicity Huffman, and the cast includes several other well-known actors, such as Vera Farmiga, John Leguizamo and Michael K. Williams. The series prominently features popular music and an orchestral score. Certain scenes are highly stylized, including the intense depiction of a character's hallucinations during his incarceration. The average viewer would not perceive "When They See Us" as a documentary, and would instead understand it as a dramatization drawn from historical events.

In comparison to the Five, Fairstein's screen-time is limited, but she plays a critical role in the series. She appears principally in Episode 1, where she is depicted as an aggressive and capable prosecutor who is quickly convinced that the Five are responsible for the attack on Meili. The visual style and pacing of Episode 1 would be familiar to viewers of scripted, prime-time programs that purport to show the work of New York's police and prosecutors. The episode depicts Fairstein as the principal architect of the Five's investigation and prosecution. She instructs members of the NYPD on their investigation tactics, develops a timeline for the attack on Meili, and urges on the prosecution of the Five, despite

evidence that the series depicts as highly ambiguous and even incompatible with their guilt.

Fairstein appears only briefly in Episodes 2 and 4, but her scenes are memorable. In Episode 2, Fairstein and Lederer discuss DNA found through a semen sample on the crime scene, and Fairstein suggests that the existence of this evidence and tests conducted on the eve of trial will "surprise" defendants. Fairstein also appears late in Episode 4, in one of the series' final scenes, where she maintains **\*60** that the Five were appropriately tried and convicted, in spite of their exoneration.

The following disclaimer appears in the closing credits of each episode:

> While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue and names are fictionalized for the purposes of dramatization. As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history.

(Compl't ¶ 228.) The Complaint notes that the disclaimer is inconspicuous and appears in a small font late in the credit rolls. (Compl't ¶¶ 225-29.)

Broadly summarized, Fairstein alleges that the series falsely portrays her participation in the prosecution of the Five, and depicts her uttering comments that are "racist and unethical." (Compl't ¶ 45.) She alleges that the series falsely shows her using "inflammatory language" by "referring to young men of color as 'thugs,' 'animals' and 'bastards,' " terms that she states she never used. (Compl't ¶ 45.) She also alleges that the series falsely shows her "as the singular mastermind behind a racist plot to obtain convictions of The Five at any cost." (Compl't ¶ 46.)

The Complaint identifies individual scenes that purportedly show Fairstein in a false and defamatory light. (Compl't ¶¶ 51-130.) The Court will discuss each of these scenes in detail, but, as examples, Fairstein alleges that the series falsely depicts her as encouraging coercive and unconstitutional investigative techniques and shows her "as singularly responsible for jailing innocent young men of color" after devising the prosecution's theory of the case. (Compl't ¶¶ 46, 126.) Fairstein asserts that, in truth, the NYPD was responsible for investigating the Five and that she played no significant role in developing a theory of the case.

Fairstein alleges that she attempted to warn defendants to avoid inaccuracies in her portrayal, but that her suggestions were ignored. (Compl't ¶¶ 131-51.)

C. Defendants' Statements about the Contents of "When They See Us."

Fairstein asserts that defendants marketed and promoted "When They See Us" as a fact-based version of the events surrounding the Five. (Compl't ¶¶ 165-231.) Netflix social media posts and advertising trailers described "When They See Us" as "[t]he truth you haven't heard" and "based on the true story of the Central Park Five." (Compl't ¶¶ 166-67.) The Complaint quotes multiple statements made by DuVernay on social media, in interviews and in public appearances that characterized "When They See Us" as fact-based, referring to it as "the real story of The Central Park 5" and "100% real." (Compl't ¶¶ 171-86.) The Complaint also quotes from public statements that DuVernay specifically made about Fairstein, including a remark in an interview with Oprah Winfrey where she stated, "And so the goal of this – okay, Linda Fairstein, okay Elizabeth Lederer, okay, all of these people on this particular case we need to be held accountable." (Compl't ¶ 182.)

Locke made similar public statements, such as, "[a] piece of American History gets rewritten with the truth," and "You can't argue with facts." (Compl't ¶¶ 187, 192.) Locke also made sharply critical statements about Fairstein, including, "I am generally someone who always tries to find the humanity in people, to understand the psychology behind what makes even people I hate act the way they do. But fuck it: Linda Fairstein is trash, was trash, **\*61** will always be trash." (Compl't ¶ 194.) In response to an op-ed piece written by Fairstein, Locke tweeted, "This morning she showed us exactly why she deserves all the rage and hate and consequences that are coming her way. She is an unrepentant liar. Fuck her." (Compl't ¶ 195.) Prior to the release of "When They See Us," Locke also successfully campaigned for the Mystery Writers of America to withdraw an award it planned to give Fairstein. (Compl't ¶¶ 152-64.)

D. Fairstein's Damages Allegations.

The Complaint asserts that following the release of "When They See Us," Fairstein has been publicly vilified, resulting in damage to her reputation and forcing her resignation from non-profit organizations. (Compl't ¶¶ 232-57.) The Complaint points to the hashtag "#CancelLindaFairstein"

that came into use on Twitter, and it quotes negative, often profane tweets that were posted with that hashtag. (Compl't ¶ 237.) Following release of the series, petitions circulated online, demanding Fairstein's removal from various board, the cancellation of her publishing contracts and a halt to the retail sales of her books. (Compl't ¶¶ 240-43.) After the release of "When They See Us," Fairstein's publishers terminated her publishing agreement and her literary agents dropped her as a client. (Compl't ¶¶ 244-46.) At the suggestion of campus administrators, Fairstein resigned from the Board of Trustees for Vassar College, and she also resigned from the boards of three non-profit organizations. (Compl't ¶¶ 250-54.) The editor-in-chief of Glamour magazine also published a statement expressing regret that the magazine named Fairstein its Woman of the Year in 1993. (Compl't ¶ 255.)

E. Overview of the Complaint.

The Complaint consists of 382 paragraphs, plus 221 footnotes that cite to public records, social media posts, news reports and a variety of websites. It brings seven causes of action. For each defendant, the Complaint brings separate claims of defamation per se and defamation per quod. (Compl't ¶¶ 258-374.) Count VII of the Complaint is brought against all defendants and alleges that they engaged in a conspiracy to defame Fairstein. (Compl't ¶¶ 375-82.)

In addition to seeking money damages, the Complaint seeks sweeping injunctive relief, including defendants' removal of certain social media posts, an order restraining defendants from making future public statements that attribute the prosecution of the Five to Fairstein, an order directing that defendants make a public statement that they had a "desire to create a fictional villain, in Ms. Fairstein, for the public to hate, that never existed in reality," and the removal and/or re-editing of portions of "When They See Us." (Compl't at pp. 110-18.) RULE 12(b)(6) STANDARD.

[2]   [3]   Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth. Id. Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679, 129 S.Ct. 1937. "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters

of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.' " *62 Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

[4]   [5]   [6]   "A motion brought under Rule 12(b)(6) challenges only the 'legal feasibility' of a complaint. The test of a claim's 'substantive merits' is 'reserved for the summary judgment procedure, governed by [Rule] 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule.' " Goel v. Bunge, Ltd., 820 F.3d 554, 558-59 (2d Cir. 2016) (quoting Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006)). A court reviewing a motion to dismiss "take[s] no account of [the complaint's] basis in evidence" and "may review only a narrow universe of materials." Id. at 559. Such materials include documents incorporated in the complaint, matters of which judicial notice may be taken, and documents that are "integral" to the complaint, even if they are not expressly incorporated. Id.

[7]   The Complaint extensively references the contents of "When They See Us," including quotations of dialogue and descriptions of scenes, accompanied with timestamps of the relevant sequences. As part of their motion papers, defendants have submitted an electronic copy of "When They See Us." (Docket # 87-A.) In her opposition memo, Fairstein states that "[t]he Series is an integral part of the Complaint and may be considered by the Court," and "respectfully requests that the Court view the Series when evaluating Defendants' Motion." (Opp. Mem. at 1 n.2.) Because the episodes of "When They See Us" are integral to the Complaint and the parties agree that they are properly considered in connection with the motion, the Court may rely on the episodes without converting the motion to dismiss into a motion for summary judgment. See, e.g., Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC, 864 F.3d 236, 247 (2d Cir. 2017) (considering a news organization's video report in the adjudication of a motion to dismiss a defamation claim); Stepanian v. City of New York, 2015 WL 5350801, at *3 (E.D.N.Y. Sept. 14, 2015) ("Since the video is incorporated into the complaint, I am allowed to consider it on a motion to dismiss.") (Gleeson, J.).

[8]   [9]   The parties have also submitted a large number of exhibits in connection with this motion. Defendants' motion cites to materials that they urge should be subject to judicial

notice, and they have submitted an appendix containing nineteen exhibits. (Docket # 88.) In opposition to the motion, Fairstein has submitted an appendix containing 78 exhibits. (Docket # 90.) A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Rule 201(c)(2), Fed. R. Evid. "The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Rule 201(b)(2). As will be discussed below, the Court takes judicial notice of public remarks that Fairstein made to the Public Safety Committee of the New York City Council on January 30, 2003. (Docket # 88-1.) An official's statements to a governmental body "are precisely the sort of materials of which [courts] may take judicial notice." ACLU v. Nat'l Sec. Agency, 925 F.3d 576, 599 n. 126 (2d Cir. 2019); see also Schubert v. City of Rye, 775 F. Supp. 2d 689, 695 n.3 (S.D.N.Y. 2011) ("[T]he minutes and recordings of the City Council meetings are matters of public record and therefore are the types of materials of which a court may take judicial notice.") (Karas, J.).

**\*63** DISCUSSION.

I. The Law of Defamation in New York.

A. Whether a Statement Is Capable of Defamatory Meaning Is an Issue of Law for the Court.

The Complaint alleges that eleven scenes in "When They See Us" depict Fairstein in a false and defamatory light. (Compl't ¶¶ 49-130.) Defendants urge that the Complaint does not plausibly allege that the scenes are defamatory and that Fairstein's claims can therefore be dismissed as a matter of law. The parties do not dispute that New York law governs plaintiff's claims. (See, e.g., 11/16/20 Tr. at 5-6.)

 **[10]**  **[11]**  **[12]**  **[13]** "Allegations of defamation present in the first instance, an issue of law for judicial determination." Dillon v. City of New York, 261 A.D.2d 34, 39, 704 N.Y.S.2d 1 (1999). Defamation "is defined as the making of a false statement which tends to 'expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.' " Foster v. Churchill, 87 N.Y.2d 744, 751, 642 N.Y.S.2d 583, 665 N.E.2d 153 (1996) (quoting Rinaldi v. Holt, Rinehart & Winston, 42 N.Y.2d 369, 379, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977)). " 'The elements are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se.' A statement is defamatory on its face when it suggests improper performance of one's professional duties or unprofessional conduct." Frechtman v. Gutterman, 115 A.D.3d 102, 104, 979 N.Y.S.2d 58 (2014) (quoting Dillon, 261 A.D.2d at 38, 704 N.Y.S.2d 1); see also Laguerre v. Maurice, 192 A.D.3d 44, 50, 138 N.Y.S.3d 123 (2020) ("A statement is defamatory per se if it ... tends to injure the plaintiff in her or his trade, business, or profession ...."). "Not all (or even most) maligning remarks can be considered defamatory. A statement is defamatory if it exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or ... induce[s] an evil opinion of one in the minds of right-thinking persons, and ... deprive[s] one of their confidence and friendly intercourse in society.' " Chau v. Lewis, 771 F.3d 118, 127 (2d Cir. 2014) (quoting Kimmerle v. N.Y. Evening Journal, Inc., 262 N.Y. 99, 102, 186 N.E. 217 (1933)).

 **[14]**  **[15]**  **[16]**  **[17]** New York recognizes a defamation claim when a statement is not defamatory on its face and instead alleges "an innuendo" that attaches "a defamatory meaning" to language referencing a plaintiff. See, e.g., Cole Fischer Rogow, Inc. v. Carl Ally, Inc., 29 A.D.2d 423, 427, 288 N.Y.S.2d 556 (1968). In a claim of defamation per quod, "no defamatory statement is present on the face of the communication but a defamatory import arises through reference to facts extrinsic to the communication." Ava v. NYP Holdings, Inc., 64 A.D.3d 407, 412, 885 N.Y.S.2d 247 (2009). "[A] plaintiff would need to show that the challenged language was capable of communicating the alleged defamatory idea when words were given meaning not ordinarily attributed to them or due to external factors. ... Whether the allegedly libelous language is capable of the libelous meaning charged by innuendo is a matter of law for the courts to decide." Idema v. Wager, 120 F. Supp. 2d 361, 368 (S.D.N.Y. 2000) (McMahon, J.). "The innuendo ... may not enlarge upon the meaning of words so as to convey a meaning that is not expressed." **\*64** Tracy v. Newsday, Inc., 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 155 N.E.2d 853 (1959).

 **[18]**  **[19]**  **[20]**  **[21]** A plaintiff "must identify a plausible defamatory meaning of the challenged statement or publication. If the statement is susceptible of only one meaning the court must determine, as a matter of law, whether that one meaning is defamatory." Celle v. Filipino Rep.

Enterprises Inc., 209 F.3d 163, 178 (2d Cir. 2000) (quotation marks omitted). "If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." Id. (quotation marks omitted). In deciding whether a statement is defamatory, courts " 'will not strain to interpret (allegedly defamatory works) 'in their mildest and most inoffensive sense to hold them nonlibelous,' " but they also "will not strain to find a defamatory interpretation where none exists." Cohn v. Nat'l Broadcasting Co., 50 N.Y.2d 885, 887, 430 N.Y.S.2d 265, 408 N.E.2d 672 (1980) (quoting November v. Time Inc., 13 N.Y.2d 175, 178, 244 N.Y.S.2d 309, 194 N.E.2d 126 (1963)).

In adjudicating this motion, the Court construes the words and actions attributed to Fairstein in the context of the series as a whole, and weighs whether they are susceptible to a defamatory interpretation from the perspective of the average viewer. Aronson v. Wiersma, 65 N.Y.2d 592, 593-94, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985) ("The words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction."); Chau, 771 F.3d at 126 ("When deciding how to construe allegedly defamatory words ... courts must do so in the context of the publication as a whole, not just the paragraph or chapter containing them, and do so 'in the same way that the reading public, acquainted with the parties and the subject would take [them].' ") (quoting Sydney v. MacFadden Newspaper Publ'g Corp., 242 N.Y. 208, 214, 151 N.E. 209, (1926)).

The relevant context for Fairstein's claims is a lengthy television drama starring famous actors distributed to paying subscribers of a streaming service. As the Ninth Circuit once observed by dictum: "Docudramas, as their names suggests, often rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience. We believe that viewers in this case would be sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts. To the contrary, most of them are aware by now that parts of such programs are more fiction than fact." Partington v. Bugliosi, 56 F.3d 1147, 1154-55 (9th Cir. 1995). The Court in Partington added that the presenters of the docudrama "must attempt to avoid

creating the impression that they are asserting objective facts rather than merely stating subjective opinions." Id. at 1155.

 [22]   Given the full content and context of the series at issue, the Court declines to conclude that the average viewer would assume that "When They See Us" is "more fiction than fact," a proposition that the defendants do not advance. But it is reasonable to expect that the average viewer of "When They See Us" would understand that dialogue in the dramatization is not a verbatim recounting of the real-life participants and is intended to capture the essence of their words and deeds.

**\*65**  B. The "Substantial Truth" Defense to Defamation.

 [23]    [24]    [25]   Defendants urge that certain of Fairstein's claims should be dismissed because the events depicted are substantially true. "Because the falsity of the statement is an element of the defamation claim, the statement's truth or substantial truth is an absolute defense." Stepanov v. Dow Jones & Co., 120 A.D.3d 28, 34, 987 N.Y.S.2d 37 (2014). "A statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." Franklin v. Daily Holdings, Inc., 135 A.D.3d 87, 94, 21 N.Y.S.3d 6 (2015) (quotation marks and alteration omitted); see also Guccione v. Hustler Mag., Inc., 800 F.2d 298, 302 (2d Cir. 1986) ("New York law recognizes that an alleged libel is not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation."). "Courts typically compare the complained of language with the alleged truth to determine whether the truth would have a different effect on the mind of the average reader." Franklin, 135 A.D.3d at 94, 21 N.Y.S.3d 6. If "the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." Cafferty v. Southern Tier Publishing Co., 226 N.Y. 87, 93, 123 N.E. 76 (1919).

 [26]   The issue of whether a statement is substantially true may present an issue of law properly decided on a motion to dismiss, provided that the Court limits its consideration to materials appropriately considered on such a motion. See Tannerite Sports, 864 F.3d at 247 ("Because falsity is an element of New York's defamation tort, and 'falsity' refers to material not substantially true, the complaint in this case must plead facts that, if proven, would establish that the defendant's statements were not substantially true."); Verragio, Ltd. v. AE

Jewelers, Inc., 2017 WL 4125368, at *6-8 (S.D.N.Y. Aug. 23, 2017) (dismissing defamation claim on grounds of substantial truth) (McMahon, J.).

C. Statements of Pure Opinion Are Privileged Against a Claim of Defamation.

 [27]    [28]    [29] Defendants also urge that certain of Fairstein's claims should be dismissed because she challenges statements of pure opinion, which are privileged against claims of defamation. Under New York law, a "defamatory statement of fact is in contrast to 'pure opinion' which under our laws is not actionable because expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." Davis v. Boeheim, 24 N.Y.3d 262, 269, 998 N.Y.S.2d 131, 22 N.E.3d 999 (2014) (quotation marks and alteration omitted). "A pure opinion may take one of two forms. It may be a statement of opinion which is accompanied by a recitation of the facts upon which it is based, or it may be an opinion not accompanied by such a factual recitation so long as it does not imply that it is based upon undisclosed facts." Id. Statements of "imaginative expression" or "rhetorical hyperbole" are "entitled to constitutional protection as opinion ...." Daniel Goldreyer, Ltd. v. Van de Wetering, 217 A.D.2d 434, 434-35, 630 N.Y.S.2d 18 (1995) (holding that trial court should have dismissed as a matter of law a defamation claim directed to a statement in an art review that "does not have a precise meaning, cannot be objectively characterized as true or false, appears in an immediate context, the 'Art' section of defendant Time Magazine, *66 where the average person would understand it as, or expect to find, expression of opinion or personal taste, and appears in a broader context of the public debate over the artistic merit of the restoration.").

 [30]    [31]  "While a pure opinion cannot be the subject of a defamation claim, an opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, is a 'mixed opinion' and is actionable." Davis, 24 N.Y.3d at 269, 998 N.Y.S.2d 131, 22 N.E.3d 999. (quotation marks and alterations omitted). "What differentiates an actionable mixed opinion from a privileged, pure opinion is the implication that the speaker knows certain facts, unknown to the audience, which support the speaker's opinion and are detrimental to the person being discussed." Id. (quotation marks and alterations omitted). " 'The actionable element of a 'mixed opinion' is not the false opinion itself

– it is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking.' " Frechtman, 115 A.D.3d at 105-06, 979 N.Y.S.2d 58 (quoting Steinhilber v. Alphonse, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986)).

 [32]    [33]    [34]    [35] The distinction between fact and opinion is an issue of law for the courts, based on the court's assessment of how the statement would be understood by the average person exposed to the statement in its full context. Id. New York courts weigh three factors to decide whether the disputed statement is fact-based or non-actionable opinion:

> "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact."

Id. at 270, 998 N.Y.S.2d 131, 22 N.E.3d 999 (quoting Mann v. Abel, 10 N.Y.3d 271, 276, 856 N.Y.S.2d 31, 885 N.E.2d 884 (2008)). The third factor "requires that the court consider the content of the communication as a whole, its tone and apparent purpose." Id. Courts should not focus on statements in isolation and instead look to the overall context to decide whether the average viewer would conclude that challenged statements conveyed facts about a plaintiff. Id.

 [36]  For example, the New York Court of Appeals heavily weighed the context of a heated labor dispute in concluding that a recording of "invective expressed in the form of heavy-handed and nonsensical humor" should be understood as a statement of opinion, not fact. Steinhilber, 68 N.Y.2d at 293, 508 N.Y.S.2d 901, 501 N.E.2d 550; see also Brian v. Richardson, 87 N.Y.2d 46, 53, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (1995) ("[T]he Op Ed page is a forum traditionally reserved for the airing of ideas on matters of public concern. Indeed, the common expectation is that the columns and articles published on a newspaper's Op Ed sections will represent the viewpoints of their authors and, as such, contain considerable hyperbole, speculation, diversified forms of expression and opinion."). "[E]ven apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate, heated labor dispute, or other circumstances in which an audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole." Steinhilber, 68 N.Y.2d at 294, 508 N.Y.S.2d 901, 501 N.E.2d

550 (quotation marks **\*67** omitted). "The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion." Steinhilber, 68 N.Y.2d at 290, 508 N.Y.S.2d 901, 501 N.E.2d 550.

II. Whether the Complaint Plausibly Alleges a Defamatory Meaning to Certain Scenes.

A. The Complaint Does Not Plausibly Allege a Defamatory Meaning to Routine or Inoffensive Workplace Activities.

1. Fairstein Does Not Plausibly Allege a Defamatory Meaning to Her Depiction at the Central Park Crime Scene.

The Complaint alleges that Fairstein is falsely depicted in the portrayal of the events of the early morning of April 20, 1989, where she arrives at the crime scene in the pre-dawn aftermath of the attack on Meili. (Compl't ¶¶ 51-56; Ep. 1, 7:30-8:50.) The scene appears immediately after the series title card and is the first time Fairstein is shown. After asking NYPD officers about Meili's condition and whether members of the press are present, she visually surveys the densely wooded area of the park where the victim was found, and states, "What the fuck was she doing here?" and "Let's make sure to get those drag marks. He dragged her in, just like right there. Look, clear as day. His footsteps, her body. Fucking hell." (Compl't ¶ 52; Ep. 1, 7:30-8:50.)

According to the Complaint, the scene falsely depicts Fairstein as leading the Crime Scene Unit of the NYPD, and also falsely depicts her as concluding that only one individual was involved in the Meili rape. (Compl't ¶¶ 53-54.) Fairstein alleges that, in truth, she was not at the crime scene on that date and that she did not direct police activity in the case. (Compl't ¶¶ 55-56.)

 [37]  Viewing the scene in the context of the entire series and construing the allegations in the light most favorable to Fairstein, the Complaint does not allege a defamatory meaning to the scene. Fairstein's presence on the crime scene, her confusion and concern as to how the victim arrived at an isolated area of Central Park, and the implication that at this early point in the investigation she considered the possibility of a single attacker could not plausibly expose Fairstein to public contempt, ridicule, or disgrace, or an

induce an evil opinion of her. Foster, 87 N.Y.2d at 751, 642 N.Y.S.2d 583, 665 N.E.2d 153. The scene orients the viewer to the circumstances of the attack and introduces Fairstein's character as an influential presence in the investigation. The average viewer would not understand Fairstein's reference to "his" footsteps as indicating a studied and firm conclusion that a single individual was responsible for the attack. The remark is a passing observation about the crime scene and only vaguely implies that one man apparently left "dragmarks." The scene does not negatively portray Fairstein, and the Complaint does not plausibly allege a basis to conclude that the average viewer would attach a defamatory meaning to her depiction in this scene.

Because the Complaint does not plausibly allege a defamatory meaning as to Fairstein's presence at the crime scene in Central Park, the defamation claims directed to this scene will be dismissed. (Compl't ¶¶ 51-56.)

2. Fairstein Does Not Plausibly Allege a Defamatory Meaning to Her Role in Drafting a Press Release.

The Complaint alleges that the series falsely depicts Fairstein's participation in drafting a press release about the case. **\*68**  (Compl't ¶¶ 59-61; Ep. 1, 8:50-9:19.) Shortly after the Central Park sequence, Fairstein arrives to the 24th Precinct police station and begins to draft a press release. (Compl't ¶ 59; Ep. 1, 8:50-9:19.) She then says, "Got to get this statement out, a few reporters out there." (Id.)

According to the Complaint, Fairstein was not present at any precinct on the morning of April 20, and instead learned about the attack after receiving a call from a police lieutenant that morning. (Compl't ¶ 57, 60.) The Complaint states that Fairstein never drafted a press release about the case and that the district attorney's office had a policy against lawyers speaking to the press. (Compl't ¶ 61.) It also states that the depiction of Fairstein's involvement in drafting a press release "is significant because the press has been widely criticized as fueling racial tensions" following the attack on Meili. (Compl't ¶ 61.)

 [38]  The Complaint does not plausibly allege a defamatory meaning to Fairstein's presence at the precinct station or her participation in drafting a press release. The contents of the press release are not revealed and the release is mentioned in passing, with no larger relevance to the series. An average viewer is unlikely to know the district attorney's internal

policies about employee communications with the press, let alone that the series shows Fairstein acting contrary to such a policy. An average viewer also would not interpret Fairstein's remark to "get this statement out" as an effort to incite the press or to stoke public anger. Accepting Fairstein's allegations that she was not present at the 24th Precinct and played no role in the drafting of a press release, a depiction of her participation in such a banal, administrative activity could not plausibly expose her to public contempt, ridicule, or disgrace, or an induce an evil opinion of her. See Foster, 87 N.Y.2d at 751, 642 N.Y.S.2d 583, 665 N.E.2d 153.

Because the Complaint does not plausibly allege a defamatory meaning as to Fairstein's involvement in the drafting of a press release, the Complaint will be dismissed to the extent that it asserts defamation based on that scene. (Compl't ¶¶ 59-61.)

3. The Scene Depicting Bureaucratic Infighting over the Case Does Not Portray Fairstein in a Defamatory Light.

The Complaint alleges that the series falsely depicted an internal rivalry within the Manhattan district attorney's office as to whether the attack on Meili would be prosecuted by Fairstein's Sex Crimes Prosecution Unit or whether the matter would be assigned to Nancy Ryan, a prosecutor who led the Homicide Division. (Compl't ¶¶ 87-93; Ep. 1, 16:53-19:48.) As depicted in the series, on the morning of April 20, 1989, a police officer tells Fairstein that Ryan had been assigned to the case, and Fairstein responds, "This is a sex crime not a homicide." (Compl't ¶ 88; Ep. 1, 16:53-17:03.) Ryan then arrives at the 24th Precinct, where she and Fairstein call District Attorney Robert Morgenthau. (Compl't ¶ 90; Ep. 1, 17:03-18:41.) In the call, Ryan states that the homicide department had been handling the case and had been on the scene before dawn, to which Fairstein replies, "Well I got there before you. I have had precinct guys here interviewing suspects." (Id.) Ryan replies, "Suspects? A dozen kids harassing bicyclists." (Id.) Fairstein replies, "These kids were on a rampage," and then states, "3,412 rapes reported to the NYPD last year. 3,412 times someone was assaulted, held down, threatened, degraded, forced. This is an epidemic, we are not in control and we can be." (Id.)

Fairstein asserts that the scene is fabricated. She states that she was not present *69 in the 24th Precinct on April 20, and that she did not discuss the internal unit to which the case would be assigned with Ryan or Morgenthau. (Compl't ¶ 91.) Instead, she spoke privately to Morgenthau on the morning of April 20

to notify him of the rape. (Compl't ¶ 91.) Fairstein asserts that, at the time, the chief of the trial division believed that his unit would handle the case because it might become a homicide, but that Ryan had no role in the case at that time. (Compl't ¶¶ 91-92.) Fairstein asserts that the inclusion of Ryan in these scenes is significant because Ryan ultimately was involved in vacating the convictions of the Five, and these scenes left viewers with the impression that if Ryan had been assigned to the case, the Five would not have been charged with the rape of Meili. (Compl't ¶ 92.)

 [39]   The Complaint does not plausibly allege a defamatory meaning to Fairstein's interactions with Ryan or the fictional portrayal of their administrative jockeying over who would supervise the case. The scenes depict Fairstein and Ryan as driven prosecutors competing to take the lead in a high-profile matter. Fairstein is depicted as emphasizing the importance of lowering the incidents of rape in the City, which would be consistent with her role as chief of the unit responsible for prosecuting sex crimes. Fairstein's disagreement with Ryan over suspects "on a rampage" employs provocative language, but the language is not so inflammatory that it would plausibly expose her to public contempt, ridicule, or disgrace, or an induce an evil opinion of her. See Foster, 87 N.Y.2d at 751, 642 N.Y.S.2d 583, 665 N.E.2d 153. Accepting Fairstein's assertion that the depiction of her conflict with Ryan has no basis in fact, the scene merely depicts a type of departmental turf war typical of many television dramas set in the workplace. The Complaint has not plausibly alleged a defamatory meaning to the scene.

Because the Complaint does not plausibly allege a defamatory meaning as to Fairstein's jockeying for supervisory control of the case, refences to an "epidemic" of rapes or "kids ... on a rampage" or "harassing bicyclists," the Complaint will be dismissed to the extent that it asserts defamation based on that scene. (Compl't ¶¶ 87-93.)

B. Defendants' Motion to Dismiss Fairstein's Claim Related to the Creation of an Attack Timeline on Grounds of Substantial Truth Will Be Denied.

Defendants urge that Fairstein has not plausibly alleged a claim of defamation as to her depiction in creating an attack timeline, they describe as "substantially true." They urge that the scene is consistent with viewpoints that Fairstein has publicly espoused over the past thirty years. Defendants therefore argue that even if certain actions depicted in the

series varied in detail from Fairstein's actions in 1989, they are not defamatory because they are substantially true.

 **[40]**  As characterized by defendants, Fairstein "has been an outspoken public face" for prosecution of the Five and has publicly defended the theory behind their prosecution. (Def. Mem. 16.) Defendants assert that the Court can properly take judicial notice of public remarks that Fairstein delivered to a committee of the New York City Council in 2003. (Def. Mem. at 10.) As will be explained, however, Fairstein's remarks in 2003 do not render the depiction of her role in the creation of the timeline as substantially true and contradict the scene in important respects. Defendants' motion to dismiss this aspect of Fairstein's claim on grounds that the scene is based in substantial truth will therefore be denied.

 **\*70**  Fairstein asserts that the series includes a false and defamatory depiction of her attempt to create a timeline for the attack on Meili. (Compl't ¶¶ 77-86.) In the series, Fairstein states to a detective, "So you were just going to let possible witnesses to a rape go on a family court ticket? Wake these kids up and start getting some information. We've got a lady raped and clinging to life here. I want their interviews on my desk immediately so I can put together a timeline. Let's work." (Compl't ¶ 77; Ep. 1, 12:39-13:03.) Later that day, Fairstein is shown reviewing papers alone and muttering certain times and incidents, such as, "9:10. Okay, bicyclists confirmed on East Drive." (Ep. 1, 15:58-16:52.) A detective enters the room, and Fairstein states, "Farrell's interviews with the boys are in. ... All this is happening in the Park and it's not connected?" (Compl't ¶ 79; Ep. 1, 15:58-16:52.) Fairstein places a Post-It note on a map of Central Park that reads "RAPE," and states, "They're not witnesses, they're suspects." (Id.) In a later scene, Fairstein is near a map that charts the victim's jogging path, while the series shows flashbacks to Meili jogging and a detective summarizes known details of the timeline of Meili's activities. (Compl't ¶ 83; Ep. 1, 34:45-36:24.) Fairstein notes a 45-minute gap in the timeline and states, "How can the same kids be raping her at the same time they are jumping bicyclists way over there?" (Id.) A detective in the room responds, "Nothing on the weapon. Question marks on the timeline. I mean, we got problems." (Id.) Fairstein then proposes a different sequence of events while a detective appears to remain skeptical, and Fairstein states that because the rape occurred, there "obviously" must be a feasible timeline. (Id.)

Fairstein asserts that this portrayal falsely depicts her as "imbuing urgency" to the investigation and "hastening the interviews of unaccompanied minors." (Compl't ¶ 77.) She asserts that she was not present in any precinct at the times depicted, never questioned unaccompanied minors, never directed the NYPD's investigation, never discussed which individuals should be held in custody or who should be released with a family court ticket, and did not plot the events of April 19 on a map. (Compl't ¶¶ 78, 80-82, 84.) She asserts that the depiction is inaccurate because Lederer led the investigation for the Manhattan District Attorney's office. (Compl't ¶¶ 82, 85.) Fairstein further asserts that, in the days immediately following the attack, Meili's route through Central Park was largely unknown because she remained in a coma. (Compl't ¶ 84.)

Defendants urge that this depiction cannot be defamatory because it is substantially true and point to a written statement submitted by Fairstein to the Public Safety Committee of the New York City Council on January 30, 2003. (Docket # 88-1.) As noted, public statements made to a governmental body "are precisely the sort of materials of which [courts] may take judicial notice." ACLU, 925 F.3d at 599 n. 126.

In her remarks, Fairstein stated in part:

> Some critics have questioned the timeline in the case, talking about exoneration as something to be determined by discrepancies of two or three minutes. This was a *rampage* inside the park – it was mob violence, moving in the erratic and uneven way that a deadly pack does, under cover of darkness. It was not a carefully sequenced and orchestrated event. ... None of the victims who testified was looking at a watch when he or she was assaulted, nor did the jogger have any memory of the exact time she left her apartment. And the rioters didn't punch time cards as they took off across roadways and ball fields looking for more blood to spill.

 **\*71**  (Docket # 88-1 at NYCLD_039835-36; emphasis in original.) As part of her remarks, Fairstein explained her view that the Five had been hastily exonerated without the appropriate scrutiny of Reyes, and advanced an argument that the Five acted in concert with Reyes. (See id. at NYCLD_039829-30 ("The DNA match between the crime scene evidence involving the jogger and Matias Reyes does *not* exonerate any of the others convicted of her attack. ... It was obvious that some were guilty of rape because they 'acted in concert' by striking her on the head or by holding down her flailing arms and legs.") (emphasis in original).) Fairstein's statement also included the following praise of Lederer and the NYPD:

More than one of the defense counsels has alleged that I was the "architect" of what they claim was a miscarriage of justice. By the time Lederer and I were invited to the precinct – twenty-one hours after the first arrests – most of the suspects had already made oral and written admissions. Lederer then did an absolutely stunning job of questioning the attackers again, on videotape, with parents cooperating fully and sitting in on the process with their sons. When I first got to the station house, I took note of how careful the police had been to bend over backwards to accommodate the special circumstances of so many juvenile suspects. (Docket # 88-1 at NYCLD_039833.)

As noted, in deciding whether a statement is substantially true, "[c]ourts typically compare the complained of language with the alleged truth to determine whether the truth would have a different effect on the mind of the average reader." Franklin, 135 A.D.3d at 94, 21 N.Y.S.3d 6. The defendants have not demonstrated that Fairstein's remarks from 2003 render her portrayal in the aftermath of the crime as substantially true. The remarks of 2003 were a retrospective defense of work performed by Lederer and the NYPD: They did not describe Fairstein performing a hands-on role in assembling the timeline or directing suspect interviews, and instead credited the performance of Lederer and the NYPD. Indeed, Fairstein's remarks challenged the perception that she was an "architect" of the case, and instead pointed to the work of Lederer and the NYPD. (Docket # 88-1 at NYCLD_039833.)

While Fairstein's 2003 defense of the timeline's accuracy is consistent with the spirit of her dialogue in "When They See Us," it does not render her portrayal in the series as substantially true. If the portrayal of Fairstein in "When They See Us" were substituted with some version of Fairstein's 2003 remarks, it would have depicted Lederer and the NYPD leading the investigation, and, at some later point, Fairstein's agreement with the NYPD's timeline of events. Such a version of events would plausibly have had a different effect on the mind of the viewer, one that did not depict Fairstein as the prime mover in marshalling evidence and drawing conclusions about the events of April 19. See Franklin, 135 A.D.3d at 94, 21 N.Y.S.3d 6.

Because defendants have not demonstrated that substantial truth as to Fairstein's role in the creation of the timeline, defendants' motion to dismiss the defamation claims related to this depiction will be denied. (Compl't ¶¶ 77-85.)

C. Defendant's Motion to Dismiss Fairstein's Claims on the Grounds that They Are Privileged as Opinion Is Granted in Part and Denied in Part.

1. The Depictions of Fairstein and Lederer Discussing the Guilt of the Five Are Non-Actionable Opinion, Except for the Depiction of Fairstein Withholding DNA Evidence.

Fairstein asserts that Episodes 1 and 2 of the series contain defamatory depictions **\*72** of certain interactions that she had with Lederer. As noted, Lederer was the lead trial lawyer in the case against the Five and worked in the Sex Crimes Prosecution Unit headed by Fairstein.

As depicted in the series, Lederer sometimes expresses doubt about the guilt of the Five, while Fairstein consistently views the Five as responsible for the attack. In Episode 1, Lederer notes that witness statements conflicted about the rape of Meili, and Fairstein describes the witnesses as "lying." (Compl't ¶ 108; Ep. 1 at 47:42-49:28.) Lederer states, "I've got to face a judge and prosecute this Linda ... what is your case?" and Fairstein replies that "they're all guilty, each of these boys assaulted Patricia Meili, they all raped her and we know this because in each of these boys' confessions, they all bear eyewitness against each other." (Id.) Lederer notes the difficulty of presenting a case with "wildly conflicting statements, no physical evidence, no weapon," and Fairstein replies that "all we need is for one of these little shits to tie this whole thing together." (Id.) Lederer later tells Fairstein that none of the Five's statements match "the central facts of the crime," and a subsequent scene shows a detective coaching one of the Five about changing his statement. (Compl't ¶ 112 & Ep. 1, 49:59-50:29.)

Lederer later tells Fairstein that the Five's accounts are inconsistent with the victim's location. (Compl't ¶ 113 & Ep. 1 at 50:30-50:49.) Fairstein says that Korey Wise is "the one, he's the glue, we'll make sure he sticks it together." (Compl't ¶ 114 & Ep. 1 at 50:46-51:01.) Wise is then shown being struck by NYPD detectives. (Compl't ¶ 115 & Ep. 1 at 52:25.)

The Complaint also alleges that the portrayal of Fairstein's conversations with Lederer about a semen-stained sock found near the rape scene are defamatory. The sock contained a DNA sample that ultimately did not match any of the Five. Episode 2 depicts a conversation between Fairstein, Morgenthau and Lederer, where Morgenthau states, "We have a useless tape, we lost our gang narrative, we can't

find DNA." (Compl't ¶ 118 & Ep. 2, 16:39-17:14.) Fairstein responds, "We have a sock. Those little bastards shot their wad into a sock thinking we wouldn't find it, but we found it." (Compl't ¶ 118 & Ep. 2, 16:39-17:14.) Morgenthau then says, "We have DNA, good. The match will nail this thing down." (Id.) Lederer wonders aloud how the NYPD initially missed the sock, and Fairstein states, "Who cares? We have it now. And the kicker is none of the defense is aware yet so we can test it right before trial. Surprise!" (Id.) Appearing distressed, Lederer replies, "Surprise." (Id.)

Fairstein and Lederer later learn that the sock's DNA does not match any member of the Five. (Compl't ¶ 120 & Ep. 2 at 29:51-31:23.) In a conversation between the two, Lederer states, "I needed the DNA and the sock to nail all this down. It doesn't match. So, five defendants clean. Their DNA isn't there. It's not anywhere." (Id.) Fairstein responds, "So there must have been another attacker. One must have gotten away." (Id.) Lederer states, "You honestly believe that?" and Fairstein replies, "I do if it helps a jury believe what we know is true." (Id.) Lederer observes that this conflicts with their theory of the case, and states, "So, we have semen in a sock and it isn't theirs, any of them. So what are we doing here?" (Id.)

The two then discuss an inconclusive cervical DNA sample from the victim, and Fairstein states the inconclusive sample "means the Five can't be ruled out. Deal with the sock DNA, play up the cervical DNA." (Compl't ¶ 121 & Ep. 2 at 29:51-31:23.) Lederer responds, "Are you listening to yourself? You sound delusional. You want me to pretend that the sock never **\*73** existed? This is crossing a line." (Id.) Fairstein replies, "What line, Elizabeth? Where is the line for Patricia [Meili], huh? I'm sick of this shit. Where's the line for her? ... Fucking City! We hear something gruesome, we grimace and we move on. Well not this time." (Id.)

Lederer then expresses concern about the Five, and Fairstein replies, "They were in the park beating people up the same night that she's getting beat up and you're telling me they had nothing to do with it? Bullshit. They said it themselves, they told us what happened." (Compl't ¶ 122 & Ep. 2, 31:24-32:23.) Lederer states, "They were told," and Fairstein responds, "Come on, the eye sees but it cannot see itself, they couldn't see the whole picture of how their one part fit into the whole. That is all we did. It's too late for this. Like you said, the whole country is watching. They are watching you. This is your opportunity. Remember her." (Id.)

Fairstein asserts that these scenes were designed to make her the villain in the case, depict conversations that never occurred and falsely show her using "abusive and derogatory language." (Compl't ¶¶ 109, 115.) She asserts that the scenes falsely depict her as "desperate" to prosecute the Five and as permitting or encouraging coercive interrogation practices. (Compl't ¶ 116.)

Fairstein states that, in truth, it was Lederer who believed that the Five participated in the Meili attack as part of a series of attacks in Central Park and that Fairstein never had a personal "theory of the case." (Compl't ¶¶ 109, 116.) Fairstein also states that Lederer provided the Five's defense counsel with DNA results from the stained sock immediately after its discovery. (Compl't ¶ 119.) According to the Complaint, Lederer's reference to her as "delusional" portrayed Fairstein "as bordering on mental illness and lacking any sense of rationality when making judgments about cases." (Compl't ¶ 125.)

As noted, statements of pure opinion are non-actionable, and the distinction between statements of fact and opinion is an issue of law for the Court, which weighs "the content of the communication as a whole, its tone and apparent purpose." Davis, 24 N.Y.3d at 270, 998 N.Y.S.2d 131, 22 N.E.3d 999. Here, defendants assert that in the context of a dramatization based on controversial historical events, an average viewer would understand the scenes to be pure opinion reflecting a dramatized debate over the strengths and weaknesses of the prosecution's case. See John E. Reid & Assocs., Inc. v. Netflix, Inc., 2020 WL 1330657, at \*8 (N.D. Ill. Mar. 23, 2020) (noting that an alleged defamatory statement in "When They See Us" was uttered by "by a fictionalized character, during a fictionalized conversation, as part of series that uses actors and actresses, music, and imagined dialogue to dramatize historical events."); Lovingood v. Discovery Commc'ns, Inc., 800 Fed. App'x 840, 847-48 (11th Cir. 2020) (in reviewing a defamation claim involving a dramatization of the Challenger space shuttle tragedy, observing that "[o]verall, a reasonable viewer would understand the film as generally not purporting to present verbatim dialogue from the pages of history.") (summary order). The Court of Appeals for the Ninth Circuit has also observed that in a television dramatization, a character's "use of hyperbolic language" may be understood by viewers as "a rhetorical device" or "a dramatic passage of dialogue designed to maintain the viewer's attention" and not as "an objective statement of fact." Partington, 56 F.3d at 1157.

As has been discussed, the average viewer would not understand "When They See Us" to be a documentary that depicts a strictly factual version of events. It stars **\*74** famous actors, incorporates popular music and includes heavily stylized, non-realistic visual sequences. The average viewer would also understand that "When They See Us" advocates a point of view that is sympathetic to the Five and critical of law enforcement. For example, the well-known protest anthem "Fight the Power" by the hip-hop group Public Enemy plays in the early minutes of Episode 1, and the final episode of the series concludes with a montage where images of the actors portraying the Five dissolve into video portraits of their real-life counterparts. Viewing the entire series in context, the average viewer would understand "When They See Us" to be a Hollywood dramatization that builds its story around the premise that the Five were wrongly prosecuted and convicted.

 **[41]**  But the scenes in Episode 2 related to the DNA-marked sock cannot be fairly classified as pure opinion, and instead are actionable mixed opinion. In those scenes, Fairstein explains that the prosecution is in possession of a DNA-marked sock that has not been disclosed to the defense, and that the prosecution will "surprise" the defense by testing the sock on the eve of trial. (Compl't ¶ 118 & Ep. 2, 16:39-17:14.) After the sock is found not to match to any of the Five, Fairstein suggests that a sixth attacker must have been involved "if it helps a jury believe what we know is true." (Compl't ¶ 120 & Ep. 2 at 29:51-31:23.) These statements and actions attributable to Fairstein have a precise meaning, are capable of being proved or disproved, and even allowing for the artistic context of "When They See Us," the average viewer could reasonably believe that these depictions were based on undisclosed facts known to the filmmakers. Davis, 24 N.Y.3d at 270, 998 N.Y.S.2d 131, 22 N.E.3d 999. These scenes depict Fairstein concealing evidence from defense counsel – a likely violation of law and of professional responsibility – and manipulating the timing of a DNA test with the goal of advantaging the prosecution. The average viewer would not have a reason to conclude that such actions reflect a dramatized opinion of the filmmakers and could fairly conclude that the depiction was based on undisclosed facts known to the defendants.

The scenes described in paragraphs 118 to 121 of the Complaint are therefore not statements of pure opinion and are actionable as defamation.

 **[42]**  The remaining interactions with Lederer use the type of dramatized dialogue that, in the full context of "When They See Us," would not be understood by the average viewer as representations of fact. (Compl't ¶ 108; Ep. 1 at 47:42-49:28; Compl't ¶ 112 & Ep. 1, 49:59-50:29; Compl't ¶ 113 & Ep. 1 at 50:30-50:49; Compl't ¶ 114 & Ep. 1 at 50:46-51:01; Compl't ¶ 122 & Ep. 2, 31:24-32:23.) Fairstein's assertions that "they're all guilty" because "they all bear eyewitness against each other," that defendant Korey Wise is the "glue" of the prosecution's case, and that the prosecution needs "one of these little shits to tie this whole thing together" would be understood by the average viewer as hyperbolic dialogue in service of the series narrative. In the full context of the series, the dialogue between Fairstein and Lederer also conveys the filmmakers' opinions about the weaknesses of the case against the Five, using heightened and pithy rhetoric for dramatic effect. A work of popular entertainment cannot reasonably capture the many fine points and nuances of a criminal proceeding, and the somewhat simplistic dialogue between Fairstein and Lederer conveys to a general audience the filmmakers' views of the flaws in the prosecution's case. This is in marked contrast to the scenes involving the DNA-marked sock, where Fairstein is  **\*75**  depicted as taking direct actions to manipulate evidence and impair the Five's ability to defend themselves.

The Court therefore concludes that the Complaint has alleged actionable defamation as to the depiction of Fairstein's disclosure of the DNA-marked sock. (Compl't ¶ 118-21 & Ep. 2, 16:39-17:14, 29:51-31:23.) The scenes where Fairstein and Lederer debate the strengths and weaknesses of the case are privileged as pure opinion and therefore are not actionable. (Compl't ¶ 108; Ep. 1 at 47:42-49:28; Compl't ¶ 112 & Ep. 1, 49:59-50:29; Compl't ¶ 113 & Ep. 1 at 50:30-50:49; Compl't ¶ 114 & Ep. 1 at 50:46-51:01; Compl't ¶ 122 & Ep. 2, 31:24-32:23.)

2. The Complaint Plausibly Alleges a Defamatory Meaning to Ryan's Statement that Fairstein "Coerced Those Boys" to Confess.

The Complaint also asserts that the series contains a defamatory depiction in a scene in Episode 4 where Fairstein meets with Nancy Ryan following exoneration of the Five. As previously discussed, an early scene of Episode 1 depicts a non-defamatory administrative conflict about whether prosecution of the Five would be overseen by Fairstein's unit or Ryan's.

The series later depicts Ryan as an important figure in reexamining the case against the Five. In one scene, Ryan and another assistant district attorney, Peter Casolaro, are shown reviewing a case file. Casolaro states, "Fairstein acknowledged the track marks ... 'this is where he pulled her in,' " and asks Ryan when the theory of the case changed. (Compl't ¶ 127 & Ep. 4 at 1:04:11-1:04:35.) Ryan replies, "I was there when it changed." (Id.)

Fairstein's final appearance in "When They See Us" occurs later in Episode 4, where she and Ryan revisit the case following exoneration of the Five. Fairstein and Ryan meet at an upscale restaurant, and Fairstein states to Ryan, "You're here to gloat. It doesn't matter, you simply identified a sixth rapist. I always said there may be more." (Compl't ¶ 128 & Ep. 4 at 1:09:49-1:12:43.) Ryan responds, "You said that to cover because you knew you coerced those boys into saying what they did."[2] (Id.) Ryan later recites the titles of novels authored by Fairstein while taking paperback copies from a bag, and states that while Fairstein was writing crime novels, the Five were serving time in prison. (Compl't ¶ 128 & Ep. 4 at 1:09:49-1:12:43.)

The scene includes a more extensive exchange between the two characters that is not quoted in the Complaint. Fairstein maintains that the Five "said what they said freely" and Ryan replies, "I actually think you convinced yourself of that. (Ep. 4 at 1:09:49-1:12:43.) Fairstein then explains to Ryan that a police commission would soon issue a 43-page report concluding that the Five were guilty of the attack. (Id.) Ryan expresses skepticism about the police conducting a self-investigation and tells Fairstein, "We pored over your confession tapes. We reconstructed the events of that night minute by minute. I know what was done." (Id.) Fairstein replies, "Oh, you know nothing," and Ryan responds by citing the extensive presence of Reyes's DNA at the crime scene and stating, "It was him. Only him." (Id.) Fairstein maintains that Reyes "ran with that pack **\*76** of kids. He stayed longer while others moved on." (Id.) After Ryan notes Fairstein's work as an author, Fairstein appears frustrated, and states that she watched while thirty NYPD detectives conducted a "brilliant" investigation to seek justice for a woman who was brutally beaten and discarded, and states, "We helped make sure those boys got what they deserved. And I'll be damned if I'm going to lose a wink of sleep over it." (Id.) Fairstein then thanks Ryan for buying her books and leaves the restaurant table. (Id.)

The Complaint asserts that Fairstein has never spoken with Ryan about the Reyes confession. (Compl't ¶¶ 126, 129.) It asserts that these scenes falsely attribute the prosecution's theory of the case to Fairstein and falsely depicts her as responsible for implementing coercive interrogation techniques by the police. (Compl't ¶ 129.)

 **[43]**    Viewed in context, the average viewer could reasonably interpret Ryan's statement that "you [Fairstein] coerced those boys into saying what they did" to be a factual assertion. Ryan's statement that her team "pored over your confession tapes" implies that Ryan's own investigation concluded that Fairstein directed the conduct of police interviews that secured confessions that she described as "coerced." This notion is underscored by Ryan's assertion that her team reconstructed the sequence of events and that, "I know what was done." The statements have a precise meaning and are capable of being proved true or false. The series depicts Ryan as an authoritative public official who questions law enforcement's approach to the case. The damning judgment of Fairstein's conduct voiced by a professional colleague could plausibly hold Fairstein up to shame, ridicule and contempt. Because Ryan's statements purport to be based on facts that she uncovered during her investigation and are not couched in subjective language, the average viewer could conclude that the defendants "know[ ] certain facts, unknown to the audience, which support the speaker[s'] opinion and are detrimental to the person being discussed." Davis, 24 N.Y.3d at 269, 998 N.Y.S.2d 131, 22 N.E.3d 999.

Defendants urge that the Ryan character merely engaged in "hyperbolic expression" and that Ryan's reference to "your" confession tapes "cannot be read as a factual statement that *Plaintiff herself* was responsible" for alleged coercive tactics. (Def. Mem. at 21; emphasis in original.) For the reasons explained, the average viewer also could conclude that Ryan's statement was based in fact and implies that Fairstein had a personal role in securing the confessions. If "words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." Celle, 209 F.3d at 178 (quotation marks omitted). Defendants' motion to dismiss will be denied as to this exchange.

 **[44]**    However, similar to the depiction of Fairstein's interactions with Lederer, other aspects of the exchange reflect the filmmakers' opinions about conflicting theories of the case and the underlying evidence, including the reliability

of the NYPD's self-investigation, whether the NYPD was "brilliant" in investigating the attack and whether Reyes plausibly acted in concert with the Five. The average viewer would understand such lines of dialogue to be a dramatized representation of the filmmakers' view that the Five did not act in concert with Reyes and that the NYPD's internal report did not offer a reliable accounting of events. The Fairstein and Ryan characters are depicted as **\*77** having conflicting and subjective opinions about these issues, and this scene functions in part as a closing summary of the filmmakers' views of weaknesses in the evidence. Even though the average viewer would likely view Fairstein as the principal villain in the series, and would likely view Ryan as a fair-minded person who had been consistently seeking the truth, such an interpretative gloss is the opinion-based prerogative of the defendants as speakers.

Defendants' motion to dismiss will therefore be denied to the extent that it plausibly alleges a defamatory meaning to Ryan's assertion in Episode 4 that the police interviews resulting in the taped confessions were coerced and made at Fairstein's direction, but will otherwise be granted as to the scene depicting Fairstein's final conversation with Ryan. (Compl't ¶¶ 126-30.)

D. The Motion to Dismiss Fairstein's Claims Directed to Her Instructions to the NYPD Is Denied.

1. The Complaint Plausibly Alleges a Defamatory Meaning to Fairstein's Instructions for Interrogation.

Fairstein alleges that the series falsely depicts her as instructing NYPD officers to harshly interrogate suspects. (Compl't ¶¶ 104-07.) In the series, she instructs members of the NYPD as follows: "We've got suspects. We've got kids in custody. Interrogate. Make them name their accomplices. This is not business as usual. The press is crawling all over this. No kid gloves here. These are not kids. They raped this woman. Our lady jogger deserves this." (Compl't ¶ 104 & Ep. 1 at 22:35-22:53.) The next scene shows Kevin Richardson alone in a room and handcuffed to a chair with a black eye. (Ep. 1 at 22:54-24:17.) Outside of Fairstein's presence, detectives of the NYPD observe that Richardson's mother left voluntarily, and one states that it "feels like Christmas." (Id.) Detectives begin to question Richardson, and one tells him, "The sooner you tell us what you know, the sooner you go home." (Id.) Richardson then asks for his mother and is told that she left. (Id.) A detective tells him, "It's just us. You

and us." (Id.) The series then shows detectives questioning members of the Five and others with varying levels of verbal aggression and what appears to be non-injurious physical contact. (Ep. 1 at 24:17-33:30.)

The Complaint alleges that this sequence "portrays Ms. Fairstein not only as a racist, but unethical as well." (Compl't ¶ 105.) It alleges that Fairstein was not involved in the NYPD's questioning of witnesses or suspects at any precinct and had no supervisory role in the police investigation. (Compl't ¶¶ 105-07.)

Defendants urge that phrases like "not business as usual" and "no kid gloves here" are typical heated rhetoric used for dramatic purposes to depict authorities are under pressure. (Def. Mem. at 24.) Defendants urge that such a "dramatic trope" cannot support the conclusion that Fairstein directed NYPD officers to bend rules or alter procedures. (Id.)

**[45]** As depicted in the series, however, Fairstein had a hands-on role in supervising the early stages of the investigation, and the series strongly suggests that she had the authority to direct the actions of the NYPD. She expressly instructs officers to "make" the suspects name their accomplices and orders them not to use "kid gloves" on the suspects because they "raped this woman" and are "not kids." This language goes beyond dramatic trope or rhetorical hyperbole: The average viewer could understand her comments as an instruction to coerce suspects into naming accomplices, and to treat the suspects as adults rather than minors because Fairstein considers them rapists. The episode **\*78** immediately shows officers using rhetorical and physical intimidation against various suspects, who are minors. The words and actions depicted have a precise meaning and are capable of being proved true or untrue, and in context, the average viewer could reasonably perceive this sequence to show members of the NYPD acting pursuant to Fairstein's instruction. The average viewer could reasonably believe that this depiction is based on facts known to defendants but unknown to the audience. Davis, 24 N.Y.3d at 269, 998 N.Y.S.2d 131, 22 N.E.3d 999.

The Court concludes that the Complaint plausibly alleges a defamatory meaning to Fairstein's instructions about suspect interrogation. The Complaint plausibly alleges that the depiction is false. In full context, the average viewer would conclude that Fairstein was responsible for instructing members of the NYPD to use harsh and coercive interrogation practices against minors. The use of false confessions brought

about through law enforcement pressure and duplicity is a significant theme in later portions of the series. The average viewer could therefore interpret Fairstein's interrogation instructions as beginning the chain of events that resulted in the unjust conviction of the Five, such that the depiction could plausibly expose Fairstein to public contempt, ridicule, or disgrace, or an induce an evil opinion of her. See Foster, 87 N.Y.2d at 751, 642 N.Y.S.2d 583, 665 N.E.2d 153.

The Court therefore concludes that Fairstein has plausibly alleged a defamatory meaning to her interrogation instructions. (Compl't ¶ 104 & Ep. 1 at 22:35-22:53.) Defendants' motion to dismiss will therefore be denied as to this scene.

2. The Complaint Plausibly Alleges Defamation Based on Fairstein's Instructions to Investigate Young Black Males.

Fairstein alleges that the series includes a defamatory depiction of her instructions to investigate young, black males in Harlem. (Compl't ¶¶ 97-103.) In a scene set at the 24th Precinct, she instructs a group of assembled NYPD officers as follows:

> I need that whole group. I have some of them, and descriptions of others, but I need all of them. Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now. I want units out strong. Come on, guys. What did we miss? Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see. You bring every kid who was in the park last night.

(Compl't ¶ 97 & Ep. 1 at 19:54-20:30.) During portions of Fairstein's remarks, the series shows NYPD officers lining young men against a fence and searching them. (Ep. 1 at 19:54-20:30.) The scene immediately following her remarks shows a group of seemingly frustrated officers, two of whom see Salaam and Wise on the street by chance, demand their ID, and take them into custody. (Ep. 1 at 20:31-22:20.)

Fairstein asserts that she did not instruct officers to round up young black men who were in Central Park and that she did not instruct officers in the case. (Compl't ¶¶ 98-102.) She asserts that the scene is also defamatory because the word "thug" has racist connotations and therefore depicts her as a racist. (Compl't ¶ 103.)

[46]  As depicted in "When They See Us," the average viewer could conclude from the scene that Fairstein directed NYPD officers to conduct a discriminatory canvas in Harlem. The depiction has a precise meaning and is capable of being proved or disproved. The instructions to "get an army of blue up in Harlem" in *79 pursuit of "young black male[s]" and to "go into those projects and you stop every little thug you see" could reasonably be understood by a viewer as a directive to indiscriminately canvass and search young black men. The term "thug" is not used to describe individuals who were believed, rightly or wrongly, to have committed the brutal rape. Rather, it implies that the "projects" in Harlem are populated with "thugs" ("stop every little thug you see") and among those stopped, one or more may know something about the rape. Fairstein's words are spoken against images of police searching young men along a fence and the series immediately transitions to the depiction of officers demanding ID from Salaam and Wise. Viewed in context and taken as a whole, the Complaint plausibly alleges that the dialogue attributed to Fairstein advocates unlawful police stops of young black males without reasonable suspicion, thereby subjecting her to hatred and contempt. The average viewer would not necessarily conclude that her remarks were merely a reflection of the filmmakers' opinions about the perspective of law enforcement, and could instead conclude that Fairstein directed discriminatory policing practices. The average viewer could reasonably believe that this depiction is based on facts known to defendants but unknown to the audience. Davis, 24 N.Y.3d at 269, 998 N.Y.S.2d 131, 22 N.E.3d 999.

Defendants' motion to dismiss Fairstein's defamation claims directed to her character's remarks urging the police to canvass the projects in Harlem and stop "every little thug" will therefore be denied. (Compl't ¶¶ 97-103.)

E. The Complaint Does Not Allege Defamation as to Fairstein's Questions about Antron McCray.

Defendants urge that Fairstein has not alleged a defamatory meaning to a scene where she is shown as directly questioning young suspects. Because Fairstein's claim is based on various inferences that lack support in the events depicted, her defamation claims will be dismissed as to this scene.

In Episode 1, on the morning of April 20, 1989, Fairstein is shown reading from a folder and asking police officers about the definition of "wiling out" or "wilding out," while

struggling with the pronunciation. (Compl't ¶ 63 & Ep. 1, 9:46-9:55.) Fairstein is then shown in a room full of young men of color who are suspected of participating in or having knowledge about the attacks in Central Park. (Compl't ¶ 65 & Ep. 1, 11:00-12:38.) She points to a black eye on Kevin Richardson, who is one of the Five, and says, "What happened to that one?" and asks a member of law enforcement what constitutes "wilding," who replies that he does not know. (Id.) Fairstein then questions an unidentified young man who is present in the room.[3] (Compl't ¶ 66 & Ep. 1, 11:00-12:38.) She asks if he saw people doing bad things in the park, and he responds that he was with his "boy Tron." (Id.) Fairstein asks the boy if he was "out wilding with Tron" before inquiring about Tron's name and address. (Id.) The Complaint notes that the young men are not shown being read Miranda rights and that questioning persons younger than sixteen outside the presence of their parents violates New York law. (Id.)

**\*80** The Complaint asserts that Fairstein never questioned suspects on April 20, including members of the Five, and that she was not familiar with the terms "wiling out" or "wilding out." (Compl't ¶¶ 67-68.) The Complaint asserts that based on publicly available documents, Antron McCray was first named by two persons who claimed that he was responsible for a "murder" in Central Park. (Compl't ¶ 69.) It asserts that the relevant interviews the Five and others occurred in the presence of a parent, following the recitation of Miranda rights, and that Fairstein played no role in any interviews about McCray. (Compl't ¶¶ 70-73.) The Complaint also asserts that Fairstein did not use the term "wilding," and asserts that the word was first used by several young men questioned about the events of April 19, before being adopted by the press as a term that stoked public fears of black men. (Compl't ¶¶ 74-76.)

**[47]** The Complaint does not plausibly allege a defamatory meaning to Fairstein's depiction in this scene. First, the scene does not show an express or implied denial of Miranda protections. The scene depicts a large number of young men gathered in a room when Fairstein arrives. There is no suggestion that they were advised of Miranda protections but also no suggestion that they were not so informed. The actions and dialogue do not reflect an express or implied limitation on their right to remain silent or to consult with an attorney. The average viewer would not understand this scene to depict a deprivation of Miranda's protections, or of any other protections afforded under the U.S. Constitution. The Complaint's assertion that the series depicts Fairstein as

violating Miranda protections is not supported by the scene viewed in context.

Fairstein's questioning of minors outside the presence of a parent or guardian is a somewhat closer issue. It is true that the scene does not reflect the presence of any parent while Fairstein questions the young men, and defendants do not dispute that New York law requires that a parent be present when law enforcement questions a minor younger than age 16. (See Def. Mem. at 23.) Similar to the issue of Miranda protections, however, the series does not suggest any calculated effort to exclude parents. The scene is brief and Fairstein's questions are generalized and conversational. Moreover, the average viewer would be unlikely to know of a requirement under New York law that a parent be present during questioning, and the scene does not suggest that Fairstein was attempting to evade legal requirements. In context, the average viewer would not view Fairstein's portrayal in this scene as violating New York's restrictions on the questioning of minors or otherwise defamatory.

**[48]** Lastly, the scene does not defame Fairstein by having her utter the word "wilding." Fairstein is shown to lack familiarity with the word's definition and pronunciation. At this moment in the series, she is repeating an unfamiliar word that she only recently encountered in an internal report. Given the word's usage in context, the average viewer would not attach a defamatory meaning to Fairstein's use of the word "wilding."

Fairstein's defamation claim directed to her questioning about "Tron" turns on speculative interpretations not supported by actions or dialogue depicted in the series. Her claim directed to these scenes will therefore be dismissed.

F. Fairstein Has Not Plausibly Alleged Defamation Based on Language Referring to the Five as "Animals."

The Complaint alleges that the defendants defamed Fairstein by depicting her as using derogatory and "dehumanizing" **\*81** language in a scene with Ryan. (Compl't ¶¶ 94-96.) In one of the scenes set at the 24th Precinct on April 20, Fairstein is shown briefing NYPD members in front of a map of Central Park. (Compl't ¶ 94 & Ep. 1 at 18:42-19:48.) Fairstein says, "They brutally raped a woman and discarded her like a piece of garbage, left her for dead, bleeding, bound, naked. And to think we were going to release these animals to family court and put them back on the streets." (Id.) Fairstein notes

that a half-hour is unaccounted for in the timeline of the attack, and, pointing to a map of Central Park, says, "What did these animals do between here and here? Are there other victims still in the Park?" (Id.) Ryan then says to Fairstein, "Good luck. You're gonna need it." (Id.) According to the Complaint, the scene is fabricated, and the dialogue "portrays Ms. Fairstein as dehumanizing children of color by referring to them as 'animals,' while trying to create support among police officers for a weak case, as indicated by ADA Ryan's skepticism." (Compl't ¶ 95.)

 [49]   In this context, the Fairstein character's use of the word "animals" is derogatory and appears intended to discomfort the viewer. Accepting Fairstein's assertion that she never uttered such a remark, the use of the word "animals" in a dramatized interpretation of historical events is not so inflammatory that it rises to the level of defamation. See Chau, 771 F.3d at 127 ("Not all (or even most) maligning remarks can be considered defamatory."). The word is used to describe suspects who she believed "raped a woman and discarded her like a piece of garbage ...." While the description of suspects as "animals" has fraught and negative connotations, given the context of the moment, the term's use reflects a character's outrage over the attacks, and is not the type of remark that plausibly exposes a person to the type of public hatred or shame that forms the basis of a defamation claim.

 [50]   Additionally, the series' use of the word "animals" is also protected as a privileged opinion on the part of the defendants. In the full context of "When They See Us," the average viewer would understand the term's use to reflect the filmmakers' perception that prosecutors and law enforcement viewed the suspects as a violent, out-of-control pack presumed to be guilty, and not as individuals. While Fairstein is free to challenge that perception, such language in a dramatized series drawn from historical events would not be understood by the average viewer as a faithful representation of Fairstein's actions and words, and would instead be viewed as heightened and hyperbolic rhetoric that reflects the filmmakers' critique of the prosecution. The degree to which Fairstein and others pre-judged the guilt of the Five and differentiated between them as individuals is a subjective opinion that does not easily lend itself to being proved or disproved.

The question understandably arises why the Court draws a distinction between the use of the terms "little thugs" and "animals." The phrase "stop every little thug you see" was used in the portrayal to refer indiscriminately to young males

in the projects of Harlem without cause for suspicion that the particular person was involved in the Central Park attack or any other crime. It portrays Fairstein as advocating an unlawful stop of innocent individuals, young, black men in Harlem. "Animals," a similarly dehumanizing term, was used to describe individuals who were believed to have participated in an exceptionally brutal and savage rape of a woman, leaving her in a coma. Neither epithet is generally considered appropriate but, in context, only one – "stop every little thug you see" – portrays Fairstein as having contempt  **\*82**  for and directing unlawful action against young men in Harlem regardless of their participation in criminal activity. In context, the use of "animals" was reserved for supposed participants in an extremely brutal crime. The average viewer seeing the entire series would understand the difference and see the word "animals" used in context as inappropriate but not implying a generalized view of all young men of color, or otherwise holding Fairstein up to ridicule and contempt for its use.

Because the Complaint does not plausibly allege a defamatory meaning to Fairstein's use of the word "animals," the Complaint will be dismissed to the extent that it asserts defamation based on that scene. (Compl't ¶¶ 94-96.)

### III. The Motion to Dismiss the Claim of Civil Conspiracy Will Be Denied.

Count VII alleges that defendants conspired to defame Fairstein. (Compl't ¶¶ 375-82.) It asserts that defendants collaboratively wrote, produced and published "When They See Us" with the intent to direct public ridicule and scorn to Fairstein and to cause her harm. (Compl't ¶¶ 377-78.)

 [51]    [52]  Defendants move to dismiss this claim on the limited ground that New York "does not recognize a freestanding claim for conspiracy." Carlson v. Am. Int'l Inc., 30 N.Y.3d 288, 310, 67 N.Y.S.3d 100, 89 N.E.3d 490 (2017). But New York law does, in fact, recognize a claim of civil conspiracy where a plaintiff adequately alleges an underlying tort. See, e.g., Alexander & Alexander of New York, Inc. v. Fritzen, 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986) ("Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort."). "In order to properly plead a cause of action to recover damages for civil conspiracy, the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement." Perez v. Lopez, 97 A.D.3d

558, 560, 948 N.Y.S.2d 312 (2012) (reversing trial court's dismissal of claim of conspiracy to defame).

**[53]** Here, the Complaint has plausibly alleges an underlying tort of defamation and that the defendants collaborated in the writing, production and publication of defamatory statements. (Compl't ¶¶ 376-77.) The question of whether defendants actually agreed to defame Fairstein is properly subject to discovery, but the opprobrium expressed toward Fairstein in certain of defendants' public comments lend some plausibility to the claim. (See, e.g., Compl't ¶ 194 (quoting public remark from Locke stating: "But fuck it: Linda Fairstein is trash, was trash, will always be trash.").)

Defendants' motion to dismiss the claim of conspiracy to commit defamation will therefore be denied.

CONCLUSION.

Defendants' motion to dismiss is granted in part and denied in part.

Specifically, the motion is denied as to the scenes described in paragraphs 77-85 (the creation of a timeline), 118-21 (the withholding of DNA evidence), 104-07 (the instructions to interrogate), 128 (Ryan's assertion that Fairstein "coerced" the Five into confessing), and 97-103 (the instructions to canvass Harlem). The motion to dismiss Fairstein's claim of civil conspiracy is also denied. (Compl't ¶¶ 375-82.)

The motion is granted as to the scenes described in paragraphs 51-56 (the Central Park sequence), 59-61 (the drafting of the press release), 87-93 (Fairstein's bureaucratic infighting with Ryan), 108-15, 122 **\*83** (debates between Lederer and Fairstein about the strength of evidence), 127-28 (statements in Fairstein's final meeting with Ryan that do not relate to "coerced" confessions), 64-66 (questioning about Antron McCray), and 94-96 (the reference to attackers as "animals").

SO ORDERED.

**All Citations**

553 F.Supp.3d 48

Footnotes

1    As will be discussed below, the Court will treat the episodes of "When They See Us" as a matter incorporated by reference into the Complaint, and will consider them in connection with this Rule 12(b)(6) motion without converting the motion into one for summary judgment.

2    The Complaint misquotes and condenses the exchange by quoting Ryan's dialogue as, "You said that to cover because you knew you coerced those boys into say what they did Linda, we pored over your confession tapes." (Compl't ¶ 128.) However, Ryan's assertion that Fairstein "coerced" the Five is made in response to Fairstein's reference to a "sixth rapist," and Ryan's assertion that "[w]e pored over your confession tapes" is raised separately, in response to Fairstein's mention of the NYPD's internal investigation.

3    The Complaint asserts that Fairstein is depicted as questioning an individual named Clarence Thomas, who was not a member of the Five. (Compl't ¶¶ 69-72.) The Complaint asserts that public records indicate that on the night of April 19, 1989, Thomas was in a police van when he identified Antron McCray as responsible for a "murder" in Central Park, and that he later described attacks purportedly committed by McCray. (Compl't ¶¶ 69, 71.)

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

⚑    KeyCite Yellow Flag

Distinguished by N.H. v. Graham, N.Y.Sup., April 24, 2025

24 N.Y.3d 713

Court of Appeals of New York.

FRONT, INC., Plaintiff,

v.

Philip KHALIL et al., Defendants.

Philip Khalil, Third–Party Plaintiff–Appellant,

v.

Jeffrey A. Kimmel et al., Third–

Party Defendants–Respondents.

Feb. 24, 2015.

**Synopsis**

**Background:** Employer brought action against former employee alleging theft of employer's proprietary information and use of that information to divert business to former employee's prospective employer, and employee filed third-party complaint against employer's counsel for defamation based on cease and desist letter that counsel sent to former employee and his prospective employer. The Supreme Court, New York County, Donna M. Mills, J., dismissed the complaint in part. Appeal was taken. The Supreme Court, Appellate Division, 103 A.D.3d 481, 960 N.Y.S.2d 79, affirmed as modified, and former employee was granted leave to appeal.

**Holdings:** The Court of Appeals, Abdus–Salaam, J., held that:

[1] prelitigation statements related to that litigation are entitled to qualified privilege, abrogating *Sexter & Warmflash v. Margrabe*, 38 A.D.3d 163, 828 N.Y.S.2d 315, *Vodopia v. Ziff–Davis*, 243 A.D.2d 368, 663 N.Y.S.2d 178, *Lieberman v. Hoffman*, 239 A.D.2d 273, 658 N.Y.S.2d 18, *Sklover v. Sack*, 102 A.D.3d 855, 958 N.Y.S.2d 474, and

[2] letter was entitled to qualified privilege.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (7)

**[1]    Libel and Slander** 🔑 Briefs, arguments, and statements of counsel

Absolute immunity from liability for defamation exists for oral or written statements made by attorneys in connection with a proceeding before a court when such words or writings are material and pertinent to the questions involved.

34 Cases that cite this headnote

**[2]    Libel and Slander** 🔑 Briefs, arguments, and statements of counsel

To allow statements by attorneys in connection with a proceeding before a court to be a basis for a defamation action would be an impediment to justice, because it would hamper the search for truth and prevent making inquiries with that freedom and boldness which the welfare of society requires.

8 Cases that cite this headnote

**[3]    Libel and Slander** 🔑 Statements made in judicial and official proceedings

Where an attorney's statements in connection with a proceeding before a court are so needlessly defamatory as to warrant the inference of express malice the privilege has been abused and protection for those statements is withdrawn.

12 Cases that cite this headnote

**[4]    Libel and Slander** 🔑 Absolute Privilege

**Libel and Slander** 🔑 Briefs, arguments, and statements of counsel

Relevant statements made by attorneys in judicial or quasi-judicial proceedings are afforded absolute protection so that those discharging a public function may speak freely to zealously represent their clients without fear of

reprisal or financial hazard; the privilege attaches to such statements irrespective of an attorney's motive for making them.

22 Cases that cite this headnote

**[5]**     **Libel and Slander**  ⚷ Qualified Privilege

**Libel and Slander**  ⚷ Existence and Effect of Malice

A statement is subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his or her own affairs, in a matter where his or her interest is concerned; in general, if the privilege is qualified, it can be lost by plaintiff's proof that defendant acted out of malice.

7 Cases that cite this headnote

**[6]**     **Libel and Slander**  ⚷ Qualified Privilege

**Libel and Slander**  ⚷ Good faith in exercise of privilege or right

Statements made by attorneys prior to the commencement of an anticipated litigation are subject to qualified privilege, and the privilege is lost where a defendant proves that the statements were not pertinent to a good-faith anticipated litigation; abrogating *Sexter & Warmflash v. Margrabe,* 38 A.D.3d 163, 828 N.Y.S.2d 315*; Vodopia v. Ziff–Davis,* 243 A.D.3d 368, 663 N.Y.S.2d 178*; Lieberman v. Hoffman,* 239 A.D.2d 273, 658 N.Y.S.2d 18*; Sklover v. Sack,* 102 A.D.3d 855, 958 N.Y.S.2d 474.

38 Cases that cite this headnote

**[7]**     **Libel and Slander**  ⚷ Qualified Privilege

**Libel and Slander**  ⚷ Good faith in exercise of privilege or right

Prelitigation cease and desist letter sent by employer's counsel to former employee who allegedly stole proprietary information, as well as to former employee's prospective employer, demanding return of the information, was entitled to qualified privilege, precluding defamation claims by employee against counsel,

where counsel had good-faith basis to anticipate litigation and letter was pertinent to that litigation.

37 Cases that cite this headnote

**Attorneys and Law Firms**

 ***582  The Marantz Law Firm, Rye (Neil G. Marantz of counsel), for third-party plaintiff-appellant.

Traub Lieberman Straus & Shrewsberry LLP, Hawthorne (Lisa L. Shrewsberry of counsel), for third-party defendants-respondents.

 ***715  OPINION OF THE COURT**

ABDUS–SALAAM, J.

 **16  This appeal requires this Court to answer the open question of whether statements made by attorneys prior to the commencement of litigation are privileged. We hold that such statements are protected by a qualified privilege. If the statements are pertinent to a good faith anticipated litigation, no cause of action for defamation can be based on those statements.

I

Defendant/third-party plaintiff Philip Khalil was employed as director of engineering for plaintiff Front, Inc. (Front), an American architectural and engineering design and consulting firm, from June 2003 through March 2011. During his employment, Khalil, a citizen of the United Kingdom, applied for and obtained resident alien status. Front sponsored Khalil's application. In March 2011, Khalil orally resigned from his position at Front, informing the firm that he intended to take a position with defendant Eckersley O'Callaghan Structural Design (EOC), a United Kingdom firm and one of Front's competitors. Khalil subsequently tendered a written letter of resignation to Front.

 *716  Shortly thereafter, an engineer employed by Front observed an external hard drive connected to Khalil's work computer. Upon investigation, Front allegedly discovered that Khalil had downloaded to the device the firm's

Front, Inc. v. Khalil, 24 N.Y.3d 713 (2015)
28 N.E.3d 15, 4 N.Y.S.3d 581, 2015 N.Y. Slip Op. 01554

entire network drive directory, which allegedly included all projects Front worked on, client contact information, and other proprietary information. Front confronted Khalil, who apparently admitted that he had intended to save Front's files to his hard drive. Front immediately terminated Khalil's employment. Upon further investigation, Front allegedly discovered that Khalil worked on approximately 40 side projects for Front's competitors, including EOC, in violation of the terms of his employment contract. Front also asserted that Khalil, with assistance from defendant James O'Callaghan, diverted work away from Front to EOC —namely, a project for the Apple Store on Broadway in New York City.

**17  ***583  Front retained Meister Seelig & Fein LLP (MSF), and, in April 2011, Jeffrey A. Kimmel, an MSF attorney, sent a letter to Khalil. The letter stated that Khalil attempted to steal Front's confidential and proprietary information, that he conducted an illegal competing side business which unlawfully diverted business opportunities from Front, misappropriated trade secrets, and violated applicable ethical and professional codes of conduct as well as the duty of loyalty owed to Front. Additionally, the letter stated that Khalil may be subject to punishment under the Economic Espionage Act of 1996, stating in a footnote that he "violated the terms of [his] application and immigrant status" and "several codes of conduct and ethics of the various boards of licensure and professional associations to which [he is] a member." The letter demanded, among other things, that Khalil cease and desist from using Front's confidential and proprietary information, return the proprietary information he had taken, and refrain from contacting Front's clients.

Thereafter, Kimmel sent a letter to O'Callaghan and EOC, enclosing and referencing the earlier letter to Khalil, and stating that Khalil conspired with EOC to breach his fiduciary duty to Front, that EOC was aware that Khalil was a full-time employee of Front, and that EOC was diverting business away from Front to itself. The letter made demands that were nearly identical to those made in the letter to Khalil. Kimmel copied O'Callaghan and Brian Eckersley, EOC partners, on the letter.

After Khalil and EOC failed to comply with Front's demands, Front commenced an action against Khalil, O'Callaghan, and **\*717** EOC. As to all defendants, Front sought damages for claims including civil conspiracy, misappropriation of trade secrets, and common-law unfair competition. As to Khalil, Front asserted causes of action for breach of contract, the implied covenant of good faith and fair dealing, and fiduciary duty.

Khalil commenced a third-party action against Kimmel and MSF, asserting a cause of action for libel per se based upon the statements made by Kimmel in his April 2011 letter to Khalil. Specifically, Khalil asserted that the allegations made in the letter were expressed as "statement[s] of fact, not based upon information and belief or otherwise qualified in any manner." Additionally, Khalil alleged interference with a prospective business relationship, and tortious interference with business relations. Khalil, O'Callaghan, and EOC collectively moved to dismiss the complaint, pursuant to CPLR 3211(a)(5) and (7) and CPLR 3016(b), on the ground that it was time-barred, failed to state a cause of action, and lacked the requisite specificity. Kimmel and MSF moved to dismiss the third-party complaint for failure to state a cause of action.

As concerns this appeal, Supreme Court, New York County determined "that the letter to Khalil is absolutely privileged" and that it therefore did "not need to reach the question of malice," citing First Department precedent as support. (*Front, Inc. v. Khalil,* 2012 N.Y. Slip Op. 31404[U], \*24, 2012 WL 1965990 [2012].) The court reasoned that the letter to Khalil "clearly relate [d] to the litigation initiated by Front" and "the demands made in the letters to Khalil and to O'Callaghan and EOC ... substantially reflect the causes of action and relief requested" in the main action. (2012 N.Y. Slip Op. 31404 [U], \*23.) The court added: "The fact that the litigation was not initiated until approximately six months after the letters were sent does not alter the court's conclusion." (2012 N.Y. Slip Op. 31404[U], \*23–24.) Khalil appealed, and Front cross-appealed.

**\*\*18  \*\*\*584**  The Appellate Division upheld the dismissal of the third-party action against Kimmel and MSF, concluding that "an absolute privilege attaches to the statements made by [Front]'s counsel in the April 2011 letters, because they were issued in the context of 'prospective litigation' " (*Front, Inc. v. Khalil,* 103 A.D.3d 481, 483–484, 960 N.Y.S.2d 79 [2013], citing *Sexter & Warmflash, P.C. v. Margrabe,* 38 A.D.3d 163, 174, 828 N.Y.S.2d 315 [1st Dept.2007]; **\*718** *Vodopia v. Ziff–Davis Publ. Co.,* 243 A.D.2d 368, 368, 663 N.Y.S.2d 178 [1st Dept. 1997] ). This Court granted Kahlil's motion for leave to appeal.[1]

II

 **[1]**    **[2]**    **[3]**    **[4]**    Commencing with this Court's 1897 decision in *Youmans v. Smith,* 153 N.Y. 214, 47 N.E. 265 (1897), we have held that absolute immunity from liability for defamation exists for oral or written statements made by attorneys in connection with a proceeding before a court "when such words and writings are material and pertinent to the questions involved" (*id.* at 219, 47 N.E. 265). There we stated that to allow such statements to be a basis for a defamation action "would be an impediment to justice, because it would hamper the search for truth and prevent making inquiries with that freedom and boldness which the welfare of society requires" (*id.* at 220, 47 N.E. 265). We also noted that where an attorney's statements are "so needlessly defamatory as to warrant the inference of express malice" the privilege has been abused and "protection is withdrawn" (*id.*). Nearly a century later in *Park Knoll Assoc. v. Schmidt,* 59 N.Y.2d 205, 464 N.Y.S.2d 424, 451 N.E.2d 182 (1983), this Court held that relevant statements made in judicial or quasi-judicial proceedings are afforded absolute protection so that those discharging a public function may speak freely to zealously represent their clients without fear of reprisal or financial hazard (*see id.* at 209, 464 N.Y.S.2d 424, 451 N.E.2d 182). The privilege attaches to such statements irrespective of an attorney's motive for making them (*see Wiener v. Weintraub,* 22 N.Y.2d 330, 331, 292 N.Y.S.2d 667, 239 N.E.2d 540 [1968] ).

Although it is well-settled that statements made in the course of litigation are entitled to absolute privilege, this Court has not directly addressed whether statements made by an attorney on behalf of his or her client in connection with prospective litigation are privileged. Three Appellate Division Departments, however, have addressed this issue directly and have come to differing conclusions. The First Department has held that an absolute privilege attaches to statements made by an attorney in connection with prospective litigation (*Sexter & Warmflash,* 38 A.D.3d at 174, 828 N.Y.S.2d 315 ["a letter among parties and counsel on the subject of pending or prospective litigation ... enjoys the protection of the absolute privilege"]; *Vodopia,* 243 A.D.2d at 368, 663 N.Y.S.2d 178 [absolute privilege applied to "a letter written ... during the course of negotiations to settle a copyright lawsuit threatened by plaintiff's client"]; **\*719** *Lieberman v. Hoffman,* 239 A.D.2d 273, 273, 658 N.Y.S.2d 18 [1st Dept.1997] ). Although the Second Department had held in *Kenny v. Cleary,* 47 A.D.2d 531, 532, 363 N.Y.S.2d 606 (2d Dept.1975) that absolute privilege did not apply to statements made prior to litigation, it has recently held in *Sklover v. Sack,* 102 A.D.3d 855, 856, 958 N.Y.S.2d 474 (2d Dept.2013) that statements made pertinent to a settlement of a prospective malpractice litigation were afforded an absolute privilege. In contrast to the First **\*\*19   \*\*\*585** and Second Departments, the Third Department has held that a statement made prior to litigation should not be afforded absolute privilege (*Uni–Service Risk Mgt. v. New York State Assn. of School Bus. Officials,* 62 A.D.2d 1093, 1094, 403 N.Y.S.2d 592 [3d Dept.1978] [the "statement was made before the commencement of (the) (a)ction ... and thus an absolute privilege did not attach"] ).

 **[5]**    Alternatively, a statement is "subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his [or her] own affairs, in a matter where his [or her] interest is concerned" (*Rosenberg v. MetLife, Inc.,* 8 N.Y.3d 359, 365, 834 N.Y.S.2d 494, 866 N.E.2d 439 [2007] [internal quotation marks omitted] ). In general, if the privilege is "qualified, it can be lost by plaintiff's proof that defendant acted out of malice" (*Park Knoll,* 59 N.Y.2d at 209, 464 N.Y.S.2d 424, 451 N.E.2d 182).

III

 **[6]**    The rationale supporting the application of privileged status to communication made by attorneys during the course of litigation is also relevant to pre-litigation communication. When litigation is anticipated, attorneys and parties should be free to communicate in order to reduce or avoid the need to actually commence litigation. Attorneys often send cease and desist letters to avoid litigation. Applying privilege to such preliminary communication encourages potential defendants to negotiate with potential plaintiffs in order to prevent costly and time-consuming judicial intervention. Communication during this pre-litigation phase should be encouraged and not chilled by the possibility of being the basis for a defamation suit.

Nonetheless, "[a]s a matter of policy, the courts confine absolute privilege to a very few situations" (*Park Knoll,* 59 N.Y.2d at 210, 464 N.Y.S.2d 424, 451 N.E.2d 182). We recognize that extending privileged status to communication made prior to anticipated litigation has the potential to be abused. Thus, applying an absolute privilege to statements made during a phase prior to litigation would be problematic and unnecessary to advance the goals of encouraging communication prior to the commencement of litigation. To **\*720** ensure that such communications are afforded

sufficient protection the privilege should be qualified. Rather than applying the general malice standard to this pre-litigation stage, the privilege should only be applied to statements pertinent to a good faith anticipated litigation. This requirement ensures that privilege does not protect attorneys who are seeking to bully, harass, or intimidate their client's adversaries by threatening baseless litigation or by asserting wholly unmeritorious claims, unsupported in law and fact, in violation of counsel's ethical obligations.[2] Therefore, we hold that statements made prior to the commencement of an anticipated litigation are privileged, and that the privilege is lost where a defendant proves that the statements were not pertinent to a good faith anticipated litigation.

IV

 **[7]**     The letters at issue here were written in the preliminary stages of an anticipated action. MSF and specifically Kimmel, acting on behalf of their client Front, sent a letter to Khalil informing him of **\*\*20   \*\*\*586** Front's investigation in an attempt to avoid litigation by requesting, among other things, that Khalil return the allegedly stolen proprietary information

and cease and desist his use of that information. A copy of that letter was then forwarded to EOC. Thus, at the time the letters were sent, Kimmel and MSF had a good faith basis to anticipate litigation and the statements in the letters were pertinent to that anticipated litigation. Therefore, the letters at issue were properly found to be subject to a privilege; however, rather than the absolute privilege applied by the courts below, a qualified privilege applied because they were written prior to litigation. Nevertheless, because the letters are privileged the third-party action was properly dismissed.

Accordingly, the Appellate Division order should be affirmed, with costs.

Chief Judge LIPPMAN and Judges READ, PIGOTT and RIVERA concur; Judges STEIN and FAHEY taking no part. Order affirmed, with costs.

**All Citations**

24 N.Y.3d 713, 28 N.E.3d 15, 4 N.Y.S.3d 581, 2015 N.Y. Slip Op. 01554

Footnotes

1       The Appellate Division order is final as against Kimmel and MSF.

2       In holding that privilege applies to these pre-litigation statements, we note that attorneys should exercise caution when corresponding with unrepresented potential parties who may be particularly susceptible to harassment and unequipped to respond properly even to appropriate communications from an attorney.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

480 F.Supp.3d 542
United States District Court, S.D. New York.

Charles GANSKE, Plaintiff,

v.

Louise Daphne MENSCH, Defendant.

No. 19-CV-6943 (RA)
|
Signed 08/20/2020

**Synopsis**
**Background:** Journalist brought action against internet blogger, asserting claims for defamation and tortious interference after he told his employer, a news agency, that he was being subjected to targeted harassment by blogger, who had made statements on social media that journalist was "xenophobic" and had "personally spread Russian bots" on a website, and was terminated.

**Holdings:** The District Court, Ronnie Abrams, J., held that:

[1] statement that plaintiff made a "xenophobic" comment was nonactionable opinion;

[2] statement about spreading a Russian bot on a website was nonactionable opinion;

[3] statement that plaintiff was sent "into a frenzy" was nonactionable opinion; and

[4] tortious interference claim was duplicative of the defamation cause of action.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (19)

**[1]** **Evidence** ⟜ Internet Websites and Electronic Communications

**Federal Civil Procedure** ⟜ Matters considered in general

On motion to dismiss for failure to state a claim, a district court has the discretion to take judicial notice of internet materials. Fed. R. Civ. P. 12(b)(6).

2 Cases that cite this headnote

**[2]** **Evidence** ⟜ Emails, text messages, and social media posts

**Federal Civil Procedure** ⟜ Matters considered in general

On motion to dismiss for failure to state a claim in journalist's defamation action against blogger regarding internet blogger's interjection into journalist's ongoing conversation on social media platform by stating, among other things, that journalist was "xenophobic," and that he "spread Russian bots" on his own website, district court would take judicial notice of two additional comments by blogger, which were made approximately 20 minutes before the allegedly defamatory comment, since the two additional comments were integral to the allegations and necessary to give context to the allegedly defamatory statements. Fed. R. Civ. P. 12(b)(6).

6 Cases that cite this headnote

**[3]** **Evidence** ⟜ Public records and documents in general

**Evidence** ⟜ Matters referred to or incorporated by pleadings

**Federal Civil Procedure** ⟜ Matters considered in general

On motion to dismiss for failure to state a claim, courts are permitted to take judicial notice of documents that are integral to the complaint and of materials in the public record for the limited purpose of noting what the documents state, rather than to prove the truth of their contents. Fed. R. Civ. P. 12(b)(6).

6 Cases that cite this headnote

**[4]**    **Libel and Slander** 🔑 Nature and elements of
defamation in general

**Libel and Slander** 🔑 Injury from
Defamation

Under New York law, "defamation" is the injury
to one's reputation either by written expression,
which is libel, or by oral expression, which is
slander.

11 Cases that cite this headnote

**[5]**    **Libel and Slander** 🔑 Nature and elements of
defamation in general

To successfully allege defamation under New
York law, the following elements must be
met: (1) a written defamatory statement of and
concerning the plaintiff, (2) publication to a third
party, (3) fault, (4) falsity of the defamatory
statement, and (5) special damages or per se
actionability.

12 Cases that cite this headnote

**[6]**    **Libel and Slander** 🔑 Construction of
defamatory language in general

Although a jury determines if a plaintiff has
been defamed, whether particular words are
defamatory presents a legal question to be
resolved by the courts in the first instance.

2 Cases that cite this headnote

**[7]**    **Constitutional Law** 🔑 Opinion

**Libel and Slander** 🔑 Actionable Words in
General

Because there is no such thing as a false idea,
courts are tasked with distinguishing between
statements of fact, which may be defamatory
under New York law, and expressions of
opinion, which are not defamatory, because they
receive absolute protection under the New York
Constitution.

4 Cases that cite this headnote

**[8]**    **Libel and Slander** 🔑 Construction of
language used

To conduct analysis of whether a statement is
defamatory or nonactionable opinion under New
York law, a court must consider what the average
person hearing or reading the communication
would take it to mean and the context of the
entire communication and of the circumstances
in which they were spoken or written.

2 Cases that cite this headnote

**[9]**    **Libel and Slander** 🔑 Construction of
language used

To assist with distinguishing between a statement
of fact and opinion, for purposes of a defamation
claim, New York courts look to three factors:
(1) whether the specific language in issue has
a precise meaning which is readily understood;
(2) whether the statements are capable of being
proven true or false; (3) whether either the
full context of the communication in which the
statement appears or the broader social context
and surrounding circumstances are such as to
signal readers or listeners that what is being read
or heard is likely to be opinion, not fact.

14 Cases that cite this headnote

**[10]**    **Libel and Slander** 🔑 Actionable Words in
General

Internet blogger's comment on social media
forum, referring to journalist's comment in
his ongoing conversation with a critic as
"xenophobic," was nonactionable opinion, rather
than defamatory under New York law, since
statement was analogous to fiery rhetoric and
a reasonable reader would likely view the
reference to journalist as "xenophobic" to be her
opinion and not conveying any objective facts
about journalist.

4 Cases that cite this headnote

**[11]**    **Libel and Slander** 🔑 Actionable Words in
General

Internet blogger's statement in comment interjected into journalist's ongoing conversation with a critic on social media platform, that journalist "clearly personally spread Russian bots on his own site," was nonactionable opinion, rather than defamatory under New York law, where blogger both referenced and hyperlinked to data on which her opinion was grounded.

1 Case that cites this headnote

**[12]    Libel and Slander**  🗝  Actionable Words in General

A statement of opinion may be actionable defamation under New York law if it implies that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader; however, if a statement of opinion discloses facts on which it is based, the opinion is not actionable.

12 Cases that cite this headnote

**[13]    Libel and Slander**  🗝  Actionable Words in General

Internet blogger's statements in comment interjected into journalist's ongoing conversation with a critic on social media platform, that critic's work on issue of journalist's alleged activity on a Russian blog had sent journalist "into a frenzy" of social media commenting and trying to discredit him, was nonactionable opinion, rather than defamatory under New York law; given that social media platform on which journalist was making the comments referred to limited the number of characters, it was common for users to post comments many times in a row, and even if blogger's statement could be construed as one of fact with precise meaning, journalist did not allege how the statement was defamatory in nature.

**[14]    Torts**  🗝  Contracts

Under New York law, the elements of a tortious interference with contract claim are (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party

intentionally and improperly procured the breach of the contract; and (d) that the breach result in damage to the plaintiff.

4 Cases that cite this headnote

**[15]    Torts**  🗝  Existence of valid or identifiable contract, relationship or expectancy

In order to state a claim for tortious interference with a contract under New York law, the plaintiff is required to identify a specific contractual term that was breached.

4 Cases that cite this headnote

**[16]    Libel and Slander**  🗝  Nature and form of remedy

A defamation cause of action has broad reach because, unlike most torts, defamation is defined in terms of the injury, damage to reputation, and not in terms of the manner in which the injury is accomplished; as such, New York law considers claims sounding in tort to be defamation claims, not only where those causes of action seek damages only for injury to reputation, but also where the entire injury complained of by plaintiff flows from the effect on his reputation.

5 Cases that cite this headnote

**[17]    Federal Civil Procedure**  🗝  Alternate, Hypothetical and Inconsistent Claims

Journalist's claim for tortious interference with contract under New York law which alleged that internet blogger devised, aided and abetted, and actively participated in scheme to defame and injure him by intentionally lying on social media that journalist had "personally spread Russian bots" on a website and that journalist was fired as a result, was duplicative of his defamation cause of action, where there were no allegations of injury separate from alleged reputational effects of the allegedly defamatory comment.

4 Cases that cite this headnote

**[18]    Torts**  🗝  Existence of valid or identifiable contract, relationship or expectancy

New York law emphasizes the requirement that a tortious interference with contract plaintiff establish that the defendant purposefully intended to cause a contract party to breach a particular contract; it is not enough, therefore, for plaintiff to merely state that defendant intentionally procured the breaches of contract, or that the comments were motivated solely to inflict harm.

3 Cases that cite this headnote

[19]  **Labor and Employment** 🔑 Elements

Journalist's complaint against internet blogger who commented on social media that journalist had "personally spread Russian bots" on a website was devoid of any plausible allegation that blogger intended to interfere with his employment contract with news agency, as required to state a claim for tortious interference with contract under New York law; journalist only made conclusory allegations that blogger had knowledge of his contract with news agency and employment, knew that her characterization of journalist would immediately create reputational risk for agency, and she intentionally interfered with journalist's contract.

1 Case that cites this headnote
More cases on this issue

**Attorneys and Law Firms**

**\*544** Maria Louisa Bianco, Ellenoff Grossman & Schole LLP, Milo Silberstein, Dealy Silberstein & Braverman, LLP, New York, NY, for Plaintiff.

Adam I. Stein, Farrell J. Miller, Cozen O'Connor, New York, NY, for Defendant.

**OPINION & ORDER**

RONNIE ABRAMS, United States District Judge:

**\*545** If the Internet is akin to the Wild West, as many have suggested, Twitter is, perhaps, the shooting gallery, where verbal gunslingers engage in prolonged hyperbolic crossfire.

It is in this context of battle by tweet that the conduct at issue in this defamation case was born. Plaintiff Charles Ganske, a journalist, alleges that Defendant Louise Daphne Mensch, a blogger and former member of Britain's Parliament, defamed him and interfered with his employment as a result of a tweet that she posted on July 27, 2018 at 12:32 a.m. (the "Tweet"). Plaintiff alleges that Defendant's single Tweet, which "interjected" herself into an ongoing conversation between Plaintiff and a third party, who called himself @Conspirator0, contained numerous defamatory statements. Now before the Court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the Court concludes that the allegedly defamatory statements in Defendant's Tweet are nonactionable statements of opinion, the motion is granted.

**BACKGROUND**[1]

**I. Extrinsic Evidence**

[1]  As an initial matter, Defendant asks the Court to take judicial notice of extrinsic evidence in reviewing her motion to dismiss. With her motion, she has submitted several exhibits on which she relies heavily in urging the dismissal of Plaintiff's claims. *See* Dkt. 22. Generally, "[i]n considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). A district court nonetheless "has the discretion to take judicial notice of internet materials." *BSH Hausgerate, GmbH v. Kamhi*, 282 F. Supp. 3d 668, 670 n.1 (S.D.N.Y. 2017). For the foregoing reasons, the Court grants in part and denies in part Defendant's request to take judicial notice of the extrinsic evidence.

[2]  [3]  First, the Court will take judicial notice of Defendant's "Exhibit 3," which — in addition to the Tweet at issue here — displays two other tweets that Defendant posted on July 27, 2018, approximately twenty minutes before the Tweet, all of which related to the same topic. *See* Dkt. 22, Att. 6 (July 27, 2018 Tweets). These two other tweets are part and parcel of Defendant's "interject[ion]" into "the conversation (thread) between Ganske and @Conspirator0." Compl. ¶ 14. Therefore, to look only at the Tweet — rather than all three tweets posted during this twenty-minute span — would not provide the necessary or proper context for understanding Defendant's statements that morning. *See Condit v. Dunne,*

[317 F. Supp. 2d 344, 357–58 (S.D.N.Y. 2004)](taking judicial notice of documents that "aid the Court in its determination of whether plaintiff states a claim for relief [for slander]" and that help **\*546** "place [the defendant's] comments in the broader social context"). Courts are permitted to take judicial notice "of documents that are 'integral to the complaint' " and "of materials in the public record ... for the limited purpose of noting what the documents state, rather than to 'prove the truth of their contents.' " *[Hesse v. Godiva Chocolatier, Inc.,](), [No. 19-CV-972 (AJN), 463 F.Supp.3d 453, 462 (S.D.N.Y. May 29, 2020)]().* Because Defendant's two other July 27, 2018 tweets are integral to the allegations in the complaint and necessary to place her comments in context, the Court will take judicial notice of Defendant's "Exhibit 3."

The Court will not, however, consider Defendant's other exhibits, including those displaying tweets posted by Defendant, Plaintiff, and third parties prior to July 27, 2018. *See* Def.'s Mot. at 12; Dkt. 22. The focus of the complaint is on Defendant's July 27, 2018 statements. While the two other tweets posted by Defendant that morning provide essential context for reviewing the Tweet's allegedly defamatory statements, tweets posted in the days and months prior to July 27, 2018 do not offer the same immediate relevance. Nor is it even clear whether Defendant's exhibits include all of the tweets posted during that time frame and thus provide a full picture of the Twitter communications between the parties prior to and on July 27, 2018. *See [Oakley v. Dolan](), [No. 17-CV-6903 (RJS), 2020 WL 818920, at \*6 (S.D.N.Y. Feb. 19, 2020)]()* (declining to take judicial notice of tweets because the defendants do not explain why this is "competent evidence that must be considered at the motion to dismiss stage instead of on a motion for summary judgment or at trial"). Accordingly, the Court considers on this motion solely Defendant's tweets of July 27, 2018, contained in Defendant's "Exhibit 3."[2]

## II. Factual Background

Plaintiff is a 37-year old journalist. From 2005 to 2007, "[a]s part of his job, he edited a website, www.russiablog.org, wrote press releases, authored op-eds, and assisted in drafting fundraiser letters and grant applications." Compl. ¶ 8. After a hiatus from journalism, Plaintiff returned in March 2011 to work "as [the] Central Region Broadcast News Editor for the Associated Press ('AP') in Chicago, Illinois." *Id.* From 2016 to 2018, still at the AP, Plaintiff served as the "National Sports Broadcast Editor" and the "Social Media/UGC specialist in Chicago." *Id.* According to Plaintiff, "[i]n his seven-and-one-half years with the AP, [he] received positive evaluations from his colleagues in Chicago and London for his UGC work and dedication to acquiring user generated content with tact and professionalism" and had "an untarnished reputation in the journalism industry." *Id.*

Defendant Mensch is a former member of Britain's Parliament and editor of Heat Street, "a 'news' site." *Id.* ¶ 9. Defendant is now "a full-time blogger" and "maintains and operates multiple Twitter accounts, including @LouiseBagshawe (suspended), @LouiseMensch, and @patribotics." *Id.* ¶¶ 1, 9 (emphasis omitted). Plaintiff asserts that "Mensch was one of the propagandists who, for over two years, heavily promoted the now completely debunked Russia collusion **\*547** hoax" and that she "trolls Twitter and claims to expose 'Russian' influence on and off the platform." *Id.* ¶¶ 9, 14. According to Plaintiff, Defendant has "a reputation in the community in which she lives and works (*i.e.*, on Twitter and generally in New York) as being very untruthful." *Id.* ¶ 4; *see also* ¶ 14 (alleging that "Mensch has a habit and routine practice of targeting persons with false claims that they are associated with Russians or Chinese").

On July 27, 2018, "Mensch came across the conversation (thread) between Ganske and @Conspirator0, and interjected herself." *Id.* ¶ 14. This litigation stems from Defendant's Tweet at 12:32 a.m. that day, sent from her @patribotics account:

**\*548**



*@patribotics (Patribotics) 2018-07-27 12:32 AM Tweet*

*Id.* ¶ 10. Plaintiff alleges that this Tweet contains "false and defamatory statements about [him]" because neither he nor his tweets were "xenophobic"; he "never spread Russian bots on any website"; "Russiablog.org was never [his] 'own' website"; and he "had no 'vendetta' or 'obsession' with anyone." *Id.* ¶¶ 10–11. Plaintiff further claims that Defendant "deliberately tagged [Plaintiff's] employer, '@AP,' **\*549** and published the tweet to '@APCentral' in order to interfere with and prejudice Plaintiff in his employment and get Plaintiff fired." *Id.* ¶ 13.

Prior to posting that Tweet, Defendant tweeted two times prior that morning in connection with the same exchange. First, at 12:17 a.m., Defendant tweeted:



*@patribotics (Patribotics) 2018-07-27 12:17 AM Tweet*

Dkt. 22, Att. 6. Then, at 12:27 a.m., Defendant tweeted again:

**\*550**



*@patribotics (Patribotics) 2018-07-27 12:27 AM Tweet*

*Id.*

After seeing Defendant's Tweet, "Ganske notified the AP that he was being subjected to targeted harassment by Mensch." Compl. ¶ 16. In response, "AP's Social Media director, Eric Carvin, did not suggest to Ganske that he had done anything on Twitter to violate the AP's Social Media Policy." *Id.* Nonetheless, on August 10, 2018, Ganske's employment was terminated, purportedly "because of Mensch's tweets." *Id.* ¶ 17.

Plaintiff filed this action on July 25, 2019, alleging defamation and tortious interference under New York law. On December 10, 2019, Defendant filed the instant motion to dismiss, *see* Dkt. 22, which Plaintiff opposed on January 3, 2020, *see* Dkt. 25.

**LEGAL STANDARD**

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a complaint must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). On a Rule 12(b)(6) motion, the question is "not whether [the **\*551** plaintiff] will ultimately prevail," but "whether [his] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011). In answering this question, the Court must "accept[ ] all factual allegations as true, but giv[e] no effect to legal conclusions couched as factual allegations." *Stadnick*, 861 F.3d at 35 (internal quotation marks omitted).

**DISCUSSION**

**I. Defamation**

Plaintiff contends that he was defamed because Defendant "used Twitter to make and publish false factual statements of and concerning Ganske" and that these "false statements have harmed Ganske and his reputation." Compl. ¶¶ 20, 23. Plaintiff alleges that Defendant's Tweet contains three separate allegedly defamatory statements: (1) "[t]o this xenophobic tweet of yours, sir, I fear we must tell @APCentral 'citation needed[ ]' "; (2) "[y]ou clearly personally spread Russian bots on your own site"; and (3) "@Conspirator0 work on it has sent you into a frenzy of tweeting and trying to discredit him." Compl. ¶ 10 (emphasis omitted). For the following reasons, the Court agrees with Defendant that these statements are expressions of opinions and not defamatory statements of fact.

**A. Legal Standard**

**[4] [5] [6]** "Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012). To successfully allege defamation under New York law, the following elements must be met: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Although a jury determines if a plaintiff has been defamed, "[w]hether particular words are defamatory presents a legal question to be resolved by the court[s] in the first instance." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 177 (2d Cir. 2000); *see also Biro*, 883 F. Supp. 2d at 457 (explaining that New York courts encourage the resolution of "defamation claims at the pleading stage, 'so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms' ").

**[7] [8] [9]** Because "there is," however, "no such thing as a false idea," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), courts are tasked "with distinguishing between statements of fact, which may be defamatory, and expressions of opinion, which 'are not defamatory; instead, they receive absolute protection under the New York Constitution.' " *Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, No. 15-CV-4779 (LTS), 2016 WL 1717218, at \*2 (S.D.N.Y. Apr. 28, 2016) (quoting *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 597 (S.D.N.Y. 2014)); *see also Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993) ("[F]alsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false."). To conduct this analysis, a court must consider "what the average person hearing or reading the communication would take it to mean" and "the context of the entire communication and of the circumstances in which they were spoken or written." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986). To assist with distinguishing between a statement of fact and opinion, New York courts look to three factors:

**\*552** (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers

or listeners that what is being read or heard is likely to be opinion, not fact. *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 288 (S.D.N.Y. 2006) (quoting *Gross*, 82 N.Y.2d at 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163).[3]

The Court's analysis here thus focuses on whether the Tweet included "a provable statement of fact," which — unlike a "statement[ ] of opinion" or a "[l]oose, figurative or hyperbolic statement[ ]" — can be "actionable as defamation." *Brahms v. Carver*, 33 F. Supp. 3d 192, 198 (E.D.N.Y. 2014); *see also Celle*, 209 F.3d at 178 (requiring courts to "decide as a matter of law whether the challenged statement is opinion").

**B. First Statement: Plaintiff's Tweet Was "Xenophobic"**
Although Plaintiff does not specifically address this issue, the Court first considers whether the statement that Plaintiff's tweet was "xenophobic" is one of fact or opinion. Compl. ¶ 10.

In this instance, it is important to first account for the context in which this allegedly defamatory statement was made as this can "signal[ ] to the reader that what is being conveyed is likely to be opinion rather than fact." *Levin*, 119 F.3d at 196; *see also Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000) ("A court may also consider whether the 'general tenor' of the publication negates the impression that challenged statements imply defamatory facts about the plaintiff."). Here, the context is Twitter, an Internet forum. "New York courts have consistently protected statements made in online forums as statements of opinion rather than fact." *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015); *see also Brahms v. Carver*, 33 F. Supp. 3d 192, 199 (E.D.N.Y. 2014) (noting, in concluding that an allegedly defamatory statement is nonactionable opinion, that it "was made on an internet forum where people typically solicit and express opinions, generally using pseudonyms"); *Biro v. Conde Nast*, 2014 WL 4851901, at *4 (explaining that its dismissal of the defamation claim was "buttressed by the context of the publications in question: an online website that was essentially a blog"); *Versaci v. Richie*, 30 A.D. 3d 648, 649, 815 N.Y.S.2d 350 (3d Dep't 2006) (concluding that an alleged defamatory statement was an opinion, in part, because it "was asserted on an Internet public message board, which, as characterized even by plaintiff, is a forum where people air concerns about any matter"); *see also Egiazaryan*

*v. Zalmayev*, 880 F. Supp. 2d 494, 507 (S.D.N.Y. 2012) (explaining that statements published in "editorial formats ... create the 'common expectation' that the communication would 'represent the viewpoint of [its] author[ ] and ... contain considerable hyperbole, **\*553** speculation, diversified forms of expression and opinion.' ").

In analyzing the unique context of statements made on Internet fora, courts have emphasized the generally informal and unedited nature of these communications. This context, as some courts have concluded, leads "readers [to] give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts." *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D. 3d 32, 44, 925 N.Y.S.2d 407 (1st Dep't 2011) ("The culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a 'freewheeling, anything-goes writing style.' "). Like the other Internet fora discussed in the above-cited cases, Twitter's forum is equally — if not more — informal and "freewheeling." *Id.* As such, the fact that Defendant's allegedly defamatory statement that Plaintiff's tweet was "xenophobic," Compl. ¶ 10, appeared on Twitter conveys a strong signal to a reasonable reader that this was Defendant's opinion.

In addition to context, the Court must also consider the other factors: whether Defendant's comment that Plaintiff's tweet was "xenophobic" lacks "a precise meaning which is readily understood" or is "capable of being proven true or false." *Gross*, 82 N.Y.2d at 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163. Although the term "xenophobic" does have a fairly clear meaning in the context of the Tweet, it is not capable of being proven true or false. *See 600 West 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 142, 589 N.Y.S.2d 825, 603 N.E.2d 930 (1992) (holding that "[t]he allegation of 'denigration' " is not actionable because, "[w]hether defined as 'cast[ing] aspersions on' or 'belittl[ing][,]' ... the term falls far short of any requirement of verifiability"). It is, rather, classic opinion that amounts to an "epithet[ ], fiery rhetoric, [and] hyperbole," which "signal[s] advocacy" and a partisan viewpoint. *Egiazaryan*, 880 F. Supp. 2d at 507. Defendant's comment, moreover, was a direct response to Plaintiff's earlier tweet, which referred to @Consiprator0 as "Senor Norteno" and insisted that "all of the work [for Russia Blog] was funded by Americans in the United States of America." Compl. ¶ 10. Plaintiff's use of the word "Senor" and heavy emphasis on America and Americans further supports the conclusion that Defendant's statement that Plaintiff's tweet was "xenophobic"

was a reaction to — and personal opinion about — Plaintiff's own words.

[10] Furthermore, the term "xenophobic" is, at a minimum, analogous to — if not, more "fiery rhetoric" than — other words that courts in this district have found to constitute " 'rhetorical hyperbole' and 'imaginative expression' that is typically understood as a statement of opinion." *See Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 312 (S.D.N.Y. 2017) (concluding that stating that the plaintiff "engaged in 'extortion, manipulation, fraud, and deceit' " is a "a vague statement ... of the 'loose, figurative, or hyperbolic' sort that is not actionable for defamation"); *Biro*, 883 F. Supp. 2d at 463 (holding that "the use of the terms 'shyster,' 'con man,' and finding an 'easy mark' is the type of rhetorical hyperbole and 'imaginative expression' that is typically understood as a statement of opinion"); *Egiazaryan*, 880 F. Supp. 2d at 507 (finding the reference to the plaintiff as "anti-Semitic and anti-American" in a "hyperbole-laden opinion piece" not to be actionable); *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("The ... use of words like 'traitor' cannot be construed as representations of fact."); *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) ("[T]he **\*554** epithets ... 'sucker,' 'fool,' 'frontman,' 'industrial waste,' ... and 'crooks or morons' ... are hyperbole and therefore not actionable opinion."). A reasonable reader would likely view Defendant's reference to Plaintiff's tweet as "xenophobic" to be her opinion and not conveying any objective facts about Plaintiff. *See Treppel v. Biovail Corp.*, No. 03-CV-3002 (PKL), 2004 WL 2339759, at \*12 (S.D.N.Y. Oct. 15, 2004) ("[A]n opinion may be offered with such excessive language that a reasonable audience may not fairly conclude that the opinion has any basis in fact.").

Accordingly, this first statement in Defendant's Tweet does not constitute a defamatory statement of fact that could serve as a basis for Plaintiff's defamation claim.

### C. Second Statement: Plaintiff "Spread Russian Bots"

[11]  [12] The second statement — that Plaintiff "clearly personally spread Russian bots on [his] own site" — is likewise not actionable. Compl. ¶ 10. While its context alone again provides strong support for the notion that Defendant's statement conveys an opinion, the analysis as to this statement differs in some respects from the first statement. Unlike an allegation that a statement is racist or xenophobic, a statement about whether someone personally spread Russian bots is capable of being proven true or false. Nonetheless, a

statement of opinion "may yet be actionable if [it] impl[ies] that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader." *Levin*, 119 F.3d at 197. However, "if a statement of opinion ... discloses the facts on which it is based ..., the opinion is not actionable." *Id.*

Defendant's Tweet provided her factual basis for stating that Plaintiff "clearly personally spread Russian bots on [his] own site" by referring directly to "@Conspirator0['s] work," which documented alleged bot activity on Russia Blog — the site for which Plaintiff formerly worked. Compl. ¶ 10. Indeed, only about twenty minutes before posting the Tweet, Defendant tweeted about @Conspirator0's work, stating that "@[C]onspirator0 has offered his work for peer review" and "[d]ata scientists who review it, accept him as their peer." Dkt. 22, Att. 6. With her tweet, she shared @Conspirator0's tweet, which described his findings that while Russia Blog "is now gone, ... 206 Twitter accounts with links to it live on. Of these, 45 (23%) appear to be automated based on either 24/7 activity or posting 90+% of their tweets via automation services." *Id.* Ten minutes after that, at 12:27 a.m., Defendant posted her next tweet, which again referred to @Conspirator0's data. *Id.* ("@Conspirator0 produced work on [Plaintiff's] old website."). Defendant even included a hyperlink to @Conspirator0's data on the alleged bot activity on Russian Blog. *See id.* As such, in asserting that Plaintiff had "clearly personally spread Russian bots" on Russia Blog, Defendant conveyed to the reader the factual basis — here, @Conspirator0's data on bot activity on Russia Blog — on which her opinion rested.

The inclusion of the hyperlink is particularly significant. Several courts have determined that the inclusion of a hyperlink to a report or article in a communication shared on an Internet forum is a sufficient means of disclosing a factual basis on which an opinion rests. As Judge Oetken explained in *Adelson v. Harris*, "the hyperlink connects one to the source of the [person's] claims." 973 F. Supp. 2d 467, 485 (S.D.N.Y. 2013). The hyperlink, Judge Oetken further noted, has become "the twenty-first century equivalent of the footnote for the purposes of attribution in defamation law, because it has become a well-recognized means for an author or the Internet to attribute a source." *Id.* at 484; **\*555** *see also Sandals Resorts Int'l Ltd.*, 86 A.D. 3d at 42–43, 925 N.Y.S.2d 407 (concluding that statements in an e-mail were "pure opinion" because "each remark is prompted by or responsive to a hyperlink, that is, it is 'accompanied by a recitation of the facts upon which it is based' "); *see also Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1103 (N.D. Cal.

1999) (holding that the inclusion of a hyperlink indicates that the defendant "adequately disclosed the facts underlying her conclusion that [the plaintiff] embezzled money").

In *Mirage Entertainment, Inc. v. FEG Entretenimientos S.A., 326 F. Supp. 3d 26 (S.D.N.Y. 2018)*, for instance, the court dismissed a defamation claim predicated on a tweet by artist Mariah Carey. Agreeing with the defendants' argument that "the Tweet is not actionable because it was Carey's opinion," the court explained that it had "provided the basis for her opinion — the E! News article reporting that Carey's concerts had been cancelled" and thus "[i]t would be clear to any reader that Carey's opinion that her fans 'deserve better' was based on the contents of that article." *Id.* at 38. Therefore, "Carey did not imply that she 'knows certain facts, unknown to the audience, which support[ed] [her] opinion," but instead, "by linking to the E! News article, she provided the basis for her opinion[.]" *Id.*

The same is true here, in that Defendant both referenced and hyperlinked to the data on which her opinion that Plaintiff "clearly personally spread Russian bots on [his] own site" was grounded.[4] Compl. ¶ 10. Accordingly, this statement is also not actionable.

### D. Third Statement: "@Conspirator0['s] Work ... Has Sent [Plaintiff] Into a Frenzy"

[13] The Court similarly rejects Plaintiff's claim of defamation with regard to the third portion of Defendant's Tweet — that "@Conspirator0['s] work on [the issue of bot activity on Russia Blog] has sent [Plaintiff] into a frenzy of tweeting and trying to discredit him." Compl. ¶ 10. For the reasons noted above, this statement is a clear-cut one of opinion, posted on Twitter and, notably, "interjected" into "the conversation (thread) between Ganske and @Conspirator0." *Id.* ¶ 14. It is difficult to conjure a "precise meaning" for the statement that Plaintiff was "sent ... into a frenzy of tweeting." *Qureshi*, 430 F. Supp. 2d at 288. Indeed, Twitter limits a user's tweet to 140 characters, which thus encourages users to post multiple times in a short period. It is common, therefore, for a user to post many times in a row. Moreover, even if this statement could be construed as one of fact with a precise meaning, Plaintiff has not alleged how this statement is defamatory in nature.

Because all three of the allegedly defamatory statements in Defendant's Tweet are nonactionable statements of opinion, Plaintiff's defamation claim is dismissed as a matter of law.[5]

**\*556  II. Tortious Interference**

Plaintiff next alleges that Defendant "intentionally interfered with Ganske's contract, property rights and business expectations by, *inter alia*, devising, aiding, abetting and actively participating in the scheme to defame and injure Ganske by intentionally lying in the tweet, by fabricating a claim that Ganske had 'personally spread Russian bots' on a website, and by retweeting the false and defamatory statements to hundreds of thousands on Twitter." Compl. ¶ 30. Specifically, he asserts that Defendant knew that he had "had a valid employment contract with the AP," *id.* ¶¶ 28–29, and that he was fired "[a]s a direct and proximate result of Mensch's tortious interference with contract, ... suffer[ing] damages and incurred loss, including, without limitation, loss of income and business, damage to reputation, prestige and standing, court costs, and other damages," *id.* ¶ 31; *see also id.* ¶ 17 ("AP terminated Ganske's employment because of Mensch's tweets.").

[14]  [15]  Under New York law, the elements of a tortious interference with contract claim are "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach result in damage to the plaintiff." *Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996)*. "In order to state a claim [for tortious interference with a contract], the plaintiff is required to 'identify a specific contractual term that was breached.' " *Millar v. Ojima, 354 F. Supp. 2d 220, 230 (E.D.N.Y. 2005)* (quoting *Risley v. Rubin, 272 A.D.2d 198, 199, 708 N.Y.S.2d 377 (1st Dep't 2000)*).

[16]  Although Plaintiff has neglected to address this argument in his opposition brief, his tortious interference claim must be dismissed because it is duplicative of his defamation claim. A defamation cause of action has "broad reach" because, "unlike most torts, defamation is defined in terms of the injury, damage to reputation, and not in terms of the manner in which the injury is accomplished." *Morrison v. Nat'l Broad. Co., 19 N.Y.2d 453, 458, 280 N.Y.S.2d 641, 227 N.E.2d 572 (1967)*. As such, "New York law considers claims sounding in tort to be defamation claims, not only where those causes of action 'seek[ ] damages only for injury to reputation,' but also where 'the entire injury complained of by plaintiff flows from the effect on his reputation.' " *Jain v. Sec. Indus. & Fin. Mkts. Ass'n., No. 08-CV-6463 (DAB), 2009 WL 3166684, at \*9 (S.D.N.Y. Sept. 28, 2009)*; *see also La Luna Enters., Inc. v. CBS Corp., 74 F. Supp. 2d 384, 392*

(S.D.N.Y. 1999) (dismissing a fraud claim because it "[wa]s based on the same alleged injury to [the plaintiff's] reputation as his defamation claim").

 [17]   Although Plaintiff gives it a different label, his tortious interference "cause of action is indistinguishable from [his] defamation cause of action." *Balderman v. Am. Broad. Cos.*, 292 A.D.2d 67, 76, 738 N.Y.S.2d 462 (4th Dep't 2002) (dismissing a fraud claim "as duplicative of the defamation cause of action" because "[a]ny injury to plaintiff ... is the result of the allegedly unfavorable portrayal of him in the broadcast"). In pleading tortious interference, his factual allegations are fully grounded on the same alleged dissemination of defamatory content via the Tweet on July 27, 2018 as the defamation cause of action. *See* Compl. ¶¶ 30–31. Therefore, here too, Plaintiff alleges only a harm that " 'flows from the effect on his reputation.' " *Jain*, 2009 WL 3166684, at *9. In other words, "the gravamen of [his] alleged injury in ... th[is] non-defamation count[ ] is either harm to [his] reputation or harm that flows from the alleged effect on [his] reputation." *Jain*, 2009 WL 3166684, at *9. **\*557** Without alleging an injury separate from the alleged reputational effects of the Tweet, Plaintiff's tortious interference claim is duplicative of his defamation claim. *See Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 730 (S.D.N.Y. 2014) ("[T]he factual allegations underlying the *prima facie* cause of action relate to the dissemination of allegedly defamatory materials; accordingly this cause of action must fail."); *Chao v. Mount Sinai Hosp.*, No. 10-CV-2869 (HB), 2010 WL 5222118, at *11 (S.D.N.Y. Dec. 17, 2010) ("Where tort claims essentially restate a defamation claim that has been dismissed on a motion to dismiss, the tort claims must also be dismissed.").

 [18]   Even if this claim were not duplicative, it still could not survive Defendant's motion to dismiss. Assuming *arguendo* that Plaintiff had sufficiently pled the first two elements of a tortious interference with contract claim — that is, the existence of an employment contract with the AP and that Defendant had actual knowledge of that contract — Plaintiff has not plausibly pled that Defendant intended to induce a breach of Plaintiff's employment contract with the AP. *See Finley*, 79 F.3d at 1294. As the Second Circuit has explained, "[i]t is clear that New York law emphasizes the requirement that a tortious interference with contract claimant establish that the defendant purposefully intended to cause a contract party to breach a particular contract." *Conte v. Emmons*, 895 F.3d 168, 172 (2d Cir. 2018). "It is not enough," therefore, "for [the] plaintiff to merely state that [the defendant] 'intentionally procured' the breaches of contract, or that 'the comments were motivated solely to inflict harm.' " *Harris v. Queens Cty. Dist. Atty's Office*, No. 08-CV-1703, 2009 WL 3805457, at *11 (E.D.N.Y. Nov. 9, 2009) (internal citation omitted).

 [19]   Plaintiff's complaint is devoid of any plausible allegation that Defendant intended to interfere with his employment contract with the AP. The only allegations to support this assertion are that Defendant "had knowledge of Ganske's contract and employment," Compl. ¶ 29; Defendant "knew that her characterization of Ganske would immediately create reputational risk for the AP," *id.* ¶ 14; and that she "intentionally interfered with Ganske's contract," *id.* ¶ 30. But these allegations regarding Defendant's intent in posting the Tweet are no more than conclusory. "[I]t is not enough that a defendant engaged in conduct ... that happened to constitute a breach of the third party's contract with the plaintiff." *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013). Plaintiff, therefore, fails to plausibly allege that "[D]efendant's objective was to procure such a breach." *Roche Diagnostics GmbH*, 992 F. Supp. 2d at 221.

Accordingly, Plaintiff's tortious interference claim is also dismissed.[6]

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted. Plaintiff may **\*558**  file an amended complaint if he has a good-faith basis to do so no later than September 20, 2020. The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 22.

**All Citations**

480 F.Supp.3d 542

---

Footnotes

1    The following facts are taken from the complaint and, for the reasons explained below, Defendant's "Exhibit 3," and assumed to be true for purposes of this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017). Although

it is labeled as "Exhibit 3" on the docket and referred to as such in Defendant's motion, *see* Dkt. 22, Att. 6, the exhibit itself is entitled "Exhibit 2."

2    Plaintiff's effort to have this Court convert this motion to one for summary judgment and then promptly deny it is rejected. *See* Pl.'s Mot. at 2 n.1. Whether to convert a motion to dismiss to one for summary judgment is within a court's discretion. *See Garcha v. City of Beacon*, 351 F. Supp. 2d 213, 216 (S.D.N.Y. 2005). Because "[n]ormally[ ] summary judgment is inappropriate before the parties have had an opportunity for discovery" and that opportunity has not occurred here, the Court will not convert Defendant's motion. *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 165 (S.D.N.Y. 2006).

3    "While New York's tripartite inquiry therefore does and is intended to differ from the inquiry required under the First Amendment, we note that the thrust of the dispositive inquiry under both New York and constitutional law is 'whether a reasonable [reader] could have concluded that [the publications were] conveying facts about the plaintiff.' " *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) (internal citations omitted). "The New York Court of Appeals has consistently found that the New York Constitution affords greater protection for statements of opinion than its federal counterpart." *Chau v. Lewis*, 935 F. Supp. 2d 644, 658 (S.D.N.Y. 2013).

4    If Plaintiff is further suggesting that it was defamatory for Defendant to refer to Russia Blog as "[his] own site," Compl. ¶¶ 10–11, that allegation too would fail. An "average person ... reading" that statement, particularly in the Twitter context, would not find it to be defamatory. *Steinhilber*, 68 N.Y.2d at 290, 508 N.Y.S.2d 901, 501 N.E.2d 550. Not only does Plaintiff himself acknowledge that he worked for Russia Blog, "edit[ing] [its] website ..., wr[iting] press releases, author[ing] op-eds, and assist[ing] in drafting fundraiser letters and grant applications," Compl. ¶ 8, but he makes no allegations as to how this assertion defamed him.

5    To the extent that Plaintiff also alleges a theory of implied defamation, this too fails for the same reason. *See Mooradian v. St. Francis Prep. Sch.*, No. 13-CV-3357, 2014 WL 11462720, at *5 (E.D.N.Y. Aug. 14, 2014) (rejecting an implied defamation claim "[b]ecause opinions are not actionable").

6    Plaintiff's tortious interference claim would also likely be dismissed for another reason. "[U]nder New York law, an at-will employment contract cannot form the basis for a tortious interference with contract action." *Balakrishnan v. Kusel*, No. 08-CV-1440, 2009 WL 1291755, at *11 (E.D.N.Y. May 8, 2009). Although the complaint does not state whether Plaintiff was an at-will employee, the Court may assume so in the absence of this allegation. *See id.* ("[T]he Court can assume that plaintiff was an at-will employee in the absence of specific allegations to the contrary."); *see also Millar*, 354 F. Supp. 2d at 230 ("Without a specific allegation to the contrary, the Court will assume that the Plaintiff were at-will employees," which generally "cannot give rise to a cause of action for tortious interference with a contract.").

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

🏳 KeyCite Blue-Striped Flag

Appeal Filed by Graham v. UMG Recordings, Inc., 2nd Cir., October 30, 2025

806 F.Supp.3d 454
United States District Court, S.D. New York.

Aubrey Drake GRAHAM, Plaintiff,

v.

UMG RECORDINGS, INC., Defendant.

25-CV-0399 (JAV)
|
Signed October 9, 2025

**Synopsis**

**Background:** Recording artist brought action against record label for defamation, harassment in the second degree under New York Penal Code, and violation of New York's consumer protection statute, alleging record label knowingly published and promoted rival artist's song, a so-called "diss track" in a musical feud between the artists, that falsely accused him of pedophilia. Record label filed motion to dismiss for failure to state a claim.

**Holdings:** The District Court, Jeannette A. Vargas, J., held that:

[1] forum of pedophilia accusation was not one an average listener would regard as conveying fact-checked verifiable content;

[2] context of accusation would not have created expectation in average listener that song stated "facts" instead of "opinion";

[3] song with accusation had to be read together with other songs in artists' public feud to assess how general audience would have perceived it;

[4] tone and language of song with accusation indicated artist was rapping hyperbolic vituperations that were "opinions," not "facts";

[5] context of song negated any implication accusation was based on undisclosed facts, and thus accusation was not "mixed opinion";

[6] New York Penal Code provision that criminalized offense of harassment did not provide private cause of action; and

[7] artist's allegations based "on information and belief" failed to plausibly allege claim for violation of New York consumer protection statute.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (50)

**[1]** **Federal Civil Procedure** 🔑 Insufficiency in general

To survive a motion to dismiss for failure to state a claim, a plaintiff may not simply allege facts that are consistent with liability; a complaint must nudge the plaintiff's claims across the line from conceivable to plausible. Fed. R. Civ. P. 12(b)(6).

**[2]** **Federal Civil Procedure** 🔑 Insufficiency in general

Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice to survive a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**[3]** **Federal Civil Procedure** 🔑 Matters deemed admitted; acceptance as true of allegations in complaint

In deciding a motion to dismiss for failure to state a claim, the district court need not credit legal conclusions couched as factual allegations. Fed. R. Civ. P. 12(b)(6).

**[4]** **Federal Civil Procedure** 🔑 Matters considered in general

In ruling on a motion to dismiss for failure to state a claim, the district court may consider documents incorporated in the complaint by reference and matters of which judicial notice may be taken. Fed. R. Civ. P. 12(b)(6); Fed. R. Evid. 201(b).

**[5]**    **Evidence**  Matters referred to or incorporated by pleadings

District court would take judicial notice of lyrics of songs, attached as exhibits to record label's motion to dismiss, which were part of so-called "rap battle" between its recording artists, to understand the necessary and proper context of the statements in dispute, in deciding whether lyrics accusing artist of pedophilia were actionable as defamation under New York law, at motion to dismiss stage; dates on which the songs were released and their lyrics were not reasonably subject to dispute, and the songs themselves, with one exception, were all referenced in the complaint. Fed. R. Civ. P. 12(b)(6); Fed. R. Evid. 201(b).

More cases on this issue

**[6]**    **Evidence**  Matters referred to or incorporated by pleadings

District court would take judicial notice of documents attached as exhibits to defendant's motion to dismiss, in deciding the motion, as they were directly referenced and relied upon in plaintiff's complaint, so that they were properly before the court. Fed. R. Civ. P. 12(b)(6); Fed. R. Evid. 201(b).

More cases on this issue

**[7]**    **Evidence**  Private or commercial websites

**Evidence**  As establishing truth of facts or matters noticed in general

District Court would take judicial notice, in deciding motion to dismiss for failure to state a claim, of the existence of the articles listed, but not the truth of their contents, in the search results from newspaper website attached as exhibits to defendant's motion to dismiss, as the documents

could be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Civ. P. 12(b)(6); Fed. R. Evid. 201(b).

More cases on this issue

**[8]**    **Libel and Slander**  Nature and elements of defamation in general

Under New York law, the elements of a defamation claim are (1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with the applicable level of fault, (6) causing injury, and (7) not protected by privilege.

**[9]**    **Libel and Slander**  Actionable Words in General

Under New York law, a defamatory statement is one that exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society.

1 Case that cites this headnote

**[10]**    **Constitutional Law**  Defamation

Under the First Amendment, there is no such thing as a false idea; only assertions of facts are capable of being proven false and thus subject to a claim of defamation under New York law. U.S. Const. Amend. 1.

**[11]**    **Constitutional Law**  Defamation

**Constitutional Law**  Opinion

New York Constitution provides for absolute protection of opinions; thus, as a matter of New York law, courts must distinguish between statements of "fact," which may be defamatory, and expressions of "opinion," which are not defamatory and have the full protection of the New York Constitution. N.Y. Const. art. 1, § 8.

**[12]    Libel and Slander** 🔑 Construction of defamatory language in general

Whether a challenged statement is "fact" or "opinion," for purposes of a defamation claim under New York law, is a legal question.

**[13]    Federal Civil Procedure** 🔑 Tort actions in general

There is particular value in resolving defamation claims under New York law at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms.

**[14]    Constitutional Law** 🔑 Defamation
**Constitutional Law** 🔑 Opinion

In distinguishing between "facts" actionable as defamation under New York law and constitutionally protected "opinion," three factors guide the district court's consideration: (1) whether the specific language in issue has a precise meaning which is readily understood, (2) whether the statements are capable of being proven true or false, and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be "opinion," not "fact"; the district court conducts this inquiry through the lens of a "reasonable" listener. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

1 Case that cites this headnote

**[15]    Constitutional Law** 🔑 Particular Issues and Applications

**Libel and Slander** 🔑 Imputation of mental illness or lack of sobriety

Recording artist's allegedly false statement in song, that rival artist was a pedophile, had a "readily understandable meaning," as factor favoring determination that the statement was

a "fact" actionable as defamation under New York law, rather than a constitutionally protected "opinion." U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[16]    Constitutional Law** 🔑 Particular Issues and Applications

**Libel and Slander** 🔑 Imputation of mental illness or lack of sobriety

Recording artist's allegedly false statement in song, that rival recording artist was a pedophile, was "capable of being proven true or false," as factor favoring determination that the statement was a "fact" actionable as defamation under New York law, rather than a constitutionally protected "opinion." U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[17]    Libel and Slander** 🔑 Words Imputing Crime and Immorality

Even accusations of criminal behavior are not actionable as defamation under New York law if, understood in context, they are "opinion" rather than "fact."

**[18]    Libel and Slander** 🔑 Construction of language used

Inquiry into whether a statement, understood in context, would be one of "opinion" rather than "fact," and thus not actionable under New York law as defamation, is a holistic one, which looks to the over-all context in which the assertions were made, in order to assess the impact that the statements would have on a reasonable listener; such context includes the forum in which the communication was published, the surrounding circumstances, the tone and language of the communication, and its apparent purpose.

**[19]    Libel and Slander** 🔑 Construction of language used

District court considers the forum in which allegedly defamatory statements appear, in

determining how the statements would be understood in context, as that is a useful gauge for determining whether the reasonable reader will treat the statements more readily as "opinion" than "fact," for purposes of determining whether the statements are defamatory under New York law; for example, the average listener is more likely to understand statements made on a news program or in a journalistic piece to be "factual," while statements made in the opinion page of a newspaper or on an internet comment page are generally perceived as "opinion."

[20]    **Libel and Slander**  Construction of language used

Forum in which a statement appears, to the extent to which it bears on whether it would be understood as a statement of "opinion" or "fact," is not dispositive of the "fact" versus "opinion" inquiry, for purposes of determining whether the statement is defamatory under New York law, but it does provide contextual indicia that can inform the district court's analysis.

1 Case that cites this headnote

[21]    **Constitutional Law**  Particular Issues and Applications

**Libel and Slander**  Imputation of mental illness or lack of sobriety

Forum in which recording artist's statements that rival recording artist was a pedophile occurred, a so-called rap "diss track" between the feuding artists with accompanying video and album art, was not one that an average listener would regard as the product of thoughtful or disinterested investigation, conveying to the public fact-checked verifiable content, for purposes of determining whether the statements, understood in context, would have been regarded as constitutionally protected statements of "opinion" rather than "fact," and thus not actionable as defamation under New York law. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

1 Case that cites this headnote

[22]    **Libel and Slander**  Construction of language used

In determining whether a statement would be understood as one of "opinion" rather than "fact," and thus not defamatory under New York law, the district court considers, after looking to the forum in which the statement appeared, the full context of the communication in which the statement appears, including the setting surrounding the communication.

[23]    **Libel and Slander**  Actionable Words in General

Under New York law, even apparent statements of "fact" may assume the character of statements of "opinion," so that they would not be defamatory, when made in public debate, heated labor dispute, or other circumstances in which an audience may anticipate the use of epithets, fiery rhetoric, or hyperbole.

[24]    **Constitutional Law**  Particular Issues and Applications

**Libel and Slander**  Imputation of mental illness or lack of sobriety

Context of recording artist's statements that rival artist was a pedophile, in so-called rap "diss track" made as part of a public feud between the artists, would not have created expectation in average listener that the song's lyrics stated "facts" instead of "opinion," for purposes of determining whether the pedophilia accusation, understood in context, would have been regarded as constitutionally protected "opinion" rather than "fact," and thus not actionable as defamation under New York law; feud between the artists, in which they exchanged increasingly inflammatory insults and accusations, including seeming challenge to make the pedophilia accusation, was a context from which audience would have anticipated use of epithets, fiery rhetoric, or hyperbole, rather than factual assertions. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[25]**  **Constitutional Law** 🔑 Particular Issues and Applications

**Libel and Slander** 🔑 Imputation of mental illness or lack of sobriety

Song in which recording artist accused rival artist of being a pedophile had to be read together with other songs released by artists in their public feud, not in isolation, to assess how general audience would have perceived accusation of pedophilia, for purposes of determining whether the accusation, understood in context, would have been regarded as constitutionally protected "opinion" rather than "fact," and thus not actionable as defamation under New York law, even if song making the accusation had achieved level of "cultural ubiquity" far beyond the others; the songs, so-called "diss tracks," were released during a rap battle, in which artists responded to insults and accusations in prior songs, the other songs were hits, and the battle, not just the song, gained "cultural ubiquity." U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[26]**  **Evidence** 🔑 Newspaper articles and other published information

Did court take judicial notice of the media reporting that surrounded the release of song, as well as the associated feud between the two artists?**Yes**

District court would take judicial notice of the extensive mainstream media reporting that surrounded the release of the song in which one recording artist accused a rival artist of being a pedophile, as well as the associated feud between the two artists, for purposes of determining whether the accusation, understood in context, would have been regarded as constitutionally protected "opinion" rather than "fact," and thus not actionable as defamation under New York law, in action against recording label that published the song by the accused artist. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8; Fed. R. Evid. 201.

More cases on this issue

**[27]**  **Constitutional Law** 🔑 Defamation

**Constitutional Law** 🔑 Opinion

Whether publications constitute a "fact" actionable as defamation under New York law or constitutionally protected "opinion" cannot vary based upon the popularity they achieve; constitutional guarantees of free speech regarding "opinions" do not rest on such a flimsy foundation. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[28]**  **Constitutional Law** 🔑 Defamation

**Constitutional Law** 🔑 Opinion

Republication cannot transform a statement of "opinion," which is constitutionally protected and thus not actionable as defamation under New York law, into a statement of "fact," which can be defamatory. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[29]**  **Libel and Slander** 🔑 Actionable Words in General

Loose, figurative, or hyperbolic statements, even if deprecating the plaintiff, and imaginative expression, cannot constitute actionable defamation under New York law.

**[30]**  **Constitutional Law** 🔑 Particular Issues and Applications

**Libel and Slander** 🔑 Imputation of mental illness or lack of sobriety

Tone and language of song in which one recording artist accused rival artist of being a pedophile, in so-called "rap diss track" that was part of a feud, indicated that accusing artist was rapping hyperbolic vituperations that were "opinions," not "facts," for purposes of determining whether the accusation, understood in context, would have been regarded as constitutionally protected "opinion" rather than "fact," and thus not actionable as defamation under New York law; song was replete with profanity, trash-talking, threats, and figurative

and hyperbolic language that were indicia of opinion, and no reasonable listener would have equated lyrics, such as, "Ain't no law, boy, you ball boy, fetch Gatorade or somethin', since 2009 I had this b**** jumpin'," with accurate factual reporting. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[31]** **Constitutional Law** 🔑 Particular Issues and Applications

**Libel and Slander** 🔑 Imputation of mental illness or lack of sobriety

Views expressed by internet users online in comments and posts, that recording artist's song accusing rival artist of being a pedophile exposed truth about that artist, did not alter analysis of District Court that, based on its full consideration of the context of the song, a so-called "rap diss track" that was part of heated public feud between the artists, a reasonable listener could not have concluded that the song's accusation of pedophilia was conveying objective "facts," rather than constitutionally protected "opinion," as would be required for the accusation to be actionable as defamation under New York law; given that billions of people were active online, support for almost any proposition, no matter how farfetched, fantastical, or unreasonable, could be found online with little effort. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[32]** **Libel and Slander** 🔑 Construction of defamatory language in general

Under New York law, distinguishing between "fact" and "opinion," as required to determine if a statement is one of "fact" and thus actionable as defamation, is question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean.

**[33]** **Constitutional Law** 🔑 Particular Issues and Applications

**Libel and Slander** 🔑 Want of chastity or sexual crimes in general

Album cover art for recording artist's song, an overlay of more than a dozen sex offender markers, which was designed to reinforce song's message that rival artist was a pedophile, was constitutionally protected "opinion," not "fact," and thus was not actionable as defamation under New York law; the accusation in the song was "opinion," and the imagery on the album cover was obviously exaggerated and doctored, so that no reasonable person viewing it would have believed that in fact law enforcement had designated 13 residents in the accused artist's home as sex offenders. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[34]** **Constitutional Law** 🔑 Particular Issues and Applications

**Libel and Slander** 🔑 Want of chastity or sexual crimes in general

Figurative imagery accompanying music video for song of recording artist that accused rival artist of being a pedophile, which depicted prolonged shot of owl in cage, allegedly projecting message that rival artist belonged behind bars, and which showed accusing artist playing hopscotch while singing "A-minor" lyric, allegedly a reference to rival artist having engaged in sexual relations with "minors," was constitutionally protected "opinion," not "fact," and thus was not actionable as defamation under New York law; the image of a caged owl could not have been reasonably understood to convey a factual message, and the hopscotch scene was not suggestive of objective reporting. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[35]** **Libel and Slander** 🔑 Actionable Words in General

Although pure opinion cannot constitute actionable defamation under New York law, "mixed opinion," which is an opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, is actionable.

**[36]    Libel and Slander** 👈 Actionable Words in General

"Mixed opinion," which is actionable as defamation under New York law, holds the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking.

**[37]    Libel and Slander** 👈 Construction of language used

**Libel and Slander** 👈 Construction of defamatory language in general

Whether statements constitute "mixed opinion," so that they are actionable as defamation under New York law, presents a legal question, which must be answered by considering, in the context of the entire communication and of the circumstances in which they were spoken or written, whether the average listener would reasonably understand the opinion as implying the assertion of undisclosed facts justifying the opinion.

**[38]    Constitutional Law** 👈 Particular Issues and Applications

**Libel and Slander** 👈 Imputation of mental illness or lack of sobriety

Context of recording artist's song, in which he accused rival artist of being a pedophile, negated any implication that song's pedophilia accusation was based on undisclosed facts, and thus the accusation was not "mixed opinion," rather than constitutionally protected "opinion," as would be required for the accusation to be actionable as defamation under New York law; song and accusation emerged in context of so-called "rap diss" battle between the artists, so that no reasonable person listening to the song would have assumed that accusing artist uniquely had access to credible, provable facts that revealed rival artist to be a pedophile, and accusation appeared to be a response to a lyric in rival artist's prior song prodding accusing artist to discuss

preexisting rumors about rival artist. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8.

**[39]    Evidence** 👈 Historical Facts

Was it appropriate to take judicial notice of facts?**Yes**

District court would take judicial notice of fact that Millie Bobby Brown was a well-known actress, and that she had given interviews stating that she and recording artist accused of pedophilia by rival artist formed a friendship when she was 14 years old and he was 32 years old, to understand whether lyrics of song in back-and-forth rap battle between the artists indicated that accused artist understood rival to be referring to preexisting rumors of the artist's pedophilia involving the actress, for purposes of determining whether the accusation was "mixed opinion" that would have been understood to be based on undisclosed facts, rather than constitutionally protected "opinion," as would be required for the accusation to be actionable as defamation under New York law. U.S. Const. Amend. 1; N.Y. Const. art. 1, § 8; Fed. R. Evid. 201.

More cases on this issue

**[40]    Action** 👈 Criminal acts

**Threats, Stalking, and Harassment** 👈 Harassment in General

**Threats, Stalking, and Harassment** 👈 Degrees

New York Penal Code provision that criminalized offense of harassment in the second degree, prohibiting the intent to annoy or alarm another and engaging in conduct that alarmed or seriously annoyed another, did not provide private cause of action; New York legislature conferred authority to enforce the criminal harassment statute upon local law enforcement, and there were no indications in the statutory scheme that the legislature intended to confer a civil cause of action for violation of the statute. N.Y. Penal Law § 240.26(3).

**[41]    Torts** 👈 Harassment in general;  sexual harassment or solicitation

New York does not recognize a civil cause of action for harassment.

**[42]    Action** 👈 Criminal acts

Under New York law, where a penal statute does not expressly confer a private right of action on individuals pursuing civil relief, recovery under such a statute may be had only if a private right of action may fairly be implied.

**[43]    Action** 👈 Criminal acts

To determine whether a criminal statute gives rise to a private right of action under New York law, courts look at three factors: (1) plaintiff must be one of the class for whose benefit the statute was enacted, (2) recognition of a private right of action must promote the legislative purpose, and (3) creation of such a right must be consistent with the legislative scheme.

**[44]    Action** 👈 Criminal acts

As a general rule, when a statute is contained solely within the Penal Law, the New York legislature intended it as a police regulation to be enforced only by a court of criminal jurisdiction; thus, rarely is there a private right of action under a criminal statute.

**[45]    Antitrust and Trade Regulation** 👈 Fraud;  deceit;  knowledge and intent

To successfully state a claim for deceptive acts and practices in violation of the New York consumer protection statute, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as result. N.Y. General Business Law § 349.

**[46]    Federal Civil Procedure** 👈 Insufficiency in general

Plausibility standard governing motions to dismiss for failure to state a claim does not prevent a plaintiff from pleading facts "on information and belief" in appropriate circumstances, but the plaintiff may only do so where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible; in that scenario, the allegations must be accompanied by a statement of the facts upon which the belief is founded. Fed. R. Civ. P. 12(b)(6).

**[47]    Antitrust and Trade Regulation** 👈 Particular cases

Recording artist failed to plausibly allege that, based "on information and belief," record label engaged in deceptive acts and practices by using covert practices to manipulate streaming, on online music streaming service, of song by rival artist accusing him of pedophilia to inflate the song's perceived popularity, for purposes of his claim for violation of New York consumer fraud statute, even if such practices might have been facts peculiarly within possession and control of recording label, where accused artist relied, to support his allegations based "on information and belief," on a small sample of the possible experience of users of the streaming service, communicated through microblog posts and other anonymized commentary online. N.Y. General Business Law § 349; Fed. R. Civ. P. 12(b)(6).

**[48]    Antitrust and Trade Regulation** 👈 Particular cases

Allegations of recording artist, that record label engaged in covert and manipulative means to inflate perceived popularity of song by rival artist accusing him of pedophilia, failed to plausibly allege claim for deceptive acts and practices in violation of New York consumer protection statute; the allegations did not indicate how any

of the deceptive practices allegedly used by recording label harmed consumers, by causing them to pay more or purchase a product they would not have otherwise purchased, and it was not clear how allegedly redirecting users of online music streaming service to the song, from the unrelated songs and artists they were searching for, would have amounted to actual harm of consumers or any limitation of their choices. N.Y. General Business Law § 349.

[49]    **Antitrust and Trade Regulation** 🔑 Consumers, purchasers, and buyers; consumer transactions

Term "consumer," for purposes of the New York consumer protection statute's prohibition of deceptive acts and practices, is consistently associated with an individual or natural person who purchases goods, services, or property primarily for personal, family, or household purposes. N.Y. General Business Law § 349.

[50]    **Antitrust and Trade Regulation** 🔑 Public impact or interest; private or internal transactions

Defendant engages in consumer-oriented activity, as required for a claim of deceptive acts and practices in violation of New York consumer protection statute, if a company's actions cause any consumer injury or harm to the public interest; for while the statute does not preclude an action brought by one business competitor against another, it is at its core a consumer protection device. N.Y. General Business Law § 349.

**Attorneys and Law Firms**

Anna Mary Gotfryd, Willkie Farr & Gallagher LLP, Washington, DC, Meryl Conant Governski, Dunn Isaacson Rhee LLP, Washington, DC, Brady M. Sullivan, Marie Anne Houghton-Larsen, Willkie Farr & Gallagher LLP, New York, NY, Michael Gottlieb, Willkie Farr & Gallagher LLP, Los Angeles, CA, for Plaintiff.

Nicholas Primer Crowell, Sidley Austin LLP, New York, NY, Rollin A. Ransom, Sidley Austin LLP, Los Angeles, CA, for Defendant.

Jack Lerner, UCI Law Clinic, UC Irvine School of Law, Irvine, CA, for Amici Charis Kubrin, Jack Lerner, Adam Dunbar, Kyle Winnen.

OPINION AND ORDER

JEANNETTE A. VARGAS, United States District Judge:

 **\*462**  This case arises from perhaps the most infamous rap battle in the genre's history, the vitriolic war of words that erupted between superstar recording artists Aubrey Drake Graham ("Drake") and Kendrick Lamar Duckworth ("Lamar" or "Kendrick Lamar") in the spring of 2024. Over the course of 16 days, the two artists released eight so-called "diss tracks," with increasingly heated rhetoric, loaded accusations, and violent imagery. The penultimate song of this feud, "Not Like Us" by Kendrick Lamar, dealt the metaphorical killing blow. The song contains lyrics explicitly  **\*463**  accusing Drake of being a pedophile, set to a catchy beat and propulsive bassline. "Not Like Us" went on to become a cultural sensation, achieving immense commercial success and critical acclaim.

Both Drake and Kendrick Lamar have recording contracts with Defendant UMG Recordings, Inc. ("UMG" or "Defendant"). Drake alleges that UMG intentionally published and promoted "Not Like Us" while knowing that the song's insinuations that he has sexual relations with minors were false and defamatory. Drake has brought this action against UMG for defamation, harassment in the second degree, and violation of section 349 of the New York General Business Law. Before the Court is Defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the Court concludes that the allegedly defamatory statements in "Not Like Us" are nonactionable opinion, the motion to dismiss is GRANTED.

**LEGAL STANDARDS**

 [1]    [2]    To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir.

2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). A plaintiff may not simply allege facts that are consistent with liability; the complaint must "nudge plaintiff's claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (cleaned up); *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

**[3]** When ruling on a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded allegations and draws all reasonable inferences in favor of the non-moving party. *Romanova v. Amilus Inc.*, 138 F.4th 104, 108 (2d Cir. 2025). The Court need not credit "legal conclusions couched as factual allegations," however. *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (quotation marks omitted).

**[4]** The Court may also consider "documents incorporated in the complaint by reference[ ] and matters of which judicial notice may be taken." *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 243 (S.D.N.Y. 2025) (citation omitted). Judicial notice is appropriate when a matter is not subject to reasonable dispute because it "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2).

## BACKGROUND

**[5]** The following background is largely taken from the allegations in the Amended Complaint, which are assumed true for purposes of this motion. ECF No. 41 ("Am. Compl."). Additionally, Defendant requests the Court take judicial notice of certain extrinsic evidence pursuant to Rule 201 of the Federal Rules of Evidence. *See* ECF No. 44 ("Req. J. Not."). These exhibits include the lyrics of the songs released as part of Drake and Kendrick Lamar's rap battle. The dates on which these songs were released and the lyrics of these songs are not reasonably subject to dispute, *see Pickett v. Migos Touring, Inc.*, 420 F. Supp. 3d 197, 207 (S.D.N.Y. 2019), and the songs themselves are (with one exception) all referenced in the Amended Complaint. Accordingly, the Court will take judicial notice of Exhibits **\*464** H through I and Exhibits K through O to the Request for Judicial Notice to understand Defendant's alleged statements in their "necessary and proper context." *Ganske v. Mensch*, 480 F. Supp. 3d 542,

545 (S.D.N.Y. 2020) (cleaned up); *see also Condit v. Dunne*, 317 F. Supp. 2d 344, 356-57 (S.D.N.Y. 2004) (taking judicial notice of submissions that place defendant's comments "in the broader social context" to "aid the Court['s]" determination of the adequacy of plaintiff's defamation claims).

**[6]** **[7]** Exhibits B, J, and P are directly referenced and relied upon in Plaintiff's Amended Complaint, Req. J. Not. at 1-4, so those documents are likewise properly before the Court. *See Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003).[1] And because the document "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), the Court also takes judicial notice of the search results from the *New York Times* website in Exhibit C. The Court takes judicial notice of the existence of the listed articles, but not the truth of their contents. *See Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*, No. 11 Civ. 8921, 2013 WL 6670584, at \*1 n.1 (S.D.N.Y. Mar. 29, 2013) (taking judicial notice of four websites on motion to dismiss because courts in this Circuit "generally ha[ve] the discretion to take judicial notice of internet material"); *see also Patsy's Italian Restaurant, Inc. v. Banas*, 575 F. Supp. 2d 427, 443 n.18 (E.D.N.Y.2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet.").

### A. Factual Allegations

Drake is a prominent recording artist and songwriter, among other public-facing endeavors. Am. Compl., ¶ 26. Drake has had a successful music career under Defendant UMG for at least 20 years. *Id.*, ¶¶ 26-27. UMG uses its brands and imprints, or labels, to provide its music artists with the means to create, promote, and distribute their music commercially. *Id.*, ¶ 27. Defendant, through Universal Music Publishing Group ("UMPG"), holds exclusive publishing and distribution rights to Drake's music as well as that of artist Kendrick Lamar. *Id.*

On April 19, 2024, Drake released a diss track directed at Kendrick Lamar called "Push Ups." Req. J. Not., Ex. H. In "Push Ups," Drake mocks Lamar's height and shoe size, Req. J. Not., Ex. H ("How the f\*\*\* you big steppin' with a size-seven men's on/... Pipsqueak, pipe down"), and questions Lamar's success, *id.* ("You ain't in no big three/... I'm at the top of the mountain, so you tight now/Just to have this talk with your a\*\*, I had to hike down.").

A few days later, Drake released "Taylor Made Freestyle," in which he used artificial intelligence-generated voices of deceased rapper 2Pac and of rapper Snoop Dogg to goad Lamar. Req. J. Not. at 2. In the track, "2Pac" and "Snoop Dogg" share their disappointment that Lamar had not yet responded to "Push Ups." *See id.*, Ex. I ("Kendrick, we need ya, the West Coast savior/... You seem a little nervous about all the publicity/... you gotta show this f***in' owl[2] who's boss on the West."). Drake, in his own voice, further taunts Kendrick for failing to come up with a satisfactory response, saying, "I know you're in that NY apartment, you strugglin' **\*465** right now, I know it/In the notepad doing lyrical gymnastics, my boy." *Id.* Drake also surmises that Kendrick was purposefully delaying his response because artist Taylor Swift had just released a new album. *Id.* ("[S]hout out to Taylor Swift/Biggest gangster in the music game right now/... She got the whole pgLang on mute like that Beyoncé challenge, y'all boys quiet for the weekend.").

Lamar fired back at Drake in "Euphoria," which was released on April 30, 2024. Req. J. Not. at 3. In the track, Lamar claims, "I make music that electrify 'em, you make music that pacify 'em" and that he would "spare [Drake] this time, that's random acts of kindness." Req. J. Not., Ex. K. He accuses Drake of fabricating his claims: "Know you a master manipulator and habitual liar too/But don't tell no lie about me and I won't tell truths 'bout you." *Id.*; *see also* Am. Compl., ¶¶ 14, 77. He insults Drake's fashion sense, Req. J. Not., Ex. K ("I hate the way that you walk, the way that you talk, I hate the way that you dress"), further raps "I believe you don't like women, it's real competition, you might pop a** with 'em," and taunts Drake for being a coward with his responses, *id.* ("I hate the way that you sneak diss, if I catch flight, it's gon' be direct.").

On May 3, 2024, the feud between Drake and Lamar escalated, as they lobbed increasingly vicious, personal accusations at each other over the course of the day. First, Lamar released "6:16 in LA," Req. J. Not. at 3, in which he calls Drake a "terrible person." *Id.*, Ex. L. Lamar accuses Drake of "playin' dirty with propaganda" and raps that if Drake was "street-smart" then he would have "caught [on] that [his] entourage is only [there] to hustle" him." *Id.*

Drake's next response arrived later that day in "Family Matters." Drake jabs at Lamar's relationship with his partner, Req. J. Not., Ex. M ("You the Black messiah wifin' up a mixed queen/And hit vanilla cream to help out with your self-esteem/On some Bobby sh**, I wanna know what Whitney need") and implies that Lamar physically abused her, *id.*

("You a dog and you know it, you just play sweet/Your baby mama captions always screamin', 'Save me'/You did her dirty all your life, you tryna make peace."). Moreover, Drake calls into question whether Lamar is the biological father of one of his children. *Id.* ("I heard that one of 'em little kids might be Dave Free/Don't make it Dave Free's").

Almost immediately after the release of "Family Matters," Lamar unleashed the scathing "Meet the Grahams," Req. J. Not. at 3, in which he accuses Drake of being a "deadbeat" father and of hiding the existence of other children. Req. J. Not., Ex. N ("You lied about your son, you lied about your daughter, huh/You lied about them other kids that's out there hopin' that you come."). Lamar also alleges that Drake has "gamblin' problems, drinkin' problems, pill-poppin' and spendin' problems/Bad with money, wh***house/Solicitin' women problems, therapy's a lovely start." *Id.* He further insinuates that Drake was a "predator" and that Drake "should die so all of these women can live with a purpose." *Id.*

The next day, on May 4, 2024, Lamar released "Not Like Us." Am. Compl., ¶¶ 6-7. "Not Like Us" explicitly names Drake and his associates as pedophiles. *Id.*, ¶¶ 60-62. Specifically, the track contains the following lyrics:

> Say, Drake, I hear you like 'em young
> You better not ever go to cell block one
> To any b**** that talk to him and they in love
> Just make sure you hide your lil' sister from him
> They tell me Chubbs the only one that
>  **\*466**
> get your hand-me-downs
> And PARTY at the party, playin' with his nose now
> And Baka got a weird case, why is he around?
> Certified Lover Boy? Certified pedophiles
>
> Wop, wop, wop, wop, wop, Dot, f*** 'em up
> Wop, wop, wop, wop, wop, I'ma do my stuff
> Why you trollin' like a b****? Ain't you tired?
> Tryna strike a chord and it's probably A-Minor

Am. Compl., Ex. A.[3]

On May 5, 2025, Drake responded in "The Heart Part 6," Req. J. Not. at 3, directly denying Lamar's allegations of pedophilia, *id.*, Ex. O ("I never been with no one underage, but now I understand why this the angle that you really mess with/Just for clarity, I feel disgusted, I'm too respected/If I was f***ing young girls, I promise I'd have been arrested/I'm way too famous for this s*** you just suggested/... Drake is not a name that you gon' see on no sex offender list."); *see also* Am.

Compl., ¶ 102. In the track, Drake further sneers that "[t]his Epstein angle was the s*** I expected" and accused Lamar of wanting to "misdirect." Req. J. Not., Ex. O. Drake also alleges that he had planted some of the information Lamar has used against him. *Id.* ("We plotted for a week, and then we fed you the information/... But you so thirsty, you not concerned with investigation/... You gotta learn to fact-check things and be less impatient.").

"Not Like Us" was a huge commercial success. It has gained immense popularity on streaming and social media platforms; it has been streamed globally more than 1.4 billion times on Spotify alone as of April 2025. Am. Compl., ¶¶ 7, 10, 58. On November 8, 2024, the Recording Academy nominated "Not Like Us" for several Grammy Awards, *id.*, ¶ 142, and in February 2025, it won Record of the Year, *id.*, ¶ 164. A week later, on February 9, 2025, Kendrick Lamar performed "Not Like Us" live during the Apple Music Super Bowl LIX Halftime Show. *Id.*, ¶ 165. The performance is alleged to be the most-watched Super Bowl Halftime Show of all time with over 133.5 million views. *Id.*, ¶ 168.

### B. Procedural History

Plaintiff brings claims for defamation, harassment in the second degree, and violation of New York General Business Law Section 349 based upon UMG's publication and promotion of "Not Like Us" (the "Recording"). Defendant has filed a motion to dismiss the Amended Complaint. ECF No. 42. On June 30, 2025, the Court heard oral argument from both parties concerning the motion to dismiss and the request for judicial notice.

Plaintiff contends that he was defamed when Defendant "decided to publish, promote, exploit, and monetize allegations that it understood were not only false, but dangerous." Am. Compl., ¶ 8. Plaintiff alleges that "[t]he Recording repeatedly accuses Drake of engaging in criminal acts, including pedophilia and/or other acts that would require registering as a sex offender and of being registered as a sex offender." *Id.*, ¶ 59.

The Amended Complaint alleges that the song implies that Lamar has "*heard* (albeit from undisclosed sources and concerning undisclosed individuals) that Drake has a predilection for underage **\*467** women." *Id.*, ¶ 60. According to the Amended Complaint, the reference to "cell block one" is "a thinly veiled threat that Drake should be careful that he never ends up in prison, a place where child predators are notoriously the targets of violence." *Id.* The line

"Certified Lover Boy? Certified pedophiles" is a "perverse reference to Drake's 2021 album 'Certified Lover Boy.' " *Id.*, ¶ 61. Plaintiff argues that the use of the term "certified" "communicates that Drake has been *found* to be a pedophile." ECF No. 58 ("Opp'n Br.") at 9. And the final line of this passage plays on the "dual meaning of minor—a person under the age of 18 and a musical scale." Am. Compl., ¶ 61.

Plaintiff further cites as defamatory the Recording's descriptions of Drake as "Malibu most wanted" and a "predator," and that his name "gotta be registered and placed on neighborhood watch." *Id.*

The associated music video (the "Video") shows "images associated with sex trafficking" to reinforce the pedophilia accusation. *Id.*, ¶ 7. The Recording is also accompanied by an album image of Drake's home in Toronto (the "Image"), which is plastered in icons used by law enforcement and public safety applications to denote the residences of registered sex offenders. *Id.*, ¶¶ 65-66.

## DISCUSSION

### I. Defamation Claims

**[8]    [9]**   "Under New York law, the elements of a defamation claim are (1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with the applicable level of fault, (6) causing injury, and (7) not protected by privilege." *Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, No. 15 CV 4779-LTS-SN, 2016 WL 1717218, at \*2 (S.D.N.Y. Apr. 28, 2016). A defamatory statement is one that "exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society." *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 690 (S.D.N.Y. 2022).

The issue in this case is whether "Not Like Us" can reasonably be understood to convey as a factual matter that Drake is a pedophile or that he has engaged in sexual relations with minors. In light of the overall context in which the statements in the Recording were made, the Court holds that it cannot.

### A. Fact vs. Opinion

[10]    [11]   "Under the First Amendment, there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). [O]nly assertions of facts are capable of being proven false." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 460 (S.D.N.Y. 2012) (citation omitted). Moreover, "the New York Constitution provides for absolute protection of opinions." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000). Thus, courts must "distinguish[ ] between statements of fact, which may be defamatory and expressions of opinion, which 'are not defamatory' " and have the full protection of the New York Constitution. *Live Face on Web, LLC*, 2016 WL 1717218, at *2 (quoting *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 597 (S.D.N.Y. 2014)).

[12]    [13]   Whether a challenged statement is fact or opinion is a legal question. *Celle*, 209 F.3d at 178. Plaintiff argues that it is inappropriate for the Court to determine, at the pleading stage, whether a reasonable listener would perceive the Recording as fact or opinion. Opp'n Br. at 13-14; **\*468** Hr'g Tr. at 24:11-26:8. Yet, because this is a question of law, New York courts routinely resolve this question at the motion to dismiss stage. *See, e.g.*, *Brian v. Richardson*, 87 N.Y.2d 46, 52, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (1995) (holding, on a motion to dismiss, that challenged statement constitutes opinion); *Dfinity Found. v. New York Times Co.*, 702 F. Supp. 3d 167, 174 (S.D.N.Y. 2023), *aff'd*, No. 23-7838-cv, 2024 WL 3565762 (2d Cir. July 29, 2024) ("Whether a statement is a 'fact [or] opinion is "a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean" and is appropriately raised at the motion to dismiss stage.' "); *Greenberg v. Spitzer*, 155 A.D.3d 27, 62 N.Y.S.3d 372, 385-86 (2d Dep't 2017) (holding that, because whether a statement is defamatory "presents a legal issue to be resolved by the court," defamation actions are particularly suitable for resolution on a motion to dismiss). "There is particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Dfinity Found.*, 702 F. Supp. 3d at 173 (cleaned up); *accord Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013).

[14]   In distinguishing between facts and opinion, three factors guide the Court's consideration:

(1) whether the specific language in issue has a precise meaning which is readily understood;

(2) whether the statements are capable of being proven true or false; and

(3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Brian*, 87 N.Y.2d at 51, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (cleaned up). The Court conducts this inquiry through the lens of a "reasonable" listener. *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997).

[15]    [16]    [17]   Plaintiff's suit is focused on a single factual message conveyed by the Recording, "the false allegation that Drake is a pedophile." Hr'g Tr. at 36:16-19; *see also* Opp'n Br. at 9 ("[T]he Recording is myopically focused on ensuring that listeners take one message away from the song: Drake is a pedophile."). This statement has a readily understandable meaning, and it is capable of being proven true or false. But "even accusations of criminal behavior are not actionable if, understood in context, they are opinion rather than fact." *Hayashi v. Ozawa*, No. 17-CV-2558 (AJN), 2019 WL 1409389, at *2 (S.D.N.Y. Mar. 28, 2019).

[18]   Thus, the Court will focus its analysis on the third factor. This inquiry is a holistic one, which looks "to the over-all context in which the assertions were made," *Brian*, 87 N.Y.2d at 51, 637 N.Y.S.2d 347, 660 N.E.2d 1126, in order to assess "the impact that the statements would have on a reasonable [listener]," *Levin*, 119 F.3d at 197. Context includes the forum in which the communication was published, the surrounding circumstances, the tone and language of the communication, and its apparent purpose. *See Brian*, 87 N.Y.2d at 51-52, 637 N.Y.S.2d 347, 660 N.E.2d 1126; *see also Hayashi*, 2019 WL 1409389, at *2.

### 1. Forum

[19]    [20]   To start, the Court considers the forum in which the allegedly defamatory statements appear, as that is a "useful gauge" for determining whether the reasonable reader will treat it more readily as **\*469** opinion than fact. *Brian*, 87 N.Y.2d at 52, 637 N.Y.S.2d 347, 660 N.E.2d 1126. For example, the average listener is more likely to understand statements made on a news program or in a journalistic piece to be factual, while statements made in the opinion page of a newspaper or on an internet comment page are

generally perceived as opinion. *See, e.g., Millus v. Newsday, Inc.*, 89 N.Y.2d 840, 842, 652 N.Y.S.2d 726, 675 N.E.2d 461 (1996) (appearance of statement on editorial page indicative of opinion); *Brian*, 87 N.Y.2d at 52, 637 N.Y.S.2d 347, 660 N.E.2d 1126 ("[T]he common expectation is that the columns and articles published on a newspaper's Op Ed sections will represent the viewpoints of their authors and, as such, contain considerable hyperbole, speculation, diversified forms of expression and opinion."); *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 925 N.Y.S.2d 407, 415 (1st Dep't 2011) ("The culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a 'freewheeling, anything-goes writing style.' "); *Ganske*, 480 F. Supp. 3d at 553 ("[T]he fact that [the] allegedly defamatory statement ... appeared on Twitter conveys a strong signal to a reasonable reader that this was [d]efendant's opinion."); *Live Face on Web, LLC*, 2016 WL 1717218, at *3 ("[T]he media vehicles used to disseminate the [alleged defamation] —a Wordpress blog, social media posts, and an unsigned press release complaining about litigation tactics—suggest to readers that they contain opinions, not facts, and they are written in an amateurish fashion."). The forum in which a statement appears is not dispositive of the fact versus opinion inquiry, but it does provide contextual indicia that can inform the Court's analysis.

**[21]** The forum here is a music recording, in particular a rap "diss track," with accompanying video and album art. Diss tracks are much more akin to forums like YouTube and X, which "encourag[e] a freewheeling, anything-goes writing style," than journalistic reporting. *Sandals Resorts*, 86 A.D.3d at 43, 925 N.Y.S.2d 407 (quotation marks omitted). The average listener is not under the impression that a diss track is the product of a thoughtful or disinterested investigation, conveying to the public fact-checked verifiable content.

## 2. Surrounding Circumstances

**[22]    [23]** Next, the Court considers the "full context of the communication in which the statement appears," including the "setting surrounding the communication." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 294, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986). The fact that the Recording was made in the midst of a rap battle is essential to assessing its impact on a reasonable listener. "Even apparent statements of fact may assume the character of statements of opinion ... when made in public debate, heated labor dispute, or other circumstances

in which an audience may anticipate the use of epithets, fiery rhetoric or hyperbole." *Id.* (cleaned up); *see also Jacobus v. Trump*, 55 Misc.3d 470, 51 N.Y.S.3d 330, 336 (N.Y. Sup. Ct.), *aff'd*, 156 A.D.3d 452, 64 N.Y.S.3d 889 (1st Dep't 2017) ("As context is key, defamatory statements advanced during the course of a heated public debate, during which an audience would reasonably anticipate the use of epithets, fiery rhetoric or hyperbole, are not actionable." (cleaned up)).

The decision by the New York Court of Appeals in *Steinhilber* is instructive in this regard. In *Steinhilber*, the allegedly defamatory statements were published in a tape-recorded telephone message that was played automatically to anyone dialing the **\*470** private phone number that was given to labor union members. 68 N.Y.2d at 287, 508 N.Y.S.2d 901, 501 N.E.2d 550. The union had assessed a fine against Plaintiff after she had defied a strike order, and the phone message appeared after she had failed to pay the fine. *Id.* at 294, 508 N.Y.S.2d 901, 501 N.E.2d 550. The New York Court of Appeals found that "the most significant circumstance" was "that the message was prepared and played as part of the union's effort to punish a former member." *Id.* The court highlighted that, in "the emotional aftermath of a strike when animosity would be expected to persist—particularly against a former member who was seen as a 'traitor' to the cause," that a listener would not expect that any insults lobbed would be factual in nature. *Id.*

Similarly, in *Torain v. Liu*, the Second Circuit affirmed the dismissal of a complaint at the pleading stage, holding that as a matter of law, comments that the plaintiff was a "sick racist pedophile," a "loser pedophile," a "broadcaster pedophile," a "child predator," a "lunatic," and that he "must be put behind bars" were expressions of opinion. 279 F. App'x 46, 46 (2d Cir. 2008). In reaching this conclusion, the Second Circuit relied upon the context in which these statements were made. Specifically, the comments were part of a "war of words" between disk-jockeys at rival radio stations that received "extensive media coverage and commentary." *Id.* at 47. As part of that feud, the plaintiff made comments on air suggesting that he would sexually abuse the minor daughter of the defendant. *Id.* The Second Circuit concluded that, in this context, no reasonable listener could have perceived the defendant's responses to "state or imply assertions of objective fact." *Id.*

In *Rapaport v. Barstool Sports, Inc.*, the district court found that an audience would not reasonably conclude that statements suggesting that the plaintiff had herpes and had

abused his ex-girlfriend constituted assertions of facts when published in a six-minute diss track music video. No. 18-CV-8783 (NRB), 2021 WL 1178240, at *15 (S.D.N.Y. Mar. 29, 2021), *aff'd*, No. 22-2080-CV, 2024 WL 88636 (2d Cir. Jan. 9, 2024). The district court observed that the statements were "delivered in the midst of a public and very acrimonious dispute between [the parties] that would have been obvious to even the most casual observer." *Id.* The video in question reviewed the "recent history of the acrimonious dispute that resulted in Rapaport's termination just days before the video's publication," and also included a photoshopped photo of the defendant in a derogatory manner. *Id.* That clear background "contextualize[d] for the audience that the statements in the video are being offered in the midst of a hostile public feud between Rapaport and Barstool." *Id.*

 [24]  Just as in *Steinhilber, Rapaport*, and *Torain*, the Recording was published as part of a heated public feud, in which both participants exchanged progressively caustic, inflammatory insults and accusations. This is precisely the type of context in which an audience may anticipate the use of "epithets, fiery rhetoric or hyperbole" rather than factual assertions. A rap diss track would not create *more* of an expectation in the average listener that the lyrics state sober facts instead of opinion than the statements at issue in those cases.

For example, in "Euphoria" Lamar calls Drake a "master manipulator and habitual liar" and "a scam artist." Req. J. Not., Ex. K. Drake responds in "Family Matters" by heavily implying that Lamar is a domestic abuser. *See id.*, Ex. M. He also raps that he "heard" that one of Lamar's sons may not be biologically his. *Id.* ("Why you never hold your son and tell him, 'Say **\*471**  cheese'?/We could've left the kids out of this, don't blame me/... I heard that one of 'em little kids might be Dave Free").

In "Meet the Grahams," Lamar takes issue with Drake involving his family members in their feud. Req. J. Not., Ex. N ("Dear Aubrey/I know you probably thinkin' I wanted to crash your party/But truthfully, I don't have a hatin' bone in my body/This supposed to be a good exhibition within the game/But you f***ed up the moment you called out my family's name/Why you had to stoop so low to discredit some decent people?"). In that same track, Lamar alleges that Drake uses the weight loss drug Ozempic. *Id.* ("Don't cut them corners like your daddy did, f*** what Ozempic did/Don't pay to play with them Brazilians, get a gym membership."). Lamar also insinuates that Drake knowingly hires sexual

offenders. *See id.* ("Grew facial hair because he understood bein' a beard just fit him better/He got sex offenders on ho-VO that he keep on a monthly allowance.").

Of particular relevance, in "Taylor Made Freestyle," Drake challenged Lamar to make the pedophilia accusations at issue. Using the artificially generated voice of deceased rapper 2Pac, Drake goads Lamar:

> Kendrick, we need ya, the West Coast savior
> Engraving your name in some hip-hop history
> If you deal with this viciously
> You seem a little nervous about all the publicity
> F*** this Canadian lightskin, Dot
> We need a no-debated West Coast victory, man
> Call him a b**** for me
> Talk about him likin' young girls, that's a gift from me
> Heard it on the Budden Podcast, it's gotta be true

*Id.*, Ex. I. It is in this context in which such lyrics as "Say, Drake, I hear you like 'em young" from the Recording must be assessed. The similarity in the wording suggests strongly that this line is a direct callback to Drake's lyrics in the prior song.

 [25]  Plaintiff argues that the Court should ignore the songs that came before and assess "Not Like Us" as a "singular entity." Hr'g Tr. at 39:14-15; *see also* Opp'n Br. at 15-17. Plaintiff argues that the average listener is not someone who is familiar with every track released as part of the rap battle before listening to the Recording. Hr'g Tr. at 32:17-33:2; 35:9-19. Because the Recording has achieved a level of "cultural ubiquity" far beyond the other seven songs, Plaintiff contends that Court should not consider those other tracks in assessing how the average listener of the Recording would perceive the allegations regarding Drake. Hr'g Tr. at 36:10-19; *id.* at 39:11-17; *see also* Opp'n Br. at 15.

There are a number of flaws with this argument. "Not Like Us" cannot be viewed in isolation but must be placed in its appropriate factual context. *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991) ("[S]tatements must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying *any* facts."). Here, that factual context is the insults and trash talking that took place via these diss tracks in the days and weeks leading up to the publication of "Not Like Us." The songs released during this rap battle are in dialogue with one another. They reference prior songs and then respond to insults and accusations made by the rival artist. *See, e.g.*, Am. Compl., ¶ 63. The songs thus

must be read together to fully assess how the general audience would perceive the statements in **\*472** the Recording. *See, e.g.*, *Celle*, 209 F.3d at 187 (holding that two newspaper articles had to be read together to understand full context).

Notably, the Second Circuit rejected a similar argument in *Torain.* There, the plaintiff argued "that the district court improperly considered the statements that he made during his 'war of words' because they were not included in his complaint." 279 F. App'x at 47 n.1. The Second Circuit held that, because the court must look at the overall context in which a statement was made in order to determine if it is actionable, the district court properly considered all statements made during the feud between the disk jockeys, regardless of whether they were included in the complaint. *Id.*

[26] Moreover, while Plaintiff is correct that the intended audience for the Recording is the general public, and not a subset of rap devotees or Kendrick Lamar fans, Opp'n Br. at 15, the recordings in the rap battle were likewise released to the general public. These were not songs accessible to a select niche few, but tracks released by commercially successful artists. While "Not Like Us" may be the most popular of the diss tracks, the other songs were hits in their own right, with streams in the tens of millions or hundreds of millions. Am. Compl., ¶ 202 n.280.

Additionally, it was not just the Recording which gained a cultural ubiquity, but the rap battle itself. In deciding this motion to dismiss, the Court need not blind itself to the public attention garnered by this particular rap battle. The Court takes judicial notice of the extensive mainstream media reporting that surrounded the release of "Not Like Us" and the associated feud between Drake and Lamar. *See, e.g.*, Req. J. Not., Exs. B, C, P.[4] Accordingly, the Court must consider the entire rap battle to assess whether the average listener would take Lamar's statements as objective fact or opinion.

[27] Perhaps most fatally for Plaintiff's argument, it would render protection for artistic expression dependent upon an impermissible retroactive analysis. At the time he released "Not Like Us," Kendrick Lamar could not have been aware that it would break streaming records, win Record of the Year at the Grammys, or be featured at the Super Bowl Halftime Show. Yet Plaintiff would have the Court divorce the Recording from the context in which it was created because of these subsequent events. Whether publications constitute actionable fact or protected opinion cannot vary based upon

the popularity they achieve. Constitutional guarantees do not rest on such a flimsy foundation.

[28] Plaintiff counters that, even if the Recording was protected opinion at the time of its initial publication, UMG's republication of "Not Like Us" in the months following, after it achieved unprecedented **\*473** levels of commercial success, exposes it to liability. Hr'g Tr. at 37:20-38:17. This argument is logically incoherent. If the Recording was nonactionable opinion at the time it was initially produced, then its republication would not expose UMG to liability. Republication cannot transform Lamar's statement of opinion into UMG's statement of fact.

### 3. Tone and Language

[29] That the Recording can only reasonably be understood as opinion is reinforced by the language employed in the song. *Steinhilber*, 68 N.Y.2d at 293, 508 N.Y.S.2d 901, 501 N.E.2d 550 (The Court examines the "tone and its apparent purpose."). "Loose, figurative or hyperbolic statements, even if deprecating the plaintiff," *Brahms v. Carver*, 33 F. Supp. 3d 192, 198 (E.D.N.Y. 2014) (cleaned up), and "imaginative expression," *Levin*, 119 F.3d at 196, cannot constitute actionable defamation. *See Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000) ("A court may also consider whether the 'general tenor' of the publication negates the impression that challenged statements imply defamatory facts about the plaintiff.").

In *Rapaport*, for example, the court concluded that the "tone and apparent purpose of the diss track," especially considering its use of hyperbolic and vitriolic words and imagery, further "reinforce[d] for the audience that the video is not intended to reflect an accurate factual assessment of Rapaport." 2021 WL 1178240, at \*16. The district court faced "no difficulty concluding that the context of this 'diss track' video reasonably signals to viewers that the challenged statements are the prejudiced, opinionated viewpoints of the Barstool Defendants." *Id.* The Second Circuit affirmed the district court's analysis, concluding that "[t]he nature and tone of the surrounding language can function as a strong indicator to the reasonable reader that the statement is not expressing or implying any facts." 2024 WL 88636, at \*4.

[30] "Not Like Us" is replete with profanity, trash-talking, threats of violence, and figurative and hyperbolic language, all of which are indicia of opinion. A reasonable listener

would not equate a song that contains lyrics such as, "Ain't no law, boy, you ball boy, fetch Gatorade or somethin', since 2009 I had this b**** jumpin'," with accurate factual reporting. Accordingly, the reasonable listener of "Not Like Us" would conclude that Lamar is rapping hyperbolic vituperations.

 **[31]**   Plaintiff contends that, in determining if the lyrics in "Not Like Us" express fact or opinion, the Court must consider the subjective views of listeners, "as well as commentators in the rap industry and the press," who understood the Recording, Video and Image as an attempt to "convey a precise factual message (pedophilia) about Drake." Opp'n Br. at 7, 9; *see also* Am. Compl., ¶ 219. The Amended Complaint cites extensively to comments and posts from YouTube and Instagram that expressed the belief that the Recording had exposed the truth and that Drake truly was engaged in "pedophilia and sexual violence against children." Am. Compl., ¶ 219; *see also id.*, ¶¶ 73-76, 78-82, 220.

 **[32]**   But "distinguishing between fact and opinion is a question of law for the courts, to be decided based on 'what the average person hearing or reading the communication would take it to mean.' " *Davis v. Boeheim*, 24 N.Y.3d 262, 269, 998 N.Y.S.2d 131, 22 N.E.3d 999 (2014) (citation omitted). "The dispositive inquiry is whether a reasonable [listener] could have concluded that the statements were conveying facts about the plaintiff." *Id.* at 269-70, 998 N.Y.S.2d 131, 22 N.E.3d 999 (citation **\*474**  omitted). Courts make that determination by looking at the full context and surrounding circumstances of the challenged communication. *Id.* at 270, 998 N.Y.S.2d 131, 22 N.E.3d 999.

The Court holds, based upon a full consideration of the context in which "Not Like Us" was published, that a reasonable listener could not have concluded that "Not Like Us" was conveying objective facts about Drake. The views expressed by users @kaioken8026, @mrright8439, and @ZxZNebula, and the other YouTube and Instagram commentators quoted in the Complaint, Am. Compl., ¶¶ 73-74, do not alter the Court's analysis. In a world in which billions of people are active online, support for almost any proposition, no matter how farfetched, fantastical or unreasonable, can be found with little effort in any number of comment sections, chat rooms, and servers. "[T]hat some readers may infer a defamatory meaning from a statement does not necessarily render the inference reasonable under the circumstances." *Jacobus*, 51 N.Y.S.3d at 336.

The artists' seven-track rap battle was a "war of words" that was the subject of substantial media scrutiny and online discourse. Although the accusation that Plaintiff is a pedophile is certainly a serious one, the broader context of a heated rap battle, with incendiary language and offensive accusations hurled by both participants, would not incline the reasonable listener to believe that "Not Like Us" imparts verifiable facts about Plaintiff.

### 4. Image and Video

 **[33]**   To the extent that Plaintiff alleges that the Image and Video are independently actionable, Am. Compl., ¶¶ 7, 8, 65-66, 105-112, the Court holds that they too constitute opinion. The Image is the album cover art for "Not Like Us." It thus shares the same overall context as the Recording itself. The Image is "designed to reinforce" the message of the Recording. Am. Compl., ¶ 7. And as the Court has already found, that message is protected opinion. Additionally, the Image itself, with its overlay of more than a dozen sex offender markers, is obviously exaggerated and doctored. No reasonable person would view the Image and believe that in fact law enforcement had designated thirteen residents in Drake's home as sex offenders.

 **[34]**   The figurative imagery accompanying the music video also constitutes protected opinion. Plaintiff alleges, for example, that the "Video depicts a prolonged shot of a live owl in a cage," projecting the message that "Drake belongs behind bars." Am. Compl. ¶ 110. An image of a caged owl cannot reasonably be understood to convey a factual message. Similarly, depicting Kendrick Lamar playing hopscotch while singing the "A-minor" lyric is not suggestive of objective reporting. *Id.* ¶ 107.

### B. Mixed Opinion

 **[35]**   **[36]**   **[37]**   Although pure opinion cannot constitute actionable defamation, "mixed opinion," which is an opinion that "implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it," is actionable. *Steinhilber*, 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550; *see also Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014). "Mixed opinion" holds "the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking." *Steinhilber*, 68 N.Y.2d at 290,

508 N.Y.S.2d 901, 501 N.E.2d 550. Whether statements constitute mixed opinion presents a legal question, "which must be answered by considering, in the context of the entire communication and of the circumstances in which they were spoken or written, whether the average listener **\*475** would reasonably understand the opinion as implying the assertion of undisclosed facts justifying the opinion." *Cooper v. Templeton*, 629 F. Supp. 3d 223, 235-36 (S.D.N.Y. 2022) (citation omitted).

 **[38]**   Just as the overall context of "Not Like Us" forecloses the argument that its lyrics can be read as factual assertions, that same context negates any implication that Lamar's lyrics are based upon undisclosed facts. *See LaNasa v. Stiene*, No. 24-1325, 2025 WL 893456, at \*3 (2d Cir. Mar. 24, 2025) (holding that, where statements are made in circumstances "where an audience may anticipate the use of epithets, fiery rhetoric or hyperbole," inference could not reasonably be drawn that assertions were based on undisclosed facts). In the context of this rap diss battle, no reasonable person would listen to "Not Like Us" and assume that Lamar uniquely had access to credible, provable facts that revealed Drake to be a pedophile.

 **[39]**   Plaintiff's arguments that the lyrics to "Not Like Us" can be read to suggest Lamar's reliance upon undisclosed facts is unavailing. Plaintiff first posits that the line, "Say Drake, I *hear* you like 'em young," indicates that Lamar had "heard" from outside sources evidence confirming that Drake is a pedophile. Opp'n Br. at 17. As discussed *infra*, however, that ignores that this line is reasonably understood to be a direct response to Drake's challenge to Lamar in "Taylor Made Freestyle" to "[t]alk about [Drake] likin' young girls/... Heard it on the Budden Podcast, it's gotta be true." Req. J. Not., Ex. I. This lyric clearly prods Lamar to discuss preexisting rumors about Drake's interest in minors.[5] Lamar's responsive lyrics are thus akin to the accusation of pedophilia in *Torain* that the Second Circuit concluded constituted pure opinion. There, the Second Circuit concluded that a reasonable person would understand based on the context that the defendant disk jockey was using the term "pedophile" in response to directly pertinent comments made by plaintiff during their "war of words," and was not relying upon undisclosed facts. 279 F. App'x at 47.

Plaintiff next points to the lyrics, "Rabbit hole is still deep, I can go further, I promise." Opp'n Br. at 17. Plaintiff argues that a reasonable listener could view this lyric as suggesting that Lamar has specific evidence to back up his assertions of

pedophilia. *Id.* It is not at all clear that this is a natural reading of this lyric. Even if this line was susceptible to such an interpretation standing alone, however, no reasonable listener could understand it in this way given the overall context. Indeed, during this rap battle, Drake and Lamar each used similar hyperbolic threatening language. *See, e.g.*, Req. J. Not., Ex. K ("But don't tell no lie about me and I won't tell truths 'bout you"); Ex. M ("Your darkest secrets are comin' to light"); Ex. N ("I **\*476**  been in this industry twelve years, I'ma tell y'all one lil' secret/It's some weird s\*\*\* goin' on and some of these artists be here to police it"); Ex. O ("I got your f\*\*\*ing lines tapped, I swear that I'm dialed in/... What about the bones we dug up in that excavation?"). This kind of posturing in a rap diss track does not make such lines more likely to be understood by the ordinary listener to be anything but pure opinion.

## II. Second Degree Harassment

 **[40]**    **[41]**   New York does not recognize a civil cause of action for harassment. *Ralin v. City of New York*, 44 A.D.3d 838, 844 N.Y.S.2d 83, 84 (2d Dep't 2007) ("New York does not recognize a cause of action to recover damages for harassment."); *Wells v. Town of Lenox*, 110 A.D.3d 1192, 974 N.Y.S.2d 591, 593 (3d Dep't 2013) ("With regard to the alleged harassment, New York does not recognize a common-law cause of action to recover damages for harassment" (cleaned up)). Notwithstanding this precedent, Plaintiff attempts to bring a claim for harassment under section 240.26(3) of the New York Penal Code. A person commits harassment in the second degree when they hold the "intent to harass, annoy or alarm another person" and "engage[ ] in a course of conduct or repeatedly commit[ ] acts which alarm or seriously annoy such other person and which serve no legitimate purpose." N.Y. Pen. Law § 240.26(3). Plaintiff alleges that the Recording, Video and Image "individually and collectively provide a call to target Drake, including through violence," Am. Compl., ¶ 249, and that Defendant's "course of conduct in publishing specific and unequivocal threats of violence has placed Plaintiff in reasonable fear of physical harm," *id.*, ¶ 250. This state criminal statute does not provide a private right of action, however. Accordingly, Plaintiff fails to state a claim for harassment.

 **[42]**    **[43]**   Under New York law, "[w]here a penal statute does not expressly confer a private right of action on individuals pursuing civil relief, recovery under such a statute 'may be had only if a private right of action may fairly be implied.' " *Hammer v. Am. Kennel Club*, 1 N.Y.3d 294, 299,

771 N.Y.S.2d 493, 803 N.E.2d 766 (2003). To determine whether a criminal statute gives rise to a private right of action, courts look at three factors: "(1) plaintiff must be one of the class for whose benefit the statute was enacted; (2) recognition of a private right of action must promote the legislative purpose; and (3) creation of such a right must be consistent with the legislative scheme." *Id.* (cleaned up).

 [44]   The third factor's bar is high because, "[a]s a general rule, when a statute is contained solely within the Penal Law Section, the [New York] legislature intended it as a police regulation to be enforced only by a court of criminal jurisdiction." *Casey Sys., Inc. v. Firecom, Inc.*, No. 94 CIV. 9327 (KTD), 1995 WL 704964, at *3 (S.D.N.Y. Nov. 29, 1995). Thus, "[r]arely is there a private right of action under a criminal statute." *Senese v. Hindle*, No. 11-CV-0072 (RJD), 2011 WL 4536955, at *11 (E.D.N.Y. Sept. 9, 2011); *see also Watson v. City of New York*, 92 F.3d 31, 36 (2d Cir. 1996) ("In the absence of any guidance from state courts, federal courts are hesitant to imply private rights of action from state criminal statutes.").

In *Hammer*, the New York Court of Appeals concluded that there was no private right of action under animal protection criminal statutes because "enforcement authority lies with police and societies for the prevention of cruelty to animals and violations [are] handled in criminal proceedings." *Id.* at 300, 771 N.Y.S.2d 493, 803 N.E.2d 766. In light of this "comprehensive statutory enforcement **\*477** scheme," recognizing a private right of action would be inconsistent with legislative intent. *Id.*; *see also Golden v. Diocese of Buffalo, NY*, 184 A.D.3d 1176, 125 N.Y.S.3d 813, 816 (4th Dep't 2020) ("[R]ecognizing a private right of action [for criminal nuisance] would not be consistent with the existing mechanism for enforcing the statute, i.e., criminal prosecution.").

Consistent with this precedent, courts routinely dismiss civil harassment claims as not cognizable under New York law. *See, e.g.*, *Cablevision Sys. Corp. v. Communic'ns Workers of Am. Dist.*, 131 A.D.3d 1087, 16 N.Y.S.3d 753, 754 (2d Dep't 2015) (applying *Hammer* to uphold dismissal of harassment claim based on Penal Law); *Broadway Cent. Prop. Inc. v. 682 Tenant Corp.*, 298 A.D.2d 253, 749 N.Y.S.2d 225, 227 (1st Dep't 2002) ("New York does not recognize a civil cause of action for harassment."); *see also Masic v. Town of Franklinville, New York*, No. 1:24-CV-18-GWC, 2025 WL 2480898, at *16 (W.D.N.Y. Aug. 27, 2025) (applying *Hammer* to find there is no implied right of action under

section 240.26); *Stathatos v. William Gottlieb Mgmt.*, No. 18-CV-03332 (KAM) (RER), 2020 WL 1694366, at *4 (E.D.N.Y. Apr. 6, 2020) ("[P]laintiff's allegations of perjury, witness intimidation, witness or evidence tampering, and harassment are criminal charges without a private right of action.").

While Plaintiff cites cases in which courts have recognized a private right of action for criminal harassment under New York law, *see* Opp'n Br. at 26 n.15, most of this authority predates *Hammer*. As for the two cited cases that post-date *Hammer*, *Baiqiao Tang v. Wengui Guo*, No. 17 Civ. 9031 (JFK), 2019 WL 6169940, at *6 (S.D.N.Y. Nov. 20, 2019), and *Blasetti v. Pietropolo*, 213 F. Supp. 2d 425, 428 (S.D.N.Y. 2002), neither of those cases mention *Hammer* or engage in the analysis required by the New York Court of Appeals to imply a private right of action from a provision of the Penal Law.[6]

There is nothing to distinguish criminal harassment from other provisions of the New York criminal code for which there is no implied private right of action. The New York legislature conferred authority to enforce the criminal harassment statute upon local law enforcement. *Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 71, 979 N.Y.S.2d 257, 2 N.E.3d 221 (2013) ("We have therefore declined to recognize a private right of action in instances where the Legislature specifically considered and expressly provided for enforcement mechanisms in the statute itself." (cleaned up)). There are no indications in the statutory scheme that the legislature intended to confer a civil cause of action for violation of section 240.26. Plaintiff's claim for harassment must therefore be dismissed.

### III. New York General Business Law Section 349

Plaintiff's final cause of action, brought under section 349 of New York General Business Law ("GBL"), fares no better. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." Plaintiff alleges that, "on information and belief," Defendant "engaged in deceptive acts and practices in the conduct **\*478** of business, trade, and commerce by covertly financially incentivizing third parties —including music platforms and social media influencers— to play, stream, and promote the Recording." Am. Compl., ¶ 256; *see also id.*, ¶¶ 13, 148, 152, 182-83. As one example, Plaintiff alleges that he "understands" that UMG covertly paid a popular NFR Podcast to promote the Recording and publish

podcast episodes and other content about the Recording. *Id.*, ¶ 182. On information and belief, Plaintiff further claims that UMG used its resources to incentivize third parties to use bots to stream the Recording and subsequently extolled the Recording's streaming numbers on Spotify while knowing that millions of the streams were false and fraudulent. *Id.*, ¶¶ 227-29, 257. Lastly, the Amended Complaint alleges that UMG paid at least one radio promoter to engage in pay-for-play arrangements, or "payola," of the Recording on New York radio stations. *Id.*, ¶¶ 184-85, 258.

 [45] To successfully state a claim under section 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020) (quotations and citations omitted). Plaintiff asserts that Defendant's deceptive acts and practices were intended to inflate the public's view of the Recording's popularity and success, which would lead a reasonable consumer of music to be materially misled. Am. Compl., ¶ 259.

Defendant first argues that Plaintiff uses an improper pleading device, as his section 349 allegations all rest upon information and belief and do not go beyond "pure conjecture and speculation." ECF No. 43 at 22-23 (quoting *Boehm v. Sportsmem, LLC*, No. 18-CV-556 (JMF), 2019 WL 3239242, at *2 n.1 (S.D.N.Y. July 18, 2019)). Plaintiff counters that the applicable standard is plausibility under *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Opp'n Br. at 23; *see also* Hr'g Tr. 43:15-22.

 [46] "*Twombly* does not prevent a plaintiff from pleading facts 'on information and belief' in appropriate circumstances," *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 526 (S.D.N.Y. 2013), but the plaintiff may only do so "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (cleaned up). In that scenario, the allegations "must be accompanied by a statement of the facts upon which the belief is founded." *Pakter*, 931 F. Supp. 2d at 527 (cleaned up).

Plaintiff argues that both *Pakter* conditions are satisfied because the Amended Complaint alleges that UMG made

indirect payments to a wide array of unknown third parties and also "pleads sufficient 'factual information' concerning UMG's scheme, including examples thereof, contemporary reports, as well as UMG's past practices." Opp'n Br. at 23. At oral argument, Plaintiff stressed that "Not Like Us" was the fastest song to reach 300 million streams on Spotify within just thirty-five days, which Plaintiff argues is a sufficient basis for the Court to infer that Defendant implemented a technique to manipulate stream totals, among other "unprecedented tactics," to reach "unprecedented rocketing up the streaming chart." Hr'g Tr. 43:23-44:18.

 **\*479** [47] The Court disagrees. To allege that UMG implemented covert practices to manipulate streams of "Not Like Us" and inflate the Recording's perceived popularity, Plaintiff relies on Tweets[7] by individual users and reporting from fans to allege that UMG utilized covert tactics to manipulate streams of "Not Like Us." Am. Compl., ¶¶ 180-183; *see also* Hr'g Tr. 45:22-46:2. The Court finds Plaintiff's reliance on online comments and reporting insufficient to meet the plausibility standard. *See Castaneda v. Amazon.com, Inc.*, 679 F. Supp. 3d 739, 750-51 (N.D. Ill. 2023) (finding that "[w]hen it comes to particularity (and plausibility, too), the experience of a no-name person" from a small set of anonymous customer reviews "does not add much heft to the complaint"); *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, Civ. No. 08-00359 JMS-BMK, 2008 WL 5423191, at *3 (D. Haw. Dec. 31, 2008) (finding a lack of probity from anonymous online comments that "invite[ ] commentators to make outrageous statements under a veil of secrecy"). A small sample of users' possible experience, communicated through Tweets and other anonymized commentary, fails to establish a plausible inference that UMG manipulated listeners into streaming "Not Like Us" instead of Drake's music.

While these covert practices of providing financial incentives to undisclosed third parties and leveraging of business relationships, if they exist, may be facts that are "peculiarly within the possession and control of" UMG, Plaintiff's allegations—based on what boils down to unreliable online commentary—do not form a "sufficient factual basis such that there is a 'reasonable expectation that discovery will reveal evidence of illegality.' " *Asset Co. IM Rest, LLC v. Katzoff*, No. 23 Civ. 9691 (JPC), 2025 WL 919489, at *11 (S.D.N.Y. Mar. 26, 2025) (quoting *Arista Records*, 604 F.3d at 120). Ultimately, Plaintiff fails to provide any facts or circumstances that would make it "highly plausible" that

UMG conducted such covert business tactics. *Moraes v. White*, 571 F. Supp. 3d 77, 103 (S.D.N.Y. 2021).

 [48]    [49]    [50]  Even if the Court accepted Plaintiff's pleadings on information and belief, Plaintiff still has not stated a claim for relief under section 349. Plaintiff has not sufficiently alleged deceptive practices that are consumer oriented. "Under New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for personal, family or household purposes." *McCracken v. Verisma Sys., Inc.*, 131 F. Supp. 3d 38, 46 (W.D.N.Y. 2015) (cleaned up). "A defendant engages in 'consumer-oriented' activity if the company's actions cause any consumer injury or harm to the public interest. *Anderson v. Unilever U.S., Inc.*, 607 F. Supp. 3d 441, 451 (S.D.N.Y. 2022) (cleaned up). While section 349 does not preclude an action brought by one business competitor against another, it is at its core a "consumer protection device." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995).

The Amended Complaint does not indicate how any of the deceptive practices allegedly utilized by UMG harmed consumers. For example, the Amended Complaint does not allege that consumers paid more than they otherwise would have for a product, purchased a product that they otherwise would not have because of misrepresentations regarding the product, or otherwise received less in value for any **\*480** purchases that they did make. *N. State Autobahn, Inc. v.*

*Progressive Ins. Grp. Co.*, 102 A.D.3d 5, 953 N.Y.S.2d 96, 102 (2d Dep't 2012) (holding that section 349 is limited to deceptive practices that "pertain[ ] to an issue that may bear on a consumer's decision to participate in a particular transaction" or which "undermine a consumer's ability to evaluate his or her market options and to make a free and intelligent choice"). The Amended Complaint is somewhat vague as to who the class of consumers is and what product, goods, or services they are purchasing. It is not clear how the alleged redirection of Spotify "users who are searching for other unrelated songs and artists" to the Recording would amount to actual harm of consumers or any limitation of their choices. At most, the allegations suggest that UMG engaged in practices to make "Not Like Us" seem more popular than it actually was, without connecting that activity to any consumer harm. Such practices, without more, do not state a claim under section 349 of the GBL.

### CONCLUSION

Defendant's motion to dismiss is GRANTED.

SO ORDERED.

### All Citations

806 F.Supp.3d 454

#### Footnotes

1    During oral argument, Plaintiff agreed that these exhibits were properly before the Court in its consideration of the motion to dismiss. ECF No. 64 ("Hr'g Tr.") at 39:11-41:16.

2    Drake's clothing brand is October's Very Own, or OVO, which is represented by an owl. Am. Compl., ¶ 36.

3    Chubbs, Party, and Baka are associates of Drake's, while K. Dot is a nickname for Kendrick Lamar. Req. J. Not., Ex. J at 3-4.

4    *See also* Mark Savage, *Drake and Kendrick Lamar beef explained—what has happened and why?*, BBC News (May 9, 2024), accessed at https://www.bbc.com/news/entertainment-arts-68739398 [https://perma.cc/AT4M-S3GH]; Dani Di Placido, *Drake vs. Kendrick Lamar—Who Won?*, Forbes (May 6, 2024), accessed at https://www.forbes.com/sites/danidiplacido/2024/05/06/drake-vs-kendrick-lamar---who-won/ [https://perma.cc/668W-3YVL]; Janay Kingsberry and Herb Scribner, *Kendrick Lamar and Drake's feud got heated and ugly. Here's what happened.*, Washington Post (May 6, 2024), accessed at https://www.washingtonpost.com/style/2024/05/06/drake-kendrick-beef-diss-tracks/ [https://perma.cc/GD95-2CJ4]; Neil Shah, *Kendrick Lamar vs. Drake: A New Rap Beef for the Streaming Era*, Wall St. J. (May 7, 2024), accessed at https://www.wsj.com/arts-culture/music/kendrick-lamar-vs-drake-rap-beef-diss-tracks-e346839d?mod=Searchresults&pos=5&page=1 [https://perma.cc/77XG-9EX6].

5    Plaintiff claims that this interpretation is "disputed" and that the Court would require "vital witness testimony" in order to properly understand this lyric's meaning. Opp'n Br. at 18. Yet at oral argument, Plaintiff's counsel could not provide

the Court with any alternative understanding of this lyric. Hr'g Tr. at 34:5-35:19. Furthermore, in "The Heart Part 6," Drake confirms that he understands Lamar to be referring to these preexisting rumors when Drake rapped, "Only f***in' with Whitneys, not Millie Bobby Browns, I'd never look twice at no teenager." Req. J. Not., Ex. O. To understand the relevant context for these back-and-forths, the Court takes judicial notice of the fact that Millie Bobby Brown is a well-known actress, and that she has given interviews stating that she and Drake formed a friendship when she was 14 years old and he was 32 years old. *See, e.g.*, Lynn Hirschberg, *Millie Bobby Brown Is Already an Icon For Her Generation*, W Magazine, accessed at https://www.wmagazine.com/story/millie-bobby-brown-w-magazine-cover-interview [https://perma.cc/R8GR-CW5S].

6    For example, *Baiqiao Tang*'s discussion of this issue is limited to a single sentence, a quotation from *Blasetti v. Pietropolo*. *Blasetti*, in turn, simply states that an implied cause of action exists without engaging in further analysis and cites as support for this proposition cases that predate *Hammer*. Further, an examination of the cases on which *Blasetti* relies likewise finds that none conducted the analysis required under New York law. The Court does not find these authorities persuasive.

7    Tweets are now known as Posts on X. X was formerly known as Twitter, where users could post their writings and media as a "Tweet."

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Gross v. New York Times Co., 82 N.Y.2d 146 (1993)

623 N.E.2d 1163, 603 N.Y.S.2d 813, 21 Media L. Rep. 2142

⚑  KeyCite Yellow Flag

Distinguished by Simpson v. The Village Voice, Inc., N.Y.Sup., August 7, 2007

82 N.Y.2d 146

Court of Appeals of New York.

Elliot M. GROSS, Appellant,

v.

NEW YORK TIMES COMPANY et al., Respondents, et al., Defendants.

Argued and Submitted Sept. 7, 1993.
|
Decided Oct. 21, 1993.

**Synopsis**

City's former chief medical examiner brought defamation action against newspaper. The Supreme Court, New York County, Wilk, J., 151 Misc.2d 571, 575 N.Y.S.2d 221, dismissed, and examiner appealed. The Supreme Court, Appellate Division, Rubin, J., 180 A.D.2d 308, 587 N.Y.S.2d 293, affirmed, and examiner again appealed. The Court of Appeals, Titone, J., held that: (1) newspaper articles, over-all thrust of which was that examiner had issued false and misleading reports about deaths in order to protect police, contained assertions of objective fact that, if proven false, could form predicate for maintainable libel action; (2) newspaper articles contained actionable charges, including that examiner had engaged in cover-ups, directed creation of "misleading" autopsy reports, and was guilty of "possibly illegal" conduct; and (3) there is no special rule of law making criminal slurs actionable regardless of whether they are asserted as opinion or fact.

Reversed.

**Procedural Posture(s):** On Appeal.

West Headnotes (10)

**[1]    Libel and Slander**  ⊶ Actionable Words in General

Inquiry as to whether reasonable person could have concluded that facts were being conveyed about plaintiff, as required for actionable defamation, must be made by court, and entails

examination of challenged statements with view toward: whether specific language in issue has precise meaning which is readily understood; whether statements are capable of being proven true or false; whether either full context of communication in which statement appears or broader social context and surrounding circumstances signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

287 Cases that cite this headnote

**[2]    Libel and Slander**  ⊶ Actionable Words in General

In determining whether particular communication alleged to be defamatory is actionable, Court of Appeals recognizes and utilizes distinction between actionable statement of opinion that implies basis in facts which are not disclosed to reader or listener and nonactionable statement of opinion accompanied by recitation of facts on which it is based or one that does not imply existence of undisclosed underlying facts; in former case, reasonable listener or reader would infer that speaker or writer knows facts which support opinion and are detrimental to subject, whereas, in latter case, hypothesis is readily understood by audience as conjecture.

219 Cases that cite this headnote

**[3]    Libel and Slander**  ⊶ Public officers in general

Newspaper articles, over-all thrust of which was that city's former chief medical examiner had issued false and misleading reports about deaths in order to protect police, contained assertions of objective fact that, if proven false, could form predicate for maintainable libel action.

3 Cases that cite this headnote

**[4]    Libel and Slander**  ⊶ Public officers in general

Newspaper articles contained actionable charges, including that city's former chief

medical examiner had engaged in cover-ups, directed creation of "misleading" autopsy reports, and was guilty of "possibly illegal" conduct; such charges, although couched in language of hypothesis or conclusion, actually would be understood by reasonable reader as assertions of fact, which were capable of being proven true or false.

60 Cases that cite this headnote

**[5]    Libel and Slander** 🔑 Words Imputing Crime and Immorality

There is no special rule of law making criminal slurs actionable regardless of whether they are asserted as opinion or fact.

15 Cases that cite this headnote

**[6]    Libel and Slander** 🔑 Words Imputing Crime and Immorality

Accusations of criminality can be regarded as mere hypothesis and, thus, not actionable on defamation theory, if facts on which they are based are fully and accurately set forth and it is clear to reasonable reader or listener that accusation is merely personal surmise built upon those facts.

40 Cases that cite this headnote

**[7]    Libel and Slander** 🔑 Actionable Words in General

**Libel and Slander** 🔑 Words Imputing Crime and Immorality

In all cases, whether challenged remark concerns criminality or some other defamatory category, courts are obliged to consider communication as whole, as well as its immediate and broader social contexts, to determine whether reasonable listener or reader is likely to understand remark as assertion of provable fact, as required for remark to be actionable.

30 Cases that cite this headnote

**[8]    Libel and Slander** 🔑 Public officers in general

Allegedly defamatory assertion that city's former chief medical examiner engaged in "corrupt" conduct, made in course of lengthy, copiously documented newspaper series written after purportedly thorough investigation, could not be treated, for purposes of determining actionability of assertion, as mere rhetorical flourish or speculative accusation of angry but ill-informed citizen made during course of heated debate, particularly as articles appeared in news section, rather than editorial or "op ed" sections.

15 Cases that cite this headnote

**[9]    Constitutional Law** 🔑 Defamation

In determining whether challenged statements assert facts that might form basis of sustainable libel action, core goal is to protect individual's historic right to vindicate reputation without impairing constitutional guarantee of free speech or casting pall over citizens' ability to engage in robust debate through print and broadcast media. U.S.C.A. Const.Amend. 1.

5 Cases that cite this headnote

**[10]    Summary Judgment** 🔑 Defamation

Compliance with requirements that defamation plaintiff in public arena prove both that statements in question are false and defamatory and that they were made with actual malice is matter that is well suited to testing, at least in first instance, on motion for summary judgment. McKinney's CPLR 3212.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*147    \*\*1164    \*\*\*814** Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, New York City (Howard M. Squadron **\*\*1165    \*\*\*815** and Steven G. Mintz, of counsel), and Segan, Culhane, Nemerov & Singer, P.C. (Leon Segan, of counsel), for appellant.

Gross v. New York Times Co., 82 N.Y.2d 146 (1993)
623 N.E.2d 1163, 603 N.Y.S.2d 813, 21 Media L. Rep. 2142

**\*148** Cahill Gordon & Reindel, New York City (Floyd Abrams and Dean Ringel, of counsel), George Freeman, Adam Liptak and Rothwell, Figg, Ernst & Kurz (Steven Lieberman, of counsel, of the District of Columbia Bar, admitted pro hac vice) for The New York Times Co. and others, respondents.

**\*149** Golden & Mandel, New York City (Philip Mandel, of counsel), for Theodore Ehrenreich, respondent.

**OPINION OF THE COURT**

TITONE, Judge.

This dispute has its origin in a series of investigative reports published by defendant New York Times between January of 1985 and February of 1986. The articles in question charged plaintiff, the former Chief Medical Examiner of the City of New York, with having mishandled several high profile cases and having used his authority to protect police officers and other city officials from suspicion after individuals in their custody had died under questionable circumstances. Defendants' articles spawned four separate criminal investigations into plaintiff's conduct, each of which terminated with findings that there was no evidence of professional misconduct or criminal wrongdoing by plaintiff. Plaintiff thereafter commenced the present action for libel. The issue at this early, preanswer stage of the litigation is whether plaintiff's pleadings sufficiently allege false, defamatory statements of *fact* rather than mere nonactionable statements of *opinion*. We hold that plaintiff's complaint, which encompasses actionable assertions of fact as well as nonactionable opinions and conclusions, is sufficient to withstand a motion to dismiss under CPLR 3211(a)(7).

I.

Plaintiff's 59–page complaint cites essentially eight "false and defamatory" articles as the basis for his libel action. The first article in the series, which was published on January 27, 1985 under defendant Philip Shenon's byline, was entitled *Chief Medical Examiner's Reports in Police–Custody Cases Disputed* and had, as a subheadline, *Cover–Ups Charged in Autopsies in Some Deaths—Gross Denies 'Misleading in Any Instance'*. The opening two paragraphs asserted that, as the City's Chief Medical Examiner, plaintiff had "produced a series of misleading or inaccurate autopsy reports on people who died in custody of the police, according to colleagues in the Medical Examiner's office and pathologists elsewhere." Further, according to the article, plaintiff had "instituted a policy of special handling for police-custody cases," had "performed **\*150** the autopsies himself" in many such cases and "[i]n others, documents show[,] he intervened to alter the findings of other pathologists." What follows is a series of assertions about plaintiff's actions in connection with several specific cases, including that of "a Brooklyn man who neighbors say was beaten by police officers" and that of Eleanor Bumpurs, "the 66–year old Bronx woman who was shot to death * * * by police officers trying to evict her."[1]

The article, which also discussed the purported disarray in the Medical Examiner's office, reported on interviews conducted with several pathologists, who both described and characterized plaintiff's specific actions in relation to cases handled by the Medical Examiner's office. One pathologist who had worked with plaintiff asserted for example, that, in the case of the man who had allegedly been beaten by the police, plaintiff had changed the autopsy findings to state that death had resulted from a procedure performed by doctors after the incident rather than from a fractured skull. The pathologist was then quoted as asserting: "What Gross has done is bend over **\*\*1166** backwards to help the **\*\*\*816** police" and "[i]t's weaseling." Another pathologist, who had not worked with plaintiff but who had been asked to review some of the disputed autopsy findings, was quoted as saying: "If he did these cases honestly, Dr. Gross is unbelievably incompetent"; "[i]f he has done this deliberately—and I believe he has—he may well be looking for a way out for the police." The tenor of the other articles cited in plaintiff's complaint was similar, with quotes from documents and individuals describing plaintiff's specific actions, disagreeing with his medical conclusions and drawing conclusions about his motives. The over-all thrust of the series was that plaintiff had issued false or misleading reports about deaths occurring within his jurisdiction in order to protect the police and that his conduct ranged from "highly suspicious" (article published Feb. 5, 1985) to "possibly illegal" (article published Jan. 28, 1985).

Before discovery had begun, defendants moved to dismiss the libel claims in plaintiff's complaint, arguing that the articles on which it was based conveyed only the opinion of its staff and their interviewees and were therefore not actionable. **\*151** [2] The trial court agreed with defendants' position and on June 10, 1991 granted the requested relief.

The Appellate Division affirmed the trial court's determination, stressing that the "articles complained of report accusatory opinions together with a recitation of the facts upon which they are based" and that "[e]specially when attributed to a source, the average reader will recognize that criticisms, allegations and accusations are not statements of fact but rather expressions of opinion" (180 A.D.2d 308, 316, 587 N.Y.S.2d 293). The Court also rejected plaintiff's contention that the articles could not be characterized as protected opinion to the extent that they suggested he was guilty of criminal wrongdoing. In the Court's view, the allegations that plaintiff had "lied" in his professional conclusions regarding the causes of death in controversial cases and had "covered up" for misconduct by city police officers were too "[v]ague" to "amount to accusations of criminal misconduct" (id., at 317, 587 N.Y.S.2d 293). This Court subsequently granted plaintiff leave to appeal from the Appellate Division's order. We now reverse and hold that the complaint should have been sustained, since, in addition to the expressed opinions and conclusions, the articles contain defamatory assertions that a reasonable reader would understand to be advanced as statements of fact.

## II.

At the core of the dispute in this case is the much discussed distinction between expressions of opinion, which are not actionable, and assertions of fact, which may form the basis of a viable libel claim. The distinction has been the subject of considerable analysis and legal evolution in recent years (see, e.g., Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1; Immuno AG. v. Moor–Jankowski, 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270, cert. denied 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 713; Steinhilber v. Alphonse, 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550). Indeed, we revisited the question ourselves just one year ago (600 W. 115th St. Corp. v. Von Gutfeld, 80 N.Y.2d 130, 589 N.Y.S.2d 825, 603 N.E.2d 930). Nonetheless, as the opinions below and the parties' submissions illustrate, there remain many unanswered questions and areas of uncertainty in this developing field of libel law.

**\*152** The underlying principles are not in dispute. The Supreme Court's decision in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 injected a constitutional dimension into what had previously **\*\*1167** **\*\*\*817** been regarded as a matter of State common law. In that case and others (e.g., Philadelphia Newspapers v. Hepps,

475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783; Curtis Publ. Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094; see also, Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789), the Court delineated the increased burden of proof that libel plaintiffs in the public arena must bear in order to assure the " 'unfettered interchange of ideas' " that is so necessary to the continued vitality of a government " 'responsive to the will of the people' " (New York Times Co. v. Sullivan, supra, 376 U.S. at 269, 84 S.Ct. at 720, quoting Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498; and Stromberg v. California, 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117). Additionally, in Greenbelt Publ. Assn. v. Bresler, 398 U.S. 6, 12, 14, 90 S.Ct. 1537, 1541, 1542, 26 L.Ed.2d 6, the Court recognized that there are constitutional restrictions on the "permissible scope" of defamation actions and, specifically, that evident "rhetorical hyperbole" is simply not actionable (see, Milkovich v. Lorain Journal Co., supra, 497 U.S. at 16, 110 S.Ct. at 2704; see also, Hustler Mag. v. Falwell, 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41; Letter Carriers v. Austin, 418 U.S. 264, 284–286, 94 S.Ct. 2770, 2781–2782, 41 L.Ed.2d 745).

The focus in this appeal, which involves a preanswer dispute over the sufficiency of the complaint, is whether the articles published by defendants fall into a category that is actionable and, more specifically, whether the articles constitute the type of opinion statements that cannot, under the case law, form the basis of a defamation claim. While the Supreme Court has rejected the notion that there is a special categorical privilege for expressions of opinion as opposed to assertions of fact, it has recognized that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection" (Milkovich v. Lorain Journal Co., supra, 497 U.S. at 17–21, 110 S.Ct. at 2704–2707). Further, this Court has adopted a similar view under our own State Constitution and has embraced a test for determining what constitutes a nonactionable statement of opinion that is more flexible and is decidedly more protective of "the cherished constitutional guarantee of free speech" (Immuno AG. v. Moor–Jankowski, supra, 77 N.Y.2d at 256, 566 N.Y.S.2d 906, 567 N.E.2d 1270; see, 600 W. 115th St. Corp. v. Von Gutfeld, supra, 80 N.Y.2d at 145, 589 N.Y.S.2d 825, 603 N.E.2d 930).

**[1]** The dispositive inquiry, under either Federal or New York law, is "whether a reasonable [reader] could have concluded that [the articles were] conveying facts about the plaintiff" (600 W. 115th St. Corp. v. Von Gutfeld, supra, 80

N.Y.2d at 139, 589 N.Y.S.2d 825, 603 N.E.2d 930). Since **\*153** falsity is a necessary element of a defamation cause of action and only "facts" are capable of being proven false, "it follows that only statements alleging facts can properly be the subject of a defamation action" (*id.,* at 139, 589 N.Y.S.2d 825, 603 N.E.2d 930; *accord, Immuno AG. v. Moor–Jankowski, supra,* 77 N.Y.2d at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270). In our State the inquiry, which must be made by the court (*see, 600 W. 115th St. Corp. v. Von Gutfeld, supra,* 80 N.Y.2d at 139, 589 N.Y.S.2d 825, 603 N.E.2d 930; *Steinhilber v. Alphonse, supra,* 68 N.Y.2d at 290, 508 N.Y.S.2d 901, 501 N.E.2d 550), entails an examination of the challenged statements with a view toward (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to " 'signal * * * readers or listeners that what is being read or heard is likely to be opinion, not fact' " (*Steinhilber v. Alphonse, supra,* at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550, quoting *Ollman v. Evans,* D.C.Cir., 750 F.2d 970, 983, *cert. denied* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 *accord, Immuno AG. v. Moor–Jankowski, supra* ).

**\*\*1168   \*\*\*818**  This is not to suggest that the wisdom to be derived from the formerly utilized common-law analysis has been completely discarded. To the contrary, although the terminology may have fallen out of favor, the seasoned common-law categories for actionable and nonactionable reportage have been invoked to inform our modern constitutional analysis(*Immuno AG. v. Moor–Jankowski, supra,* 77 N.Y.2d at 250, 566 N.Y.S.2d 906, 567 N.E.2d 1270; *see, e.g., James v. Gannett Co.,* 40 N.Y.2d 415, 386 N.Y.S.2d 871, 353 N.E.2d 834; *Julian v. American Bus. Consultants,* 2 N.Y.2d 1, 155 N.Y.S.2d 1, 137 N.E.2d 1; *see also, Steinhilber v. Alphonse, supra,* 68 N.Y.2d at 293, 508 N.Y.S.2d 901, 501 N.E.2d 550).

 **[2]**   Thus, in determining whether a particular communication is actionable, we continue to recognize and utilize the important distinction between a statement of opinion that implies a basis in facts which are not disclosed to the reader or listener (*see, Hotchner v. Castillo–Puche,* 2d Cir., 551 F.2d 910, 913, *cert. denied sub nom. Hotchner v. Doubleday & Co.,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95; Restatement [Second] of Torts § 566), and a statement of opinion that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of

undisclosed underlying facts (*see, Ollman v. Evans, supra,* at 976; *Buckley v. Littell,* 2d Cir., 539 F.2d 882, 893, *cert. denied* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 Restatement [Second] of Torts § 566, comment *c).* The former are actionable not because they convey "false opinions" but rather because a reasonable listener or reader would infer that "the speaker [or writer] knows certain facts, unknown to [the] **\*154** audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]" (*Steinhilber v. Alphonse, supra,* 68 N.Y.2d at 290, 508 N.Y.S.2d 901, 501 N.E.2d 550). In contrast, the latter are not actionable because, as was noted by the dissenting opinion in *Milkovich v. Lorain Journal Co., supra,* 497 U.S. at 26–27, 28, n. 5, 110 S.Ct. at 2709–2710, 2710–2711, n. 5 [Brennan, J.], a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture (*see, e.g., Potomac Valve & Fitting v. Crawford Fitting Co.,* 4th Cir., 829 F.2d 1280, 1290). Indeed, this class of statements provides a clear illustration of situations in which the full context of the communication " 'signal[s] * * * readers or listeners that what is being read or heard is likely to be opinion, not fact' " (*Steinhilber v. Alphonse, supra,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550; quoting *Ollman v. Evans, supra,* at 983).

III.

Applying these principles to plaintiff's cause is not a simple task because plaintiff's pleadings cite the whole series of articles, each in its entirety, as the basis for plaintiff's defamation claim. Obviously, not every word and assertion in the disputed articles is false or defamatory. Some of the actions and words attributed to plaintiff undoubtedly did take place. Furthermore, many of the objective assertions made in this series of many thousand words are uncontroversial and are therefore not the proper subject for a defamation action.

 **[3]**    **[4]**   We conclude, however, that the courts below erred in dismissing the complaint, since the articles it cited contain many assertions of objective fact that, if proven false, could form the predicate for a maintainable libel action. Additionally, although the articles contain many assertions that would be understood by the reasonable reader as mere hypotheses premised on stated facts, there are also actionable charges made in the articles—such as the charges that plaintiff engaged in cover-ups, directed the creation of "misleading" autopsy reports and was guilty of "possibly illegal" conduct —that, although couched in the language of hypothesis or

conclusion, actually would be understood by the reasonable reader as assertions of fact (*see, Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 382, 397 N.Y.S.2d 943, 366 N.E.2d 1299).

 **\*\*1169 \*\*\*819** **[5]**    Contrary to the Appellate Division's conclusion, these assertions are not too vague to constitute concrete accusations of criminality. Nonetheless, we hold them to be actionable not, **\*155** as plaintiff would have it, because they involve accusations of criminality per se, but rather because in this context they convey "facts" that are capable of being proven true or false. Although plaintiff repeatedly suggests otherwise, there is simply no special rule of law making criminal slurs actionable regardless of whether they are asserted as opinion or fact.

In *Silsdorf v. Levine,* 59 N.Y.2d 8, 16, 462 N.Y.S.2d 822, 449 N.E.2d 716, *cert. denied* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111), we merely held that an accusation of criminality that, read in context, is set forth as a fact is not transformed into a nonactionable expression of opinion merely because it is couched "in the form of [an] opinion." To illustrate, if the statement "John is a thief" is actionable when considered in its applicable context, the statement *"I believe* John is a thief" would be equally actionable when placed in precisely the same context. By the same token, however, the assertion that "John is a thief" could well be treated as an expression of opinion or rhetorical hyperbole where it is accompanied by other statements, such as "John stole my heart," that, taken in context, convey to the reasonable reader that something other than an objective fact is being asserted. Indeed, it has already been held that assertions that a person is guilty of "blackmail," "fraud," "bribery" and "corruption" could, in certain contexts, be understood as mere, nonactionable "rhetorical hyperbole" or "vigorous epithet[s]" (*see, e.g., Greenbelt Publ. Assn. v. Bresler, supra,* 398 U.S. at 14, 90 S.Ct. at 1542; *600 W. 115th St. Corp. v. Von Gutfeld, supra,* 80 N.Y.2d at 143–145, 589 N.Y.S.2d 825, 603 N.E.2d 930).

 **[6]**    **[7]**    Similarly, even when uttered or published in a more serious tone, accusations of criminality could be regarded as mere hypothesis and therefore not actionable if the facts on which they are based are fully and accurately set forth and it is clear to the reasonable reader or listener that the accusation is merely a personal surmise built upon those facts. In all cases, whether the challenged remark concerns criminality or some other defamatory category, the courts are obliged to consider the communication as a whole, as well as its immediate and broader social contexts, to determine whether

the reasonable listener or reader is likely to understand the remark as an assertion of provable fact (*600 W. 115th St. Corp. v. Von Gutfeld, supra; see, Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270, *supra).*

 **[8]**    In this case, the assertion that plaintiff engaged in "corrupt" conduct in his capacity as Chief Medical Examiner cannot be treated as a mere rhetorical flourish or the speculative **\*156** accusation of an angry but ill-informed citizen made during the course of a heated debate (*see, 600 W. 115th St. Corp. v. Von Gutfeld, supra).* Rather, the accusation was made in the course of a lengthy, copiously documented newspaper series that was written only after what purported to be a thorough investigation. Having been offered as a special feature series rather than as coverage of a current news story, the disputed articles were calculated to give the impression they were "the product of some deliberation, not of the heat of [the] moment" (*id.,* 80 N.Y.2d at 142, 589 N.Y.S.2d 825, 603 N.E.2d 930). Moreover, since the articles appeared in the news section rather than the editorial or "op ed" sections, the common expectations that apply to those more opinionated journalistic endeavors were inapplicable here (*see, Immuno AG. v. Moor–Jankowski, supra).* Thus, the circumstances under which these accusations were published "encourag[ed] the reasonable reader to be less skeptical and more willing to conclude that [they] stat[ed] or impl[ied] facts" (*600 W. 115th St. Corp. v. Von Gutfeld, supra,* at 142, 589 N.Y.S.2d 825, 603 N.E.2d 930.)

 **[9]**    **[10]**    In closing, we stress once again our commitment to avoiding the "hypertechnical parsing" of written and spoken words for the purpose of identifying "possible 'fact[s]' " that might form the basis of **\*\*1170** a **\*\*\*820** sustainable libel action (*Immuno AG. v. Moor–Jankowski, supra,* 77 N.Y.2d at 256, 566 N.Y.S.2d 906, 567 N.E.2d 1270). The core goal of "exercises" such as this is to protect the individual's historic right to vindicate reputation without impairing our "cherished constitutional guarantee of free speech" (*id.,* at 256, 566 N.Y.S.2d 906, 567 N.E.2d 1270) or casting a pall over citizens' ability to engage in robust debate through the print and broadcast media. In this case, the reputation of a public official with significant professional credentials was allegedly impaired by a series of widely read newspaper articles that portrayed him as unethical and corrupt. Under the circumstances of his case, we conclude that this individual should be permitted to go forward in an effort to establish a right to a libel recovery. The defendants' expressional rights as well as the cherished values embodied in the First Amendment guarantees can be adequately protected in this

**Gross v. New York Times Co., 82 N.Y.2d 146 (1993)**
623 N.E.2d 1163, 603 N.Y.S.2d 813, 21 Media L. Rep. 2142

context by the well-established rule requiring that plaintiff prove not only that the statements he cites are false and defamatory but also that they were made with actual malice. As this Court has previously observed, compliance with the latter requirements is a matter that is well suited to testing, at least in the first instance, on a motion for summary judgment brought pursuant to CPLR 3212 (*see, Immuno AG. v. Moor–Jankowski, supra,* at 256, 566 N.Y.S.2d 906, 567 N.E.2d 1270; *Karaduman v. Newsday, Inc.,* 51 N.Y.2d 531, 545, 435 N.Y.S.2d 556, 416 N.E.2d 557).

**\*157** Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed, with costs, and the motion of the Times defendants to dismiss causes of action 1 through 5 and 8 through 13 of the complaint denied.

Chief Judge KAYE, C.J., and SIMONS, HANCOCK and BELLACOSA, JJ., concur.

SMITH and LEVINE, JJ., taking no part.

**Opinion**
Order, insofar as appealed from, reversed, etc.

**All Citations**

82 N.Y.2d 146, 623 N.E.2d 1163, 603 N.Y.S.2d 813, 21 Media L. Rep. 2142

Footnotes

1    For a review of the factual background of the Bumpurs case, see *People v. Sullivan,* 68 N.Y.2d 495, 510 N.Y.S.2d 518, 503 N.E.2d 74.

2    The dismissal motion at issue in this appeal is the one made by The New York Times, Philip Shenon, Sam Roberts, A.M. Rosenthal and Peter Milones, all of whom are affiliated with defendant newspaper. An earlier dismissal motion by the other named defendants was granted by the trial court. The trial court also dismissed plaintiff's sixth, seventh, fourteenth and fifteenth causes of action against the New York Times defendants. Those dismissals are not being challenged on this appeal.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

🚩 KeyCite Yellow Flag

Distinguished by 600 West 115th Street Corp. v. Von Gutfeld, N.Y.A.D. 1 Dept., June 25, 1991

77 N.Y.2d 235
Court of Appeals of New York.

IMMUNO AG., Appellant,

v.

J. MOOR–JANKOWSKI, Respondent.

264
|
Jan. 15, 1991.
|
Certiorari Denied June 3, 1991. See111 S.Ct. 2261.

**Synopsis**

Libel action was brought against, inter alia, editor of scientific journal, which published letter to editor criticizing biologic products manufacturer's plan to establish African facility for hepatitis research using wild chimpanzees. The Supreme Court, New York County, Shainswit, J., denied editor's motion for summary judgment, and editor appealed. The Supreme Court, Appellate Division, 145 A.D.2d 114, 537 N.Y.S.2d 129, reversed. Manufacturer appealed by permission granted. The Court of Appeals, 74 N.Y.2d 548, 549 N.Y.S.2d 938, 549 N.E.2d 129, affirmed. On petition for writ of certiorari, the United States Supreme Court, 110 S.Ct. 3266, vacated and remanded for further consideration. On remand, the Court of Appeals, Kaye, J., held that: (1) manufacturer failed to show falsity of factual assertions in letter to editor; (2) remand of action from United States Supreme Court to Court of Appeals "for further consideration in light of" another Supreme Court opinion addressing federal law applicable to libel actions did not preclude Court of Appeals from resolving case on separate and independent state constitutional ground, as well as under federal law; (3) under State Constitution, analysis of statements which are subject of libel action to determine whether statements are actionable fact or protected opinion should begin by looking at content of whole communication, its tone and apparent purpose in order to determine whether reasonable person would view statement as expressing or implying any facts; and (4) under state constitutional analysis, presumptions and predictions in letter as to what "appeared to be" or "might well be" or "could well happen" or "should be" were protected from libel action.

Affirmed.

Simons, Titone and Hancock, JJ., filed separate opinions concurring in result.

**Procedural Posture(s):** On Appeal.

West Headnotes (9)

**[1]**   **Libel and Slander** 🔑 Actionable Words in General

In determining whether speech is actionable or is protected opinion in libel action, key inquiry is whether challenged expression, however labeled by defendant, would reasonably appear to state or imply assertions of objective fact; literal words of challenged statements do not entitle media defendant to "opinion" immunity or libel plaintiff to go forward with its action, and courts must also consider impression created by words used as well as general tenor of expression from point of view of reasonable person. U.S.C.A. Const.Amend. 1.

96 Cases that cite this headnote

**[2]**   **Libel and Slander** 🔑 Presumptions and Burden of Proof

Libel plaintiff has burden of showing falsity of factual assertions.

6 Cases that cite this headnote

**[3]**   **Libel and Slander** 🔑 Merchants, tradespeople, and manufacturers

Biologic product manufacturer failed to show falsity of factual assertions in letter to editor of scientific journal critizing manufacturer's plan to establish African facility for hepatitis research using wild chimpanzees, core premise of letter asserted that there was no scientific method to determine carrier status, and that manufacturer would release possible carrier chimpanzees who might endanger wild population.

3 Cases that cite this headnote

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 130 of 230

Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235 (1991)
567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

**[4]    Libel and Slander** 👈 Merchants, tradespeople, and manufacturers

Even if assertion in letter to editor of scientific journal critizing biologic products manufacturer's plan for hepatitis research using wild chimpanzees, that no scientific test existed to determine carrier status, had been shown to be false, that assertion would not itself libel manufacturer, as it did not state actual facts about manufacturer.

3 Cases that cite this headnote

**[5]    Federal Courts** 👈 Mandate; effect of decision in lower court; proceedings on remand

Remand of libel action from United States Supreme Court to Court of Appeals "for further consideration in light of" another Supreme Court opinion addressing federal law applicable to libel actions did not preclude Court of Appeals from resolving case on separate and independent state constitutional ground, as well as under federal law. U.S.C.A. Const.Amend. 1; McKinney's Const. Art. 1, § 8.

17 Cases that cite this headnote

**[6]    Constitutional Law** 👈 Opinion

Under State Constitution, analysis of statements which are subject of libel action to determine whether statements are actionable fact or protected opinion should begin by looking at content of whole communication, its tone and apparent purpose in order to determine whether reasonable person would view statement as expressing or implying any facts. McKinney's Const. Art. 1, § 8.

144 Cases that cite this headnote

**[7]    Constitutional Law** 👈 Defamation

Under state constitutional analysis, media defendant has no license to misportray facts; false statements are actionable in libel when they would be perceived as factual by reasonable person. McKinney's Const. Art. 1, § 8.

12 Cases that cite this headnote

**[8]    Constitutional Law** 👈 Particular issues and applications

Letter to editor of scientific journal criticizing biologic products manufacturer's plan for hepatitis research using wild chimpanzees, which stated that "release of chimpanzee 'veterans' of hepatitis * * * research would be hazardous to wild populations, as there is no way to determine that an animal is definitely not a carrier * * *," both expressed and implied statements of fact that, if shown to be false, would be actionable under state constitutional analysis; core premise of letter asserted that there was no scientific method to determine carrier status, and that manufacturer would release possible carrier chimpanzees who might endanger wild population. McKinney's Const. Art. 1, § 8.

11 Cases that cite this headnote

**[9]    Constitutional Law** 👈 Particular Issues and Applications

**Libel and Slander** 👈 Merchants, tradespeople, and manufacturers

Under state constitutional analysis, presumptions and predictions in letter to editor criticizing biologic products manufacturer's plan for hepatitis research using wild chimpanzees as to what "appeared to be" or "might well be" or "could well happen" or "should be" were protected from libel action, as they would not have been viewed by average reader of journal as conveying actual facts about manufacturer. McKinney's Const. Art. 1, § 8.

33 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*236    \*\*1271    \*\*\*907** Raymond S. Fersko, Anders R. Sterner, Mitchell Lapidus and Jonathan W. Lubell, New York City, for appellant.

**\*237** Philip A. Byler and Louis Lauer, New York City, for respondent.

Floyd Abrams, Taryn V. Shelton, Robert J. Pape, Kathryn J. Rodgers, Thomas DeJulio, Michael G. MacDonald, James E. McCarthy, III, S. Andrew Schaffer, Ada Meloy, New York City, Shelley Sanders Kehl, Brooklyn, Herbert D. Schwartzman, Jamaica, Thomas S. Evans, Syracuse, and Martin H. Bockstein, New York City, for Adelphi University et al., amici curiae.

**\*238** Laura M. Mattera, New York City, for Sierra Club et al., amici curiae.

Henry R. Kaufman, New York City, for World Wildlife Fund et al., amici curiae.

Arthur N. Eisenberg and Kenneth P. Norwick, New York City, for New York Civil Liberties Union, amicus curiae.

**\*239** Edward A. Miller, New York City, for Association of American Publishers, Inc., amicus curiae.

**OPINION OF THE COURT**

KAYE, Judge.

One year ago, applying what appeared to be settled law, we affirmed the dismissal of plaintiff's libel action against the editor of a scientific journal, essentially for his publication of a signed letter to the editor on a subject of public controversy. We concluded that there was no triable issue of fact as to the falsity of the threshold factual assertions of the letter, that—beyond those threshold factual assertions—the letter writer's statements of opinion were entitled to the absolute protection of the State and Federal constitutional free speech guarantees, and that charges of defendant's deliberate incitement to have a defamatory letter published lacked factual foundation (*Immuno AG. v. Moor–Jankowski,* 74 N.Y.2d 548, 549 N.Y.S.2d 938, 549 N.E.2d 129).

**\*\*1272 \*\*\*908** On plaintiff's petition, the United States Supreme Court granted certiorari, vacated our judgment, and remanded the case for further consideration in light of **\*240** *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1, decided June 21, 1990. 497 U.S. 1021, 110 S.Ct. 3266, 111 L.Ed.2d 776. For the reasons stated below, we adhere to our determination that defendant's summary judgment motion was properly granted and the

complaint dismissed, premising our decision on independent State constitutional grounds as well as the Federal review directed by the Supreme Court.

I.

This libel action arises out of a letter to the editor published in the Journal of Medical Primatology in December 1983. The letter was written by Dr. Shirley McGreal as Chairwoman of the International Primate Protection League (IPPL), an organization known for its vigorous advocacy on behalf of primates, particularly those used for biomedical research. Defendant Dr. J. Moor–Jankowski, a professor of medical research at New York University School of Medicine and director of the Laboratory for Experimental Medicine and Surgery in Primates of the New York University Medical Center, is cofounder and editor of the Journal.

The subject of McGreal's letter (reprinted at 145 A.D.2d 114 at 118–120, 537 N.Y.S.2d 129) was a plan by plaintiff, Immuno AG.—a multinational corporation based in Austria that manufactures biologic products derived from blood plasma—to establish a facility in Sierra Leone, West Africa, for hepatitis research using chimpanzees. Voicing the concerns of IPPL, McGreal's letter was critical of Immuno's proposal on a number of grounds: (1) that the motivation for the plan was presumably to avoid international policies or legal restrictions on the importation of chimpanzees, an endangered species; (2) that it could decimate the wild chimpanzee population, as capture of chimpanzees generally involved killing their mothers, and it was questionable whether experimental animals could be returned to the wild, as plaintiff proposed; and (3) that returning the animals to the wild could well spread hepatitis to the rest of the chimpanzee population. McGreal stated that the current population of captive chimpanzees should be adequate to supply any legitimate requirements.

The letter was prefaced by an Editorial Note written by defendant that set out its background. Identifying McGreal as Chairwoman of IPPL, the Note stated that the Journal had received the initial version of the letter in January 1983 and **\*241** had submitted it to plaintiff for comment or reply.[1] Plaintiff had acknowledged receipt of defendant's letter in February, offering no comment but that it was referring the matter to its New York lawyers. Thereafter, plaintiff's lawyers wrote that the statements were inaccurate, unfair and reckless, and requested the documents upon which the accusations

were based, threatening legal action if the letter were printed before plaintiff had a meaningful opportunity to reply. The Editorial Note went on to state that the editors had advised plaintiff's attorneys that they should obtain the documentation directly from McGreal, and extended the period for plaintiff's reply by two months. The letter was published nearly a year after its receipt. In the meantime, articles had appeared in the Austrian press apparently confirming much of what McGreal had written, and defendant received no further word from plaintiff or its lawyers.

In addition to the letter that is the focus of contention, plaintiff complains that it was defamed by comments made by defendant quoted in an article entitled "Loophole May Allow Trade in African Chimps" that appeared in the New Scientist magazine **1273 ***909 shortly before McGreal's letter was published. Defendant is quoted as saying that the supply of captive chimpanzees was sufficient for research, describing plaintiff's attempts to circumvent controls on endangered species as "scientific imperialism," and warning that they will "backfire on people like me involved in the bona fide use of chimpanzees and other primate animals" for research.

In December 1984, plaintiff commenced this lawsuit against Moor–Jankowski and seven other defendants, including McGreal and the publishers and distributors of the New Scientist and the Journal of Medical Primatology, and it has since been vigorously litigated. By now, all the defendants except Moor–Jankowski have settled with plaintiff for what the motion court described as "substantial sums," and the complaint has been dismissed as to them. After extensive discovery—his own deposition conducted over 14 days—defendant moved for summary judgment. Supreme Court granted the motion to the *242 extent of dismissing a claim for prima facie tort. It denied the motion as to the defamation claims, ruling that the statements at issue were statements of fact and, regardless of whether plaintiff was a public figure, there were triable issues of fact concerning whether defendant acted with actual malice in making or publishing the statements.

On defendant's appeal, the Appellate Division unanimously reversed Supreme Court's judgment (insofar as appealed from), granted defendant's motion, and dismissed the complaint (145 A.D.2d 114, 537 N.Y.S.2d 129). The court held that all of the comments attributed to defendant in the New Scientist article were expressions of opinion that could not, as a matter of law, support an action for defamation. As to the McGreal letter, the Appellate Division

held that for the most part it too was a constitutionally protected expression of opinion. To the extent there were (in the court's view) statements of a factual nature, the Appellate Division examined each statement meticulously, and concluded from the voluminous record that plaintiff had failed to adduce evidence of falsity. We now affirm, adopting without further elaboration our prior conclusion as to the lack of factual foundation for the deliberate incitement charges, and concentrating our analysis on the substance of the challenged statements.

II.

Our analysis first focuses on *Milkovich,* in compliance with the Supreme Court's direction on remand.

As the Supreme Court wrote, *Milkovich* leaves in place all previously existing Federal constitutional protections, including the " ' "breathing space" ' " which " ' "freedoms of expression require in order to survive" ' " (497 U.S., at ——, 110 S.Ct., at 2706, quoting *Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 772, 106 S.Ct. 1558, 1561, 89 L.Ed.2d 783), and specifically including immunity for statements of opinion relating to matters of public concern that do not contain a provably false factual connotation (497 U.S., at ——, 110 S.Ct., at 2706; *Philadelphia Newspapers v. Hepps, supra). Milkovich,* however, puts an end to the perception—as it turns out, misperception—traceable to dictum in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 that, in addition to all other Federal constitutional protections, there is a "wholesale defamation exemption for anything that might be labeled 'opinion.' " (497 U.S., at ——, 110 S.Ct., at 2705, *supra.*)

Thus, statements of opinion relating to matters of public *243 concern are today no less subject to constitutional protection, but speech earns no greater protection simply because it is labeled "opinion."

[1] The key inquiry is whether challenged expression, however labeled by defendant, would reasonably appear to state or imply assertions of objective fact. In making this inquiry, courts cannot stop at literalism. The literal words of challenged statements do not entitle a media defendant to "opinion" immunity or a libel plaintiff to go forward with its action. In determining whether speech is actionable, courts must additionally consider the impression created by the words used as well as the **1274 ***910 general tenor

Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235 (1991)
567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

of the expression, from the point of view of the reasonable person.

As often happens, a court's application of stated rules to the facts before it illuminates the rules. In this case the exercise is especially instructive.

The Supreme Court in *Milkovich* reversed the Ohio court's judgment—in substance reached in the companion case *Scott v. News–Herald,* 25 Ohio St.3d 243, 496 N.E.2d 699—dismissing plaintiff's defamation complaint. The State court, applying the widely used four-part *Ollman* formula (*Ollman v. Evans,* 750 F.2d 970 [D.C.Cir.], *cert. denied* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 [*see especially,* Rehnquist, J., dissenting] ) for separating immune opinion from actionable fact, had looked first to the article's specific words as commonly understood, and second to whether the statements were verifiable, and it concluded that on both scores plaintiff would have stated a valid cause of action. The plain import of the challenged statements was that plaintiff had committed perjury, a verifiable fact.

But the Ohio court went on to dismiss the complaint because of the remaining two *Ollman* factors (the full context of the article in which the challenged statements appear, and the broader social context or setting surrounding the communication).[2] The court was persuaded from the language of the article and its context that the reasonable reader would **\*244** recognize it as no more than the writer's opinion on a subject of public concern, and therefore constitutionally protected. "Examining the article in its larger context * * * the large caption 'TD Says' * * * would indicate to even the most gullible reader that the article was, in fact, opinion" (*Scott v. News–Herald,* 25 Ohio St.3d, at 252, 496 N.E.2d, at 707, *supra* ) and, because the article appeared on the sports page—a "traditional haven for cajoling, invective, and hyperbole"—the challenged statements by the sports columnist likely would not have been read as charging the crime of perjury in judicial hearings (25 Ohio St.3d, at 253–254, 496 N.E.2d, at 708).

The United States Supreme Court, looking at basically the same first two *Ollman* factors, determined that a reasonable fact finder could conclude that the challenged statements in *Milkovich* implied an assertion that petitioner had perjured himself in a judicial proceeding, and the connotation that petitioner had committed a felony was sufficiently factual to be susceptible of being proved true or false. Those were the same conclusions that had been reached by the Ohio court.

The critical difference lay in the Supreme Court's treatment of the second two *Ollman* factors—the immediate and broader context of the article—reduced essentially to one: type of speech. Moreover, the Court made clear that by protected type of speech it had in mind the rhetorical hyperbole, vigorous epithets, and lusty and imaginative expression found in *Hustler Mag. v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 [ad parody]; *Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 [labor dispute], and *Greenbelt Publ. Assn. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 [heated real estate negotiation]—all instances where the Court had determined that the imprecise language and unusual setting would signal the reasonable observer that no actual facts were being conveyed about an individual.

In *Milkovich,* the Supreme Court resolved "type of speech" considerations in two sentences: "This is not the sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining petitioner committed the crime of perjury. Nor does **\*\*1275** **\*\*\*911** the general tenor of the article negate this impression." (*Milkovich v. Lorain Journal Co.,* 497 U.S., at ——, 110 S.Ct., at 2707, *supra.*) In this analysis, the Supreme Court said nothing of either the conjectural language of the disputed article, or the format of the piece—a signed editorial column appearing on the sports page. Both those considerations occupied the Ohio court and **\*245** the dissent at length (*see, Milkovich v. Lorain Journal Co., supra,* at —— – ——, 110 S.Ct., at 2710–2713 [Brennan, J., dissenting] ), ultimately persuading those Judges that no reasonable reader would have regarded the challenged assertions, *in their context,* as factual. The Supreme Court's failure to mention either point becomes particularly telling when its writing is laid against the State court opinion and Justice Brennan's dissent.

Thus, if not alone from the Supreme Court's statement of the governing rules, then from its application of those rules to the facts of *Milkovich,* it appears that the following balance has been struck between First Amendment protection for media defendants and protection for individual reputation: except for special situations of loose, figurative, hyperbolic language, statements that contain or imply assertions of provably false fact will likely be actionable.

We next apply *Milkovich* to the facts before us.

In general, as previously observed, it is hard to conceive that any published statement could be without some factual grounding. In particular, we recognized that the McGreal letter was provoked by a certain state of affairs, that it set out limited points of factual reference, and that to the extent that letter contained defamatory factual statements about plaintiff, they would be actionable if false (74 N.Y.2d, at 559, 549 N.Y.S.2d 938, 549 N.E.2d 129, *supra* ).

Unlike the Supreme Court's characterization of the analysis done in *Scott v. News–Herald,* we did not, and do not, hold that the assertions of verifiable fact in the McGreal letter were overridden or "trumped" by their immediate or broader context and therefore automatically and categorically protected as opinion. We did not, and do not, hold that all letters to the editor are absolutely immune from defamation actions, or that there is a wholesale exemption for anything that might be labeled "opinion."

 **[2]**     **[3]**     But a libel plaintiff has the burden of showing the falsity of factual assertions (*see, Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783, *supra; Steinhilber v. Alphonse,* 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550; *Silsdorf v. Levine,* 59 N.Y.2d 8, 462 N.Y.S.2d 822, 449 N.E.2d 716, *cert. denied* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111), and we concluded that plaintiff did not meet that burden. Given the thorough Appellate Division review of the factual assertions in issue, there hardly seemed a need for repetition of the charges and the relevant evidence. We noted simply that the factual review undertaken by the Appellate Division established that plaintiff had raised no triable issue as to the falsity of any of the threshold factual assertions of the McGreal  **\*246**  letter (*Immuno AG. v. Moor–Jankowski,* 74 N.Y.2d 548, 559, 549 N.Y.S.2d 938, 549 N.E.2d 129, *supra* ).

We continue to believe that the Appellate Division review, to the extent it identified assertions of fact and concluded that such assertions had not been shown to be false, established that no triable issue of fact existed. While there still appears no need for us to restate those extensive findings, application of *Milkovich* to what plaintiff characterizes as the "core libel," or "core premise," or "core factual statement" of the IPPL letter illustrates the enduring soundness of that analysis.

According to plaintiff, the core premise of the letter is as follows: "Release of chimpanzee 'veterans' of hepatitis non-A, non-B research would be hazardous to wild populations,

as there is no way to determine that an animal is definitely not a carrier of the disease."

Applying *Milkovich,* we discern two assertions of fact, one express and one implied.. **\*\*1276   \*\*\*912** First, the statement asserts that there is no scientific method for determining if a chimpanzee exposed to the non-A, non-B virus is not a carrier of the disease. Second, the statement implies that plaintiff will release possible carrier-chimpanzees who may endanger the wild population. Both assertions—the existence of a scientific test to determine carrier status, and plaintiff's plans—are verifiable. Finally, the "type of speech," unlike *Falwell, Letter Carriers* or *Greenbelt,* is restrained, the statements are seriously maintained, and they have an apparent basis in fact.

Though this core premise could be actionable, plaintiff's complaint was nonetheless properly dismissed because, on the record presented, it was apparent that plaintiff did not satisfy its burden of proving those statements false (*see,* 145 A.D.2d, at 139–141, 537 N.Y.S.2d 129; *Philadelphia Newspapers v. Hepps,* 475 U.S., at 767, 106 S.Ct., at 1558, *supra; Milkovich v. Lorain Journal Co.,* 497 U.S., at ——, 110 S.Ct., at 2704, *supra* ).

As for the express assertion of the absence of a test, plaintiff has pointed us to no proof establishing a scientific test in the relevant period that could conclusively determine the carrier state in chimpanzees or, more specifically, could definitely rule out that a veteran chimpanzee was not a carrier of the virus. When considered against the extensive record, plaintiff's effort to establish that there was a fail-proof test, by weaving together isolated fragments of the testimony of various experts (including defendant), simply does not satisfy its legal burden.

 **[4]**     **\*247**  To the contrary, what is apparent from the record is that in the relevant period there was an ongoing process of discovery and debate centering on the very existence of a carrier state of the virus, all of which was made even more inconclusive by ambiguity as to precisely when relevant technology was acquired. When asked if it was possible that certain tests for detecting the carrier state would yield negative results even though the chimpanzee carried the virus, plaintiff's Dr. Johann Eibl replied "[t]here is no proof on that." Finally, even if the express assertion of the "core premise" had been shown to be false, that assertion would not itself libel plaintiff, because it does not " 'stat[e] actual facts' about [that] individual." (*Milkovich v. Lorain Journal Co., 497 U.S.,*

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 135 of 230

Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235 (1991)
567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

at ——, 110 S.Ct., at 2706, *supra; see also, King Prods. v. Douglas,* 742 F.Supp. 778, 784 [S.D.N.Y.].)

Similarly, as the Appellate Division concluded, there was no proof of falsity of the implied assertion of fact—that plaintiff in the relevant period planned to release chimpanzees with no means of definitely determining that they were not carriers of the disease, thus endangering the wild populations. It is clear from the record that plaintiff, in 1983, was considering the option of rehabilitating chimpanzees used at the projected Sierra Leone facility, for return to a natural state (*see,* 145 A.D.2d, at 136, 537 N.Y.S.2d 129). With no proof of the falsity of the express assertion that there was a conclusive test of carrier status available in 1983, it follows that there was also no proof of the falsity of the implied assertion that plaintiff planned to return its veteran test animals with no means of definitely determining that they were not hepatitis carriers.

As an additional matter, the Appellate Division considered infectiousness as well as carrier status (the "core premise" refers only to carriers [*see,* 145 A.D.2d, at 139, 537 N.Y.S.2d 129] ). Although there was testimony that infectiousness might be tested by inoculating a healthy chimpanzee with the blood of a potentially infected animal to see whether the healthy animal developed hepatitis symptoms, plaintiff produced no proof that it would in fact be implementing that procedure at its facility. That procedure was described by Dr. Alfred Prince, a leading expert, as "expensive," "laborious" and "wasteful," in that it involved the deliberate infection of healthy chimpanzees to test the infectiousness of animals that had been exposed to the virus. As the Appellate Division noted, "McGreal can hardly be faulted for not assuming that Immuno would necessarily **\*248** perform the inoculation procedure on every one of the many chimps it intended to return to the **\*\*1277  \*\*\*913** wild." (145 A.D.2d, at 140, 537 N.Y.S.2d 129.)

In sum, our "further consideration in light of *Milkovich*" 497 U.S. ——, 110 S.Ct. 2695, *supra,* using the core premise as illustrative, confirms our conclusion that, on this factual record, summary judgment was properly granted to defendant.[3]

III.

We next proceed to a State law analysis, and also conclude on this separate and independent ground that the complaint was correctly dismissed.

A.

 **[5]**    It has long been recognized that matters of free expression in books, movies and the arts generally, are particularly suited to resolution as a matter of State common law and State constitutional law, the Supreme Court under the Federal Constitution fixing only the minimum standards applicable throughout the Nation, and the State courts supplementing those standards to meet local needs and expectations (*see, e.g., People ex rel. Arcara v. Cloud Books,* 68 N.Y.2d 553, 557–558, 510 N.Y.S.2d 844, 503 N.E.2d 492). Indeed, striking an appropriate balance "between the need for vigorous public discourse and the need to redress injury to citizens wrought by invidious or irresponsible speech" (*Milkovich v. Lorain Journal Co.,* 497 U.S., at ——, 110 S.Ct., at 2703, *supra* ), is consistent with the traditional role of State courts in applying privileges, including the opinion privilege, which have their roots in the common law (*see, Immuno AG. v. Moor–Jankowski,* 74 N.Y.2d, at 555, 549 N.Y.S.2d 938, 549 N.E.2d 129, *supra; Cole Fisher Rogow, Inc. v. Carl Ally, Inc.,* 25 N.Y.2d 943, 305 N.Y.S.2d 154, 252 N.E.2d 633; *Julian v. American Business Consultants,* 2 N.Y.2d 1, 155 N.Y.S.2d 1, 137 N.E.2d 1; *Hoeppner v. Dunkirk Print. Co.,* 254 N.Y. 95, 99, 172 N.E. 139).

 **\*249**  This State, a cultural center for the Nation, has long provided a hospitable climate for the free exchange of ideas (*Matter of Beach v. Shanley,* 62 N.Y.2d 241, 255–256, 476 N.Y.S.2d 765, 465 N.E.2d 304 [Wachtler, J., concurring] ). That tradition is embodied in the free speech guarantee of the New York State Constitution, beginning with the ringing declaration that "[e]very citizen may freely speak, write and publish * * * sentiments on all subjects." (N.Y. Const., art. I, § 8.) Those words, unchanged since the adoption of the constitutional provision in 1821, reflect the deliberate choice of the New York State Constitutional Convention not to follow the language of the First Amendment, ratified 30 years earlier, but instead to set forth our basic democratic ideal of liberty of the press in strong affirmative terms (*see,* Forkosch, *Freedom of the Press: Croswell's Case,* 33 Fordham L.Rev. 415 [1965] ).

"The expansive language of our State constitutional guarantee (*compare,* N.Y. Const., art. I, § 8, *with* U.S. Const. 1st

Amend.), its formulation and adoption prior to the Supreme Court's application of the First Amendment to the States * * * the recognition in very early New York history of a constitutionally guaranteed liberty of the press * * * and the consistent tradition in this State of providing the broadest possible protection to 'the sensitive role of gathering and disseminating news of public events' * * * all call for particular vigilance by the courts of this State in safeguarding the free press against undue interference." **1278 ***914 (*O'Neill v. Oakgrove Constr.,* 71 N.Y.2d 521, 528–529, 528 N.Y.S.2d 1, 523 N.E.2d 277.)

Thus, whether by the application of "interpretive" (*e.g.,* text, history) or "noninterpretive" (*e.g.,* tradition, policy) (*see, People v. P.J. Video,* 68 N.Y.2d 296, 302–303, 508 N.Y.S.2d 907, 501 N.E.2d 556, *cert. denied* 479 U.S. 1091, 107 S.Ct. 1301, 94 L.Ed.2d 156) factors, the "protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by" the Federal Constitution (*O'Neill v. Oakgrove Constr.,* 71 N.Y.2d, at 529, n. 3, 528 N.Y.S.2d 1, 523 N.E.2d 277, *supra*).

Had defendant initially presented the issue as one of independent State constitutional law, instead of as an undenominated argument premised on the assumed identity of State and Federal law, it might have been resolved on that basis a year ago. The intervening occurrence of *Milkovich,* however, does not cause us to change our explicit conclusion that the case was correctly analyzed and decided in accordance with the core values protected by the State Constitution (*see,* 74 N.Y.2d, at 560, 549 N.Y.S.2d 938, 549 N.E.2d 129, *supra; see also, People v. Class,* 67 N.Y.2d 431, 503 N.Y.S.2d 313, 494 N.E.2d 444). **\*250** Several considerations impel us to restate those conclusions separately now, underscoring that we decide this case on the basis of State law independently, and that in our State law analysis reference to Federal cases is for the purpose of guidance only, not because it compels the result we reach (*see, Michigan v. Long,* 463 U.S. 1032, 1038, n. 4, 1041–1042, 103 S.Ct. 3469, 3475, n. 4, 3476–3477, 77 L.Ed.2d 1201).

First and foremost, we look to our State law because of the nature of the issue in controversy—liberty of the press— where this State has its own exceptional history and rich tradition (*see,* discussion, at 249, at 913 of 566 N.Y.S.2d, at 1277 of 567 N.E.2d, *supra* ). While we look to the unique New York State constitutional text and history, our analysis also is informed by the common law of this State. It has long been our standard in defamation actions to read published articles in

context to test their effect on the average reader, not to isolate particular phrases but to consider the publication as a whole (*see, e.g., James v. Gannett Co.,* 40 N.Y.2d 415, 419–420, 386 N.Y.S.2d 871, 353 N.E.2d 834; *Julian v. American Business Consultants,* 2 N.Y.2d 1, 14–15, 155 N.Y.S.2d 1, 137 N.E.2d 1, *supra* ).

Second, we are mindful not only of our role in the Federal system but also of our responsibility to settle the law of this State. As has been observed, *Milkovich* may leave an area of uncertainty for future litigation, with courts and authors in the interim lacking clear guidance regarding the opinion privilege; while all of the Supreme Court Justices agreed on the rule, they differed sharply as to how the rule should be applied. If we again assume the identity of State and Federal law, and assume that *Milkovich* has effected no change in the law, we perpetuate the uncertainty in our State law. Moreover, we are concerned that—if indeed "type of speech" is to be construed narrowly—insufficient protection may be accorded to central values protected by the law of this State. We would begin the analysis—just as we did previously in this case, and just as we did in *Steinhilber,* 68 N.Y.2d, at 293, 508 N.Y.S.2d 901, 501 N.E.2d 550, *supra* —with the content of the whole communication, its tone and apparent purpose. That is a clear and familiar standard that in our view properly balances the interests involved. It has been consistently applied throughout the State for several years, following State common law and following *Steinhilber.*

Finally, the case comes to us in the posture of a summary judgment motion, which searches the record and presents only issues of law. The State law issues have now been fully briefed, and there are no factual questions to be resolved. As the Supreme Court noted in *Milkovich,* the Ohio court remains **\*251** free, on remand some 15 years after the challenged article, to address State law issues (497 U.S., at ——, 110 S.Ct., at 2702, n. 5, *supra*); were this case to be heard by the Supreme Court and reversed, that would be equally true on a further remand to this Court. In view of **1279 ***915** the costly,[4] sizeable record already amassed, including hundreds of pages of briefs, no purpose is served by compelling *these* parties, on *this* record and *these* briefs, to consider another trip to Washington, with the prospect that State law review before this Court would ultimately be available.

None of the concerns expressed in the Simons concurrence persuade us that the requested State law review should be deferred or denied.

Case 1:25-cv-03552-JLR Document 162-3 Filed 03/12/26 Page 137 of 230

Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235 (1991)
567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

*Any* independent State law activity in one sense can frustrate the pronouncement of Federal law. In another sense, however, State constitutional law review—which is a responsibility of State courts and a strength of our Federal system—advances the process of pronouncing Federal law; a State can act as a "laboratory" in more ways than one, as indeed Justice Brandeis recognized in *New State Ice Co. v. Liebmann* in his reference to State statutes (285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 [dissenting]; *see also, Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, *especially,* at 82, n. 1, 106 S.Ct. at 1715, n. 1). By the same token, Federal cases, including Supreme Court cases—even *Milkovich* itself—can act as a source of guidance for State courts in formulating State law, even though interpretation of those cases in State law decisions reached on adequate and independent State grounds will be unreviewable by the Supreme Court (*see, Michigan v. Long,* 463 U.S., at 1041, 103 S.Ct., at 3476, *supra*).

In analyzing cases under the State Constitution, this Court has not wedded itself to any single methodology, recognizing that the proper approach may vary with the circumstances (*see, e.g., Rivers v. Katz,* 67 N.Y.2d 485, 504 N.Y.S.2d 74, 495 N.E.2d 337 [primacy method]; *People v. Stith,* 69 N.Y.2d 313, 316, n. *, 514 N.Y.S.2d 201, 506 N.E.2d 911 [dual method]; *People ex rel. Arcara v. Cloud Books,* 68 N.Y.2d 553, 510 N.Y.S.2d 844, 503 N.E.2d 492, *supra* [interstitial method]). Several times recently we have pointedly rested our decisions on both Federal and independent State constitutional grounds (*see, e.g., O'Neill v. Oakgrove Constr.,* 71 N.Y.2d, at 528, 528 N.Y.S.2d 1, 523 N.E.2d 277, *supra; People v. Stith, supra*).

That analysis is particularly appropriate here because of the unusual procedural posture of the case. The Supreme Court **\*252** has specifically directed us to consider the case in light of *Milkovich,* and we comply with that direction, as courts throughout the Nation have done in similar circumstances (*see, e.g., People v. Duncan,* 124 Ill.2d 400, 125 Ill.Dec. 265, 530 N.E.2d 423 [1988]). But that does not compel us to ignore our prior decision or the arguments fully presented on remand that provide an alternative basis for resolving the case (*see,* Hellman, *Granted, Vacated, and Remanded—Shedding Light on a Dark Corner of Supreme Court Practice,* 67 Judicature 389, 394–395 [1984]).[5] Turning **\*\*1280 \*\*\*916** our back on the now developed, controlling State law issues would be no service to the Supreme Court, or the litigants, or the law of this State.

**[6]** We therefore proceed to resolve this case independently as a matter of State law, concluding that—as we previously held in *Immuno*—the standard articulated and applied in *Steinhilber* furnishes the operative standard in this State for separating actionable fact from protected opinion.

B.

Letters to the editor, unlike ordinary reporting, are not published on the authority of the newspaper or journal. In this case, for instance, defendant's prefatory Editorial Note signaled that the letter was to be given only the weight its readers chose to accord McGreal's views; such reservations may be generally understood even when letters are not accompanied by any editorial note. Thus, any damage to reputation **\*253** done by a letter to the editor generally depends on its inherent persuasiveness and the credibility of the writer, not on the belief that it is true because it appears in a particular publication.

Significantly, for many members of the public, a letter to the editor may be the only available opportunity to air concerns about issues affecting them. A citizen troubled by things going wrong "should be free to 'write to the newspaper': and the newspaper should be free to publish [the] letter. It is often the only way to get things put right." (*Slim v. Daily Tel.,* [1968] 1 All ER 497, 503, quoted in *Pollnow v. Poughkeepsie Newspapers,* 107 A.D.2d 10, 16, 486 N.Y.S.2d 11 [Titone, J.], *aff'd on other grounds,* 67 N.Y.2d 778, 501 N.Y.S.2d 17, 492 N.E.2d 125.) The availability of such a forum is important not only because it allows persons or groups with views on a subject of public interest to reach and persuade the broader community but also because it allows the readership to learn about grievances, both from the original writers and from those who respond, that perhaps had previously circulated only as rumor; such a forum can advance an issue beyond invective. Finally, at the least, the public may learn something, for better or worse, about the person or group that wrote such a letter (*see,* Franklin, *Libel and Letters to the Editor: Toward an Open Forum,* 57 U.Colo.L.Rev. 651, 663–664 [1986]). Thus, in determining how the average person would view McGreal's letter, we take into account that it is a letter to the editor and that "[t]he common expectation of a letter to the editor is not that it will serve as a vehicle for the rigorous and comprehensive presentation of factual matter but as one principally for the expression of individual opinion." (145 A.D.2d, at 129, 537 N.Y.S.2d 129.)

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 138 of 230

Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235 (1991)
567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

Passing from the broader social setting to the immediate context of the letter, we note that the common expectation regarding letters to the editor has particular pertinence here.

As the Appellate Division observed, the Journal of Medical Primatology is directed to a highly specialized group of readers—medical doctors, researchers and the medical and science libraries of academic institutions. The average reader is thus likely not a novice in the field of medical primatology, but brings "a well-developed understanding of the issues facing biomedical researches using primates as research subjects." (145 A.D.2d, at 129, 537 N.Y.S.2d 129.) The prefatory Note additionally called particular attention to the circumstances surrounding the letter, pointing up that this was McGreal's view, and that **\*254** plaintiff's attorneys considered her statements to be "wholly inaccurate and reckless" and "not a fair comment" on plaintiff's proposed project.

The letter itself related to a public controversy regarding use of live animals belonging to endangered species, including chimpanzees, in animal experimentation and research. McGreal (a known animal rights activist) and IPPL (whose very name broadcasts its point of view) were fully identified to readers of the letter. The letter made clear that its purpose was to voice the conservationist concerns of this partisan group in order "to draw this situation to the attention of interested parties." **\*\*1281** **\*\*\*917** Thus, like the broader social setting of McGreal's letter, the immediate context of the letter, together with the prefatory Note, would induce the average reader of this Journal to look upon the communication as an expression of opinion rather than a statement of fact, even though the language was serious and restrained.

 **[7]**    Given the purpose of court review—to determine whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff—we believe that an analysis that begins by looking at the content of the whole communication, its tone and apparent purpose (*Steinhilber v. Alphonse,* 68 N.Y.2d, at 293, 508 N.Y.S.2d 901, 501 N.E.2d 550, *supra* ) better balances the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions, and finds them actionable unless couched in loose, figurative or hyperbolic language in charged circumstances (*see generally,* Note, *Fact and Opinion in Defamation: Recognizing the Formative Power of Context,* 58 Fordham L.Rev. 761 [1990] ). A media defendant surely has no license

to misportray facts; false statements are actionable when they would be perceived as factual by the reasonable person. But statements must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying *any* facts.

 **[8]**    The difference is more than theoretical. In the present case, for example, we conclude that what plaintiff now characterizes as the "core premise" of the IPPL letter both expressed and implied statements of fact that, if shown to be false (which they were not), would be actionable. That is true as well of other factual reference points considered by the Appellate Division and held to be lacking in demonstrated falsity. Our State law analysis of the remainder of the letter, however, **\*255** would not involve the fine parsing of its length and breadth that might now be required under Federal law for speech that is not loose, figurative or hyperbolic (*see, e.g., Unelko Corp. v. Rooney,* 912 F.2d 1049 [9th Cir.] ). Isolating challenged speech and first extracting its express and implied factual statements, without knowing the full context in which they were uttered, indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context.

 **[9]**    We conclude that the body of the letter in issue communicated the accusations of a group committed to the protection of primates, and that the writer's presumptions and predictions as to what "appeared to be" or "might well be" or "could well happen" or "should be" would not have been viewed by the average reader of the Journal as conveying actual facts about plaintiff. It may well be, for example, that McGreal's statements regarding plaintiff's motivations —if studied long enough in isolation—could be found to contain implied factual assertions, but viewed as IPPL's letter to the editor, it would be plain to the reasonable reader of this scientific publication that McGreal was voicing no more than a highly partisan point of view.

Thus, we conclude that an approach that takes into account the full context of challenged speech, as previously set forth in *Immuno* and *Steinhilber,* accords with the central value of assuring "full and vigorous exposition and expression of opinion on matters of public interest." (*Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 384, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456.)

The public forum function of letters to the editor is closely related in spirit to the "marketplace of ideas" and oversight

and informational values that compelled recognition of the privileges of fair comment, fair report and the immunity accorded expression of opinion. These values are best effectuated by according defendant some latitude to publish a letter to the editor on a matter of legitimate public concern—the letter's author, affiliation, bias and premises fully disclosed, rebuttal openly invited—free of defamation litigation. A publication that provides a forum for such statements on controversial matters is not acting **1282 ***918 in a fashion "at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected" (*Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125), but to the contrary is fostering those very values.

*256 Finally, we reaffirm our regard for the particular value of summary judgment, where appropriate, in libel cases (*see, Karaduman v. Newsday, Inc.,* 51 N.Y.2d 531, 545, 435 N.Y.S.2d 556, 416 N.E.2d 557). Indeed, this is an additional ground for preferring the independent State law approach to one that might make summary disposition less likely (*see, Milkovich v. Lorain Journal Co.,* 497 U.S., at ——, 110 S.Ct., at 2698, *supra; see also, Florida Med. Center v. New York Post Co.,* 568 So.2d 454 [Fla.Dist.Ct.App.] ). The chilling effect of protracted litigation can be especially severe for scholarly journals, such as defendant's, whose editors will likely have more than a passing familiarity with the subject matter of the specialized materials they publish. If required as to every line of a reader's expressed viewpoint to meet the standard of *Chapadeau v. Utica Observer–Dispatch,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569, they may as a practical matter have little alternative to lengthy litigation or substantial settlement. In such instances, hypertechnical parsing of a possible "fact" from its plain context of "opinion" loses sight of the objective of the entire exercise, which is to assure that—with due regard for the protection of individual reputation—the cherished constitutional guarantee of free speech is preserved.[6]

*257 Accordingly, upon reargument, following remand by the Supreme Court of the United States, we again conclude that the order of the Appellate Division should be affirmed, with costs.

SIMONS, Judge (concurring).

This case is before us on remand from the Supreme Court of the United States for reconsideration in view of its intervening decision in **1283 ***919 *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1. After reconsideration, the majority has affirmed an order granting summary judgment to defendant. I agree with it that judgment was properly awarded on Federal grounds. In reconsidering the case, however, the majority has rendered an interpretation of *Milkovich* which is narrower than necessary to resolve the matter before us and one which appears, from statements in the *Milkovich* opinions, to be far more constricted than the Supreme Court intended. My purpose in writing is not to resolve these differences over the scope of the protection afforded by *Milkovich.* Only the Supreme Court can do that. My concern is that the Supreme Court will not have the opportunity to do so in this case because the majority has foreclosed review by also resting its decision on independent State grounds (*see, Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201). I do not agree with the procedure followed, particularly in the circumstances of this case, and I find the majority's reasoning supporting the two theories inconsistent. Accordingly, I cannot join in the opinion of the Court.

I

In pre–*Milkovich* decisions, the Federal and State courts had generally concluded that statements of opinion were protected from libel actions by the First Amendment. These holdings were based in large part on the statement of Justice Powell that "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we *258 depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789.) Despite the sweep of that language, State and lower Federal courts recognized that *Gertz* had not created a blanket exemption for defamatory words merely because they were labeled as "opinion" (*see, Steinhilber v. Alphonse,* 68 N.Y.2d 283, 289–292, 508 N.Y.S.2d 901, 501 N.E.2d 550; *Cianci v. New Times Publ. Co.,* 639 F.2d 54, 61, quoted in *Milkovich v. Lorain Journal Co.,* 497 U.S., at ——, 110 S.Ct., at 2705, 111 L.Ed.2d, at 17). False factual accusations could easily be couched in the language of opinion. Thus, the courts quickly devised methods of distinguishing actionable statements of fact from nonactionable statements of opinion. The test was divided into various methods of determining whether the statements conveyed a precise meaning which could be characterized as true or false and, if the words were ambiguous, by resolving the ambiguity after an examination on the context in which the statements appeared (*see, Ollman*

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 140 of 230

Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235 (1991)
567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

*v. Evans,* 750 F.2d 970, 976, *cert. denied* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278; *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 292, 508 N.Y.S.2d 901, 501 N.E.2d 550, *supra* ).

The Supreme Court addressed the issue directly for the first time in *Milkovich,* holding that there is no separate constitutional privilege for statements that might be labeled "opinion". The Court recognized that statements on matters of public concern must be provable as false before they are actionable and that requires a determination of whether they are matters of opinion or fact. Matters of public concern which do not contain a "provably false factual connotation" receive full constitutional protection (*id.,* 497 U.S., at ——, 110 S.Ct., at 2706, 111 L.Ed.2d, at 18). Next, the Court recognized protection for statements that cannot "reasonably [be] interpreted as stating actual facts" about an individual (*Hustler Mag. v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41). Avoiding literal definitions, the Court stated that prior case law required an examination of the "circumstances" in which the statement was made (*Milkovich v. Lorain Journal Co., supra,* 497 U.S. at ——, 110 S.Ct. at 2704, 111 L.Ed.2d, at 16; *see, Hustler Mag. v. Falwell, supra; Greenbelt Publ. Assn. v. Bresler,* 398 U.S. 6, 13, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6; *Letter Carriers v. Austin,* 418 U.S. 264, 284–286, 94 S.Ct. 2770, 2781–2782, 41 L.Ed.2d 745). This "assur [es] that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation" (*Milkovich v. Lorain Journal* **\*\*1284   \*\*\*920** *Co.,* 497 U.S., at ——, 110 S.Ct., at 2706, 111 L.Ed.2d, at 19).

It can be argued that the *Milkovich* decision did not change **\*259** the law of defamation as it was previously applied by State and lower Federal courts. Justice Brennan did not believe it had and it is notable that the majority did not take exception to his observation that the Court had merely restated the law "lower courts have been relying on for the past decade" (*see, Milkovich v. Lorain Journal Co., supra,* at ——, 110 S.Ct., at 2709, 111 L.Ed.2d, at 21 [Brennan, J., dissenting] ). His view is shared by others (*see, e.g., The Supreme Court, 1989 Term—Leading Cases,* 104 Harv.L.Rev. 219, 223). Justice Brennan's disagreement with the result was based simply upon the application of the rule, i.e., what a "reasonable reader" would have understood the statements in *Milkovich* to mean. The majority believed that the challenged statements could be interpreted as either stating or implying defamatory facts; Justices Brennan and Marshall believed that they could not.

II

The majority holds in the first part of its opinion, considering plaintiff's claim under the Federal Constitution, that summary judgment was properly granted to defendant. It then asserts that *Milkovich* creates "uncertainty" as to whether the "context" of a statement may be considered and interprets *Milkovich* as stating a rule which protects opinion only in "special situations" involving "loose, figurative, hyperbolic language" (majority opn., at 245, at 911 of 566 N.Y.S.2d, at 1275 of 567 N.E.2d). Thus, after resolving plaintiff's claim under the Federal Constitution, the majority reopens the issue with its interpretation as justification for its additional ruling on State constitutional grounds recognizing a greater importance for context.

Context is not controlling in this case, however, under either the majority's narrow view of *Milkovich* or our State rules. The Appellate Division, in a unanimous 27–page analysis of plaintiff's claims stated that, for the most part, the McGreal letter was a constitutionally protected expression of opinion. To the extent the court identified unambiguous assertions of fact, it found that they had not been proven false—or indeed were demonstrably true—and therefore ruled that plaintiff failed to meet its burden of proof (*see, Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783). We accepted its conclusion when the case was first before us and the majority again accepts it for the purpose of deciding the Federal question (*see,* **\*260** majority opn., at 245–246, 248, n. 3, at 911–912, 913, n. 3 of 566 N.Y.S.2d, at 1275–1276, 1277, n. 3 of 567 N.E.2d).[1] Thus, plaintiff's claims fail regardless of the "circumstances" or "context" in which the alleged defamatory words appear.

Nevertheless, the majority proceeds to examine the context of the statements under the State Constitution because a different conclusion could conceivably emerge under *Milkovich* (majority opn., at 248, n. 3, at 913, n. 3 of 567 N.Y.S.2d, at 1277, n. 3 of 566 N.E.2d). If certain statements in the McGreal letter alleged to be defamatory may be actionable after *Milkovich* the majority should identify them in its discussion of the Federal claim and deny summary judgment. That is the request made of us by the Supreme Court: examine plaintiff's defamation claim in light of *Milkovich* and determine if a cause of action is stated. The majority has failed to do so, however, hypothesizing that some unspecified statement may be actionable unless considered in context under a broad State rule permitting such evaluation. Its

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**\*\*1285 \*\*\*921** grant of summary judgment on Federal grounds, based on a narrow view of *Milkovich* in which context is not controlling, is inconsistent with the discussion on State law in which context becomes critical. It leaves both grounds for the decision suspect and seriously impairs the credibility of the Court's analysis.

III

Aside from these considerations, there are several institutional concerns which should be addressed.

This Court, as the highest court in the State, is primarily concerned with the institutional function of declaring and applying constitutional and common-law principles, authoritatively interpreting statutes and formulating policy on issues of State-wide concern. When the Court reviews a question of Federal constitutional law, however, it acts as part of a larger judicial system embracing not only New York but the Nation as a whole. When Federal questions are presented, its institutional functions are subordinated to the Supreme Court and it **\*261** acts, in effect, as an intermediate court. Notwithstanding this different role, it is important that State courts participate in the Nation's court structure. They have much to contribute to the Supreme Court's determination of Federal law by addressing the issues thoroughly and persuasively and providing local perspectives for the development of constitutional rules (*see, Johnson v. Louisiana,* 406 U.S. 356, 376, 92 S.Ct. 1620, 1641, 32 L.Ed.2d 152; *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 [Brandeis, J., dissenting] ). Inasmuch as the Supreme Court is charged with the ultimate responsibility for pronouncing Federal law, however, it should be given the opportunity to accept, modify or reject a State court's determination of what the Federal Constitution requires.

Our unnecessary reliance on State law in this case frustrates that process. Under general principles, Supreme Court jurisdiction to review a Federal question fails if the decision of the State court is also based on adequate and independent State grounds (*see, Michigan v. Long,* 463 U.S., *supra,* at 1038, n. 4, 1041–1042, 103 S.Ct., at 3475, n. 4, 3476–3477; *Fox Film Corp. v. Muller,* 296 U.S. 207, 210, 56 S.Ct. 183, 184, 80 L.Ed. 158; *cf., Delaware v. Prouse,* 440 U.S. 648, 651–653, 99 S.Ct. 1391, 1394–1396, 59 L.Ed.2d 660; *and see, Ohio v. Johnson,* 467 U.S. 493, 499, 104 S.Ct. 2536, 2540, 81 L.Ed.2d 425; Comment, *Ohio v. Johnson: The Continuing Demise of the Adequate and Independent State Ground Rule,* 57 U.Colo.L.Rev. 395, 416). The Supreme Court will not review the matter because it can no longer control the litigation; its decision would constitute merely an advisory opinion. The State court's pronouncements on Federal law, correct or not, thus become judicial dictum because they are not the dispositive reasons for the Court's decision.

Resting the decision on dual grounds also violates established rules of judicial restraint. Traditional doctrine holds that a court should decide no more than necessary to resolve the dispute before it. Constitutional questions should be avoided if possible (*see, Communist Party v. Catherwood,* 367 U.S. 389, 392, 81 S.Ct. 1465, 1467, 6 L.Ed.2d 919; *People v. Felix,* 58 N.Y.2d 156, 161, 460 N.Y.S.2d 1, 446 N.E.2d 757; *Matter of Beach v. Shanley,* 62 N.Y.2d 241, 254, 476 N.Y.S.2d 765, 465 N.E.2d 304). The practice of deciding a case on dual grounds, thereby insulating the Federal question from Supreme Court review has been described as "illegitimate" (*see,* Bice, *Anderson and the Adequate State Ground,* 45 S.Cal.L.Rev. 750, 757; Collins, *The Once "New Judicial Federalism" and Its Critics,* 64 Wash.L.Rev. 5, 7 [quoting Bice and criticisms of the California Supreme Court's practice of dualism by various public officials] ). It is said to be not only contrary to the general rules underlying judicial restraint but also a perversion of the "new federalism", pushing State **\*262** constitutional power beyond its proper limits by purporting to state Federal law but insulating the analysis from review by the Supreme Court. The inevitable consequence of dual reliance is that the Supreme Court, charged with ultimate authority in the area, loses a measure of control over the law it has created. To the extent that **\*\*1286 \*\*\*922** we declare Federal law but foreclose review, we undermine the Supreme Court's institutional role, denying it the opportunity to harmonize divergent State court decisions or speak on issues it deems important. The result is much the same as if the four departments of the Appellate Division were to frustrate us in the performance of our institutional responsibilities by deciding State constitutional law issues and then, by procedural means, foreclosing our review of their decisions.

Whether criticisms of the practice of dual reliance are justified as a general proposition, they are valid when the procedure followed in this case is considered.[2] Our original decision contained no statement that it rested on independent State grounds (*see,* 74 N.Y.2d 548, 549 N.Y.S.2d 938, 549 N.E.2d 129). With the case in that posture, the Supreme Court

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 142 of 230

Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235 (1991)
567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

granted certiorari, indicating its desire to pass on the issues of Federal law and, as a matter of comity, remitted the case to us before ruling so that we might reconsider it in light of the intervening *Milkovich* decision. We have reviewed the appeal and concluded that under *Milkovich* the plaintiff has failed to satisfy its burden of proving defamation. The majority does not stop there, however. Having previously invited Supreme Court review by **\*263** failing to rest our decision on independent State grounds, it now changes course and blocks that review by asserting them.

The majority contends this procedure is warranted by concerns of finality and judicial economy. Those are practical concerns present in every case. They rarely justify overriding established rules of judicial restraint and they should hardly control the decision-making process in this case. If the law was such that plaintiff could prevail on Federal grounds but could not prevail on State grounds, then resort to the protection afforded by our State Constitution might be justified. But plaintiff has no cause of action on Federal grounds, even with the narrow protection the majority accords defendant under *Milkovich.* If, notwithstanding this holding, we had proceeded in our Federal analysis to examine the role of context in opinion cases it would represent inexcusable dictum because it would not control the outcome of the case. It becomes no less so because the discussion is cast in terms of State law.

The result of reaching both State and Federal grounds is that the discussion of Federal law, under Supreme Court precedent, is dictum because we have relied on independent State grounds. Conversely, the discussion of State grounds is largely dictum because context is not controlling in this case. The process is not in keeping with our institutional responsibility to provide stability and certainty in the development of law.

Accordingly, I concur for affirmance solely on the ground that the plaintiff's claims are not actionable under the holding in *Milkovich v. Lorain Journal Co. (supra).*

TITONE, Judge (concurring).

As do each of the other six members of this Court, I concur in the conclusion that **\*\*1287  \*\*\*923** plaintiff has not established an actionable defamation and that, accordingly, its complaint was properly dismissed. I also join in many of the concerns addressed in Judges Simons's and Hancock's concurrences about the propriety and wisdom of deciding this appeal on alternative State and Federal constitutional

analyses. Judge Simons's extended discussion of the apparent inconsistency in the majority's two-part analysis, as well as his review of the jurisprudential considerations militating against the majority's use of the "dual" approach in this case, are thorough and persuasive, and require no further elaboration here.[*] Nonetheless, I have chosen to write separately because, **\*264** in my view, the controlling legal principles should, at least in the first instance, be derived from State, rather than Federal, law.

Even if, as the majority's opinion suggests, the Supreme Court's recent decision in *Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1* has changed the contours of what is actionable under the Federal Constitution (*but see,* 497 U.S., at ——, 110 S.Ct., at 2708–2709, *supra* [Brennan, J., dissenting]; *see also,* concurring opns. per Simons, J., at 258–259, at 919–920 of 566 N.Y.S.2d, at 1283–1284 of 567 N.E.2d, Hancock, Jr., J., at 268, at 926 of 566 N.Y.S.2d, at 1290 of 567 N.E.2d), its over-all significance for our present purposes should not be overestimated. *Milkovich* and its predecessor *Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789,* merely established and shaped the constitutional floor below which State defamation rules may not fall (*see, People ex rel. Arcara v. Cloud Books, 68 N.Y.2d 553, 557, 510 N.Y.S.2d 844, 503 N.E.2d 492; see also,* Kaye, *Dual Constitutionalism in Practice and Principle, 61 St. John's L.Rev. 399, 403).* As such, they simply delineated the limitations imposed by the First Amendment on the State-derived common-law rights of defamation plaintiffs. There is nothing in *Milkovich* or any of the related cases that impairs the States' power to impose additional limitations, based on either their own Constitutions or the traditions underlying their previously established common-law doctrines (*see, e.g., PruneYard Shopping Center v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741).*

Thus, our first obligation as a State common-law court is to determine whether the dismissal of this plaintiff's complaint is consistent with our State's common-law and constitutional defamation rules. Resolution of this question is, in my view, a necessary and logically prior step that must be taken before any Federal constitutional issue is considered. As one State court has aptly observed: "The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim. This is required, not for the sake either of parochialism or of style, but because the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law" **\*265** (*Sterling v. Cupp, 290 Or. 611,*

614, 625 P.2d 123, 126, quoted in *Massachusetts v. Upton,* 466 U.S. 727, 736, 104 S.Ct. 2085, 2090, 80 L.Ed.2d 721 [Stevens, J., concurring]; *accord, State v. Badger,* 141 Vt. 430, 448, 450 A.2d 336, 347 ["(f)ufillment of this Court's responsibilities as a member of the federalist system requires us to consider the availability of state grounds before federal appeal"] ).

Under our system of federalism, the State courts have both the privilege and the responsibility of enunciating the State's law and providing the first line of protection for the people's liberties. "It is also important that state judges do not unnecessarily invite [the Supreme Court] to undertake review of state-court judgments" **1288 ***924 (*Massachusetts v. Upton, supra,* 466 U.S. at 737, 104 S.Ct. at 2090 [Stevens, J., concurring] ).

With these principles in mind, I would decide this case solely by reference to New York State law, specifically its *common-law* defamation precepts. Indeed, in this State there exists a pre-*Gertz* body of case law that remains untouched by *Milkovich* and provides an ample framework for resolving the issue placed before us on this remand.

As this Court observed the first time this case was before it, the roots of the modern, constitutionally based opinion privilege lie in the common-law doctrine according a qualified privilege to "fair comment" (74 N.Y.2d, at 555, 549 N.Y.S.2d 938, 549 N.E.2d 129). This doctrine has existed as part of New York's common law of defamation, albeit in cramped form, since at least 1840, when a journalist named Stone was sued for his vitriolic denunciation of a book authored by James Fenimore Cooper (*Cooper v. Stone,* 24 Wend. 434; *see also, Bingham v. Gaynor,* 203 N.Y. 27, 96 N.E. 84; *Triggs v. Sun Print. & Publ. Assn.,* 179 N.Y. 144, 71 N.E. 739; *Hamilton v. Eno,* 81 N.Y. 116). By 1930, this Court had unequivocally stated that "[e]very one has a right to comment on matters of public interest and concern, provided he does so fairly and with an honest purpose." (*Hoeppner v. Dunkirk Print. Co.,* 254 N.Y. 95, 99, 172 N.E. 139.) And, by the latter half of the twentieth century, the "fair comment" doctrine was being applied expansively so as to make New York's common-law defamation rules consistent with the State and Federal constitutional guarantees of free speech, as well as with the value that society places on the open and free exchange of ideas (*see, e.g., Julian v. American Business Consultants,* 2 N.Y.2d 1, 155 N.Y.S.2d 1, 137 N.E.2d 1; *see also, Cole Fisher Rogow, Inc. v. Carl Ally, Inc.,* 25 N.Y.2d 943, 305 N.Y.S.2d 154, 252 N.E.2d 633).

To be sure, when *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 and its progeny introduced a constitutional dimension into the law of defamation, judicial attention shifted away **266** from the evolving common-law "fair comment" privilege and, in its stead, a parallel body of constitutional case law premised on the dictum in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, *supra,* was developed (*see, e.g., Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299), culminating in our Court's recent decisions in *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550 and this case (74 N.Y.2d 548, 549 N.Y.S.2d 938, 549 N.E.2d 129, *supra*). However, now that *Gertz* has proven to be a false lead, we may, without serious difficulty, retrace our steps and pick up the path where we left it when *Gertz* was decided. Such a course would lead to essentially the same conclusion that the majority has reached, i.e., that the statements plaintiff challenges are not actionable.

As was true of the line of cases built upon *Gertz v. Robert Welch, Inc. (supra),* the central concern of the "fair comment" cases was to protect both "the right to comment on public affairs" and "the public's access to important information" (*see, Immuno AG. v. Moor–Jankowski,* 74 N.Y.2d 548, 556, 549 N.Y.S.2d 938, 549 N.E.2d 129, *supra* ). In furtherance of that concern, it is highly appropriate to consider the context, tone and character of a statement challenged as defamatory when determining whether it constitutes a privileged "fair comment" or an actionable assertion of fact. Indeed, our common-law cases have often included references to reading the challenged work "as a whole" and in their proper context (*e.g., James v. Gannett Co.,* 40 N.Y.2d 415, 419–420, 386 N.Y.S.2d 871, 353 N.E.2d 834; *Julian v. American Business Consultants,* 2 N.Y.2d 1, 14–15, 155 N.Y.S.2d 1, 137 N.E.2d 1, *supra* ). The majority's current rationale, which emphasizes "the content of the whole communication, its tone and apparent purpose" (majority opn., at 254, at 917 of 566 N.Y.S.2d, at 1281 of 567 N.E.2d), fits easily and neatly within this analytical framework.

The approach I advocate—considering State common-law principles before looking **1289 ***925 to the State Constitution's strictures—is particularly apt in this context, where the cause of action and the corresponding rights and duties of the parties are themselves creatures of the common law. In most of our prior decisions holding a State constitutional provision to be more protective of individual

liberties than its Federal counterpart, the particular right at issue had no source at all other than constitutional law. In *People v. Griminger,* 71 N.Y.2d 635, 529 N.Y.S.2d 55, 524 N.E.2d 409, *People v. P.J. Video,* 68 N.Y.2d 296, 508 N.Y.S.2d 907, 501 N.E.2d 556; *People v. Class,* 67 N.Y.2d 431, 503 N.Y.S.2d 313, 494 N.E.2d 444 and *People v. Bigelow,* 66 N.Y.2d 417, 497 N.Y.S.2d 630, 488 N.E.2d 451, for example, we were called upon to decide the scope of the rights conferred by article I, § 12 of our State Constitution where the only other possible source of the protection was the Fourth Amendment to the Federal Constitution —and that source had been ruled **\*267** unavailable (*cf., People v. Johnson,* 66 N.Y.2d 398, 497 N.Y.S.2d 618, 488 N.E.2d 439; *see also, People ex rel. Arcara v. Cloud Books,* 68 N.Y.2d 553, 510 N.Y.S.2d 844, 503 N.E.2d 492, *supra* [constitutional free speech guarantee]; *People v. Bethea,* 67 N.Y.2d 364, 502 N.Y.S.2d 713, 493 N.E.2d 937 [constitutional privilege against self-incrimination]; *Sharrock v. Dell Buick–Cadillac,* 45 N.Y.2d 152, 408 N.Y.S.2d 39, 379 N.E.2d 1169 [constitutional due process guarantee]; *People v. Hobson,* 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 [constitutional right to counsel guarantee] ). In such circumstances, there is no choice but to invoke the State Constitution, and we properly did not hesitate to do so.

Here, in contrast, the controversy concerns the scope of, and restrictions upon, private rights whose immediate source is a judicially created common-law cause of action, i.e., defamation. In this context, it seems more than a little anomalous to leap directly to an inquiry into what the State Constitution forbids. Implicit in such an inquiry is the assumption that were it not for the constitutional restraints, the law would permit what is determined to be constitutionally forbidden. While such an approach may be required when the court is called upon to enforce an unambiguous rule established by another branch of government, such as a legislative enactment, it seems out of place when the rule to be enforced is a common-law rule *of the courts' own making.* In the latter circumstance, the sounder approach is to simply shape the common-law rule so as to avoid a constitutional clash. Such an approach is particularly appropriate in an area where, as here, the common law has not developed and hardened to the point where a constitutionally compatible rule is foreclosed by clear precedent.

Whether we use common-law principles to "inform" our constitutional analysis (majority opn., at 250, at 914 of 566 N.Y.S.2d, at 1278 of 567 N.E.2d) or instead reverse that order of priority as I suggest (*see also, People v. Conyers,*

52 N.Y.2d 454, 438 N.Y.S.2d 741, 420 N.E.2d 933) is not merely a matter of semantics. The approach I suggest has the advantage of being in harmony with the well-established principle that courts should avoid passing upon constitutional questions when the case can be disposed of in another way (*e.g., Matter of Beach v. Shanley,* 62 N.Y.2d 241, 254, 476 N.Y.S.2d 765, 465 N.E.2d 304; *People v. Felix,* 58 N.Y.2d 156, 161, 460 N.Y.S.2d 1, 446 N.E.2d 757). It also avoids a problem I have previously mentioned in connection with constitutionally based decision making, i.e., the practical difficulty of reversing or modifying the rule that the judiciary has adopted (*see,* Titone, *State Constitutional Interpretation: The Search for an Anchor in a Rough Sea,* 61 St. John's L.Rev. 431, 439, and n. 39; *see also,* Maltz, *The Dark Side of State Court Activism,* 63 Tex.L.Rev. 995, 1000).

**\*268** In summary, I agree with the majority's ultimate conclusion that the statements contained in the McGreal letter do not constitute express or implied assertions of fact and are therefore not actionable under our State's law. That conclusion, for me, ends the inquiry. Accordingly, I vote to affirm the decision below dismissing plaintiff's complaint.

**\*\*1290 \*\*\*926** HANCOCK, Judge (concurring).

I agree with Judge Simons (concurring opn., part II) that this appeal is properly resolved under *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 without addressing the issue of context. Were a discussion of this issue warranted, however, I would hold that nothing in *Milkovich* suggests that the Supreme Court has altered its attitude toward the context of and circumstances surrounding written or spoken words as an obvious and ordinarily indispensable consideration in deciding the legal question "of what the average person hearing or reading the [words] would take [them] to mean" (*Steinhilber v. Alphonse,* 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 501 N.E.2d 550). On the contrary, the majority's opinion in *Milkovich* and its discussion of the "context" cases (*see particularly, Greenbelt Publ. Assn. v. Bresler,* 398 U.S. 6, 13–14, 90 S.Ct. 1537, 1541–1542, 26 L.Ed.2d 6; *Letter Carriers v. Austin,* 418 U.S. 264, 284–286, 94 S.Ct. 2770, 2781–2782, 41 L.Ed.2d 745; *Hustler Mag. v. Falwell,* 485 U.S. 46, 53–57, 108 S.Ct. 876, 880–883, 99 L.Ed.2d 41) as well as Justice Brennan's dissenting opinion in *Milkovich* (*see particularly,* 497 U.S., at ——, 110 S.Ct., at 2708–2710) lead me to the conclusion that context continues as a factor of undiminished significance and that the Federal law as summarized in *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 289–292, 508 N.Y.S.2d 901, 501 N.E.2d 550, *supra* ) is essentially unchanged (*accord, The Supreme Court, 1989*

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 145 of 230

Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235 (1991)
567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

*Term—Leading Cases,* 104 Harv.L.Rev. 219, 223; *see also,* concurring opn. of Simons, J., at 258–259, at 919–920 of 566 N.Y.S.2d, at 1283–1284 of 567 N.E.2d).

There are cases, in my opinion, where basing a decision on both Federal and State constitutional grounds may be entirely appropriate. For the reasons stated by Judge Simons (concurring opn., at 262–263, at 921–922 of 566 N.Y.S.2d, at 1285–1286 of 567 N.E.2d), however, I am persuaded that this is not such a case. Accordingly, I would affirm solely on the ground that plaintiff has no cause of action under Federal law.

WACHTLER, C.J., and ALEXANDER and BELLACOSA, JJ., concur with KAYE, J.

SIMONS, TITONE and HANCOCK, JJ., concur in result in separate opinions.

Upon reargument, following remand by the Supreme Court of the United States, order affirmed, with costs.

### All Citations

77 N.Y.2d 235, 567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

Footnotes

1    The letter defendant actually sent to plaintiff enclosed the McGreal letter, noting that "if the allegations in her letter can be proved to us to be incorrect we will return the letter to Dr. McGreal declining its publication." It further noted "past results of interventions" by McGreal regarding animal exportation and experimentation programs in India, Bangladesh and elsewhere, and that "[i]t is the policy of the Journal to allow all the concerned parties to take a position in a controversial matter."

2    In Milkovich's action (Scott pursued a separate action on the same article), the Ohio Supreme Court—only shortly before *Ollman* was handed down—had actually reversed the summary judgment awarded to defendants, concluding that the statements in issue were factual assertions and not constitutionally protected opinion (*Milkovich v. News–Herald,* 15 Ohio St.3d 292, 473 N.E.2d 1191, *cert. denied* 474 U.S. 953, 106 S.Ct. 322, 88 L.Ed.2d 305). Only after *Ollman* did the Ohio Supreme Court dismiss the complaints—Scott's as well as Milkovich's—as protected opinion. From the case chronology it is obvious that the Ohio court considered the latter two *Ollman* factors determinative.

3    In this section of the opinion, we follow plaintiff's format, analyzing the "core premise" under *Milkovich.* Plaintiff additionally continues to press all of its prior defamation claims, and makes clear that its case is not limited to the core premise. While we believe that we have complied with the Supreme Court mandate by reviewing the express and implied factual assertions of the McGreal letter and New Scientist article as they were identified by the Appellate Division, it is impossible to state with complete certainty that some of the statements previously considered protected opinion, because of the language and format of the speech, would not now be viewed as implied assertions of fact. This may be an area of uncertainty left open by *Milkovich (see, The Supreme Court, 1989 Term—Leading Cases,* 104 Harv.L.Rev. 219, 226–227 [1990] ).

4    The affidavit of one of the original parties, dated September 3, 1986, indicates that the insurance company settled with plaintiff over her protest when legal costs exceeded several hundred thousand dollars.

5    As Professor Hellman indicates in this and his fuller treatment of the subject of Supreme Court orders of "grant, vacate and remand" (the GVR) (*see,* Hellman, *The Supreme Court's Second Thoughts: Remand for Reconsideration and Denials of Review in Cases Held for Plenary Decisions,* 11 Hastings Const. LQ 5 [1983] ), the GVR remains a mystery to most of the legal profession (*id.,* at 5–6). Of 90 cases he studied in which there was at least a surface inconsistency between the vacated judgment and the cited decision, the lower court in more than 60 adhered to its original ruling, reviewing the Supreme Court decision but upholding its own earlier judgment on some other ground (67 Judicature, at 394–395). There is no basis for the declaration that the Supreme Court here was "indicating its desire to pass on the issues of Federal law and, as a matter of comity, remitted the case to us before ruling so that we might reconsider it in light of the intervening *Milkovich* decision." (Simons, J., concurrence, at 262, at 922 of 566 N.Y.S.2d, at 1286 of 567 N.E.2d.) Moreover, the word "illegitimate" is taken wholly out of context from Bice, *Anderson and the Adequate State Ground,* 45 S.Cal.L.Rev. 750 (1972) (concurrence, at 261, at 921 of 566 N.Y.S.2d, at 1285 of 567 N.E.2d). Indeed, the author of that article makes

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 146 of 230

Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235 (1991)
567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

clear that foreclosing dual constitutional analysis in all circumstances "would prevent the legitimate efficiency gains that fully deciding the state and federal claims often can provide". (*Id.,* at 758.)

6   A few words are in order about the various concurrences. All of the concurrers joined unanimously in the first *Immuno* opinion (which invoked both the State and Federal Constitutions as the basis for decision), they joined unanimously in the *Steinhilber* analysis beginning with the content of the whole communication, its tone and apparent purpose (68 N.Y.2d 283, 293, 508 N.Y.S.2d 901, 501 N.E.2d 550), and they all now join unanimously in awarding summary judgment to defendant.

Judge Simons would affirm on Federal constitutional grounds alone, deferring the State constitutional issues that have been fully briefed and argued for a further remand by the United States Supreme Court. Judge Hancock also would affirm on Federal constitutional grounds alone. Unlike Judge Simons, however, he does not view dual constitutional analysis as "illegitimate" (*see, e.g., People v. Cintron,* 75 N.Y.2d 249, 259, 552 N.Y.S.2d 68, 551 N.E.2d 561 [Hancock, Jr., J.]; *People v. Dietze,* 75 N.Y.2d 47, 50, n. 1, 550 N.Y.S.2d 595, 549 N.E.2d 1166 [Hancock, Jr., J.]; *Seawall Assocs. v. City of New York,* 74 N.Y.2d 92, 115–116, 544 N.Y.S.2d 542, 542 N.E.2d 1059 [Hancock, Jr., J.]; *O'Neill v. Oakgrove Constr.,* 71 N.Y.2d 521, 528–529, 528 N.Y.S.2d 1, 523 N.E.2d 277 [Hancock, Jr., J.]; *People v. Stith,* 69 N.Y.2d 313, 316, n. *, 514 N.Y.S.2d 201, 506 N.E.2d 911 [Hancock, Jr., J.] ). Judge Titone agrees (Titone, J., concurrence, at 263–264, at 923 of 566 N.Y.S.2d, at 1287 of 567 N.E.2d).

Because the Federal analysis is conclusive, Judges Simons and Hancock would decide this case on Federal law alone. Because the Federal analysis is inconclusive, Judge Titone would decide this case on State law alone. Judge Titone, however, would not decide the case on the basis of State constitutional law, as briefed and argued by the parties. Although he would reach "essentially the same conclusion that the majority has reached" (Titone, J., concurrence, at 266, at 924 of 566 N.Y.S.2d, at 1288 of 567 N.E.2d), he would do so on the basis of State *common* law. Apart from the fact that defendant has not tendered his argument on this basis, the first *Immuno* opinion was expressly premised on State and Federal constitutional grounds. Even on a clean slate, this Court has not previously wedded itself to the primacy methodology (Titone, J., concurrence, at 264–265, at 923 of 566 N.Y.S.2d, at 1287 of 567 N.E.2d), nor have we hesitated to recognize a constitutional right with its source in the common law (*see, e.g., Rivers v. Katz,* 67 N.Y.2d 485, 504 N.Y.S.2d 74, 495 N.E.2d 337).

Among the possible approaches to the single result we all agree is correct—the concurrers have now put the full range of alternatives before the public—we continue to believe that the majority's choice best serves all of the interests at stake.

1   For some reason, the majority believes its obligation to examine plaintiff's Federal claim is limited to reviewing the "express and implied factual assertions * * * as they were identified by the Appellate Division" (majority opn., at 248, n. 3, at 913 of 566 N.Y.S.2d, at 1277 of 567 N.E.2d). On a motion for summary judgment, however, the Court is required to pass on the defamatory nature of all the statements alleged to be actionable. Although the majority appears to believe the Appellate Division did not perform this function, it explicitly stated that it had done so (*see,* 145 A.D.2d 114, 143, 537 N.Y.S.2d 129 ["of the many statements cited by the plaintiff * * * there was not one that was actionable"] ).

2   As Judge Kaye notes (majority opn., at 251, at 915 of 566 N.Y.S.2d, at 1279 of 567 N.E.2d), neither the Court nor its individual Judges have consistently followed any announced standards for departing from Federal law to adopt a different State rule or settled on any preferred methodology for doing so (*but see, People v. P.J. Video,* 68 N.Y.2d 296, 508 N.Y.S.2d 907, 501 N.E.2d 556). No problem is presented when, as in the first appeal in this case, we perceive Federal and State law to be the same. But when they diverge, we have followed a variety of approaches. Indeed, the Court recently has appeared to shy away from establishing any standards and, without guidance from us, parties have been free in cases asserting both Federal and State constitutional claims to rely on the general equities of the case, to appeal to the subjective views of the individual Judges on what the rule ought to be and to urge adoption of the methodology best suited to arrive at the desired result. Hopefully we will, in time, achieve an articulable consensus on how these matters should be handled. To that end, I first stated my opposition to the dual method in *Matter of Patchogue–Medford Congress of Teachers v. Board of Educ.,* 70 N.Y.2d 57, 71, 517 N.Y.S.2d 456, 510 N.E.2d 325 [Simons, J., concurring] and my opposition to going beyond the necessities of the case to declare new State law in *People v. Vilardi,* 76 N.Y.2d 67, 78, 556 N.Y.S.2d 518, 555 N.E.2d 915 [Simons, J., concurring].

**Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235 (1991)**
567 N.E.2d 1270, 566 N.Y.S.2d 906, 59 USLW 2459, 18 Media L. Rep. 1625

\*       Like Judge Hancock, I would not rule out the use of the "dual" approach in cases where the posture makes it necessary or appropriate (*see, e.g., People v. Dunn,* 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054). In this case, however, the approach seems particularly inapt because, as the majority itself admits, its Federal constitutional analysis is inconclusive. Further, to the extent that a tentative conclusion has been reached, the Federal analysis leads to the same conclusion as does the "independent and *adequate*" State law rationale and, consequently, is unnecessary dictum.

---

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag

Declined to Extend by Carroll v. Trump, 2nd Cir.(N.Y.), September 8, 2025

80 N.Y.2d 429
Court of Appeals of New York.

Barnet L. LIBERMAN, Appellant,

v.

Leonard GELSTEIN, Respondent.

Nov. 24, 1992.

**Synopsis**
Landlord brought slander action against tenant. The Supreme Court, New York County, Saxe, J., granted tenant's motion for summary judgment, and landlord appealed. The Supreme Court, Appellate Division, 178 A.D.2d 215, 577 N.Y.S.2d 271, affirmed. The Court of Appeals, Kaye, J., held that: (1) tenant's statement that landlord had bribed police officers constituted slander per se; (2) tenant's statement that landlord threatened to kill him and his family was not slander per se; (3) tenant's statements that landlord had threatened to kill him and his family did not fall within "trade, business, or profession" exception to special damages rule; (4) tenant's statement that landlord was bribing police officers fell within "common interest privilege"; and (5) tenant's statement that landlord had bribed police officers was not made with either actual or common-law malice.

Affirmed.

Smith, J., dissented in part voted to modify and filed an opinion.

West Headnotes (14)

[1]     **Libel and Slander** 🔑 Injury from Defamation

Slander is not actionable unless plaintiff suffers "special damages"; "special damages" contemplate loss of something having economic or pecuniary value.

93 Cases that cite this headnote

[2]     **Libel and Slander** 🔑 Presumption as to damage;  special damages

Plaintiff who has suffered no special damage may bring action for "slander per se" if statements in question charge plaintiff with serious crime, tend to injure in his or her trade, business, or profession, indicate that plaintiff has loathsome disease, or impute unchastity to a woman; when statements fall within one of those categories, law presumes damages will result, and thus damages need not be alleged or proven.

355 Cases that cite this headnote

[3]     **Libel and Slander** 🔑 Presumption as to damage;  special damages

Not every imputation of unlawful behavior, is slanderous per se; law distinguishes between serious and relatively minor offenses, and only statements regarding the former are actionable without proof of damages.

49 Cases that cite this headnote

[4]     **Libel and Slander** 🔑 Words Imputing Crime and Immorality

Tenant's alleged statement that "there is a cop on the take from [landlord]" charged landlord with serious crime of bribery, and thus was actionable without need to establish special harm.

4 Cases that cite this headnote

[5]     **Libel and Slander** 🔑 Nature of crime and punishment

Tenant's alleged statement that "[landlord] * * * threatened to kill me and my family" was not slanderous per se; although statement attributed to landlord commission of crime of harassment, harassment was relatively minor offense which did not constitute even a misdemeanor under state Penal Law, and thus any harm to landlord's reputation was correspondingly insubstantial.

38 Cases that cite this headnote

**[6]**   **Libel and Slander**   Words Imputing Crime and Immorality

Tenant's alleged statement that "[landlord] threw a punch at me * * * screamed at my wife and daughter * * * called my daughter a slut and threatened to kill me and my family" was not actionable under the "trade, business or profession" exception to general rule that slander plaintiff must plead special damages; statements at issue were unrelated to landlord's status as landlord.

54 Cases that cite this headnote

**[7]**   **Libel and Slander**   Absolute Privilege

       **Libel and Slander**   Qualified Privilege

Public interest is served by shielding certain communications, though possibly defamatory, from litigation, rather than risk stifling them altogether; when compelling public policy requires that speaker be immune from suit, law affords absolute privilege, while statements fostering lesser public interest are only conditionally privileged.

50 Cases that cite this headnote

**[8]**   **Libel and Slander**   Common Interest in Subject-Matter

Conditional or qualified privilege extends to communication made by one person to another upon a subject in which both have interests; rational for applying this "common interest privilege" is that so long as privilege is not abused, flow of information between persons sharing common interest should not be impeded.

147 Cases that cite this headnote

**[9]**   **Libel and Slander**   Common Interest in Subject-Matter

Tenant's alleged statement to fellow tenant that landlord was bribing police officers so that landlord could illegally park his automobiles in front of apartment building was conditionally privileged under "common interest privilege" where both tenant and fellow tenant were

members of governing body of association formed to protect tenants' interest, and landlord's bribery of police officers so that his automobiles could occupy spaces in front of building was inimical to tenants' interest.

11 Cases that cite this headnote

**[10]**   **Libel and Slander**   Existence and Effect of Malice

Shield provided by qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with malice.

55 Cases that cite this headnote

**[11]**   **Libel and Slander**   Existence and Effect of Malice

For purposes of determining whether allegedly slanderous statements made by defendant are protected by qualified privilege, either constitutional malice standard, that defendant made statement with knowledge that it was false or with reckless disregard of whether it was false or not, or common-law malice standard of spite or ill will is sufficient to defeat conditional privilege. U.S.C.A. Const.Amend. 1.

225 Cases that cite this headnote

**[12]**   **Constitutional Law**   Defamation

Under First Amendment "actual malice" standard, plaintiff must demonstrate that statements were made with high degree of awareness of their probable falsity; there must be sufficient evidence to permit conclusion that defendant in fact entertained serious doubts as to truth of publication. U.S.C.A. Const.Amend. 1.

69 Cases that cite this headnote

**[13]**   **Libel and Slander**   Discharge of duty to others or to public and common interest in subject-matter

Tenant's alleged statement that landlord was bribing police officers in order that landlord could illegally park his cars outside apartment building was not made with "actual malice";

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

although tenant admitted that he did not know whether bribery charge was true, there was no indication that tenant was highly aware that it was probably false.

46 Cases that cite this headnote

[14]    **Libel and Slander** 👈 Discharge of duty to others or to public and common interest in subject-matter

Tenant's alleged statement that landlord had bribed police officers so that landlord would be allowed to illegally park his automobiles in front of apartment building was not made with common-law malice; although, at time of statement, tenant harbored ill will toward landlord, tenant made statement to fellow member of tenants' association so that fellow tenant could utilize his contact at police precinct in order to determine whether allegations of bribery were true.

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*431  \*\*346  \*\*\*859** Dechert Price & Rhoads, New York City (Robert A. Cohen and Owen D. Kalt, of counsel), for appellant.

Gordon & Silber, P.C., New York City (Peter Pearson Traub, Jr., of counsel), for respondent.

**\*432  OPINION OF THE COURT**

KAYE, Judge.

In this action for slander, we consider whether the plaintiff has stated a viable claim without any showing of special damages, whether the alleged slander is protected by qualified privilege, and whether there is a triable issue of fact as to malice. We conclude that plaintiff's claims were correctly dismissed on summary judgment.

I.

Before us is one of eight actions, consolidated for disposition by the motion court, centering on a luxury apartment building in Manhattan. Plaintiff, Barnet L. Liberman, is the building's landlord. Defendant, Leonard Gelstein (a tenant), is on the board of governors of the tenants' association. Disputes between the landlord and tenants of the building erupted nearly a decade ago, when the tenants organized opposition to the landlord's application for a rent increase, and they have continued and proliferated through the conversion of the building to cooperative ownership (*see, e.g., Matter of 421 Hudson St. Tenants Assn. v. Abrams,* 140 Misc.2d 166, 530 N.Y.S.2d 441).

This defamation action against Gelstein is one of three suits brought by Liberman against individual members of the tenant association's board of governors. Gelstein has countersued Liberman and his wife for misconduct arising from a criminal **\*433** complaint filed by Mrs. Liberman, which apparently resulted in Gelstein's overnight incarceration.

The present complaint alleged five causes of action sounding in slander. Only two—the second and fifth—are pressed by plaintiff on this appeal. The other causes of action involving, for example, accusations by Gelstein that Liberman charged an illegal $10 monthly dog rent and stole electricity from the building, have over the years been dropped.

In his second cause of action, plaintiff alleged that in July 1986, the following conversation took place between defendant and another tenant of the building, Robert Kohler.

> "Gelstein: Can you find out from your friend at the precinct which cop is on the take from Liberman?
>
> "Kohler: What are you talking about?
>
> "Gelstein: There is a cop on the take from Liberman. That's why none of the building's cars ever get tickets—they can park anywhere because Liberman's paid them off. He gives them a hundred or two hundred a week."

The fifth cause of action alleged that in May 1986 defendant made the following statement in the presence of employees of the building:

> "Liberman threw a punch at me. He screamed at my wife and daughter. He called my daughter a slut and threatened to kill me and my family."

Liberman v. Gelstein, 80 N.Y.2d 429 (1992)
605 N.E.2d 344, 590 N.Y.S.2d 857, 21 Media L. Rep. 1079

Plaintiff claimed $5 million damages on each cause of action for injury to his reputation and emotional distress. After discovery, defendant sought summary judgment dismissing the complaint. On the second cause of action, defendant invoked the "common interest" qualified privilege, characterizing his conversation with Kohler, **\*\*347** **\*\*\*860** a colleague on the board of governors, as an inquiry designed to uncover wrongdoing by the landlord affecting tenants. At his deposition, defendant testified that several vehicles operated by the building's management regularly parked in front of the building beyond the legal limit but never received parking summonses. He further testified that he was told by two building employees, whom he identified, that Liberman was bribing the police to avoid parking tickets. Defendant admitted that he did not know whether the allegations were true, but testified that they **\*434** "sounded truthful" to him. Accordingly, defendant testified that he approached Kohler—whose friend was captain of the local police precinct—in an effort to discover whether the allegations were true.

Plaintiff responded that there was an issue of fact on malice, which if proved at trial, would defeat the qualified privilege. Plaintiff argued that malice of the common-law variety (spite or ill will) could be inferred from defendant's over-all conduct toward plaintiff, including one occasion in July 1987 when defendant threw a lit firecracker into his car and another in May 1986 when he pounded on the car's windows and attempted to rip out the windshield wiper. Moreover, plaintiff argued, malice of the constitutional variety (knowledge of falsity or reckless disregard for truth or falsity) could be found in defendant's concession that he had no actual knowledge of bribery and the lack of trustworthiness of his sources, "disgruntled" building employees.

On the fifth cause of action, defendant argued that the statements were either true, not defamatory or never made.

In dismissing the second cause of action, Supreme Court agreed with defendant that the statements were qualifiedly privileged and plaintiff failed to sustain his burden of raising a triable issue on malice. The court also held that the statements comprising the fifth cause of action could only have been understood by the recipients, who were familiar with the parties' history of disagreements, as rhetorical hyperbole.

The Appellate Division affirmed, 178 A.D.2d 215, 577 N.Y.S.2d 271, agreeing with Supreme Court's reasoning. One Justice, who would have reinstated the second cause of action,

dissented in part. He was not "entirely persuaded" that the statements were qualifiedly privileged, and thought that in any event defendant's deposition testimony that he did not know whether the bribery charge was true was itself sufficient to raise a triable issue whether the statements were made with reckless disregard as to their truth or falsity.

The Appellate Division granted leave, and we affirm.

II.

**[1]**    Slander as a rule is not actionable unless the plaintiff suffers special damage (*see, Aronson v. Wiersma,* 65 N.Y.2d 592, 594, 493 N.Y.S.2d 1006, 483 N.E.2d 1138; *Matherson v. Marchello,* 100 A.D.2d 233, 236, 473 N.Y.S.2d 998 [Titone, J.P.]; Restatement [Second] of Torts [Restatement] § 575). Special damages contemplate "the loss of something having economic **\*435** or pecuniary value" (Restatement § 575, comment *b; see,* Prosser and Keeton, Torts [Prosser] § 112, at 794 [5th ed.] ). Plaintiff has not alleged special damages, and thus his slander claims are not sustainable unless they fall within one of the exceptions to the rule.

**[2]**    The four established exceptions (collectively "slander per se") consist of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman (*see, Moore v. Francis,* 121 N.Y. 199, 203, 23 N.E. 1127; *Privitera v. Town of Phelps,* 79 A.D.2d 1, 3, 435 N.Y.S.2d 402 [Simons, J.]; Civil Rights Law § 77; 2 Seelman, Libel and Slander in the State of New York, at 869–907 [1964]; Restatement §§ 570–573; Smolla, Defamation § 7.05). When statements fall within one of these categories, **\*\*348** **\*\*\*861** the law presumes that damages will result, and they need not be alleged or proven.[1]

**[3]**    Plaintiff claims that both sets of statements were slanderous per se inasmuch as they charged him with criminal conduct. Not every imputation of unlawful behavior, however, is slanderous per se. "With the extension of criminal punishment to many minor offenses, it was obviously necessary to make some distinction as to the character of the crime, since a charge of a traffic violation, for example, would not exclude a person from society, and today would do little, if any, harm to his [or her] reputation at all" (Prosser § 112, at 789). Thus, the law distinguishes between serious and relatively minor offenses, and only statements regarding the former are actionable without proof of damage (*see,*

Restatement § 571, comment *g* [list of crimes actionable as per se slander includes murder, burglary, larceny, arson, rape, kidnapping] ).

**\*436** **[4]** We agree with plaintiff that defendant's alleged statement that "[t]here is a cop on the take from Liberman" charges a serious crime—bribery (*see,* Penal Law § 200.00; *People v. Tran,* 80 N.Y.2d 170, 589 N.Y.S.2d 845, 603 N.E.2d 950). Accordingly, the statements constituting the second cause of action are actionable without the need to establish special harm, and absent any privilege would be sufficient to go to a jury.

**[5]** We disagree, however, with plaintiff's contention that the statement "Liberman * * * threatened to kill me and my family" was slanderous per se.[2] Plaintiff claims these words falsely attributed to him the commission of the crime of harassment (*see,* Penal Law § 240.25; *People v. Dorns,* 88 Misc.2d 1064, 390 N.Y.S.2d 546 [threats to kill] ). Harassment is a relatively minor offense in the New York Penal Law—not even a misdemeanor—and thus the harm to the reputation of a person falsely accused of committing harassment would be correspondingly insubstantial. Hence, even if we agreed with plaintiff that the statement would not have been construed by the listeners as rhetorical hyperbole, the cause of action must nevertheless be dismissed because it is not slanderous per se to claim that someone committed harassment.

**[6]** Plaintiff alternatively argues that the statements in the fifth cause of action tended to harm him in his business as a property owner, and thus are actionable under the "trade, business or profession" exception. That exception, however, is "limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities" (Prosser § 112, at 791). Thus, "charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him" (Restatement § 573, comment *c* ). The statements at issue are unrelated to plaintiff's status as a landlord, and therefore do not fall into the "trade, business or profession" exception *(see, Aronson v. Wiersma,* 65 N.Y.2d, at 594, 493 N.Y.S.2d 1006, 483 N.E.2d 1138, *supra).*

In sum, the second cause of action is on its face sustainable without special damages because it involves charges of serious crime, and the fifth cause of action was correctly dismissed.

III.

We next consider whether the courts below properly concluded that defendant's conversation with Kohler was conditionally **\*\*349** **\*\*\*862** privileged and that plaintiff failed to raise an issue of fact on malice.

**\*437** **[7]** Courts have long recognized that the public interest is served by shielding certain communications, though possibly defamatory, from litigation, rather than risk stifling them altogether (*see, Bingham v. Gaynor,* 203 N.Y. 27, 31, 96 N.E. 84). When compelling public policy requires that the speaker be immune from suit, the law affords an absolute privilege, while statements fostering a lesser public interest are only conditionally privileged (*see, 600 W. 115th St. Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 135–136, 589 N.Y.S.2d 825, 603 N.E.2d 930; *Park Knoll Assocs. v. Schmidt,* 59 N.Y.2d 205, 208–209, 464 N.Y.S.2d 424, 451 N.E.2d 182; *Toker v. Pollak,* 44 N.Y.2d 211, 218–220, 405 N.Y.S.2d 1, 376 N.E.2d 163).

**[8]** One such conditional, or qualified, privilege extends to a "communication made by one person to another upon a subject in which both have an interest" (*Stillman v. Ford,* 22 N.Y.2d 48, 53, 290 N.Y.S.2d 893, 238 N.E.2d 304). This "common interest" privilege (*see,* Restatement § 596) has been applied, for example, to employees of an organization (*see, Loughry v. Lincoln First Bank,* 67 N.Y.2d 369, 376, 502 N.Y.S.2d 965, 494 N.E.2d 70), members of a faculty tenure committee (*Stukuls v. State of New York,* 42 N.Y.2d 272, 397 N.Y.S.2d 740, 366 N.E.2d 829) and constituent physicians of a health insurance plan (*Shapiro v. Health Ins. Plan,* 7 N.Y.2d 56, 60–61, 194 N.Y.S.2d 509, 163 N.E.2d 333). The rationale for applying the privilege in these circumstances is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded.

**[9]** We thus agree with the motion court and Appellate Division that defendant's conversation with Kohler was conditionally privileged (*see,* Restatement § 596, comment *d* ["Tenants in common * * * are included within the rule stated in this Section as being conditionally privileged to

communicate among themselves matter defamatory of others which concerns their common interests"] ). Gelstein and Kohler were members of the governing body of an association formed to protect the tenants' interests. If Liberman was in fact bribing the police so that his cars could occupy spaces in front of the building, that would be inimical to those interests. Thus, Gelstein had a qualified right to communicate his suspicions —though defamatory of Liberman—to Kohler.

 **[10]**    The shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with "malice" *(see, Park Knoll Assocs. v. Schmidt,* 59 N.Y.2d, at 211, 464 N.Y.S.2d 424, 451 N.E.2d 182, *supra).* Under common law, malice meant spite or ill will *(see, Stillman v. Ford,* 22 N.Y.2d, at 53, 290 N.Y.S.2d 893, 238 N.E.2d 304, *supra; Shapiro v. Health Ins. Plan,* 7 N.Y.2d, at 61, 194 N.Y.S.2d 509, 163 N.E.2d 333, *supra).* In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686), however, the Supreme Court established an **\*438** "actual malice" standard for certain cases governed by the First Amendment: "knowledge that [the statement] was false or * * * reckless disregard of whether it was false or not" (376 U.S., at 279–280, 84 S.Ct. at 726). Consequently, the term "malice" has become somewhat confused *(see, Mahoney v. Adirondack Publ. Co.,* 71 N.Y.2d 31, 36, n. 1, 523 N.Y.S.2d 480, 517 N.E.2d 1365; *see also, Greenbelt Publ. Assn. v. Bresler,* 398 U.S. 6, 10, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6 [trial court erred in First Amendment case by charging jury under common-law malice standard] ). Indeed, as the Supreme Court itself recently acknowledged *(Masson v. New Yorker Mag.,* 501 U.S. 496, ——, 111 S.Ct. 2419, 2429–2430, 115 L.Ed.2d 447):

> "Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will * * * We have used the term actual malice as a shorthand to describe the First Amendment protections for speech injurious to reputation and we continue to do so here. But the term can confuse as well as enlighten. In this respect, the phrase may be an unfortunate one."

 **\*\*350    \*\*\*863    [11]**    Nevertheless, malice has now assumed a dual meaning, and we have recognized that the constitutional as well as the common-law standard will suffice to defeat a conditional privilege *(see, Loughry v. Lincoln First Bank,* 67 N.Y.2d, at 376, 502 N.Y.S.2d 965, 494 N.E.2d 70, *supra; O'Rorke v. Carpenter,* 55 N.Y.2d 798, 799, 447 N.Y.S.2d 434, 432 N.E.2d 136; *Stillman v. Ford,* 22 N.Y.2d,

at 53, 290 N.Y.S.2d 893, 238 N.E.2d 304, *supra; see also,* Restatement §§ 600, 603, comment *a).*

 **[12]**    Under the *Times* malice standard, the plaintiff must demonstrate that the "statements [were] made with [a] high degree of awareness of their probable falsity" *(Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125). In other words, there "must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication" *(St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262; *see also,* Restatement § 600, comment *b).*

 **[13]**    Applying these principles, we conclude that there is no triable malice issue under the *Times* standard. Although the dissenter below suggested that Gelstein's admission that he did not know whether the bribery charge was true raised a triable issue on malice, there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action. Moreover, as the motion court correctly observed, plaintiff's mere characterization **\*439** of Gelstein's informants as "disgruntled" is insufficient to raise a triable issue. Although plaintiff criticizes defendant for not producing affidavits from the informants—arguing that "it has never been factually established that Gelstein had any source"—it was plaintiff's burden to raise a factual issue on malice, and he did not seek to depose the employees either.[3] In sum, this record is insufficient to raise a triable issue of fact under the *Times* standard of malice.

 **[14]**    Similarly, there is insufficient evidence of malice under the common-law definition. A jury could undoubtedly find that, at the time Gelstein discussed his bribery suspicions with Kohler, Gelstein harbored ill will toward Liberman. In this context, however, spite or ill will refers not to defendant's general feelings about plaintiff, but to the speaker's motivation for making the defamatory statements *(see,* Restatement § 603, and comment *a; Stukuls v. State of New York,* 42 N.Y.2d, at 281–282, 397 N.Y.S.2d 740, 366 N.E.2d 829, *supra; Stillman v. Ford,* 22 N.Y.2d, at 53, 290 N.Y.S.2d 893, 238 N.E.2d 304, *supra).* If the defendant's statements were made to further the interest protected by the privilege, it matters not that defendant *also* despised plaintiff. Thus, a triable issue is raised only if a jury could reasonably conclude that "malice was the one and only cause for the publication" *(Stukuls v. State of New York,* 42 N.Y.2d, at 282, 397 N.Y.S.2d 740, 366 N.E.2d 829, *supra).*

Plaintiff has not sustained that burden. Significantly, Gelstein did not make a public announcement of his suspicions—from which an inference could be drawn that his motive was to defame Liberman—but relayed them to a colleague who was in a position to investigate. As noted, the conversation was within the common interest of Gelstein and Kohler, and there is nothing in this record from which a reasonable jury could find that Gelstein was not seeking to advance that common interest.

Thus, the courts below properly concluded that defendant's conversation with Kohler was qualifiedly privileged, and plaintiff failed to raise a fact issue on malice.[4]

**\*440    \*\*351    \*\*\*864** Accordingly, the order of the Appellate Division should be affirmed, with costs.

SMITH, Judge (dissenting in part).
Because there is an issue of fact as to whether defendant's statements accusing the plaintiff of bribery either resulted from a reckless disregard for the truth or falsity of the statements or were motivated solely by malice, the order of the Appellate Division should be modified by denying so much of defendant's motion for summary judgment as sought to dismiss the second cause of action and reinstating that cause of action. Therefore, I dissent with respect to the second cause of action.

In this defamation action, the plaintiff landlord and defendant tenant, a board member of the tenants' association, have been involved in continuous disputes over the last 10 years concerning rent increases and the conversion of the property to cooperative ownership. Numerous civil and criminal actions involving these parties and/or others have resulted therefrom.

The second cause of action is based upon the following conversation between the defendant and a fellow board member:

"Gelstein: Can you find out from your friend at the precinct which cop is on the take from Liberman?

"Kohler: What are you talking about?

"Gelstein: There is a cop on the take from Liberman. That's why none of the building's cars ever get tickets—they can

park anywhere because Liberman's paid them off. He gives them a hundred or two hundred a week."

There is no dispute that these statements were made. However, defendant contends that these were not statements, but rather his effort on behalf of the tenants' association to investigate what he had supposedly learned from named plaintiff's employees. He had no knowledge of the truth or falsity of this bribery accusation. Accordingly, defendant asserted **\*441** that, if defamatory, the statements were within the ambit of the common interest qualified privilege and that he had acted "without malice or negligence."

Two issues are raised here concerning the second cause of action. The first is whether or not there was a qualified privilege to make the statement. The second is, assuming there was a qualified privilege, whether there has been raised a sufficient factual showing of malice, knowledge of the falsity of the statement, or reckless disregard of its truth or falsity to defeat the motion for summary judgment (*Loughry v. Lincoln First Bank,* 67 N.Y.2d 369, 376, 502 N.Y.S.2d 965, 494 N.E.2d 70).

The majority has properly concluded that there is a qualified privilege here. Moreover, the plaintiff does not challenge the assertion that the statement was qualifiedly privileged.

Given this qualified privilege, the burden shifts to the plaintiff to show that the statement is nevertheless actionable because it is false and motivated by malice *(Toker v. Pollak,* 44 N.Y.2d 211, 219, 405 N.Y.S.2d 1, 376 N.E.2d 163; *Park Knoll Assocs. v. Schmidt,* 59 N.Y.2d 205, 209, 464 N.Y.S.2d 424, 451 N.E.2d 182; Restatement [Second] of Torts § 613). As the law has developed in this area, "malice" has been assigned different meanings based upon the context.[1] At common law, malice has been based upon a determination that the statement is false, that the defendant knew **\*\*352    \*\*\*865** it to be false when published and, therefore, the defendant acted in bad faith *(Lovell Co. v. Houghton,* 116 N.Y. 520, 22 N.E. 1066). In other words, actual malice at common law meant " 'personal spite or ill will, or culpable recklessness or negligence' " *(Hoeppner v. Dunkirk Print. Co.,* 254 N.Y. 95, 106, 172 N.E. 139; *see also, Shapiro v. Health Ins. Plan,* 7 N.Y.2d 56, 61, 194 N.Y.S.2d 509, 163 N.E.2d 333). For malice to be found, the fact that the statement was false had to be augmented by defendant's desire to injure the plaintiff *(id.).* For purposes of a constitutional analysis, actual malice has been defined as "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not" *(New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726,

11 L.Ed.2d 686; *Trails W. v. Wolff,* 32 N.Y.2d 207, 219, 344 N.Y.S.2d 863, 298 N.E.2d 52). The standard articulated in *New York Times Co. v. Sullivan (supra)* was expanded to consider whether there was a "high degree of awareness" of the statement's probable falsity (*Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125) or that the defendant "in fact" entertained "serious doubts" as to its truth (*St. Amant v.* **\*442** *Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262), as we acknowledged in *Pauling v. National Review,* 22 N.Y.2d 818, 819, 292 N.Y.S.2d 913, 239 N.E.2d 654). These expansions of the constitutional standard evoke the common-law concept of bad faith. Indeed, this Court has recognized that consideration of malice in the constitutional and the common-law sense is proper in determining whether a qualified privilege is to be given effect (*Loughry v. Lincoln First Bank,* 67 N.Y.2d 369, 376, 502 N.Y.S.2d 965, 494 N.E.2d 70, *supra* [conditional privilege may be negated by "statements published with malice or with knowledge of their falsity or reckless disregard as to their truth or falsity"] ).[2] This dual analysis is reflected in the New York Pattern Jury Instructions on qualified privilege (*see,* PJI 3:32 [1991 Supp.] ).

In light of the foregoing, the issue of malice in the case at bar should be reviewed under both standards. Under the constitutional standard, there is an issue of fact as to whether there was a reckless disregard for the truth or falsity of the bribery accusation or whether defendant, in good faith, was attempting to ascertain the truth or falsity of the accusation. The record is presently lacking any evidence to support the conclusion that defendant knew that the accusation was false, that there was a high degree of awareness of probable falsity, or that he entertained serious doubts as to its truthfulness. Defendant denies any knowledge as to its truth or falsity but maintains that he believed the accusation to be true because the source was two of plaintiff's employees, whom he identified. (These persons have not yet been deposed.) However, as to whether the defendant may have shown a reckless disregard for the truth, it is significant that the defendant and Kohler, the person to whom the statement was first made, dispute whether the accusation was stated as a matter of fact or as part of an inquiry. In Kohler's version of the conversation, the inquiry contained therein pertained to the identification of the bribed police officer, not the truth of the accusation. Clearly, there is an issue of fact here that may be resolved by further discovery or that may require determination by a trier of fact.

Turning to a common-law analysis, there is sufficient evidence in this record to create an issue of fact as to whether defendant's statements were motivated solely by spite or ill will. The parties' acrimonious relationship is accentuated by, **\*443** *inter alia,* lawsuits, defendant tossing a possibly lit firecracker into plaintiff's vehicle, and an incident where defendant pounded on plaintiff's vehicle while occupied by plaintiff, his wife, and their children. And, as discussed above, if it is found that defendant stated the accusation as fact, spite or ill will may have been the sole motivation.

**\*\*353 \*\*\*866** Therefore, if plaintiff proves that the accusation is false, the foregoing considerations suffice to create issues of fact as to malice under both standards.

The conclusion that there is no triable issue of fact here because a jury could not reasonably conclude that malice alone was the motivation for the statement is not supported by the record. Plaintiff indeed has the burden of proving that malice alone was the cause for the publication (*Stukuls v. State of New York,* 42 N.Y.2d 272, 281–282, 397 N.Y.S.2d 740, 366 N.E.2d 829). However, having presented a basis for that conclusion, plaintiff should be afforded an opportunity to present such evidence to a trier of fact that the actions of the defendant were duplicitous and motivated solely by malice (*see, Stukuls v. State of New York, supra,* at 282, 397 N.Y.S.2d 740, 366 N.E.2d 829 [the claim, affidavits, and the need for additional discovery precluded finding that plaintiff could not raise an issue of fact] ). In this case, plaintiff has alleged that defendant filed the motion for summary judgment before depositions of the employees who supposedly told defendant of the bribery scheme could be taken. Accordingly, the second cause of action should be reinstated.

SIMONS, Acting C.J., and TITONE, HANCOCK and BELLACOSA, JJ., concur with KAYE, J.

SMITH, J., dissents in part and votes to modify in a separate opinion.
Order affirmed, with costs.

**All Citations**

80 N.Y.2d 429, 605 N.E.2d 344, 590 N.Y.S.2d 857, 21 Media L. Rep. 1079

**Liberman v. Gelstein, 80 N.Y.2d 429 (1992)**
605 N.E.2d 344, 590 N.Y.S.2d 857, 21 Media L. Rep. 1079

Footnotes

1   The presumed-damages rule has been found unconstitutional in certain First Amendment cases (*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789) and criticized for use in defamation cases generally (*see, e.g.,* Anderson, *Reputation, Compensation, and Proof,* 25 Wm. & Mary L.Rev. 747 [1984]; Uniform Defamation Act [Feb. 6, 1992 draft] § 9, and comment thereto). Our disposition makes it unnecessary to consider the issue here.

2   On this appeal, this is the only portion of the fifth cause of action raised by plaintiff.

3   Plaintiff's appellate argument that he needs further discovery (*see,* dissenting opn., at 442, at 865 of 590 N.Y.S.2d, at 352 of 605 N.E.2d is unavailing. Almost three years elapsed between defendant's assertion of the common-interest privilege in his verified answer and the motion for summary judgment. Indeed, plaintiff never claimed a need for discovery in opposition to the motion (*see,* CPLR 3212 [f] ).

4   The dissent's contrary conclusion is puzzling in light of its acknowledgment that the "record is presently lacking any evidence to support the conclusion that defendant knew that the [bribery] accusation was false, that there was a high degree of probable falsity, or that he entertained serious doubts as to its truthfulness." (Dissenting opn. at 442, at 865 of 590 N.Y.S.2d, at 352 of 605 N.E.2d.) Moreover, the purported factual issue whether the bribery "accusation was stated as a matter of fact or as part of an inquiry" (dissenting opn., at 442, at 865 of 590 N.Y.S.2d, at 352 of 605 N.E.2d) goes not to malice, but to whether there is an actionable statement in the first instance. Insofar as the dissent concludes that the parties' "acrimonious relationship" is sufficient to raise a triable issue under the common-law standard (dissenting opn. at 442, at 865 of 590 N.Y.S.2d, at 352 of 605 N.E.2d), we have observed that the "existence of earlier disputes between the parties is not evidence of malice" (*Shapiro v. Health Ins. Plan,* 7 N.Y.2d, at 64, 194 N.Y.S.2d 509, 163 N.E.2d 333, *supra*).

1   In response to the divergent meanings attributed to the term "malice" in the defamation area, the Restatement (Second) of Torts has abandoned its use for the more comprehensive "abuse of privilege" terminology.

2   It should be noted that in *Loughry* the jury found, *inter alia,* that the defendants acted "solely from malice intend[ed] to injure plaintiff" (*supra,* 67 N.Y.2d at 376, 502 N.Y.S.2d 965, 494 N.E.2d 70).

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 157 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)

110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

⚑    KeyCite Yellow Flag

Not Followed on State Law Grounds Levin v. McPhee, 2nd Cir.(N.Y.), July 17, 1997

110 S.Ct. 2695
Supreme Court of the United States

Michael MILKOVICH, Sr., Petitioner,

v.

LORAIN JOURNAL CO. et al.

No. 89–645.
|
Argued April 24, 1990.
|
Decided June 21, 1990.

**Synopsis**

Former high school wrestling coach brought defamation action against newspaper and reporter. The Court of Common Pleas, Lake County, entered directed verdict against coach, and coach appealed. The Court of Appeals, 65 Ohio App.2d 143, 416 N.E.2d 662, reversed and remanded. The Ohio Supreme Court dismissed the ensuing appeal. On remand, the Court of Common Pleas entered summary judgment for defendants, and coach appealed. The Court of Appeals affirmed. The Ohio Supreme Court, 15 Ohio St.3d 292, 473 N.E.2d 1191, reversed and remanded. On remand, the Court of Common Pleas entered summary judgment for defendants. Coach appealed. The Court of Appeals, 46 Ohio App.3d 20, 545 N.E.2d 1320, affirmed. The Ohio Supreme Court dismissed the ensuing appeal. After grant of certiorari, the Supreme Court, Chief Justice Rehnquist, held that: (1) separate constitutional privilege for "opinion" was not required in addition to established safeguards regarding defamation to ensure freedom of expression guaranteed by First Amendment, and (2) reasonable fact finder could conclude that statements in reporter's column implied assertion that high school coach perjured himself in judicial proceeding, and implication that coach committed perjury was sufficiently factual to be susceptible of being proved true or false and might permit defamation recovery.

Reversed and remanded.

Justice Brennan, filed dissenting opinion in which Justice Marshall joined.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment; Motion for Judgment as a Matter of Law (JMOL)/ Directed Verdict.

West Headnotes (7)

**[1]    Res Judicata** ☞ Public Officials and Employees

High school coach who was not party to school superintendent's defamation suit was not bound in coach's own defamation suit that involved same newspaper column by court's statements in superintendent's suit that coach could not be considered other than public figure for purposes of controversy at issue, under Ohio law; coach was not party to proceedings involving superintendent.

11 Cases that cite this headnote

**[2]    Federal Courts** ☞ Review of State Courts

Ruling of Ohio Supreme Court that an allegedly defamed high school coach was not a public figure or public official for purposes of newspaper column continued to be law of the case on that issue, where Ohio Court of Appeals did not address public-private figure question on remand.

37 Cases that cite this headnote

**[3]    Federal Courts** ☞ Particular Cases, Contexts, and Questions

Determination in defamation suit by school superintendent that newspaper column was constitutionally protected opinion would not be considered a determination on independent state constitutional grounds precluding federal review in separate defamation suit by school coach arising from same newspaper column on theory State Constitution was relied upon to recognize opinion privilege for defamation purposes; decision in superintendent's suit relied heavily on federal decisions interpreting scope of First Amendment protection accorded defamation defendants. U.S.C.A. Const.Amend. 1.

156 Cases that cite this headnote

**[4]    Constitutional Law** 🗝 Opinion

Separate constitutional privilege for "opinion" was not required in addition to established safeguards against defamation liability to ensure freedom of expression guaranteed by First Amendment. U.S.C.A. Const.Amend. 1.

189 Cases that cite this headnote

**[5]    Libel and Slander** 🗝 Criticism and comment on public matters and publication of news

Where statement of "opinion" on matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of truth in order to recover. U.S.C.A. Const.Amend. 1.

1019 Cases that cite this headnote

**[6]    Libel and Slander** 🗝 Criticism and Comment on Public Matters;  Public Figures

Where statement of "opinion" on matter of public concern reasonably implies false and defamatory facts involving private figure, plaintiff must show that false implications were made with some level of fault to support recovery. U.S.C.A. Const.Amend. 1.

738 Cases that cite this headnote

**[7]    Libel and Slander** 🗝 Weight and Sufficiency

Reasonable fact finder could conclude that statements in reporter's column implied assertion that high school coach perjured himself in judicial proceeding, and implication that coach committed perjury was sufficiently factual to be susceptible of being proved true or false and might permit defamation recovery by coach against reporter and newspaper. U.S.C.A. Const.Amend. 1.

549 Cases that cite this headnote

**\*\*2696** *Syllabus*[*]

**\*1** While petitioner Milkovich was a high school wrestling coach, his team was involved in an altercation at a match with another high school's team. Both he and School Superintendent Scott testified at an investigatory hearing before the Ohio High School Athletic Association (OHSAA), which placed the team on probation. They testified again during a suit by several parents, in which a county court overturned OHSAA's ruling. The day after the court's decision, respondent Lorain Journal Company's newspaper published a column authored by respondent Diadiun, which implied that Milkovich lied under oath in the judicial proceeding. Milkovich commenced a defamation action against respondents in the county court, alleging that the column accused him of committing the **\*\*2697** crime of perjury, damaged him in his occupation of teacher and coach, and constituted libel *per se.* Ultimately, the trial court granted summary judgment for respondents. The Ohio Court of Appeals affirmed, considering itself bound by the State Supreme Court's determination in Superintendent Scott's separate action against respondents that, as a matter of law, the article was constitutionally protected opinion.

*Held:*

1. The First Amendment does not require a separate "opinion" privilege limiting the application of state defamation laws. While the Amendment does limit such application, *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, the breathing space that freedoms of expression require to survive is adequately secured by existing constitutional doctrine. **\*2** Foremost, where a media defendant is involved, a statement on matters of public concern must be provable as false before liability can be assessed, *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783, thus ensuring full constitutional protection for a statement of opinion having no provably false factual connotation. Next, statements that cannot reasonably be interpreted as stating actual facts about an individual are protected, see, *e.g., Greenbelt Cooperative Publishing Assn., Inc. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6, thus assuring that public debate will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" which

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 159 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)

110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

has traditionally added much to the discourse of this Nation. The reference to "opinion" in dictum in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–340, 94 S.Ct. 2997, 3006–3007, 41 L.Ed.2d 789, was not intended to create a wholesale defamation exemption for "opinion." Read in context, the *Gertz* dictum is merely a reiteration of Justice Holmes' "marketplace of ideas" concept, see *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173. Simply couching a statement—"Jones is a liar"—in terms of opinion —"In my opinion Jones is a liar"—does not dispel the factual implications contained in the statement. Pp. 2702–2707.

2. A reasonable factfinder could conclude that the statements in the Diadiun column imply an assertion that Milkovich perjured himself in a judicial proceeding. The article did not use the sort of loose, figurative, or hyperbolic language that would negate the impression that Diadiun was seriously maintaining Milkovich committed perjury. Nor does the article's general tenor negate this impression. In addition, the connotation that Milkovich committed perjury is sufficiently factual that it is susceptible of being proved true or false by comparing, *inter alia,* his testimony before the OHSAA board with his subsequent testimony before the trial court. Pp. 2707–2708.

3. This decision balances the First Amendment's vital guarantee of free and uninhibited discussion of public issues with the important social values that underlie defamation law and society's pervasive and strong interest in preventing and redressing attacks upon reputation. Pp. 2707–2708.

46 Ohio App.3d 20, 545 N.E.2d 1320 (1989), reversed and remanded.

REHNQUIST, C.J., delivered the opinion of the Court, in which WHITE, BLACKMUN, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 2708.

**Attorneys and Law Firms**

*Brent L. English* argued the cause for petitioner. With him on the brief was *John D. Brown.*

 **\*3** *Richard D. Panza* argued the cause for respondents. With him on the brief were *William G. Wickens, David Herzer, Richard A. Naegle, P. Cameron DeVore,* and *Marshall J. Nelson.* \*

\* Briefs of *amici curiae* urging affirmance were filed for Dow Jones & Co. et al. by Robert D. Sack, Richard J. Tofel, Richard M. Schmidt, Jr., Devereux Chatillon, Douglas P. Jacobs, Barbara L. Wartelle, Harvey L. Lipton, Laura R. Handman, Slade R. Metcalf, Richard J. Ovelmen, Deborah R. Linfield, Jane E. Kirtley, and Bruce W. Sanford; and for the American Civil Liberties Union et al. by Henry R. Kaufman.

*Louis A. Colombo* and *David L. Marburger* filed a brief for the Ohio Newspaper Association et al. as *amicus curiae.*

**Opinion**

Chief Justice REHNQUIST delivered the opinion of the Court.

Respondent J. Theodore Diadiun authored an article in an Ohio newspaper implying that petitioner Michael Milkovich, a local high school wrestling coach, lied under oath **\*\*2698** in a judicial proceeding about an incident involving petitioner and his team which occurred at a wrestling match. Petitioner sued Diadiun and the newspaper for libel, and the Ohio Court of Appeals affirmed a lower court entry of summary judgment against petitioner. This judgment was based in part on the grounds that the article constituted an "opinion" protected from the reach of state defamation law by the First Amendment to the United States Constitution. We hold that the First Amendment does not prohibit the application of Ohio's libel laws to the alleged defamations contained in the article.

This lawsuit is before us for the third time in an odyssey of litigation spanning nearly 15 years.[1] Petitioner Milkovich, now retired, was the wrestling coach at Maple Heights High  **\*4** School in Maple Heights, Ohio. In 1974, his team was involved in an altercation at a home wrestling match with a team from Mentor High School. Several people were injured. In response to the incident, the Ohio High School Athletic Association (OHSAA) held a hearing at which Milkovich and H. Don Scott, the Superintendent of Maple Heights Public Schools, testified. Following the hearing, OHSAA placed the Maple Heights team on probation for a year and declared the team ineligible for the 1975 state tournament. OHSAA also censured Milkovich for his actions during the altercation. Thereafter, several parents and wrestlers sued OHSAA in the Court of Common Pleas of Franklin County, Ohio, seeking a restraining order against OHSAA's ruling on the grounds that they had been denied due process in the OHSAA proceeding. Both Milkovich and Scott testified in that proceeding. The

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 160 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)
110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

court overturned OHSAA's probation and ineligibility orders on due process grounds.

The day after the court rendered its decision, respondent Diadiun's column appeared in the News–Herald, a newspaper which circulates in Lake County, Ohio, and is owned by respondent Lorain Journal Co. The column bore the heading "Maple beat the law with the 'big lie,' " beneath which appeared Diadiun's photograph and the words "TD Says." The carryover page headline announced "... Diadiun says Maple told a lie." The column contained the following passages:

" '... [A] lesson was learned (or relearned) yesterday by the student body of Maple Heights High School, and by anyone who attended the Maple–Mentor wrestling meet of last Feb. 8.

" 'A lesson which, sadly, in view of the events of the past year, is well they learned early.

" 'It is simply this: If you get in a jam, lie your way out.

 *5 " 'If you're successful enough, and powerful enough, and can sound sincere enough, you stand an excellent chance of making the lie stand up, regardless of what really happened.

" 'The teachers responsible were mainly head Maple wrestling coach, Mike Milkovich, and former superintendent of schools H. Donald Scott.

. . . . .

" 'Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth.

" 'But they got away with it.

" 'Is that the kind of lesson we want our young people learning from their high school administrators and coaches?

" 'I think not.' " *Milkovich v. News–Herald,* 46 Ohio App.3d 20, 21, 545 N.E.2d 1320, 1321–1322 (1989).[2]

 *6 **2699 Petitioner commenced a defamation action against respondents in the Court of Common Pleas of Lake County, Ohio, alleging that the headline of Diadiun's article and the *7 nine passages quoted above "accused plaintiff of committing the crime of perjury, an indictable offense in the State of Ohio, and damaged plaintiff directly in his life-time occupation **2700 of coach and teacher, and constituted libel per se." App. 12. The action proceeded to trial, and the court granted a directed verdict to respondents on the ground that the evidence failed to establish the article was published with "actual malice" as required by *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). See App. 21–22. The Ohio Court of Appeals for the Eleventh Appellate District reversed and remanded, holding that there was sufficient evidence of actual malice to go to the jury. See *Milkovich v. Lorain Journal,* 65 Ohio App.2d 143, 416 N.E.2d 662 (1979). The Ohio *8 Supreme Court dismissed the ensuing appeal for want of a substantial constitutional question, and this Court denied certiorari. 449 U.S. 966, 101 S.Ct. 380, 66 L.Ed.2d 232 (1980).

On remand, relying in part on our decision in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the trial court granted summary judgment to respondents on the grounds that the article was an opinion protected from a libel action by "constitutional law," App. 55, and alternatively, as a public figure, petitioner had failed to make out a prima facie case of actual malice. *Id.,* at 55–59. The Ohio Court of Appeals affirmed both determinations. *Id.,* at 62–70. On appeal, the Supreme Court of Ohio reversed and remanded. The court first decided that petitioner was neither a public figure nor a public official under the relevant decisions of this Court. See *Milkovich v. News–Herald,* 15 Ohio St.3d 292, 294–299, 473 N.E.2d 1191, 1193–1196 (1984). The court then found that "the statements in issue are factual assertions as a matter of law, and are not constitutionally protected as the opinions of the writer.... The plain import of the author's assertions is that Milkovich, *inter alia,* committed the crime of perjury in a court of law." *Id.,* at 298–299, 473 N.E.2d, at 1196–1197. This Court again denied certiorari. 474 U.S. 953, 106 S.Ct. 322, 88 L.Ed.2d 305 (1985).

Meanwhile, Superintendent Scott had been pursuing a separate defamation action through the Ohio courts. Two years after its *Milkovich* decision, in considering Scott's appeal, the Ohio Supreme Court reversed its position on Diadiun's article, concluding that the column was "constitutionally protected opinion." *Scott v. News–Herald,* 25 Ohio St.3d 243, 254, 496 N.E.2d 699, 709 (1986). Consequently, the court upheld a lower court's grant of summary judgment against Scott.

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 161 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)
110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

The *Scott* court decided that the proper analysis for determining whether utterances are fact or opinion was set forth in the decision of the United States Court of Appeals for the District of Columbia Circuit in *Ollman v. Evans,* 242 U.S.App.D.C. 301, 750 F.2d 970 (1984), cert. denied, **\*9** 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). See *Scott,* 25 Ohio St.3d, at 250, 496 N.E.2d, at 706. Under that analysis, four factors are considered to ascertain whether, under the "totality of circumstances," a statement is fact or opinion. These factors are: (1) "the specific language used"; (2) "whether the statement is verifiable"; (3) "the general context of the statement"; and (4) "the broader context in which the statement appeared." *Ibid.* The court found that application of the first two factors to the column militated in favor of deeming the challenged passages actionable assertions of fact. *Id.,* at 250–252, 496 N.E.2d, at 706–707. That potential outcome was trumped, however, by the court's consideration of the third and fourth factors. With respect to the third factor, the general context, the court explained that "the large caption 'TD Says' ... would indicate to even the most gullible reader that the article was, in fact, opinion." *Id.,* at 252, 496 N.E.2d, at 707.[3] As for the fourth factor, the "broader context," the court reasoned that because the **\*\*2701** article appeared on a sports page—"a traditional haven for cajoling, invective, and hyperbole"—the article would probably be construed as opinion. *Id.,* at 253–254, 496 N.E.2d, at 708.[4]

**\*10** **[1]** **[2]** **[3]** Subsequently, considering itself bound by the Ohio Supreme Court's decision in *Scott,* the Ohio Court of Appeals in the instant proceedings affirmed a trial court's grant of summary judgment in favor of respondents, concluding that "it has been decided, as a matter of law, that the article in question was constitutionally protected opinion." 46 Ohio App.3d, at 23, 545 N.E.2d, at 1324. The Supreme Court of Ohio dismissed petitioner's ensuing appeal for want of a substantial constitutional question. App. 119. We granted certiorari, 493 U.S. 1055, 110 S.Ct. 863, 107 L.Ed.2d 947 (1990), to consider the important questions raised by the Ohio courts' recognition of a constitutionally required "opinion" exception to the application of its defamation laws. We now reverse.[5]

**\*11** **\*\*2702** Since the latter half of the 16th century, the common law has afforded a cause of action for damage to a person's reputation by the publication of false and defamatory statements. See L. Eldredge, Law of Defamation 5 (1978).

**\*12** In Shakespeare's Othello, Iago says to Othello:

"Good name in man and woman, dear my lord,

Is the immediate jewel of their souls.

Who steals my purse steals trash;

'Tis something, nothing;

'Twas mine, 'tis his, and has been slave to thousands;

But he that filches from me my good name

Robs me of that which not enriches him,

And makes me poor indeed." Act III, scene 3.

Defamation law developed not only as a means of allowing an individual to vindicate his good name, but also for the purpose of obtaining redress for harm caused by such statements. Eldredge, *supra,* at 5. As the common law developed in this country, apart from the issue of damages, one usually needed only allege an unprivileged publication of false and defamatory matter to state a cause of action for defamation. See, *e.g.,* Restatement of Torts § 558 (1938); *Gertz* **\*13** *v. Robert Welch, Inc.,* 418 U.S., at 370, 94 S.Ct., at 3022 (WHITE, J., dissenting) ("Under typical state defamation law, the defamed private citizen had to prove only a false publication that would subject him to hatred, contempt, or ridicule"). The common law generally did not place any additional restrictions on the type of statement that could be actionable. Indeed, defamatory communications were deemed actionable regardless of whether they were deemed to be statements of fact or opinion. See, *e.g.,* Restatement of Torts, *supra,* §§ 565–567. As noted in the 1977 Restatement (Second) of Torts § 566, Comment *a:*

"Under the law of defamation, an expression of opinion could be defamatory if the **\*\*2703** expression was sufficiently derogatory of another as to cause harm to his reputation, so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.... The expression of opinion was also actionable in a suit for defamation, despite the normal requirement that the communication be false as well as defamatory.... This position was maintained even though the truth or falsity of an opinion—as distinguished from a statement of fact—is not a matter that can be objectively determined and truth is a complete defense to a suit for defamation."

However, due to concerns that unduly burdensome defamation laws could stifle valuable public debate, the

privilege of "fair comment" was incorporated into the common law as an affirmative defense to an action for defamation. "The principle of 'fair comment' afford[ed] legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact." 1 F. Harper & F. James, Law of Torts § 5.28, p. 456 (1956) (footnote omitted). As this statement implies, comment was generally privileged when it concerned a matter of public concern, was upon true or privileged facts, represented the actual opinion of the speaker, and was not made **\*14** solely for the purpose of causing harm. See Restatement of Torts, *supra,* § 606. "According to the majority rule, the privilege of fair comment applied only to an expression of opinion and not to a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts, *supra,* § 566, Comment *a.* Thus under the common law, the privilege of "fair comment" was the device employed to strike the appropriate balance between the need for vigorous public discourse and the need to redress injury to citizens wrought by invidious or irresponsible speech.

In 1964, we decided in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, that the First Amendment to the United States Constitution placed limits on the application of the state law of defamation. There the Court recognized the need for "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*, at 279–280, 84 S.Ct., at 726. This rule was prompted by a concern that, with respect to the criticism of public officials in their conduct of governmental affairs, a state-law " 'rule compelling the critic of official conduct to guarantee the truth of all his factual assertions' would deter protected speech." *Gertz v. Robert Welch, Inc., supra,* 418 U.S., at 334, 94 S.Ct., at 3004 (quoting *New York Times, supra,* 376 U.S., at 279, 84 S.Ct., at 725).

Three years later, in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), a majority of the Court determined "that the *New York Times* test should apply to criticism of 'public figures' as well as 'public officials.' The Court extended the constitutional privilege announced in that case to protect defamatory criticism of nonpublic persons 'who are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.' " *Gertz, supra,*

418 U.S., at 336–337, 94 S.Ct., at 3005 **\*15** quoting *Butts, supra,* at 164, 87 S.Ct., at 1996 (Warren, C.J., concurring in result)). As Chief Justice Warren noted in concurrence, "[o]ur citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.' " *Butts, supra,* at 164, 87 S.Ct., at 1996. The Court has also determined that both for public officials and public figures, a showing of *New York Times* malice is subject to a clear and convincing standard **\*\*2704** of proof. *Gertz, supra,* 418 U.S., at 342, 94 S.Ct., at 3008.

The next step in this constitutional evolution was the Court's consideration of a private individual's defamation actions involving statements of public concern. Although the issue was initially in doubt, see *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the Court ultimately concluded that the *New York Times* malice standard was inappropriate for a private person attempting to prove he was defamed on matters of public interest. *Gertz v. Robert Welch, Inc., supra.* As we explained:

"Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.

. . . . .

"[More important,] public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual." *Id.* 418 U.S., at 344–345, 94 S.Ct., at 3009 (footnote omitted).

Nonetheless, the Court believed that certain significant constitutional protections were warranted in this area. First, we held that the States could not impose liability without requiring some showing of fault. See *id.,* at 347–348, 94 S.Ct., at 3010–3011 ("This approach ... recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury **\*16** to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation"). Second, we held that the States could not permit recovery of presumed or punitive damages on less than a showing of *New York Times* malice. See 418 U.S., at 350, 94 S.Ct., at 3012 ("Like the doctrine of presumed damages,

Case 1:25-cv-03552-JLR Document 162-3 Filed 03/12/26 Page 163 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)
110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship ...").

Still later, in *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), we held that "the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." *Id.,* at 777, 106 S.Ct., at 1564. In other words, the Court fashioned "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Id.,* at 776, 106 S.Ct., at 1563. Although recognizing that "requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so," the Court believed that this result was justified on the grounds that "placement by state law of the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result." *Id.,* at 777–778, 106 S.Ct., at 1564.

We have also recognized constitutional limits on the *type* of speech which may be the subject of state defamation actions. In *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), a real estate developer had engaged in negotiations with a local city council for a zoning variance on certain of his land, while simultaneously negotiating with the city on other land the city wished to purchase from him. A local newspaper published certain articles stating that some people had characterized the developer's negotiating position as "blackmail," and the developer sued for libel. Rejecting a contention that liability could be premised on the notion that the word "blackmail" implied the developer had committed the actual crime of blackmail, we held that "the imposition of **\*17** liability on such a basis was constitutionally impermissible—that as a matter of constitutional law, the word 'blackmail' in these circumstances was not slander when spoken, and not libel when reported in the Greenbelt News Review." *Id.,* at 13, 90 S.Ct., at 1541. **\*\*2705** Noting that the published reports "were accurate and full," the Court reasoned that "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Id.,* at 13–14, 90 S.Ct., at 1541–1542. See also *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988) (First Amendment precluded recovery under state emotional distress action for ad parody which "could not reasonably have been interpreted as stating actual facts about the public

figure involved"); *Letter Carriers v. Austin,* 418 U.S. 264, 284–286, 94 S.Ct. 2770, 2781–2782, 41 L.Ed.2d 745 (1974) (use of the word "traitor" in literary definition of a union "scab" not basis for a defamation action under federal labor law since used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members").

The Court has also determined that "in cases raising First Amendment issues ... an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting *New York Times,* 376 U.S., at 284–286, 84 S.Ct., at 728–729). "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562 (1989).

 **[4]** Respondents would have us recognize, in addition to the established safeguards discussed above, still another First–Amendment-based protection for defamatory statements which are categorized as "opinion" as opposed to "fact." For **\*18** this proposition they rely principally on the following dictum from our opinion in *Gertz:*

> "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." 418 U.S., at 339–340, 94 S.Ct., at 3007 (footnote omitted).

Judge Friendly appropriately observed that this passage "has become the opening salvo in all arguments for protection from defamation actions on the ground of opinion, even though the case did not remotely concern the question." *Cianci v. New Times Publishing Co.,* 639 F.2d 54, 61 (CA2 1980). Read in context, though, the fair meaning of the passage is to equate the word "opinion" in the second sentence with the word "idea" in the first sentence. Under this view, the language was merely a reiteration of Justice Holmes' classic "marketplace of ideas" concept. See *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (dissenting opinion) ("[T]he ultimate good desired is better reached by free trade in ideas—... the best test of truth is the power of the thought to get itself accepted in the competition of the market").

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 164 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)
110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

Thus, we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption for anything that might be labeled "opinion." See *Cianci, supra,* at 62, n. 10 (The "marketplace of ideas" origin of this passage "points strongly to the view that the 'opinions' held to be constitutionally protected were the sort of thing that could be corrected by discussion"). Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of "opinion" may often imply an assertion of objective fact.

If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of **2706** facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts **19** upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.' " See *Cianci, supra,* at 64. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts, § 566, Comment *a* (1977).

Apart from their reliance on the *Gertz* dictum, respondents do not really contend that a statement such as, "In my opinion John Jones is a liar," should be protected by a separate privilege for "opinion" under the First Amendment. But they do contend that in every defamation case the First Amendment mandates an inquiry into whether a statement is "opinion" or "fact," and that only the latter statements may be actionable. They propose that a number of factors developed by the lower courts (in what we hold was a mistaken reliance on the *Gertz* dictum) be considered in deciding which is which. But we think the " 'breathing space' " which " '[f]reedoms of expression require in order to survive,' " *Hepps,* 475 U.S., at 772, 106 S.Ct., at 1561 (quoting *New York Times, supra,* 376 U.S., at 272, 84 S.Ct., at 721), is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between "opinion" and fact.

Foremost, we think *Hepps* stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant **20** is involved.[6] Thus, unlike the statement, "In my opinion Mayor Jones is a liar," the statement, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," would not be actionable. *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.[7]

Next, the *Bresler–Letter Carriers–Falwell* line of cases provides protection for statements that cannot "reasonably [be] interpreted as stating actual facts" about an individual. *Falwell,* 485 U.S., at 50, 108 S.Ct., at 879. This provides assurance that public debate will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" which has traditionally added much to the discourse of our Nation. See *id.,* at 53–55, 108 S.Ct., at 880–882.

[5]  [6]   The *New York Times–Butts–Gertz* culpability requirements further ensure that debate on public issues remains "uninhibited, robust, and wide-open." *New York Times,* 376 U.S., at 270, 84 S.Ct., at 720. Thus, where a statement of "opinion" on a matter **2707** of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth. Similarly, where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some level of fault **21** as required by *Gertz.*[8] Finally, the enhanced appellate review required by *Bose Corp.* provides assurance that the foregoing determinations will be made in a manner so as not to "constitute a forbidden intrusion of the field of free expression." *Bose Corp.,* 466 U.S., at 499, 104 S.Ct., at 1959 (quotation omitted).

[7]   We are not persuaded that, in addition to these protections, an additional separate constitutional privilege for "opinion" is required to ensure the freedom of expression guaranteed by the First Amendment. The dispositive question in the present case then becomes whether a reasonable factfinder could conclude that the statements in the Diadiun column imply an assertion that petitioner Milkovich perjured

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 165 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)
110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

himself in a judicial proceeding. We think this question must be answered in the affirmative. As the Ohio Supreme Court itself observed: "[T]he clear impact in some nine sentences and a caption is that [Milkovich] 'lied at the hearing after ... having given his solemn oath to tell the truth.' " *Scott,* 25 Ohio St.3d, at 251, 496 N.E.2d, at 707. This is not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression.

We also think the connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false. A determination whether petitioner lied in this instance can be made on a core of objective evidence by comparing, *inter alia,* petitioner's testimony before the OHSAA board with his subsequent testimony before the trial court. As the *Scott* court noted regarding the plaintiff in that case: "[W]hether or not H. Don Scott did indeed perjure himself is certainly verifiable by a perjury action with evidence adduced from the transcripts and witnesses present at  **\*22**  the hearing. Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." *Id.,* at 252, 496 N.E.2d, at 707. So too with petitioner Milkovich.[9]

The numerous decisions discussed above establishing First Amendment protection for defendants in defamation actions surely demonstrate the Court's recognition of the Amendment's vital guarantee of free and uninhibited discussion of public issues. But there is also another side to the equation; we have regularly acknowledged the "important social values which underlie the law of defamation," and recognized that "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation."  **\*\*2708**  *Rosenblatt v. Baer,* 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966). Justice Stewart in that case put it with his customary clarity:

> "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.

> . . . . .

> "The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem.  **\*23**  Yet, imperfect though it is, an action for damages is

the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored." *Id.,* at 92–93, 86 S.Ct., at 679–680 (concurring opinion).

We believe our decision in the present case holds the balance true. The judgment of the Ohio Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

Justice BRENNAN, with whom Justice MARSHALL joins, dissenting.

Since this Court first hinted that the First Amendment provides some manner of protection for statements of opinion,[1] notwithstanding any common-law protection, courts and commentators have struggled with the contours of this protection and its relationship to other doctrines within our First Amendment jurisprudence. Today, for the first time, the Court addresses this question directly and, to my mind, does so cogently and almost entirely correctly. I agree with the Court that under our line of cases culminating in *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986), only defamatory statements that are capable of being proved false are subject to liability under state libel law. See *ante,* at 2704.[2] I also agree with the Court that the "statement"  **\*24**  that the plaintiff must prove false under *Hepps* is not invariably the literal phrase published but rather what a reasonable reader would have understood the author to have said. See *ante,* at 2704–2705 (discussing *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)).

In other words, while the Court today dispels any misimpression that there is a so-called opinion privilege *wholly in addition* to the protections we have already found to be guaranteed by the First Amendment, it determines that a protection for statements of pure opinion is dictated by *existing* First Amendment doctrine. As the Court explains, "full constitutional protection" extends to any statement relating to matters of public concern "that cannot 'reasonably [be] interpreted as stating actual facts' about an individual."  **\*\*2709**  *Ante,* at 2706. Among the circumstances to be scrutinized by a court in ascertaining whether a statement

purports to state or imply "actual facts about an individual," as shown by the Court's analysis of the statements at issue here, see *ante,* at 2707 and n. 9, are the same indicia that lower courts have been relying on for the past decade or so to distinguish between statements of fact and statements of opinion: the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made. See, *e.g., Potomac Valve & Fitting Inc. v. Crawford Fitting Co.,* 829 F.2d 1280 (CA4 1987); *Janklow v. Newsweek, Inc.,* 788 F.2d 1300 (CA8 1986); *Ollman v. Evans,* 242 U.S.App.D.C. 301, 750 F.2d 970 (1984), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

 **\*25** With all of the above, I am essentially in agreement. I part company with the Court at the point where it applies these general rules to the statements at issue in this case because I find that the challenged statements cannot reasonably be interpreted as either stating or implying defamatory facts about petitioner. Under the rule articulated in the majority opinion, therefore, the statements are due "full constitutional protection." I respectfully dissent.

I

As the majority recognizes, the kind of language used and the context in which it is used may signal readers that an author is not purporting to state or imply actual, known facts. In such cases, this Court has rejected claims to the contrary and found that liability may not attach "as a matter of constitutional law." *Ante,* at 2704. See, *e.g., Bresler, supra* (metaphor); *Letter Carriers, supra* (hyperbole); *Falwell, supra* (parody). In *Bresler,* for example, we found that Bresler could not recover for being accused of "blackmail" because the readers of the article would have understood the author to mean only that Bresler was manipulative and extremely unreasonable. See *ante,* at 2704. In *Letter Carriers,* we found that plaintiffs could not recover for being accused of being "traitor[s]" because the newsletter's readers would have understood that the author meant that plaintiffs' accurately reported actions were reprehensible and destructive to the social fabric, not that plaintiffs committed treason. See *ante,* at 2705.

Statements of belief or opinion are like hyperbole, as the majority agrees, in that they are not understood as actual assertions of fact about an individual, but they may be actionable if they *imply* the existence of false and defamatory facts. See *ante,* at 2706. The majority provides some general

guidance for identifying when statements of opinion imply assertions of fact. But it is a matter worthy of further attention **\*26** in order "to confine the perimeters of [an] unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 505, 104 S.Ct. 1949, 1962, 80 L.Ed.2d 502 (1984). Although statements of opinion *may* imply an assertion of a false and defamatory fact, they do not *invariably* do so. Distinguishing which statements do imply an assertion of a false and defamatory fact requires the same solicitous and thorough evaluation that this Court has engaged in when determining whether particular exaggerated or satirical statements could reasonably be understood to have asserted such facts. See *Bresler, supra; Letter Carriers, supra; Falwell, supra.* As Justice Holmes observed long ago: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918).

For instance, the statement that "Jones is a liar," or the example given by the majority, "In my opinion John Jones is a liar"—standing **\*\*2710** alone—can reasonably be interpreted as implying that there are facts known to the speaker to cause him to form such an opinion. See *ante,* at 2706. But a different result must obtain if the speaker's comments had instead been as follows: "Jones' brother once lied to me; Jones just told me he was 25; I've never met Jones before and I don't actually know how old he is or anything else about him, but he looks 16; I think Jones lied about his age just now." In the latter case, there are at least six statements, two of which may arguably be actionable. The first such statement is factual and defamatory and may support a defamation action by Jones' brother. The second statement, however, that "I think Jones lied about his age just now," can be reasonably interpreted in context only as a statement that the speaker infers, from the facts stated, that Jones told a particular lie. It is clear to the listener that the speaker does **\*27** not actually know whether Jones lied and does not have any other reasons for thinking he did.[3] Thus, the only fact implied by the second statement is that the speaker drew this inference. If the inference is sincere or nondefamatory, the speaker is not liable for damages.[4]

 **\*28** II

Case 1:25-cv-03552-JLR Document 162-3 Filed 03/12/26 Page 167 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)

110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

The majority does not rest its decision today on any finding that the statements at issue explicitly state a false and defamatory fact. Nor could it. Diadiun's assumption that Milkovich must have lied at the court hearing is patently conjecture.[5] The majority finds Diadiun's statements actionable, however, because it concludes that these statements imply a factual assertion that Milkovich perjured himself at the judicial proceeding. **2711 I disagree. Diadiun not only reveals the facts upon which he is relying but he makes it clear at which point he runs out of facts and is simply guessing. Read in context, the statements cannot reasonably be interpreted as implying such an assertion as fact. See *ante,* at 2698–2699, n. 2 (reproducing the column).

Diadiun begins the column by noting that, on the day before, a Court of Common Pleas had overturned the decision by the Ohio High School Athletic Association (OHSAA) to suspend the Maple Heights wrestling team from that year's state tournament. He adds that the reversal was based on due process grounds. Diadiun emphasizes to the audience that he was present at the wrestling meet where the brawl that led to the team's suspension took place and that he was present at the hearing before the OHSAA. He attributes the brawl to Maple Heights coach Milkovich's wild gestures, ranting and egging the crowd on against the competing team from Mentor. He then describes Milkovich's testimony before the OHSAA, characterizing it as deliberate misrepresentation *29 "attempting not only to convince the board of [his] own innocence, but, incredibly, shift the blame of the affair to Mentor." *Ante,* at 2699, n. 2. Diadiun then quotes statements allegedly made by Milkovich to the commissioners to the effect that his wrestlers had not been involved in the fight and his gestures had been mere shrugs.

At that point in the article, the author openly begins to surmise. Diadiun says that it "*seemed* " that Milkovich's and another official's story contained enough contradictions and obvious untruths that the OHSAA board was able to see through it and that "[*p*]*robably* " the OHSAA's suspension of the Maple Heights team reflected displeasure as much at the testimony as at the melee. *Ante,* at 2699, n. 2 (emphasis added). Then Diadiun guesses that by the time of the court hearing, the two officials "*apparently* had their version of the incident polished and reconstructed, and the judge *apparently* believed them." *Ibid.* (emphasis added). For the first time, the column quotes a third party's version of events. The source, an OHSAA commissioner, is described—in evident contrast to Diadiun—as having attended the proceeding. The column does not quote any testimony from the court proceeding,

nor does it describe what Milkovich said in court. There is only a vague statement from the OHSAA commissioner that the testimony "sounded pretty darned unfamiliar."[6] For the first time, Diadiun fails *30 to claim any firsthand knowledge, after stressing that he had personally attended both the meet and the OHSAA hearing. After noting again that the judge ruled in Milkovich's and Maple Heights' favor, Diadiun proclaims: "Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth." *Ibid.*

No reasonable reader could understand Diadiun to be impliedly asserting—as fact—that Milkovich had perjured himself. Nor could such a reader infer that Diadiun had further information about Milkovich's court testimony on which his belief was based. It is plain from the column that Diadiun did not attend the court hearing. Diadiun also clearly had no detailed second hand information about what Milkovich had said in court. Instead, **2712 what suffices for "detail" and "color" are quotations from the OHSAA hearing—old news compared to the court decision which prompted the column —and a vague quotation from an OHSAA commissioner. Readers could see that Diadiun was focused on the court's reversal of the OHSAA's decision and was angrily supposing what must have led to it.[7]

*31 Even the insinuation that Milkovich had repeated, in court, a more plausible version of the misrepresentations he had made at the OHSAA hearing is preceded by the cautionary term "apparently"—an unmistakable sign that Diadiun did not know what Milkovich had actually said in court. "[C]autionary language or interrogatories of this type put the reader on notice that what is being read is opinion and thus weaken any inference that the author possesses knowledge of damaging, undisclosed facts.... In a word, when the reasonable reader encounters cautionary language, he tends to 'discount that which follows.' " *Ollman v. Evans,* 242 U.S.App.D.C., at 314, 750 F.2d, at 983, quoting *Burns v. McGraw–Hill Broadcasting Co.,* 659 P.2d 1351, 1360 (Colo.1983). See also B. Sanford, Libel and Privacy: The Prevention and Defense of Litigation 145 (1987) (explaining that many courts have found that words like "apparent" reveal "that the assertion is qualified or speculative and is not to be understood as a declaration of fact"); *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 784 (CA9 1980) (explaining that a statement phrased in language of apparency "is less likely to be understood as a statement of *32 fact rather than as a statement of

Case 1:25-cv-03552-JLR   Document 162-3   Filed 03/12/26   Page 168 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)

110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

opinion"); *Gregory v. McDonnell Douglas Corp.,* 17 Cal.3d 596, 603, 131 Cal.Rptr. 641, 644, 552 P.2d 425, 429 (1976) (finding a letter "cautiously phrased in terms of apparency" did not imply factual assertions); *Stewart v. Chicago Title Ins. Co.,* 151 Ill.App.3d 888, 894, 104 Ill.Dec. 865, 868, 503 N.E.2d 580, 583 (1987) (finding a letter "couched in language of opinion rather than firsthand knowledge" did not imply factual assertions). Thus, it is evident from what Diadiun actually wrote that he had no unstated reasons for concluding that Milkovich perjured himself.

Furthermore, the tone and format of the piece notify readers to expect speculation and personal judgment. The tone is pointed, exaggerated, and heavily laden with emotional rhetoric and moral outrage. Diadiun never says, for instance, that Milkovich committed perjury. He says that "[a]nyone who **\*\*2713** attended the meet ... knows in his heart" that Milkovich lied—obvious hyperbole as Diadiun does not purport to have researched what everyone who attended the meet knows in his heart.

The format of the piece is a signed editorial column with a photograph of the columnist and the logo "TD Says." Even the headline on the page where the column is continued —"Diadiun says Maple told a lie," *ante,* at 2698—reminds readers that they are reading one man's commentary. While signed columns may certainly include statements of fact, they are also the "well recognized home of opinion and comment." *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 227 (CA2 1985). Certain formats—editorials, reviews, political cartoons, letters to the editor—signal the reader to anticipate a departure from what is actually known by the author as fact. See *Ollman v. Evans, supra,* at 317, 750 F.2d, at 986 ("The reasonable reader who peruses [a] column on the editorial or Op–Ed page is fully aware that the statements found there are not 'hard' news like those printed on the front page or elsewhere in the news sections of the newspaper"); R. Smolla, Law of Defamation § 6.12(4), n. 252 (1990) (collecting **\*33** cases); Zimmerman, Curbing the High Price of Loose Talk, 18 U.C.D.L.Rev. 359, 442 (1985) (stressing the need to take into account "the cultural common sense of the ordinary listener or reader").[8]

III

Although I agree with the majority that statements must be scrutinized for implicit factual assertions, the majority's scrutiny in this case does not "hol [d] the balance true,"

*ante,* at 2708, between protection of individual reputation and freedom of speech. The statements complained of neither state nor imply a false assertion of fact, and, under the rule the Court reconfirms today, they should be found not libel " 'as a matter of constitutional law.' " *Ante,* at 2704, quoting *Bresler,* 398 U.S., at 13, 90 S.Ct., at 1541. Readers of Diadiun's column are signaled repeatedly that the author does not actually know what Milkovich said at the court hearing and that the author is surmising, from factual premises made explicit in the column, that Milkovich must have lied in court.[9]

 **\*34**  **\*\*2714**  Like the "imaginative expression" and the "rhetorical hyperbole" which the Court finds have "traditionally added much to the discourse of our Nation," *ante,* at 2706, conjecture is intrinsic to "the free flow of ideas and opinions on matters of public interest and concern" that is at "the heart of the First Amendment." *Falwell,* 485 U.S., at 50, 108 S.Ct., at 879. The public and press regularly examine the activities of those who affect our lives. "One of the perogatives of American citizenship is the right to criticize men and measures." *Id.,* at 51, 108 S.Ct., at 879 (quoting *Baumgartner v. United States,* 322 U.S. 665, 673–674, 64 S.Ct. 1240, 1244–1245, 88 L.Ed. 1525 (1944)). But often only some of the facts are known, and solely through insistent prodding—through conjecture as well as research—can important public questions be subjected to the "uninhibited, robust, and wide-open" debate to which this country is profoundly committed. *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

Did NASA officials ignore sound warnings that the Challenger Space Shuttle would explode? Did Cuban–American **\*35** leaders arrange for John Fitzgerald Kennedy's assassination? Was Kurt Waldheim a Nazi officer? Such questions are matters of public concern long before all the facts are unearthed, if they ever are. Conjecture is a means of fueling a national discourse on such questions and stimulating public pressure for answers from those who know more. " 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' " *Id.,* at 269, 84 S.Ct., at 720 (quoting *Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931)).

Case 1:25-cv-03552-JLR Document 162-3 Filed 03/12/26 Page 169 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)

110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

What may be more disturbing to some about Diadiun's conjecture than, say, an editorial in 1960 speculating that Francis Gary Powers was in fact a spy, despite the Government's initial assurances that he was not, is the naiveté of Diadiun's conclusion. The basis of the court decision that is the subject of Diadiun's column was that Maple Heights had been denied its right to due process by the OHSAA. Diadiun, as it happens, not only knew this but included it in his column. But to anyone who knows what "due process" means, it does not follow that the court must have believed some lie about what happened at the wrestling meet, because what happened at the meet would not have been germane to the questions at issue. There may have been testimony about what happened, and that testimony may have been perjured, but to anyone who understands the patois of the legal profession there is no reason to assume—from the court's decision—that such testimony must have been given.

Diadiun, therefore, *is* guilty. He is guilty of jumping to conclusions, of benightedly assuming that court decisions are always based on the merits, and of looking foolish to lawyers. He is not, however, liable for defamation. Ignorance, without more, has never served to defeat freedom of speech. "The constitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are **\*36** offered.' " *New York Times, supra,* at 271, 84 S.Ct., at 721 (quoting *NAACP v. Button,* 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963)).

I appreciate this Court's concern with redressing injuries to an individual's reputation. But as long as it is clear to the reader that he is being offered conjecture and not solid information, the danger to reputation is **\*\*2715** one we have chosen to tolerate in pursuit of " 'individual liberty [and] the common quest for truth and the vitality of society as a whole.' " *Falwell, supra,* 485 U.S., at 50–51, 108 S.Ct., at 879 (quoting *Bose Corp.,* 466 U.S., at 503–504, 104 S.Ct., at 1960–1961). Readers are as capable of independently evaluating the merits of such speculative conclusions as they are of evaluating the merits of pure opprobrium. Punishing such conjecture protects reputation only at the cost of expunging a genuinely useful mechanism for public debate. "In a society which takes seriously the principle that government rests upon the consent of the governed, freedom of the press must be the most cherished tenet." *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113, 115 (CA2), cert. denied *sub nom. Edwards v. New York Times Co.,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).

It is, therefore, imperative that we take the most particular care where freedom of speech is at risk, not only in articulating the rules mandated by the First Amendment, but also in applying them. " 'Whatever is added to the field of libel is taken from the field of free debate.' " *New York Times, supra,* at 272, 84 S.Ct., at 721 (quoting *Sweeney v. Patterson,* 76 U.S.App.D.C. 23, 24, 128 F.2d 457, 458, cert. denied, 317 U.S. 678, 63 S.Ct. 160, 87 L.Ed. 544 (1942)). Because I would affirm the Ohio Court of Appeals' grant of summary judgment to respondents, albeit on somewhat different reasoning, I respectfully dissent.

### All Citations

497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061, 17 Media L. Rep. 2009

Footnotes

\*	The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1	The Court has previously denied certiorari twice in this litigation on various judgments rendered by the Ohio courts. See *Lorain Journal Co. v. Milkovich,* 474 U.S. 953, 106 S.Ct. 322, 88 L.Ed.2d 305 (1985); *Lorain Journal Co. v. Milkovich,* 449 U.S. 966, 101 S.Ct. 380, 66 L.Ed.2d 232 (1980).

2	In its entirety, the article reads as follows:

	"Yesterday in the Franklin County Common Pleas Court, judge Paul Martin overturned an Ohio High School Athletic Assn. decision to suspend the Maple Heights wrestling team from this year's state tournament.

110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

"It's not final yet—the judge granted Maple only a temporary injunction against the ruling—but unless the judge acts much more quickly than he did in this decision (he has been deliberating since a Nov. 8 hearing) the temporary injunction will allow Maple to compete in the tournament and make any further discussion meaningless.

"But there is something much more important involved here than whether Maple was denied due process by the OHSAA, the basis of the temporary injunction.

"When a person takes on a job in a school, whether it be as a teacher, coach, administrator or even maintenance worker, it is well to remember that his primary job is that of educator.

"There is scarcely a person concerned with school who doesn't leave his mark in some way on the young people who pass his way—many are the lessons taken away from school by students which weren't learned from a lesson plan or out of a book. They come from personal experiences with and observations of their superiors and peers, from watching actions and reactions.

"Such a lesson was learned (or relearned) yesterday by the student body of Maple Heights High School, and by anyone who attended the Maple–Mentor wrestling meet of last Feb. 8.

"A lesson which, sadly, in view of the events of the past year, is well they learned early.

"It is simply this: If you get in a jam, lie your way out.

"If you're successful enough, and powerful enough, and can sound sincere enough, you stand an excellent chance of making the lie stand up, regardless of what really happened.

"The teachers responsible were mainly head Maple wrestling coach, Mike Milkovich, and former superintendent of schools H. Donald Scott.

"Last winter they were faced with a difficult situation. Milkovich's ranting from the side of the mat and egging the crowd on against the meet official and the opposing team backfired during a meet with Greater Cleveland Conference rival Metor [*sic*], and resulted in first the Maple Heights team, then many of the partisan crowd attacking the Mentor squad in a brawl which sent four Mentor wrestlers to the hospital.

"Naturally, when Mentor protested to the governing body of high school sports, the OHSAA, the two men were called on the carpet to account for the incident.

"But they declined to walk into the hearing and face up to their responsibilities, as one would hope a coach of Milkovich's accomplishments and reputation would do, and one would certainly expect from a man with the responsible poisition [*sic*] of superintendent of schools.

"Instead they chose to come to the hearing and misrepresent the things that happened to the OHSAA Board of Control, attempting not only to convince the board of their own innocence, but, incredibly, shift the blame of the affair to Mentor.

"I was among the 2,000–plus witnesses of the meet at which the trouble broke out, and I also attended the hearing before the OHSAA, so I was in a unique position of being the only non-involved party to observe both the meet itself and the Milkovich–Scott version presented to the board.

"Any resemblance between the two occurrances [*sic*] is purely coincidental.

"To anyone who was at the meet, it need only be said that the Maple coach's wild gestures during the events leading up to the brawl were passed off by the two as 'shrugs,' and that Milkovich claimed he was 'Powerless to control the crowd' before the melee.

"Fortunately, it seemed at the time, the Milkovich–Scott version of the incident presented to the board of control had enough contradictions and obvious untruths so that the six board members were able to see through it.

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 171 of 230

110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

"Probably as much in distasteful reaction to the chicanery of the two officials as in displeasure over the actual incident, the board then voted to suspend Maple from this year's tournament and to put Maple Heights, and both Milkovich and his son, Mike Jr. (the Maple Jaycee coach), on two-year probation.

"But unfortunately, by the time the hearing before Judge Martin rolled around, Milkovich and Scott apparently had their version of the incident polished and reconstructed, and the judge apparently believed them.

" 'I can say that some of the stories told to the judge sounded pretty darned unfamiliar,' said Dr. Harold Meyer, commissioner of the OHSAA, who attended the hearing. 'It certainly sounded different from what they told us.'

"Nevertheless, the judge bought their story, and ruled in their favor.

"Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth.

"But they got away with it.

"Is that the kind of lesson we want our young people learning from their high school administrators and coaches?

"I think not." App. to Pet. for Cert. A138—A139.

3    The court continued:

"This position is borne out by the second headline on the continuation of the article which states: '... *Diadiun says* Maple told a lie.' ... The issue, in context, was not the statement that there was a legal hearing and Milkovich and Scott lied. Rather, based upon Diadiun's having witnessed the original altercation and OHSAA hearing, it was his view that any position represented by Milkovich and Scott less than a full admission of culpability was, in his view, a lie.... A review of the context of the statements in question demonstrates that Diadiun is not making an attempt to be impartial and no secret is made of his bias.... While Diadiun's mind is certainly made up, the average reader viewing the words in their internal context would be hard pressed to accept Diadiun's statements as an impartial reporting of perjury." *Scott,* 25 Ohio St.3d, at 252–253, 496 N.E.2d, at 707–708 (emphasis in original).

4    Specifically, the court reasoned as follows:

"It is important to recognize that Diadiun's article appeared on the sports page—a traditional haven for cajoling, invective, and hyperbole.... In this broader context we doubt that a reader would assign the same weight to Diadiun's statement as if it had appeared under the byline 'Law Correspondent' on page one of the newspaper.... On balance ... a reader would not expect a sports writer on the sports page to be particularly knowledgeable about procedural due process and perjury. It is our belief that 'legal conclusions' in such a context would probably be construed as the writer's opinion." *Scott, Id.,* at 253–254, 496 N.E.2d, at 708.

5    Preliminarily, respondents contend that our review of the "opinion" question in this case is precluded by the Ohio Supreme Court's decision in *Scott v. News-Herald,* 25 Ohio St.3d 243, 496 N.E.2d 699 (1986). First, respondents claim that the determination by the Ohio Supreme Court in *Milkovich v. News–Herald,* 15 Ohio St.3d 292, 298, 473 N.E.2d 1191, 1196 (1984), that petitioner is not a public official or figure was overruled in *Scott.* Thus, since petitioner has failed to establish actual malice, his action is precluded under *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). This contention is meritless. Respondents rely on the following statements made by the Ohio Supreme Court in its discussion of Scott's status as a public official: " 'To say that Milkovich nevertheless was not a public figure for purposes of discussion about the controversy is simply nonsense,' " 25 Ohio St.3d, at 247, 496 N.E.2d, at 704 (quoting *Milkovich v. Lorain Journal Co.,* 474 U.S. 953, 964, 106 S.Ct. 322, 330, 88 L.Ed.2d 305 (1985) (BRENNAN, J., dissenting from denial of certiorari)), and "we overrule *Milkovich* in its restrictive view of public officials and hold a public school superintendent is a public official for purposes of defamation law." 25 Ohio St.3d, at 248, 496 N.E.2d, at 704. However, it is clear from the context in which these statements were made that the court was simply supporting its determination that Scott was a public official, and that as relates to petitioner Milkovich, these statements were pure dicta. But more importantly, petitioner Milkovich was not a party to the proceedings in *Scott* and thus would not be bound by anything in that ruling under Ohio law. See

110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

*Hainbuchner v. Miner,* 31 Ohio St.3d 133, 137, 509 N.E.2d 424, 427 (1987) ("It is universally recognized that a former judgment, in order to be *res judicata* in a subsequent action, must have been rendered in an action in which the parties to the subsequent action were adverse parties") (quotation omitted). Since the Ohio Court of Appeals did not address the public-private figure question on remand from the Ohio Supreme Court in *Milkovich* (because it decided against petitioner on the basis of the opinion ruling in *Scott* ), the ruling of the Ohio Supreme Court in *Milkovich* presumably continues to be law of the case on that issue. See *Hawley v. Ritley,* 35 Ohio St.3d 157, 160, 519 N.E.2d 390, 393 (1988) ("[T]he decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels").

Nor is there any merit to respondents' contention that the Court of Appeals below alternatively decided there was no negligence in this case even if petitioner were regarded as a private figure, and thus the action is precluded by our decision in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Although the appellate court noted that "the instant cause does not present any material issue of fact as to negligence or 'actual malice,' " *Milkovich v. News–Herald,* 46 Ohio App.3d 20, 24, 545 N.E.2d 1320, 1325 (1989), this statement was immediately explained by the court's following statement that the *Scott* ruling on the opinion issue had accorded respondents absolute immunity from liability. See 46 Ohio App.3d, at 24, 545 N.E.2d, at 1325. The court never made an evidentiary determination on the issue of respondents' negligence.

Next, respondents concede that the *Scott* court relied on the United States Constitution as well as the Ohio Constitution in its recognition of an opinion privilege, Brief for Respondents 18, but argue that certain statements made by the court evidenced an intent to independently rest the decision on state-law grounds, see 25 Ohio St.3d, at 244, 496 N.E.2d, at 701 ("We find the article to be an opinion, protected by Section 11, Article I of the Ohio Constitution ..."); *id.,* at 245, 496 N.E.2d, at 702 ("These ideals are not only an integral part of First Amendment freedoms under the federal Constitution but are independently reinforced in Section 11, Article I of the Ohio Constitution ..."), thereby precluding federal review under *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). We similarly reject this contention. In the *Milkovich* proceedings below, the Court of Appeals relied completely on *Scott* in concluding that Diadiun's article was privileged opinion. See 46 Ohio App.3d, at 23–25, 545 N.E.2d, at 1324–1325. *Scott* relied heavily on federal decisions interpreting the scope of First Amendment protection accorded defamation defendants, see, *e.g.,* 25 Ohio St.3d, at 244, 496 N.E.2d, at 701 ("The federal Constitution has been construed to protect published opinions ever since the United States Supreme Court's opinion in *Gertz v. Robert Welch, Inc.* ..."), and concluded that "[b]ased upon the totality of circumstances it is our view that Diadiun's article was constitutionally protected opinion both with respect to the federal Constitution and under our state Constitution." *Id.,* at 254, 496 N.E.2d, at 709. Thus, the *Scott* decision was at least "interwoven with the federal law," and was not clear on its face as to the court's intent to rely on independent state grounds, yet failed to make a "plain statement ... that the federal cases ... [did] not themselves compel the result that the court ... reached." *Long, supra,* 463 U.S., at 1040–1041, 103 S.Ct., at 3476. Under *Long,* then, federal review is not barred in this case. We note that the Ohio Supreme Court remains free, of course, to address all of the foregoing issues on remand.

6    In *Hepps* the Court reserved judgment on cases involving nonmedia defendants, see 475 U.S., at 779, n. 4, 106 S.Ct., at 1565, n. 4, and accordingly we do the same. Prior to *Hepps,* of course, where public-official or public-figure plaintiffs were involved, the *New York Times* rule already required a showing of falsity before liability could result. 475 U.S., at 775, 106 S.Ct., at 1563.

7    We note that the issue of falsity relates to the *defamatory* facts implied by a statement. For instance, the statement, "I think Jones lied," may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action, though falsity at the first level may serve to establish malice where that is required for recovery.

8    Of course, the limitations on presumed or punitive damages established by *New York Times* and *Gertz* also apply to the type of statements at issue here.

9    In their brief, *amici* Dow Jones et al. urge us to view the disputed statements "[a]gainst the background of a high profile controversy in a small community," and says that "[t]hey related to a matter of pressing public concern in a small town." Brief for Dow Jones et al. as *Amici Curiae* 27. We do not have the same certainty as do *amici* that people in a "small

town" view statements such as these differently from people in a large city. Be that as it may, however, *amici* err in their factual assumption. Maple Heights is located in Cuyahoga County, Ohio, and in the 1980 census had a population of 29,735. Mentor is located in Lake County, Ohio, and in the 1980 census had a population of 42,065. Lake County adjoins Cuyahoga County on the east, and in the 1980 census had a population of 212,801. Both Maple Heights and Mentor are included in the Cleveland standard consolidated statistical area, which in 1980 had a population of 2,834,062. The high schools of both Mentor and Maple Heights played in the Greater Cleveland Conference.

See, *e.g., New York Times Co. v. Sullivan,* 376 U.S. 254, 292, n. 30, 84 S.Ct. 710, 732, n. 30, 11 L.Ed.2d 686 (1964) ("Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact"); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–340, 94 S.Ct. 2997, 3006–3007, 41 L.Ed.2d 789 (1974) ("Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas").

The defendant in the *Hepps* case was a major daily newspaper and, as the majority notes, see *ante,* at 2704, the Court declined to decide whether the rule it applied to the newspaper would also apply to a nonmedia defendant. See 475 U.S., at 779, n. 4, 106 S.Ct., at 1565, n. 4. I continue to believe that "such a distinction is 'irreconcilable with the fundamental First Amendment principle that "[t]he inherent worth of ... speech in terms of its capacity for informing the public does not depend upon the identity of the source, whether corporation, association, union, or individual." ' " *Id.,* at 780, 106 S.Ct., at 1565 (BRENNAN, J., concurring) (citations omitted).

The Restatement (Second) of Torts § 566, Comment *c* (1977), makes a similar observation. It explains that a statement that "I think C must be an alcoholic" is potentially libelous because a jury might find that it implies the speaker knew undisclosed facts to justify the statement. In contrast, it finds that the following statement could not be found to imply any defamatory facts:

"A writes to B about his neighbor C: 'He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic.' "

Yet even though clear disclosure of a comment's factual predicate precludes a finding that the comment implies other defamatory facts, this does not signify that a statement, preceded by only a partial factual predicate or none at all, necessarily implies other facts. The operative question remains whether reasonable readers would have actually interpreted the statement as implying defamatory facts. See *ante,* at 2706, n. 7; see generally Note, 13 Wm. Mitchell L.Rev. 545 (1987); Comment, 74 Calif.L.Rev. 1001 (1986); Zimmerman, Curbing the High Price of Loose Talk, 18 U.C.D.L.Rev. 359 (1985).

See *ante,* at 2706, n. 7 (noting that under *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), "the issue of falsity relates to the defamatory facts *implied* by a statement" (emphasis changed)). *Hepps* mandates protection for speech that does not actually state or imply false and defamatory facts—independently of the *Bresler–Letter Carriers–Falwell* line of cases. Implicit in the constitutional rule that a plaintiff must prove a statement false to recover damages is a requirement to determine first what statement was actually made. The proof that *Hepps* requires from the plaintiff hinges on what the statement can reasonably be interpreted to mean. For instance, if Riley tells his friends that Smith cheats at cards and Smith then proves that he did not rob a convenience store, Smith cannot recover damages for libel on that basis because he has proved the wrong assertion false. Likewise, in the example in text, Jones cannot recover for defamation for the statement "I think Jones lied about his age just now" by producing proof that he did not lie about his age because, like Smith, he would have proved the wrong assertion false. The assertion Jones must prove false is that the speaker had, in fact, drawn the inference that Jones lied.

Conjecture, when recognizable as such, alerts the audience that the statement is one of belief, not fact. The audience understands that the speaker is merely putting forward a hypothesis. Although the hypothesis involves a factual question, it is understood as the author's "best guess." Of course, if the speculative conclusion is preceded by stated factual premises, and one or more of them is false and defamatory, an action for libel may lie *as to them.* But the speculative conclusion itself is actionable only if it implies the existence of another false and defamatory fact.

Case 1:25-cv-03552-JLR  Document 162-3  Filed 03/12/26  Page 174 of 230

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)
110 S.Ct. 2695, 111 L.Ed.2d 1, 58 USLW 4846, 60 Ed. Law Rep. 1061...

The commissioner is quoted as having said: " 'I can say that some of the stories told to the judge sounded pretty darned unfamiliar.... It certainly sounded different from what they told us.' " *Ante,* at 2699, n. 2. This quotation might also be regarded as a stated factual premise on which Diadiun's speculation is based. However, Milkovich did not complain of the quotation in his pleadings. In any event, it is unlikely that it would be found defamatory. Diadiun had already characterized the testimony of the two officials before the OHSAA as "obvious untruths." Thus, the commissioner's alleged assertion that the testimony in court was different is quite nebulous. It might indicate that the officials told the truth in court, in contrast to the version given to the commissioners, or that the officials discussed entirely different issues, rather than that they told a new lie.

Both state and federal courts have found that audiences can recognize conjecture that neither states nor implies any assertions of fact, just as they can recognize hyperbole. For example, in *Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.,* 829 F.2d 1280, 1290 (CA4 1987), the court found that a disparaging statement about a product test in an industry newsletter, set forth following a list of seven observations about the test's methodology, "readily appears to be nothing more than the author's personal inference from the test results. The premises are explicit, and the reader is by no means required to share [the author's] conclusion." For the same reason, the court in *Dunlap v. Wayne,* 105 Wash.2d 529, 540, 716 P.2d 842, 849 (1986), concluded: "Arguments for actionability disappear when the audience members know the facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statement themselves." See also *National Assn. of Government Employees, Inc. v. Central Broadcasting Corp.,* 379 Mass. 220, 226, 396 N.E.2d 996, 1000 (1979) (finding that, as listeners were told the facts upon which a radio talk show host based her conclusion, they "could make up their own minds and generate their own opinions or ideas which might or might not accord with [the host's]").

The common-law doctrine of fair comment was also premised on such an observation. Where the reader knew or was told the factual foundation for a comment and could therefore independently judge whether the comment was reasonable, a defendant's unreasonable comment was held to defame " 'himself rather than the subject of his remarks.' " Hill, Defamation and Privacy Under the First Amendment, 76 Colum.L.Rev. 1205, 1229 (1976) (quoting *Popham v. Pickburn,* 158 Eng.Rep. 730, 733 (Ex.1862) (Wilde, B.)). "As Thomas Jefferson observed in his first Inaugural Address ... error of opinion need not and ought not be corrected by the courts 'where reason is left free to combat it.' " *Potomac, supra,* at 1288–1289, quoting Thomas Jefferson's first Inaugural Address (The Complete Jefferson 385 (S. Padover ed. 1943)).

The readers of Diadiun's column would also have been alerted to regard any implicit claim of impartiality by Diadiun with skepticism because Diadiun's newspaper is published in the county in which Mentor High School—home to the team that was allegedly mauled at the wrestling meet—is located. Where readers know that an author represents one side in a controversy, they are properly warned to expect that the opinions expressed may rest on passion rather than factual foundation. See, *e.g., Potomac Valve & Fitting Inc. v. Crawford Fitting Co.,* 829 F.2d, at 1290 (explaining that the contents of a company's newsletter would be understood as reflecting the professional interests of the company rather than as "a dispassionate and impartial assessment" of a test of a competitor's product); *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 784 (CA9 1980) (recognizing that statements in the early weeks of litigation by one side about the other were likely to include unsubstantiated charges, but that these "are highly unlikely to be understood by their audience as statements of fact").

Milkovich does not challenge the accuracy of any of Diadiun's stated premises. Nor does he complain or proffer proof that Diadiun had not, in fact, concluded from the stated premises that Milkovich must have lied in court. There is, therefore, no call to consider under what circumstances an insincere speculation would constitute a false and defamatory statement under *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). However, I would think that documentary or eyewitness testimony that the speaker did not believe his own professed opinion would be required before a court would be permitted to decide that there was sufficient evidence to find that the statement was false and submit the question to a jury. Without such objective evidence, a jury's judgment might be too influenced by its view of what was said. As we have long recognized, a jury "is unlikely to be neutral with respect to the content of speech and holds a real danger of becoming an instrument for the suppression of those 'vehement, caustic, and sometimes unpleasantly sharp attacks,' ... which must be protected if the guarantees of the First and Fourteenth Amendments are to prevail." *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 277, 91 S.Ct. 621, 628, 28 L.Ed.2d 35 (1971) (quoting *New York Times,* 376 U.S., at 270, 84 S.Ct., at 720). See also *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 510–511, and n. 29, 104 S.Ct. 1949, 1964–1965, and n. 29, 80 L.Ed.2d 502 (1984) (discussing the risks of submitting various questions to juries where freedom of speech is at stake); *Gertz,* 418 U.S., at 349, 94 S.Ct., at 3011 (expressing concern

about juries punishing unpopular opinion rather than compensating individuals for injuries sustained by the publication of a false fact); R. Smolla, Law of Defamation §§ 6.05(3)(a)–(c) (1990); Zimmerman, 18 U.C.D.L.Rev., at 430.

---

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

205 A.D.3d 13
Supreme Court, Appellate Division,
Second Department, New York.

Matthew PORGES, etc., respondent-appellant,

v.

Melani WEITZ, appellant-respondent.

2019–04846, (Index 8206/14)
|
Argued—January 18, 2022
|
March 16, 2022

**Synopsis**
**Background:** Minor member of national tennis association, through his parents, filed action against mother whose son was allegedly being bullied by member during association junior tournaments, seeking to recover damages for common-law defamation and defamation per se, stemming from e-mail mother sent to association official asserting that member had been removed from other tennis programs. The Supreme Court, Nassau County, Antonio I. Brandveen, J., denied mother's motion for summary judgment and member's cross-motion for summary judgment. Mother appealed and member cross-appealed.

**[Holding:]** The Supreme Court, Appellate Division, Zayas, J., held that mother's e-mail was protected by common interest qualified privilege.

Affirmed in part and reversed in part.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (10)

**[1]**    **Libel and Slander**  ⚖  Nature and elements of defamation in general

Elements of cause of action for defamation are a false statement that tends to expose person to public contempt, hatred, ridicule, aversion, or disgrace, published without privilege or authorization to third party, amounting to fault as judged by, at minimum, a negligence standard, and either causing special harm or constituting defamation per se.

1 Case that cites this headnote

**[2]**    **Libel and Slander**  ⚖  Qualified Privilege

A statement is protected by a qualified privilege in defamation action when a person makes a bona fide communication upon a subject in which he or she has an interest, or a legal, moral, or social duty to speak, and the communication is made to a person having a corresponding interest or duty.

2 Cases that cite this headnote

**[3]**    **Libel and Slander**  ⚖  Qualified Privilege
**Libel and Slander**  ⚖  Exceeding privilege or right

Rationale for applying qualified privilege in defamation action when a person makes a bona fide communication upon a subject in which he or she has an interest, or a legal, moral, or social duty to speak, and the communication is made to a person having a corresponding interest or duty is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded.

1 Case that cites this headnote

**[4]**    **Libel and Slander**  ⚖  Common Interest in Subject-Matter

There is no bright line test by which courts identify with exactitude those occasions that are protected by common interest qualified privilege in defamation actions and those that are not.

1 Case that cites this headnote

**[5]**    **Libel and Slander**  ⚖  Common Interest in Subject-Matter

Whether common interest qualified privilege applies in defamation action turns on whether, given the relation of the parties and the surrounding circumstances, there is a reasonable

ground for supposing an innocent motive for giving the information, and to deprive the act of an appearance of officious intermeddling with the affairs of others.

2 Cases that cite this headnote

**[6]    Libel and Slander** 🔑 Common Interest in Subject-Matter

E-mail to national tennis association official sent by mother whose son was allegedly bullied by minor member of association during association tournaments, which stated that member had been removed from other tennis programs, was protected by common interest qualified privilege in defamation action filed by member; mother had an interest in complying with official's request that she put her concerns about member in writing, society had strong interest in not stifling reports of bullying behavior to appropriate authorities, official had duty to ensure the integrity of association tournaments, and it would have been unreasonable to conclude that mother was not motivated by legitimate concerns for son's well-being or that mother made statements while being aware of their alleged falsity.

**[7]    Libel and Slander** 🔑 Existence and Effect of Malice

Shield provided by qualified privilege in defamation action may be dissolved if plaintiff can demonstrate that defendant spoke with malice.

1 Case that cites this headnote

**[8]    Libel and Slander** 🔑 Existence and Effect of Malice

Malice required to dissolve qualified privilege in defamation action can be established in two ways: (1) by showing either common-law malice, that is, spite or ill will, or (2) actual malice, that is, knowledge of falsehood of statement or reckless disregard for truth.

1 Case that cites this headnote

**[9]    Summary Judgment** 🔑 Defamation

In order to demonstrate existence of triable issue of fact with respect to common-law malice, precluding summary judgment in defamation action on grounds of qualified privilege, allegedly defamed plaintiff must show that jury could reasonably conclude that speaker spoke out of spite or ill will, and that such malicious motivation was one and only cause for publication.

1 Case that cites this headnote

**[10]    Libel and Slander** 🔑 Existence and Effect of Malice

Uncertainty about the accuracy of information is not enough to establish malice required to dissolve qualified privilege in defamation action.

 **\*\*585**  APPEAL by the defendant, and CROSS APPEAL by the plaintiff, in an action to recover damages for defamation, from an order of the Supreme Court (Antonio I. Brandveen, J.) entered April 18, 2019, in Nassau County. The order, insofar as appealed from, denied the defendant's motion for summary judgment dismissing the complaint. The order, insofar as cross-appealed from, denied the plaintiff's cross motion for summary judgment on the issue of liability on the first and second causes of action.

**Attorneys and Law Firms**

O'Connor, O'Connor, Hintz & Deveney, LLP, Melville, NY (Eileen M. Baumgartner of counsel), for appellant-respondent.

The Law Office of Steven Cohn, P.C., Carle Place, NY (Peter Chatzinoff of counsel), for respondent-appellant.

VALERIE BRATHWAITE NELSON, J.P., CHERYL E. CHAMBERS, SHERI S. ROMAN, JOSEPH A. ZAYAS, JJ.

OPINION & ORDER

ZAYAS, J.

**\*14  \*\*586**  This defamation action arises from the defendant's report, via email, to a United States Tennis Association (hereinafter USTA) official, that her son was being bullied by the plaintiff at USTA junior tennis tournaments and at other tennis programs and events. The plaintiff's bullying, the defendant reported, ranged from offensive name-calling to physically menacing behavior, and it caused her to fear for her son's safety. The plaintiff "[couldn't] understand," she wrote, "how a child like [the plaintiff] [was] allowed to continue to compete or even be associated with the USTA." The defendant's email also noted that the plaintiff had been "kicked out" of two tennis facilities and instruction programs on Long Island.

The complaint did not assert that the allegations of bullying were defamatory. It alleged, instead, that the plaintiff had not, in fact, been thrown out of either tennis program, and the defendant's assertions to the contrary were false and caused him "injury in his trade [and] chosen profession." The defendant moved for summary judgment dismissing the complaint, contending, among other things, that the allegedly defamatory **\*15** statements were protected by the common interest qualified privilege and that there was no evidence that they had been made with malice. The Supreme Court denied the defendant's motion, concluding that she had failed to eliminate triable issues of fact on that point. We disagree.

*Facts and Procedural History*

In 2013, the plaintiff, Matthew Porges, was a member of the USTA and a ranked player in his age group. He trained at several tennis facilities and with various coaches and programs, mainly on Long Island and in Queens. The defendant's son, Daniel, also played USTA junior tennis and knew the plaintiff from tournaments, as well as from group lessons, tennis camps, and other programs.

Problems arose between the plaintiff and Daniel. According to Daniel, the plaintiff, who was much bigger than Daniel, "called [him] names and bull[ied him] as well as other kids." In terms of the name-calling, "the main two words" the plaintiff used with Daniel were "pussy" and "faggot." This happened during tennis lessons, and also at tournaments. When the plaintiff and Daniel played against each other at a tournament at the Alley Pond Tennis Center, for example, the plaintiff threw his racquet and called Daniel names during changeovers. The plaintiff's mother, Daniel recounted, who was watching the tournament, taunted Daniel during "a good

amount of the **\*\*587** match." At the end of the match, the plaintiff kicked Daniel's Powerade bottle across the court and picked up Daniel's racquet bag and threw it.

As a result of these and other similar incidents, the defendant called Julie Bliss, who was, at the time, the Director of Junior Competition for the USTA's Eastern section. Bliss's role at the USTA included overseeing all junior tournament play. The defendant told Bliss that Daniel and the plaintiff were both scheduled to play at an upcoming tournament, but, because Daniel was "afraid of [the plaintiff] and the way that he behaved," Daniel did not want to compete against him. More broadly, the defendant said, Daniel "[didn't] need to be bullied every time he play[ed] a match with [the plaintiff], and [she] was afraid for his safety and safety was a huge issue." Bliss asked the defendant to put her concerns in writing.

Accordingly, on August 27, 2013, the defendant emailed Bliss. She began her message by noting that Bliss had told her to "put our conversation [of] last week about [the plaintiff] in **\*16** writing." The defendant then recounted, in a series of bullet points, that she and Bliss had discussed: the plaintiff's bullying of Daniel; the plaintiff's kicking of Daniel's Powerade bottle and racquet bag after a match; the plaintiff's "calling [Daniel] names I won't repeat"; and that Daniel refused to play in tournaments in which the plaintiff was entered. One of the bullet points stated that the plaintiff "[had] been kicked out of Robbie Wagner Tennis Academy [hereinafter Robbie Wagner TA] and Sportime"— two tennis fitness and instruction facilities on Long Island. The defendant recommended that Bliss "call Mike Kosoff or Lawrence Kleiger [from Sportime] to discuss." The defendant concluded her email by stating: "Based on [the plaintiff's] behavior during the USTA tournaments, I can't understand how a child like this is allowed to continue to compete or even be associated with the USTA. The whole thing is very upsetting to me, I grew up playing USTA tournaments and there has never been any child allowed to behave in this manner and still compete."

Upon receipt of the defendant's email, Bliss reached out to several individuals in the junior tennis community to ask for their input regarding the plaintiff's behavior, including individuals involved with Robbie Wagner TA and Sportime. On September 4, 2013, Michael Kossoff, the Director of Tennis at Sportime's Syosset and Bethpage facilities, responded to Bliss in an email. He wrote: "He [the plaintiff] was a major problem for us, and we no longer allow him to

play at our facility. His behavior was [some] of the worst we have ever seen."

That same day, Robbie Wagner, the president and owner of Robbie Wagner Tournament Training (hereinafter RWTT), also emailed Bliss. He said that there were "[n]o real problems" with the plaintiff. But, at the same time, he indicated that the plaintiff's former coach "would not teach him any more," and therefore, the plaintiff's family had "left" the program. Wagner noted that, "[t]his semester," the plaintiff was "back" taking private lessons, but he was not "allowed to participate in drill programs at RWTT."

In early September, the defendant emailed Bliss again and shared with her a screenshot of a "very disturbing" message that had been sent by the plaintiff to one of Daniel's friends (another tennis player) through Instagram. The message said, "I would tell u to hang urself in the shower but u prob don't even have one cuz ur house is so small." Daniel told his mother about another incident involving social media, in which the **\*17** plaintiff posted an embarrassing video on Facebook of a player at **\*\*588** Robbie Wagner TA being thrown into a garbage can or dumpster.

In August 2014, the plaintiff, by his parents, commenced this action against the defendant to recover damages for common-law defamation and defamation per se.[*] The defamation causes of action were predicated on a single aspect of the email that the defendant sent to Bliss: her assertion that the plaintiff had been kicked out of Robbie Wagner TA and Sportime. According to the plaintiff, he had "never been removed, suspended or kicked out" of either program. The defendant's claims to the contrary, the plaintiff alleged, were part of "a campaign of harassment," the effects of which included "injury in [the plaintiff's] trade [and] chosen profession."

In June 2018, the defendant moved for summary judgment dismissing the complaint. She contended, among other bases for dismissal, that the allegedly defamatory statements were protected by a qualified privilege and that there was no evidence that they were made with malice, and, in any event, the statements were true, or at least substantially so. The plaintiff opposed the motion and cross-moved for summary judgment on the issue of liability on the common-law defamation and defamation per se causes of action.

In the order appealed from, entered April 18, 2019, the Supreme Court denied the motion and the cross motion,

concluding that neither party had demonstrated entitlement to judgment as a matter of law. The defendant appeals, and the plaintiff cross-appeals.

*Legal Analysis*

**[1]** "The elements of a cause of action for defamation are (a) a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion, or disgrace, (b) published without privilege or authorization to a third party, (c) amounting to fault as judged by, at a minimum, a negligence standard, and (d) either causing special harm or constituting defamation per se" (*Greenberg v. Spitzer,* 155 A.D.3d 27, 41, 62 N.Y.S.3d 372).

**[2]** **[3]** "Courts have long recognized that the public interest is served by shielding certain communications, though possibly **\*18** defamatory, from litigation, rather than risk stifling them altogether" (*Liberman v. Gelstein,* 80 N.Y.2d 429, 437, 590 N.Y.S.2d 857, 605 N.E.2d 344). A statement is protected by a qualified privilege "when a person makes a bona fide communication upon a subject in which he or she has an interest, or a legal, moral, or social duty to speak, and the communication is made to a person having a corresponding interest or duty" (*Garson v. Hendlin,* 141 A.D.2d 55, 60, 532 N.Y.S.2d 776 [internal quotation marks omitted]). "The rationale for applying the privilege in these circumstances is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded" (*Liberman v. Gelstein,* 80 N.Y.2d at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344).

**[4]** **[5]** There is "no bright line test by which the courts identify with exactitude those occasions which are privileged and those which are not" (*Garson v. Hendlin,* 141 A.D.2d at 61, 532 N.Y.S.2d 776). Of particular relevance here, courts have applied the so-called common interest privilege to shield from defamation litigation statements made "in a good faith effort" ( **\*\*589** *New York Horse Rescue Corp. v. Suffolk County Socy. for the Prevention of Cruelty to Animals,* 164 A.D.3d 909, 911, 83 N.Y.S.3d 566) to "address[ ] a potentially unsafe environment which children in [the declarant's] community frequented" (*id.* at 911, 83 N.Y.S.3d 566), as well as communications that were "motivated by [an] asserted concern for the best interests of the children" to whom the communication pertained (*Garson v. Hendlin,* 141 A.D.2d at 62, 532 N.Y.S.2d 776). The privilege has also been applied to statements concerning

unsportsmanlike behavior and otherwise antisocial conduct —among adults—made by members of a sports club to the club's executives (*see Brockman v. Frank,* 149 Misc.2d 399, 401, 565 N.Y.S.2d 426 [Sup. Ct., N.Y. County]). Ultimately, whether the privilege applies turns on whether, given "the relation of the parties" (*Lewis v. Chapman,* 16 N.Y. 369, 375) and the surrounding circumstances, there is a "reasonable ground for supposing an innocent motive for giving the information, and to deprive the act of an appearance of officious intermeddling with the affairs of others" (*id.* at 375).

 **[6]**  We have little difficulty concluding in this case that the defendant established, prima facie, that her email to Bliss was protected by a qualified privilege. The defendant unquestionably had an interest, as a parent, in complying with Bliss's request that she put her concerns in writing and thus reporting, in a more formal way, serious allegations of bullying—none of which, it bears emphasizing, were alleged to be defamatory—that, **\*19**  in her view, put her son's physical and emotional well-being at risk (*see New York Horse Rescue Corp. v. Suffolk County Socy. for the Prevention of Cruelty to Animals,* 164 A.D.3d at 911, 83 N.Y.S.3d 566; *Garson v. Hendlin,* 141 A.D.2d at 62, 532 N.Y.S.2d 776). Indeed, the defendant was not only aware of incidents involving Daniel, but other young tennis players as well. They ranged from troublingly offensive name-calling and physically intimidating acts (such as throwing Daniel's racquet bag and kicking his beverage bottle), to posting embarrassing videos of other players on social media, and even suggesting, in a message sent through Instagram, that a child should "hang [him]self in the shower." Society has a strong interest in not "stifling" (*Liberman v. Gelstein,* 80 N.Y.2d at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344) reports of this sort of behavior to the appropriate authorities, whether they be school officials, or, as here, sports administrators (*see Garson v. Hendlin,* 141 A.D.2d at 62, 532 N.Y.S.2d 776 ["it has been generally agreed that a qualified privilege attaches to communications relative to family matters, made in good faith to the proper parties, by members of a family, intimate friends, and third persons under a duty to speak" (internal quotation marks omitted)]).

Bliss had a corresponding duty, given her role overseeing USTA junior tournaments, to ensure that the integrity of those tournaments was not undermined by unsportsmanlike behavior, and that competitors were free to compete without the fear of being bullied or harassed (*see Brockman v. Frank,* 149 Misc.2d at 401, 565 N.Y.S.2d 426). Moreover, aside from being the parent of a current USTA junior competitor,

the defendant herself had grown up playing USTA junior tournaments and remained active in the sport as an adult, which provided a further basis for inferring "an innocent motive for giving the information [about the plaintiff to Bliss]" (*Lewis v. Chapman,* 16 N.Y. at 375).

 **[7]**    **[8]**  "The shield provided by a qualified privilege may be dissolved if [the] plaintiff can demonstrate that [the] defendant spoke with malice" (  **\*\*590** *Liberman v. Gelstein,* 80 N.Y.2d at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344 [internal quotation marks omitted]). Malice, in this context, can be established in two ways: by showing "either common-law malice, i.e., spite or ill will, or ... actual malice, i.e., knowledge of falsehood of the statement or reckless disregard for the truth" (*Laguerre v. Maurice,* 192 A.D.3d 44, 49, 138 N.Y.S.3d 123 [internal quotation marks omitted]).

 **[9]**  In order to demonstrate the existence of a triable issue of fact with respect to common-law malice, an allegedly defamed plaintiff "must show that a jury could reasonably conclude that **\*20**  the speaker spoke out of spite or ill will, and that such malicious motivation was the one and only cause for the publication" (*Hoesten v. Best,* 34 A.D.3d 143, 158, 821 N.Y.S.2d 40 [internal quotation marks omitted]). The plaintiff cannot make that showing here. Although he claims that the defendant's communication with Bliss was the product of "a vendetta" against him, the goal of which was "to destroy his reputation and tennis career," we find that narrative fanciful. The extensive submissions provided to the Supreme Court in connection with the summary judgment motion and cross motion make clear that no factfinder could reasonably conclude that the defendant was not motivated, at least in substantial part, by legitimate concerns for her son's emotional well-being and physical safety. On this point, it is worth emphasizing, again, that the central concerns articulated in the defendant's email—about bullying and poor sportsmanship—were not alleged to be defamatory. And it cannot be said that, by including the information about Robbie Wagner TA and Sportime, the defendant "went beyond what was necessary to convey [that central] message" (*Berger v. Temple Beth–El of Great Neck,* 41 A.D.3d 626, 627, 839 N.Y.S.2d 504). In fact, on other issues discussed in the email, the defendant was circumspect, notably choosing not to repeat the extremely offensive names that the plaintiff had called Daniel, or to mention bullying incidents of which she was aware involving the plaintiff and other children.

Nor is there a triable issue of fact as to actual malice—that is, whether the defendant made the supposedly defamatory

statements "with a high degree of awareness of their probable falsity" (*id.* at 627, 839 N.Y.S.2d 504). When it comes to demonstrating actual malice, the Court of Appeals has observed that "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false" (*Liberman v. Gelstein,* 80 N.Y.2d at 438, 590 N.Y.S.2d 857, 605 N.E.2d 344).

In evaluating whether the defendant would have been highly aware that her statement that the plaintiff had been thrown out of Sportime was probably false, it suffices to note that Kossoff confirmed to Bliss, just days after the defendant emailed Bliss, that this statement was accurate. He wrote that "[the plaintiff] was a major problem for us," "we no longer allow him to play at our facility," and "[h]is behavior was [some] of the worst we have ever seen." And, of course, the defendant had suggested that Bliss reach out to Kossoff "to discuss" the plaintiff's situation with Sportime—which would have been a **\*21** strange thing for the defendant to do if she believed the information she was conveying was false.

It is true, as the plaintiff argues, that Kossoff attempted to walk back these statements during his deposition, several years after the fact. But Kossoff's backpedaling did not raise a triable issue of fact as to whether the defendant was highly aware of the alleged falsity of her statement at the time she made it (*see Sagaille v. Carrega,* 194 A.D.3d 92, 96, 143 N.Y.S.3d 36), particularly given other evidence **\*\*591** in the record, aside from Kossoff's email, that the plaintiff had, in fact, been asked to leave Sportime, and that Sportime, as an organization, and the Porges family had mutually agreed, when they "parted ways," "not [to] defame each other." In other words, according to Sportime's general manager, "Sportime would not talk poorly about [the plaintiff] and [the plaintiff] would not speak badly about Sportime."

Wagner's response to Bliss's inquiry about the plaintiff's behavior was more measured than Kossoff's. He informed Bliss that there were "[n]o real problems" with the plaintiff. But he also admitted that the plaintiff's former coach "would not teach him any more," and consequently, the Porges family had "left" the program. Wagner went on to say that, although the plaintiff was "back" taking private lessons, he was not "allowed to participate in drill programs at RWTT."

**[10]** Certainly a person with knowledge of those facts could fairly conclude that the plaintiff had been asked to leave

the Robbie Wagner program, at least for some period of time (*cf. Fleckenstein v. Friedman,* 266 N.Y.19, 23, 193 N.E. 537 ["(w)hen the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done" (internal quotation marks omitted)]). After all, the plaintiff's coach had apparently decided not to work with him anymore. And the plaintiff was not permitted to enroll in drill programs—a decision that, one could reasonably infer, reflected a desire on the part of Robbie Wagner TA to minimize the plaintiff's interactions with other children. Moreover, the defendant stated at her deposition that another parent had told her that the plaintiff had been thrown out of that program. Given all of this, the worst that can be said is that the defendant did not know for sure whether the plaintiff had been removed from Robbie Wagner TA. But uncertainty about the accuracy of information is not enough to establish malice (*see Liberman v. Gelstein,* 80 N.Y.2d at 438, 590 N.Y.S.2d 857, 605 N.E.2d 344).

**\*22** Accordingly, the Supreme Court should have granted the defendant's motion for summary judgment dismissing the complaint.

In light of our determination, we need not address the parties' remaining contentions.

Therefore, the order is reversed insofar as appealed from, on the law, the defendant's motion for summary judgment dismissing the complaint is granted, and the order is affirmed insofar as cross-appealed from.

ORDERED that the order is reversed insofar as appealed from, on the law, and the defendant's motion for summary judgment dismissing the complaint is granted; and it is further,

ORDERED that the order is affirmed insofar as cross-appealed from; and it is further,

ORDERED that one bill of costs is awarded to the defendant.

BRATHWAITE NELSON, J.P., CHAMBERS and ROMAN, JJ., concur.

**All Citations**

205 A.D.3d 13, 165 N.Y.S.3d 584, 2022 N.Y. Slip Op. 01823

**Porges v. Weitz, 205 A.D.3d 13 (2022)**
165 N.Y.S.3d 584, 2022 N.Y. Slip Op. 01823

Footnotes

\*      The plaintiff's complaint erroneously denominated his request for punitive damages as a separate cause of action, which New York does not recognize (*see Gershman v. Ahmad,* 156 A.D.3d 868, 868, 67 N.Y.S.3d 663).

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by Carroll v. Trump, 2nd Cir.(N.Y.), September 8, 2025

253 A.D.2d 183

Supreme Court, Appellate Division,
First Department, New York.

Steven PRESENT, Plaintiff–Respondent,

v.

AVON PRODUCTS, INC., et
al., Defendants–Appellants,

and

Rasulo Graphic Service, Inc. et al., Defendants.

Steven Present, Plaintiff–Respondent,

v.

Avon Products, Inc., et al.,
Defendants–Appellants.

March 30, 1999.

**Synopsis**

Former employee brought action against employer, his subordinates, and an outside vendor, alleging defamation and malicious prosecution, after he was discharged and criminally prosecuted for falsifying billing records and misappropriating company property. The Civil Court, New York County, Norman Ryp, J., denied defendants' motion for summary judgment, and the Supreme Court, Appellate Term, affirmed. Defendants appealed. The Supreme Court, Appellate Division, Rosenberger, J.P., held that: (1) employer's complaint to police was subject to qualified common interest privilege; (2) employee's calling subordinates "liars" was insufficient to raise triable issue of fact regarding defamation claim against subordinates; and (3) employee failed to establish element of malicious prosecution claim that defendants initiated criminal prosecution against him or that employer lacked probable cause to make criminal complaint.

Reversed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**West Headnotes (22)**

**[1]**   **Libel and Slander** 🔑 As to Character of Employee

Employer's reporting to police that former employee had misappropriated company property and falsified billing records was subject to qualified common interest privilege, where employer conducted cautious and thorough internal investigation before making report, including confirming allegations with outside vendors who had no motive to collude.

2 Cases that cite this headnote

**[2]**   **Libel and Slander** 🔑 Qualified Privilege

Good faith communication upon any subject matter in which the speaker has an interest, or in reference to which he has a duty, is qualifiedly privileged if made to a person having a corresponding interest or duty.

8 Cases that cite this headnote

**[3]**   **Libel and Slander** 🔑 Common Business Interest

Common interest privilege to defamation claims covers statements by employees to management about another employee's job-related misconduct, as well as statements by an outside vendor or independent contractor.

6 Cases that cite this headnote

**[4]**   **Libel and Slander** 🔑 Common Interest in Subject-Matter

Qualified common interest privilege to claim of defamation extends to reports to the police or the district attorney's office about another's suspected crimes.

5 Cases that cite this headnote

**[5]**   **Libel and Slander** 🔑 Good Faith in Exercise of Privilege or Right

If the person passing on the information has a good faith belief in its truth, he is shielded from liability for defamation, even if a more prudent person would not have reported it or the information turns out to be false.

2 Cases that cite this headnote

[6]     **Libel and Slander** 🔑 Good Faith in Exercise of Privilege or Right

**Libel and Slander** 🔑 Existence and Effect of Malice

To overcome a qualified privilege, a plaintiff in a defamation action needs to challenge the good faith of the defendants by showing that they acted with malice.

4 Cases that cite this headnote

[7]     **Libel and Slander** 🔑 Malice

Speaker exhibits constitutional malice, when he makes a defamatory statement while knowing that it is false or recklessly disregarding whether it is false.

2 Cases that cite this headnote

[8]     **Libel and Slander** 🔑 Existence and Effect of Malice

Plaintiff presenting defamation claim subject to a qualified privilege must set forth evidence to support the conclusion that defendants entertained serious doubts as to the truth of the statement.

6 Cases that cite this headnote

[9]     **Libel and Slander** 🔑 Presumptions and Burden of Proof

Even a negligent investigation into truth of allegedly defamatory statement, without more, does not create an inference that a defendant suspected the falsity of the information and purposefully avoided seeking out facts that would confirm its falsity.

2 Cases that cite this headnote

[10]    **Libel and Slander** 🔑 Good Faith in Exercise of Privilege or Right

Employer relied in good faith on statements of sources who confirmed allegedly defamatory allegations that former employee had misappropriated company property and falsified billing records, where there was no substantial reason to question accuracy of sources.

1 Case that cites this headnote

[11]    **Libel and Slander** 🔑 Falsity

Former employee's calling his subordinates "liars" was insufficient to raise triable issue of fact as to defamation claim based on subordinates' reports to management that employee coerced them into facilitating his schemes to misappropriate company property and to falsify billing statements, given that reports were consistent with one another, contrary to subordinates' own interests, and backed up by documentary evidence.

[12]    **Libel and Slander** 🔑 Malice

Triable issue as to common-law malice is raised in defamation action only if a reasonable jury could find that the speaker was solely motivated by a desire to injure the plaintiff.

5 Cases that cite this headnote

[13]    **Libel and Slander** 🔑 Malice

Fact that defendants may have harbored ill will towards plaintiff is insufficient to establish common-law malice, without some evidence that this animus was the one and only cause for the publication of the allegedly defamatory statement.

6 Cases that cite this headnote

[14]    **Libel and Slander** 🔑 Discharge of Duty to Others or to Public and Common Interest in Subject-Matter

Specific and verifiable allegations from former employee's subordinates to employer and

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 185 of 230

Present v. Avon Products, Inc., 253 A.D.2d 183 (1999)
687 N.Y.S.2d 330, 1999 N.Y. Slip Op. 02740, 1999 N.Y. Slip Op. 02741

from employer to police, that employee was misappropriating company property and falsifying billing statements, were not so vituperative or over broad as to raise a question of common law malice, as was required to overcome common interest privilege in defamation action.

6 Cases that cite this headnote

[15]  **Malicious Prosecution**  Nature and Elements of Malicious Prosecution in General

Elements of an action for malicious prosecution are: (1) the initiation of a proceeding; (2) its termination favorably to the plaintiff; (3) a lack of probable cause; and (4) malice.

5 Cases that cite this headnote

[16]  **Malicious Prosecution**  Instigation of or Participation in Prosecution

Former employee's subordinates, who merely gave testimony at employer's direction that employee misappropriated company property and falsified billing statements, did not initiate criminal proceedings charging former employee with petit larceny, falsifying business records, and criminal coercion.

[17]  **Malicious Prosecution**  Instigation of or Participation in Prosecution

Mere reporting of a crime to police and giving testimony are insufficient to establish initiation of a proceeding element of malicious prosecution claim; it must be shown that defendant played an active role in the prosecution, such as giving advice and importuning the authorities to act.

18 Cases that cite this headnote

[18]  **Malicious Prosecution**  Instigation of or Participation in Prosecution

Employer, who reported former employee's conduct to the police and responded to inquiries from law enforcement authorities, was not the initiator of former employee's criminal prosecution for misappropriating company

property and falsifying business records, for purposes of employee's malicious prosecution claim.

1 Case that cites this headnote

[19]  **Malicious Prosecution**  Instigation of or Participation in Prosecution

One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding, for purposes of malicious prosecution claim.

18 Cases that cite this headnote

[20]  **Malicious Prosecution**  Personal Knowledge and Statements of Others

**Malicious Prosecution**  Inference from Result of Prosecution

Employer had probable cause, for purposes of malicious prosecution claim, to make complaint to police that former employee had misappropriated company property and falsified billing statements; employer conducted thorough investigation that turned up confessions from other employees involved in misconduct and corroborating documentation that independently supported former employee's guilt and jury was unable to reach verdict on charges of petit larceny, falsifying business records, and criminal coercion.

1 Case that cites this headnote

[21]  **Malicious Prosecution**  Belief in Guilt of Accused

"Probable cause," for purposes of malicious prosecution action, consists of such facts and circumstances as would lead a reasonably prudent person in a similar situation to believe plaintiff guilty.

1 Case that cites this headnote

[22]  **Malicious Prosecution**  Motive of Prosecution

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 186 of 230

Present v. Avon Products, Inc., 253 A.D.2d 183 (1999)
687 N.Y.S.2d 330, 1999 N.Y. Slip Op. 02740, 1999 N.Y. Slip Op. 02741

"Malice," for purposes of malicious prosecution claim, is a wrong or improper motive, something other than a desire to see the ends of justice served.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*184   \*\*332** Donald A. Derfner, of counsel (Christopher P. Benischek, on the brief, Derfner & Mahler, LLP, attorneys) for plaintiff-respondent.

**\*185** T. Barry Kingham, of counsel (Michelle A. Rice, Steven A. Reiss and Christopher Morvillo, on the brief, Curtis, Mallet–Prevost Colt & Mosle and Weil, Gotshal & Manges, attorneys) for defendants-appellants.

ERNST H. ROSENBERGER, J.P., PETER TOM, RICHARD W. WALLACH and ANGELA M. MAZZARELLI, JJ.

**Opinion**

ROSENBERGER, J.P.

Plaintiff Steven Present was dismissed by his employer, defendant Avon Products, Inc., after an internal investigation turned up evidence that he had falsified billing records and stolen company property. Defendants Henry Isdith and Susan Pike were fellow employees who described Present's misconduct to management and provided supporting documentation. Defendant Al Urbont, an outside vendor, did the same. Avon referred the matter to the police, who in turn contacted the District Attorney's Office. Present was charged with seven misdemeanors; he was acquitted of one, and the jury was unable to reach a verdict on the other six. The District Attorney decided against a retrial and the remaining charges were dismissed. Plaintiff then asserted the instant claims for defamation and malicious prosecution. As the following elaboration of the facts will show, however, these claims should have been dismissed.

Avon is a well-known manufacturer and vendor of beauty products. Its bi-weekly sales brochure is a primary selling device used by its representatives who sell the products to consumers. At all times relevant to this action, Present was one of four Creative Managers in the Brochure Department, which designed the sales brochure. Defendants Pike and Isdith were art directors who worked directly under him. In early 1991, Dennis Holland was appointed Creative Director, which made him Present's immediate supervisor. Holland then interviewed all the employees in the department, in order to familiarize himself with the people and activities he would be supervising.

As Holland was making his rounds, he turned up several instances of questionable conduct by Present. First, Mary Fiedler, the billing coordinator, mentioned that Present often broke down large vendors' invoices into several smaller ones in amounts below $2,000, his personal approval authority. Such a practice would enable him to shield improper invoices from review.

Second, when Holland interviewed Pike on June 6, 1991, she told Holland that Present had directed her to purchase a **\*186** leather jacket as a prop for a photo shoot and to give it to him after the shoot was completed. She also said that at Present's urging, she asked the stylist who supplied the jacket to submit a falsified invoice so that Avon would not detect Present's appropriation of the jacket for his personal use. In defense of her part in this wrongful scheme, Pike said she was afraid of losing her job if she defied Present. Additionally, Pike stated that Present had directed her to approve invoices from Rasulo Graphic Service, Inc., a photograph processing company, for developing personal photographs for Present's friend. The invoices billed this work to Avon.

**\*\*333** Third, a few days later, Holland interviewed Isdith, who mentioned yet another unorthodox act by Present. Present allegedly directed Isdith to tell Urbont, the Rasulo representative, to buy a $900 watch for Present's personal use and charge it to Avon. Like Pike, Isdith claimed he had approved the fictitious bills (which he had marked with a "W" to distinguish them from real Avon expenses) out of fear for his job.

Shortly thereafter, Urbont sent Holland two letters confirming that he had sent Avon fictitious bills to cover the personal expenses of the watch and the photographs, because Present allegedly threatened to cease doing business with Rasulo unless he complied. Urbont enclosed copies of the relevant invoices and receipts.

Holland advised his superiors of what he had learned. The matter was referred to Avon's in-house counsel, who reviewed the documents and independently interviewed Fiedler, Pike, Isdith and Urbont to confirm what they had reported. Pike and Isdith signed affidavits setting forth their stories.

Even then, Present was not terminated. Executives from the Human Resources and Legal Departments confronted him with the accusations. When he could offer no convincing explanation, he was suspended pending further investigation. After two other outside vendors admitted billing Avon for clothing for Present's personal use, Avon terminated Present's employment on June 20, 1991.

Avon's Internal Audit and Security Departments conducted their own independent investigation and found the same evidence. John Massoni of the security department submitted the matter to the Police Department, which referred it to the District Attorney's Office. The District Attorney's Office initially sought to charge Present with grand larceny, a felony. This complaint was superseded by a Prosecutor's Information containing seven misdemeanor counts: three counts of petit **\*187** larceny (the watch, the photos and the jacket), two counts of falsifying business records (for the watch and the jacket), and two counts of criminal coercion of Pike and Isdith. On November 25, 1992, the jury acquitted Present of the petit larceny charge relating to the photos, but were unable to agree on the other charges. The District Attorney elected not to retry Present and the charges were dismissed.

Present brought two related actions against his accusers, which were consolidated. On May 26, 1992, after criminal charges had been filed, he sued Avon, Pike, Isdith, Massoni, Urbont and Rasulo, asserting claims of defamation, wrongful termination, fraud and age discrimination. On November 15, 1993, a year after the end of the criminal proceedings, he brought a malicious prosecution action against Avon, Isdith, Pike and Urbont (collectively "defendants" or "defendants-appellants"). Present has voluntarily discontinued the fraud claim against all defendants. The claims against Massoni and Rasulo were dismissed on motion. The Civil Court, without discussion, denied defendants-appellants' motion for summary judgment. The Appellate Term reversed in part and granted summary judgment dismissing Present's wrongful termination and age discrimination claims, and Present has not cross-appealed from that portion of the order. The issue before us is therefore whether the Appellate Term erred in finding triable issues regarding the remaining claims for defamation and malicious prosecution. These claims should have been dismissed.

 **[1]**    Present's defamation claim against the individual defendants is predicated on their reports about him to Avon management. His defamation claim against Avon is based on

Avon's statements to the police that he had misappropriated company property and falsified billing records. As defendants asserted in their summary judgment motion, all of the challenged statements are undoubtedly covered by a qualified privilege. This being the case, it was incumbent upon plaintiff to raise an issue of fact as to whether defendants acted with constitutional or common-law malice, which he failed to do.

 **[2]    [3]    [4]    [5]**    A good faith communication upon any subject matter in which the speaker has an interest, or in reference to which he has a duty, is qualifiedly privileged if made to a person having a corresponding interest or duty **\*\*334** (*Clark v. Somers,* 162 A.D.2d 982, 557 N.Y.S.2d 209). The common interest privilege covers statements by employees to management about another employee's job-related misconduct (*Loughry v. Lincoln First Bank,* 67 N.Y.2d 369, 376, 502 N.Y.S.2d 965, 494 N.E.2d 70). The same is true of statements by an outside vendor or independent **\*188** contractor (*see, Clark v. Somers, supra*). This qualified privilege also extends to reports to the police or the District Attorney's Office about another's suspected crimes (*Toker v. Pollak,* 44 N.Y.2d 211, 220, 405 N.Y.S.2d 1, 376 N.E.2d 163). If the person passing on the information has a good faith belief in its truth, he is shielded from liability for defamation, even if a more prudent person would not have reported it or the information turns out to be false (*Toker, supra,* at 220, 405 N.Y.S.2d 1, 376 N.E.2d 163).

 **[6]    [7]    [8]**    Essentially, to overcome the privilege, plaintiff needs to challenge the good faith of the defendants by showing that they acted with malice (*Loughry, supra,* at 376, 502 N.Y.S.2d 965, 494 N.E.2d 70). A speaker exhibits constitutional malice, as defined in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686, when he makes a defamatory statement while knowing that it is false or recklessly disregarding whether it is false. The plaintiff must set forth evidence to support the conclusion that defendants entertained serious doubts as to the truth of the statement (*St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262).

In the case at bar, all the evidence points to the contrary. Avon was commendably cautious and thorough in conducting its internal investigation. It made no disclosures to the police until several managers had cross-checked the employees' accusations and compiled a significant file of supporting documentation. Several outside vendors who had no motive to collude confirmed the employees' stories in all major details. Only then did Avon take action.

Case 1:25-cv-03552-JLR   Document 162-3   Filed 03/12/26   Page 188 of 230

Present v. Avon Products, Inc., 253 A.D.2d 183 (1999)
687 N.Y.S.2d 330, 1999 N.Y. Slip Op. 02740, 1999 N.Y. Slip Op. 02741

[9]  [10]  Plaintiff identifies allegedly favorable evidence that Avon did not investigate, but this is not determinative. Even a negligent investigation, without more, does not create an inference that a defendant suspected the falsity of the information and purposefully avoided seeking out facts that would confirm its falsity (*Sweeney v. Prisoners' Legal Servs.,* 84 N.Y.2d 786, 793, 622 N.Y.S.2d 896, 647 N.E.2d 101). Lacking any substantial reason to question the accuracy of its sources, Avon should not be held liable for its good-faith reliance on their statements (*see, Suozzi v. Parente,* 202 A.D.2d 94, 102, 616 N.Y.S.2d 355, *lv. dismissed in part, denied in part* 85 N.Y.2d 923, 627 N.Y.S.2d 321, 650 N.E.2d 1323).

[11]  As to the individual defendants, their statements to Avon management were purportedly based on their first-hand experience of being coerced into facilitating plaintiff's schemes. Plaintiff cannot raise a triable issue simply by calling them liars, especially where the allegations made by the individual defendants were consistent with one another, contrary to their own interests, and backed up by documentary evidence (*see, Moore v. Dormin,* 252 A.D.2d 421, 676 N.Y.S.2d 90).

[12]  [13]  *189  Alternatively, a plaintiff may try to prove that defendants acted with malice as defined under the common-law standard. A triable issue as to common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure the plaintiff (*Thanasoulis v. National Assn. for the Specialty Foods Trade,* 226 A.D.2d 227, 229, 640 N.Y.S.2d 562). The fact that defendants may have harbored ill will towards plaintiff is insufficient, without some evidence that this animus was "the one and only cause for the publication" (*Stukuls v. State of New York,* 42 N.Y.2d 272, 282, 397 N.Y.S.2d 740, 366 N.E.2d 829). "If the defendant's statements were made to further the interest protected by the privilege, it matters not that defendant *also* despised plaintiff" (*Liberman v. Gelstein,* 80 N.Y.2d 429, 439, 590 N.Y.S.2d 857, 605 N.E.2d 344 [emphasis in original] ).

[14]  Here, all the statements at issue clearly furthered the purpose of the privilege, namely to allow companies to investigate employees' criminal misconduct and to share this information with law enforcement authorities. The accusations were specific  **335 and verifiable and were not so vituperative or over broad as to raise a question of malice (*compare, Herlihy v. Metropolitan Museum of Art,* 214

A.D.2d 250, 633 N.Y.S.2d 106). Nor were they published so widely as to fall outside the scope of the privilege (*see, Stukuls, supra,* at 281, 397 N.Y.S.2d 740, 366 N.E.2d 829 [noting that privilege may be "subject to defeasance by excessive publication"] ).

[15]  Plaintiff similarly failed to raise an issue of fact as to malicious prosecution. The elements of an action for malicious prosecution are (1) the initiation of a proceeding; (2) its termination favorably to the plaintiff; (3) a lack of probable cause; and (4) malice (*Colon v. City of New York,* 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248).

[16]  [17]  First, plaintiff cannot show that defendants initiated the proceeding. "The mere reporting of a crime to police and giving testimony are insufficient; it must be shown that defendant played an active role in the prosecution, such as giving advice and importuning the authorities to act" (*Viza v. Town of Greece,* 94 A.D.2d 965, 966, 463 N.Y.S.2d 970; *see also, Raschid v. News Syndicate Co.,* 239 App.Div. 289, 267 N.Y.S. 221, *affd. as modified* 265 N.Y. 1, 191 N.E. 713). The individual defendants merely gave testimony at Avon's direction. Thus, this cause of action fails as against them.

[18]  [19]  As for Avon, its role was limited to reporting the matter to the police and responding to inquiries from law enforcement authorities. One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding (*Hopkinson v. Lehigh Valley R. Co.,* 249 N.Y. 296, 300, 164 N.E. 104). *190  We find no evidentiary support for Present's assertion that Avon was willfully ignorant of exculpatory information or withheld same from the police. Plaintiff identifies a few documents that Avon allegedly should have provided, but these are either irrelevant or actually corroborative of the case against plaintiff.

With respect to the second element, favorable termination, defendants conceded this point in prior proceedings. Were we to reach it, we would find that with the exception of the count on which plaintiff was acquitted, the dismissal of the six remaining counts on which the jury did not agree is not a favorable termination because it "leaves the question of guilt or innocence unanswered" (*Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 504–05, 478 N.Y.S.2d 823, 467 N.E.2d 487).

[20]  [21]  Third, Avon clearly had probable cause to make its complaint to the police. Probable cause consists of such facts and circumstances as would lead a reasonably

prudent person in a similar situation to believe plaintiff guilty (*Colon v. City of New York, supra,* at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248). As noted above, Avon conducted a thorough investigation that turned up numerous independent sources of evidence supporting plaintiff's guilt, including confessions from other employees involved in the misconduct and corroborating documentation (*Rawson v. Leggett,* 184 N.Y. 504, 512, 77 N.E. 662). Furthermore, "the jury's inability to reach a verdict ... confirm [ed] that there surely was probable cause for his prosecution" (*Singleton v. City of New York,* 632 F.2d 185, 193 (2nd Cir.1980), *cert. denied* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347). Plaintiff has put forth no evidence of perjury or suppression of evidence to overcome this presumption (*see, Colon v. City of New York, supra,* at 83, 468 N.Y.S.2d 453, 455 N.E.2d 1248).

 [22]    Finally, plaintiff has not presented any evidence that Avon acted with malice, which in this context means "a wrong or improper motive, something other than a desire to see the ends of justice served" (*Nardelli v. Stamberg,* 44 N.Y.2d 500, 503, 406 N.Y.S.2d 443, 377 N.E.2d 975). According to plaintiff's conspiracy theory, Avon's allegedly bad-faith decision to "frame" him and terminate his employment was motivated by a desire to cut costs. Avon would have fulfilled its entire objective, if such it was, by firing him. It scarcely needed to turn him over to the police. Any issues plaintiff attempts to raise with respect to the individual defendants' motives are academic in light of his failure to show a lack of probable cause for the criminal prosecution. A well-founded prosecution, or one which reasonably appeared so, will not be deemed malicious even **\*\*336** if undertaken with "the worst

of motives" (*Munoz v. City of New York,* 18 N.Y.2d 6, 9, 271 N.Y.S.2d 645, 218 N.E.2d 527).

 **\*191**  We have considered plaintiff's remaining contentions and rejected them.

Accordingly, the order of the Appellate Term of the Supreme Court, First Department, entered on or about June 16, 1998, which, insofar as appealed from, affirmed the order of the Civil Court, New York County (Norman Ryp, J.), entered June 12, 1997, denying defendants-appellants' motion for summary judgment dismissing plaintiff's remaining claims for defamation and malicious prosecution, should be reversed, on the law, without costs, the motion granted, and the complaint dismissed. The Clerk is directed to enter judgment in favor of defendants-appellants dismissing the complaint as against them.

Order of the Appellate Term of the Supreme Court, First Department, entered on or about June 16, 1998, reversed, on the law, without costs, the motion for summary judgment dismissing plaintiff's remaining claims for defamation and malicious prosecution granted, and the complaint dismissed. Motion seeking a stay and for other related relief denied.

All concur.

**All Citations**

253 A.D.2d 183, 687 N.Y.S.2d 330, 1999 N.Y. Slip Op. 02740, 1999 N.Y. Slip Op. 02741

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2 A.D.2d 567

Supreme Court, Appellate Division,
First Department, New York.

Samuel SHENKMAN, Plaintiff-Respondent,

v.

Walter F. O'MALLEY, Defendant-Appellant.

Nov. 27, 1956.

**Synopsis**

Action by physician against president of major league baseball team for president's alleged slanderous statements concerning physician's services rendered to team member and charges therefor. The Supreme Court, Special Term, Aron Steuer, J., entered, on April 30, 1956, in the New York County Clerk's office, order granting physician's motion to strike the first, second, and third complete affirmative defenses and the first partial defense set forth in the amended answer and, also, striking certain other allegations set forth in the second partial defense, and president appealed. The Supreme Court, Appellate Division, Breitel, J., held, inter alia, that, where president, in his first complete defense, did not allege that his comment was based upon facts truly stated, but the 'facts' upon which he relied were the opinions of physicians that the prior services by another physician had been successful, and such facts were asserted simply as the opinion of experts, defense based upon privilege of fair comment would not be applicable.

Order modified and, as modified, affirmed.

See also 1 Misc.2d 794, 147 N.Y.S.2d 87.

West Headnotes (15)

**[1]**  **Libel and Slander**  🔑 Amended and Supplemental Pleadings

Where, in slander action, first complete defense was insufficient, but there was possible defense based upon the 'rolled up plea' of truth and fair comment contained in such defense, defendant would be permitted to replead the first complete defense.

**[2]**  **Libel and Slander**  🔑 Criticism and Comment on Public Matters;  Public Figures

Where president of major league baseball team commented on physician's services for team member and physician's fee therefor, subject matter of president's statement was in area of public interest and, hence, subject to privilege of fair comment, and medical treatment of such players, especially in reference to their capacity to play, would likewise be a matter of general comment and interest.

**[3]**  **Libel and Slander**  🔑 Truth as Justification in General

In civil defamation action, truth of attributed statement constitutes a complete and absolute defense.

2 Cases that cite this headnote

**[4]**  **Libel and Slander**  🔑 Criticism and Comment on Public Matters;  Public Figures

Where the attributed statements are not true, and plaintiff has been defamed thereby, an absolute or qualified privilege may obtain provided that certain preconditions dictated by public policy are fulfilled, and the policy is to permit, within reasonable limits, free and intelligent discussion of matters in the public interest.

5 Cases that cite this headnote

**[5]**  **Libel and Slander**  🔑 Criticism and Comment on Public Matters;  Public Figures

Where, in respect to a matter of public interest, one expresses a defamatory opinion which is based upon facts truly stated, there is, in absence of malice, a complete defense.

1 Case that cites this headnote

**[6]**  **Libel and Slander**  🔑 Exceeding Privilege or Right

Privilege of fair comment applies only when the facts are truly stated.

**[7]    Libel and Slander**  🔑 Exceeding Privilege or Right

Where, in action by physician against president of major league baseball team for president's alleged slanderous remarks in regard to services rendered by physician for team member and charge for such services, president, in his first complete defense, did not allege that his comment was based upon facts truly stated, but the 'facts' upon which he relied were the opinions of physicians that prior services by another physician had been successful, and such facts were asserted simply as the opinion of experts, defense based upon privilege of fair comment would not be applicable.

3 Cases that cite this headnote

**[8]    Libel and Slander**  🔑 Exceeding Privilege or Right

No considerations of public policy make it desirable that person be privileged to base fair comment upon opinions of others, however truly reported.

**[9]    Libel and Slander**  🔑 Grounds of Mitigation

If president of major league baseball team sincerely relied upon opinions of reputable physicians in making his alleged slanderous statements in regard to physician's services rendered team member and charges therefor, such reliance would be material to the degree of alleged malice with which president allegedly acted and would tend to negate malice, and, therefore, in slander action by the physician against the president, jury could consider such reliance in mitigation of damages should physician otherwise sustain his complaint.

**[10]    Libel and Slander**  🔑 Request or Provocation by Person Injured

Defense of reply to defamatory attack is available to one who has been defamed in the first instance and who, in response to the attack,

responds in kind, and it would seem to be the better rule that the first attacking statement must be defamatory before the defense is available.

1 Case that cites this headnote

**[11]    Libel and Slander**  🔑 Request or Provocation by Person Injured

Under defense of reply to defamatory attack, injury, if any, to a plaintiff is excused on ground that plaintiff is the one who was started the altercation.

**[12]    Libel and Slander**  🔑 Request or Provocation by Person Injured

Under privilege of reply to defamatory attack, not every counterattack, if defamatory, will be excused merely because it is in response to defamation, but there must be some reasonable proportion between attack and counterattack.

4 Cases that cite this headnote

**[13]    Libel and Slander**  🔑 Request or Provocation by Person Injured

**Libel and Slander**  🔑 Provocation and Passion

To be privileged, defamatory reply to attack must, among other things, be a reply to a defamatory attack, not merely to a critical, adverse, unpleasant, or even grossly irritating comment, and the effect of provocation is not ignored by the law but is comprehended under the partial defenses in mitigation of damages.

2 Cases that cite this headnote

**[14]    Libel and Slander**  🔑 Partial Justification

In action by physician against president of major league baseball team for alleged slanderous remarks concerning physician's services rendered team member and charges therefor, pleadings were sufficient to raise triable issue as to whether president's reply to physician's alleged initial attack was excessive

provided that it would be found that the initial attack was, as alleged, defamatory.

**[15]**   **Libel and Slander** ☞ Common Interest in Subject-Matter

**Libel and Slander** ☞ Common Business Interest

There is no general qualified privilege to issue generally a defamatory statement, as distinguished from a reply to defamatory attack, merely because it may serve to protect a business interest, but statement made to others who share a common interest or duty in the same property, business, or relationship is privileged.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*569**   **\*\*292**   J. Howard Carter, New York City, of counsel (James W. Rodgers and Andrew L. Hughes, New York City, with him on the brief; Townley, Updike, Carter & Rodgers, New York City, attorneys), for appellant.

Boris Marcus, New York City, of counsel (Benjamin Schenkman, New York City, with him on the brief, Marcus & Schenkman, New York City, attorneys), for respondent.

**\*578**   Before PECK, P. J., and BREITEL, COX, FRANK and BERGAN, JJ.

**Opinion**

BREITEL, Justice.

In this action for slander, on motion, three complete defenses and two partial defenses, interposed in the amended answer, have been attacked on the ground of legal insufficiency. Defendant appeals, and urges reinstatement of each of the defenses.

**[1]**   It is concluded that the partial defenses are legally sufficient and should be sustained, for they tend to negate malice and are, therefore, **\*\*293** admissible in mitigation of damages; that the second complete defense is sufficient; but that neither the first nor the third complete defense is sufficient and they were properly stricken. Defendant, however, should be permitted to replead the first complete

defense, since there is a possible defense based on the 'rolled up plea' of truth and fair comment.

**\*570**   Plaintiff is a physician, and defendant is the president of the professional baseball team, best known as the Brooklyn Dodgers. One of the team's starring players, Roy Campanella, suffered a hand injury, which gravely interfered with his playing. An operation was performed by one Dr. Fett to remove a bone chip. Some months later, plaintiff physician recommended and performed a second operation affecting a nerve in the hand. He submitted a bill for his professional services to Mr. Campanella and, later, to defendant O'Malley's corporation in the sum of $9,500. The bill was not paid. Plaintiff physician sued to recover his fee, and through his lawyer, by filing the suit papers and contemporaneous statements, obtained wide publicity, the purport of which was that neither Mr. Campanella nor the Brooklyn Dodgers was paying for an operation which had rehabilitated Mr. Campanella's playing capacity.

The statements of plaintiff Shenkman, through his lawyer, upon which defendant O'Malley relies in asserting his defenses are contained in two newspaper accounts attached as exhibits to the amended answer. The first read as follows:
'I sent the $9,500 bill to Mr. Campanella and it was promptly returned with the suggestion that the Brooklyn Dodgers Baseball Club was responsible for the bill.

'Then I sent it to the club, and they immediately sent it back, informing me that Campanella alone was responsible for payment.

'Between Campanella and the club, I have been paid nothing.'

Earlier in the newspaper account plaintiff Shenkman was quoted as having said that Mr. Campanella had 'refused to pay one cent.' In another newspaper the quoted statement read as follows:
'After it was over, Campy expressed his deep gratitude and told Dr. Shenkman to send the bill to the Brooklyn Ball Club.

'He sent the bill there and then the Dodger front office said it wasn't their baby. They disclaimed any responsibility for it. And though Roy was grateful at first, he has apparently forgotten his obligation.'

The second newspaper account also contained the general statement that:

**\*\*294**  'A neuro-surgeon charged today that the Dodgers baseball management has run out on the bill for the operation which brought Roy Campanella's left hand and big bat back into the lineup this year.'

Whether these statements are defamatory is not before the court. For the purposes of **\*571** the second complete defense it will be assumed, as it is alleged by defendant O'Malley, that such statements are defamatory.

Upon release of plaintiff's publicity, defendant O'Malley issued a statement to the press—the subject of this slander action. The statement, as set forth in the answer,[1] reads as follows:
'I am shocked at the self-serving story appearing in evening papers in support of Dr. Shenkman's exorbitant claim of $9,500 for what will probably prove to be an unnecessary second operation on Roy Campanella's hand. The medical profession appreciates that the original operation was successfully performed by a recognized specialist, Dr. Herbert Fett. Dr. Shenkman telephoned me in February and was most anxious to settle his claim, and admitted that he had not fixed a price or advised Roy that he contemplated such a charge. It appears that he thought he was operating on Roy's bankroll. I told him his charge was unconscionable and suggested he sue. He offered to arbitrate before a committee of doctors. I told him I preferred a jury of people who pay doctor's bills not send them. It took Dr. Shenkman a long time to get up courage to sue.'

It will be observed immediately that the statement contains, among others, the following significant representations. The first is that the physician's claimed fee is exorbitant. The second is that the second operation was probably unnecessary. The third is that, by way of opinion, the medical profession believes that the first operation had been successful. The fourth is that plaintiff physician thought he was operating on the patient's bankroll, rather than on his hand.

The questions involved are raised by three complete defenses and two partial defenses. The first complete defense is the 'rolled up plea' of truth and fair comment. The second complete defense is the qualified privilege of reply to a defamatory attack. The third complete defense is the qualified privilege of protection of business interests in response to attack. The first partial defense, in effect, asserts that defendant O'Malley relied on the opinions of the medical profession in making the statement involved in the action in replying to the attack upon him and his professional

baseball organization. The second partial defense is of similar purport and is based upon the provocation **\*\*295** caused by the publicity instigated in connection with the lawsuit commenced by plaintiff physician to recover his professional fee.

 **[2]**  It is beyond dispute that the subject matter of defendant O'Malley's statement (and assumed, but not decided, for the **\*572** purpose of considering the pleaded defenses, to be defamatory) is in the area of the public interest and, hence, subject to fair comment. The Brooklyn Dodgers and its players receive persistent national publicity and, on occasion, world-wide attention. Medical treatment of such players, especially in reference to their capacity to play, is likewise a matter of general comment and interest. This aspect of the defenses, therefore, requires no further discussion.

 **[3]    [4]    [5]    [6]**  In a civil defamation action, truth of the attributed statement is a complete and absolute defense. When the attributed statements, however, are not true, and the plaintiff has been defamed thereby, nevertheless, a privilege, absolute or qualified, may obtain, provided, certain preconditions dictated by public policy are fulfilled. (Restatement, Torts, § 582 et seq.; Prosser, Torts, 2nd Ed. § 95.) Thus, if with respect to a matter of public interest, one expresses a defamatory opinion, based upon facts truly stated, there is, in the absence of malice, a complete defense. Bingham v. Gaynor, 203 N.Y. 27, 96 N.E. 84. The policy is to permit, within reasonable limits, free and intelligent discussion of matters in the public interest. Such discussion could not be effected, if reasonably-drawn inferences resulted in liability, merely because they should prove to be wrong. Foley v. Press Publishing Co., 226 App.Div. 535, esp. at page 548, 235 N.Y.S. 340, 355. But the privilege of fair comment applies only when the facts are truly stated. Ibid. 226 App.Div. at page 544, 235 N.Y.S. at page 351. It has never been applied to an opinion expressed and based upon the opinions of others, which may or may not be true. Skinner v. Powers, 1 Wend. 451; Patten v. Harper's Weekly Corp., 93 Misc. 368, 158 N.Y.S. 70; Stafford v. Stafford, 165 App.Div. 27, 150 N.Y.S. 212; cf. Cassidy v. Gannett Co., Inc., 173 Misc. 634, at page 640, 18 N.Y.S.2d 729, at page 735.

 **[7]**  In the first complete defense, defendant O'Malley does not allege that his comment was based upon facts truly stated. On the contrary, the so-called 'facts' upon which he relies are the opinions of physicians that the first hand-operation was 'successful' and the opinion of the medical profession that such operation was successfully performed by a recognized specialist. It is not made clear that the successfulness of the

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

first operation means any more than successful removal of a bone fragment from the hand of the patient, as distinguished from being successful in accomplishing the ultimate objective of restoring the full use of the hand to the patient. Moreover, it is not even clear from the allegations that the 'success' of the first **296 operation signifies that no further operation was required or was desirable. In any event, even these 'facts' are not asserted as objectively true, but simply as the opinion *573 of experts. This falls short of the basis for fair comment. (Gatley, Libel and Slander [4th Ed.], pp. 346 et seq.)

It is true, that upon a trial, the nature and the successfulness of the first operation would be proven, undoubtedly, by opinion testimony, namely, through the lips and the opinions of experts. Nevertheless, it would be incumbent upon the jury, after being properly charged, to find the objective facts as distinguished from the opinions of the experts. Clemons v. Mellon, 27 App.Div. 349, 49 N.Y.S. 1129.[2] As defendant has pleaded, it would suffice if the jury were to find merely that defendant relied on the extra-judicially expressed opinions of experts, regardless of whether those opinions were, in fact, right or wrong.

 [8]    No considerations of public policy make it desirable that persons be privileged to base fair comment upon the opinions of others, however truly reported. Such a policy would justify endless repetition of defamatory matter, no matter how false, simply because the defamatory matter, or its supporting basis, was the product of widespread— even expert—opinion or prejudice. Consequently, the first complete defense is insufficient. Defendant, however, should be permitted to replead in the event he wishes to rely on establishing that, in fact, the first operation was completely successful, in the sense of dispensing with the need of and further operation. If so, a jury might find legally sufficient support for the comment of defendant O'Malley that plaintiff physician consciously engaged in an unnecessary operation for the purpose of obtaining an unjustified professional fee. Of course, if the comment does not convey as much, it is not slanderous in the absence of special damage alleged, and there is no office for the defense. Gurtler v. Union Parts Mfg. Co., 285 App.Div. 643, 140 N.Y.S.2d 254.

 [9]    While the opinion matter contained in the first complete defense does not support the qualified privilege of fair comment, it does support the first and second partial defenses of reasonable reliance and provocation which go to mitigation of damages. If defemdant 'O'Malley sincerely relied upon the opinions of reputable physicians, then it certainly is material to the degree of malice with which he acted. It would tend to negate malice, and a jury should consider such reliance **297 in mitigation of damages, should plaintiff otherwise sustain his complaint. *574 Crane v. New York World Tel. Corp., 308 N.Y. 470, 126 N.E.2d 753; O'Connor v. Field, 266 App.Div. 121, 41 N.Y.S.2d 492.

 [10]    [11]    The second complete defense relates to reply to defamatory attack. This defense is available to one who has been defamed in the first instance, and who, in response to the attack, responds in kind. It has been questioned whether it is necessary that the first attacking statement be defamatory. (Seelman, Libel and Slander, § 256.) It would seem that the better rule and the sounder policy is that it should. (As a matter of fact, defendant O'Malley in his amended answer evidently assumes this to be the rule because, several times, he alleges that the initial attack was defamatory.) The occasion of a non-defamatory attack should not excuse false diatribe in reply. That in its nature would be excessive response. A crude analogy may be drawn from the law of assault where mere words, no matter how provocative, may not justify a battery in response. This defense of reply is material, of course, only where the response in kind is defamatory. The injury, if any, to plaintiff is excused, because it is the plaintiff who started the altercation. The rule was clearly stated by this court, many years ago:

'The important question is whether the defendant had the right to impugn the motives of its assailant, if it did so honestly without malice and for the sole purpose of repelling the assault upon it, and not with the view of injuring the plaintiff. One who makes a public attack upon another subjects his own motives to discussion. It is a contradiction in terms to say that the one attacked is a privileged only to speak the truth, and not to make a counter attack, or that legitimate self-defense consists only in a denial of the charge or a statement of what is claimed to be the truth respecting its subject-matter. One in self-defense is not confined to parrying the trusts of his assailant. Of course, the counter attack must not be unrelated to the charge, but surely the motives of the one making it are pertinent. The plaintiff selected the forum for the dispute and in that forum it would certainly tend to repel or minimize the harmful tendency of the charges to show that the one making them was actuated by an improper motive.' Collier v. Postum Cereal Co., Limited, 150 App.Div. 169, 178, 134 N.Y.S. 847, 853.

The qualified privilege of reply as a defense to an action for defamation had no substantial recognition in New York before 1910 (Seelman, Libel and Slander, supra, p. 249). Where the defense has been allowed, the defamatory nature of the reply bore a pertinency to the content, and was reasonably proportionate to the magnitude of the **298** defamation, in the first attack. Thus, in the Collier case, supra, plaintiff had charged defendant *575* with conducting a deliberately false advertising campaign in relation to its food product. To this the defendant replied plaintiff had prostituted truth in its magazine columns to force advertisers, including the defendant, to purchase space in the magazine. Similarly, in Preston v. Hobbs, 161 App.Div. 363, 146 N.Y.S. 419, the initial attack was that defendant's associate had, on the threat of withdrawal of its advertising, bridled the press to suppress unfavorable publicity. The reply was that the plaintiff lied and was a muckraker, with indictments pending against him. In Fowler v. New York Herald, 184 App.Div. 608, 172 N.Y.S. 423, plaintiff had charged that the defendant sponsored an imposter. Defendant thereupon stated that plaintiff, as a result of his physical condition, was incompetent. In Siegel v. Metropolitan Life Ins. Co., 263 App.Div. 299, 32 N.Y.S.2d 658, plaintiff had charged, in a series of radio broadcasts, that defendant insurance company was milking its policyholders. Thereupon defendant, in a circular letter to its agents, stated that plaintiff was a former agent who had been fired for irregularities in his accounts.

The privilege of reply in other jurisdictions has been even more limited than in New York (33 Amer.Jurisprud., Libel and Slander, §§ 134–5; Newell, Slander and Libel [4th Ed.], § 429; but see Gatley, Libel and Slander [4th Ed.], p. 265 [English rule on reply to a demand]). The reason for the limitations on this qualified privilege has been well stated:
'The law does not allow independent wrongs, of the nature treated of in this work, to be set off against each other and a balance found in favor of the less culpable party. The principle which allows proof of provocation in mitigation of damages is the same as that which is applicable in the case of a provoked assault; and if there has been time and opportunity for hot blood to cool and calm reason to resume its ordinary control, a mere provocation not connected with the wrong cannot be shown. If in this respect there is any distinction between the cases of personal encounter and assault and written defamation, it would seem that the rule should be applied with at least as great strictness in the latter class as in the former, since the composition and publication of a libel in general involves necessarily some degree of deliberation and opportunity for reflection. There are plain reasons of public policy for this limitation of the right to reply in extenuation of such wrongs, upon remote provoking inducements not connected with the matter in issue. If the law were less strict there would be less self-restraint from acts of violence and wrong calculated to disturb the peace of society. Men **299** would be too ready to take it upon themselves to avenge their *576* personal grievances; an again, in the trial of causes for alleged wrongs, the principal issue would be embarrassed and confused, if not overwhelmed, by numerous collateral issues.' (Newell, Slander and Libel, supra, p. 457.)

(See also Turner v. MGM [1950] 1 All.E.R. 449, 470–71.)

In New York, and elsewhere, the courts have not been slow to strike a defense of reply when the defamation therein was grossly disproportionate to the original charge—or was not pertinent or relevant thereto. Guenther v. Ridgway, 187 App.Div. 593, 596, 176 N.Y.S. 89, 92; Zierler v. Held, N.Y.L.J., June 29, 1944, p. 2480, col. 5; Reynolds v. Pegler, 2 Cir., 223 F.2d 429, certiorari denied 350 U.S. 846, 76 S.Ct. 80; Conroy v. Fall River Herald News Co., 306 Mass. 488, 28 N.E.2d 729, 132 A.L.R. 927. See cases collected in Gatley, supra, at p. 272.

[12] When one examines the allegations of the second complete defense of reply in this case, it cannot be said, as a matter of law, that the counterattack was not pertinent to the initial attack. The initial attack related to the non-payment for medical services rendered. The counterattack, in effect, charged that the services was unnecessary and that the physician believed he was operating on the patient's bankroll, rather than on his hand. Excessiveness of reply aside for the moment, one need not pay for services that are the result of quackery and malpractice. (Of course, once again, if defendant O'Malley's counterattacking statement does not convey as much, in the absence of special damages alleged, it is not slanderous, and there is no office for the defense of reply. [Gurtler v. Union Parts Mfg. Co., supra, 285 App.Div. 643, 140 N.Y.S.2d 254.]) The other test, which the qualified privilege of reply must withstand, is that of excessiveness. Not every counterattack, if defamatory, will be excused, merely because it is in response to defamation. There must be some reasonable proportion between attack and counterattack. Once again, one may draw a crude analogy from the law of assault. If a man, with equal physique, attacks another with his fists it may not justify the use of a firearm in response. But it cannot be said on the pleading alone, as in the law of assault, that defendant O'Malley's response was excessive. That will remain a proper question for the jury to determine, as it views and makes its findings with respect to all the relevant facts and circumstances presented to it,

in accordance with the rules of law upon which it will be charged.

 **[13]**    As noted earlier, the defamatory reply to attack, if it is to be privileged, must, among other things, be a reply to a defamatory attack, not merely to any critical, adverse, unpleasant, or even grossly irritating comment. Of course, the effect of provocation **\*577** is not ignored **\*\*300** by the law but is comprehended under partial defenses in mitigation of damages.

 **[14]**    Hence, the second complete defense is sufficient, since there remains to be resolved a question of fact whether the reply to the initial attack was excessive or not, provided, of course, it is found that the initial attack was, as alleged in the amended answer, defamatory.

The third complete defense has been denominated by the defendant as the qualified privilege to protect one's own interest. In support of this privilege he cites: John W. Lovell Co. v. Houghton, 116 N.Y. 520, 22 N.E. 1066, 6 L.R.A. 363; Siegel v. Metropolitan Life Ins. Co., 263 App.Div. 299, 32 N.Y.S.2d 658, supra; Tierney v. Ruppert, 150 App.Div. 863, 135 N.Y.S. 365; Bowsky v. Cimiotti Unhairing Co., 72 App.Div. 172, 76 N.Y.S. 465. The Lovell case and the Bowsky case may be treated together. They stand for no more than the proposition that a person obtaining a copyright or a patent has a qualified privilege to assert that plaintiff is about to infringe the copyright or patent. The Tierney case involved a situation where the holder of a chattel mortgage posted a notice of sale, although, in fact, the mortgagor was not in default. This is based on the privilege in a person, having an interest in property, to make some general publication which he believes true, without malicious motive, 'provided such publication is necessary and proper in the protection of defendant's interest.' Tierney v. Ruppert, 150 App.Div. 863, 865, 135 N.Y.S. 365, 368, supra. It is apparent that these three cases relate to narrow privileges available to defendants having particular relationships to sepcific property. They are entirely inapposite to the situation of the defendant in this case.

The final case, cited as authority by the defendant for the existence of a qualified privilege to protect one's own interest, is the Siegel case. In the Siegel case, however, the communication was between the defendant insurance company and its agents. In short, the Siegel case involved a communication between persons having a common interest or duty with respect to the same subject matter, namely,

the business of the Metropolitan Life Insurance Co. This is the subject of an entirely different qualified privilege. See Hamilton v. Eno, 81 N.Y. 116; Ashcroft v. Hammond, 197 N.Y. 488, 90 N.E. 1117.

 **[15]**    There just is no general qualified privilege to issue generally a defamatory statement, as distinguished from a reply to defamatory attack, merely because it may serve to 'protect a business interest.' Not to be confused is the making of a privileged statement to others who share a common interest or duty in the same property, business or relationship, e. g., employer and employees, stockholders and corporation, **\*\*301** member and association. See, Prosser, Torts, 2nd Ed., supra, § 95, at pp. 614–5 and 618–9. Nor should there be such a privilege.

Always to be kept in mind, in considering a defense of privilege, whether qualified or absolute, is that the defendant seeks exculpation for falsely detracting from the plaintiff's reputation to a degree that is slanderous, or, in the appropriate case, libelous. If defendant's assertion is true, there is no need for a defense, and there is no need for a privilege. To say that any protection of a business interest, subjected to criticism, should excuse calumny is foreign to our thinking. Of course, the law of defamation has spelled out privileges to excuse false attack. But the privileges arise only when a supervening public policy dictates the necessity for non-malicious communication in well-defined relationships, where greater harm would be done if persons were permitted to speak only at the peril of complete accuracy. A business interest may be so all-embracive,—and proportionately larger as the business is greater—that the amount of harm that could be done, without remedy, would be incalculable. Indeed, the larger the business the greater would be the scope of immunity from liability for injury. The purposes of the law of defamation would not be served by so untrammeled a privilege as that suggested in the third complete defense.

Hence, the third complete defense is legally insufficient.

Accordingly, the order at Special Term should be modified by reinstatement of the second complete defense and of the first partial defense, together with reinstatement of such of the allegations, with the exception of paragraph $5' thereof, contained in the first complete defense as are necessary to the statement of the first and second partial defenses, with leave to defendant to replead the first complete defense of truth and fair comment, and the order of the Special Term is otherwise affirmed. In view of the irregular procedure followed in bringing on appeals from each of the two orders at

**Shenkman v. O'Malley, 2 A.D.2d 567 (1956)**

157 N.Y.S.2d 290

Special Term, there should be no costs allowed to either party as against the other. Settle order.

Order granting plaintiff's motion to strike certain affirmative defenses and paragraphs in the amended answer, unanimously modified in accordance with the opinion herein and, as so modified, affirmed. Settle order on notice.

All concur.

**All Citations**

2 A.D.2d 567, 157 N.Y.S.2d 290

Footnotes

1    The complaint alleges a similar, but truncated, version.

2    This libel case involved opinion testimony to the effect that defendant's daughter could not have been blinded by the administration of belladonna by plaintiff physician. While the court reversed a judgment for defendant, after trial, it did so, only because the opinion testimony was uncontradicted. The ultimate fact to be proved was, nevertheless, that belladonna could not cause blindness, not the state of medical opinion thereon.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag

Declined to Follow by Adler v. I & M Rail Link, L.L.C., N.D.Iowa, June 17, 1998

70 F.3d 255
United States Court of Appeals,
Second Circuit.

Bruce C. SHRADER, Plaintiff–Appellant,

v.

CSX TRANSPORTATION,

INC., Defendant–Appellee.

No. 40, Docket 95–7037.
|
Argued Oct. 24, 1995.
|
Decided Nov. 15, 1995.

**Synopsis**

Railroad worker appealed decision of public law board that he filed false accident report, and alleged that his discharge stemming from that incident violated the Federal Employers' Liability Act (FELA). Railroad moved to dismiss both charges. The United States District Court for the Western District of New York, William M. Skretny, J., in separate actions, dismissed worker's challenge to board's decision, and dismissed FELA claim. Worker appealed. The Court of Appeals, Calabresi, Circuit Judge, held that: (1) worker's failure to mention board order in his notice of appeal barred Court of Appeals from considering claim that order should be set aside, (2) FELA's prohibitions of retaliation against persons who cooperate with accident investigations do not cover situation in which employee tells employer about his or her own accident.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

West Headnotes (7)

**[1]**    **Federal Courts**  🔑 Requisites and sufficiency; defects

Worker's failure to mention public law board order, which stated that worker had filed false

accident report, in his notice of appeal from trial court decision that filing false accident report was not protected conduct under Federal Employers Liability Act (FELA), barred Court of Appeals from considering claim that order should be set aside. F.R.A.P.Rule 3(c), 28 U.S.C.A.

18 Cases that cite this headnote

**[2]**    **Federal Courts**  🔑 Requisites and sufficiency; defects

Court of Appeals construes notices of appeal liberally, taking parties' intentions into account.

47 Cases that cite this headnote

**[3]**    **Federal Courts**  🔑 New trial, rehearing, or reconsideration

District court's decision to grant motion for reconsideration is not an appealable final order. 28 U.S.C.A. § 1291.

1938 Cases that cite this headnote

**[4]**    **Federal Civil Procedure**  🔑 Error by court

Motion for reconsideration will generally be denied unless moving party can point to controlling decisions or data that court overlooked and that might reasonably be expected to alter conclusion reached by court.

5379 Cases that cite this headnote

**[5]**    **Federal Civil Procedure**  🔑 Further evidence or argument

Motion to reconsider should not be granted where moving party seeks solely to relitigate issue already decided.

2632 Cases that cite this headnote

**[6]**    **Federal Civil Procedure**  🔑 Motion and proceedings thereon

District court properly reconsidered its ruling permitting employee to maintain Federal Employers' Liability Act (FELA) lawsuit against

employer who fired employee for filing false accident report, where employer introduced additional relevant case law and substantial legislative history in support of its position that such claims were not encompassed by FELA.

31 Cases that cite this headnote

**[7]** **Labor and Employment** 🔑 Protected activities

Federal Employers' Liability Act (FELA) prohibitions against retaliation do not cover situation in which employee tells employer about his or her own accident, and even if they did, retaliation would not be prohibited where employee's accident report was falsified. Federal Employers' Liability Act, § 10, as amended, 45 U.S.C.A. § 60.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*255** John F. Collins, Buffalo, NY, Collins & Collins (Mark W. Pawlak, of counsel), for Plaintiff–Appellant.

**\*256** Susan C. Roney, Buffalo, NY, Nixon, Hargave, Devans & Doyle (David P. Ford, of counsel), for Defendant–Appellee.

Before: FEINBERG, OAKES and CALABRESI, Circuit Judges.

**Opinion**

CALABRESI, Circuit Judge:

The dispute underlying this appeal began in 1991, when appellant Bruce Shrader alleged that he was injured in an on-the-job accident at a train yard run by CSX Transportation, Inc. (CSXT). The company ultimately determined that Shrader's claim of injury was false, and fired him "for conduct unbecoming a CSXT employee." Shrader challenged the determination that his claim was false in arbitration before a Public Law Board, convened pursuant to section 3 of the Railway Labor Act (RLA), *codified at* 45 U.S.C. § 153. The Board determined that there was sufficient evidence to support CSXT's decision to fire Shrader for filing a false accident report. Shrader appealed that decision

to the United States District Court for the Western District of New York (William M. Skretny, J.). Shrader further maintained that his discharge was in violation of section 10 of the Federal Employers' Liability Act (FELA), *codified at* 45 U.S.C. § 60, which provides criminal penalties when an employer "prevent[s] employees ... from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee." CSXT moved to dismiss both charges for failure to state a claim upon which relief could be granted, under Fed.R.Civ.P. 12(b)(6). On August 1, 1994, the district court dismissed Shrader's challenge to the Board's decision, but declined to dismiss the FELA claim. CSXT then filed a motion for reconsideration of the decision not to dismiss the second claim. The court granted the motion for reconsideration and, on December 8, 1994, dismissed Shrader's FELA claim, concluding that the prohibition against interfering with an employee who "voluntarily" furnishes information to a "person in interest" concerning a workplace accident does not apply in a situation, like this one, in which the employee has filed with his employer a mandatory report of his own alleged accident.

Shrader now appeals from the district court's decision to reconsider its August 1 order and its subsequent dismissal of his FELA claim. The appellant's brief also challenges the district court's August 1, 1994, refusal to set aside the decision of the arbitral Board.

I.

**[1]** **[2]** **[3]** The Notice of Appeal filed with this court by Shrader indicated his intent to appeal only from the district court's December 8, 1994, order. Since a notice of appeal "must designate the judgment, order, or part thereof appealed from," Fed.R.App.P. 3(c), the appellant's failure to mention the August 1 order in his notice of appeal bars us from considering his claim that the Board's decision should have been set aside. Of course, we construe notices of appeal liberally, taking the parties' intentions into account. *See United States v. Schwimmer,* 968 F.2d 1570, 1574–75 (2d Cir.1992). Here, however, not only does the notice of appeal refer solely to the December 8 order, but the December 8 order itself, while making reference to the August 1 order, does so simply to note the failure of that order to dismiss the FELA claim. It is clear, therefore, that the December 8 order appealed from decides nothing other than the FELA claim. We accordingly have no jurisdiction to review the district court's earlier decision to dismiss the appellant's RLA

challenge. In any event, we note in passing that the appellant's challenge to the Board's decision appears to be meritless.

## II.[1]

 **[4]**    Shrader also argues that the district court erred in granting CSXT's motion for **\*257** reconsideration of the August 1 order. The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court. *See Schonberger v. Serchuk,* 742 F.Supp. 108, 119 (S.D.N.Y.1990); *Adams v. United States,* 686 F.Supp. 417, 418 (S.D.N.Y.1988). CSXT argues that it did present the district court with data that the court had not previously considered. First, CSXT pointed to numerous statements in the FELA's legislative history, which the district court had not discussed in its original ruling, and which CSXT claimed gave support to CSXT's interpretation of the statute. Second, CSXT argued that the district court had originally examined only two of the circuit court decisions on the issue before it. Instead, four circuits—every one that had considered the applicability of section 10 to circumstances similar to those presented by Shrader's complaint—had concluded that section 10 did not apply. *See Bielicke v. Terminal R.R. Ass'n,* 30 F.3d 877, 878 (7th Cir.1994); *Lewy v. Southern Pac. Transp. Co.,* 799 F.2d 1281, 1293 (9th Cir.1986); *Gonzalez v. Southern Pac. Transp. Co.,* 773 F.2d 637, 644 (5th Cir.1985) ( *"Gonzalez II "); Landfried v. Terminal R.R. Ass'n,* 721 F.2d 254, 256 (8th Cir.1983), *cert. denied,* 466 U.S. 928, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984).

 **[5]**     **[6]**    Admittedly, a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided. But in light of CSXT's introduction of additional relevant case law and substantial legislative history, we cannot say that the district court's decision to reconsider its earlier ruling was an abuse of discretion.

## III.

 **[7]**    Finally, Shrader challenges the district court's decision to dismiss his FELA complaint for failure to state a claim upon which relief can be granted. We reject this challenge, concluding not only that the terms of the statute do not include situations in which an employee—as required by a railroad-employer—informs that employer about his or her own accident, but also that, even if the statute did include those situations, it would not apply where, as here, the employee's accident report was properly found to have been falsified.[2]

Section 10 of the FELA makes criminal employer interference with an employee who "voluntarily" furnishes information concerning a workplace injury to "a person in interest." 45 U.S.C. § 60.[3] The courts of appeals **\*258** that have considered the application of this provision have concluded that an employee's filing of his own FELA claim with his employer does not constitute the voluntary furnishing of information to a person in interest about an employee's injury, within the meaning of section 10 of the FELA. *See Bielicke,* 30 F.3d at 878; *Lewy,* 799 F.2d at 1293; *Gonzalez II,* 773 F.2d at 642; *Landfried,* 721 F.2d at 256.

The FELA's legislative history provides strong support for the view that section 10 was enacted to "permit those who have information concerning the facts and circumstances of a personal injury to give statements to the injured employee or his dependents, or to someone authorized to represent him or them." S.Rep. No. 661, 76th Cong., 1st Sess. 5 (1939). It was not meant to protect an employee who reports his or her own injury to an employer as required by the employer's rules. The enacting legislators' concern was that employers might be able to prevent employees from testifying on behalf of their co-workers when the precise circumstances of an accident were disputed. *See id.; see also* H.R.Rep. No. 1422, 76th Cong., 1st Sess. 2 (1939). Hence, they made retaliation in such instances a crime, while at the same time relying on the procedures established under the RLA as the sole method of protecting an employee from discharge in retaliation for the filing of his or her own accident report. *See, e.g., Mayon v. Southern Pac. Transp. Co.,* 805 F.2d 1250, 1252–53 (5th Cir.1986) ("[O]ne who helps a co-worker file an FELA claim may have a cause of action under § 60 for retaliatory discharge. One who is discharged for filing his own FELA claim, however, does not. Only the remedies of the RLA are available."). In the case before us, Shrader filed a mandatory accident report regarding his own accident with his employer. Since the FELA's prohibitions against retaliatory discharge were not intended to apply in this situation, Shrader must rely on the procedures and remedies established under the RLA.

Further, even if section 10 of the FELA provided a cause of action for employees who have filed, or are preparing to file, their own accident claims, Shrader still would not be entitled

to the protections of section 10 because of the arbitration panel's conclusion that his accident report was false. In this respect, the circumstances before us are similar to those facing the Fifth Circuit in *Gonzalez*. In *Gonzalez II,* the court, which had remanded for a determination of whether the employee's corroborating accident report had been falsified, *see Gonzalez I,* 755 F.2d at 1185–86, reheard the case and considered the effect of an RLA arbitrator's subsequent determination that the report had in fact been false. The Fifth Circuit then dismissed the suit, holding that section 10 of the FELA does not provide protection for the filing of a false accident report. *See Gonzalez II,* 773 F.2d at 642; *cf. Benjamin v. Traffic Exec. Ass'n Eastern Railroads,* 869 F.2d 107, 111 (2d Cir.1989) (in a collateral proceeding, a labor arbitration panel's decision was held to have preclusive effect). We agree. Shrader was not dismissed in retaliation for filing an accident report; he was dismissed for dishonesty, and that is not protected conduct under the FELA.

CONCLUSION

In the case before us, an RLA arbitration panel has found that Shrader's accident report was falsified. Even were we to reject the conclusions of the other courts of appeals and the strong evidence in the FELA's legislative history that section 10 applies only to employees who assist their injured co-workers by furnishing information about an accident, we would still affirm the district court's dismissal of this action because Shrader's filing of a false accident report is not protected by the FELA.

We have examined all of the appellant's arguments and find them to be without merit. Accordingly, we affirm the order of the district court.

**All Citations**

70 F.3d 255

Footnotes

1    We note at the outset that we have grave doubts about the reviewability of a district court's decision to grant a motion for reconsideration. Certainly, such a decision would not be an appealable final order, sufficient in itself to give this court jurisdiction. *See* 28 U.S.C. § 1291. Whether the grant of a motion to reconsider is reviewable once an appellate court has jurisdiction over the case for independent reasons is dubious at best. Because neither party has discussed whether such a grant is reviewable—and in fact both parties have vigorously argued the merits of the district court's decision to grant the motion—and because the issue of whether the court erred in granting the motion is easily disposed of on the merits, we resolve those merits. We do so, however, without suggesting that the grant of such a motion to reconsider is in fact reviewable.

2    Because we find that Shrader does not have a claim under section 10 of the FELA for the reasons set out below, we do not address the question whether that section, which provides *criminal* penalties for certain employer behavior, can also be the basis of a private cause of action by the employee against the employer.

3    CSXT argues that section 10 of the FELA does not apply to this case because the railroad is not a "person in interest" under the statute. While the district court relied on this argument in reaching its decision, we decline to take that route. In fact, the only court of appeals to have focused on that particular clause of section 10 found—in an opinion that has since been withdrawn—that it did include the railroad. *See Gonzalez v. Southern Pac. Transp. Co.,* 755 F.2d 1179, 1185 (5th Cir.1985) (*"Gonzalez I"*), *withdrawn and superseded on reh'g, Gonzalez v. Southern Pac. Transp. Co.,* 773 F.2d 637 (5th Cir.1985) ( *"Gonzalez II"*). In *Gonzalez,* an employee had voluntarily filed a corroborating accident report with the railroad at the request of an injured co-worker. *See Gonzalez I* at 1182. The railroad argued that it was not a "person in interest" under the FELA's section 10, and that section 10 was thus inapplicable. *See id.* at 1183. The Fifth Circuit rejected this argument, and held that when an employee provides information to the railroad about a fellow employee's accident, the railroad is a "person in interest" for the purposes of the FELA's section 10. *See id.* at 1183–85. The decision in *Gonzalez I* was withdrawn on rehearing after an arbitration panel determined that the information provided by Gonzalez had been false, and that Gonzalez's filing of the report was therefore not protected by the FELA. *See Gonzalez II,* 773 F.2d at 642. Because Shrader here filed a report about his own accident, and not a corroborating report for a co-worker, we need not address the argument upon which CSXT seeks to rely.

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S.
                                                                    Government Works.

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 203 of 230

Steinhilber v. Alphonse, 68 N.Y.2d 283 (1986)
501 N.E.2d 550, 508 N.Y.S.2d 901, 123 L.R.R.M. (BNA) 2937, 65 A.L.R.4th 987...

🚩 KeyCite Yellow Flag

Distinguished by Guerrero v. Carva, N.Y.A.D. 1 Dept., June 17, 2004

68 N.Y.2d 283

Court of Appeals of New York.

Louise STEINHILBER, Appellant,

v.

John M. ALPHONSE, as President
of the Communications Workers of
America, Local 1120, Defendant,

and

Richard Martini et al., Respondents.

Oct. 23, 1986.

**Synopsis**

In defamation action brought by former union member, the Supreme Court at Special Term, Ulster County, Torraca, J., partially denied defendants' motion to dismiss, and they appealed. The Supreme Court, Appellate Division, Kane, J., 115 A.D.2d 844, 495 N.Y.S.2d 907, dismissed the complaint, and plaintiff appealed. The Court of Appeals, Hancock, J., held that statements in banner and taped telephone message allegedly referring to former union member as "scab," and lacking in talent, ambition and initiative, were nonactionable expressions of pure opinion.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

West Headnotes (5)

**[1]    Libel and Slander** 🔑 Actionable Words in General

Expression of pure opinion is not actionable.

138 Cases that cite this headnote

**[2]    Libel and Slander** 🔑 Actionable Words in General

Nonactionable "pure opinion" is statement of opinion accompanied by recitation of facts upon which it is based, or, if not accompanied by such factual recitation, statement that does not imply it is based upon undisclosed facts.

300 Cases that cite this headnote

**[3]    Libel and Slander** 🔑 Actionable Words in General

Actionable element of "mixed opinion" is not false opinion itself, but implication that speaker knows certain facts, unknown to audience, which support his opinion and are detrimental to person about whom he is speaking.

154 Cases that cite this headnote

**[4]    Libel and Slander** 🔑 Actionable Words in General

Statements in recorded telephone message regarding union member, which referred to her as "scab" and stated that she lacked talent, ambition and initiative, were nonactionable pure opinions, when taken in context of entire message, which was evidently intended to be invective expressed in form of heavy-handed and nonsensical humor.

79 Cases that cite this headnote

**[5]    Libel and Slander** 🔑 Actionable Words in General

Statement contained in banner displayed as part of picketing activity during strike, referring to union member as "scab" was intended as expression of disapproval and, as such, was nonactionable opinion.

10 Cases that cite this headnote

**Attorneys and Law Firms**

**\*284  \*\*550  \*\*\*901**  Jon A. Simonson and John F. Tobin, New Paltz, for appellant.

**\*285**  Stephen L. Fine, New York City, for respondents.

Steinhilber v. Alphonse, 68 N.Y.2d 283 (1986)

501 N.E.2d 550, 508 N.Y.S.2d 901, 123 L.R.R.M. (BNA) 2937, 65 A.L.R.4th 987...

**\*286  OPINION OF THE COURT**

HANCOCK, Judge.

It is a settled rule that expressions of an opinion "false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions" (*Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 380, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied* **\*\*\*902** 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456). The question here is whether the Appellate Division has properly applied this rule in dismissing plaintiff's defamation action under CPLR 3211(a)(7) upon the ground that the two **\*\*551** allegedly defamatory communications, complained of in separate causes of action, are pure opinions and, as such, not actionable as a matter of law.

I

The essential facts appear from plaintiff's complaint and her supplementary affidavit. Plaintiff was a member of defendant Communications Workers of America, Local 1120, and employed at New York Telephone Company in Saugerties, New **\*287** York. On August 7, 1983 the union declared a strike. Plaintiff continued to work and did so as a union member in violation of the strike order and union rules until August 11, 1983 when she resigned from the union. In January 1984 the union assessed a fine against her for working during the strike, and, in March of that year, the membership authorized the officers of the union to take necessary steps to collect the fine which she had not paid.

The communication giving rise to plaintiff's first cause of action was a tape-recorded telephone message made by defendant Martini, vice-president of Local 1120, which played automatically on April 25, 1984 to anyone dialing the private telephone number provided to union members. (The union maintained a telephone answering and information service for its members.) The recorded message stated: "*Wednesday, April 25th* It is with amazement I report to you, the good membership of this union that Louise the scab Steinhilber has been named secretary of the week by a local radio station. Even further beyond comprehension is the fact that a union member, Barbara Van Etten, is the one who called the radio station to suggest Louise the scab be considered for what should be an honorable position. In Barbara's case,

brains aren't everything. In fact, in her case they are nothing. She has a soft heart and a head to match. Louise the scab, years ago, she was an unknown failure. Now she is a known failure. She lacks only three things to get ahead, talent, ambition, and initiative. But she has friends. In fact, if you have her for a friend, you don't need any enemies. In times of trouble, she is waiting to catch you * * * bent over at the right angle. At least, she looks like a million, every year of it. Her boyfriend drinks ten cups of coffee a day to steady his nerves, just so he can look at her face. When she comes into a room, the mice jump up on chairs. But she could be a perfect model, for a shipbuilder. If she ever gets into an elevator, if she could fit in it, it better be going down. And, in case I haven't made my point, 1986 is closing in upon all of us. Let's choose our friends by their deeds. Only in solidarity can we expect to be successful. For the Communication Workers of America, Local 1120, this is Rick Martini."

Plaintiff bases her second cause of action on a banner displayed on August 11, 1983—during picketing activity—on the pickup truck of defendant Schatzel, the area representative of Local 1120. The words on the banner, which plaintiff concedes "formed a part of the [union] protests," were:

**\*288** "# 1 scab louise steinhilber sucks".

Defendants moved to dismiss both causes of action on two grounds: (1) that because the communications grew out of a labor dispute and were entitled to the protection afforded by section 7 of the National Labor Relations Act (29 U.S.C. § 158[c] ), the allegations of malice and of actual damage in the complaint were insufficient and the complaint was subject to dismissal under the rules established in *Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 and *Linn v. Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582; and (2) that, in any event, the communications were statements of pure opinion, not statements of fact or of mixed fact and opinion, and, as such, not actionable. Because it was not alleged that defendant Schatzel was connected in any way with the taped message or that defendant Martini had had anything to do with the **\*\*\*903** display of the banner, Special Term dismissed the first cause of action as to Schatzel and the second as to Martini. In all other respects, it denied the motion.

**\*\*552** The majority at the Appellate Division held that the banner, but not the taped message, was a communication made "in the context of a labor dispute" (115 A.D.2d 844, 845,

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 205 of 230

Steinhilber v. Alphonse, 68 N.Y.2d 283 (1986)
501 N.E.2d 550, 508 N.Y.S.2d 901, 123 L.R.R.M. (BNA) 2937, 65 A.L.R.4th 987...

495 N.Y.S.2d 907). It did not, however, reach the question of the adequacy of the complaint under *Letter Carriers v. Austin (supra)* and *Linn v. Plant Guard Workers (supra),* because it concluded that both communications were statements of pure opinion and that the complaint should, for that reason, be dismissed. The Appellate Division, therefore, modified the order and granted the motion dismissing the complaint in its entirety. The dissenters at the Appellate Division would have denied the motion as to the first cause of action holding that the statement in the taped recorded message—"she lacks only three things to get ahead, talent, ambition, and initiative"— was an expression of mixed fact and opinion which, as distinguished from a statement of pure opinion, is actionable (115 A.D.2d 844, 847–848, 495 N.Y.S.2d 907).

For reasons which will appear, we agree with the majority at the Appellate Division that both statements in issue were expressions of pure opinion. The order dismissing the complaint should, therefore, be affirmed. We find it unnecessary to reach defendant's contentions that the statements arose out of a labor dispute and that the complaint does not contain the allegations of malice and actual damages required by *Letter Carriers* and *Linn.*

**\*289** II

In addressing the decisive question, whether the statements are opinions and thus privileged, we observe that in framing the issue both parties have assumed the applicability of *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789.[1] Under *Gertz,* if the statements are held to be expressions of opinion, they are entitled to the absolute protection of the First Amendment by virtue of the Supreme Court's categorical statement that: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas" (418 U.S. at pp. 339–340, 94 S.Ct. at p. 3007, *supra* ).[2]

**[1]** **[2]** **[3]** The rule to be applied may be simply stated. An expression of pure opinion is not actionable. It receives the Federal constitutional protection accorded to the expression of ideas, no matter how vituperative or unreasonable it may be (*see, Rinaldi v. Holt, Rinehart & Winston, supra,* 42 N.Y.2d at p. 380, 397 N.Y.S.2d 943, 366 N.E.2d 1299; *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at pp. 339–349, 94 S.Ct. at pp. 3006–3011). A "pure opinion" is a statement of opinion which is accompanied by a recitation of the facts upon

which it is based. An opinion not accompanied by such a factual recitation may, nevertheless, be "pure opinion" if it does not imply that it is based upon undisclosed facts (*see, Ollman v. Evans,* 750 F.2d 970, 976 [D.C.Cir.], *cert. denied* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278; **\*\*\*904** *Buckley v. Littell,* 539 F.2d 882, 893 [2d Cir.], *cert. denied* 429 U.S. 1062, 97 S.Ct. 785, 786, 50 L.Ed.2d 777; Restatement [Second] of Torts § 566 comment c). When, however, the statement of opinion implies that it is based upon facts **\*\*553** which justify the opinion but are unknown to those reading or hearing it, it is a "mixed opinion" and is actionable (*see, Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 [2d Cir.], *cert. denied sub nom. Hotchner v. Doubleday & Co.,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95; *cf. Cianci v. New Times* **\*290** *Pub. Co.,* 639 F.2d 54, 64, 65 [2d Cir.] ).[3] The actionable element of a "mixed opinion" is not the false opinion itself —it is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking. (*Rand v. New York Times Co.,* 75 A.D.2d 417, 422, 430 N.Y.S.2d 271; *cf. Silsdorf v. Levine,* 59 N.Y.2d 8, 14, 462 N.Y.S.2d 822, 449 N.E.2d 716, where the complaint alleged not only that the opinion was defamatory but that the accompanying recitation of facts upon which it was based was either a "gross distortion" or "misrepresentation of fact".)

While it is clear that expressions of opinion receive absolute constitutional protection under *Gertz,* determining whether a given statement expresses fact or opinion may be difficult. The question is one of law for the court and one which must be answered on the basis of what the average person hearing or reading the communication would take it to mean (*see, Rinaldi v. Holt, Rinehart & Winston, supra,* 42 N.Y.2d at p. 381, 397 N.Y.S.2d 943, 366 N.E.2d 1299; *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.,* 759 F.2d 219, 227–228 [2d Cir.] ). There is no definitive test or set of criteria (*see, Mr. Chow of N.Y. v. Ste. Jour Azur S.A., supra,* at pp. 225–226). The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion (*see,* Restatement [Second] of Torts § 566 comment c).

While the Supreme Court in *Gertz* did not focus on the distinction between fact and opinion, the court, in a case decided on the same day as *Gertz, Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, *supra*, has provided a helpful precedent. In *Letter Carriers,* involving a newsletter sent out

Case 1:25-cv-03552-JLR Document 162-3 Filed 03/12/26 Page 206 of 230

Steinhilber v. Alphonse, 68 N.Y.2d 283 (1986)
501 N.E.2d 550, 508 N.Y.S.2d 901, 123 L.R.R.M. (BNA) 2937, 65 A.L.R.4th 987...

during a labor dispute, the question involved libel judgments based on references to plaintiffs as "scabs" followed by a quoted description of a "scab" as "a traitor to his God, his country, his family and his class" attributed to author Jack London.[4] In reversing **\*291** the judgments and holding that the "scab" description was absolutely protected under the National Labor Relations Act, the court considered both the **\*\*\*905** context of the entire communication and the type of "intemperate, abusive, or insulting language" (*id.,* at p. 283, 94 S.Ct. at p. 2781) that would commonly be employed in the particular social **\*\*554** setting of a labor dispute. It concluded that no reader of the newsletter would have understood the union "to be charging the appellees with committing the criminal offense of treason" and that London's words were "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join" (*id.,* at pp. 285, 286, 94 S.Ct. at p. 2782). (*See also, Greenbelt Pub. Assn. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6, relied on in *Letter Carriers v. Austin, supra,* where the court weighed the broader social context in considering news reports of statements made at a public zoning meeting characterizing plaintiff's negotiating position as "blackmail" and concluded that "even the most careless reader must have perceived that the word ['blackmail'] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable".)

We eschew any attempt here to reduce the problem of distinguishing fact from opinion to a rigid set of criteria which can be universally applied. The infinite variety of meanings conveyed by words—depending on the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used—rules out, in our view, a formulistic approach. A court must have the flexibility to consider the relevant factors and to accord **\*292** each the degree of importance which the specific circumstances warrant. It should be noted, however, that in adopting various approaches to separating fact from opinion, some courts have emphasized specific criteria and set forth general guidelines. (*See, e.g., Mr. Chow of N.Y. v. Ste. Jour Azur S.A.,* 759 F.2d 219, 225–226 [2d Cir.], *supra,* adopting and applying analysis set forth in plurality opn in en banc decision in *Ollman v. Evans,* 750 F.2d 970, *cert. denied* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278, *supra; Ollman v. Evans, supra,* at pp. 977–984, majority opn. Starr, J., positing a four-factor analysis [discussed *infra* ]; *but see, Ollman,* concurring opn. Bork, J.,

at pp. 993–1010, rejecting any "mechanistic rule" based on the semantic nature of the assertion in favor of a determination on "totality of the circumstances"; *and see also, Ollman,* concurring opn. MacKinnon, J., at p. 1016, and *Ollman,* dissenting in part opn, Robinson, Ch. J., at pp. 1021–1028; *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781 [9th Cir.], adopting a multifactor, totality of circumstances test; *Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 [2d Cir.], *cert. denied sub nom. Hotchner v. Doubleday & Co.,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95, *supra,* emphasizing the verifiability *vel non* of the statement in issue; *Buckley v. Littell,* 539 F.2d 882, 895 [2d Cir.], *cert. denied* 429 U.S. 1062, 97 S.Ct. 785, 786, 50 L.Ed.2d 777, *supra,* concentrating on the context of the statement and whether the concept conveyed was "loosely definable", and "variously interpretable".)

While none of the opinions in the Federal cases cited above purports to devise a universal test, several discuss general criteria. One, which contains a helpful discussion, is Judge Starr's plurality opinion in *Ollman v. Evans (supra),* setting out four factors which should generally be considered in differentiating between fact and opinion. The four factors are: (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might "signal to readers or listeners that what is being read or heard is likely to be opinion, not fact" ( **\*\*\*906** *Ollman v. Evans, supra,* at p. 983; *see,* discussion of four factors, *id.,* at pp. 978–984).

**\*293** III

**[4]** In analyzing whether the statements that plaintiff lacked "talent, ambition, **\*\*555** and initiative" would be understood by the average listener as pure opinion or as implying that the speaker had an undisclosed basis for the statements, as plaintiff contends, we first examine the content of the whole communication as well as its tone and its apparent purpose. Like Jack London's description of a "scab" (n. 2, *supra* ) it is evident that the tape-recorded message was intended to be invective expressed in the form of heavy-handed and nonsensical humor. In what could be viewed as a clumsy

Case 1:25-cv-03552-JLR   Document 162-3   Filed 03/12/26   Page 207 of 230

Steinhilber v. Alphonse, 68 N.Y.2d 283 (1986)

501 N.E.2d 550, 508 N.Y.S.2d 901, 123 L.R.R.M. (BNA) 2937, 65 A.L.R.4th 987...

effort to imitate London, the message strives in a juvenile way to achieve humor in, for example, the comments that plaintiff "looks like a million, every year of it", that her "boyfriend drinks ten cups of coffee a day to steady his nerves, just so he can look at her face", and that when plaintiff "comes into a room, the mice jump up on chairs." The sentence which plaintiff selects from the message and claims is "factually laden"—impugning her as lacking in "talent, ambition, and initiative"[5]—is preceded and followed by statements which are clearly part of the attempt at humor prevailing throughout: "In Barbara's case, brains aren't everything. In fact, in her case they are nothing. She has a soft heart and a head to match. Louise the scab, years ago, she was an unknown failure. Now she is a known failure. *She lacks only three things to get ahead, talent, ambition, and initiative.* But she has friends. In fact, if you have her for a friend, you don't need any enemies. In times of trouble, she is waiting to catch you * * * bent over at the right angle" (emphasis added). We conclude, contrary to the view expressed in the dissent at the Appellate Division, that the statement's verbal context would clearly suggest to the ordinary person listening to the message that the comment concerning plaintiff's lack of "talent, ambition, and initiative", like the rest of the message, was not intended to be understood as an assertion of fact or as opinion based on undisclosed facts.

 **\*294**  Consideration of the circumstances and of the broader social context (i.e., the factual background leading to the preparation of the tape recording for the union members possessing the special number of the information line) confirms the conclusion that the recorded message would be taken by the ordinary person not literally, but figuratively. As noted, we do not reach defendants' contention that the taped message was protected speech under the National Labor Relations Act. But it by no means follows that we may not, for the purpose of distinguishing fact from opinion, consider the most significant circumstance of the broader social context: that the message was prepared and played as part of the union's effort to punish a former member. Plaintiff concededly was a "scab" during the strike. For defiance of the strike order, the union assessed a fine against her which she did not pay. In the emotional aftermath of a strike when animosity would be expected to persist—particularly against a former member who was seen as a "traitor" to the cause—it is not surprising that union officials would speak of plaintiff to the membership in highly unflattering terms. As observed by the Supreme Court in *Letter Carriers:* "such exaggerated rhetoric [as applying the word 'traitor' to an employee who crossed the picket line] [is] commonplace in labor disputes" (418 U.S.

264, 286, 94 S.Ct. 2770, 2782, *supra*). An analysis of the statement that plaintiff lacks "talent, ambition, and initiative" in the light of the third  **\*\*\*907**  and fourth *Ollman* factors (the full verbal context of the statement and its broader social context) thus compels the conclusion that the statement would be taken as pure opinion.

To be sure, in another context, a flat statement that a person lacks talent or  **\*\*556**  ambition or initiative might be viewed as a factual assertion, if considered under the first and second *Ollman* factors: whether the statement is sufficiently specific to convey "a precise core of meaning for which a consensus of understanding exists" (*Ollman v. Evans, supra,* at p. 979) and whether it is "capable of being objectively characterized as true or false" (*Ollman v. Evans, supra,* at p. 979). But, "even apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate, heated labor dispute, or other circumstances in which an 'audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole' " (*Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 784 [9th Cir.], *supra* ). Here, the inescapable conclusion from the verbal context of the entire message and all of the circumstances under which it  **\*295**  was delivered is that the statement would be understood by the ordinary listener for what it is: a tasteless effort to lampoon plaintiff for her activities as a "scab", conduct which to the union was an unpardonable transgression.

 **[5]**   What we have said applies with even greater force to plaintiff's second cause of action based on the scurrilous banner displayed as part of the picketing activity during the strike. The majority at the Appellate Division held that the banner, in "the context in which the statement was made", was intended as "an expression of disapproval" and that it was, as such, an opinion and not actionable (115 A.D.2d 844, 847, 495 N.Y.S.2d 907). We agree with these conclusions and observe that the dissenters at the Appellate Division have not taken issue with them.

The order of the Appellate Division should, therefore, be affirmed, with costs.


WACHTLER, C.J., and MEYER, SIMONS, KAYE, ALEXANDER and TITONE, JJ., concur.
Order affirmed, with costs.

501 N.E.2d 550, 508 N.Y.S.2d 901, 123 L.R.R.M. (BNA) 2937, 65 A.L.R.4th 987...

**All Citations**

68 N.Y.2d 283, 501 N.E.2d 550, 508 N.Y.S.2d 901, 123 L.R.R.M. (BNA) 2937, 65 A.L.R.4th 987, 55 USLW 2315, 1 IER Cases 1212, 13 Media L. Rep. 1562

Footnotes

1    Accordingly, we do not consider whether the statements in issue could be viewed as speech about a private person by nonmedia defendants concerning matters which arguably were not of public concern and, thus, not constitutionally protected under *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (*see, Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 1562–1564, 89 L.Ed.2d 783; *Dun & Bradstreet v. Greenmoss Bldrs.,* 472 U.S. 749, 105 S.Ct. 2939, 2944–2947, 86 L.Ed.2d 593) or whether the statements could be actionable absent such constitutional protection (*see,* Restatement [Second] of Torts § 566 comment c, at 173).

2    Although the statement is dictum, it has been interpreted by a majority of Federal courts and our court (*see, Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 380, 397 N.Y.S.2d 943, 366 N.E.2d 1299) as a statement of controlling law that an expression of an opinion is absolutely protected (*see, Ollman v. Evans,* 750 F.2d 970, 974, n. 6; *but see, Ollman,* concurring opn. Bork, J., *id.,* at pp. 998, 999).

3    The rule as set forth in the Restatement (Second) of Torts § 566 is as follows: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."

4    London's full description follows:

    "The Scab

    "After God had finished the rattlesnake, the toad, and the vampire, He had some awful substance left with which He made a scab.

    "A scab is a two-legged animal with a corkscrew soul, a water brain, a combination backbone of jelly and glue. Where others have hearts, he carries a tumor of rotten principles.

    "When a scab comes down the street, men turn their backs and Angels weep in Heaven, and the Devil shuts the gates of hell to keep him out.

    "No man (or woman) has a right to scab so long as there is a pool of water to drown his carcass in, or a rope long enough to hang his body with. Judas was a gentleman compared with a scab. For betraying his Master, he had character enough to hang himself. A scab has not.

    "Esau sold his birthright for a mess of pottage. Judas sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. *The scab sells his birthright, country, his wife, his children and his fellowmen for an unfulfilled promise from his employer.*

    *"Esau was a traitor to himself; Judas was a traitor to his God; Benedict Arnold was a traitor to his country; a SCAB is a traitor to his God, his country, his family and his class."* (418 U.S. 264, 268, 94 S.Ct. 2770, 2773 [emphasis supplied].)

5    Although it was not emphasized in the briefs or at argument, plaintiff also contends that the statement "she is a known failure" is an assertion of fact, not an opinion. Our comments concerning the verbal and broader social context of the communication apply equally, of course, to this contention. Moreover, the bald statement that someone is a "failure", standing alone and removed from any context, would, we believe—even more than an assertion that a person lacks "talent, ambition, and initiative"—be understood as opinion.

**Steinhilber v. Alphonse, 68 N.Y.2d 283 (1986)**

501 N.E.2d 550, 508 N.Y.S.2d 901, 123 L.R.R.M. (BNA) 2937, 65 A.L.R.4th 987...

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Called into Doubt by Brandenburg v. Greek Orthodox Archdiocese of North America, S.D.N.Y., June 1, 2021

42 N.Y.2d 272
Court of Appeals of New York.

Henry I. STUKULS, Appellant,

v.

STATE of New York, Respondent.

(Claim No. 59376.)
|
July 7, 1977.

**Synopsis**

Former teacher at state university brought action against State for libel and slander. The Court of Claims granted State's motion to dismiss, and former teacher appealed. The Supreme Court, Appellate Division, 53 A.D.2d 368, 385 N.Y.S.2d 852, affirmed. The Court of Appeals, Fuchsberg, J., held that publication made by acting president of state university of allegedly defamatory letter concerning teacher to faculty evaluation committee meeting to consider tenure for teacher was not entitled to shelter of absolute privilege.

Reversed and remitted.

Jones, J., filed a concurring opinion in which Breitel, C. J., and Gabrielli, J., concurred.

Wachtler, J., filed a dissenting opinion in which Jasen, J., concurred.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

West Headnotes (7)

**[1]**     **Pretrial Procedure** 🔑 Hearing and Determination in General

On a motion to dismiss for failure to state a cause of action, court is concerned with whether pleading states a cause of action rather than ultimate determination of the facts. (Per Fuchsberg, J., with one judge concurring

and three judges concurring specially.) CPLR 3211(a), par. 7.

43 Cases that cite this headnote

**[2]**     **Libel and Slander** 🔑 Existence and Effect of Malice

A qualified privilege is one that is available only in absence of malice while an absolute privilege, a veritable immunity, is impervious to proof and therefore to a charge of malice. (Per Fuchsberg, J., with one judge concurring and three judges concurring specially.)

28 Cases that cite this headnote

**[3]**     **Libel and Slander** 🔑 Official Acts, Reports, and Records

Unless a government official is a principal executive of state or local government or is entrusted by law with administrative or executive policy-making responsibilities of considerable dimension, policy considerations do not require that he be given an absolute privilege. (Per Fuchsberg, J., with one judge concurring and three judges concurring specially.)

23 Cases that cite this headnote

**[4]**     **Libel and Slander** 🔑 Official Acts, Reports, and Records

Absolute privilege exists to protect those who bear greatest burdens of government or those to whose official functioning it is essential that they be insulated from harassment and financial hazards that may accompany suits for damages by victims of even malicious libels or slanders. (Per Fuchsberg, J., with one judge concurring and three judges concurring specially.)

7 Cases that cite this headnote

**[5]**     **Libel and Slander** 🔑 Absolute Privilege

Absolute immunity is intended for welfare of the public and not for governmental employees. (Per Fuchsberg, J., with one judge concurring and three judges concurring specially.)

Stukuls v. State, 42 N.Y.2d 272 (1977)

366 N.E.2d 829, 397 N.Y.S.2d 740

**[6]    Libel and Slander** 👉 Discharge of Duty to Public

Public officials who are not entitled to the immunizing shield of an absolute privilege may be entitled to protection from liability for defamation afforded those who communicate orally or in writing in good faith in the course of the performance of their duties of office. (Per Fuchsberg, J., with one judge concurring and three judges concurring specially.)

42 Cases that cite this headnote

**[7]    Libel and Slander** 👉 Official Acts, Reports, and Records

Publication made by acting president of state university of allegedly defamatory letter concerning teacher to faculty evaluation committee meeting to consider tenure for teacher was not entitled to shelter of absolute privilege.

45 Cases that cite this headnote

**Attorneys and Law Firms**

**\*273   \*\*830   \*\*\*741**  Thomas P. Gilhooley and Theodore F. Fenstermacher, Cortland, for appellant.

Louis J. Lefkowitz, Atty. Gen. (Alan W. Rubenstein and Ruth Kessler Toch, Albany, of counsel), for respondent.

**Opinion**

FUCHSBERG, Judge.

This claim for libel and slander was brought against the State by Dr. Henry I. Stukuls, a former member of the faculty of the State University College at Cortland. The **\*274** allegedly defamatory matter was uttered and published by Dr. Whitney T. Corey, a vice-president for academic affairs at the college, who, in the absence of Dr. Richard Jones, the college's president, would also act in the latter's stead.[1]

The case comes to us on appeal from the disposition of two motions, that of Dr. Stukuls for pretrial discovery and the

State's cross motion under CPLR 3211 (subd. (a), par. 7) to dismiss the claim for failure to state a cause of action. The cross motion was granted by the Court of Claims because it was of the opinion that the doctrine of absolute privilege was applicable; it then dismissed the discovery motion as moot. The Appellate Division affirmed, but by a divided court, the dissent taking the view that only a qualified privilege was available in this case. For the reasons which follow, we hold that the doctrine of absolute privilege was not a bar to the claim.

The defamation is said to have taken place when, as both parties agree, Dr. Corey, at a meeting with the members of a five-man ad hoc faculty committee which had been chosen to pass on Dr. Stukuls' qualifications for tenure, read the contents of a letter which it is not denied accused Dr. Stukuls, a married man, of having attempted to seduce a young woman who was a student in one of his classes.[2] It is not disputed that the truth of the assertions, made by an unnamed author, had never **\*\*831** been verified though the letter had arrived at the college months earlier. Dr. Stukuls **\*\*\*742** has never actually seen the letter, heard it read or been afforded the opportunity to do so. However, the Court of Claims Judge, after making an in camera inspection of it upon the return of the motion for discovery, found "(t)here is no question that, if not true, statements contained in the letter were libelous." Dr. Corey, in his affidavit, does not suggest that the claimant's expressed understanding of the import of the letter is either inaccurate or exaggerated, nor does he add any qualifying matter to indicate that its description is taken out of context.

 **\*275**  In his verified claim and supporting affidavit, the claimant adds that Dr. Corey was opposed to the grant of tenure and, because of a malicious and willful design to have it denied, had, among other things, chosen to advantage himself of President Jones' absence from the country to take the letter from the president's private file so that he might use it as a means of affecting the committee's judgment, read the letter to the committee though he knew its accusations had been the subject of a rumor that had been circulated and discredited many months earlier, and, as he has since admitted to Dr. Stukuls and to others, removed favorable student course evaluations and letters from Dr. Stukuls' personnel file before submitting it to the committee. The claimant pleads that, as a consequence of the uttering and publishing of the defamatory matter, he was denied tenure and was greatly injured in his personal and professional reputation.

 **[1]**    Against that background, and bearing in mind that on a motion under CPLR 3211 (subd. (a), par. 7) we are concerned with whether the pleading states a cause of action rather

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

366 N.E.2d 829, 397 N.Y.S.2d 740

than the ultimate determination of the facts (see Rovello v. Orofino Realty Co., 40 N.Y.2d 633, 389 N.Y.S.2d 314, 357 N.E.2d 970), we turn to the central question on this appeal: Is defendant protected by an absolute privilege or a qualified one?

 [2]    The difference between the two rests in the role of malice. A qualified privilege is one that is available only in the absence of malice, while an absolute privilege, a veritable immunity, is impervious to proof, and therefore to a charge, of malice (Andrews v. Gardiner, 224 N.Y. 440, 446, 121 N.E. 341, 343).

Absolute privilege is an ancient doctrine. Long recognized by English law as a means to protect freedom of speech and deliberation in Parliament, it was later embodied in American Constitutions, including that of New York State (N.Y.Const., art. III, s 11), so that our legislators would enjoy an uninhibited range of freedom to propose, oppose, debate, adopt or reject ideas as precursors to legislative action (see Yankwich, Immunity of Congressional Speech Its Origin, Meaning and Scope, 99 U. of Pa.L.Rev. 960; see, also, Hinds' Precedents of the House of Representatives, s 2670 et seq.; and s 1655). By a parallel development in the judicial sphere it has served to bolster our Judges' freedom to act without fear or favor in the furtherance of a "vigorous and independent administration of justice" (Yates v. Lansing, 5 Johns. 282, 292 (Kent, Ch. J.), affd. 9 Johns. 395). Instinct in the immunity from suit for libel and  *276  slander granted to the ministers of each of these two branches of government, legislators and Judges both, is recognition that the exercise of the responsibilities of those offices requires the making or pronouncement of judgments, the exercise of discretion, the expression and encouragement of even controverted fact and opinion, and the recognition, evolution or enforcement of public policy.[3]

The right of nonjudicial and nonlegislative governmental officials to assert such an immunity is of relatively recent origin. It had its genesis in England in 1895 (Chatterton  ***743  v. Secretary of State of India (1895), 2 Q.B. 189) and was adopted in this country  **832  a year later (Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (postmaster general)). Significantly, both cases involved cabinet officers and were based upon the rationale that such highranking officials, "who speak for the government or as its mouthpiece", formulate and pronounce policy in varying degrees and, therefore, in a broad sense are an embodiment of government itself, should not, while carrying out their official

duties,[4] be apprehensive that their motives might become the subject of inquiry in a civil suit (Veeder, Absolute Immunity in Defamation, 10 Col.L.Rev. 131, 141).

In England, the doctrine's application for the most part continued to be applied to top-level officials whose conduct constitutes an "act of state" (Szalatnay-Stacho v. Fink (1947), 1 K.B. 1), but in the United States it has followed a more checkered jurisprudential course. Our Federal courts, which at first adopted the concept of absolute privilege for the executive branch of Government with great hesitancy, gradually extended the zone of its application to encompass an ever-broadening range of officials. That trend culminated in a variegated group of opinions in a five to four decision noteworthy for the divergence of the views of the members of the court on the public policy to be applied (Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434; see Becht, Absolute Privilege of the Executive in Defamation, 15 Vand.L.Rev. 1127, esp. pp. 1135-1148; cf. Prosser, Torts (4th ed.), s 114, p. 783).

In the State courts, except for cases against officials of cabinet rank, the decisions have been divided and often inconsistent.  *277  This has led to much judicial and other soul-searching, with most of the commentators in the end arriving at the conclusion that absolute privilege for officials of the executive branch of government should be reserved for only those at its highest echelons (Becht, op. cit., pp. 1148-1171; see, also, Restatement, Torts 2d, s 591, and Comments thereto; s 598A; Handler & Klein, Defense of Privilege in Defamation Suits Against Government Executive Officials, 74 Harv.L.Rev. 44, 50, n. 24; Gray, Private Wrongs of Public Servants, 47 Cal.L.Rev. 303).

New York has been reluctant to extend the applicability of absolute privilege to cases that would represent a departure from the policies which originally brought the doctrine into being. Thus, we have applied it to a borough president, who, as a member of the Board of Estimate, then New York City's senior legislative body, and the elected head of one of the five boroughs which make up that megalopolis, was one of its chief executives (Sheridan v. Crisona, 14 N.Y.2d 108, 249 N.Y.S.2d 161, 198 N.E.2d 359) and to members of the New York City Board of Higher Education, which is specifically empowered by statute to "govern and administer" the city's entire system of colleges (Education Law, s 6202; see, also, Education Law, s 6203; Lombardo v. Stoke, 18 N.Y.2d 394, 276 N.Y.S.2d 97, 222 N.E.2d 721). Other courts in our State have granted the benefits of absolute privilege to the State Commissioner of Education, "the chief executive officer of

the state system of education" (Education Law, s 305, subd. 1); Laurence Univ. v. State of New York, 41 A.D.2d 463, 344 N.Y.S.2d 183), to a town supervisor, the chief executive officer of that unit of government (Town Law, s 29; see, also, County Law, s 150; Duffy v. Kipers, 26 A.D.2d 127, 271 N.Y.S.2d 338) and to members of a city board of education entrusted with authority to administer all the schools within the jurisdiction of its school system (Education Law, s 2501 et seq.; Smith v. Helbraun, 21 A.D.2d 830, 251 N.Y.S.2d 533).

By way of contrast, only a qualified privilege has been extended to the head of a ***744 New York State school for deaf mutes (Hemmens v. Nelson, 138 N.Y. 517, 523, 34 N.E. 342, 344), to employees, as distinguished from board members, of a board of education (Green v. Kinsella, 36 A.D.2d 677, 319 N.Y.S.2d 780), to a State examiner of **833 accounts (Peeples v. State of New York, 179 Misc. 272, 38 N.Y.S.2d 690, qualifiedly disapproved in Ward Telecommunications & Computer Servs. v. State of New York, 42 N.Y.2d 289, 397 N.Y.S.2d 751, 366 N.E.2d 840 (decided herewith)), and to a high school principal (McAulay v. Maloff, 82 Misc.2d 447, 369 N.Y.S.2d 946; see, also, Walker v. Best, 107 App.Div. 304, 95 N.Y.S. 151; cf. *278 Restatement,Torts 2d, s 598A, supporting only a "conditional privilege" for "inferior" State officials). It is interesting that, in Lombardo v. Stoke (supra, 18 N.Y.S.2d pp. 398-399, 276 N.Y.S.2d pp. 99-100, 222 N.E.2d pp. 722-723), while recognizing an absolute immunity for members of the board of higher education, we would not willy-nilly do so for the president of one of its constituent colleges, but thought it better to save that question for another day.[5] That day is now.

[3] [4] [5] This analysis leads us to conclude that, unless an official is a principal executive of State or local government or is entrusted by law with administrative or executive policy-making responsibilities of considerable dimension, policy considerations do not require that he be given an absolute license to defame. The privilege exists to protect those who bear the greatest burdens of government or those to whose official functioning it is essential that they be insulated from the harassment and financial hazards that may accompany suits for damages by the victims of even malicious libels or slanders. This at least serves a recognized public purpose. But to cloak public officers who do not have such a need with the privilege to wrongfully vilify others with impunity while their critics remain fully liable for their own tortious communications, would tend to squelch criticism of government by its citizens while serving no sufficiently countervailing public purpose. After all, the immunity is intended for the welfare of the public and not

for governmental employees (cf. Doe v. McMillan, 412 U.S. 306, 319-324, 93 S.Ct. 2018, 36 L.Ed.2d 912; Hyman v. Press Pub. Co., 199 App.Div. 609, 611). A less discriminating resort to absolute immunity would remove a desirable "check upon calumny" (Andrews v. Gardiner, 224 N.Y. 440, 448, 121 N.E.2d 341, 344 (Cardozo, J.)).

[6] Public officials who are not entitled to the immunizing shield of an absolute privilege are not left without the considerable, albeit incomplete, protections from liability for defamation afforded those who communicate orally or in writing in good faith in the course of the performance of their duties of office. Judge (later Chief Judge) Desmond's survey of the law of qualified privilege, applicable alike to public officials and to others, makes that clear: " ' "A communication made bona fide upon any subject matter in which the party communicating *279 has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contained criminating matter which, without this privilege, would be slanderous and actionable; and this though the duty be not a legal one, but only a moral or social duty of imperfect obligation" ' (Byam v. Collins, 111 N.Y. 143, 150, 19 N.E. 75). 'The rule of law that permits such publications grew out of the desirability in the public interest of encouraging a full and fair statement by persons having a legal or moral duty to communicate their knowledge and information about a person in whom they have an interest to another who also has an interest in such person. ***745 Such privilege is known as a "qualified privilege." It is qualified because it does not extend beyond such statements as the writer makes in the performance of such duty and in good faith believing them to be true' (Bingham v. Gaynor, 203 N.Y. 27, 31, 96 N.E. 84, 85). When defendant's statements are presumptively privileged the rule is that, in order to render them actionable, **834 it is 'incumbent on the plaintiff to prove that (they were) false and that the defendant was actuated by express malice or actual ill-will. While there are numerous cases in the books in which it is said that as to privileged communications the good faith of the defendant and the existence of actual malice are questions of fact for the jury, the expression must not be misunderstood. Those questions are for the jury only where there is evidence in the case warranting their submission to the jury, and the burden of proof is on the plaintiff' (Ashcroft v. Hammond, 197 N.Y. 488, 495-496, 90 N.E. 1117, 1120; see Hemmens v. Nelson, 138 N.Y. 517, 529, 34 N.E. 342, 345). Falsity is not sufficient for an inference of malice. ' "It must be * * * consistent only with a desire to injure the plaintiff to justify * * * (sending) the question of malice to the jury" ' (Fowles

v. Bowen, 30 N.Y. 20, 26; see Loewinthan v. Le Vine, 299 N.Y. 372, 375, 87 N.E.2d 303, 304). 'By actual malice is meant "personal spite or ill will, or culpable recklessness or negligence" ' (Hoeppner v. Dunkirk Print. Co., 254 N.Y. 95, 106, 172 N.E. 139, 142)." (Shapiro v. Health Ins. Plan of Greater N.Y., 7 N.Y.2d 56, 60-61, 194 N.Y.S.2d 509, 512-13, 163 N.E.2d 333, 335-36.)

[7]    Now applying the principles to which we have alluded, we note first that, while Dr. Corey's role in communicating with the tenure committee no doubt was an important one to the parties involved, and not least of all to himself as acting president and vice-president of the college, neither of his two offices falls within the class of executive positions in our State and local government for whom the extraordinary doctrine of *280 absolute privilege is intended. The State University's decision-making process is vested in its trustees and Chancellor. It is they who administer our system of higher education at its policy-making level, which embraces even the ultimate determination of whether tenure is to be granted (see Education Law, ss 354, 355; 8 NYCRR 335.3; cf. Gadzella v. Neumaier, 67 Misc.2d 585, 324 N.Y.S.2d 600). Dr. Corey was not carrying out those functions. His actions under scrutiny here were ones undertaken during the discharge of his own official duties (cf. Ward Telecommunications & Computer Servs. v. State of New York, 42 N.Y.2d 289, 397 N.Y.S.2d 751, 366 N.E.2d 840, supra (decided herewith)).

Basically, Dr. Corey's functions are akin to those exercised by the heads of the schools in McAulay v. Maloff, 82 Misc.2d 447, 369 N.Y.S.2d 946, supra and Hemmens v. Nelson, 138 N.Y. 517, 34 N.E. 342, supra, to neither of whom the doctrine was found applicable. As Justice Mahoney observed in the course of his dissent at the Appellate Division in the present case, "it is difficult to perceive how the goal of protecting our highest administrative, judicial and legislative officials from undue harassment is advanced by extending the salutary doctrine of absolute privilege to all presidents of public colleges" (53 A.D.2d 368, 373, 385 N.Y.S.2d 852, 855). In fact, one would be hard put to rationalize a recognition of absolute immunity for the president of a public college while limiting the presidents of the many outstanding private colleges in our State, with their often broader, more independent and additional responsibilities in fund-raising and policy-making areas, to the significant safeguards of qualified privilege alone (cf. Bounds v. Mutual of Omaha Ins. Co., 37 A.D.2d 1008, 1009, 325 N.Y.S.2d 573, 575).

Indeed, it seems to us that the proliferation of government into more and more activities which in the past had been confined to the private sector militates against any automatic equating of governmental employment with absolute immunity or its ***746 ready extension beyond the areas into which it has heretofore been permitted. (See Pecue v. West, 233 N.Y. 316, 321, 135 N.E. 515, 516; Andrews v. Gardiner, 224 N.Y. 440, 121 N.E.2d 341, supra; 1 Seelman, Libel and Slander s 272, p. 367.)

However, the claimant's row will not be one easy for him to hoe. The indication is strong that the communication for which Dr. Stukuls faults Dr. Corey and, therefore, the State, as his employer, was one made in the course of Dr. Corey's employment. The **835 subject in connection with which the communication presumably was made was one in which Dr. Corey had an official interest, if not a duty. That also may hold true *281 with respect to his personal recommendation, which here was adverse. The letter reading did not take place before a large or disinterested audience, but at a meeting of the small, and perhaps sophisticated, committee of five people, in each of whom a corresponding interest, or duty, resided. In his affidavit, Dr. Corey further asserts that he made an affirmative attempt to narrowly confine the publication of the contents of the letter by exacting a pledge that the committee members would keep the information to themselves, though Dr. Stukuls argues that the inference to be drawn from the apparently unsuccessful attempt at secrecy is that there was a consciousness of wrongdoing.

Furthermore, if the letter was presented as rumor or suspicion rather than as fact, Dr. Stukuls will be confronted with an additional obstacle.[6] For, as to a defamatory rumor as distinguished from a defamatory fact, mere knowledge or belief that the rumor is false will not necessarily defeat the privilege, provided it was "(a) * * * state(d) * * * as rumor or suspicion and not as fact, and (b) the relation of the parties, the importance of the interests affected and the harm likely to be done make the publication reasonable." (Restatement, Torts 2d, s 602.) This gives recognition to the fact that "there are occasions on which it may be entirely proper to give information of a rumor or a mere suspicion, as such, without any belief or reason to believe that it represents the truth" (Prosser, Torts (4th ed.), s 115, pp. 795-796).

Of course, even then, the protection of the privilege will still be subject to defeasance by excessive publication (Restatement, Torts 2d, s 604), or by the publication of defamatory matter solely for an improper purpose (id., s 605),

including its publication "solely from spite or ill will" (id., s 603, Comment a ). (See Brewer v. Second Baptist Church of Los Angeles, 32 Cal.2d 791, 797, 197 P.2d 713 (Traynor, J.); Prosser, Torts (4th ed), s 115, pp. 792-796.) But, in this case, given the undisputed responsibilities of the committee, the relationship which Dr. Stukuls and Dr. Corey each bore to its functioning in this instance and the embarrassment which could ensue if, not having been presented to the committee for whatever it was worth, the rumor, if that it was, were to surface later as fact or rumor, it might be well-nigh impossible for Dr. Stukuls to successfully carry **\*282** the burden of proving that malice was the one and only cause for the publication. (See Restatement, Torts 2d, s 613, subd. (1), par. (h).)

On the other hand, on the basis of the allegations in his claim and his affidavit taken as a whole, it cannot be said in advance of discovery that Dr. Stukuls will not be able to raise an issue of fact. That Dr. Corey uttered the defamatory matter before the committee does not necessarily mean that he was doing so to advance its interests. He may have been acting duplicitously while motivated solely by his ill will towards Dr. Stukuls. In fact, at this juncture, we do not know whether Dr. Corey was under a professional obligation to see to it that the letter came to the attention of the committee at all. If, for instance, it was rumor, or known to him or other college **\*\*\*747** authorities to be false or to be no more than a republication of a rumor which previously had been discredited, he may not have had any obligation to communicate; rather, under such circumstances, he may have been under a contrary obligation, that is, not to use such misleading, unreliable or defamatory matter.

It therefore could be found as a fact, after taking into account such things as the college's practice with regard to communications of that sort, the surreptitious manner in which Dr. Corey communicated it to the committee, his contemporaneous extraction of favorable documents from Dr. Stukuls' **\*\*836** file and such other facts as may be developed on discovery, that Dr. Corey was embarked on but a spiteful course of his own. In short, whether the defamatory matter was presented as rumor would be important, but not necessarily determinative.

Dr. Stukuls should therefore have been given the opportunity to discover the source and contents of the letter; at whose initiative its reading in fact came about; what relationship it bore, if any, to the past circulation of a rumor; what part the revelation of the letter played in the committee's recommendation and in President Jones' ultimate decision to recommend against tenure to the university; the statements which accompanied the reading of the letter, including those which tended to characterize it as fact or rumor; the extent of Dr. Corey's knowledge of its truth or falsity and his efforts, if any, to acquire that information; the practice, if one there was, with regard to the use of such letters in arriving at tenure decisions at the college; the nature of the other documents **\*283** removed from claimant's file by Dr. Corey and when and why that was done; whether Dr. Stukuls was confronted with the contents of the letter and afforded an opportunity to respond to it; and such other matters as the Court of Claims in its judgment may deem appropriate.

Accordingly, the order of the Appellate Division should be reversed and the case remitted to the Court of Claims for consideration and disposition of the motion for discovery in accordance with this opinion.

JONES, Judge, concurring.

I agree that the publication by Dr. Corey of the defamatory letter to the faculty evaluation committee is not entitled to the shelter of an absolute privilege. What I perceive as a deficiency in Judge Fuchsberg's opinion, however, impels me to write this concurrence. Although that opinion now takes note of the special treatment the law accords publication of defamatory rumor, I still regard its analysis and application of this aspect of the qualified or conditional privilege a privilege to which all concede this publication was entitled at a minimum as insufficient in its development and incorrect in its focus.

"(T)here are occasions on which it may be entirely proper to give information of a rumor or a mere suspicion, as such, without any belief or any reason to believe that it represents the truth." (Prosser, Torts (4th ed.), s 115, pp. 795-796.) Section 602 of the Restatement Second of the Law of Torts is squarely in point:

"Publication of Defamatory Rumor

"One who upon an occasion giving rise to a conditional privilege publishes a defamatory rumor or suspicion concerning another does not abuse the privilege, even if he knows or believes the rumor or suspicion to be false, if

"(a) he states the defamatory matter as rumor or suspicion and not as fact, and

"(b) the relation of the parties, the importance of the interests affected and the harm likely to be done make the publication reasonable."

In my analysis this case should be remitted for proof as to whether Dr. Corey brought the defamatory letter to the attention of the evaluation committee for the purpose of advancing the interests of that committee in reaching its determination, **\*\*\*748** and whether in so informing the committee he **\*284** reported the contents of the letter to it only as rumor and suspicion (rather than fact) which would be relevant to its deliberations. If such be the proof, that will end the matter in judgment for the State. If, on the contrary, the proof shows that the report was not made for the benefit of the committee or that Dr. Corey reported the contents of the letter as fact rather than rumor, it will then be appropriate to proceed to the inquiry contemplated by Judge Fuchsberg, i. e., whether the publication was made with malice. It is the characterization that Dr. Corey gave his communication to the committee, not whether the letter turns out to have been cast in terms of rumor or suspicion rather than of fact, which will be determinative.

**\*\*837** The law with respect to publication of defamatory rumor was anticipated in this State at least as early as 1922 when our court in Pecue v. West, 233 N.Y. 316, 323, 135 N.E. 515, 517 recognized that different consequences would attach to a publication if the author "reports it not as a rumor but as a statement of fact for which he vouches", and pointedly noted there that "(w)e are not dealing with a case where a citizen transmits to a district attorney for his investigation information, suspicions, rumors, gossip, for what they are worth", adding "(m)alice could not be inferred from such an act, nor would it evince bad faith or recklessness." (Cf. Doane v. Grew, 220 Mass. 171, 107 N.E. 620.)

It makes great common sense that there should be no liability in circumstances in which there is a qualified or conditional privilege, if the publisher reports the defamatory matter to advance the legitimate interests of the recipient and he states it only for what it is rumor or suspicion and not fact. The present case admirably illustrates this principle. The faculty evaluation committee was charged with responsibility to pass on Dr. Stukuls' qualifications for tenure. The legitimate interests of that committee dictated that its members be informed of all available relevant information, certainly including that in the Dr. Stukuls file. It is not disputed that the letter which Dr. Corey brought to the committee's attention came from the president's file on Dr. Stukuls. It appears that Dr. Corey may be said to have been invited, by reasonable implication if not expressly, to furnish, the committee with data relevant to its deliberations. In his position this would have been natural if not mandatory. It

may even be asserted that, having knowledge of the existence of the defamatory letter in the president's file, Dr. Corey was under a professional **\*285** obligation to see to it that the letter came to the attention of the committee not as an accurate and true statement of fact as to what was charged in the letter, but as a rumored report with respect to the truth of which Dr. Corey had no knowledge and made no representations. Other situations can readily be visualized in which the legitimate interests of the recipients and the relation to them of the publisher would make failure to report known rumors an undoubted dereliction of duty. In such instances it would be irrational to predicate liability on an assertion that the publisher knew of the falsity of the publication or that he acted in reckless disregard of its truth or falsity, i. e., the concept traditionally labeled "malice" in the law of defamation (cf. Restatement, Torts 2d, s 600). Indeed, any such inquiry would be irrelevant; the qualified or conditional privilege itself extends in the circumstances to publication of what is stated by the publisher to be rumor or suspicion, even though known by him to be wholly without foundation.

That this rule should be applied to cases like the present may be otherwise demonstrated. Assume the defamed teacher later were to make a sexual assault on a student and in consequence a claim or action were instituted against the educational institution. It takes no imagination to visualize the relish with which the claimant's attorney would view proof that for some reason a letter charging similar prior sexual misbehavior, **\*\*\*749** known to have been in the files, was kept from the committee whose recommendation led to retention of the teacher on the faculty.

On the other hand, if the proof shows that Dr. Corey did not act for the purpose of advancing the legitimate interests of the evaluation committee, but made the report to the committee solely from spite or ill will against Dr. Stukuls, there would be an abuse of the qualified or conditional privilege giving rise to liability. If the report to the committee was made for the purpose of advancing the legitimate interests of the committee, however, the fact that the report was inspired in part by resentment or indignation at Dr. Stukuls' rumored misbehavior would not constitute an abuse of the privilege. (Restatement, Torts 2d, s 603, Comment a ; see s 605.)

In sum it is my view that, irrespective of the presence or absence of the traditional element of "malice" or of ill will, the qualified **\*\*838** or conditional privilege which attached to Dr. Corey's communications with the faculty committee would not **\*286** have been abused and the State would not be liable if the letter about Dr. Stukuls was presented to the

faculty committee for its benefit and was identified as rumor or suspicion only, with no vouching on his part, directly or indirectly, that its contents were true.

I agree with Judge Fuchsberg that it was error at the Appellate Division to have affirmed the dismissal of the claim on the ground of absolute privilege. I would, therefore, reinstate the claim and remit the case to the Court of Claims for consideration and disposition of claimant's motion for discovery and for other appropriate proceedings.

WACHTLER, Judge (dissenting).

In my view an absolute privilege should attach in the instant case and, therefore, I dissent.

The appellant was seeking continuing appointment ("tenure") as a member of the psychology department of the State University College at Cortland. Pursuant to the procedures established for reviewing an applicant's credentials and qualifications, an ad hoc committee ("committee"), consisting of five members of the faculty at the college, was established. This committee was to investigate the applicant and render an advisory recommendation to the president of the college.

In December, 1974, the committee met to consider appellant's application and called 17 witnesses in connection with the matter. One of these witnesses, Dr. Whitney Corey, was then the vice-president for academic affairs and the acting president of the college. During the course of the meeting, Dr. Corey, in response to inquiries from the committee, read portions of a previously undisclosed letter written about the appellant by an unidentified student. Appellant contends that the letter was defamatory and instituted this action against the State as Dr. Corey's employer. Appellant moved for pretrial discovery and the State cross-moved to dismiss the claim, asserting the defense of absolute privilege. The Court of Claims granted the State's cross motion, and the Appellate Division affirmed, by a divided court.

The issue presented is whether the acting president of a college within the State University system is accorded an absolute privilege with respect to allegedly defamatory statements of another reported by him in the course of his official duties. If that be the case, no liability may be imposed even if the statements were uttered with actual malice (see Sheridan v. Crisona, 14 N.Y.2d 108, 249 N.Y.S.2d 161, 198 N.E.2d 359). If, on the other hand, Dr. Corey **\*287** enjoys only a qualified privilege, an action sounding in defamation

would lie if the appellant could establish actual malice (see Hemmens v. Nelson, 138 N.Y. 517, 341 N.E. 342).

This question was left unanswered by this court's holding in Lombardo v. Stoke, 18 N.Y.2d 394, 398-399, 276 N.Y.S.2d 97, 100, 222 N.E.2d 721, 723 where we noted that: "Whether or not the president of a **\*\*\*750** municipal college may, under appropriate circumstances, raise the defense of absolute privilege \* \* \* is a question we do not now decide in view of the record before us. In their complaint, the plaintiffs have actually alleged that the defamatory statement was issued 'with the knowledge and consent' of the defendant board (of higher education) and published after the board 'ratified and approved' the text. Accordingly, we need concern ourselves only with the scope of the board's privilege which, under the circumstances, may be invoked by President Stoke who was allegedly acting at the board's direction and on its behalf." We then held that the board was entitled to absolute privilege in connection with a press release it had issued (Lombardo v. Stoke, supra, p. 399, 276 N.Y.S.2d p. 100, 222 N.E.2d p. 723). Analysis of our decision in that case and of other leading cases leads me to the inescapable conclusion that the protection of absolute privilege is appropriate under the circumstances of this case.

Public policy considerations and the desire to promote the free flow of information necessary to the efficient administration of **\*\*839** public affairs led this court to provide an executive official an absolute privilege "to publish false and defamatory matter \* \* \* in the exercise of his executive function if the matter has some relation to the executive proceeding in which the official is acting" (Cheatum v. Wehle, 5 N.Y.2d 585, 592, 186 N.Y.S.2d 606, 611, 159 N.E.2d 166, 170, citing 3 Restatement, Torts, s 591). While the Cheatum case dealt with executive officers of the State, courts have recognized that similar considerations of public policy mandated the extension of the shield of absolute immunity to other executive officials as long as the allegedly defamatory remarks were made within the scope of their official duties (see, e. g., Sheridan v. Crisona, 14 N.Y.2d 108, 249 N.Y.S.2d 161, 198 N.E.2d 359, supra (a borough president); Lombardo v. Stoke, 18 N.Y.2d 394, 276 N.Y.S.2d 97, 222 N.E.2d 721, supra (the board of higher education); Laurence Univ. v. State of New York, 41 A.D.2d 463, 344 N.Y.S.2d 183 (Commissioner of Education and his subordinates); Duffy v. Kipers, 26 A.D.2d 127, 271 N.Y.S.2d 338 (town supervisor); Smith v. Helbraun, 21 A.D.2d 830, 251 N.Y.S.2d 533 (Board of Education of the City of Peekskill)). These decisions make clear the rule that where the executive official is acting within the scope of his official duties and the matter **\*288** is one of

366 N.E.2d 829, 397 N.Y.S.2d 740

general importance and public concern, he is cloaked with an absolute privilege. The privilege is extended in order to secure and enhance the public policy of this State to encourage efficient governmental administration.

In the case now before us, the granting or withholding of tenure at State institutions of higher learning is clearly a matter of public interest. The public is best served only if the most qualified applicants receive appointments. In this regard, the committee was established for the purpose of advising the president in matters of tenure, and it cannot be gainsaid it is essential that the committee be fully and candidly apprised of all matters which might in any way relate to the applicant's fitness and qualifications. Concomitantly, the acting president of a college within the State University system, when in possession of information potentially pertinent to the committee's inquiry, is clearly acting within the scope of his official duties and must be free to communicate that information to the committee in an open and unfettered manner.

Further, the burden of investigating the credibility of the information in the possession of the school official should not be placed upon his shoulders. Rather, it is the committee that is charged with making a report and recommendation concerning tenure. Hence, it is the committee which should investigate the information received by it and determine the weight to be accorded that information. To require that the acting president verify all information received by him before he could transmit it to the committee would distort the established **\*\*\*751** procedure for tenure decisions and tend to deprive the committee of the benefit of complete candor and full disclosure of essential information. The protection of

the interests of the public at large therefore requires that Dr. Corey be accorded this absolute privilege.

Of course, we need but note that this absolute privilege only attaches where the official is acting in his official capacity and within the context of an official proceeding (Lombardo v. Stoke, 18 N.Y.2d 394, 401, 276 N.Y.S.2d 97, 102, 222 N.E.2d 721, 725, supra ). Further, the subject of the communication must be relevant to the matter at issue (see James v. Powell, 14 N.Y.2d 881, 252 N.Y.S.2d 87, 200 N.E.2d 772). Thus, while Dr. Corey's statements before the committee are protected by absolute privilege, were he to read the same letter to the general public from the steps of the schoolhouse, no such protection would be granted.

Accordingly, the order of the Appellate Division should be affirmed.

 **\*289** Opinion by FUCHSBERG, J., in which COOKE, J., concurs.

BREITEL, C. J., and GABRIELLI, J., concur in another opinion by JONES, J.

WACHTLER, J., dissents and votes to affirm in a separate opinion in which JASEN, J., concurs.

 **\*\*840** Order reversed, without costs, claim reinstated and case remitted to the Court of Claims for further proceedings in accordance with the opinions herein.

**All Citations**

42 N.Y.2d 272, 366 N.E.2d 829, 397 N.Y.S.2d 740

---

Footnotes

1    The claim is brought against the State alone under the doctrine of respondeat superior (cf. Jones v. State of New York, 33 N.Y.2d 275, 352 N.Y.S.2d 169, 307 N.E.2d 236; Goodyear Aluminum Prods. v. State of New York, 12 A.D.2d 692, 207 N.Y.S.2d 904).

2    Dr. Corey says that he "met" with the committee. Although the dissent refers to his role there as that of a "witness", that designation, which appears to be taken from a brief of one of the litigants, has no foundation in the record. Nothing indicates that his appearance was testimonial in nature. In any event, no special significance is to be attributed to either characterization in the context of this case.

3    We are not concerned in this case with auxiliary grants of absolute privilege to others, such as lawyers and witnesses, who occupy other vital places in adjudicatory, and legislative proceedings (see Prosser, Torts (4th ed.), s 114, pp. 777-779).

4    Absolute immunity does not apply to a communication outside an official's competence (Cheatum v. Wehle, 5 N.Y.2d 585, 593, 186 N.Y.S.2d 606, 611, 159 N.E.2d 166, 170).

5    Lombardo v. Stoke (supra, 18 N.Y.2d p. 402, 276 N.Y.S.2d p. 102, 222 N.E.2d p. 725) reveals that Judge Keating's comments in his concurring opinion that absolute privilege "should be sparingly extended" was consonant with the views of a majority of that court. Judges Van Voorhis and Burke expressly joined that opinion; Judge Scileppi, by his dissent, evidenced a readiness for even a firmer position against extension.

6    The word "rumor" has been well defined as signifying "a flying or popular report, the common talk * * * not the remarks of a single person" (Smith v. Moore, 74 Vt. 81, 86, 52 A. 320, 321).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 220 of 230

Virgin Atlantic Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245 (1992)

139 L.R.R.M. (BNA) 2541, 60 USLW 2619, 121 Lab.Cas. P 10,011...

🚩 KeyCite Yellow Flag

Declined to Extend by Washington Cent. R. Co., Inc. v. National Mediation Bd., E.D.Wash., June 25, 1993

956 F.2d 1245
United States Court of Appeals,
Second Circuit.

VIRGIN ATLANTIC AIRWAYS,
LTD., Mario Batista, Lawrence French,
Julio Rosa, Jose Marcello Garcia,
John Aquino, and Edgar Lambertus,
Plaintiffs–Appellees, Cross–Appellants,
v.
NATIONAL MEDIATION BOARD,
an agency of the United States of
America, International Brotherhood of
Teamsters, Local 851, Anthony Farina,
individually and as president of Local 851,
International Brotherhood of Teamsters
Airline Division, William Genoese,
individually and as Director of International
Brotherhood of Teamsters Airline Division,
Defendants–Appellants, Cross–Appellees.

Nos. 687, 688, Dockets 91–6211,
91–6223, 91–6225 and 91–6253.
|
Argued Dec. 16, 1991.
|
Decided Feb. 20, 1992.

**Synopsis**

Employer brought action challenging National Mediation Board's (NMB's) certification of union as bargaining representative. Union filed counterclaim seeking enforcement of certification and alleging that employer violated Railway Labor Act (RLA). NMB moved to dismiss complaint. The United States District Court for the Eastern District of New York, set certification aside and dismissed union's counterclaim. NMB filed motion to review prior decision. The District Court, Israel Leo Glasser, J., 132 F.R.D. 342, found no basis for motion and imposed Rule 11 sanctions. Cross-appeals were taken. The Court of Appeals, Meskill,

Circuit Judge, held that: (1) district court did not have authority to set aside certification; (2) union stated cause of action against employer for interference with employees' selection of union representative in violation of Railway Labor Act and, thus, district court should not have summarily dismissed that counterclaim; (3) Railway Labor Act section imposing general duty on carriers to exert every reasonable effort to make agreement concerning working conditions did not apply where union and carrier never bargained with each other; and (4) imposition of Rule 11 sanctions was not an abuse of discretion.

Affirmed in part, reversed and remanded in part.

West Headnotes (16)

[1]   **Labor and Employment**  ⚬ Jurisdictional disputes;  representation
      **Labor and Employment**  ⚬ Carriers; Railway Labor Act

Representation dispute which involved controversy surrounding designation and authorization of employee representative under Railway Labor Act (RLA) was committed to exclusive jurisdiction of National Mediation Board (NMB); therefore, Administrative Procedure Act (APA) judicial review provision did not apply to NMB's certification of union. 5 U.S.C.A. §§ 551 et seq., 701(a)(2); Railway Labor Act, § 1 et seq., 45 U.S.C.A. § 151 et seq.

4 Cases that cite this headnote

[2]   **Labor and Employment**  ⚬ Determination of result
      **Labor and Employment**  ⚬ Weight and sufficiency

National Mediation Board (NMB) did not violate Railway Labor Act (RLA) or regulation governing participation by discharged employees in representation elections when it counted votes as they were on original count date, not the delayed date, and included four discharged employees who had actions pending for reinstatement on that date, even though claims for reinstatement were no longer pending

139 L.R.R.M. (BNA) 2541, 60 USLW 2619, 121 Lab.Cas. P 10,011...

when votes were actually counted; NMB practice when ballots were impounded resulting in delay of count beyond count date was to preserve status quo on original count date. Railway Labor Act, §§ 1, subd. 5, 2, subd. 9, 45 U.S.C.A. §§ 151, subd. 5, 152, subd. 9.

4 Cases that cite this headnote

**[3]    Labor and Employment** ⚷ Conduct of Election

National Mediation Board (NMB) may properly use its power to designate participants in elections to counteract or prevent carrier influence in choice of employee representative.

2 Cases that cite this headnote

**[4]    Labor and Employment** ⚷ Election of Representative

Nothing in Railway Labor Act (RLA) requires National Mediation Board (NMB) to stay representation elections pending resolution of dispute over allegedly wrongful discharge of employee. Railway Labor Act, § 1 et seq., 45 U.S.C.A. § 151 et seq.

1 Case that cites this headnote

**[5]    Constitutional Law** ⚷ Notice and hearing; proceedings and review

**Labor and Employment** ⚷ Arbitration proceedings in general

Internal procedures manual of National Mediation Board (NMB) did not create due process rights in the public. U.S.C.A. Const.Amends. 5, 14.

2 Cases that cite this headnote

**[6]    Constitutional Law** ⚷ Labor Relations; Labor Organizations and Collective Bargaining

**Labor and Employment** ⚷ Particular employees

National Mediation Board (NMB) inclusion of four challenged votes of discharged employees who had actions pending for reinstatement

on original count date but whose claims for reinstatement were no longer pending when votes were actually counted did not violate regulation governing participation by discharged employees in representation elections given NMB's practice of maintaining status quo in the face of delays in counts of vote; therefore, NMB did not violate employer's due process rights by counting those votes. U.S.C.A. Const.Amends. 5, 14.

4 Cases that cite this headnote

**[7]    Constitutional Law** ⚷ Labor organizations; collective bargaining

**Labor and Employment** ⚷ Certification of Bargaining Representative

National Mediation Board's (NMB) certification of union did not violate any First Amendment right of free association held by an individual employee; First Amendment did not guarantee any employee the right not to be represented by group chosen by less than majority of co-workers. U.S.C.A. Const.Amend. 1.

7 Cases that cite this headnote

**[8]    Labor and Employment** ⚷ Representation proceedings

District court did not have authority to set aside National Mediation Board's (NMB) certification of union where NMB neither grossly violated Railway Labor Act (RLA) nor violated the Constitution. Railway Labor Act, §§ 1 et seq., 2, subd. 9, 45 U.S.C.A. §§ 151 et seq., 152, subd. 9.

2 Cases that cite this headnote

**[9]    Labor and Employment** ⚷ Pleading

Union stated cause of action against carrier for interference with employees' selection of representative in violation of Railway Labor Act (RLA) by alleging that carrier discharged employees who were engaged in strike designed to enforce National Mediation Board (NMB) certification and solicited employees to sign prepared statements repudiating union. Railway

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 222 of 230

Virgin Atlantic Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245 (1992)

139 L.R.R.M. (BNA) 2541, 60 USLW 2619, 121 Lab.Cas. P 10,011...

Labor Act, § 2, subds. 3, 4, 45 U.S.C.A. § 152, subds. 3, 4.

3 Cases that cite this headnote

**[10]    Labor and Employment** 👈 Nature and scope of duty in general

Railway Labor Act (RLA) section imposing general duty on carriers to exert every reasonable effort to make agreement concerning working conditions did not apply where union and carrier never bargained with each other. Railway Labor Act, § 2, subd. 7, 45 U.S.C.A. § 152, subd. 7.

4 Cases that cite this headnote

**[11]    Labor and Employment** 👈 Wages in general

Where no steps toward bargaining had been taken by union and carrier, unilateral alteration of rates of pay by carrier did not violate Railway Labor Act's (RLA) duty to exert every reasonable effort to make agreements. Railway Labor Act, §§ 2, subds. 1, 7, 6, 45 U.S.C.A. §§ 152, subds. 1, 7, 156.

4 Cases that cite this headnote

**[12]    Costs, Fees, and Sanctions** 👈 Labor and employment

Fact that National Mediation Board (NMB) was correct on merits of its motion to dismiss carrier's action to set aside union certification did not mandate determination that Rule 11 sanctions imposed by district court were an abuse of discretion where district court did not impose sanctions for substance of motion but imposed them because it found that making of motion at that juncture in case, given local rule and law of the case doctrine, was not justified by existing law or good-faith argument for extension, modification or reversal of existing law. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.; U.S.Dist.Ct.Rules E.D.N.Y., Civil Rule 3(j).

33 Cases that cite this headnote

**[13]    Federal Courts** 👈 Sanctions

In reviewing imposition of Rule 11 sanctions, appellate court should apply abuse of discretion standard to every aspect of district court's ruling. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.

3 Cases that cite this headnote

**[14]    Federal Civil Procedure** 👈 Time for instituting proceedings

District court was within its discretion in characterizing National Mediation Board's (NMB) "resubmitted" motion to dismiss carrier's action to set aside union certification as in reality a motion for reargument and thus barred as untimely under local rule. U.S.Dist.Ct.Rules E.D.N.Y., Civil Rule 3(j).

12 Cases that cite this headnote

**[15]    Courts** 👈 Previous Decisions in Same Case as Law of the Case

The law of the case doctrine is admittedly discretionary and does not limit court's power to reconsider its own decisions prior to final judgment.

177 Cases that cite this headnote

**[16]    Federal Civil Procedure** 👈 Grounds and Factors

Major grounds justifying reconsideration of decision are intervening change of controlling law, availability of new evidence, or need to correct clear error or prevent manifest injustice.

2606 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1247**  Frank A. Rosenfeld, Dept. of Justice, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., William Kanter, Dept. of Justice, Washington, D.C., Andrew J. Maloney, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., Ronald M. Etters, General Counsel, Nat. Mediation Bd., Washington, D.C., of counsel), for appellant Natl. Mediation Bd.

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 223 of 230

Virgin Atlantic Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245 (1992)

139 L.R.R.M. (BNA) 2541, 60 USLW 2619, 121 Lab.Cas. P 10,011...

James A. McCall, Washington, D.C. (James T. Grady, General Counsel, Intern. Broth. of Teamsters, Washington, D.C., Jeffrey P. Englander, Morrison, Cohen, Singer & Weinstein, New York City, of counsel), for appellant Intern. Broth. of Teamsters.

Michael Delikat, New York City (Jill L. Rosenberg, Orrick, Herrington & Sutcliffe, of counsel), for appellees.

Before MESKILL, KEARSE and WINTER, Circuit Judges.

**Opinion**

MESKILL, Circuit Judge:

These appeals and cross-appeals involve the validity of a review by the United States District Court for the Eastern District of New York, Glasser, *J.,* of the certification of an employee representative under the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.* The National Mediation Board (NMB) is empowered by section 2, Ninth of the RLA, 45 U.S.C. § 152, Ninth, to investigate and resolve disputes among employees of a carrier by rail or air as to the identity of their bargaining representative, 132 F.R.D. 342. Once the carrier receives certification from the NMB that a particular individual or organization is the duly authorized representative of a group of employees, the carrier is obligated to bargain with that representative.

The district court erred in determining that it had jurisdiction to review the union certification and incorrectly held that the certification was invalid. The court wrongly dismissed many of the counterclaims brought by the union against the carrier. The district court, however, correctly dismissed the union's counterclaim concerning the status quo provisions of the RLA because there was no pre-existing bargaining relationship between the parties. Finally, we hold that the district court did not abuse its discretion in finding that the NMB violated Fed.R.Civ.P. 11 by filing a repetitive motion.

BACKGROUND

On February 17, 1988 the International Brotherhood of Teamsters, Local 851 (hereinafter, along with appellant International Brotherhood of Teamsters Airline Division, "Union") filed an application with the NMB to investigate a dispute among certain employees of Virgin Atlantic Airways, Ltd. (Virgin). There had been talk of unionization among this group of workers for several months prior to this application.

Shortly after filing the application, the Union, along with several discharged Virgin employees, brought an action in federal court (the *Hodges* action) alleging that Virgin had unlawfully interfered with the right of the employees to select their own bargaining representative. The complaint alleged, among other things, that six employees had been discharged because they were vocal supporters of the Union. The discharged employees sought reinstatement. Two of the six were eventually rehired by Virgin, but the remaining four did not work at Virgin after February 6, 1988.

The NMB proceeded to investigate the representation dispute among the Virgin employees. In March 1988 an NMB representative held a conference with Virgin and **\*1248** the Union. Virgin requested that the four plaintiffs in the *Hodges* action not be included among those employees eligible to vote in any election held to determine representation. Under an NMB rule, discharged employees with pending reinstatement actions are eligible to vote. *See* 29 C.F.R. § 1206.6 (1991). Virgin recognized this rule, but argued that the four should not be allowed to vote because the *Hodges* action was merely an attempt to take advantage of that rule rather than a bona fide reinstatement action. Virgin requested that the NMB stay its processing of the application until the district court ruled on the reinstatement claim.

By the end of March, the NMB representative had authorized an election among the employees and had included the four *Hodges* plaintiffs among those employees eligible to vote. The election was scheduled for April 25, 1988. The NMB representative explicitly informed the parties that they could appeal any decision of the representative to the NMB. Virgin did not appeal the decision to include the *Hodges* plaintiffs within the specified time.

On April 19, 1988 Virgin sent a telex to the NMB with two requests. First, Virgin noted that the trial in the *Hodges* case had been scheduled for the same date as the election and requested that the count be moved to the following day as Virgin wished its attorneys to be present at the vote count. Second, because the district court was expected to rule on the reinstatement claims promptly, Virgin requested that the challenged ballots be sequestered and that, if those ballots proved determinative, the NMB postpone the count until the determination of the district court.

The NMB responded the next day with a telex to Virgin that stated: "Due to eligibility questions raised by telex of

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 224 of 230

Virgin Atlantic Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245 (1992)

139 L.R.R.M. (BNA) 2541, 60 USLW 2619, 121 Lab.Cas. P 10,011...

April 19, 1988 ... the count of ballots ... is postponed. Ballots received by the board ... will be impounded at 2:00 p.m. on Monday, April 25, 1988 and counted at a later date after all questions of eligibility have been determined."

On April 26, 1988 the NMB again communicated with Virgin and reversed its earlier position. It informed Virgin that the votes would be counted on April 27 and that all ballots from those eligible to vote as of the original April 25 count date would be included. Citing similar determinations in other cases, the NMB denied Virgin's request for a delay in the count.

On April 27, 1988 the district court in the *Hodges* action held that the four employees had not been discharged because of their union activity and thus were not entitled to reinstatement. Virgin informed the NMB of this decision immediately and again requested that the votes of the four employees not be counted.

The NMB again denied this request and counted all the ballots. The Union received twelve of a possible twenty-one votes, including the four challenged votes. Thus, a majority of the eligible voters designated the Union as their representative. Had the four challenged ballots been excluded, the Union would not have had majority support. On May 2, 1988 the NMB certified the Union as the bargaining representative of the employees.

Despite the certification by the NMB, Virgin refused to bargain with the Union. Instead, Virgin solicited its employees to sign a prepared statement that read: "I have rethought my position regarding Virgin Atlantic and the Union and would like to collectively work with Management for one year after which time I would like the option of considering a Union to represent me."

After repeated overtures to Virgin to negotiate, the Union called a strike on July 6, 1988. Virgin again refused to negotiate with the Union at a mediation session on August 8, 1988 called at the direction of the NMB. The striking workers, led by the Union, then engaged in secondary picketing directed against United Air Lines, a company that did business with Virgin. *See United Air Lines v. Airline Div., etc.,* 874 F.2d 110 (2d Cir.1989).

On October 11, 1988 Virgin and six of its fleet service employees filed this action in the United States District Court for the Eastern District of New York against the NMB,

the Union and others. They sought **\*1249** to set aside the certification, claiming that the NMB had grossly violated the RLA, had violated the First and Fifth Amendments to the Constitution and had violated the Administrative Procedure Act. Virgin also sought to enjoin picketing by the Union.

The Union filed a counterclaim against Virgin, seeking enforcement of the NMB certification and alleging that Virgin had violated the RLA by unilaterally altering the terms and conditions of employment. The Union also alleged that Virgin had impermissibly interfered with the employees' choice of a bargaining representative through the solicitation of signatures for the prepared statement.

The NMB moved to dismiss the complaint. The NMB argued that its actions in certifying a bargaining representative were not subject to judicial review except where the NMB had "grossly violated" the terms of the RLA. The NMB argued that no such violation had occurred and therefore the district court could not review the certification. On February 24, 1989, after briefing and oral argument, the district court denied the NMB's motion to dismiss. The district court recognized the limited judicial review available for NMB certifications. However, the court held that, because the NMB counted the votes of individuals who were not "employees" for purposes of the RLA, there was jurisdiction to review the certification "[u]pon the precise facts of this case."

The parties agreed that the litigation should be stayed pending an interlocutory appeal of the denial of the motion to dismiss to this Court. After a delay, the district court entered an order pursuant to 28 U.S.C. § 1292(b) for an interlocutory appeal in February 1990. On March 15, 1990 we, in our discretion, declined to permit the interlocutory appeal to be taken and returned the matter to the district court.

On June 6, 1990 the NMB filed a motion styled as a "Resubmitted Motion to Dismiss, or in the Alternative, for Summary Judgment." That motion fundamentally relied on the same reasons the NMB had offered in its first motion to dismiss. After a hearing, the district court denied the motion on the basis of a local rule requiring that motions for reargument be made within ten days of the original decision and the law of the case doctrine. The district court imposed sanctions on the NMB under Rule 11 for filing what was essentially the same motion that the court had denied over a year earlier.

Virgin Atlantic Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245 (1992)
139 L.R.R.M. (BNA) 2541, 60 USLW 2619, 121 Lab.Cas. P 10,011...

Virgin then moved for summary judgment and, after a hearing, the district court granted the motion in June 1991. The district court held that the NMB had "grossly violated" the RLA by counting the votes of the four challenged individuals. Therefore the district court held that the certification of the Union was invalid. The district court dismissed the Union's counterclaims and granted summary judgment to the NMB on Virgin's remaining claim that the certification violated the First and Fifth Amendments and the Administrative Procedure Act. Virgin, the Union and the NMB now appeal from the various determinations of the district court.

DISCUSSION

1. *The Certification*
The district court invalidated the certification on a motion for summary judgment pursuant to Fed.R.Civ.P. 56(c). That rule provides that a court should enter judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this case, the parties do not contend that any of the material facts are in dispute. The parties, however, disagree as to which of them is "entitled to a judgment as a matter of law."

The RLA provides that when there is a dispute between employees as to the identity of their representative the NMB should investigate and certify the identity of that representative. 45 U.S.C. § 152, Ninth. The jurisdiction of a federal court to review the certification of a bargaining representative by the NMB under the RLA has been held to be extremely limited. "The scope **\*1250** of judicial review and intervention is confined to 'instances of constitutional dimension or gross violation of the statute.' " *British Airways Board v. National Mediation Board,* 685 F.2d 52, 55 (2d Cir.1982) (citations omitted).

 **[1]**    Virgin contends, however, that the NMB's actions are susceptible to more exacting judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* The district court correctly rejected this contention. By its terms, the judicial review provision of the APA does not apply if "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). As we have stated before, " '[r]epresentation disputes,' which involve controversies surrounding the designation and authorization of representatives of employees covered under the RLA, are committed to the exclusive jurisdiction of the NMB." *Air*

*Line Pilots Ass'n v. Texas Int'l Airlines,* 656 F.2d 16, 20 n. 6 (2d Cir.1981) (citations omitted). *See also Railway Clerks v. Employees Ass'n,* 380 U.S. 650, 658–60, 85 S.Ct. 1192, 1196–98, 14 L.Ed.2d 133 (1965); *Switchmen's Union v. National Mediation Board,* 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). Therefore, review of the certification is not available under the APA.

Thus, the certification here properly could be set aside only if the NMB grossly violated the RLA or violated some constitutional principle. The district court found that it had jurisdiction to review this certification because the NMB had grossly violated the terms of the statute. Virgin argues additionally that the certification violates the Constitution. We disagree with both contentions.

   a. Violation of the RLA
 **[2]**    As we noted in *British Airways,* "[i]nspection of the [RLA] reveals that there are relatively few commands capable of being violated." 685 F.2d at 56. Nonetheless, the district court found that the NMB had grossly violated the statute by including in the representation election individuals who were not "employees" of Virgin.

Section 2, Ninth of the RLA provides that when a dispute arises among a carrier's employees as to the identity of their representative "it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify ... the name or names of the [representative] designated and authorized to represent the employees." 45 U.S.C. § 152, Ninth. That section permits, but does not require, the NMB to "take a secret ballot of the employees involved." *Id.*

Section 1, Fifth, defines "employee" for purposes of the RLA as "every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission." 45 U.S.C. § 151, Fifth. Virgin argues that, because a federal district court denied the challenged voters reinstatement, the NMB could not include them among the "employees" for purposes of the vote.

However it is the NMB, not the federal judiciary, that determines voter eligibility in elections held pursuant to the RLA. Section 2, Ninth of the statute explicitly states that "[i]n the conduct of any election for the purposes herein indicated *the Board shall designate who may participate in the election*

and establish the rules to govern the election." 45 U.S.C. § 152, Ninth (emphasis added).

The NMB has established a regulation that governs the participation by discharged employees in representation elections. 29 C.F.R. § 1206.6 states, in pertinent part:

> Dismissed employees whose requests for reinstatement [on] account of wrongful dismissal are pending before proper authorities ... are eligible to participate in elections among the craft or class of employees in which they are employed at time of dismissal. This does not include dismissed employees whose guilt has been determined, and who are seeking reinstatement on a leniency basis.

**\*1251** 29 C.F.R. § 1206.6. Virgin claims that because the four dismissed employees' claims for reinstatement were no longer "pending" when the votes were actually counted, inclusion of their votes violated the regulation.

However, the NMB has a practice that "[w]hen the ballots in an election are impounded because of a question which requires resolution prior to the count, and the impounding results in a delay of the count beyond the count date ... the status quo as it existed on the *original count date* must be preserved in order to prevent any change in the outcome as it would have been in the absence of the delay." *Altair Airlines,* 7 NMB No. 254 (1980) (emphasis added); *see also Continental Airlines,* 14 NMB No. 29 (1987); *Trans World Airlines,* 13 NMB No. 64 (1986). Nothing in 29 C.F.R. § 1206.6 or the RLA prohibits such a practice.

The NMB followed this practice here by, on April 27, counting the votes as they were on April 25, the original count date. On April 25, the four challenged voters had pending actions for reinstatement. Therefore, the NMB did not violate the regulation or the statute by counting the four ballots.

 **[3]**    Moreover, a major concern of an NMB representation investigation is to "insure the choice of representatives by the employees *without interference, influence, or coercion exercised by the carrier.*" 45 U.S.C. § 152, Ninth (emphasis added); *see Virginian Railway v. System Federation No. 40, 300 U.S. 515, 545–47, 57 S.Ct. 592, 598–99, 81 L.Ed. 789 (1937).* The NMB may properly use its power to designate participants in elections to counteract or prevent carrier influence in the choice of a representative by the employees. In *British Airways* for example, we refused to examine the propriety of a certification where the NMB held an election among employees two years after determining voter eligibility. 685 F.2d at 54–56.

 **[4]**    Nothing in the RLA requires the NMB to stay elections pending resolution of a dispute over an allegedly wrongful discharge. Moreover, nothing in the statute mandates that, having once told the carrier that the election would be stayed, the NMB may not reverse its decision.

In short, the NMB did not violate any command of the RLA. Therefore, the district court erred in setting aside the certification on the ground that the NMB had grossly violated the statute.

 b. Constitutional Concerns

 **[5]**    **[6]**    Virgin claims that the certification violated its right to due process of law guaranteed by the Fifth Amendment because the NMB violated (1) its own internal procedures and (2) the regulations set forth in the federal register. "[I]t is clear that the internal procedures manual of an executive agency does not create due process rights in the public." *Lynch v. United States Parole Comm'n,* 768 F.2d 491, 497 (2d Cir.1985). Thus, we need not address whether the NMB adhered to its internal procedures. However, an agency's violation of a federal regulation relating to it may constitute a violation of due process. *See Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *International House v. NLRB,* 676 F.2d 906, 912 (2d Cir.1982). Virgin argues that, by counting the votes of four discharged employees, the NMB violated 29 C.F.R. § 1206.6. As noted above, the inclusion of the four challenged votes did not violate that regulation given the NMB's practice of maintaining the status quo in the face of delays in the count of votes. Therefore, the NMB did not violate Virgin's due process rights.

 **[7]**    Several Virgin employees join Virgin in objecting to the NMB certification of the Union as the employee representative. These individuals claim that the certification violated their First Amendment right of free association. They claim that the First Amendment guarantees them the right not to be represented by a group chosen by less than a majority of their co-workers.

Not surprisingly, there is little support for such a proposition. The First Amendment right of free association has never **\*1252** been held to mandate "majority rule" in the labor relations sphere. If the First Amendment did protect individuals from being represented by a group that they do not wish to have represent them, it is difficult to understand why that right would cease to exist when a majority of the workers

elected the union. *See Railway Employes' Department v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) (upholding "union shop" provisions of the RLA against First Amendment challenges); *International Ass'n of Machinists v. Trans World Airlines,* 839 F.2d 809, 812 (D.C.Cir.) (disenfranchised employees did not have a First Amendment claim), *cert. denied,* 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988). The district court properly held that the certification in this case did not violate the First Amendment rights of any individual employee.

 **[8]**    The NMB, therefore, did not violate any constitutional provision in certifying the Union as the representative of the Virgin employees. Because the NMB neither grossly violated the RLA nor violated the Constitution, the district court did not have the authority to set aside the certification. *British Airways,* 685 F.2d at 55. The certification should be reinstated.


2. *The Union's Counterclaims*
The Union appeals from the district court's entry of summary judgment in favor of Virgin on the Union's counterclaims against Virgin. The Union asked the court for declaratory and injunctive relief, including a declaration that the NMB certification was valid, that Virgin's unilateral changes in working conditions and refusal to recognize the Union violated the RLA and that the strike against Virgin did not violate the RLA. The Union also asked the district court to order Virgin to bargain with the Union. In part because the district court held that the Union certification was invalid, the court dismissed these counterclaims.

As our discussion above indicates, the Union is entitled to a declaration that the certification is valid and that Virgin's refusal to bargain with the Union violated the RLA. As we stated with regard to this very situation in *United Air Lines:*

> [T]he RLA is unambiguous with regard to the carrier's obligation once the NMB transmits that certification to the employer:
>
>> Upon receipt of such certification the carrier *shall treat with* the representative so certified as the representative of the craft or class for the purposes of this chapter.
>
> 45 U.S.C. § 152, Ninth (emphasis added). Thus, the carrier, Virgin, had an absolute duty under section 152 Ninth to sit down at the bargaining table with the union.

874 F.2d at 115. That "absolute duty" remains unfulfilled to this day and the Union is entitled to a declaration and an injunction to enforce that duty.

 **[9]**    The Union also claims that Virgin violated section 2, Third and Fourth. Section 2, Third provides, in pertinent part, that "no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier." 45 U.S.C. § 152, Third. Section 2, Fourth similarly prohibits employer interference in the selection of employee representatives. *Id.* § 152, Fourth. In support of this counterclaim, the Union asserts that Virgin discharged employees who were engaged in a strike designed to enforce the NMB certification and solicited employees to sign a prepared statement repudiating the Union. These actions, if proven, constitute interference by the carrier with the employees' selection of a representative. *See NLRB v. Exchange Parts Co.,* 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964) (increase in benefits, if undertaken to discourage support for union, unlawful under the National Labor Relations Act (NLRA)); *Nazareth Regional High School v. NLRB,* 549 F.2d 873, 883 (2d Cir.1977) (under NLRA, coercion normally may be inferred from the fact that supervisors are involved in soliciting signatures on anti-union petitions); *cf.* **\*1253** *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 383–84, 89 S.Ct. 1109, 1117–19, 22 L.Ed.2d 344 (1969) (cases construing NLRA may be helpful in construing similar provisions of RLA). The counterclaim states a claim for violation of 45 U.S.C. § 152, Third and Fourth. Therefore, the district court should not have summarily dismissed this counterclaim.

 **[10]**    The Union further alleges that Virgin, by unilaterally altering rates of pay, violated section 2, First and Seventh of the RLA, 45 U.S.C. § 152, First and Seventh. Section 2, First imposes a general duty on carriers to "exert every reasonable effort" to make agreements concerning working conditions. 45 U.S.C. § 152, First. Section 2, Seventh states, in pertinent part:

> No carrier ... shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

*Id.* § 152, Seventh. Section 156 of Title 45, section 6 of the RLA, in turn requires that carriers and representatives give each other thirty days written notice of "an intended change in agreements affecting rates of pay, rules, or working conditions."

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 228 of 230

Virgin Atlantic Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245 (1992)

139 L.R.R.M. (BNA) 2541, 60 USLW 2619, 121 Lab.Cas. P 10,011...

As the district court recognized, the Supreme Court has held that the phrase "as embodied in agreements" limits this provision of the act to agreements reached after collective bargaining. *Williams v. Terminal Co.,* 315 U.S. 386, 399–400, 62 S.Ct. 659, 667–68, 86 L.Ed. 914 (1942). In *Williams,* the plaintiffs, employees who had never engaged in collective bargaining with their employer, tried to halt unilateral changes in working conditions by the employer. At the time of the unilateral change in working conditions, one group of plaintiffs had authorized a representative under the RLA. That representative had, prior to the change, requested to bargain with the employer. The Court held that nothing in the RLA prevented changes prior to the actual existence of a collective bargaining agreement:

> The institution of negotiations for collective bargaining does not change the authority of the carrier. The prohibitions of § 6 against change of wages or conditions pending bargaining and those of § 2, Seventh, are aimed at preventing changes in conditions *previously fixed by collective bargaining agreements.* Arrangements made after collective bargaining obviously are entitled to a higher degree of permanency and continuity than those made by the carrier for its own convenience and purpose.

*Id.* at 402–03, 62 S.Ct. at 668–69 (emphasis added).

The Supreme Court cast some doubt on the vitality of *Williams'* interpretation of section 2, Seventh in *Detroit & Toledo Shore Line R.R. v. United Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). However, as the D.C. Circuit stated when faced with a similar problem, the *Detroit & Toledo* decision "plainly stops short of overruling *Williams* and leaves it binding in a case like the one before us where there has been 'absolutely no prior history of any collective bargaining or agreement between the parties on any matter.'" *Trans World Airlines,* 839 F.2d at 814 (citation omitted).

Although some courts have held that something less than a formalized collective bargaining agreement may be sufficient to trigger the status quo provisions of the RLA, *see International Ass'n of Machinists v. Transportes Aereos Mercantiles,* 924 F.2d 1005, 1008–10 (11th Cir.) (unratified agreement represented status quo), *cert. denied,* 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991), here there was not even that. The Union and Virgin never bargained with each other. Therefore, section 2, Seventh, does not apply.

**[11]** Similarly, where no steps toward bargaining have been taken, the unilateral alteration of rates of pay by an employer does not violate the section 2, First duty to "exert every reasonable effort" to make agreements. *See Regional Airline Pilots v. Wings West Airlines,* 915 F.2d 1399, 1402–03 (9th Cir.1990), *cert. denied,* 501 U.S. 1251, 111 S.Ct. 2891, 115 L.Ed.2d 1056 (1991); *Trans World Airlines,* 839 F.2d at 814–15. The district court properly dismissed this counterclaim under this provision of the RLA.

**\*1254** 3. *Rule 11 Sanctions*

**[12]** In February 1989 the NMB made a motion to dismiss Virgin's action to set aside the Union certification. In that motion, the NMB argued that the district court did not have jurisdiction to review the certification, citing many of the cases and principles discussed above. The district court denied the motion. The district court recognized the limited nature of judicial review in this context, but held that on the precise facts of this case there was jurisdiction to review the certification.

Approximately sixteen months after the original motion to dismiss was denied by the district court the NMB filed what it characterized as a "Resubmitted Motion to Dismiss, or in the Alternative, for Summary Judgment." In its memorandum supporting that motion, the NMB argued that the principles that it had argued in its original motion had been "reaffirmed" by intervening case law.

The NMB argued that their motion was justified by Fed.R.Civ.P. 54(b), which provides, in pertinent part, that, unless the court expressly directs otherwise, any order or decision "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Fed.R.Civ.P. 54(b). The NMB asserted that this provision impliedly allows motions requesting that the court reverse one of its earlier decisions.

The district court denied the motion. It held that the motion was in reality a motion to reargue the prior motion. As such, the motion was barred by a local rule that provided that such motions must be made within ten days. The district court held that the motion also should be denied based on the law of the case doctrine. It found that there was no significant new law presented in the motion. The district court found that the motion merely rehashed principles with which the court was familiar and that it had considered at the time of the first motion. The district court also held that the NMB's theory under Rule 54(b) was totally without merit.

In addition, the district court rejected the NMB's asserted reason for filing the motion. The NMB stated at oral argument before the district court that the reason for the motion was to place the case in a posture that would allow for an appeal. The court concluded that, because the NMB had repeatedly objected to entry of summary judgment for Virgin—a device that would have allowed for an appeal to this court—the NMB was insincere in its avowed reason for the motion.

The district court therefore held that that motion violated Fed.R.Civ.P. 11 (Rule 11) and ordered the NMB to pay the reasonable costs incurred by Virgin in opposing the motion. Rule 11 states in pertinent part:

> The signature of an attorney or party constitutes a certificate by the signer ... that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Fed.R.Civ.P. 11. The district court held that the filing of the motion was not justified by existing law or by a good faith argument for extension, modification or reversal of existing law. The court stated: "The reasons upon which the court based its denial of the motion were patent. Local Rule 3(j) and the law of the case doctrine, each of which was readily discoverable, would have counseled against the filing of this motion."

[13]    The NMB contends that the district court erred in finding that it violated the strictures of Rule 11 by making its second motion to dismiss. In reviewing the imposition of sanctions under Rule 11, "an appellate court should apply an abuse-of-discretion standard" to every aspect of the district court's ruling. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). However, "[a] district court would necessarily **\*1255** abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.*

The NMB argues that because, as we hold today, it was correct on the merits of its motion to dismiss, the finding that the motion violated Rule 11 was an abuse of discretion. However, the district court did not impose sanctions on the NMB for the substance of its motion. The district court found that the NMB violated Rule 11 because making the motion *at that*

*juncture in the case,* given Local Rule 3(j) and the law of the case doctrine, was not justified by existing law or a good faith argument for the extension, modification or reversal of existing law. Therefore, the fact that the NMB was correct on the merits of its motion does not mandate a determination that the Rule 11 sanctions constituted an abuse of discretion.

[14]    Although we hold today that the district court erred in denying the NMB's initial motion to dismiss, it was justified in denying the resubmitted motion based on the law of the case doctrine. *See* 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* ¶ 0.404[4.—1], at 124–26. Similarly, the district court was within its discretion in characterizing the NMB's "resubmitted" motion to dismiss as in reality a motion for reargument and thus barred as untimely under Local Rule 3(j).

[15]    [16]    The law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment. *See Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power."); *First Nat'l Bank of Hollywood v. American Foam Rubber Corp.,* 530 F.2d 450, 453 n. 3 (2d Cir.) ("In this Circuit, the law of the case is a discretionary doctrine that need not be applied when no prejudice results from its omission.") (citation omitted), *cert. denied,* 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976). However, "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Zdanok v. Glidden Co.,* 327 F.2d 944, 953 (2d Cir.), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). The major grounds justifying reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 at 790. *Accord, Doe v. New York City Dep't of Social Services,* 709 F.2d 782, 789 (2d Cir.) (discussing law of the case in the appellate context), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). The district court explicitly found that none of those reasons was present in this case. Even if Rule 54(b) allows parties to request district courts to revisit earlier rulings, the moving party must do so within the strictures of the law of the case doctrine.

Given the deferential standard of review we must use in reviewing all aspects of a district court's imposition of Rule 11 sanctions, we cannot say that the court abused its discretion

Case 1:25-cv-03552-JLR    Document 162-3    Filed 03/12/26    Page 230 of 230

Virgin Atlantic Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245 (1992)
139 L.R.R.M. (BNA) 2541, 60 USLW 2619, 121 Lab.Cas. P 10,011...

in finding that the NMB's position in making its motion was not justified. Judge Glasser's prior decision emphasized that there was jurisdiction to review the certification "[u]pon the precise facts of this case." None of the intervening cases cited in the NMB's memorandum supporting the resubmitted motion addressed the "precise facts of this case," or even closely similar facts. Judge Glasser's initial error in asserting jurisdiction was not so clear that the law of the case doctrine would be justifiably ignored. The imposition of the Rule 11 sanctions, therefore, was not an abuse of discretion.

CONCLUSION

Because the procedures used by the NMB in determining the identity of the bargaining representative of the contested group of Virgin employees neither grossly violated the RLA nor raised any constitutional concerns, the district court had no power to review the certification of the Union in this case. The district court, therefore, also improperly dismissed some **\*1256** of the Union's counterclaims. Because there was no prior history of collective bargaining between the parties,

however, the district court correctly concluded that Virgin's unilateral change in the terms and conditions of employment did not violate 45 U.S.C. § 152, Seventh. Moreover, the imposition of sanctions against the NMB for its resubmitted motion, given the court's prior narrow ruling on that subject, the local rule relating to reargument and the law of the case doctrine, was not an abuse of discretion and thus we affirm the imposition of those sanctions.

We therefore reverse the district court's invalidation of the NMB certification of the Union as the representative of the employees at issue here. With the exception of the dismissal of the Union's counterclaim under 45 U.S.C. § 152, Seventh, we reverse the dismissal of the Union's counterclaims. We affirm the imposition of sanctions against the NMB under Rule 11. We vacate the judgment and remand to the district court for further proceedings not inconsistent with this opinion.

**All Citations**

956 F.2d 1245, 139 L.R.R.M. (BNA) 2541, 60 USLW 2619, 121 Lab.Cas. P 10,011, 22 Fed.R.Serv.3d 417

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.