# Exhibit 3

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 25-cv-03552
- - - - - - - - - - - - - - - - - - - - - - -x
JOSEPH CARTAGENA,

                    Plaintiff,

        -against-

TERRANCE DIXON, TYRONE BLACKBURN,
and T.A. BLACKBURN LAW, PLLC,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - -x

                    February 24, 2026
                    10:05 a.m.
        ***** CONFIDENTIAL *****
              Videotaped Deposition of
TERRANCE DIXON, taken by Plaintiff,
pursuant to Notice, held at the offices of
REED SMITH LLP, 599 Lexington Avenue,
New York, New York, before Sharon Pearce,
RDR, CRR, CRC, NYRCR, a Registered
Diplomate Reporter, Certified Realtime
Reporter, and Notary Public of the State
of New York.

                *      *      *

Page 2

A P P E A R A N C E S:

    REED SMITH LLP
        Attorneys for Plaintiff
        599 Lexington Avenue
        New York, New York 10022

    BY:  ROB CARNES, ESQ.
         IAN M. TURETSKY, ESQ.
         JORDAN SIEV, ESQ.


    TACOPINA SEIGEL & DEOREO
        Attorneys for Plaintiff
        275 Madison Avenue
        New York, New York 10016

    BY:  CHAD D. SEIGEL, ESQ.
         ELEONORA LANZONE, ESQ.
         MATTHEW DEOREO, ESQ.



    BLACKBURN LAW, PLLC
        Attorneys for Defendant
        1242 E. 80th Street
        Brooklyn, New York 11236
    BY:  TYRONE BLACKBURN, ESQ.


 ALSO PRESENT:

    JAMES MCAFEE, Videographer

    THE HONORABLE JUDGE ROCHON, ESQ. (Via Phone)

Page 8

DIXON - CONFIDENTIAL

you believed was false; is that right?

A.    Absolutely.

Q.    All right.  So you read that complaint carefully before it was filed.

Is that fair?

A.    Yes, sir.

Q.    All right.  And you maintained that everything in your complaint is complete and truthful; is that right?

A.    Yes, sir.

Q.    Okay.  Now, according to your complaint, you worked for --

MR. BLACKBURN:  Objection.  He is not answering any questions pertaining to the second complaint. The Court has stayed discovery in that complaint, and he's not answering not one question concerning that.

MR. SEIGEL:  Okay.  Well, we may have to --

MR. BLACKBURN:  Call the Court.

MR. SEIGEL:  Yeah.  We may have to, because --

MR. BLACKBURN:  Go right ahead.

Page 24

DIXON - CONFIDENTIAL

MR. SEIGEL:  Yes, your Honor.

So first of all, I heard Mr. Dixon say that we don't allege extortion.  It's actually paragraph 144 of the complaint.  While it's not an extortion cause of action, it is an intentional infliction of emotional distress based on extortion which we alleged in our complaint.  Likewise, there's no question that we allege that the allegations of forced labor and coercive sex trafficking are false.  It's in paragraph 69 of our complaint.  So Mr. Dixon is just wrong in that regard.  The two matters overlap entirely.

THE COURT:  Okay.  Thank you very much.  All right.  I have heard argument from both sides.  And I'm looking to Federal Rule of Civil Procedure 30(C)(2), which talks about the sections in instructing a deponent not to answer during a deposition.  I find that in applying that rule, the

Page 25

DIXON - CONFIDENTIAL

deponent must answer the questions that have been raised by the plaintiff, and I'm overruling any objection raised by Mr. Blackburn. There are not issues of privilege at play.  The information is relevant or could lead to admissible evidence. Whether the claims are time barred, whether there is litigation privilege at play, something appears in the complaint are merits issues that you can get to ultimately in defending the case.  But they are not grounds to instruct a witness not to answer.  And therefore, he must answer the questions that are posed to him in this arena.

Okay.  Anything further, Mr. Seigel?

MR. SEIGEL:  Yes, your Honor. In an abundance of caution, just sort of save additional resources, would the Court consider a standing order on this issue with respect to the

Page 28

DIXON - CONFIDENTIAL

continue without the sound.

Mr. Dixon, do you see yourself on stage there in that video?

A.    Yes, sir.

Q.    Okay.  And is that an example, even without the sound, of you hyping up a crowd for Fat Joe?

MR. BLACKBURN:  Objection. There is no foundation set on this video.  The video is not playing. There's no audio sound.  We don't know what he's doing inside of that video. And -- number two.  And number three, this is Instagram.  It says Instagram but we have no certification of Instagram that that's an actual video from Instagram and/or any certification of Instagram that that video is from a page owned by Mr. Dixon.

MR. SEIGEL:  All right.  You have your objection.

BY MR. SEIGEL:

Q.    So my question for you,

DIXON - CONFIDENTIAL

Mr. Dixon, is do you see yourself in that video?  Is that you?

A.    Yes.

Q.    Okay.  And does that appear, even without sound, to be you hyping up a crowd?

A.    I remember that night like it was yesterday.

Q.    Okay.

A.    I wasn't hyping the crowd up like that.  That was me performing my song, and Joe was hyping me up.

Q.    Okay.  Very good.

So that's you performing on a stage; is that right?

A.    Yes, sir.

Q.    And that's -- as a result, that's something that you posted on your Instagram; is that right?

MR. BLACKBURN:  Objection.
Again --

A.    I don't recall.

Q.    It's a question.

MR. BLACKBURN:  I'm stating my

Page 32

DIXON - CONFIDENTIAL

Instagram page.

A.    No.

Q.    What was your Instagram page?

A.    I don't recall.  I had so many different names that I don't remember.

Q.    Okay.  What were all your names that you do remember?

A.    I don't.  I don't remember any of them.

Q.    You don't remember any of your Instagram names.

A.    No.

Q.    Not one.

A.    Not one.

Q.    What Instagram page do you have now?

A.    I don't recall.

Q.    You don't -- do you use Instagram now?

A.    I got somebody that work an Instagram page.  But --

Q.    Okay.  Who works your Instagram page now?

A.    A friend.

Page 40

DIXON - CONFIDENTIAL

THE WITNESS:  My team -- I don't know.  I didn't see it.  I didn't see that page.  I don't know.  That's what I said to you.

BY MR. SEIGEL:

Q.    Okay.  You said you have a team that posts material on Instagram for you; right?

A.    Yes, sir.

Q.    That was your testimony.

A.    Yes, sir.

Q.    And my question for you is how do you know that your team posts items for you on Instagram?

A.    I'm assuming.  They my biggest supporters.  Who else supporting me?

Q.    Okay.  Who is "they"?

A.    My team.

Q.    All right.  And name one member of your team.

A.    I don't recall.  There's so many of them.

Q.    If there are so many, you can't name one?

Page 43

DIXON - CONFIDENTIAL

transcript where the answer is.

You're going to keep doing this?  How

many times do we have to get the judge

on the phone with your obstructionist

behavior?

MR. BLACKBURN:  Watch your tone.

MR. SEIGEL:  Watch my tone?

You're the one who says "what the

hell" on a transcript.

MR. BLACKBURN:  Watch how you

speak to me.

MR. SEIGEL:  Anyway --

MR. BLACKBURN:  Understand?

