**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**JOSEPH CARTAGENA**,
    *Plaintiff*,

    v.

**TERRANCE DIXON, TYRONE BLACKBURN, and T.A. BLACKBURN LAW, PLLC,**
    *Defendants*.

Civil Action No. 25-cv-03552

---

**PLAINTIFF JOSEPH CARTAGENA'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SANCTIONS**

---

Joseph Tacopina
Chad Seigel
**Tacopina Seigel & DeOreo**
275 Madison Avenue, 35th Floor
New York, New York 10016
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
212-227-8877

**Of Counsel:**

Jordan W. Siev
Ian M. Turetsky
**Reed Smith LLP**
599 Lexington, 22nd Floor
New York, New York 10022
jsiev@reedsmith.com
212-205-6085

*Attorneys for Plaintiff Joseph Cartagena*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................... 7

I.     Blackburn Initially Tried to Dodge Depositions Altogether............................... 7

II.    Defendants Failed To Appear For Their Depositions In Violation of Court Orders .......... 7

III.   Blackburn Frustrated His Deposition By Claiming to Have Taken Narcotics ................... 9

IV.    Days Before his Deposition, Blackburn Aggressively Defended Dixon's Deposition .... 10

       A.     Blackburn's Ad Hominem, Homophobic and Transphobic Attacks .................... 10

       B.     Defendants' Thinly Veiled Threats of Physical Violence ................................. 11

       C.     Blackburn's Improper Speaking Objections and Witness Coaching .................... 12

       D.     Blackburn's Improper Instructions Not to Answer .............................................. 13

       E.     Dixon's Elusive and Inconsistent Answers ......................................................... 14

       F.     Blackburn Prevents Mr. Cartagena From Completing Dixon's Deposition ......... 15

V.     Blackburn has Engaged in a Pattern of Abusive Litigation Tactics For Years ................ 16

ARGUMENT ....................................................................................................................... 17

I.     Blackburn Obstructed His Deposition Using False Claims of Cognitive Impairment ..... 18

       A.     Blackburn's Purported Impairment is Belied By His Own Testimony ................ 18

       B.     Blackburn's Purported Impairment is Belied By His Conduct During Dixon's
              Deposition ........................................................................................................... 19

       C.     Blackburn's Purported Impairment is Belied By His Pre-Deposition
              Representations .................................................................................................... 19

       D.     Blackburn's Purported Impairment is Belied By His Busy Professional and
              Vacation Schedule Throughout His "Recovery" Period ...................................... 20

       E.     Blackburn's Purported Impairment is Belied By His Own Doctor's Note ........... 21

       F.     Blackburn Did Not Seek an Extension of His Depositions ................................. 22

II.    Blackburn and Dixon Obstructed Dixon's Deposition Using Delay Tactics and
       Harassment, Necessitating a Continued Deposition ........................................................ 22

III.   The Court Should Sanction Defendants for their Obstruction of the Depositions .......... 24

       A.     The Court Should Order Defendants to Reimburse Mr. Cartagena for his
              Reasonable Costs and Fees ................................................................................. 25

       B.     The Court Should Refer Blackburn to the Grievance Committee ....................... 27

IV.    The Court Should Appoint a Special Master to Schedule and Preside Over all Pending
       and Future Depositions ................................................................................................... 28

CONCLUSION .................................................................................................................... 29

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burks v. Stickney*,
    837 F. App'x 829 (2d Cir. 2020) ............................................................................27

*Cerco Bridge Loans 6 LLC v. Schenker*,
    768 F. Supp. 3d 559 (S.D.N.Y. 2025)....................................................................26

*Enmon v. Prospect Capital Corp.*,
    675 F.3d 138 (2d Cir. 2012)...................................................................................25

*Feng Cai Wang v. You Garden Dumpling, Inc.*,
    No. 20 CV 4588 (RER) (CLP), 2025 U.S. Dist. LEXIS 254838 (E.D.N.Y.
    Dec. 9, 2025)...........................................................................................................24

*Flores v. Entergy Nuclear Operations, Inc.*,
    313 F. Supp. 3d 511 (S.D.N.Y. 2018).....................................................................26

*Gardner v. Combs*,
    No. 2:24-cv-07729, 2025 U.S. Dist. LEXIS 258523 (D.N.J. Dec. 15, 2025).........27

*Glasstech, Inc. v. Freund*,
    No. 23-CV-6004, 2025 U.S. Dist. LEXIS 128651 (S.D.N.Y. July 8, 2025) ...........27

*Hildebrandt v. siParadigm LLC*,
    No. 23-cv-21835 (D.N.J.), ECF 64 .........................................................................20

*Jessamy v. City of Mount Vernon*,
    No. 18CV11826, 2020 U.S. Dist. LEXIS 13984 (S.D.N.Y. Jan. 27, 2020) ............18

*Jones v. Combs*,
    2025 WL 896829 (S.D.N.Y. 2025)..........................................................................16

*Kelly v. Rosenberg & Estis, P.C.*,
    No. 25-CV-4776, 2026 U.S. Dist. LEXIS 43380 (S.D.N.Y. Feb. 25, 2026)...........24

*Kertesz v. Colony Tire et al.*,
    No. 2:24-cv-08419 (D.N.J.) .....................................................................................19

*Morales v. Zondo, Inc.*,
    204 F.R.D. 50 (S.D.N.Y. 2001) ..............................................................................25

*Rivera v. Jeziosky*,
    No. 03-CV-830(M), 2007 U.S. Dist. LEXIS 20950 (W.D.N.Y. Mar. 23, 2007) ....22

*Robinson v. De Niro*,
   No. 19-CV-9156, 2022 U.S. Dist. LEXIS 14384 (S.D.N.Y. Jan. 26, 2022) ...........................24

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
   624 F.3d 123 (2d Cir. 2010)..............................................................................................25

*Sakon v. Andreo*,
   119 F.3d 109 (2d Cir. 1997)...............................................................................................24

*Sang Lan v. Time Warner, Inc.*,
   2015 U.S. Dist. LEXIS 58460 (S.D.N.Y. May 4, 2015) ........................................................26

*Shapiro v. Freeman*,
   38 F.R.D. 308 (S.D.N.Y. 1965) ....................................................................................28, 29

*Snowden v. Doe*,
   No. 3:23-cv-1204, 2024 U.S. Dist. LEXIS 200872 (D. Conn. Nov. 5, 2024).........................18

*Steele v. CVS Pharmacy, Inc.*,
   No. 15-CV-4261 (JGK) (KNF), 2016 U.S. Dist. LEXIS 74935 (S.D.N.Y. May
   18, 2016) ........................................................................................................................26

*Tsimbidaros v. Int'l Bhd. of Painters & Allied Trades, Painters Local Union
   1719*, No. 95-9040, 1996 U.S. App. LEXIS 15369 (2d Cir. June 25, 1996)...........................18

*Unique Concepts, Inc. v. Brown*,
   115 F.R.D. 292 (S.D.N.Y. 1987) .......................................................................................25

*Usherson v. Bandshell Artist Mgmt.*,
   No. 19-CV-6368 (JMF), 2020 U.S. Dist. LEXIS 112368 (S.D.N.Y. June 26,
   2020) ........................................................................................................................27, 28

*Zunzurovski v. Fisher*,
   No. 23-cv-10881(DLC), 2024 U.S. Dist. LEXIS 62568 (S.D.N.Y. Apr. 3,
   2024) ........................................................................................................................16, 27

**Statutes**

28 U.S.C. § 1927.......................................................................................................6, 17, 25

**Rules**

Fed. R. Civ. P. 11.........................................................................................................6, 27

Fed. R. Civ. P. 30.............................................................................................................6

Fed. R. Civ. P. 30(c) .........................................................................................................28

