UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
JOSEPH CARTAGENA,

                    PLAINTIFF,

     -against-    Case No.:
                  25-cv-03552

TERRANCE DIXON, TYRONE BLACKBURN, and
T.A. BLACKBURN LAW, PLLC,

                    DEFENDANTS.
-------------------------------------X

                    DATE: March 27, 2026

                    TIME: 10:33 A.M.


                    CONFIDENTIAL VIDEOTAPED

REALTIME EXAMINATION BEFORE TRIAL of the

Defendant, TYRONE BLACKBURN, taken by the

Plaintiff, pursuant to a Subpoena, held at

the offices of Reed Smith LLP, 599

Lexington Avenue, 22nd Floor, New York, New

York 10022, before Karyn Chiusano, a Notary

Public of the State of New York.

1

2

A P P E A R A N C E S:

TACOPINA SEIGEL & DeOREO
Attorneys for Plaintiffs
JOSEPH CARTAGENA
275 Madison Avenue ~ 35th Floor
New York, New York 10016
BY: JOSEPH TACOPINA, ESQ.
    CHAD SEIGEL, ESQ.
    MATTHEW DeOREO, ESQ.
    ELEONORA LANZONE, ESQ.
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
mdeoreo@tacopinalaw.com
elanzone@tacopinalaw.com


        *      and      *


REED SMITH LLP
Attorneys for the Plaintiff
JOSEPH CARTAGENA
599 Lexington Avenue ~ 22nd Floor
New York, New York 10022
BY: IAN TURETSKY, ESQ.
ituretsky@reedsmith.com


T.A. BLACKBURN LAW, PLLC
  Attorneys for the Defendants
  TERRANCE DIXON, TYRONE BLACKBURN, and
  T.A. BLACKBURN LAW, PLLC
  1242 East 80th Street
  Brooklyn, New York 11236
  BY: TYRONE BLACKBURN, ESQ.
  tblackburn@tablackburnlaw.com


ALSO PRESENT:
  JAMES McAFEE, Videographer
  JORDAN W. SIEV


        *        *        *


2

3

221. UNIFORM RULES FOR THE
        CONDUCT OF DEPOSITIONS
221.1 Objections at Depositions
(a) Objections in general. No objections
shall be made at a deposition except those
which, pursuant to subdivision (b), (c) or
(d) of Rule 3115 of the Civil Practice Law
and Rules, would be waived if not

interposed, and except in compliance with such order such objections made at a deposition shall be noted by the officer before whom the deposition is taken, and the answer shall be given and the deposition shall proceed subject to the objections and to the right of a person to apply for appropriate relief pursuant to Article 31 of the CPLR.

(b) Speaking objections restricted. Every objection raised during a deposition shall be stated succinctly and framed so as not to suggest an answer to the deponent and, at the request of the questioning attorney, shall include a clear statement as to any defect in form or other basis of error or irregularity.  Except to the extent permitted by CPLR Rule 3115 or by this rule, during the course of the examination persons in attendance shall not make statements or comments that interfere with the questioning.

221.2 Refusal to answer when objection is made. A deponent shall answer all questions at a deposition, except (i) to preserve a privilege or right of confidentiality, (ii) to enforce a limitation set forth in an order of the court, or (iii) when the question is plainly improper and would, if answered, cause significant prejudice to any person.  An attorney shall not direct a deponent not to answer except as provided in CPLR Rule 3115 or this subdivision. Any refusal to answer or direction not to answer shall be accompanied by a succinct and clear statement of the basis therefor. If the deponent does not answer a question, the examining party shall have the right to complete the remainder of the deposition.

3

4

## 221. UNIFORM RULES FOR THE CONDUCT OF DEPOSITIONS

221.3 Communication with the deponent

An attorney shall not interrupt the deposition for the purpose of communicating with the deponent unless all parties consent or the communication is made for the purpose of determining whether the question should not be answered on the grounds set forth in section 221.2 of these rules and, in such event, the reason for the communication shall be stated for the record succinctly and clearly.

IT IS FURTHER STIPULATED AND AGREED that the examination before trial may be utilized for all purposes as provided by any Notary Public with the same force and effect as if signed before a clerk or a Judge of the court.

IT IS FURTHER STIPULATED AND AGREED that the examination before trial may be utilized for all purposes as provided by the CPLR.

IT IS FURTHER STIPULATED AND AGREED that all rights provided to all parties by the CPLR cannot be deemed waived and the appropriate sections of the CPLR shall be controlling with respect hereto.

IT IS FURTHER STIPULATED AND AGREED by and between the attorneys for the respective parties hereto that a copy of this examination shall be furnished, without charge, to the attorneys representing the witness testifying herein.

4

5

* CONFIDENTIAL ~ TYRONE BLACKBURN *

MS. LANZONE:  Can you mark this, please?

(Whereupon, Plaintiff's Exhibit 70, First Amended Complaint, was marked for identification.)

THE VIDEOGRAPHER:  Good morning.

We are going on record.

The time is 10:33 A.M. on March 27th, 2026.

Please note that the microphones are sensitive and may

pick up whispering and private conversations.

Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit Number 1 of the video-recorded deposition of Tyrone Blackburn, taken by counsels for plaintiff in the matter of Joseph Cartagena versus Terrance Dixon,

5

6

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Terrance [sic] Blackburn, and T.A. Blackburn Law PLLC, filed in the United States District Court, Southern District of New York, Civil Action Number 25-cv-03552.

The location of this deposition is Reed Smith LLP, 599 Lexington Avenue, New York, New York.

My name is James McAfee, and I'm the videographer.  The court reporter is Karyn Chiusano.  We're from the firm Veritext.

I'm not authorized to administer an oath.  I'm not related to any party in this action, nor am I financially interested in the

outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record beginning with the noticing attorney.

6

7

* CONFIDENTIAL ~ TYRONE BLACKBURN *

MR. TACOPINA:  For Mr. Cartagena, Joseph Tacopina, Chad Seigel, Eleonora Lanzone, Ian, do you want to put your...

MR. TURETSKY:  I- -- Ian Turetsky, and Jordan Siev, from Reed Smith.

THE VIDEOGRAPHER:  Will our court reporter swear in the witness?

THE COURT REPORTER:  Can you raise your right hand, please?

(Witness complies.)

THE COURT REPORTER:  Do you swear that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  Yes.

T Y R O N E    B L A C K B U R N, called as a witness, having been first duly sworn

by a Notary Public of the State of New York, was examined and testified as follows:

THE COURT REPORTER: Wonderful.

7

8

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Can I kindly have your name; spelling, please?

THE WITNESS: Tyrone, T-Y-R-O-N-E, last name Blackburn, B-L-A-C-K-B-U-R-N.

THE COURT REPORTER: Wonderful. Can I kindly have your address?

THE WITNESS: 1242 East 80th Street, Brooklyn, New York 11236.

THE COURT REPORTER: Okay. Any time you're ready, I'm ready for you.

MR. TACOPINA: Thank you.

EXAMINATION BY

MR. TACOPINA:

Q. Sir, please introduce yourself and state who you represent.

MR. BLACKBURN: Before we begin, I want to note several standing objections and place the following on the record:

First, plaintiff's counsel has noticed two separate depositions, what is functionally the same

* CONFIDENTIAL ~ TYRONE BLACKBURN *

witness.  I'm the sole principal, sole employee and sole attorney of T.A. Blackburn Law, PLLC.  There is no corporation representative other than me.

By splitting the deposition into individual depositions and a 30(b)(6), plaintiff's counsel is attempting to circumvent the one-day-of-seven-hours' limitation and -- and Rule 30(b)(1).

I object to this maneuver and reserve the right to seek a protective order under Rule 26(c) and Rule 30(d)(3) if the total examination time becomes unreasonable or if plaintiff's counsel uses the two deposition structures to ask repetitive questions in two different capacities.

I note that the first deposition session lasted approximately one hour, and that time should count against the total

allotment.

Second, I object to any line of questioning that seeks to invade the attorney-client privilege between myself and my client, Mr. Dixon, under CPLR §4503(a)(1), confidential communications made in the course of professional employment are privileged.

As co-defendants in this action, our communications are further protected by the joint defense privilege under but -- Bass Public Limited Co. v Promus Companies, Inc., 868 F. Supp. 615 and Ambac Assurance Corp. v Countrywide Home Loans, 27 N.Y. 3d 616.

Neither party may waive that privilege, without the consent of both.

And also, separately, obligated, under New York Rules of Professional Conduct, Rule 1.6(a), not to reveal confidential

10

11

information pursuant to 22 N.Y.C.R.R. 221.2(a), and Federal Rules of Civil Procedure 30(c)(2).

I will instruct myself not to answer any questions that calls for the disclosure of privileged communications.

Third, I invoke my right under the Fifth Amendment, with respect to any questions concerning the pending -- the pending criminal matter Indictment Number 3558-2025.

Fourth, I object to any questions regarding my medical history, medical providers, or medical procedures under Federal Civil Rules of Procedure 401.

My medical history has no tendency to make any fact or consequence in this defamation action more or less probable.  Under Federal Rule of Civil -- Civil Evidence 403, any marginal probative value substantially out -- it substantially

11

12

* CONFIDENTIAL ~ TYRONE BLACKBURN *

outweighed by unfair prejudice.

I also assert physician-patient privilege under CPLR §4504, applicable under Federal Rules of Evidence 501 and Condit v. Dunne, 2- -- 225 Federal FRD 100.

This court held that in

defamation cases, personal injury

must be limited to information relevant to sub- -- to substantiate -- to substantial truth, mitigation of damages, and impeachment, and that "no fishing expeditions will be tolerated."

This line of questioning also violates CPLR §3103(a), the authorities of Goff v Paul, 8 A.D. 3d 97 [sic]. It's the fourth department, 2004 case, Quinio v. Aala, 2022 WL 21125 (E.D.N.Y. 2022), and the United States v Franzone, 2025 case holding that "family background, health, and age are not relevant to the defendants' guilt or

12

13

* CONFIDENTIAL ~ TYRONE BLACKBURN *

innocence" under FR -- Federal Rules of Evidence 401/403, confirm that courts exclude health evidence as irrelevant.

If this line is pursued, I will suspend the deposition under Rule 30(b)(3) and CPLR §3103(b), service of a protective order motion automatically suspends disclosure on the disputed matter.

Fifth, under Liberty Petroleum

v Gulf Oil, 164 A.D. 3d. 401, and Kapon v Koch, 23 N.Y. 3d. 32, when deposing an opposing party's attorney, the examining party must demonstrate good cause and necessity for each line of questioning.

I reserve the right to object to any question that appears designed to disqualify me as counsel or that seeks information available from other sources.

Sixth, I reserve a general relevance objection under Federal

13

14

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Rules of Evidence 401, 402, and 403, and CPLR §301- -- 3101(a) to any questions that do not bear on the element of surviving defamation claims - specifically:

(1) whether the alleged statements were made;

(2) whether they were false;

(3) whether the defendants acted with actual malice; and

(4) what damages plaintiff suffered.

Under Condit v Dunne, 225 F.R.D., 100 and Allen v Crowell-Collier Pub. Co., 21 N.Y. 2d

403, the discovery must be "material and necessary."

Seventh, I note that today's deposition includes a 30(b)(6) examination of T. Blackburn Law, PLLC with 11 specific topics identified in Exhibit A to the March 17, 2026 notice.

I am prepared to testify on

14

15

* CONFIDENTIAL ~ TYRONE BLACKBURN *

those 11 topics.  Questioning beyond those topics during the 30(b)(6) portion exceeds the scope of this deposition; see Paparella v Prudential Insurance Co., 108 F.R.D. 727, that's a Massachusetts case, Reed v Bennett, 193 F.R.D. 689. That's a federal Kansas case.

I request that the record clearly distinguishes when I am being examined individually versus as the 30(b)(6) designee.

These objections are continuing and deem not be restated for each question.

MR. TACOPINA:  Okay.  So, now we could start the deposition and that time is not going to count towards our deposition, nor will that

last hour or so, a few weeks ago,

count, as Mr. Blackburn couldn't

recall anything because he said he

was under the influence of narcotics

that day.


15


16


* CONFIDENTIAL ~ TYRONE BLACKBURN *

So, obviously, that doesn't and

won't count as our time allotted

deposition.

I'll also make other point:

I won't address everything in

the letter that you just read.

One other point is:

You cited probative and

prejudicial values and whether or not

you'd answer question's weighing the

probative value versus prejudicial

value, that's a rule of evidence, as

you probably know; it's not for

depositions, it's not for discovery.

So, those are rules of

evidence; scope and discovery is

anything that could possibly be

admissible in a case that

admissibility will be determined

later, when we get to the rules of

evidence.  Obviously, that doesn't

happen now.

Anyway, let's try and start all

16

17

* CONFIDENTIAL ~ TYRONE BLACKBURN *

these other issues if they arise.

Q.   Can you please state your name and who you represent?

A.   Tyrone Blackburn.

I represent myself.

Q.   Okay.  And your law firm?

A.   MLLAS [sic].

Q.   And for the record:

Are you currently under the influence of any medication or other substances that prevents you from testifying fully and truthfully today?

A.   No.

Q.   And is there any reason you cannot testify fully and truthfully today?

A.   No.

Q.   Are you a licensed attorney?

A.   Yes.

Q.   And where are you licensed to practice law?

A.   State of New York; State of New Jersey.

Q.   Okay.  Have you ever been suspended or disbarred from the practice of

17

18

* CONFIDENTIAL ~ TYRONE BLACKBURN *

law in any jurisdiction?

A.    No.

Q.    Okay.  Is -- and your law firm is T.A. Blackburn Law PLLC; correct?

A.    Yes.

Q.    Okay.  That's a private -- professional, rather, limited liability company, right?

A.    Yes.

My firm is a professional limit -- limited liability organization, under New York law.

Q.    And you're the sole member?

A.    Yes.

Q.    Okay.  Then, therefore, you're authorized to speak on the firm's behalf?

MR. TACOPINA:  Question?

A.    Is that a question?

Q.    Yeah.

It was a question.

That's what --

A.    Okay.

Q.    -- we're doing:  I'll ask the questions.

18

19

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    I -- I didn't -- I didn't --

Q.    It's okay.

Okay.  So, are you authorized to speak and act on the firm's behalf?

A.    As the sole principal, um, I am authorized to speak on the sole -- on the firm's behalf.

Q.    Okay.  Is anyone else authorized to speak on the firm's behalf, other than you?

A.    I'm the sole employee.

I may engage independent contractors from time to time, as needed, but I do not have anybody else working for me that can speak on the firm's behalf.

Q.    Okay.  And you're aware, obviously, that Mr. Cartagena's complaint named you, personally, along with the firm as a co-defendant, along with Mr. Dixon, right?

A.    I believe that's what -- I believe that's my understanding.

Q.    Okay.  I want to ask you some questions about your -- your overall health

19

20

* CONFIDENTIAL ~ TYRONE BLACKBURN *

and -- and whether you consider your mental, physical, and emotional well-being to be compromised.

And before I ask those questions, I -- I just want to point out that you put your medical history into

issue, you put it into the public domain,

when you submitted letters to different

courts.

So I just want to ask you a couple questions about that because I believe it does go to the malice factor.

On December 3rd of last year, 2025, you submitted a letter to Judge Semper in the District of New Jersey advising that certain losses you've experienced have had a profoundly detrimental effect on your mental, physical, and emotional well-being.

Do you recall saying that?

MR. BLACKBURN:  Objection; irrelevant.

Harassing.

Under CPLR §3103(a), my medical

20

21

* CONFIDENTIAL ~ TYRONE BLACKBURN *

history has no bearing on the defamation claims in this case, see Goff v Paul 8 AD 3d. 917 and Bowers v Walsh, I will not answer.

Q.    Okay.  I would tend to agree with you, except you put your medical history into issue, and you put it into the public domain when you cited that you were experiencing severe depression, anxiety, and an inability to sleep, when you

submitted a public letter to Judge Semper.

So I'm going to ask you questions about that?

Are you refusing to answer them?

A.   Yes.

MR. TACOPINA:  Okay.  Please mark that for a ruling.

I am still going to ask the questions:

Q.   You also stated to Judge Semper that those circumstances were rendering you unable to provide your clients, plural, with the quality of representation they

21

22

* CONFIDENTIAL ~ TYRONE BLACKBURN *

deserve and to which they're entitled.

Do you recall saying that in your letter?

MR. TACOPINA:  And we have that letter, Exhibit 2, right?

That's up on the board.

MR. BLACKBURN:  Objection; irrelevant, under Federal Rules of Evidence and the CPLR §3301(a).

I assert physician-patient privilege under CPLR §4504, applicable under Federal Rules of Evidence 501 in Condon v. Blaine 65, the court held that personal injury

must be limited to information
relevant to defendants' possible

defenses of substantial truth,

mitigation of damages, and

impeachment, and that no fishing

expeditions will be tolerated in the

friend zone.

This court held that health

evidence is usually irrelevant to the

issues of guilt or innocence or any

22

23

* CONFIDENTIAL ~ TYRONE BLACKBURN *

relevance of such evidence is

outweighed by the risk of prejudice.

This is exact -- this is

exactly the kind of harassing,

irrelevant inquiry that CPLR §3303

was designed to prevent.

I will not answer.

MR. TACOPINA:  Okay.  I will

just note --

Q.    And I assume that's going to be

your answer to all of these questions;

correct, Mr. Blackburn?

A.    Yes.

MR. TACOPINA:  Okay.  I will

just note you cited

"patient-physician privilege."

I would otherwise agree with

you, except you put that

patient-privileged information into the public domain yourself, by writing a letter claiming that you were too incompetent, depressed, anxious to represent your clients.

So, there's no

23

24

* CONFIDENTIAL ~ TYRONE BLACKBURN *

patient-physician privilege once you put that out there.

But I understand your objection, and we will keep going.

Please mark all of these questions for a ruling.

Q.    You also told Judge Semper that as a result, you were actively working to help all of your clients secure new representation.

Same answer; correct, Mr. Blackburn?

You don't have to read it again.

A.    I am putting you on notice that I consider this line of questioning to be harassing, in bad faith, and designed to solely to embarrass and annoy me, in violation of CPLR §3301(a).

You pursued this identical line of questioning in the first session, and it has no relevance to any claim or defense

under White v Martens, 100 AD 205.

I have the right to seek

24

25

* CONFIDENTIAL ~ TYRONE BLACKBURN *

protection.  If you ask another question about my medical history, I will suspend this deposition and seek an emergency protective order.

This is your final order.

Q.    Well, despite that warning, I'm going to go on and ask questions that --

A.    Okay.

Q.    -- you put into a court file about your mental health.

No one is asking you questions about things that aren't revealed by you, personally.

So, your stated reason for submitting that letter was to withdraw from your case before Judge Semper.  You told Judge Semper that you believed -- and I have your letter up there, it's Exhibit 2.

"Transparency with the court was essential, given your obligations to your clients in the administration of justice."

And given that you were supposedly concerned about transparency and

25

* CONFIDENTIAL ~ TYRONE BLACKBURN *

your obligations to the court, why did you tell Judge Semper you were actually working to "help all your clients secure new representation," when you are continuing to actively represent Mr. Dixon in this matter?

Do you see the relevance?

Can you answer that?

A.   Same answer as before.

Q.   Okay.  How is it you're too mentally, physically, and emotionally compromised to represent clients in New Jersey, but somehow you can do that in New York?

A.   Same answer.

Q.   Okay.  And lastly:  Did you share with Mr. Dixon the fact that you cannot represent clients because of your deteriorated mental -- emotional and mental state?

Are you going to read something or is there no answer?

A.   No.

I'm going to answer.

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Give me a minute.

Q. All right.

MR. BLACKBURN: Objection.

The question calls for the disclosure of confidential attorney-client communications protected under CPLR §4503(a)(1) and the joint defense privilege under Bass v Public v Promus 8868(f) supplemental 615.

The privilege belongs to the client and cannot be waived by counsel unilaterally, Carte Blanche v Diners Club 130 FRB 28.

I instruct myself not to answer.

Q. Did you research those cases there, personally?

A. It's work product.

I'm not answering that, either.

Q. You're not answering if you did it personally or -- did -- did AI come up with those cases or are those yours?

A. Work product.


27


28


* CONFIDENTIAL ~ TYRONE BLACKBURN *

I'm not answering.

Q. Okay.

MR. TACOPINA: Again, just mark all of those for a ruling, please.

Thanks.

Q.    So, you currently represent Mr. Dixon as defendant in this litigation, meaning Mr. Cartagena's lawsuit against both him and you, under Case Number 25-cv-3552?

And it's Exhibit 1 that we have up there.

You also, in a separate -- you separately represent Mr. Dixon as a plaintiff in connection with his own lawsuit against Mr. Cartagena and others, under Case Number 25-cv-5144.

As his attorney in both matters, you've obviously been advising Mr. Dixon in connection with each of them; correct?

And I'm not asking you the substance of what you told him, but you've been advising him; correct?

28

29

* CONFIDENTIAL ~ TYRONE BLACKBURN *

MR. BLACKBURN:  Objection.

Same privilege -- same privileged objections, as I made before.

Q.    Okay.  This is not a privilege. I'm not asking for what you told him, but you can have your objection.

A.    Well...

Q.    When did you first meet

Mr. Dixon?

MR. BLACKBURN:  Objection.

Same -- same objection as before.

Q.    When you first met Mr. Dixon -- what -- what's the objection?  Privilege?

MR. BLACKBURN:  Same privileged objection, yes, as before.

Q.    As to when you met Mr. Dixon?

MR. TACOPINA:  Okay.  Please mark that for a ruling.

Q.    How did you meet Mr. Dixon?

MR. BLACKBURN:  Same.

Q.    Okay.  Who, if anyone, was present when you met Mr. Dixon?

29

30

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    Nobody.

Q.    Okay.  And how are you being compensated for the services you render on Mr. Dixon's behalf as a plaintiff in his lawsuit against Mr. Cartagena?

A.    Same as before.

Same -- same question as the one before the last.

Q.    You're saying that's privileged information?

A.    Privileged communications, yes.

Q.    Your retainer agreement is privileged?  So attorney-client privilege,

you're saying?

Is that what you're saying?

A.   Same -- same answer.

Q.   Oh.  Are you being compensated for your representation -- representation of Mr. Dixon in this lawsuit where you're both defendants?

A.   Same answer.

MR. TACOPINA:  Okay.  Mark it for a ruling, please.

Q.   In connection with this

30

31

* CONFIDENTIAL ~ TYRONE BLACKBURN *

litigation, you understand that Paragraph 81 of Mr. Cartagena's second amended complaint alleged that:

"Blackburn's sheer insistence on extorting a settlement from Cartagena on Dixon's behalf indicated that they would do whatever it took to get the money Dixon knew Cartagena did not owe him."

That's Paragraph 1 -- I'm sorry -- Exhibit 1 of the Cartagena's second amended complaint, Page 19.

Given that you, personally, acted as Mr. Dixon's counsel and advised him accordingly, assumingly, when sending demand letters and filing your complaint on his behalf, do you believe there's a potential conflict of interest concerning

your continued representation of Mr. Dixon?

A.    Repeat the question.

Q.    Sure.

A.    I don't understand.

Q.    Given that you, personally, acted as Mr. Dixon's counsel and the court advised him accordingly, when sending

31

32

* CONFIDENTIAL ~ TYRONE BLACKBURN *

demand letters and filing your complaint on his behalf, Mr. Dixon's behalf, do you believe that there's a potential conflict of interest concerning your continued representation of Mr. Dixon?

It's a "yes" or "no."

A.    I'm not understanding.

I'm -- you have to just -- because it sounds like you -- you start your question with something about a paragraph in the complaint.

Q.    Correct.

A.    So, I'm trying -- I'm trying to figure out or trying to understand how the two correlate, so what --

Q.    Okay.  I will ask you another question.

A.    Yeah.

Q.    You understand that Mr. Dixon could potentially argue that the conduct which he has been accused of as a defendant

was based on your legal advice; correct?
Do you understand that?

A.    That is not my understanding.

32

33

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    Okay.  Would you agree that since you're Mr. Dixon's co-defendant in this case, it certainly benefits you if he doesn't turn on you and blame you for his actions in this case?

Would you agree with that?

A.    Wait.

Ask that question again.

Q.    Sure.

Would you agree with the fact that since you're Mr. Dixon's co-defendant in this case, it certainly would benefit you, Mr. Blackburn, if he doesn't turn on you and blame you for his actions that he's a defendant in?

Would you agree with that?

A.    I mean, I think -- I think that's -- I guess, yeah, I guess.

Q.    All right.

A.    I don't know.

Q.    And despite telling the judge in New Jersey --

MR. TACOPINA:  You know what?

You said you're not going to

* CONFIDENTIAL ~ TYRONE BLACKBURN *

answer these questions, I'm not even going to ask them again.

Q.   You're aware that the -- that you're accused of defaming Mr. Cartagena in the second cause of action, right?

You're aware of that?

Exhibit 1, the second amended complaint?

A.   I believe that's what he claims.

Q.   Okay.

A.   Yes.

Q.   It's Paragraph 34, but it's there, if you need to see it.

You own and maintain the Instagram account with the handle @tyroneblackburn in your personal capacity, right?

A.   I do not own anything.

Q.   You don't own anything?  Okay.

Now, while I'm not suggesting you were a partner in the Instagram corporation, what I'm asking you is:

Is it your account that you

34

* CONFIDENTIAL ~ TYRONE BLACKBURN *

control and maintain on Instagram that is

@tyroneblackburn?

A.    No.

That is not -- that is not my -- I don't own that, no.

Q.    Okay.  So, when you wrote in your -- let's see -- what is this? -- this was your response -- Mr. Blackburn's response to request for admissions, Exhibit 4, which is on the screen.

When you, in that admission and in your response, Page 2 to 3, Number 1, right:

"ADMITTED Defendant Tyrone Blackburn owns and maintains -- owns and maintains -- the Instagram account with the handle @tyroneblackburn in his personal capacity.

"Defendants used this account to post content regarding legal matters, the entertainment industry, and related topics of public interest."

So -- and then I'll read on if you want to.

35

36

* CONFIDENTIAL ~ TYRONE BLACKBURN *

"However, the defendant denies that ownership and use of this personal social media account create any liability unto the claims asserted in this action."

Okay.  So, did see where you acknowledged and admitted, in writing, that

you -- or you own and maintain the Instagram account @tyroneblackburn?

A.    I think there's a -- there's a typo there.  It's not -- I don't own Tyrone Blackburn because there's no Instagram account with that handle.

So, I believe, under:

"Request for Admissions No. 2, admit that you used the Instagram account with the handle tyrone_blackburn."

So, the answer is -- is inaccurate.  The underscore is missing.

So that's -- that's not -- I -- I -- what I'm saying is true:

I don't own @tyroneblackburn because that's not the -- that's not the correct handle.

Q.    Okay.  But I'm getting that


36


37


    * CONFIDENTIAL ~ TYRONE BLACKBURN *

information from where?

A.    I don't know what that is.  Yo --

Q.    That's your response.

A.    You just read something.  I can't see.  It's zoomed -- it's zoomed in.

Q.    Okay.  Here we go.  It's Plaintiff's Exhibit Number 4.

It's:

"Defendant Tyrone Blackburn's

Responses to the Plaintiff's First Set of

Requests For Admission."

So, those are your words, sir.

A.    It might be a typo.  Because

that's shared.  I think there might have

been a typo because of how the handle is

written.

Q.    Okay.  So, you made a typo on

how the handle is written.

Is that what you're saying?

A.    I guess.

Q.    Oh, you guess?  Okay.

So, the underscore is the

dis- -- distinction.


37

38


* CONFIDENTIAL ~ TYRONE BLACKBURN *

Between January 1st, 2023 and

at least November 2025, you specifically

used that Instagram account to post content

that you authored and personally created;

correct?

A.    Which -- in that --- which

account are you speaking of again?

Q.    The account that you admitted

to in this response to request for

admissions, Exhibit Number 4, Number 3,

Pages 4 and 5.

A.    That is --

Q.   Is that another typo, on your behalf?

(Witness reviews document.)

A.   Yeah.

That's not -- that's not -- I don't own that handle, no.

Q.   Those are your words that's saying you do own it, right?

A.   Yeah.

That's the -- that's the wrong handle.  I think that is a typo.

Q.   A typo?  Okay.

38

39

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   Um-hum.

Q.   You sure you didn't change your Instagram account name from @tyroneblackburn to be one with the underscore in it?

Did you initially have that as your Instagram account?

A.   No.

Q.   No, you didn't?  Okay.

So, now that you -- you're saying that that's a typo, let's now do it with the underscore.  Okay?

So, between January 1st, 2023 and at least November 2025, you specifically used that Instagram account, tyrone_blackburn, to post content that you

authored and personally created; correct?

A. I believe I did, yes.

Q. Okay. And the statements you published on that particular Instagram account included public statements regarding Mr. Cartagena, right?

A. I'm not really sure --

Q. Okay.

39

40

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A. -- which statement you are...

Q. Go to Number 4, Pages 5 and 6, please.

This is, again, your words:

"ADMITTED. Defendant Tyrone Blackburn published statements on his personal Instagram account and in podcast appearances and made public statements regarding Plaintiff Joseph Cartagena.

"Defendant published such statements or caused them to be published, or Defendant made statements that were published by others..."

Okay. Do you agree with what you wrote there? What you admitted there?

A. I don't see -- I can't see -- what -- what as -- I think it was --

Q. You can't see what? I'm sorry.

A. No.

It was zoomed out. She just

zoomed it. I'm just reading it.

Q. Okay. Okay. If you want, I can give you a hard copy.

A. No.

40

41

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Well, she zoomed out again. If it just stayed zoomed in, I could...

Well, you can give me a hard copy, it would be easier.

Q. Sure.

This is Page --

MS. LANZONE: 6.

