UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Terrance Dixon, A/K/A "TA," Plaintiff,<br><br>v.<br><br>Joseph Antonio Cartagena P/K/A "Fat Joe,"<br>Peter "Pistol Pete" Torres,<br>Richard "Rich Player" Jospitre,<br>Erica Juliana Moreira,<br>Sneaker Addict Touring LLC,<br>Slate, Inc.,<br>Roc Nation, LLC,<br>John Does 1–10,<br>Jane Does 1–10, and<br>ABC Corporations 1–10,<br>Defendants. | Case No. 1:25-cv-05144-JLR-JW<br><br>-and-<br><br>Case No. 1-25-cv-03552-JLR-JW<br><br>Declaration of<br>Tyrone Blackburn |

I, Tyrone A. Blackburn, Esq., pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America as follows:

1. I am an attorney duly admitted to practice before this Court and the principal of T.A. Blackburn Law, PLLC. I appear in this action in three capacities: (i) as counsel of record for Defendant Terrance Dixon; (ii) pro se as Defendant Tyrone Blackburn; and (iii) on behalf of Defendant T.A. Blackburn Law, PLLC. I submit this Declaration in support of my motion, pursuant to Local Civil Rule 1.4 and consistent with Rules 1.7 and 1.16 of the New York Rules of Professional Conduct, for leave to withdraw as counsel for Defendant Terrance Dixon only, and for a sixty (60) day stay of proceedings as to Mr. Dixon.
2. I have personal knowledge of the matters set forth herein, except where stated on information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would competently testify to the matters set forth herein.
3. This action was commenced by Plaintiff Joseph Cartagena on or about April 29, 2025. Plaintiff is represented by Joseph Tacopina, Esq. and Chad Seigel, Esq. of Tacopina Seigel Trial Lawyers d/b/a Tacopina Seigel & DeOreo, together with Jordan W. Siev, Esq. and Ian M. Turetsky, Esq. of Reed Smith LLP (collectively, "Plaintiff's Counsel").
4. Defendants previously moved for sanctions pursuant to Federal Rule of Civil Procedure 11. That motion has been decided by the Court.

Events Giving Rise to The Disqualifying Conflict

5. The circumstances giving rise to this motion did not exist at the time I undertook the representation of Mr. Dixon. They have crystallized over the past several weeks and, taken together, now make continued representation of Mr. Dixon in this action ethically impermissible and, as a practical matter, incompatible with the effective and safe conduct of Mr. Dixon's defense, and prosecution of his civil action against Mr. Cartagena.

6. Underlying criminal proceedings against undersigned counsel. As the Court is aware from prior filings in this action, I have been the subject of a criminal proceeding in the Supreme Court of the State of New York, County of Kings, under Indictment No. 75222-25, arising out of an incident on May 12, 2025, at approximately 6:15 p.m. in front of 1242 East 80th Street, Brooklyn, New York, which houses both my law office and my residence — the same operative facts that Plaintiff has placed at issue in certain aspects of this civil action. The criminal proceeding concerned an alleged assault upon Mr. James Hunt, with Mr. Nicholas J. Palmeri identified as an eyewitness who, according to the grand jury record, intervened in and "Yanked" Mr. Hunt backwards. I have at all times denied any wrongdoing.

7. Dismissal of the initial indictment. On May 26, 2026, the Honorable Dale Fong-Frederick, Acting Justice of the Supreme Court of the State of New York, County of Kings, dismissed the initial indictment against me (Ind. No. 75222-25) pursuant to N.Y. Criminal Procedure Law § 210.35(5), with leave to re-present, upon a finding that the integrity of the grand jury proceeding had been impaired. As reflected in the court's written decision, the impairment arose from improper prosecutorial cross-examination on collateral matters, including references to unrelated federal-court proceedings and to inadmissible extrinsic civil matters (the email Reed Smith shared with the ADA the evening of October 14, 2025), together with legally inaccurate representations made to the grand jury regarding service of process. A true and correct copy of the dismissal order is annexed hereto as **Exhibit A**.

8. Dismissal by the second grand jury. On or about June 18, 2026, upon re-presentment, a second, independent Kings County Grand Jury dismissed the matter, declining to return an indictment against me on any charge arising from the subject incident. The Office of the Kings County District Attorney has confirmed that disposition in writing. The criminal matter against me has accordingly been terminated in its entirety. (**See, Exhibit B**).

