Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH CARTAGENA, et al., Plaintiffs, v. TERRANCE DIXON, et al., Defendant.

Case No.: 25-cv-3552

New York, New York

May 18, 2026

TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE JENNIFER E. WILLIS

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: TACOPINA SEIGEL & DeOREO
BY: Chad D. Seigel, Esq.
275 Madison Avenue
New York, New York 10016

For Plaintiff: REED SMITH LLP
BY: Ian M. Turetsky, Esq.
599 Lexington Avenue
New York, New York 10022

For Defendant: T.S. BLACKBURN LAW, PLLC
BY: Tyrone A. Blackburn, Esq.
1242 East 80th Street
Brooklyn, New York 11236

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

THE DEPUTY CLERK: The Court now calls Joseph Cartagena v. Terrance Dixon, et al.; Case Number: 25-cv-3552.

Counsel, please make your appearances for the record.

MR. SEIGEL: Good afternoon, your Honor.

For Joseph Cartagena, Chad Seigel from Tacopina, Seigel & DeOreo, and with me is Ian Turetsky from Reed Smith. Thank you.

MR. TURETSKY: Good morning.

THE COURT: Good morning.

MR. BLACKBURN: Good afternoon, your Honor. Tyrone Blackburn on behalf of the defendants.

THE COURT: All right. And good afternoon to you as well, sir.

So we are here for -- initially, plaintiff had filed a motion for sanctions, and then in his response, Defendant Blackburn, on behalf of himself and his law firm, filed a cross-motion for sanctions. These are all fully briefed. I'm in receipt of all the papers, as well as a number of exhibits.

I'm trying to think of, sort of, the best way to, sort of, proceed with this so that everybody has a chance to be heard on all the permutations. I

think what I want to do is cabin the two sanctions motions. Even though obviously they are intertwined to some degree, I would like to, sort of, focus just on plaintiff's first, and then once we have had full argument from both sides on that, I would like to focus then just on Mr. Blackburn's cross-motion for sanctions.

So even though, yes, there's obviously some overlap, and there's some similar, you know, events and things in the timeline that may reference both motions, I would still like to, sort of, take them one in turn.

So I will turn to plaintiff's counsel first to hear you on your request for sanctions, sir.

MR. SEIGEL: Thank you very much, your Honor. Should I stand?

THE COURT: Whichever you prefer.

MR. SEIGEL: Okay. Thank you.

So I know the Court's read all the papers very carefully, so I just want to highlight some of the more salient points.

Our motion for sanctions, at its core, is fundamentally about abuse of the judicial process by an attorney, an attorney who has repeatedly engaged in *ad hominem* attacks, who has obstructed discovery,

who has disregarded court orders, who has lied repeatedly, both as an advocate and as a witness, who's repeatedly used speaking objections and witness coaching, who's made vulgar, homophobic and transphobic comments directed at opposing counsel, who's issued comments during a deposition constituting threats and intimidation, who's attempted to use an alleged medical impairment falsely as both a sword and a shield, and who has continued violating court directives even after sanctions were imposed.

And, your Honor, this is not occurring in a vacuum. Multiple federal judges have already recognized this pattern. Judge Oetken cautioned Mr. Blackburn about personal attacks and inflammatory conduct. Judge Cote referred him to the disciplinary committee. And this Court already sanctioned defendants; meaning both Mr. Blackburn and his client, Mr. Dixon, for failing to appear at court-ordered depositions on February 6th and February 9th.

And yet, even after being sanctioned by the Court, Mr. Blackburn still has not complied with a fee order that's in effect. That's the subject of a separate motion, but it is telling, your Honor,

because this is not an isolated incident, it's escalating misconduct.

And what makes this especially serious is that Mr. Blackburn was not only counsel in this case, he was also a defendant and a sworn witness. So the Court's not simply dealing with sharp advocacy, but with an attorney using his dual role to obstruct discovery and to evade accountability. And that misconduct spans every phase of discovery.

As I already alluded to, the Court found the defendants in contempt for failing to appear at court-ordered depositions in this case, the court-ordered reimbursement of costs, but the defendants continue their misconduct in this case. And that matters because it basically shows that lesser sanctions have proven ineffective; that continuing noncompliance matters because it shows a deliberate disregard for judicial authority.

To use the vernacular, he keeps thumbing his nose at the Court. And for whatever reason --

THE COURT: Well, on that point, let me ask you.

The finding that sanctions were appropriate by Judge Rochon, did that not -- didn't that occur after the two depositions in question?

Meaning, obviously, there was the missing of the -- was it February 6th or February 5th and February 9th?

MR. SEIGEL: Right.

THE COURT: Then there was the Dixon deposition. Then there was the Blackburn attempted deposition, and then later the full deposition. And unless I'm getting this wrong -- I do have -- the binder's quite large.

But the finding from Judge Rochon, I guess it was before -- wasn't until after, sort of, the Dixon and -- we'll call it Blackburn Part 1 Deposition.

So to your argument that her finding of sanctions and saying that fees were appropriate -- I know that there's another sanctions request because those fees apparently have not yet been paid, but that is not before me. But to say that that didn't have a deterrent effect, does the record really bear that out when that hadn't yet been levied at the time that these two depositions took place?

MR. SEIGEL: If we were simply dealing with this one case in a vacuum, I would tend to agree with that assessment. However, what we're looking at here constitutes a portion of a much broader

pattern that involves not just other courts, other jurists in this jurisdiction, Judge Cote, Judge Oetken --

THE COURT: Well, I heard you on that, and I don't disagree with you on that.

MR. SEIGEL: Okay.

THE COURT: But you specifically said that the finding of sanctions -- that sanctions were appropriate for the missing of the February depositions and the imposition of costs shows that -- his subsequent behavior shows that that was not significant enough. And what I'm saying is, doesn't the timing, sort of, belie that particular portion of your argument?

MR. SEIGEL: In this case, your Honor, he was also admonished by this Court for AI citations that he used improperly. But I would also add that when I said that there hasn't been a deterrent effect -- and I know that the most recent sanctions motion is still pending -- it is something that we take to heart.

Your Honor, the fact is that there is a pattern here of disregard for judicial authority, and it's been manifested by what we submit is systematic obstruction, particularly, that we

encountered during the depositions of both Mr. Dixon and Mr. Blackburn.

Now, the Court has the transcripts and the videos and what they reflect. And I'm sure the Court's aware from reviewing it, I was the deposing attorney, so I was on the receiving end of this. And there were continued speaking objections, witness coaching, argumentative interruptions, a refusal to permit a witness to answer that just plagued the entire process.

There were ongoing personal attacks, in our assessment, in an effort to provoke confrontation rather than permit an orderly examination, and it was right from the outset, your Honor. Obviously, as the Court knows, Rule 30 requires objections to be concise, non-argumentative, non-suggestive. That rule was violated, and it was violated repeatedly.

Importantly, here, it resulted in real prejudice to us. The defendants succeeded in materially interfering with our ability to complete meaningful examinations.

And, critically, Mr. Blackburn's misconduct was directed not only at counsel generally, but, as I noted, specifically and personally at me. So one of the reasons that sanctions is necessary here,

your Honor, is because Mr. Blackburn repeatedly attempted to derail proceedings through deeply personal attacks rather than legitimate advocacy. This wasn't about defending a client. From my assessment, having been there in the room at the time -- and there is video -- it was about humiliation and intimidation.

He repeatedly made comments about me personally that had nothing whatsoever to do with the merits of the case. And at one point during the deposition -- this is the February 24th deposition -- he made a vulgar, sexual remark about my mother.

Now, we didn't put this in the papers, and I haven't shared this with anyone publicly. That had an impact on me. And the reason, your Honor, is my mother passed away from cancer when she was 50 years old.

THE COURT: I'm sorry.

MR. SEIGEL: I had just turned 25. I had passed the Bar. I hadn't yet been admitted. It was a difficult time in my life. To have an attorney, opposing counsel, make a comment that she should have -- I can't even believe I'm saying these words in a federal courtroom, but I have to make a record -- my mother should have "spit instead of

swallowed," referring to my father's semen -- to say that that had no conceivable litigation purpose is an understatement.

And your Honor has the transcript. I ignored it. Wasn't easy, but I ignored it like many other comments during that deposition.

THE COURT: Sir, let me ask you something.

I don't think anyone anywhere could possibly dispute the idea that the comments made during the Dixon deposition, the February 24th deposition, were outrageous, insulting, wholly inappropriate coming from anyone, frankly, let alone an officer of the court.

And so, one, I am sorry that those attacks were levied on you, and I certainly appreciate that there can be numerous ways in which an *ad hominem* attack can impact people, even beyond what someone may intend, and it seems that that is very much the case here.

The question I want to ask you, though, is this -- and it's, sort of, anticipating a bit what Mr. Blackburn may say and has already said in the papers -- do I have to find, in order to sanction him personally with respect to, sort of, the outrageous comments -- obviously, we've got a second

problem in terms of what happened at the -- was it March 6th, the forced attempt to depose him.

But as to, sort of, the just outrageous and wholly inappropriate comments that were made, do I have to find that his claims that those comments were brought about by the use of prescribed pain medication -- do I have to find that not credible in order to sanction him?

Meaning, you know -- and, obviously, part of the arguments that you make in the papers, and I'm sure you're prepared to make here today, is that you do find it to be incredible, and I'll certainly allow you to make that argument.

But my question to you is, do I need to, in fact, make such a finding, or is there some other avenue to say, regardless of whether this is a credible explanation or not for the comments, you know, is there some other way to get to sanctions?

So I would, sort of, like to hear you on both those things.

MR. SEIGEL: Sure.

THE COURT: Both, you know, if you want to make an argument that you find, sort of, the medical explanation for -- we're now talking about February 24th, but you can extend it to March 6th if you

would like -- that you find that to be not credible and the Court should find accordingly.

But I would also like to hear you on, does that -- is that finding even necessary to, sort of, get to sanctions as to either one of these dates?

MR. SEIGEL: Thank you, your Honor.

So it's our position, as detailed in our papers, that the Court does not need to find that his conduct was a result of some medically induced impairment. I'll address that in a moment. As the Court anticipated, we don't believe that to be a credible -- a credible statement.

But if Mr. Blackburn truly believed that he was cognitively impaired during the deposition on February 24th to the point of unreliable testimony, then, as an attorney, he had an obligation not to proceed. And, in fact, we sent him e-mails on February 20th and February 23rd offering him the opportunity to move the deposition, and he did not avail himself of that.

In addition, I would point out that, in his papers, it's explicit, he does not use the medical impairment as a purported defense with respect to the February 24th deposition; only with regard to his own deposition on March 6th. And, in fact, on

the point you just referenced, it's our position that his narcotic-impairment defense does indeed collapse under scrutiny because, as I just referenced, he agreed to proceed with the deposition -- actually, with all of his depositions -- on February 24th and on March 6th.

During that period of time, he actively litigated other matters. He aggressively -- that's an understatement. But he aggressively defended his client, Mr. Dixon's deposition. And, in fact, the notion that he may have been medically impaired during this period is undercut by the fact that, after the appearance, when I -- it was taken at Reed Smith's office. As I went downstairs to the parking garage, I saw Mr. Blackburn there. I deliberately kept my distance, and I saw that he drove from the deposition. Presumably, he, therefore, drove to the deposition as well. So if he's capable of operating heavy machinery, I don't think he was cognitively impaired.

Also, he functioned strategically whenever useful. And significantly, your Honor -- I think the record is well established on this -- he traveled extensively during the same period of time, including on a ten-day Caribbean vacation for which

he took a flight, despite lying to the Court previously that he wasn't flying anywhere.