MR. SEIGEL:  My question for you

again --

MR. BLACKBURN:  I don't work for

you.  Watch how you speak to me.

MR. SEIGEL:  My question for you

again -- because what's the answer?

What's the answer.

MR. BLACKBURN:  You have a lot

of --

MR. SEIGEL:  What's the answer?

MR. BLACKBURN:  You'd never do

Page 44

DIXON - CONFIDENTIAL

this if it was outside.  So watch your mouth and watch how you speak to me.

MR. SEIGEL:  Okay.  Thank you.

BY MR. SEIGEL:

Q.    Do you understand that saying you don't recall something when you in fact do is a false statement subject to perjury?

A.    How you know I do?  How you going to tell me --

Q.    I'm not asking  -- it's a separate question.

A.    I don't recall.

Q.    I understand you're saying that.

A.    All right.  So --

Q.    Do you understand that if you're saying you don't recall --

A.    I understand.

Q.    -- when you in fact do, that's perjury?

A.    I don't recall.

MR. BLACKBURN:  He said he doesn't recall.

CERTIFIED STENOGRAPHER:  I can't

Page 59

DIXON - CONFIDENTIAL

he doesn't recall, he can't produce; right?

MR. BLACKBURN:  No, no, no. That's not what he said.  That's a different question, and it's a different answer.

MR. SEIGEL:  And by the way, instruct your client not to ask me questions.

MR. BLACKBURN:  This guy is, like --

THE WITNESS:  It's all right, man.  It's all right.  He frustrated.

MR. BLACKBURN:  It's like his tampon is -- like, what is wrong with him?

THE WITNESS:  On the record, he frustrated.

BY MR. SEIGEL:

Q.    That's good.

A.    On the record.

Q.    Okay.  So as of today, you're saying you can't recall if you can produce anything; right?

Page 70

DIXON - CONFIDENTIAL

MR. BLACKBURN:  Play the song.

MR. SEIGEL:  This is my deposition.

MR. BLACKBURN:  Play the song.

Q.    My question is --

A.    Let me tell you something.  You asking me lyrics about Fat Joe from a time me and this guy --

MR. BLACKBURN:  How many years?  28 years?

A.    Let me tell you something.  It was a long time ago.  Let me tell you something, bro.  Me and that guy, bro, man, you know you --

MR. BLACKBURN:  He's not -- no, no, no.  No, no, no.  Don't --

MR. SEIGEL:  No.  Don't let him -- don't interrupt him.  He was answering.

MR. BLACKBURN:  Don't offer anything.  No.  He wasn't answering anything.

MR. SEIGEL:  I didn't hear a period.

DIXON - CONFIDENTIAL

Mr. Cartagena's -- is it business manager?

A.    Business manager, one of his enforcers.  Yeah.  He's the guy that -- that said I should be dead right now.  He was telling --

Q.    All right.

A.    -- Percy.  He was telling Percy. God bless the dead Percy.  He was telling Percy on the phone that I need to get killed.  I should be dead right now.

Q.    All right.

A.    Yeah.  You want to hear that audio too?

Q.    Mr. Dixon, I want to show you --

A.    You want to hear that audio?

Q.    -- what was pre-marked as Exhibit 3.

A.    Do you want to hear the audio, man, and stop playing these games?

Q.    What I want to do is this, is show you Exhibit 3.

A.    Let's get to the real stuff.

DIXON - CONFIDENTIAL

A.    But I frequently speak to him. He remembers that day like it was yesterday too.  A whole bunch of people. Got a whole lot of witnesses, girls that see me write for Joe, came to the house that I'm still in touch with, that's willing to take the stand.

Q.    Which girls?

A.    I'm not saying her name right now.

Q.    Again --

A.    I'm not saying her name until the time is right.

Q.    When is the time right?

A.    We still going; right?

Q.    Actually, we're in discovery. Now would be the time.  You're under oath and being deposed.  This is the time.

A.    I got to think about her name. I don't recall.

Q.    Okay.  Any other girls?

A.    No.  Just one.

Q.    Okay.  Now --

A.    I forgot her name, though.

Page 125

DIXON - CONFIDENTIAL

A.    He chopped it up with me on the plane.  It was his laptop.

Q.    When was the last time you spoke to Elis Pacheco?

A.    I don't recall.

Q.    Was it within the last month?

A.    I don't recall.

Q.    Was it within the last week?

A.    I don't recall.

Q.    Did you speak to him yesterday?

A.    I don't recall.

Q.    Is that truthful testimony?

A.    Yes, sir.

Q.    Okay.  You don't recall speaking with him yesterday?

        MR. BLACKBURN:  Asked and answered.  Move on.  Don't answer that.

Q.    Well, when you would speak with him, how would you do so?  Would it be in person or by phone or some other method?

A.    I don't recall.

Q.    Do you have any text messages at present with Mr. Pacheco?

Page 126

DIXON - CONFIDENTIAL

A.    I don't recall.

Q.    Did you ever seek to subpoena the receipts you referenced Mr. Pacheco having regarding your contributions to Mr. Cartagena's songs?

A.    Did I what?

Q.    Ever seek to subpoena the evidence you claim Mr. Pacheco possesses?

A.    I don't recall.

Q.    Did you ever make any effort to try to get that particular evidence?

A.    I don't recall.  But when I do, I'll get it.

Q.    Given that we're in litigation now, pertaining to your claims, don't you think now would have been the appropriate time, or by now, to seek that evidence?

A.    It was short notice, to be honest with you, about this deposition. It was short notice.  If it was about -- I would have known a month ago, two months ago, I would have came with the whole mother load.

Q.    When were you first told by

Page 127

DIXON - CONFIDENTIAL

Mr. Blackburn that we were seeking to depose you?

MR. BLACKBURN:  Objection. Don't answer that.

A.    I don't recall.

Q.    When did you first receive notice, without getting into the substance of it, regarding our efforts to depose you in connection with this case?

MR. BLACKBURN:  Objection.

A.    I don't recall.

Q.    Before filing your own lawsuit against Mr. Cartagena, why didn't you seek to get evidence to support your claims?

A.    I don't recall.  But I told you I got evidence. ███ ████ ███ ███ ██████ ████ ██ ███ ██████ ██ █████ ██ ██ ██████ ████ ███ ████ ███ ████ ███████ ████ ██ ██ █ █████ ███ ██████ ██ █████ ████ ███ ███ █████ ████ ██ ███

Q.    But not the evidence regarding your claims to entitlement to royalties and payments for songs.

A.    I don't recall.  I don't recall.

Page 132

DIXON - CONFIDENTIAL

you a thousand dollars, and you wrote that whole song for the kid."

Q.    What lyrics did you contribute to the song "Dirty Diana"?

A.    You got to play the song.

Q.    All right.  When the song was recorded, who was present?

A.    Me, Joe, and the shadows.

Q.    And do you have any writings, videos, or audios to evidence your contributions to "Dirty Diana"?

A.    I don't recall.

Q.    Did you make any efforts to obtain such evidence?

A.    I don't recall.

Q.    Now, based on your experience in the music industry, you understand that when someone writes and/or performs on a song -- withdrawn.