Fed. R. Civ. P. 30(c)(2).....................................................................................................13

iv

Fed. R. Civ. P. 30(d)(1)..................................................................................................17, 23

Fed. R. Civ. P. 30(d)(2)..................................................................................................17, 24

Fed. R. Civ. P. 37................................................................................................................6

Fed. R. Civ. P. 37(b) ........................................................................................................18

Fed. R. Civ. P. 37(b)(1).....................................................................................................25

Fed. R. Civ. P. 37(d)(3)................................................................................................22, 26

Fed. R. Civ. P. 53..............................................................................................................28

**Other Authorities**

http://myepiccarnival.com ...............................................................................................21

**[10:14 A.M. - 10:16 A.M.]**

**Joseph Tacopina:**   *[D]o you represent Mr. Dixon as a plaintiff in connection with his own lawsuit against Mr. Cartegena and others?*
*…*
*…*

**Tyrone Blackburn:**   ***So many cases, I don't know.*** *I can't just – it's a lot of cases. I have a lot of cases, so… [I'll] just have to go back and check right now. I don't have my records in front of me, so…*

(Siev Decl. Ex. 1 at 19:1-20:12 (emphasis added); Siev Decl. Ex. 4 at 0:51-1:15)
…
…

**[11:32 A.M.]**

**Judge Rochon:**   *Do you represent Mr. Dixon, Mr. Blackburn?*

**Tyrone Blackburn:**   ***Yes, of course. Yeah.***

(*Id.* at 92:8-11 (emphasis added))

## PRELIMINARY STATEMENT

This is the sworn testimony of Defendant Tyrone Blackburn, a member of the Bar and an officer of this Court, giving two different answers to the same fundamental question—whether he represents his client—just one hour apart. Beyond the obvious duty to testify truthfully under oath, it is axiomatic that attorneys owe fundamental duties of honesty, candor, and cooperation in the orderly administration of justice. When counsel treats litigation as a battlefield where deceit and obstruction are fair game, the integrity of the judicial process suffers. Defendants Blackburn and T.A. Blackburn Law, PLLC (collectively, "**Blackburn**") have trampled these obligations at every turn. Blackburn first stonewalled depositions entirely, then failed to appear in violation of an order of this Court purportedly because of an (apparently) cosmetic procedure, and finally, after appearing, fabricated claims of memory failure to evade answering nearly every question. Despite repeated warnings from this Court that non-compliance would not be tolerated, Blackburn's

1

calculated campaign of misrepresentation and obstruction persists. The time for warnings has passed.

The record of misconduct is staggering. At his own court-ordered deposition, Blackburn professed an inability to answer even the most rudimentary questions. A complete list of topics Blackburn refused or claimed he was unable to answer is contained in **Exhibit 2** to the Declaration of Jordan Siev, including whether:

- He is a defendant in this case;

- He could testify truthfully;

- He attended Dixon's deposition ten days earlier;

- He was on medications at Dixon's deposition;

- He owns the @tyroneblackburn Instagram account;

- He wrote and filed a letter stating that he was withdrawing from active practice;

- He advised his malpractice carrier about being sued;

- He recalls a doctor telling him to refrain from work for two months;

- He was billing his client hourly or on contingency in this matter; or

- He had been advising Dixon on specific matters.

What could possibly explain a member of the Bar's wholesale failure to testify truthfully? According to Blackburn, he ingested eight medications, including narcotics, the morning of his deposition that could "[p]ossibly" prevent him from testifying truthfully. He insisted that "the medication and the local anesthesia does funny things that I don't know … It's messing my head up, you know" and that "[m]y brain is a little foggy because of the medication." He then represented to the Court: "I have taken narcotics today and that I do think that it's kind of int-- interfering a little bit with -- with -- with my ability to remember." These medications, he claimed, resulted from procedures on January 23, 2026 and February 3, 2026.

2

Of course, Blackburn provided no advance notice to opposing counsel or the Court of his inability to testify that day. This is because Blackburn's story collapses under the slightest scrutiny. He could not identify the medications he claimed to have taken that morning. He could not identify what medical procedure necessitated this pharmaceutical regimen, let alone his doctor's medical specialty. Most tellingly, Blackburn's memory failures were suspiciously selective. His recall was conveniently impaired when questioned by Mr. Cartagena's counsel, but restored to full clarity when speaking with the Court less than an hour later. Whereas it took Blackburn several minutes to tell counsel for Mr. Cartagena that he did not know whether he represented Dixon when asked, it took him mere seconds to say "Yes, of course" when posed the same question by the Court.

The reason is that Blackburn's excuse was a sham. His own prior representations to this Court and others prove it. In a December 3, 2025 letter to the Honorable Jamel K. Semper, Blackburn advised that he must withdraw from active practice because health issues rendered him unable to provide competent representation. Yet on February 13, 2026, after Blackburn's procedures but before his March 6 deposition, Blackburn reversed course, assuring Judge Semper that his "health challenges" had "been addressed[.]" If he could practice before Judge Semper on February 13, 2026, he was capable of testifying truthfully at his deposition on March 6, 2026.

Similarly, on February 5, 2026—one day before he failed to appear for his first court-ordered deposition—Blackburn filed a letter requesting to extend the discovery deadline for two months because medications he was taking rendered him "unable to prepare for or attend the depositions" for the next "six to eight weeks" (i.e. until late March). But during a Court conference just five days later, Blackburn claimed that he had numerous court obligations throughout February and that he *could* sit for depositions in late February and early March, all within the six-to-eight-

week window. Given these discrepancies, the Court noted that Blackburn's claim regarding his purported treatment window "appear[ed] not to be" accurate.

Blackburn's own doctor's note further dismantles his story. Dr. Jason Emer—a cosmetic surgeon—advised Blackburn "to refrain from work for 2 weeks" after one or both of his procedures "for recovery and pain management." Two weeks. Yet Blackburn was deposed on March 6, 2026, over a month after his second procedure and well beyond even his own doctor's modest recovery window.

More fundamentally, Blackburn's claims of cognitive impairment are flatly contradicted by his own conduct during the very six-to-eight-week period he now claims to have been incapacitated:

- At Dixon's deposition days before his own, Blackburn was anything but impaired. He was alert, aggressive, and fully engaged for hours, launching discriminatory attacks, making crude sexual remarks, threatening opposing counsel with physical violence, and coaching his client throughout the examination. He asked Mr. Cartagena's counsel, Chad Seigel, "***What date is your transition surgery?***", made repeated homophobic references to Mr. Seigel's purported "***husband***," and told Mr. Seigel that his mother "***should have spit you out instead of swallowing***." Blackburn also made a sexist remark: "***[t]his guy is, like … it's like his tampon is [wet or something]- - like, what is wrong with him?***" Blackburn also mocked his appearance, shouting: "***You need some damn Botox like your co-counsel, Joe Taco Face***"—a derogatory epithet for Mr. Cartagena's counsel, Joseph Tacopina. His misconduct escalated to thinly veiled threats of violence: "***You'd never do this if it was outside. So watch your mouth and watch how you speak to me***." He and Dixon openly discussed how they could

4

physically harm Mr. Seigel, with Dixon boasting "*I could take you down with my left hand*" and Blackburn adding, "*Everybody could take you down … very easily*." Blackburn then called Mr. Seigel a "*piece of shit*." Throughout, Blackburn launched a relentless barrage of improper speaking objections and baseless instructions not to answer. And when asked if he was feeling okay because his eyes appeared red, Blackburn responded without hesitation: "*Yes. I'm perfectly fine*."

- Just two days before his deposition, Blackburn sent a letter to the Court representing that he had appearances scheduled in other courts that morning, and affirmed he was "fully available and prepared to participate in" an afternoon conference before the Court.