Q. -- Page 6

Here you go.

So, here's the whole exhibit that you created.

And I will direct you to Page 6.

Here you go.

A. Okay.

Q. And you can hold onto that, if you want.

A. And you're talking -- you're talking about which -- okay. So, this is -- all right.

Q. Yeah.

Well, it's actually what's on the board up there, but you can take a look at it.

41

42

* CONFIDENTIAL ~ TYRONE BLACKBURN *

(Witness complies.)

A.   This is for...

Q.   What's that?

A.   No.

I'm just trying to read -- I'm reading the question, too, to make sure I know the question.

Q.   Okay.  If you want, I will reread you the question.

A.   No.  No.  No.

For the -- the question that this relates to --

Q.   I see.

A.   -- that's what I'm just..

(Witness reviews document.)

A.   Yeah.

Hold on.

Is this for Request Number 4 still?  I believe?  Yeah.

All right.  Okay.

Q.   All right.

A.   What's the question?

Q.   So, the statements that you published on that particular Instagram

42

43

account between those dates I mentioned earlier; January 1st, 2023, November 2025, you published particular statements that include public statements regarding Joseph Cartagena?

A.    Are you referring to -- and this is from Request Number 4, which is a...

Q.    Yes.

A.    And the Request Number 4 refers -- references Paragraph 132 of the complaint?

Q.    Whatever it says there, sir.

A.    Well, I'm asking you because you -- you're asking me to respond to the document.

Q.    No.

I'm asking you a simple question based on the document in your hand --

A.    No.

Q.    -- which is --

A.    But that document is referencing a particular section of the

43

44

complaint.

Q.    Um-hum.

A.    And your question is completely

different than what the document is saying.

So, the --

Q.   Well, my --

A.   -- the complaint -- the -- the question says:

"Paragraph 132 of the complaint."

So I'm just asking if the question -- if the -- if your question is reflected in Paragraph 132 of the complaint so I know what I'm asking -- so I know what I'm -- I'm answering.

I want to answer correctly.

Q.   Yeah.

My question's referring to what you wrote in the request -- response for request for admissions.

What you wrote, which is simply this...

A.   No.  No.  No.

Q.   No.  No.  Let me finish my

44

45

* CONFIDENTIAL ~ TYRONE BLACKBURN *

question.

A.   No.

But...

Q.   I'm going to finish my question.

The statements you published on that particular Instagram account

included -- simply included public statements regarding Joseph Cartagena as you wrote in that paragraph; is that --

A.   This -- this --

Q.   -- true or not?

A.   Yes.

But this question is referencing a Paragraph 132 of the complaint.

I'm asking you -- I don't know what Paragraph 132 of the complaint says, because I don't see the language here.

So, if you can read that, then I could be able to provide a full answer.

I don't...

Q.   See, Mr. Blackburn, while I appreciate that, it's our deposition.

45

46

* CONFIDENTIAL ~ TYRONE BLACKBURN *

That's irrelevant.

I'm not asking you --

A.   Well, I can't --

Q.   -- how it ties into 132.

A.   Okay.

Q.   I'm ask- --

A.   Well...

Q.   No.

My question is this --

A.   I can't -- I can't -- I can't answer the question because I don't have

the full context of the question.

Q.    No.

You can answer the question.

A.    You're asking me to respond to -- to -- to answer something that -- that's relating to a document.

The document references a speciticular -- a particular paragraph.

Q.    Hum...

A.    So, how am I going to answer honestly, if I don't know what the paragraph says?

Q.    Here's --

46

47

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    So...

Q.    -- how you could answer honestly:  You have the -- the -- your response in front of you.

I'm simply asking you:  Did you write that in your response?

Which is simply this:

You published statements on that Instagram account that included public statements regarding Joseph Cartagena.

That's all I'm asking you.

On your Instagram account, did you publish statements in those dates we mentioned that include Joseph Cartagena --

A.    What dates were those?

Q.   -- as you admitted?

A.   What dates were those?

Q.   January 1st, 2023 to November 2025.

A.   I did not publish anything in January of 2023.

Q.   Okay.

A.   February of 2023.

Q.   Let's go back.

47

48

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   Or March of 2023 or April through December of 2023.

2024?

I don't believe I published anything from --

Q.   Let me show you this...

A.   -- January to December concerning Mr. Cartagena.

As it pertains to January, February, March of 2025, I don't believe I published anything in regards to Mr. Cartagena, either.

So, I'm -- you know, again, I'm not really sure.  Um...

Q.   So, the date of your response here, just so we're clear here for the record, was November 17th, 2025.

The response included the language and I'll read again, Number 3,

Pages 4 and 5 --

A. Oh, you -- you're reading

something different. That was the --

that's the thing --

Q. It's not.

48

49

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Based on your last answer --

A. You're reading something
different.

Q. -- I'm reading something
different.

I'm going back earlier in the
complaint --

A. Oh, I didn't know.

Q. -- because you just said those
dates were not accurate.

So you admitted in your
response that:

"Defendant Tyrone Blackburn
posted content" on his "Instagram" -- "to
the Instagram account at
tyroneblackburn" --

We now know it's -- the
underscore, it was a typo you had made.

-- "from January 1st, 2023
through the present date."

The "present date" was November
of 2025.

Was that an accurate statement

* CONFIDENTIAL ~ TYRONE BLACKBURN *

requests for admissions?

A.    Well, that -- it was -- it was inaccurate because it says:

Tyroneblackburn --

"@tyroneblackburn."

Q.    Right.  Right.

A.    So, I don't own that handle. So...

Q.    Right.

With the underscore --

A.    I -- I --

Q.    -- we -- we understand --

A.    Yeah.

Q.    -- it was a typo.

You said that five times.

A.    Yeah.

So -- so, the thing is I cannot say that this is -- I can't -- so, it wouldn't be honest or -- or accurate for me to say that this is true.

What I would say is, is that I would probably have to amend this to correct the -- the handle there because I'll be representing -- it's -- it's a --

* CONFIDENTIAL ~ TYRONE BLACKBURN *

it's a clear misrepresentation if I was to stand by this because this is -- this is not accurate.

So, I can't --

Q.    Okay.

A.    -- testify to the truth of this exact thing, as it's written --

Q.    Right.

A.    -- unfortunately.

Q.    I appreciate that.

You said it was a typo and typos happen.

But my question is:  Now, that you corrected what the actual name of the Instagram handle is, the substance of what you're saying there is still the same; correct?

Assuming you had the right Instagram handle that you meant to type in.

From January 1st, 2023 through the present date, you posted content regarding Mr. Cartagena; correct?

A.    So, I did -- I did post.

Q.    Okay.


51


52


* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    Yes.

Q.    That's it.

All right. For instance, on

April 29th, and we can show you the exhibit

of your Instagram post.

April 29, 2025, you posted on

your Instagram account, again, with the

underscore -- tyrone_blackburn that:

"Mr. Cartagena ordered a hit

job against Mr. Dixon."

Right?

A.    He made a coordinated effort to

harm Mr. Dixon professionally, legally, and

personally.

And I had a good-faith basis to

that characterization based on the

information from my client.

Q.    Right.

And my question was very

specific now:  It's that you stated that

Mr. Cartagena ordered a hit job on

Mr. Dixon, right?

A.    I made a post on Instagram

around that time, yes.

52

53

* CONFIDENTIAL ~ TYRONE BLACKBURN *

And I think the post speaks for

itself.

Q.    Do you not want to admit what

you wrote in your post:

"Ordered a hit job" against my

client?

A. A- -- a- -- according to -- I

think -- I think your -- the complaint,

Paragraph 132, says "April 30th, 2025."

Is that what the complaint

says?

So, I'm not sure -- I'm -- I'm

kind of -- I'm trying to figure out what --

if -- if the date is correct in the

complaint regarding the Instagram post

that you're -- that you're referencing.

I'm -- I'm still a little

confused.

Q. Okay. So, just to deal with

your confusion:

You just read a summary of what

that Instagram post was. The one where you

start out with, you know:

"I can run and file a baseless

53

54

* CONFIDENTIAL ~ TYRONE BLACKBURN *

lawsuit."

Okay. That same paragraph that

you posted --

A. Yeah.

I can't -- it's very -- it's

very small, I can't see that.

Q. Okay. Why don't you take that

-- a copy. Here, we'll give you a hard

copy.

MR. TACOPINA: Exhibit 5 has

been handed to Mr. Blackburn.

(Whereupon, Plaintiff's Exhibit

5, PREVIOUSLY MARKED:  4/29/26

Blackburn Instagram post, was

tendered.)

Q.    So, in that same paragraph that you just described, under oath, about what the purpose of your post was for, you write in there:

"Your client, @fatjoe, ordered a hit job against my client."

Correct?

I'm just simply asking:  Did you write that in there?

54

55

* CONFIDENTIAL ~ TYRONE BLACKBURN *

(Witness reviews document.)

A.    Okay.  What is your question?

Q.    Sure.

In that Instagram post, dated April 29th, 2025, according to this exhibit, Number 5, your post, you wrote that Mr. Cartagena ordered a hit job against your client, Mr. Dixon; correct?

A.    I did make an Instagram post around that time; and the post speaks for itself.

Q.    "The post speaks for itself."

So, for some reason, you don't want to acknowledge the words that you so

proudly put out there publicly that your

client ordered a hit job against my client.

Okay?

You also made public statements

about Mr. Cartagena in podcast appearances,

right, as you said?

A.    I'm -- what -- what podcast was

that?

Q.    Well, you know, you just saw

your admission that you made statements

55

56

* CONFIDENTIAL ~ TYRONE BLACKBURN *

about Mr. Cartagena in podcast appearances.

Let's start with that.

Was that an accurate statement

that you made to the court?

A.    What page is that?

Q.    That's Exhibit Number 4.

And you can go to --

MS. LANZONE:  Page 6.

Q.    -- Page 6 again.

Under the part where...

"ADMITTED IN PART:  DENIED IN

PART."

Halfway through the page.

"Admitted:"

This is you writing this.

"Defendant Tyrone" Back- --

"Blackburn published statements on his

personal Instagram account and in podcast

appearances and made public statements
regarding Plaintiff Joseph Cartagena."

Was that accurate?

A.    I'm reading this.

Hold on.

(Witness reviews document.)

56

57

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    I know I --- I know I made a --
I think I made an appearance on a podcast,
but I'm not sure.

Q.    Okay.

A.    I don't recall what the topic
was.

Q.    Okay.  Well, when you wrote
this response and submitted this to the
court, you recalled what the topic was
then.

It was:

"Podcast appearances regarding
Plaintiff Joseph Cartagena."

Do you disagree with what you
wrote here?

A.    I mean, I -- I mean, I -- I may
have discussed him then, as you know, I've
been -- I was under- -- I was taking
medication for awhile, so I don't really
remember what I wrote back in November, but
if that's what it says here.

Q.    Okay.  You appeared on a

podcast, called the "Star Report," and

said -- you, Mr. Blackburn, gave me, Joe

57

58

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Tacopina, and my office, a quote:

"One minute clip of Pistol Pete threatening or actually, no, trying to set up Mr. Dixon to be pounded out."

Do you recall saying that on the podcast?

If not, I could let you hear yourself saying it.

Do you recall saying that or do you want me to play it?

(Witness reviews document.)

Q.   Mr. Dixon [sic], what are you reading?

A.   I'm not Mr. Dixon.

MR. TACOPINA:  I'm sorry.

Q.   Mr. Blackburn, what are you reading?

I'm asking you a question.

There's nothing on that piece of paper that will answer that question.

So, I'm asking you:  What are you reading?

A.   Okay.  Could you repeat the question?

58

* CONFIDENTIAL ~ TYRONE BLACKBURN *

THE WITNESS:  I'm sorry.

Q.    Sure.

You gave, on the "Star Report" -- a podcast called the "Star Report" --

MR. TACOPINA:  I apologize for calling you Mr. Dixon.

Q.    You, Mr. Blackburn, gave me and my office, quote -- this is what you said:

"A one minute clip of Pistol Pete threatening or actually, no, trying to set up Mr. Dixon to be pounded out."

Do you recall saying that?

A.    I don't recall saying that.

Q.    Okay.

MR. TACOPINA:  Let's -- let's play that clip.

(Audio playing in background.)

Q.    That was you; right?

A.    It sounds like me, but I didn't create that -- that recording, so I can't authenticate...

Q.    You can't authenticate a recording of --

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    I can't --

Q. -- your own voice?

A. -- I can't -- I can't authenticate that recording. I did not create that recording, I do not own podcast.

I do not know where the source of that came from.

Q. Do you think --

A. I think it needs to be established --

Q. -- you need to be the owner of the podcast to authenticate a -- a recording?

A. But you didn't --

Q. Is that what you think?

A. -- but you have not established where that podcast -- where that recording came from, so I can't testify to its authenticity.

Q. Well, let's see, that's a podcast called the "Star Report" that you appeared on.

There's your name right there:

60

61

* CONFIDENTIAL ~ TYRONE BLACKBURN *

"Tyrone Blackburn, $50.00."

What's the $50.00?

Do you know what that's about?

A. Again, I -- I don't know -- I cannot testify to the -- the -- you know,

what's on this or -- or who created this.

I cannot --

Q.    I didn't ask you who created it.

A.    Why you said --

Q.    You can't tell --

A.    Why you -- I can't -- I can't --

Q.    -- that's your voice is on it?

A.    I can't testify as to what this is or to the au- -- the authenticity of this thing until you --

Q.    Um-hum.

A.    -- establish some sort of record of where this came from, with some sort of certification that this is even authentic --

Q.    Um-hum.

A.    -- there's no way that I can

61

62

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

properly answer these questions, for the first time.

Q.    So, how do you think it goes, Mr. Blackburn?

A.    What?  I don't --

Q.    That's how you think it goes? That's how you think --

A.    I'm -- I'm -- I'm just --

Q.    -- the authentication process

goes?

A. -- asking you...

Q. Well, here, I'm going to ask you again. I'm going to play your voice for you again.

And I'll say: Maybe you're going to say it's not your voice, it's AI.

Just say whatever it is. I want to here the answer.

MR. TACOPINA: Play it again.

(Audio playing in background.)

Q. Was that your voice, Mr. Blackburn, or you don't know if that's your voice?

A. Well, again, you just mentioned

62

63

* CONFIDENTIAL ~ TYRONE BLACKBURN *

"AI," so I don't know what -- where -- where the source of that came from.

Unless you have some sort of certification that that's a authentic clip from whatever source it's from, it's really difficult for me to answer that.

Especially in today's era.

I don't want to make a mistake and say something that's going to held against me.

So, I'm just asking for some sort of certification that establishes the authenticity of that -- of that thing that

you just played.

Q.    Right.

You know this is a deposition?

So, if and when we get to a point of admitting that into evidence at a trial, maybe we'll discuss that.

But my question is:  Was that your voice that you just heard:  Yes or no?

A.    Well, again, same -- same response as before.

Q.    "You don't know" is the answer,

63

64

* CONFIDENTIAL ~ TYRONE BLACKBURN *

right?

A.    Same response as -- as prior response.

Q.    I don't know what the prior response is, so why don't you answer it again.

THE WITNESS:  Can you read it back for me, please.

(Whereupon, the referred to Answer was read back by the Reporter:

"ANSWER:  Well, again, you just mentioned "AI," so I don't know what -- where -- where the source of that came from.

"Unless you have some sort of certification that that's a authentic clip from whatever source it's from,

it's really difficult for me to

answer that.  Especially in today's

era.

"I don't want to make a mistake

and say something that's going to

held against me.

"So, I'm just asking for some

64

65

* CONFIDENTIAL ~ TYRONE BLACKBURN *

sort of certification that

establishes the authenticity of

that -- of that thing that you just

played.")

Q.    Okay.  So, my question was:  Is that your voice and that's your answer that was just read back; correct?

A.    Same answer, yes.

Q.    Okay.  Did you appear on that podcast, the "Star" [sic] podcast?

A.    I don't recall which podcast.

I -- I -- I've appeared on a couple of them.

Q.    Okay.

A.    So, I don't recall.

You may have to -- I don't know.

Q.    Well, which ones did you appear on?

A.    I don't remember every single -- I don't remember the names.  Like

I --

Q.    How about one?

A.    I -- I don't remember.  I have

65

66

* CONFIDENTIAL ~ TYRONE BLACKBURN *

to -- actually, I have to, like, check --

check my phone or check something.  I don't

know.

Q.    Check something.  Okay.

So, you don't remember the name

of one podcast you appeared on; correct?

A.    I think I appeared on "Choke,"

but I don't want to -- Choke -- some --

Choke -- Choke something.

I don't remember the exact

name, but I don't want to be quoted and

then I'm wrong.

So, I don't want to -- I'm

like, trying to have -- I'm -- I'm a little

hesitant with saying the names, as I don't

really appear much on anything, so I don't

want to...

I think I may have appeared on

a podcast with -- I think I may have

appeared on Larry Reid's podcast -- well,

not podcast, but on his YouTube channel --

Q.    Um-hum.

A.    -- as well.  So, I don't...

Q.    Well, you're familiar with the

* CONFIDENTIAL ~ TYRONE BLACKBURN *

"Star Report," right?

This podcast that we just played for you, you're familiar with it, right?

A.    I think I heard -- heard of it.

Q.    As a matter of fact, according to you, you listened to it all the time.

That's what you said in that podcast.

A.    Again, I can't authenticate --

Q.    I'm not asking you to authenticate anything.

A.    I mean --

Q.    Do you listen to it all the time?

A.    Why are you yelling?

Q.    I'm not yelling.

A.    You're --- you're raising your voice, and you are yelling.

So, I, again, same qu- -- same answer as before regarding the -- regarding the authenti- -- authentication.

Q.    See, again, you might not be understanding this question, I understand

* CONFIDENTIAL ~ TYRONE BLACKBURN *

it may be complicated, but here's the

question again:

You stated that you appeared or

listened to this podcast regularly.

My question is this question --

A.    Why are you --

Q.    I'm not asking you to

authenticate anything.

A.    Why you yelling?

Q.    Here's my question --

A.    Why are you yelling?

Q.    Sir, I'm not yelling.

A.    You're yelling.

Q.    Here's my question --

A.    Your voice is getting very

loud.

Q.    Okay.  Well, there's a video

that will determine if I'm yelling, but

that's okay.

So, here's my question:  Did

you regularly listen to the "Star Report"

podcast?

A.    No.

Q.    No, you did not?

68

69

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    No.

Q.    Okay.  Did you say that:

"For 19 minutes, Pistol Pete

was trying to convince this man to lure

your client to a certain location so he and

his goons could pound him out and teach him

a lesson on behalf of Fat Joe"?

Do you recall saying that?

A.   Again, same -- same -- same

response regarding the -- regarding that --

that recording.

I don't know where it's from.

Same -- same answer as before.

Q.   You okay today?

A.   Yes.

I'm perfectly fine.

Q.   So, here's my question:  It has

nothing to do with a recording.

I'm asking you, did you say:

"For 19 minutes, Pistol Pete

was trying to convince this man to lure

your client to a certain location so he and

his goons could pound him out and teach him

a lesson on behalf of Fat Joe."

69

70

* CONFIDENTIAL ~ TYRONE BLACKBURN *

I'm asking you:  Did you say

that?

A.   Did I say that when?

Did I say that where?

To whom?  I mean --

Q.   Okay.  Let's play that clip,

see if this refreshes your recollection.

A.   I don't --

(Audio playing in background.)

Q. Okay. Does that sound like your voice?

A. Again, with the same -- same answer regarding this exhibit that you posted --

Q. Um-hum.

A. -- that I made earlier.

Q. Okay. My question was not: Is this an authentic tape?

My question was: Was that your voice?

A. Same answer as before.

MR. TACOPINA: Which is a non-answer, so please mark that for a ruling.


70


71


* CONFIDENTIAL ~ TYRONE BLACKBURN *

Oh, let's play this one.

Let's got to the fourth one.

Q. Do you recall saying that:

"Fat Joe started dating the young lady when she was 16 years old and he was in his late 30s."

Do you remember saying that?

Making that allegation?

A. No.

Q. You don't?

MR. TACOPINA: Play that.

(Audio playing in background.)

Q. Same answer, right?

You don't know if that's you or not?

A. Same answer as it pertains to this particular exhibit.

Q. Well, I'm not asking about an exhibit.

I'm asking you: Do you know if that --

A. Is this --

Q. -- was your voice or not?

A. -- is this an exhibit or --

71

72

* CONFIDENTIAL ~ TYRONE BLACKBURN *

this has not been marked, has it?

Q. Here's the question I --

A. I -- I'm assuming it's an exhibit.

THE WITNESS: I apologize for that.

A. I didn't --

Q. That's okay.

Here's the question: Was that your voice or not or you don't know?

A. Same answer as before pertaining to the recording that you have up here.

Q. That's not an answer to a question whether that's your voice or not, Mr. Blackburn.

Is that your voice?

A.    What's the -- what's the question?

Q.    "Is that your voice?"

A.    I think you asked that question earlier, and I believe I provided that answer.

So, the same answer I provided

72

73

* CONFIDENTIAL ~ TYRONE BLACKBURN *

earlier applies to the -- to the same question here not.

Q.    Okay.

MR. TACOPINA:  And for the record:

This podcast is Exhibit Number 6.

(Whereupon, Plaintiff's Exhibit 6, PREVIOUSLY MARKED: TSR Podcast, CARTAGENA_0000021, was tendered.)

Q.    One more:  Do you recall saying to the "Star Report" interviewer that on this recording, the young lady says that:

"What Fat Joe did was inappropriate because, you know, she was a child."

Do you recall saying that?

Do you recall saying it?

I'm -- I'm not asking you if it's authenticate.

Do you recall saying those

words to anyone?

A.    I -- I don't recall.

It's a very, very broad

73

74

* CONFIDENTIAL ~ TYRONE BLACKBURN *

question:

"To anyone."

I'm not really -- you're going

to have to be more specific as to what --

what you're referring to.

Q.    Sure.

I'll be more specific:  Did you

say to the interviewer on the "Star

Report" --

A.    It sounds -- it sounds like

you're yelling again.

Q.    Did you say to the interviewer

on the "Star Report" that on this recording

the young lady --

A.    I --

Q.    -- says that:

"What Fat Joe did was

inappropriate because, you know, she was a

child."

Do you recall saying that?

A.    I don't know.  I don't recall

saying that.

Q.    You don't recall saying that?

MR. TACOPINA:  Let's play that

74

75

* CONFIDENTIAL ~ TYRONE BLACKBURN *

little snippet.

(Audio playing in background.)

Q.    You don't recall saying that, do you?

A.    Again, same -- same -- same -- same answer as it pertains to this exhibit, as I said earlier.

Q.    Okay.

MR. TACOPINA:  Please just mark that.

Q.    Regarding your allegations against Mr. Cartagena, you included them in a complaint that you filed against him and others on June 19th, 2025, that's exhibit Number 7, your complaint.

(Whereupon, Plaintiff's Exhibit 7, PREVIOUSLY MARKED:  Civil Complaint Dixon v. Cartagena, et al., was tendered.)

Q.    Just yesterday, you filed an amended complaint, right?

A.    I believe the court, in our last deposition, made it very clear that I'm to answer no questions regarding the

75

Dixon v Cartagena matter, and I'm going to stand by that instruction.

Q. Okay. The court did not, in any way, shape, or form, say you were to answer no questions.

But your position is you're not going to answer questions, right?

A. It's not relevant to the current -- to the current case.

If you would like to question -- if -- if you have any questions regarding the Dixon v Cartagena matter, I think you should schedule a deposition in that matter.

Q. Okay. Well, here's the question that's relevant:

With regard to a initial -- your initial complaint, filed on June 19, 2025, the front page of that complaint contained a, quote/unquote, trigger warning, in red, that the document contained, quote:

Highly graphic information of a sexual nature, including sexual assault,

76

77

and graphic details of sex trafficking and other criminal activity by Mr. Cartagena.

Do you recall writing that in

your complaint?

MR. BLACKBURN:  Objection; beyond the scope of this deposition.

This deposition is noticed in Cartagena v Dixon, Number 25-cv-03552.

Questions about the claims in Dixon v Cartagena, 25-cv-05144, are not relevant to the claims or defenses in this case under Federal Rules to Federal Procedure 26(b)(1).

And I'm not going to discuss the substance of a separate pending action.

Q.   What are you being sued for as a defendant, Mr. Blackburn?

What are you being sued for; do you know?

A.   I -- I have no idea.

Q.   You have no idea what you're being sued for?

77

78

* CONFIDENTIAL ~ TYRONE BLACKBURN *

You're here doing a deposition as a defendant and you don't even know why you're here?

A.   Yeah.

No.  I mean, I think -- I think that according to the amended complaint, on April 30th, 2025, according to the

complaint, it says that:

"I'm being sued because of an

Instagram post."

And I think the May 2nd, 2025,

it claims that I made some sort of claims

about your client.

So, that's -- that -- that's --

that is what I think the scope is.

Q.    So, you just stated on the

record that the court directed you not to

answer any questions regarding the matter

where you're plaintiff's counsel and

Mr. Cartagena is the defendant.

This was raised on the Dixon

deposition.

And the court actually made a

ruling.  I'm going to read the court's

78

79

* CONFIDENTIAL ~ TYRONE BLACKBURN *

ruling to you, see if you understand it or

remember it:

"I heard arguments from both

sides, and I'm looking to Federal Rule of

Civil Procedure 30(c)(2), which talks about

the sanc- -- the sections and instructing a

deponent not to answer during a deposition.

"I find that applying that

rule, the deponent must answer the

questions that have been raised by the

plaintiff, and I'm overruling any objection

raised by Mr. Blackburn.  There are not

issues of privilege at play.  The

information is relevant or could lead to

admissible evidence.

"Whether the claims are time

barred, whether there is litigation

privilege at play, something appears in the

complaint" -- some -- "something appears in

the complaint are merits issues that you

can get to ultimately in defending the

case, but they're not grounds to instruct

the witness not to answer; and therefore,

you must answer the questions that are

79

80

* CONFIDENTIAL ~ TYRONE BLACKBURN *

posed to him in this area."

Do you recall that ruling by
the court?

A.    I'm not sure what that came
from.  I believe you just said Dixon's
deposition.

I'm referring to the
conversation that we had with the court
during the one-hour deposition that I had
prior to today's deposition.

Q.    Okay.  You wanted the public
and the press to read your initial
complaint, right, sir?

A.    I -- I -- I don't -- I don't
understand the question.

Could you please rephrase that?

Q.    You don't understand that?

Okay.  I'm going to try and -- maybe I will

say it slower:

You wanted the public and the

press to read your initial complaint;

correct?

A.    What -- I -- I -- what

complaint?  I don't have any complaint, so

80

81

* CONFIDENTIAL ~ TYRONE BLACKBURN *

yo what you're -- you said:

"Your complaint."

I'm not sure...

Q.    Yeah.

The one you filed.

The one you talked about on the

podcast and everything.

A.    Based on -- who -- the question

is a little confusing because as -- as

stated, it sounds like you're asking me if

I personally had -- like, if I'm filing a

complaint for myself is what it sounds

like.

Q.    I didn't ask you that.

A.    Okay.

Q.    When you file a complaint as a

lawyer, you're filing a complaint.  Like, I

filed a complaint against you, I filed that

complaint.

A.   I -- I file -- I file multiple

complaints.  You have got to be specific as

to what you're talking about.

Q.   Okay.  The complaint against

Mr. Cartagena.  I wasn't asking you about

81

82

* CONFIDENTIAL ~ TYRONE BLACKBURN *

the complaint in New Jersey where you said

you were mentally unfit to proceed.  I'm

talking about this case here,

Mr. Cartagena's.

A.   I have never filed a complaint

where I said that I'm mentally fit --

unfit.  I never filed a complaint that says

that.  I don't recall.

Q.   I didn't ask you if you filed a

complaint that said that.  Okay.

A.   You just -- you just made that

statement on the record.  I think that is a

little --

Q.   Well, you filed a complaint in

Judge Semper's courtroom in New Jersey,

right?

A.   When?  I filed multiple

complaints in Judge Semper's court.

Q.   Really.

How about the one that was the

subject of your December 25th letter, where

you told Judge Semper that you cannot

proceed because of mental and emotional

issues?

82

83

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Do you remember that complaint?

A.   It's a couple of complaints.  I filed at least five or six of them to Judge Semper, so I'm not really sure.  Can you be more specific as to what you're talking about?

Q.   Sure.

Which complaints did you seek to withdraw from because of your mental well-being?

MR. BLACKBURN:  Objection to relevance under the rules that I stated earlier.

In Conduit v Duane, this court held that personal inquiries must be limited to information relevant to defendant's possible defenses of substantial truth, mitigation of damages, and impeachment, and no fishing expeditions are tolerated.

So, I'm not going to be responding to any questions concerning my personal health, as it does not bear on the issues in this

83

84

* CONFIDENTIAL ~ TYRONE BLACKBURN *

case, which I believe are limited to two potentially defamatory statements, so sorry.

Q.   So, now you remember you're being sued for defamation?

Is that what it is?

A.   I believe that I answered that question earlier --

Q.   Yeah.

A.   -- about three or four questions ago.

Q.   Okay.

A.   But I don't have the transcript in front of me, so I can't really tell you exactly where that question was, but it was earlier.

Q.   Were you trying to attract interest of the media in your complaint against Mr. Cartagena?

A.   No, I was not.

Q.   No.

Who was --

A.   And, one -- and, one, I don't have -- I don't -- I personally do not have

84

85

* CONFIDENTIAL ~ TYRONE BLACKBURN *

a person -- I don't have a complaint -- I personally do not have a complaint against

Mr. Cartagena, so I don't know.

Q.   I thought we cleared that up.

The complaint you filed on behalf of

Mr. Dixon that you filed.