9. Unlicensed private investigator dispatched by Plaintiff's co-counsel. On May 12, 2025, Mr. James Hunt (a/k/a Jamie Hunt), purporting to act through The Hunt Group LLC, appeared unannounced at 1242 East 80th Street, Brooklyn, New York — the location that serves as both my law office and my residence — accompanied by Mr. Nicholas J. Palmeri. On May 20, 2025, Mr. Hunt executed and caused to be filed in this action an affidavit of service (ECF No. 20) in which he represented under oath that he is "a licensed private investigator in the State of New York" acting through The Hunt Group LLC.

10. Based on my direct communications with the New York State Department of State, Division of Licensing Services, the licensure record for The Hunt Group LLC reflects the following: (i) a first private investigator license, UID No. 11000207807, with an effective start date of January 14, 2023, and an expiration date of January 13, 2025; and (ii) a second private investigator license, UID No. 11000238749, with an effective start date of February 13, 2026, and a renewal date of February 12, 2028.

11. Between January 14, 2025, and February 12, 2026 — a period of thirteen months that encompasses both the May 12, 2025, encounter at my home and law office and the May 20, 2025, affidavit filed at ECF No. 20, as well as the October 14, 2025, Grand Jury Testimony. The Hunt Group LLC held no active private investigator license reflected in the Department of State's records. A summary timeline cross-referencing the licensure record against the affidavit filed at ECF No. 20 is annexed hereto as **Exhibit C**.

12. The conduct of Mr. Hunt on May 12, 2025, constituted, on its face, a violation of New York law. New York General Business Law § 70(2) makes it unlawful for any person, firm, limited liability company, or corporation to engage in the business of private investigator, or to hold itself out as being able to do so, without first obtaining a license from the Department of State. General Business Law § 70(4) provides that any violation of Article 7 is a Class A misdemeanor. On May 12, 2025, when Mr. Hunt appeared at my home and law office purporting to act as a private investigator on behalf of The Hunt Group LLC, again on May 20, 2025, when he swore in a filing in this action that he was a licensed New York private investigator, and on October 14, 2025, when he testified before the Kings County grand jury, the Hunt Group LLC held no active license.

13. Plaintiff's co-counsel dispatched and utilized the unlicensed investigator. Upon information and belief, The Hunt Group LLC, Mr. Hunt, and Mr. Palmeri were retained, directed, and dispatched to my home and law office by Reed Smith LLP and Ian M. Turetsky, Esq. — Plaintiff's co-counsel of record in this action — in connection with this litigation. Reed Smith LLP and Mr. Turetsky knew, or in the exercise of reasonable diligence should have known, that The Hunt Group LLC did not hold an active New York private investigator license on May 12, 2025, or on May 20, 2025. They nonetheless caused Mr. Hunt to approach me at my residence and law office and thereafter caused his affidavit — which affirmatively represents licensed status — to be filed in this action at ECF No. 20. (**See, Exhibit D**)
14. The fabricated vehicular-assault narrative and the coordinated media ambush. Following the May 12, 2025, encounter, a false narrative was communicated to law enforcement and, ultimately, to a Kings County grand jury — namely, that I had struck Mr. Hunt with my vehicle, run him over, or fled the scene in a manner constituting vehicular assault. That narrative is false. It is directly contradicted by Mr. Hunt's own sworn affidavit of service filed at ECF No. 20, which describes me remaining inside my vehicle with the window closed and papers being placed under the windshield, and which contains no allegation whatsoever that I struck, injured, ran over, or assaulted Mr. Hunt with any vehicle.
15. It is further contradicted by the June 11, 2026, Mercedes-Benz vehicle diagnostic, which confirmed that no collision event was logged on or about May 12, 2025. (**See, Exhibit E**).
16. June 19, 2025 — the TMZ call. On June 19, 2025 — the same day I commenced my civil action against Plaintiff — at approximately 7:00 p.m., I received a telephone call from a reporter identifying himself as Jacob, calling from TMZ. He informed me that there was an active arrest warrant out for my arrest but could not share what the underlying allegations were. At no point prior to that call had I been contacted by the NYPD, by any prosecutor's office, or by any law enforcement agency of any kind regarding a warrant, an investigation, or a pending charge.
17. The unverifiable warrant. Following the TMZ call, I immediately attempted to verify the existence of the warrant. I contacted prosecutors' colleagues and classmates of mine currently employed by the Kings County District Attorney's Office, and contacts within the NYPD. None of them were able to locate a warrant for my arrest in any accessible system.