Specifically, in response to his efforts to move the earlier depositions, he said that he could not proceed because of medical reasons, that he was impaired, he had undergone a couple of procedures, and, as a result, he was asking to adjourn the depositions for two months.

When pressed on that, he claimed that he would be taking medications for six to eight weeks. We have uncovered, because of a filing in another case, that he was, in fact, taking a cruise. And when we brought that to the Court's attention, he tried to minimize and said, oh, well, I'm just lying down. I'm not flying anywhere.

Lo and behold, we look into it further, and he flew to Florida to get on the cruise to go to the Caribbean during this period he was purportedly so incapacitated. And we only discovered this after, but -- excuse me. I misspoke when I said "Florida." He actually flew to Puerto Rico. Puerto Rico.

And he embarked on that cruise for the purpose of vacationing at Carnaval. He actually -- subsequent papers noted that he was going to a street party. So any notion that he was medically

impaired during this time is just belied by the record.

And, in fact, on the point of timing here, the only proof that he's ever presented regarding his supposed medical condition during the depositions on February 24th and March 6th is a letter from a doctor, who we looked into. It's apparently a cosmetic doctor, your Honor, who provides voluntary cosmetic procedures. And in a letter dated February 27th, the doctor stated that Mr. Blackburn underwent some procedures on January 23rd and February 3rd.

I will pause here for a moment.

So with respect to Mr. Blackburn's claim that he could not fly -- this doctor was located in California, so it appears that Mr. Blackburn not only flew to Puerto Rico, but also to California and back, despite telling Judge Rochon that he could not fly and was not flying.

But, in any event, the doctor prepared a letter advising Mr. Blackburn to refrain from work for two weeks -- two weeks -- for recovery and pain management, which would be the pain medication.

So two weeks after Mr. Blackburn's last procedure on February 3rd would have been February

17th, which is well before the depositions in this case, the deposition in which he attacked me. The record's clear on that.

And, by the way, on that point, because of what I perceived to be Mr. Blackburn's unhinged behavior, I actually turned to him at one point and asked him if he was okay, and his response was, "Yes, I'm perfectly fine."

So his own words, sort of, belie any notion that he was medically impaired. But the point is that this medical impairment is a fiction, and we submit that the Court should reject that tactic. The record doesn't reflect generalized incapacity; it reflects strategic and selective evasiveness.

So the Court has the record, which is replete with all of the personal *ad hominem* attacks. Obviously, Judge Oetken warned him about this. Judge Cote has already referred him to the disciplinary committee as well.

And I want to pause because that's extraordinary for two reasons. It demonstrates that what's taking place here isn't merely a discovery dispute. It's not -- it goes well beyond that. And it's not simply plaintiff's or plaintiff's counsel's subjective characterization, there is a history of

this. And when we raised this issue with Judge Rochon in the past, Mr. Blackburn falsely claimed to her Honor that it wasn't true, that he wasn't referred.

Now, the actual language of Judge Cote's decision is unmistakable. In *Zunzurovski*, what her Honor wrote is, "Tyrone Blackburn is referred to the Grievance Committee of this district."

Judge Oetken, in his subsequent decision admonishing Mr. Blackburn for *ad hominem* attacks -- which I would submit didn't even rise anywhere near the level of what I was subjected to, but Judge Oetken noted at the time of that decision that there was a "pending referral."

So he was clearly referred to the grievance committee, whether it took action or not, obviously, we can't speak to, but there's no ambiguity about what occurred. A federal judge determined that Mr. Blackburn's conduct warranted referral to the disciplinary authorities of this district. And that matters enormously because he's attempted to minimize, distort, or outright deny prior judicial findings regarding his misconduct.

Your Honor, I should probably address this as well. I know it, sort of, touches on his

cross-motion, but there is some relationship here because he did apologize. That's his big, big claim here. And without question, that apology reflects his acknowledgment that he engaged in inexcusable misconduct, which is why he then resorts to touting this purported apology as though it meaningfully cures the conduct at issue, but it doesn't, your Honor. First, the apology came only after our sanctions motion was filed.

And I want to highlight, your Honor, something that I noted only over the weekend when reviewing the papers. It was jarring.

Mr. Blackburn stated -- this is in his -- excuse me -- his notice for cross-sanctions motions, page 8 of his memo. The on-the-record apology made at the March 27, 2026 deposition is entirely absent from plaintiff's motion. The omission is not a trivial oversight, it is a deliberate choice to suppress the one piece of evidence that most directly undermines our narrative.

THE COURT: And I suppose you're going to point out the fact that you filed your motion four days before the deposition --

MR. SEIGEL: Thank you.

THE COURT: -- and, therefore, four days

before the apology.

MR. SEIGEL: I'm very -- thank you. It was -- I read that -- astonishing to me.

Clearly, your Honor, the sanctions motion was filed before his apology. His apology came only after the transcripts and video exposed his conduct, and Mr. Blackburn realized that the Court would directly review what happened.

Beyond that, in his papers, he also makes reference -- and I don't think we cited this in our papers, but he also makes reference to the fact that, after his personal attacks at me, at the next deposition, he apologized. That's not true.

So what happened at the next deposition -- so just chronologically --

THE COURT: So the idea is that he made the comments, the *ad hominem* attacks against you on February 24th in the Dixon deposition. The next deposition chronologically would be the --

MR. SEIGEL: March 6th.

THE COURT: -- March 6th deposition, which was, sort of, the attempted deposition of him. There was no apology at that deposition, and so, therefore, it's a factual inaccuracy to say he apologized at the next deposition.

MR. SEIGEL: Beyond --

THE COURT: Noted as well.

MR. SEIGEL: Thank you, your Honor.

Beyond that, he didn't simply not apologize, he doubled down on his *ad hominem* attacks. You know, he purportedly claimed -- not purportedly. He claimed that he purportedly couldn't recall the deposition from less than two weeks earlier when he attacked me, and yet, somehow, he had enough mental capacity during that to actually recall the very transphobic *ad hominem* attack that he used against me at that prior deposition. So, your Honor, clearly, he was feigning his medical impairment.

And on that point, during the March 6th deposition, Mr. Blackburn claimed to not remember appearing at -- I just pointed this out -- at his client's own deposition less than two weeks earlier. But beyond that, he also, during that March 6th deposition, could not say whether he, in fact, represented his co-defendant. Now, that just defies credibility, defies common sense. The quote is actually -- it's astonishing.

Here's how he incredulously responded when he was asked, "Do you represent Mr. Dixon," your

co-defendant, which I would think would stand out in someone's mind. "So many cases, I don't know. I can't just -- it's a lot of cases. I have a lot of cases, so I'll just have to go back and check right now. I don't have my records in front of me."

At that point, what are we to do?

So we contact Judge Rochon, raise the issue. And at that point, his memory suddenly improved.

When her Honor asked him, "Do you represent Mr. Dixon," his response -- because now, of course, he couldn't falsely deny it, it would be absurd -- "Yes, of course. Yeah."

It's just a pattern, your Honor, with him. So his selective memory loss, which he claims is a result of medication, which isn't supported by the record, is incredible. This is all --

THE COURT: So when you say it's not supported by the record, your basis for that is the fact that the only, sort of, corroborating information, the only information coming from a source other than Mr. Blackburn about any medical procedures and any ongoing treatment, is this letter dated -- what is it -- February 27th from the doctor --

MR. SEIGEL: Yes.

THE COURT: -- that only speaks about dates of two procedures and needing to, sort of, refrain from work for two weeks, and obviously doesn't make reference to the idea that there might be prescription pain medication for six to eight weeks?

Is that what you mean when you say that there's no evidence of any medical ...

MR. SEIGEL: Yes, your Honor. Thank you very much. That's exactly what I mean.

And, in fact, the surrounding evidence critically undermines the notion that he was medically impaired.

THE COURT: When you say "surrounding evidence," what are you referring to?

MR. SEIGEL: Very good.

So I'm referring to his disparate conduct both at the February 24th deposition where he was extraordinarily aggressive. He had his full capacities; enough to come up with -- they were untoward but clever taunts to assert continuous objections, to obstruct the proceedings. That was anything but a medical impairment. And yet almost two weeks later, when presumably his medical condition should be improving, he claims that he

cannot even recall whether he represents a co-defendant. It's just -- it's not plausible.

And then, of course, you have all the surrounding circumstances I described with regard to his activity and other matters which are spelled out in our papers, and his own travel schedule. It's just -- this is not someone who is medically impaired.

And then you take into account the fact that this is someone -- and I don't say this lightly because I understand the severity of the allegations that are being leveled -- but someone who has repeatedly lied to courts.

In particular, your Honor, Mr. Blackburn has been found in the Western District of Pennsylvania for making misrepresentations while under oath regarding his use of artificial intelligence. During the proceeding, he claimed, "this is the first time I've ever encountered a situation like this. I just received a new subscription to LexisNexis."

Lo and behold, we looked into his history, and it happened at least a half-dozen times before. He always used the same excuse. I don't think anyone up until now has pulled together all of these

transcripts and the evidence of this, but it is an ongoing, blatant pattern of misrepresentations to the Court.

So, your Honor, I'm not sure what more needs to be said on this point. I mean, the Court has the remarks that he's made to me; I don't need to go through them. I know your Honor has reviewed the papers carefully and seen the transcripts.

The fact that he's using a fictitious narrative regarding a medical impairment to defend against himself, the fact that he touts some apology that only came after the fact as his defense, all these circumstances show why sanctions are warranted here.

And, your Honor, just so -- to recap the sequence here, putting aside other jurisdictions -- by the way, and it's not just federal court, we've noted this in state court as well. But Judge Oetken, in this district, has cautioned him.

If I received anything like that, I would be petrified. I would be so cautious. I've been practicing since 1997, your Honor, and I have never received even the slightest admonition. I can tell you it would have a chilling effect. I take my responsibilities as an attorney very, very

seriously.

That's not the situation here. Attorneys need -- look, we should be held to a higher standard, right? What we do, we're not just -- the bar should be higher, your Honor, and yet Judge Oetken has cautioned him. Judge Cote referred him.

Here's the sequence: This Court found him in contempt and sanctioned him. He still hasn't complied with the fee order, which I know is a separate matter, but the progression demonstrates escalating disregard for judicial authority. And without meaningful sanctions, there's every reason to believe that the conduct will continue, which is why, you know, we've asked for certain relief, including fees and costs, that Mr. Dixon's deposition be reopened.

In particular, there was a line of inquiry that I was trying to get into. They -- to use, sort of, vernacular again, they ran out the clock. And in the midst of my final question, I was cut off, and out the door they went. So we would ask that that deposition be reopened just for a limited purpose.

I can assure your Honor -- trust me -- I don't want to do that again. Once was enough, but

there's a certain line of area that we do need to go into. We would ask that any further deposition be conducted with a special master. And I don't say this lightly, your Honor. I don't think I've ever said this in my entire career, but we're asking that Mr. Blackburn be referred to the Grievance Committee. And we're not asking that for some litigation gamesmanship.

This is not ordinary incivility. It's not a one-off either. As I said, officers are -- excuse me -- attorneys are officers of the court. And when an attorney repeatedly attacks opposing counsel personally, injects vulgar, sexual remarks involving family members, disregards court orders, obstructs discovery, and then lies or evades under oath, the issue becomes larger than this case, your Honor, it becomes a question of protecting the integrity of federal proceedings themselves. And the Court has already attempted lesser sanctions, and they haven't worked, so we're asking the Court to grant our sanctions motion in full and deny his cross-motion entirely. And I can address that when --

THE COURT: Well, we're not getting to his cross-motion yet. We're cabining this.