Specifically, as it pertains to Mr. Cartagena, it's your understanding that he would have been receiving payments for the songs that he -- that he released; is that right?

Page 133

DIXON - CONFIDENTIAL

MR. BLACKBURN:  Asked and answered.  You asked that earlier. Move on.  Next question.

Q.    You can answer that.

MR. BLACKBURN:  No.

Q.    He has his objection.

MR. BLACKBURN:  No, no, no, no. He asked -- answered that earlier. It's the exact same question you asked earlier.  You can move on.

Q.    All right.  Let's be specific, then.

With respect to the song Money Over Bitches, No Problems, How Did We Get Here, and Ha Ha, from the album Darkside Volume 1, it's your understanding that Mr. Cartagena would have been receiving payments for those specific songs after they were released; right?

A.    Absolutely.  They were studio songs.  Of course he's going to get paid for it.  And then he went independent.  So he was making good money, great money.

Q.    As early as 2010; right?

DIXON - CONFIDENTIAL

and say, "Hey, look, I'm entitled to money," right, "This is what Mr. Cartagena told me," why didn't you tell him, "Hey, he also told me I'm getting a 15 percent ownership and 15 percent of gross earnings"?

A.    Because --

MR. BLACKBURN:  Asked and answered.  He already answered that. You asked that three questions ago.

MR. SEIGEL:  What's the answer?

MR. BLACKBURN:  No.  He already answered that.

MR. SEIGEL:  Show me in the transcript where it's answered.

MR. BLACKBURN:  You already asked him why --

MR. SEIGEL:  Show me.  Enough with the speaking objection.

MR. BLACKBURN:  You asked him about the 15 percent.  He already told you that he just did the foundation of these songs.  That's what he said, so that's it.

Page 183

DIXON - CONFIDENTIAL

That's what you sent to Mr. Jospitre at 10:30 a.m.; right?

A.    Yes, sir.

Q.    Now, in these messages to him, you ignore Mr. Jospitre's text to you pointing out the difference between your original request on April 28th and your later one on May 2, 2023; right?

MR. BLACKBURN:  Objection. Mischaracterization.  He clearly answers it and says my life is hard and that this is how you niggas want to play.

MR. SEIGEL:  Again, the speaking objections, Mr. Blackburn, they have to stop.

MR. BLACKBURN:  That was in direct response to what he said.  That was a direct response to what he said.

BY MR. SEIGEL:

Q.    Okay.  Was your -- your statement, "I just want to get paid for whatever I did.  I'm not a sucker.  I put my career to the side" -- was that your

DIXON - CONFIDENTIAL

flow.

Q.    Why did you let him know that you also remembered his supposed assurance to you regarding the 15 percent ownership and 15 percent gross earnings?

MR. BLACKBURN:  Asked and answered.  Don't answer it again.

MR. SEIGEL:  It's not -- no, no. It's a different question.

MR. BLACKBURN:  No.  Same question.  Asked and answered.

MR. SEIGEL:  You have to stop. You have to stop coaching the witness.

MR. BLACKBURN:  I'm not coaching him.

THE WITNESS:  He not coaching me.  He not coaching me.

MR. SEIGEL:  You're being obstructionist.

MR. BLACKBURN:  No.  I'm not coaching him.  You trying to be slick and you not slick.

MR. SEIGEL:  What's the answer, then?  What's the answer?

Page 187

DIXON - CONFIDENTIAL

MR. BLACKBURN:  He already answered it.  He said --

THE WITNESS:  You just said you wasn't going to try to trip me up; right?

(Crosstalk)

MR. BLACKBURN:  -- multiple questions all -- you know, throughout the duration of his time with him, and he said that multiple times to the exact same question.

MR. SEIGEL:  My question is different.

MR. BLACKBURN:  No, it's not.

MR. SEIGEL:  And Mr. Blackburn, you can listen.

BY MR. SEIGEL:

Q.    My question is you said the reason that you told Mr. Cartagena the songs that you allegedly contributed to is to let him know that you remembered.

A.    Yes, sir.

Q.    My question -- and I have not heard an answer to this yet -- is why you

Page 221

DIXON - CONFIDENTIAL

MR. BLACKBURN:  Objection.

A.    I never really got $10,000 in gifts.  Only in Dubai.

Q.    Right.  And you brought them back to the United States; correct?

A.    My clothes?  Correct.

Q.    Okay.  Okay.  Now, Mr. Dixon, you previously sold drugs; right?

A.    Yes.

MR. BLACKBURN:  Objection.

Q.    What type of drugs did you sell?

A.    I don't recall.  I just know it wasn't right.

Q.    All right.  When did you sell drugs?

MR. BLACKBURN:  Objection. Relevance.  What does it have to do with this defamation case?

MR. SEIGEL:  You noted your objection.

MR. BLACKBURN:  You don't have to answer that.

A.    I don't recall.

MR. BLACKBURN:  Do not answer

Page 222

DIXON - CONFIDENTIAL

that.  Do not answer any questions about any drugs, anything like that.

Q.   Let's do this, then.

A.   Fat Joe sold drugs too.

Q.   Let's do this.  I want to show you --

A.   A lot.

Q.   You appeared on a podcast called Off The Books; right?

A.   Yes, sir.

Q.   All right.  And you did that in April of 2025?

A.   I don't recall.

Q.   All right.  But last year; right?

A.   I don't recall what year it was.

          (Plaintiff's Exhibit 10, Video clip from Off Da Books podcast dated April 13, 2025, was hereby marked for identification, as of this date.)

Q.   All right.  I'm going to show you what's been pre-marked as Exhibit 10.  And I'll represent that it is an Off Da Books podcast from April 13, 2025.  And

Page 223

DIXON - CONFIDENTIAL

for the record, I want to play you a clip of the podcast that begins at 33 minutes and 40 seconds and continues to 33 minutes and 49 seconds.

(Video playing)

BY MR. SEIGEL:

Q.    Okay.  So what you said on that podcast was, "It's -- it's life, man.  You got to do what you got to do to survive.  I don't want to -- I don't want to -- I don't want to go back to hustling and selling drugs and putting my people on and you know what I'm saying."

MR. BLACKBURN:  Objection.

Q.    Correct?

A.    I don't know what I said before that.

Q.    Excuse me?

A.    But what I said before that?

MR. BLACKBURN:  Objection.

Q.    Let's start with did you say that?

MR. BLACKBURN:  Objection.  I'm stating my objection.  One, no

Page 224

DIXON - CONFIDENTIAL

foundation set for this video.  We don't know where it came from.  We don't know -- there's no certification from YouTube or any source that this video is authentic.  There's no authentication for this video at all.  And there's no way that you can determine that that's Mr. Dixon or not because it could be AI-generated.

Q.    Okay.  Watch this.  You ready?

Mr. Dixon, is that you on the screen?

MR. BLACKBURN:  Looks like him.

A.    Fly.  It do look like me.

Q.    Yeah.  Pretty fly; right?  Sounds cool too; right?  That's you, right, on the screen?

A.    You got two eyes?

Q.    Yeah.  Do you?

A.    I got --

Q.    Your lawyer is objecting to foundation, so you need to say it.

A.    I don't recall.

Q.    Come on.  You don't recall if

Page 225

DIXON - CONFIDENTIAL

that's you on the screen?