- Blackburn made several substantive filings in the days before and after his deposition without any suggestion of impairment, including: (*a*) an opposition to Mr. Cartagena's motion for sanctions and contempt; (*b*) a motion to compel and to extend discovery deadlines; and (*c*) a motion for reconsideration of this Court's Opinion and Order denying Defendants' motion to dismiss.

- Perhaps most damning, Blackburn made demonstrably false statements to this Court to bolster his already frail claims of impairment. When questioned during a Court conference about his ability to take a 10-day international vacation but not sit through a seven-hour deposition in his hometown, Blackburn claimed he could handle the vacation because he was "not flying anywhere." In reality, Blackburn jetted off to Puerto Rico just days after his last procedure. He then embarked on a cruise to Trinidad and Tobago for Carnival. The cruise, billed as "Epic Carnival Experience 2026," promised guests the "freedom to disembark the ship to partake in all the Epic Carnival

5

activities!" and "seven days of endless excitement, adventure, and dancing . . . ." He has since admitted during his deposition that he "thinks" he also traveled to California for his medical procedure, obviously requiring a return trip.

This is not the conduct of someone too ill to sit for a deposition. It is the conduct of someone being untruthful whenever it suits his effort to delay or obstruct these proceedings.

Blackburn's misconduct in this case is not an aberration. He has been sanctioned in multiple jurisdictions for similar behavior, including a referral to the Grievance Committee of this District for repeated failures to meet Rule 11 obligations. He has been admonished for submissions "rife with distributing allegations" against his adversaries and calling opposing counsel a "disgusting racist" for "rejecting his preferred mediators." Another court has documented his "pattern behavior … across multiple jurisdictions" and required him to self-report sanctions to attorney licensing entities. This Court itself has issued numerous warnings that non-compliance would not be tolerated and that sanctions would "likely escalate" in the event of continued misconduct. Those warnings have been ignored at every turn. The pattern continues. The misconduct persists and will persist until Blackburn is faced with real consequences for his actions.

Accordingly, under Federal Rules of Civil Procedure ("**FRCP**") 30 and 37, 28 U.S.C. § 1927, and this Court's inherent authority, Mr. Cartagena respectfully requests that the Court: (i) order Defendants to reimburse Mr. Cartagena for the costs and attorneys' fees caused by their misconduct; (ii) refer Blackburn to the Grievance Committee for disciplinary proceedings; (iii) reopen Dixon's deposition to permit a short, unimpeded examination free from obstruction; and (iv) appoint a special master to schedule and preside over any upcoming depositions of Defendants.

6

## BACKGROUND

### I.    Blackburn Initially Tried to Dodge Depositions Altogether

In early January 2026, Mr. Cartagena noticed Defendants' depositions for January 21-22, 2026. ECF 120-1. At a subsequent conference, the Court directed the parties to complete document productions by January 16 to allow depositions to be completed by month's end—then the close of fact discovery. ECF 119. Blackburn raised no issues with the schedule or notices. ECF 119. Hours after the conference ended, however, he reversed course. Blackburn claimed for the first time that he was unavailable for his depositions due to a "personal family matter" and a "pre-planned medical procedure." ECF 120-2 at 6. He only offered deposition dates beyond the January 30, 2026 discovery cutoff. *Id.*

Mr. Cartagena promptly sought another conference to address Defendants' obstruction. ECF 120. In response, Blackburn informed the Court he was unavailable on January 21-22 due to "a family obligation," had a "pre-planned medical procedure" on January 23 requiring recovery through January 26, and would be out of the country from February 10-20. ECF No. 131 at 1. Despite this litany of conflicts, Blackburn confirmed availability for February 6 and 9. *Id.* The Court thus ordered Defendants to appear for depositions on those dates (the "**First Deposition Order**"). ECF 133. Mr. Cartagena served appropriate deposition notices. ECF 136-1.

### II.    Defendants Failed To Appear For Their Depositions In Violation of Court Orders

Before the depositions, Mr. Cartagena twice requested attendee names from Blackburn for building security purposes, but received no response. ECF 136-2 at 2-3. On February 3, just days before the first Court-ordered deposition, Blackburn informed Mr. Cartagena that Defendants would not comply with the First Deposition Order. ECF 136-2 at 2. Blackburn vaguely claimed that his recovery from a medical procedure had "been difficult" and he was having a "follow up procedure" that day, but offered no detail or documentation. ECF 136-2 at 2. Blackburn also stated

7

he would inform the Court of his non-compliance that evening. ECF 136-2 at 2. He did not. He also did not do so on the following day.

Mr. Cartagena was therefore forced to seek yet another conference to compel Blackburn's compliance with the First Deposition Order. ECF 136. Only then, on February 5, did Blackburn file a letter with the Court, which stated that he expected to be on medications that rendered him "unable to prepare for or attend the depositions" for "approximately six to eight weeks." ECF 137. He also requested an extension of the discovery deadline by two months. *Id.* But with the First Deposition Order still in effect, Mr. Cartagena proceeded with the depositions. Defendants did not show, and Mr. Cartagena noted Defendants' non-appearances for the record. ECF 143-1, 143-2.

On February 10, the Court held a discovery conference in which Blackburn made numerous misrepresentations to avoid accountability for violating the First Deposition Order. With Blackburn's new representations that he would be medically incapable of sitting for a deposition for two more months, counsel for Mr. Cartagena reminded the Court of the conflict that Blackburn's prolonged treatment period posed with his prior representation that he would be out of the country from February 11-20. ECF 146-6 at 11:11-23. Only then, for the first time, Blackburn disclosed that he would be taking a ten-day vacation. *Id.* at 13:13-14. To bolster the credibility of his story, however, Blackburn claimed that he was "not flying anywhere." *Id.* As Mr. Cartagena would later learn, this claim was false. Blackburn jetted off to Puerto Rico just days after his last procedure. He then set sail on a cruise to Trinidad and Tobago for Carnival. ECF 147-1.

Without knowing about Blackburn's flight, the Court accepted Blackburn's representations as true and issued another order ("**Second Deposition Order**") providing that Defendants "agreed" to be deposed on February 24 and March 6 and ordering them to do so. ECF 145. The

8

Court also set a briefing schedule for Mr. Cartagena's motion for sanctions against Defendants for their failure to comply with the First Deposition Order. That motion is fully briefed. ECF 146, 147, 150, 160.

**III.     Blackburn Frustrated His Deposition By Claiming to Have Taken Narcotics**

Blackburn defended Dixon's deposition on February 24 ("**Dixon's Deposition**"). Although Blackburn technically appeared for his deposition a few days later, he was unable or unwilling to answer basic questions. Blackburn could not answer whether he: (*a*) is a named defendant in this case (Siev Decl. Ex. 1 at 9:10-16); (*b*) could testify truthfully, *id.* at 7:9-25; (*c*) attended Dixon's Deposition ten days earlier, *id.* at 22:2-15; (*d*) owns the @tyroneblackburn Instagram account, *id.* at 36:4-39:3; (*e*) was billing hourly or on contingency, *id.* at 25:9-22; or (*f*) was representing Dixon or had been advising Dixon on specific matters, *id.* at 19:1-25:24; Siev Decl. Ex. 4.[1]

Blackburn claimed he had taken eight different medications that morning, including narcotics, that could "[p]ossibly" prevent him from testifying truthfully. Siev Decl. Ex. 1 at 7:21-25; *see also id.* at 18:2-7 ("[T]he medication and the local anesthesia does funny things that I don't know…It's messing my head up, you know"); *id.* at 34:94-6; 46:4-9. When asked whether, despite his medical condition, he had been able to defend Dixon's Deposition just ten days earlier, Blackburn claimed he could not "remember what happened last week." *Id.* at 50:8-14. Blackburn could not identify a single medication by name, *id.* at 34:7-18, the type of medical procedure he underwent, *id.* at 67:19-68:17, or his doctor's medical specialty, *id.* 66:17-24.