A.   You -- you -- you didn't say

that.  You didn't say that.  You didn't say

that throughout this -- throughout this

thing.  You started talking about Judge

Semper, and you started talking about a

whole bunch different things in Judge

Semper's court.

Q.   Okay.  So -- so -- so again --

A.   You never said that.

Q.   Right.  Well, we're saying it

now.

So, the complaint you filed, as

a lawyer, on behalf of Mr. Dixon, were you

trying to attract media attention to that?

A.   No.

Q.   You weren't?

A.   Yo think so, no.

Q.   Who is Tiffany Morgan?

85

86

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   I believe she is a -- I believe

she is a lawyer.

Q.   You believe she is a lawyer?

You believe she is a lawyer.

She actually edited your

initial complaint against Mr. Cartagena

after you have protracted it, right?

A.    She -- I don't recall that, no.

Q.    Didn't she work with you?

A.    No.

She has never worked with me.

Q.    Never worked with you?  Thank you.

A.    Like, work -- when you say "worked with me," you have to define that.

Q.    Sure.

Did she help edit your complaint against Mr. Cartagena?

A.    No.

I don't -- I don't recall if she did or she didn't.

Q.    Well, how do you know Ms. Morgan, then?

A.    I think she called me on -- on

86

87

* CONFIDENTIAL ~ TYRONE BLACKBURN *

an issue regarding another unrelated case, something in the entertainment industry.

Q.    And what --

A.    It dealt with -- I believe it dealt with, like, ownership rights or something.  I don't know.

Q.    You don't know?  Okay.

So, it's your testimony under oath here that Tiffany Morgan did not ever do any work on the Cartagena complaint and

helped you draft it?

That's your testimony under oath, right?

A.   Again, I don't -- I don't remember what -- I don't -- I don't believe she did.  I don't remember, honestly.

Q.   Well, is she a lawyer or not?

A.   Yeah, she is a lawyer.

But I don't -- but as I said before, we were working on a different case, where she asked me some questions about a completely different matter.  I think it has to do with ownership interest in some sort of, I don't know, song --

87

88

* CONFIDENTIAL ~ TYRONE BLACKBURN *

songs catalogues or -- I don't know.

Q.   So, therefore, there would be no e-mails between you and Ms. Morgan referencing the Cartagena complaint and asking her to edit it, right?

A.   I have no -- I have no -- I have no idea.

Q.   You have no idea?  Well, you just said it didn't happen, so you should have an idea.

A.   No.

Actually, what I said was I do not know, so you're misstating prior testimony.

Q. So, you don't know if Ms. Morgan, who at first you didn't even know was a lawyer, you don't remember if Ms. Morgan --

A. I never said that -- no.

Again, misstating prior testimony.

Q. You don't know --

A. Hold on.

Q. No, no.

88

89

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Mr. Blackburn, I will finish my question --

A. No, no, no, no.

Q. -- then you could give your little speech.

You don't know if Ms. Morgan --

A. No, no, no.

I'm not giving a speech.

Q. -- edited your Cartagena complaint?

THE REPORTER: One at a time,

A. Again, I said I do not -- I do not remember any conversations with Ms. Morgan or communications regarding this case, so I don't -- I don't remember. I really don't.

Q. Okay.

A. I know that I was working with

her on something completely unrelated to this.

Q. A few months before filing the initial complaint on March 23rd, 2025, you first sent a demand letter to Mr. Cartagena, right?

89

90

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A. Did I? I don't remember.

Q. It's Exhibit 8. We will put it up. Just a second. We will put it up.

A. I don't remember. I don't remember doing it.

(Whereupon, Plaintiff's Exhibit 8, PREVIOUSLY MARKED: 3-23-25 Blackburn demand letter, was tendered.)

MR. TACOPINA: And zoom in so we can see the date, that's March 23rd, 2025.

Q. Do you see that, sir?

A. I believe it is, yeah.

Q. Okay.

A. That's what it says.

Q. Okay. Now, your demand letter, the one on March 23rd, 2025 was based solely on the complain that Mr. Dixon:

"For over 16 years"..."contributed extensively as a lyrist and vocalist to numerous

90

91

* CONFIDENTIAL ~ TYRONE BLACKBURN *

That, again, same exhibit that's Page 1, third paragraph, second sentence. I will highlight that here for you.

Do you see that, sir?

A. I believe the document speaks for itself.

Q. You believe the document speaks for itself? Okay.

And:

"Mr. Dixon has never been credited" -- you wrote -- "or compensated for his authorship and vocal contributions."

The document speaks for itself that you wrote, right?

A. Same response.

Q. What would that be?

A. Same response as before.

Q. Well, there were a lot of responses before.

What's the response?

A. To the prior question was on this document, same response.

91

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    That it speaks for itself?

A.    Same response.

Q.    So, you can't acknowledge what you wrote?

A.    Same response.  I'm -- I'm giving you the answer.  If it's the same response, it's the same response.

Q.    What are you reading there, sir?  I'm just curious.  You have all these printed things.  Is that some objections what you have written out?

I'm asking you questions, you're like reading documents.

A.    What's the -- what's the -- what's the next question regarding -- regarding this, um, defamation case?

Q.    That's my question right now: What are you reading?

A.    Work product.

Q.    Work product?

Who generated that work product?

A.    Is this relevant to the two defamation claims that you -- that your

92

93

* CONFIDENTIAL ~ TYRONE BLACKBURN *

clients that I made which is the subject

of, I believe, this litigation?

Because I think we should probably get to that.

Q. You do?

Okay. Well, if you think so, Mr. Blackburn, being that you have such -- such a good lawyer, I will get right to that then.

On March 23rd, your demand letter was 14 pages long, Exhibit 8. The document speaks for itself.

You wouldn't have sent that sizable demand letter without first speaking to your client about his claims, would you have?

Don't cite privilege. I'm not asking for privileged information.

I'm simply asking you: You wouldn't have sent a sizable demand letter without first speaking to your client about his claims, right?

A. Yes.

Q. Okay. Obviously -- obviously,

93

94

* CONFIDENTIAL ~ TYRONE BLACKBURN *
your goal in sending that demand letter was to try to extract a large settlement as possible for your client? That's what we all do.

A. I wouldn't say that's a goal.

I think that I was just sending a demand

letter to start a conversation with Mr. --

with the -- with the respondent.

Q.   So, your goal wasn't to get a

large settlement as possible for your

client?

A.   I'm not sure if that -- I mean,

I can't -- I can't tell you -- no.  My goal

was to invite Mr. Cartagena to have a

conversation regarding the claims that my

client raised.

Q.   And where were you hoping that

conversation went?

A.   To a mutual resolution of my

client's claims.

Q.   Right.

And that means that you wanted

the most money possible for your client;

correct?

94

95

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   I don't know if that would have

been the resolution.  It could have been --

I mean --

Q.   Letter of apology?

A.   That's a very speculative

response.  I don't know because we haven't

gotten that far.

Q.   Well, I'm not asking you to

speculate.  I'm asking you what was in your

mind when you sent that letter?  What was your goal?  Tyrone Blackburn's goal?

A.    In sending this letter, the goal was to get a response.  That's it.

Q.    Okay.  Not -- was the goal ever to get as much of a settlement as possible from Mr. Cartagena for your client?

A.    No.

Q.    No?

A.    The goal from this letter have led to garner a response and to have a conversation regarding my client's claims.

Q.    And in the conversation, were you going to ask for money?

A.    Regarding -- what?  What

95

96

* CONFIDENTIAL ~ TYRONE BLACKBURN *

conversation?

Q.    The conversation you just said you were hoping to have based on this letter?

A.    No.

In the -- no, in the conversation we were going to discuss my client's claims.

Q.    And what were you going to ask for in discussing your client's claims?

A.    A response to what he's alleging.

Q.    Okay.  You were not going to

ask for any money in those conversations,

right?

A.    You don't -- I don't ask for

money when you send an initial invitation

to have a conversation.

It's to still vet and see what

the -- what the responses are to the claims

alleged.

Q.    Well, actually, what you wrote

in the whole thing in your letter, which

we'll just call "an invitation to have a

96

97

* CONFIDENTIAL ~ TYRONE BLACKBURN *

conversation," was a demand for relief and

settlement proposal.

You just wrote after saying

that you didn't do this:

"Hereby demands" --  "Mr. Dixon

hereby demands that Fat Joe and all

relevant affiliate entities remedy these

violations immediately.  At a minimum,

Mr. Dixon seeks fair compensation payment

to Mr. Dixon for all of his rightful shares

of royalties, advances and other things..."

The letter goes on.

So, you're asking for money in

the letter; correct, Mr. Blackburn?

A.    What was his prior question to

this one?  Just want to be clear.

(Whereupon, the referred to

Question was read back by the Reporter:

"QUESTION: Okay. You were not going to ask for any money in those conversations, right?")

MR. BLACKBURN: And what was before that?

97

98

* CONFIDENTIAL ~ TYRONE BLACKBURN *

(Whereupon, the referred to Question was read back by the Reporter:

"QUESTION: And what were you going to ask for in discussing your client's claims?")

MR. BLACKBURN: Okay. So -- and then -- and then, the last question, the beginning of it?

(Whereupon, the referred to Question was read back by the Reporter:

"QUESTION: Well, actually, what you wrote in the whole thing in your letter, which we'll just call "an invitation to have a conversation," was a demand for relief and settlement proposal.

"You just wrote after saying that you didn't do this:

"Hereby demands" --  "Mr. Dixon

hereby demands that Fat Joe and all relevant affiliate entities remedy these violations immediately.  At a

98

99

* CONFIDENTIAL ~ TYRONE BLACKBURN *

minimum, Mr. Dixon seeks fair compensation payment to Mr. Dixon for all of his rightful shares of royalties, advances and other things..."

"The letter goes on.

"So, you're asking for money in the letter; correct, Mr. Blackburn?")

MR. TACOPINA:  On the record.

A.    I think the questions are two different types of questions.

The question prior to the very last question called for what I en- -- I hoped for in the invitation to the conversation.

And what I -- I believe is what you're saying, is wha- -- what I wanted to get out of it, which was a response to the claims that my client raised.

Then, you tried to claim that the -- that -- that -- that -- that the intent was, I guess, different based on these documents which I said:  Speaks for itself.

* CONFIDENTIAL ~ TYRONE BLACKBURN *

So, I guess the answer these questions, the same response would be as I said before as it stands to this document, which is:  The document speaks for itself.

Q.    I have no idea what you're talking about.

I'm simply asking you this: You said that that letter was not a demand for money, it was an invitation to have a conversation.

Do you see in your letter --

A.    No.

You asked me --

Q.    Do you see --

A.    -- what the goal was.

Q.    Here's my --

A.    And I said what the goal was.

Q.    -- new question, Mr. Blackburn.

A.    You asked me what the goal was.

Q.    Yeah.

A.    And I said that the goal con- -- was for us to have a conversation regarding Mr. Dixon's claims, and for -- and for, you know, us to continue exploring

* CONFIDENTIAL ~ TYRONE BLACKBURN *

what the issues are and what his responses
are.

Q.    Right.

And I also asked you if your
goal was to get money for your client and
you said "no," right?

A.    No.

I said the goal was to have a
conversation regarding the claims.

Q.    And here is my new question:
Now, in the demand letter you're making a
demand for money on behalf of Mr. Dixon
right?

A.    I think that the -- that the
letter speaks for itself.

Q.    And so, that's a "yes"?

Okay.

A.    That's not what I said.  The
document speaks for itself.

Q.    There's nothing in your letter
on March 25th -- on March 223rd, 2025 where
you're making any claims regarding sexual
assault, sex trafficking or other criminal
activity, is there?

101

102

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    The letter speaks for it.

Q.    The letter speaks for itself?

A.    Yeah.

It's --

Q.    Are you incapable of answering the question?

A.    I'm giving you the answer.

Q.    You don't want to say what --

A.    That's not the answer.

Q.    -- what's not in the letter?

A.    That the letter speaks for itself.

Q.    Okay.  So, what it speaks for itself is that there's not one mention there in Exhibit 8, of you claiming on behalf of your client that there were any claims regarding sexual assault, sex trafficking and other criminal activity.

Further, what the letter also speaks for itself on, is that there was nothing in there about coerced sex acts. Okay.

What you also didn't write in that letter, because it speaks for itself,

102

103

* CONFIDENTIAL ~ TYRONE BLACKBURN *

is that there's nothing there about minors.

Also, in the letter that speaks for itself that you authored, there is nothing in there about pedophilia.

Also, in the letter that speaks for itself, there is nothing in there about TVPA claims.

So what -- the demand letter

sought was a share of all royalties, advances and other earnings from songs to which you claim Mr. Dixon contributed.

You e-mailed that letter to Mr. Cartagena on March 23rd, 2025 and that's Exhibit 9.

MR. TACOPINA: Do you have that?

(Whereupon, Exhibit 9, PREVIOUSLY MARKED: March 23, 2025 demand letter from Mr. Blackburn to Mr. Cartagena, was tendered.)

Q. Is that your e-mail, Mr. Blackburn?

A. I can't see that. It's very small.

103

104

* CONFIDENTIAL ~ TYRONE BLACKBURN *

MR. TACOPINA: Okay. Zoom it right up all the way.

Q. There you go, sir.

A. It's a little blurry.

Q. That's blurry?

A. To me. I mean, it's my eyes, so I can't --

Q. Okay. We will give you a hard copy.

I'm showing you now is, again, Exhibit 9. And it's on the board. It's blurry on the board, but take a look at the

hard copy (handing).

Is that your e-mail?

(Witness reviews document.)

A.    I don't see -- it says "attached."  I don't see attachments.

Q.    I'm asking you:  Is your e-mail, sir?

A.    Yes.

The e-mail address?

Q.    Yes.

A.    Yes.

I have to see -- but I have to

104

105

* CONFIDENTIAL ~ TYRONE BLACKBURN *

make sure that this is the right...

(Witness reviews document.)

Q.    Sir, I just asked you if you that last page is your e-mail.

A.    I have to -- I have to confirm --

Q.    You have to confirm if that's your e-mail address?

A.    -- what the -- what the source of -- I already said that it was my e-mail address.  But I am saying I have to confirm what the source of this e-mail is from.  I can't just say that this -- because it looks like this is something that came from --

Q.    The source of the e-mail is

from.  The source of the e-mail is from you.

A.   No, it's not, actually.

Q.   It's not from Tyrone Blackburn?

A.   The document that you presented is a document that I believe came from Erica Moreira, so that's the source of the document.  That's all I'm saying.

105

106

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   It's called an e-mail chain, and I have one question for you:  Is the March 23rd, 2025 e-mail at 10:16 P.M. from Tyrone Blackburn to Fat Joe, is that your e-mail?

And you said it was, right?

A.   The e-mail address is my e-mail, and I believe that that is a part of -- and -- and it's a part of an e-mail chain from Erica Moreira.  So --

Q.   Did you send that e-mail to Fat Joe?

A.   But it says "attachment."  I don't see any attachment.

Q.   Right.  I get that part. There's the notice of appearance.

Here's my question:  Did you send that e-mail to Fat Joe, the one on March 23rd?

A.   I believe I did.

Q. Okay.

A. I think so.

Q. Thank you.

Can I have that, please?

106

107

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Thank you.

A. Here you go (handing).

Q. And you said -- you mentioned there was an e-mail chain from Ms. Moreira.

Ms. Moreira responded to you by saying that your client's comments on social media were slanderous and libelous, and she denied any of these allegations or claims that you made, right, in sum and substance?

A. And I don't like to summarize things, so --

Q. You don't like to summarize things?

A. I'm not trying to -- you know, just if we can read what she says.

Q. Well, let's -- let me ask you: What was Ms. Moreira's response?

A. I don't know. I don't remember what she said. That's why I'm asking you to --

Q. Okay. Sure.

I will read it to you.

A. -- provide me with her

* CONFIDENTIAL ~ TYRONE BLACKBURN *

response.

Q.    Sure.

I don't want -- the document speaks for itself, I thought, but okay.

So, on April 14th, Ms. Moreira responded to you and advised you that -- and this is Exhibit 9, Page 20 -- she advised you that:

"Your client was paid for years of his services in connection with live performances as Mr. Cartagena's 'hype' man. And that was the extent of his services."

She went on in that same letter to say:

"...your client's comments on social media were slanderous and libelous..."

And, first of all, do you recall getting that response from Ms. Moreira?

And it's up on the board there, if you want to take a look at it.

A.    It's very zoomed in.  I can't --

MR. TACOPINA:  Zoom -- really zoom in.

MS. LANZONE:  Like that?

A.    Where -- what's the source of that?

Q.    What is the source of that?

A.    Yeah.

Q.    It's an e-mail from Ms. Moreira to you.

A.    Yeah, but it doesn't look like an e-mail that I'm looking at.

Q.    It's a -- I'm going to focus your attention just to this one page here, just what's up on the board.  It's Exhibit 9.

Just that e-mail right there, Ms. Moreira to you in response to your e-mail to her client, Fat Joe?

(Witness reviews document.)

A.    Okay.  Yes.

Q.    Got it?  Okay?

A.    Um-hum.

Q.    Okay.  That's Ms. Moreira's response to you.  And she in that response

109

110

denies the claims and said that your client's statements on social media were slanderous and libelous.

You just read that, right, sir?

A. Yes, that's what she said.

Q. Okay. So, after you received that letter -- or that e-mail -- I'm sorry -- on April 14th from Ms. Moreira, one week later, on April 21st, you e-mailed a second demand letter to Ms. Moreira.

Do you remember the second e-mail -- demand letter that you e-mailed to Ms. Moreira --

A. No.

Q. -- in general?

A. No, I don't.

Q. Okay. We will put it up. We have it.

So, on the 21st of April, your demand letter attached what you described as a finalized and comprehensive civil claim that was ready for immediate filing in the United States District Court of the Southern District of New York. That's

110

111

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Exhibit 10.

(Whereupon, Exhibit 10,

PREVIOUSLY MARKED:  4-21-25 Blackburn

demand letter and complaint

attached, was tendered.)

Q. Your words:

"We have finalized a

comprehensive civil complaint ready for

immediate filing in the Southern District

of New York."

That's your April 21st demand letter.

Does that refresh your recollection that you sent that to her?

A.   I don't have -- where is -- where is the letter?  Right above that?

Q.   Right up here.

A.   Again...

Q.   You can't see that.  Okay.

First page, this is Exhibit 10, and it's this paragraph right here.  I will put a little slash here.  Right here (indicating).

(Witness reviews document.)

111

112

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   Just that one paragraph, Mr. Blackburn.

A.   I need to read the full context of what it says.

Q.   Okay.  Sure.  Sure?

(Witness reviews document.)

A.   Okay.  Okay.  I read it, yeah (handing).

Q.   Okay.  And this new complaint of yours, a second demand letter to Ms. Moreira, I should say -- by the way, I

assume --

MR. TACOPINA:  Well I don't
want to assume anything.

Q.   Let me ask you:  Did Mr. Dixon,
your client, authorize you to send that
demand letter?

A.   That is privileged
communications.

Q.   Okay.  It's really not,
Mr. Blackburn.

A.   Well, that's --

Q.   You should take a look at the
privilege laws.

112

113

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   Okay.  Well, that's my --
that's my response.

Q.   That's your response.

MR. TACOPINA:  Okay.  We will
mark that for a ruling.

Q.   Being authorized to send a
demand letter is not a privileged
conversation, but I guess you'll learn
that.

I mean, you're not suggesting
you just sent this on your own, right,
without your client knowing about it, are
you?

A.   Same -- same -- same answer.

Q.   Same answer.  Okay.

So, the complaint that you attached to your April 21st demand letter contained allegations going way beyond what you contained in your March 23rd demand letter; correct?

You don't remember?

A.    I believe the com- -- the -- the -- the -- the letters you just shared with me only speaks about the potential --

113

114

* CONFIDENTIAL ~ TYRONE BLACKBURN *

I think it was an invitation to mediation I think it is, and -- okay.  I think she is highlighting something.  Let me see.  She highlighted.

Q.    No, she is not highlighting anything.

So, here's my question --

A.    She just highlighted something.

Q.    -- so, the complaint that you sent in your second demand letter on April 21st, con- -- just listen to the question -- contained allegations going beyond what you contained in your March 23rd demand letter:  Yes or no?

A.    I believe there were additional additional claims --

Q.    Okay.

A.    -- that -- that were raised based on additional work that I was doing

with my client that discovered additional claims.

Q.   Hum... and what you said you discovered was that the complaint set forth causes of action under the Trafficking

114

115

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Victims Protection Act, right?

A.   I think that's what the letter says.

Q.   And that's referred to as a TVPA claim.

As I'm sure you know, a TVPA claim was certainly never mentioned in your first demand letter on March 23rd of 2025, right?

A.   I don't think it was, no.

Q.   Okay.  And according to the complaint, you said to -- sent to Ms. Moreira on April 21st, the TVPA claim was based on the allegation that Mr. Cartagena subjected Mr. Dixon to repeated incidents of sex trafficking by coercion, right?

A.   Is that -- is that what the letter says?

Q.   Yeah, it is.

A.   Where?

Q.   Where?

A.   Yeah.

115

116

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    Sure.

It's Exhibit 10, again, 133.

MR. TACOPINA:  Let's zoom right into that.

Q.    Can you see 133 there:

"Defendant also subjected Plaintiff to repeated incidents of sex trafficking by coercion in violation of §1591."

A.    I thought you were referring to the letter.  I didn't think you were referring to --

Q.    But that was attached to the letter, Mr. Blackburn; that was attached to your letter.

A.    After some of the first like --

THE COURT REPORTER:  I didn't hear you.

A.    I thought -- no.  I'm just clarifying that I thought he was discussing the first two pages of the letter.  He didn't say anything about any attachments. That's why I was asking for clarification of the question.

116

117

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   Okay.  So, now, that we're clear on that, that's your complaint that you've attached to the letter, as I just asked.

But, in any event, what you said was that Mr. Cartagena subjected Mr. Dixon to repeated incidents of sex trafficking by coercion, right?

A.   I believe that's what -- that's what that paragraph says.  But, again, I think that has to do with the Dixon v. Cartagena matter; so I'm not really sure how that's relevant to the two alleged defamatory statements that were raised in this complaint.

So, I'm not really --

Q.   Um-hum.  Well, I'll tell you how it does:  We allege in Paragraph 107 of our complaint --

A.   Um-hum.

Q.   -- that as part of the extortion, Dixon followed through on prior threats and filed an initial complaint.

So, we're allowed to then ask

117

118

* CONFIDENTIAL ~ TYRONE BLACKBURN *

you questions about your initial complaint.

A.   You said "Dixon," so --

Q.   I did say "Dixon."

A.   -- I'm not --

Q.   You're his lawyer?

A.   -- I'm not -- I'm not Dixon.

Q.   No.

I know you're not Dixon --

A.   Yeah.

Q.   -- but you're his lawyer who filed a complaint on his behalf.

A.   And I'm being sued --

Q.   Right.

A.   -- for two statements that you guys said that I made.

So, I'm not really sure how -- what --

Q.   Well --

A.   -- the -- the complaint that Dixon filed.  It sounds like a claim against Dixon.  It doesn't sound like a claim -- a claim against me.  So --

Q.   That's not true.

A.   -- again, I would like to --


118


119


* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   Because on March 10th, the court ruled, ruled, and we have a transcript of this, that filed claim regarding the dismissal of the -- of the -- for the one claim, the court specifically held that:

"These extortion attempts were relevant to Mr. Dixon and Mr. Blackburn's malice which is an element of a public figure defamation claim."

So that's what it's relevant, sir.

A.   You said --

Q.   Now --

A.   Wait.  Wait.  Read that again?

Q.   You want to read it again what the court ruled?

A.   Yes.

Q.   In -- in March 10, 2026, in its opinion dismiss- -- dismissing the extreme emotional distress claim, the court specifically held that:

"The extortion attempts were relevant to Mr. Dixon and Mr. Blackburn's

119

120

* CONFIDENTIAL ~ TYRONE BLACKBURN *

malice, which is an element of a public figure defamation claim."

So, therefore, we are able to ask you these questions.  Okay.

A.   And what was --

Q.   So those are rules.

A.   -- what was -- what was the -- the -- I'm trying -- I'm just trying to understand.  What was the question before concerning this when he told me -- when he

brought up -- when you first starting

asking this question, what was that

original question again?

I'm just trying to figure out

what...

(Whereupon, the referred to

Question was read back by the

Reporter:

"QUESTION:  Okay.  So, now,

that we're clear on that, that's your

complaint that you've attached to the

letter, as I just asked.")

THE WITNESS:  I think the

question had to do with a specific

120

121

* CONFIDENTIAL ~ TYRONE BLACKBURN *

paragraph that he mentioned from the

complaint that -- that his client

thought, so that's what I'm referring

to.

MR. TACOPINA:  It starts:

"According to the complaint you sent

to Ms. Moreira on April 21st..."

(Whereupon, the referred to

Question was read back by the

Reporter:

"QUESTION:  And according to

the complaint, you said to -- sent to

Ms. Moreira on April 21st...")

THE WITNESS:  No.  No.

Not that question.  There was a question -- there was -- the question was he was quoting -- not that, he was quoting the actual complaint that they filed.  That's the question.  That that was the question before this.  I'm trying to figure out like...

Q.   Are you talking about the complaint, Second Cause of Action under the

121

122

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Trafficking Victims Protection Act?

A.   No.

I'm talking about the complaint that your client filed.  And I believe you quoted a specific paragraph or something within, so I'm just trying -- that's the question I'm --

Q.   Okay.  We allege in Paragraph 107 of our complaint, that's what you're referring to.

A.   Yes.  That question, please.

Q.   Do you want me to read again or --

A.   No.  No.

I -- I want -- I want this on the record.

MR. DeOREO:  It starts:  "Well, I will tell you how it does..."

(Whereupon, the referred to Question was read back by the Reporter:

"QUESTION: Well, I'll tell you how it does: We allege in Paragraph 107 of your that as part of the --

122

123

* CONFIDENTIAL ~ TYRONE BLACKBURN *

MR. TACOPINA: Our. Our complaint.

THE COURT REPORTER: Our complaint, sorry.

(Whereupon, the referred to Question was read back by the Reporter:

"QUESTION: -- that as part of the extortion, Dixon followed through on prior threats and filed an initial complaint.

"So, we're allowed to then ask you questions about your initial complaint.")

THE COURT REPORTER: I'm not really sure.

MR. TACOPINA: We, thus, can ask questions about the initial complaints relevant to these defamation and extortion claim, rather.

Q. So, that was the question,

Mr. Blackburn?

A.   Okay.  So, yeah, go ahead.


123

124


* CONFIDENTIAL ~ TYRONE BLACKBURN *

THE WITNESS:  Sorry.

Q.   All right.

A.   No. No.

Go ahead.  No.

Q.   All right.  So, at bottom, at bottom, you agree that the complaint didn't reference -- aside from these new acts of -- of sex trafficking and whatnot, your complaint didn't reference racketeering or RICO predicate acts in the complaint that you sent on the April 21st letter to Ms. Moreira with the complaint attached --

MR. TACOPINA:  I'm sorry.

Q.   -- Exhibit 10.

Do you recall that if it mentioned anything about racketeering or RICO predicate acts?

A.   I -- let me see.  I don't -- I -- I -- it --

Q.   Okay.

A.   Do you have you copy of it?

MR. TACOPINA:  Give me the complaint again.

Q.   So, I'm just going to give you

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

the complaint.  Well, here's actually the letter.  All right.  And then, attached is the complaint.  So take a look real quick at that, please.

(Witness complies.)

(Witness reviews document.)

Q.    There's nothing in there about RICO, right, Mr. Blackburn?

A.    Um... I'm still reviewing, I don't recall.  Just give me a minute, let me just --

Q.    It's your complaint.

A.    What was the question?

Q.    Well, what were you just looking for?

A.    I was just reviewing the complaint.

Q.    Looking for what, though?

A.    I was just re- -- I was reviewing the complaint.

I'm asking you to repeat the question.

Q.    Okay.  You'd agree that that complaint didn't reference any racketeering

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

or RICO predicate acts, the one that you

sent to Ms. Moreira on April 21st, 2025, right?

A. Yeah.

I don't -- yeah, I didn't see that there.

Q. Okay. Your claims didn't expand into a RICO case until a week later on April 28th, that's Exhibit 9, where you wrote to Ms. Moreira an e-mail:

"This case should expanded to a civil RICO case."

Do you remember sending her that e-mail?

A. I can't see it.

Q. I'm ask -- I asked you if you remember sending that e-mail?

A. I need to see the document, I can't just --

Q. Um-hum. You can't read what's on the board there?

A. There's like a glare.

Q. A glare?

A. So, I need to see the doc- --

126

127

* CONFIDENTIAL ~ TYRONE BLACKBURN *

I've -- I've said that before, just give me the paper, I'll just read the papers.

Q. It's right here.

So, what I'm not going to have you to now, Mr. Blackburn, is I'm not going

to have you re-read --

A.    Oh, boy.

Q.    -- all of Exhibit 9.  This is a series of e-mails.

I'm asking you a pointed question:  On April 28th what you wrote to Ms. Moreira, just this portion on the bottom of the page?

(Witness reviews document.)

Q.    Sir, did you read that on the bottom of Page 6 of Exhibit Number 10?

A.    Hold on.  I'm trying put the context.

Q.    The context of an e-mail that you wrote?  It's pretty self explanatory; isn't it?

A.    I believe it says:

"Erica,

"This case has just expanded

127

128

* CONFIDENTIAL ~ TYRONE BLACKBURN *

into a Civil RICO case.  My client has provided me with a recording of Pistol Pete, a repeated felon and the current right-hand man of Mr. Cartagena trying to get another individual (Percy), who is now deceased, to bring Mr. Dixon to a location where Pistol Pete and his gang of 30+ Terror Squad thugs could "pound him out" which is code for" slashing "him up (a

thing that Pistol Pete was known for) and

killing him.  Pete directly implicated

Mr. Cartagena, saying he is more worried

about Mr. Dixon than Cuban Link because

Mr. Dixon was in the room with him and

could implicate him with all of the"

other -- "with all the underage girls,

several of whom I identified.  Pistol Pete

was also stupid enough to admit to running

into clubs and assaulting people on behalf

of Mr. Cartagena.  He admits to pressing

Tony Yayo of G-Unit."