18. June 25, 2025 — the pre-processing media leak. On June 25, 2025, at approximately 5:00 a.m., I was arrested in Brooklyn, New York. Before I could be fingerprinted, arraigned, or otherwise processed into any public arrest system, Mr. Tacopina appeared on TMZ discussing my arrest and stating publicly that I had "mowed down" a 66-year-old process server, and had committed felonious assault, a statement that is false, that is inconsistent with the contemporaneous sworn record filed by Mr. Hunt himself at ECF No. 20, and that could not have been made by a person acting on public information alone.

19. The grand jury "investigation" was a five-page exercise conducted by a single officer, two days after Reed Smith's ex parte collusion email transmission. On October 16, 2025 — two days after the October 14, 2025, ex parte email from Reed Smith LLP to ADA Salvatore Prince — the sole law enforcement witness to appear before the Kings County grand jury was Detective Jason Sharp, Shield No. 3276, of the 69 Precinct Detective Squad. A true and correct copy of Detective Sharp's grand jury testimony is annexed hereto as **Exhibit F**. The substance of that testimony is contained on transcript pages 6 through 11 — a total of approximately five pages.

20. On the face of **Exhibit F**, the following is undisputed: (i) Detective Sharp identified only one witness with whom he had spoken — James Hunt; (ii) Detective Sharp collected video from a single source — the neighboring residence at 1240 East 80th Street — the timestamp on which was 1 hour and 6 minutes off from real time; (iii) Detective Sharp did not interview me before presenting the matter to the grand jury; (iv) Detective Sharp did not obtain, request, or examine my Mercedez Benz vehicle diagnostic data; (v) Detective Sharp did not canvass or interview any independent witness other than Mr. Hunt; (vi) Detective Sharp did not test any part of the vehicular-assault narrative against Mr. Hunt's own contemporaneous sworn affidavit at ECF No. 20, which contains no allegation whatsoever of vehicular contact; and (vii) Detective Sharp confirmed the arrest date as June 25, 2025.

21. Detective Sharp pleaded guilty, before an NYPD Department tribunal, to an act likely to be injurious to a child under seventeen — his own three-year-old son. The single most important disclosure in **Exhibit G** is Disclosure No. 7, memorializing NYPD Department Advocate's Office Case No. DADS 2013-9174. The Department charged him with three specifications, the second of which was, verbatim, "knowingly act[ing] in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old." That child was his

own three-year-old son. The disposition on the face of **Exhibit G** is: "1. GUILTY. 2. GUILTY. 3. GUILTY. (PLEA)."

22. The balance of Exhibit G. **Exhibit G** discloses eleven additional matters involving Detective Sharp, including: a federal civil rights action, Robertson v. Sharp, No. 13-CV-01172 (E.D.N.Y.); two substantiated 2019 failures to make required notifications to the Duty Captain and Internal Affairs Bureau; a substantiated 2023 finding for an incomplete or improper memo book; a 2011 allegation of excessive force; and a 2019 allegation of racial profiling.

23. Corroboration in contemporaneous public reporting. The events underlying Disclosures Nos. 6 and 7 of **Exhibit G** were matters of public record. According to contemporaneous news reporting, Detective Sharp — then assigned to the NYPD's Brooklyn gang unit — was arrested at his home in Bellmore, Long Island, and charged with third-degree assault, endangering the welfare of a child, and fourth-degree criminal mischief, after he became inebriated and struck their three-year-old son Connor in the face, causing swelling and bruising to the child's right eye, cheek, and nose. The child told responding officers, "My daddy punched me in the face." True and correct copies of the contemporaneous news reports are annexed hereto as **Exhibit H**.

24. Why the Giglio record is relevant here. I raise Detective Sharp's Giglio record not to disparage him personally but because it bears directly on the credibility of the grand jury process by which Reed Smith LLP's ex parte narrative was carried into the grand jury room. On May 26, 2026, Justice Fong-Frederick dismissed the indictment resulting from Detective Sharp's testimony. On June 18, 2026, a second grand jury — presented without Reed Smith's ex parte materials — declined to return an indictment on any charge.

25. The motive: to bury the underlying allegations against Plaintiff. I state the following not for its truth in this proceeding but to make plain to the Court what, in my sworn belief, motivated the campaign described above. Plaintiff is the subject of serious sexual-misconduct allegations involving minors. Those allegations are the subject of Mr. Dixons Federal-court action against Plaintiff, Dixon v. Cartagena, and are further reflected (i) in Plaintiff's own recorded music — including the track "She's My Mama," (**See, Exhibit I**), in which Plaintiff describes, in his own voice and in his own words, sexual acts committed with a sixteen-year-old female.