MR. SEIGEL: Right.

THE COURT: Let me just ask you two questions about the relief that you are asking for.

You said, with respect to the reopening of the Dixon deposition, that you're asking for it to be for a limited purpose.

Exactly what would that -- is it a line of questioning? Is it a certain period of time?

What exactly is it in terms of articulating the specific relief that you want with respect to the -- if there is an ongoing, a reopened deposition of Mr. Dixon?

MR. SEIGEL: Conservatively, your Honor, we would ask for two hours. My hope is not to have to use all of that, but that --

THE COURT: Well, you -- in addition, you -- okay.

So you're saying a limit in terms of time. You also said "limited purpose." That is different than limited time frame. So what is the limited purpose that you are proposing?

MR. SEIGEL: Sure.

So one of the allegations that we raise is that Mr. Blackburn and Mr. Dixon defamed our client, alleging that Mr. Dixon was compelled to engage in over 4,000 sex acts. I began to probe that area;

actually did so initially.

Mr. Dixon was only able to recall two such instances, and then later in the deposition, he blurts out another. I try to probe, but I'm cut off.

So my concern is, if and when this ever goes to trial and we question him about that, if -- we would no longer be in a position to say, oh, you only claim to recall two instances.

THE COURT: Well, I don't want to know what the concern is, I want to know what exactly it is --

MR. SEIGEL: Fair enough.

THE COURT: -- that you are asking of this Court in terms of relief.

MR. SEIGEL: Okay. Thank you, your Honor.

Okay. So, look, the relief would be, in general, a two-hour window to go back and to probe that issue along with others where there were -- there were impediments to us fully developing a record.

THE COURT: And what are those other areas?

MR. SEIGEL: Okay. So, for instance, his Instagram account, right? That would be something that we want to probe. The commissions or royalties to which he claimed he was entitled, we would wish

to probe that. His communications -- it's off the top of my head, your Honor -- but his alleged communications with a particular manager which he says supports his position. We tried to ask him about that; we didn't get very far.

A big point of contention, that defamatory statements had been made during a podcast called *Off Da* -- *Off Da Wall*, right?

Yeah, *Off Da Wall*, I believe, is the name.

O-F-F -- for the court reporter -- D-A, Da.

So, initially -- I don't know if your Honor needs more color on that. I can move past it, but -- okay. So we would want to probe with respect to that.

I'm just trying to think if there are any other lines of inquiry.

So, I mean, in general, the defamatory statements which he has now tried to distance himself from, both on video, the *Off Da Wall* podcast, and his Instagram messages, circumstances surrounding his claim to royalties and these purported sex acts that he claims he was compelled to participate in.

I think -- yeah, I think that's it, your Honor.

THE COURT: All right.

And then let me ask you, with respect to your request for a special master, obviously, as is articulated in your papers, there were issues at both the February 24th and the March 6th attempted deposition, but then Mr. Blackburn was deposed on -- whatever -- March 27th, I believe.

Were there -- and I would gather, since there has not been a motion with respect to that, that that deposition, in the main, happened without the, sort of, rhetoric that was being used in the February deposition, without the memory problems that were claimed in the March 6th deposition.

So if that is true, that the March 27th deposition of Mr. Blackburn happened fairly unimpeded, then would that not be evidence that a special master is not, in fact, needed for any remaining depositions?

And by "remaining depositions," I believe all we would have left would be the reopened, limited-purpose deposition of Mr. Dixon. Because my understanding of the rulings previously made by Judge Rochon is that discovery was otherwise closed with the exception of these two depositions. So --

MR. SEIGEL: I see your point. It is a

valid question, obviously, but there's a distinction between him appearing on behalf of a witness and him appearing on behalf of himself.

During his own deposition, he engaged in what I would represent to be similar type of evasive commentary, but the distinction is, he is the witness, I'm okay with that. We'll use that at trial.

So I don't -- the distinction is, the answers that he gave, himself as a witness, he has to live with. But with regard to a client he's representing, where he deters us from getting the information we need, that's a different story, which is why we need a special master for that.

THE COURT: All right.

Anything more you would like to say, sir, before I turn to Mr. Blackburn for his response?

MR. SEIGEL: Nothing else, your Honor. Thank you.

THE COURT: All right.

Mr. Blackburn?

MR. BLACKBURN: Good afternoon, your Honor.

So just to respond to what counsel stated, as I said in my papers, I did apologize on March 27th for what I said, and I apologize again here

today because I do not believe that the statements that were made and the way in which I was responding to some things that were being said to me and said to my client -- I don't think that was appropriate at all. Banging on the table, throwing your glasses down, sticking your hand in people's faces, telling me that I'm -- essentially, I'm a criminal, accusing me of running someone over with a vehicle --

THE COURT: Well, it sounds, sir, like you're getting into your cross-motion. And as I told your opponent, I want to cabin these. So I will certainly hear you on the, sort of, unclean hands and they've-done-bad-things-too argument later, but right now, I just want to hear your response.

And so what I've heard you said is --

MR. BLACKBURN: So no. Your Honor, that's all --

THE COURT: -- you did apologize, you acknowledged that this behavior --

MR. BLACKBURN: That's all --

THE COURT: -- was wholly unacceptable, right?

MR. BLACKBURN: That -- no.

Your Honor, what I just shared was the --

from what -- I read the transcript. Those are the things that Mr. Seigel is doing. They are in a deposition.

THE COURT: Okay. But we're not talking about what he's alleged to have done. We'll get to that.

MR. BLACKBURN: Okay.

THE COURT: Here's what I'm saying, sir.

MR. BLACKBURN: All right. No problem. No problem.

THE COURT: I want to hear your response --

MR. BLACKBURN: Okay. No problem.

THE COURT: -- to his request for sanctions against you.

MR. BLACKBURN: Of course.

THE COURT: And what I have heard you say that's responsive is, number one, that you apologize and, number two, that you acknowledge that the comments that you made were not appropriate.

So I've heard that. I'll hear the rest of your response.

MR. BLACKBURN: Of course.

So on the 23rd of January and on the 3rd of February, I did have two procedures. On the 3rd, I e-mailed Mr. Turetsky as I was actually entering

into the operating room to let him know that I would not be able to attend the deposition on the 6th and the 9th because of the procedure that I was having on the 3rd. I assumed, you know, he would have wrote a letter to the Court or said something, but no. He --

THE COURT: I'm sorry. You assumed he would have done what?

MR. BLACKBURN: Would have at least acknowledged the fact that I was going through another procedure and -- you know, I mean, I've had other situations with other counsels, opposing counsels in the past, where it's just, like, common courtesy.

And I know it's my responsibility. I'm not saying that it was a requirement at all, but just common courtesy where -- you know, if someone tells you, hey, listen, this is what is going on -- I didn't have the ability to get onto the docket.

THE COURT: Well --

MR. BLACKBURN: That was a problem.

THE COURT: But except -- look, but the not showing up at the court-ordered depositions on the 6th is an issue that has already been presented to Judge Rochon and that Judge Rochon has already

imposed sanctions for.

So I certainly hear you as saying, look, there was a legitimate medical treatment that you had and that there was some attempt, at least, around the time of the second procedure on February 3rd to contact your opponent. But that is not the --

MR. BLACKBURN: Of course.

THE COURT: -- alleged sanctionable behavior that's before me.

MR. BLACKBURN: Of course. Of course.

THE COURT: Judge Rochon has already dealt with that.

MR. BLACKBURN: Of course. I was just trying to, like, go through the same timeline and just provide responses to certain things that were said.

So we did have a February 10th conference, where I expressed -- where I shared and I actually showed the bag of medication that I was on. I wasn't -- it wasn't something I was making up out of whole cloth.

I do not take medication. I do not drink alcohol. I do not engage any kind of recreational drugs or anything like that. I eat very healthy and

clean. I -- you know, so when -- I don't even take Tylenol, so when anything is introduced into my system, it has a negative impact, which I was trying to avoid.

I have -- I had 90 days of this medication to take. It was a narcotic.

THE COURT: My reading of the transcript of that February 10th conference before Judge Rochon is that you indicated that you would be able to be deposed when you returned from that pre-planned trip that you had.

MR. BLACKBURN: No, no. So what I --

THE COURT: That is what it says because I read it and I have it here, but go ahead, sir.

MR. BLACKBURN: Okay.

So I showed the pills that I had. And the depositions were scheduled for the 24th and I believe on the 6th. I think in that transcript that you are -- that you have, your Honor, Judge Rochon said that -- she asked for my calendar, and I read off some dates, I believe. I don't have it in front of me, but I'm just trying to go based off of my memory.

THE COURT: Sure. I have a copy of the transcript.

MR. BLACKBURN: Yep.

So -- and she said, well, you know, if you -- because I had, like, status conferences and stuff in other courts --

THE COURT: And it seemed like several other depositions as well. Just from what -- the page I have before me, there was another deposition that you said was going to be on the 26th and another one -- I know there were at least two -- and one on the 27th as well.

MR. BLACKBURN: So what I shared with her was a request to move the deadlines out. She did not allow that. That's fine.

The deposition that occurred on the 24th, like I said, I came. I was very heavily medicated.

THE COURT: Well, I just want to, first, be on the same page, that we're in agreement that you did say at that February 10th conference --

MR. BLACKBURN: Well, I don't have the transcript, but if you --

THE COURT: I do, and I can certainly hand it to you, sir, if you don't --

MR. BLACKBURN: No, no. It's not --

THE COURT: -- want to take my word about what it says.

MR. BLACKBURN: No, no. I take your word 100 percent.

THE COURT: Okay.

MR. BLACKBURN: I take your word. I'm not saying that that's not -- but I don't, you know --

THE COURT: All right.

MR. BLACKBURN: I don't recall.

THE COURT: So you agreed that these could go forward on February 24th and March 6th.

And then you were starting to tell me about what happened on February 24th. You can go right ahead.

MR. BLACKBURN: Okay.

So on -- during the -- the February 24th deposition, at the very beginning, Mr. Seigel, I believe, tried to ask questions regarding the Dixon v. Cartagena case. There was a stay on all discovery for the Dixon v. Cartagena case in the -- in September, I believe, of last year, and the order was very clear that there should be no discovery conducted on that deposition, so I told my -- I instructed my client not to answer that -- any of those questions.

Mr. Seigel had an attitude, like, threw his -- turned around in his chair and mumbled

something under his breath about me running people over with my car. That's why I brought that up, because I'm just painting a picture of what was happening throughout that time.

Then we contacted the Court, and we had the conference with Judge Rochon, and she said there should be no questions regarding the -- that Dixon v. Cartagena case, but she -- I think she allowed, like, a -- limited areas of what they could ask questions on.

Then the deposition proceeded and he was yelling at the client. Now, I wish I had stopped the deposition at that point and just left with my client because the behavior was extremely abusive because he was yelling at my client, pounding the table, sticking his hand -- or pointing his finger in my face, pointing his finger at my client.

THE COURT: And are you telling me this because you think that that justifies the --

MR. BLACKBURN: No, no.

THE COURT: -- wholly inappropriate statements that you made? Or are you telling me this first --

MR. BLACKBURN: Oh, no. I --

THE COURT: -- then telling me why?

MR. BLACKBURN: I already said that my statements were inappropriate.

THE COURT: Okay. So why are you telling me about his behavior?

We will get to your cross-motion after we address his motion.

So are you saying that the behavior that you say you saw from Mr. Tacopina somehow --

MR. BLACKBURN: No, no, no. He's not --

THE COURT: -- is relevant to your response to the --

MR. BLACKBURN: He's not Tacopina. No, no.