A.    Nah.

Q.    Nah.

A.    Nah.

Q.    Does that look like you?

A.    Look like he could be related.

Q.    Yeah.  Looks like he could be related.  Looks like he could be you; right?

A.    Looks like he could be related.

Q.    Yeah.  Does it sound like you?  Let's do this.  You ready?

A.    AI.

Q.    AI.

A.    I could make somebody sound like you AI.  I could take your voice.

Q.    Yeah.  So is it your testimony that what we're watching right now on that screen is artificial intelligence-generated?

A.    I don't recall.

Q.    You don't recall.

A.    No.

Q.    Is that you?

Page 226

DIXON - CONFIDENTIAL

A.    It looks like it.  It looks like it could be a family member.

Q.    I'm going to ask for an answer to my specific question.  Simple.

Is the person on the right of that screen on the Off The Wall  podcast that you appeared on -- is that person you --

MR. BLACKBURN:  Objection.

Q.    -- that we're watching?

MR. BLACKBURN:  Objection.  As I said before, you have not laid any foundation, no certification that that video is authentic from any source, YouTube or otherwise.

MR. SEIGEL:  Mr. Blackburn --

MR. BLACKBURN:  And he cannot answer to that question.

MR. SEIGEL:  -- the reason -- the way to lay a foundation is by asking a witness who is in a video if it's him.  That is one way to authenticate a video.

MR. BLACKBURN:  He just said

Page 227

DIXON - CONFIDENTIAL

that it looks like it's AI.  It could be and he doesn't really know because you have failed to authenticate where this video came from.

BY MR. SEIGEL:

Q.    I'll do it again.

Did you do a podcast with Off the -- what is it -- Off The Books.  Okay.

MR. BLACKBURN:  Asked and answered.  You don't have to answer that again.

Q.    Off The Books.

The answer is yes.

MR. BLACKBURN:  He already answered -- he already answered the question.

MR. SEIGEL:  All right.  Let's do this.  How about this.

MR. BLACKBURN:  If you want, you could look at the transcript and check the answer if you want.

MR. SEIGEL:  How about this? How about this?  Mr. Blackburn, you've got to stop the speaking objections.

Page 228

DIXON - CONFIDENTIAL

BY MR. SEIGEL:

    Q.    All right.  You're aware that Off The Books produces a video; right?

         MR. BLACKBURN:  Objection.  How could he know what off the books produces?

         MR. SEIGEL:  You have to stop coaching.

         MR. BLACKBURN:  I'm not coaching him.  I'm just asking --

         MR. SEIGEL:  How does he know? Here's -- here's one way.  We're watching a video of him.

         MR. BLACKBURN:  Why are you screaming at me?

         MR. SEIGEL:  Mr. Blackburn, because you have to stop with the coaching.

         MR. BLACKBURN:  Why are you screaming at me?  Don't -- I'm not coaching him.  And --

         MR. SEIGEL:  Honestly, this obstructionist behavior has to stop. You are.

DIXON - CONFIDENTIAL

(Crosstalk)

MR. BLACKBURN:  No, no, no.

MR. SEIGEL:  It's outlandish.

MR. BLACKBURN:  Do not scream at me.

MR. SEIGEL:  Okay.

MR. BLACKBURN:  Watch your tone and watch the way you talk to me.

MR. SEIGEL:  Anyway -- because you know what?  You need to stop coaching him.

MR. BLACKBURN:  No.  I'm not coaching him.  I'm not -- you asked him --

MR. SEIGEL:  How would he know?  Well, he appeared on the show, and that's him.  That's one way he would know.

(Crosstalk)

MR. BLACKBURN:  Does he own the company?  Did you ask him, "Hey, are you affiliated with this particular podcast?"

MR. SEIGEL:  How about did he

Page 234

DIXON - CONFIDENTIAL

(Crosstalk)

MR. BLACKBURN:  No.  I have to -- I have to state my point.

MR. SEIGEL:  It's unreal.  All right.  You have your objection. Fine.  I'll -- withdrawn.  Withdrawn. We're done.  Withdrawn.

(Crosstalk)

MR. BLACKBURN:  I have not stated --

MR. SEIGEL:  Now you're just wasting time.

MR. BLACKBURN:  I have not stated my objection.

MR. SEIGEL:  Objection to what? There's a withdrawn question.

MR. BLACKBURN:  What was the question --

MR. SEIGEL:  There's no question pending.

MR. BLACKBURN:  What was the question?

MR. SEIGEL:  No question.

MR. BLACKBURN:  Why is your face

Page 235

DIXON - CONFIDENTIAL

getting red?  What's wrong with you?
Like, calm down.

MR. SEIGEL:  All right.

MR. BLACKBURN:  You know --

MR. SEIGEL:  Anyway --

MR. BLACKBURN:  Take blood
pressure pills.

BY MR. SEIGEL:

Q.   My question for you -- my
question for you is -- okay.  You
appeared on --

MR. BLACKBURN:  Drink some
water.

Q.   You appeared on a podcast last
year; correct?

A.   I don't recall what year.  I
don't recall.

Q.   Okay.  But at some point, you
appeared on a podcast called Off Da Books;
right?

A.   I don't recall.

Q.   Do you recall appearing on a
podcast called Off The Books?

A.   I don't recall.

DIXON - CONFIDENTIAL

Q.    So when I asked you the question approximately five minutes ago -- and for the record, it's line 191:04 through 191:06 --

"QUESTION:  You appeared on a podcast called Off The Books; right?

"ANSWER:  Yes, sir."

Do you recall being asked that question and giving that answer?

A.    I don't recall.

Q.    Did something happen?

A.    It must have been a few voices or I must have heard it wrong.  You want to repeat it again?  You want to repeat that question again?  You could repeat it again if you want.

Q.    Are you changing your testimony?

MR. BLACKBURN:  He's not changing his testimony.  He just told you that there was multiple voices. He doesn't remember.

MR. SEIGEL:  Multiple voices where?

MR. BLACKBURN:  That's what he

DIXON - CONFIDENTIAL

said.

Q.    I'm asking --

A.    I just -- you know, I just went through my emotional breakdown.

Q.    You know there's a video.

A.    When I went back to the past thinking about all the hard work that I put in and sacrificing, putting my kids to the side, so, you know, I got to gather myself.

Q.    You know, by the way, that your words aren't just being transcribed.  You know there's a video recording you; right?

A.    It's all good.

Q.    It's all good.

A.    I know that.

Q.    And you know, right, the video will show there were no voices when I asked you that question.  It was me asking you a question and you giving an answer; right?

A.    I mean, again, I was going through an emotional breakdown when you asking -- you know --

Page 265

DIXON - CONFIDENTIAL

money.  You terrible, bro.  Terrible.

Q.    Okay.  When you were texting Mr. Jospitre in 2023 --

A.    Jospitre.  Jospitre.

Q.    Jospitre.  Thank you very much.

MR. BLACKBURN:  Don't even know his damn name.  It's crazy.

MR. SEIGEL:  Okay.  Just keep going with the expletives, Mr. Blackburn.  It's very professional.