Mr. Cartagena was thus forced to call this Court to intervene. When the Court asked Blackburn questions, however, his cognitive functions magically restored. The Court asked, "Do

---

[1] Blackburn's memory issues did not stop him from continuing his transphobic remarks. *See* Siev Decl. Ex. 1 at 56:12-18 ("**Q.** Do you remember asking Mr. Seigel what was the date of this transition surgery? **A.** He's -- he's having a transition? I thought he transitioned already."); Ex. 5 (video).

you represent Mr. Dixon, Mr. Blackburn?" *Id.* at 92:8-9. Blackburn responded, "Yes, of course. Yeah." *Id.* at 92: 10-11. The Court adjourned the deposition for the week of March 23. *Id.* at 104:4-6.

**IV.    Days Before his Deposition, Blackburn Aggressively Defended Dixon's Deposition**

In defending Dixon's Deposition several days before his own, Blackburn's conduct was obstructive, harassing, unprofessional and wholly unbecoming of a member of the Bar.

**A.  Blackburn's *Ad Hominem*, Homophobic and Transphobic Attacks**

Throughout Dixon's Deposition, Blackburn made homophobic references to Mr. Seigel's purported "husband," stating, "Your husband is not in [t]his room," Siev Decl. Ex. 3 at 64 (561:5-12); "You can talk to your husband like this," *id.* at 47 (355:2-3); and "I'm not your husband[,]" *id.* at 67 (601:20-21). Blackburn also made repeated comments suggesting that Mr. Seigel was undergoing a gender transition, asking: "The same medication that you're on for your transition; right?" *id.* at 48-49 (356:18-357-2); and "What date is your transition surgery?" *id.* at 49 (357:9-10).

Blackburn directed profanity and vulgar personal insults at Mr. Seigel, stating that his mother "is an alleged criminal" and "should have spit you out instead of swallowing." *Id.* at 53 (367:16-20). He further stated, "[t]his guy is, like … [i]t's like his tampon is [wet or something] -- like, what is wrong with him?" *Id.* at 13 (59:15-17). Blackburn shamelessly insulted and baited Mr. Seigel, taunting, "Why is your face getting red? What's wrong with you? Like, calm down … Take blood pressure pills… [d]rink some water" *id.* at 35-36 (234:25-235:14); "We'll get your blood pressure medication … Trust me, you're going to lose it[,]" *id.* at 44 at (323:8-12); "What the hell is wrong with you?" *id.* at 42 (285:10-11).

Blackburn also attacked Mr. Seigel's physical appearance, stating "your hair dye is fading," Siev Decl. Ex. 6 at 1:08-1:10; "[y]our forehead is wrinkled. Are you ok? … You need some damn

Botox like your co-counsel, Joe Taco Face"—a derogatory epithet for Mr. Cartagena's counsel, Joseph Tacopina, Siev Decl. Ex. 3 at 68-69 (603:20-604:2); *id.* Ex. 6 at 0:52-1:04 (video).

Dixon also made countless mocking and condescending comments. *See e.g.*, *id.* at 72 (612:23) ("Why you scared, Mr. Seigel?"); *id.* at 73 (613:4-5) ("Why you scared, Jon Snow?"); *id.* at 15 (78:20) ("stop playing these games"); *id.* at 57 (436:20) ("You wasting your time, bro."); *id.* at 57 (388:10-11) ("Take your glasses off and clean them, then"); *id.* at 63 (558:2-3) ("Supposed to take your word, a guy that's representing a pedophile?"); *id.* at 73 (613:14-16) ("Ya'll terrible, man. I'm sure you got little sisters and all that. You all terrible, man.").

**B.  Defendants' Thinly Veiled Threats of Physical Violence**

Blackburn made implied threats of physical violence. He stated: "You'd never do this if it was outside. So watch your mouth and watch how you speak to me." *Id.* at 11 (43:25-44:3). He threatened: "Who the fuck do you think you're yelling at? Who do you think you're talking to?" *Id.* at 67 (601:13-15); Siev Decl. Ex. 6 at 0:14-0:20.[2] At one point, Blackburn referred to counsel as a "piece of shit."[3] *Id.* at 58 (418:13-14). Blackburn made similar statements throughout, including: "You don't know where I'm from[,]" *id.* at 58 (488:11-12); "Watch your tone[,]" *id.* at 11 (43:11-12); "I don't work for you. Watch how you speak to me[,]" *id.* at 11 (43:17-18); and much more.

Defendants also discussed how they could physically harm Mr. Cartagena's counsel:

| **Chad Seigel:** | But you could have taken Fat Joe Down. |
| --- | --- |
| **Terrance Dixon:** | One on one, of course. |

---

[2] These statements regarding counsel's disposition and tone—despite Blackburn's deluge of personal insults and taunts—are patently false, as is clear from the video of the deposition. *See* Siev Decl. Ex. 6.

[3] When asked to clarify, Blackburn denied the statement: "I never called you a piece of shit. I don't know what you're talking about." *See* Siev Decl. Ex. 3 at 55-56 (418:25-419:3).

| | |
|---|---|
| **Chad Seigel:** | Yeah, of course. |
| **Terrance Dixon:** | I could take you down— |
| **Chad Seigel:** | Okay. |
| **Tyrone Blackburn:** | Everyone could take you down— |
| **Terrance Dixon:** | I could take you down with my left hand— |
| **Tyrone Blackburn:** | —very easily. |
| **Terrance Dixon:** | —in a one-on-one. Yeah, of course. |

*Id.* at 50-51 (359:23-360:12).

### C. Blackburn's Improper Speaking Objections and Witness Coaching

Blackburn's improper speaking objections and witness coaching pervaded Dixon's Deposition. He repeatedly interjected argumentative commentary, fed Dixon suggested answers, and testified on Dixon's behalf. Blackburn made repeated speaking objections challenging video evidence without proper foundation, including extended objections stating there was "no certification" of social media videos. *Id.* at 7 (28:9-21); 43 (289:16-25).

Blackburn also repeatedly coached Dixon by testifying on his behalf and explaining the purported purpose of opposing counsel's questions. When Mr. Seigel asked Dixon questions he had not answered, Blackburn interjected, stating things like "[h]e already answered that" before providing answers himself. *Id.* at 22 (169:10-11, 22-25); 23 (183:10-20). Blackburn further coached Dixon by asking rhetorical questions designed to suggest answers and by explaining opposing counsel's litigation strategy, stating: "He's trying to paint this picture that we colluded and tried to coerce [****] into saying something specific in order to support your case." *Id.* at 66 (597:16-25); *see also* 33 (228:5-7); 34 (229:21-24); 65 (570:2-19).

12

### D. Blackburn's Improper Instructions Not to Answer

Blackburn's improper instructions began almost immediately. When Mr. Seigel asked Dixon about a statement in his complaint against Mr. Cartagena, Blackburn instructed Dixon not to answer "any questions pertaining to the second Complaint." *Id.* at 4 (8:14-19). Mr. Cartagena sought this Court's intervention, and the Court ruled that the instruction was improper under Fed. R. Civ. Proc. 30(c)(2). *Id.* at 5 (24:20-25:18). Blackburn was undeterred and continued to instruct his witness not to answer questions that would not have elicited privileged testimony. *See, e.g.*, *id.* at 14 (70:6-23); 17 (125:15-19); 18 (126:25-127:5); 20-21 (132:17-133:11); 24-25 (186:3-187:17); 26-27 (221:12-222:3); 41 (274:3-11); 59-60 (490:6-491:10); 61-62 (555:18-556:25); 70-71 (605:19-606:6). Blackburn did not even provide a basis for his instructions. When Dixon was asked whether he lied, for example, Blackburn instructed: "Don't answer that." *Id.* 59 (490:6-14). When asked on what grounds, Blackburn refused to provide any basis. *Id.* 59-60 (490-18-491:4) (**Mr. Blackburn:** "I already objected. That's it. Don't answer that. Move on."; **Mr. Seigel:** "You're not going to – you're not going to put a basis on the record?"; **Mr. Blackburn:** "No, I'm not. No.").