"Additionally, in 2023, my

client directly texted you to discuss his

copyright claims, but you ignored him.

128

129

* CONFIDENTIAL ~ TYRONE BLACKBURN *

"In any event, I am actively

working on the RICO and waiting for the

transcripts of Pistol Pete's recording,

which I will be inserting into the"..."RICO

section of the complaint."

Q.    Okay.  That's the one?

A.    Yes.

Q.    You wrote that to Ms. Moreira,

right?

A.    Yes, um-hum.

Q.    Okay.  And you wouldn't have

written those statements if they weren't

true, right, Mr. Blackburn?

A. I -- I sent that e-mail

to Ms. --

Q. Moreira.

A. -- Moreira based on what I had in my possession and what I believed were accurate and true, yes.

Q. What you believe were accurate and true. Okay.

So, your initial complaint that you sent never alleged any minors were threatened to have sex, right, the initial

129

130

* CONFIDENTIAL ~ TYRONE BLACKBURN *

complaint that you sent?

A. I -- I don't -- I don't have that in front of me. You said the -- the initial complaint I sent. I don't have -- I don't have that document in front of me. I don't remember. You just asked me. I -- I -- I have reviewed it to look at a RICO thing. I don't remember. If you have it, I can look at it again. I don't remember. I can't answer it and say --

Q. If you don't remember, you don't remember. Your initial complaint is your initial complaint, right? To use your words, they speak for themself?

A. I mean, no, I didn't say that. I said: You want me to answer a question that is very different than the last

question that you asked me to review the complaint for.

So, now I'm asking you: If you want me to answer that question, I would need to see the complaint so I can review it so I can answer that question accurately, and I just know that

130

131

* CONFIDENTIAL ~ TYRONE BLACKBURN *

something --

Q. Okay. Here is -- here is -- here is my question --

A. Well, I mean, I am going to try. I think --

Q. You're making a speech which is irrelevant to my question.

A. No, no. I'm not making -- I'm not making a speech.

Q. Of course you do. You're trying -- you're trying to filibuster.

A. I am not filibustering. I'm not.

Q. You are. So, I'm going to re- -- withdraw that question now and I'm going to ask you a new question.

A. You're yelling. You're yelling again.

Q. I'm sorry I hurt your feelings, Mr. Blackburn.

A. You're not hurting my feelings.

I just want to let you know that you're

yelling --

Q.    That's really not yelling,

131

132

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Mr. Blackburn.

A.    You are yelling.  You are

yelling.  You cannot be yelling.

Q.    Okay.  Okay.  And you're being

argumentative.

Do you know what that is?

A.    I'm not being argumentative.

Q.    Do you know what that is?

A.    I am letting you know that you

are yelling --

Q.    Put argumentative into AI, and

it will explain what it is.

A.    I'm saying that you are yelling

and it's -- and it's harassing.

Q.    Anyway, I'm sorry to harass

you, sir.

So, here is the new question:

Do you sit -- as you sit here, do you

recall in your initial complaint, the

June 19, 2025 Dixon complaint, if you

alleged any minors were threatened to have

sex?

Do you recall?  Yes or no.

A.    Wait.  What?

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   Wait.  What?  Okay.

In your initial complaint --

A.   No, no.  No.  It was -- you're, like, jumbling up.  I am trying to understand the question.

Q.   Jumbling up.  Okay.

I will try and unjumble it.

In your initial complaint, the Dixon complaint from June 19, 2025, you never alleged that had any minors were threatened to have sex.

Do you recall that?  Yes or no?

A.   Do you have a copy of that complaint?

Q.   Oh, I sure do, but here is my question:  Without looking at the complaint, do you remember if you included threats to minors to have sex in that complaint?

Do you remember, as you sit here?

(Witness reviews document.)

A.   I think you -- I'm not sure if this -- if that question is relevant to the

* CONFIDENTIAL ~ TYRONE BLACKBURN *

claims that are in this case for

defamation, so I don't believe that I am

going to answer that, based on the fact

that we had a call with Judge Rochon at the

last deposition, where she said that this

is for Cartengena v Dixon --

Q.    Um-hum.

A.    -- and I don't -- and that

Dixon v Cartengena.

So, if you want to call the

court so we can get some clarification.

MR. TACOPINA:  We're just going

to mark it.  We'll mark this as

directly relevant to the claims

against you, but you can't recall

that.  We will let the court rule on

that later.

A.    You're talking about a

complaint that was filed on 6/19.

Q.    Yeah.

Less than a year ago?

A.    And I believe -- I believe

that -- that that is not relevant to the

defamation claims that you are raising in

134

135

* CONFIDENTIAL ~ TYRONE BLACKBURN *

this case against me.

Q.    Right.  We have been through

this already.

A.    I believe we are, I think, on

your second amended complaint, Paragraph 132, where I believe it had -- you

reference April 30th, 2025 Instagram post and a May 2nd, 2025 podcast, so --

Q.    Mr. Blackburn, I have no idea what you're talking about.

A.    Apparently --

Q.    But they're relevant because they go to the extortion claim in which you are a defendant and being deposed on right now.  But if you can't follow that, we're going to mark it for a ruling.  That's it.  That's enough.

A.    No.  Uh-uh.  No, no.  You're -- no, there's no extortion claim.

Q.    We're going to move on now.

A.    What -- what -- what's -- what's in the -- what's in the complaint that I think survived the motion to dismiss is the two defamation allegations that you

135

136

* CONFIDENTIAL ~ TYRONE BLACKBURN *

made.

Q.    Um-hum.

A.    I think that's what that is.  I don't have it in front of me.

Q.    So, and this -- okay.

A.    But I do recall that at the last deposition that we had with Judge Rochon when you called her said that --

Q.   Yeah.

A.   -- this is about Cartengena v

Dixon, and it's not about V -- Dixon v

Cartengena matter.

Q.   So, see, the extortion attempts, according to the court, are still highly relevant to Mr. Cartengena's defamation claims against you.

But if that's something you're not grasping right now, I'm just going to move on, because you're going to eventually have to do this in front of a jury, and if you want to give these answers to a jury, be my guest.

Okay.  So, we're going to now ask you about the claims.  You made a claim

136

137

* CONFIDENTIAL ~ TYRONE BLACKBURN *

in the complaint, Exhibit 10, for a demand of no less than $2.6 million in damages.

How did you come up with that number?

A.   I -- again, I don't know what complaint you're referring to.  You -- you are like, mentioning --

Q.   Okay.  We'll put it up on the board.

A.   Which one is this one?

Q.   April 21st, 2025 complaint, Paragraphs 15 and 16.

A.   Was this is filed or which one is this?

Q.   It's not filed.  It's what you sent to Ms. Moreira making a demand.  It's the Exhibit 10, again.  And, again, it's your complaint that you attached to the letter from April 21st, 2025, and it was Paragraph 15 and 16.  And what you said:

"Plaintiff seeks no less" --

Paragraph 16.

"Plaintiff seeks no less than $2.6 million in damages and injunctive and

137

138

* CONFIDENTIAL ~ TYRONE BLACKBURN *

equitable belief to ensure Defendant cannot continue to profit from Plaintiff's legacy in silence."

How did you come up with 2.6 million?

A.   That was based on communications that I had with my client at that time.

Q.   Based on communications with your client.  Okay.

But what was the calculation of damage?  I mean, it wasn't like Mr. Dixon just came and said:  It's 2.6 million, right?

A.   I can't tell you what Mr. Dixon said, because --

Q. I didn't ask you that.

A. -- that would violate attorney-client privilege.

Q. Right.

So, tell me how you came up with 2.6 million.

A. Like I said before, that was based on a conversations that I had with my

138

139

* CONFIDENTIAL ~ TYRONE BLACKBURN *

client, which is privileged.

Q. Yeah.

You know, I don't think you quite grasp what a privilege is, but you can't make a demand for 2.6 million without breaking it down and saying how you got to that number. You would have to do that eventually to a court --

A. Eventually.

Q. -- opposing counsel, right?

A. Eventually.

Q. So, it's not privileged.

So, why don't you tells us how you made a demand for 2.6 million?

A. Based on communications with my client at that time, which is privileged communications.

MR. TACOPINA: Okay. We're going to take a short break for the videographer's purposes.

THE VIDEOGRAPHER: We're going to go off record.

The time is 12:22 P.M.

This concludes Media Unit

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Number 1.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: We are back on record.

The time is 12:32 P.M.

And this is the start of Media Unit Number 2.

Q. Okay. Mr. Blackburn, we -- you just read your April 28th, 2025 e-mail to Ms. Moreira. You just read that into the record. The one where you said you -- you ended it by saying you're currently working on a RICO and waiting for the transcript of Pistol Pete's recording, that you'd be inserting in- -- into a civil RICO section of the complaint.

In that, you wrote that Pistol Pete was going to get "his gang of 30+ Terror Squad thugs and 'pound out'" your client.

Now, and then, you said:

"...which is code for slicing him up"..."and killing him."

* CONFIDENTIAL ~ TYRONE BLACKBURN *

You wrote that to Ms. Moreira.
You just read that into the record.

Who informed you of that accusation?

A.    Wait.  I believe that the message -- I said that there was a recording and there was a -- I was just summarizing what the -- what I believe I heard from the recording.

Q.    Okay.  So, you actually heard that recording yourself?

A.    I believe it -- I wasn't quoting what the recording says.  This was a summary of what was on that recording; from my interpretation of what was being said in that recording.

Q.    Right.

What is in quotes is the words:

"Pounded" -- "pound him out?"

Which you said was:

"Code for slicing him up"..."and killing him."

Who told you that "pound him out" is code for slicing him up and killing

him?

A.    I believe that that may be privileged communications between my client and I.  So, I can't really respond to that.

Q.    So, your client told you that?  Okay.

Because it wouldn't be privileged unless it was someone other than your client.

So, this -- did you ever listen to the tape yourself?

A.    I did hear the recording.

Q.    Yeah.

And you heard the words "pound him out," that Pistol Pete was going to get his gang and pound him out, Mr. Dixon?

A.    I think I just responded to that -- a very similar question when I said that that was my in- -- that I did not -- there were no quotes here, I wasn't quoting verbatim.  But it was my interpretation of what I heard on the recording at that time, yes.

Q.    Okay.  And in terms of -- of

142

143

what you described as "a hit," were you referring to what was alleged in Paragraph 211 of the initial complaint that you filed

on June 19th, 2025, that Pistol Pete and Rich Player contacted someone named Percy with the explicit goal of leveraging up his relationship with Mr. Dixon to facilitate a violent setup?

MR. BLACKBURN:  I will state the prior objection, which was that the court in the initial deposition that I was sitting in, stated, when we called her, that this deposition is for the Cartagena v. Dixon case and not the Dixon v. Cartagena case.

So, I will not be answering any questions that was filed concerning what was on -- in documents on the docket regarding the Dixon v. Cartagena matter.

MR. TACOPINA:  Can you just mark that statement, please, because, Mr. Blackburn, I just read the last court's transcript, there's nothing

143

144

* CONFIDENTIAL ~ TYRONE BLACKBURN *

in there that the court made any ruling --

MR. BLACKBURN:  What --

MR. TACOPINA:  -- so you must have misunderstood.  You were on medication.

MR. BLACKBURN:  You said --

you said "court transcript"?

What court transcript?

MR. TACOPINA:  Your last deposition.

Do you remember that?

MR. BLACKBURN:  No.

That was not from -- no.

MR. TACOPINA:  You're talking about the Dixon deposition?

MR. BLACKBURN:  You -- you were talking about the Dixon deposition?

MR. TACOPINA:  Oh.

MR. BLACKBURN:   I'm telling you what my understanding of what the court said during the one-hour deposition that I had prior to this one.

144

145

* CONFIDENTIAL ~ TYRONE BLACKBURN *

MR. TACOPINA:   Oh, you're talking about the one hour that we had together, you and I; correct?

MR. BLACKBURN:   I'm talking about the one-hour deposition that I was sitting in.  That's my answer.

MR. TACOPINA:  That was your understanding of that?

MR. BLACKBURN:  That was my understanding of that I was --

MR. TACOPINA:  You were on so

many narcotics that day, you couldn't even answer a question, Mr. Blackburn.

MR. BLACKBURN:  I don't -- I'm --

MR. TACOPINA:  But you have a recollection of what the court said?

MR. BLACKBURN:  -- I -- I believe that that's what she said and if I'm wrong --

MR. TACOPINA:  You are wrong.

MR. BLACKBURN:  -- and I'm not quoting her, but that's what --

145

146

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

that's what I believe I remember her saying.

MR. TACOPINA:  Okay.  You are wrong.  We're going to mark that and we'll be back again Mr. Dix- -- Mr. Blackburn.  I'm sure you probably know that.

Q.    How did you obtain that recording of Pistol Peter?

MR. BLACKBURN:  Objection; attorney-client privilege.

Q.    You know, how you obtained the recording cannot be covered by an attorney-client privilege.

Do you understand that?

You don't understand that, do you?

A.   That's my answer.

Q.   It's your answer.

A.   Sam answer.

Q.   Attorney-client privilege. Okay.

MR. TACOPINA:  Mark that.

Q.   What law school did you go to,

146

147

* CONFIDENTIAL ~ TYRONE BLACKBURN *

sir?

A.   What relevance does that have to the causes of actions in this case --

Q.   No.

I just want to understand where you learned --

A.   Which is --

Q.   -- about the attorney-client privilege?

A.   -- which is dealing with two alleged defamatory statements that your client claims were defamatory --

Q.   Um-hum.

A.   -- as detailed in -- in the second amended complaint, Paragraph 132 --

Q.   Um-hum.

A.   -- which I believe is a April 30th, 2025 post and a May 2nd, 2025 podcast.

Q. Where did this recording between Pistol Pete and Percy supposedly take place?

A. I -- I -- again, that -- that would be privileged communications between

147

148

* CONFIDENTIAL ~ TYRONE BLACKBURN *

my client and I.

Q. Where a recording took place with two people who's not your client or you is privileged; is that what you're saying?

A. That is a privilege -- because you're asking me where a recording --

Q. I --

A. Well, one, I don't -- again, it has to do with my client. My client gave me some information and that's privileged communications. I'm not providing that information because it's privileged.

Q. All right. So, that's your answer to the question: When did the recording supposedly take place?

A. Privileged communication with my client.

Q. Oh, okay. And how do you know that that record- -- recording is authentic, not made up by AI? How do you know that?

A. Again, privileged communication

with my client.  Same answer.

148

149

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    So, your client was able to authenticate a recording that he wasn't a party to?

A.    Same answer.

Q.    What's the answer?

A.    Privileged communication.

Q.    It's really not, Mr. Blackburn, but you can just keep --

A.    I know.

Q.    -- saying that.

So, eventually there will be 12 people or 6 jury in front of you, and, you know, if you want to play that game all day, you could do it.

That's your answer:  Is privileged communication, the authenticity of a tape?

A.    Same answer.

Q.    Okay.  So, after receiving your April 22nd, 2025 e-mail, Ms. Moreira e-mailed you back at 2:24 that same day saying that the:

"...information is totally false and, unfortunately, in line with the

149

150

* CONFIDENTIAL ~ TYRONE BLACKBURN *

other untrue and defamatory statements made about Fat Joe."

MR. TACOPINA:  And that is Exhibit 9, Page 17 of the e-mail from Ms. Moreira to Mr. Blackburn.

Can you just put that up there?

MS. LANZONE:  Yes.

MR. TACOPINA:  Yep.  There it is.  It's up there.

Q.    Okay.  That is Exhibit 9.

In response to that, you e-mailed Ms. Moreira back that same night at 8:57 writing:

"My client has hundreds of photo, audio recordings, and several witnesses who have already provided statements to confirm his claims. Including a statement from a woman who was 15 years old when she was involved with your client, and she has photos and other evidence to substantiate."

Did you see those photos that you just referred to in that letter?

A.    Again, that is a -- that I see

150

151

* CONFIDENTIAL ~ TYRONE BLACKBURN *

what words -- what --

Q.    Are you listen to me?

A.    I'm listening.  I'm just trying to --

Q.    What -- what are you reading, sir?

A.    I'm trying to -- I'm trying to --

Q.    Okay.

A.    I'm trying to gather my thoughts and figure out what you're asking.

Q.    I'm going to ask you again.

A.    Because you just did a whole entire thing and then you like...

Q.    Did a whole entire thing?

A.    You just like --

Q.    You mean I read a question?

A.    Like it was just like you just tra- -- like a trailing statement and then you dropped the, like, generic question t the end.

I'm trying to figure out --

Q.    Well, maybe if you stop reading --

151

152

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    I'm listening.

Q.    -- the notes in front --

A.    I'm listening to you.

Q.    -- of you, Mr. Blackburn.

A.    I'm listening to what you're saying.  I'm trying to figure -- trying

to --

Q.    I'm going to ask it again.

A.    -- understand what you're saying.  Thank you.

MR. TACOPINA:  So, now I'm going to make a request for the documents in front of you.

Q.    You know that anything you use to refresh your recollection, is discoverable and you have to disclose it.  So...

A.    Well, I'm not -- I'm not -- I'm not discussing to reflect -- I'm not reflecting my recollection of anything, so that's --

Q.    Not reflecting, refreshing.

A.    No, nothing is -- is refreshing my recollection.  I am just trying to

152

153

* CONFIDENTIAL ~ TYRONE BLACKBURN *

figure out -- I'm trying to under- -- I'm listening to what you're saying, so I'm trying to understand the question.

You did a whole entire statement, and then you just trailed on and -- and dropped a question at the end.  So, I am trying to parse through all of the things that you were just saying.  So, just ask the question again.

Q.    Sure.

And, again, I'm going to ask you:  What is it that you're reading in front of you?

Because we're entitled to it. You know that, right?

A.    No.

This is work product.

Q.    It's work product?

A.    Yes.

Q.    Okay.

A.    It's not --

Q.    You know you're testifying as a witness today, right, not an attorney?

A.    Okay.  Ask your question,

153

154

* CONFIDENTIAL ~ TYRONE BLACKBURN *

please.

Q.    I'm making a request for those documents.

You're refusing, right?

A.    Okay.  Yes, I'm refusing.

Q.    Okay.  So, here we go.  I'm going to ask the question again.  See if you can hang with me on this one:  I'm reading you your words back, okay, to Ms. Moreira on April 22nd, 2025, at 8:57. Here's what you said --

A.    Where is the document?  You -- you -- you're -- you're --

Q.    It's Exhibit 9.  It's right up

on the board. If you can't see it --

A.   That's not -- that's not on the board, actually. So -- so, you're -- you're -- you're completing misstating what's on the board.

Q.   Oh, you got me.

A.   That's what --

Q.   Well, I actually think it is on the board, Mr. Blackburn.

Can you see the board?


154


155


* CONFIDENTIAL ~ TYRONE BLACKBURN *

I thought you couldn't see the board.

A.   No.

Q.   No what?

A.   That is not -- it looks like a letter. That's what I'm saying.

Q.   It's an e-mail.

A.   She just zoomed out to show that it's an e-mail.

Q.   Correct, which is what I said.

A.   Which is why I said I do not know what it is that you're reading.

Q.   Holy Name Christ. I thought you couldn't see the board before.

A.   It was zoomed in, and it looks like a letter. It doesn't look like an e-mail.

Q.   Here is my question to you --

A. You asked me a question about an e-mail --

Q. Yes, which is what that is?

A. -- and looking on the board -- no. When it was zoomed in, like I just shared with you, it looks like a letter.

155

156

* CONFIDENTIAL ~ TYRONE BLACKBURN *

So, I'm -- I'm asking to see --

Q. It looked like a letter?

A. Because I could not see.

Q. Okay.

A. All right. Send me --

Q. Okay.

A. Send me -- let me see the document so I can --

Q. No.

I got an answer to the question.

A. I cannot see the --

Q. You could -- you could see the board now, right?

A. I cannot see the board. I said to you from --

Q. Okay. So, right here, I'm going to read this to you again. Okay?

A. You can read it to me. I need to read it to myself to verify what it is that you're asking me the question about.

Q. I mean, here -- okay. Here's

what you said, and then I will show it to
you:

156

157

* CONFIDENTIAL ~ TYRONE BLACKBURN *

"My client" you wrote to

Ms. Moreira on April 22nd, Page 16:

"My client has hundreds of

photos, audio recordings, and several

witnesses who have already provided

statements to confirm his claims.

Including a statement from a woman who was

15 years old when she was involved with

your client, and she has photos and other

evidence" substantiating "it."

You wrote that to Ms. Moreira.

Here it is in your e-mail (handing).

Do you see that right there,

that one paragraph?

(Witness reviews document.)

Q.   Mr. Blackburn, you can waste as

much time as you want.

A.   I'm not wasting time.

Q.   I'm asking you a specific

question --

A.   I'm trying to see --

Q.   -- about an e-mail you sent to

Ms. Moreira on the date.  I have the page

open to it.  I'm asking you about a quote

157

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

in an e-mail.

A.    Oh, yeah, right.  So -- so, my response to that is:  I'm going to insert an objection under -- because this is a settlement communication protected by FRE 408.  States here:

"For settlement purposes only."

THE COURT REPORTER:  I didn't hear what you said.

A.    It says:

"For settlement purposes only."

The substance of counsel-to-counsel settlement conversations is protected by Federal Rules of Evidence for asserted work product.  I'm not going to detail what was said in any settlement conversations with Ms. Moreira.

Q.    Oh.  Well, Mr. Blackburn, you see, it's not protected from discovery. You can't say "work product," because she sent it to our counsel in this case.

And more importantly, you simply just read an e-mail into the record before about that paper.

159

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

A.    I don't believe -- I don't

believe that that was part of that same train.

Q. You don't believe it was part of that same what? Train?

A. Train of communications.

Q. You mean chain?

A. Train, chain.

Q. Chain, train, claim are. Okay. So --

A. This is becoming abusive, Mr. Tacopina. It seems like you're trying to harass me here.

Q. Oh, I'm sorry, Mr. Blackburn. I mean, I think you did call my partner a transgender last time. I think you said something about his mother --

A. I don't know -- I don't know what you're --

Q. -- swallowing, and you're actually saying that I'm being harassing to you and abusive?

A. I don't -- I don't recall.

Q. You don't recall?

159

160

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A. No.

Q. You don't recall that?

Were you on medicine that day, too?

A. I actually was, yes.

Q.    Yeah.

Okay.  You forgot to mention that to the court, I guess.

A.    No.

Actually, I -- I told the judge that on my -- I think I said it in my letter on the 5th, when I asked for a delay in the --

Q.    Um-hum.

A.    -- in these proceedings until I -- I was off my medication.

Q.    But you're off it now, right?

A.    Oh, I am, yeah, now, definitely.

Q.    Okay.  And the medication was for that surgery you said you had, right?

That's why you had to delay the depositions; correct?

A.    Same response as I said earlier

160

161

* CONFIDENTIAL ~ TYRONE BLACKBURN *

regarding questions regarding my health, which is:  I'm not going to be providing no answers, particularly if it's irrelevant, it's harassing, and I will not answer.

Q.    Well, no, but except you used your medical condition to not show up for deposition, so -- and then you went on a cruise, remember?  So, I get to ask you about that stuff, Mr. Blackburn.

Q. Do you recall the procedure that you had?

A. No.

What does that have to do with the claims for defamation? I believe your client is alleging that I defamed him on April 30th, 2025 and on May 2nd, 2025.

Q. So, my question is: The things that you claimed in the letter that you sent to us --

A. You're yelling again.

Q. No, I'm really not, Mr. Blackburn.

A. You are. You're yelling.


161


162


* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q. The things that you put -- the good thing there's a videotape here that will determine if I'm yelling.

A. Well, not --

Q. This would be yelling.

A. See?

Q. That's what I wasn't doing.

A. That's -- that's -- that's abusive.

Q. That's what I wasn't doing.

A. That's abusive.

Q. I'm just trying to give you a distinction.

A. No, yo need a distinction.

Q. It's a little bit difficult.

A. Yo need a distinction.

Q. So, anyway, this --

A. I think that this is becoming extremely abusive.

Q. I'm sorry.

A. So, I'm -- I'm --

Q. From the guy who said his mother should have spit out instead of swallowed to my co-counsel.


162


163


* CONFIDENTIAL ~ TYRONE BLACKBURN *

A. I -- I don't -- I don't remember saying that.

Q. Well, there's a videotape of you saying it, so that's a good thing.

A. I was on medication, so I don't know.

Q. Oh, that medication has really caused you to be a horrible person, then, I guess, if you say that.

A. Well, I'm off of it now, and I am pretty calm, so I don't know --

Q. So:

"My client," you said, "has hundreds or photos, audio recordings..."

And then, there's a 15 year old who she was involved -- he was involved with who has photos and other evidence.

That's what you wrote to us.

Here is my question:  Have you ever seen what the 15 year old had?

A.    I -- and this is regarding -- which e-mail was this?

Is this an e-mail or a letter?

Q.    You just read this thing.  It's

163

164

* CONFIDENTIAL ~ TYRONE BLACKBURN *

an e-mail.

A.    Our -- okay.  So, the same answer as I did before, because this was a settlement conversation, settlement communication, so I am -- I am not going to be able to answer this question.

Q.    Did you just cite the law that you're using to say that this is a settlement conversation so you can't answer a question in a deposition?

A.    This was a part of a -- a settlement communication, where we were discussing, I believe, possible mediators and others things.  So, it was just a back-and-forth between Ms. Moreira and I at that time.

Q.    Right.

But you wrote facts in there, making allegations, so you have to answer the questions about the facts that you wrote.

You understand that, right?

A.   Settlement communications, so we were discussing potential resolution of

164

165

* CONFIDENTIAL ~ TYRONE BLACKBURN *

this matter, and we were going back and forth concerning possible mediators to resolve this case.

Q.   Okay.  That's your position, that's your -- your statement.  That's fine.

MR. TACOPINA:  Please mark that for a later ruling.

Q.   But the things that you referred to in this settlement communication, have you produced any of that in discovery?

That's just a yes-or-no question.

A.   I -- I don't -- I don't recall. I don't have the discovery productions in front of me.

Q.   Okay.  Do you intend on using any of that at trial, what you just -- what I just read to you, the things that you're citing is settlement communication protected?

A.   I -- I don't -- I don't -- I don't know what -- I can't answer that.  I

* CONFIDENTIAL ~ TYRONE BLACKBURN *

don't know what's going to be used.

Q.    Really?  You don't know?

A.    No, I don't.

Q.    Okay.

A.    Not right now.

Q.    So, after this e-mail we just discussed that you're not answering questions in a deposition on as a witness because you're citing some sort of a settlement privilege which doesn't exist in any universe, I want to ask you some questions about the phone call that you had with Ms. Moreira on April 23rd.

A.    Same thing.  Same -- same -- same -- same response would be for those questions.

Q.    Oh, you're not going to answer any questions?

A.    So, I mean -- I mean, conversations that I had with Ms. Moreira were based on settlement conversations.

Q.    Um-hum.  So, you're not going to answer any questions about the recorded conversations you had with Ms. Moreira?

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    Well, I -- I never -- I don't know about the -- the -- the -- the delivery of any recorded conversations.

But what I'm saying is:  The communications that I had with Ms. Moreira, at least my understanding of those communications when I was having them with her, were to come to a resolution and to explore the claims and responses to those claims that my client has, and her -- and her client's responses under the guise and context of possible mediation and a possible resolution to -- to the conflict prior to any lawsuit being filed.

Q.    Okay.  So, did you say you don't know about any recordings?

Did you say that?

A.    I said that I do not know about any authenticity of any recordings that Ms. Moreira may have or may not have made, so I can't answer that.  We have not played anything, so I cannot speak to those things.

Q.    Well, how about the recordings

167

168

* CONFIDENTIAL ~ TYRONE BLACKBURN *

that you made, Mr. Blackburn?  How about those?

A.    What recordings are you talking about?

Q.    The recordings of your conversation with Ms. Moreira.

A.    I have not --

Q.    Did you record a conversation with her?

A.    Did I?  I may have.  Yo -- I don't know.  I don't know.

Q.    You may have?  Okay.

Well, let's show you Exhibit 13 to clear up whether you may have or, in fact, you did.

(Whereupon, Plaintiff's Exhibit 13, PREVIOUSLY MARKED:  Blackburn and Joe Tacopina e-mail chain, was tendered.)

MR. TACOPINA:  Pull up 13, please.

Q.    This is an e-mail from you to me.  On Page 3, you wrote:

"Extortion?  I am the wrong

168

169

* CONFIDENTIAL ~ TYRONE BLACKBURN *

person to play this game with.  I have recorded every conversation with Erica."

So, was that a lie that you told me in that e-mail?

A.    What date was that?  4/29?

Q.    That was --

A.    I can't see.  I can't see.

Q.    Well, I'll answer your

question. 4/29/2025.

(Witness reviews document.)

A.   I believe -- I believe I did,
yeah.

Q.   I'm sorry.  You believe you did
what?

A.   According to that e-mail, I
believe I did, yeah.

Q.   So, you did record every
conversation with Ms. Moreira?

A.   I believe I did, yeah.

Q.   Did you turn that over in
discovery?

A.   I'm not sure I did.  I don't --
I don't know what was produced.  I don't
have any of that in front of me right now,

169

170

* CONFIDENTIAL ~ TYRONE BLACKBURN *

I can't answer that.