26. It is my sworn belief, based on the totality of the conduct described in this Declaration, that Reed Smith LLP, Mr. Turetsky, Mr. Tacopina, Mr. Hunt, and The Hunt Group LLC engaged in the campaign described above for the purpose of stigmatizing me, terminating my

representation of Mr. Dixon, and burying the underlying allegations against Plaintiff before they could be adjudicated on their merits.

27. The disciplinary complaint and the prior notice to this Court. In addition to the criminal collusion described above, counsel for Plaintiff and their agents also lodged a disciplinary complaint against me with the Attorney Grievance Committee for the New York State Supreme Court, Appellate Division. I raised the pattern reflected above and the litigation-by-ambush character of Plaintiff's counsel's conduct — before this Court previously, and no relief was granted. I mention that history not to relitigate it but to be candid with the Court about why I am seeking withdrawal now, at this stage.

28. Ex parte communications with the assigned Assistant District Attorney on the eve of my grand jury appearance. On the evening of October 14, 2025 — the night before my confidential appearance before the Kings County grand jury — Mr. Hunt transmitted to Assistant District Attorney Salvatore Prince an email bearing the subject line "Fwd: Blackburn Grand Jury," forwarding a message from Mr. Turetsky and attaching documents assembled by Reed Smith LLP. Mr. Turetsky's forwarded message directed Mr. Hunt's attention to attached documents that purported to "demonstrate" facts adverse to me for use in the prosecutor's grand jury presentation. (**See Exhibit J**). Those materials were furnished voluntarily — without any grand jury subpoena, court order, or other compulsory process — and without notice to me or my counsel. Mr. Turetsky was not subpoenaed by the Kings County District Attorney's Office, was not served with any grand jury subpoena, and had no legitimate role as a witness, complainant's counsel, or advisor to the prosecution. He has himself acknowledged, on a recorded Zoom call, that he did not represent Mr. Hunt and that Reed Smith LLP was not Mr. Hunt's counsel of record — an admission that eliminates any colorable professional justification for his intervention in the criminal matter and confirms that his transmission of documents and directives to Mr. Hunt for onward delivery to ADA Prince lacked any lawful professional predicate.

New Civil Actions Commenced by Undersigned Counsel

29. Following the termination of the criminal matter, and based on the record developed therein, I have commenced three separate civil actions in the Supreme Court of the State of New York, County of Kings, arising out of the same operative facts:

a) On June 24, 2026, I filed a Verified Complaint captioned Tyrone A. Blackburn, Esq. v. Joseph Tacopina, Esq., and Tacopina Seigel Trial Lawyers d/b/a Tacopina Seigel & DeOreo, Index No. 523539/2026 (Sup. Ct. Kings Cnty.), asserting claims sounding in defamation per se, defamation, tortious interference with an existing client relationship, negligence per se, trespass to land, negligent hiring, retention, and supervision, and violation of N.Y. City Administrative Code § 20-409.2. A true and correct copy is annexed hereto as **Exhibit K**.

b) On June 26, 2026, I filed a Verified Complaint captioned Tyrone A. Blackburn, Esq. v. EHM Productions, Inc. (d/b/a TMZ), Fox Television Stations, LLC, Fox Corporation, Harvey Levin, Charles G. Latibeaudiere, and ABC Corporations 1-10, Index No. 523929/2026 (Sup. Ct. Kings Cnty.), asserting claims sounding in defamation per se, defamation in the alternative, and tortious interference with prospective economic advantage. A true and correct copy is annexed hereto as **Exhibit L**.

c) On June 30, 2026, I filed a Complaint captioned Tyrone A. Blackburn, Esq. v. Reed Smith LLP, Ian M. Turetsky, Esq., The Hunt Group LLC, James Hunt a/k/a Jamie Hunt, Nicholas J. Palmeri, John Does 1-10, and XYZ Entities 1-10, Index No. 524424/2026 (Sup. Ct. Kings Cnty.), asserting claims against Reed Smith LLP and Ian M. Turetsky, Esq. — Plaintiff's co-counsel of record in this action — together with claims against The Hunt Group LLC, James Hunt, and Nicholas J. Palmeri. A true and correct copy is annexed hereto as **Exhibit M**.