THE COURT: Sir, please, don't interrupt me.

MR. BLACKBURN: I'm not.

THE COURT: You are, in fact, because I'm speaking and you're speaking, and that's problematic for a couple reasons. One, it's disrespectful. Number two, we do not have a live court reporter, we have a recording. And when someone has to listen to this recording and make a transcript, it will be difficult for them to do so if you and I are speaking at the same time.

So I will absolutely let you be heard. I will let everybody be heard. And I don't stand on

ceremony about you go first, you go second, and then you go again. If there's something you forget, I want to hear it because I want to have a full record, and when I make a decision, I want it to be based on the best information that I can have, but you cannot speak when I speak. Okay?

MR. BLACKBURN: I apologize.

THE COURT: All right.

So you keep wanting to get into the behavior that you say Mr. Tacopina engaged in. And, again, I will hear you on that motion later, but is it relevant to your response to their request for sanctions against you and Mr. Dixon, both for the outrageous comments that were made? Number two, for what they see as, sort of, obstruction of their ability to have a meaningful deposition of Mr. Dixon, and then also for your memory issues that you had during the March 6th deposition?

So is Mr. Tacopina's alleged behavior relevant to your response on any of those three things?

MR. BLACKBURN: So I was -- what I was trying to -- and I should have never interjected; I should have allowed you to finish your question.

I was not saying that Mr. Tacopina -- I was

not -- when I -- what I'm referring to now is what happened at the Dixon deposition. Those were Mr. Seigel's actions, not Mr. Tacopina's actions. I was just explaining to you, giving the full picture and making the full record of what occurred during that time frame.

THE COURT: But what -- so how are Mr. Seigel's -- and sorry if I attributed that to the wrong attorney. But how are his actions relevant to your response to their request for sanctions against you and Mr. Dixon?

MR. BLACKBURN: I was going to -- so cause and effect. When you -- if you're banging the table and being --

THE COURT: Well, then it sounds like you are saying that there's a justification for your outrageous comments.

MR. BLACKBURN: No justification.

THE COURT: No?

MR. BLACKBURN: No. None.

THE COURT: Okay.

MR. BLACKBURN: As I said before, your Honor, I'm not -- one, I'm not proud of what I said and how, you know, everything transpired.

THE COURT: Well, look, let me be clear

because I don't want to waste anybody's time.

I do want you to be heard, and so I'm going to say something, and once I'm done, you're free to say whatever you want to.

MR. BLACKBURN: Okay.

THE COURT: There is no explanation in the world that you or anybody else is ever going to provide that will have this Court saying that the kind of rhetoric that you were using is appropriate.

So, look, should they be banging on the table? I don't know if they did or they didn't, but they certainly shouldn't be.

Should they have been insulting you? I don't know if they did or they didn't, but they certainly shouldn't be.

But there's nothing that they could have possibly said that would make this kind of rhetoric from anybody -- if Mr. Dixon was alleged to have said this, I would be outraged, let alone from an officer of the court.

So if you want to continue to tell me, here's what Mr. Seigel did, here's what Mr. Tacopina did, here's the context, cause and effect, they said something that prompted this behavior from me, you can go ahead and say it, sir. I will allow you to

be heard. But I'm telling you right now, there's no world where I'm ever going to think this kind of rhetoric from an officer of this court is ever appropriate. So carry on if you'd like to, or you can move to another argument.

MR. BLACKBURN: So I'm not going to -- I'm not making any excuses. I said from the onset that it was inappropriate and that I should have never responded in that way, and I should have ended the deposition immediately if I felt that there was behavior or something that was causing either myself or my client to engage in any kind of behavior that would be untoward.

So I'm not making any excuses at all. I was just trying to paint the picture of what was occurring so we can have a full understanding of what occurred. That's all I was doing. So if the Court interprets that as me making an excuse, I apologize. And I want to make it very clear, I am not making any excuses.

I just want to respond to the allegation regarding the ten-day Caribbean cruise and all that stuff.

I paid for that cruise and I booked it in February of 2025, and I went with my father. And we

flew -- I did fly to Puerto Rico, and I sat on the cruise ship the entire time. I was not partying in the street and all these other things like they are trying to paint a picture of.

Regarding the medication I was on, I was on medication for 90 days, and it did have an impact on me. I was dating someone. She broke up with me because my mood had changed very, very dramatically as a result of the medication I was on.

As it pertains -- yeah.

And I don't believe I ever said that I was not flying anywhere. When we had the call with Judge Rochon, I was already in Puerto Rico at that time.

THE COURT: I'm sorry. I couldn't hear you. When you had which phone call with Judge Rochon?

I just missed what you were --

MR. BLACKBURN: Sorry.

Yeah, I was saying, when we had the conference call, I believe it was on February 10th.

THE COURT: Okay.

MR. BLACKBURN: I was already in --

THE COURT: I see.

MR. BLACKBURN: Yeah.

THE COURT: Okay. So during the February 10th, it was a remote call, and you were saying you had already traveled to --

MR. BLACKBURN: Yeah, I was already --

THE COURT: Okay.

MR. BLACKBURN: Yeah.

And I believe that that was already stated on the record. I don't have the record in front of me, but I believe that is what was there.

THE COURT: That was not on the record during the February 10th conference. I do have the transcript for that, but -- but either way, I don't know that that's relevant, but -- so remote call; already in Puerto Rico. Okay.

MR. BLACKBURN: Okay. When it came to their characterization of my doctor being a "cosmetic doctor," I'm -- you know, I don't know if the Court wants me to get into my private health.

THE COURT: So -- and I do want to be clear about something. Look --

MR. BLACKBURN: And all these other things.

THE COURT: -- whatever kind of procedure someone has, whether it is mandatory or elective, is really no concern of the Court's. I don't think it's relevant. I think the question is, was there a

medical procedure?

Obviously, we do have a letter that you had submitted in connection with the initial request for sanctions because of the missed depositions on February 6th and February 9th from the doctor, verifying that there was a procedure. What procedure it was is of no concern to the Court. It is totally irrelevant. The point is there was a medical procedure.

That letter does also indicate that the doctor recommended two weeks of, sort of, no work after those procedures. So I do agree with you that I think the characterization made by your opponent, that this was a cosmetic procedure, is an irrelevant characterization. It seems to imply that, well, if it was a required procedure, that's one thing, but cosmetic is elective. The Court doesn't care.

What the Court cares about is, was there a procedure? Was there medication? Did it, in truth, impact your behavior?

I do -- so that is noted, sir, that I think the comment about "cosmetic" was unnecessary on the part of your opponent.

MR. BLACKBURN: And it was not cosmetic. I just want to say that for the record, but I know

it's not --

THE COURT: Again, as the Court just said, it's of no moment.

MR. BLACKBURN: Yes. I apologize, your Honor.

So as it pertains to Judge Cote, as they like to bring up consistently, like I said before, Judge Cote -- I was never referred to the Grievance Committee. I called --

THE COURT: Well, I did read the order by Judge Cote, and it says that she is referring to the Grievance Committee, so I'm not quite sure how you want me to interpret that.

MR. BLACKBURN: I mean, that's what the order says, but no reference ever occurred, is all I'm trying --

THE COURT: I'm sorry. No what ever occurred?

MR. BLACKBURN: No reference to, like -- so the Grievance Committee, I contacted them. They had no investigation being done on me. And it's about two years now, and nothing has come from that at all. So I'm just --

THE COURT: Well, sir, you certainly don't know the inner workings of the judiciary of the

Southern District of New York in terms of how quickly they act on a referral from a particular judge, at what stage it might have been at.

Certainly, we can say it's two years and no action has been taken. I'll certainly take judicial notice of that point. But Judge Cote clearly says in the order that she is referring you. And the bottom line is, whether the Grievance Committee did something with that information or not, it certainly is evidence that at least one judge in this district thought that you had engaged in behavior that that judge, at least, thought warranted a referral.

Whether the Grievance Committee took any action is up to the Grievance Committee, but I do not think there can be any question that Judge Cote thought that the behavior she observed in the case that she presided over warranted a referral.

MR. BLACKBURN: Okay.

And then they -- I think they brought up Judge Oetken regarding my opposition to the motion to dismiss that was filed in there.

And just for the record, because I would just want to clarify some things that was said, the case with Judge Oetken is a case against Sean Combs, and at the time that the opposition was filed,

myself and an attorney for -- who was litigating another case both had our devices hacked at the exact same time.

THE COURT: Both had what? I'm sorry.

MR. BLACKBURN: Our laptops and all of our devices hacked.

THE COURT: Hacked. Okay.

MR. BLACKBURN: Yeah.

THE COURT: I just didn't hear that word. Thank you.

MR. BLACKBURN: Yes.

And we both contacted the Southern District of New York, filed complaints, filed reports and everything regarding that.

So all of my records and everything was deleted. All the folders were emptied out. And I had to scramble to find all of the -- I had about eight cases against him, and I had to find all of those records. And she also lost all of her records as well.

So to say that I was a little upset is an understatement. But that --

THE COURT: I'm sorry. How does this relate to -- and I do have a copy of Judge Oetken's decision as well, where he says that your filings

were replete with inaccurate statements of law, conclusory accusations and inappropriate *ad hominem* attacks on opposing counsel.

Are you saying that the inaccurate statements of law, conclusory accusations and inappropriate *ad hominem* attacks were the results of your devices being hacked?

MR. BLACKBURN: No. I was explaining what led up to -- what was happening around that time. I just think that context, you know, matters.

THE COURT: Sure.

MR. BLACKBURN: So what --

THE COURT: Explain to me -- no, no, because this is the second time that this has happened.

One, you wanted to tell me about Attorney Seigel saying things and how that somehow led to you making some of the most outrageous comments I've ever heard be made by an attorney.

And now you're saying that your device was hacked and that that somehow led to inaccurate statements of law, conclusory accusations and inappropriate *ad hominem* attacks. So explain to me how the hacking led to those three things.

MR. BLACKBURN: So what I was responding to

in the opposition was statements made by counsel for Mr. Combs, and my response was to that response. So, again, not proud of that. I should have been ...

THE COURT: So you were provoked into making *ad hominem* attacks, conclusory accusations and inaccurate statements of law.

MR. BLACKBURN: So when -- the inaccurate statements of law that he is referring to was the fact that Sean Combs had just been indicted, and I believe I wrote something like, you know -- well, you know --

THE COURT: You said he was presumed guilty. Is that the part you are talking about?

MR. BLACKBURN: Yes. Presumed guilty, yeah.

THE COURT: Okay.

MR. BLACKBURN: Yeah, precisely. So that's what Judge Oetken was referring to, which he's 100 percent correct. So I should have -- you know, I -- you know, I should have never said that.

Regarding Mr. Seigel's questioning regarding the 4,000 different sex acts from the Dixon v. Cartagena case, again, that is from the adjacent case, and I did not feel that those

statements -- that those questions were relevant, so that's why I objected to them.

THE COURT: You do not get to object to relevance at a deposition.

Well, you can object. I'm sorry. Misstated.

You can object, and then the person answers the question. You cannot object and direct them not to answer the question because it takes up too much time at a deposition. By definition, there's no judge there to make a ruling.

So you know this, obviously. You have done -- you have practiced law for many years, and you -- you know, even the month that these depositions in question were happening, there were at least several others that you were doing.

Unless it is dealing with something to do with privilege, where we don't want the cat out of the bag, you object and they answer. You do not get to direct your client to not answer. So I take what you said as an acknowledgement that that is exactly what happened during the deposition. But carry on, sir.