THE WITNESS:  He's just wasting a lot of time doing the weak stuff.  You don't want to get to the sauciness.  You don't want that on camera.  We going to get it, though.

BY MR. SEIGEL:

Q.    Okay.

A.    We going to get to it.

Q.    So my question for you is you were writing these messages to Mr. Jospitre --

MR. BLACKBURN:  Learn how to pronounce his last name.

Page 266

DIXON - CONFIDENTIAL

Q.    -- looking for money; right?

A.    What that text say?

Q.    I'm asking you.

A.    Does it say anything about I want this amount of money?

Q.    I'm not asking about a specific amount.  I'm asking if you were looking for any money.

MR. BLACKBURN:  Asked and answered.  Asked and answered.  Don't answer any questions about that again.

MR. SEIGEL:  You're instructing him not to answer.

MR. BLACKBURN:  Yes, because he has answered it about 100 times.

THE WITNESS:  I'm not going to answer.

MR. SEIGEL:  What's the answer?

MR. BLACKBURN:  He answered -- listen, move on.

MR. SEIGEL:  No.  Just to be clear, let's make a record, because we're going to have to take it up with the Court.  What do you claim his

Page 274

DIXON - CONFIDENTIAL

place.

Q.    You actually do.  You're testifying today.  It's a deposition.  It's a court order.

A.    It's in a safe place.  It's in a safe place.  It's in my crib.  It's in a safe place.

Q.    Okay.  Where is your crib?

MR. BLACKBURN:  Objection.  Do not answer that.

A.    All over The Bronx.

Q.    All over The Bronx.

A.    All over.  Couch to couch.  Sofa surfer.  You forgot?

Q.    Okay.

A.    You know your client, couch surfer -- sofa surfer, dirty section.

Q.    Have you --

A.    It's the dirty section.

Q.    Have you produced that photograph to your counsel?

MR. BLACKBURN:  Objection.  Do not respond to that.

A.    It doesn't matter whether I

Page 285

DIXON - CONFIDENTIAL

he got in contact with Fat Joe, and he was in too deep. That is why he stayed.

MR. SEIGEL: What does --

MR. BLACKBURN: Read the transcript.

THE WITNESS: In too deep means --

MR. BLACKBURN: What the hell is wrong with you?

MR. SEIGEL: You have to please calm down.

THE WITNESS: In too deep means putting in a lot of work and not getting compensated for it.

BY MR. SEIGEL:

Q.    Okay. Thank you.

A.    Putting in a lot of work and not getting compensated for it.

MR. SEIGEL: I'm sorry. What was that?

MR. BLACKBURN: Nothing.

A.    I sacrificed a lot, man. I sacrificed a lot.

Page 289

DIXON - CONFIDENTIAL

for you now.  Or I'm going to try to.

Okay.  Here we go.

(Video playing).

BY MR. SEIGEL:

Q.    Okay.  Now, the first question I want to ask you is if you heard the person on that screen say, "Mike Beck offered me 60,000 cash, like, yo, TA, fuck them niggas, leave them niggas, bro, come with me when Mike Beck was starting his shit, heavy bank, Beck was on his way to blow. Beck was about to blow."

Did you hear that individual say that?

MR. BLACKBURN:  Objection.

Before you respond, that video -- like I said before, there's no foundation set for that video.  There's no certification of where that video came from.  Could have pulled it out of thin air.  There's no certification from YouTube or whatever platform.  I honestly don't know what platform that is.  So there's no way that he can

Page 323

DIXON - CONFIDENTIAL

testifying?  Because I'd love to get you under oath, which, by the way is going to happen.

MR. BLACKBURN:  Oh, yes.  And it's going to be fun for you.

MR. SEIGEL:  Yeah, it will.

MR. BLACKBURN:  We'll get your blood pressure medication.

MR. SEIGEL:  Anyway --

MR. BLACKBURN:  Trust me you're going to lose it.

MR. SEIGEL:  Listen, don't worry.  You'll be questioned about your medications.

MR. BLACKBURN:  This is --

(Crosstalk)

MR. SEIGEL:  You'll be questioned about your medications.

MR. BLACKBURN:  Trust and believe.

MR. SEIGEL:  Okay.

MR. BLACKBURN:  Trust and believe.

MR. SEIGEL:  Anyway -- so --

Page 330

DIXON - CONFIDENTIAL

to go off the record.  The time is --

MR. BLACKBURN:  No, no, no, no, no.  I'm not consenting to no break.

MR. SEIGEL:  I have to use the bathroom.  Can I use the bathroom?

MR. BLACKBURN:  You can take a bathroom break, yes, you can go.

MR. SEIGEL:  Thank you.

MR. BLACKBURN:  But I'm not consenting to stopping the clock, that's for sure.

THE VIDEOGRAPHER:  We're going to go off the record.  The time is --

MR. BLACKBURN:  I'm not going off the record.  I'm not going off the record.  I have to consent to it.  I'm not consenting.

MR. SEIGEL:  Just so it's clear, the reporter asked for the break because of a technical issue.  Are you okay with that, Mr. Blackburn?

MR. BLACKBURN:  Yes.

MR. SEIGEL:  Yes.

THE VIDEOGRAPHER:  The time is

Page 351

DIXON - CONFIDENTIAL

Q.    Do you know that your lawyer, Mr. Blackburn, who is appearing for you in this action, has been found to use artificial intelligence in connection with his filings?

A.    I don't recall.

MR. BLACKBURN:  So has two federal judges.

Q.    When you say you don't recall, were you ever told?

A.    I don't recall.

Q.    All right.

A.    Yo, you got five people working with you, and this is the best you all could come up with?  Seriously, man?  Five.  How many are you all?  Sheesh, this is the best you all could come up with?

Q.    So when you appeared on the Off Da Wall podcast, you said --

MR. BLACKBURN:  Objection. Assumes facts that's not in evidence. He never said that he appeared on any podcast.  Never said that.

Q.    So the video that we're seeing

**Page 355**

DIXON - CONFIDENTIAL

MR. BLACKBURN:  You can talk to your husband like this.

(Crosstalk)

Q.    Did you --

A.    I don't recall.

Q.    My question is did you post that particular Off Da Books podcast on your Instagram account?

A.    I don't recall.

Q.    Would anyone else have posted it?

A.    I don't recall.

Q.    Did it just magically appear on your account?

MR. BLACKBURN:  You don't even know what date it is.

A.    I mean, magic is real.  There's a lot of people that do magic out there.

MR. SEIGEL:  It's April 16, 2025, Mr. Blackburn, the date on his Instagram account that you admitted to on his behalf.

MR. BLACKBURN:  Did you get a certification from Instagram that

DIXON - CONFIDENTIAL

that's his account?

MR. SEIGEL:  Yeah.  And you know what?  I have an admission from you.

MR. BLACKBURN:  Instagram says --

MR. SEIGEL:  I have an admission from you.

MR. BLACKBURN:  -- that they own all of the --

MR. SEIGEL:  Are you backing off that admission, or was that another typo?  Were you under medication at that time maybe?

MR. BLACKBURN:  Yeah, I was. Probably.  Yeah, I was.

MR. SEIGEL:  Right?

MR. BLACKBURN:  The same medication that you're on for your transition; right?