Blackburn also improperly asserted "asked and answered" objections to questions that had not been answered. When Mr. Seigel asked Dixon whether he sought any money from his lawsuit against Mr. Cartagena, Blackburn instructed: "Don't answer any questions about that again." When Mr. Seigel asked whether Blackburn was "instructing him not to answer," Blackburn replied, erroneously, "[y]es, because he has answered it about 100 times." *Id.* at 40 (266:11-16). Similarly, when Mr. Seigel asked Dixon whether hearing his own voice on a recording had refreshed Dixon's recollection as to whether it was, in fact, him on the recording, Blackburn instructed: "Asked and answered. Don't answer it." *Id.* at 70-71 (605:19-606:6).

13

### E.  Dixon's Elusive and Inconsistent Answers

Blackburn's coaching proved successful. Throughout the deposition, Dixon claimed not to recall answers to questions that either (*i*) clearly called for his knowledge rather than recollection, *see, e.g.*, *id*. at 29 (224:11-24) (whether a person in a video was Mr. Dixon himself or somebody else), 30 (225:18-22) (whether a video portraying Mr. Dixon was generated by artificial intelligence); 46 (351:2-6) (whether he knew that multiple judges have found Blackburn to have used artificial intelligence in his filings); or (*ii*) called for the recollection of basic information that would be highly unusual to forget, *see, e.g.*, *id.* at 9 (32:11-12) (the name of any of his Instagram accounts), 10 (40:20-22) (the name of any individuals on his "team" that purportedly post material on Instagram on Dixon's behalf). At one point, Dixon testified that he could not recall whether he had spoken with somebody just one day before his deposition, *id.* at 17 (125:11-12) (**Q.** "Did you speak to him yesterday?" **A.** "I don't recall."), despite claiming to remember events *helpful* to his defenses "like it was yesterday." *Id.* at 8 (29:8-9). Dixon also frequently stated "I don't recall" after Blackburn instructed him not to respond to questions for which he clearly knew the answers. *Id.* at 52 (363:2-11). On other occasions, Dixon indicated he knew an answer, only to claim moments later that he no longer recalled. *Id*. at 16 (108:9-21).

One particularly egregious instance of such obstructionist behavior consumes 18 pages of the deposition transcription and exemplifies each of these transgressions. There, Dixon backtracked on his testimony concerning whether he was the individual in a videorecording making defamatory statements about Mr. Cartagena. Dixon initially admitted to appearing on a podcast called "Off da Books." *Id.* at 27 (222:9-11). Counsel for Mr. Cartagena then played a clip from a videorecording of Dixon's appearance on the Off da Books podcast. *Id.* at 27-28 (222:22-223:6). Counsel asked Dixon to confirm that he had, in fact, said what was being played in the segment. *Id.* at 28 (223:8-23). Blackburn immediately objected to the video's foundation,

14

questioned the video's authenticity and stated, "there's no way that you can determine that that's Mr. Dixon or not because it could be AI-generated." *Id.* at 28-29 (223:24-224:10).

Counsel thereafter attempted to lay a foundation by asking Dixon if he was the individual portrayed in the video. *Id.* at 29 (224:11-13). Despite acknowledging that the individual in the video looked just like him, Dixon nonsensically repeated, "I don't recall," and stated that it could be "AI." *Id.* at 29-31 (224:15-226:3). After a prolonged exchange, counsel again asked Dixon to clarify if he recalled appearing on the "Off Da Books" podcast. *Id.* at 36 (235:19-21). This time, Dixon stated, "I don't recall." *Id.* (235:22). When asked if he was changing his testimony, Dixon stated that there "must have been a few voices or I must have heard it wrong" and that he had an "emotional breakdown." *Id.* at 37-38 (236:9-237:5).

### F.  Blackburn Prevents Mr. Cartagena From Completing Dixon's Deposition

After seven hours of obstructionist behavior, Blackburn cut Mr. Seigel off mid-question to instruct his client not to answer one final time, stating "Time is up. Don't answer that. Time is up. Seven hours is over." Siev Decl. Ex. 3 at 74 (667:15-17). Mr. Seigel then requested to leave the record open with respect to Blackburn's directions not to answer questions. *Id.* at 76 (669:2-5).

Despite proceeding for seven hours on record, Mr. Cartagena did not receive responsive answers to critical questions because of Defendants' misconduct at Dixon's Deposition, including: *(i)* the last time Dixon had spoken to Mr. Cartagena's former manager, who Dixon suggests is a crucial witness in this case, *id.* at 17 (125:4-19); *(ii)* when he was first told by Blackburn that Mr. Cartagena was seeking to depose him, *id.* at 19 (127:2-12); *(iii)* when Dixon sold drugs, *id.* at 26 (221:8-222:3); *(iv)* whether Dixon was "looking for money" when he texted Mr. Cartagena's manager in 2023, shortly before starting his campaign of defamation, *id.* at 39-40 (265:3-266:21); and *(v)* whether Blackburn is representing Dixon on a contingency basis or another financial arrangement, *id.* at 61 (555:18-556:12). Mr. Cartagena also ran out of time before Dixon could

15

fully testify to the basis of the defamatory statements in the complaint that he filed against Mr. Cartagena, including that he was coerced into more than 4,000 sexual acts in connection with his employment with Mr. Cartagena.

**V.      Blackburn has Engaged in a Pattern of Abusive Litigation Tactics For Years**

Blackburn's conduct at the depositions is nothing new. Blackburn appears to employ threats and harassment against his clients' adversaries and counsel alike as a litigation tactic. In one case, he called opposing counsel a "disgusting racist" for rejecting his preferred mediators, *Zunzurovski v. Fisher*, No. 23-cv-10881(DLC), 2024 U.S. Dist. LEXIS 62568, at *14 (S.D.N.Y. Apr. 3, 2024), and filed a 53-page, public affidavit with irrelevant allegations about his client's adversary having an extra-marital affair, Decl. of Aleksandar Zunzurovski at 1-3, *Zunzurovski v. Fisher*, No. 23-cv-10881 (Mar. 13, 2024 S.D.N.Y.), ECF 20-1. In another case, he "hurl[ed] schoolyard taunts" at opposing counsel, writing that they are "obsessed with me, and although initially flattering, their obsession has become creepy." *Jones v. Combs*, 2025 WL 896829, at *4, 9 (S.D.N.Y. 2025) (admonishing Blackburn for making "inappropriate ad hominem attacks").

This Court has also already issued numerous warnings to Blackburn:

- "I expect compliance with all of the rules and professional responsibilities before me. If I don't see that, I'll act accordingly[.]" ECF 71 at 13:15-19.

- "[Blackburn's actions] delayed discovery and wasted the parties' and the Court's resources in addressing an issue that perhaps could have been resolved without Court intervention if Defendants had timely communicated with Plaintiff. The Court expects that this will not happen in the future." ECF 80.

- "[T]here have been, suffice it to say, several extensions to get these depositions done, including now court-ordered deadlines that were not abided by, nor did the defendant

16

contact the Court to request relief from the Court's order. That does not sit well with the Court. I don't take that lightly. But, in any event, we're going to get these depositions done on these dates that were ordered, and if they don't take place on these dates that are ordered, then the appropriate sanctions will likely escalate." ECF 146-6 at 18.

- "Defendants failed to comply with the Court-ordered Protective Order dated December 8, 2025 by filing such documents without following the process set forth in that Order, including paragraph 21. Defendants are advised that future non-compliance will not be tolerated." ECF 158.