Q.   Okay.  Do you remember, on your
call with Ms. Moreira that you recorded,
you told her that:

"I have definitely seen the
videos where Mr. Cartagena's voice is heard
in the background, where Mr. Dixon is
engaging in sex acts and Mr. Cartagena is
behind camera or someone is behind the
camera, but Cartagena is in the room."

Was that true when you said
that on that call?

A. I don't recall any conversation

with Ms. -- Ms. -- Ms. --

Q. Moreira.

A. -- Ms. Moreira, because I don't have -- again, this is almost a year ago, and I don't have any notes or anything regarding those conversations.

Q. Okay. We're going to play it, then, your conversation with Ms. Moreira.

MR. TACOPINA: Go ahead.

(Audio playing in background.)

A. It sounds very choppy. I

170

171

* CONFIDENTIAL ~ TYRONE BLACKBURN *

don't...

Q. Well, you said that to Ms. Moreira.

Was that true when you said that?

A. Well, one, I don't know -- I can't authenticate this -- this recording, so I -- I can't -- I don't know what or where this -- this recording originated from.

And I believe that we did have conversations concerning some of the claims that my client was having that my client had against Mr. Cartagena.

I do believe she was giving me some responses and she was going through

what -- some of the things that my client may have showed him.  But I'm not a hundred percent -- I don't remember that part of the conversation, and I can't really authenticate this recording because I didn't make this recording.

Q.    So, you think -- you're understanding of an authentication process

171

172

* CONFIDENTIAL ~ TYRONE BLACKBURN *

is you have to make the recording to be able to authenticate it.

Is that what you think?

A.    Well, I'm saying is I can't -- I don't know where this recording came from.  I don't know how the recording was made.  I don't know the ownership chain of this recording.  So, that's why I'm having difficulty with -- with answering this.  I don't want to misstate anything.  I don't have -- like, it's just --

Q.    So, are you saying under oath that you don't know if that's your voice?

A.    Well, I -- so, what I said earlier is that it sounds very choppy.  So, again, I don't know what was used to record this thing.  To authent- -- it is very hard for me to -- to -- to -- to say clearly, and I don't want to misstate myself or misstate anything.  So, that's -- that's

what I'm saying.

Q.   So, you're not sure it was your voice, the voice you just heard?

A.   I mean when you played it, it's

172

173

* CONFIDENTIAL ~ TYRONE BLACKBURN *

very choppy.  I cannot -- it's actually breaking up, so that's what I'm saying. It's not a clear recording at all, actually.

Q.   So, if a jury were here, that's what you would say, you would say that voice recording was breaking up --

A.   I am talking about -- see, we're not -- we're not -- you're talking about the jury.  I'm not talking about the jury.  I'm talking about --

Q.   Because that's what's eventually going to happen, Mr. Blackburn, so your answers now get played in front of them.  I don't know if you know that process.

A.   I am talking -- I am talking about what I'm hearing presently, sitting here, based on the equipment in the room, and what you just played.

So, I'm saying that what I'm hearing sounds extremely choppy, so if you have a clearer recording that you can play that doesn't sound that way so I can

* CONFIDENTIAL ~ TYRONE BLACKBURN *

clearly hear what's being said, I will try to evaluate that.

Q.   You know this was turned over to you in discovery, right, or do you not know that?

A.   Again, to the same reference of questions regarding discovery.  I do not have the discovery documents or discovery or anything in front of me, so I can't recollect what all -- all what was turned over, right.

This is -- you're asking me to try to remember thousands of documents and thousands of -- or hundreds, I should say, different things that you sent.  I don't remember this particular thing at all, actually.

Q.   Okay.  So, now I'm just going to ask you a straight question about a recording or authentication.  Here is a simple question:  Have you, Tyrone Blackburn, seen videos where Mr. Cartagena's voice is heard in the background where Mr. Dixon is engaging in

sex acts and you could see Cartagena in the room?

A.   I'm going to have to assert the same privileged -- attorney-client privilege, as I answered earlier.

And I'm going to also say that this question is not relevant to the scope of the claims remaining in this litigation, which is your client's claim that I defamed him as of April 30th, 2025, as well as his claim that I defamed him on May 2nd, 2025.

Q.   So, you just cited -- I just want to make sure we have this for the record because we're going to have to speak to the judge about this.

I asked you if you observed a video in which Mr. Cartagena was on it, and Mr. Dixon was committing -- engaging in a sex act, and you saw Mr. Cartagena in the video, and you just cited attorney-client privilege.

Is that what you just said?

A.   Well, I mean, I -- I would also a -- a -- cite attorney work product

175

176

because the nature and scope of my pre-filing investigations and litigation preparations, I believe, are protected.

So, whatever I did in preparation to prepare my client's case and to investigate the validity of his claims, I believe, are all protected.

And that has to do with the Dixon v. Cartagena matter and not the Cartagena v. Dixon case, which is I believe what we are here to discuss.

And like I said before, your client has made two claims claiming that I defamed him on April 30th, 2025 and May 2nd, 2025 so...

Q.   Okay.  So, your answer is that you don't -- you refuse to answer a question whether you saw a video evidencing your client engaging in sex and Mr. Cartagena being in the room, based on attorney-client privilege and work product. Got it.

MR. TACOPINA:  Please mark that.

176

177

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   You were served with a request for document productions dated October 29, 2025 which requested that you produce all video recordings:

"...about, referencing, supporting, contradicting or otherwise evidencing the truth or falsity of the

sexual misconduct" mentioned in your complaint.

Despite claiming to have definitively seem them, including in that video, you didn't produce any videos of Mr. Dixon supposedly having sex with Mr. Cartagena in the room, did you?

A.    Well, the production was, I believe, for the Cartagena v Dixon matter, not the Dixon v Cartagena matter.

And I think that that question led into discovery for the second case, which I believe that this court stayed discovery on.

So, I'm not sure how that question was relevant or that request was relevant to this present litigation.

177

178

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    Well, we have explained at least a half a dozen times why it is and what the court ruled on that regarding any of these claims, and the certainly extortion attempts are relevant to Mr. Cartagena's argument.

A.    No.

I think -- I think --

Q.    You're trying to deny the litigation privileges, not protecting Mr. Blackburn's statements.

A.    The question was regard -- and the statements that I believe the court was referring to was the April 30th, 2025 and the May 2nd, 2025 statements that are remaining in this case regarding the alleged defamatory statements.

I don't believe that the court's opinion had anything to do with any settlement communications with Erica Moreira or any other potential work-product investigations that you are trying to delve into right now.

Q.    Okay.  So, in discovery, you

178

179

* CONFIDENTIAL ~ TYRONE BLACKBURN *

have to produce your evidence.  I'm sure you probably know that.

So, the reason you didn't produce this video that you claim to have seen is because they don't exist, right, Mr. Blackburn?

A.    No.

I said earlier -- and I think you're misstating prior -- prior -- prior testimony -- is my statement is -- well, my answer to this particular question is that the court stayed discovery in the Dixon v Cartagena matter.

And any -- anything that stems from any kind of items or documents that

are used to draft Mr. Dixon's complaint

would be discoverable within the Dixon v

Cartagena matter.

And from what the court said, she's not -- you know, we're not allowed to do discovery in that case.

So, I'm not -- I could not -- whatever I used, whatever I saw, whatever was produced to me from my client relates

179

180

* CONFIDENTIAL ~ TYRONE BLACKBURN *

to the filing of that litigation and nothing to do with the two statements that I am accused of making in this case on April 30th, 2025 and May 2nd, 2025.

Q.    Okay.  So, you're again misstating what the court ruled.  The court never ruled what you just said for the fifteenth time.

But, also, my question is this: You were hit with a request for production in this case, in this case?

A.    You're yelling again.  You're yelling again.

Q.    You were hit with a request for production, okay, Exhibit Number 5, by the way, Number 1 on Page 8, and the production -- production request was for documents.  And that was defined as including video recordings, sexual

misconduct claims defined on Page 3, including any allegation plaintiff --

A.   I don't see anything.  It's just --

Q.   You don't see anything?

180

181

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Just listen to my question, man.

A.   No.

Q.   Just look at my question.

A.   You're yelling again.

Q.   I'm not yelling again.

Listen to my question.

A.   See, now -- now -- now you're being -- you're mocking me, you're being aggressive.

Q.   Again, from the guy who told my partner --

A.   You're.

Q.   -- that his mother should have spit out instead of swallowed, right, a mock transgender.

A.   I -- I -- I don't -- and I believe -- I believe that was probably the medication.

Q.   Oh, okay.

A.   And if it was said, then, you know, I apologize to your -- to your partner regarding that.  It was not

intentional.

181

182

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   You were on medication that day, too?

A.   I was, like I said.  I answered that question, too.

Q.   And you drove your car home after that, huh?

A.   Did I?

Q.   Yeah, you did.

A.   I don't -- I don't remember.  I think I -- I may have.  Yeah, maybe.  I don't know.

Q.   Yeah.  Well, it's scary.

So, anyway, we made a request for production of this video in this case. You didn't say:  I'm not turning it over, it's not part of this case, you didn't reply that, did you, Mr. Blackburn?

A.   Yo -- if you're reading something or you're referencing it in the document, I think you should probably share it with me so I can know what you're saying.

You're asking me a question about a document from months ago.  I don't

182

183

* CONFIDENTIAL ~ TYRONE BLACKBURN *

have it in front of me.  I don't know.  I can't just guess.

But what I'm telling you now is that any material or work product that was produced or any -- or -- or was a part of my investigation of Mr. Dixon's claims are protected and are not relevant to the two defamation claims that was made against me in this case, which was an April 30th, 2025 Instagram post and a May 2nd, 2025 podcast appearance, apparently.

Q.   So, you know those videos don't exist, right, Mr. Blackburn?

They don't exist, do they?

A.   Again, again, my response --

Q.   That's a yes-or-no answer.

A.   Again, my response --

Q.   It doesn't give you cause to have a speech.

It's yes or no.

Do they exist or not?

A.   This is -- this is harassing. I have to be able to answer the question.

Q.   Well, you're not answering the

183

184

* CONFIDENTIAL ~ TYRONE BLACKBURN *

question.  That's the problem with you.

A.   I am answering the questions.

Q.    You're flipping through pages, reading something.

A.    I am not flipping anything. I'm just holding --

Q.    You're not flipping?

A.    I'm not flipping. I'm just holding -- holding papers, and I am answering your question.

Q.    Does the video exist: Yes or no?

A.    The answer to that question is the same I gave before, which is that: I cannot discuss work product or anything that dealt with my investigation and communications with my clients because that was in anticipation of the filing of the Dixon v. Cartagena matter and we are currently in the Cartagena v. Dixon case and that's what this deposition is about --

Q.    Okay.

A.    -- which is the two defamatory statements that your client alleged were

184

185

* CONFIDENTIAL ~ TYRONE BLACKBURN *

defamatory to him.

Q.    Okay. And what were those two defamatory statements?

A.    I think he may have said something about posts on an Instagram from April 30th, 2025, and --

Q.   What was it?

A.   -- I believe --

I don't have the actual quote in front of me.

And I believe it was a May 2nd, 2025, I recall it was a podcast, again...

Q.   So, that big Instagram post that I showed you before, which is Exhibit 5, that's one of them.

You then talk about a pattern in your Instagram, what you're being sued for, Mr. Blackburn.

A.   You're yelling again.

Q.   ..."two" -- "two females discuss your client's disgusting pattern of grooming and sleeping with 16-year-old children."

You actually wrote that.

185

186

* CONFIDENTIAL ~ TYRONE BLACKBURN *

What evidence do you have of that --

A.   I don't --

Q.   -- in this cause?

A.   I don't -- I don't know what you're -- what you're referencing.  You haven't pre- -- presented an exhibit or anything in front of me.

Q.   No.

I did present it.  We read it

before.

A.   No.

Q.   It's Exhibit 5.

A.   What was -- what his last --

Q.   It's your --

A.   -- question, please?  Because I don't think he said an exhibit in the question.

Q.   I'm going to ask the questions.

A.   You're yelling -- you're yelling again.

Q.   Yeah.

I am yelling.

A.   And you're pointing --

186

187

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   Because now you're --

A.   -- and --

Q.   -- starting to be an obstructionist.

A.   I'm not.  I'm asking --

Q.   If you want we'll go to the court right now.

A.   I'm asking --

Q.   You have a history with this court of being obstructionist --

A.   You're yelling.

Q.   -- being --

A.   I feel threatened.

Q.   -- sanctioned --

You feel threatened?

A.    Yes.

You're -- you're lea- -- leaning --

Q.    Oh.

A.    -- over the table, sticking your hand in my face.

Q.    There's a video right there. You know that, right?

A.    But you're leaning and your --

187

188

* CONFIDENTIAL ~ TYRONE BLACKBURN *

and your -- and your -- and it looks --

Q.    There's  video.

A.    -- and you're inching closer.

I was asking --

Q.    You're a clown.  Does that --

A.    You just called me a clown?

Q.    I did.  I called you a clown.

A.    Okay.  That's --

Q.    Because you are.

A.    Okay.

Q.    I mean, you're being sanctioned in every court you ever appeared in.

A.    Okay.

Q.    You're under indicted for running over our process server.

A.    Well --

Q.    You told him his "mother should spit instead of swallow"?

A. I don't know remember saying that.

Q. I don't care if you remember. There's a video of it.

A. You're yelling and screaming at me.

188

189

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q. Okay.

A. And that's abusive.

Q. I know you're not going to be around much longer in this business, so you might as well try and go out with some dignity, so why don't you try and answer some questions. Okay?

You made an Instagram post --

MR. BLACKBURN: I'm asking the court reporter if she can respond to a -- if you can just show me where in the last question he asked regarding some Instagram post, did he cite what the exhibit was? I don't know what he's reading from. That's why I'm asking you.

MR. TACOPINA: When I told it, I said this is Exhibit 5.

MR. BLACKBURN: No.

I didn't -- I don't think that that's what you said.

MR. TACOPINA: Okay.

(Whereupon, the referred to Question was read back by the

189

190

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Reporter:

"QUESTION:  So, that big Instagram post that I showed you before, which is Exhibit 5, that's one of them.

"You then talk...")

MR. BLACKBURN:  I didn't hear -- I didn't hear the exhibit.

Thank you.

Q.    Okay.  So, now, I'm going to read you Exhibit 5, which one of the claims of -- of defamation you're being sued for. You wrote to me:

"You ran and filed a baseless lawsuit against my client in the SDNY, alleging defamation and intentional infliction of emotional distress in an attempt to get ahead of the forthcoming lawsuit against your client @fatjoe.  No matter how hard you try to deflect and cherry-pick e-mails and conversations, your client has a lot of explaining to do.  I invited you and me to meet with the SDNY prosecutors, but you have yet to respond.

190

* CONFIDENTIAL ~ TYRONE BLACKBURN *

You can bring the 19-minute audio recording of your client's felonious henchmen, Pistol Pete, soliciting a former member of Terror Squad to lure my client to a specific location for Pistol Pete to 'pound him out.'  Your client, @fatjoe, ordered a hit job against my client.  Pistol Pete also discusses how he had to run down on @tonyyayo a member of @gun-" --

MR. TACOPINA:  I can't read that.

Q.    -- "gunitbrands due to some fued" -- fueled -- you wrote fued, but you mean feud -- "feud with @50cent and run up"..."clubs to that attack other victims. Your client should also prepare to answer questions supporting two additional recordings where two female discuss your client's disgusting pattern of grooming and sleeping with 16-year-old children."

Is that your statement that you publicized that you are being sued for?

Now, I get to ask you what evidence do you have of Mr. Cartagena

* CONFIDENTIAL ~ TYRONE BLACKBURN *

grooming 16-year-old children?

You say you have recordings,
which recordings are those?

A. I'm not really sure what

specifically -- so -- let me see the --

the --

MR. TACOPINA:  Do you have an

extra copy?

A. -- the exhibit.

Q. (Handing.)

(Witness reviews document.)

A. Oh, I think -- so -- so, it was

the last question, the last sentence here

you're asking about:

"Your client should also

prepared to answer questions surrounding

two additional recordings where two

females...."

Okay.  Those were, I believe, a

part of the -- the -- the document that my

client provided to me.

And stuff that he had -- he had

in his possession, those -- those two

recordings that I'm referring to was part

192

193

* CONFIDENTIAL ~ TYRONE BLACKBURN *

of my investigation.

And so, the same answer that I

made before regarding my preparation and my

work product for the filing of Mr. Dixon's

claims would apply to those recordings.

Q.   Yeah.

It really wouldn't because you put this into the public domain.  You see you waived your work product privilege, if there every won was -- was one, which there wasn't.

But you waived it when you make an Instagram post to the world to say that you had these two recordings of -- of females discussing Fat Joe's pattern of grooming and sleeping with 16-year-old children.

So, now that you waived that, because you made Instagram posts, and are being sued for defamation based on this post, where are the recordings?

A.   I don't think that I waived anything because I didn't talk -- I didn't identify anyone in -- I -- I didn't

193

194

* CONFIDENTIAL ~ TYRONE BLACKBURN *

identify who the -- who the recordings were of.

I just spoke in general terms of -- of recordings existing.

So, again, I'm going to reassert the same privilege as I stated before.

MR. TACOPINA:  Please mark that.

Q.   You said here that you have recordings of two females discussing Joe's disgusting pattern of grooming and sleeping with 16-year-old children, the fact that you didn't name who they are doesn't protect this document, you put this out there publicly.

So, my question to you is: Where are the recordings?

A.   Same -- same answer as before.

Q.   How about the 19-minute audio recording of Pistol Pete?

See, you do name that recording, the person in that recording.

So, where's that 19-minute

194

195

* CONFIDENTIAL ~ TYRONE BLACKBURN *

recording of Pistol Pete?

A.   So, the Pistol Pete recording, I believe I turned over copies of that as part of my disclosures here.  I'm not certain because I don't have my files in front of me, and I can't really say 100 percent.

So, I don't want to be inaccurate with that.

Q.   So, according to your complaint, you mention --

A.   I don't have a complaint, but go ahead.

Q. You see, yeah, I think you understand what I'm saying --

A. I don't. I don't.

Q. -- when you, as a lawyer file --

A. I don't. I don't.

Q. You don't understand it?

A. No.

Q. I'm going to explain it to you.

A. I just want to be clear.

Q. I'll explain it to you. Okay.

195

196

* CONFIDENTIAL ~ TYRONE BLACKBURN *

I'll explain it to you.

When you file a complaint and you author a complaint on behalf of the client, it's your complaint.

So, according to the complaint you filed on behalf of Mr. Dixon, you identified your initial complaint -- in your initial complaint:

"A minor Doe Number 2 who is married to a professional athlete."

MR. BLACKBURN: Again, I'm going to assert the same objection that I stated earlier regarding the Dixon v. Cartagena complaint which the judge says: There shall be no discovery on.

Q. You know the judge didn't say

that?

A. She did. We have --

Q. She did not.

I think your medication probably kicked in high?

A. You didn't appear at that hearing, so I'm --

196

197

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q. Well, you just said you had medication. You don't remember saying he -- "his mother should" --

A. I'm talking about --

Q. -- "have spit instead of swallow."

A. Again, like I said before: I was on medication during that deposition concerning those statements.

I apologized to your colleague for whatever was said while I was under medication.

But what I would say is that the -- I believe that there was a court appearance that happen we had earlier, it may have been early September or something like that, where the court said that the discovery on the Dixon v. Cartagena matter is stayed.

So, until she resolved the forthcoming motion to dismiss, because I

did make an application, I believe, at that

time to engage in -- in discovery, as we

engaged in discovery for the Cartagena v.

197

198

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Dixon matter and she denied that request.

So, what I'm saying is that I

believe the last question that you asked me

relates directly to the Dixon v. Cartagena

matter, and from what I understand, the

discovery in that case is not ongoing and

that question is not proper for the issues

raised in this case concerning defamation

that your client alleged I made.

Q.    Okay.  It's exactly relevant

because in the defamation claim -- and we

just showed you Exhibit 5 -- you're

claiming that minors were involved.

By the way, you claimed that

publicly.  Yesterday, you filed an amended

complaint.  You withdrew any allegations of

Mr. Cartagena being involved with any

minors; correct?

A.    Again, you're talking about the

Dixon v. Cartagena matter, and we're here

to discuss the Cartagena v Dixon matter,

and we're here to discuss the -- the -- the

alleged claims of defamation that your

client -- your client raised.

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q. Thank you, Mr. Blackburn.

One of those claims were you posted something saying that my client was grooming and sleeping with 16-year-old children, yet yesterday you withdrew that part of the complaint?

A. Same answer as before.

Q. Are you reading something interesting?

A. No.

Q. Oh.

A. I'm just saying: Same answer as before.

Q. Okay.

A. That's my answer.

Q. That's your answer.

So, one of the minor's is someone named Nicole, this Norweigian woman named Nicole.

Did you ever speak to her?

A. Again, if you're asking me about any work that I have done regarding my preparations or my investigations concerning Mr. Dixon's lawsuit and his

* CONFIDENTIAL ~ TYRONE BLACKBURN *

claims, I will assert my product -- my work-product objection, and I will not be be answering those questions.

If you have questions pertaining to the April 30th, 2025 alleged post and the --

Q.   That exists?

A.   -- and May 2nd, 2025 podcast allegation.

Q.   Um-hum.  So, you think if you spoke to a witness, that's covered by work product?

A.   Again, we're talking about a different lawsuit.

Q.   No, we're not, sir.

A.   You're talking --

Q.   Because you mention in the lawsuit that you're being sued for it.

A.   I never mention --

Q.   You mentioned this post, that he had sex with minors.  You're being sued for that.

So, now I'm asking you:  Which minors did you speak with?

200

201

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Because you're being sued for this, sir.

A.   I -- I -- again, I'm going to assert the same -- same privilege I said

before, same answer.

Q.    I think you're getting some bad AI information about what privilege is, but I guess if you want to keep asserting it, keep asserting it.

How about Minor Doe Number 3 that you discussed?

A.    Again, you're asking questions regarding what was filed in a lawsuit that I believe the court stated we are not to do discovery on, and I think during the first deposition that I had when you called the court, she said that -- that this is about Cartagena v Dixon and not about Dixon v Cartagena.  That's what she said during my call.

We can check the transcript from the last -- the last deposition, but I believe that that's what she said.  So, I cannot answer any questions regarding what

201

202

* CONFIDENTIAL ~ TYRONE BLACKBURN *

was filed or wasn't filed in Dixon v Cartagena.

Q.    You know that fabricating evidence constitutes extortion, right?

Do you know that?

That's just a question.

A.    I am not sure what the elements of extortion is.

Q.    You don't know?

A.    So, there's no extortion claim present in any case, so I don't know.

Q.    Yeah.

      But, again, let me remind you what the judge said only two weeks ago. There was an opinion that she wrote, and she held that extortion attempts are relevant to Mr. Cartagena's attempt -- argument as to why the litigation privilege does not protect Mr. Blackburn's defamatory statements.

A.    You're yelling again.

Q.    I was not yelling.

A.    You just screamed the word "relevant" at me.

202

203

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    I screamed it?  Did I scream it?

A.    Yeah, I mean, very loud.

Q.

A.    But, again, that was regarding I think a different -- I think you're miss -- you're misstating what she is stating there versus what she said during the call from the last --

Q.    I'm misstating what she is stating there.  I read her opinion.  So, maybe she was misstating.  Is that what

you're saying?

A. No.

I think you're misstating what
was -- what the impending was -- was -- was
in regards, and I think it was in regards
to theses two allegations, and it has
nothing to do with what was filed in Dixon
v. Cartagena.

Because I believe she also said
that she could not -- she could not use or
reference or consider what was filed in
Dixon v. Cartagena because it came after

203

204

* CONFIDENTIAL ~ TYRONE BLACKBURN *
the alleged dates of these alleged
statements.

Q. She said nothing of the sort --

A. I think --

Q. -- so, I think maybe it was
your medication on March 6th that caused
you to make up these hallucinatory
statements because there is no record of --

A. I am -- I am talking about -- I
am talking about what I believe the reading
of her opinion was. I think it was pretty
long, so there is other things in there.

So, all I am saying is that I
do not believe that this line of
questioning regarding what was filed after
these alleged defamatory statements were

made is appropriate, based on the court's

order that discovery in Dixon v. Cartagena

is stayed.

Q.    So, you said the $2.6 million

demand was based on attorney-client

privileged information, and you refuse to

say how you break that up.

You then came with a $20

204

205

* CONFIDENTIAL ~ TYRONE BLACKBURN *

million demand.

How did you calculate a $20

million demand?

A.    Same answer as the last one

regarding --

Q.    Oh, it was your client,

Mr. Dixon, who came to you and said:  Look,

I know you said 2.6 million, Mr. Blackburn,

but the real damage is 20 million.  Here is

how you calculate that.

That's what you're saying,

right?

A.    That's not what I just said.

You're misstating prior -- prior -- prior

testimony.

Q.    What did you say, then?

A.    I just said:  Same answer as

before.

Q.    Which was what?

A.    I believe that's what I said,

right?

Q.   Well, what was the same answer?

I don't remember it, so tell me what the

same answer before was.

205

206

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   Regarding the $2.6 million, I

think.  So, the same answer regarding the

$2.6 million.

Q.   I don't remember the answer, so

tell me.

A.   Well, it's in the transcript.

Q.   Yo care if it's in the

transcript.  I'm asking you now to tell me.

A.   Why are you -- why are you

yelling and like, getting, like, riled up?

Q.   I'm not riled up.

A.   It's in -- it's in -- it's in

the transcript.

Q.   Yeah.

I'm not going to make this

court reporter go back for an hour of those

questions.  I'm asking you right now.

A.   Same answer as before.

Q.   And what was the answer?

A.   I don't recall what the answer

was.

Q.   You think you're being cute,

right?

A.   I am not being cute.  I'm just

206

207

* CONFIDENTIAL ~ TYRONE BLACKBURN *

being --

Q.    You're being obstructionist and cute.

A.    I'm not being obstructionist. I'm answering the question.  I said that it's the same answer as I gave --

Q.    How did you come up with $20 million?

A.    The same way that I came up with the 2.6, which is a conversation between my client, which is privileged.

Q.    You just have no idea what the privilege laws are about, do you?

A.    Okay.  I mean, that's your opinion.

Q.    That's not my opinion.  That's a fact.

A.    Okay.

MR. TACOPINA:  Please mark this part of the -- if you want to even call this a deposition.

Q.    Do you remember Ms. Moreira asking you what supported your claim of a $20 million demand in your recorded phone

208

call?

Do you remember that at all?

A.   Again, I don't recall what was said between her and I, number one.

And number two, I cannot authenticate any recordings.

And, again, before, I'm not sure what recording you're playing.

Q.   We will play it for you.

(Audio playing in background.)

MR. TACOPINA:  Stop it.

Q.   Is that choppy or do you hear that pretty good?

A.   Still choppy.

Q.   That's choppy to you?

A.   Again --

Q.   Again, thank God there is a video of this.

MR. TACOPINA:  Go ahead.  Play it.

(Audio playing in background.)

Q.   Was -- was that your voice?

A.   Again, I can't really make out what is being said because it -- it just

208

209

sounds pretty shaky to me.

But if you can, like, get a clearer audio and play that a little -- you

know, play it a little louder.

I don't know if it's the speaker that's right over my ear or something, but I'm not hearing it as -- as clear.

And I can't really authenticate where this -- you know, where this recording is coming from or what device was used to make it, but if you want, if you have another device to play it on...

Q.   So, the answer is you don't know if that's your voice or not?

A.   I am asking you -- it is -- it's not -- I'm not hearing it clearly to definitively state that.  That's why I'm just saying, if you have something else...

Q.   Well, Mr. Blackburn, everyone in this room heard that clearly.  Everyone can see the blackboard.  You can't see the blackboard, the -- the board that's up there posting our exhibits, and you can't

209

210

* CONFIDENTIAL ~ TYRONE BLACKBURN *

hear a recording that's on videotape, fortunately, that's clear to everyone else. So, I don't know what to tell you.

But the question is:  Is that your voice, and the answer is:  You can't tell?

A.   The same answer that I just

gave. Same answer I just gave.

Q.    Okay. Yeah.

A.    I'm asking if you have a different device you can play it on so it can be more clear, but, you know, I can't --

Q.    You -- you received that in discovery.

Did you ever even listen to it?

A.    Again, I got a lot of stuff in discovery. I do not remember everything. I don't have my files or nothing in front of me. Like, you know, you're asking me to try to remember what was sent in, like, a hundred -- hundreds of -- of -- of pieces of -- of stuff that was sent over.

Q.    No.

210

211

* CONFIDENTIAL ~ TYRONE BLACKBURN *

I'm simply asking if you actually listened to that recording in discovery?

A.    Again, I was asked --

Q.    You don't remember?

A.    I am trying to. I -- I asked you if you can bring something so I can hear it more clear, but you're -- you know, you're getting --

Q.    I know, you can't hear it. I understand. You cannot hear this. I mean,

there is a court reporter that's taking down the words of it, but you can't hear it.  I understand.

A.   I don't know what the court reporter is taking down.

Q.   Here is my question to you:  In your review of discovery, do you recall ever listening to your tapes with Ms. Moreira:  Yes or no?

A.   I really don't remember.

Q.   Okay.  That's it.

MR. TACOPINA:  You know what I think we're going to do?  I think I

211

212

* CONFIDENTIAL ~ TYRONE BLACKBURN *

would like to take maybe a 15-minute break.

I don't know what you guys want.

Let me ask you:  Do you all need a longer break than that?

THE COURT REPORTER:  30.

MR. TACOPINA:  30?  30.  Okay.

Can we take a 30-minute break for lunch?  Mr. Blackburn, you good with that, the 30 minutes?