30. As of the date of this Declaration, I am accordingly a plaintiff-litigant against (i) Plaintiff's own counsel of record in this action — namely, Joseph Tacopina, Esq. and his law firm, and Reed Smith LLP and Ian M. Turetsky, Esq. — and (ii) witnesses and other individuals, including James Hunt and Nicholas J. Palmeri, whose conduct, credibility, and documentary record are or will be central to the defense of Mr. Dixon in this action.

The Non-Waivable Conflict of
Interest and Independent Safety Grounds for Withdrawal

31. New York Rule of Professional Conduct 1.7(a)(2) provides that, except as permitted by Rule 1.7(b), a lawyer shall not represent a client if a reasonable lawyer would conclude that there is a significant risk that the lawyer's professional judgment on behalf of the client will be adversely affected by the lawyer's own financial, business, property, or other personal interests.

32. The conflict presented here is direct and personal. I am now an adverse litigant in three pending state-court actions against Plaintiff's counsel of record and against witnesses whose conduct is intertwined with the defense of Mr. Dixon in this case. A reasonable lawyer would conclude — and I have concluded — that there is a significant risk that my professional judgment on behalf of Mr. Dixon in this action would be adversely affected by that adversity. The risk is not theoretical; it is present in every interaction with opposing counsel, in every discovery and motion decision, and in every strategic choice.

33. Because the conflict arises out of active hostile litigation between undersigned counsel and Plaintiff's counsel of record, it is not, in my professional judgment, a conflict that can be cured by informed client consent under Rule 1.7(b). Even if Mr. Dixon were willing to consent, I could not, consistent with my obligations under Rule 1.7(b)(1), reasonably conclude that I would be able to provide competent and diligent representation to Mr. Dixon under these circumstances.

34. Rule 1.16(b)(1) further requires withdrawal where continued representation will result in a violation of the Rules of Professional Conduct. Rule 1.16(c)(1), (2), and (7) permit withdrawal where the client's interests are not materially adversely affected, where the representation has been rendered unreasonably difficult by the client or by circumstances, and for other good cause. Each of those grounds is independently satisfied here.

35. Irretrievable hostility. I am compelled to be candid with the Court. The events described herein — the arrival of unlicensed agents at my home and law office, the fabrication of a vehicular-assault narrative against me, the ex parte transmission of materials to the Kings County District Attorney on the eve of my confidential grand jury appearance in an effort to tank my grand jury appearance, my arrest and prolonged criminal prosecution before two grand juries, and the subsequent denials of responsibility by Plaintiff's co-counsel — have generated, on my part, a depth of animosity toward Plaintiff's counsel of record that I am unable to conceal from myself and that I will not misrepresent to this Court. That animosity is not a passing frustration;

it is the settled and, in my honest self-assessment, irreconcilable product of what I believe was done to me and to my family.

36. The criminal matter is over. The animosity it produced is not.

37. On the morning of June 25, 2025, a warrant squad arrived at my home at 5:00 a.m. I watched my mother's face when she heard the knock at the door. I watched the tears run down her face. That image — my mother, in her own home, reduced to tears at five in the morning because of a warrant that should never have been sought and a charge that a criminal court Justice and a second grand jury ultimately refused to sustain — is burned into me permanently. To dispatch two individuals with the documented records described above to ambush me in my own driveway, and then to manufacture a felony charge out of that encounter to protect an individual whose own recorded words identify him as a predator of minors, is not zealous advocacy. It is malicious, bad-faith litigation. The depth of feeling I carry about what was done to me and to my family is visceral.

38. I state the following plainly, and under penalty of perjury:

    (a) I regard any physical proximity to Plaintiff's counsel of record and their retained agents as unsafe. I say that not for effect, but because it is true. They failed in their effort to have me convicted, and I do not trust that they would not orchestrate another retaliatory action against me.

    (b) Given the intensity of my personal reaction to what has been done to me, and given the pending state-court litigation in which Plaintiff's counsel and their agents are adverse defendants to me, I do not believe that requiring me to appear in the same physical space as Plaintiff's counsel and their retained agents — whether at deposition, at conference, or at trial — is consistent with the safety of any person in that room, including my own. Withdrawal is the responsible course.