MR. BLACKBURN: So -- yes.

So I did instruct him not to answer those

questions based on the fact that we had a call with Judge Rochon, and the -- in September, we had a conference with Judge Rochon where she stayed discovery in the Dixon v. Cartagena case, so I -- my instruction to him as to not answering was based on the fact that discovery in that case was stayed, at least from -- with my interpretation, understanding of what Judge Rochon's September order was ...

THE COURT: Would you like to respond, sir, to your opponent's argument that this Court should not credit the idea that you were on medication that impacted you during these depositions because, number one, there was no corroboration, other than your word, about the medications? And number two, they, in their papers and here orally, have argued that, because you were going to other court appearances, engaging in written work but also defending other depositions during the same time frame, that this Court should conclude that your explanation that it was medication that affected you during these depositions is one that I should not credit?

Would you like to respond to that argument?

MR. BLACKBURN: Yes, of course.

So, for starters, respectfully, they are

not medical providers or scientists, so, you know, their --

THE COURT: Well -- but we do not have on the record anything from a medical provider, other than that one letter from your doctor, which does not say anything, other than the two proceedings happened -- procedures, excuse me-- happened, and that there was two weeks of, sort of, you know, no work recommended by the doctor. But it certainly does not say that there is six to eight weeks of pain medication that you would be taking.

MR. BLACKBURN: I have the prescription. If the Court would like for me to provide a copy of that, I will --

THE COURT: Well, you could have submitted whatever you want to -- wanted to in your opposition to their motion for sanctions, sir, just as you submitted that letter to Judge Rochon in your opposition to that initial request for sanctions. So I have what I have before me, and before me, I only have the one doctor's letter.

MR. BLACKBURN: Okay.

So, like I said before, this isn't -- counsels are not medical providers. And if the Court -- I mean, I can supplement my filing with

the --

THE COURT: I have what I have before me, sir.

MR. BLACKBURN: Okay. Fine. But I was on medication for 90 days. I -- you know, I don't know what else to say about that.

And for them to say that it shouldn't be credited -- as I explained in my deposition when Mr. Tacopina raised the question, the filings that they are claiming that I filed, all these other things were refilings for documents that were already drafted, so it was not like I was creating or making up new things from scratch. These are all resubmissions that the respective courts asked me to resubmit.

THE COURT: Well, let me ask you this, sir.

During the February 10th conference before Judge Rochon, you indicated that you had another deposition that was preplanned in another matter for February 26th. You also indicated to her that there was another deposition in yet another case that was preplanned for February 27th.

Did those go forward, sir?

MR. BLACKBURN: I'll tell you right now. I have a calendar here.

The 26th? No, that depo did not happen. And the -- and you said the 25th?

THE COURT: 27th.

MR. BLACKBURN: That deposition did happen, but I didn't take the deposition. That was my co-counsel who did that in another matter. I didn't defend, I should say -- sorry -- that deposition.

My co-counsel from California defended that deposition, but it was just on the calendar, so I was just reading.

THE COURT: And what is the reason that the deposition on February 26th did not go forward?

MR. BLACKBURN: The deposition on the -- I wasn't feeling well.

THE COURT: Okay. Continue.

MR. BLACKBURN: I think this -- I think that pretty much answers a lot of -- I think I went through all the claims that they raised.

THE COURT: So nothing else you would like to say, sir, on this point?

MR. BLACKBURN: On this -- oh, no. On that point, no.

Regarding the -- their claim that the Court should not credit my medical, I mean, I don't even know how. If you look at the deposition from the

24th and the deposition, the -- well, the last deposition that I had was literally night and day. And I was very calm, you know. I -- you know, if I was someone that was firing off, I think that deposition would have been the deposition where I would have been responsive to what was being said to me at that time. But as I explained on multiple occasions, that one, I was not myself; I was not because of the medication I was on. I don't take medications, and I explained that in great detail, I believe, in that deposition, and I explained it again here today. I mean --

THE COURT: Well, let me ask, sir, before that March 6th deposition, it does not appear that you made any --

MR. BLACKBURN: The March 6th or the March 20th?

THE COURT: March 6th.

MR. BLACKBURN: Okay.

THE COURT: That you -- it does not appear that you made any attempt to cancel or reschedule that deposition. So, again, I've got the February 10th --

MR. BLACKBURN: Based on -- sorry. Go ahead.

THE COURT: I've got the February 10th transcript before me, where you tell Judge Rochon that you will be able to do these depositions in this time frame, and she schedules them. And then you're saying you're still feeling the effects of this medication. And that may very well be true, but I have absolutely nothing that I see in the record that would indicate that prior -- so after the February 10th and prior to the March 6th -- that you attempted to reschedule that deposition based on the fact that you were taking medication still.

MR. BLACKBURN: I didn't think I could. Judge Rochon was not -- was very clear that she wanted the depositions to proceed. I attempted to have them moved out. I made a request to have them moved out. It was rejected.

THE COURT: Well, you didn't go to the 6th and the 9th. She sanctioned you for that. On the 10th, you said you would be able to do these depositions. They were an agreed-upon schedule, that that would be on the 24th and on March 6th.

And then you're saying you were still taking medication, that it -- it was affecting you. You did not, it appears -- and you're agreeing -- attempt to reschedule it again based on your

continued use of the medication, right?

MR. BLACKBURN: Yeah. I don't think I had a choice, honestly.

THE COURT: Okay. So the answer to my question is, yes, I didn't attempt to reschedule them, right?

MR. BLACKBURN: No. Of course, yes. I didn't, yes.

THE COURT: Okay. Thank you. You can continue.

MR. BLACKBURN: No, no. I mean, you know, that's pretty much it. I just did not think that I had a choice in the matter when it came to attempting to reschedule it further, so I just followed what the order was from the 10th and, you know, that was it.

But as I came on the 6th and I was asked the question if I'm under any medication, the answer is yes. And I explained what the -- you know, what my condition was, what the situation was at the time, and then it was rescheduled again to the dates that initially I wanted based on the fact that the 19th would have been the last day for my -- for the medication I was on. And it was scheduled the week after that, so ...

THE COURT: Well, the 19th would not have been 90 days. Earlier, you said that the medication was for 90 days.

MR. BLACKBURN: From the 23rd. From the 23rd.

THE COURT: I'm sorry.

You had a proceeding at the end -- a procedure. I keep saying "proceeding" like it's court -- procedure towards the end of January and another on February 3rd. You've said several times here that it was 90 days' worth of --

MR. BLACKBURN: I was just --

THE COURT: -- medication.

End of January, end of February, end of March is two months. At best, that's 60 days, maybe 65. That's not 90 days. So which was it?

MR. BLACKBURN: So -- no. So --

THE COURT: No?

MR. BLACKBURN: Please. I'm sorry.

THE COURT: Okay. Go ahead.

MR. BLACKBURN: So calculating from the 23rd --

THE COURT: Of January?

MR. BLACKBURN: Yes.

THE COURT: Okay.

MR. BLACKBURN: That's what I was basing it on.

THE COURT: Well, 90 days from the 23rd of January would put us at the end of April, and now you're saying you were done with the medication by March 27th. That's 60 days or so, right?

MR. BLACKBURN: Well, I -- I mean, I'm not a mathematician. I'm not a mathematician, your Honor, but that --

THE COURT: Sir, you said several times here that you had 90 days' worth of medication. Again, I have absolutely no external corroboration. I only have your word about a no proceeding -- procedure. I don't know why I can't get that right.

A procedure happened. A doctor has corroborated that. We know that you were recommended to not work for two weeks. A doctor has corroborated that. What a doctor has not, in any way, corroborated is that there was medication -- specifically, pain medication, which often is a narcotic -- that you were prescribed for some extended period of time beyond the two weeks. We have only your word.

You said in the papers and to Judge Rochon that it was six to eight weeks. You've said several

times here you held up a bag, it had medication, 90 days' worth of medication that you were prescribed. That's what you told me. That would put it to the end of April. You are now telling me you were off the medication by March 27th.

So my question to you is, were you prescribed 90 days of medication or eight weeks of medication? Because those are not the same.

MR. BLACKBURN: I may be calculating the weeks wrong, but it's six to eight weeks. That's how much time it was --

THE COURT: Okay. You can continue, sir.

MR. BLACKBURN: -- for the medication that I had.

I mean, I said "90 days," but it's not -- six to eight weeks is the amount of medication that I had. And, again, I can provide you with the prescription.

THE COURT: You had your opportunity to provide whatever you wanted to. I have the record I have before me. Continue on, please.

MR. BLACKBURN: I mean, that's it. I don't have anything else. I think I responded to everything that they said, so ...

THE COURT: Okay. All right.

I will turn back to plaintiff on their request for sanctions. And then once I've heard from them, we will then turn to Mr. Blackburn's cross-motion for sanctions.

MR. SEIGEL: Thank you, your Honor.

I'll be brief. I just want to address the one issue regarding Mr. Blackburn's claim of cause and effect. I know your Honor has addressed it.

But specifically with the conduct he attributes to me, which included purported mumbling, pounding, and throwing my glasses --

THE COURT: Well, again, sir, I am going to -- I'm going to ask you the same question I asked him.

MR. SEIGEL: Sure.

THE COURT: I have already said that I do not believe that anything that could have been said could have provoked or justified his comments. Certainly, his accusation that you-all engaged in sanctionable behavior is one that we will turn to next, but beyond that, I don't know that I need to hear a response from you at this juncture.

MR. SEIGEL: I'll sit down.

THE COURT: Okay.

MR. SEIGEL: Thank you.

THE COURT: All right.

So now, Mr. Blackburn, we will turn to your cross-motion for sanctions, sir.

MR. BLACKBURN: All right. Thank you, your Honor.

So the cross-motion for sanctions is based on the behavior of Mr. Tacopina, who's not here today, and his repeated statements referring to me as a clown, yelling and screaming, pounding the table, essentially threatening my career, also making statements concerning -- assuming that I'm a criminal because of some false claim that was made against me regarding running somebody over with a vehicle.

And then to touch on what I was sharing earlier regarding the deposition on the 24th, there were additional statements made by Mr. Seigel along the same lines as Mr. Tacopina, where he also said that I "like running people over" with my car, and was also banging the table, sticking his finger in my face, in my client's face, yelling and screaming, and engaging in very similar behavior as Mr. Tacopina was engaged in during my deposition.

If you look at the transcript, I asked -- I said to him multiple times, you're yelling, you're

yelling again. I was very calm. And he kept it up, and he actually said, yes, I'm yelling, and, you know, continued to refer to me as a clown.

You know, I just, you know, share that to say that that's -- I think that that warrants -- if I'm going to be sanctioned for things that I made and my behavior during the deposition, which I think was not good and not acceptable, that I believe that sanctions should be equally imposed against the plaintiff's counsel for their behavior and what they said to me and my client during our depositions.

In addition to --

THE COURT: Well, the centerpiece of your written submission did not appear to be -- you certainly did articulate in the writing these comments that were made directed at you and the yelling and the like. That certainly is in your papers. But the majority of your -- the response to their sanction and the moving papers on the cross-motion focused on this claim that your opponents somehow leaked the transcript of the deposition and the snippets of the video to the press.

Do you want to say anything in support of that claim, sir?

MR. BLACKBURN: Yes.

So we -- throughout this entire case, it has been like a nonstop back and forth with -- well, not back and forth because I haven't been responding, but a nonstop onslaught from plaintiffs with the media. Every filing is coordinated with a particular --

THE COURT: What do you mean by "coordinated"?