MR. SEIGEL:  Or you're emotionally unstable at that point like you put letters into New Jersey; right?

MR. BLACKBURN:  For your

DIXON - CONFIDENTIAL

transition; right?

MR. SEIGEL:  Maybe you're not capable of representing him in this matter.  You know what?  We'll wait for your -- we'll wait for your deposition for you to answer those questions.  Okay.

MR. BLACKBURN:  What date is your transition surgery?

THE WITNESS:  I see the strategy.  You all just going to waste mad -- wasted three hours on this subject right here.  That's the strategy.

MR. SEIGEL:  Okay.

THE WITNESS:  Because you all don't want to go past this, because you all know where it's going to go, on camera, for the record.  You all knew where it's going to go.  It's already there.  I don't know why we playing.  It's already there, man. It's how many lawyers --

BY MR. SEIGEL:

DIXON - CONFIDENTIAL

A.    No.  One on one.

Q.    One on one.

A.    One on one.

Q.    Okay.

A.    But did you hear what I just said?

Q.    Yeah.  I heard what you said.

A.    ████ ██████ ████ ████████ ████ ██ ██████

Q.    Yeah.  Let me ask you a question.

A.    Did you hear that?

Q.    Yeah.  I heard you say that.

A.    All right.  Okay.

Q.    Okay.  Yeah.  Tell me, ████ ████ ████ ██████████ Something funny?  Excuse me. What was that?

A.    ████ ██████

Q.    Okay.  ████ ████ ██ █ ████████

A.    ████ ██████ ██████ ██████ ████ ██████ ████ ████ ████ █

Q.    But you could have taken Fat Joe down.

A.    One on one, of course.

DIXON - CONFIDENTIAL

Q.    Yeah, of course.

A.    I could take you down --

Q.    Okay.

MR. BLACKBURN:  Everybody could take you down --

A.    I could take you down with my left hand --

(Crosstalk)

MR. BLACKBURN:  -- very easily.

A.    -- in a one-on-one.  Yeah, of course.

MR. SEIGEL:  Mr. Blackburn, was that a threat?

MR. BLACKBURN:  What threat?  I didn't threaten you.

MR. SEIGEL:  Thank you very much.

THE WITNESS:  Yeah, of course.

MR. SEIGEL:  Okay.  ███ ███ ███ ███ ███ ████████

MR. BLACKBURN:  I didn't threaten you.

BY MR. SEIGEL:

Q.    ███ ████ ███ █████ ███████

Page 363

DIXON - CONFIDENTIAL

Q.    Do you owe any money to the IRS?

A.    I wasn't making that money with Fat Joe.

Q.    Right.  Do you owe any money to the IRS?

MR. BLACKBURN:  Don't answer that.

A.    I don't recall.

Q.    You don't recall.

A.    I don't recall.

Q.    Now, you certainly testified already that you didn't declare any of the money that you would have received from the sheikh in terms of clothing in your income taxes.  But --

MR. BLACKBURN:  He didn't say that.  He just said that he got clothing, and it was done overseas. He never said that he --

A.    I never told you I came back with cash.

MR. BLACKBURN:  He did not talk about taxes.

Q.    Right.

Page 367

DIXON - CONFIDENTIAL testimony.

A.    You trying to trip me up.

Q.    No.  I'm asking a question.

MR. BLACKBURN:  That is not his testimony.  He is not --

MR. SEIGEL:  Mr. Blackburn, as an attorney, you know what aiding and abetting is; right?

MR. BLACKBURN:  It is --

MR. SEIGEL:  As a criminal, certainly, you're -- excuse me -- an alleged criminal, you're certainly familiar with --

(Crosstalk)

MR. BLACKBURN:  Your mother is an alleged criminal.

MR. SEIGEL:  Yeah.

MR. BLACKBURN:  She should have spit you out instead of swallowing.

BY MR. SEIGEL:

Q.    My point is -- my point is, according to your testimony right now, you are seeking to assist Mr. Cartagena in evading reporting requirements coming into

DIXON - CONFIDENTIAL

you're laughing and smiling?  Is that the video?  The picture you're referring to?

A.    I see Joe laughing.

Q.    Are you in that?

A.    You see me?

Q.    I'm asking you.  I can't --

A.    Do you see me?

Q.    No.

A.    Take your glasses off and clean them, then.

Q.    Okay.  So that's you there.

A.    Take your glasses off, clean them, and you tell me.

Q.    I'm not the one testifying here today, Mr. Dixon.  You are compelled by court order.  If you want to violate it, that's your prerogative and we can take action.  But you're required to testify.

A.    That's me.

Q.    Is that you?

A.    That's me in the picture, yes.

Q.    Thank you very much.

Okay.  That's not artificial intelligence; right?

DIXON - CONFIDENTIAL

MR. BLACKBURN:  Yes, you was asking him a question --

MR. SEIGEL:  So my question --

MR. BLACKBURN:  And I have been paying attention, for your information.

(Crosstalk)

BY MR. SEIGEL:

Q.    My question for you -- my question for you, Mr. Dixon and I'm not referencing the --

MR. BLACKBURN:  This piece of shit.

MR. SEIGEL:  Piece of what?

MR. BLACKBURN:  Nothing.  Go ahead.  Continue.

MR. SEIGEL:  I think the word was "piece of shit."  Yeah.  It's on the record.  Okay.  You want to stand by that?

MR. BLACKBURN:  What?

MR. SEIGEL:  You just called me a piece of shit.

MR. BLACKBURN:  I never called

Page 419

DIXON - CONFIDENTIAL
you a piece of shit.  I don't know
what you're talking about.

THE WITNESS:  You got five
people with you, man.

MR. SEIGEL:  Okay.

THE WITNESS:  You got all of
these people on the line with you, and
this is -- this is -- you
embarrassing.  You know that?  You
embarrassing yourself --

MR. SEIGEL:  All right.

THE WITNESS:  -- and your
company.

MR. SEIGEL:  Thank you.  Thank
you.

THE WITNESS:  You know that;
right?

BY MR. SEIGEL:

Q.    Thank you, Mr. Dixon.

So here is my question for you.
Okay?  And I'm not referring to the video.
I'm asking you this question right now.

Is it true that what bothered
you with regard to Fat Joe is that you put

Page 436

DIXON - CONFIDENTIAL

Do you see that on the screen?

A.    Yes, sir.

Q.    Okay.  And he told you to call her and let Erica know what you wanted credit for; right?

A.    And I -- we spoke about this three hours ago.  I called her.  She said she ain't have no time for me.  "I'm busy.  Don't call me right now."

Okay.  Rich -- call her back the next day.  I called her the next day.  "Hey, I don't have no time.  I'm busy."

I got a lot going on in my life.  What do you want me to do?  I already gave him 16 years of my life.  What you want me to do?

Q.    Okay.  So --

A.    We already spoke about that, man.  You wasting your time, bro.

Q.    Fair to say the call didn't go well from your perspective; right?

A.    It didn't go well, no, of course not.

Q.    Right.  And in fact, on

Page 488

DIXON - CONFIDENTIAL

day.  Okay?

MR. SEIGEL:  Are you getting frustrated?  Do you need a break?