Despite these warnings, Blackburn shows no signs of stopping.

## <u>ARGUMENT</u>

"The court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." FRCP 30(d)(2). Moreover, "the court must allow additional time consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination." FRCP 30(d)(1). "Any attorney or other person admitted to conduct cases in any court of the United States … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Finally, "[i]f the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court." FRCP 37(b). Defendants violated the Second Deposition Order by impeding, delaying, and frustrating Dixon's and Blackburn's Depositions in violation of these rules.

17

**I.    Blackburn Obstructed His Deposition Using False Claims of Cognitive Impairment**

At his deposition, Blackburn falsely claimed that he could not answer numerous questions requiring only basic recollection. This was not a good-faith inability to testify. It was instead a calculated strategy to frustrate the fair examination of a party defendant as evident by his own deposition testimony, his representations to this Court and others, his purported doctors' note, and his conduct shortly before and after the deposition. And even if Blackburn was somehow impaired, he failed to notify Mr. Cartagena and the Court *in advance* of his deposition or attempt to reschedule it when he knew that he would be impaired.

Such conduct is textbook obstruction. *See Tsimbidaros v. Int'l Bhd. of Painters & Allied Trades, Painters Local Union 1719*, No. 95-9040, 1996 U.S. App. LEXIS 15369, at *5 (2d Cir. June 25, 1996) (affirming judgment dismissing case and awarding expenses and fees where plaintiff, *inter alia*, "rendered [his deposition] a meaningless exercise by [appearing but] stating that his medication rendered him incapacitated."); *Snowden v. Doe*, No. 3:23-cv-1204, 2024 U.S. Dist. LEXIS 200872, at *5-6 (D. Conn. Nov. 5, 2024); *Jessamy v. City of Mount Vernon*, No. 18CV11826, 2020 U.S. Dist. LEXIS 13984, at *7 (S.D.N.Y. Jan. 27, 2020).

**A.  Blackburn's Purported Impairment is Belied By His Own Testimony**

Blackburn's claims about not being able to recall information are belied by his own testimony. *First*, during his deposition, he claimed to recall that Mr. Seigel had "transitioned" already—an obviously false transphobic jab that Blackburn had first taken at Mr. Seigel during Dixon's Deposition. Siev Decl. Ex. 1 at 56:17-18. *Second*, when Mr. Cartagena asked Blackburn if he represents Dixon, he testified that he did not know: "So many cases, I don't know…. I don't have my records in front of me … ." *Id.* at 20:10-15. But when the Court asked him the same question a matter of minutes later, Blackburn stated "Yes, of course. Yeah." *Id.* at 86:21-24. *Third*, whereas Blackburn purported not to even remember being at Dixon's Deposition on February 24,

2026, *id.* at 21:7-12, he seemed to have no trouble recalling the letter he filed with this Court on February 5, 2026—just several weeks earlier, but still after his first procedure—stating that he would be on medications for six to eight weeks. *Id.* 94:21-24. Blackburn's recall therefore appears to be conveniently diminished when asked questions by Mr. Cartagena, but fine when examined by the Court.

## B. Blackburn's Purported Impairment is Belied By His Conduct During Dixon's Deposition

The contrast between Blackburn's conduct at Dixon's Deposition and his own deposition is telling. At Dixon's Deposition, Blackburn was alert and engaged enough to launch hours of discriminatory attacks, make crude sexual remarks, threaten opposing counsel with physical violence, and coach his client throughout the examination. Yet just ten days later, at his own deposition, Blackburn claimed he was so impaired by medication that he could not remember whether he attended Dixon's Deposition at all, let alone recall his own egregious conduct. The Court should not credit this transparent attempt to evade accountability.

## C. Blackburn's Purported Impairment is Belied By His Pre-Deposition Representations

Blackburn's prior representations to this Court and others further disprove his incapacity. For instance, on December 3, 2025, Blackburn filed a letter in *Hildebrandt v. siParadigm LLC*, No. 23-cv-21835 (D.N.J.) ("*Hildebrandt*") titled "Notification of Leave of Absence." *Hildebrandt*, ECF 59. In that letter, Blackburn informed Judge Semper that he must withdraw from active practice and five cases because he was suffering "severe depression, anxiety, and inability to sleep" rendering him incapable of providing competent counsel. *Id.* at 1. He stated that he is working to transition his clients to successor counsel and anticipates making motions to withdraw "in the coming weeks." *Id.* at 2. Blackburn never withdrew.

19

Instead, on February 13, 2026, he sought leave to file an untimely amended complaint. *Hildebrandt*, ECF 64. Blackburn's letter cited his January 23 and February 3 procedures "and their immediate after-effects" for not complying with the Court's deadline. *Id.* at 1. Blackburn nevertheless confirmed that, contrary to his December 3, 2025 letter, he "will continue as counsel in this matter," "[t]he health challenges described in my December 3, 2025, letter have been addressed, and I am able to represent Plaintiffs going forward," and that he "implemented additional safeguards to ensure that all future filings comply with the Federal Rules and the Court's directives." *Id.* at 2. Assuming Blackburn truthfully told Judge Semper that his health issues were "addressed" and he could practice before Judge Semper on February 13, 2026, he was also capable of testifying truthfully at his deposition on March 6, 2026.

### D.  Blackburn's Purported Impairment is Belied By His Busy Professional and Vacation Schedule Throughout His "Recovery" Period

Blackburn's conduct since his deposition is also inconsistent with cognitive impairment. On March 2, 2026—four days before his deposition—Blackburn opposed Mr. Cartagena's motion for sanctions and contempt for violating the Court's First Deposition Order, which includes a 20-paragraph declaration under penalty of perjury. ECF 150-1. On the same day, Blackburn also filed an "emergency" motion to compel and to extend discovery deadlines. ECF 152. Indeed, just two days before his deposition, Blackburn asked the Court to adjourn a conference to later in the day because he had appearances scheduled in Kings County Supreme Court and the United States District Court for the Eastern District of New York that morning, and affirmed he was "fully available and prepared to participate in" an afternoon conference before the Court. ECF 156. *See also* ECF 137 at 13:12-19, 14:14-20, 15:8-9. In none of these filings did Blackburn inform the Court that he was too incapacitated to be deposed.

20

Blackburn continued working after his failed deposition. Blackburn has since filed two motions (frivolous as they are), both containing detailed factual and legal analysis about why the Court erred in denying his motion to dismiss, and why it should permit him to file an amended complaint despite failing to respond to Mr. Cartagena's own motion to dismiss. ECF 162, 163.

Moreover, as the Court knows, Blackburn represented that he was able to go on vacation days after his procedure because he was "not flying anywhere." Yet Blackburn jetted off to Puerto Rico just days after his last procedure. He then set sail on a cruise to Trinidad and Tobago for Carnival. ECF 147-1. The cruise, billed as "Epic Carnival Experience 2026," promised guests the "freedom to disembark the ship to partake in all the Epic Carnival activities!" and "seven days of endless excitement, adventure, and dancing … ." *See* http://myepiccarnival.com. Blackburn also admits he "thinks" he traveled to California for his procedure, obviously requiring a return trip. *See* Siev Decl. Ex. 1 at 66:4-16. Blackburn concedes that he continued working during his cruise. ECF 150-1.

In short, Blackburn's conduct is hardly the work product and vacation schedule of somebody who cannot remember that he is a defendant in this case.

### E. Blackburn's Purported Impairment is Belied By His Own Doctor's Note

Blackburn submitted a note from Dr. Emer in opposition to Mr. Cartagena's prior motion for sanctions. ECF 150-2. In the note, Dr. Jason Emer advises Blackburn "to refrain from work for 2 weeks" after his January 23, 2026 and/or February 3, 2026 procedures "for recovery and pain management." But Blackburn was deposed on March 6, 2026, over a month after his second procedure and well beyond even his own doctor's modest recovery window. Dr. Emer's note eviscerates Blackburn's narrative.