THE WITNESS:  .

MR. TACOPINA:  Okay.

THE VIDEOGRAPHER:  The time is 1:28 P.M.

This concludes Media Unit Number 2.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:  We are back on the record.

The time is 2:17 P.M.

Excuse me.  Correction.

The time is 2:18 P.M.

212

213

* CONFIDENTIAL ~ TYRONE BLACKBURN *

And this is the start of Media Unit Number 3.

Q.    Okay.  Mr. Blackburn, in our complaint against you, Mr. Cartagena's complaint against you, you were -- there was an attempt to serve you while you were in your car.

Now, if I ask you any questions about the process server incident, are you going to assert the Fifth Amendment?

A.    Yes.

Q.    Okay.

MR. TACOPINA:  I ask that to be marked, also, please, thank you, for a ruling.

Q.    Okay.  After you were first sued by Mr. Cartagena on April 29, 2025, you eventually -- your client eventually sued Mr. Cartagena; correct?

A.    I believe so, yes.

Q.    Okay.  And I think it was about two months later, on June 19th, that the complaint was filed.

Under the penalty of perjury,

213

214

* CONFIDENTIAL ~ TYRONE BLACKBURN *

you personally verified that the initial complaint with respect -- with -- with respect to the truth of these contents, correct, the attorney verification?

A.    I believe so.  But that matter is a public record, which I think you can -- you can find.

Q.    Sure.

It's Exhibit Number 7.  And I will just show you the attorney verification very quickly.

MR. TACOPINA:  Do you have it?

MS. LANZONE:  Um-hum.

Q.    Okay.  She is putting up Exhibit Number 7.  That's your attorney verification from June 19th, 2025, on the Dixon complaint.

During his deposition on February 24th, Mr. Dixon testified that he read the initial complaint carefully before it was filed.  He didn't verify the complaint, though.

Why -- why didn't he verify it

like you did?

214

215

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   You're asking me questions regarding the actions of somebody else I can't answer.

Q.   Well, the actions of your client in filing the complaint.

A.   Okay.  Well, I'll assert my attorney-client privileged objection that I asserted earlier.

And I will also state that this is -- again, this complaint that you're asking me about is out of scope of what this deposition is intended for, and you're asking me about a separate pending action in this deposition, which I think is not appropriate at this time.

Q.   We have been through this.  As I said, it's completely appropriate.  It ties into one another.  And the court did not rule in any way, shape, or form that you were prohibited from answering questions regarding that complaint if it ties in.  And one of the rulings, obviously, were that such --

MR. TACOPINA:  Hold on.

215

216

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    -- the court ruled that our claimed extortion attempts were relevant to Mr. Cartagena's argument as to why all these privileged -- including litigation privilege don't protect you from these defamatory statements and me asking these questions and the extortion attempt is relevant in.

Also, that the extortion attempts are still highly relevant in Mr. Cartagena's defamation claims.

So, I don't -- I don't know why you keep citing something that the court said.

A.    Well, I think -- I think you may have misstated from the nature of that opinion.  You're reading one section from a 20-something-page opinion, and I think that was the -- the decision from the motion to dismiss that we filed.

Q.    Right.

That's what I'm relying on.

A.    I am talking about this current deposition and what the court said in I

216

217

* CONFIDENTIAL ~ TYRONE BLACKBURN *

believe it was September, I could be wrong, but we had the hearing, and the court made

it very clear that the discovery in the
Dixon v Cartagena case is not -- is --

is -- is stayed, and that the only real

discovery from the Cartagena v Dixon

matter, which is what we're here to

discuss.

So, I think that questions

pertaining to a public complaint that is a

separate pending matter should be taken up

in depositions for that complaint.  I don't

believe that this is the right forum for

that.

Q.    Well, despite your belief, I am

going to ask you to answer these questions,

unless you're saying you will not.

A.    My objection is the -- that

question is beyond the scope of this

deposition.  This deposition was noticed on

Cartagena v Dixon --

Q.    Right.

A.    -- which involves a claim in a

separate action.  Questions about the


217


218


* CONFIDENTIAL ~ TYRONE BLACKBURN *

claims in that separate action are not

relevant to the claims or defenses in this

case, and are beyond the permissible scope

of this deposition under Rule of Civil

Procedure 26(b)(1).

Q.    Well, I just read you what the

court ruled, that these attempts and -- and, so to speak, extortion claims on our part are highly relevant to your defamation -- to Mr. Cartagena's defamation claim against you, yet you keep citing from what the court said.

I'm reading from the court's opinion. Why don't you tell me where the court said what you're saying it said?

I mean, you're reading something, so I don't know if you're -- that little piece of paper in your hand has the transcript or a piece of the transcript, but where -- what can you cite in which the court is defining the scope of this deposition the way you put it?

A. You have completely misstated prior testimony. What I said was I -- I

218

219

* CONFIDENTIAL ~ TYRONE BLACKBURN *

gave my objection. You asked the question. I said: I'm not going to answer it. I believe that was the prior question prior to what you just stated, and I stated my objection and explained why I was objecting. So --

Q. You said the court made a ruling that you're not to answer those questions.

A. That's not -- that's not what I

just read.

Q.   Oh, you -- I didn't ask you what you just read.  Did you not previously say that the court made a ruling that you didn't have to answer this questions [sic]?

A.   I don't -- I didn't say that the court had a ruling that I didn't have to answer the question that you posed.

I said that the court, in September, which you did not appear, you know, at that court appearance -- you didn't appear at a lot of court appearances --

Q.   There is a transcript.  You

219

220

* CONFIDENTIAL ~ TYRONE BLACKBURN *
know what that is, right?

A.   -- you didn't appear at a lot -- let me finish my answer.  You didn't appear at a lot of court appearances in this case, so you may have missed it.  I'm not going to -- I'm not going to --

Q.   I actually read the transcripts, unlike you.

A.   I'm not going to -- I'm not going to hold it against you.

Q.   Oh, thank you, Mr. Blackburn. I really would hate if you hold that against me.

A.   Sir, you know, you didn't show

up.

Q. How was your cruise, by the way?

A. You didn't show up, so --

Q. How was your cruise?

A. That's also beyond the scope of --

Q. Did you actually lay in your bed like you swore to the court you were going to do?

220

221

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A. That was -- that's actually beyond the scope of --

Q. You know, there is video of you on that cruise ship walking around having drinks, right?

A. Drinks? I don't drink alcohol.

Q. Well, drinking whatever you were drinking. I didn't say you were drinking alcohol.

A. Yo -- I don't drink.

But anyway --

Q. I didn't say you were drinking alcohol.

A. -- that is beyond the scope --

Q. You drink water, right?

A. -- that was beyond the scope of -- of this -- of this deposition, and I will not answer any questions regarding

that.

Q. Well, you made a representation

to the court under oath.

Now, question: Did you

actually lay in your bed the entire cruise

like you swore to the court you were going

221

222

* CONFIDENTIAL ~ TYRONE BLACKBURN *

to do?

A. As I said before, same -- same

answer.

Q. Okay. We're going to put up

Exhibit 70. This is your filed amended

complaint from, oh, yesterday.

MR. TACOPINA: Do you have that

up there?

Okay.

Q. In your amended complaint, you

no longer accuse Mr. Cartagena of engaging

in sexual relations with children; correct?

A. The case -- that -- that

complaint is a -- is a matter of public

record, and it speaks for itself. I'm not

going to discuss the substance of this

separate pending action at this deposition.

Q. It speaks for itself objection.

Okay.

So, it also speaks for itself.

And that -- that complaint that

you filed yesterday no longer mentions

Minor Doe Number 1, no longer mentions
Minor Doe Number 2, no longer mentions

222

223

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Minor Doe Number 3.  In fact, your amended complaint, which speaks for itself, doesn't mention any minors at all; correct?

A.   Same -- same response.

Q.   Okay.  And in contrast, your initial complaint filed more than nine months ago, in June of 2025, included allegations that Mr. Cartagena engaged in sexual relations with children as predicate acts under RICO, but you're amended complaint also abandons the RICO claim, right, same response?

A.   Same response as before.

Q.   Yeah.

Why did you abandon the RICO cause of action in your amended complaint?

A.   Like I said before, I'm not going to discuss any kind of communications that I have with my client concerning what he is doing it on an unrelated matter.

And I'm only here to discuss the allegations of defamation that I believe present on Line 132 of your client's second amended complaint.

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

Q.    Okay.  And -- and -- and for the record --

MR. TACOPINA:  Give me one second, please.

Q.    -- why doe your amended complaint -- because it does go through this defamation action.

MR. TACOPINA:  Can I see Exhibit 5, please?

Q.    Exhibit 5, which is your Instagram post, which you publicly claimed that Mr. Cartagena was grooming and sleeping with 16-year-old children.  That's what you're being sued for, one of the causes of action.

Why in your amended complaint do you back away from the allegations that you put in the public domain?

A.    Same answer as the answer before regarding the amended complaint.

MR. TACOPINA:  Okay.  Please mark that, as well.

Q.    You're familiar with Rule 11 of the Federal Rules of Civil Procedure?

225

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

A.    Yes.

Q.    Okay.  There you go.

Can you tell us what subsection

of that rule requires -- what -- what

Subsection (b) of that rule requires

regarding pleadings?

A.    I don't have the rule in front

of me.  I can't...

Q.    Okay.  I will read it to you.

Specifically, Federal Rule of

Civil Procedure, Rule 11(b) provides that:

"By presenting to the court a

pleading, written motion, or other paper,

an attorney certifies to the best of the

person's knowledge, information, and belief

formed after an inquiry reasonable under

the circumstances:

"It is not being presented" --

to -- for any improper purpose, such as to

harass;.

"That the claims and other

legal contentions are warranted by existing

law;

"And that the factual

225


226


* CONFIDENTIAL ~ TYRONE BLACKBURN *

contentions have evidentiary support."

That's Rule 11.

Are you familiar with that?

A.    If that's your recitation of

what you read, I don't -- I don't see a

rule -- you haven't presented me with any documents, and as I said before, I don't have the document in front of me, and I have never memorized the rule, so --

Q.   Okay.  Well, document -- Rule 11, Exhibit 26 is up on the screen.

(Whereupon, Exhibit 26, PREVIOUSLY MARKED:  Federal Rule of Civil Procedure, Rule 11, was tendered.)

Q.   And it's precisely what I just read.

A.   Can't -- can't -- can't see that.  Do you have a hand -- a hard copy?

Q.   Well, you're going to have to take my word for it.  Or I'll give it to you.  How about that?  I will give you 26.

A.   Okay.  Let's see.

Q.   Take a look at that.

226

227

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   Very small print.

Q.   Very small print, you can't hearing the recording, you can't see the screen.  Very good, Mr. Blackburn.

A.   Very tiny.

Q.   Give it back to me.

A.   Very different than --

Q.   Back to me.  Okay.  Give it back to me.  I just --

A.    Than the -- than the documents -- than what you just shared with me -- you shared with me this morning --

Q.    All right.  Right, okay, Mr. Blackburn.

A.    -- the print was bigger, I could read this.

Q.    You can't read that?

A.    I cannot see this.  It is very small.

Q.    So, give it back, then.  Give it back.

A.    Why are you yelling and being so aggressive?

Q.    Because you're -- you're --

227

228

* CONFIDENTIAL ~ TYRONE BLACKBURN *

you're being obstructionist.

A.    I'm not being obstructionist.

Q.    Okay.

A.    I'm -- I'm just saying --

Q.    You should be familiar with Rule 11, right?  I mean, that has been cited a few -- few times, right?

I mean, do you remember Judge Cote in the Southern District?

A.    I am not --

Q.    She brang you up on a Rule 11 violation, right?

A.    I am not I am not sure how --

how -- I don't believe it is what she said.

Q.   You don't believe it?

A.   But if you -- whatever --
whatever you want to do, sir.

Q.   Oh, well, we'll go through.
We'll go through it.

A.   Come on.  Let's go.

Q.   So, body of complaint is part
of an extortion, as we claimed, which goes
to your malice, okay, including making
false allegations.  That's Rule 11.  That's

228

229

* CONFIDENTIAL ~ TYRONE BLACKBURN *
what Judge Cote said you had done in a
previous case, but we will get to that in a
second.

So, Rule 11 provides that a
court may impose sanctions for not making
such reasonable inquiry and that such
sanctions can include both monetary and
non-monetary penalties.

So, before filing the initial
complaint in this case against
Mr. Cartagena and others, you were required
to conduct a reasonable inquiry confirming
the truth of the allegations.

Did you do that?

A.   I did conduct an investigation,
and whatever steps I took to investigate
the claims that my client made is protected

by work product, I believe, and I am not

going to be discussing any of those steps

that happened.

Q.   Well, that's what you believe,

but you believed wrong.

What materials did you review?

A.   Same answer.


229

230


* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   Who did you interview?

A.   Same answer.

Q.   You believe that is covered by

work product?

Your initial complaint alleged

that:

"While in Milwaukee, Defendant

Cartagena groped a Caucasian concertgoer

when he put his hands up the woman's skirt

and grabbed her vagina."

Where did you get that

allegation from?

A.   Again, that's -- that is not

relevant to this current action.  It is not

one of the defamatory statements that your

client is alleging was made, so --

Q.   Okay.  So, based on that

answer --

A.   -- out of scope.

Q.   Based on that answer --

A.   And it is a privileged

communication --

Q.    Privileged?

A.    -- between my client and I,

230

231

* CONFIDENTIAL ~ TYRONE BLACKBURN *

because it was conversation that I had and

part of my investigation from my client

that -- that led to the filing of -- of --

of that complaint.

Q.    Okay.  Good.

So, now we're going to read

what's relevant here, according to what you

just said.  Because you said what's

relevant is the two defamation claims,

subject to the case in which you are the

defendant.  So, Plaintiff's Exhibit 5 is

one of them.

I am not going to ask you about

what you said is fair game in this, because

you're saying this doesn't apply here, you

don't have to answer, attorney-client

privilege.

Let's go through every line of

what you wrote in your Instagram post, and

tell me where you got that information from

that you wrote.

So, you claim that -- that

19-minute recording of Pistol Pete you call

my client's henchman is basically a hit job

* CONFIDENTIAL ~ TYRONE BLACKBURN *

against your client.  You have evidence of that.

You listened to that tape yourself before making this post?

A.    Same answer as I said earlier: I believe you asked this very same question before, which is that -- that as part of my investigation of my client's claims, that I reviewed certain documents.

And I'm not going to go into detail as to what steps I took and -- and investigated my client's claims because it is protected work product.

Q.    Protected work product.

But you publicized your protected work product, so you can't now use that as a sword and a shield.

You -- you understand that concept, the sword and the shield?

A.    Same answer as before.

Q.    Same answer, so you're not going to answer.

MR. TACOPINA:  Please mark all of these for -- for rulings.

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    So, the hit job that you said you heard on tape, okay.

And did you listen personally to the recordings of two females discussing Fat Joe's grooming them and saying that he slept with a 16 year old?

Did you -- did you listen to that part of this claim here in which you're a defendant for and being deposed for today?

A.    Same -- same answer.

Q.    Same answer, which is what?

A.    What's on the record.

Q.    No.

I want an answer to this question.  I'm entitled to an answer, so why don't you give me an answer?

THE WITNESS:  Could -- could you read back the last answer, please?

Q.    The last answer was:

"Same answer as before."

A.    There was an answer before that.

233

234

* CONFIDENTIAL ~ TYRONE BLACKBURN *

THE WITNESS:  Could you read that one, please?  Thank you.

(Whereupon, the referred to Answer was read back by the Reporter:

"ANSWER: Same answer as I said earlier: I believe you asked this very same question before, which is that -- that as part of my investigation of my client's claims, that I reviewed certain documents.

"And I'm not going to go into detail as to what steps I took and -- and investigated my client's claims because it is protected work product.")

Q. Okay. And my response to that was: It's not protected by work product when you publicize it to the world on your Instagram page.

So, my question is now: Did you listen to those recordings you posted about on your Instagram page?

A. I did listen to those recordings, I believe so, yes.

234

235

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q. You did.

And where are those recordings now?

A. Again, that has to do with a separate legal action, nothing to do with this current case.

Q. What are you talking about? You're being sued for that.

A.    So --

Q.    It has to do with this case exactly.  It's one of the claims you're being sued for?

A.    Those -- those -- those -- those -- those -- any materials that I reviewed or acquired or that my client provided to me to support his claims are protected materials that I used as part of the investigation and to his claims and acc- -- and his accusations, and I believe that those are protected, and I cannot discuss --

Q.    Protected by what?

A.    I just stated this throughout the entire deposition.  I'm not going to go

235

236

* CONFIDENTIAL ~ TYRONE BLACKBURN *

through that again.

Q.    Well, you said:  Privilege, attorney-client privileged work product.

A.    Privileged work product.

Q.    Really.

But yet --

A.    As I stated --

Q.    -- you talked about it, you breached any potential argument you would have is -- is now gone.

You understand that?

A.    Same answer.

Q. Same answer.

MR. TACOPINA: We'll mark that for a ruling.

Q. You also told Erica Moreira you spoke to the underaged females. And that's not work product. I'm sure you understand that.

So, did you speak to those females?

A. I don't recall sending that to Erica Moreira.

But like I said before, my

236

237

* CONFIDENTIAL ~ TYRONE BLACKBURN *
investigation and whatever I did during that investigation to -- to investigate my client's claims, again, are protected, as I just stated two questions ago. Same answer for those questions.

Q. Okay. You know we will be coming back doing this again, right, because you can't assert a privilege to something that you waived. But your understanding of the privilege is just not based on the reality of law or anything. But we'll -- we'll be back, Mr. Blackburn.

Okay. So, you made these public allegations about Mr. Cartagena being a pedophile, basically. Grooming 16 year olds, having sex with underage girls.

And then -- and you're being sued for that, by the way. And then, you just withdraw it.

Why did you do that after making the allegations, understanding the ramifications of the allegations, and you're being sued for those allegations?

A. The public statements that

237

238

* CONFIDENTIAL ~ TYRONE BLACKBURN *

you're referring to I do not believe ever mentioned the word "pedophile" in there, so you're -- you're -- you're misstating what -- I believe you're misstating, unless you have something I can review, you're misstating it.

Q. Here's -- pedophile is a -- a summary word that describes what you put publicly out there, which is:

"Two females, underage females, discussed discussed in grooming and sleeping with 16-year-old children."

That would make him a pedophile, just in case you were uncertain about that.

So, here's my question: You're being sued for that. You just withdrew that claim.

A. Well, if that's your definition of pedophile, then I think --

Q. Yeah, it is.

A. -- that your client putting out a song where he details the fact that he grooms 16-year-old children and forces them

238

239

* CONFIDENTIAL ~ TYRONE BLACKBURN *

to perform fellatio on him --

Q. Hum.

A. -- that is an admission of him being a pedophile.

Q. Oh, you think rap songs, when they talk about shooting and killing and doing all sorts of things, that's admissions? Well, that's good.

But being that we're not here to talk about Mr. Cartagena's rap song --

A. No. Just -- no, no. I'm talking about --

Q. -- because you're very strict about what we're here to talk about.

A. I am talking about the definition.

Q. We're talking about your claims --

A. The definition -- your -- you just made a definition. I'm accepting your definition --

Q. Mr. Blackburn, Mr. Blackburn, be quiet. Be quiet.

A. -- of -- of what a pedophile

239

240

* CONFIDENTIAL ~ TYRONE BLACKBURN *

is.

Q.    Here is -- here is -- here is
the claim --

A.    And your definition according
to you --

Q.    -- that you committed
defamation -- you committed defamation --

A.    -- is that a statement about
someone being 16 years old -- 16 years old.

Q.    Um-hum.

A.    That that in and of itself
indicates that the person is a pedophile.
So, I'm just --

Q.    Does it not?

A.    I am just sharing that your
client put out a song where he is talking
about grooming a child, and then getting
that child to perform fellatio on him.

Q.    Right.
So, why did you withdraw the
complaint, then?

A.    So --

Q.    Why did you withdraw those
claims in your complaint?

240

241

A.    Again --

Q.    Hey, you got a song.  There you go.

A.    Again, whatever happened in another litigation that is currently pending that is not the nature of what this deposition is for has no relevance here.

Q.    No relevance.

A.    So, I am not going to answer --

Q.    You know these are intertwined, right, these two cases?

A.    Well, I tried to ask Judge Rochon if you can have discovery completed in both cases, and she said no.  And she said that -- that -- that this case will go on with discovery and the other case, discovery will be stayed, so...

Q.    With represent to Rule 11, have you ever been sanctioned or disciplined by any state or federal court?

A.    With respect to Rule 11, again, that question, I believe, is out of scope --

Q.    Out of scope?

241

242

A.    -- for the purpose of the -- of -- of this -- of this deposition.  And I think that it is abusive and being asked

for the sole purpose of harassing me and

for the sole purpose of garnering media

attention, since I'm sure you're going to

be leaking this --

Q.    Garnering media attention?

A.    I'm sure you're going to be

leaking this or sharing this with your

friends at TMZ.

Q.    I'm not leaking anything.

That's your little move, Mr. Blackburn --

A.    No, no, no, no.

Q.    -- with your little posts and

your interviews.

I haven't done any podcast

interviews like you have done.

A.    Yo -- I don't --

Q.    But anyway, let me explain to

you --

A.    You have done TMZ interviews.

Q.    I will try and explain this to

you.  I will try and explain this to you.


242


243


* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    I believe you were on TMZ.

That's a -- that's a media interview.

Q.    I will try to -- I will try to

explain this to you in English.  Okay?

With respect to Rule 11 --

A.    I think that was a little bit

disrespectful and --

Q.    With respect to Rule 11, I have asked you:

"Have been sanctioned?"

The -- be quiet when I am asking you a question.

A.    You're yelling and screaming again.

Q.    Yes.

Because you're going to keep interrupting my question.

A.    You're yelling and screaming at me.

Q.    We will be back here again, and eventually -- eventually, if you're lucky, there will be a jury here.

THE COURT REPORTER:    One at a time, please.

243

244

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    I think you're -- I think -- I think -- I think you're being very abusive.

Q.    Really?

A.    You're yelling and screaming.

Q.    No one here is screaming. There is a recording.

A.    You just -- well, you just started yelling and screaming.

Q.    I will do this:  I will talk softly?

A.    You're pounding on the table

and screaming.

Q.    I didn't pound on the table once.

A.    Yes, you did.  You --

Q.    Are your medications kicking in now?

A.    I am not on medication.  And that --

Q.    Okay.  There is no one yelling.

A.    -- and that's also -- and that's also offensive.

Q.    Offensive?

A.    And an abusive attack that you

244

245

* CONFIDENTIAL ~ TYRONE BLACKBURN *

just made against me because I was on medication.

Q.    Oh, you called him a transgender wearing a tampon in the last deposition, right?

A.    Like I said -- like I said before, I was on medication --

Q.    Okay.  You were on medication. Okay.

A.    -- during that deposition and whatever --

Q.    We're all on medication.  Okay?

A.    -- whatever -- whatever statements that may have been said during that deposition directed at your co- --

co-counsel was not intended.  I apologize
to him for those statements, based on the

condition that I was under, as a result of

the medication that I was on.

Q.    Okay.  So, again, the reason

why Rule 11 sanctions are relevant is

because we're making a claim of defamation,

and part of that claim is extortion and

we're saying you defamed him.  Okay?


245

246


* CONFIDENTIAL ~ TYRONE BLACKBURN *

So, malice includes making

false statements.

And what you have been cited

for previously -- and I think you even

talked to Erica about this in -- in your

conversation that was recorded.  You have

been cited for Rule 11 in the Southern

District of New York, right?

A.    Again, I don't -- I don't know

if that is relevant to this matter.  I know

that we're here to discuss two defamation

allegations your clients made, and you're

discussing something from a different

proceeding.

So, I'm just -- this is a

completely different case or different

cases.  Yo -- you know, so I'm just here to

discuss the issues that are in the four

corners of your -- of your client's claim

about me, which is the two defamation claims.

Q.   So, if I ask you any questions about your prior sanctions or your admonitions by courts, particularly the

246

247

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Southern District of New York, you're not going to answer them, correct, so I can save us all some time here?

A.   I mean, it's -- it's the same -- it's the same -- the same -- same objection that I would -- I would be raising, depending upon the question.  I can't just guess what the question is going to be.

Q.   No problem.

Okay.  Well, then, I am going to ask it.

You see, what we're claiming is that you didn't do any investigation here. You just made defamatory statements that you never heard of a 16 year old making any claims consistent with your dismissal of those claims yesterday.

And Judge Cote specifically said that you failed to conduct the investigation required by Rule 11.  It appears to be a pattern by you, Mr. Blackburn, she ruled.  And the Court

248

* CONFIDENTIAL ~ TYRONE BLACKBURN *

that you had filed in the Southern District

of New York that were dismissed for lack of

jurisdiction or a request for a change of

venue.

Do you remember being

admonished by Judge Cote about this pattern

of violating Rule 11?

A.   So, I think the first part of

your statement that you just made talked

about --

Q.   That was the Court's statement,

actually.

A.   No, no, no.  Actually, if you

go to the beginning of what he said before

he began reading what's in front of him, he

talked about actual malice, and the fact

that he believes that I didn't listen to

any of the recordings concerning two

16-year-old girls.  I believe that's what

he said.  And if I'm wrong, you can confirm

that.

So, to answer your full

statement concerning whatever I posted, it

was based on my good-faith basis from what

* CONFIDENTIAL ~ TYRONE BLACKBURN *

I believed from the information and the sources that my client provided me, so there is no actual malice.

And my interpretation of -- of those sources after my investigation led me to draft the complaint and to file the complaint in an unrelated case that we're not here to discuss.

That's my response to that, to that first part of what you just said.

Q. Okay. So, you filed at least six cases in the Southern District of New York that were dismissed, based on misinformation contained in your complaint.

How -- how do you justify that?

A. I am not sure what cases you're referring to.

Q. Oh, you don't know?

A. No.

Q. You don't know the six cases that were dismissed?

How many cases have you had dismissed?

A. No.

249

250

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Tell me -- tell me -- tell me what you're referring to. You're just

making a blanket statement without speaking

about what case you're talking about.

Q.   Okay, then.  Yeah, hold on a second.

Being that you want to know which case it's on, I will give you the cases that you were a counsel in that were dismissed.

We can start out with Jones verse Fox Rothschild.

Remember that case?

A.   Oh, yes.  I believe I was co-counsel with another lawyer on that matter, and the case had dual claims in New York State human rights law violations, I believe, and --

Q.   I'm not asking you really what the case is about.

A.   You asked me and I'm going to --

Q.   No, no, no.

A.   -- I am finalizing.

250

251

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Can I finish my answer?  Thank you.

Q.   No, you can't.

A.   Well, I'm going to answer --

Q.   Because I'm not asking you what the case was about.

A.   I'm going to answer -- I'm

going to answer the question.

Q.   You asked me to refer you to the six cases.

A.   You cannot -- you cannot cut me off from answering my question.

Q.   Don't tell me what I can do. You know nothing about being a lawyer or the rules of evidence --

A.   I'm answering -- I'm answering --

Q.   -- or the rules of procedure.

A.   You're attacking me, and this is -- I'm trying to answer the question.

Q.   Try and be a lawyer for five minutes, huh, just five?

A.   Again, this is abusive behavior.

251

252

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   And so is showing up in a T-shirt in federal court.  Go ahead.

A.   Again, abusive behavior.  And as I'm stating, because you were talking about dismissing of this specific case, the case was dual -- dual claims, I believe --

Q.   Um-hum.

A.   -- citing New Jersey lag as well as New York human rights law claims concerning a woman who was sexually

harassed by her employer in both locations

and a motion was made to transfer venues

and I believe the court in that indication

decided that had New Jersey had more of

a -- of a -- what do you call it, more of

a -- an of a substantial weight on the

claims and so he transferred it to the

district of New Jersey there was no finding

of -- of improper jurisdiction in that

matter.

Q.   And now, here's something funny

you just seeking press and seeking press

attention.

Do you remember the case

252

253

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Zonzoro Platski?

A.   What happened to the other

five?

Q.   You're asking to answer the

other here is the other five I'm going to

name them?

A.   I am not going to filibust.

Q.   Let me finish my question

because you're starting to be obstructive

and be quiet?

A.   You're screaming at me.  And I

just asked a simple question and you stated

that you -- you started lifting off names

and I answered the first case and now.

Q. No?

A. And now I asked you about the other questions and now you're being yelling and screaming.

Q. You're so sensitive I didn't realize?

A. Very abusive and argumentative.

Q. Wine guard verse CVS?

A. That is not my case.

Q. I'm not asking you a case?

253

254

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A. That was a counsel.

Q. I'm not asking you have a question. You keep this up this is on videotape keep it up type up?

A. You're making a claim.

Q. You're on the record?

A. The CVS case.

Q. Okay?

A. I was  serving for local counsel for a 76-year old out of Pennsylvania.

Q. Judge Coates cited that case --

A. No.

I never signed any documents in that case.

Q. Are you done with your answer?

A. No.

Q. Keep going keep going?

A.    The CVS case was filed in a case out of Pennsylvania what he was not barred in New York and he was an older African-American gentleman is and he asked me if I can pro hack him in so I can file his case I didn't sign the pleading or

254

255

* CONFIDENTIAL ~ TYRONE BLACKBURN *

anything else and I got him into the docket and everything and I made no other entries on the docket, it was not my case and whatever happened between him and counsel for Defendant's in that matter that resulted in a mutual, I believe decision to have the case moved somewhere else has nothing to do with me, I know what Judge coat sited ands I just explained she was not the judge on any of those cases and she cannot sua sponte go back and find fault with decisions and actions that her colleagues made in matters that were not before but that is what is she those to do.