    (c) Even if the Court were to conclude that the Rule 1.7 conflict alone did not compel withdrawal — which, respectfully, I do not believe it could — the personal-hostility and safety considerations set forth above independently constitute good cause for withdrawal under Local Civil Rule 1.4 and Rule 1.16(c)(7). I have never before, in any matter, sought withdrawal on these grounds. I do so here only because the circumstances of this case, and the conduct of Plaintiff's counsel and their agents toward me and my family, leave me no alternative consistent with my duties to Mr. Dixon, and to this Court.

39. I raised these concerns before this Court on more than one occasion during the past year. I complained of litigation by ambush. I moved for reconsideration of the motion to dismiss, which I continue to believe was erroneously denied. My complaints were not meaningfully addressed. If I had done to Plaintiff's counsel what Plaintiff's counsel and their agents did to me — coordinated a pre-dawn ambush of a colleague at his home, transmit ex parte materials to a prosecutor on the eve of that colleague's grand jury appearance, and then stood before the press and declared that he had 'mowed down' a process server — this Court would have been incensed, and the consequences to me would have been swift and severe.

40. That asymmetry is part of the record I am placing before the Court, not as a basis for relief in this motion, but because candor requires me to explain, fully and honestly, why continued representation of Mr. Dixon under these circumstances is not something I am able in good conscience to do. Rule 1.16(b)(1) requires withdrawal where continued representation would result in a violation of the Rules of Professional Conduct; Rule 1.16(c)(7) permits withdrawal for good cause. In my professional judgment, both are satisfied here — quite apart from the Rule 1.7 conflict already established.

<u>Satisfaction of Local Civil Rule 1.4</u>

41. Local Civil Rule 1.4 permits withdrawal only "upon a showing by affidavit or otherwise of satisfactory reasons for withdrawal" and upon consideration of "the posture of the case, including its position, if any, on the calendar, and whether or not the attorney is asserting a retaining and/or charging lien."

42. <u>Satisfactory reasons</u>. The emergence of pending, active, hostile litigation between undersigned counsel and Plaintiff's counsel of record, the concurrent adverse posture toward witnesses central to Mr. Dixon's defense, the resulting non-waivable conflict under Rule 1.7, the mandatory withdrawal obligation under Rule 1.16(b)(1), and the personal safety considerations arising from the underlying events — are, respectfully, more than sufficient to constitute satisfactory reasons under Rule 1.4.

43. <u>Posture of the case</u>. The case is not on the trial calendar. The Rule 11 motion has been decided. There is no imminent event which the Court is required to adjourn to permit orderly transition to substitute counsel or to pro se status.

44. <u>No retaining or charging lien</u>. Undersigned counsel is not asserting a retaining lien or a charging lien against Mr. Dixon's file or any potential recovery in this action. Mr. Dixon's

complete file will be delivered to him promptly, and undersigned counsel will cooperate reasonably with any successor counsel in the orderly transition of the representation.

No Prejudice — Sixty-Day Stay Requested

45. Mr. Dixon will not be materially prejudiced if the requested relief is granted. With a sixty (60) day stay, Mr. Dixon will have a reasonable opportunity to (i) retain substitute counsel of his choosing, (ii) apply for pro bono counsel through this Court's Pro Se Office and Pro Bono Counsel Program, or (iii) elect to proceed pro se.

46. I have advised and will continue to advise Mr. Dixon of the facts and circumstances giving rise to this motion and of his rights and options upon withdrawal, to the extent consistent with the constraints described in the preceding sections.

Reservation Of Rights

47. Undersigned counsel expressly reserves all rights, remedies, and claims arising from the conduct described in this Declaration and in the actions referenced herein, including, without limitation, rights and remedies under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent authority. This motion seeks only leave to withdraw as counsel for Defendant Terrance Dixon and a limited sixty (60) day stay of proceedings and does not request substantive relief against Plaintiff's counsel or any other party at this time. Nothing in this Declaration shall be construed as a waiver or forfeiture of any such rights or remedies, all of which are expressly preserved.

48. No prior application for the relief requested in the accompanying motion has been made.

Conclusion

49. For the foregoing reasons, I respectfully request that the Court enter an Order (i) granting leave to withdraw as counsel for Defendant Terrance Dixon, (ii) staying all proceedings and deadlines as to Mr. Dixon for sixty (60) days, and (iii) granting such further relief as the Court deems just and proper.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 3, 2026, in Brooklyn, New York.

Respectfully submitted,

/s/ Tyrone A. Blackburn
Tyrone A. Blackburn, Esq.
T.A. BLACKBURN LAW, PLLC