MR. BLACKBURN: So as soon as the filing is made, quotes are being attributed to counsels for -- well, Mr. Tacopina in particular. They are posting -- you know, these individuals online are posting transcripts.

THE COURT: My understanding was that you didn't include in your moving papers any alleged quotes that the media said they got through a conversation with counsel.

How I read the moving papers was they -- on the same day that they -- the day they filed the sanctions motion, there were some -- maybe it was an article. I can't remember. There were two things. There was one thing that came out the same day on the 24th and another thing that came out the next day on the 25th, and I may be mixing them up, but

that the timing you alleged was, sort of, too -- you know, too convenient timing to, sort of, have been independent.

But I didn't see anything in your moving papers that actually spoke to anything concrete that would say counsel for plaintiff gave this information to the media as opposed to posted it on the public docket, where anyone could have access to it.

And so if there's something that goes to that nexus, not just they posted it and the media got access to it, as anyone can from the docket, but that they gave it to the media because you use language like "leaked" and "provided" and the like, which implies they are giving it to the media. They're calling somebody at whatever this source was, right, and saying, here's the stuff, go ahead and publish it.

Do you have anything that would go to that allegation, sir?

MR. BLACKBURN: So that's based on the fact that, when the posts were made and the filing was made, I didn't have a copy of the -- I didn't have a copy of the video. There was -- there were parts and portions of the deposition video recording that

were published that I don't believe was a part of --

THE COURT: They put several video clips as part of their filing.

MR. BLACKBURN: So it's not -- it's not just limited to what they did with this particular filing.

THE COURT: But I'm asking about this particular filing.

Do you have anything that would go to that nexus that would say they gave it to the media as opposed to they posted it on the public docket, where anyone, including the media, can have access to it?

MR. BLACKBURN: I mean, I don't have access to their personal, like, laptops or devices. That is --

THE COURT: So the answer to my question is you have nothing that goes to that nexus; this is just a supposition that they gave it to the media. Is that correct?

MR. BLACKBURN: Well, I guess, your Honor.

THE COURT: Okay.

MR. BLACKBURN: So, you know, there's a piece of the history of this case that I think is relevant to all of this just from inception and from

the actions of counsel. They have coordinated a lot with TMZ and other --

THE COURT: Explain to me what you mean by "coordinated" because you use that same language in this particular situation with the March 24th filing, and yet you have acknowledged you have absolutely nothing that shows there was, in fact, some communication directly. So when you say there's a history to the case --

MR. BLACKBURN: I will tell you.

THE COURT: I certainly have a recent referral, so I don't know all of the history, only what I've seen on the docket.

MR. BLACKBURN: Sure.

THE COURT: So speak to me about what historically speaks to coordination between plaintiff's counsel and the media.

MR. BLACKBURN: So on the 19th of June, when I filed the Dixon v. Cartagena case, I received a call from a reporter at TMZ asking me if I knew that I had a warrant out for my arrest.

I had not been contacted by the police. I had not been contacted by any prosecutors or anything regarding any warrant. I had not committed a crime. I was not -- you know, I didn't engage in

any kind of anything that would warrant me having a warrant out for my arrest.

And within five days -- knock, knock, knock on my door -- I get arrested. And before I am even fingerprinted, Mr. Tacopina is on TMZ speaking about my arrest. I hadn't even been processed yet at -- in Kings County.

A couple of months later, fast-forward, Mr. Turetsky here is coordinating with the Brooklyn District Attorney at that time prior to -- the night before, I should say, my grand jury appearance, he's sending him e-mails and messages and strategy on how to tank my grand jury presentation.

THE COURT: And how do you know this, sir?

MR. BLACKBURN: Because I have the e-mails. The Eastern District -- not the Eastern District, but the Kings County prosecutors turned over the e-mails.

When I confronted Mr. Turetsky regarding that same fact, he was in shock that I knew about it and said emphatically that he does not represent the individual who's accusing me of doing anything wrong to him and that the grand jury is a public -- it's on a public docket and everyone knows about it, which is not true at all.

And what resulted from that is that the ADA was removed from the case in Queens County. The judge in that case reamed the prosecutors. And that case is about to be dismissed on the 26th of May, as the Court indicated.

MR. TURETSKY: Your Honor, if I -- if I could just --

MR. BLACKBURN: I'm not --

THE COURT: You will have an opportunity to respond, sir. Thank you.

Go ahead, sir.

MR. BLACKBURN: In addition to that, somehow, I -- when -- before I knew of the grand jury's decision, TMZ knew of the grand jury's decision; again, signaling to me --

THE COURT: Well, that doesn't speak to the idea that plaintiff's counsel might have known. Frankly, that would suggest, if anything, that someone in the prosecutor's office would know because the grand jury is a closed proceeding, and the only folks in there are the grand jurors, who are sworn to secrecy but are free citizens of the world and might speak if they want to, and the prosecutor and the witnesses in question. So I don't know how information about a grand jury

decision getting to the press at all implicates plaintiff's counsel.

MR. BLACKBURN: Well, your Honor, I am basing this on the fact that they have consistently, throughout this case, from April of -- April 21st up until present day, have been making statements and doing interviews on these different platforms. Mr. Tacopina, in particular, making defamatory statements about myself and accusing me of things that are just wholly untrue.

THE COURT: All right. So I certainly hear you as saying that there has been some history of communication with the press by plaintiff's counsel.

All right. Anything more you would like to say, sir?

MR. BLACKBURN: Absent that, I just think that the behavior of Mr. Tacopina -- and I think -- I don't know if the Court has a copy of the video. I don't have a copy of my video deposition. But if you review -- viewed that, you would hear how loud Mr. Tacopina was, and the fact that I was literally sitting not even 2 feet away from him. And he was, I believe, trying to goad me into having a similar reaction to the reaction that I had on the 24th of February during Mr. Dixon's deposition, and I didn't

fall for it. I didn't, you know -- you know, I just kept on making the record. The fact that he was engaging in this behavior and calling me names and doing all these other things -- so I just, you know, I just want to reiterate again that I'm not proud of my behavior on the 24th, as I -- you know, as I said earlier, but I don't believe that the behavior of Mr. Tacopina warranted that kind of reaction.

And, you know, I explained very clearly to him at the time what was occurring, and I apologized to Mr. Seigel multiple times concerning what I was going through on the 24th, and they continued and consistently, throughout the deposition, until about the very end, with the attacks and the yelling and the screaming and the pounding on the table and the name-calling. So that's it.

THE COURT: All right. Thank you.

Plaintiff?

It just -- is that an alarm?

Oh, okay. Just -- I figured if it was a fire alarm, it would be a little more urgent than that, one would hope.

But I did hear something. Just wanted to make sure, one, it wasn't just me and, two, that it wasn't, in fact, an evacuate now.

Plaintiff's Counsel, if you would like to respond.

MR. SEIGEL: Thank you.

Good thing it's not the elevator. We were stuck in it before.

THE COURT: It does happen. It's one of the charms of an older building.

MR. SEIGEL: I thought we were going to have to appear virtually from the elevator.

Your Honor, as I was about to reference before with regard to the cause-and-effect comment that Mr. Blackburn made, he said that I was mumbling. It's a little muddled, quite frankly. I'm not sure whether or not he's attributing this conduct exclusively to Mr. Tacopina or to both of us.

But at least initially, I heard him say that during the February 24th deposition of his client, Mr. Dixon, I was mumbling, pounding, that I threw my glasses. It is not true. Nothing in the transcript or the audio or video reflects any of that.

And I would add that I was mic'd. I had the mic on my lapel. If there was any type of conduct of that nature, I have no reason to think it

would not have been picked up. Also, he didn't raise any of these contentions in his papers, and that's because it's simply untrue.

In fact, in his motion for cross-sanctions, what he states on page 26 -- it's the first full paragraph -- "Fourth, this Court should issue a formal reprimand to Messieurs Tacopina and Seigel for their examination conduct at the March 27, 2026 deposition," which is the only conduct he apparently takes issue with in his papers.

I didn't speak at that deposition. It was Mr. Tacopina who conducted it, so it looks like he may have just thrown the kitchen sink in. But, in any event, I'll deal with that in a moment.

I think Mr. Blackburn's cross-motion for sanctions -- I respectfully submit it is not a serious application. It's retaliation, and it's an act of deflection where he attempts to convert himself from offender to victim.

First of all, dealing with the various arguments he raised in his papers -- I don't think this was touched on today, but I'll just address it quickly.

We complied with the de-designation procedures in the protective order. We gave him an

opportunity to -- regarding the deposition, we gave him an opportunity to contest it. He never objected, never moved to seal, never sought emergency relief. So the confidentiality outrage in his papers, I would submit, is, sort of, manufactured, after-the-fact litigation spin.

Likewise, this notion that -- he alludes to this several times throughout his papers -- that we didn't provide him copies of, I guess, the depositions. It's just -- it is not true. We spelled it out in our papers. We sent him a full unredacted copy of Mr. Dixon's February 24th deposition before filing our sanctions motion.

He clearly had a copy of his March 6th deposition transcript. And, in fact, it was filed on the public docket. And Mr. Blackburn publicly filed his March 27th deposition, so I think that issue is put to rest.

Likewise, this notion about us leaking -- or plaintiff's counsel leaking things to the press, it's simply unfounded. We didn't. And, in fact, as the Court aptly referenced, the press specifically acknowledged that it was reporting on the public filings. It wasn't anything that came from us. The articles actually reference that. We weren't

leaking anything.

And as for the comments that Mr. Blackburn seeks to attribute to my law partner, Mr. Tacopina, specifically with respect to TMZ, that was before the litigation started. He is mindful of extrajudicial statements and the need to avoid prejudice.

With regard to -- sort of, dealing with this in short shrift. But with regard to the statements that Mr. Dixon takes issue with specifically attributed to Mr. Tacopina at the March 27, 2026 deposition, I'll deal with them in turn.

First, the notion that Mr. Tacopina was yelling -- I was there, seated right next to him. We provided a video clip to the Court. He wasn't yelling. He actually does have a loud voice, but it wasn't yelling. And when Mr. Blackburn accused him of yelling, which we think was gamesmanship, Mr. Tacopina -- I was there. He sarcastically made the remark, "I was yelling."

It's almost like -- I've always wanted to do this in federal court. It's like the *My Cousin Vinny* reference where "I shot the clerk."

It was similar to that, your Honor. He'll be happy I got to use that. So anyway, it's just

not supported by the video evidence.

With regard to the "clown" comment, the fact of the matter is, given some of the antics and bombastic responses by the witness throughout these proceedings, Mr. Blackburn was, in fact, clowning around during them, in our opinion; claiming at one moment, for instance, he couldn't remember representing his own client at a deposition. Later --

THE COURT: So your argument, it sounds like, is similar to the argument that Mr. Blackburn tried to make, which was that Mr. Tacopina was provoked into saying this by Mr. Blackburn's behavior.

Let me ask you, sir, do you think it is appropriate for an officer of the court to refer to a witness during a deposition as a clown?

Yes or no, please, sir.

MR. SEIGEL: I wish he were here.

THE COURT: Yeah, but you are. So, yes or no, is it appropriate for an officer of the court to refer to a deponent in a deposition as a clown?

I'll save you the -- I'll give you the spoiler alert. It's not.

MR. SEIGEL: Thank you for answering that.

THE COURT: Okay.

So another question. The comments about him hitting someone or running over the process server with the car, while it is certainly factually true that he has been indicted and there is a pending case -- what will happen with that case? I have no idea. But as a matter of fact, that is true, but -- and it wasn't really apparent to the Court from his response to your motion, which was the moving papers on the cross-motion.