MR. BLACKBURN:  With who?  You?

MR. SEIGEL:  Do you need a break?  Okay.

MR. BLACKBURN:  Who?  You?

MR. SEIGEL:  All right. Anyway --

MR. BLACKBURN:  You don't know where I'm from.  So --

(Crosstalk)

THE WITNESS:  Let me tell you something.  Every time you throw me off and you cut me off like that, you sidetrack me.  So I be ready to get into some real details --

MR. BLACKBURN:  Because he doesn't want you to talk about it.

THE WITNESS:  -- and you do it on purpose.  You sidetrack me, man.

BY MR. SEIGEL:

Q.    You know what I want?  I want you to respond to my questions directly.

Page 490

DIXON - CONFIDENTIAL

A.    I don't remember.  I might have told them that I ain't see it or she's lying.  I don't recall exactly what I told them because it was so long ago.

Q.    All right.  Did you lie to the police during law enforcement's official investigation?  Is that your testimony?

A.    That's what you want to call it.

Q.    It's your testimony that you lied to the police.

A.    If --

MR. BLACKBURN:  Objection. Don't answer that.

MR. SEIGEL:  You're instructing him not to respond?

MR. BLACKBURN:  Yes, I am.

MR. SEIGEL:  On what ground?

MR. BLACKBURN:  Next question.

MR. SEIGEL:  On what ground?

MR. BLACKBURN:  I already objected.  That's it.  Don't answer that.  Move on.

MR. SEIGEL:  You're not going to -- you're not going to put a basis

Page 491

DIXON - CONFIDENTIAL

on the record.

MR. BLACKBURN:  No, I'm not.

No.

BY MR. SEIGEL:

Q.    Are you refusing to answer that question?

MR. BLACKBURN:  Don't answer the question.

A.    I don't recall.

Q.    Okay.  By the way, you're aware that this woman in Wisconsin actually accused you and not Mr. Cartagena of inappropriately touching her.

You know that; right?

A.    Accused me of what?

Q.    Inappropriately touching her.

A.    She accused me of inappropriately touching her?  So if she accused me, why they got Fat Joe face up there, if she accused me?

Q.    She accused you, did she not?

A.    What she say?  I don't know. What she say?

Q.    Okay.  So you had asked about

Page 555

DIXON - CONFIDENTIAL

started happening.

Q.    Why did you decide to retain him?

A.    I mean, I was trying to get anybody, man, to help me.  I was trying to get anybody.  But I reached out to several different attorneys, and they was all scared.  They ain't want to take the case.  They ain't want to be bothered with Fat Joe or anything affiliated with the other guys.  So I got somebody that would do it.

Q.    Okay.  And do you remember how you came across him?

A.    I don't recall.

MR. BLACKBURN:  He said he doesn't recall.

Q.    Okay.  Now, regarding your claims against Mr. Cartagena, is Mr. Blackburn representing you on a contingency basis or under some other financial arrangement?

MR. BLACKBURN:  Objection.  Don't answer that.

MR. SEIGEL:  It's not

Page 556

DIXON - CONFIDENTIAL

privileged.

MR. BLACKBURN:  Well, it is privileged -- it is privileged.  Don't answer that.

MR. SEIGEL:  You know that retainer structures are not privileged.  You know that; right?

MR. BLACKBURN:  Okay.  Good.  So you can ask him -- you can take it up with the Court.  Don't answer that.

MR. SEIGEL:  Okay.

BY MR. SEIGEL:

Q.    What about this litigation today where you're a defendant?

What financial arrangement do you have with Mr. Blackburn regarding his representation of you?

MR. BLACKBURN:  Objection.  Don't answer that either.

A.    Why you --

MR. BLACKBURN:  Don't --

THE WITNESS:  I'm not going to answer it.

MR. BLACKBURN:  No, no, no.

Page 558

DIXON - CONFIDENTIAL

A.    Supposed to take your word, a guy that's representing a pedophile?

Q.    Well, now that you've heard about it, do you think maybe when this is done, you might look it up?

A.    If I got some time.  You taking up a lot of my time today, Playboy.

Q.    What about after today?

A.    Depends, Playboy.  I told you --

Q.    You got a lot going on?

A.    I might go somewhere and just visualize I'm on the Cayman Island.

Q.    Mr. Blackburn is the only person you were able to find to take your case; right?

A.    Absolutely.

Q.    Okay.  Now, in the post on your Instagram page, Fat Joe is called a pedophile; right?

MR. BLACKBURN:  Which post?

MR. SEIGEL:  I'm asking him a question.

MR. BLACKBURN:  Just a random post?

Page 561

DIXON - CONFIDENTIAL

MR. BLACKBURN:  You better watch your tone.

Q.    -- and claiming that he has --

MR. BLACKBURN:  Your husband is not in his room.  Don't yell at my client.

Q.    -- sex with a 16-year-old girl named Nikki A/K/A Chiquita?

MR. BLACKBURN:  Your husband is not in the room.  Don't yell at my client.

Q.    Do you remember that?

A.    I don't recall.

Q.    You don't recall that.

You're looking at the page now. You don't recall that?

A.    I don't recall.  Why you getting frustrated?

MR. BLACKBURN:  Your client talking about music about a child --

(Crosstalk).

Q.    I'm asking a question.

Do you recall right now --

MR. BLACKBURN:  And he's not a

Page 570

DIXON - CONFIDENTIAL

Didn't you guys turn this over into evidence?  Didn't you have James Hunt contact her and go to her house and all this other stuff?  So why are you asking him to turn over phone numbers?  You got that information.  You sent your private investigator to see her, no?

MR. SEIGEL:  All right.  You have your objection.

MR. BLACKBURN:  I mean, didn't you -- I mean, so why are you asking him that?  You sent your private investigator to see her, and she refused to talk to him.  So why are you now asking Mr. Dixon to provide her phone number if you already have your private eye go speak to her?

BY MR. SEIGEL:

Q.    Mr. Dixon, do you have her phone number?

MR. BLACKBURN:  I mean, if you can recall it, you can recall it.  If not, not.  It is what it is.  They

DIXON - CONFIDENTIAL

Q.    Question:  How old was █████ when you recorded her?

A.    I don't recall.  I can't tell you a time, date, or year, but I know it wasn't too far back.

Q.    Well, you know it was after you hired Mr. Blackburn.  We've established that; right?

MR. BLACKBURN:  No.  Nothing has been established.

Q.    Do you know that?

A.    What you getting at, though?

Q.    My question -- what I'm getting at --

MR. BLACKBURN:  He's trying to get at the fact that -- he's trying to paint this picture that we colluded and tried to coerce █████ into saying something specific in order to support your case.  That's the --

A.    You heard the recordings with Pistol Pete --

MR. BLACKBURN:  -- BS he's trying to pull, but it's not working.

Page 601

DIXON - CONFIDENTIAL

A.    If I have a lawyer, so what?

Q.    That's not my question if you had one, so what?

I'm asking you if it refreshes your recollection that you had one at that time.

MR. BLACKBURN:  He just said he doesn't recall.

MR. SEIGEL:  That's not what he said.  I'm asking if it refreshed his recollection.