21

### F. Blackburn Did Not Seek an Extension of His Depositions

If Blackburn were truly so impaired that he could not answer whether he is a defendant in this case or whether he attended a deposition ten days earlier, he had an obligation to notify Mr. Cartagena and the Court in advance and seek to reschedule. Instead, Blackburn appeared at the deposition, consumed the time and resources of all parties, and then used his claimed impairment as a shield to avoid answering any substantive questions. *See Rivera v. Jeziosky*, No. 03-CV-830(M), 2007 U.S. Dist. LEXIS 20950, at *13 (W.D.N.Y. Mar. 23, 2007) ("Even accepting as true plaintiff's claim that his medication caused negative side effects that hindered his ability to testify … , had plaintiff been aware of his medication schedule and his reactions to that medication, he should have insisted upon another day to be deposed.").

In fact, just four days before his deposition, Blackburn filed a letter with this Court explaining that he failed to appear at his prior noticed deposition because he "was taking multiple prescribed narcotic pain medications, sleep aids, and other drugs that caused significant drowsiness and cognitive slowing." ECF 150 at 4. He then stated that: "it was more consistent" with Rule 37(d)(3)'s "substantial justification" and "other circumstances" language to notify Plaintiff and request an adjournment, rather than to appear while impaired. *Id.* at 4-5. Blackburn failed to follow his own advice here.

Accordingly, Blackburn impeded, delayed, and frustrated his March 6, 2026 deposition. Sanctions are therefore appropriate.

## II. Blackburn and Dixon Obstructed Dixon's Deposition Using Delay Tactics and Harassment, Necessitating a Continued Deposition

At Dixon's Deposition, Blackburn engaged in *ad hominem* attacks, homophobic and transphobic remarks, profanity, and thinly veiled threats of physical violence directed at Mr. Cartagena's counsel. Siev Decl. Ex. 3 at 11-12 (43:25-44:3); 35-36 (234:25-235:3); 47 (355:2-3);

22

48 (356:18-20); 49 (357:9-10); 50-51 (359:23-360:10); 53 (367:16-20); 58 (488:11-12); 64 (561:5-12); 67 (601:13-15). He also repeatedly made improper speaking objections, coached Dixon by providing suggested answers and testifying on his behalf, and improperly instructed Dixon not to answer questions without asserting any valid privilege. *Id.* at 14 (70:6-23); 17 (125:15-19); 18-19 (126:25-127:5); 20-21 (132:17-133:11); 24-25 (186:3-187:17); 26-27 (221:12-222:3); 41 (274:3-11); 59 (490:6-491:10); 61 (555:18-556:25); 70-71 (605:19-606:6). Dixon himself joined in the misconduct, making repeated insults and mocking comments toward Mr. Cartagena's counsel. *Id.* at 15 (78:19-20); 54 (388:10-11); 57 (436:19-20); 63 (558:2-3); 72-73 (612:23-613:16). Defendants engaged in misconduct during Dixon's Deposition so egregious and disruptive that a second day of examination is necessary.

Under Fed. R. Civ. P. 30(d)(1), "a deposition is limited to 1 day of 7 hours. The court *must* allow additional time consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination." (emphasis added). Both bases for allowing more time to depose Dixon are present.

*First*, additional time is necessary for Mr. Cartagena to fairly examine Dixon on important topics, including the sex acts he claims he was coerced into while working for Mr. Cartagena. *See* Dixon Compl. ¶ 140 ("[Dixon] estimates that, over 16 years, he was coerced into more than 4,000 sexual acts to maintain his standing within … [Mr. Cartagena's purported] Enterprise."). Dixon did not disclose any information about these purported acts during discovery but had just begun to testify about this topic during his deposition when Blackburn abruptly announced that the deposition was over. Mr. Cartagena is entitled to examine Dixon on this topic where these coercion claims are part of this publicly-filed sham litigation and have defamed Mr. Cartagena.

23

*Second*, Dixon and Blackburn intentionally impeded and delayed Dixon's Deposition. Throughout Dixon's Deposition, Blackburn made his intent to run out the clock abundantly clear. He instructed Dixon not to answer questions that Dixon then did not answer and made extensive speaking objections that used up Mr. Cartagena's time to depose Dixon. When counsel for Mr. Cartagena requested a bathroom break, Blackburn stated "You can take a bathroom break, yes, you can go . . . . But I'm not consenting to stopping the clock, that's for sure." Siev Decl. Ex. 3 at 45 (330:5-12). Upon reaching seven hours on record, Blackburn abruptly terminated the deposition mid-question and instructed Dixon not to answer the question.

Under these circumstances, the Court must allow Mr. Cartagena additional time to examine Dixon. *See Kelly v. Rosenberg & Estis, P.C.*, No. 25-CV-4776, 2026 U.S. Dist. LEXIS 43380, at *3 (S.D.N.Y. Feb. 25, 2026) (granting three additional hours to depose witness); *Robinson v. De Niro*, No. 19-CV-9156, 2022 U.S. Dist. LEXIS 14384, at *8 (S.D.N.Y. Jan. 26, 2022) (allowing defendants to take additional testimony from plaintiff where plaintiff's counsel "wasted time with objections to form that were unnecessary and not even warranted" and "also engaged in unnecessary speaking objections"); *Feng Cai Wang v. You Garden Dumpling, Inc.*, No. 20 CV 4588, 2025 U.S. Dist. LEXIS 254838, at *9 (E.D.N.Y. Dec. 9, 2025) (allowing defendants to take additional testimony from plaintiff where deposition transcript was "riddled with improper speaking objections," among other improper efforts to coach the witness).

## III.    The Court Should Sanction Defendants for their Obstruction of the Depositions

"Sanctions may be authorized by any of a number of rules or statutory provisions, or may be permissible on the basis of the court's inherent power." *Sakon v. Andreo*, 119 F.3d 109, 113 (2d Cir. 1997). Four forms of sanctions are particularly relevant here.

*First*, under FRCP 30(d)(2), "the court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays,

24

or frustrates the fair examination of the deponent." *Second*, under FRCP 37(b)(1), where the court "orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court." *Third*, district courts have the "inherent power" to sanction a party "for bad faith conduct violating the court's orders even if procedural rules exist which sanction the same conduct." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010). *Fourth*, under 28 U.S.C. § 1927, a district court may award attorney's fees against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." The standard for sanctions under Section 1927 is effectively the same as the inherent-authority standard: A court must find that "(1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith." *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir. 2012).

Sanctions are warranted against Defendants. A range of substantial monetary and non-monetary sanctions against Blackburn, including his referral to the Grievance Committee, are amply justified here.

### A. The Court Should Order Defendants to Reimburse Mr. Cartagena for his Reasonable Costs and Fees

Where counsel injects detailed and lengthy objections, "instructions not to answer, instructions how to answer, colloquies, interruptions, and *ad hominem* attacks" that disrupt and protract the length of a deposition, fees and costs are warranted. *Morales v. Zondo, Inc.*, 204 F.R.D. 50, 54 (S.D.N.Y. 2001) (imposing sanctions where offending attorney's obstructive conduct was so pervasive that he appeared on more than 85 percent of the transcript pages); *Unique Concepts, Inc. v. Brown*, 115 F.R.D. 292, 293 (S.D.N.Y. 1987) (imposing sanctions under Section 1927 where counsel appeared on 91 percent of the pages of the deposition transcript with statements

25

other than an objection as to form). Blackburn's conduct during Dixon's Deposition therefore warrants sanctions.