Q.    Whether she could or couldn't she did?

A.    That's what she chose to do she didn't sanction me there was no sanction she threatened to sight me to the grievance committee no sanction was need to the sanction committee and I actually sanction her previous commissions to do really

255

256

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   Let's talk about the case before Judge coat?

A.   Sure.

Q.   And why it's relevant to this?

A.   Sure.

Q.   In the case before Judge Coate she ruled that in the you told her that are you filed a case in Federal Court precisely for the reason to make it more likely that the press would report on it she found that based on your statements to her?

A.   No.

Q.   No?

A.   That is wrong.

Q.   Is it?

A.   Again.

Q.   Judge Coate was wrong?

A.   No.

What you just said was wrong.

Q.   On March 5th --

A.   Okay.

Q.   I'm going to finish.

On a March 5th counsel reported that -- something funny?

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   Yeah.

Because you're wrong you did no research.

Q.   A guy that didn't know what he said last week you have some nerve.

So, I'm going to read you a quote from the judge's finding?

A.   Go ahead.

Q.   At the March 5th conference, defense counsel reported --

A.   Exactly.

Q.   -- that Blackburn had told her that he filed a case in Federal Court that would be more likely to pick up on him is that false?

A.   Yeah.

Q.   Judge Coate found that to be true?

A.   No. No  no.

She -- the defense counsel is true at all there was no documents presented, nothing to establish anything that -- that -- that -- that the Defense Counsel stated.

257

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   In her legal opinion?

A.    The engineer on ski indication in the Southern District of New York of New York and I did on LexisNexis and determining the address in New York State and my clients representation that that is where he believed she list as well.  And when I filed the -- the -- the -- the litigation, Defense Counsel said that her client is a Resident of the State of New Jersey and I asked her to provide documentation or proof to that effect and she did not and so there are no rules in the civil rule of procedure or any other rules that requires the counsel to take the word of an another lawyer absent prove and so I had no reason to just talk the word of opposing counsel in the Versorosk case I did my research and I did what I found to be the correct address for Ms. Fisher and my client confirmed the same.  If counsel had a different understanding, it was her obligation to provide me with proof and then, I would have used that -- I would

258

259

* CONFIDENTIAL ~ TYRONE BLACKBURN *

have used that information to -- to withdraw the case when we -- when the case was filed she presented the documents at that point and when she presented it, that is when the confirmation was made and under

my obligations at that point, I voluntarily withdraw the matter.

Q.   In her legal opinion Judge Coates legal opinion?

A.   That's fine.

Q.   Judge Coates inferred, quote, this is her words that you improperly filed cases in federal court to draw immediate attention and pressure defense to settle quickly that is Judge Coate.

Do you recall that?

A.   That is not an accurate assessment I had one case before her for maybe 60 days in total if that long and what she stated is what the Defense Counsel stated, I was there, I saw what the Defense Counsel said on the record I saw what she wrote in her records and it seems Judge Coates copied verbatim.

259

260

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   Judge Coates didn't believe you but believed you're posing counsel apparently?

A.   Her statement was based on the fact that I filed a lawsuit on behalf of my client that two-thirds of his settlement funds which went against the Retainer Agreement that he had d in that case and she was engaging according to him and a --

in a sworn affidavit and according to the text messages that she gave to him in a relationship with a matter that she was defending him on and didn't disclose toss him and was giving attorney-client communications and that hindered and harmed and he lost two million dollars as a result of her actions.

Q. And you do you know in Judge Coates opinion?

A. And later on.

Q. And I don't know air you're fill bust?

A. And I'm not.

Q. This will filibuster?

260

261

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A. I'm giving you have what my answer.

Q. Now you can give me details of the case?

A. I don't remember.

Q. You're going to stop?

A. Call the Judge call the Judge call the court.

Q. You understand you understand that what you said in front of Judge coat didn't change her mind of you she actually referred you're that was in her opinion?

A. That is what she said but there

was no, sir referral.

Q.    There was a referral?

A.    Okay unless Judge Coates is lying.

A.    Okay.  Okay. Okay unless you said so.

MR. TACOPINA:  I know it's in the decision.

A.    Okay.

Q.    What about the Judge asserting you in your conduct?

261

262

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    And Judge Ogden that is the Sean matter and he was referring to go -- what I wrote in my opposition brief to Defendant's notion dismiss and I took responsibility for that because I was very angry when I wrote that because prior -- my devices were hacked by the combs Defendant's and I informed the court and I have made a report to the Federal Government regarding the same thing and another counsel in another matter against these same Defendant's called me and heard that -- at the same exact time.

Q.    Who is that is which counsel was that?

A.    Kenia Davis.

Q.    Who?

A.    Kenia Davis.

Q.    Kenia Davis he is?

A.    Yeah.  We had a call at the same time.

Q.    You were hacked?

A.    She said were you going through you hack right now I opened up my laptop

262

263

* CONFIDENTIAL ~ TYRONE BLACKBURN *

all much my folders were emptied specifically for the Sean's matter every folder every sub sub-folder was deleted and the language was like Tibetan and I reported that to the court and I reported -- and while that was happening the motion was pending, and, you know, I was a little let's say annoyed at what -- at what transpired.

Q.    Okay.

A.    So --

Q.    Okay.  So, the Combs defense team hacked into your computer?

A.    Someone hacked -- someone did it.  It happened to her and it would to me at the exact same time didn't you say that your cousin got control of your computer and sent it to a client of yours.

A.    That is not what I'm saying.  Again, Judge Odgen and my friends, too.

Q.    And do you remember a case

where you represented a female who claimed she was sexually abused by a singer rapper I'm not going to mention his name where you

263

264

* CONFIDENTIAL ~ TYRONE BLACKBURN *

broke up the relationship with her and she fired you and you wrote her one of the most vile e-mails ever ever written regarding her body parts and her smells -- that is funny to you had you?

A.    No had, I don't know what you're talking about.

Q.    You don't know what I'm talking about?

A.    It sounds like you're complete will he -- I have never had a client -- go ahead sorry finish your finish your finish your statement go ahead.

Q.    We brought that to Judge Rochon's attention early on and your claim was that you didn't write that despicable letter to your ex-client regarding the smell of her body parts and all sorts of things, you said someone hacked into your computer?

A.    I don't remember that.

Q.    You don't remember that?

A.    Ask your questions and you're making statements and making statements

* CONFIDENTIAL ~ TYRONE BLACKBURN *

without producing anything.

Q.    Did someone break into your phone separate from the combs incident and send an e-mail that purported to be on behalf of an ex-client?

A.    I don't know what you're referring to and it I can't speculate as to what you're talking about and if there is something you want to show or complain, please go ahead.

Q.    Maori Granger, do you know who she is?  Come on.  You know who she is. She was your ex-client?

A.    No, she was never my mind.

Q.    She was not your client?

A.    The name sounds familiar but I do not -- I do not -- she was never a client of mine, no.

Q.    What was she to you?

A.    She was knock to me.  She, I believe was -- I couldn't are wouldn't call her a friend they have a very weird relationship about someone I dated I think.

Q.    You indicated her?

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A. I never dated her no way no.

She is connected to me through -- she is connected to someone else and I'm into the clear with the full connection and it has been a number of years and I haven't ever haven't spoken to her since I believe 23? I'm not -- I'm not -- I don't remember. I don't have -- I don't remember when the last time I spoke to her. But it was a long time though.

Q. Well, you sent her a text message where you said that: Your life is shit, your life will continue to be shit. You will never find true happiness. You will get old, you will be lonely, and you will go broke. You got Ally to spend nearly 20 -- $200,000 on a fucking apartment she didn't live in. You had your drug-dealing man steal her and which I relationship reason to believe and you stripped and dumped her car and you said nothing to her for month you are a worthless bent alley smell bags her shoes you know, the fucking nerve to wear her

266

267

* CONFIDENTIAL ~ TYRONE BLACKBURN *

shit. What a fucking joke. I told Ally not to have your fucking ass in my car and apartment. She doesn't listen."

Do you remember something like

that to this lady?

A.    No.

That's nothing I would ever send to any female ever.

Q.    I hope your -- sorry.

A.    I don't -- I don't -- I don't -- I don't talk to any woman in that manner, so I don't know.

Q.    And the complaint that is a staffed?

A.    I have never been served with a complaint with mission grain engineer I have never seen a complaint from Ms. Granger, so, again --

Q.    You have never seen it it?

A.    I have never been sued by miss grain engineer and I have no litigation you said complaint regarding miss grain engineer and so I can't speak to that.

Q.    So, you didn't write --

267

268

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    And I didn't send I don't speak to women like that and I would have never send something like that to any fee fail.

Q.    Well, here is what you wrote you continued to write --

A.    You're reading something and are not presenting something.

Q.    Right these that is the way it

works I do what I want?

A.    You're asking questions.

Q.    You seem to have a good idea who she is, though.

A.    I remember the name.  I haven't spoken to her in years.

Q.    "Not to mention your fucking uterus ain't worth a fucking damn with all your boils and fucking lesions you have in your nasty-ass pussy.  You fucked Chris Brown, then you  her."

A.    I have never been -- I have never been intimate with her.  I wouldn't know what her body parts are.

Q.    -- "and forget and even fucked you.  Ain't that some shit."

268

269

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    I -- I --

Q.    "How lackluster and easily forgettable your pussy is.  Another reason you have a serious bacterial vaginosis, so it's no wonder why you keep a fucking man because your pussy is too stink."

A.    I never --

Q.    "You need to bend over" -- so when I'm done, you get to do your little speech.

A.    I never --

Q.    "You need to bend over and soak

it in holy water."

A.    I don't know what her body parts smell like or look like.

Q.    -- "so your rancid pussy is likely getting smoked out your cunt.

"Lastly, whatever you said will be returned a hundred times over.  I have more access and more money than you.  This ain't money.  This ain't war.  I heard that line I think that was to me.

So, then, you write to her:

"I am very sorry for the

269

270

* CONFIDENTIAL ~ TYRONE BLACKBURN *

previous message.  I didn't know that was sent.  My stupid cousin took my laptop and sent it to you.  I would never send something like this.  Please accept my apology.  Whatever Ally and I have going on has nothing to do with you.  I was venting to my cousin and was up set I didn't know what is that what happened your cousin got ahold of your phone?

A.    Again, I don't know what it is what it is that is you're reading and again I haven't spoken to this lady they  years and so I can not speak about conversations that -- that may have been said if -- if what you're saying is what was sent in a text to her, and then I -- and then,

obviously, you read an apology that was

sent after that something may have happened

years and I don't know how this is relevant

to the defamation.

Q.   It goes to malice and what you

constantly commit?

A.   It's not about malice the

malice from my understanding of what malice

270

271

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Social Security it has to show that I knew

that the statements that I made concerning

your client was false or something to that

effect, and I did it or said it anyway when

that is just not the case here.  Like I

said before, you know, whatever things you

claim that were defamatory, I believed and

continue to believe that those at the same

time were substantially true, based on the

investigation.

Q.   And an I'm not?

A.   That are based on.

Q.   I'm not base?

A.   I am.

Q.   You don't give toy give a

summations?

A.   I am not giving.

Q.   I don't care whether it's

relevant or truthful?

A.   I am answering a question.

Q. There is no, sir problem?

A. You're being very aggressive.

Q. You don't care?

A. Look at me.


271


272


* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q. You never represented may or see gray engineer. And you said you never represented her?

A. And again like I said before: Questions pertaining to an individual that I haven't spoken to or senior anything in three years has absolutely no bearing on the subject matter --

Q. Right.

A. -- of this deposition or the issues in this case.

Q. Right.

A. There are a --

Q. Except that you -- yeah yeah?

A. A whole bunch of different things that you have not presented today me to, you started reading things.

Q. They're your text messages.

A. You have not confirmed.

Q. I have not confirmed?

A. That is not sustained there's no exhibit up there's no exhibit in front much me, you're just reading to me.

Q. Um-hum?

272

273

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    And as I'm stating I don't think that that -- whatever you're doing here is not relevant to the claims raised in -- in this case at all and it is just being used in an forward to try to harass, I believe, so...

Q.    So, any way you were asked the question was this from the transcript of a few minutes ago Majority Grangerr.  Was she your client?

She was not my client?

You have a retainer agreement with from April 6, 2023 where this firm has been retained to represent Majority Granger grain engineer so she was your client?

A.    Honestly I don't -- I don't recall if -- if I have a -- if I have a retainer with her but I mean you're reading something here and you're not showing me --

Q.    And you were very firm that she was not your client?

A.    I mean it has been years.

Q.    Well it was 3.  You don't recall who you represented three years ago?

273

274

A.    No, actually I don't.

Q.    Take a look at that?

      (Witness reviews document.)

Q.    Just look at the document?

A.    It's not a retainer.

Q.    It's not a retainer?

A.    No, it's not a retainer are.

Q.    What does the learn say?

A.    It's not a retainer.

Q.    Let me?

A.    You're not presenting anything into evidence.

Q.    So, it's a letter that you sent to the company?

A.    Hold on.  Nothing was sent.

Q.    Nothing was sent?

A.    No.

Q.    It's a letter addressed to SB E enter statement by you on April 6 saying my firm has been represented today represent Majority Granger that is funny to you?

A.    No, I'm funny.

Q.    I have never been sanction add unlike you ever?

274

275

A.    And you said it was a retainer it is not a retainer you're making blanket staples and you're saying this is a letter

that was sent to an employer or whatever it is and you were just drawing conclusion.

Q.    I'm drawing conclusion?

A.    I'm drawing conclusions.

Q.    Your command of the English language is stunning it's stunning?

A.    I didn't send that to anyone.

Q.    You just wrote a letter?

A.    I wrote a letter.

Q.    Saying that you represent to her?

A.    That I sent to Majority for her to read.

Q.    And now you remember her yeah?

A.    Now showed to too me and you were reading things.

Q.    Okay?

A.    And now that I I'm looking at to the and how it was written and how it was formatted it was probably something that I was it was in anticipation of

275

276

* CONFIDENTIAL ~ TYRONE BLACKBURN *

possibly retainer her and you said it was a retainer and it was not a retainer and then you said it was a letter that was sent to someone, I never send it to anyone, I don't believe from what you showed me.

Q.    What does it said that you sent her that you represented her?

A.    It was a graft.

Q.    It was a draft?

A.    The way it was written.

Q.    And two minutes ago Mr. Blackburn, you didn't even remember?

A.    Exactly.

Q.    Guess what is we just found?

A.    Tell me what you just found.

Q.    The Retainer Agreement that you were mocking me about let's look at the Retainer Agreement?

A.    What you showed me was no, sir what you were talking about.

Q.    And this is Retainer Agreement from Tyrone Blackburn.  There is not another Tyrone Blackburn.  Hold on a second let me me make sure we have the right one

276

277

* CONFIDENTIAL ~ TYRONE BLACKBURN *

east 808 street yet.  That is your Retainer Agreement with your firm on it?

A.    Let me see.

Q.    Sure (handing.)

A.    Again, what you're showing me here.

Q.    Is what?

A.    Is a draft.

Q.    Oh?

A.    Again, because you're -- you're representing this as if I actually -- as if

the retainer assigned and everything was finalized this was not that at all.

Q.    So, make sure that I have the record clear?

A.    Hold on your question was.

Q.    It's a draft Retainer Agreement and a Draft Letter?

A.    The question was whether or not she was my client and I said no.

Q.    Write?

A.    And now you're presenting me with a retainer -- the paper is clearly not aligned it looks like it was in word form

277

278

* CONFIDENTIAL ~ TYRONE BLACKBURN *

hence why.

Q.    Hence why?

A.    It's -- this is con started here and then, the same thing for the letter, nothing is finalized so unless you have --

Q.    Okay?

A.    -- I guess a signed document or anything, I can't -- I may have had conversations with this individual, may have send are sent over a retainer.

Q.    Right?

A.    Nothing I believe was finalized I think I send over.

Q.    And, that was I am trying to

send?

Q. I don't care about that answer

I don't care about your allegation?

A. No, it's -

Q. Because it's irrelevant, sir.

A. It's not irrelevant.

Q. Your speeches are filibustic?

A. You brought up --

Q. It showed that you lied under

278

279

* CONFIDENTIAL ~ TYRONE BLACKBURN *

oath?

A. You brought something up and I am trying to finish my --

Q. That your client --

A. You brought something up up that your client was deposed on the 24 of February and following that deposition following a request by Mr. Seigel that you instructed your client not no answer the question you made the statement that Mr. Seigel wearing a tampon, right.

A. I don't recall that.

Q. You don't recall that?

A. An and as I said earlier I believe.

Q. I can't care what you said earlier?

A.

Q. That is Exhibit 3?

A. Any statements that I was under.

Q. Drugs for your Cosmetic Surgery that you don't remember what it was?

A. When I was using medication I

279

280

* CONFIDENTIAL ~ TYRONE BLACKBURN *
believe was a result of the medication that I was on.

MR. TACOPINA: The video.

A. And activities on.

Q. And we will take a look?

A. And I definitely don't mean any of those.

Q. And you're complaining what you did at a deposition about an oh, a month ago.

(Audio playing in background.)

MR. TACOPINA: You've transcript of it?

MS. LANZONE: Yes.

MR. TACOPINA: I'm sure a jury would look to hear that.

Let me see if he up in 8 through 7 and Mr. Siegel said, and by the way, instruct your client not to the ask me to questions Mr. Siegel say that and it's already all right you say it's like his tampon is like: What's wrong with him.

Q. You made that statement to him

280

281

* CONFIDENTIAL ~ TYRONE BLACKBURN *

right?

A. I don't recall saying that statement to Mr. Seigel as I said before I was under medication I requested from the Court to postpone the depositions for the purpose of me being under medication and.

Q. You requested the court that day to postponements?

A. No. No. No. Prior to that deposition on February 5 I made the request and the curt didn't grant it.

Q. Because you were on a screws right?

A. No, no, no, I made the request and she didn't grant it.

Q. So, those words up there are the judge's fault?

A. No, no, I don't recall saying that and if I did say that, you know, I apologize to Mr. Seigel for saying that because it was not my intention to --

Q. Okay?

A. To -- to defend him in any way it was the effects of the medication at

281

282

* CONFIDENTIAL ~ TYRONE BLACKBURN *

that time.

Q.   Which medication was it is to make the at tax?

A.   Same answer as earlier today regarding relevance of my -- of my health and I'm disclosing any of that.

Q.   Wait a minute a little different now before you said it was the medication and that he was a tampon and his mother should have spit him out rather than swallowed?

Q.   What medication with you take to have you say that?

A.   I don't see that.

Q.   You don't see that one?

I'll show you that one.  Hold on.

"Mr. Blackburn, your mother is an alleged criminal?

"Mr. Seigel:  Yes.

"Mr Blackburn:  She should have spit you out instead of swallowing."

A.   Go back.

Q.   It's right there?

282

283

* CONFIDENTIAL ~ TYRONE BLACKBURN *

No.  Your mother is an alleged criminal you said to Mr. Seigel she should

have spit you out in sped of swallowing?

Case 1:25-cv-03552-JLR-JW   Document 184-3   Filed 04/09/26   Page 249 of 298

A.    I can't recall.

Q.    What medication were you on that would have made you say that?

A.    And from what I recall, I don't have -- I have not reviewed the transcript from from Mr. Dixon's deposition nor have -- and I don't think I have a copy of the video of the deposition, either but --

MR. TACOPINA:  I will represent this is a true and accurate copy and in case you think I'm tampering this what medication were you on for you to say she should have spit you out instead of squealing what medication.

A.    As I said before I was on medication at that time and I believe that anything beyond the scope of that answer is irrelevant and harassing because I'm not going possible to providing any information concerning my health and what I was taking at the time.  I believe that I informed the

283

284

* CONFIDENTIAL ~ TYRONE BLACKBURN *

court that I was on medication at the time, on two occasions and I'm going to stick to that representation and I'm not.

Q.    You were hiding behind the medication for you saying she should have spit you out instead of swallowing what

medication was that?

A.    Same answer as before.

Q.    Let's play a little snippet from that deposition.

MS. LANZONE:  (Audio in background.

Q.    So, who the fuck do you think you're yelling at?  I'm not your husband.

When you said that was that also the effects that you were on using fuck in the deposition and saying I'm not your husband?

A.    Well --

Q.    It's a little homophonic, by the way.

A.    Well, let's make two sections it's you're making statements and.

Q.    It's confusing for you --

284

285

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    I am trying to respond.

Q.    Then respond.  Stop stuttering?

A.    You were yelling and you're being overly aggressive.

Q.    And what you heard there is called yelling?

A.    That is in response to him yelling -- you think I said don't yell at me or whatever it is.  Again, I don't remember exactly what happened throughout

that duration of the entire deposition,

Burt clearly I was responding to him

yelling and again, not appropriate I'm not

produced of that at all, I don't think that

that was the right course to make take.  I

think that I should have just and ended the

deposition if I felt that there was abusive

behavior going on and again I was under

medication and I think that may have

impacted my response to what was said,

so...

Q.    During that same deposition Mr.

Dixon was asked whether an Instagram

account with the handled at that strategy

285

286

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

was his and he replied I don't remember.

Be Mr. Dixon was asked if he owned and

maintained the Instagram account with the

handle at that strategy and he answer add I

don't recall so Mr. Seigel then read as

follows from an RFA or request for

admission response that you drew that you

draft on behalf of your client "admitted

that Terrance Dixon once and maintains the

handle and Instagram at that strategy.  And

so when Mr. Dixon didn't recall if it was

his I believe in account, you responded to

what Mr. Seigel read by saying he

misrepresented what you wrote."

A.   I...

Q.   I will finish Mr. Seigel showed you Page 3 of what was marked as Exhibit 34 in Mr. Dixon deposition which was your actual response in response Mr. Dixon and what you wrote was you admitted that that Instagram account with that handle was -- belonged today Mr. Dixon. So, that was only a few months before the Dixon deposition yet you saw him sit there and misstate

286

287

* CONFIDENTIAL ~ TYRONE BLACKBURN *

facts correct?

A.   I cannot tell you what -- what was in the mind of my clients, I can not control how he answers at the same time or how he answers deposition questions and again, I was under -- I was on medication at the time during that deposition, so you know, you're asking me a question about what -- what his responses were and again, I can't -- I can't -- get into his mind regarding that.

Q.   Well, don't worry about his mind let's talk about your mind because during Mr. Seigel questioning and we will put that transcript up you say that Mr. Dixon said he didn't post anything recall saying that in the deposition?

A.   I don't recall that, no.

Q. Okay. It's deposition page 39,

Exhibit 20 to 236789 and when you said that Mr. Blackburn, you already admitted object Mr. Dixon on behalf he upload the deposition at that strategy which he owned and used and when you interrupted Mr.

287

288

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Seigel questioning stating that Mr. Dixon never posted anything that wasn't true?

A. I am looking at the transcript -- I can't -- really see what is written there and you claim that you have it.

Q. You can't see that big blown up through?

A. I can't see with the glare.

Q. Well, you wear glasses and it's a glare for me?

A. You can show me and so I know what is happening.

Q. And here's the consent? Page 3920 through 21.

Q. It's two lines it should take you a whole 3 seconds?

Q. Sir, did you reads those two lines that I gave you like three minutes ago?

A. Okay. So I believe it was a response to a -- I don't know it looks like there was an objection or something that

was being made, I think there Mr. Seigel is

asking him something regarding some posts

288

289

* CONFIDENTIAL ~ TYRONE BLACKBURN *

and I think that he -- at the said that he doesn't post any associates and Mr. Seigel responds -- like he came back again with another question and then, I think I said asked and answer and I said I don't recall the exhibit and there was some back and forth regarding that. And so I believe that section that you referenced the he same was a continued deposition that Mr. Seigel and a were having over multiple multiple pages.

Q.    Okay.

A.    And that is my reading of it if you want to reply the video I think it would be easier for gain better context of what was happening.

Q.    And the point is that you have already admitted that Mr. Dixon made the statement on his Instagram account and you are here saying that he never posted he never said that?

A.    I was referring to -- I believe I was referring to the life testimony that Mr. Dixon was making at the time, I was not -- I don't believe I was referring to

* CONFIDENTIAL ~ TYRONE BLACKBURN *

any documents or I don't think any exhibits were being played I was answering the answer to Mr. Dixon gave at the time of the deposition and I was referring to the fact that Mr. Seigel might have been asking the same question over and over and I think -- yeah, I think my response was due to the fact that can he asked essentially the same question multiple times and the client just answered the question and that that response I believe as I'm reading refers to the question on that day that was being asked.

Q.    Okay.  Okay.  We will take ma back. Thanks?

A.    Okay (handing.)

Q.    Thank you.

Q.    All right, you brought up con testing perhaps the podcast that you were on the "Star Report," you brought that up basically the issue of artificial intelligence is something and you brought it up in Mr. Dixon deposition and it's alleged in paragraph 66 of this complaint

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Cartagena complaint at that you were

personally accused of using artificial litigation and in fact in Jakes versus Youngblood junction William stick man issued an order to show cause directing you to you show cause as to the fabricated question and case law in your briefs in that case?

Do you recall that?

A.   Again, I'm just going to state as I said earlier that I don't understand how this lined of yes-ing has anything to do with the claims being raised for defamation and malice.

Q.   And malice did you just say malicious is right exactly?

A.   No, the malicious conduct of the claims and you know, I think that this is way out of scope as to what this deposition is for so I will not be answering that question.

Q.   Okay.  And just to use your own word that you just stated malice all evidence concerning you're booze I have use

291

292

* CONFIDENTIAL ~ TYRONE BLACKBURN *

of the juice additional system is irrelevant because it's directly related to your malice and despite your stating that you are not A going to answer the question; is that correct?

A. I am stating that it is out of

scope as to what this deposition I think is for.

Q. Okay?

A. And so my response is the same.

MR. TACOPINA: Please mark this as well.

A. It's not relevant.

Q. Okay. And in that case, it was found that you actually fabricated questions in case law in that case and you filed a motion to dismiss which the court found fabricated cases from case through didn't exist. Is that accurate?

A. Same response as the last one, yeah.

Q. As the last one? Okay.

That case there was actually a rule of sanctions before Judge Stickman,

292

293

* CONFIDENTIAL ~ TYRONE BLACKBURN *

and you told Judge Stickman under oath even before count accused you on June 7th of using artificial intelligence in your May 5th, 2025 brief you highlighted case law and you were in the process of correcting it correct?

A. Again.

Q. You're not answering?

A. Again, same -- same -- same --

same answer as before.

Q.    So, let me just make sure so we can save us some time here.

So, any of the questions I'm going to ask you about your abuse of the judicial system by misrepresenting things from AI and all of these rulings by different courts and the findings by Judge Sticklin -- Stickman, you're not going to answer; correct?

A.    If it's relevant to this -- to the claims in this case I think it's two -- the two claims of defamation but again it's out of scope, it's -- it's clearly out of scope from what --

293

294

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    I don't know what out of scope means are you trying to go say it's irrelevant?

A.    Out of scope.

Q.    Out of scope?

A.    Yes for what the nature of this deposition is.

Q.    Do you understand that relevancy is not a basis toss object and refuse to answer questions during a deposition do you know that?

A.    No.

I'm just stating my objection.

MR. TACOPINA: Okay. So, we're going to have to mark that, too.

We will back again, Mr. Blackburn, but that's okay.

We'll keep doing this all day, if you want.

Q. The court in that case, by that way found you lied to it in your explanations about AI did you lie to Judge Stickman?

A. Same answer as last one.


294


295


* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q. Same answer?

A. Yeah.

Q. Happened again in a case in New Jersey. And that's Judge Semper's case, I guess, that's that Herrtz verse Colony Tire, which was pending before Judge Semper, you got called out by the judge for citing case law that didn't exist.

Was that because of AI?

A. Same answer as before.

Q. Okay. Another case, April. This was a New York State Supreme Court case, Facie verse Fisher, before Judge Rosato in New York State New York scream you were then called out about using AI in papers that is you filed when you said it want happen again you did it again. Did

you respond to those allegations insist

court Mr. Blackburn?

A. Same answer for all --

Q. Same answer?

A. Of them.

Q. Okay.

Q. So, before Judge Stickman in

295

296

* CONFIDENTIAL ~ TYRONE BLACKBURN *

that matter, you submitted an affidavit July 19 of 2025 where you swore I have practice the law since 2018 and during that time I have never encountered citation or quotation issues in any legal filing submitted to a court that was just last July. That wasn't a true statement was it?

A. Same answer as the last one.

Q. You testified previously during the Rule 11 sanctions hearing on July 24 of 2025 and you swore under oath by Judge Stickman that you never used this Lexis AI thing before is that true?

A. Same -- same answer.

Q. Okay. You are aware their false at the same time under oath constitute perjury right?

A. Of course, yes.

Q. Okay. So ultimately based on what stick man characterize zzz your miss contact in the Jake case the Judge

sanctioned you $5,000.00 and revoking your

pro hack admission status in the Western

District of Pennsylvania; correct?


296


297


* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    Same answer.  So, again, same answer as before regarding all of these questions concerning matters that are not before this court or even relevant to this -- to this deposition.

Q.    And in particular, in the court's order, Judge Stickman's order, the court expressed its belief that he monetary sanctions were necessary to deter you from future misconduct, especially due to your decision to double down on your misuse of AI after it was brought to the attention of the court.

The word "misconduct" is a term that's been used to describe your behavior by multiple courts right, Mr. Blackburn, multiple courts?

A.    Same answer.

Q.    Same answer?

Okay.  Different question, same answer?  Okay.

Judge Oetken used that term to describe your behavior before himself in the jokes versus combs case Judge coat used

* CONFIDENTIAL ~ TYRONE BLACKBURN *

and after filed your -- after your July 24, 2025 sanctions hearing in the Jakes case, you filed a memorandum of law in this case seeking to dismiss Mr. Cartegena's complaint, second amended complaint in this case.