But in his, sort of, surreply, he does clarify that his objection to this language isn't, I'm not under indictment; it was that it was an inappropriate sort of comment to make. It appears that it was not, sort of, part of questioning of him; that instead it was said merely as a that -- you know, sort of, that's why you're under indictment, or you're a criminal, or you're, sort of, this bad person. So, again, more in the nature of an *ad hominem*, even if based on factual things.

Would you agree with his assessment, that that is how that information was being utilized during the course of that deposition?

MR. SEIGEL: I recall -- your Honor, admittedly, I don't remember the exact exchange.

I'm just being candid with the Court.

I do recall that there was a line of inquiry in the cross -- I called it a cross outline -- in the deposition outline where there were queries regarding Mr. Blackburn's efforts to evade judicial process and avoid service, which was connected to that line of inquiry, that issue.

Admittedly -- I apologize for this -- I just -- I don't know offhand if it was in that context or another.

THE COURT: So let me hear you on -- again, I don't think -- I do not expect, in the usual course, to have lawyers from either side before me essentially arguing, well, I was provoked, the other side was behaving badly, or the opponent was behaving badly, and so I, you know, threw all the requirements of an officer of the court and all the rules with respect to civility out of the window and decided to just descend into *ad hominems*. And I do want to be clear that I think the comments and the tenor of the comments made by Mr. Blackburn are on an entirely different level than what is alleged to have been said by Mr. Tacopina, but I -- so I want to hear you specifically on, if I find that your colleague's comments were inappropriate and, sort

of, unbecoming of an officer of the court, what then is the appropriate response from the Court?

MR. SEIGEL: If the Court makes that determination, I would submit that no formal sanction would be warranted.

Mr. Tacopina takes his obligations as an officer of the court very seriously. He's never been reprimanded, sanctioned, admonished in any form whatsoever during the course of his more-than-three decades of practice. So I can assure your Honor that, after leaving this proceeding -- he could be here himself right now but the fact that he's traveling -- I will advise him of such, and I have no doubt that he will guide himself accordingly.

He has no history whatsoever of any improprieties, none that's ever been brought to his attention. And I can assure your Honor, given my long history with him -- and I've known him since 2001 -- that he will act accordingly going forward.

Obviously, I don't need the Court to be mindful of the fact that any type of sanction is one that remains with an attorney. It's a blemish, a scarlet letter, so to speak, that he would have to carry for his remaining days. We submit, given the circumstances and lack of any history here, that the

comments made wouldn't rise to the level of a formal sanction. I think even just the Court's comments right now would be enough to create a chilling effect. So we would ask your Honor to deny the request.

THE COURT: All right. Anything else you would like to say?

MR. SEIGEL: No, your Honor. Thank you.

THE COURT: All right. I will turn back to you, Mr. Blackburn, for the last word on your cross-motion.

MR. TURETSKY: Your Honor?

THE COURT: Yes?

MR. TURETSKY: Just if I may, I will be incredibly brief.

This is the second opportunity or the time that Mr. Blackburn has accused me of -- in open court of tanking his grand jury testimony.

It's an active criminal matter. I'm not going to comment more, other than to say, your Honor, that nothing could be further from the truth. We have been not coordinating or anything like that.

But we'll let that process play out, but I just wanted to set the record straight, that clearly, obviously, there's been no misconduct on

our part.

THE COURT: All right. Thank you.

Mr. Blackburn, I'll give you the last word on your cross-motion for sanctions, sir.

MR. BLACKBURN: So, your Honor, number one, what Mr. Turetsky just said is not true. I have the e-mails, and I can share that with the Court if the Court wants.

As it pertains to the "clown" statement, it was not in the context of questioning. It was just different, multiple spurts of you're a clown, you know that? You're a clown. You're a clown. You're a clown. And all these other things throughout his deposition.

And I just wanted to share this because I don't think the transcript shows this, but during a break towards the end of the deposition, I heard Mr. Tacopina breathing funny, and --

THE COURT: I'm sorry. I missed what you said.

MR. BLACKBURN: He was breathing funny.

THE COURT: Breathing funny?

MR. BLACKBURN: Yes.

THE COURT: Okay.

MR. BLACKBURN: So I said to him -- and

this doesn't have to go in the transcript, but I said to him -- I said, you know, it sounds like you may have a condition very similar to my father's. And he said, you're 100 percent correct. You're right. Right?

Now, it's not in the transcript because we were not on the record, but I just wanted to share with you that we had a sidebar, had a conversation.

Hold on. It's important.

THE COURT: All right.

MR. BLACKBURN: Yes, we had a sidebar, had a conversation. And if you look at, like, the last five minutes of the deposition, the tenor and tone of Mr. Tacopina completely shifted after him and I had that conversation on the side.

And then after the deposition, we spoke again concerning -- so I just shared that to say that the statements that were made concerning him calling me a clown and all that stuff all came before him and I having that one-on-one regarding a very sensitive topic, and it just shows that either there was some, sort of, you know, premeditation to come in there and to try to rile me up or to try to insult me and get me to react or to engage in a similar type of back and forth as the -- as what

happened on the 24th of February, but it all went away towards the end.

And, you know, I just wanted to share that to say that I don't think that the "clown" comments was him being passionate or him -- you know, or something like that. I think that the goal was to get a rise and to get a reaction out of me in order to have a similar outcome that occurred on the 24th of February.

So when I said that I did not get a copy of the -- that they had not shared the depositions, I was -- received the December 6th deposition, and I believe -- no, not December. What am I saying -- the March 6th as well as the 27th from the court reporter because I e-mailed her, and we exchanged numbers, and I got that from her directly.

Counsel's never turned that over to me, and they were not cc'd on those e-mails as well. And I think the Court knows --

THE COURT: The representation that they made was that you have the transcripts, number one, because they did send you via e-mail -- and they sent a copy of that e-mail -- the Dixon transcript in full from February 24th. That, number two, the March 6th transcript you would have had in full

because they attached it in full as an exhibit to their motion for sanctions; and that, obviously, you must have the March 27th transcript because you attached it in full as an exhibit.

So I hear you as saying they did not directly give it to you, but where in that is there sanctionable behavior?

You made much in your papers about, you know, I don't have a copy, but the world has a copy, except everybody has a copy of what's published on the docket, and that you were forced to, sort of, defend yourself -- you didn't use the phrase "with your hands tied behind your back," but essentially saying that, that because you hadn't received a copy, you know, how can you defend yourself?

But, again, you had the February 24th because they e-mailed it to you. You had March 6th because it's on the public docket. And, obviously, as you've just said yourself, you were able to get March 6th and March 27th from the court reporter yourself.

So what is the -- what is the -- you know, what have they done wrong in that respect?

MR. BLACKBURN: I do not have the video -- the video depositions. I -- like I said before, the

court reporter sent me the rough copy of the -- of what she did on the 6th and what she did on the 27th.

THE COURT: Okay.

MR. BLACKBURN: I have not gotten anything from -- I -- as it pertains to the video portion of the depositions. So I don't have the final, complete version of the depositions, and I don't have the videos as well. So that's all I'm trying to say with that.

And Mr. Seigel said that the only time that Mr. Tacopina made any statements was prior to litigation. That's not true. If the court just Googles "TMZ" from January -- from -- sorry, not January -- June 25, 2025, and type in "mowed down," you will see very clearly that Mr. Tacopina is sitting in his vehicle on television and says -- when TMZ says, oh, the attorney, Blackburn, allegedly mowed down a process server, he said, oh, you could remove the phrase "mowed down." He did it. He did it.

That was on the 25th of June, so that wasn't some -- and hadn't even been processed yet by the time he made that statement. And it's not true. I did not mow anybody down. I did not run anybody

over. But that's being handled in Kings County.

So either way, that's all I wanted -- I just wanted to clarify those things that were said.

THE COURT: All right.

MR. BLACKBURN: Can I sit?

THE COURT: You may.

Anything more from either side with respect to either motions?

MR. SEIGEL: Not from us, your Honor. No.

THE COURT: All right. I'm going to take a brief recess. I don't know that I'm actually going to -- I'm going to take a brief recess, and I'll be back.

(Recess.)

THE COURT: You may be seated.

THE DEPUTY CLERK: We are now back on the record in the matter of Joseph Cartagena versus Terrance Dixon, et al.; Case Number: 25-cv-3552.

THE COURT: All right. So I want to just orally let you-all know what my decisions will be. I will obviously be following up today's conference with a much more detailed written order, but I think it's important for everyone to leave here today knowing, you know, what the parameters of the rulings will be. And in connection with that, I do,

of course, want a copy of the transcript of today's proceeding, so I'm directing the parties, just in case I forget to say it later, to order a copy of that posthaste. I would like to get the written decision done while everything is still, you know, fresh in my mind, so I would like to have the transcript sooner rather than later.

As I have already indicated, the tenor of the rhetoric that Mr. Blackburn engaged in during the February 24th deposition is of a sort that I have -- frankly, I was going to say rarely -- never seen from an attorney. I think we have all seen unfortunate circumstances where an attorney has used intemperate language, said things that, on reflection, they realize they should not, but the levels of commentary made here, both homophobic, transphobic, sexualized comments about an opponent's mother is shocking to read and not the sort of thing that I have ever seen by an officer of this court, and I find that that behavior is entirely warranting of sanctions.

The only -- sort of, the explanation provided here -- the context attempted to be provided was that somehow this was provoked.

As I said earlier during the exchange with

Mr. Blackburn, there is nothing that your opponents could have said that would make these comments appropriate ones and certainly not ones that should be levied by an officer of the court.

In addition, I do find that the objections, in addition to the comments, did obstruct the ability of plaintiff's counsel to have a full and meaningful deposition of Mr. Dixon on February 24th.

As we discussed, the appropriate thing to do if there is a question that is asked that an attorney thinks is objectionable, as long as it is not going to privilege, is to object and let the answer happen. An attorney is not to direct their client not to answer the questions.

And my review of the transcript from that deposition and the, sort of, query with Judge Rochon is on this question about directing Mr. Dixon not to answer, that she specifically said that the deponent must answer the question, and then, you know, she got off the call after making that ruling.

There had been a request by plaintiff's counsel to, sort of, have a standing, you know, sort of ruling from her. She declined to do that. But there is no question that when she was contacted about this tactic of not only objecting but

directing the witness not to answer, she indicated the witness must answer. And after that call with her, the objections and the instructions not to answer continue for hours.

And so I find that based on that behavior that it is appropriate to allow an additional -- to reopen, if you will, the deposition of Mr. Dixon for no more than two hours for the limited purpose of covering the five or so categories of information that plaintiffs articulated. I will put those categories in the order once I have the transcript.

As to the March 6th deposition, I do think that there is a question about -- certainly, Mr. Blackburn had a medical procedure, had two -- at least two, had a follow-up, and was recommended to not work in order to heal, stave off infection and take pain medication, but there is a question about how long that pain medication was to be utilized.

I have no corroboration by way of the doctor's information that Mr. Blackburn, in fact, was to take medication -- excuse me -- was to take medication for longer than the two weeks indicated in the letter; certainly, nothing that says six to eight weeks. And here, there's been inconsistent representations by Mr. Blackburn. There was a

discussion that perhaps it was 90 days' worth of medication and, no, maybe it was actually only 60 days. It is not clear to this Court.

I also have nothing before me that would indicate that the taking of whatever this medication is would have caused the sort of selective amnesia that was on display during the March 6th deposition.

Mr. Blackburn posits that there is a way in which there can, sort of, be issue-specific memory issues that can be triggered by what he terms aggressive questioning. I have absolutely nothing before me from a medical professional that would substantiate that such a thing is even possible.