MR. BLACKBURN:  Who the fuck do you think you're yelling at?  Who do you think you're talking to?

MR. SEIGEL:  Did you get that?

MR. BLACKBURN:  Yes.  I hope she got it.  Don't ever disrespect me.

MR. SEIGEL:  Keep going.

MR. BLACKBURN:  I'm not your husband.

MR. SEIGEL:  Keep going.

MR. BLACKBURN:  Okay?

MR. SEIGEL:  Anything else?

MR. BLACKBURN:  Watch your

Page 603

DIXON - CONFIDENTIAL

answered the damn question.

MR. SEIGEL:  The question is what?

MR. BLACKBURN:  You don't like the answer.  Too bad.  Too bad.

MR. SEIGEL:  Your eyes are very red.

MR. BLACKBURN:  Okay?  No, no, no, no, no.

MR. SEIGEL:  Are you okay?

MR. BLACKBURN:  Yes.  I'm perfectly fine.

MR. SEIGEL:  Did you take any substances --

MR. BLACKBURN:  Your forehead is wrinkled --

MR. SEIGEL:  -- during the break?

MR. BLACKBURN:  Your forehead is wrinkled.  Are you okay?

MR. SEIGEL:  Because I will tell you --

MR. BLACKBURN:  You need some damn Botox like your co-counsel, Joe

Page 604

DIXON - CONFIDENTIAL

Taco Face.

MR. SEIGEL:  You seem a little unhinged.  Are you okay?

MR. BLACKBURN:  No, no, no.  Are you okay?

MR. SEIGEL:  Are you still on medication?

MR. BLACKBURN:  Your guy --

(Crosstalk)

MR. SEIGEL:  You were telling the judge that you were taking medication for six to eight weeks. Are you on them now?

MR. BLACKBURN:  Are you okay?

MR. SEIGEL:  We'll deal with it at your deposition.

MR. BLACKBURN:  Yes, of course, and I hope it's you.

MR. SEIGEL:  Okay.

MR. BLACKBURN:  I really hope it's you.

BY MR. SEIGEL:

Q.    Anyway, Mr. Dixon, I still haven't heard a response to my question.

Page 605

DIXON - CONFIDENTIAL

MR. BLACKBURN: He answered the question. Don't say nothing else.

MR. SEIGEL: You're preventing your client from answering the question.

MR. BLACKBURN: Asked and answered. Asked and answered. Asked and answered.

MR. SEIGEL: You're not going to let him answer this question.

MR. BLACKBURN: He answered it already five times already.

MR. SEIGEL: All right. Let's try it now. Let me ask the question, and then you can interject if you feel like it.

BY MR. SEIGEL:

Q. So after hearing yourself on a recording say, "I got a lawyer," and so my attorney contacted his people during your recorded conversation with ███, does that refresh your recollection that you had an attorney at the time that you recorded ███?

Page 606

DIXON - CONFIDENTIAL

MR. BLACKBURN:  Asked and answered.  Don't answer it.

Q.    You're refusing to answer?

MR. BLACKBURN:  Don't answer it.  Move on.

Q.    All right.  Did your attorney -- withdrawn.

Did you ever ask ████ during that recorded conversation whether she had sex with Mr. Cartagena?

A.    I don't recall.  It's many, but the recording is right there.  You could easily play it.

Q.    If I had the time, I would.

A.    You have some time, bro.  We got a good 40 minutes.

Q.    Ask your attorney.

A.    If you stop circling and back-peddling on the same stuff, we could get through this stuff.

Q.    Well, you'd agree with me that during your recorded conversation with her, ████ never actually said she had sex with Mr. Cartagena.

Page 612

DIXON - CONFIDENTIAL

Okay.  My question is other than the audio --

A.    Play the audio or next question.

Q.    Okay.

A.    Can we talk about the coercion?  Can we talk about that?  Because I remember it.

Q.    All right.  So are you able to identify anything other than the audio to support your claim that Mr. Cartagena had --

A.    Play the audio --

Q.    -- had sex --

A.    Play the audio, and we get into detail, bro.

Q.    Okay.

A.    Play the audio, and I got you.

Q.    All right.

A.    Play the audio.  Why you scared?

Q.    So I'm going to assume the answer to --

A.    Why you scared, Mr. Seigel?

Q.    -- my question is no.

A.    Why you scared?

Page 613

DIXON - CONFIDENTIAL

Q.    I'm happy to play it if your attorney grants me more time.

A.    Why you scared, Jon Snow?  Why you scared, Jon Snow?

Q.    Talk to your attorney.

A.    Why you scared, Jon Snow?

Q.    Get him to consent to more time.

MR. SEIGEL: Mr. Blackburn, seeing as how you client --

MR. BLACKBURN:  Your client is a pedophile.  He put it in his music.  I don't really know what --

A.    Ya'll terrible, man.  I'm sure you got little sisters and all that.  You all terrible, man.

(Crosstalk)

MR. BLACKBURN:  Who knows?

Q.    Mr. Dixon --

A.    Terrible.

Q.    Mr. Dixon, you mentioned another recorded conversation with another female. Who was that female?

A.    Another conversation with -- oh, her cousin.

Page 667

DIXON - CONFIDENTIAL

it's, like, ▮ ▮ ▮▮▮▮ ▮▮▮▮ ▮▮ ▮▮▮ ▮▮▮▮ ▮▮ ▮▮▮ ▮▮▮ ▮▮▮ ▮▮ ▮▮ ▮ ▮▮▮ ▮▮ ▮▮ ▮▮ ▮ ▮ ▮▮ ▮▮ ▮ ▮▮ ▮ ▮ ▮▮ ▮ ▮▮ ▮▮▮ ▮▮▮ ▮▮ ▮ ▮▮ ▮▮▮ So that -- all the songs, the music, I felt like I did everything right. I never crossed him.  So I question myself why.  Sometimes I wish I could go back in time, change back the hands of time and do it all over again, but I can't.

Q.    Would you say that the messages you posted on your Instagram account crosses --

MR. BLACKBURN:  Time is up. Don't answer that.  Time is up.  Seven hours is over.

MR. SEIGEL:  Is it over?

THE VIDEOGRAPHER:  We're at seven hours.

MR. DEOREO:  Just to put on the record that plaintiff marks this deposition and the transcript as confidential on the court-ordered stipulation of the confidentiality.

Page 668

DIXON - CONFIDENTIAL

THE WITNESS:  What you saying?

MR. BLACKBURN:  Nothing. There's nothing else to say.  Don't speak any more.  It's over.  It's over.  Don't say anything else.

(Continued on the next page to allow for signature line and jurat.)

Page 669

DIXON - CONFIDENTIAL

MR. SEIGEL:  Just for the record, I want to leave the record open with respect to him directing his client not to answer questions.

MR. DEOREO:  And for the speaking objections.

MR. SEIGEL:  Okay.

THE VIDEOGRAPHER:  We are off the record.  The time is 7:02 p.m. and this concludes tad's testimony given by Terrance Dixon.  The total number was seven and will be retained by Veritext.

(TIME NOTED:  7:02 p.m.)

_____
TERRANCE DIXON


_____
Subscribed and sworn to before me this _____ day of _____, 2026.
_____
Notary Public