As for Blackburn's March 6, 2026 deposition, the Court "must" require Blackburn "to pay the reasonable expenses, including attorney's fees, caused by" his effective failure to appear at the deposition. FRCP 37(d)(3). Defendants should reimburse Mr. Cartagena for the fees he incurred because of Defendants' violations of the Order and Notices, including fees Mr. Cartagena incurred to secure a court reporter and videographer. *See Cerco Bridge Loans 6 LLC v. Schenker*, 768 F. Supp. 3d 559, 591 (S.D.N.Y. 2025) (approving award for costs in connection with court reporter and videographer cancellation fees); *Steele v. CVS Pharmacy, Inc.*, No. 15-CV-4261 (JGK) (KNF), 2016 U.S. Dist. LEXIS 74935, at *4 and *14 (S.D.N.Y. May 18, 2016) (approving "reasonable expenses incurred" for cancelled deposition, including court reporter fees and videographer fees).

The Court should also order Defendants to reimburse Mr. Cartagena for the attorneys' fees he incurred preparing for Blackburn's deposition, which effectively was completely rescheduled. *See Sang Lan v. Time Warner, Inc.,* 2015 U.S. Dist. LEXIS 58460, at *3 (S.D.N.Y. May 4, 2015) (rewarding partial recovery of attorneys' fees incurred to prepare for a cancelled deposition because "cancellation of the deposition means that defendants' counsel will have to repeat some of their preparation in advance of a rescheduled deposition."); *accord Flores v. Entergy Nuclear Operations, Inc.*, 313 F. Supp. 3d 511, 522 (S.D.N.Y. 2018); *see also Cerco Bridge Loans 6 LLC*, 768 F. Supp. 3d at 589 (holding that it is reasonable for a party to recover for 25% of the time spent preparing for a rescheduled deposition that proceeded days later).

Finally, the Court should order Defendants to reimburse Mr. Cartagena for the attorneys' fees he incurred in preparing, filing, and attending any Court conferences regarding this motion. *Cf. Cerco Bridge Loans 6 LLC*, 768 F. Supp. 3d at 588-92 (awarding fees for time spent opposing

26

a baseless motion to quash deposition); *Burks v. Stickney*, 837 F. App'x 829, 832-33 (2d Cir. 2020) ("Reasonable fees may include attorney's fees and costs in connection with filing a motion for sanctions."); *Glasstech, Inc. v. Freund*, No. 23-CV-6004, 2025 U.S. Dist. LEXIS 128651, at *21 (S.D.N.Y. July 8, 2025) (awarding fees and costs for time spent preparing sanctions motion).

## B. The Court Should Refer Blackburn to the Grievance Committee

The Court should send a copy of any opinion and order it renders in response to the Motion, if granted, to the Chair of the Court's Grievance Committee to take whatever action the Committee deems appropriate. *See Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368, 2020 U.S. Dist. LEXIS 112368, at *79-80 (S.D.N.Y. June 26, 2020) (referring attorney and his firm to grievance committee for their repeated failure to "conduct themselves in a manner compatible with the role of courts in the administration of justice").

Blackburn has a documented pattern of violating court rules and orders in multiple state and federal courts. A referral would be consistent with orders of other Courts that have noted Blackburn's "pattern behavior … across multiple jurisdictions" of failing "to provide any response to [opposing] counsel or the court when … issue[s were] specifically brought to his attention." *Gardner v. Combs*, No. 2:24-cv-07729, 2025 U.S. Dist. LEXIS 258523, at *10 (D.N.J. Dec. 15, 2025) (imposing sanctions on Blackburn, including requirements for him to self-report sanctions opinion, order, and order to show cause "to the appropriate attorney licensing entities in the States of New Jersey and New York"); *see Zunzurovski*, 2024 U.S. Dist. LEXIS 62568, at *15 (referring Blackburn to the Committee on Grievances of the Southern District of New York for repeated failures to meet Rule 11 obligations).

At this juncture, it is clear that "there may be no sanction short of disbarment that would stop [Blackburn] from further misconduct." *Usherson*, 2020 U.S. Dist. LEXIS 112368, at *70. The

27

Grievance Committee will likely only do so if it is put on notice of the full extent of Blackburn's misconduct.

## IV.    The Court Should Appoint a Special Master to Schedule and Preside Over all Pending and Future Depositions

Finally, the Court should appoint a Special Master to schedule and oversee the remaining depositions. Under FRCP 53, a court may appoint a Special Master to, among other things, "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Courts in this district have appointed a special master to preside over depositions in a case where the lawyers for a party have been "acting in the utmost bad faith." *Shapiro v. Freeman*, 38 F.R.D. 308, 311 (S.D.N.Y. 1965).

The conduct in this case is strikingly similar to that in *Shapiro v. Freeman*, where a court appointed a special master to oversee all depositions in that case after attorneys for the plaintiffs repeatedly engaged in misconduct related to depositions. There, the plaintiffs' attorney objected to nearly every question "designed to elicit relevant and nonprivileged facts on Sherrill Shapiro's psychological adjustment to school" and persistently instructed the deponents not to answer on the basis of a court order it claimed restricted the scope of examination. *Id.* at *310-11. Despite defense counsel's repeated assertions that there was no basis for an instruction to answer under FRCP 30(c), plaintiffs' attorney continued to do so, "beseeching the deponents not to answer perfectly proper questions," going so far at one point as "to order the witness not to answer, and, at another, to threaten to file a formal complaint against defendants' attorney with the Association of the Bar of the City of New York." *Id.* at 311. "The net result was all but a complete waste of the time" of the defense counsel, who only spent "three and one-half hours there in a vain effort to garner relevant evidence." *Id.*

28

Blackburn's conduct in this case has been far worse, however. Over the course of more than seven hours, Blackburn instructed Dixon not to answer questions that would elicit relevant and non-privileged testimony, raised baseless and rambling speaking objections, and spewed profanity, insults, and threats at counsel for Mr. Cartagena. Then, at his own deposition, Blackburn was either intoxicated on drugs to the point of not being able to recall basic facts or—somehow worse—he lied about his recall.

Where, as here, Blackburn "has no conception of his obligation to observe the rules 'as an officer of the court'" and instead is "bent on concealing vital facts or, at best, waging a war of delay, expense, harassment and frustration, … the cooperative atmosphere envisaged by the federal rules [of civil procedure] has been poisoned by antagonism." *Id.* at 312. The appointment of a special master to schedule and preside over all pending and future depositions in this case—whose fees and expenses should be paid by Blackburn—is a just and necessary outcome here, just as it was in *Shapiro*.

## **CONCLUSION**

For the foregoing reasons, the Court should enter an order (i) compelling Defendants to reimburse Mr. Cartagena for the costs and attorneys' fees caused by their misconduct; (ii) referring Blackburn to the Grievance Committee; (iii) reopening Dixon's Deposition to allow an unimpeded examination; and (iv) appointing a special master to schedule and preside over any upcoming depositions.

Dated:    March 24, 2026
          New York, New York

29

By:    /s/ Jordan W. Siev

Jordan W. Siev
Ian M. Turetsky
**REED SMITH LLP**
599 Lexington, 22nd Floor
New York, New York 10022
jsiev@reedsmith.com
ituretsky@reedsmith.com
212-205-6085


Joseph Tacopina
Chad Seigel
Matthew DeOreo
**TACOPINA SEIGEL & DEOREO**
275 Madison Avenue, 35th Floor
New York, New York 10016
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
mdeoreo@tacopinalaw.com
212-227-8877

*Attorneys for Plaintiff Joseph Cartagena*

i

**WORD CERTIFICATION**

I hereby certify that the word count of this Memorandum of Law complies with the word limit of Local Rule 7.1(c). According to the word-processing system used to prepare this Memorandum of Law, the total word count for all printed text, exclusive of the material omitted under Local Rule 7.1(c), is 8,729 words.

Dated: New York, New York

March 24, 2026

*/s/ Jordan W. Siev*

Jordan W. Siev