And in response, we filed deposition papers on February 5th, 2025, which pointed out that your motion was replete with misrepresentations and fabrications of legal authority generated by AI?

Do you recall that? That is this case.

A.    Yes.  And that was a mistake that you made from when I was drafting I believe it -- I believe I may have worked off of the original memorandum of law that I filed for the -- either the second -- second amended complaint or the -- no, the first amended complaint states that an American working off of that and I think that have some of the arguments or something -- and the case law I pulled you

* CONFIDENTIAL ~ TYRONE BLACKBURN *

lot of cases from Lexis at the time and actually I have a whole folder of all of the cases and specific cases that I highlighted sections for and I uploaded that had to the Lexis that I was using at the time and I generated the -- the response which had errors in it and I had edited it and I did not check the -- what is it called, the citations -- well, the -- the -- the case see indication closely as I should have done I believe and that was a mistake on my part when it was brought up I went back reviewed the corrections and I informed the court of the same and provided the court with the accurate document.

Q.    All right.  You said you reviewed your LexisNexis subscription and it included updated AI features?

A.    And when I spoke about the LexisNexis feature I had -- not any more but I would like a work -- working agreement with another solo practitioner who used -- I had Lexis for years he used my math -- I mean my subscription for years

299

300

* CONFIDENTIAL ~ TYRONE BLACKBURN *

and I used his like he renewed -- he signed up for it instead of me signing up for it and I used his.

And when I said I had a

subscription colloquially, that is what I believe it was based on the fact that at least for four years I was working closely with another attorney and we shared our Lexis case, and if you look at cases that I think I attached to the filing, the -- the actual account own other if you can use those technical terms was -- was my former colleague.

Q.   Right.

Now, you said to the judge, Judge Rochon in this case, that it was your account?

A.   Yes.

Q.   You didn't say it was a shared account?

A.   No -- yes, I should have been more clear have I -- because of -- it has been almost -- it was like four or five years at the time that I was sharing with

300

301

* CONFIDENTIAL ~ TYRONE BLACKBURN *

my former colleague who is a solo practitioner, this Lexis account, what I said was my Lexis account -- that's what I was referring to.  The fact we share I have a log in, I have everything so it was a misstatement I should have been more clear with -- with that piece of my representation which was to clarify the

fact that I'm sharing that this is a shared account with the someone else but it is something that I worked with -- activities working with someone -- I don't use Lexis I use west law now but at the time this was drafted, it was a Lexis account, yes.

Q.   Who was the co-practitioner that you claim to have shared this account with?

A.   Fred Charles.

Q.   What's his name?

A.   Fred Charles.

Q.   Fred Charles.

A.   Um-hum.

Q.   And how many years did you share the account with Fred Charles?

301

302

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   This specific account?  Only beginning, I believe in 2025 and end of 2024.  I don't know exactly the date that he signed up, but I believe my subscription ended or was up for renewal it might have been December of 24 and I was going back and forth with Lexis concerning, I think, like, funding the plan.  I had a lot of issues with my personal account because I couldn't gain access toss things that I was paying for and there was a lot of back and forth at that time and around that timed

Fred notified that he he had signed up for

it and you just gave up on my account and

still fighting with Lexis regarding some of

the -- some of the billing issues that I

had with them for my account.

But this account it was I guess

January until -- until I signed up with

west law, but my prior account I believe I

had it from 20 -- 2019, I think.

Q.    So?

A.    I started sharing with Fred in

2020 or 2021.


302

303


* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    And you claim to have a share

agreement and you know that Lexis never

granted you a shared Subscription

Agreement?

A.    I don't know what the agreement

or says.

Q.    And you signed it under someone

else's credentials?

A.    As I said before I was sharing

with a friend who is another solo

practitioner and before we used today share

a lot of practices before and he is

disabled and I tried to help him out and I

gave me H him my access for at least four

years.

Q.    So any way, you didn't have

authorization to sign into LexisNexis you
had to sign in under Freds credentials

right?

     A.    The word authorization is a
little tricky because Fred authorized me to
use his account and so, you know --

     Q.    So, you had feds authorization?

     A.    Yeah.


                    303

                              304

          * CONFIDENTIAL ~ TYRONE BLACKBURN *

          Q.    And you used LexisNexis
authorizes?

          A.    Well.

          Q.    No?

          A.    If that is what the -- if
you're going to read some agreement or
something like that I'm telling you what
the context of the relationship was with
Fred and I when it comes to shared
resources as solo practice particular
others my representation of my account when
I --

          Q.    Said that to the court?

          A.    To Judge Roman.

          Q.    As an attorney you are aware
that the computer fraud abuse act under ten
makes a crime punishable to be access
computer over data storage facility like
LexisNexis without authorization from the
company you are aware of that right?

A.    Litigation and I'm not a criminal, defense attorney and I don't -- I believe not familiar with the statute that you are reading nor do I you this it

304

305

* CONFIDENTIAL ~ TYRONE BLACKBURN *

applies to to to to to hear I'm not -- so again, I'm not familiar with that statute and that is the answer.

Q.    Okay.  Well, one thing you made clear is that elections didn't give you Mr. Blackburn access to access it's database that we can agree we just read?

A.    Fred gave me authorization.

Q.    I asked if LexisNexis did?

A.    You asked me if I just said and I am telling you Fred gave me authorization to go access the LexisNexis account.

Q.    The here is my question you would agree that he Lexis next as didn't give you Mr. Blackburn actuary authority to access it's Nexus Lexus next as account?

A.    My account that I had for years I believe at that time still having back and forths was that account and it did not a  --  -- the account number on Lexuss data case where these cases came from was under Feds Account Number but I had a -- at that time that I was utilizing and building these cases active back and forthwith

* CONFIDENTIAL ~ TYRONE BLACKBURN *

LexisNexis concerning the issues that I raised earlier with my personal account that I had for multiple years and again I am trying to figure out when say access, I -- I had consent from -- from Fred to utilize his account and -- and I already had quote unquote access to the old account that I had because I was going -- having an issue with LexisNexis regarding some billing stuff.

Q.   And LexisNexis and you were having an issue and instead of dealing with that you took someone else's account and give it to you and signed up to you Lexis protege?

A.   Are you're drug a conclusion.

Q.   That is what is you just said?

A.   I did not say I was having money he shall use.

Q.   You just said?

A.   I think you're misstating prior.

Q.   Okay?

A.   And I said I was having an

issue with the account.

Q.   Billing issue?

A.   I said I was having an account and I I think I said earlier that I was having problems to have access of the features that I I was paying for and that is where the back and forth came from and I don't know how that's relevant he ever but if you want to waste your time talking about that let's talk about that.

Q.   Your theft about AI and data is relevant to me and it may not for me I know you're indicted for one crime but it's okay?

A.   I didn't steal anything.

Q.   Well, according to LexisNexis you did because you didn't have an account or access so according to them you stole from them?

A.   And according to Lexis nexus where that is.

Q.   The letter you didn't see that?

A.   Election us nexus stole from them.

307

308

Q.   You were not granted or possess authorization to enter into the account the LexisNexis service AI or protege think

further said that although there was someone's a subscription err to products that department include the protege or Lexis AI and if you sign on to an account that you were not required to using someone else's credentials you know that is stealing from the company?

A.    You just said that lexus nexus said that I stalled.

Q.    I didn't have say that, sir?

A.    What did you just say.  I mean you can --

Q.    Play your games.  Play your games?

A.    I am talking about the statements that you just call.

You called me a clown again.

Q.    In generating your memorandum of law in this case you were questioned by Judge Rochon on January 7, 2016 as to whether you used AI or a chat both in order

308

309

* CONFIDENTIAL ~ TYRONE BLACKBURN *

to draft your responses that is chapter 14 at the status conference that I wasn't at but there was a transcript much and according to that you responded today Judge Rochon do you recall that your the case toss Judge Rochon?

A.    I don't have -- I don't

remember that.

Q. It was really right up through I will read it for you were served with a request for a production of documents new this case on October 29, 2025 specifically the request for production Number 11 asked that you produce "all documents communications about money allegedly owed to and/or received from Dixon or Plaintiff or any other entity affiliated with the Plaintiff during the court conference on July 7, 2026 you told Judge Roman that when prepping your responses you summarized Mr. Cartagena requests you produced an order to better respond to them?"

A. Yeah.

Q. And when Judge row than when

309

310

* CONFIDENTIAL ~ TYRONE BLACKBURN *

I'm done you can do your thing and Judge Rochon gave your proposed summary for production Number 11 and as Judge Rochon said what you identified as Mr. Cartagena Number 11 produce all documents registration records regarding copyright ownership song writing credits producing credits or any musical recordings or words in which you have a claim to any interest.

During that January 7th conference Judge row than pointed out that

Mr. Combs actual requests for Number One about money allegedly owed owed to or received by Mr. Dixon or any an entity affiliated with Plaintiff?

A. Yeah, and as I showed her later on and I went through the questions I may have miss numbered the responses to -- I was drafting my, you know, the summations but I had to resubmit the responses and the reflected -- each number reflected the number and the response.

Q. Okay. Well here was your actual answer and that is not what you said

310

311

* CONFIDENTIAL ~ TYRONE BLACKBURN *
and you I will read it from the transcript R your answer was and this is Exhibit 14 from the January 7th, 26 status conference?

(Whereupon, Plaintiff's Exhibit #, (DESC), was marked for identification.)

Q. Page 8 lines 3 of 16. Okay. Your honor I don't know. It's not -- again it's not verbatim as requested. They're asking about money alleged owed or received by Dixon to Plaintiff and I believe that I went beyond what they were asking for by talking about the registrations and the certifications of the records regarding the ownership and the author ship of the song

writing so I don't know why I wrote that

that way but so I can't really -- you know,

I was just trying to give, I believe more

than what they were asking for because the

entire issue here deals with the fact that

they failed to give him proper author ship

and to pay him for the work that he did on

these songs and on the album so I just

that's what I believe that is there is


311

312


* CONFIDENTIAL ~ TYRONE BLACKBURN *

nothing about you misnumbering the

responses is there?

A.    No, I believe there is another

section in that conversation with the court

where she brought up another question and

my response was the answer I think was a

number -- a number below and I had

misnumbered -- that is what I was referring

to with misnumbering and when it comes to

this, yes, my response, I believe so that

question was to cover all of the claims

concerning any kind of money that -- that

Mr. Dixon was owed and I was trying to go

just -- as I claimed there from that

response was toss cover the entire

landscape of -- of claims that he had.  And

so, again, I should have just went -- went

question by question as opposed to trying

to summarize or rewrite the questions and I

felt they were very long mean of them had

multiple sub-parts and hence why I rewrote

everything and I corrected it with a follow

up submission to -- to defense, I believe.

Q.    Okay.  Let me get this straight


312


313


* CONFIDENTIAL ~ TYRONE BLACKBURN *

it was your store me you weren't using

artificial to respond to Mr. Cartagena

request for production and you were instead

trying to help Mr. Cartagena more than what

we asked for?

A.    No, you're misstating the

testimony what I said was I gave to -- when

it comes tombs this particular answer as I

shared with the Judge I believe I was

answering the question and providing the

full context of what monetary demand was

and I think it was probably the same thing

that I may have shared in -- in -- and --

and -- and free litigation communications

so that is just what it was I was trying to

give a broad answer to cover the total

landscape of what his monetary landscape

was.

Q.    Let me ask the question again

it is your position your story that up

weren't using artificial intelligence to

response to Mr. Cartagena's request for

production?

A.   Yeah, that is what I said.

313

314

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.   And to justify that you gave him for and when you reference registration and certification of the author ship of the songs writing you said at entire issue deals with the fact Mr. Cartagena failed to give Mr. Dixon to give him proper author ship and to pay him for the work that he did on the songs and albums is it your claim that the entire issue deals with the alleged fact that can Mr. Combs failed follow give Mr. Dixon?

A.   No.

Q.   And pay him for the work that he supposedly did on the songs and albums?

A.   No.

Q.   Okay?

A.   When I was talking to the court based on that specific question, I was saying and you I should have been more clear and I was trying to answer to the totality of what -- of what his damages are which did not only include, you know, the claims that were in the original filing and his unpaid pages and all of the other

314

315

* CONFIDENTIAL ~ TYRONE BLACKBURN *

things but also include these issues regarding the registration and the compensation for his works so that is what I said, the entire case Social Security involving and I was talking about the entire landscape of his case or his claim, I should say.

Q.    And when Judge Rochon pressed you on this you wrote quote I don't know why I wrote it that way do you remember that?

A.    Yes.

Q.    Okay?

A.    I felt I should have written the answer and I probably could have written the answer more clearer and I could have explained what it is there.

Q.    And Mr. Dixon the reason you couldn't give a clearer answer is that you used AI to help create this response right?

A.    No.

Q.    You did not?

A.    No, same answer as I gave the judges.

315

316

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q.    Did you -- did you lie to magistrate Judge Joe Marutollo in the

Eastern District of New York?

A.    Who.

Q.    Judge Marutollo last February -- I'm sorry I'm sorry this February.  The you know, like a month ago you filed a letter with this Judge Mat- -- Marutollo, do you know who that is?

A.    I don't know what -- what -- what you're referring to or what case you're referring to.

A.    Okay well you filed the letter a month ago with this magistrate Judge about a Cruz you took on February 11, February with three court orders with cane versus U mortgage do you remember that now.

A.    Judge... I was on the juice, I did not have my records and they had submitted -- I believe they had submitted an order to meet and confer regarding -- I don't want to misstate it but it had to do with the pre -- the pre -- I think the pretrial prep I think it was but I had

316

317

* CONFIDENTIAL ~ TYRONE BLACKBURN *

received a message from are from opposing counsel during that time where she -- sorry where she gave me -- she was trying to meet with me so we could go over our individual submissions and you couldn't -- like the access one I didn't have my files and two,

the -- the WiFi on the ship and everything was a little shaky.

Q.    And this letter up through that you wrote to the Eastern District of New York and you write respectfully in response to the court February 13, 2026 order February 2026 order, February 232026 order to show cause and the courts February 25, 2026 order entered this morning at 12:09 A.M., you write:

I apologize sincerely for my delayed compliance with the Court's orders and wish to ex-complain the circumstance that caused the delay on February 11, 20236 idea farted on a prepaid royal Caribbean cruise from Puerto Rico which was scheduled to return to Pureto Rico on February 20, 2026.  I was attached communal indication

317

318

* CONFIDENTIAL ~ TYRONE BLACKBURN *
scroll down please when the courts February 13, 2026 order issued settle dead likes for the meet and confer and pretrial submissions I was at sea and did not have access to the full case file my office files or reliable internet connectivity which you just said is sufficient to access CM/E CF or prepare the required submissions although the cruise meaningful access toss E CF outside the United States or to my

litigation systems while at sea on or about

February 19, 2026 I advised counsel for

Defendant's of my situation when I mapped

to receive an e-mail from them while at Lee

however I did not have the ability to

download documents access the docket review

Discovery concerns and I returned to the

cruise on February 20, 26 I did not return

to New York until February 22, you say 2025

I think you meant 2026 and immediately

began working to comply with the courts

orders I acknowledge that I have filed an

seeking and extension and you go on and

talk about the communications with chambers

318

319

* CONFIDENTIAL ~ TYRONE BLACKBURN *

and so forth taking full responsibility?

Q.    In fact in an affidavit to

Judge Rochon on March 2, 2026 you

acknowledge on February 13 while you were

on your cruise where you claim to have a

lack of reliable connectivity to access CM

ECS filings you made 3 ECF filings in 3

separate cases, right?

Do you remember doing that?

A.    I may have --

Q.    It was a few weeks ago?

A.    It was the same days.

Q.    We will pull it up if you want?

Q.    Exhibit 61?

(Whereupon, Plaintiff's Exhibit #, (DESC), was marked for identification.)

Q. The affidavit starts on Page 9?

Do you see that? That.

MS. LANZONE: Yes.

MR. TACOPINA: It up there.

MS. LANZONE: Yeah.

Q. Plaintiffs counsel further argue that I made --

319

320

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A. That is the truth.

Q. Okay?

A. No, 100 percent true.

Q. Okay?

A. I did not have -- I could not access the cane matter on the E CF on the docket because I was at sea. I -- I -- and I didn't have access to my cane case files but I did -- I was able -- I think I was able to make a State Court filing if I'm not -- I don't remember which one I believe I made the State court filing in New Jersey and may have submitted something in New York but the access to E CF depending on which court it is and where you're at the time of trying to file it it's problematic I have had the same issue before when I was -- not even at sea I was at Saint Lucia

and I couldn't file documents for a case

that I had in in New Jersey on ECF and I

had to reach out to you chambers and I had

to get that correct the. Apparently there

are problems with -- with access from

internet using the EPN and staples EPN

320

321

* CONFIDENTIAL ~ TYRONE BLACKBURN *

allows me to have access to the file and

other times it doesn't work and I take

screenshots to show the court that are I

didn't have ago yes.

Q.    And to the Eastern District
court you said you had no access to ECF?

A.    Right.

I didn't have access during the
trip.

Q.    In your affidavit to Judge
Rochon you acknowledge February 13 while
abroad cruise to the magistrate relied
automobile you made 3 ECF filings in 3
separate Federal cases right.  That is what
you explained to Judge...

A.    I just explained to you that I
couldn't access ECF to this mat other right
here, the cane matter and whether or not
there was other connectivity, you know,
non-issues in other jurisdictions, could,
you know, I could have accessed it I'm not
saying I couldn't accessed it when it comes

to other matters and when it came to this

case and this matter, I couldn't gain

321

322

* CONFIDENTIAL ~ TYRONE BLACKBURN *

access to it because I couldn't gain access

to ECF and I have a kicks and I think I

have a screenshot here.

Q.   You have one?

A.   I think I may have one during

that time where I took a like a control

something just to document what the --

because I was getting this error message,

you know it was this -- pertaining to

this -- just to this thing I don't know why

and I was able to file on other cases

without a problem, State Court and over

stuff too I don't know.

Q.   And you can get on to the ECF

on cases that had you made files on 3

separate cases you were able to get object

ECF; is that correct?

A.   I use BPNs sometimes it works

sometimes it doesn't work but I could not

gain it was not a lie I couldn't gain

access to BCNI.

Q.   You have a screenshot?

A.   I said I think I may have a

screenshot of it and sometimes when this

* CONFIDENTIAL ~ TYRONE BLACKBURN *

happens I like to be take a screenshot to let it show what the language is and some type of contact with ECF and again you were at sea depending on where you're and if you're slows to land and you catch a land signal and cover things but I don't know what time of day this was or where exactly this was when I filed the first thing versus when I tried toy gain access to this and it was very hard to tell, I had no reason to -- to -- to like I spoke to counsel regarding to get a conversation about if and it shouldn't be an issue, I just didn't have an opportunity to submit something with king.

Q.    And you said your filings on the cruise were miss tier y'all and brief that you were able to make the file s I don't know your own?

A.    I suppose that is what I go.

Q.    Being you swore to the affidavit I hope that is what is you use?

A.    And being that.

Q.    And you said that the judges to

323

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Judge Rochon and notices that did not

require access to full case files office

systems or the ability to download review

and prepare sub litigation documents you

made awful those at the same time to Judge

Rochon?

        A.   I believe that is what is it
was that I filed.

        Q.   Okay?

        A.   To -- for those other
documents, I had the -- this was based on
the king case because the king case it was
a whole trial prep that -- that they wanted
me to do so you know I don't -- I don't --
again, I believe not -- Tim not -- I'm not
sure at what point in the day on the 13 I
was trying to access ECF in this Cain
matter but I could not -- I could not down
loan anything I was getting an objection.

        Q.   And despite --

        THE WITNESS:  I have to use the
    restroom.

        Can I take a break?

        Thank you.


                        324


                                325



        * CONFIDENTIAL ~ TYRONE BLACKBURN *

            THE VIDEOGRAPHER:  We are going
      to go off record.

            And this concludes Media Unit
      Number 3.

            (Whereupon, a short recess was

taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 4:37 P.M.

And this is the start of Media Unit Number 4.

Q.    Okay.  So we were just talking about the affidavit you made to Judge Rochon regarding the minute steer y'all and the filings the nature of those file s despite claiming that and say ago they were merely letter motions what letter motions the ones that you sent from the cruise an 86-page 555 paragraph proposed amended complaint verse some spirit or whatever they're called there?

A.    Side Para 4 gram.

Q.    In New Jersey?

A.    So I will describe that.

Q.    Okay.  Of?

325

326

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.    When I was on the cruise I came prepared for certain things that I knew had to get done while I was going to be away. The Hilda Brandt case I had I had issues filing that as well, so I initially tried to file it on the ten and it didn't work I tried to file it on the 11 and it department work but on the ten I think I I sent the court or the magistrate of that

court Judge men an e-mail with the copy of

the screen shot that I I was seeing and it

said something to the effect item not found

or something because of the WiFi and the

WiFI service wasn't terrible and I couldn't

access the ECF and that was the problem it

was terrible and it was not just the Hilda

Brandt case I had I had a State Court case

a notice of dismissal it was a one page

case Cartagena verse rent an I believe it

was and then, there was November case that

I had on it and it was due on the 13 around

that time, I believe that may have been an

Eastern District of New York case, I think

it was Nontongo versus Nationwide and I --

326

327

* CONFIDENTIAL ~ TYRONE BLACKBURN *

and in that case too, I had to send an

e-mail to the magistrate she's the chief

magistrate I don't know her name but I

believe I sent the e-mail to the screenshot

I saw from ECF the warning that I got from

ECF in that case, too.  That is item not

found or object not found when I tried to

click on the link and the way that ECF is

set up is that when you're filing on ECF

you have to you put it in -- you have to

you put the extra step it have you

authentication and another box comes up and

you have to use the you authenticate for

app and even that was giving me problems

because the album didn't match the question

because the you authentication number

wasn't matching the number it was out of

sink from the request online so there were

multiple things that I was trying to file

and I had to have the opposing counsel in

the rain a file saying that he can sign on

my behalf and consent it for him for the

voluntarily settle that was settled and I

sent to the Judge Retry the Hilda Brandt


327

328


* CONFIDENTIAL ~ TYRONE BLACKBURN *

case on the 17 or 18 and then, I was able

to upload it after I kept fighting with

the -- with the -- with the anyone and then

there was an Nontongo issue that case that

is Fred was on and so that is why we don't

talk any more and I found out that he

forged a clients signatures onset will

meant documents and that is a whole other

thing and that was the Nontango documents

were for we had a hearing and I had to file

something in association with that and same

error message like eye Tom not found that

is what I I was referring to.

Q.    And there was another one

another ECF filing on the cruise in a

Cortez case?

A.    Kertz case.

Q.    Kertz?

A.    I think that may have been either my leave to amend notion.

Q.    Yes, file to lead through?

A.    Yes yeah, that one -- I don't know -- it's important to know the time of day because where I was on the water and

328

329

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

how -- I was I either playing in the port at that time or I was pulling in to the support I was close to land and I was able to file things when I was close toes Grenada I wasn't going to Grenada but I picked up a sink national but the Kertz thing was already wait he been that was complaint was already written and the memorandum of law for that matter was already written because I had a previously filed it and I had to refile it again and so everything was all right pre done in that but it was not a situation where you know.

I was being dishonest with Judge Rochon I just had a lot of things I had I had to file could file didn't file sending different letters toss different chambers and I remember the Nontango magistrate said I had to file the individual courts individual rules and I

said look at the screenshot it says no

thing found and so I had today fight and --

and -- and -- and -- and get the document


329

330


* CONFIDENTIAL ~ TYRONE BLACKBURN *

filed it was late but I got it filed

notwithstanding the less when I got access

to the WiFi.

Q.    Look those two filings alone

those two?

A.    Yeah, those are large filings.

Q.    Okay?

A.    It wasn't --

Q.    And you had enough

connectivity?

A.    And what you ever trying to get

at or what you were trying to get at is

that I characterize the items that was

filed or some of the things that was small,

that's not a -- a -- a lie, because I -- I

-- I think I did -- around that time I

filed a -- like a one pager on -- on -- on

like a State Court master err rarity E

regarding -- I forget what the issue was

but there were a lot of filings around that

time, yeah.

Q.    Okay.  And you would you agree

then the March two affidavit from Judge row

than about the filings being minute sphere

* CONFIDENTIAL ~ TYRONE BLACKBURN *

y'all and brief and the notices wasn't exactly accurate because one thing was an 11 page memorandum that attached a 54 affidavit?

A.    It was not that.

Q.    I understand there was a lot of material, a 99-page redline document a lot of documentation that is you were able to send?

A.    Yeah, I don't know if you practice in New Jersey.

Q.    I understand?

A.    But if you're going to bring a complaint in New Jersey, similar to New York but they ask for a different type of -- they have a specific -- Jersey rules are very weird they have a very very specific way in the way that they want there and it required the brackets and all of the things but again just for the context of the Kertz matter that is pending, the leave to amend and the amended complaint -- I had already -- so here is the truth about the Kertz and the

* CONFIDENTIAL ~ TYRONE BLACKBURN *

understanding of what happened there, I I had already submitted a leave to amend and I think that the defense objected to that submission because all I provide was the 11 page memorandum and the amended complaint but I didn't put the outline version of it and then, the court asked me to resubmit it and I didn't have -- so the re Smith submission was essentially the original complaint the motion the memorandum that I filed months ago along with the mended complaint which I also filed months ago and now the now red line or outlined complaint and that -- yeah, that is what I think that was for. So again I wasn't trying to, you know you know mislead or lie to the court, I -- I'd lot of filings like I said I have all of the e-mails messages back and forth different faults -- different issues I was having with ECF around other systems.

Q.   Okay.  But at bottom, you would you agree that you had enough connective?

A.   Eventually.

Q.   On the cruise --

332

333

* CONFIDENTIAL ~ TYRONE BLACKBURN *

A.   At certainly points.

Q.   Okay.

A.   I am not -- I'm not -- I'm not denying that.  I think -- I think that

response was in response to what you guys

filed concerning king and what I

represented to the Judge in Cain which was

100 percent true that despite all of the

other issues that I was having, I was able

to get certain things filed and the counsel

in sink, I was able to communicate with

her, tell her what was happening and you

know, she told me he been joy your screws

and blah, blah, blah, blah, and that she

was file on the docket, I thought and I

should have confirm to her that she would

inform to the court about the issues that I

was having and the concerns that I shared

with her but she didn't add that

correspondence so no harm to foul.

Q.    And now my next series of

questions are going objection to about the

letter to our court dated February 25, 2026

saying that doctors expect you to stay on

333

334

\* CONFIDENTIAL ~ TYRONE BLACKBURN \*

medications for six to eight weeks and you

said the letter of conclusion --

A.    I want to say that that letter

is accurate --

Q.    Okay.

A.    As you saw from the last -- the

last deposition, after the court denied

that and the issues that I was having at

the last deposition, you know, she

essentially granted it afterwards because

she gave me the full duration of the six

weeks and this week which is an additional

week and I will say this about the he had

medication that I I'm taking I do not

consume -- I I'm very particular in what I

I drink and what I eat because I have had

other health challenges from being a kid

and then, as an adult, you know, breathing

issues we talked about it off the record

about those things and so I made a very

conscious effort about five years ago, be

careful.  I don't consume over-the-counter

medications.  I don't take Tylenol for

headaches.  I -- I use holistic different


334

335


* CONFIDENTIAL ~ TYRONE BLACKBURN *

types of things to deal with my health.

        So, when I had -- I had this

procedure and I had to take this medication

because I had no choice but to take this

medication it literally had a negative

impact on my mood, it had a negative

impact -- you know, I was dating someone, I

got her back now, but like she broke up

with you me because of my mood, it was --

it was a 180 from -- from the formal way

than I'm with her my communication tile was

off everything was off that is why the

letter asking for the court for a brief delay and I Jewish just knew from the way that I was feeling from everything that I was prescribed that I was not myself.

Q. Okay. That's fine. So what I was going to ask you and earlier I said I wasn't going to ask them and the types of medications and the procedures that you have had?

A. I don't want to answer that happen and I don't think it's relevant the same objection still stands.

335

336

* CONFIDENTIAL ~ TYRONE BLACKBURN *

Q. Okay?

A. If it's that important and if you guys want to confirm what it is I have no issues with providing you with the names of -- of -- of the medication that I was on via some Protective Order or, you know, under seal with the court so that you can research it and you can see what the side effects are and for the main medication and you know, to be Dwight honest, I fought really hard not to take the one that had the impact on me very long very hard and sometimes I just could not bear you know, the pain after so I had to take it. But it's a narcotic, it's a very strong narcotic, it's an open owed, people

overdose on these things and you know, it -- it -- it causes multiple side effects

like nausea or stomach pains and one of the

main side effects is like anger, outbursts,

short-temperedness, and that sort of thing.

Q.    Okay.

A.    Yeah, that is what is it was.

Q.    Okay.  All right.  Thank you.

336

337

* CONFIDENTIAL ~ TYRONE BLACKBURN *

MR. TACOPINA:  Look, based on

all of the objections you made and

the parts of the transcript that we

marked for rulings that is where we

need to go.

A.    Sure.

Q.    So, without that we are good

today we will get some rulings but thank

you guys all right?

THE VIDEOGRAPHER:  All right.

Great.

MR. TACOPINA:  Thank you.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  We are off

the record.

The time is 4:52 P.M.

And this concludes today's

testimony given by Tyrone Burke.

The total number of media

used --

THE WITNESS: Blackburn, not Burke.

THE VIDEOGRAPHER: Excuse me.

-- Tyrone Blackburn.

337

338

* CONFIDENTIAL ~ TYRONE BLACKBURN *

THE WITNESS:  Um-hum.

THE VIDEOGRAPHER:  The total number of media units used was four, and will be retained by Veritext.

MR. BLACKBURN:  Can I have a rough and a daily, as well?

338