And, certainly, the transcripts and the video from the February 24th deposition, which was a week, week and a half beforehand, do not at all support the idea that Mr. Blackburn was having memory issues as a result of this medication. The fact that he was conducting business, that he had other cases where he was going to court, doesn't seem to support the idea that he was so impaired that he could not participate meaningfully either on the February 24th or the March 6th deposition. And so I do think it is an appropriate sanction, both that the Dixon deposition be reopened and also that

the costs and fees associated with scheduling the second -- the follow-up deposition on March 27th be paid for because it should have been able to be done once on the 6th in a meaningful way.

And if it is true that Mr. Blackburn was still taking medication -- and, again, I think there's a question as to that, but if it is true, then the appropriate course would have been to make some attempt to cancel or move that deposition.

Again, the transcript from February 10th makes clear Mr. Blackburn said he would be able to do these depositions at the end of February and the beginning of March. They were agreed-upon dates. If it turned out, in truth, that he was still taking medication, still suffering the aftereffects of that medication, the appropriate course would have been, in advance of that deposition, to write to the court and say, I am still taking medication, perhaps supplementing it with another letter from a doctor. We only have the one in this case. He made no attempts to do so, and his only explanation was he thought he had no choice.

The Court disagrees. It was wholly and completely a waste of his opponent's time and resources to come to a deposition and then, in

truth, not be able to remember or strategically not be able to remember. Again, there is a question in the Court's mind as to that. And so I think it is appropriate, as I said, for the fees and the costs associated with the do-over deposition to fall to Mr. Blackburn.

With respect to the arguments that he makes that, you know, financially, he's not able to pay, there is nothing on the record before the Court that speaks to that. He merely says that he's a pro se litigant and an attorney with a small practice.

There are many attorneys with a small practice who have ample resources. There is absolutely nothing provided by way of declaration that would indicate that he cannot pay a -- the fees associated, both with the aborted deposition and also with the briefing that his opponent was forced to do in order to be the prevailing party on this motion for sanctions.

Turning next to the question of a referral to Grievance, I do think it is appropriate. I will make that referral.

My written order will detail this more, but it goes beyond just the unbelievably outrageous comments made in the February 24th deposition, and

it goes beyond whatever was happening in the March 6th deposition.

I would say that Mr. Blackburn's response to the sanctions motion/cross-motion for sanctions is the best evidence of why sanctions and a referral to Grievance are appropriate. Again, I will detail this more in my order, but that filing is replete with -- charitably, I could call them inaccuracies. It could be deliberate obfuscation, but certainly it appears to me, both from that filing from prior transcripts and from the hearing today that Mr. Blackburn, at the very least, is cavalier with respect to the accuracy of his statements.

He filed a cross-motion for sanctions based primarily -- not entirely, but primarily on this idea that his opponents had leaked -- and that's a word he uses -- information to the press. There is absolutely nothing in the filing that would support that contention. He acknowledged here today that he has no direct information that would support that contention. It is conjecture which mimics what Judge Oetken said in his ruling in the *Jones v. Combs* case, that we have -- in that case, it was inaccurate statements of law, but the second thing was conclusory accusations, information that is in

no way based even on a scintilla of information. It is just a conclusion drawn from conjecture. And, of course, we also have in this case, again, the inappropriate *ad hominem* attacks on opposing counsel.

So the core of what was being asked for in that filing was in no way supported and was in no way a good-faith filing. And I think that is why, in the surreply, basically, Mr. Blackburn barely mentions the leaking, the alleged leaking, again. And here, during oral argument, the whole focus was on him being called a clown and being insulted by Mr. Tacopina and, until I prompted, initially was saying nothing about what had been the core of his cross-claim, which was the alleged leaking and also the alleged violation of a court order, when, in truth, his opponent followed the requirements of the protective order. I believe it's paragraph 20 to the letter, which is the deposition is automatically held as highly confidential.

The side that is offering this information, which, in this case, would be plaintiff, can sort of de-designate that, can specify which sections should be kept confidential and which should not. His opponents followed exactly what the protective order

required them to do.

While I do think giving someone merely to the end of the business day is perhaps a little too short of time, their filing is not made for four days, so that was ample time for Mr. Blackburn to have responded. It's certainly possible that he is busy -- was busy. It's certainly possible that perhaps he was traveling again.

If an attorney has a small enough practice that no one else is minding the shop when they're gone, then the standard process would be to, at the very least, have an out-of-office sort of alert on their e-mail so that when opponents attempt to contact them, they will get back something that says, I am not available. And then, presumably, his opponents would have waited more than the four days before filing.

But to say under those circumstances where they followed to the letter the requirements of the protective order, where there's not one shred of information that would imply that they actually directly gave this information to the press -- but to say they're in contempt of a court order and they have leaked to the press, again, on its own, is outrageous conduct.

I could go on, and the written order will, but there are just multiple, multiple places in the filings where Mr. Blackburn makes representations that are simply inaccurate from a charitable lens and untrue from a different lens.

The Court is deeply, deeply, deeply troubled by the filings, by the record in this case and, frankly, by the oral arguments that were made today. And for that reason, I will, after the filing of my written order granting the request for sanctions, be referring him to the Grievance Committee of the Southern District of New York.

I am not, at this juncture, going to report -- excuse me -- appoint a special master. I heard and certainly understood the arguments made by plaintiff's counsel, and I understand why they are concerned. One would hope that following today's ruling, whether he has the written ruling in his hands or not, that Mr. Blackburn would be chastened by this ruling, and certainly, hopefully, has heard and understood the expectation in terms of how he is to comport himself going forward, including not directing his client not to answer questions.

I want to -- I will get to the cross-motion momentarily, but Mr. Dixon -- there was a request

for sanctions about against Mr. Dixon as well. I was surprised, frankly, to see that the response, the responsive papers filed by Mr. Blackburn, said it was on behalf of Mr. Blackburn and on behalf of Mr. Blackburn's law firm and did not say that it was on behalf of his client, Mr. Dixon, who was accused of sanctionable behavior as well, did not really address in any meaningful way his client, Mr. Dixon. Plaintiff asked me to interpret that as essentially an admission.

And, again, I think when we talk about fines, it is appropriate for counsel to be paying those. And Mr. Dixon, as a consequence of his behavior, will have to be deposed for two hours again. I'm also directing that a copy of the ultimate written order be given to Mr. Dixon because I want it to be made clear to Mr. Dixon that his behavior at the deposition was inappropriate, that he is directed to answer questions that are asked of him. If there is an objection, that's certainly fine. And at the appropriate juncture, if we're talking about admissibility, ultimately, for a motion for summary judgment or for trial, Judge Rochon can, and perhaps will, be called upon to rule on that. But the appropriate course, if there's an

objection, you then answer the question. And so I'm directing that Mr. Dixon receive a copy as well because I want to make sure he is on notice about his obligations going forward.

Lastly, with respect to the cross-motion for sanctions, as I've said, the core of that motion is something that I find to be entirely without merit, which is the accusation that plaintiff's counsel did not follow the requirements of the protective order and also this conjecture that they leaked information to the press. There was absolutely nothing to support either one of those contentions.

But that last brings us to the tenor of the language that was being used against Mr. Blackburn. And here, I am going to -- I need more information. I want a copy of the videotape of the deposition. That can be provided to the court *ex parte*. It need not be shared. But I do want to see the sort of volume, whether there is table pounding, whether there is yelling.

But I certainly here, in person, want to direct plaintiff's counsel to certainly let their colleague, who I understand is traveling, but it's certainly unfortunate since he is the person in the

main who was accused of using intemperate language -- and I agree with Mr. -- excuse me -- with Mr. Blackburn in that respect.

It doesn't matter what Mr. Blackburn said, doesn't matter how he was behaving; it is not appropriate for a lawyer, in response, to call him a clown.

Now, I don't know if there was yelling. We've had a dispute as to that. But I know at least once in the transcript -- Mr. Blackburn said "multiple times." I have searched the transcript, and the word "clown" appears twice; once on page 188 -- sorry -- twice on page 188 and then on page 308. But on 308, I only see that word being used by Mr. Blackburn, not by Mr. Tacopina.

So not quite sure what happened there, but that certainly isn't a record of it being said multiple times, but it doesn't matter. Calling a deponent and opposing counsel a clown is not appropriate.

I will have to review the transcript again. I did, but, frankly, at a bit of a skim because there's a lot of documents here, and this was not the -- I wanted to see it, but it wasn't the -- it wasn't a place where I thought I needed to dig into

all of it.

So in terms of how and in what way Mr. Blackburn's indictment was being utilized, if there were appropriate questions about it, that's one thing. If it was being used as an *ad hominem* attack against Mr. Blackburn, that's not appropriate, and I don't care what he said -- well, I do care what he said. It's why he's being sanctioned. But it does not justify Mr. Tacopina responding in kind.

I am not, however, going to be sanctioning Mr. Tacopina, and the reason is because I have before me a, sort of, narrow band of behavior from him which I find to be inappropriate. I do not have a pattern. I do not have a record of prior judges cautioning him, telling him -- you know, saying that he has been using *ad hominem* attacks about opposing counsel.

I have the representation -- excuse me -- by his colleagues that he has practiced for 30 years and, during that time, has not been sanctioned, has not been disciplined. I take that representation as true. But I definitely want it relayed to Mr. Tacopina -- and I want a copy of the ultimate order and of today's transcript provided for him --

that whatever the provocation is he thinks he has received, it is not appropriate for an officer of this court to result -- resort to name-calling.

And at the very least, the "clown" comment is name-calling. And it may be more than that. As I said, I'm directing counsel for plaintiff to send -- I don't know if it's too long via e-mail. Probably, it is. So flash drive?

MR. TURETSKY: I could send a flash drive or an FTP, whatever the Court prefers. Or both.

THE COURT: I -- there's -- we have to go through the tech department, but I don't know. So maybe both, and I'll, sort of, see which one the tech people say I can access. They don't want us just inserting things into the computer.

MR. TURETSKY: Sure.

THE COURT: They've got to screen things first. But either way, I certainly want to see the tenor of how he's communicating because it can -- it perhaps could be more concerning behavior than what is demonstrated by the cold reading of the transcript.

But I want to make sure that he understands the Court is not happy with his behavior either. He is not being sanctioned because it is not -- while

it is inappropriate, it does not rise to just the, you know, sort of complete rank level that Mr. Blackburn's behavior rises to.

And I think that covers everything. Is there anything else that we need to discuss at this juncture?

MR. SEIGEL: Your Honor, just for the record, the podcast that I referenced, which would be one area of inquiry for Mr. Dixon during his deposition, reopened deposition, would be *Off Da Books*. I said, "*Off Da Wall*." It's actually *Off Da Books*.

THE COURT: Okay. Thank you.

MR. SEIGEL: Thank you.

THE COURT: All right. Anything else we need to discuss at this juncture?

MR. TURETSKY: Not from us, your Honor.

THE COURT: All right. How quickly can you get me a copy of the deposition video?

MR. TURETSKY: Within 24 hours.

THE COURT: All right. Very well.

Mr. Blackburn, anything else on behalf of you, sir?

MR. BLACKBURN: No.

THE COURT: All right. In that case, we

are adjourned. Everyone, have a good rest of their day.

MR. SEIGEL: Thank you, your Honor.

0o0

C E R T I F I C A T E

I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Cartagena v. Dixon, et al.; Docket #25CV3552 was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature ___Adrienne M. Mignano___

ADRIENNE M. MIGNANO, RPR

Date: May 20, 2026